IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

MIDLAND - ODESSA DIVISION

FILED
DEC 2 0 2007
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

CLINTON LEE YOUNG )
)
VS. )        NO. MO:07-CV-00002-RAJ
)
NATHANIEL QUARTERMAN )

**PETITION FOR WRIT OF
HABEAS CORPUS BY A PERSON
IN STATE CUSTODY**

This Application is prepared in compliance with Rule 2(c) of the Supreme Court Rules governing Section 2254 Cases; it is based upon the model form.

1.  Name and location of Court which entered the Judgment of conviction under attack: 238th District Court, Midland County, Texas.  Applicant is now a prisoner at the Polunsky Unit in Livingston, Texas.

2.  Date of judgment of conviction: Sentence entered April 11, 2003.

3.  Type of sentence: death

4.  Nature of offense involved (all counts) Capital Murder - murder of two individuals pursuant to same scheme and course of conduct; murder in the commission of robbery and kidnapping.  Tex. Penal Code Sec. 19.03(a)(2); 19.03(a)(7)(B).

5.  What was your plea: Not Guilty.

    If you entered a guilty plea to one count of the indictment and a not guilty plea to another count of the indictment, give details: not applicable.

6.  Kind of trial: jury

7.  Did you testify at trial?  No

8.  Did you appeal from the judgment of conviction?  Yes

9.  If you did appeal, answer the following:

    A.  Name of the Court:  Texas Court of Criminal Appeals, Austin, Texas;
    B.  Result: Affirmed.  Unpublished opinion No. AP 74,643.
    C.  Date of Result: September 28, 2005
    D.  Citation: 2005 WL 2374669 (Tx. Crim. App. 2005)

E.    Appealed to United States Supreme Court <u>Young v. Texas</u>, 126 S.Ct. 1652 (2006) Writ of Certiorari denied.

F.    Grounds Raised:

Applicant raised in his direct appeal to the Texas Court of Criminal Appeals the following "federalized complaints."

## POINT SIX

**THE TEXAS STATUTORY SCHEME ALLOWING PROSECUTORIAL DISCRETION IN DECIDING WHICH CAPITAL MURDERS WILL INVOLVE SEEKING THE DEATH PENALTY DENIES APPELLANT DUE PROCESS.**

## POINT SEVEN

**THE TEXAS STATUTORY SCHEME ALLOWS PROSECUTORIAL DISCRETION IN DETERMINING THOSE WHO ARE DEATH PENALTY ELIGIBLE VIOLATES THE 8TH AMENDMENT.**

## POINT EIGHT

**PETITIONER'S JURY IN THIS CAUSE HAD NO VEHICLE TO CONSIDER TO GIVE EFFECT TO PETITIONER'S ADHD AND OTHER MITIGATING EVIDENCE.**

## POINT ELEVEN
### LEGALLY SUFFICIENT REVIEW

**THE EVIDENCE RELIED UPON TO PROVE CAPITAL MURDER BY COMMITTING MULTIPLE MURDERS IN THE SAME CRIMINAL TRANSACTION OR IN THE SAME SCHEME OR COURSE OF CONDUCT (TEXAS PENAL COCE 19.03(a)(7) IS LEGALLY INSUFFICIENT TO SUPPORT THE VERDICT.**

## POINT TWELVE
### FACTUAL SUFFICIENT REVIEW

**THE EVIDENCE IS FACTUALLY INSUFFICIENT TO SUPPORT THE JURY'S VERDICT OF CAPITAL MURDER BY COMMITTING MULTIPLE MURDERS.**

## POINT THIRTEEN
### LEGAL INSUFFICIENCY, ROBBERY

**THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUSTAIN THE JURY VERDICT ON THE THEORY OF AN INTENTIONAL MURDER IN THE COURSE OF THE COMMISSION OF A ROBBERY.**

## POINT FOURTEEN
### FACT INSUFFICIENCY, ROBBERY

THE EVIDENCE IS FACTUALLY INSUFFICIENT TO SUSTAIN THE JURY VERDICT ON THE THEORY OF AN INTENTIONAL MURDER IN THE COURSE OF COMMITTING A ROBBERY.

### POINT SIXTEEN
### CHALLENGE FOR CAUSE

THE TRIAL COURT ERRED IN GRANTING THE STATE'S CHALLENGE FOR CAUSE TO VENIRE PERSON, DANIE LYNN ROBERTS, DENYING TRIAL BY AN IMPARTIAL JURY AS GUARANTED BY 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

### POINT SEVENTEEN

THE EVIDENCE IS LEGALLY INSUFFICIENT TO WARRANT AN AFFIRMATIVE FINDING BY THE JURY TO SPECIAL ISSUE ONE.

### POINT EIGHTEEN

THE EVIDENCE WAS FACTUALLY INSUFFICIENT TO WARRANT AN AFFIRMATIVE FINDING BY THE JURY TO SPECIAL ISSUE ONE.

### POINT NINETEEN
### LEGALLY SUFFICIENT

THE EVIDENCE WAS LEGALLY INSUFFICIENT TO WARRANT AN AFFIRMATIVE FINDING BY THE JURY TO THE ANTI-PARTIES ISSUE, SPECIAL ISSUE NUMBER TWO.

### POINT TWENTY
### FACTUALLY SUFFICIENT

THE EVIDENCE WAS FACTUALLY INSUFFICIENT TO WARRANT AN AFFIRMATIVE FINDING BY THE JURY TO THE ANTI-PARTIES ISSUE, SPECIAL ISSUE NUMBER TWO.

### POINT THIRTY-THREE

THE TEXAS PENAL CODE SEC. 8.07 VIOLATES THE 8TH AND 14TH AMENDMENTS TO THE FEDERAL CONSTITUTION BECAUSE IT ALLOWS THE INFLICTION OF THE DEATH PENALTY ON A PERSON UNDER TWENTY-ONE YEARS OF AGE.

10.   Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any court, state or federal?  Yes

3

11.   If your answer to 10 is yes, give the following information:

    (1)   Name of the Court: Texas Court of Criminal Appeals;

    (2)   Nature of Proceedings: State Application for Writ of Habeas Corpus; filed April 21, 2005; denied by written Order December 20, 2006.

    (3)   Grounds Raised:   Applicant's restraint is illegal for the following reasons:

**GROUND FOR REVIEW ONE**:   Applicant's rights to Due Process were violated by the trial judge's assessment of costs associated with his trial.

**GROUND FOR REVIEW TWO**: Applicant's rights to Equal Protection were violated by the trial judge's assessment of costs associated with his trial.

**GROUND FOR REVIEW THREE**:Applicant's Eighth Amendment rights were violated by the trial judge's assessment of costs associated with his trial.

**GROUND FOR REVIEW FOUR**: the trial judge's assessment of costs in this proceeding is not supported by Texas law or any constitutional provision.

**GROUND FOR REVIEW FIVE**: The Trial judge's assessment of costs in this proceeding, to be withheld from applicant's inmate trust account, was an unconstitutional taking without Due Process.

**GROUND FOR REVIEW SIX**: Applicant's rights to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution were violated because the Texas Court of Criminal Appeals refuses to review the sufficiency of the mitigating evidence to support the jury's verdict.

**GROUND FOR REVIEW SEVEN**:Applicant's rights under the Eighth Amendment were violated by the refusal of the Texas Court of Criminal Appeals to review the sufficiency of the mitigating evidence to support the jury's verdict.

**GROUND FOR REVIEW EIGHT**:Applicant's execution would violate the Eighth and Fourteenth amendments.

**GROUND FOR REVIEW NINE**: The Eighth and Fourteenth Amendments prohibit applicant's execution based upon his age and immaturity.

**GROUND FOR REVIEW TEN**: Applicant's rights to the effective assistance of counsel under the Sixth Amendment were violated by trial counsel's failure to discover and present evidence of physical, emotional and sexual abuse in applicant's home.

**GROUND FOR REVIEW ELEVEN**:   Because of the additional evidence discovered since applicant's conviction and sentence, never heard by the jury, applicant's Due Process rights would be violated by his execution.

**GROUND FOR REVIEW TWELVE**:   Applicant's rights to the effective assistance of trial counsel were violated.

**GROUND FOR REVIEW THIRTEEN**:   Applicant's rights to due process under the Fourteenth Amendment were violated by the actions of the prosecutor in this case.

**GROUND FOR REVIEW FOURTEEN**:   the prosecutor and police interfered with applicant's right to the effective assistance of counsel under the Sixth Amendment and Fourteenth Amendments.

**APPLICANT RAISED THE FOLLOWING**
**"FEDERALIZED" POINTS IN HIS**
**DIRECT APPEAL WHICH WAS DENIED**
**SEPTEMBER 28, 2005 BY UNPUBLISHED OPINION.**

Applicant filed a Successor Writ January 17, 2005 raising one additional point which was denied by the Texas Court of Appeals December 20, 2006. (2006 WL 3735495)

> **APPLICANT'S GROUND 15.   APPLICANT'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED BY HIS TRIAL ATTORNEYS FAILING TO OBJECT TO THE COURT'S SUPPLEMENTAL JURY CHARGE: (A) BEING A COMMENT ON THE WEIGHT OF THE EVIDENCE; (B) ALLOWING THE JURY TO ANSWER THE SECOND SPECIAL ISSUE IN THE AFFIRMATIVE WITHOUT REQUIRING ALL TWELVE JURORS TO ANSWER "YES", AND (C) THAT THE INSTRUCTION PREVENTED THE JURY FROM "CONSIDERING CIRCUMSTANCES OF THE OFFENSE FAVORABLE TO APPELLANT THAT MIGHT HAVE BEEN CONSIDERED MITIGATING EVIDENCE."**

> Did you receive an evidentiary hearing on your state habeas corpus petition?  Yes.

