jury a vehicle to allow the jury to give effect to the evidence before it. The Court stated:

> "Defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems may be less culpable than Defendants who have no such excuse."

In order to insure reliability in the determination of death as the appropriate punishment in a specific case, the jury must be able to consider and give effect to any mitigating evidence relevant to any Defendant's background, character, or circumstances of the crime. Penry 492 US at 328. In Smith v. Texas, the Supreme Court indicates that jurors must give full consideration and full effect to mitigating circumstances in choosing a Defendant's appropriate sentence in order to have individualized sentencing. Smith v. Texas, 543 US 37, 38 (2004). In Nelson v. Quarterman, 472 F.3d 287 (5th Cir. 2006) and Brewer v. Quarterman, 127 S.Ct. 1706 (2007) the Fifth Circuit and the Supreme Court decided that Penry (1) indeed met that the mitigation issue must give full effect to all evidence which is mitigating.

There is no question that Applicant in this case presented evidence which can in appropriate circumstances be considered mitigating. In his habeas corpus petition Applicant repeats some of the evidence about him which is mitigating. However, the Texas Special Issue makes no specific mention of a jury considering mental health and physical health; saying the circumstances of the Defendant and the Defendant's background do not sufficiently identify that mental health information deserves any consideration under the special issue submission. Without such specific instruction Texas has come no

50

closer to a properly worded mitigation special issue which answers the questions raised by <u>Penry 1</u> when Texas had no mitigation issue to give full effect to mitigation evidence. Applicant argues that Texas is no closer to a proper mitigation issue than it was at the time of the pre-<u>Penry 1</u> special issue submission system; thus there still exists a reasonable likelihood that a jury is precluded from giving full consideration-full effect to any mitigation evidence that relates to severe mental problems and ADHD as Applicant suffered.

## V.

**PROSECUTORIAL DISCRETION IN DECIDING WHICH CAPITAL MURDERS WILL INVOLVE SEEKING THE DEATH PENALTY DENIES APPLICANT DUE PROCESS OF LAW AS GUARANTEED THROUGH THE FIFTH AND FOURTEENTH AMENDMENTS.**

## VI.

**THE TEXAS STATUTORY SCHEME ALLOWING PROSECUTORIAL DISCRETION IN DETERMINING THOSE WHO ARE DEATH PENALTY ELIGIBLE VIOLATES THE EIGHTH AMENDMENT TO THE FEDERAL CONSTITUTION.**

In his fifth and sixth grounds for review Applicant contends that the Texas Statutory Scheme of determining which persons accused of capital murder will face the death penalty violates the Fifth, Fourteenth and Eighth Amendments. Applicant has provided adequate argument and authorities for these two points in his Petition for Writ of Habeas Corpus and therefore in this Memoranda incorporates such arguments and authorities.

## VII.

**APPLICANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL FROM HIS TRIAL COUNSEL IN THE FOLLOWING PARTICULARS:**

A. TRIAL COUNSEL'S FAILURE TO OBJECT TO THE TYC RECORDS MARKED AS AN EXHIBIT;

B. TRIAL COUNSEL'S FAILURE TO CALL APPLICANT'S FORMER GRADE SCHOOL TEACHERS M. A. FONT AND MARY HALL.

C. TRIAL COUNSEL'S MISUSE OF A BALLISTICS' REPORT WHICH IF ADMITTED WOULD HAVE IMPLICATED SOMEONE ELSE IN THE SHOOTING OF DOYLE DOUGLAS OTHER THAN APPLICANT.

An accused person's right to be represented by counsel is a fundamental component of the criminal justice system. Lawyers in criminal cases "are necessities, not luxuries." Gideon v. Wainwright, 372 US 335, 344 (1963).

The right to the assistance of counsel is the right to effective assistance of counsel. McMann v. Richardson, 397 US 759, 771 (Note 14)(1970).

It is only fair to admit that Applicant's trial lawyers provided zealous representation of Applicant. Nevertheless even good lawyers can make serious mistakes.

### A.

Applicant complains about his trial counsel's failure to object to the TYC records which were marked as Exhibit 147 and offered into evidence without objection. Trial counsel told the court that this was a strategic decision after reading the records and discussing them with the trial team. (Writ Hearing 3/24). Trial counsel was aware of the contents of the records. Trial counsel formed an objective opinion about the TYC records and how they could be used at trial.

Strategic choices made after [a] thorough investigation of laws and facts relevant to plausible options are virtually unchallengeable;

and strategic choices made after [a] less complete investigation are reasonable precisely to the extent that unreasonable professional judgment support the limitations on investigation." Wiggins v. Smith, 539 U.S. 510, 521 (2003) (quoting Strickland, 466 U.S. at 690-91).

