DONALD VERNAY (Texas State Bar No. 24035581)
1604 Golf Course Road SE
Rio Rancho, New Mexico  87124
(Email: Minimal1243@yahoo.com)
Telephone: (505) 892-2766
Facsimile: (505) 892-8119

SEAN K. KENNEDY (California Bar No. 145632)
Federal Public Defender
MARGO A. ROCCONI (California Bar No. 156805)
(E-mail:  Margo_Rocconi@fd.org)
BRAD D. LEVENSON (California Bar No. 166073)
(E-mail:  Brad_Levenson@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California  90012-4202
Telephone: (213) 894-7521/2026
Facsimile: (213) 894-0081

Attorneys for Petitioner
CLINTON LEE YOUNG

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

## MIDLAND DIVISION

| | |
|---|---|
| CLINTON LEE YOUNG,<br><br>          Petitioner,<br><br>     v.<br><br>NATHANIEL QUARTERMAN,<br>Director, Texas Department of Criminal Justice, Correctional Institutions Division,<br><br>          Respondent. | NO. 7:07-CV-00002-RAJ<br><br>**DEATH PENALTY CASE**<br><br>**FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBITS**<br><br>[28 U.S.C. § 2254] |

Clinton Lee Young ("Petitioner" or "Mr. Young"), through his attorneys, files this First Amended Petition for Writ of Habeas Corpus on the ground that he is unlawfully held in custody, in violation of the laws and constitutions of the United States of America, by the Texas Department of Criminal Justice, Nathaniel

Quarterman, Director.

# I.

## STATEMENT OF FACTS

**A.    Introduction**[1]

1.     Not since 1970, and certainly not in Al Schorre's then seventeen-year career as the District Attorney of Midland County had Schorre's office been able to secure a death conviction.[2]  With Clinton Young's arrest, however, Midland County decided that its luck was going to change, no matter what the cost.

2.     In order to secure a death conviction, the State failed to turn over material exculpatory evidence and further, knowingly presented false testimony at Mr. Young's trial.  Unbeknownst to the defense, David Page, the only person who was with Mr. Young at the time of both the Doyle Douglas and Samuel Petrey homicides, and Mark Ray, the individual who fired the final (and perhaps fatal) shot into Douglas's head the night of the crimes, secretly negotiated with the State for reduced charges and sentences in exchange for their testimony against Mr. Young.  Not only did the State fail to turn over this material, exculpatory evidence, the State knowingly presented testimony at a pre-trial hearing that no such deals existed.  The withholding of the evidence regarding Page's and Ray's plea negotiations, and the knowing presentation of perjured testimony, mandate that Mr. Young's conviction be overturned.  *See Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Napue v. Illinois*, 360 U.S. 264,

---

[1]  "CR" "RR" and "SRR" respectively refer to the Clerk's Record, the Reporter's Record, and the Supplemental Reporter's Record of Mr. Young's trial. "CWR" and "RWR" respectively refer to the Clerk's Writ Record and Reporter's Writ Record of Mr. Young's state writ proceeding.  Exhibits will be referred to in an abbreviated manner as, "Ex,"and either have been previously filed in this Court or are being filed concurrently with this amended petition.

[2]  And, as of the date of the filing of this Amended Petition, has not been able to secure one since.

269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).

3.     The State further failed to turn over material, exculpatory evidence concerning State's witness A.P. Merillat.  Unbeknownst to the defense, Merillat, a Senior Criminal Investigator with the Special Prosecution Unit of the Texas Department of Criminal Justice, was conferring benefits to inmates in Texas prisons.  The communications between Merillat and various inmates were in direct contradiction to facts testified to by Merillat at Mr. Young's trial, and raise doubt as to Merillat's credibility and the accuracy of his testimony.  This evidence would have been used to impeach his credibility.

4.     The State also interfered with Mr. Young's investigation and presentation of mitigating evidence in the punishment phase.  After improperly receiving the sealed billing records of the defense's mitigation specialist/social historian, Gerald Byington, the State reported Byington to the Texas Commission on Private Security, alleging Byington was conducting investigatory work illegally.  The result of the prosecutor's actions was to foreclose the defense from properly investigating and presenting a social history of Mr. Young, which should have been presented at trial.

5.     The State also failed to investigate two of the major crime scenes, and the police work at the Petrey murder scene was sloppy, at best.  Specifically, the State never investigated the location where Douglas was originally shot (where authorities would have found shell casings on the ground which were fired from Page's gun, proving Page, not Young, shot Douglas), nor the place where Petrey was originally kidnapped (where eyewitnesses would have identified Page as the kidnapper, not Mr. Young).

6.     Further, the State conducted sloppy police work at the Petrey murder scene including, but not limited to: failing to secure and analyze the Petrey murder scene; overlooking evidence in plain view, including tire marks, a tire iron, and

Pages's gloves; and failing to make a photo log of everything that was collected at the scene.

7.     Not only was Mr. Young the subject of rampant prosecutorial misconduct, Mr. Young was tried by a biased judge. Judge John C. Hyde, of the 385th District Court in Midland County, Texas, made up his mind about Mr. Young's guilt and punishment of death before the trial even began. Before the commencement of opening statements, before any evidence was introduced to the jury, and even before the adversarial process had commenced, the trial judge had "pre-judged" Mr. Young as a dangerous man, worthy of the death penalty. Judge Hyde believed that not only was Mr. Young dangerous, but he was "fully capable" of harming other people if he was not convicted of capital murder. This same judge then sat as both judge and jury over Mr. Young's motion for new trial, and state post-conviction litigation. Judge Hyde's actual bias is structural error warranting a new trial. *Richardson v. Quarterman*, 537 F.3d 466, 473 (5th Cir. 2008), *citing Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35 (1999); *see Edwards v. Balisok*, 520 U.S. 641, 647, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997).

8.     Moreover, while Mr. Young's trial counsel tried hard to defend their client, their performance in key areas was objectively unreasonable, causing Mr. Young prejudice. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 2674 (1984).

9.     Trial counsel failed to investigate how the State obtained Mr. Young's Texas Youth Commission records before any charges against Mr. Young were filed. Had they investigated, counsel would have discovered the records were not only illegally obtained by the State, but also that, as District Attorney Schorre later admitted at a pre-trial hearing, those records were used by the State in deciding to charge Mr. Young with the death penalty. Counsel further failed to object to the records on hearsay and confrontation grounds.

10.    Trial counsel further failed to present ballistics evidence that conclusively would have demonstrated that Mr. Young did not shoot Petrey, as testified to by David Page.  The ballistics evidence also would have raised a reasonable doubt as to Mr. Young's participation in the Douglas murder.

11.    Trial counsel also failed to investigate and present a complete social history of their client.  By conducting only cursory interviews of some family members, defense counsel stopped short of making a reasonable investigation for purposes of uncovering relevant mitigating evidence.

