Ed. 2d 914 (2002); *Fratta*, 536 F.3d at 504; *Henderson v. Quarterman*, 460 F.3d 654, 659 (5th Cir. 2005). A state court decision is "contrary to" clearly established federal law if it arrives at a conclusion opposite to that of the Supreme Court on a question of law, or decides the case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); *accord Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 653, 166 L. Ed. 2d 482 (2006); *Gardner v. Johnson*, 247 F.3d 551, 557 (5th Cir. 2001). To be an "unreasonable application of" clearly established federal law, the state court decision must have identified the correct legal rule but unreasonably applied it to the facts at hand. *Williams,* 529 U.S. at 406; *Buntion v. Quarterman*, 524 F.3d 664, 670 (5th Cir. 2008).

107. "Supreme Court holdings at the time of the state court's last reasoned decision are the source of clearly established Federal law for the purposes of AEDPA," *citing Williams*, 529 U.S. at 412; *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007) (granting habeas relief under AEDPA because state court decision ignored "fundamental principles established by [the Supreme Court's] most relevant precedents").

108. As the Supreme Court has stated, "in the context of federal habeas," "[d]eference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell (Miller-El I)*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003). To that end, while the standard as articulated in section 2254 is demanding, it is "not insatiable; as we said the last time this case was here, "'[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke (Miller-El II)*, 545 U.S. 231, 240, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (granting habeas relief under AEDPA), *citing Miller-El I*, 537 U.S. at 340; *see Panetti v. Quarterman*, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007) ("AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'"), *citing Carey*, 127 S. Ct. at 656 (Kennedy,

J., concurring in judgment).

109.   In the Fifth Circuit, "the question of whether a state court's decision is an adjudication on the merits turns on 'the court's disposition of the case -- whether substantive or procedural.'"  *Salazar*, 419 F.3d 384, 395 (5th Cir. 2003) (*quoting Mercadel v. Cain*, 179 F.3d 271, 274 (5th Cir. 1999) (*per curiam*) (internal quotations omitted).

## IV.

## NEWLY  DISCOVERED EVIDENCE CLAIMS

## CLAIM ONE

## THE PROSECUTION'S FAILURE TO PRODUCE EXCULPATORY EVIDENCE, AND THE PRESENTATION OF FALSE TESTIMONY, VIOLATED MR. YOUNG'S CONSTITUTIONAL RIGHTS

110.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecution violated its duty to disclose exculpatory evidence (that David Page and Mark Ray were offered deals by the State), and knowingly presented perjured testimony (that Page and Ray had not engaged in plea negotiations with the district attorney).  This allowed Page and Ray to give a false impression of the evidence to the jury and allowed false evidence to go uncorrected.

111.   *Exhaustion*:  Concurrently with this Petition, Mr. Young is filing a motion pursuant to *Rhines v. Weber*, 544 U.S. 269, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005), requesting a stay in this case in order to return to state court to exhaust newly discovered evidence claims.  Should this Court grant the *Rhines* motion, Mr. Young will include this claim in Mr. Young's state habeas application.

112.   If Respondent disputes any of the facts alleged below, Mr. Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Mr. Young has been afforded discovery and the disclosure of material evidence by

the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

113.   The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

114.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

## A.   Introduction

115.   Habeas relief is compelled here because the State created false impressions that were material and which could, in reasonable likelihood, have affected the judgment of the jury.

116.   Mark Ray and David Page, unbeknownst to the defense, were testifying against Mr. Young in exchange for reduced charges and lenient sentences. Not only were the Ray and Page plea arrangements not disclosed to the defense, the prosecution actively obfuscated the fact that Ray and Page were testifying in exchange for leniency. The facts below establish that false information had a prejudicial impact on Mr. Young's capital case.

## B.   Relevant Facts

117.   In March of 2002, counsel for Mr. Young filed a motion with the trial court requesting that any and all plea agreements between any prosecuting attorney and any prosecution witness be revealed. (Exs. 33 [March motion]; *see also* 31 [Feb. motion].) In April 2002, the motion was granted by the court. (Exs. 34; *see also* 35 [Sept. 2002 order].)

118.   The State's case against Mr. Young, with regard to the Douglas killing, was based on the testimony of the same individuals who were involved in Douglas's death:  Mark Ray, David Page, and Darnell McCoy. The State's case

against Mr. Young, with regard to the Petrey homicide, was almost entirely based upon the testimony of Page.

119.  Because the evidence regarding the Douglas and Petrey murders was based on accomplice testimony, it was incumbent upon the State to portray those witnesses as trustworthy, and to reduce the possibility of their impeachment, which would have materially weakened the prosecution's case and materially strengthened the defense case.  In furtherance of that goal, the State failed to disclose to the defense its plea negotiations with Ray and Page and further, presented false evidence regarding those pleas negotiations.

### 1.     Ray's Plea Deal

120.  On November 25, 2001, Doyle Douglas was killed.  Mark Ray was arrested for Douglas's murder on November 26, 2001.  (Ex. 71 at 804 [Douglas Murder Report - Ray].)  At the time of his arrest, Rick Berry was the District Attorney of Harrison County, the locus of the crime.  (Ex. 70 [Rick Berry DA Info.].)[10]  Ray was charged on November 29 with the murder of Douglas, a class one felony within the meaning of Texas Penal Code section 19.03.  (Ex. 69 at 798 [Ray - Murder Charge].)  Ray spoke to the police on November 26 and November 27, 2001.  (Ex. 71 [Douglas Murder Report - Ray].)

121.  Several months after his arrest for murder, Ray was offered a deal by District Attorney Berry which consisted of a reduced charge of aggravated homicide and a prison term of sixty years.  Ray turned down the deal.  (Ex. 117 at ¶ 6 [Decl. of Mark Ray].)  Several months later, District Attorney Berry revised the plea offer to "something like" forty or forty-five years.  Ray again turned down the offer.  (*Id.* at ¶ 7.)

---

[10]  In 2002, incumbent Rick Berry was challenged by Joe Black for the Democratic nomination for Harrison County District Attorney.  Black won the nomination on March 12, 2002.  Black also won the November general election. (http://www.sos.state.tx.us/elections/historical/index.shtml.)  Berry remained the District Attorney until January 1, 2003, when Black was sworn in.  (2 SRR at 114, 116.)

122.   About a month later, DA Berry offered Ray a new deal of thirty years.
With this deal, District Attorney Berry told Ray, "Look, I'm not after you. We
already have the guy we want." The thirty-year deal was "on the table" for a very
long time. Richard Hurlburt, Ray's attorney, told Ray that Berry really wanted
Ray to testify against Mr. Young. Ray decided to reject the deal, and Hurlburt
began to prepare for trial. (*Id.* at ¶ 8 [Decl. of Ray].)

123.   Later, District Attorney Berry offered Ray a deal of twenty years, for
a reduced charge of aggravated kidnapping. Ray again rejected that deal. Berry
then offered Ray a deal of ten years. Right before the general election for District
Attorney, Berry offered Ray a deal for five years for a reduced charge of second
degree kidnapping. Berry assured Ray that he would not serve much time if Ray
testified against Mr. Young. (*Id.* at ¶¶ 9-10 [Decl. of Ray].)

