investigate fully, counsel requests an opportunity to supplement or amend this Petition.

230.   The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

231.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

## A.   Underlying Facts Related to this Claim

232.   The jury in this case returned its verdict of death on April 11, 2003. Judge Hyde, who presided over Mr. Young's trial, sentenced Mr. Young to death that same day.  (CR at 866-71; 37 RR at 29.)

233.   Three days later, Judge Hyde sent a letter to each of the jurors.  (*See* Ex. 101 at ¶ 5 [Decl. of Michael Byrne].)[19]  In that letter, Judge Hyde told the jurors that they had made the correct decision informing them of his own belief that Mr. Young was a dangerous man who was capable of harming someone else:

> After spending several weeks with the Defendant in jury
> selection before the trial began, I gained some insight
> into his personality and I got to hear and see much more
> than the jury heard.  In my view, he is a dangerous man
> who is fully capable of harming someone else.  Your jury
> made the correct decision.

(Ex. 93 [Juror Letters from Judge Hyde].)  According to the letter, the judge's opinion was based upon evidence the jury did not hear and his own personal opinion.  (*Id.*)

---

[19]  Since they were written, the letters had been stored in Judge Hyde's chambers and had never been made available to the defense.  (Ex. 140 [Decl. of John Beaver].)

234.   Judge Hyde then presided over, and denied, Mr. Young's motion for new trial. (38 RR at 6, et. seq.)  Later, Judge Hyde presided over, made factual findings against, and denied Mr. Young's state habeas application. (Ex. 30 at 424 [Hyde's Denial of Writ of Habeas Corpus])

**B.    Relevant Law**

235.   Among those basic fair trial rights that cannot ever be treated as harmless is a defendant's right to an impartial judge. *Gray v. Mississippi*, 481 U.S. 648, 668, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987); *accord Gomez v. United States*, 490 U.S. 858, 876, 109 S. Ct. 2237, 104 L. Ed. 2d 923 (1989).  It is well settled that "[n]o matter what the evidence against [a defendant], he had the right to have an impartial judge." *Tumev v. Ohio*, 273 U.S. 510, 535, 47 S. Ct. 437, 71 L. Ed. 749 (1927); *accord Bracy v. Gramley*, 520 U.S. 899, 904-05, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997) ("the floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal . . . before a judge with no actual bias against the defendant . . .", internal quotations omitted); *accord Withrow v. Larkin*, 421 U.S. 35, 46-47, 95 S. Ct. 1456, 43 L. Ed. 2d 712  (1975); *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955); *Richardson*, 537 F.3d at 474; *Buntion*, 524 F.3d at 672; *Bigby v. Dretke*, 402 F.3d 551, 558 (5th Cir. 2005) (cornerstone of American judicial system is right to fair and impartial process).

236.   A defendant may establish denial of this right by demonstrating actual bias or merely the appearance of bias. *Taylor v. Hayes*, 418 U.S. 488, 501-04, 94 S. Ct. 2697, 41 L. Ed. 2d 897 (1974); *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1972); *Richardson*, 537 F.3d at 474-75. Actual bias occurs when the judge harbors personal animosity toward the defendant or has a personal interest in the outcome of the particular case. *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994); *Aetna Life  Ins.  Co. v. Lavoie*, 475  U.S. 813, 823, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986) (calling for recusal where state supreme court  justice's interest was

"direct, personal, substantial, [and] pecuniary"); *Tumey*, 273 U.S. at 523; *In re Murchison*, 349 U.S. at 138 (finding bias where judge acting as one-man grand jury in secret hearings charged two witnesses with contempt and then presided over witnesses' contempt hearings); *Taylor v. Hayes*, 418 U.S. at 501-03 (finding bias where judge was subject to litigant's direct personal insults).

237.   The standard for determining implied bias requires a petitioner to establish that a "genuine question exists" concerning the judge's impartiality. *Buntion*, 524 F.3d at 669; *United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir. 1997) ("'whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'"); *see Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980).

238.   Structural error occurs when a trial judge is biased. *Richardson*, 537 F.3d at 473, *citing Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35 (1999). "A criminal defendant who is tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him." *Edwards v. Balisok*, 520 U.S. 641, 647, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997); *Buntion*, 524 F.3d at 672.

## C.   Judge Hyde Was Actually Biased Against Mr. Young and Mr. Young's Conviction must Be Reversed

239.   Here, there is clear evidence that Judge Hyde was actually biased against Mr. Young. According to the letter he sent to each of the jurors, Judge Hyde made up his mind about Mr. Young's guilt before the trial even began. Even before any evidence was introduced at trial, before opening statements were presented, and before the adversarial process had commenced, this trier of fact had "pre-judged" Mr. Young as a dangerous man, worthy of the death penalty. Judge Hyde believed that not only was Mr. Young dangerous, but he was "fully capable" of harming other people had he not been convicted of capital murder. (Ex. 93

[Juror Letters from Judge Hyde].)  These statements show that Judge Hyde was not an impartial judicial officer who should have been removed from Mr. Young's case.  *See Bracy*, 520 U.S. at 909 (petitioner needs evidence that the judge was actually biased in petitioner's *own* case); *Taylor*, 418 U.S. at 501 (bias shown where there is a mounting display of unfavorable personal attitude toward the petitioner); Tex. R. of Civ. Proc. 18(b).

240.  For purposes of the trial, as the proverbial gate keeper, Judge Hyde was entrusted with the responsibility of deciding what evidence the trier of fact would be permitted to see and hear in this case.  However, Judge Hyde himself had already decided, before the trial had even begun, that Mr. Young was a dangerous person worthy of the death penalty.  Any rulings made by the judge with respect to evidence admitted or excluded was tainted by the judge's personal animosity toward Mr. Young.  Such bias clearly violated Mr. Young's due process rights. *Tumev*, 273 U.S. at 535; *see Franklin v. McCaughtry*, 398 F.3d 955 (7th Cir. 2005); *see also* Texas Code of Judicial Conduct, Canon 3.B.(5) ("A judge shall perform judicial duties without bias or prejudice"), (6) ( A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not knowingly permit staff, court officials and others subject to the judge's direction and control to do so").

241.  To make matters more improper, Judge Hyde sat as both judge and jury during Mr. Young's motion for new trial.  With the jury's job now complete, Judge Hyde alone decided Mr. Young's fate while presiding over the motion for new trial.  Judge Hyde, however, had already made up his mind that Mr. Young was worthy of the death penalty, a sentiment he did not hesitate to convey to the jurors in his letter.  Judge Hyde's bias most probably led him to protect the juror's verdict of guilt, a verdict the judge agreed with, and tainted his rulings during Mr.

Young's motion.

242.   The prospect of judicial bias is intolerable in any case, let alone one where the ultimate sentence, death, has been imposed.  *See Spaziano v. Florida*, 468 U.S. 447, 468, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984).

> [B]ecause the impartiality of the adjudicator goes to the very integrity of the legal system, the *Chapman* harmless-error analysis cannot apply. We have recognized that "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error." [Citation omitted.]  The right to an impartial adjudicator, be it judge or jury, is such a right. [Citations omitted.]
>
> . . . [A] capital defendant's constitutional right not to be sentenced by a tribunal organized to return a verdict of death surely equates with a criminal defendant's right not to have his culpability determined by a tribunal organized to convict.

*Gray*, 481 U.S. at 668, internal quotations omitted.  As Mr. Young has shown that Judge Hyde was biased against him, his conviction and sentence must be overturned.  "[W]hat matters is not the reality of bias or prejudice but its appearance." *Liteky*, 510 U.S. at 548.

