to Mr. Young's state of mind while the murders took place did not mean that Mr. Young had been the triggerman that caused the murders. (*Id.* at 199.)

338.   Dr. Mathew testified that it was his opinion Mr. Young was treatable with cognitive therapy, identifying false beliefs and correcting them, in addition to medication. (*Id.* at 203-04.)

339.   Upon release from TYC, Dr. Mathew testified that Mr. Young should have been placed in something similar to outpatient commitment, where a discharged patient is required by court to attend a clinic. (34 RR at 207.) According to Dr. Mathew, although acknowledging that nobody could predict the future, it was his opinion that if Mr. Young "had been on that medication and then somebody kept an eye on him and made sure he took that treatment, two people would not have died unnecessarily and he wouldn't be in the predicament he's in." (*Id.*)

340.   On cross-examination, Dr. Mathew acknowledged that the incident with criminal activity was quite high in patients with ADD, "so if I get a youngster with severe ADD at the age of 14, I would probably say that this person can be always a danger to the society." (*Id.* at 212.) Dr. Mathew testified that unlike others, he thought Mr. Young was treatable because he thought he could connect with Mr. Young. (34 RR at 236.)

341.   When specifically asked about future dangerousness, Dr. Mathew acknowledged that with attention deficit disorder "and poor impulse control, and if put in a situation where he is constantly provoked by other people and he does not have any treatment, that Mr. Young may get into fights." (*Id.* at 238.) While acknowledging that he could not predict the future, he testified that in a good environment with some medical care, he would expect Mr. Young to do reasonably well. (*Id.* at 238.) He also testified that he saw no relationship between Mr. Young and a serial killer, as previously described by the State. (*Id.* at 240.)

342.    Dr. Ross Green, a child psychologist, testified that Mr. Young was the "poster child for ADHD" (36 RR at 18), because report after report described him as "exceedingly hyperactive, impulsive, inattentive." (*Id.* at 23.) According to Dr. Green, Mr. Young was a stimulant non-responder, and as such, the stimulants he was prescribed throughout ten to twelve years of his life were not treating his ADHD. (*Id.* at 19.)

343.    To Dr. Green, six months, rather than the ten to twelve years it took, should have been enough time to reach the conclusion that Mr. Young was a stimulant non-responder. (*Id.* at 19-20.)  Instead of continuously giving Mr. Young stimulants, he should have been treated with other types of medication such as  mood stabilizers. (*Id.* at 23.)  Dr. Green concluded that most forms of treatment applied to Mr. Young as he entered adolescence were ineffective, referring to them as "poor treatment," until he received the proper cocktail medication toward the end of his imprisonment at TYC. (*Id.* at 23, 37- 40.)

344.    Like his colleagues, Dr. Green testified that he did not consider the Wendell incident as sexual deviance. (*Id.* at 39.) He testified that ADHD and cognitive disorder were highly treatable through proper medication and cognitive training, and that Mr. Young was highly treatable. (*Id.* at 41, 43.)  When asked specifically if a child would choose to be impulsive, hyperactive and inattentive, or whether those children were "born evil," Dr. Green responded that:

> Clint's hyperactivity, poor impulse control and
> inattention never brought him anything but misery.  It's
> really an extremely sad tale of a child who I believe was
> highly treatable, continued to be highly treatable and is
> still highly treatable.  Nobody chooses to be inattentive,
> hyperactive and impulsive if they can do it differently.

(36 RR at 44.)

**D.     State's Rebuttal**

345.   On rebuttal, the State called Dr. George Herman Cirkovic, a neurologist not board certified in psychiatry (35 RR at 172). Dr. Cirkovic testified that he disagreed with the conclusion that Mr. Young's qEEG was "abnormal" (35 RR at 146-47); that he considered the seizures Mr. Young suffered as a child as "benign febrile convulsions" with no effect to brain function itself (*Id.* at 155); and that ADD, in his opinion, was not a real diagnosis (*Id.* at 163), although he considered it a "brain dysfunction."[25]  (*Id.* at 181.)

346.   Dr. Cirkovic testified that after administering a neurological exam on Mr. Young lasting about one hour and forty minutes (*id.* at 184), he did not find any neurological impairments.  (*Id.* at 157.)  He diagnosed Mr. Young as having "mania," which he described as individuals exhibiting personality traits as tremendously impulsive, grandiose, aggressive, antisocial, cruelty towards others, who can not learn from their mistakes and whose inattention is caused by the fact that they have millions thoughts getting into their heads and are trying to consider what to do next.  (*Id.* at 165.)

347.   Though he did not have a name for it, Dr. Cirkovic thought that the type of mania Mr. Young had was "sociopathy with mania and homicidal behavior."  (*Id.* at 165.)  Dr. Cirkovic opined that Mr. Young could not be "fixed" and thought that Mr. Young was "extremely dangerous" (*id.* at 166-67); whose lack of impulse control would get the better of him while in the prison system (*id.* at 168); and that the prison system would be "bad" for Mr. Young's condition. (*Id.* at 170-71.)  According to Dr. Cirkovic, while Mr. Young's mania could be treated, his conduct disorder and whatever caused the "homicide part" could not

---

[25]  While Dr. Cirkovic opined that ADD was not "real" diagnosis, his telephone number was 1-800-755-ADHD and specifically treated individuals with ADHD.  (35 RR at 179-80.)

be treated, the same way a serial killer could not be treated.  (*Id.* at 196-97.)

**E.      Jury Instructions**

348.   Mr. Young's jury was instructed as follows at the punishment phase:

In answering the issues submitted to you, the jury must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feelings.[26]

(CT at 858.)

In deliberating on issues in this case except as provided in the following paragraph, the jury shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or circumstances of the offense that militate for or mitigate against the imposition of the death penalty.

