*Kimmelman*, 477 U.S. at 383-85.

403.   In this case, trial counsel failed to investigate how the State obtained the TYC records pertinent to Mr. Young's detention before any charges against Mr. Young were filed.  Had counsel investigated how those records were obtained, they would have discovered the records were not only illegally obtained by the State, but also that, more likely than not, the records were used by the State in deciding to charge Mr. Young with the death penalty.  Counsel's failure to investigate how the State obtained those records, and whether the State improperly used those records in charging Mr. Young with a capital crime, was ineffective.  Because counsel failed to conduct a thorough investigation before deciding whether or not to object to the admissibility of the records, counsel's choice could not have been strategic.

**1.     Pre-trial Investigation and Indictment**

404.   On November 29, 2001 – three days after Mr. Young had been detained by Midland authorities for the murder of Petrey, Rick Berry, then the District Attorney for Harrison County, sought a court order from Marion County to obtain Mr. Young's juvenile records from the TYC.[43]  (Ex. 70).  The letter is all of but two sentences long, stating: "My office request [sic] a copy of the TYC records on Clint Young, DOB 7-19-83.  Thank you for your cooperation in this matter."  (*Id.*)  The request was approved on the same day.[44]

405.   On December 10, 2001, TYC produced 1,209 pages of records pertinent to Mr. Young's detention in TYC, including information concerning Mr.

---

[43]     As alleged in other parts of this Petition, prosecutorial misconduct was not limited to this incident.  *See Brady* and *Napue* Claims One and Two, *ante.*

[44]     As the signature on the letter is illegible, it is unclear who approved the request, and whether whomever approved the request had the authority to approve the release of those records.

Young's diagnosis and treatment while at TYC; information concerning his involuntary commitment to TYC; incidents preceding his commitment to TYC; alcohol and drug abuse information; and Mr. Young's mental health impressions. Among the information revealed by the records, the TYC records revealed that Mr. Young:

> Has had problems since a young age.  He is aggressive, had difficulty accepting responsibility for his actions, no remorse for negative behavior, argumentative and has a short attention span. Clint's father - abuses drugs & alcohol & has nothing to do with his child. - The last time Clint saw his father, his father assaulted him. . . . Father is suspected abuser of drugs & alcohol - Grandfather died from psorosis [sic] of the liver.

(Ex. 21 at 213-14 [State Trial Exhibit 147, at 285, 287].)

406.   The records obtained by the State also indicated that Mr. Young suffered from ADHD (*id.* at 293); that Mr. Young had "mental health needs requiring treatment" for which he was prescribed "psychotropic medications"(*id.* at 300); and that Mr. Young presented evidence of emotional pain (*id.* at 362):

> This client is likely to be experiencing considerable emotional pain, which . . . [is] part of a broad array of factors such as low self-esteem, suicidal . . ., history of trauma, and other symptoms suggestive of mood problems.  It is important to bear in mind that self-destructive behavioral  . . . .

(*Id.* at 363.)  TYC records also disclosed the extensiveness of Mr. Young's alcohol problems.  (*Id.* at 367-69.)

407.   On December 20, 2001, a grand jury indictment was filed charging Mr. Young with the capital murder of Samuel Petrey.  (CR at 3.)

408.   On February 7, 2002, Mr. Young was re-indicted.  In the first count of the re-indictment, it was alleged that Mr. Young murdered both Samuel Petrey and Doyle Douglas pursuant to the same scheme and course of conduct, within the meaning of Texas Penal Code section 19.03(a)(7).  In the second paragraph of the re-indictment, it was alleged that Mr. Young intentionally murdered Mr. Petrey during the commission of robbery and kidnapping, within the meaning of Texas Penal Code section 19.03(a)(2).  (CR at 4-5.)

409.   On February 12, 2002, Mr. Young was arraigned on charges of the offense of capital murder.  (2 RR at 4.)  The arraignment was based on the February 7, 2002 indictment.  (*Id.* at 5-6.)  Mr. Young was then advised the State would be seeking the death penalty.  (*Id.* at 6.)

410.   On May 23, 2002, the trial court granted Mr. Young's motion to compel disclosure of evidence to be offered in support of the Texas' special issues on punishment and information relating to mitigating circumstances.  (CR at 217.) The trial court ordered the prosecution to disclose all such evidence no later that August 16, 2002.  (*Id.*)

411.   On an unspecified date, but before trial, the State served on trial counsel a copy of the TYC records.[45]  (2 RWR at 211.)

412.   On June 7, 2002, almost seven months after the State had obtained the TYC records, the State filed a "Notice of Filing of Business Records & Request for Sealing of Records," notifying the court that "the State [had] filed with the

---

[45]   Evidence was taken on this claim during the hearing on Mr. Young's state Application.  On direct examination, defense counsel Ian Cantacuzene, who handled the punishment phase of Mr. Young's trial, testified, in pertinent part:

I can't remember the day it happened, but it was during a pretrial hearing, and they were allegedly brought in and dumped on a table in this courtroom, and we had them -- I don't want to guess, I think eight, 10 months before trial.

(3 RWR at 22.)

135

Clerk of this Court" Mr. Young's TYC records. (CR at 224.) The notice indicated that a copy of those records "were delivered to defendant's attorneys in open court" date prior to June 7, 2002. (*Id.*) The TYC records were accompanied by a Certificate of Custodian to Copy of Official Records, under Texas Rules of Civil Evidence, Rule 902 (4). (Ex. 21 at 215 [State Trial Ex. 147 at 1].)

413.   Also on June 7, 2002, the State filed its "Notice of Extraneous Offenses," notifying defense counsel that the State proposed to use the TYC records during the punishment phase of Mr. Young's trial. (CR at 222). In describing the relevancy of such records, the State referred to the TYC records as: "Assaults and other acts of misconduct, including prior drug use, as set out in the records of the Texas Youth Commission which have been previously filed in this cause with the District Clerk." (*Id.*)

414.   On July 12, 2002, DA Schorre testified at a pre-trial hearing that Midland County had a written policy concerning who should be charged with the death penalty. (5 RR at 96.) The policy stated:

In a capital case, the decision to seek the death penalty will only be authorized by the District Attorney.