> Result:   The Trial Court entered Findings of Fact and Conclusions of Law denying relief.

> Date of Trial Court entry:  June 26, 2006.

> Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?   (1) First petition and Successor Petition:

Petition was denied on the 20th day of December, 2006.  2006
WL 3735395 (Tx. Crim. App. 2006)

If you did not appeal from the adverse action on any petition,
application or motion, explain briefly why you did not:  NOT APPLICABLE.

12.   Statement regarding Statute of Limitations under the AEDPA:

Petitioner filed his State Writ April 22, 2005.  On the 20th day of
December, 2006, the Texas Court of Criminal Appeals denied petitioner
relief on his VACCP 11.071 post-conviction application.  Pursuant to 28
USC 2244, et. seq., petitioner has one year in which to file his Federal
Habeas Application which does not run until December 20, 2007.  This
petition is filed in obedience to the Orders of the United States
District Court Western District of Texas, Midland-Odessa Division which
gives petitioner the entire one year in which to file his Federal Habeas
Application.

13.   State concisely every ground on which you claim that you are being
held unlawfully.  Summarize briefly the facts supporting each ground.
If necessary you may attach pages stating additional grounds and facts
supporting the same.

Please note that these points are grouped according to similar
issues together.

14.   If any of the grounds previously listed as grounds for relief were
not previously presented in any other court, state or federal, state
briefly what grounds were not so presented and give your reason for not
presenting them.  Applicant has briefed 12 points in this petition; he
adds a list of unexhausted state claims for relief under Rhines v.
Webber, 544 U.S. 269, 125 S.Ct. 1528 (2005).

15.   Do you have any petition or appeal now pending in any state or
federal court as to the judgment under attack?  No.

## PETITIONER/APPLICANT GROUNDS FOR RELIEF

**Ground for Review One:** Applicant's conviction for capital murder is based upon legally insufficient evidence because even after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt.

**Factual Basis:**   An inquiry into the legal sufficiency of the evidence to support a state conviction relies upon the test enunciated in <u>Jackson v. Virginia</u>, 443 US 307 (1979).   To address the sufficiency of the evidence underlying Applicant's conviction a brief recitation of the facts before the State Court is appropriate.

1.   Applicant attacks the legal sufficiency of the evidence suggesting that he murdered two people in the same criminal episode.

Applicant was 18 years 4 months in November of 2003 and had never lived in or visited Midland County, Texas until he came to Midland, Texas that November to see his current girlfriend, Amber Lynch.   (RR 26/179).   Amber had gone to Midland with her dad and his girlfriend to spend Thanksgiving with her paternal grandmother.   (RR 23/41).   Applicant grew up in East Texas; his home life was not happy.   His mother left his biological father when Applicant was nine months old.   (RR 33/82).   Applicant's biological father, Billy, when he saw Applicant, was physically abusive and non-caring toward Applicant.   Visitation exposed Applicant to his dad's alcoholism and personal cruelty.   Applicant who suffers from severe ADHD had medication for ADHD in his youth but when he would go to stay with his father Billy Young, Billy Young did not force Applicant to use the psychotropic medication.   (RR 33/101).

Applicant suffered difficulty at both home and school from an early age onward.   He attended regular school, he was on juvenile probation, he received a mental commitment to the Waco Center for Youth, and finally was incarcerated in the Texas Youth Commission for almost three years.   (RR 33/122).   After his release from TYC, Applicant lived intermittently with his mother and his stepfather.   Applicant and his friends frequented a place called Fisher's Motel located in Ore City, Texas.   (RR 26/130).   Applicant's girlfriend Amber, had an uncle, Doyle Douglas, with whom Applicant was acquainted and who was of interest to Applicant because Douglas owned a white Pontiac two-door vehicle which was usually in working condition.   (RR 21/97-98).   Doyle Douglas had personal problems.   According to his brother he, Douglas, suffered from Schizophrenia.   (RR 23/33).   Like Applicant and Applicant's friends Douglas was a drug user and so it was not unusual that Applicant, Doyle Douglas, David Page, Mark Ray and Darnell McCoy drove to Longview, Texas allegedly to get some marijuana.   (RR 21/101).   At that Longview, Texas location Applicant allegedly produced a silver pistol with which he shot Doyle Douglas at least two times telling the other folks available that Douglas was a child molester and that Douglas was working for the police.   (RR 22/102; RR 21/252).   After the shooting Applicant allegedly instructed Page, Ray and McCoy to put Douglas' body in the trunk with Applicant taking Douglas' place as the driver of the automobile driving the car then to a remote area off the interstate highway outside of Longview where Douglas' body was removed from the trunk of the car,

rolled down to a creek and shot again.  This time by Mark Ray using a pistol given to him by Applicant with the gun being fired into a pillow which had been placed over Doyle Douglas' head.  (RR 22/125, 122). Leaving Douglas' body at the location where he had been shot Applicant then talked about a trip to Midland to see Amber Lynch and wanted someone to go to Midland with him.  (RR 22/138, 142). David Page agreed to accompany the Applicant to Midland and the two of them drove in the Douglas vehicle down I-20 toward Midland making several stops until they stopped at a grocery store in Eastland, Texas where Page approached an older man and asked the older man for directions and then forced the man at gunpoint to drive his truck with Applicant as a passenger to a highway exit ramp close to the 320 mile marker where the Douglas vehicle was then abandoned in some trees and brush (RR 26/213).  The older man was Sam Petry, an Eastland resident who then accompanied Applicant, Ray and Page to Midland in Petry's pickup.  Two days later Sam Petry was allegedly shot by Applicant with the Petry vehicle being maintained in the control of Applicant and David Page with Page being later leaving Applicant's presence to turn himself into law enforcement in Midland. (RR 26/249; 188-189).

The shootings of Douglas and Petry by Applicant to constitute capital murder had to constitute murder in the same scheme or course of conduct.  Texas Penal Code Sec. 19.03(a)(7)(A).  The evidence establishes two murders, one in East Texas (Harrison County, Texas) and one in West Texas (Midland County) many hours apart and occurring after numerous transactions by Applicant and Page with other persons miles apart from each other.  Applicant did not kill Douglas and Petry in the same criminal transaction.  There was simply not a continuous and uninterrupted series of events over a short period of time and distance resulting in the death of multiple persons that could constitute death in the same criminal transaction.  Thus the only way the jury verdict could be satisfied was that Appellant would be guilty, if guilty of anything at all, of the offense of the murder of Douglas and the murder of Petry, not the murder of both as part of the same scheme or course of conduct.  Applicant does not see how viewing the evidence in a light favorable to the verdict could authorize any trier of fact to find the essential elements of multiple murders in the same criminal transaction beyond a reasonable doubt.

2.    Alleged murder of Sam Petry in the process of committing a robbery or kidnapping.

The death of Sam Petry occurred many hours after Petry and his truck were diverted by Applicant and Page.  (RR 26/191, 220, 241). Petry was shot by either Applicant or Page before Page turned himself in to the Midland authorities and before Applicant drove off in Petry's truck.  The autopsy of Petry revealed $285.03 still in his pocket.  (RR 21/26).  Applicant notes that under intentional murder committed during a robbery the intent to rob must be formulated before or at the time of the murder.  Proof that the robbery was committed was an afterthought and unrelated to the murder is not sufficient to prove capital murder under the scheme envisioned by the Texas statute.  Texas Penal Code, Sec. 19.03(a)(2).

8

There was no evidence to show that Applicant formulated an intent to kill Petry when he and Page first approached Petry in order to obtain control of Petry's vehicle.  As already indicated Applicant suffers from severe ADHD, is impulsive, and unpredictable.  (RR 31,268; RR 36/35).

Young is simultaneously filing a memorandum in support of this petition.  The Applicant would specifically incorporate by reference as if fully copied and set forth at length, the memorandum in support and the attachments thereto.

**Ground for Review Two:** Applicant's conviction for capital murder and his certification for death on the basis of the first special issue is legally insufficient because even after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found that there was a probability that Applicant would commit criminal acts of violence that would constitute a continuing threat to society.

**Factual Basis:**   Applicant was 18 years and 4 months when the murders of Douglas and Petry occurred.   (RR 33/81).   Applicant's involvement with both decedents involved co-parties.   Neither the death of Douglas or Petry showed Applicant giving a great deal of calculated thought to his participation.    The trial evidence suggests that Applicant shot Douglas twice and that co-party Mark Ray shot Douglas the third time. (RR 22/89, 123, 125).   Applicant had only been released from the Texas Youth Commission since February 20, 2001.   (RR 21/222).   Suffering from severe ADHD Applicant was not taking psychotropic medicine which had been prescribed for him at TYC and which had seemed to at least in the latter stages of his incarceration at TYC control his ADHD.   (RR 33/89; 125).   Applicant's home life was less than ideal with an alcoholic father who did not provide for Applicant.   As a juvenile Applicant had had an unauthorized use of a motor vehicle charge, two burglaries, a theft, and an assault with sexual overtones at the Waco Center for Youth.   (RR 2/222-223).   Applicant was released from TYC and after release only used methamphetamine (RR 21/305).

Applicant was involved in the burglary of a sporting goods store in Diana, Texas.   Several weapons including a Colt Huntsman .22 caliber pistol (State's 3) were reported stolen.   (RR 30/42).   Applicant was involved in a burglary and shooting incident in Longview, Texas at the home of Carlos Torres Ramos.   (RR 30/66, 79).