Applicant feels that counsel's strategic decision to allow the records to come in as a group is a flawed strategy. Applicant realizes that trial counsel's objection that his failure to object is based upon strategic choices is most normally immune to complaint. Choices made after a "less than complete investigation" are reasonable only to the extent that reasonable professional judgment supports the limited investigation. Ex Parte Kunkle, 852 SW 2d 499, at 505 quoting Strickland, 104 S.Ct. 2052, 2065 (1984).

However, Applicant was a young man when he went to the TYC and his legal troubles in Midland came at a time when Applicant's most recent length of incarceration was at the TYC. The TYC records were the most detailed records of Applicant's behavior and demeanor in a time frame just prior to the murders. The massive bulk of the TYC records and the fact that they seem to possess more negative than positive information about Applicant makes objecting to the mass of the records and measuring their admissibility or inadmissibility individually a sounder trial strategy.

Counsel's perceived thought about the records was that they were too voluminous for a jury to review. This is not an assumption that should be easily made or one which should motivate the selection of a good strategy or a bad strategy.

B.

State's evidence at trial painted Applicant as a discipline problem at an early age. However there was evidence available to the contrary. Two former grade school teachers Margaret Font and Mary Hall had positive things to say about Applicant. Despite the availability of these witnesses, and their positive input about Applicant, neither witness was called.

A decision not to use evidence that is available involves what must be a complete review of the evidence with a regard for the strengths and weaknesses of one's case. The State's case at punishment involved witness after witness speaking of how dangerous, how disruptive or violent Applicant had been and was capable of being. Counsel needed some positive evidence of Applicant's behavior in his formative years to rebut the mass of negative information about him which the State offered. Rebuttal did not occur.

C.

The testimony at trial was that Doyle Douglas was shot in the head three times with a small caliber weapon. The ballistics expert's uncertainty as to which weapon fired the bullet or bullets killing Doyle Douglas was evidence assisting Applicant in his protestations of actual innocence of the Douglas murder. (Habeas Exhibit W-5). For some reason trial counsel did not argue that this failure of the state to conclusively place the Douglas murder weapon in Applicant's hand raised reasonable doubt. Instead the jury was left to view Applicant as a person who owned, possessed or took numerous firearms and was well familiar with all types of firearms having fired them.

55

It was crucial for Applicant to pursue any possible evidence of actual innocence because actual innocence is a door to potential appellate relief. Trial counsel's failure to pursue this argument allowed the jury to conclude that Applicant was responsible for Doyle Douglas' death and to close their ears and eyes to considering other possibilities raised by this scientific evidence.

The omitted evidence was so compelling that there was a reasonable probability that at least one juror would have changed his or her mind about sentencing Applicant to death. Williams, 529 U.S. at 394; Strickland, 466 U.S. at 693; Neal v. Puckett, 268 F.3d 230, 241 (5th Cir. 2002)(en banc).

## VIII.

**APPLICANT'S RIGHTS TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION WERE VIOLATED BECAUSE THE TEXAS COURT OF CRIMINAL APPEALS REFUSES TO REVIEW THE SUFFICIENCY OF THE MITIGATING EVIDENCE TO SUPPORT THE JURY'S VERDICT.**

## IX.

**APPLICANT'S RIGHTS UNDER THE EIGHTH AMENDMENT TO THE FEDERAL CONSTITUTION WERE VIOLATED BY THE REFUSAL OF THE TEXAS COURT OF CRIMINAL APPEALS TO REVIEW THE SUFFICIENCY OF THE MITIGATING EVIDENCE TO SUPPORT THE JURY'S VERDICT.**

In the Eighth and Ninth Grounds for Review Applicant complains that the Texas Court of Criminal Appeals refuses to review the sufficiency of the mitigation evidence developed at trial violating Applicant's due process rights under the Fifth and Fourteenth Amendments and his right to be free of cruel and unusual punishment under the Eighth Amendment of the Constitution. Applicant has provided adequate argument and authorities for these grounds for review in his Petition for Writ of Habeas Corpus and incorporates such matters herein in his request for relief.

## X.

### APPLICANT'S MENTAL AGE AND IMMATURITY AT THE TIME OF THE CAPITAL MURDER PROHIBIT EXECUTION ON EIGHT AND FOURTEENTH AMENDMENT GROUNDS.

Applicant was 18 years and 4 months old at the time that the murders of Douglas and Petry occurred. (DOB: 7/19/83). In a pre-trial hearing (January 27, 2003) Applicant called a psychologist, Kelly Goodness, who possessed specialized training in child and adolescent development. (RR 1/Pre-Trial 1/27/03, Page 7). Dr. Goodness explained that the human brain and the frontal lobe development of human beings is not complete until age 21. Due to a lack of full brain development at age 18, Goodness indicated that adolescents are less culpable than adults and that in her discipline age 21 or 22, not 18, comes closest to the date of actual adult maturation. (Pre-Trial 1/27/03, Page 13). Despite Applicant's complaints the trial court overruled Applicant's motion maintaining that the death penalty should not be inflicted on offenders under 21 years of age.