12.    Not only was Mr. Young a subject of ineffective trial counsel, Mr. Young was represented by incompetent counsel for purposes of his state post-conviction proceeding.  *See Ex parte Graves*, 70 S.W.3d 103, 114 (Tex. Crim. App. 2002); *Ries v. Quarterman*, 522 F.3d 517, 526 n.5 (5th Cir. 2008).  Gary Taylor was appointed by the court to represent Mr. Young to challenge, at the state level, the constitutionally of his conviction for capital murder and his sentence to death, the ultimate punishment.  Mr. Taylor's incompetence stemmed from his failure to adequately direct and supervise his primary investigator/mitigation specialist, Lisa Milstein, in this case and prior cases, despite evidence that Milstein was undergoing psychological problems and drug addiction that led Milstein to invent unmeritorious claims and to submit unsupportable affidavits.  In Mr. Young's case, it came to light at the state evidentiary hearing that Milstein had bought and smoked crack cocaine with a witness, and offered herself sexually to that same witness so that the witness would sign an affidavit which supported Milstein's false allegation that Mr. Young's father sexually molested Mr. Young.  Mr. Taylor did not adequately direct and supervise Milstein, and then withdrew from the case before the hearing.  Taylor's incompetence caused prejudice to Mr. Young's state post-conviction litigation in that Taylor did not investigate and

5

present meritorious claims as he spent all his energy focusing on the unsupportable sexual molestation claim.[3]

13.     The question before this Court is whether there is federal constitutional redress for the multiple wrongs which befell Mr. Young.  The answer to that question must be in the affirmative.

**B.     The Life History of Clinton Lee Young**

**1.     Introduction**

14.     Mr. Young is a portrait of what can go wrong when a young person is born into, and travels through, a life filled with emotional and physical abuse, lack of stability, structure, and support, and with no positive role models to emulate. At almost every turn, Mr. Young experienced failure -- at home, in school, with relationships, and at various community based systems like the Waco Center for Youth and the Texas Youth Commission.  Although these systems were established to provide treatment and structure to aid Mr. Young, they instead contributed to his continued failure because, although they identified some of his problems, they failed to implement adequate treatment.   (Ex. 96 [Decl. of Toni Knox at ¶ 183].)

15.     Mr. Young was born genetically loaded toward mental illness and chemical dependency.  To complicate matters, Mr. Young's educational and social development were affected by numerous social and familial problems which surrounded him.  These combined factors affected Mr. Young's social functioning, impulse control, and curbed development of appropriate skills from a very young age. (Ex. 96 at ¶ 8 [Decl. of Knox].)

16.     Mr. Young suffers from Attention Deficit Hyperactivity Disorder (ADHD), which was diagnosed at an early age.  Mr. Young's ADHD was and is a

---

[3] Furthermore, Mr. Young's appellate counsel, Rusty Wall, was also ineffective.  For that matter, Mr. Wall and Ori White, who served as Mr. Young's prior federal habeas counsel, were also ineffective.

medical problem. ADHD is a biological and chemical malfunction in an immature brain. The effects of Mr. Young's genetically and biologically determined impulsive and distractible response style was aggravated by the chaotic, traumatic home environment in which he spent his formative years. Children who suffer from severe ADHD disorder require intensive limit setting and a stable environment. It was unlikely that any adult in Mr. Young's home could have provided such structure or stability. (Ex. 97 at ¶ 24 [Decl. of Dr. Daneen Milam].)

### 2.   The Family Mr. Young Was Born Into

17.   Mr. Young's mother, Carla Lynn Wade, was abandoned by her own biological mother who would not care for her.[4] And although Carla had a good relationship with her adoptive father, who was also her great uncle, she did not have a good relationship with her adopted mother, who was not nurturing. (Exs. 96 at ¶¶ 10, 12, 24-26 [Decl. of Knox]; 123 at ¶¶ 2-4 [Decl. of Carla Sexton].)

18.   Mr. Young's father, Billy Young, was a womanizer who abused his wives. Billy had three children with his first wife, Rebecca. Those children were Sharon Renee, and twin boys, Dino and Dano. Billy was physically abusive to Rebecca and after he divorced her, soon after the birth of the twins, Rebecca "disappeared" and subsequently had very little contact with her children. (Ex. 96 at ¶¶ 18, 29 [Decl. of Knox].)

19.   Billy next met and married Frances May, a sixteen-year-old waitress. Billy was ten years older than Frances May when they met. Billy and Frances May had one child together, Christy Lynn. Billy was physically abusive to Frances May, and the two separated soon after the birth of their daughter. (Ex. 96 at ¶¶ 19-20 [Decl. of Knox].)

20.   Carla was seventeen when she met Billy in 1982. The two married in 1983. And while Carla loved Billy's children, they all were "train wrecks," and

---

[4] When the two meet and reconciled years later, Carla's biological mother introduced Carla as her cousin. (Ex. 123 at ¶ 5 [Decl. of Carla Sexton].)

she was ill-equipped to handle the responsibility of raising four children. Further, Billy was physically abusive to Carla, as he was with his previous wives. Carla was even abused by Billy when she was pregnant with Clint. (Exs. 96 at ¶¶ 25-26 [Decl. of Knox]; 123 at ¶¶ 8, 10-11 [Decl. of Sexton].)

### 3.    Mr. Young's Pre-disposition for Addiction and Mental Illness

21.    A person can be predisposed to mental illness and addiction through genetics. (*See* Exs. 96 and 97.)

22.    By all accounts, alcoholism and mental illness were present in Mr. Young's maternal family. It is reported that Carla's biological grandfather suffered from alcoholism, and Carla had an aunt with serious mental illness. (Exs. 96 at ¶ 13 [Decl. of Knox]; 123 at ¶¶ 5, 7 [Decl. of Sexton].)

23.    In Mr. Young's paternal family, both his father, Billy, and grandfather, William, were alcoholics. (Ex. 96 at ¶¶ 16, 21, 33, 46, 137, 139 [Decl. of Knox].) Billy also used marijuana and cocaine. (Ex. 96 at ¶¶ 23, 35, 46, 137-38 [Decl. of Knox].) Billy's family also suffered from manic depression. (Ex. 96 at ¶ 139 [Decl. of Knox].)

### 4.    Mr. Young's Early Years

24.    Mr. Young was born on July 18, 1983, three weeks prematurely due to induced labor brought about by Carla's hypertension. (Exs. 1 and 2) Almost certainly Billy's physical abuse and the burden of caring for Billy's children contributed to Mr. Young's early birth. (Exs. 96 at ¶ 27 [Decl. of Knox]; 123 at ¶ 11 [Decl. of Sexton].)

25.    After enduring Billy's drinking and physical abuse, Carla separated from Billy in 1984. Carla first went to live with her family, from whom she had been estranged, and then moved to a friend's house. Mr. Young celebrated his first birthday in this chaotic time. (Exs. 96 at ¶¶ 51-52 [Decl. of Knox]; 123 at ¶ 13 [Decl. of Sexton].)

26.     On April 5, 1985, Mr. Young suffered a febrile seizure. Less than two months later, Mr. Young suffered a second seizure. Both times, a spinal tap and other tests were performed on Mr. Young. During this time period, Carla met and began dating Quentin Sexton. (Exs. 96 at ¶¶ 52-53, 119 [Decl. of Knox]; 123 at ¶¶ 14, 16 [Decl. of Sexton].)