124.   At one point, Berry told Ray, in the presence of Ray's attorney, that
he did not want to publically acknowledge that a plea bargain was in the works.
Instead, Berry wanted Ray to sign a plea deal after the trial. With that
understanding, Ray agreed to testify against Mr. Young. (*Id.* at ¶ 11 [Decl. of
Ray].)

125.   In March 2003, Ray was transferred from Harrison County to the
Ector County jail in Odessa. (Ex. 61 [Ector County Jail Records].) According to
Ray, during the months leading up to the trial (and during the trial itself), the
authorities made it clear to Ray that his testimony was important to convict Mr.
Young of capital murder. (Ex. 117 at ¶ 12 [Decl. of Ray].)

126.   This message was repeated not only by District Attorney Berry, but
also by Midland County District Attorney Investigator J.D. Luckie. Luckie urged
Ray to remain silent about the plea deal. Luckie "pretty much told [Ray] to keep
[the plea deal] under wraps." (*Id.* at ¶ 13 [Decl. of Ray].) Luckie told Ray that if
"it got out" that he had been offered a plea deal, "it would give the defense a
stronger case and make it harder to convict Clint." (Ex. 117 at ¶ 13 [Decl. of

Ray]; *see* 22 RR at 168-69 [J.D. Luckie talks to Ray during a break at trial].)

127.   Ray was also told by the authorities that he could not sign the plea deal before Mr. Young's trial because then Ray could truthfully testify on the witness stand that he had not entered into a plea deal.  (Ex. 117 at ¶ 14 [Decl. of Ray].)

128.   Mr. Young's trial began on March 17, 2003.  (21 RR at 14.)  Ray testified at Mr. Young's trial on March 18, 2003.  In summary, Ray testified that Mr. Young shot Douglas twice in the head, took the others hostage, and later forced Ray to shoot Douglas in the head.  (22 RR at 37-258)

129.   On a lunch break during Mr. Young's trial, Ray was told by then Special Assistant District Attorney Berry that the five year plea deal was still "on the table."  (Ex. 117 at ¶ 15 [Decl. of Ray]; *see* CR at 738.)[11]

130.   The evidence that Ray received assurances regarding a plea deal, in exchange for his testimony against Mr. Young, were never disclosed to defense counsel.  (Exs. 126 at ¶¶ 3-4 [Decl. of Paul Williams]; 116 at ¶ 14 [Decl. of Nancy Piette].)  To that end, the State presented false evidence regarding this deal before and during Mr. Young's trial.

131.   At a pre-trial hearing on January 21, 2003, Midland County District Attorney Al Schorre called Rick Berry as a witness.  DA Schorre asked Berry whether he was aware of any deals being made with any of the witnesses during the time he was the District Attorney of Harrison County.  Berry replied that he was not:

> No, sir.  I am unaware of any deals with any witnesses
> either that I have done or that anyone else has done,
> either during the time I was District Attorney or during

---

[11]   After the trial, District Attorney Black told Ray that he could not give the five years offered by Berry.  On June 18, 2003, Ray pled guilty to kidnapping, a second degree felony.  Ray agreed to a fifteen year term.  (Exs. 72 [Ray Plea Papers - Harrison County]; 117 at ¶ 16 [Decl. of Ray].)

the time I've been in private practice.

(2 SRR at 109-10.)

132.   During cross-examination, defense counsel questioned Berry about plea deals:

> Q.   [Ian Cantacuzene] Now, as far as Mark Ray goes, do you know whether any plea arrangements have taken place between him and his attorney and your office, or your former office?
>
> A.   [Rick Berry] No, I'm not -- I have not participated in any type of plea negotiations to elicit any type testimony from him.
>
> Q.   Has a plea offer been made to him as far as you're aware?
>
> A.   No.
>
> Q.   Would somebody else have that responsibility or would someone else have had that responsibility prior to you leaving office and going into private practice?
>
> A.   No.  In my office beforehand, I was the only one to have responsibility.  Now it would be Mr. Black or someone in Mr. Black's office.

(2 SRR at 112-13.)  Later that same day, both newly elected Harrison County District Attorney Joe Black and Harrison County investigator Hall Reavis both testified that they were not aware of any deals being made with Ray.  (2 SRR at 124, 127, 130-31.)

133.   At trial, Special Assistant District Attorney Rick Berry (appointed by Midland County to assist in Mr. Young's prosecution) questioned Ray on direct examination as to whether he had "received any kind of deal, any kind of promise,

any kind of favor from any District Attorney's Office or anyone in exchange for your testimony today?"  Ray answered, "None whatsoever, sir." (22 RR at 147.) On cross-examination, defense counsel asked Ray about any leverage the State had over him with respect to his testimony.  Berry objected to the question.  (22 RR at 239-40; *see also* 242-44.)

### 2.   Page's Plea Deal

134.   As previously stated, David Page was involved in both the Douglas and Petrey homicides.  Page turned himself into the authorities in Midland, Texas, on November 26, 2001.  (26 RR at 149-55.)  Page was represented by Midland attorney, H.W. "Woody" Leverett, Jr.  (Ex. 111 at ¶ 2 [Decl. of Woody Leverett].)

135.   Beginning in February of 2001, Leverett attended at least three meetings with Midland County District Attorney Al Schorre, and his staff (including prosecutor Clingman, Investigator Luckie, and Deputy Sheriff Paul Hallmark), about Page's case.  The meetings were intended to work out a plea arrangement for Page, where Page would receive a reduced sentence in exchange for his testimony against Mr. Young.  (*Id.* at ¶ 3 [Decl. of Leverett].)

136.   Throughout the discussions, Leverett was attempting to get the best deal for Page in exchange for Page's agreement to testify against Young.  The DA verbally committed to a plea offer in the fifteen to thirty year range, provided that Page did not throw the prosecution a curve ball when testifying.  According to Leverett, the "only open questions were what the final offer would be, in terms of years, and whether Page would accept the offer."  Leverett kept Page informed of all plea offers and all discussions.  (*Id.* at ¶ 5.)

137.   The meetings between Page, Leverett, and the Midland County District Attorney's office continued until January 2003, a few months before Mr. Young's trial.  At one of the final meetings, DA Schorre went over Pages's testimony in preparation for Mr. Young's trial.  (*Id.* at ¶ 7 [Decl. of Leverett]; Ex. 63 at 725-27 [Leverett Billing Records and Letter]; *see also* 27 RR at 16, 147.)

138.   Page testified at Mr. Young's trial on March 24 and 25, 2003.  In summary, Page testified that Mr. Young shot Douglas in the head, forced Page to drive to Midland with him, and Mr. Young kidnapped and murdered Sam Petrey. (26 RR at 128, et. seq., and 27 RR at 6-243.)

139.   At trial, on direct examination, Midland County prosecutor Clingman asked Page whether he had received " any kind of an agreement to give you any particular sentence," to which Page responded, "No, ma'am." (26 RR at 257.)  On cross-examination, Page testified that he had not been offered any type of deal or agreement by the State in exchange for his testimony.  At one point, Page testified that "[t]hey haven't came to me with anything."  (27 RR at 127, 130-31.)

140.   After Mr. Young's trial, Page agreed to a thirty year plea for aggravated kidnapping.  Leverett was angry with DA Schorre because he believed Page had testified for the State exactly as Page had been expected to, and Leverett felt "we had been led to believe we could very likely receive a pleas offer well below thirty years.  (Ex. 111 at ¶ 9 [Decl. of Leverett].)