**D.   Because of Judge Hyde's Bias Against Mr. Young, Any Claim Ruled upon by Judge Hyde During the State Post-Conviction Proceeding Should Be Reviewed De Novo by this Court**

243.   Not only did Judge Hyde preside over Mr. Young's trial and motion for new trial, the judge presided over Mr. Young's state writ hearing.  The appearance of bias is heightened by the fact that Judge Hyde served as the sole trier of fact in the state writ hearing.  As a result, Mr. Young was forced to have all

substantive and procedural issues decided by the same judge who had a bias against him. *See Alexander v. Primerica Holdings*, 10 F.3d 155, 163 (3d Cir. 1993) (granting recusal motion based in part on "the fact that this is a non-jury case, and that Judge Lechner will be deciding each and every substantive issue at trial"); *see In re Murchison*, 349 U.S. at 133 (judge disqualified because he acted as both a one-man grand jury and trial judge). Every decision Judge Hyde rendered was tainted by his desire to protect the death verdict against Mr. Young. Every ruling he made was to keep "a dangerous man" from "harming someone else." (Ex. 93.) By word and by deed, the judge assumed the role of the prosecutor. *Vasquez-Ramirez v. United States Dist. Court (In re Vasquez-Ramirez)*, 443 F.3d 692, 701 (9th Cir. 2006) ("the judge oversteps his bounds when he forces the prosecutor to pursue charges the prosecutor would rather not"). "It is no doubt a position that he could fill with distinction, but it is occupied by another person." *In re United States*, 345 F.3d 450, 453 (7th Cir. 2003). Because Judge Hyde was biased against Mr. Young, any claim ruled upon by Judge Hyde during the state post-conviction proceeding should be reviewed de novo by this Court.[20] *Liteky*, 510 U.S. at 548.

## V.

## PREVIOUSLY EXHAUSTED CLAIMS

## CLAIM FOUR

## MR. YOUNG'S CAPITAL SENTENCING JURY WAS DENIED A VEHICLE FOR EXPRESSING ITS REASONED MORAL RESPONSE TO YOUNG'S MITIGATING EVIDENCE, IN VIOLATION OF THE SUPREME COURT *PENRY* LINE OF CASES

244. Mr. Young's convictions, confinement, and sentence violate the Fifth,

---

[20] Based upon the incompetence of state habeas counsel, discussed *post*, and the bias of Judge Hyde, the proper remedy here is for Mr. Young to receive an entirely new state habeas proceeding, including the filing of a new state writ application.

Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because Mr. Young's jury was denied a vehicle for expressing its reasoned moral response to Mr. Young's mitigating evidence; the jury was prevented from giving *full* consideration and *full* effect to Mr. Young's mitigating circumstances.

245.   *Exhaustion*:  This claim was presented as Point Eight in Mr. Young's direct appeal.  (AOB at 12-13, 40-45.)

## A.   Introduction

246.   Long before the jury began to hear any evidence as to whether Mr. Young should be put to death by the State of Texas, the State made its view to the court known that mitigation evidence was nothing more than "touchy-feely stuff . . . ."[21]  (8 RR at 7.)  The State's dismissive and derisive definition of mitigation, in spite of over thirty years of Supreme Court history, drove and ultimately concluded in Mr. Young's capital sentencing jury being deprived a vehicle to give its reasoned moral response to Mr. Young's mitigating evidence.

## B.   State's Evidence in Aggravation

247.   At the sentencing phase of Mr. Young's trial, the State introduced evidence of Mr. Young's prior offenses and what the State described as "a pattern of criminal conduct that started when [Mr. Young] was very young."  (30 RR at 14.)  According to the State, it would show that "pattern of criminal conduct" through "school records, . . . in the way of doctors, . . . [and] in the way of other state agencies that had contact with [Mr. Young] over the years."  (*Id.*)

248.   The State began its case in punishment by introducing evidence of prior criminal acts in which Mr. Young had participated after his release from the Texas Youth Commission.[22]  The State then turned to Mr. Young's so called

---

[21]  *See*, Claim Six, *post*.

[22]  The incidents included the burglary of a gun shop; the burglary of the residence of someone Mr. Young and cohorts thought kept proceedings of narcotic sales at his home; and, testimony that Mr. Young may have planned to stage the robbery of a local store.  (30 RR at 30-197.)

"pattern of criminal conduct" that would establish, according to the State, Mr.
Young's propensity for future dangerousness.

**1.    The State's Evidence of "Pattern of Criminal Conduct" Through
State Agencies**

249.    The State brought in Teresa Candelaria, a lieutenant in the Midland
County Central Detention Center, who testified that Mr. Young was manipulative
because Mr. Young had convinced an officer to give him extra food.  (30 RR at
199.)

250.    The State then called Nathan Wendell, who testified that an
altercation had ensued while both Wendell, then sixteen years old, and Mr. Young,
then fourteen years old, were residents at the Waco Center for Youth.  (31 RR at
19-20.)  Wendell testified that what began as 'horseplaying' between Wendell, Mr.
Young and another boy (31 RR at 13), had ended up with Mr. Young "infuriated"
when a necklace given to him by his girlfriend got broken during the horseplaying.
Wendell described how Mr. Young then frantically began hitting and punching
and kicking Wendell in the head, who refused to hit back.  (*Id.* at 13-14.)
Wendell testified that when he began to cry, Mr. Young then "pulled his pants
down" and put his penis in Wendell's face, and said "Suck, you bitch, suck it."
(*Id.* at 15.)  Wendell testified that he then turned his head, deflecting the penis,
which touched Wendell's ear.  (*Id.* at 16.)  Wendell clarified that Mr. Young had
not tried to force his penis into Wendell's mouth or rape him, but that Mr. Young
had "just exposed himself to [him] and touched [his] ear." (31 RR at 25.)

251.    The State then called Richard McMullin, who worked at the Waco
Center for Youth for over twelve years.  (31 RR at 32-35.)  Mr. McMullin
described the Center's goal as "giv[ing] each youth a chance for change . . . [by]
provid[ing] them with services that give them opportunity to make some
improvements in their life." (*Id.* at 35.)  McMullin testified that Mr. Young had
been sent to the Center because of "behaviors related to ADHD and some

74

behaviors related to violating some laws and, you know, opposition to the authority." (*Id.* at 37.)   McMullin testified that while Mr. Young was originally likeable, over the course of his stay at Waco, he "started having more problems with depression and things that were disruptive."   Mr. McMullin attributed this to Mr. Young's ADHD, which eventually led Mr. McMullin to start "feeling concern about if I could keep other kids safe from him." (*Id.* at 42-43.)

252.   The State called Probation Office Clems, who was first assigned to supervise a then ten-year old Young over the theft of a flute. (31 RR at 215-16.) Clems testified that she supervised Mr. Young for a number of adjudications from 1996 through 1998, including burglary of a building, unauthorized used of a motor vehicle, theft of a firearm from his mother, burglary of a habitation, and indecency with a child and assault causing bodily injury over the incident with Wendell. (*Id.* at 220-21.)   Clems testified that after the last two incidents, Mr. Young was committed to the jurisdiction of the Texas Youth Commission ("TYC") on July 8th, 1998. (*Id.*)   Clems described Mr. Young as bright, impulsive, aggressive, and manipulative. (*Id.* at 222.)   She described Mr. Young as the "worst" child under her supervision in terms of violence and dangerousness in her eighteen year career as a probation officer. (*Id.* at 223.)

253.   The State called Garrett Gilliam, a caseworker at TYC during Mr. Young's imprisonment at the facility. (31 RR at 257-58.)   Mr. Gilliam testified that he was struck by Mr. Young while Gilliam was trying to break up a fight with another inmate. (31 RR at 262-64.)   Gilliam testified that in some occasions, the kids in the TYC dorms, including Mr. Young, would try to take control by rioting. (31 RR at 266.)   Gilliam described Mr. Young as aggressive, dangerous, impulsive, and sometimes deliberate. (*Id.* at 267-68.)