The Jury's answer or answers to the issues must be directly related to the defendant's personal culpability. You are instructed in answering Issue No. 1 and Issue No. 2 that only the conduct of the defendant can be considered and that the instructions pertaining to the conduct of other persons under the law of parties heretofore given you on guilt/innocence cannot be considered in answering Issue No.1 or in answering

---

[26]  This instruction is usually known as the "anti-sympathy" instruction.  Mr. Young objected to this instruction, (36 RR at 79), and proposed that the jury be instructed that "not all sympathy is out of the range of consideration to this jury." (*Id.* at 80; CR at 877-88.)

Issue No.2.[27]

(CR at 859.)

### ISSUE NO 1.

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society? Answer by stating, "yes," (there is a probability) or "no," (there is not a probability). Answer by stating "yes" or "no."[28]

(CR at 860.)

### ISSUE NO. 2

Do you find from the evidence beyond a reasonable doubt that the defendant, himself, actually caused the death of the deceased individuals or he did not himself actually cause the death of the deceased individuals, but he intended to kill the deceased individuals or anticipated that human life would be taken?  Answer by stating "yes" or "no."[29]

(CR at 861.)

---

[27] Mr. Young's counsel objected to this instruction. (CR at 880.) Mr. Young's objections to this instruction were overruled. (36 RR at 75-76; CR at 877-88.)

[28] This instruction is usually referred to as the "future dangerousness" special issue. Mr. Young's requests to provide the jury with definitions of "probability," "criminal acts of violence" and "continuing threat to society" were denied. (36 RR at 77-79; CR at 877-88.)

[29] This instruction is usually refereed to as the "anti-parties" special issue, and it is applicable only to persons convicted under the "law of the parties." *See* Tex. Crim. Proc. Code Ann. art. 37.071(2)(b)(2).

> The jury shall consider mitigating evidence to be
> evidence that a juror might regard as reducing the
> defendant's moral blameworthiness or which would
> make a death sentence inappropriate in this case.[30]

(CR at 862-63.)

### ISSUE NO. 3

> Do you find from the evidence, taking into
> consideration all of the evidence, including the
> circumstances of the offense, the circumstances of the
> defendant, his character and background, and the
> personal moral culpability of the defendant, that there is
> a sufficient mitigating circumstance or circumstances to
> warrant that a sentence of life imprisonment rather than a
> death sentence be imposed? Answer by stating "yes" or
> "no."[31]

(*Id.*)

## F.     Relevant Legal Authority

349.   Long before the Supreme Court decided *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (*Penry I*), it was already clearly and firmly established federal law that:

> [S]entencing juries must be able to give meaningful
> consideration and effect to all mitigating evidence that
> might provide a basis for refusing to impose the death

---

[30] Mr. Young objected to this instruction.  (CR at 877-80)

[31] Mr. Young objected to this instruction as it related to the other instructions.  (CR at 877-80.)

penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.

*Abdul-Kabir,* 127 S. Ct. at 1664, *citing Woodson v. North Carolina,* 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976), *Proffitt v. Florida,* 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), and *Jurek v. Texas,* 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976).

350.   In *Penry v. Johnson,* 532 U.S. 782, 797, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001) (*Penry II*), the Court further explained the importance of a sentencing juror's ability to give full consideration and full effect to the mitigation evidence a defendant facing the ultimate punishment proffers:

> *Penry I* did not hold that the mere mention of "mitigating circumstances" to a capital sentencing jury satisfies the Eighth Amendment. Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may "consider" mitigating circumstances in deciding the appropriate sentence. Rather, the key under *Penry I* is that the jury be able to "consider and give effect to [a defendant's mitigating] evidence in imposing sentence." 492 U.S., at 319, 109 S.Ct. 2934 (emphasis added). *See also Johnson v. Texas,* 509 U.S. 350, 381, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (O'Connor, J., dissenting) ("[A] sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances" (emphasis in original)). For it is only when the jury is given a "vehicle for expressing

> its 'reasoned moral response' to that evidence in
> rendering its sentencing decision," *Penry I*, 492 U.S., at
> 328, 109 S.Ct. 2934, that we can be sure that the jury
> "has treated the defendant as a 'uniquely individual
> human bein [g]' and has made a reliable determination
> that death is the appropriate sentence," *Id.* at 319, 109
> S.Ct. 2934 (*quoting Woodson v. North Carolina*, 428
> U.S. 280, 304, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944
> (1976)).

*Penry II*, 532 U.S. at 797; *cited in Abdul-Kabir*, 127 S. Ct. at 1674.

351.   In other words, "the jury must be permitted to 'consider fully' such mitigating evidence and . . . such consideration 'would be meaningless' unless the jury not only ha[s] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Abdul-Kabir*, 127 S. Ct. at 1672.

352.   A jury may be precluded from giving full consideration to the relevant mitigating qualitites of a petitioner's proffered evidence "not only as a result of the instructions given, but also as a result of prosecutorial argument dictating that such consideration is forbidden. *Abdul-Kabir*, 127 S. Ct. at 1671 n.21, 1672-74.

353.   In reviewing a habeas petitioner's claim challenging the propriety of a jury instruction under *Penry I* and its progeny, a reviewing court must determine whether there is a reasonable likelihood that the state trial court's instructions and prosecutorial argument to the jury that sentenced a petitioner to death prevented the petitioner's jurors from giving meaningful consideration to constitutionally relevant mitigating evidence. *Abdul-Kabir*, 127 S.Ct. at 1674.  While the

reasonable standard requires that a petitioner show "more than a mere possibility" that his jury was prevented from giving full consideration and full effect to the evidence, a petitioner is not required to prove "that it was more likely than not" that the jury was prevented from doing so. *Johnson*, 509 U.S. at 367; *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990).

354.   Constitutionally relevant mitigating evidence under the Eighth and Fourteenth Amendment "in all but the rarest kind of capital case must not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) ("We are now faced with those questions and we conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in original).

355.   A reviewing court must "approach jury instructions in the same way a jury would - with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Penry II*, 532 U.S. at 800, *citing Boyde*, 494 U.S. at 381.