In considering the decision, the District Attorney will review factors including, but not limited to, the following:

A)   aggravated and mitigating facts of the offense;

B)   the age, criminal history, intellectual capabilities, and the mental/physical status of the offender;

to determine the likelihood that a jury would render an affirmative finding of "future dangerousness."

(5 RR at 155.)

136

415.   Acknowledging that Midland County had not obtained the death penalty on any of the four prior cases where Midland had sought the death penalty, DA Schorre testified that in comparison, at the time of Mr. Young's case, he "look[ed] more at the Defendant's background." (*Id.* at 102.)

> I think from actually in my standpoint when I look at the case, besides the facts of the case and how horrific the case may be, I look for things that we can show the jury that it's going to be a track record of prior antisocial conduct, prior criminal offenses that will help them in that determination on future dangerousness.

(5 RR at 102.)

> On cross-examination, via a narrative, Schorre testified as follows:
> In the assessment in this case on whether or not to seek the death penalty, I've followed the same criteria.  I looked at the nature of the offense, two people were killed, when I went and looked at the background of the Defendant, I found an extensive criminal history, both as a juvenile, as an adult, there is -- was a real long adjudication that eventually sent him to TYC, multiple offenses listed in there, multiple felonies listed in there. I went through around a thousand pages of the TYC records with multiple offense, assaults against staff as well as other juvenile inmates . . .  so when I look at not only the facts of this homicide, but the Defendant's background, I'm left with a person that I can reasonably make the assessment based upon several year track record that a jury could agree with me that he is going to be dangerous in the future and would therefore fall into the death penalty worthy group, which is the same assessment I made every time we've had to decide to seek the death penalty.

(5 RR at 120-21.)

137

416. At the punishment phase of Mr. Young's trial, the court admitted the TYC records into evidence without any objections from the defense. (30 RR at 194.)

## 2. State Hearing

417. Evidence was taken on this claim during the hearing on Mr. Young's state Application. On direct examination, defense counsel testified that it had been a strategic decision to not object to the records. (3 RWR at 27.)

418. Trial counsel testified that there was nothing wrong with the TYC records because they were filed timely (3 RWR at 26), and that the information protected by "HIPAA had been redacted." (2 RWR at 181). Counsel also testified that although at first he had found the documents overwhelming, he and co-counsel had "poured over" the documents, and had decided that the TYC records supported Mr. Young's case in mitigation by showing that when properly medicated for his ADHD, his behavior would improve and thus, show that he would not be a future danger in a prison setting. (2 RWR at 212.) While recognizing the harmful potential of the records, trial counsel testified that they were more helpful than harmful to Mr. Young's case in punishment. (*Id.* at 212-14.)

## 3. Relevant Legal Authority

### a. Fourth Amendment Right to Privacy

419. The acquisition of Mr. Young's TYC records violated his Fourth Amendment right to privacy, which provides "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated." The attainment of Mr. Young's TYC records in which Mr. Young had a vested proprietary interest was an illegal and unconstitutional procurement in violation of the Fourth Amendment of the United

138

States Constitution and Article I, section 9 of the Texas Constitution.

420.    Texas Constitution article I, section 9, protecting against unreasonable searches and seizures, has been held to be at least as extensive as the U.S. Constitutional Amendment IV.  *State v. Comeaux*, 818 S.W.2d 46, 49 (Tex. Crim. App. 1991).  As with the Fourth Amendment, the purpose of article I, section 9 is to safeguard an individual's legitimate expectation of privacy from unreasonable governmental intrusions.  *Green v. State*, 566 S.W.2d 578, 582 (Tex. Crim. App. 1978); *Richardson v. State*, 865 S.W.2d 944, 948 (Tex. Crim. App. 1993).  The Fourth Amendment and article I, section 9, protect "people not places."  *Green*, 566 S.W.2d at 582; *Richardson*, 865 S.W.2d at 948.

421.    A privilege stands as an absolute bar to the disclosure of evidence (absent an exception) while the Fourth Amendment merely imposes certain reasonableness requirements as a condition for obtaining the evidence.  That TYC records have not been given the absolute protection of a privilege does not mean they might not possess the qualified protections embodied by the Fourth Amendment.  *State v. Hardy,* 963 S.W.2d 516, 524 (Tex. Crim. App. 1997).

422.    In order to present a federal or state constitutional claim based on a search and seizure, Mr. Young must be within the purview of constitutional protection.  He must establish that he had an actual (subjective) legitimate expectation of privacy in the invaded place or property and that the expectation of privacy is one that society is prepared to accept as objectively reasonable.  *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979); *Comeaux*, 818 S.W.2d at 51.

//

//

139

### 4. Mr. Young had a Legitimate Subjective Expectation of Privacy in his TYC Records

423.   Mr. Young's records were not "seized" or "searched" under the Fourth Amendment, unless Mr. Young had a legitimate expectation of privacy in them. *Hardy*, 963 S.W.2d 516.  To determine if the accused has made a showing of a legitimate right of privacy, courts may look to the totality of the circumstances.  However, legitimization of expectations of privacy by law must have a source outside of the Fourth Amendment either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.  *Comeaux*, 818 S.W.2d at 51.

424.   There is a general understanding that there is an expectation of privacy in physician-patient communications.  As such Mr. Young had a reasonable expectation that his TYC records, particularly those relating to highly confidential personal information such as Mr. Young's mental health, drug and alcohol abuse, family dysfunction and the reasons for his involuntary commitment to TYC, would remain private.  Furthermore at no stage did Mr. Young have reason to contemplate that his confidential TYC records would be disclosed to others at all, least of all without notice or the intervention of a court with proper jurisdiction.  The physician-patient relationship provides an environment which ensures that a patient confides in his doctor any and all details which facilitate the provision of quality medical treatment in the best interests of the patient.  Anything less jeopardizes the health of the patient, in particular, that of a juvenile.

//

//

//

5.   **Society Has an Objective Expectation of Privacy in Relation to Medical Records in General, Including Those Concerning a Juvenile**

425.   To fairly evaluate society's expectations, a state should step beyond its boundaries and take a nationwide perspective. *Hardy*, 963 S.W.2d at 524. Thus, had the issue been raised by trial counsel at the time of trial, the issue to be resolved in the case of Mr. Young's case was whether society has a general expectation of privacy in medical records held by a third party, namely the Texas Youth Commission of Travis County, State of Texas.