Applicant had no serious disciplinary problems while in the Midland County Jail.   In fact the last six months of his Midland incarceration found him on the record to be a pretty good inmate.   (RR 30/214).   Dr. Roy Mathew, a Psychiatrist who had examined Applicant ventured the opinion that Applicant was treatable with medication and did not meet the criteria of a serial killer.   (RR 33/214).   Dr. Mathew and another mental health expert, Dr. Darren Milam, both believed that Applicant's ADHD could be controlled with psychotropic medications.   (RR 35/206).

Under the Texas rules the State has the burden of proving future dangerousness beyond a reasonable doubt.   This requires the State to show that Applicant if allowed to live, will continue to commit criminal acts of violence and be a continuing threat in or out of prison.   Ladd v. State, 3 SW 3d 547, 557 (Tx. Crim. App. 1999).   In considering future dangerousness a jury may properly consider all the evidence adduced at the guilt stage of the trial.   Santana v. State, 714 SW 2d 1 (Tx. Crim. App. 1986).   The circumstances of the offenses alone, if severe enough, can sustain an affirmative answer to the future dangerous issue against a sufficiency challenge.   Muniz v. State, 573 SW 3d 792, 795 (Tx. Crim. App. 1978).

In this case the evidence of future dangerousness is legally insufficient to warrant an affirmative finding as to the future dangerousness issue. Applicant had filed an application to be considered for community supervision. (CR 4/729). Other than this capital murder, Applicant had never been indicted for a major felony. (CR 2/222-223). The State offered no direct reputation evidence that Applicant had a bad reputation for being peaceable and law abiding. Applicant's problems with the law are related to his ADHD and his use of controlled substances. Applicant was taken to task by the State for his infractions at the TYC; however, he attempted to offer evidence and explain his disciplinary write-ups and the manner and system under which those reports were produced. Some of his handlers at TYC indicated that he was not a major discipline problem. (RR 35/31, 38).

**Ground for Review Three:**   Applicant's certification for death is based upon legally insufficient evidence concerning Special Issue No. 2 because viewing the evidence in a light most favorable to the prosecution no rational trier of fact could have found that the Applicant himself actually caused the death of the deceased individuals or if he did not actually cause the death of the deceased individuals he intended to kill the deceased individuals or anticipated that human life would be taken.

**Factual Basis:**   The jury in this cause was charged that it could find the Applicant guilty of capital murder as a party under Texas Penal Code Sec. 7.01 and Sec. 7.02.   The second issue tendered to the jury at punishment asked whether the Applicant caused the death of the decedents or if he did not actually cause the death of the decedents he intended to kill the decedents or others or anticipated that human life would be taken.   VACCP Article 37.071(2)(b)(2)(2).

At the outset Applicant admits that with regard to the Douglas murder viewing the evidence in the light most favorable to the verdict indicates Applicant actually caused Douglas' death or intended to kill him or anticipated that Douglas' life would be taken.   Applicant allegedly shot Douglas twice before Mark Ray shot him once with any of the three wounds inflicted on Douglas making survival highly unlikely. (RR 21/21, 24; RR 22/89).

However the evidence is more conflicted with regard to the Petry murder.  Mark Ray and Applicant were both in Petry's company when Petry was shot.  No blood belonging to Petry was found on tennis shoes taken from Applicant at the time of Applicant's arrest.  (RR 27/74 Exhibit S-105).  However a pair of gloves found as evidence in the Petry case was consistent with explaining why David Page left no fingerprints.   DNA found implicated Page wearing the gloves not Applicant.   (RR 27/265, 268, 257).  At least one witness a Midland County inmate, Chris McElwee, testified that David Page told him in the Midland County Jail that he, Page, was wearing gloves when Petry was shot and there was no powder burn to be found on his hands.  (RR 27/272, 275).

The strongest evidence suggesting that Applicant intended Petry's death came from David Page who testified he witnessed the shooting. However, Texas has a traditionally low opinion of accomplice witnesses' testimony makes Page's comments concerning Applicant less persuasive than in cases where Page made such statements and was not a party to the offense.

**Ground for Review Four:** Despite the presence of a mitigation issue Applicant's jury still lacked a proper vehicle to consider and give effect to Applicant's ADHD and other mitigating evidence.

<u>**Factual Basis**</u>:    Applicant's punishment charge contained a special issue concerning mitigation:

<u>**ISSUE THREE**</u>

> **DO YOU FIND FROM THE EVIDENCE, TAKING INTO CONSIDERATION ALL OF THE EVIDENCE, INCLUDING THE CIRCUMSTANCES OF THE OFFENSE, THE CIRCUMSTANCES OF THE DEFENDANT, HIS CHARACTER AND BACKGROUND, AND THE PERSONAL MORAL CULPABILITY OF THE APPLICANT, THAT THERE IS A SUFFICIENT MITIGATING CIRCUMSTANCE OR CIRCUMSTANCES TO WARRANT THAT THE SENTENCE OF LIFE IMPRISONMENT RATHER THAN A DEATH SENTENCE BE IMPOSED?**

Punishment Charge, Paragraph 9.

During the punishment phase of the trial, Applicant offered evidence of an early identified ADHD condition indicating poor impulse control and poor control of inhibitions by Applicant.    (RR 33/21). While incarcerated in TYC, a mixture of psychotropic drugs (Depakote, Ritalin, and Clonidine) seemed to work much better to control Applicant's ADHD.    (RR 36/43).    Without proper medication Dr. Danean Milam described Applicant as a "Mercedes Benz automobile with no brakes.".    (RR 33/25).    Dr. Milam and a Dr. Ross Green agreed that ADHD is treatable and that medication is the most effective treatment for ADHD exhibited by Applicant.    (RR 36/15).

The record contained no evidence that Applicant is retarded or suffers from dementia.    (RR 33/181).    Instead Applicant has a high IQ, but without proper medication while intoxicated on amphetamines at least at the time of the Douglas murder, he, the Applicant, was psychotic. That is out of touch with reality - and probably in withdrawal at the time of the Petry murder.    (RR 34/193, 197, 198).    Dr. Roy Mathew testified that Applicant is treatable and that Applicant does not meet the dangerous criteria of a serial killer.    (RR 35/200, 206, 214).    At the time of the commission of the offense Applicant was only 18 years 4 months old and had never before been convicted of a felony offense.    (CR 4/729).    On the day of Douglas' murder, Applicant had taken amphetamines and not had the prescription medication previously prescribed at TYC which gave the best possibility of control of his mental condition.

Applicant's home life was less than ideal.    His mother left his dad because the father was abusive to her.    Applicant had contact with his biological father but Applicant always seemed to behave worse after seeing his father.    (RR 33/81, 101).    Applicant's mother remarried but she and the stepfather had trouble with Applicant who was always the person in the middle.    (RR 33/96).

In <u>Brewer v. Quarterman</u>, ____ U.S.____, <u>127</u> S.Ct. <u>1706</u>, (2007), the Supreme Court finally recognized that the 1991 Texas Capital Sentencing Statutes under which no mitigation issue was submitted were defective because the jury was prevented from considering constitutionally relevant mitigating evidence despite the changes in Texas' submissions occasioned by <u>Penry v. Lynaugh</u>, 492 US 302 (1989). Applicant notes that he went to trial under the new system applied to capital murder cases occurring on or after September 1, 1991. Nevertheless, Texas inclusion of a special issue concerning mitigation evidence is only a cosmetic change because the Texas issue does not define mitigating evidence as any aspect of a Defendant's character or record or encourage review of the circumstances of the offense which the Applicant offers as the basis for a sentence less than death. <u>Lockett v. Ohio</u>, 438 US 586, 604 (1975). The Texas special issue concerning mitigation which Applicant received fails to specifically instruct the jury to consider all such evidence in order to encourage a full development of the record whereby Applicant's death or worthiness can be sufficiently reviewed and tested. The special issue as applied to Applicant is not individualized or expansive enough to allow full and complete consideration of all the evidence which may or may not be mitigating.

**Ground for Review Five:** The Texas statutory scheme allowing prosecutorial discretion in deciding which capital murders will involve seeking the death penalty denies Applicant due process of law.

**Factual Basis:**   At his pre-trial hearings Applicant called District Attorney Al Schorre about Midland County, Texas' decision making mechanism to determine which capital murder case or cases are considered death worthy.  At the time of this hearing Applicant had been arraigned and informed that the State would seek the death penalty.  (RR 2/6). District Attorney Schorre stated on the record that his office had a written policy on death cases and a written policy authorizing only the District Attorney to make the decision as in which capital murder case to seek or not seek the death penalty.  (RR 5 Exhibit D-8; 96).   The policy stated in part:

> "In considering the decision, the District Attorney will review factors including, but not limited to, the following:
>
> A.   Aggravating and mitigating facts of the offense;
>
> B.   The age, criminal history intellectual capabilities and the mental/physical status of the offender; to determine the likelihood that a jury would render an affirmative finding of "future danger-ousness."

Applicant also offered evidence compiled by a third-year Texas Tech law student, Elena Roberts, about prosecutorial discretion in seeking the death penalty.  (RR 7/88).  Roberts related that she had received about 79 responses to her survey and had determined that at least three of the responding counties (Harris, Midland, and Trinity) had written policies concerning death penalty eligibility while at least 75 other counties had no written policy with one county (Travis) having an internal reviewing committee to make non-binding recommendations to the District Attorney.  (RR 7/Exhibit - D 2).  It is clear that Texas law presently lacks any uniform standards as to when prosecutors should seek the death penalty.  By providing those standards to guide a prosecutor in his decision as to when to seek and not to seek the death penalty a prosecutor is able to make the decision on his own according to either written or unwritten standards which may vary widely from county to county.  (RR 7/111-112).   Thus whether a person is charged with a capital crime for which he will face the death penalty becomes dependent largely upon arbitrary factors such as the county in which the crime occurs.  Applicant complains that the Texas system therefore violates due process of law because there are no specific standards to ensure the non-arbitrary treatment of capital offenders by prosecutors are the only source of decision making as to the death worthiness in each particular case.