In March 2005 the Supreme Court determined in <u>Roper v. Simmons</u>, 125 S.Ct. 1183 (205) that the 8th Amendment forbade capital punishment for offenders committing offenses while under 18 years of age. The Court majority, through Justice Kennedy, discussed at length the distinct social purposes served by the death penalty and the lack of those purposes being accomplished with offenders of a young age. The <u>Roper</u> Court concluded that retribution and deterrence seemed to have little if any applicability to very young offenders. <u>Roper</u>, Supra, Page 1195; <u>Gregg v. Georgia</u>, 428 US 153, 183 (1976). Under the facts of <u>Roper</u>, the Court determined to draw a line at 18 years of age as the

58

point where society had drawn the line marking the transition from childhood to adulthood and therefore age 18 was adopted by the Supreme Court in <u>Roper</u>.  <u>Roper</u>, Supra, Page 1198.

However scientific inquiry reviewed by the Court in <u>Roper</u> mentions the vast differences between juvenile and adult offenders; Dr. Goodness is not the only mental health professional who has formed the opinion that young people do not have complete brain development until perhaps ages 21 or 22.

Three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders.  First, as any parent knows and as the scientific and sociological studies respondent and his amici cite tend to confirm, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young.  These qualities often result in impetuous and ill-considered actions and decisions."

The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure.

The third broad difference is that the character of a juvenile is not as well formed as that of an adult.  The personality traits of juveniles are more transitory, less fixed.

These differences render suspect any conclusion that a juvenile falls among the worst offenders.  The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." <u>Thompson</u>, Supra at 835, 108 S.Ct. 2687 (plurality opinion).

From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.

Applicant believes that there is reason to criticize the bright line that only persons under 18 years of age are not death penalty worthy. What is at stake in decisions concerning the 8th Amendment is that the 8th Amendment seems to derive its meaning from evolving standards of decency that mark the progress of a maturing society. TROP v. Dallas, 356 US 86, 100-101 (1958). Despite Applicant being officially over 18 years of age he is still an adolescent lacking complete mental development as do all other human beings under 21 years of age. Thus, evolving standards would indicate that the manner in which to determine who was an adolescent and was not an adolescent must be something more than counting the days, months and years adding to one's numerical age.

Applicant understands that this Court must by necessity go on precedent. However, Applicant raises this issue in the event a court of appropriate rule-making authority might grant relief on this complaint.

60

## XI.

THE TRIAL COURT'S SUPPLEMENTAL INSTRUCTION IMPROPERLY COERCED THE JURY TO ANSWER ISSUE NO. TWO, ALLOWED THE JURY TO ANSWER "YES" TO ISSUE NO. TWO WITHOUT REQUIRING ALL TWELVE JURORS TO ANSWER IN THE AFFIRMATIVE TO SPECIAL ISSUE NO. TWO, WAS AN IMPERMISSIBLE COMMENT ON THE WEIGHT OF THE EVIDENCE BY THE TRIAL COURT AND PREVENTED THE JURY FROM CONSIDERING THE CIRCUMSTANCES OF THE OFFENSE FAVORABLE TO APPLICANT THAT MIGHT HAVE BEEN CONSIDERED MITIGATING EVIDENCE IN VIOLATION OF THE APPLICANT'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE U. S. CONSTITUTION.

THIS GROUND FOR REVIEW IS ADEQUATELY EXPLAINED FACTUALLY AND LEGALLY IN THE WRIT ITSELF. THEREFORE, APPLICANT ADOPTS THE LANGUAGE AND ARGUMENTWS FROM HIS WRIT IN THIS MEMORANDUM AS IF PHYSICALLY PLACED WITHIN THIS DOCUMENT.

## XII.

### APPELLANT'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AND THE SIXTH AMENDMENT WERE VIOLATED WHEN THE STATE INTERFERRED WITH APPELLANT'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

Trial counsels bear a heavy responsibility to properly evaluate and investigate a capital murder case. Trial counsel to be effective should present to the sentencing entity any and all mitigating evidence which might be available. The Eighth Amendment gives capital defendants the right to introduce any and all relevant mitigating evidence. Skipper v. South Carolina, 476 US 1, 8 (1986). Without mitigation evidence a jury is then called upon to determine whether a man they do not know will live or die and unless presented with particular circumstances of his past may have been prevented from being empowered to balance fairly the seriousness of his transgressions with the conditions of his life. Collier v. Turpin, 177 F.3d 1184, 1204 (11th Cir. 1999). An accused must humanize himself before the sentencing authority. Brownlee v. Haley, 306 F.3d 1043 (11th Cir. 2002). Each accused person is different and requires preparation for sentencing.