27.     In 1986, while Carla and Quentin were engaging in an on-again, off-again relationship, Billy took Mr. Young from Carla and refused to give him back unless she signed papers relinquishing her custodial rights. Billy wanted custody rights over Mr. Young not because he wanted to raise his son, but because he wanted to avoid child support payments. Only when Carla signed the legal paperwork did Billy return Mr. Young. (Exs. 96 at ¶ 56 [Decl. of Knox]; 123 at ¶ 15 [Decl. of Sexton].)

28.     Despite the constant fighting and instability in their relationship, Quentin and Carla married in March 1987 when Mr. Young was three years old. (Exs. 96 at ¶ 58 [Decl. of Knox]; 123 at ¶ 16 [Decl. of Sexton].) By the age of four, Mr. Young's hyperactivity was noticeable to Carla and others. The initial diagnosis was ADHD, an illness that plagues Mr. Young to this day. (Ex. 96 at ¶¶ 128-29 [Decl. of Knox].)

29.     At first, Mr. Young was prescribed medication exclusively from the stimulant family. The popular drug for ADHD for many years was Ritalin. Mr. Young was started on Ritalin in October 1989. He frequently reported "stomach aches" related to the drug. Later, school and medical records indicated that Mr. Young frequently ran out of medication and that Carla did not always follow the prescribing instructions. (Ex. 96 at ¶ 129 [Decl. of Knox].)

**5.     Family Life and School**

30.     Billy was an uninvolved parent, and did not provide his children with parenting support or advice. (Ex. 96 at ¶ 31 [Decl. of Knox].) Billy was abusive to all his children, but especially to Mr. Young. When Mr. Young was between

four and six years old, Billy threw Clint against a bathroom wall and began to "beat[] the hell out of [him]." (Exs. 96 at ¶¶ 33-34 [Decl. of Knox]; 123 at ¶ 10 [Decl. of Sexton].)  On a couple of occasions, Billy hit Mr. Young with a wooden board.  On still another occasion, Billy knocked Mr. Young to the floor and dragged and beat him.  Mr. Young was left with bruises. (Ex. 96 at ¶¶ 47-48, 153, 155 [Decl. of Knox].)   Billy was also emotionally abusive to Mr. Young.  (Ex. 96 at ¶ 157 [Decl. of Knox].)

31.    Carla became so angry with Billy's unsupportive attitude and abusive behavior that when Mr. Young was around five years old, she changed his name from William Clifton Young, III to Clinton Lee Young. (Exs. 96 at ¶ 60 [Decl. of Knox]; 123 at ¶¶ 21-22 [Decl. of Sexton].)

32.    Carla frequently felt torn between Quentin and her son.  On the other hand, Quentin was forced to take on the care of Mr. Young, who was not his biological child.  Mr. Young was very aware that Quentin did not love him and often rebelled against his rigid rules and treatment. (Ex. 96 at ¶ 169 [Decl. of Knox].)  Mr. Young was also physically and emotionally abused by Quentin. (Ex. 96 at ¶¶ 77, 97, 157-58 [Decl. of Knox].)

33.    Under this backdrop, Mr. Young found himself constantly getting into trouble at home and school, whether he was defacing a text book or dropping a match into the lawnmower burning his eyebrows and eyelashes. (Exs. 96 at ¶¶ 61-62 [Decl. of Knox]; 123 at ¶ 24 [Decl. of Sexton].)

34.    Carla became so frustrated with her son's behavior that in 1993, she took him to a doctor for an EEG and CT scan.  The EEG indicated slower brain waves for someone Mr. Young's age. (Ex. 96 at ¶¶ 61-62, 128, 162 [Decl. of Knox].)

35.    Two days later, Mr. Young took an unloaded antique collector's item gun to school.  Carla was arrested for "endangering a child" because the gun was left so that Mr. Young had access to it.  Shortly after this incident, Mr. Young was

evaluated at the school to determine if he met the criteria for "Emotionally Disturbed Special Education Services." A Dr. Walker determined that Mr. Young met the criteria for special education services because of his behavior. Mr. Young was administered the Wechsler Intelligence Scale for Children III (WISC III). Mr. Young's Full Scale IQ was 112. (Ex. 96 at ¶ 65 [Decl. of Knox].) After the incident at school and her arrest, and without waiting for the school year to end, Carla sent Mr. Young to live with his father in Wyoming. (Exs. 96 at ¶¶ 65-66 [Decl. of Knox]; 123 at ¶ 27 [Decl. of Sexton].)

36.     A few weeks later, while registered in the fourth grade at a school in Gukkettem, Wyoming, Mr. Young was administered a Test of Conduct and Emotional Problems. This test indicated Mr. Young suffered from a high level of dysfunction. (Ex. 96 at ¶¶ 67 [Decl. of Knox].)

37.     By the Fall of 1993, Mr. Young was sent back to live with his mother. Carla enrolled Mr. Young into a special education program at Avinger Elementary. (Ex. 96 at ¶ 70 [Decl. of Knox].)

**6.     Early Treatment**

38.     At age nine, Mr. Young was switched from Ritalin to a different stimulant, Cylert. In 1994, Mr. Young was started on a trial of Thorazine, an anti-psychotic, sedating drug. The Thorazine was stopped quickly because it caused Mr. Young to suffer breathing problems and palpitations. Mr. Young remained on Cylert for about three years. (Ex. 96 at ¶ 130 [Decl. of Knox].)

39.     Mr. Young was charged with theft at the age of ten, and was seen by Dr. Ray Scardina at the Tyler Psychiatric Clinic. Mr. Young was again diagnosed with ADHD. (Ex. 96 at ¶¶ 70, 129 [Decl. of Knox].)

40.     It was recommend that Mr. Young be admitted to a residential treatment facility where he would receive structure, medication, and individual and family therapy. However, instead of receiving the recommended treatment, Mr. Young was placed in a group home called Triangle Pines. While there, Mr.

Young frequently begged to come home and promised his behavior would be better if he could return to living with Carla. (Exs. 96 at ¶¶ 71-72 [Decl. of Knox]; 123 at ¶ 28 [Decl. of Sexton].)

41.    Mr. Young's placement at Triangle Pines provided only a displacement of his problems, although it offered some respite for Carla, who was growing weary of reacting and struggling to care for her troubled child.   Mr. Young's placement at this particular group home was a stark mismatch.  Most such homes served as foster care facilities and/or re-entry and step-down type facilities for adolescents who had long term residential treatment, which was not the case with Mr. Young.  He did not fit in at Triangle Pines, and ended up an outstanding problem. (Ex. 96 at ¶ 73 [Decl. of Knox].)

42.    For Mr. Young to have been properly treated at Triangle Pines, the entire family, including Carla, Quentin, and Billy, would have had to be involved. They would have had to make some sacrifices, which at the time, given their own personal and interpersonal challenges, they simply could not, or would not, do. (Ex. 96 at ¶¶ 74, 169 [Decl. of Knox].)