## C.   Relevant Legal Authority

### 1.   *Brady v. Maryland*

141.   "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); accord *Banks v. Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004); *Mahler v. Kaylo*, 537 F. 3d 494, 499 (5th Cir. 2008); *Dickson v. Quarterman*, 462 F.3d 470, 477 (5th Cir. 2005).  In order to prevail on a *Brady* claim, a petitioner must demonstrate that:  (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State either willfully or inadvertently; and (3) prejudice must have ensued.  *Strickler v.*

*Greene*, 527 U.S. 263, 281-82, 119 S. Ct 1936, 144 L. Ed. 2d 286 (1999); *accord Mahler*, 537 F.3d at 500; *Tassin v. Cain*, 517 F. 3d 770, 780 (5th Cir. 2008); *Dickson*, 462 F. 3d at 477.

142.   For prejudice to ensue, the suppressed, favorable evidence must be "material." *Brady*, 373 U.S. at 87.  Evidence is material under *Brady* if a reasonable probability exists that, had the evidence been disclosed to the defense, the result of the proceeding would have been difficult. *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).  A reasonable probability is one that sufficiently undermines confidence in the outcome of the trial. *Id.*; *Mahler*, 537 F. 3d at 500.  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).  When determining whether the *Brady* information was material and therefore prejudicial, the evidence must be considered in light of the evidence available for trial that supports the petitioner's conviction. *See Towns v. Smith*, 395 F. 3d 251, 260 (6th Cir. 2005); *United States v. Bencs*, 28 F. 3d 555, 560 (6th Cir. 1994) ("[m]ateriality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial") (citing *United States v. Agurs*, 427 U.S. 97, 112 n.20, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)).

**2.   *Napue v. Illinois***

143.   A conviction obtained using knowingly perjured testimony violates due process. *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 79 L. Ed. 791 (1935); *Alcorta v. Texas*, 355 U.S. 28, 31, 78 S. Ct. 103, 2 L. Ed. 2d 9 (1957) (due process violated when prosecution allows jury to be presented with a materially false impression).  A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go

40

uncorrected. *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996) (*citing Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)); *United States v. Barnham.* 595 F.2d 231, 240-41 (5th Cir. 1979).

144.   The prohibition against the use of false testimony applies even when the testimony in question was relevant only to the witness's credibility. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).  When this happens, reversal of the defendant's conviction is a near certainty because courts do not employ a strict materiality test or a harmless-error analysis.  *See Alcorta*, 355 U.S. 28 (reversing conviction and death sentence where sole eyewitness lied about his romantic involvement with the victim -- lies the government condoned and covered up).

145.   The presentation of false evidence is intolerable because it perpetrates a fraud on the judge and the jury and undermines the "rudimentary demands of justice."  *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 79 L. Ed. 791 (1935).  The fraud is also insupportable because of its corrosive effect on the judicial process and because the instrument of deceit is a prosecutor, "whose obligation . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v.  United States*, 295 U.S. 78, 88, 55 S. Ct.  629, 79 L. Ed.  2d 1314 (1935).  To prevail on a claim based on *Napue*, the petitioner must show "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Reed v.  Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007); *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998).

146.   "False evidence is 'material' only if there is any reasonable likelihood that [it] could have affected the jury's verdict." *Goodwin v.  Johnson*, 132 F.3d 162, 185 (5th Cir.  1997).

**D.     Because The Prosecutor Failed to Disclose Material Exculpatory Evidence and Presented False Testimony Regarding Page's and Ray's Plea Deal with the State, Mr. Young's Petition Should be Granted**

147.   The State in this case not only suppressed evidence that it had engaged in extensive plea negotiations with Page and Ray (*see Brady/Strickler*), the State also used knowingly perjured testimony at trial (*see Napue*).  Both constitute constitutional violations that require habeas relief.

148.   With regard to the elements of the *Brady* claim, first, the evidence in question was favorable to Mr. Young because it impeached Ray and Page. *Strickler*, 527 U.S. at 281-82; *United States v. Miller*, 520 F.3d 504, 514 (5th Cir. 2008) ("Impeachment evidence falls within *Brady's* reach"); *accord Mahler*, 537 F.3d at 503 (habeas relief granted where State's case against Mahler likewise depended on the reliability of the very witness whose pretrial statements were suppressed).  Had counsel known that Ray and Page agreed to testify against Mr. Young in exchange for reduced charges and a lenient sentence, counsel would have used that information to impeach Page's and Ray's credibility i.e., Ray was lying about his own culpability in the Douglas murder and untruthfully shifted the blame to Young, and Page was lying about his own culpability in the Douglas and Petrey murders and untruthfully shifted the blame to Young. (*See* Ex. 126 at ¶ 5 [Decl. of Williams].)  Any reasonable defense counsel would have used this impeachment evidence.

149.   Counsel also would have used the plea information in an attempt to bleed Ray's and Page's deal with McCoy -- if Ray and Page had a deal with the State, it was to be expected that McCoy was also testifying against Mr. Young in exchange for an undisclosed benefit.[12] (*Id.* at ¶ 8 [Decl. of Williams].)

---

[12]  It appears Darnell McCoy also had a deal with the State.  However, unlike Ray and Page, who were arrested and charged with crimes against Douglas or Petrey, McCoy became the State's "star witness," which meant, for the State,

150.   Further, if this information had come out during trial, counsel would have asked the court for a mistrial based on government misconduct as the prosecution had testified under oath during pre-trial motions that no plea agreements had been reached, and that no plea discussions had occurred. (Ex. 126 at ¶ 6 [Decl. of Williams].)  And if this information had come to light before the start of trial, counsel would have questioned prospective jurors how they would react to State witnesses who received "back hand" deals with the State. (*Id.* at ¶ 11.)

151.   With respect to the second prong of *Brady*, the evidence was suppressed by the State. *Strickler*, 527 U.S. at 281-82.  Specifically, trial counsel was never informed that the State had discussed a plea agreement with either Ray or Page.  And while the district attorney's file was open for counsel to review, it did not contain any information that would have led counsel to know about such deals. (Exs. 126 at ¶ 4 [Decl. of Williams]; 116 at ¶ 14 [Decl. of Piette].)  For that matter, the State affirmatively presented evidence at a pretrial hearing that no deal was in place with Ray. (2 RR at 109-10, 112-13.)

152.   With respect to the third prong of *Brady*, the fact that counsel was never informed that Ray and Page were agreeing to testify against Mr. Young in exchange for reduced charges and lenient sentences, was prejudicial to Mr. Young's case.  It was clear that the State wanted the jury to believe Ray's and

---

secretly "sanitizing" McCoy's rap sheet before Young's trial. (Ex. 110 at ¶ 4 [Decl. of Greg Krikorian].)  To that end, between the time he became the State's "start witness" against Mr. Young, and the time of Mr. Young's trial, McCoy was stopped for various drug and traffic crimes in at least Longview, Gilmer, Gladewater, and Ore City, but was never held by the authorities.  Rather, McCoy would be arrested, charged, and then released.  According to McCoy's wife, Patricia, these cases would just go away, as if they never happened. (*Id.* at ¶¶ 5-6; *see also* Ex. 68 [McCoy Criminal Records].)  At one point, shortly before Mr. Young's trial, Harrison County Investigator Hall Reavis and at least one other investigator or policeman came to the McCoy house.  Patricia overheard Reavis tell Darnell, "We know you got in trouble for marijuana."  When Reavis said this, he was smiling, as if to assure Darnell McCoy that the charge would somehow be taken care of by authorities. (*Id.* at ¶ 7.)