254.   On cross-examination, Mr. Gilliam acknowledge that TYC was basically a prison, where "any attempts at rehabilitation are basically a joke because of the myriad of problems going on inside TYC." (*Id.* at 270.)   He also

acknowledged that Mr. Young was found in a subsequent administrative hearing not to have "intentionally or knowingly or recklessly" hit Mr. Gilliam in the jaw (*id.* at 276-77), and that Mr. Young had written him a letter apologizing for the incident. (*Id.* at 278.)[23]

255.    The State called Jacqueline Timmons, a guard at TYC. Timmons testified that she had received several blows by Mr. Young when she tried to break up a fight. (31 RR at 291-92.) She also testified she considered Mr. Young aggressive, violent, and a dangerous person. (*Id.* at 292-93.)

## 2.    State's Evidence of "Pattern of Criminal Conduct" Through School Records

256.    The State introduced the testimony of Debbie Barton, Mr. Young's first grade school teacher, who testified as to Mr. Young's misbehavior in first grade. (31 RR at 101.) According to Barton, Mr. Young was suspended multiple times for biting and hitting children and damaging books in class (*Id.* at 101-04), cutting children with scissors, and while in kindergarten and first grade repeatedly talking about guns. (*Id.* at 118.) According to Barton, due to his behavior, she requested Young be withdrawn from school. (*Id.*)

257.    Crystal Stokley, a teacher at Mr. Young's middle school, testified that when she asked Mr. Young to give over his wallet chain because it was a prohibited item, Mr. Young became very angry, slammed a door, and gave her "a look that I felt if he could have, he would have killed me." (31 RR at 164.) Stokley then avoided Young and thought of him as a "Jekyll and Hyde type." (*Id.* at 165.)

---

[23]   When Mr. Gilliam explained that the juveniles were assigned to write letters after incidents in order to teach them empathy, DA Schorre stated: "I don't think their program's working, because I've got two dead people in this case and another guy who he did his best to kill." (*Id.* at 285.) The court sustained the defense's objection to the remarks, and instructed the prosecutor to direct his questions to the witness. The court did not instruct the jury to disregard the remark. (*Id.* at 285-86.)

### 3.   State's Evidence of "Pattern of Criminal Conduct" Through Testimony of Doctors

258.   The State elicited testimony from Dr. Don Walker, who examined Mr. Young after he brought a gun to school in the fourth grade. (31 RR at 120-26.) Dr. Walker testified that what he remembered most about Mr. Young was his "extremely strong almost obsession with Rambo like personalities, movie personalities, . . . lots of guns, lot of violence." (*Id.* at 124-25.) Dr. Walker recommended that Mr. Young be referred to a psychiatrist, which he considered a rare referral in his career. (*Id.* at 126.)   Dr. Walker tentatively diagnosed Mr. Young with ADHD and with "conduct disorder under undersocialized aggressive." (*Id.*) Dr. Walker clarified that although "there may be a higher percentage of ADHD people who kill people than non ADHD people, . . . [he did ] not see one as an excuse for the other." (*Id.* at 156.)   When the State asked Dr. Walker if he was surprised that he was testifying at Mr. Young's punishment phase trial, Dr. Walker responded "I wish I could tell you yes, but I'm really not." (*Id.*)   Dr. Walker explained that when he examined Mr. Young as a nine-year old, he feared that Mr. Young "had two strikes against him and a fast-breaking third strike that was over the edge of the plate." (*Id.* at 157.)   Dr. Walker then elaborated:

> I've got to come back and say that the literature does not
> support us in being able to make predictions about who's
> going to do what in the future . . . It would be unethical,
> it would be unrealistic.  My crystal ball broke a long
> time.  The bearings were out many years ago.  You never
> know, but I'll tell you what, I thought he was high
> enough risk that suggested Ray Scardina see him,
> because I have a lot of regard for Ray's ability.  I've
> never seen his report, so I don't know what he said, but I
> wanted him to see him, because I thought he might hurt -

> \- I said himself or somebody else, but I was fearful it
>
> might be somebody else more than himself.

(31 RR 157-58.)

259.   The State called Dr. Helen Short, the psychiatrist at the Waco Center for Youth after Mr. Young was committed there involuntarily through a civil, psychiatric hold. (32 RR at 1-8.) Dr. Short testified that when she admitted Mr. Young to the Waco Center, when he was fourteen and a half years old, she noticed signs of his mental illness, mainly ADHD and hyperactivity. (*Id.* at 14.) In admitting Mr. Young to Waco, Dr. Short testified she reviewed Mr. Young's prior records from other facilities, including Triangle Pines, which led her to the conclusion Mr. Young was "oppositional," defiant, rebellious, argumentative, impulsive, uncooperative, whining, demanding, a liar, someone who steals, without any insight into his behavior, and showed no remorse for his behavior." (*Id.* at 17-18.)

260.   According to Dr. Short, although Mr. Young reported that he did not care what happened to him, she noted Mr. Young stated that "[I]f I keep going down the path I am on now, I may end up in prison." (*Id.* at 20.) When Dr. Short asked Mr. Young about his drug usage, Mr. Young revealed "pretty heavy drug use" for a fourteen-year-old, including as many cigarettes as he could get ahold of, alcohol to the point of being "totally plastered" seven to ten times, marijuana almost daily for a month, using cocaine four times and crystal meth twice, acid five times, and mushrooms twice. (*Id.* at 21-22.) Most of this drug consumption occurred while Mr. Young lived with his father in North Carolina. (*Id.*)

261.   In reviewing his social history, Dr. Short testified she discovered "that Clint comes from a long line of people with heavy legal problems," including alcohol and drug abuse on the father's side. (*Id.* at 23.) Dr. Short reported that according to Mr. Young's mother, the "paternal side of the family is a pretty violent, 'rowdy,' bunch." (*Id.* at 24) The mother also reported that

"[f]ourteen of 16 of the cousins on the paternal side of the family have gone to prison." (*Id.*) Dr. Short testified that although Waco was mandated to do follow-up psychological testing within ninety days after Mr. Young was admitted, the Waco psychologist "just didn't get to it." (*Id.* at 26.)

262.   When specifically asked about her diagnosis of Mr. Young, Dr. Short testified that she had diagnosed Mr. Young as having "Attention Deficit Disorder, ADHD . . . primarily inattentive, conduct disorder and a disorder of written expression." (*Id.* at 27.) After diagnosing Mr. Young, Dr. Short prescribed medication the same medication Mr. Young was taking upon arrival, which she changed according to Mr. Young's incident reports, placed him in the Behavior Management Program, put him in school, in essence, the "usual stuff" that was done at Waco. (*Id.* at 34, 38-39, 44.)

263.   Dr. Short testified that on May 4th, she put Mr. Young on homicide precautions over the Wendell incident. (*Id.* at 45-46.) Dr. Short testified that after the Wendell incident, she "kind of had enough" and decided that Mr. Young be sent to TYC because Waco was not equipped to handle "that kind of aggressive troubled kids." (*Id.* at 47.) Dr. Short testified that her diagnosis of Mr. Young had changed:

> [W]hen he left, I still gave him a diagnosis of ADHD and conduct disorder, but I included, in looking at the record, I included a diagnosis of antisocial personality disorder, which I shouldn't have, because legally or technically I can't but I think, you know, thinking back on it, wondering why I did that, I think that I was so convinced at that point by the persistent and pervasive pattern with Clint, since he was a young child, that that's what was wrong.

(*Id.* at 48.)