356.   Under the AEDPA, a federal court may grant habeas relief when the state court's "adjudication of a claim on the merits resulted in a decision that involved an unreasonable application of the relevant law.  When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied." *Panetti v. Quarterman*,  127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007) (internal citation

omitted).  "A federal court must then resolve the claim without the deference AEDPA otherwise requires."  *Id.*

**G.     The CCA Adjudication of Mr. Young's Claim on the Merits Resulted in a Decision That Was Contrary To, or Involved an Unreasonable Application Of, Clearly Established Federal Law, as Determined by the Supreme Court of the United States**

357.   In Mr. Young's case, the CCA based its decision solely on the fact that Mr. Young's jury had been given the new Texas statutory mitigation instruction, which according to the CCA allows the jury to consider all of the evidence presented at trial in answering the mitigation special issue.[32]  *Young v. State,* 2005 WL 2374669, *8 (Tex. Crim. App. 2005).  As its authority, the CCA cited to *Cantu v. State*, 939 S.W.2d 627, 639-40 (Tex. Crim. App. 1997).  *Id. Cantu,* however, is an unreasonable interpretation and application of *Penry I* and its progeny and is, itself, not applicable to Mr. Young's case.

358.   Although the CCA noted in *Cantu* that the pre-1991 version of Article 37.071 "ha[d] been amended, at least in part, to address concerns raised [by *Penry I*] with respect to mitigating evidence," *Cantu*, 939 S.W.2d at 639, the Supreme Court is yet to hold that Article 37.071 meets the requirements

---

[32] In denying Mr. Young's claim on direct appeal, the CCA simply stated, in pertinent part:

> The jury in this case was given the statutory mitigation instruction. See Art. 37.071 §2(e)(1).  The statutory instruction allows the jury to consider all of the evidence presented at trial in answering the mitigation special issue. *Cantu v. State*, 939 S.W.2d 627, 639-40 (Tex. Crim. App.1996)).  Appellant presented evidence of his ADHD and other mitigating evidence, and the jury was given a vehicle through which it could consider and give effect to that evidence.  Appellant's eighth point of error is overruled.

*Young v. State,* 2005 WL 2374669, *8 (2005 Tex. Crim. App.)

110

enunciated in *Penry I* and its progeny.[33]  Although in *Cantu* the CCA was correct in noting that "the Texas death penalty scheme was found constitutional by the Supreme Court in *Jurek*, 428 U.S. at 270-72, the CCA failed to recognize the conditional nature of such finding, a finding that was "resting fundamentally" on the assurance that the special instructions would permit the jury to fully consider a petitioner's mitigating evidence, and that such special instructions would be interpreted broadly enough to allow the jury to play its proper role. *Abdul-Kabir*, 127 S. Ct. at 1668 n.15, *citing Penry I*, 492 U.S. at 318, 320-21.

359.   Moreover, in *Cantu*, the CCA failed to properly recognize that prosecutorial arguments, in addition to jury instructions, may preclude a capital sentencing jury from giving full consideration to the relevant mitigating qualitites of a petitioner's proffered evidence when prosecutorial arguments dictate such consideration is forbidden.[34]

360.   Finally, the *Cantu* court refused to reach the issue, raised by Cantu, that the requirement of a "nexus" between mitigating evidence and the crime was no longer valid under the post-*Penry I* Texas capital penalty scheme.  *Cantu*, 939 S.W.2d at 633.  As the Supreme Court has repeatedly stated, a petitioner need not establish a 'nexus' between the mitigating evidence and the crime committed for such mitigation to be constitutionally relevant under the auspices of *Penry I* and its progeny.  *Tennard v. Dretke*, 542 U.S. 274, 287, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004) ("As we have explained, the Fifth Circuit's screening test has no basis

---

[33]  In passing, the Supreme Court has noted that the new Texas capital sentencing scheme provides a "helpful frame of reference" for a catchall instruction that "might" comply with *Penry I. Penry II*,  532 U.S. at 803.

[34]  The *Cantu* court analyzed the impropriety of the prosecutorial arguments under a Texas statute and finding "no bad faith" on the part of the prosecutor. Nothing in *Penry I* and its progeny suggest that a finding of "bad faith" is required when analyzing a prosecutor's statements in this line of cases.

in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context. We therefore hold that the Fifth Circuit assessed Tennard's *Penry* claim under an improper legal standard."); *Smith v. Texas*, 543 U.S. 37, 44, 125 S. Ct. 400, 160 L. Ed. 2d 303 (2004) ("The Texas Court of Criminal Appeals relied on precisely the same "screening test" we held constitutionally inadequate in *Tennard*.").

361. For all the aforementioned reasons, the CCA assessed Mr. Young's *Penry* claim under an improper legal standard. As such, this Court must evaluate Mr. Young's *Penry* claim de novo, rather than applying the objective reasonableness standard of 298 U.S.C. § 2254(d).

**H.   Mr. Young's Capital Sentencing Jury Was Denied a Vehicle to Express its Reasoned Moral Response to Mr. Young's Mitigating Evidence**

362. While Mr. Young was allowed to introduce mitigating evidence, the jury that sentenced him to death was not allowed to fully consider Mr. Young's evidence in mitigation, or to give full effect to such mitigation. Instead, the jury instructions, as well as the argument by the State: (1) improperly limited the type of evidence the jury could consider as mitigating; (2) improperly required a nexus between Mr. Young's mitigating evidence and the crime; (3) prevented the jury from giving Mr. Young an individualized sentencing process; and (4) prevented the jury from considering Mr. Young's mitigating evidence beyond the scope of either the future dangerousness special issue and Mr. Young's personal conduct in the criminal acts.