426.   As the relevant Fourth Amendment expectations are those of American society, a court cannot unilaterally make a policy choice on the matter. Moreover, the absence or inapplicability of a privilege does not foreclose the existence of an expectation of privacy recognized by society. *Hardy*, 963 S.W.2d at 524.   Further it has been recognized that:

> [t]here are some subjective expectations of privacy, however, that society does sanction as legitimate in spite of limited, confidential disclosure.  We would not want to say, for example, that society does not recognize the confidentiality of information imparted to a physician behind the closed doors of an examination room.  That certain facts may be revealed in the necessarily candid process of diagnosis and treatment does not mean we no longer have a collective interest in insulating them from public scrutiny.  On the contrary, society accepts -- indeed, positively insists -- that such information, although of necessity partly exposed, should nevertheless retain its essentially private character.

*Comeaux*, 818 S.W.2d at 52-53; *see also Richardson*, 865 S.W.2d at 952.

141

427.   The Supreme Court has on one occasion addressed society's expectations with regard to records held by a third party.  In *United States v. Miller*, 425 U.S. 435, 96 S. Ct. 1619, 48 L. Ed. 2d 71(1976), the Court held that a depositor possessed no reasonable expectation of privacy in bank records relating to his account.  *Id.* at 440-43.  In support of its holding, the Supreme Court explained that a depositor voluntarily exposes his financial information to the banking institution and assumes the risk that those records will be conveyed to the government.  *Id.* at 442-43.

428.   Like the bank, TYC is a third party entrusted with personal information.  However, release of medical information to hospitals within juvenile detention facilities to which one has been involuntarily committed is less optional than the release of financial information to banks.  A person can choose not to maintain a bank account, but it hardly seems reasonable to expect someone to forego medical attention, especially when such medical attention has been mandated through a court order involuntarily committing a juvenile to such facility.  *See Hardy*, 963 S.W.2d at 524.  As a consequence, not only did Mr. Young possess a subjective expectation of a right to privacy in his medical records and information contained in his TYC records, but this was an expectation that he shared with society in general.

429.   The Supreme Court has held that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell.  The Court added that it believed that it is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.  *State v Schieneman*, 77 S.W.3d 810, 812 (Tex. Crim. App. 2002) (quoting *Hudson v. Palmer*, 468 U.S. 517, 525-26, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)).

430.   However, prisoners, including juveniles, must be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration. *Hudson*, 468 U.S. at 523 . At the time the records were obtained by the State, Mr. Young's reasonable expectation of privacy in his medical records, particularly those relating to his mental health, drug and alcohol abuse, family dysfunction and the reasons for his involuntary commitment to TYC, was not inconsistent with the objectives of incarceration which justify seizure (institutional security and internal order) in *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

431.   Furthermore the nature of the seizure of Mr. Young's medical records from a custodial institution does not conform with any of the accepted circumstances in which seizure has been sanctioned by the courts.  The seizure of the medical records was not necessary to ensure the safety of the prison staff, the administrative personnel, inmates or visitors. *Hudson*, 468 U.S. at 527.  In addition, the seizure of Mr. Young's medical records did not extend to preventing the flow of illicit weapons into the prison; or attempts to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize. *Id.* Society may well not be prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell; and, therefore the proscription against unreasonable searches does not apply in the confines of the prison cell. *Id.* at 526.  However, when Mr. Young's TYC records were seized by the State, Mr. Young stood detained, not yet charged of the crimes of capital murder.  The case law provides no suggestion for supporting the argument that Mr. Young's confidential medical records could be unreasonably seized from a custodial institution where the State had yet to carry its burden of proof to show Mr. Young was guilty of the crimes for which he remained detained.

143

432.   In determining in this case whether an expectation of privacy is legitimate or reasonable involves a balancing of two interests.  Namely the interest of Mr. Young in the inherent privacy of his medical records and the interest of the district attorney's office in seizing the medical records before Mr. Young was charged with the crimes in question, let alone found guilty of those crimes.

433.   Because the TYC records were obtained prior to Mr. Young's indictment on this case, while Mr. Young was on probation, at the time the State seized Mr. Young's TYC records, the State's interests in institutional security and internal order were not at stake.  Agreeing, without conceding, that TYC records could have become relevant if and when Mr. Young was found guilty of capital murder, Mr. Young's expectation of privacy in those records was more substantial before he was even charged with capital murder.

434.   Barely four days after the incidents in question took place, and before much investigation had already taken place, the State of Texas, in this case, cannot assert that its interest in determining Mr. Young's so called propensity to future dangerousness outweighed Mr. Young's expectation of privacy in his TYC records.  It justly follows that an individual's interest in the privacy of his medical records, a right which is understood throughout the community as applying to all citizens, should overcome the interest of a district attorney's office in illegally obtaining records which are of dubious relevance to the case at that time, especially when the U.S. Constitution mandates that the presumption of innocence still applied.

435.   "The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *United States v. Jacobsen*, 466 U.S. 109, 117, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984); *Hardy*, 963 S.W.2d at 525.  There is no suggestion that Mr.

Young or the medical personnel had, prior to the seizure by the district attorney, frustrated the expectation of privacy in Mr. Young's health records by disclosure of some degree.

### 6.   Mr. Young's Expectation of Privacy Before He Was Charged with the Underlying Convictions

436.   Not only did Mr. Young have a "subjective" expectation of privacy in his TYC records, Mr. Young also had an objective expectation of privacy in those records because he was yet to be charged with any crimes, let alone capital murders at the time Mr. Young's records were seized by the State.

437.   Under Texas Occupations Code, Mr. Young's TYC records are confidential and thus generally protected from disclosure.

Texas Occupations Code section 159.002 states, in pertinent part:

(a) A communication between a physician and a patient, relative to or in connection with any professional services as a physician to the patient, is confidential and privileged and may not be disclosed except as provided by this chapter.

(b) A record of the identity, diagnosis, evaluation, or treatment of a patient by a physician that is created or maintained by a physician is confidential and privileged and may not be disclosed except as provided by this chapter.

(c) A person who receives information from a confidential communication or record as described by this chapter, other than a person listed in Section 159.004 who is acting on the patient's behalf, may not disclose the information except to the extent that disclosure is consistent with the authorized purposes for which the information was first obtained.