**Ground for Review Six:** The Texas Statutory Scheme allowing prosecutorial discretion in determining those who are death penalty eligible violates the 8th Amendment to the Federal Constitution.

**Factual Basis:**   Relying upon the same facts, Applicant sought to argue that the Texas Scheme to determine which cases will be true death penalty prosecutions violate 8th Amendment concerns as to cruel and unusual punishment.

       Since Furman v. Georgia, the Furman system that existed prior to Furman has been described as one where the death penalty was inflicted in a wanton and freakish manner.   Furman was designed to eliminate existing capital punishment schemes where there was no meaningful basis to distinguish between the case in which the death penalty is to be applied and those situations in which the death penalty is not to be applied. Furman v. Georgia, 408 US 238, 313 (1972). In Jurek v. Texas, 428 US 262 (1976) the Supreme Court approved the new Texas scheme even though that scheme did not require standards to guide prosecutors' decisions as to when to seek the death penalty.   The pre-Furman imposition of the death penalty was a system where the 8th Amendment was violated because prosecutors could choose without any governing standards whatsoever which of those accused of capital murder would face the death penalty.   The post-Furman is equally as freakish and random and therefore still unconstitutional under the 8th Amendment. In short the Texas statutes allow for arbitrary inconsistent treatment of similarly situated defendants.   The present statutes are no less unconstitutional under the 8th Amendment than would be a system mandating that prosecutors seek the death penalty in every death eligible case. Therefore any 8th Amendment analysis finds that the present Texas system is based on unfettered prosecutorial decision making. violates the 8th Amendment.   Applicant acknowledges the language in Jurek which seems to dismiss his concerns.  (Jurek, 96 S.Ct. at Page 29, 37).   However, Jurek has been in effect overruled by Brewer vs. Quarterman, and therefore Jurek is not the last word on this subject.

**Ground for Review Seven (a):**

Applicant received ineffective assistance of counsel from his trial counsel in the following particulars:

A.   Trial counsel's failure to object to the TYC records marked as an exhibit;

B.   Trial counsel's failure to call Applicant's former grade school teachers M. A. Font and Mary Hall.

C.   Trial counsel's misuse of a ballistics' report which if admitted would have implicated someone else in the shooting of Doyle Douglas other than Applicant.

**Factual Basis:**   Applicant's trial counsel are still subject to review for ineffective assistance under <u>Strickland v. Washington</u>, 466 US 648 (1984). Although more than twenty years old <u>Strickland</u> remains as the Supreme Court's most explicit statement on what constitutes effective assistance of counsel. To succeed on a <u>Strickland</u> claim Applicant must show that his attorney's performance was outside the scope of prevailing professional norms at the time of counsel's representation of Applicant and that such an inappropriate performance or failure to perform had an effect on the outcome of Applicant's trial.

In this case the prosecutors filed a notice of business records relating to records maintained on Applicant while he was under the authority of the Texas Youth Commission. The entire group of TYC records was admitted in Applicant's trial without objection from Applicant's trial counsel. (RR 30/194;S-147). The reason for these records being submitted under the Business Record Exception is that the TYC records are hearsay and only admissible under some exception to the hearsay rule.

Within the TYC records are numerous documents styled "Incident Report". Incident Reports concern allegations of disciplinary or rule infractions. On their face these Incident Reports do not demonstrate they were made by a person with personal knowledge of the incident. These Incident Reports then would not be admissible as business record exceptions. The Incident Report records are also susceptible to the State's proving that such records are relevant and that their probative value outweighs their prejudicial effect. (TRE 401 and 403).

Applicant complains that the State introduced these records in an attempt to portray Applicant as an impossible delinquent who was a disruption from the moment he arrived at TYC and all through his placement.

Ian Cantacuzene, one of Applicant's trial counsel, testified that he was intimately familiar with the Texas Youth Commission Records introduced at trial as State's Trial Exhibit 147 and decided as a matter of strategy not to object to the records offer. (RR Writ Hearing 3/27). Mr. Cantacuzene testified that he thought it was best to contain the incidents reported in the records to the records "as opposed to having each individual juvenile or correctional officer come forth and start expanding their memory or refreshing things or telling other bad incidents about which at the time they were either too busy or too lazy

to write down.   (RR Writ Hearing 2/210-212).   Mr. Cantacuzene stated
further:

> "We thought that by leaving those records in
> their entirety, it allowed us to spin the
> documents better on behalf of the client as
> opposed to having witness after witness come in
> and testify because it would have been going
> over negative of each one first and then you
> know us having to try to polish that up and
> create it into a positive."   (Writ Hearing
> 2/213).

Applicant also had mental health witness, his psychiatrist, Dr.
Mathew, his psychologist, Daneen Milam, and Dr. Roy Green the ADD/ADHD
expert from Massachusetts.   (RR Writ Hearing 2/214).   Mr. Cantacuzene
testified to a belief that as a whole the TYC records helped Applicant's
case, and so the defense made a strategic decision not to object to the
TYC records on that basis.   (RR Writ Hearing        3/27).

Applicant complains that his trial counsel's strategy concerning
such records is flawed by an unreasonable interpretation of the effect
of the TYC records as evidence which is not positive to Applicant but
indeed negative.

**Ground for Review Seven (b):**       Applicant's trial counsel were familiar with Applicant's former grade school teachers, M. A. Font and Mary Hall.

**Factual Basis:**   M. A. Font and Mary Hall would have testified that Applicant in school was a good child, bright, even if he was hyperactive.  Applicant contends that such evidence was favorable in the general time periods in which they observed Applicant and their testimony was relevant to the jury's consideration of the first and third punishment issues.

While Mr. Ian Cantacuzene did not remember Mary Hall he did indicate that M. A. Font was contacted but the decision was made not to call her as a mitigation witness because Ms. Font did not think that the Applicant's mother, Carla Sexton, gave the Applicant the support he needed and because Ms. Font thought that Applicant was able to control his behavior if he wanted to control his behavior.  (RR Writ Hearing 3/50-51).

Applicant was only 18 years 4 months at the time of the murder and was a young man when he went to trial having been incarcerated since late November 2001.  Applicant was in need of every conceivable witness who could have good things to say about him or who could give him a positive persona to answer the State's plan to label Applicant a bad person in every way possible.  Applicant urges the Court that its ineffective assistance of counsel not to use positive evidence such as the favorable comments of Font and Hall and that every such witness for Applicant was crucial.

**Ground for Review Seven (c):**   Counsel had information that someone else other than Applicant shot Doyle Douglas.

**<u>Factual Basis:</u>**   Testimony at trial was deduced that Doyle Douglas was shot the third time by Mark Ray based upon the testimony of Mark Ray and the often-changed testimony of David Page.  A ballistic report from a Mr. Jim Koonce exists and was introduced at the writ hearing as Defense Exhibit W-5.

One of the witnesses to the Doyle Douglas shooting, Darnell McCoy, testified that Applicant shot Doyle Douglas in the car parked at the dope house with a .22 caliber firearm with a long barrel and a clip. (RR 21/113).  Another eyewitness, Mark Ray, testified that the handgun Applicant used to shoot Mr. Douglas in the car at the dope house was a semi-automatic handgun like an old styled German Ruger with a barrel four to six inches long and the metallic nickel finish and clip.  (RR 22/96).  David Page testified the handgun Applicant used to shoot Mr. Douglas was a .22 caliber semi-automatic handgun.  (RR 26/157-165).

For his part Mark Ray told the jury that State's Exhibit 5, a .22 caliber revolver/pistol with a broken handle was the handgun with which Applicant made him shoot Mr. Douglas in the head at the creek.  (RR 22/249-250).  State's Exhibit 5 was supposedly borrowed by Applicant from one John Nunn sometime before Thanksgiving and when returned had a broken grip.  (RR 22/11-16).  State's Exhibit 5 was described by expert testimony as an RG double-action .22 caliber long rifle/revolver commonly known as a Saturday Night Special.  (RR 25/150-151).

At the time of Applicant's arrest after his vehicle was stopped by peace officers in Midland County, Applicant possessed a Colt Huntsman .22 caliber semi-automatic handgun.  (RR 24/170-171).  This weapon was introduced and referred to as State's Trial Exhibit 3.  State's Exhibit 3 was identified as one of the firearms taken in the burglary of an East Texas business located in Diana, Texas.  (RR 30/30-38).

From the autopsy of Doyle Douglas it was established that Douglas was shot in the head three times by a small caliber weapon.  (RR 22/263-268).  .22 Caliber shell casings were recovered from Mr. Douglas' car when it was discovered abandoned near Eastland, Texas.  (RR 30/235-239).  The casings found in Douglas' vehicle were connected with the .22 Colt Huntsman handgun seized from Applicant at the time of his arrest.  (RR 25/158-159).