> "A process that accords no significance to relevant facets of the character and record of the individual offender are the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of mankind. It treats all persons convicted of a designated offense not as uniquely individual human beings but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death."

The American Bar Association in its ABA Guidelines for Capital Counsel issued as far back as 1989 encouraged counsel to present all

reasonably available evidence in mitigation unless there is some strategic reason to forego some portion of that evidence. Such evidence includes medical history, educational history, family and social history, rehabilitation of potential client, record of prior offenses and expert testimony. <u>ABA Guidelines</u> 11.8.6 (1989). Such guidelines were referred to in <u>Strickland</u> but by the time of <u>Wiggins v. Smith</u>, these guidelines had become well-defined norms. <u>Strickland v. Washington</u>, 466 US at 688, <u>Wiggins v. Smith</u>, 123 S. Ct. at 2536.

According to affidavits taken in support of Applicant's state writ at least three witnesses desired to give testimony which would have been admissible at punishment but refrained from doing so because they were either told not to visit with defense counsel or encouraged to stay away from defense counsel and defense investigators. If defense counsel is going to carry out the heavy burden to prepare adequately and present evidence the defense should be able to do so without interference from the state. When the state takes action to prevent a witness from testifying that Applicant had positive character traits and a witness does not support administering the death penalty to applicant the defense should be able to use such testimony at punishment. Patricia McCoy and Darnell McCoy would have given admissible testimony that Applicant was not a future danger and before the incident with Doyle Douglas had never been seen to act mean or violent. Patricia McCoy was also familiar with Applicant's drug use and addiction prior to the two murders. Both witnesses would have expressed opinions that Defendant's behavior was not normal and had more to do with the use of controlled substances than equaling Applicant's normal personality.

The objective of the Sixth Amendment is to insure a fair trial for persons like Applicant. <u>Strickland</u> Supra 686-687. Trial counsel has the duty to bring to bear skills or knowledge that will render the trial a reliable adversarial testing process. <u>Harris v. Day</u>, 226 F.3d 361, 264 (5th Cir. 2000). Applicant argues that the totality of his trial counsel representation is adversely affected when the State through any of its agents attempts to encourage or prevent witnesses from being interviewed or offering information that may be discoverable. If counsel's failure to present such witnesses is occasioned not by adequate investigation but by the State's tactics preventing counsel from uncovering discoverable mitigation evidence, Applicant's right to due process and effective assistance of counsel as guaranteed by the Fourteenth and Sixth Amendments is negatively impacted by such state action.

## PRAYER

For the foregoing reasons, Applicant/Petitioner respectfully prays that this Court:

1. Grant the writ returnable to Texas Court of Criminal Appeals;
2. Hold evidentiary hearing;
3. Enter a Judgment ordering Petitioner's release, reforming his sentence to Life Imprisonment, or remanding him to custody of the local Sheriff to answer the indictment or consider punishment, as the law and facts may require.

RESPECTFULLY SUBMITTED,

_____
J.K. Rusty Wall #20756500
Law Office of J.K. Rusty Wall
P.O. Box 50123
Midland, Tx. 79710-0123
432-682-1522; 432-682-0510

_____
Ori T. White #21321600
Law Office of Ori White
P.O. Box 160
Ft. Stockton, Tx. 79735-0160
432-360-9286

## AFFIDAVIT

State of Texas }
County of Midland }

On this the 20th day of December, 2007, appeared J.K. Rusty Wall, a person known to me, who, after being by me first duly sworn, deposed and said:

My Name is J.K. Rusty Wall, and I am an attorney licensed by the State of Texas. I am one of the lawyers for Clinton Young, the Applicant, Petitioner, in the numbered and titled cause mentioned above. I have read the allegations in the above and forgoing Memorandum in Support of Petition for Habeas Corpus and the allegations therein are true and correct according to my belief.
Further Affiant Sayeth Not.

_____
J.K. Rusty Wall

SUBSCRIBED AND SWORN TO before me; the undersigned authority on this the 20th Day of December 2007.

*[Notary seal: CECIL ANN CARTER, MY COMMISSION EXPIRES March 25, 2009]*

Notary Public in and for
THE STATE OF TEXAS
My Commission Expires:

## Memorandum Certificate of Service

On the 20th day of December, 2007, a copy of the foregoing Memo in support of Petition for Habeas Relief was served by United States Mail, postage-prepaid to Stephen Hoffman, Assistant Attorney General P.O. Box12548 Capitol Station, Austin, Tx. 78711.

J. K. Rusty Wall