43.    Given that there was no adequate treatment for Mr. Young at Triangle Pines, there was no significant improvement in Mr. Young's mental health.   The day before his eleventh birthday, Mr. Young was removed from the group home because he showed no signs of progress.   (Ex. 96 at ¶ 75 [Decl. of Knox].)

44.    In the fall of 1994, prior to being enrolled in public school, Mr. Young was re-evaluated by Dr. Scardina, who again diagnosed Mr. Young as suffering from ADHD, Severe, Conduct Disorder, Undifferentiated; Developmental Written Language Disorder, and History of Febrile Seizures. (Ex. 96 at ¶¶ 76, 130 [Decl. of Knox].)  In addition to his problems at school, Mr. Young was also reacting to the worsening problems at home.  Quentin's drinking had become heavy, and he was becoming increasingly verbally abusive to both Carla and Mr. Young. (Ex. 96 at ¶ 77 [Decl. of Knox].)

45.     Mr. Young received further school testing in the winter of 1996.  He was again administered the WISC-III.  Mr. Young's scores were similar to his original scores:  his Full Scale IQ was 115, and he was again diagnosed with ADHD.  (Ex. 96 at ¶ 78 [Decl. of Knox].)

46.     At age thirteen, with Carla working extensive hours, supervision of Mr. Young was badly compromised.  On August 8, 1996, Mr. Young was arrested and charged with burglary.  Mr. Young was enrolled in the eighth grade but was withdrawn five days later and sent to live with his father in North Carolina.  Subject again to the family's emotionally charged twists and turns, destabilization and disruption had become the norm in Mr. Young's life.  (Ex. 96 at ¶ 79 [Decl. of Knox].)

47.     Mr. Young always felt like an "outsider" due to the fact he was tossed back and forth between his families.  When Mr. Young went to stay with Billy, it was not because his father was anxious to have him, it was because his mother was usually frustrated with her son's behavior.  Each time Mr. Young was thrust into another family setting, there was little planning or thought about his feelings.  (Ex. 96  at ¶ 170 [Decl. of Knox].)

48.     While in North Carolina, Mr. Young had minimal supervision, smoked marijuana, and also tried crack cocaine and acid.  Mr. Young also drank alcohol on the weekends.  When Mr. Young's father relocated from North Carolina to Daingerfield, Texas, Mr. Young was again withdrawn from school.  (Ex. 96 at ¶¶ 79-80 [Decl. of Knox].)

49.     During this last period that Mr. Young was living with Billy in Texas, Billy was arrested for injury to a child after he assaulted Mr. Young.  Billy assaulted Mr. Young with his fists, neck, and body.  Billy's sister finally stopped Billy from further hurting Mr. Young.  (Ex. 96 ¶ 154 [Decl. of Knox].)

//

//

### 7.    Mr. Young Enters a World of Institutions

50.    When Mr. Young was fourteen years old, while Carla and Quentin were out of town, Mr. Young stole a friend's car and took an eight-year-old boy and twelve-year-old girl to Louisiana with him.  Soon after this incident, Mr. Young was withdrawn from Jefferson High School, which would be his last opportunity to interact as a teenager in a non-correctional school. (Ex. 96 at ¶ 82 [Decl. of Knox].)

51.    In December 1997, Mr. Young was charged with burglary of a habitation.  After his arrest, he was incarcerated at the juvenile detention center for more than a month until he could be placed.  In January 1998, Mr. Young was admitted to the Waco Center for Youth by the Texas Department of Mental Health and Mental Retardation.  (Ex. 96 at ¶ 83 [Decl. of Knox].)

52.    The Waco Center for Youth was the only state-funded residential program for adolescents age thirteen to eighteen in Texas.  Admission to the eighty-two bed unit required a mental health diagnosis.  Dr. Helen Short was the only psychiatrist responsible for seeing the patients at the Waco Center.  Dr. Short initially diagnosed Mr. Young with ADHD, Primarily Inattentive, Conduct Disorder and a Disorder of Written Expression.  (Ex. 96 at ¶¶ 83-85 [Decl. of Knox].)

53.    When Mr. Young arrived at the Waco Center, he was taking Adderral. Although the drug had not appeared to be helpful for Mr. Young, Dr. Short decided to continue to treat Mr. Young with the drug.  Mr. Young continued to exhibit hyperactive and impulsive behavior.  After Mr. Young was involved in an altercation with a peer, Dr. Short doubled the dose of the same medication.  Mr. Young became even more aggressive.  Dr. Short eventually changed Mr. Young to another stimulant and he continued to exhibit aggressive behavior.  When Mr. Young did not respond to the next stimulant drug, he was kept from all activities, including school and the cafeteria.  While on total restriction, Mr. Young's

behavior worsened and, on one occasion, he was put into restraints. (Ex. 96 at ¶¶ 86, 131 [Decl. of Knox].)

54.     While being housed at Waco for several months, Mr. Young had received little in the way of treatment.  On restriction, he was unable to attend group therapy or any other therapeutic activities.  After two months, Dr. Short changed Mr. Young's medication from a stimulant to an anti-depressant: Wellbutrin.  Mr. Young did not respond to the Wellbutrin and got into an altercation with a peer.  (Ex. 96 at ¶¶ 87, 131-32 [Decl. of Knox].)

55.     Despite Waco's mission statement -- "It is our responsibility to provide a long-term treatment environment that supports behavior change" -- Mr. Young's stay at Waco represented a worst-case scenario for a severe ADHD patient.  He received no more than three hours per week of therapeutic activities, he was restricted from school, and confined to an unstructured and punitive setting.  Inevitably, the pure disciplinarian approach failed.  (Ex. 96 at ¶¶ 88-89 [Decl. of Knox].)

56.     In April 1998, Mr. Young was found to have committed an assault and indecency against another youth.  The incident involved what was initially horseplay between Mr. Young and another Waco resident.  The horseplay got out of hand, with both participants becoming angry, and it was alleged that Mr. Young pulled his penis from his pants and attempted to stick it in the other youth's ear. (Ex. 96 at ¶ 90 [Decl. of Knox].)

57.     Mr. Young was charged with Indecent Exposure to a Child and labeled a "sex offender."  Due to the nature of the charges, Mr. Young was required to register on the State of Texas Sexual Offender list.  Although this requirement was later lifted in October 2001, it was yet another instance where Mr. Young was made to feel even more like a criminal and re-enforced to him his sense of failure. (Ex. 96 at ¶ 91 [Decl. of Knox].)

58.    Throughout the years, Mr. Young has steadfastly denied that he is a sexual predator. However, it became a focal point in many of the conversations and interviews he has had with mental health professionals. The valuable time spent addressing this "problem" might well have been used to work with Mr. Young on tangible problems including his chemical dependency and mental health issues. (Ex. 96 at ¶ 92 [Decl. of Knox].)