Page's testimony and thus, it attempted to bolster their credibility by not revealing the deals. Had the jury not credited Ray's and Page's version of the events, Mr. Young would not have been eligible for capital murder. (*See* Exs. 101 at ¶ 3 [Decl. of Juror Michael Byrne]; 100 at ¶¶ 5-6 [Decl. of Juror James Bobo].)

153.   Bolstering Ray's and Page's credibility significantly strengthened the State's theory that Mr. Young was the crime leader of the entire enterprise i.e., that Mr. Young was the person who orchestrated both the Douglas and Petrey killings. Said another way, by bolstering Ray's and Page's credibility, the state was able to minimize their involvement in the Douglas and Petrey murders and at the same time, increase Mr. Young's culpability for the crimes charged.

154.   It was important for the State to portray Ray and Page as victims, along with McCoy. Had the jury known about the existence of a deal, there is a reasonable probability the jury would have viewed Ray's and Page's involvement in the murder in a much different light: that Ray's and Page's testimony was self-serving; they were not held hostage as they testified to; with regard to Ray he alone willingly fired the last and what could have been the fatal shot into Douglas; and with regard to Page it was he who fired the shots that killed Petrey. *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) (exposing motivation of witness in testifying is proper and important function); *see Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir. 2000).

155.   Moreover, had the jury known of the deals, it would have been able to discern that Ray and Page had vested interests in the final outcome of the trial - that Mr. Young be viewed as the sole murderer of Douglas and Petrey. The State verified this when J.D. Luckie told Ray that it would be harder to convict Mr. Young should knowledge of the plea deal be made public. (Ex. 117 at ¶ 13 [Decl. of Ray].)

156.   With regard to the Douglas murder, had the jury known that Ray and Page were receiving deals for their testimony, the State would have been left

solely with the testimony of McCoy and Brook. Brook, however, was tainted based on his own prior criminal history including the very recent Torres robbery. (21 RR at 234.) And with regard to McCoy, he, too, presented the State with a problem as McCoy had a year before Mr. Young's trial been accused of molesting fourteen-year old Megan Barnett. McCoy had also recently attempted suicide, which, it could be argued, was a result of his complicity in the Douglas murder. (21 RR at 93.)

157.   Ray, without a criminal past, was the State's crucial star witness for the Douglas killing, and thus, Mr. Young's conviction, at least as far as the Douglas killing went, was primarily based on Ray's credibility.

158.   And with regard to the Petrey homicide, had the jury known that Page was receiving leniency for his testimony, the jury would have discredited his version of events, which placed the blame of the kidnapping, robbery, and murder of Petrey squarely on Mr. Young.

159.   Moreover, in this case, Mr. Young was charged under Texas's Law of the Parties statute, making him vicariously liable for capital murder through the actions of his cohorts. *See* Tex. Penal Code § 19.02(b). Had the jury known that Ray and Page were receiving promised deals (Ray for five years and Page for aggravated kidnapping instead of murder), it was reasonably probable that the jury would not have convicted Mr. Young of murder based upon the instructions given, let alone capital murder.

160.   To make matters worse, in closing guilt/innocence phase argument, the prosecutor argued that Ray was going to face capital murder charges following Mr. Young's case, and Page was going to face murder charges. (29 RR at 25-26.) However, the State knew this to be untrue.

161.   The evidence of Ray's and Page's plea deals were also material to the punishment phase. In order to evaluate Mr. Young's conduct under Special Issue No. 2, the jury was told to look at Mr. Young's conduct alone, not in conjunction

with the conduct of the other parties.  By believing Ray's and Page's testimony, the jury believed Mr. Young was the cause of both murders or intended to cause the deaths.  Had the jury known of the deals, Ray's and Page's credibility would have been severely impeached, and it is reasonably probable Mr. Young would not have been given the death penalty.

162.    The fact that there was no specific written plea deal between the prosecution and Ray and Page does not mean there was not a deal in place.  To that end, the State specifically told Ray that it did not want to memorialize the plea deal until after the trial and that the verbal agreement should not "get out" to the public.  (Ex. 117 at ¶¶ 11, 13 [Decl. of Ray].)  However, once Ray and Page agreed to testify in exchange for reduced charges and a lenient sentence, the deal was complete.  *Tassin*, 517 F.3d at 778 ("The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction") (*quoting Bagley*, 473 U.S. at 683 (opinion of Blackmun, J., joined by O'Connor, J.) (emphasis added); *Wilkerson*, 233 F.3d at 890-91 ("what tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists"); *accord Burbank v. Cain*, 535 F.3d 350, 359 (5th Cir. 2008) (not important that the agreement was never finalized); *see Giglio*, 405 U.S. at 153 n.4 (Court reversed defendant's conviction and remanded for a new trial under *Brady* because prosecutor failed to disclose a leniency promise to a principal witness); *accord Mahler*, 537 F.3d at 503; *Duggan v. State*, 778 S.W. 2d 465, 468 (Tex. Crim. App. 1989) (rejecting the assertion that an agreement of leniency must be "formalized" to writing before it could be introduced as evidence finding that "[i]t makes no difference whether the understanding is consummated by a wink, a nod and a handshake, or by a signed and notarized formal document ceremoniously impressed with a wax seal.  A deal is a deal"); *Burkhalter v. State*, 493 S.W. 2d 214, 216-18 (Tex. Crim. App. 1973)

(the evidence of "suggestion and innuendos" of such a deal should have been introduced to the jury).

163. If Ray's and Page's plea deal had come to light during trial, the State would have lost complete credibility with the jury (*see* Ex. 126 at ¶ 7 [Decl. of Williams]), especially in light of the problems that the jurors had with the Midland County investigation, especially that which involved Investigator Paul Hallmark. (38 RR at 135, 141-42.) If the jury was concerned about the sheriff's handling of the crime scene (which it appeared they were), that concern can be interpreted as questioning the integrity of the forensic evidence, thus increasing the jury's reliance on the testimony of the cohorts in reaching the verdict. If the Ray and Page deals had come to light during the trial, the jury would not have relied upon their testimony **and** that information would have further reduced the jury's confidence in the handling of the forensic evidence.

164. Relief should also be granted on Mr. Young's *Napue* claim -- that Mr. Young's conviction was based upon the use of knowingly perjured testimony i.e., the States's insistence that Ray and Page were not given deals before trial.

165. With respect to Ray, DA Rick Berry's testimony that Ray had not received a plea deal (2 RR at 111) was actually false. To that end, Berry was the person who negotiated a plea deal with Ray. Second, the prosecution knew the testimony was false. For that matter, Black solicited this false testimony from Berry, and in turn, Berry solicited the false testimony from Ray.[13] And third, the false testimony was material, for the same reasons explained above with regard to the *Brady* claim.