264.   When asked what was the best predictor of possible future conduct, Dr. Short responded: "In my opinion and in the opinion of many others and in research, the best predictor of future behavior is past behavior." (*Id.* at 54.)  She went on to state that Mr. Young "was very dangerous . . . easily in the tope five percent" among other kids she had seen. (*Id.* at 55.)  Over an objection by the defense, Dr. Short was asked what would move her evaluation from antisocial personality disorder to "being a psychopathic." (*Id.* at 58.)  From psychopathic, the State elicited Dr. Short's opinion as to 'serial killers.' (*Id.* at 60.)

265.   Dr. Short testified that although Mr. Young had suffered febrile seizures when he was eighteen months old, she did not think those seizures were the cause of Mr. Young's problems. (*Id.* at 167.)  She repeated that there was no treatment for a person with a personality disorder, that the "best you could do is protect other people from them," that "statistically, the younger they begin to criminally act out, the worse the prognosis is." (*Id.* at 169-70.)

### C.   Mr. Young's Evidence in Mitigation

266.   In response, Mr. Young presented two categories of mitigating evidence. The first consisted of testimony from Mr. Young's mother, stepbrothers, stepsisters, and neighbors, who described Mr. Young's unhappy childhood as one plagued by his severe ADHD, his family's inability to deal with such brain dysfunction, and the dysfunctional family into which Mr. Young was born.

267.   Carla Sexton, Mr. Young's mother, described Mr. Young's traumatic childhood as well as her own less than ideal childhood.  Carla testified that she had been raised by her uncle when her mother abandoned her, and that she had married Mr. Young's father, William Young, or "Billy," to get out of her home. (33 RR at 80.)  Carla testified that she lived with Billy less than a year or so because he was mentally and physically abusive, and that his abuse affected her pregnancy with Mr. Young, who was born a month before full term. (*Id.* at 81.)  Carla testified that Billy was also physically abusive of his other four children, of

whom he had custody, and that Carla would get between Billy and his children so "he would take it out on [her] instead of them." (*Id.* at 81-82)

268.   Ashamed of what she considered her own fault, she only left Billy after her mother came to her house, saw her swollen face, and asked her if Billy had been hitting her. With the help of her family, Carla, with her nine-month-old child, left. (*Id.* at 82.) Carla did not receive any child support from Billy. (*Id.* at 83.) When Mr. Young was eighteen months old, he had his first seizure while visiting with Billy; and a second seizure when he was about twenty-four months old. (*Id.* at 84; Ex. 2 at 7, 12-15 [Pediatric-Seizure Records].)

269.   At that time, on the sporadic occasions when Mr. Young would visit his father, Mr. Young would come back "real tight, just hyper, dirty, hungry." (*Id.* at 84.) After the febrile seizures, Carla noticed something different about Mr. Young. She began to notice his hyperactivity, how he could not sit and watch cartoons like normal kids. (*Id.* at 85.) Carla described that around this time, Mr. Young got "caught in the middle" between her and Billy. First, Billy would come around to see Mr. Young when it was easy for him, and at one point, Billy took Mr. Young with him. When Carla went to get her son back,

> [I]t got physical and Clint was in the house screaming
> that he wanted his mama, and several months went on
> and he wouldn't let me have him . . . and [Billy] went
> and filed for divorce and he called me, and he said, 'if
> you'll come sign these papers, I'll let you have him and
> you can take him, but I don't pay any child support," so I
> met him at a gas station in Pittsburgh and signed them,
> never read them, and he let me have him and had him
> ever since.

(33 RR at 86.)

270.   Only years later, when Carla was finally able to modify the forced divorce decree, was she able to collect child support from Billy, about two to three years' worth, although Billy never provided health insurance for Mr. Young. (*Id.* at 87.) To support her child, Carla worked up to three jobs at the time, and never sought public assistance because Mr. Young "was for [her] to take care of." (*Id.* at 88.)

271.   Although both Mr. Young and Carla were looking forward to his attending kindergarten, Carla began getting calls from the school early on. (*Id.* at 90.) He began to have problems being still in the classroom, paying attention, and focusing. (*Id.*) She first heard about ADHD when she went to Mr. Young's kindergarten to discuss his problems. Upon the suggestion from the school, Carla took Mr. Young to the doctor. From there Mr. Young began what would become a long history of prescription psycothropic medications. (33 RR at 91.)

272.   Mr. Young's problems worsened when he entered the first grade, and Carla discontinued the Ritalin because she saw no improvement and he continued to have side effects. (*Id.* at 93.) Caring for Mr. Young became very frustrating as Carla was going to school to become a hairdresser and she continued getting calls from school. (*Id.* at 94.) Mr. Young began refusing to go to school, and many times, Mr. Young would come back from school crying. (*Id.* at 94.)

273.   When Mr. Young was around four years old, Carla married her current husband, Quentin Sexton. (33 RR at 88-89.) Soon after, while Mr. Young was having problems with school, Carla became pregnant with her second child, Jesse. (*Id.* at 95.) Around this time, as their house had burned down, the Sexton family -- Mr. Young, Carla and Quentin, and Brandy, Quentin's daughter -- all lived in a trailer next to the destroyed property. During this time, Quentin was drinking an average of twelve to eighteen beers a day. As Quentin's patience with Mr. Young began wearing thin, Carla began fighting with Quentin over how to discipline Mr. Young. (*Id.* at 96.)

274.   When Mr. Young began the second grade, Carla reinitiated medicating him again, to no avail.  It was in second grade that Mr. Young was assessed and labeled emotionally disturbed.  (*Id.* at 97.)  After the diagnosis, Carla was "totally lost," and without any help from Mr. Young's father, she did what she could do: "I took him to doctor after doctor . . . trying to find out what was wrong." (*Id.* at 97.)  She took him to too many doctors to keep track of.  (*Id.* at 98.)  As the home situation became worst, Carla argued with her husband "all the time, the stress, no home, my son, job, school," to the point where she took it out on Mr. Young.  (33 RR at 99.)

275.   When Mr. Young was nine years old, he took and old antique gun that the Sextons kept as a "knicknack."  When Mr. Young was caught at school with the antique gun, charges were filed against both Carla and Quentin for endangerment to a child.  (*Id.* at 100.)  After that incident, Carla sent Mr. Young to live with Billy in Wyoming for three months, "a bad mistake" on her part.  (*Id.* at 101.)

276.   At that point, because Carla did not know what else to do, Mr. Young was sent to Triangle Pines Group Home, the first of what would become a long list of agencies failing to address Mr. Young's special needs.  There, Mr. Young was prescribed a number of medications, including, but not limited to, Ritalin, Cylert, Zoloft, and Thorazine. (*Id.* at 103.)

277.   Triangle Pines was a  brand new facility, with Mr. Young being the second student there.  (*Id.* at 105.)  Although Carla was very hopeful at the beginning about Triangle Pines, for which Mr. Young's elementary school was paying (Ex 5; Placement Contract Jefferson  School ), she later acknowledged it was a bad decision.  (*Id.* at 106.)  Mr. Young stayed at Triangle Pines for only two or three months.  Upon Mr. Young's return from Triangle Pines, Carla took her son to be examined by Dr. Scardina.  (*Id.* at 107.)  Again, the stress at home was mounting, with Quentin drinking excessively, to the point of passing out.  (*Id.* at

83

108.) Carla continued taking Mr. Young to doctors hoping they would help her get her "baby" back, and continued trying different medications. (*Id.* at 107.)