363. Under these circumstances, there is more than a reasonable likelihood that the State instructions and prosecutorial argument prevented Mr. Young's jurors from giving meaningful consideration to the constitutionally relevant mitigating evidence presented to his capital sentencing jury. As a result, the jury

that sentenced Mr. Young to death lacked a vehicle for expressing its reasoned moral response, thus raising the prospect that the jury did not treat Mr. Young as a uniquely individual human being, and therefore, reducing the confidence that the jury made a reliable determination that death is the appropriate sentence in this instant. As such, Mr. Young's sentence of death cannot stand.

## I.  The Trial Court Improperly Limited the Type of Evidence the Jury Could Consider as Mitigating

364.    Over Mr. Young's objection, the trial court gave Mr. Young's jury the so called "anti-sympathy" instruction. (CR at 858.) The court instructed Mr. Young's capital sentencing jury that it must not be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feelings." (*Id.*) Because the finding of future dangerousness requires that the jury engage in what the CCA itself has called a "necessarily speculative enterprise,"[35] a jury could have reasonably interpreted this instruction as limiting only the jury's ability to evaluate Mr. Young's mitigation evidence, and not similarly restricting the jury's discretion when it came to future dangerousness.[36]

---

[35] *Burns v. State*, 761 S.W.2d 353, 358 (Tex. Crim. App. 1988) (recognizing that assessing a defendant's ability to coexist peacefully in society is a "necessarily speculative enterprise.").

[36] Because the jury instructions given to Mr. Young's jury are not similar to the instructions analyzed in *California v. Brown*, 479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987), *Brown* is not controlling in this situation. In *Brown*, the jury was instructed that it "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling," *id.* at 540, but also was given an instruction that listed "specific aggravating and mitigating factors the sentencer is to consider in determining punishment." *Id.* at 546 (O'Connor, J., concurring). Unlike *Brown*, here in Mr. Young's case, Special Issue No. 1 as to whether there is a "probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" is not similarly specific as the instructions in *Brown*. Because the 'aggravating' instruction in Mr. Young's case is not nearly as specific as the instruction involved in *Brown*, in Mr. Young's case the reasonable likelihood that the anti-sympathy instruction, coupled with prosecutorial argument, prevented the jury from giving full consideration and full effect to Mr. Young's mitigating evidence is considerably higher than it was

365.   The prosecutors' argument most likely had the effect of further leading the jury to consider Mr. Young's mitigation evidence precisely as evidence based on "mere sympathy" that the jury was instructed to disregard. The prosecutors repeatedly told the jury that the decisive factor in sentencing Mr. Young was his future dangerousness and that Mr. Young's mitigating evidence were mere excuses.

> They promised you they would explain to you why.
> Now, they've explained real well why he doesn't sit well
> in a chair when he was in school and why he had a lot of
> difficulty with getting his work done and not being able
> to make his teachers happy and what not, but there hasn't
> been a single person to come into this courtroom for the
> defense or for the state that has testified that there is any
> correlation between his behavior, the killing of these two
> men, and having ADD.  No one.  Not a single person.

(36 RR at 98.)

366.   The prosecutor continued:

> There's no question he had ADD.  No question at all,
> and it certainly affected him when he was a younger
> man, and it is a true shame that things were not advanced
> enough in the Texas system to get him quickly on to that
> magic cocktail and to get his behavior under control, but,
> ladies and gentlemen, when he had that opportunity, as
> I've already said to you, he chose not to take the
> medicine.  He chose to go his own way.  Well, then,

the case in *Brown*.

114

make him responsible for the way that he chose, because

that's really what this is about is responsibility.  Has

there been anything in his character or his background

that forgives his blameworthiness for this crime?

There's not.  There's simply not.

(36 RR at 98-99.)

367.    Although defense counsel attempted to remind the jury that Mr.

Young was not seeking forgiveness, but rather, mercy from his sentencing given

his disadvantaged background and emotional and mental problems, as *Penry I* and

its progeny required,[37] the prosecutor led the jury to believe such consideration

---

[37] During his closing argument, Mr. Young's trial counsel addressed the
State's remarks concerning forgiveness.  Trial counsel stated, in pertinent part:

> Ms. Clingman said that there is no forgiveness for Clint
> Young, and I agree with her on that.  We're not talking
> about forgiveness.  This young man is going to spend the
> rest of his life in the penitentiary.  No one here is talking
> about forgiveness.  What we are talking about is
> mitigating circumstances . . . mitigating circumstances is
> not forgiveness. . . . mitigating circumstance is
> something that someone has no control over. . . .  [T]he
> State is going to want you to look at the evidence
> through the filter of the darkest areas of your soul, hatred
> and fear.  We are asking you to look at the evidence in
> the light of the better angels of your nature, compassion
> and life.

(36 RR at 111.)

> So what we have to do is we have to follow the law.  We
> have to think, "For me as an individual, one who has to
> make a decision that I can live with for the rest of my
> life, is there some reason in looking at this 19 year old
> boy, this teenager, that I can find mercy and compassion,
> that I can vote for a sentence of life," and you know
> what, it's easy to do something when you're scared.  It's
> easy to respond to fear and hatred, all right?  It is hard to
> do the right thing, to show mercy to people.

(36 RR at 123-24.)

was forbidden.  The State, given the last word before the jury retired for deliberations, stated:

> Compassion.  Compassion's wonderful.  Mercy's wonderful, but we're supposed to save it for the right people.  Certainly we have compassion and I know you do for the families sitting out here, but what he asked you to do is set aside your total sense of compassion for future victims, and that's what we're talking about.  This is -- this is reality, folks, okay?  You are our shot, the 12 of you are our only shot at facing reality and making a decision in this case that's not only going to bring a sense of justice to these people, but protection for other people, the future Sam Petreys, the future Doyle Douglases.  That's what we're asking, is this guy going to be dangerous, is this guy going to hurt other people?  And we have to look at that reality and then take action, as difficult as it may be, to ensure we protect the other people.
>
> The defense has done or tried to do a good makeover in this case.  You saw his mugshot.  You can go dig it out of the box later on, the way he looked, his presentation back at the time of his arrest, they've done all they can do to clean him up, make him look presentable, pat on him a little bit once in a while, try to keep him calm, put on a show, and they've engaged in the blame game.  They've told you they were going to

bring you reasons, but all they've done is bring excuses

and play the blame game for you for over the last week.