Tex. Occ. Code, § 159.002.

438.   The term "physician" under this code has been interpreted broadly by the CCA to encompass other persons providing health care. *In re Dolezal*, 970 S.W.2d 650, 652 (Tex. Crim. App. 1998) ("protecting communications with a chiropractor even though a chiropractor is "not, technically, a physician.").

Texas Occupations Code section 159.003 states, in pertinent part,

(a) An exception to the privilege of confidentiality in a court or administrative proceeding exists:

(10) in a criminal prosecution in which the patient is a victim, witness, or defendant;

**(b) This section does not authorize the release of confidential information to investigate or substantiate criminal charges against a patient**.

(c) Records or communications are not discoverable under Subsection (a)(10) until the court in which the prosecution is pending makes an in camera determination as to the relevancy of the records or communications or any portion of the records or communications. That determination does not constitute a determination as to the admissibility of the information.

Tex. Occ. Code, § 159.003 (emphasis added).

439.   In Mr. Young's case, the State of Texas subverted all of the protections created by the State itself to protect Mr. Young's expectation of privacy in those documents.   Here, by its own admission, the State used the TYC records in deciding to charge Mr. Young with a capital crime and in deciding to seek the death penalty against Mr. Young, and not any of his cohorts.

In the assessment in this case on whether or not to seek the death penalty . . . when I went and looked at the background of the Defendant, . . . there is -- was a real long adjudication that eventually sent him to TYC, multiple

146

offenses listed in there, multiple felonies listed in there.  I went through

around a thousand pages of the TYC records with multiple offenses,

assaults against staff as well as other juvenile inmates . . . so when I look at

not only the facts of this homicide, but the Defendant's background, I'm left

with a person that I can reasonably make the assessment based upon several

year track record that a jury could agree with me that he is going to be

dangerous in the future.

(5 RR at 120-21.)

440.   At the time the TYC records were seized, the Texas Family Code

allowed disclosure of information to "a government agency if the disclosure is

required or authorized by law," or "with leave of the juvenile court, . . . [to a]

person, agency, or institution having a legitimate interest in the proceeding or in

the work of the court."  Act of 1995, Ch. 262, § 53, 1995 Tex. Sess. Law Serv. 327

(codified as Tex. Code Fam. § 58.005 (a) (4) and (7)).

441.   Here, the record is clear that the State accessed Mr. Young's

confidential TYC records precisely for the illicit purpose that the laws of the State

of Texas precluded.

442.   Although at the time Mr. Young's records were seized, Section

58.007 of the Texas Family Code provided that "a prosecuting attorney may obtain

the record of a defendant's adjudication," such access was premised on those

records being accessed "[f]or the purpose of offering a record as evidence in the

punishment phase of the criminal proceeding."  Act of 2001, Ch 1297,  Tex. Sess.

Law Serv. Ch. 1297 (H.B. 1118) (codified as Tex. Fam. Code, § 58.007).

443.   Similarly, under the Human Resources Code, access to those records

by a prosecuting attorney without a court order were available to a prosecutor only

"[f]or the purpose of offering a record as evidence in the punishment phase of a

147

criminal proceeding." Tex. Hum. Res. § 61.095.

444.   Thus, because the State cannot argue that it intended to introduced those records at the punishment phase of a trial yet to occur when an indictment had not even been filed, the State cannot argue that Mr. Young's TYC records, which included confidential medical information, could be accessed at the time they were seized by the State.  Furthermore, because by its own admission, the State used the TYC records to "investigate or substantiate criminal charges against" Mr. Young, the State used the TYC records for a purpose clearly prohibited by Texas law.

445.   Here, the violation is so egregious precisely because those records were used to investigate or substantiate criminal charges against Mr. Young and to seek the death penalty against him.  In addition, the records were obtained with total disregard for the protective measures created by the state to minimize the risk of misuse of such records, mainly the requirement of "an in camera determination as to the relevancy of the records or communications or any portion of the records or communications."  Simply, the records were released because the State asked a juvenile court to release those records without the juvenile court requiring any further showing from the State.  The DA asked, and a court complied.

**7.    Exclusion of Evidence**

446.   Texas  Code of Criminal Procedure, section 38.23(a), provides that no evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

447.   Thus, the medical records illegally obtained by the district attorney's office were not admissible at the punishment phase of Mr. Young's trial.  Had trial

148

counsel made a motion to suppress such documents, the trial court would have
excluded from evidence at trial the TYC records obtained in violation of the
Fourth Amendment to the United States Constitution and Article 1, Section 9 of
the Texas Constitution.

### 8.    The Decision Was Not Strategic

448.   Contrary to trial counsel's assertions, their refusal to object to the
TYC records does not qualify as a strategic decision.  Trial counsel claimed that it
was better to let the TYC records come in and embrace them.  (3 RWR at 181-83.)
Even accepting this contention as reasonable, this purported excuse went only to
the effectiveness of their tactics at trial, not whether trial counsel were reasonable
in failing to investigate the matter entirely.  Clearly, trial counsel saw the danger in
allowing the jury to learn about Mr. Young's so called "propensity" for future
dangerousness by the fact trial counsel objected to the State's experts' ability to
predict future dangerousness.  (32 RR at 60-61.)  The lack of investigation was
less reasonable precisely because the State admitted the TYC records were used
for an illicit purpose: to seek the death penalty against Mr. Young.  Whether trial
counsel would have decided to "embrace" Mr. Young's TYC records is irrelevant.
Quite simply, trial counsel "could not make a valid strategic choice because he had
made no investigation." *Knighton v. Maggio*, 740 F.2d 1344, 1350 (5th Cir.
1984).

### 9.    Prejudice from Failing to Investigate and Challenge the State's Seizure of Mr. Young's TYC Records

449.   The prejudice to Mr. Young does not dissipate even if were
Respondent to argue that all the State had to do was follow proper procedure to
obtain Mr. Young's records for those records to be admissible at trial.  As DA
Schorre himself testified, those records had been used in his decision to charge

Mr. Young's with capital murder and seek the death penalty against him. Although Schorre testified he based his assessment on the alleged participation of Mr. Young in two other incidents, the burglary of a gun shop and the home invasion of an alleged drug dealer, Schorre emphasized what he described as Mr. Young's "several year track records that a jury could agree with me that he is going to be dangerous in the future and would therefore fall into the death penalty worthy group." (5 RR at 121.) Thus, the prejudice to Mr. Young was, at a minimum, in the State using those records to determine Mr. Young should be charged with a capital murder for which the State would seek the death penalty.