The State also possessed shell casings found at the scene of Mr. Petry's murder.  Tim Koonce told the jury that State's Trial Exhibit 9 which was a bullet taken from the head of Mr. Douglas was not fired from a .22 caliber revolver which belonged to John Nunn but that he, Koonce, could not identify or eliminate State's Trial Exhibit 9 as having been fired from the State's Trial Exhibit 3 the .22 caliber semi-automatic handgun seized from the Applicant.  (RR 25/161-162).  Mr. Koonce also testified he was unable to identify or eliminate State Trial Exhibit 10 as having been fired from State's Trial Exhibit 3 which was the .22 caliber semi-automatic handgun seized from the Applicant.  (RR 25/161-162).  The ballistics report from Mr. Koonce again stated that he was

unable to identify or eliminate the bullet State's Trial Exhibit 11 as having been fired from State's Trial Exhibit 5, the RG .22 caliber revolver taken from Mr. Nunn.   Mr. Koonce was able to say that the bullet, State's Trial Exhibit 11, was not fired from State's Exhibit 3, the .22 caliber semi-automatic handgun seized from Applicant at time of his arrest.   (RR 25/161-162).

Thus the evidence that Applicant shot Doyle Douglas two times in the head with a Colt Huntsman .22 caliber semi-automatic handgun in his possession at the time of arrest (State's Exhibit No. 3), is inconclusive and trial counsel should have argued that this ballistics evidence showed the State's failure to tie the loose ends of the case together.

**GROUND FOR REVIEW EIGHT**: Applicant's rights to due process of law under the Fifth and Fourteenth Amendments to the Federal Constitution were violated because the Texas Court of Criminal Appeals refuses to review the sufficiency of the mitigating evidence to support the jury's verdict.

**GROUND FOR REVIEW NINE**: Applicant's rights under the Eighth Amendment to the Federal Constitution were violated by the refusal of the Texas Court of Criminal Appeals to review the sufficiency of the mitigating evidence to support the jury's verdict.

**Factual Basis**:   On  direct  appeal  Applicant  complained  that  the evidence was factually and legally insufficient to support the jury's negative answer to the Third Special Issue. Appellant's Appellate Brief Points 21 & 22. In its opinion the Texas Court of Criminal Appeals refused to address such matters repeating:

> In his twenty-first and twenty-second points of error, Appellant challenges the legal and factual sufficiency of the evidence to support the jury's finding on the mitigation special issue.   This  Court  does  not  review  the sufficiency  of  the  evidence  to  support  the mitigation special issue.  McGinn v. State, 961 SW  2d  161,  166  (Tex.  Crim.  App.  1998). Appellant's  twenty-first  and  twenty-second points of error are overruled.

Under Texas law at the time Applicant went to trial, Texas juries were permitted to consider any relevant mitigating evidence, that is any evidence about the circumstances of the offense, the Applicant's character or background, and the Applicant's personal moral culpability that might justify a life sentence instead of a death sentence.   VACCP Article 37.071, Sec. 2(e).  By statute Texas law requires the Court of Criminal Appeals to reform a sentence of death to a sentence of life if the Court finds that there is legally insufficient evidence to support an affirmative answer to an issue submitted to the jury under Section 2(b) Article 37.071 (VACCP Article 44.251(a) [in effect for offenses committed before September 1, 2007].

In any death sentence there is both an eligibility issue and In a selection issue.  Tuilepa v. California, 512 US ___967___, 114 S. Ct.

2630, 2640 (1994); <u>Coker v. Georgia</u>, 433 US 584, 97 S.Ct. 2861, 2863 (1977).  The selection decision requires an individualized sentencing consideration and must be sufficiently broad to accommodate all relevant mitigating evidence.  The State must insure the process is neutral and principled so as to guard against bias or caprice.  <u>Greg v. Georgia</u>, 96 S.Ct. 2909, 2912 (1976).  To insure such a process, the decisions must be subject to appellate review.  <u>Barker v. Dugger</u>, 111 S.Ct. 731 (1991). A meaningful review of death sentences and their procedures promotes reliability and consistency.  <u>Clemons v. Mississippi</u>, 110 S.Ct. 1441 (1990).

The present Texas capital sentencing scheme was found facially constitutional in <u>Jurek v. Texas</u>, 96 S.Ct. 2950 (1976), which held in part:

> "By providing prompt judicial review of the jury's decision in a court with state wide jurisdiction, Texas has provided a means to promote the even handed, rational, and consistent imposition of death sentences under law.  Because this system serves to assure that sentences of death will not be wantonly or freakishly imposed, it does not violate the constitution".  <u>Jurek</u> Supra at Page 2958.

Applicant contends that by the Eighth Amendment and the due process clause of the Fifth and Fourteenth Amendments mandate appellate review.  The Supreme Court has consistently held that decisions which give rise to the death penalty must be subject to appellate review. <u>Proffitt v. Florida</u>, 428 US 242, __245__ (__1976__) and <u>Clemons v. Mississippi</u>, Id at Page __1443__.  In <u>Clemons</u> the Supreme Court espoused the necessity of meaningful appellate review, a process consistent with pursuit of the Eighth Amendment's objectives with measured consistent application of the death penalty and fairness to the accused;

> "We see no reason to believe that careful
> appellate weighing of aggravating against
> mitigating circumstances in cases such as this
> would not produce "measured consistent
> application" the death penalty or in any way be
> unfair to the defendant.  It is a routine test
> of appellate courts to decide whether the
> evidence is such that the sentencer could have
> arrived at the death penalty that was imposed
> and as the opinions below indicate, a similar
> process of weighing aggravating and mitigating
> evidence is involved in an appellate court's
> proportionality review.  Furthermore this court
> has repeatedly emphasized that meaningful
> appellate review promotes reliability and
> consistency.  It is also important to note that
> state Supreme Courts and states that authorize
> the death penalty may well review many death
> sentences and that typical jurors, in contrast,
> will serve on only one such case during their
> lifetimes.  We accordingly see nothing in
> appellate weighing or re-weighing of the
> aggravating and mitigating circumstances that is
> at odds with the contemporary standards of
> fairness or that is inherently unreliable and
> likely to result in arbitrary imposition of the
> death sentence.  <u>Clemons</u> Supra 110 S.Ct. at
> 1448-49.

This failure to perform a meaningful appellate review would result

in an automatic rule affirmance which does violence to the Court's

opinion in <u>Lockett v. Ohio</u>,  438 US  586 (  1978 )  _____.  Thus, in

reviewing state capital sentencing schemes the Supreme Court seems to

comment on the importance of appellate review so as to uphold the state

statutes constitutionality. Oregon has a mitigation punishment issue

similar to that of Texas, but Oregon engages in appellate review of the

sufficiency of the evidence admitted to sustain a jury's answer to that

issue.   The Oregon Supreme Court agreed with the Texas court's

characterization of punishment evidence about mitigation as being of a

discretionary nature.  <u>State v. Moore</u>, 927 Pacific 2d 1073 (Ore Sup. Ct.

1996).  Despite the discretionary nature the Oregon court concluded the

jury's answer to the issue was subject to judicial review and that a court could review the jury's answer on a rational basis.

Although states are not obligated to provide appellate review once a state provides for appellate activity the procedure must be accompanied by certain due process considerations. The Texas courts' refusal to conduct such a review violates Applicant's right to due process.

**GROUND FOR REVIEW TEN**:  Because of his age and immaturity at the time of the acts in question the Eighth and Fourteenth Amendments prohibit Applicant's execution.

Applicant was born on July 19, 1983.  The capital crime which he is alleged to have committed occurred November 26, 2001.  At the time of his offense Applicant was approximately eighteen years four months old.

In his brief on direct appeal Applicant contended that the infliction of the death penalty on anyone under the age of twenty-one years violated the Eighth and Fourteenth Amendments to the Federal Constitution.  At the time Applicant filed his appellate brief the Supreme Court was considering <u>Roper v. Simmons</u>, No. 03-633 which resulted in <u>Roper V. Simmons</u>, 543 US 551 (2005). In <u>Roper</u> the Supreme Court overruled its previous ruling in <u>Stanford v. Kentucky</u>, and held that the Eight and the Fourteenth Amendments forbade the execution of individuals who were under the age of eighteen at the time of their alleged offenses.  Applicant contended unsuccessfully on appeal and on his cert petition that his age and peculiar circumstances also forbade the imposition of death in his case under the Eighth and Fourteenth Amendments.

In <u>Roper</u> the Supreme Court again looked at evolving standards of decency holding that the death penalty should be limited only to offenders who commit "a narrow category of the most serious crimes." <u>Atkins v. Virginia</u>, 536 US 304, 317 (2003); the Court instructs the states to restrict the death penalty to those whom are the most deserving of execution.  The efficiency of the death penalty continues to be questioned by more of the states; just last week New Jersey abolished capital punishment altogether.

26

The person of the Applicant described throughout his trial through the testimony of lay witnesses and experts established a personality indistinguishable from the descriptions of juveniles whom the Supreme Court describes as being less morally culpable individuals. Applicant is impulsive, immature and has an underdeveloped sense of responsibility. The record gives numerous examples of impetuous ill-considered actions and reckless behavior by Applicant.

At age eighteen years four months Applicant's brain was still an adolescent brain with Applicant continuing to function as a person who acts under eighteen years of age. Age should be synonymous with mental functioning and brain development not just time measurement of age.