59.    In May 1998, after spending nearly five months at Waco, Mr. Young was given a psychological evaluation by Deborah Kintner. Mr. Young's Full Scale IQ was 112, but it appeared that Mr. Young might have been suffering from a mood disorder and that he had difficulty with impulse control. Projective testing revealed Mr. Young's feelings of inadequacy, insecurity, and inferiority. Ms. Kintner reported it was likely that Mr. Young compensated for his feelings of inadequacy with hostility and aggression. The tests also revealed that Mr. Young viewed himself as a failure and was having feelings of hopelessness, perhaps a result of his childhood full of placements and replacements, dismissals and expulsions. Failing out of Waco, Mr. Young was placed at the Texas Youth Commission ("TYC"). (Ex. 96 at ¶¶ 95-96 [Decl. of Knox].)

## 8.    Years at TYC

60.    A TYC facility is a highly-structured and consequence-based environment. Youths are monitored twenty-four hours a day, seven days a week. Routine evaluations are based on a youth's ability to follow the rules, maintain self-discipline, and integrate with others. Mr. Young's initial mental needs assessment at TYC was rated as having moderate needs and was described as having a mood disorder. Mr. Young's assessment also indicated he was likely to have been subject to physical and emotional abuse and neglect. (Ex. 96 at ¶¶ 97-98 [Decl. of Knox].)

61.    In August 1998, a psychiatrist, Dr. Groves, noted Mr. Young was having trouble with anger, impulsivity, and restlessness, as well as difficulty

16

focusing, and that he was easily distracted. Dr. Groves diagnosed Mr. Young with ADHD, Combined and Conduct Disorder. Mr. Young was prescribed Wellbutrin. (Ex. 96 at ¶ 135 [Decl. of Knox].)

62.    In September 1999, in yet another attempt to properly medicate him, Mr. Young was prescribed Depakote, a mood stabilizer used to treat bi-polar disorder. Mr. Young remained on Depakote until February 2001, when he was discharged from TYC. Mr. Young had also been restarted on Clonidine. While taking the combination of Depakote and Clonidine, Mr. Young's behavior, and his symptoms, significantly improved. (Ex. 96 at ¶ 136 [Decl. of Knox].)

63.    Although during his stay at TYC Mr. Young had numerous incidents of failure to comply with rules, there is evidence that Mr. Young attempted to adapt by working with his psychiatrist to evaluate and improve his therapy. Mr. Young also imposed sanctions upon himself in order to avoid conflicts with the rules, TYC staff, and other youths. (Ex. 96 at ¶ 105 [Decl. of Knox].)

64.    Mr. Young was also able to form good relationships with several of the guards at TYC. A female guard that knew Mr. Young for his entire stay at TYC realized that Mr. Young was hyper and in turn, she tried to keep him busy, which usually kept him out of trouble, and subsequently, she had no problems with him. This guard, recognizing Mr. Young's restlessness, would allow him to come out of his "personal area" and help with chores. The correctional officer even had a pet name for Mr. Young, calling him "her boy." Mr. Young's behavior with this guard exemplifies how well he responded to someone who furnished the positive attention and support he needed. (Exs. 96 at ¶ 106 [Decl. of Knox]; 97 at ¶ 20 [Decl. of Milam].)

65.    Mr. Young spent his sixteenth and seventeenth birthdays at TYC. In fact, Mr. Young spent the majority of his teenage years away from typical teenage activities and socialization. (Ex. 96 at ¶ 107 [Decl. of Knox].)

66.    The main purpose for sending Mr. Young to TYC was to promote his rehabilitation in order for him to return to the free world and lead a productive life. However, due to the myriad of problems that plagued TYC during this time, most of Mr. Young's needs were not met or even addressed.  For example, Mr. Young was assessed as chemically dependent, but received no treatment for chemical dependency while at the facility.  (Ex. 96 at ¶¶ 99-100, 108-10, 126-27 [Decl. of Knox].)

### 9.    Mr. Young's Return to the Outside World

67.    On February 22, 2001, Mr. Young was released from TYC.  As a youth, Mr. Young entered the prison-type environment without a mature identity or the ability to make sound independent judgments.  When the controls of TYC were removed, Mr. Young lacked an internal structure to revert to or rely upon. Institutionalized, at age seventeen, Mr. Young struggled to find a place he fit in the world.  (Exs. 96 at ¶ 111 [Decl. of Knox]; 97 at ¶ 23 [Decl. of Milam].)

68.    Prior to his release, Mr. Young had been surrounded by external limits on his behavior, and he was accustomed to the structure of the environment controlling his behavior.  Mr. Young's own internal control system remained undeveloped.  Some development might have been possible after his discharge, had he been released to a structured, supportive environment that included stable family relationships, work opportunities, helpful forms of parole supervision, support from the community, and provisions for chemical dependency and psychiatric treatment.  But this was not the case with Mr. Young.  (Ex. 96 at ¶¶ 112, 175 [Decl. of Knox].)

69.    Carla was initially supportive and welcomed Mr. Young home, but Mr. Young was again exposed to the poor relationship with his stepfather and other negative influences.  (Ex. 96 at ¶ 112 [Decl. of Knox]; 123 at ¶¶ 32-33 [Decl. of Sexton].)

70.    Following his release from TYC, Mr. Young was referred to the Texas Mental Health Mental Retardation (MHMR) Centers. But those facilities were overwhelmed, understaffed, and underfunded, and appointments with psychiatrists were not easy to get. Further, Mr. Young had limited transportation and no driver's license, which made getting to MHMR difficult, especially from the rural area in which he lived. (Ex. 97 at ¶ 15 [Decl. of Milam].)

71.    For the first few months of his release, Mr. Young did well. He had a new sense of discipline, was working, and was fastidious about his appearance to the point he would always make his bed and keep his tennis shoes sparkling clean. (Ex. 123 at ¶ 32 [Decl. of Sexton].)

72.    Mr. Young got a job as a dishwasher at a restaurant, but was soon off balance emotionally and psychologically. He soon fared poorly at his job and was terminated in the middle of April 2001. Mr. Young then started work at J. R. Construction with his father. By this time, Mr. Young had met Amber Lynch and was starting to hang out at the Shady Shores Motel, where Amber lived. (Exs. 96 at ¶¶ 113, 141-42, 176 [Decl. of Knox]; 123 at ¶ 33[Decl. of Sexton].)

73.    Without a structured therapy or medication plan, Mr. Young's turning to self-medication, via other stimulants, was almost inevitable. When he was released from TYC with no external regulators to keep him on track, and instead surrounded by an abundance of street drugs, Mr. Young transitioned to methamphetamine, also known as "speed," "meth," or "crystal meth." Methamphetamine, albeit illegal, has properties similar to the FDA-approved medicine Young had been taking all his life. Despite its highly addictive nature and extremely dangerous side effects, it was a simple conversion for Mr. Young because of his long-term use of a chemically similar drug. (Ex. 97 at ¶ 17 [Decl. of Milam].)

74.    After losing his job and doing drugs with his half brothers, Mr. Young began to deteriorate and became more vulnerable to re-offending. The

initial negative psychological factors affecting Mr. Young as a newly released prisoner manifested, and Mr. Young experienced internal chaos, disorganization, stress, and fear. (Ex. 96 at ¶¶ 114, 145 [Decl. of Knox].)

75.    Mr. Young had been considering other options for his future and he met with a recruiter for the armed forces. (Ex. 96 at ¶ 115 [Decl. of Knox].)