166. And with respect to Page, prosecutor Clingman specifically asked Page on re-direct examination whether he had received "any kind of an

---

[13] Even if Black did not know the testimony was false, Black was charged with constructive knowledge of every fact that any member of the prosecution team was actually aware of. *Ex Parte Adams*, 768 S.W.2d 281, 292 (Tex. Crim. App. 1989).

agreement" for his testimony, to which Page responded, "No, ma'am." (26 RR at 257.) However, the State had, in fact, been negotiating with Page since February of 2002. (Exs. 63 [Billing Records of Woody Leverett]; 111at ¶¶ 3-4 [Decl. of Leverett].)  Second, the prosecution knew the testimony was false.  And third, the false testimony was material, for the same reasons explained above with regard to the *Brady* claim.  *See Barnham*, 595 F.2d at 243 (failure to testify about benefits promised).

167.   Mr. Young's conviction for capital murder, and his punishment of death, was based upon suppressed evidence, that Ray and Page were given secret plea deals, and upon knowingly presented perjured testimony, that the State had never entered into plea negotiations with Ray and Page.  Accordingly, Mr. Young's conviction for capital murder, and his sentence of death, are not "worthy of confidence."  *Kyles*, 514 U.S. at 434.  Moreover, the disclosure of this evidence would have painted the State's case against Mr. Young in "such a different light as to undermine confidence in the verdict."  *Id.* at 435.

168.   The State, in this case, should have been a seeker of truth and justice rather than a competitor intent on winning at all costs.  It was the jury who should have been permitted to review all the evidence necessary to make an informed decision.  Instead, the State chose to present a case full of lies and half truths.  Mr. Young should be afforded relief in this case.

**E.     The State Deprived Mr. Young of His Right to Confront the Witnesses Against Him When it Instructed Mark Ray Not to Reveal the Plea Agreement When He Testified at Young's Trial**

169.   Independent of the errors described above, the State deprived Mr. Young of his right to confront witnesses when it instructed Mark Ray not to reveal his plea agreement when he testified at Young's trial.

170.   As previously stated, Harrison County District Attorney Rick Berry told Ray not to publically acknowledge that a plea deal was in the works.  Further,

Midland County District Attorney Chief Investigator J.D. Luckie urged Ray to stay silent about the plea deal, to "keep it under wraps" and that "if it got out that [Ray had] been offered a plea deal, it would give the defense a stronger case and make it harder to convict Clint." (Ex. 117 at ¶¶ 11, 13 [Decl. of Ray].)

171.  By instructing Ray not to divulge the plea deal he had entered into, the State deprived Mr. Young of his constitutional right to rebut the State's evidence through cross-examination. *Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005).[14]

172.  As stated by trial counsel, had the defense known that Ray and/or Page were in plea negotiations with the State, it would have "vigorously cross examined them about the deals, using the plea discussions as impeachment evidence." (Ex. 126 at ¶ 5 [Decl. of Williams].)

173.  This error, in conjunction with the errors described above, warrant habeas relief.

**F.     Conclusion**

174.  The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

175.  Further, this claim could not be raised before because the State not only failed to turn this evidence over to the defense, it took steps to hide this evidence from view.

---

[14]  The same can be said about David Page.  While the evidence is less clear that Page was *specifically* told not to divulge his plea deal, the State certainly did not turn that information over to the defense prior to, or during trial.

## CLAIM TWO

## THE PROSECUTION'S SUPPRESSION OF EVIDENCE CONCERNING STATE WITNESS A. P. MERILLAT VIOLATED MR. YOUNG'S CONSTITUTIONAL RIGHTS

176.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecution suppressed evidence regarding State witness A. P. Merillat, and the State's suppression of the evidence prevented the defense from challenging the witnesses' credibility.

177.   *Exhaustion*:  Should this Court grant Mr. Young's *Rhine's* motion, this claim will be presented in Mr. Young's state habeas application.

178.   If Respondent disputes any of the facts alleged below, Mr. Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Mr. Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

179.   The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

180.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

A.    **Merillat's Testimony at Mr. Young's Trial**

181.   On April 21, 2003, defense counsel filed a motion to exclude the testimony of A. P. Merillat ("Merillat"), arguing, in part, that Merillat would testify as an expert on future dangerousness without being qualified to do so.  (CR at 844.)  Defense counsel reiterated his motion at trial, arguing that Merillat would

refer to specific instances of violence within the Texas prison system, which were not relevant to the allegation that Mr. Young himself would commit acts of violence while incarcerated. (35 RR at 48.)

182. In response, the State argued Merillat's testimony was relevant to Mr. Young's punishment phase because Merillat would testify to the following: the various levels of classifications of prisoners; opportunities for violence and types of violence that can occur in prison; opportunities inmates have to make weapons while in prison; and what types of drugs are available in prison, including psychotropic drugs, and how inmates hide those drugs. (35 RR at 48.) The State proffered that Merillat would not offer expert opinion as to Mr. Young's future dangerousness. (*Id.*)

183. Upon prompting by the trial court, the State assured the court Merillat would testify as to events or circumstances based on his personal knowledge. (35 RR at 50). On those bases, the court allowed Merillat to testify. (*Id.*)

184. According to his curriculum vitae ("CV"), Merillat was a Senior Criminal Investigator with the Special Prosecution Unit, whose responsibilities included investigating felonies occurring in the Texas prison system, "[p]roviding special investigative assistance to local district attorneys . . . [and] Statewide Capital Murder prosecution assistance" since 1989. (Ex. 129 [Merillat CV].) In his CV, Merillat described himself as a "[c]onsultant to local Texas police departments/District Attorneys offices in major assault, homicide and child sex crimes," and as an "[i]n-court second chair with prosecutors in one hundred (100) jury trials" from 1989 through 2002. (*Id.*)

185. During the punishment phase of Mr. Young's trial, Merillat testified that he considered the Special Prosecution Unit ("SPU"), an office created and funded by the Texas Governor's office since 1984, independent from the Texas prison system. (35 RR at 56.) Because the governor's grant was administered through Walker County, Merillat considered himself "not a state employee [but] a

county employee." (*Id.*)

186.   According to Merillat, the Governor of Texas created the SPU to prosecute crimes committed within the prison system which could not be prosecuted by counties where a given prison was  located. (35 RR at 56.) According to Merillat, his office prosecuted 794 cases, from capital murder to improper sex with an inmate, the year before Mr. Young's trial.  (*Id.* at 65.) Merillat testified that out of those 794 cases, 130 cases were drug related. (*Id.* at 66.)

187.   According to Merillat, contraband, including drugs, arrived into prison though the legal mail. (*Id.* at 67.) Merillat testified that prison gangs controlled the trade of contraband in prison. (*Id.* at 67-68.) Merillat also testified that prescription drugs, including drugs distributed to a given inmate through a "pill line," could be used as contraband and traded by the inmate who was prescribed that medication.  Over defense objection, Merillat testified that even Ritalin could become contraband in prison. (35 RR at 71.)

> Q.    All right.  Do pills that you receive in the pill line,
>        do those ever act as currency or money, have a
>        value for the inmate in prison?  In other words,
>        can I, if I'm an inmate that's prescribed Ritalin,
>        let's say, can I, rather than take my Ritalin pill and
>        use it for something?
>
> A.    Yes, ma'am.  Drugs, medicine, narcotics, anything
>        like that, it won't have the same type of value that
>        a jar of foot powder will, but it will mean
>        something to the person that you're trying to sell it
>        to or who has ordered you to go get it, steal it, hide
>        it and bring it to him, such as that, so it's valuable,
>        but not – doesn't have a dollar amount.