278.   As the medications changed, so would Mr. Young's behavior. (33 RR at 109.) "[D]epending on which medication it was[,] [s]ometimes he would be wound up real tight, just very hyper, and then sometimes it depended on what it was, he just wanted to sleep." (*Id.*)

279.   Once Mr. Young returned from his father's house in Wyoming, his run-ins with the law became worse. (*Id.* at 103.) Mr. Young's first formal incident was at ten years old, when he and his older stepsister brought home a flute from school. (*Id.* at 103-04.) Although Carla returned the flute undamaged, Mr. Young was put on juvenile probation. At thirteen or fourteen, although not prosecuted, Mr. Young and other boys were caught stealing wine coolers from the local store. (*Id.* at 104-05.)

280.   In the winter of 1996, Carla reluctantly sent Mr. Young to North Carolina to live with his father. (*Id.* at 110, 112.) Towards the end of the fall, Carla received a telephone call from a frantic and scared Mr. Young in North Carolina. (*Id.* at 112-13.) When she went to pick up her son at the sheriff's station where he was being held, Carla saw bruises on Mr. Young's neck, stomach, and back. (*Id.* at 114.) She would later find out that Mr. Young, then thirteen years old, had been assaulted by his own father. Billy was later charged for assaulting his own son. (35 RR at 136-37.)

281.   The problems continued once Carla brought Mr. Young back home. During a short weekend vacation with her husband, upon leaving Mr. Young at a friend's house, Carla received a call informing her that Mr. Young had taken the friend's car and driven away. (33 RR at 116.) Carla first drove her husband home, who told her she had to do something with her son. She then picked her son up at the sheriff's station in Minden, Louisiana. On the ride back, Mr. Young, in anger, demanded that her mother let him go. (*Id.* at 117.) Every time she would

stop at a red light, he would try to get out of the car.  Not knowing what else to do,
Carla drove her own son to the Marion County Sheriff's Department, to file
charges against him because she "didn't want him on the street." (*Id.* at 118-19.)

282.   Mr. Young was then declared mentally ill and was committed to the
Waco Center for Youth. (*Id.*)  Again, Carla was hopeful Mr. Young would get
some assistance at Waco. (*Id.* at 119.)  During an outing while Mr. Young was in
Waco, Carla took Mr. Young to the zoo, the baseball museum in Waco, and spent
a good day together. (*Id.* at 120.)  During the outing, upon Mr. Young's
insistence, Carla bought a necklace Mr. Young wanted to buy for a little girl that
was also at Waco, a "little girlfriend."  Once Mr. Young had been expelled from
Waco, he was sent to TYC. (*Id.* at 121.)  He was supposed to stay at TYC for
thirteen months, but ended up being detained there for almost three years. (*Id.* at
122.)

283.   Toward the end of Mr. Young's stay at TYC, for the first time in a
long time, Carla noticed a drastic change, this time for the better.  "He was more
calm and settled and not as rambunctious and seemed like he had the ability to
think things through more." (33 RR at 122.)  While at TYC, Mr. Young obtained
his GED. (*Id.*)  Carla, however, did not attend his graduation.  When he was
released from TYC, although Carla wanted to pick him up, Mr. Young insisted on
taking the bus back home. (*Id.* at 122-23.)

284.   When Mr. Young came home, now almost eighteen years old, he was
"wonderful."  He had matured a lot while at TYC although he was still on
medication.  At first, Mr. Young dutifully took his medication, and apologized to
Carla for all the things he had put her through. (*Id.* at 124.)

285.   Mr. Young was "like a different kid" when he came home. (*Id.* at
123.)  He had goals, wanted to go to the Army and had a positive attitude. (*Id.* at
123-24.)  However, Carla never met with Mr. Young's parole officer, and at no

time did a parole officer meet with her and tell her the conditions of Mr. Young's juvenile parole. (*Id.*)

286.   At first, Mr. Young successfully maintained employment and was going to school. Carla put rules in place to limit the people with whom he could associate, in particular, his older brothers, because of their drug activity. (*Id.* at 125-26.) Once Mr. Young lost his job, and although Carla begged and pleaded with Mr. Young against it, Mr. Young went to work with his father in Wichita Falls, and then laying carpet with Dino and Dano, his older twin brothers. (*Id.* at 126.)

287.   When he came back form Wichita Falls, Mr. Young had drastically changed, this time not for the better. (*Id.* at 126-27.) He was no longer taking his medication, he was not clean, he was no longer going to school, and his interest in the Army no longer seemed genuine. Carla begged and pleaded with him to stay on the medication, but Mr. Young told her he just wanted everybody to think he was normal. (*Id.* at 125.) Young also insisted on staying with his stepbrothers, and left Carla's home to go live with Dano at Shady Shores. (*Id.* at 127.)

288.   Since Carla was under the impression the parole officer had the ability to do so, she called Mr. Young's parole officer to ask for help, to "put him back if nothing else, make him take these meds." (*Id.* at 128.) Every once in a while, Mr. Young would pop in to see his mother. He would go to her home and ask her for money, since he had already sold his car. Carla worried that he was doing drugs, whether he was eating, or whether he had a place to sleep. (*Id.* at 129.)

289.   On Thanksgiving of 2001, Carla went to get her son, took him home and made him something to eat. (*Id.* at 129.) When she asked him to let her wash his clothes because he was "filthy dirty," Mr. Young said he could not stay. When he asked Carla to take him back to Shady Shores, Carla refused, so Mr. Young left. That was the last time Carla saw her son before he was arrested in Midland

County. (*Id.*)

290.   In spite of all his problems, Carla described her son as kind. (33 RR at 130-33.) He was very protective of his little sister, holding her, playing with her, and helping Carla give her baths. When he was sent to TYC, he wrote letters to Quentin asking him to stop drinking. Mr. Young loved to be outside, helping his mother in the garden. As a child, Carla never saw her son being cruel toward any animal in any way. Mr. Young was a very accident prone child. (*Id.* at 132)

291.   Carla testified that once Mr. Young was arrested for the murders, she had visited, written, and kept in contact with him through telephone calls. (*Id.* at 137.) She also accompanied him to court and had seen a change in him, making her believe that to a certain degree, he understood what was going on. Carla ended her direct testimony by asking the jury to spare her son's life. (*Id.* at 143.)

292.   On cross-examination, Carla did not agree with the State's description of Mr. Young as being obsessed with guns nor that he had an unusual fascination with guns. (*Id.* at 146.)

293.   Other family members and neighbors testified as to Mr. Young's painful childhood. Mr. Young's father, Billy Young, was a severe alcoholic, who would drink to the point of passing out, then wake up and drink some more. (33 RR at 157, 190, 245, 257. ) Billy would drink "from the time he got up to the time he came home." (33 RR at 245.) His children would have to take cigarettes out of his hand because he would pass out, scared he would burn the house down. (33 RR at 245-46.) In addition to alcohol, Billy abused drugs, sometimes spending hundreds of dollars on crack cocaine (33 RR at 253), and sometimes sharing drugs with at least one of his sons. (33 RR at 266.) Billy was a "mean" person, even when he was not drinking, whose children lived in fear of him. (33 RR at 193.)

294.   His children feared him so much that when he passed out, the children would feel "relieved . . . [b]ecause [they] knew [they] were safe for one more day, or until the next time. (*Id.* at 261.) Billy was also abusive toward the

women with whom he lived.  (33 RR at 197.)

295.   Though Billy hit all his children, he was particularly abusive towards Mr. Young, whom he severely and repeatedly beat. (33 RR at 265-66.)  When Mr. Young was four or five, Billy picked Mr. Young up and threw him against the bathroom wall.  (*Id.* at 259.)  On another occasion, after apparently receiving a note from Mr. Young's school, Billy took Mr. Young to a shed and hit him with a two by four.  (33 RR at 155, 247-48.)  When Mr. Young, as he was being hit, called Billy "a mother fucker," Billy began hitting Mr. Young with "his fists, neck, face, body."  (*Id.* at 248-49.)  Billy was placed under arrest and given probation for this assault on Mr. Young.  (*Id.* at 215, 248.)