Crummy mama, crummy doctors, everybody else is at

fault.  Tried to play -- then they want to play the guilt trip

on you, okay?  Oh, you be able to live with yourself?

Okay?

(36 RR at 126-27.)

368.   It is more likely than not that the jury would have concluded that "compassion" toward Mr. Young, that mercy towards the individual person facing the death penalty, was not encompassed by the prosecutor's definition of "reality," whereas the only proper evidence the jury could consider "real" under the prosecutor's definition of what is real, was that which established Mr. Young's future dangerousness.

369.   Part of the strength of Mr. Young's mitigating evidence was that in spite of his high potential, the lack of proper treatment meant that Mr. Young was never able to, as it were, achieve his whole potential.  As Dr. Green testified, the strength of Mr. Young's mitigation was that Clint's hyperactivity, poor impulse control and inattention never brought him anything but misery.  It's really an extremely sad tale of a child who . . . was highly treatable, continued to be highly treatable and is still highly treatable.  Nobody chooses to be inattentive, hyperactive and impulsive if they can do it differently.

(36 RR at 44.)

370.   In its closing remarks, the prosecution told Mr. Young's capital sentencing jury it was forbidden to heed Dr. Green's statement that Mr. Young's life was truly "an extremely sad tale" of a child who, in spite of his high I.Q. level, was never properly treated for his brain dysfunction.  Instead, as the prosecution

said during trial, "if ifs and buts were candy and nuts, we would all have a very merry Christmas." (34 RR at 108.)

> Too bad, and I think all of us agree, too bad that he came
> from a genetically defective family, and you got to see
> them, and it's sad to see. Two brothers are up here in
> prison outfits, I got to listen to his sisters that didn't give
> me a lot of reassurance on some of it, but it's too bad.
> It's too bad he had a hard childhood.

(36 RR at 128.)

> That offends me. It offends my sense of justice that
> there's a moral compass left in this world, that we're just
> going to blame the doctors and the pill manufacturers
> and the teachers and our mothers for everything that
> went wrong and we're not going to have a steady course
> in this society any more, because let me tell you, ladies
> and gentlemen, when we get to that point in time, we
> have lost it. A people that no longer have vision in a
> moral compass, that is a society that is going to fall, and
> that's where a lot of folks want to head us to. We're
> going to excuse and blame and justify and pat on -- the
> little darlings on the back so they never have to take any
> responsibility for anything they've ever done or will do.

(36 RR at 129.)

371. The anti-sympathy instruction told the jury it was impermissible to feel "sad" for Mr. Young's situation, or to give effect to his predicament by sparing his life. The prosecutor's argument further ensured that the jury could not

consider Mr. Young's long history of inappropriate treatment under the auspices of the state as mitigating. Instead, they were told to view such evidence as mere excuses.

372.   The confusion created by the anti-sympathy instruction, and exploited by the prosecution in this case, was further compounded by the instruction meant to limit the "law of the parties" instruction given during Mr. Young's guilt phase. Because the jury was instructed that Mr. Young could be vicariously liable for the capital murders, and because the CCA seems to recognize that the Eighth Amendment does not permit the imposition of the death penalty on a petitioner who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed" *Enmund v. Florida*, 458 U.S. 782, 797, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982), the state trial court gave the jury the so-called anti-parties instruction.[38]   In addition, however, the jury was also instructed to limit its deliberations as to Issue No. 1 (future dangerousness), by considering only Mr. Young's "conduct."  (CR 859.)

373.   The instruction meant to limit the jury's discretion as to punishment on a conviction obtained through the "law of the parties" is what "made the jury charge as a whole internally contradictory, and placed law-abiding jurors in an

---

[38]   The post-*Penry* statute attempted to clarify the mens rea requirement previously addressed by the pre-1991 Texas capital question of "deliberateness." Because capital murder in Texas typically requires  an 'intentional killing,' a person convicted under Texas "law of the parties" may not necessarily have intended to kill.  *See* Tex. Pen. Code §§ 7.01, 7.02.  The post-*Penry* statute replaced the "deliberateness" *mens rea* with a question applicable only to persons convicted under the "law of the parties."  *See* Tex. Crim. Proc. Code Ann. art. 37.071(2)(b)(2).  To further complicate matters in this case, although Mr. Young's jury at the end of the guilt phase was instructed under Texas Penal Code § 7.02(a)(2), the CCA analyzed the sufficiency of the evidence supporting Mr. Young's conviction of capital murder under Tex. Pen. Code § 7.02(b), the wrong statute.  (*See* Claim Seven, *post*.)

impossible situation." *Penry II*, 532 U.S. at 799.  On the one hand, the jury was commanded to consider "all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or circumstances of the offense that militate for or mitigate against the imposition of the death penalty." (CR 859 at ¶ 1.)  On the other hand, the jury was instructed that, when it came to Issue No. 1 and Issue No. 2, "only the conduct of the defendant can be considered and that the instructions pertaining to the conduct of other persons under the "law of the parties" heretofore given you on guilt/innocence cannot be considered in answering Issue No.1 or in answering Issue No. 2." (CR 859 at ¶ 2.)

374.   Thus, a jury could have reasonably concluded that it could only consider Mr. Young's "conduct" when evaluating whether he would be a future danger and whether Mr. Young had anticipated the death of the deceased. In determining Special Issues One and Two, the jury could have reasonably concluded that it could not consider Mr. Young's severe ADHD, his drug consumption, or the fact that he may have been unable to anticipate the reactions of his co-defendants because Mr. Young had been institutionalized by the State through his formative years.  In fact, the jury manifested its confusion and unsuccessfully sought clarification from the court through a question during the first day of deliberations.[39]

375.   In Mr. Young's case, the language modifying the "anti-parties" instruction became the functional equivalent to the type of "nullification

---

[39]   The jury's question was read into the record as follows:
          Regarding Issue Number 2, the question says, "cause the death of the deceased individuals, quote, intended to kill the deceased individuals.  Question: Do you have to believe both or at least one?" (36 RR at 135.)

instructions" the Supreme Court has already found improper. *Penry II*, 532 U.S. at 797-800.