### 10.   Trial Counsel Also Failed to Object to the TYC Records on Hearsay Grounds

450.   As previously stated, the prosecutors in this case filed a Notice of Filing of Business Records on June 7, 2002 relating to Mr. Young's records from TYC. (CR at 224.) These records were later admitted in Mr. Young's trial, as State's Exhibit 147, without objection. (30 RR at 194-95.)

451.   Rule 801(d) of the Texas Rules of Evidence defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The TYC records found in State's Exhibit 147 constitute hearsay.

452.   Under Rule 802 of the Texas Rules of Evidence, hearsay is not admissible except as provided by statute or rule. Rule 803(6) of the Texas Rules of Evidence, under which State's Exhibit 147 was apparently admitted, provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business

activity, and if it was the regular practice of that business activity to
make the memorandum, report, record, or data compilation, all as
shown by the testimony of the custodian or other qualified witness, or
by affidavit . . ., unless the source of information or the method or
circumstances of preparation indicate lack of trustworthiness.
"Business" as used in this paragraph includes any and every kind of
regular organized activity whether conducted for profit or not.

*Id.*

453.   The TYC records contain numerous documents entitled "Incident
Report," which purport to reflect disciplinary violations or rule infractions.
However, the majority of the reports do not demonstrate that they were made by a
person with personal knowledge of the incident.

454.   Moreover, under Rules 401 and 403 of the Rules of Evidence, the
State had the burden to prove that the records were relevant and that their
probative value outweighed any prejudicial effect.  A large portion of the TYC
records were also not admissible as they were either not relevant to the issues
raised at trial, or were more prejudicial than probative.

455.   For example, incident report number 134 reflects that Mr. Young was
referred by a staff person named L. Klahsen.  While the report indicates Mr.
Young was cursing and talking during church services, the records do not
demonstrate that L. Klahsen personally observed any of these actions.  The report
further indicates that pill cups fell out of Mr. Young's shirt as he got into a
security van and then the name "Alvarez" appears in brackets.  It is impossible to
discern from this report whether L. Klahsen observed this event or that he/she was
reporting what some unknown person named Alvarez observed.  (*See* 43 RR at
103.)  Even assuming, arguendo, this report was even relevant to the issues raised

at trial, there was no showing that the report was generated by someone with personal knowledge of the events described.

456.   There are hundreds of similar reports.  Incident report number 120 notes that Mr. Young was observed turning the computer screen backwards, but does not reflect that either the referring staff person, D Ardoin, or "CNP," the initials appearing at the end of the report, even observed these events. (*See* 43 RR at 116.) In incident report number 118, dated September 23, 1999, either the referring staff person, Mr. Clifton, or "CNP" observed that Mr. Young "may have been throwing gang signs at peers." (*See* 43 RR at 119.)  The report does not demonstrate what circumstances allowed the officer to arrive at this conclusion, or whether it was personally observed by the officer.

457.   There are other reports which similarly contain such hearsay information. (*See* 43 RR at 121 ("control" observed Mr. Young hiding contraband in his personal area - no indication who issued the report); 43 RR at 124 (Mr. Young was "checked up" for behavior but does not reflect whether this was observed by the referring staff person or if it was based on hearsay statements by others); 43 RR at 127 (Mr. Young yelled "fuck you" during his checkup and that this was a daily occurrence -- but does not reflect whether the later statement was based on personal information or hearsay); 43 RR at 133 (Mr. Young was "huddle up" earlier for excessive talking -- does not indicate whether the referring staff person observed this behavior).)

458.   A similar incident report, number 132, reflects that "M. Martin" was the referring staff person.  The report indicates only that "Youth needs time out." It does not demonstrate what circumstances prompted this report.  Moreover, following this information, the report includes the notation "CNP."  Once again, the report does not demonstrate whether Martin or "CNP" was the person who

observed this incident.  To that end, this report was not relevant to any material issue in this case, and it is not clear whether the reporting person had any personal knowledge of the events described.  (*See* 43 RR at 104.)

459.    Other reports have similar issues.  (*See e.g.*, 43 RR at 105, 108, 111-15, 117-19, 124-26, 128-31, 135-37; *see also* 43 RR at 137 (report reflects that Mr. Young became confused -- report is not relevant to any material issue at trial); 43 RR at 139 (report reflects it is based upon hearsay statements concerning an earlier referral); 43 RR at 146 (report reflects Mr. Young had gang related material but contains no information demonstrating any indicia of reliability -- report also reflects that further investigation revealed the accusation to be false thus, the report was not relevant and more prejudicial than probative); 43 RR at 152 (report reflects Mr. Young participated in suspected "gang related" activity but does not demonstrate what the activity was or what training or experience the officer had to recognize such activity -- no indicia of reliability in the statements); 43 RR at 164 (report reflects Mr. Young had gang related drawings in his area -- report does not describe drawings or indicate the expertise upon which such a conclusion was based); 43 RR at 172 (report indicates Mr. Young was out of dress code -- not relevant to any material issue at trial); 43 RR at 216 (report reflects "aggravated"  and nothing further - report was not relevant to any material issue at trial).

460.    Some of the incident reports reflect statements made by other inmates at TYC, which constitute hearsay and have no indicia of reliability.  (*See e.g.*, 43 RR at 109.)  The reliability of the incident reports are further questionable in light of the testimony at trial.  TYC guard Jacqueline Timmons testified that reports in State's Exhibit 147 were not the actual reports prepared by the person with knowledge of the events referred to therein.  Instead, Timmons testified, the

153

records in States Exhibit 147 were only a synopsis of the incident reports.  (31 RR at 301.)  Assuming the validity of her testimony, there was no evidence presented regarding who prepared the synopsis or what information was not provided within the synopsis.

461.   In another report, there is a "brief" description of Mr. Young's "history of delinquency" which by its inherent nature was hearsay.  The description does not, however, indicate who wrote it, the reliability of the statements, or who provided the information to the person who wrote it.  (43 RR at 246.)