## GROUND FOR REVIEW ELEVEN

**THE TRIAL COURT'S SUPPLEMENTARY INSTRUCTION IMPROPERLY COERCED THE JURY TO ANSWER ISSUE NO. TWO, ALLOWED THE JURY TO ANSWER "YES" TO ISSUE NO. TWO WITHOUT REQUIRING ALL TWELVE JURORS TO ANSWER IN THE AFFIRMATIVE SPECIAL ISSUE NUMBER TWO, WAS AN IMPERMISSIBLE COMMENT ON THE WEIGHT OF THE EVIDENCE BY THE TRIAL COURT AND PREVENTED THE JURY FROM CONSIDERING CIRCUMSTANCES OF THE OFFENSE FAVORABLE TO APPLICANT THAT MIGHT HAVE BEEN CONSIDERED MITIGATING EVIDENCE IN VIOLATION OF THE APPLICANT'S RIGHTS UNDER THE 5th, 6th, 8TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION.**

## FACTS

**Trial Facts.**

During jury deliberations on punishment the jury sent a question to the trial court with regard to the anti-parties Special Issue No. 2. Here is the question:

> *Regarding Issue Number 2 cause the death of deceased individuals, intended to kill the deceased individuals. Question: Do you have to believe both or at least one?* (RR Vol. 36/135)

The court responded as follows:

> *Members of the Jury. Paragraph 1 of the indictment charged capital murder by the death of two individuals pursuant to the same scheme or course of conduct. Paragraph 2 of the indictment charged capital murder by the death of an individual during the course of*

*kidnapping and robbery. If your consideration
of Issue No. 2 on punishment is as to Paragraph
1 of the indictment, the death of two
individuals is required to be found by the
jury. If your consideration is as to the
second paragraph of the indictment, the death
of an individual, Samuel Petrey, is required.*
(RR Vol. 36/135).

**Appellate Review by the Texas Court of Criminal
Appeals.**

Applicant objected to the court's supplemental
instruction. (RR Vol. 36/135-137). The court
overruled all of Applicant's objections. (RR
Vol. 36/137). In Applicant's appeal, he alleged
the following related to the supplementary
instruction:
1. The Trial Court's Supplementary Instruction
Improperly Coerced The Jury To Answer Issue No.
Two;
2. The Trial Court's Supplementary Instruction
Allowed The Jury To Answer Yes To Issue No. Two
Without Requiring All Twelve Jurors To Answer
In The Affirmative.
3. The Trial Court' S Supplementary
Instruction Directed The Jury's Answer To Issue
No. Two And Was An Impermissible Comment On The
Weight Of The Evidence By The Trial Court.
4. The Trial Court' S Supplementary
Instruction Prevented The Jury From Considering
Circumstances Of The Offense Favorable To
Appellant That Might Have Been Considered
Mitigating Evidence.

Thereafter, the Texas Court of Criminal Appeals
overruled these appellate point of error and
stated:

On appeal, appellant claims that the
instruction improperly coerced the jury to
answer the second special issue in the
affirmative, that the instruction allowed the
jury to answer the second special issue in the
affirmative without requiring all twelve jurors
to answer "yes," that the instruction was an
improper comment on the weight of the evidence,
and that the instruction prevented the jury
from "considering circumstances of the offense
favorable to appellant that might have been
considered mitigating evidence." Because
appellant's objections at trial do not comport
with the claims he now raises, he has failed to
preserve those claims for appeal. Tex.R.App. P.
33.1. Appellant's first, second, third, and
fourth points of error are overruled.  Young
vs. State, No. AP-74643, Sept. 28, 2005,  2005
WL 2374669 (Tex.Crim.App.).


**Preservation of Error at Trial.**

Applicant's trial attorneys objected as
follows:

- The court lessened the State's burden of
proof under Special Issue Number 2. RR 36/136,
Lines 2 -7.

- The court's supplemental instruction
lessened the State's burden of proof which
should have been beyond a reasonable doubt on
Issue Number 2.  RR 36/136, Lines 8-20.

- Sixth Amendment objection to being deprived of right to trial by jury. RR 36/136, Lines 21-23.

- Fourteenth Amendment objection based on violation of due process.  RR 36/136, Lines 21-23.

- Objection under the Texas Constitution Article 10, Section 9, 10 and 19.  RR 36/136, Lines 1-4.

- We object under the Fourteenth Amendment because it violates due process, and we further object under the Fifth Amendment as applicable to the State under Fourteenth Amendment.  RR 36/136, Lines 1-4.

- Objection under the 8th Amendment to the U.S. Constitution based on *Inman [sic] Enmund vs. Florida*, 458 U.S. 782.  RR 36/137, Lines 5-10.


**The Texas Court of Criminal Appeals' Decision to find waiver resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.**

The "contrary to" and "unreasonable
application" application clauses of § 2254(d)(1)
are independent. <u>Williams v. Taylor</u>, 529 U.S. 362,
404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).   A
state court decision will be "contrary to" our
clearly established precedent if the state court
either "applies a rule that contradicts the
governing law set forth in our cases," or
"confronts a set of facts that are materially
indistinguishable from a decision of this Court and
nevertheless arrives at a result different from our
precedent." Id., at 405-406, 120 S.Ct. 1495.   A
state court decision will be an "unreasonable
application of" our clearly established precedent
if it "correctly identifies the governing legal
rule but applies it unreasonably to the facts of a
particular prisoner's case." Id., at 407-408, 120
S.Ct. 1495. <u>Penry  v. Johnson</u>, 532 U.S. 782, 792,
121 S.Ct. 1910 (2001).

The Texas Court of Criminal Appeals decision to
find waiver fulfills both prongs and allows for
this court to grant relief.  Applicant preserved
those crucial issues for appellate review.  Below
is a diagram showing the preservation of these
errors for review:

| Error Claimed on Appeal | Objections at Trial |
| --- | --- |
| 1.   THE TRIAL COURT'S SUPPLEMENTARY INSTRUCTION IMPROPERLY COERCED THE JURY TO ANSWER ISSUE NO. TWO. | Fourteenth Amendment objection based on violation of due process.  RR 36/136, Lines 21-23.<br>   We object under the Fourteenth Amendment because it violates due process, and we further object under the Fifth Amendment as applicable to the State under Fourteenth Amendment. RR 36/136, Lines 1-4.<br>   Sixth Amendment objection to |

| | |
|---|---|
| | being deprived of right to trial by jury. RR 36/136, Lines 21-23. |
| | Objection under the 8th Amendment to the U.S. Constitution based on Inman [sic] Enmund vs. Florida, 458 U.S. 782. RR 36/137, Lines 5-10. |
| 2.    THE TRIAL COURT'S SUPPLEMENTARY INSTRUCTION ALLOWED THE JURY TO ANSWER YES TO ISSUE NO. TWO WITHOUT REQUIRING ALL TWELVE JURORS TO ANSWER IN THE AFFIRMATIVE. | Fourteenth Amendment objection based on violation of due process.   RR 36/136, Lines 21-23. |
| | We object under the Fourteenth Amendment because it violates due process, and we further object under the Fifth Amendment as applicable to the State under Fourteenth Amendment. RR 36/136, Lines 1-4. |
| | Sixth Amendment objection to being deprived of right to trial by jury. RR 36/136, Lines 21-23. |
| | Objection under the 8th Amendment to the U.S. Constitution based on Inman [sic] Enmund vs. Florida, 458 U.S. 782. RR 36/137, Lines 5-10. |
| 3.    THE TRIAL COURT'S SUPPLEMENTARY INSTRUCTION DIRECTED THE JURY'S ANSWER TO ISSUE NO. TWO AND WAS AN IMPERMISSIBLE COMMENT ON THE WEIGHT OF THE EVIDENCE BY THE TRIAL COURT. | Fourteenth Amendment objection based on violation of due process.   RR 36/136, Lines 21-23. |
| | We object under the Fourteenth Amendment because it violates due process, and we further object under the Fifth Amendment as applicable to the State under Fourteenth Amendment. RR 36/136, Lines 1-4. |
| | Sixth Amendment objection to being deprived of right to trial by jury. RR 36/136, Lines 21-23. |
| | Objection under the 8th Amendment to the U.S. Constitution based on Inman [sic] Enmund vs. Florida, 458 U.S. 782. RR 36/137, Lines 5-10. |
| 4.    THE TRIAL COURT'S SUPPLEMENTARY INSTRUCTION PREVENTED THE JURY FROM | Fourteenth Amendment objection based on violation of due process.   RR 36/136, Lines |

| | |
|---|---|
| CONSIDERING CIRCUMSTANCES OF THE OFFENSE FAVORABLE TO APPELLANT THAT MIGHT HAVE BEEN CONSIDERED MITIGATING EVIDENCE. | 21-23.<br><br>We object under the Fourteenth Amendment because it violates due process, and we further object under the Fifth Amendment as applicable to the State under Fourteenth Amendment. RR 36/136, Lines 1-4.<br><br>Sixth Amendment objection to being deprived of right to trial by jury. RR 36/136, Lines 21-23.<br><br>Objection under the 8th Amendment to the U.S. Constitution based on Inman [sic] Enmund vs. Florida, 458 U.S. 782. RR 36/137, Lines 5-10. |

The objections made at trial comport with the errors preserved which the Applicant attempted to argue in his appeal.  Moreover, in the argument portion of his brief the Applicant argued cases relevant to a supplementary instruction's impact on the jury.  For example, in <u>Jenkins v. United States</u>, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965) ( per curiam ), where the trial judge responded to a deadlocked jury's inquiry: 'You have got to reach a decision in this case.' " The U.S. Supreme Court concluded that "in its context and under all the circumstances the judge's statement had the coercive effect attributed to it." *Ibid.* The brief also discussed Lowenfield v. Phelps,  484 U.S. 231, *239, 108 S.Ct. 546, **551 (U.S.La.,1988), which contained a discussion of Supreme Court cases which analyzed the supplemental instructions to juries.  The cases related to jury instruction problems are analyzed under a due process analysis.  "The only question

for us is "whether the ailing instruction by itself
so infected the entire trial that the resulting
conviction violates due process." <u>Estelle v.</u>
<u>McGuire</u>, 502 U.S. 62, *72, 112 S.Ct. 475, **482
(U.S.Cal.,1991).