76.    Mr. Young celebrated his eighteenth birthday on July 19, 2001, in the free world. However, Mr. Young's drug use caused increased problems between him and Amber and frequently made him more aggressive. It was at this time that Mr. Young met David Page, Darnell McCoy, and Mark Ray. The combination of hanging out with his brother Dano, who was using drugs, and other drug users hanging around the Shady Shores area, contributed to Mr. Young's relapse and mental deterioration. Not only did Mr. Young's prior social history events and past experiences influence and affect his behavior, but here they would "elicit, shape, and modify [his] thoughts and actions." (Ex. 96 at ¶ 117 [Decl. of Knox].)

77.    Mr. Young's mother was also aware of the effect that Shady Shores was having on her son. Carla noticed that Mr. Young's behavior and even his appearance were changing, which she specifically recognized as clear signs of trouble. Carla attempted to contact Mr. Young's parole officer to encourage him to monitor Mr. Young more closely. (Exs. 96 at ¶¶ 118, 146 [Decl. of Knox]; 123 at ¶¶ 33-36 [Decl. of Sexton].)

78.    In November 2001, Amber went to spend the Thanksgiving holidays with her grandmother in Midland, Texas. With Amber gone, Mr. Young became more involved in various illegal activities which culminated in his arrest for the murders of Doyle Douglas and Samuel Petrey. (Ex. 96 at ¶ 119 [Decl. of Knox].)

79.    Mr. Young was continually told by his mother, step-father, father, and others that he would never amount to anything and would end up in prison. (Ex. 96 at ¶ 147 [Decl. of Knox].) "Ultimately, Mr. Young's environmental factors of severe negligence and abuse led to his identification and fulfillment of his father's

discouraging prediction." (Ex. 97 at ¶ 21 [Decl. of Milam].)

## C.   Mr. Young's Trial

### 1.   Guilt/Innocence Phase -- Prosecution Case

80.   The prosecution presented evidence that in late November, 2001, Mr. Young and three others, David Page, Mark Ray, and Darnell McCoy, rode with Doyle Douglas, in his car, from Marshall to Longview, Texas, to buy marijuana. Page, Ray, and McCoy testified that once there, Mr. Young shot Douglas twice in the head and commanded them to put Douglas in the trunk. Mr. Young then drove to a remote wooded area, where he ordered the group to push Douglas face down in a creek and forced Ray, at gunpoint, to shoot Douglas for the third time.

81.   According to the State's witnesses, Mr. Young, now driving Douglas's car, dropped Ray and McCoy at their homes. Page volunteered to ride with Mr. Young to Midland, where Mr. Young planned to see his girlfriend, Amber, who was at her grandmother's for Thanksgiving. Along the way, Mr. Young and Page abducted the second victim, Samuel Petrey, in his pick-up truck, and they abandoned the Douglas car. With Petrey sitting in the rear cab, Mr. Young and Page then drove to Midland.

82.   Page testified that just south of Midland at an oil pump site, Mr. Young directed Page and Petrey to dispel evidence from the truck. Mr. Young then shot Petrey twice in the head, and Mr. Young and Page drove off. Aware now that they were wanted by the police for the Douglas murder, Mr. Young dropped Page in Midland, where Page turned himself in. Mr. Young met briefly with Amber outside a grocery store, then set out to return to east Texas. He was arrested along Interstate 20.

83.   Mr. Young was indicted by a Grand Jury for capital murder, which alleged that he intentionally murdered two people in the course of the same criminal scheme or in different criminal transactions committed pursuant to the same scheme or course of conduct and/or committed murder in the course of

kidnapping and robbery. Ray and Page were held on murder charges and later pled guilty to lesser charges. McCoy, who had by his own volition directed the police to Douglas's body, was never charged.

84.     The State's case against Mr. Young relied primarily on the testimony of Ray, Page, and McCoy. The State maintained that Young was the driving force in the murders and kidnapping, and that the others' involvement was the result of duress caused by Mr. Young. Ray, for example, testified that he only shot Douglas because Mr. Young threatened to harm him or his family if he didn't. Likewise, Page, who participated in the crimes from start to finish, said he did so only out of fear of Mr. Young. Mr. Young's sole purpose over the course of the two murders, according to the State, was to travel to Midland to see his girlfriend.

## 2.     Guilt/Innocence Phase -- Defense Case

85.     The defense's case focused mainly on three problems with the State's case: conflicting testimony of the three eyewitnesses, inconsistent ballistic evidence, and signs of complicity among those who claimed to be threatened or held hostage by Mr. Young. Cross-examination of McCoy, Ray, and Page raised questions as to who among them was telling the truth. Ray had initially told police Mr. Young fired all three shots at Douglas, then recanted when he learned McCoy had told police Ray shot Douglas at the creek. Page, on the other hand, re-enacted the Petrey murder on videotape, then reversed his staging of the scene when he learned the coroner's report rendered his prior version implausible.

86.     Page, Ray, and McCoy had trouble identifying who was sitting in which position in the Douglas car at the time of the murder. The three men never identified with any credibility whether they also carried weapons during the crime (there were several handguns recovered, two of which had been fired). The defense also highlighted the numerous occasions on which Page, who claimed to be a hostage of Mr. Young, could have easily parted company. Similarly, Petrey

had numerous opportunities to separate from his captors but chose to stay with them.

### 3.   Punishment Phase -- Prosecution Case

87.   The State put on evidence that Mr. Young had wanted to kill a drug dealer only days before the killings for which he had been convicted, in addition to burglarizing a gun shop to acquire murder weapons found in the instant case.  The State also presented evidence that Mr. Young was an unstoppable offender, whose life of crime had started as early as age nine, when he brought a gun to school, and that he only showed signs of worsening.

88.   The State's key witness at punishment was the medical director at Waco Center for Youth.  She testified that her attempts to treat Mr. Young for severe ADHD had failed, and she opined Mr. Young was suffering from Anti-Social Personality Disorder.  She eventually concluded Mr. Young was irredeemable, and that he left her with no choice but to commit him to the TYC after an alleged "sexual" assault on another young male.  The State presented over 1,200 pages of records from the TYC, which represented countless attempts to medicate, discipline, and punish Mr. Young.  One juvenile officer testified that Mr. Young was "the worst [she] ha[d] ever seen."

89.   The State also presented evidence by way of psychiatry experts and correctional experts that Mr. Young could not be fixed.  Over objection, the prosecutor elicited testimony from one doctor that likened Mr. Young to a "serial killer"and a "psychopath."  Experts from the special prosecution division of the Department of Criminal Justice testified that a "Life Without Parole" sentence would not provide any guarantee that Mr. Young would not harm or kill again.  The State's proposition to the jury was that the only way to stop Mr. Young from harming others again would be by a sentence of death.

### 4.   Punishment Phase -- Defense Case

90.   Trial counsel presented evidence that Mr. Young came from a broken

and transitory family.  Experts and medical professionals for the defense testified about Mr. Young's ADHD.  On cross- examination, many of the State's witnesses agreed that Mr. Young had been mishandled or ignored while he was in various therapeutic/correctional institutions, or that the facilities were altogether ill-equipped for a case such as his.