> Q.   I see.  Would you say that it's valued in a very
>       positive way or just in a menial way, medication,
>       pills?
>
> A.   The rare and harder to obtain an item is, the more
>       value it has, so if it's an aspirin, it's not very
>       valuable, but if it's a pill or something that nobody
>       knows what it is, it looks like something from a
>       drugstore, well, it's going to be worth a lot of
>       money to somebody, or a lot of value, we'll say.
>
> Q.   Do inmates ever use things of that nature, such as
>       pills, to curry favor with other inmates in prison?
>
> A.   Yes, ma'am.  I know the Texas Syndicate does that
>       quite heavily.

(35 RR at 76-77.)

188.   Merillat testified that violence was pervasive within the prison system.  According to Merillat, inmates avoided assaults by paying other inmates for protection.  (35 RR at 83-84.)  Another way to avoid being assaulted, including being raped within a prison when first assigned to a particular unit, was for an inmate to "catch out," or engage in an activity that would lead that inmate to incur a disciplinary violation so that the inmate could be housed in a disciplinary cell and thus isolated from other inmates.  (*Id.* at 84.)  A way of "catching out" included fabricating a weapon.  (*Id.* at 84-85.)

> Q.   But does that count against them as far as
>       potentially raising their level of housing?
>
> A.   It's very difficult, because -- well, we prosecuted a
>       hundred -- almost 200 weapons cases last year
>       alone.  We have hundreds of weapons.  That's
>       probably our most frequent crime.  It's hard to

53

> determine what's a catch out and what is really
> going to be used to cut an officer's throat or kill
> another man, so that's one of my jobs is to get that
> case in, that report of the case and try to determine
> through witnesses or through the man himself,
> through the circumstances, through the
> documentation of what he's been through the past
> several weeks to see if that matches up, and if it
> does, we won't prosecute. We'll dismiss those
> cases. We're not out just to hang inmates at all.
> So it's a difficult situation, and whereas there are
> many catch out cases, there are many, many more
> that are not, that are serious crimes that when it's
> time to go to trial, the inmates all of a sudden say
> hey, that was a catch out case, I was getting
> hogged or I was getting ho checked by these guys,
> I had to make that thing, so it's real hard to
> determine.

(35 RR at 85-86.)

189.   According to Merillat, the highest level of security available within the prison system was high security and death row, which were similar in most respects but for the fact that those on death row received a capital sentence. (35 RR at 122.) According to Merillat, even within the more restrictive high security cells, opportunities for violence still existed:

> Now, there are only a few high security units in the state.
> They're reserved for the absolute worst that you can do
> nothing else with, nothing else would help, so they put
> him in this high security. That's a whole nother [sic]

> story.  Everything an inmate does is done inside the cell,
> eat, shower, everything.  He gets out one hour a day if
> he's been good by himself to go recreate in a small yard
> by himself.  He has to be escorted by two officers to
> come out of that cell in handcuffs, so he's fed through
> that -- that's called a bean slot, that little door that opens
> that looks into the cell down at the bottom . . . .

(35 RR at 90-91.)  Merillat also testified that inmates made weapons out of virtually anything in prison.  (35 RR at 86, 93.)

190.   Asked whether there would be a way to ensure Mr. Young was confined within the highest level of security in the prison system, Merillat testified that no one could tell the prison system how to house an inmate:

> Q.   Okay.  Is there any way that these ladies and
> gentlemen of the jury can be assured as to what an
> inmate's classification will be other than what
> you've already told us about or what type or
> housing an inmate will have in prison?
>
> A.   It will depend on the inmate, no one else.
>
> Q.   Okay.  So even if they wanted to send a message
> to prison and say, "House this guy in
> Administrative Segregation," could a jury do that?
>
> A.   A jury or a judge, nobody can tell the prison where
> or how to house an inmate.

(35 RR at 96-97.)

191.   According to Merillat, if an inmate was "a member of one of seven recognized street gangs, he'll never get out of Seg.  That's about the only person who will never get out of Ad Seg is one of those seven street gang members.  Even an escapee will sooner or later work his way out of Ad Seg if he behaves."  (35 RR

at 120.)

192.   According to Merillat, inmates have escaped from prison, including from death row, and he considered that the statistics published by the Texas Department of Criminal Justice did not accurately reflect such incidents. (35 RR at 126.)  According to Merillat, his definition of when an escape occurred within the prison system was more accurate than the definition of the Texas Department of Corrections. (35 RR at 127.)

## B.   Suppressed Evidence

193.   Unbeknownst to defense counsel at trial, Merillat's testimony was false, and his credibility could have been challenged but for the State's suppression of the evidence.

194.   As far back as 1998, Merillat was assisting an inmate achieve "deconfirmation" as a gang member (a benefit in the prison system) so that the inmate could procure information for the SPU which the SPU would in turn use against other inmates. (Ex. 132 [SPU 6/15/98 Letter].)  Merillat continued assisting that inmate even though Merillat knew the inmate had not given up his gang activity. (Ex. 133 [Eason letter to Merillat 6/2000].)

195.   As far back as 1999, Merillat acknowledged that although an inmate who had been providing SPU with information concerning another inmate had been caught manufacturing a weapon by prison authorities, "just because a disciplinary case was written, it does not mean that our office will file a criminal charge." (Ex. 134 [SPU 10/14/99 Letter].)

196.   As far back as 2000, Merillat was arranging for inmates to be transferred within the prison system (Ex.135 [SPU 7/12/2000 Letter]), and even get out of segregation units. (Ex. 136 [Whited 4/4/2000 Letter].)

197.   Also as far back as March 2000, Merillat was making arrangements with prison officials to allow letters from gang members to reach an inmate informant, even though that inmate, with help from Merillat, had informed prison

authorities he had renounced his gang affiliation.  (Ex. 137 [Innes Notes 3-01-00].)

198.   Unbeknownst to Mr. Young's defense team, the SPU prosecutorial team in a capital murder case against an inmate had suppressed exculpatory evidence against that defendant. *See Anibal Canales Jr. v. Quarterman*, CV No. 03-69-TJW (E. Dist. Tex).  Merillat, as a Senior Criminal Investigator and part of that SPU team, was intrinsically involved with that suppression.  (*See e.g.* Ex. 138 [Merillat 6/12/2000 Letter]) ("As far as a witness list, we haven't sent one out yet, Mr. Mullin [the SPU prosecutor] and I are holding off as long as we can.").[15]

**C.    Relevant Law**

199.   As previously stated, it is clearly established federal law that "[t]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilty or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *Mahler*, 537 F.3d at 499; *Kopycinski v. Scott*, 64 F.3d 223, 225 (5th Cir. 1995). The duty to provide favorable evidence applies "even when the accused fails to specifically request such evidence." *Mahler*, 537 F.3d at 499 (*citing Strickler*, 527 U.S. at 280; *Kyles*, 514 U.S. at 433).

200.   To prevail on a *Brady* claim, a petitioner "must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material" to his guilt or punishment. *Mahler*, 537 F.3d at 500 (*citing Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994)).