296.   In addition to the physical abuse, Billy was also verbally abusive towards Mr. Young, calling him "'sorry little son of a bitch' and call[ing] him all kinds of foul, vulgar language and . . . always on him, talking down to him."  (33 RR at 258.)  Billy would call his son "worthless" through all of Mr. Young's childhood.  (*Id.*)  Yet, although Mr. Young would usually come back home upset from visiting Billy, and sometimes with bruises on his legs and the lower part of his body, Mr. Young loved going to see his father.  (34 RR at 121-22. )

297.   Mr. Young's treatment by his stepfather was also far from ideal. Quentin Sexton, also an alcoholic (34 RR at 119, 127-29), would lose his temper with Mr. Young, once hitting Mr. Young repeatedly with his steel-toed boots.  (34 RR at 119-20.)  When six-year-old Clinton complained of Quentin's rough play with him, Quentin would call him a "pussy," and tell him to "go cry on his mom's tit."  (34 RR at 120.)

298.   Quentin once broke a broom over Mr. Young's head.  (35 RR at 140.) At the Sexton household, Mr. Young would be punished with paddles and belts, and his screams and could be heard by his stepsister in another room.  (34 RR at 121.)  Yet, Mr. Young's desire to please Quentin, or perhaps fear of him, made Mr. Young walk about a half a mile away to a store to get a beer for Quentin,

when Quentin asked Mr. Young to get him a beer from the refrigerator and there
was none. (33 RR at 188.)

299.   Lay witnesses also testified as to Mr. Young's ADHD and the
repercussion his ADHD had on him.  Almost all of Mr. Young's mitigation
witnesses remember how 'hyper' he was as a child.  He was more active than other
boys. (33 RR at 159.)  Mr. Young would go from one extreme to the next:  he
would be hyper for a little bit and then he would be real calm. (33 RR at 264.)  He
had a very short attention span. (*Id.* at 263.)

300.   Paula Pettingale, who had a lake house near the Sextons' and who
knew Mr. Young since he was about three years old,  remembers Mr. Young being
hyperactive even as a young child. (34 RR at 127-30.)  Mr. Young would throw
tantrums and on at least one occasion, cried and screamed for about an hour. (*Id.*
at 133.)  He was also impulsive.  Once, when Mr. Young was around five years
old, he tried to ignite a Christmas tree because the tree had no lights. (*Id.* at 198.)

301.   In order to deal with his hyperactivity, some correctional officers
allowed him to volunteer to clean the dorm so that he could work off some of his
energy. (35 RR at 8-9, 33.)  To deal with Mr. Young standing up during class,
one of his teachers asked Mr. Young to help other students, straighten books, or
sweep the floor, something to help him transfer some of his energy. (35 RR at 27.)

302.   In spite of his ADHD and his behavioral problems, his siblings,
friends, teachers and even some correctional officers thought fondly of Mr.
Young, remembering him as a "good kid." (35 RR at 27, 34.)  Mr. Young was
great to have around as a little brother (33 RR at 195), really kind, loving and
smart. (33 RR at 182, 195; 34 RR at 123, 155.)  He was particularly attached to
Jessie, his youngest sister, helping her get dressed, playing with her, and never
acting hurtful towards her. (34 RR at 124-25.)

303.   His siblings and neighbors testified they never saw Mr. Young being
cruel to animals. (34 RR at 124, 132, 149.)  Although he was hyperactive,

89

siblings, neighbors, teachers and correctional officers remembered him as neither
violent nor aggressive. (34 RR at 132; 35 RR at 10.) Others remember that Mr.
Young seemed to have a need for approval, and a need to please. (34 RR at 132.)

304.   Although teachers and correctional officers recognized he was
hyperactive, they testified they did not think of him as a problem. (34 RR at 149;
35 RR at 8-9, 34, 40.) A correctional officer called him "my little boy." (35 RR at
12.) One of his teachers while Mr. Young was incarcerated at TYC, referred to
Mr. Young as "Tigger," as in Tigger and Pooh, because he bounced around a lot,
kind of hyper, and his uniform then was orange, like Tigger. (35 RR at 29.)
Another correctional officer testified that she liked Mr. Young so much that she
could have taken him home as a foster child. (35 RR at 43.)

305.   Lay witnesses also remarked on the change they saw in him once Mr.
Young received the adequate medication to treat his ADHD. Toward the end of
his incarceration at TYC, his teachers rejoiced with him in the remarkable change
in his behavior - some describing the change as "miraculous." (35 RR at 27-28.)

306.   Lay witnesses testified about the hopeful outlook and optimism Mr.
Young had when he was first released from TYC. He seemed genuinely happy to
reconnect with people with whom he had shared happy moments, and seemed
melancholic at the things he had to forgo, like playing ball, while incarcerated as a
juvenile.[24] (33 RR at 180-82.) He seemed to rejoice in helping his sister with her
gardening, and playing with her kids. (33 RR at 210.) He was a good worker who
an employer described as "terrific," never stealing from the store or destructive in
the store, never rude or impolite or aggressive toward customers. (33 RR at 223-
26.) Mr. Young encouraged his employer's daughter to continue with her
education, treating her and her brothers as if they were Mr. Young's own little

---

[24]   The court sustained the State's objection as to hearsay when Ms. Kelly
Sexton began testifying that, upon seeing boys playing ball, Mr. Young had said
"You know, I missed all that . . ." (33 RR at 180.)

siblings, helping with their homework and caring for them.  (33 RR at 233-35.)

307.  Lay witnesses also testified, as his mother had, about the deteriorating circumstance surrounding Mr. Young before the murders.  By August 18, 2001, his stepsister, Sharon Renee Gentry, told him to leave the premises and get clean when he first arrived home in preparation to attend her wedding.  (33 RR at 207-09.)  Gentry told him to leave because he was not himself and seemed in need of a shower.  As someone who had herself experimented with drugs, Gentry considered Mr. Young's behavior as consistent with someone who has been using methamphetamine.  (*Id.* at 208.)

308.  After hearing about the murders for which Mr. Young stood accused and convicted of, lay witnesses testified about their sorrow over the events, but also professed continued love towards Mr. Young and their intention to continue their valued friendship.  (33 RR at 230, 238; 34 RR at 137, 155).  Though they were aware of the murders, their love for Mr. Young did not waiver.  Such was the case of Paula Pettingale, who knowing about the crimes, decided to keep the childhood pictures she had of Mr. Young up in her home by the lake.  (34 RR at 137.)

309.  Two lay ministers testified about Mr. Young's spiritual beliefs while in detention awaiting trial, testifying about his devotion while they ministered to him, and that, in spite knowing he was accused of murders, never felt threatened by Mr. Young during their face- to- face prayer meetings.  (34 RR at 244-46, 254, 258.)  Siblings, friends, teachers, correctional officers and neighbors all asked the jury to spare Mr. Young's life.  (33 RR at 203; 34 RR at 126, 137.)

310.  The second category of mitigating evidence came from expert witnesses who discussed Mr. Young's brain dysfunctions, the consequences of Mr. Young's abused and troubled childhood, and the repercussions Mr. Young's ADHD had on his development.  They also described the unfortunate, long history of improper and inadequate treatment Mr. Young received at the hands of state-

run agencies entrusted with his well-being, which instead of providing adequate treatment, gave up on him and passed him on to other agencies. (34 RR 44-45, 48; 36 RR at 23, 37- 40.)