376.   Additionally, prosecutorial arguments had the most likely effect of making the jury further believe they could only consider Mr. Young's "conduct" in deciding Special Issues One and Two, and that his mitigating evidence was not applicable to those questions.  In fact, that is precisely what the prosecutors in this case told Mr. Young's capital sentencing jury.  Where as in addressing Special Issues One and Two, the prosecutor emphasized Mr. Young's conduct both during the crimes and in his previous behavioral problems, the prosecution addressed Mr. Young's mitigation apart from those issues by turning it into aggravating evidence:

> His background.  From the evidence that has been brought to you, apparently he has an extraordinarily horrible genetic structure from his father's side of the family. His father's an alcoholic.  Fourteen out of 16 of his cousins are in prison on that side of the family. I wasn't a big believer in genetics until we got into this case, and that old saying of "blood will tell," well, apparently it has told way too much in this case.  With his genetic background, apparently he is predisposed to criminality, alcohol abuse and drug abuse.

(36 RR at 97.)

377.   Just as in *Penry* and its progeny, the language modifying the anti-parties instruction and the prosecutorial argument in Mr. Young's case ensured that the jury's ability to consider and give effect to Mr. Young's "two-edged sword" of mitigating evidence remained "shackled and confined within the scope

121

of" Special Issues One and Two. *See Abdul-Kabir*, 127 S. Ct. at 1669 ("When the evidence proffered is double edged, or is as likely to be viewed as aggravating as it is as mitigating, the [pre-1991] statute most obviously fails to provide for adequate consideration of such evidence.").

**J.      Improper Nexus Required**

378.   The definition of "mitigating evidence" provided to the jury improperly required a nexus between Mr. Young's mitigating evidence and the criminal acts for which he was convicted.  Limiting the definition of mitigating evidence to that which "a juror might regard as reducing the defendant's moral blameworthiness" not only inserted an element of capriciousness in the jury's determination, but it also linked such mitigating evidence to the crimes in question.

379.   The prosecutors' comments to the jury had the likely effect to further emphasize that the instructions required a nexus between Mr. Young's mitigating evidence and the criminal acts for which he had been convicted.  *Penry II*, 532 U.S. at 800.

> They promised you they would explain to you
> why.  Now, they've explained real well why he doesn't
> sit well in a chair when he was in school and why he had
> a lot of difficulty with getting his work done and not
> being able to make his teachers happy and what not, but
> there hasn't been a single person to come into this
> courtroom for the defense or for the state that has
> testified that there is any correlation between his
> behavior, the killing of these two men, and having ADD.
> No one. Not a single person. . . .  It doesn't explain why.

> Ladies and gentlemen, when you look at this case in
> total, is there anything to reduce his personal moral
> blameworthiness, and I submit to you, ladies and
> gentlemen, there is not.

(36 RR at 98-99.)

380.   The state court also understood that mitigating evidence could be mitigating only to the extent that such evidence had a nexus to the criminal acts. In its Order on Applicant's Application for Postconviction Writ of Habeas Corpus, which the CCA adopted, the state court found that Mr. Young's trial counsel were not ineffective in failing to present "additional evidence that illegal drug use and criminal activity was rampant at the Fisherman's Motel," in part, because "[t]he [c]ourt finds that such evidence is not mitigating evidence, and it does not reduce or mitigate the Applicant's moral culpability for killing Doyle Douglas and Samuel Petrey." (Ex. 30 at 350 [Hyde's Denial of Writ].)   The state court, as well as the CCA, failed to provide any explanation as to why such evidence did not fit into what Texas courts, contrary to clearly and firmly established federal law, may be considered as mitigating evidence.

381.   In the course of its closing arguments, the State of Texas reduced to a legal insignificance more than thirty years of federal constitutional law.  As the Supreme Court has said repeatedly, and most strenuously in *Tennard*, 542 U.S. at 287, the nexus requirement is inconsistent with the standard adopted for relevance of mitigating evidence in the capital sentencing context.  Although the Supreme Court has, for more than thirty years, insisted that mitigation must be broadly defined, in this case, mitigation had no place in the sentencing jury's decision whether or not to sentence, on behalf of the State of Texas, Mr. Young to death.

**K.     Confining Mr. Young's Mitigation to its Harmful Effect**

382.   The court's instructions to Mr. Young's capital sentencing jury and the prosecutorial argument, as mentioned above, resulted in preventing the jury from giving full effect to Mr. Young's mitigating evidence.  As the Supreme Court has most recently stated in a similar case where the petitioner presented evidence concerning mental illness, the strength of Mr. Young's mitigating evidence was not "its potential to contest his immediate dangerousness, to which end the expert's testimony was at least as harmful as it was helpful."[40]  *Abdul-Kabir*, 127 S.Ct. at 1661.  "Instead, its strength was its tendency to prove that his violent propensities were caused by factors beyond his control – namely," Mr. Young's brain dysfunction, childhood abuse and a history of improper treatment at the hands of state agencies entrusted with his psychiatric health.