462.   Additionally, States Exhibit 147 contains many psychiatric/psychological evaluations and tests which are in part based upon hearsay statements, do not demonstrate the qualifications of the person preparing the report, are not relevant to any issue at trial, and do not demonstrate indicia of reliability.  (*See e.g.*, 43 RR at 267, 275, 363-420.)

463.   The State introduced such records in an attempt to portray Mr. Young as an incorrigible delinquent and a future danger to society.  However, there was no strategical reason for trial counsel to have permitted the admission of inflammatory evidence which did not meet the requirements of the exception to the prohibition against hearsay.

464.   To that end, at the state writ hearing, counsel testified he did not even believe the jury would read the TYC records.  (3 RWR at 77-78.)  Counsel was incorrect.  The jury's verdict was based primarily on those records.  Counsel's performance was deficient, and it prejudiced Mr. Young's case.

**C.    Counsel's Failure to Present the Testimony of Mr. Young's Former Teachers**

465.   In addition to the failure to object to the introduction of the TYC

records, as discussed above, counsel further failed to present the testimony of Margaret Ann Fant and Mary Hall, two of Mr. Young's former school teachers. Counsel's failure to interview and present the testimony of the two teachers was ineffective.

### 1.   Fant and Hall

466.   Defense Investigator Jeff Marugg interviewed both Fant and Hall before the commencement of Mr. Young's trial.

467.   Fant was Mr. Young's fifth grade teacher for at least a part of that school year. Fant, who was fond of Mr. Young and knew him as a sweet and respectful child, believed he had no family guidance. According to Fant, Mr. Young never gave her any trouble and always tried to do the right things in school, although he would give up on projects faster than other children. (*See* Ex. 104 at ¶¶ 1-2 [Decl. of Margaret Fant].)

468.   Fant believed that Mr. Young did well with her because he needed someone to talk to, because she treated him like a human being, and because she gave him guidance. While Fant believed that Mr. Young was troubled, she also believed he had a lot of potential. (*Id.* at ¶¶ 5.)

469.   Mary Hall was Mr. Young's physical education teacher in kindergarten and first grade. Hall never had any problems with Mr. Young and he behaved himself in her class. She thought he was more of a follower than a leader.

### 2.   State Hearing

470.   Evidence was taken on this claim during the hearing on Mr. Young's state Application. On direct examination, defense counsel Ian Cantacuzene testified that neither school teacher had been located and interviewed. (2 RWR at 220-21.) Later, on cross-examination, defense counsel again stated that his defense team had never located these particular teachers or, if they had located

them, one of the teachers ended up saying something "bad" about Mr. Young. (3
RWR at 46-48.)  After a short break, defense counsel stated that after reviewing
materials and talking to Mr. Young's mother, he wised to offer the following
information regarding Fant: (1) Fant had been interviewed after all; (2) she was
Mr. Young's favorite teacher; and (3) a possible reason for not calling Fant,
although counsel could not specifically remember, was that Fant would say Mr.
Young had not received support at home from his mother, and that Mr. Young was
able to control his behavior when he wanted to.  According to defense counsel,
both of these facts were contrary to the defense presentation.  First, the defense felt
that Mr. Young's mother "did try very hard . . . ."  And second, the defense theory
was the Mr. Young could not control his behavior. (3 RWR at 51-52.)  Defense
counsel, however, was not certain of the reasoning behind not calling Fant:

> Q.    [Assistant District Attorney Ralph Petty]
>        Okay.  So you didn't want to chance
>        contradicting your evidence?
>
> A.    [Ian Cantacuzene] It's the only thing I can
>        think of in talking to Mr. Williams.  That's
>        the best I could think of just on the break.

(3 RWR at 52.)  With regard to Hall, defense counsel stated that there were notes
about her in the defense file, but he could not remember why she was not called
except that the notes indicate "that she did not find Clint to be hyperactive at all,
and really, good golly, everybody that's ever seen him said the boy was
hyperactive." (3 RWR at 53.)

471.   Later, Mr. Young's lead counsel on the case, Paul Williams, testified
that it did appear that defense investigator Marugg interviewed Fant and Hall
(habeas counsel Ori White had shown counsel Marugg's report).  As to Fant,

Williams stated:

> In fact, when you first brought it up to me this morning, I had no
> recollection of it whatsoever.  When we were out on one of the breaks
> and you showed me the report that Mr. Marugg did . . . I now do
> recall that Mr. Marugg and I met in my office and went over his
> report together, and the report on Ms. Fant was positive.  I honestly
> don't remember why we didn't call her, Mr. White.  I just simply
> don't recall.

(3 RWR at 69.)  Williams also did not have any recollection as to Hall.  (*Id.*)

### 3.    Counsel Had No Informed, Legitimate Reason Not Calling Fant or Hall as Witnesses at the Punishment Phase

472.   The testimony of the two teachers would have presented favorable
evidence from the same general time periods in which the State's witnesses
observed Mr. Young, and was relevant to the jury's consideration of the first and
third special punishment issues.  On the other hand, both defense attorneys offered
little or no guidance on why the former teachers were not called.

473.   First, Williams had no independent recollection of either witness.
And with respect to Fant, after reading Marugg's interview notes, stated that the
report seemed "positive" but could not offer any reason for not calling her.  (3
RWR at 69.)

474.   And with respect to Cantacuzene, he, too had no independent
recollection of either witness.  And it was only after reading Marugg's report that
he offered some "possible" reasons for not calling Fant:  that Fant would testify
that Mr. Young did not receive support at home from his mother and Mr. Young
was able to control his behavior, both of which were contrary to counsel's defense
theory of the case.  (3 RWR at 50-51.)  However, Cantacuzene's reasoning was

157

faulty.

475.   First, Fant never laid the blame at Mr. Young's mother's feet.  Rather, Fant told Marugg that Mr. Young had no family guidance, pointing the blame to all who raised him.  Second, defense witness Dr. Milam gave testimony that Mr. Young often had no supervision at home as his mother was off working from 4:00 p.m. to 1:00 a.m.  Dr. Milam also testified that when Mr. Young's EEG showed he needed serious help, Carla sent him to Wyoming instead.  (34 RR at 43-45.)  Dr. Milam also testified that no one in Mr. Young's family seemed to know how to treat their son's ADHD.  (34 RR at 52-53.)  Thus, far from being contrary to defense strategy, Fant's testimony was no different, in that one respect, from that which was presented by Dr. Milam.