Ironically, Applicant's objections to the trial
court's supplemental instruction can be summed up
collectively as due process objections.

This is exactly why those errors were preserved and
were ripe for appellate review.  The Texas Court of
Criminal Appeals decision(1) resulted in a decision
that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as
determined by the Supreme Court of the United
States; or (2) resulted in a decision that was
based on an unreasonable determination of the facts
in light of the evidence presented in the State
court proceeding.

### THE PROBLEMATIC PUNISHMENT CHARGE

In fact the jury's question goes to the heart
of the issue: *Regarding Issue Number 2 cause the*
*death of deceased individuals, intended to kill the*
*deceased individuals.  Question: Do you have to*
*believe both or at least one? RR* 36/135. The
punishment charge failed to delineate that ISSUE
NO. 2 requires independent consideration of
paragraph one and paragraph two of the amended
indictment.  Tex.Code Crim. Proc. art. 37.071, §
2(e)(1). (See Charge on Punishment,

The jury recognized the complexity of the
issue, and the Court in attempting to resolve the

problem gave the supplemental instruction, *supra*. The Court's employment of the following imperative language deprived Applicant of a trial by jury on ISSUE NO. 2. *If your consideration of Issue No. 2 on punishment is as to Paragraph 1 of the indictment, the death of two individuals **is required** to be found by the jury. If your consideration is as to the second paragraph of the indictment, the death of an individual, Samuel Petrey, **is required**.*[9]  *(Emphasis Added)*.

The jury could have understood this language to be mandatory.  The context certainly reads as compelling the jury to make that finding.  The Court may have actually meant for it to be mandatory by stating: "The jury found him guilty of the death of Samuel Petrey during the course of committing kidnapping and robbery.  It would be erroneous for the Court now to say that they can disregard that finding of capital murder and only – and still now have to go back to the East Texas murder as well."  RR 36/137.

**LEGAL ARGUMENT.**

It is well settled law that the Court may issue additional instructions, so long as the instructions could have been properly issued in the original charge to the jury.  The Appellate Court in Guajardo v. State, 176 S.W.3d 402 (Tex.App.- Houston [1 Dist.],2004) stated:

When the trial judge responds substantively to a jury question during deliberations, that

---

[9]RR 36/135.

communication constitutes an additional or
supplemental jury instruction. Daniell v.
State, 848 S.W.2d 145, 147 (Tex.Crim.App.1993).
A trial court has broad discretion in
submitting proper definitions to the jury.
Roise v. State, 7 S.W.3d 225, 242 (Tex.App.-
Austin 1999, pet. ref'd). A trial court is
allowed to give a supplemental instruction if
requested by the jury. *See* Garza v. State, 55
S.W.3d 74, 77 (Tex.App.-Corpus Christi 2001,
pet. ref'd) (stating that, if prerequisites of
article 36.16 are met, court may give
supplemental charge); Tex.Code Crim. Proc. Ann.
art. 36.16 (Vernon Supp.2004).

The Court's instruction in the case, *sub
judice,* was used mandatory language and conflicted
with the instructions in the punishment charge
relevant to ISSUE NO. 2.  The State still had the
burden of proving the issue beyond a reasonable
doubt which the supplemental instruction failed to
mention.  Moreover, there is no mention of that
intent or anticipation of death was required.
There is a very real danger that the jury took the
instruction as commanding them to find
affirmatively on that vital issue.

In Brown v. State, 122 S.W.3d 794, 799
(Tex.Crim.App.,2003), the Court of Criminal Appeals
lucidly discussed a similar issue:

On the far end of the "improper-judicial-comment"
scale is a comment or instruction that states a
mandatory presumption and thereby violates due
process.  Mandatory presumptions violate due
process by shifting the burden of production or
proof to a criminal defendant on a critical factor

element of the offense. Thus, in <u>Francis v. Franklin</u>, a case factually similar to this one-in which the defendant fired a shot through a door, killing someone-the Supreme Court held that the first two sentences of the following instruction violated due process:

> The acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted.

<u>Francis v. Franklin</u>, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); <u>Brown</u>, 122 S.W.3d 794 at 799 (Tex.Crim.App.,2003) citing, <u>Sandstrom v. Montana</u>, 442 U.S. 510, 514-19, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The above language constituted reversible error because "[t]he challenged sentences are cast in the language of command." *Id.*

In the Applicant's case, command language is contained in the supplemental instruction given to the jurors. There was no mention of the State's burden of proof. Standing alone, the supplemental instruction in this case shifted the burden of proof and was not authorized by statute.[14] The Court, in <u>Brown</u>, proclaimed that "to meet due process, any such instruction must be permissive rather than mandatory. . ." The mandatory language created and conveyed the thought that they were

---

[14]The Court described instructions which state a mandatory presumptions as being "on the far end of the 'improper-judicial-comment' scale. *Brown* at 799.

"required" to find in the affirmative.  The
omission of the State's burden of proof and the
mental state in the supplemental instruction caused
the Applicant to suffer egregious constitutional
harm.  Therefore, the error was fundamental error
and deprived the Applicant of the right to trial by
jury and Due Process on that issue.

When a jury asks a question during the
process of deliberation, a balanced and clear
response is required.  "Under those circumstances a
trial judge must be acutely sensitive to the
probability that the jurors will listen to his
additional instructions with particular interest
and will rely more heavily on such instructions
than on any single portion of the original charge."
U.S. v. Carter 491 F.2d 625, 633 (C.A.Miss. 1974) .
The timing of the supplemental charge occurred
at the punishment phase and was the last
instruction given to the jury which makes the
impact even more dangerous to the Applicant.  'The
influence of the trial judge on the jury is
necessarily and properly of great weight,'Starr v.
United States, 153 U.S. 614, 626, 14 S.Ct. 919,
923, 38 L.Ed. 841, and jurors are ever watchful of
the words that fall from him. Particularly in a
criminal trial, **the judge's last word is apt to be
the decisive word.** Bollenbach v. U.S., 326 U.S. 607
at 612, 66 S.Ct. 402 at 405 (U.S. 1946).  (Emphasis
added.)

When the maximum sentence authorized by law
depends upon the existence of a fact, the Fifth and
Sixth Amendments require the fact to be proven to a
jury beyond a reasonable doubt.  In order for the
Applicant to be sentenced to death, a finding on

issue number 2 was required by Tex.Code Crim. Proc.
art. 37.071, § 2(e)(1).

In Jones v. United States, 526 U.S. 227, 243
n.6 (1999), the Court stated the rule of
constitutional law that addresses the presented:
"[U]nder the Due Process Clause of the Fifth
Amendment and the notice and jury trial guarantees
of the Sixth Amendment, any fact (other than prior
conviction) that increases the maximum penalty for
a crime must be charged in an indictment, submitted
to a jury, and proven beyond a reasonable doubt."
Jones construed a federal carjacking statute to
avoid the grave constitutional questions that would
have arisen if the statute had allowed judges to
find facts that authorize a longer sentence. Jones,
526 U.S. at 239.

The in Jones the jury instruction read:

> "In order to bring back a verdict recommending
> the punishment of death or life without the
> possibility of release, all twelve of you must
> unanimously vote in favor of such specific
> penalty." App. 43-45.

Those instructions misinformed the jury in two
intertwined respects: First, they wrongly
identified a "lesser sentence" option; second, the
instructions were open to the reading that, absent
juror unanimity on death or life without release,
the District Court could impose a lesser sentence.
Jones v. U.S.  527 U.S. 373, 413-414, 119 S.Ct.
2090, 2114 (U.S.Tex.,1999) (footnotes omitted).

The supplemental instruction appears on its
face to substitute the Court's judgment for the

jury's.  The trial court's submission of the
supplemental charge constitutes reversible charge
error under Almanza v. State, 686 S.W.2d 157
(Tex.Crim.App.1984).  It is well-settled that an
appellant who complains on appeal of an unobjected-
to, non-constitutional jury charge error will
obtain a reversal only if the error is so egregious
and created such harm that he has not had a fair
and impartial trial on punishment.  There is no
explanation as to why the Texas Court of Criminal
Appeals did not even perform a plain error
analysis.

The Texas Court of Criminal Appeal's
characterizing the Applicant's points of error as
waiver of error is clearly incorrect.  For reasons
stated above, the Supreme Court characterizes the
nature of the Applicant's objections at trial as
Constitutional objections.  In addition, those
objections were preserved and the Applicant
attempted to obtain review of those points of error
which the Texas Court of Criminal Appeals
unreasonable claimed were waived under . Tex.R.App.
P. 33.1.

A state court decision is contrary to clearly
established Supreme Court precedent if: (1) "the
state court applies a rule that contradicts the
governing law set forth in [the Supreme Court's]
cases," or (2) "the state court confronts a set of
facts that are materially indistinguishable from a
decision of [the Supreme] Court and nevertheless
arrives at a result different from [Supreme Court]
precedent." Williams v. Taylor, 529 U.S. 362, 405-
406, 120 S.Ct. 1495, (2000). A state court decision
is an unreasonable application of clearly

established Supreme Court precedent if the state
court "correctly identifies the governing legal
rule but applies it unreasonably to the facts of a
particular prisoner's case." *Williams,* 529 U.S. at
407-408, 120 S.Ct. 1495.