91.    The defense presented expert testimony by a neurologist who examined Mr. Young's brain function with an EEG, once at age nine, and again at trial. The doctor testified that both test results indicated an abnormality in Mr. Young's brain.  Further expert testimony was presented to educate the jury on the nature of ADHD, and how it could be treated.

## II.

## PROCEDURAL HISTORY

92.    Mr. Young is confined under a sentence of death pursuant to the judgment of the 385th District Court, Midland County, Texas, case number CR27181, which was rendered on April 11, 2003 and entered on April 14, 2003.[5] (CR at 866; 37 RR at 29.)

## A.    Trial Court Proceedings

### 1.    Appointment of Counsel

93.    On December 10, 2001, Paul Williams was appointed to represent Mr. Young.  On December 20, 2001, Ian Cantacuzene was appointed as co-counsel for Mr. Young.  (CR at 8, 9.)  On December 26, 2002, J. K. (Rusty) Wall was appointed as appellate counsel on Mr. Young's behalf.  (CR at 691.)

### 2.    Indictment and Re-Indictment

94.    On December 20, 2001, a grand jury indictment was filed charging Mr. Young with the capital murder of Samuel Petrey.  (CR at 3.)  On February 7, 2002, Mr. Young was re-indicted.  In the first count of the re-indictment, it was

---

[5] Judge John G. Hyde presided over Mr. Young's trial, motion for new trial, and state post-conviction proceedings.

alleged that Mr. Young murdered both Samuel Petrey and Doyle Douglas pursuant
to the same criminal transaction or in different criminal transactions committed
pursuant to the same course of conduct, within the meaning of Texas Penal Code
Section 19.03(a)(7).  In the second paragraph of the re-indictment, it was alleged
that Mr. Young intentionally murdered Mr. Petrey during the commission of
robbery and kidnapping.  (CR at 4-5.)

### 3.    Trial

95.    The First Amended Indictment was read to the defendant on March
17, 2003.  (21 RR at 14-16.)  Opening statements in the guilt/innocence phase
commenced the same day.  (21 RR at 16-42.)  On March 25, 2003, both sides
rested their presentation of evidence.  (27 RR at 296.)  The case was submitted to
the jury for guilt/innocence deliberations on March 27, 2003.  (29 RR at 72.)   The
jury returned guilty verdicts as to both paragraphs of the first amended indictment
the same day.  (29 RR at 72-73.)

96.    On March 28, 2003, the punishment phase began.  (30 RR at 11-22.)
The punishment phase was completed on April 10, 2003.  (36 RR at 71.)  The jury
commenced deliberations that afternoon.  (36 RR at 134.)  A few hours later, the
jurors sent a note to the judge asking for clarification on Special Issue No. 2.[6]  (36
RR at 134-35.)  The following morning April 11, 2003, the jurors sent another
note, this one regarding whether Mr. Young was medicated while in the custody of
the Midland County jail.[7]  (37 RR at 5.)  That afternoon, a hearing was held in
open court, outside the presence of the jury, regarding the fact that Midland
County Sheriff Painter had eaten lunch with the jurors during the recent break.

---

[6] Specifically, the jury asked: "Regarding Issue No. 2 . . . 'cause the death
of deceased individuals,' 'intended to kill the deceased individuals.'  Question:
Do you have to believe both or at least one?"  (36 RR at 134-35.)

[7] Specifically, the jury asked: "We find no record of his current medication
for ADHD during his stay in Midland County.  Is this in the record or are we just
not finding it?"  (37 RR at 5.)

(37 RR at 6-27.)  Soon after that lunch break, the jurors returned their answers to the special questions, answering questions one and two in the affirmative, and question three in the negative.  The court sentenced Mr. Young to death.  (CR at 866-71; 37 RR at 29.)

### 4.    Motion for New Trial

97.    On May 9, 2003, Mr. Young filed a motion for new trial based upon the following claims:  (1) Sheriff Gary Painter's improper fraternization with the jury; (2) insufficiency of the evidence concerning paragraph one of the amended indictment - murder of more than one person in the same course or scheme of conduct; (3) insufficiency of the evidence concerning paragraph two of the amended indictment - robbery and kidnapping of Mr. Petrey; (4) insufficiency of the evidence concerning the special issues at the punishment phase; and (5) ineffective assistance of trial counsel at both phases of trial.  (CR at 901-12.)  The court granted an evidentiary hearing with respect to Mr. Young's new trial motion.  (38 RR et seq., 39 RR at 100.)  On June 20, 2003, the motion for new trial was denied.  (CR at 922; 39 RR at 100-05.)

### B.    State Appellate Proceedings

98.    On June 8, 2004, Mr. Wall filed an opening brief on appeal, *Clinton Lee Young v. The State of Texas*, Texas Court of Criminal Appeals (CCA) cause number AP-74,643.[8]  On December 8, 2004, the Attorney General filed the State's

---

[8] The grounds raised in Mr. Young's appeal included, but were not limited to:

(Point One) The trial court's supplementary instruction improperly coerced the jury to answer issue number two.

(Point Two) The trial court's supplementary instruction allowed the jury to answer "yes" to special issue number two without requiring all twelve jurors to answer in the affirmative.

(Point Three) The trial court's supplementary instruction directed the jury's answer to issue number two and was an impermissible comment on the weight of the evidence by the trial court.

(Point Four) The trial court's supplementary instruction prevented the jury from considering circumstances of the offense favorable to Mr. Young that might have been considered mitigation evidence.

Brief.  Mr. Young filed a supplemental brief on January 25, 2005.  On September 28, 2005, the CCA, in an unpublished opinion, denied Mr. Young's appeal. *Clinton Lee Young v. State* 2005 WL 2374669 (Tex. Crim. App. 2005).

---

(Point Five) The jury's fraternization with Sheriff Painter during deliberations was improper.

(Point Six) The Texas statutory scheme, allowing prosecutorial discretion in deciding which capital murders will involve seeking the death penalty, denies due process.

(Point Seven) The Texas statutory scheme allows prosecutorial discretion in determining those who are death penalty eligible in violation of the Eighth Amendment.

(Point Eight) Mr. Young's jury had no vehicle to give effect to Mr. Young's ADHD and other mitigating evidence.

(Point Nine) The trial court erred in overruling Mr. Young's motion to quash the indictment.

(Point Ten) The trial court committed reversible error by failing to require the third special issue to be submitted in accordance with *Apprendi v. New Jersey*.

(Points Eleven and Twelve) There was insufficient evidence, both factually and legally, to prove capital murder by committing multiple murders in the same criminal transaction or in the same scheme or course of conduct.

(Points Thirteen and Fourteen) The evidence was insufficient, both factually and legally, to sustain the jury verdict on the theory of an intentional murder in the course of the commission of a robbery.

(Point Fifteen) Texas Penal Code section 19.03(a)(2) is unconstitutional.

(Point Sixteen) The trial court erred in granting the state's challenge for cause to prospective juror Danie Lynn Roberts.

(Points Seventeen and Eighteen) The evidence is legally and factually insufficient to warrant an affirmative finding by the jury to special issue number one.