**D.    The Prosecution Suppressed Evidence Concerning A. P. Merillat**

201.   Under *Brady*, the prosecution's duty to disclose favorable evidence is

---

[15] In his pending petition for federal habeas relief, Mr. Canales alleges the prosecutorial team:  suppressed evidence, contrary to *Brady*; allowed a material witness to testify falsely in violation of *Napue* and its progeny; and that the SPU, including Merillat, deliberately elicited information from a defendant in custody and under indictment in violation of *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), and its progeny.  (*Canales v. Quarterman*, CV03-69 [Docket no. 7].)

not limited to evidence within the actual knowledge or possession of the
prosecutor. It is well-settled that *Brady* obligates the "individual prosecutor . . . to
learn of any favorable evidence known to the others acting on the government's
behalf . . . [,] including the police." *Mahler*, 537 F.3d at 499 (*citing Kyles*, 514
U.S. at 437). Furthermore, under certain circumstances, the prosecution may be
deemed in constructive possession of *Brady* material. *See United States v.
Webster,* 392 F.3d 787, 798 n.20 (5th Cir. 2004) (*citing Martinez v. Wainwright*,
621 F.2d 184, 186-87 (5th Cir. 1980) (finding no suggestion in *Brady* "that
different 'arms' of the government are severable entities" and thus holding that
prosecutor had suppressed deceased's rap sheet, which resided in medical
examiner's office and had been provided by the FBI); *United States v. Auten*, 632
F.2d 478, 481 (5th Cir. 1980) (finding prosecution was in possession of criminal
history of witness even though no background check was conducted, reasoning, in
part, that "[i]f disclosure were excused in instances where the prosecution has not
sought out information readily available to it, [the court] would be inviting and
placing a premium on conduct unworthy of representatives of the United States
Government."); *United States v. Deutsch*, 475 F.2d 55, 57-58 (5th Cir. 1973)
(finding prosecutor was, for purposes of *Brady*, in possession of information in
Postal Service files).

202.   Although the availability of information is measured in terms of
whether the information is in the possession of some arm of the State, *Crivens v.
Roth*, 172 F.3d 991, 997-98 (9th Cir. 1999) (*citing United States v. Perdomo*, 929
F.2d 967, 971 (3d Cir. 1991)), for purposes of *Brady* "the prosecution is deemed to
have knowledge of information readily available to it." *Williams v. Whitley*, 940
F.2d 132, 133 (5th Cir. 1991).

203.   In Mr. Young's case, the State was in possession of evidence
challenging Merillat's credibility. As Merillat testified, part of his responsibilities
included investigating felonies occurring in the Texas prison system, and

providing special investigative assistance to local district attorneys and Statewide Capital Murder prosecution assistance. Thus, Merillat's assistance to the prosecutorial team in Mr. Young's case in the form of his testimony, at the minimum, means the prosecutorial team against Mr. Young was in possession of Merillat's knowledge concerning Merillat's dealings in the Canales's case. *See e.g. United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979) (imputing knowledge of state law enforcement team that witness' lawyer had been paid from state funds to federal prosecuting team and finding that "nondisclosure, whether stemming from negligence or design, was the responsibility of the prosecutor.").

204.   Furthermore, as the Fifth Circuit has held in the past, there is no suggestion in *Brady* "that different 'arms' of the government are severable entities." *Martinez*, 621 F.2d at 186-87. As in *Martinez*, here, the prosecutor team was in constructive possession of the letters written by Merillat, when Merillat, funded by the Governor's office of the State of Texas, was required to assist and consult with local district attorney's offices as part of the Statewide Capital Murder prosecution assistance.

205.   As in the case of *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980), the prosecution in Mr. Young's case cannot argue that it did not possess the impeaching evidence against Merillat because it did not seek it. As in *Auten*, "[i]f disclosure were excused in instances where the prosecution has not sought out information readily available to it, [the court] would be inviting and placing a premium on conduct unworthy" of representatives of a State seeking the death penalty against a defendant. *Id.*

206.   The State will no doubt argue that it did not suppress the evidence because the defense team could have easily access the information through the "well-honored, traditional non-*Brady* method of simply asking the witness while he is testifying." *See e.g. Crivens v. Roth*, 172 F.3d at 998; *Titsworth v. Dretke*, 401 F.3d 301, 307 (5th Cir. 2005). As in *Crivens* and *Titsworth*, that principle is

pushed too far on the facts of Mr. Young's case.   Merillat would not have told the complete truth if asked about his participation in the prosecution of the Canales case based on the fact that SPU had not disclosed that evidence to Canales's trial counsel and had only been obtained by federal counsel during the pendency of Mr. Canales' federal habeas petition.   (*Canales* post-stay briefing, Doc # 36 at 4).

207.   Thus, evidence that could be used to impeach Merillat's testimony was suppressed at Mr. Young's death penalty trial.

208.   Independent of this error, to the extent this information was available at the time of trial, counsel was ineffective for investigating and presenting it.

**E.   Evidence That Could Be Used to Impeach Merillat Was Favorable to Mr. Young**

209.   "*Brady* encompasses evidence that may be used to impeach a witness's credibility." *Kopycinski*, 64 F.3d at 225 (citing *Bagley*, 473 U.S. at 676).

210.   The communications between Merillat and various inmates raises doubt as to Merillat's credibility and the accuracy of his testimony.   While Merillat testified that no one, either a judge or a jury, could tell the prison system where or how to house an inmate (35 RR at 96), Merillat's letters show that he, although independent from the prison system, could tell the prison system how to house an inmate who was assisting SPU obtain evidence against other inmates. (Exs. 132 [SPU 6/15/98 Letter]; 133 [Eason to Merillat 6/2000]; 135 [SPU 7/12/2000 Letter];  136 [Whited 4/4/2000 Letter].)

211.   While Merillat testified that the "only person who will never get out of Administrative Segregation is one of those seven street gang members" (35 RR at 120), he neglected to mention that gang members, even while still participating in gang related activities, can get out of Administrative Segregation in exchange for their cooperation with SPU.  (Ex. 136 [Whited 4/4/2000 Letter].)

212.   While Merillat testified that it was extremely difficult to investigate a "catch out" allegation, where the inmate had manufactured a weapon in order to be

placed in a safer location (35 RR at 85-86), letters from Merillat contradicted the difficulty of such investigation, and in some circumstances, all Merillat needed was the inmate's self-serving statement. (Ex. 134 [SPU 10/14/99 Letter].)

213. The suppressed evidence concerning Merillat's role in the Canales investigation and prosecution was favorable to Mr. Young's case because it is quintessential impeaching evidence.

**F.     The Suppressed and Favorable Evidence Was Material for Mr. Young's Sentence to the Death Penalty**

214. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *Kopycinski*, 64 F.3d at 225-26. "[O]nce a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review. Assuming, *arguendo*, that a harmless-error enquiry were to apply, "a *Bagley* error could not be treated as harmless, since a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury's verdict." *Kyles*, 514 U.S. at 435 (internal quotation marks and citations omitted). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Bagley*, 473 U.S. at 682.