311.   Dr. Meyer Proler, a physician with a specialization in clinical neurophysiology, testified that a recent electroencephalogram or "EEG" given to Mr. Young, and a qEEG (quantitative EEG), were abnormal. (32 RR at 180-87, 203.) In comparing the EEG done on Mr. Young in 2003, to the one done in 1993, Dr. Proler testified that not only was the 1993 exam also abnormal, but that the comparison showed the abnormality had become more severe. (*Id.* at 206.) Dr. Proler testified that the 2003 EEG was consistent with severe ADHD and that while the EEG showed abnormality that denoted a disturbance in physiology, it was still possible to treat Young's condition. (*Id.* at 206, 208.)

312.   Doctor Daneen A. Milam, a chemical psychologist, spent from ten to twelve hours with Mr. Young and administered a series of neuropsychological tests. (34 RR at 14.) She testified that while Mr. Young's I.Q. was in the 85th or 90th percentile, his brain functioning was only within the normal limits, what she would expect from someone with an I.Q. in the 50th percentile. (*Id.* at 16-17.) Dr. Milam testified that she saw a consistent pattern of ADHD in Mr. Young based upon her review of the records and interviews she conducted. (*Id.* at 20.) She testified that ADHD prevents regular inhibitors of conduct from developing normally, creating an inability to inhibit behavior across the board (*id.* at 24), she also noted that ADHD affects a person's ability to pick up or perceive social clues, because a person with a ADHD cannot focus. (34 RR at 48.) She indicated that a person's behavior is part genetics, in this case the ADHD – contributing to poor impulse control -- and part shaped by the environment surrounding the person when developing -- in the case of Mr. Young, his family dysfunction. (*Id.* at 25.) Providing an analogy for Mr. Young's early development, or lack thereof, Dr. Milam described Mr. Young as a "Mercedes-Benz with this great motor and no

brakes, no brakes at all." (*Id.*)

313.   After reviewing Mr. Young's records, from kindergarten to the day he left TYC, Dr. Milam concluded that most of the conduct identified as problematic emanated from Mr. Young's severe ADHD. (34 RR at 27.)  She testified that a five-year-old child does not choose to be bad. (*Id.* at 30.)  When Mr. Young was diagnosed with ADHD and began being medicated, in her opinion, no one "ever looked across [the] records before" and noticed that Mr. Young did not respond well to stimulants such as Ritalin, to control his ADHD. (*Id.* at 31.)

314.   When Mr. Young was in first grade, the stressors in Mr. Young's early life increased, especially around the time his house burned down. (*Id.* at 34.)  As the continuous stressors mounted, Mr. Young's behavior continued being inappropriate, the same type of behavior other children normally have, "just more of it." (*Id.* at 35.)  By second grade, Dr. Milam testified that Mr. Young was deemed "at risk" because of his low performance in mathematics and writing. (*Id.* at 36.)  At this time, although Mr. Young was seeing a child psychiatrist and a child psychologist, leading to remarkable improvement, the visits were discontinued because of their expense. (*Id.* at 37.)

315.   By the third grade, Mr. Young's grades were below average, and his school records described him as having poor judgment, impulsiveness. (*Id.* at 38.)  Dr. Milam testified that these records reflected some disruptive behavior and that she was concerned with the decisions on how Mr. Young was handled at that time. (*Id.*)  Dr. Milam concluded that at this time, there was enough hostility against Mr. Young at home that led to him being sent to live with his father. (*Id.* at 39.)

316.   Dr. Milam testified that Mr. Young's constant complaining about having stomachaches was really tied to the stimulants he was being prescribed to control his ADHD. (*Id.* at 40.)  While he continued to have problems at school during the forth grade, Dr. Milam concluded that it was "very difficult for him to do his homework when his mother is working from 4:00 until 1:00 in the

morning." (*Id.* at 41.) Dr. Milam testified that the label Mr. Young received as "emotionally disturbed" indicated family dysfunction in Mr. Young's life. (*Id.* at 44.) Given the diagnoses by Dr. Walker when Mr. Young was in fourth grade, Dr. Milam testified that Mr. Young should have received follow-up psychiatric evaluation. (*Id.*) Instead, he was sent to Wyoming to live with his father, which had a devastating effect on Mr. Young. (*Id.* at 45.)

317.   Unlike other children who were developing proper inhibitors, Mr. Young was unable to do so, thus "growing into his deficits," and becoming more and more identified as a problem. (*Id.* at 46.) Dr. Milam characterized as "a lost year" the year it took for Mr. Young to see a psychiatrist from the time he was identified as needing to see one. (*Id.* at 48.) By the fifth grade, Mr. Young instead was sent to Triangle Pines, which according to Dr. Milam, was a "disaster." (*Id.* at 49.) Instead of properly evaluating and treating him, Mr. Young was discharged from Triangle Pines for exhibiting the same behavior he was sent to Triangle Pines to modify. (*Id.* at 49-50.) Instead of the structured environment he needed to deal with his ADHD, Mr. Young was once again sent to live with his father, an unstructured environment where there were an abundance of drugs. (*Id.* at 51-52.) Once at Waco, Mr. Young's history of receiving inappropriate treatment continued. (*Id.* at 53.) The medication given to Mr. Young was totally ineffective in controlling the behavior cause by his ADHD. (*Id.* at 53-54.)

318.   Mr. Young was also expelled from Waco for exhibiting the same type of behavior he was sent there to learn how to control. (*Id.* at 56.) Dr. Milam characterized the incident with Mr. Wendell as indecency to a child as "totally bogus." (*Id.* at 56.)

319.   As had been the case at school, at Triangle Pines, and at Waco, Mr. Young again received inappropriate treatment once he was sent to TYC. (34 RR at 59-60.) As a child who had received stimulants since the age of six, Dr. Milam did not have an explanation why TYC would determine that Mr. Young had "no

94

known medical needs" upon admission. (*Id.*) Neither could Dr. Milam explain
why, although upon admission TYC recommended that Mr. Young receive a high
level of care, where he "require[d] supervision by multiple staff in limited access
setting," Mr. Young was placed in a level of care with minimal supervision. (*Id.* at
59-60.)

320.  Dr. Milam could not explain either why a child of fourteen years old
who, during his admission intake at TYC  reported extensive drug and alcohol
consumption, expressing that he felt hooked on alcohol, and in spite of reporting a
family history of intensive drug and alcohol abuse, for the two years and nine
months that Mr. Young was at TYC, never received any drug treatment
whatsoever.  (34 RR at 62-63.)

321.  Reminiscent of what others had testified about his father, Mr. Young
reported "that he would awake in the mornings drinking to relieve the withdrawal
symptoms due to his alcohol abuse." (Ex. 3 at 28 [Chem. Dep. SASSI]). To Dr.
Milam, it did not make sense that TYC, having Mr. Young's records, and having
found Mr. Young to easily meet the criteria as a chemically dependent patient, did
not provide Mr. Young with any chemical dependency treatment. (*Id.* at 64, 96.)

322.  The limited treatment that Mr. Young received outside of the standard
group program that TYC offered, an anger management program, was self-
initiated. (34 RR at 68.)  Again, Mr. Young was expelled from that treatment
because he could not control his anger. (*Id.* at 69.)  As Dr. Milam testified, "[h]e
got angry at anger management class and they kicked him out . . . [j]ust like
Triangle Pines." (*Id.*)

323.  Dr. Milam testified she could not explain why the Treatment Needs
Assessment given to Mr. Young a month before he was released from TYC, and
where Mr. Young had been given psychoactive drugs while at TYC, stated he had
no known medical needs. (*Id.* at 72.) Nor could Dr. Milam explain that once
released from TYC, and when he was on parole, Mr. Young was not ordered to go

to mental health programs, and continue his medication regime. (*Id.* at 74-75.)