383.   Contrary to *Lockett*, 438 U.S. at 605; *Bell v. Ohio*, 438 U.S. 637, 643, 98 S. Ct. 2977, 57 L. Ed. 2d 1010 (1978) (reversing defendant's death sentence because the Ohio death penalty statute "prevented the sentencing judges from considering the particular circumstances of his crime and aspects of his character and record as mitigating factors."); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986) ("the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'") (*citing Eddings*, 455 U.S. at 114); *Hitchcock v. Dugger*, 481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987) (reversing defendant's death sentence because the Florida statute limited the mitigating factors the sentencer could consider and "the advisory jury

---

[40] Indeed, Mr. Young's own counsel understood the harmful effect of Mr. Young's mitigating evidence when he told the the jury that "[i]t's when we give mercy to our enemy, the ones we're afraid of, the ones we don't trust, that is what makes us great, and that's what gives us the moral right to judge and to punish." (36 RR at 124.)

was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances."); *Parker v. Dugger*, 498 U.S. 308, 314-15, 321, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991); in addition to *Penry* and its progeny, the State of Texas ensured that the only manner in which the jury could consider Mr. Young's mitigation evidence was in deciding whether or not he presented a future danger.

> You've heard over and over again from these folks, "Only Doctor Mathew says 'I can fix him.'"   I think he's going to fix him with yoga, because that's the only paper I've found of his on fixing people, but everybody else says, "Look, I'm sorry, this guy is dangerous and we don't know enough in the psychiatric community to fix him."  That's the reality.  It's too bad. I wish we were smarter and I wish we knew what else to do, but what's scary is the guy's real bright and manipulative, and he's thinking all the time.

(36 RR at 131.)

384.   The State's instructions, coupled with the prosecution's arguments to the jury, were the complete opposite of the Court's opinion in *Penry I*, which the Court has described as "endorsing the views" Justice O'Connor expressed in her separate opinion in *Franklin v. Lynaugh*, 487 U.S. 164, 172, 183-85, 108 S. Ct 2320, 101 L. Ed. 2d 155 (1988) (O'Connor, J., concurring in judgment). *Abdul-Kabir*, 127 S.Ct. at 1667-68.  In *Franklin*, Justice O'Connor described the principle underlying *Lockett*, *Eddings*, and *Hithchock* as the principle that "punishment should be directly related to the personal culpability of the criminal defendant." *Id.*  As the Court has previously articulated,

> [E]vidence about the defendant's background and
> character is relevant because of the belief, long held by
> this society, that defendants who commit criminal acts
> that are attributable to a disadvantaged background, or to
> emotional and mental problems, may be less culpable
> than defendants who have no such excuse  . . . . Thus,
> the sentence imposed at the penalty stage should reflect a
> reasoned moral response to the defendant's background,
> character, and crime.
>
> In light of this principle it is clear that a State may not
> constitutionally prevent the sentencing body from giving
> effect to evidence relevant to the defendant's background
> or character or the circumstances of the offense that
> mitigates against the death penalty. *Indeed, the right to*
> *have the sentencer consider and weigh relevant*
> *mitigating evidence would be meaningless unless the*
> *sentencer was also permitted to give effect to its*
> *consideration.*

*Abdul-Kabir,* 127 S. Ct. at 1667-68, *citing Franklin v. Lynaugh,* 487 U.S. at 184-85 (O'Connor, J., concurring in judgment) (emphasis in original).

385.   The strength of Mr. Young's mitigation evidence was that under the proper medication, he was able to control his ADHD-induced behavior.  However, according to the prosecutor's arguments, the only evidence the jury could consider was that Mr. Young was a future danger and that "he could not be fixed" because 'you heard what TDC's like. Ms. Clingman's right, we're embarrassed that TDC is like that.  I wish it wasn't.  I hope we can do whatever we can to correct it . . ."

(36 RR at 132.)[41]

386.   As it was the case in *Penry II*, the jury's ability to consider and give effect to Mr. Young's mitigating evidence was still shackled and confined within the scope of the issue of future dangerousness and his "deliberateness" in the offense.

**L.    Conclusion**

387.   Although the jury received the 1991 mitigating evidence instruction adopted by Texas post *Penry I*, the instructions given to Mr. Young's capital sentencing jury, as a whole, suffered from the same infirmities as others the Supreme Court has found constitutionally inadequate as applied, and did not resolve the internal conflict caused by the anti-sympathy instruction and the language modifying the anti-parties instruction. As it was in *Penry II*, although the instructions made mention of mitigating evidence, the instructions as a whole limited the scope of Mr. Young's mitigating evidence, thus "the mechanism [the instructions] purported to create for the jurors to give effect to that evidence was ineffective and illogical." *Penry II*, 532 U.S. at 803.

388.   Although the jury was first told they could consider such evidence in answering all the questions, the jury was then instructed to consider only Mr. Young's conduct in answering Special Issues One and Two, thus leading the jury to believe they could not consider Mr. Young's mitigating evidence in negating a finding as to those two issues.  Furthermore, to the extent the jury was able to

---

[41] This statement was most likely in reference to the testimony by Royce Smithey, A. P. Merillat, Dessie Cherry, and Dr. Cirkovic concerning prison conditions in Texas.  Such testimony included that there was no guarantee Mr. Young would receive the proper medication during imprisonment (35 RR at 65-69, 74.); that his ADHD would worsen with the stressors of regular imprisonment (35 RR at 170-71); and because whatever good programs there were in the prison system, they would disappear as a result of a budget crisis (33 RR at 64).

consider Mr. Young's mitigating evidence as to the first two issues, prosecutorial comments ensured that the jurors could only give such evidence its aggravating effect, thus ensuring that Mr. Young' evidence remained shackled by the confines of such issues. By requiring a nexus between Mr. Young's mitigation evidence and the criminal acts, the instructions and the prosecutorial argument prevented the jury from giving Mr. Young's mitigating evidence relevance to his moral culpability beyond the scope of future dangerousness and "deliberateness" questions. Therefore, the instructions would have provided the jury with no vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision.

389. As it was the case in *Penry II*, for the reasons stated above, there is a reasonable likelihood that the state trial court's instructions and prosecutorial argument deprived the jury from the vehicle to express its reasoned moral response and to give full effect to the mitigation evidence presented and return a life verdict as a result. As a reviewing court cannot be sure that the jury treated Mr. Young as a uniquely individual human being in making its determination that death was his appropriate sentence.