476.   And with respect to Cantacuzene's reference to Fant stating that Mr. Young not being able to control his behavior, Fant never told this to Marugg.  In short, counsel's reasons for not calling either witness were neither thought out or strategic.  Thus, counsel's performance was objectively unreasonable.

477.   The failure to call Hall prejudiced Mr. Young.  The State presented the testimony of Mr. Young's first grade teacher, Debbie Barton.  Barton painted a dismal portrait of Mr. Young including that he bit and hit other students, tore up books, fell behind in his work, did not make friends, and had to be removed from the school district.  (31 RR at 101-05.)  Without the testimony of Hall, who taught Mr. Young in the same time period as Barton and would have testified to Mr. Young's good behavior, among other things, Barton's negative testimony was left unrebutted.

478.   And with respect to Fant, her testimony would have painted a more accurate portrait of the problems Mr. Young faced at that age - a child who was not receiving the proper guidance from his family.

479.   The failure to call these witnesses was an opportunity lost by defense counsel.  The State portrayed Mr. Young, even from his earliest years, as a trouble maker who showed a persistent pattern of criminal conduct over his lifetime.  Fant and Hall would have assisted in countering that image, certainly rebutting some of the State's more damaging testimony of Mr. Young's early years.  Counsel's performance, or lack thereof, caused tremendous prejudice to Mr. Young's case.

**D.**     **Counsel's Failure to Utilize Available Ballistics Evidence That Would Have Shown that Someone Other than Mr. Young Shot Doyle Douglas**

480.   At the time of trial, defense counsel had a ballistics report from State's witness, Tim Counce, that cast doubt on whether the firearm in Mr. Young's possession could have been the gun that was used to shoot Doyle Douglas.  However, counsel failed to utilize this report in cross-examination of lay and expert witnesses who testified to the shooting, and failed to retain and present their own expert witness who could have testified consistently to Counce's opinion in the report and during his testimony.

481.   At trial, both Mark Ray and David Page testified that Mr. Young shot Doyle Douglas twice in the head while sitting to his left in the passenger-side front seat with State's Exhibit 3, the Colt Huntsman .22 caliber weapon.  Both also testified that Ray shot Douglas for the third time in the back of the head.  In fact, according to the ballistics, the gun that the accomplice witnesses testified Mr. Young possessed on the night of the shooting was ruled out as the gun that shot the bullet into the right side of Doyle Douglas's head.  According to this report, Ray was in possession of the gun that caused the injury to the right side of Douglas's head.

### 1.     Relevant Trial Testimony

482.   Prosecution expert Tim Counce, a forensic firearms and toolmark examiner for the Texas Department of Public Safety, prepared a favorable report and testified at trial to the inconclusive nature of the ballistics evidence, but was able to rule out certain theories of the evidence that was useful to Mr. Young's case.  Trial counsel failed to ask that his report be admitted into evidence, which defense counsel (Paul Williams) realized only during his closing argument.  (29 RR at 47-48.)  Once he realized his mistake, he asked the jury to request a read-back of Mr. Counce's testimony in order to put the pieces of evidence together. (29 RR at 48.)  The prosecutor took advantage of this mistake by arguing that the jury should not ask for a read-back and that the defense lawyer just got it wrong:

> Now, I take issue, you'll have to rely on your notes, I think defense counsel, Mr. Cantacuzene tried to straighten out Mr. Williams, but I think Mr. Williams has the testimony on the spent bullets, the projectiles and where they were recovered and what they match up to entirely wrong.  I think it's good faith mistake and Mr. Cantacuzene tried to correct him, but he's got that part wrong.  You go back and you look from your notes what Mr. Counce said.

(29 RR at 67.)  Counce's ballistics report was admitted into evidence at the state writ hearing as Defense Exhibit W-5.  (3 RWR at 50.)  (Ex. 88)

483.   McCoy testified that Mr. Young shot Douglas in the car with a .22 caliber firearm with a long barrel and a clip.  (21 RR at 113.)  Ray testified that the handgun Mr. Young used to shoot Douglas in the car was a semi-automatic handgun like an old styled German Ruger with a barrel four to six inches long and

the metallic nickel finish and clip, which he identified as State's Exhibit 3, the Colt Huntsman. (22 RR at 96, 249-50.) Page testified that the handgun Mr. Young used to shoot Douglas was a .22 caliber semi-automatic handgun. (26 RR at 157-65.)

484.    Ray testified that State's Exhibit 5, a .22 caliber revolver/pistol with a broken handle, was the weapon he used to shoot Douglas in the head at the creek. (22 at RR 250.) State's Exhibit 5 was described by Mr. Counce as an R-G double-action .22 caliber long rifle/revolver, commonly known as a Saturday Night Special. (25 RR at 150-51.)

485.    At the time of Mr. Young's arrest after his vehicle was stopped by officers in Midland County, Mr. Young possessed a Colt Huntsman .22 caliber semi-automatic handgun. (24 RR at 170-71.) This weapon was introduced and referred to as State's Trial Exhibit 3. State's Exhibit 3 was identified as one of the firearms taken in the burglary of an East Texas business located in Diana, Texas. (30 RR at 30-38.)

486.    Prosecution expert Jill Urban testified that she performed the autopsy of Doyle Douglas and concluded that Douglas was shot in the head three times by a small caliber weapon. (22 RR at 263-68.) Shell casings (.22 caliber) were recovered from Douglas's car when it was discovered abandoned near Eastland, Texas. (23 RR at 43-46.) The casings found in Douglas's vehicle were connected with the .22 Colt Huntsman handgun seized from Mr. Young at the time of his arrest. (25 RR at 158-59.)

487.    Counce testified that State's Exhibit 9, which was a bullet taken from the left side of Douglas's head, was not fired from State's Exhibit 5, a .22 caliber revolver, but that he could not identify or eliminate State's Exhibit 9 as having been fired from State's Exhibit 3, which was the .22 caliber semi-automatic

161

handgun seized from the Mr. Young.  (25 RR at 161-62.)  Counce also testified that he was unable to identify or eliminate State's Exhibit 10, the bullet recovered from the back of Douglas's head, as having been fired from State's Exhibit 3, which was the .22 caliber semi-automatic handgun seized from the Mr. Young. (*Id.*)  In his report, Counce concludes that "[i]t is our opinion that the above mentioned projectiles [9 and 10] were not fired from the R-G revolver" (State's Exhibit 5).  (Ex. 88 at 967 [Counce Report].)