## The Supplemental Instruction's Impact.

As stated previously, the use of mandatory
language could have caused the jury to feel that
they were "required" to find ISSUE NO. 2
affirmatively.  The fact that they were apparently
having some challenges deciding the issue;
otherwise, they would not have asked the question.
They could have considered the use of the
imperative term as foreclosing further deliberation
on the issue.

Besides the testimony of David Page who was a
party to both murders, the jury may have been
struggling with his progressively casting the blame
on the Applicant in each of his confessions.  RR
26/260-262; RR 27/6-29. The jury may have recalled
that Page's hands glowed in response to the
presumptive trace metal test but did not match any
pictures in the officer's book.  RR 25/101-102.  It
is reasonable to conclude that the jury struggled
with Page's confession that he killed Petrey with
gloves on which was corroborated by Page's DNA
being present in the inside of the palm area of the
gloves.  RR 27/271-275; RR 25/97.

The supplemental instruction did not mention
the State's burden and does not mention "intent" or
"anticipation of death."  This is how it
constituted a comment on the weight of the
evidence.  The instruction prevented the jury from

considering circumstances of the offense favorable
to Applicant that might have been considered
mitigating evidence because once the Court employed
mandatory language, the jury could have taken it
that it was settled that the Applicant either
actually caused the death of the individuals or
anticipated that human life would be taken.

The impact on the Applicant is substantial.
For example, the jury may have had doubts about
Applicant's intent or his anticipation of human
life being taken.  What is of Constitutional
concern, is that the instruction allows 6 jurors to
believe that the Applicant intended or anticipated
that the life of Doyle Douglas would be taken and 6
jurors to believe that the Applicant intended or
anticipated that the life of Samuel Petrey would be
taken to answer ISSUE NO. 2 affirmatively.  It
would not have to be 6 and 6, it could be any
combination thereof.

Perhaps most importantly the court's
supplemental instruction precluded the jury from
considering as a possible mitigating factor
Applicant's possible lack of desire to kill or
participate in the death of just one of the men.
The 8th and 14th Amendments require that the
sentencer be permitted to focus on the character
and propensities of the offender, and the offense.
Pennsylvania v. Ashe, 302 US 51, 55 (1937).   The
sentencer must not be precluded from considering,
as a mitigating factor, any circumstances of the
offense, which might justify a sentence other than
death.  Lockett v. Ohio, 98 S. Ct. 2954, 2964
(1978). The trial court's instruction impermissibly
interfered with such determination.

The trial court's employment of mandatory language, deprived the Applicant of his right to due process under the 5th, 6th, 8th and 14th Amendments and constituted egregious error depriving him of a fair and impartial trial. *Almanza*, 686 S.W.2d at 172.  This was not recognized by the Texas Court of Criminal Appeals.

In          proceedings a court must "assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in Brecht, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in Chapman, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705."  Fry v. Pliler, 127 S.Ct. 2321, 2328 (2007).

The judge improperly cast himself in the role of trier of fact and directed a verdict on an essential element of the bank robbery charge by instructing the jury that the bank was federally insured.  U.S. v. Mentz, 840 F.2d 315 (6th Cir. 1988).  This is precisely what the supplemental instruction did and is accentuated by trial court's statement: "The jury found him guilty of the death of Samuel Petrey during the course of committing kidnapping and robbery.  It would be erroneous for the Court now to say that they can disregard that finding of capital murder and only – and still now have to go back to the East Texas murder as well." RR 36/137.  The instruction's "substantial and injurious effect" mandates that this court grant relief.

**GROUND FOR REVIEW TWELVE**:  Applicant's rights to due process under the Fourteenth Amendment were violated when the prosecutor and law enforcement interfered with Applicant's right to effective assistance of counsel.

**Factual Basis**:   Applicant requested by separate motion that the prosecution provide any and all evidence which is favorable or material to the issue of guilt and punishment.  (Applicant's Pre-trial motions).

Applicant obtained written statements from Amber Lynch Harrison, Patricia McCoy and Darnell McCoy.  Amber Lynch's is unsigned; Patricia McCoy's statement was witnessed by Lisa Milstein.  Amber Lynch's was signed, but she repudiated most of it on the stand at the writ hearing. Patricia McCoy's and Darnell McCoy's statements were witnesses by Lisa Milstein.  Other statements taken by Milstein had been repudiated by the witness, but not these two statements.

Applicant complains that Amber Lynch told Midland prosecutors and police that she did not support the death penalty.  She attempted to discuss certain positive character traits which she saw in Applicant. Although a juvenile, Lynch wanted to speak to Applicant's trial counsel, but she states that her mother advised her that it was not in her best interest to speak to defense attorneys or to the Applicant.  Based on mom's advice, she did not do so.

Patricia McCoy states in her statement that she contacted the District Attorney's office but was instructed that she didn't have to talk to the defense, and she was not to talk to defense attorneys or investigators working for the defense. (See Affidavit No. ___8___). Patricia McCoy believed that neither she nor her husband were allowed to speak to defense representatives.  She was asked to review the pictures of Doyle Douglas over and over again and to review written statements and videotapes so that she could help her husband, Darnell McCoy, remember what was in those statements.

Applicant believes that Amber Lynch could have testified that she was opposed to the death penalty.

Darnell McCoy and Patricia McCoy were aware of substantial mitigating evidence to support the defense theories at trial.  Darnell McCoy expressed the view that Applicant was not a future danger and had never before the incident with Doyle Douglas seen Applicant act mean or violent. (See unsigned Affidavit No. ___9___). Patricia McCoy was aware of Applicant's addiction and excessive drug use in the weeks preceding two murders.  She observed his bizarre behavior and paranoia. Based on her observation she did not believe Applicant would be a future danger and she never observed Applicant being mean or violent.  Based on her conversations neither she nor her husband believed they were allowed to be interviewed by the defense and they were not.

Applicant complains that his inability to discover evidence and present it from the McCoys was directly related to the instructions they received from either police representatives or the prosecutor's office. Applicant urges the Court that the State's behavior concerning these

witnesses constitutes suppression of evidence   which could have demonstrated to the jury the Applicant was not violent and not a future danger. This evidence was relevant and would have assisted the jury in the deliberation on punishment issues.  The suppression of such evidence whether it was intentional or inadvertent on the part of the State violates Applicant's due process rights to a fair trial and the right of due process as guaranteed by the Fifth and Fourteenth Amendments.

Applicant's right to effective assistance of counsel was also adversely affected because the State's actions prevented the defense from being able to investigate the case, obtain material mitigating evidence and present such evidence to the fact finder.

<u>APPLICANT'S UNEXHAUSTED STATE CLAIMS</u>

NO. CR 27,181

EX PARTE                          *           IN THE DISTRICT COURT
                                  *
                                  *        385TH JUDICIAL DISTRICT
                                  *
CLINTON LEE YOUNG                 *          MIDLAND COUNTY, TEXAS


**APPLICANT'S PRO SE COMPLAINTS**


**APPLICANT'S PRO SE COMPLAINTS**
**LETTER TO THE COURT DATED JULY 14, 2005**
**FILED JULY 20, 2005**

## INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

1.   "Ineffective assistance of trial counsel, for failing to admit additional reports that pertained to the ballistic reports and autopsy reports which challenged state's theory."

2.   "Ineffective assistance of counsel for failing to have tests conducted on the car of victim Doyle Douglas which would have provided exculpatory evidence."

3.   "Ineffective assistance of trial counsel for failing to object to the admission of my county jail records. These records contained false information that should have been challenged.  I informed my trial lawyer of this  and he  told me not to worry about it, that the jury would not read it."

4.   "Ineffective assistance of counsel.  My trial counsel failed to investigate claim of co-defendants conspiring though an  ex-girlfriend of David Page.   The D.A. in closing arguments stated that the co-defendants could not have collaborated this story.   The co-defendants did collaborate their story through a mutual friend.   This claim was never investigated."

5.   "Ineffective assistance of trial counsel for failing to request mis-trial (sic) when it was discovered that a relative of the victim was on my jury.  The jury had talked

together and prayed together before the juror was dismissed."

6. "Ineffective assistance of trial counsel for failing to question Debbie Sanders about her conversation with Carla Sexton in which she told her that she clearly heard Mary [Mark] Ray brag to Patrick Brooks [Brook] that he [Mark Ray] shot Doyle Douglas. This would also have challenged Patrick Brooks's (sic) testimony."

7. "Ineffective assistance of trial counsel for failing to strike Mrs. Haydee Guerreo from my jury. She did not speak or understand English well enough to fluently understand all of the testimony and evidence. I did not want her on my jury because she would have trouble understanding the scientific and legal terms as well as the evidence. If she would have been struck Mrs. Gentry would have been on my jury. It has been said that following my conviction she made a statement to the fact that she never would have convicted me of capitol (sic) murder."

8. "Ineffective assistance of counsel for no impeaching J. Timmons who testified against me. My counsel was in possession of a report that was written by J. Timmons that would have shown her testimony to be false."

9. "Ineffective assistance of trial counsel for failing to object when Assistant D.A Teresa Clingman lied to the jury in closing arguments, by stating to the jury that I admitted to the murder to a defense witness when no such evidence was proven or brought up in the trial. The D.A. further added that I never expressed remorse which is not true and my counsel failed to get this across to the jury."

10. Ineffective assistance of counsel by failing to admit into evidence during the guilt/innocence phase of the trial that due to defendant severe ADHD, mental illness and current state of mind that he could not have anticipated other defendant's actions.

## PROSECUTORIAL MISCONDUCT CLAIMS.

1. "Prosecutor misconduct. The D.A. was in possession of a report written by J. Timmons of T.Y.C. that would have