(Points Nineteen and Twenty) The evidence was legally and factually insufficient to warrant an affirmative finding by the jury to the anti-parties issue.

(Points Twenty-One and Twenty-Two) The evidence was factually and legally insufficient to warrant a "no" answer to the mitigation special issue.

(Points Twenty-Three to Twenty-Five) The trial court erred when it denied Mr. Young's request to include the *Gessa* reasonable doubt instruction in its punishment charge.

(Point Twenty-Six) The court failed to instruct the jury as to the meaning of "probability," "criminal acts of violence," and "a continuing threat to society."

(Point Twenty-Seven) The trial court erred by denying Mr. Young's motion requesting the court to define that "probability" means "more likely than not."

(Point Twenty-Eight)  The trial court erred in failing to instruct that the burden of proof on the mitigation issue was on the state to prove beyond a reasonable doubt that there was not sufficient mitigating evidence to warrant a life sentence.

(Points Twenty-Nine to Thirty-One) Article 37.071 is unconstitutional.

(Point Thirty-Two) The court committed reversible error by disallowing Mr. Young's polygraph impeachment of David Page.

(Point Thirty-Three) Texas Penal Code section 8.07 violates the federal Constitution.

(Point Thirty-Four) Article 35.16(b)(1) specifically establishes a challenge for cause which violates the First Amendment.

99.   The Supreme Court denied a petition for writ of certiorari from the affirmance of judgments on April 3, 2006. *Clinton Lee Young v. Texas*, 547 U.S. 1056, 126 S. Ct. 1652, 164 L. Ed. 2d 398 (2006).

## C.   State Habeas Proceedings

100.   On April 16, 2003, Gary Taylor was appointed to represent Mr. Young for purposes of the state application for writ of habeas corpus. (CR at 876(a).) On January 5, 2005, Mr. Taylor filed a request for an extension of time to file the application for writ of habeas corpus. (CWR at 351.) Judge Hyde granted the motion the following day, giving Mr. Taylor an additional ninety days to file the application. (CWR at 355.) On April 22, 2005, Mr. Taylor filed a state application for writ of habeas corpus on behalf of Mr. Young. The Application raised fourteen grounds for relief.[9] (CWR 001-162.) On July 13, 2005, Mr.

---

[9] The grounds included, but were not limited to:

(Ground One) The trial judge's assessment of costs associated with trial constituted a due process violation.

(Ground Two) The trial judge's assessment of costs associated with trial constituted an equal protection violation.

(Ground Three) The trial judge's assessment of costs associated with trial violated the Eighth Amendment.

(Ground Four) The trial judge's assessment of costs associated with trial is not supported by Texas law or any constitutional provision.

(Ground Five) The trial judge's assessment of costs associated with this proceeding was an unconstitutional taking without due process.

(Ground Six) The Texas Court of Criminal Appeals' refusal to review the sufficiency of the mitigating evidence constituted a violation of due process under the Fifth and Fourteenth amendments.

(Ground Seven) The Texas Court of Criminal Appeals' refusal to review the sufficiency of the mitigating evidence constituted a violation of the Eighth Amendment.

(Ground Eight) The execution of Mr. Young would constitute a violation of the Eighth and Fourteenth amendments.

(Ground Nine) The Eighth and Fourteenth Amendments prohibit execution of Mr. Young based on his age and immaturity.

(Ground Ten) Mr. Young's right to the effective assistance of counsel under the Sixth Amendment was violated by trial counsel's failure to discover and present evidence of physical, emotional, and sexual abuse.

(Ground Eleven) Additional evidence discovered since conviction, and not heard by the jury, would make execution a violation of Mr. Young's Due Process rights.

(Ground Twelve) Mr. Young's rights to the effective assistance of trial counsel was violated.

Taylor moved to withdraw as Mr. Young's counsel. (CWR at 359-61.) Mr. Young, in pro se, filed letters with the state writ court raising additional claims not raised in Mr. Taylor's state Application. (Ex. 51.) On August 8, 2005, the court relieved Mr. Taylor and appointed Ori White to represent Mr. Young. (CWR at 365.) On August 19, 2005, the State filed its answer to Mr. Young's Application. (CWR at 366.)

101. On November 7, 2005, Mr. White requested permission to file supplemental claims to the Application. On February 6, 2006, the Court ordered an evidentiary hearing in this case. (CWR at 738.) The evidentiary hearing was held on March 1, 2, 3, 9, and 10, 2006. (RWR at Vols. 1-7.) Telephonic depositions, which became part of the evidentiary record, were held on March 17 and 24, 2006. (Exs. 42-44.)

102. The State filed its findings of fact and conclusions of law on June 1, 2006. Mr. Young's proposed findings were filed on June 6, 2006. The state court denied Mr. Young's Application on June 26, 2006. (Ex. 30 at 424.) The CCA denied the Application in an unpublished boiler plate denial on December 20, 2006. *See Ex Parte Young*, 2006 WL 3735395 (Tex. Crim. App. 2006).

**D.   Federal Court Proceedings**

103. On January 3, 2007, Ori White filed in this Court a motion for appointment of federal habeas counsel on behalf of Mr. Young. (Docket no. 1.) On January 17, 2007, this Court appointed Mr. White and Mr. Wall to represent Mr. Young. (Docket no. 2.) Mr. Young's Petition was filed in this Court on December 20, 2007. (Docket no. 18.)

104. On January 24, 2008, the Court conducted a hearing regarding Mr. Young's request for appointment of new federal habeas counsel. (Docket no. 23;

---

(Ground Thirteen) Mr. Young's right to Due Process under the Fourteenth Amendment was violated by the actions of the prosecutor in this case.
(Ground Fourteen) The prosecutor and police interfered with Mr. Young's right to the effective assistance of counsel.

Ex. 57.) On January 30, 2008, the Court granted Mr. Young's request for new counsel. (Docket. no. 24.) On March 3, 2008, the Court appointed present counsel to represent Mr. Young. (Docket. no. 29.) On March 13, 2008, present counsel (Don Vernay and the Office of the Federal Public Defender) requested until October 18, 2008 to file an amended federal petition. (Docket no. 31.) On March 25, 2008, this Court granted Mr. Young until October 20, 2008 to file the amended petition. (Docket no. 37.) Respondent filed a motion for summary judgment on March 20, 2008, which was based on the prior federal habeas petition. (Docket no. 34.)

## III.

## AEDPA STANDARDS

105.   Because this Petition is filed after April 16, 1996, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. *Lindh v. Murphy*, 521 U.S. 320, 117 S. Ct. 2059, 138 L. Ed. 2d. 481 (1997); *Ries v. Quarterman*, 522 F.3d 517, 522 (5th Cir. 2008.) Under the AEDPA, a habeas corpus application may not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim: (1) resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (2006); *Fratta v. Quarterman*, 536 F.3d 485, 499 (5th Cir. 2008). Section 2254(e)(1) states that "a determination of a factual issue made by a State court shall be presumed to be correct" and that the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

106.   The terms "contrary to" and "unreasonable application" have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L.