215. Merillat's credibility was instrumental to the finding that there was a probability that Mr. Young would commit acts of violence while in the prison system if given a life sentence, because Merillat testified that opportunities of violence were abundant there. Merillat went as far as saying that his testimony, at least when it came to the number of escapes within the prison system, was more believable than what the Department of Corrections itself published. (35 RR at 126.)

216.   As Merillat himself has described in his article, "[i]n the numerous capital cases [he has] been called to testify in, that question -- the "future danger" issue -- has become the central, significant matter under consideration." (Ex. 130 at 1174 [A. P. Merillat, *The Question of Future Dangerousness of Capital Defendants*, 69 Tex. B.J. 738, 738 (2006)].)  According to Merillat himself, his testimony is instrumental in capital death cases, because:

> [T]he information that I bring to juries quite frequently rebuts defense testimony and theories that if a capital murderer is given a life sentence, the restrictions placed upon him would make it nearly impossible for him to continue a course of violence after arriving at prison. It is not uncommon for capital murder juries to hear testimony from many retired TDCJ administrators who travel across the state testifying for the defense. If jurors hear only testimony from these witnesses who attempt to portray a picture of a super-secure prison system designed to prevent convicted killers from victimizing anyone during their time in prison, then verdicts can render favorably to defendants.  But those verdicts might not be rendered on what is factual. The information that follows is a sampling of what I testify to when called into capital trials.  The facts will illustrate why jurors over the years may have been convinced to issue affirmative answers to the future dangerousness question after hearing this testimony.  A benefit to you readers who are on the defense bar is that you can examine and dissect this information, put your heads together, and come up with ways to rebut my testimony and convince

> jurors that I am a crackpot.  Most important, however,
> the citizens who pay for the Texas prison juggernaut
> deserve to know the facts.  When I write articles, give
> lectures, or even have informal conversations regarding
> the crime situation in Texas prisons, I never fail to
> receive reactions betraying the fact that few people know
> what it's really like in our state's penitentiary system.

(Ex. 130 at 1175 [Merillat Article].)

217.    While the defense bar may not yet be able to convince a jury that
Merillat is a "crackpot," a complete disclosure of Merillat's actions, including
those in the case of Mr. Canales, would have allowed Mr. Young to come up with
ways to rebut his testimony, by showing that Merillat has himself suppressed
exculpatory evidence in at least one death penalty case, thereby putting into
question his credibility.

218.    Had Merillat's trickery in the investigation of Mr. Canales and his
trial been revealed,[16] defense counsel in Mr. Young's case would no doubt had
reminded the trial court, as well as the jury, of the upmost duty a prosecutorial
team has to follow the law.  As the Supreme Court has stated:

> [A Prosecutor] is the representative not of an ordinary
> party to a controversy, but of a sovereignty whose
> obligation to govern impartially is as compelling as its
> obligation to govern at all; and whose interest, therefore,
> in a criminal prosecution is not that it shall win a case,
> but that justice shall be done.  As such, he is in a peculiar
> and very definite sense the servant of the law, the

---

[16]  Canales was prosecuted by the Special Prosecution Unit out of
Hunstville.  *Canales v. State*, 98 S. W. 3d 690 (Tex. Crim. App. 2003); Appellant
Canales' Opening Brief, 2001 WL 34386405, *3.  Trial in the Canales case was
conducted from October 24 to October 27, 2000.  *Id.* at *9.

> twofold aim of which is that guilt shall not escape or
> innocence suffer.  He may prosecute with earnestness
> and vigor-indeed, he should do so.  But, while he may
> strike hard blows, he is not at liberty to strike foul ones.
> It is as much his duty to refrain from improper methods
> calculated to produce a wrongful conviction as it is to
> use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629,  79 L. Ed. 2d 1314 (1935).

219.   As part of the SPU, and in particular, as part of the prosecutorial team that prosecuted Mr. Canales, Merillat not only struck hard blows, as he should have, but he also struck foul ones.  Without the disclosure of the evidence illustrating Merillat's foul strokes in other death penalty cases, Mr. Young's defense team could not challenge Merillat's credibility.

220.   In Mr. Young's case, Merillat's testimony as to inmates' opportunities to distribute prescribed drugs was particularly instrumental to the jury's finding as to the future dangerous issue.  Mr. Young presented evidence that, with proper medication, his ADHD induced disciplinary problems while in an institutionalized setting were controlled.  By testifying that inmates housed anywhere but death row or High Security could use their medications as contraband, Merillat testified as to the "probability" that Mr. Young would do so if sentenced to life, simply because, according to Merillat, the opportunity in prison to do so existed.[17]  Thus, although Mr. Young presented unrefuted evidence that his ADHD behavior was controlled under the proper medication and that he had never refused to take his medication while institutionalized, let alone that he had used such prescribed medications as contraband, Merillat's testimony allowed for

---

[17]  Although Royce Smithey, Merillat's fellow investigator, also testified at trial as to prison conditions (31 RR at 168 et seq.), Smithey did not testify as to prescription drugs being a source of contraband.

the "possibility" that Mr. Young "could" refuse to take his medication and instead, use it as contraband if given a life sentence.

221.   Because Texas law requires the jury to be unanimous when voting for death, "the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death." *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) (discussing Louisiana law).   Without Merillat's testimony, Mr. Young's evidence that his behavior was controlled with the proper medication, went unrefuted.   Thus, there is a reasonable probability that, had the evidence been disclosed to the defense, at least one juror could have changed with respect to the imposition of the death penalty.   In Mr. Young's case, the suppressed evidence is sufficient to undermine confidence in the outcome of Mr. Young's death sentence.[18]

222.   Because the State suppressed impeaching evidence concerning Merillat, and because Merillat's testimony was material to the jury's finding that Mr. Young could commit acts of violence while in prison if given a life sentence, rather than a death penalty, Mr. Young's sentence to death was the result of a *Brady* violation which deprived Mr. Young of due process.   As such, Mr. Young's sentence to death does not pass constitutional muster and should therefore be vacated.

## G.   The State Deprived Mr. Young of His Right to Confront Merillat

223.   Independent of the error described above, the State deprived Mr. Young of his right to confront Merillat when it suppressed the evidence described above.   *See Burbank*, 535 F.3d at 358 (defendant's confrontation rights violated

---

[18] If, through the course of Mr. Young's federal habeas proceedings, counsel discovers that the prosecutors were aware that Merillat was testifying falsely or allowed his untrue testimony to go uncorrected, in violation of *Napue* and its progeny, counsel will amend his Petition accordingly.

where he refused to permit cross examination on witnesses' plea deal); *Davis*, 415 U.S. at 316-17.

224.   This error, in conjunction with the error described above, warrants habeas relief.

## H.   Conclusion

225.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

226.   Further, this claim could not be raised before because the State not only failed to turn this evidence over to the defense, it took steps to hide this evidence from view.

## CLAIM THREE

## THE JUDGE WHO PRESIDED OVER MR. YOUNG'S TRIAL WAS NOT IMPARTIAL

227.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because Judge Hyde was biased, and if counsel had known of this bias, they would have moved to recuse the judge from presiding over Mr. Young's trial, motion for new trial, and state writ hearing.

228.   *Exhaustion*:  Should this Court grant Mr. Young's *Rhine's* motion, this claim will be presented in Mr. Young's state habeas application.

229.   If Respondent disputes any of the facts alleged below, Mr. Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Mr. Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to