324.   Dr. Milam described the substantial disruptions of program incidents memorialized in the TYC records as "hauntingly familiar" with Mr. Young's records as a first grade student: talking back, cursing, getting out of his personal area, shooting rubber bands. (34 RR at 77.)   Most of the incidents describing assault on students referred to trivial incidents like popping students with rubber bands and shoving. (*Id.* at 79.)   Of the fourteen incidents categorized as a danger to others, some involved food fights and beating on the cafeteria table. (*Id.*)   Because everything needed to be written down, some of the incidents were written down even though they were just allegations. (*Id.* at 80.)

325.   The problems that Dr. Milam considered serious, by comparison, were few.   There were only two "possession of a weapon" incidents, one when Mr. Young was found to possess a tattoo machine, and when he was found with a needle which could be used to create tattoos. (*Id.* at 82.)   There were two "assault to staff" incidents, where a staff member was hit while trying to separate Mr. Young and another youth, and an incident of which Mr. Young was acquitted because it could not be shown that Mr. Young had intended to hit the staff member. (*Id.* at 83.)   The single incident categorized as destruction of property entailed Mr. Young writing on his jacket.   The single incident classified as "injury to self" entailed Mr. Young tattooing himself. (*Id.*)

326.   Dr. Milam testified that Mr. Young's long internment in TYC meant that Mr. Young's incident-prone behavior was not voluntary, not a product of choice, but rather, involuntary. (34 RR at 87-88.)

327.   Comparing the psychiatric follow-ups to the incident summary, Dr. Milam was able to conclude that once the TYC psychiatrist found the adequate doses of the medication that worked for Mr. Young, the number of incidents dropped dramatically. (*Id.* at 92.)   Dr. Milam testified that the TYC psychiatrist continued trying different medications and different combinations until, towards

the end of Summer of 2000, "[t]hey got it right.  No doubt they got it right.  (*Id.* at 93.)

328.   Once Mr. Young was paroled, however, continuing medication was not made a condition of his parole.  (*Id.* at 93.)

329.   Dr. Milam testified that although Mr. Young was a bright boy, there was something significantly wrong with his brain, a condition for which Dr. Milam opined he was never actually treated.  (*Id.* at 95.)  Although the symptoms of his ADHD – his behavior -- were treated, Mr. Young never received treatment for the underlying problem, his ADHD.  (*Id.* at 96.)

330.   On cross-examination, Dr. Milam testified that her diagnosis of Mr. Young was mild brain damage, severe attention deficit disorder and severe behavioral problems.  (*Id.* at 103.)  During cross-examination, the State minimized the role of Dr. Milam's testimony by chastising her for not reviewing the records of the crimes for which Mr. Young was convicted, thus implying that Dr. Milam's testimony should be confined to the crimes in question, rather than as mitigating evidence outside of the confines of the crimes and only concerning future dangerousness.  (34 RR at 105-08.)

> Q.   As the defense witness which you regularly appear as, that's true, the mitigating factors, you're supposed to bring out those things that will try to convince a jury that they should not assess the death penalty.  And I understand, but now you've made yourself, instead of an independent witness, an advocate for the Defendant?
>
> A.   How?
>
> Q.   Well, you've already said you're supposed to bring out just the mitigating factors?
>
> A.   Pro and con.  I'm just supposed to tell the truth.

Q.   Well, yes, ma'am, but part of the truth is what
     happened during the crime, what his conduct was,
     what may've motivated him to do it, why he
     reacted that way under certain circumstances?

(34 RR at 105.)

Q.   I mean, the jury is looking at you for a diagnosis,
     which you gave us a moment ago, and now a
     prognosis, okay.  What is your prognosis as a
     defense expert who regularly appears in capital
     murder cases on behalf of the Defendant, what is
     your prognosis for this Young Defendant?

A.   That he will probably have to be incarcerated the
     rest of his life.

Q.   You don't see -- I mean, are you telling this jury
     that -- that he can't be fixed, is that what you're
     saying?

A.   He can't be fixed.

Q.   Cannot be fixed?

A.   He could have.

Q.   Well, if ifs and buts were candy and nuts, we
     would all have a very merry Christmas.

A.   That's true.

(34 RR at 107-08.)

331.   When Dr. Milam explained that Mr. Young's actions during the
crimes were the result of a combinations of several factors, including his ADHD,
his substance abuse problems, his genetics, his environment and a series of
circumstances, the State went back to the future dangerousness aspect of Mr.
Young's behavior:

Q.    This Defendant is fixed, and as far as psychology
or psychiatry is concerned, y'all can't fix him.
He's broken and you can't fix him?

A.    He can be controlled, that the meds – he can be
controlled by medication and they proved that at
TYC.

Q.    That's your opinion?

A.    Yes, sir.

(34 RR at 109-10.)

332.    Dr. Roy Mathew, a psychiatrist and an adviser on the advisory board
of the Diagnostic and Statistical Manual, Fourth edition ("DSM IV") in the area of
drug abuse, interviewed Mr. Young twice, for about four and a half hours, and
reviewed over twenty-four documents, including reports from Deputy Kent
Spencer and Deputy Reba Beam.  (34 RR at 165.)   Based upon the review of the
records, Dr. Mathew testified that Mr. Young was prescribed a number of
psychotropic medications throughout his life, including Ritalin, Thorazine, Cylert,
Zoloft, Wellbutrin, Adderall, Dexedrine, Clonidine, Denadryl, Depakote, and
Mellaril.  (*Id.* at 166.)  Dr. Mathew, noticing that Mr. Young had been civilly
committed to Waco Center, testified that by finding that a person can no longer
manage his own affairs, the responsibility of caring for that person becomes the
psychiatrist's.  (*Id.* at 167-68.)

333.    Dr. Mathew testified that Dr. Short's diagnosis of Mr. Young as
having antisocial personality disorder as a fourteen-year-old child was improper.
(*Id.* at 171.)  Because of the extremely negative connotation of that term, and
because personality is not formed at that age, the standard practice in
psychiatry was not to make this diagnosis before the patient turned eighteen.  (*Id.*
at 172.)

99

334.   Dr. Mathew testified "there is no question" Mr. Young has very severe ADHD, which Dr. Mathew described as a brain disorder with physical differences in the brain. (*Id.* at 173-74, 177.)  According to Dr. Mathew, the development of a child with ADHD would also be influenced by the environment surrounding him "so that if an attention deficit disorder child is born into a dysfunctional family where parents themselves have problems, then that child grows up, that child's personality and attention deficit disorder will be very different compared to the child who was born into a good family."  (34 RR at 178-79.)

335.   Providing an analogy for Mr. Young's brain disorder, Dr. Mathew described Mr. Young's ADHD as a computer with a faulty electric generator, unable to regulate the amount of energy the brain received with the amount of activity it produced. (*Id.* at 181-82.)  The faulty electric generator produced a child who could not focus on any one thing when there were a number of stimuli around him. (*Id.* at 183-84.)

336.   Dr. Mathew testified that there was a great correlation between ADD and drug abuse, with some researchers concluding that as many as forty percent of ADD patients start using drugs at a very early age. (*Id.* at 186-87.)  While amphetamine was used to treat two conditions, narcolepsy and attention deficit disorder, methamphetamine is not clinically used because it is highly addictive. (*Id.* at 188.)  Methamphetamine, as all amphetamines, can produce delusions or psychosis that are indistinguishable form paranoid schizophrenia. (*Id.* at 189-90.)

337.   Dr. Mathew testified that, based upon his review of the records and his interview with Mr. Young, in his opinion, Mr. Young was intoxicated with methamphetamine during the first murder and psychotic at the time, and thus out of touch with reality. (34 RR at 196-97.)  At the time of the second murder, Dr. Mathew testified that Mr. Young was in methamphetamine withdrawal. (*Id.* at 198.)  Dr. Mathew further explained his testimony by saying that the inference as

100