## CLAIM FIVE

## MR. YOUNG WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT AND PUNISHMENT PHASES OF HIS CAPITAL TRIAL

390. Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because his attorneys failed to provide reasonably competent assistance at the guilt and punishment phases of trial. But for counsel's unprofessional actions and omissions, the result of the proceeding would have been different. *Wiggins v.*

*Smith,* 539 U.S. 510, 521, 534, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003); *Strickland,* 466 U.S. at 694.

391.   *Exhaustion of Claim*:  Sections B, C, and D, of this claim were presented as Ground for Review Twelve in the state application. (State App. at 85-91.)

392.   AEDPA:  Sections B, C, and D of this claim were rejected in a reasoned opinion by the state district court (Ex. 30), which was affirmed in a boiler plate denial by the CCA.  *Ex Parte Young,* 2006 WL 3735395.  The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.  *See Strickland,* 466 U.S. 668.

393.   If Respondent disputes any of the facts alleged below, Mr. Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Mr. Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this First Amended Petition.

394.   The declarations and other exhibits accompanying this First Amended Petition, as well as the allegations and facts set forth elsewhere in this First Amended Petition, are hereby incorporated by reference into this claim as though set forth in full.

395.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

//

//

## A.    Legal Standard

396.    An ineffective assistance of counsel claim has two components:  Mr. Young must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521.  "To establish deficient performance, [Mr. Young] must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Id. (quoting Strickland*, 466 U.S. at 688); *Reis v. Quarterman*, 522 F.3d 522, 526-27 (5th Cir. 2008); *Soffar v. Dretke*, 368 F.3d 441, 472 (5th Cir. 2004).  To establish prejudice, Mr. Young "'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins*, 539 U.S. at 534 (*quoting Strickland*, 466 U.S. at 694); *accord Reis*, 522 F.3d at 527.

397.    A "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (internal quotations omitted).

398.    Reasonableness of counsel's performance is assessed by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) ("[W]e have long referred [to the ABA Standards for Criminal Justice] as guides to determining what is reasonable") (*citing Wiggins*, 539 U.S. at 524); *Florida v. Nixon*, 543 U.S. 175, 191, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004); *Wiggins*, 539 U.S. at 524.  Because adequacy is based upon "counsel's perspective at the time," (*Strickland*, 466 U.S. at 589), courts must look to the guidelines then in effect. *Smith  v. Dretke*, 422 F.3d 269,

279 (5th Cir. 2005) (applying ABA Standards for Criminal Justice (2d Ed. 1980) which were in effect at time of trial); *see also Sonnier v. Quarterman,* 476 F.3d 349, 358 n.3 (5th Cir. 2007).

399.   At the time of Mr. Young's trial, his attorneys' obligations were governed by the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 2003 (the "Guidelines") and the ABA Standards for Criminal Justice (3d Ed. 1993) (the "Standards"). "Those Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 387 n.7 (referring to 1989 Standards). Pursuant to the Guidelines, counsel has an obligation to conduct at every stage a "thorough and independent investigation ( ) relating to the issues of both guilt and penalty." Guidelines 10.7(A).[42] Similarly, the Standards imposed an affirmative obligation "to conduct a prompt investigation of the circumstances of the case and to explore *all* avenues leading to facts relevant to the merits of the case ." Standards 4-4.1 (emphasis added). Most significantly, "[t]he duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *Id.*

400.   Once capital trial counsel completes the necessary pretrial investigation, he must then formulate a defense theory "that will be effective in connection with both guilt and penalty . . . . Guideline 10.10.1 (2003); *accord* Guideline 11.7.1 (1989). Clearly established Federal law dictates that defense

---

[42]   Because the investigation leading up to Mr. Young's trial occurred prior to the February, 2003 enactment of the 2003 Guidelines, it could be argued that the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases was controlling here. Even if that is so, there appears to be no material difference between the two. (*See* ABA Guideline 11.4.1 (1989) (counsel required to conduct "independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial").

counsel must conduct a *reasonable investigation* or, at a minimum, to make a reasonable decision that makes specific investigation unnecessary. *Strickland*, 466 U.S. at 691; *accord Sonnier*, 476 F.3d at 358.  Trial counsel may not limit the scope of their investigation unless it determined that further investigation would be "counterproductive or fruitless." *Lewis v. Dretke*, 355 F.3d 364, 367, (5th Cir. 2003); *accord Smith v. Dretke*, 422 F.3d 269, 280 (5th Cir. 2005).

## B.   Counsel's Failure to Object to the TYC Records

401.   Where the prosecution seeks to introduce facts about a prior offense in aggravation, counsel has a "duty to make all reasonable efforts to learn what they [can] about the offense." *Rompilla*, 545 U.S. at 385; *Moore v. Johnson*, 194 F.3d 586, 608 (5th Cir. 1999) (articulating trial counsel's "affirmative duty to identify the state's witnesses to extraneous conduct and to interview those witnesses if possible"); *Valdez v. Johnson*, 93 F. Supp. 2d 769, 780 (S.D. Tex. 1999), rev'd on other grounds, 274 F.3d 941 (5th Cir. 2001) ("counsel has a duty to investigate the nature of defendant's prior criminal history, especially when evidence of these previous crimes is likely to be raised by the prosecution at trial.").

402.   It is clearly established federal law that counsel's failure to make an obvious and meritorious objection to illegally obtained evidence forming the basis of the state's case amounts to ineffective assistance of counsel, where such failure was not due to trial strategy considerations, but because defense counsel was unaware of the illegality of the evidence due to a failure to conduct pretrial discovery. *Kimmelman v. Morrison*, 477 U.S. 365, 383-85, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); *accord Moreno v. Dretke*, 450 F.3d 158, 167-68 (5th Cir. 2006).  Thus, counsel's failure to object to the TYC records, which violated Mr. Young's Fourth Amendment rights, as will be discussed below, is cognizable here.