488.   Counce's testimony and the ballistics report by Counce stated that he was unable to identify or eliminate State's Exhibit 11, the bullet taken from the right side of Douglas's head, as having been fired from State's Exhibit 5.  Counce was able to say that the bullet, State's Exhibit 11, was not fired from State's Exhibit 3, the .22 caliber semi-automatic handgun seized from Mr. Young at time of his arrest. ( Id .)  In his report he stated, "[i]t is our opinion that the mentioned projectile was not fired from the submitted Colt pistol." (*Id.*)

### 2.      Relevant State Writ Testimony

489.   At the state writ hearing, both trial lawyers, Ian Cantacuzene and Paul Williams, testified that Williams had argued the ballistics evidence in an incorrect manner during the closing argument, and that Nancy Piette (the trial paralegal) and Cantacuzene had to interrupt Williams's closing.  (2 RWR at 236-37.)  According to Williams, the defense team did not hire their own ballistics expert because they felt that they did not need one.  (3 RWR at 102-03.)  Instead, they relied upon the State's experts. (*Id.*)  Williams testified that he did not cross-examine Counce with respect to their defense theory of what the ballistics showed in their favor because he did not know what the answer to the question would be.  (3 RWR at 104, 107.)

490. This line of reasoning was clearly flawed; an expert hired by the defense team would have been able to preview his testimony with the team to ensure that favorable testimony would have been elicited. Further, there was no evidence at trial that Mr. Counce would not speak to the defense team prior to his testimony, so that they could have previewed their questions. The favorable ballistics evidence should have been presented through the live testimony of a qualified expert.

### 3. Trial Counsel Should Have Argued and Presented Ballistics Evidence at Trial

491. All of the ballistics information detailed in Section 1 was available to trial counsel at the time of trial. Counsel failed to ask that Counce's report be admitted into evidence and failed to present independent, corroborating ballistics evidence through their own expert. Had they done so, the expert could have testified that:

Mark Ray testified that he fired a single shot into the back of the head of Doyle Douglas. The assertion is not supported by the physical evidence. The physical evidence is consistent with showing that Mark Ray, who admitted to using the R-G .22 LR Revolver, firing the shot into the right side of the victim's head. The shot to the back of the head of Doyle Douglas is listed as Gunshot Wound # 1 in the autopsy report. (22 RR at 268). The shot to the left side of the head is listed as Gunshot Wound # 2 in the autopsy report. (22 RR at 264). Both of these shots were revealed by the autopsy report and later by laboratory examinations at the TDPS Laboratory to be consistent with being fired by the Colt Huntsman .22LR pistol, or the State's Exhibit 3.

(Ex. 95 at ¶ 7 [Decl. of Richard Ernest].)

492.   Richard Ernest, a forensic ballistics consultant, or someone like Ernest, could have testified at trial that State's Exhibits 9 and 10 would not have been consistent with the testimony that Mr. Young fired these two shots first using the Colt Huntsman .22LR pistol before Mark Ray later fired the shot into the back of the head of the victim.  Ernest could have testified that:

> Because of the physical dimensions and limitations involved in an automobile, it is the opinion of this examiner that it is unlikely that these two shots (State's Exhibits 9 and 10) were fired inside the automobile by the front seat passenger, Clinton Young, into the left side of the head and back of the head of the victim, Doyle Douglas, while he (the victim) was in the driver's position in the automobile. Given this evidence, it is more likely that Douglas was shot by someone who was firing from the victim's left side (the driver's side of the car).

(Ex. 95 at ¶ 8 [Decl. of Ernest].)

493.   The testimony at trial was that Doyle Douglas was shot in the head three times with a small caliber weapon.  The prosecution's ballistics experts uncertainty as to which weapon fired the bullets that killed Douglas was helpful to the defense.  The evidence that Mr. Young shot Douglas two times in the head with a Colt Huntsman .22 caliber semi-automatic handgun in his possession at the time of arrest (State's Exhibit 3), was inconclusive, and trial counsel should have argued that this ballistics evidence showed that Ray, McCoy, and Page were not telling the truth and the State had not proven its case beyond a reasonable doubt. *See Draughon v. Dretke*, 427 F.3d 286, 296-97 (5th Cir. 2005) (counsel ineffective for failing to obtain forensic examination of the path of the fatal bullet and the

absence of forensic evidence facilitated the state's portrait of defendant as a violent young man; without forensic testimony only defendant could counter state's theory that there had been a short distance between defendant and the victim).

494.   The trial lawyers should have developed and presented the evidence to show that Page and Ray shot Douglas.   Mr. Young was seated in the passenger side of the car, close to Douglas and to his right.   Mr. Young could not have shot Douglas in the left side of the head because of where he was sitting.   All of this information, if presented properly and with the reports of Tim Counce and Jill Urban, would have shown that Mr. Young could not have shot Douglas and that the shots to the left and back of the head are consistent with being fired by Page, who was standing to the left of Douglas outside the car on the drivers side with the door open.   An expert could have testified that the wound to the right side of Douglas's head, along with the reports and Ray's admission of guilt, shows that Ray was responsible for that wound.   Page and Ray were equally culpable as none of the three bullet wounds was found to be post-mortem.   If this evidence had been presented to the jury and argued in this manner, it is reasonably probable that the jury would not have voted guilty as to the homicide of Douglas.

### 4.    Conclusion

495.   The omitted evidence is so compelling that there was a reasonable probability that at least one juror would have changed his or her mind about convicting Mr. Young of capital murder had the evidence been presented. *Williams*, 529 U.S. at 394; *Strickland*, 466 U.S. at 693; *Neal v. Puckett*, 286 F.3d 230, 241 (5th Cir. 2002) (en banc).   Additionally, there is a reasonably probability that the ballistics evidence would have caused the jury to vote "no" on Special Issue No. 2, whether the "defendant actually caused the death of the deceased

individuals," (CR at 861), which would have resulted in a life sentence.

## E.   Conclusion

496.   The foregoing violations of Mr. Young's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

497.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

498.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

//

//

//