## CLAIM SIX

**MR. YOUNG'S CONSTITUTIONAL RIGHTS WERE VIOLATED BECAUSE THE EVIDENCE WAS INSUFFICIENT TO FIND THAT THE KILLINGS OCCURRED IN THE SAME CRIMINAL TRANSACTION OR IN DIFFERENT CRIMINAL TRANSACTIONS COMMITTED PURSUANT TO THE SAME SCHEME OR COURSE OF CONDUCT**

499.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because there is insufficient evidence to find that the shootings of Douglas and Petrey occurred either in the same criminal transaction or in different criminal transactions committed pursuant to the same scheme or course of conduct.

500.   *Exhaustion of Claim*: This claim was presented as Points Eleven and Twelve in the direct appeal.  (AOB at 13-14, 53-58.)

501.   *AEDPA*: On appeal, Mr. Young alleged that there was insufficient evidence to support the jury's verdict of guilt on either of the theories of which he was indicted:  (1) Mr. Young intentionally and knowingly caused the deaths of Petrey and Douglas during the same criminal transaction or different criminal transactions but pursuant to the same scheme and course of conduct; and (2) Mr. Young intentionally and knowingly caused the death of Petrey during the course of kidnapping or robbery.  *Young v. State*, 2005 WL 2374669, at *1.  The CCA only dealt with the second theory of guilt because "[i]f the evidence is sufficient to support one of the theories in the indictment, we need not address the other theories."  (*Id.*)  Because the CCA did not reach this claim on direct appeal, although it was raised for the state court's consideration, review is de novo as there is no decision to assess under 28 U.S.C. § 2254(d).

167

**A.     Legal Standard**

502.   Evidence is sufficient to support a conviction if, viewing all the record evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged).  The same standard is used by Texas courts in determining the sufficiency of evidence. *Hooper v. State*, 214 S.W.2d 9, 13 (Tex. Crim. App. 2007); *Sells v. State*, 121 S.W.2d 748, 753-54 n.4 (Tex. Crim. App. 2003); *Jackson v. State*, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000).

503.   In making this determination, the jury must be free to disbelieve testimony and to infer that the truth is otherwise when such an inference is supported by circumstantial evidence regarding the actions of the accused. *Jackson*, 443 U.S. at 319.  Insufficient evidence claims are reviewed by looking at the elements of the crime under state law. *Jackson*, 443 U.S. at 324 n.16.

**B.     Relevant Facts**

504.   The amended indictment in this case charged Mr. Young in paragraph one with the offense of the murder of Douglas and Petrey in either the same criminal transaction or in different criminal transactions committed pursuant to the same scheme or course of conduct.  (CR at 754-56.)  The jury returned a general verdict finding Mr. Young guilty of capital murder.  (CR at 866-67.)

505.   Reviewing the evidence in the light most favorable to the prosecution, the evidence showed the following.  On the evening of November 24, 2001, Mr. Young, Mark Ray, Darnell McCoy, and David Page wanted to go to Longview to

buy "blunts," marijuana wrapped in cigar paper. (21 RR at 154; 22 RR at 69; 26 RR at 138.) As no one in the group had a working car of his own, Doyle Douglas agreed to drive the group to Longview.[46] (21 RR at 93, 99-100; 22 RR at 47, 61-62; 26 RR at 145.) The group started out for Longview around midnight. (22 RR at 51; 26 RR at 150.)

506.   At the location where the drugs were to be bought, Mr. Young shot Douglas twice in the head, stating something about needing Douglas's car. (21 RR at 105-07; 22 RR at 89; 26 RR at 158.) Mr. Young searched through Douglas's pockets, found a police type badge, and commented that he always knew Douglas was a snitch. (26 RR at 163.) Douglas was then put into the trunk of the car, still alive, and the group drove around for some time. (21 RR at 120-21; 26 RR at 164-65.) They later stopped in a secluded forest area and rolled, dragged, and/or kicked Douglas into a shallow creek bed, face down. (21 RR at 128; 22 RR at 120; 26 RR at 172-76.) Ray then fired the last shot into Douglas's head. (21 RR at 129; 22 RR at 125; 26 RR at 178-79.) After Douglas was shot, Page stole Douglas's wallet and its contents. (21 RR at 118-19.)

507.   The group then drove to a Longview motel to see Patrick Brook. (22 RR at 104; 26 RR at 190.) There, Mr. Young told Brook that Douglas was a child molester and a rapist and he deserved what happened to him. (21 RR at 117; 22 RR at 102.) Somewhere along the way, Mr. Young told McCoy that he needed Douglas's car to see Amber. (21 RR at 134.) Mr. Young then drove back to Ore City where he and Page dropped off McCoy and Ray. (21 RR at 136; 22 RR at 232; 26 RR at 181.) Mr. Young and Page then began driving to Midland. (26 RR at 187.)

---

[46] Douglas was the uncle of Amber Lynch, Mr. Young's girlfriend at the time of the crimes. (24 RR at 74; 21 RR at 134; 27 RR at 79.)

508.   While on the road to Midland, Mr. Young decided he needed a different car because he could not arrive in Midland with Amber's uncle's vehicle. (26 RR at 197-98.)  In a grocery store parking lot in Eastland, Texas, Mr. Young approached Petrey as he got into his pick-up truck, and took control of the vehicle. (26 RR at 203-05.)  Young and Page then continued on to Midland, arriving around 2:00 a.m. on November 26, 2001.  (26 RR at 217.)

509.   Once in Midland, the group went to a Walmart in Odessa, then to a hospital in Odessa, and then to a Walmart in Midland, arriving there around 7:15 a.m.  (26 RR at 225-38.)

510.   Mr. Young and Page drove to a pump-jack site to get rid of the evidence.  (26 RR at 240-41.)  There, Mr. Young telephoned Amber.  (26 RR at 238.)  Amber's father, Bart, got on the telephone and told Mr. Young that he knew what had happened to Douglas and that the police were looking for Young and Page.  Page called his father around 8:12 a.m., and then asked Mr. Young to drop him off so he could turn himself in.  (26 RR at 238-40.)

511.   Still at the pump-jack site, Mr. Young said something like, "Sorry, Sam, you know too much.  You got to die. . . . " and shot Petrey twice. (26 RR at 246.)  Mr. Young then dropped off Page at a restaurant.  (26 RR at 249.)  Mr. Young was later captured after a high speed pursuit  (24 RR at 145-50.)

C.   **Argument**

512.   The state's theory was that Mr. Young shot Douglas and Petrey in order to secure a car to see Amber Lynch, who was in Midland, Texas for the Thanksgiving holiday.  (29 RR at 9, 11, 25-26, 68.)  Assuming, arguendo, the evidence in the light most favorable to the prosecution shows that Mr. Young shot both Douglas and Petrey, the evidence also shows that the murders were not part of the "same criminal transaction" or "different criminal transactions committed

pursuant to the same scheme or course of conduct."

513.   Under Texas state law, there are two ways to commit a capital offense by murdering two or more people:  (1) during the same criminal transaction; or (2) during different criminal transactions committed pursuant to the same scheme or course of conduct. *Rios v. State*, 846 S.W.2d 310, 314 (Tex. Crim. App. 1992); *see* Tex. Pen. Code § 19.03(a)(7)(A), (B); *Coble v. State*, 871 S.W.2d 192 (Tex. Crim. App. 1993); *accord Wood v. Quarterman*, 503 F.3d 408, 412 (5th Cir. 2007).

514.   If a defendant is charged with murdering two or more persons during the same criminal transaction, the State must prove that he "engaged in a continuous and uninterrupted process, over a short period of time, of carrying on, or carrying out murder of more than one person." *Id.*; *accord Vuoung v. State*, 830 S.W.2d 929, 941 (Tex. Crim. App. 1992); *see Coble v. State*, 871 S.W.2d at 197-99 ("same criminal transaction" covers mass murders, such as killing people in a crowded room with a bomb).

515.   Two or more murders committed within a few hours of each other can occur during the "same criminal transaction" if the defendant engaged in a continuous and uninterrupted activity that tied them together. *Coble*, 871 S.W.2d at 197-99.

516.   On the other hand, when a defendant is charged with murdering two or more persons during separate criminal transactions, the State must prove that the murders occurred pursuant to the "same course of conduct." *Rios*, 846 S.W.2d at 314. the "same scheme or course of conduct" applies to "serial" murderers. *Coble*, 871 S.W.2d at 199 n.10.  Those who commit murders pursuant to the "same scheme or course of conduct" have an "over-arching objective or motive" or engage in "a regular mode or pattern of . . . behavior." *Corwin v. State*, 870

171

S.W.2d 23, 28-29 (Tex. Crim. App. 1993).

517.   Here, there was insufficient evidence to demonstrate that Mr. Young committed the murders during the "same criminal transaction."  The evidence showed that the first murder, that of Douglas, occurred sometime in the early morning hours of November 25th.  (22 RR at 108.)  On the other hand, Petrey was murdered sometime after 8:30 a.m on November 26th, some *thirty* plus hours later. (26 RR at 240.)  Based upon the length of time between the murders, there was insufficient evidence to support a conviction of multiple murder during the "same criminal transaction."  *See Feldman v. State*, 71 S.W.3d 738 (Tex. Crim. App. 2002) (motorcyclist killed a truck driver during road rage on a highway and killed another truck driver approximately *forty-five minutes later*); *Coble*, 871 S.W.2d at 197-99 (two or more murders committed within a *few hours* of each other can occur during the "same criminal transaction" if the defendant engaged in a continuous and uninterrupted activity that tied them together); *Vuoung*, 830 S.W.2d 929 (defendant's killing victims with semiautomatic rifle in crowded tavern in continuous and uninterrupted chain of conduct occurring over very short period of time was in same criminal transaction).

518.   Nor were the murders committed during the "same criminal transaction"  because the evidence was not sufficient to show a "continuous and uninterrupted process . . . ."  Tex. Pen. Code § 19.03(a)(7)(A). Here, looking at the evidence in the light most favorable to the State, after Mr. Young shot Douglas, but before he shot Petrey, the following events took place:  Ray shot Douglas; the group went to see Patrick Brook; Young drove Ray and McCoy back to Shady Shores; Young and Page began driving toward Midland; and they stopped at a convenience store, two Walmart Stores, and a hospital.  (26 RR at 193, 225.)  Based upon this evidence, the murders were not committed during a

172

continuous and uninterrupted process. *See Jackson v. State*, 17 S.W.3d 664, 669 (Tex. Crim. App. 2000); *Rios*, 846 S.W.2d at 315.

519.   The evidence was also insufficient to show the murders were committed during different criminal transactions but pursuant to the "same scheme or course of conduct."[47] As previously stated, those who commit murders pursuant to the "same scheme or course of conduct" have an "over-arching objective or motive" or engage in "a regular mode or pattern of . . . behavior." *Corwin*, 870 S.W.2d at 28-29.

520.   Here, the State argued that Mr. Young's motive for both murders was the taking of the vehicles in order to see Amber Lynch in West Texas. (*See* 29 RR at 9, 11, 25-26, 68.) However, the taking of Douglas's car and Douglas's eventual murder had little to do with Mr. Young going to see his girlfriend in Midland.

521.   Viewing the evidence in the light most favorable to the State, the first objective that evening was to secure Douglas's car in order for Mr. Young to take himself and his friends to Longview, Texas, to buy "blunts." (21 RR at 154; 22 RR at 69; 26 RR at 138.) As no one in the group had transportation, Douglas represented the group's best chance of getting to Longview to buy drugs. (21 RR at 93, 99-100; 22 RR at 47, 61-62; 26 RR at 145.)

522.   Viewing the evidence in the light most favorable to the State, the second objective that evening was for Mr. Young to secure Douglas's car in order to go see Patrick Brook. (22 RR at 104; 26 RR at 190.) Mr. Young was angry at Brook because of a gun transaction, and because Brook had "stolen" Debbie Sanders away from Mr. Young's brother, Dano. (26 RR at 166-67.) Mr. Young told Dano that he was going to kill Brook and get Sanders back for Dano. (21 RR

---

[47] While the jury was instructed as to the meaning of "same criminal transaction," they were not instructed as to the meaning of "same scheme or course of conduct." (CR at 808-09.)

at 98.) In order to do that, Mr. Young told Dano that he was going to ask for Douglas's car and that if Douglas refused, he was going to knock him out and take the vehicle. (21 RR at 283-91.)

523. Viewing the evidence in the light most favorable to the State, the third objective that evening was to kill Douglas because he was a child molester, a rapist, and snitch. After Mr. Young shot Douglas, he told McCoy that Douglas deserved what happened to him because he was a child molester and rapist. (21 RR at 117; 26 RR at 263-64.) Further, when the group went to see Brook after the shooting, Mr. Young told Brook that he killed Douglas because he found a law enforcement badge in Douglas's car. (21 RR at 252; 26 RR at 163.)

524. Moreover, if the "over-arching objective" (*Corwin*, 870 S.W.2d at 28-29) that evening was to kill Douglas and secure his car to see Amber in Midland, there was no reason for Young to have taken McCoy, Page, and Ray, and then to travel to Springhill, then to Longview, then back to Ore City, and then to Midland. At best, Mr. Young's intent changed at some point after Douglas was shot.

525. Thus, far from killing Douglas in order to secure his car for the purpose of seeing his girlfriend, Mr. Young's motive were far more complicated, yet completely separate from seeing Amber. As the evidence was insufficient to sustain the verdict, relief is warranted.

526. The foregoing violations of Mr. Young's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9; *Holloway v. Arkansas*, 435 U.S. 475, 489, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978).

527. The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not

mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

528.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668. Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

**CLAIM SEVEN**

**MR. YOUNG'S CONSTITUTIONAL RIGHTS WERE
VIOLATED BECAUSE THE EVIDENCE WAS INSUFFICIENT
TO FIND THAT THE PETREY MURDER OCCURRED IN
COMMISSION OF ROBBERY OR KIDNAPPING**

529.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because there is insufficient evidence to find that the intentional murder of victim Petrey occurred in the course of the commission of robbery or kidnapping.

530.   *Exhaustion of Claim*: This claim was presented as Points Twelve and Thirteen in the direct appeal. (AOB at 14-15, 59-60.)

531.   *AEDPA*: This claim was rejected in a reasoned opinion by the CCA. *Young v. State*, 2005 WL 2374669, at *1-3. However, as will be explained more fully below, because the state court's adjudication of this claim was dependent on an unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires," i.e, applying de novo review. *See Panetti*, 127 S. Ct. at 2858.

A.    **Legal Standard**

532.   As discussed in Claim Six, evidence is sufficient to support a conviction if, viewing all the record evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.  The same standard is used by Texas courts in determining the sufficiency of evidence. *Hooper*, 214 S.W.2d at 13.

B.    **28 U.S.C. Section 2254(d) Does Not Apply**

533.   Regarding the offense of the Petrey murder, the jury was instructed pursuant to paragraph two of the amended indictment in this case:

> A person also commits the offense of CAPITAL
> MURDER if he intentionally causes the death of an
> individual in the course of committing or attempting to
> commit the offense of KIDNAPPING or ROBBERY.

(CR at 5, 809.)

534.   With regard to this murder charge, the jury was instructed as to the "law of the parties." (CR at 813.)  Under Texas law, a defendant who did not actually cause the death of the deceased can be convicted of any capital offense as a conspirator (Tex. Penal Code § 7.02(b)), or as a party under either an accomplice theory or a theory involving the legal duty to act (Tex. Penal Code § 7.02(a)).

535.   In this case, the jury was instructed as to an accomplice theory under section 7.02(a)(2):

> A person is criminally responsible for an offense
> committed by the conduct of another if acting with the
> intent to promote or assist the commission of the offense,
> he solicits, encourages, directs, aids, or attempts to aid

the other person to commit the offense.

(CR at 813; *see also* 814-25.)  However, without explanation the CCA, in their opinion denying Mr. Young's direct appeal, analyzed this sufficiency claim under 7.02(b):

> In an attempt to carry out a conspiracy to commit one
> felony, another felony is committed by one of the
> conspirators, all conspirators are guilty of the felony
> actually committed, though having no intent to commit
> it, if the offense was committed in furtherance of the
> unlawful purpose and was one that should have been
> anticipated as a result of the carrying out of the
> conspiracy.

*Young v. State*, 2005 WL 2374669, * 1.

536.   "When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law," the federal courts "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.  Insufficient evidence claims are reviewed by looking at the elements of the crime under state law. *Jackson*, 443 U.S. at 324 n.16.  Here, the CCA, in its opinion, analyzed the sufficiency of the evidence claim here under the wrong state law.  Thus, under *Panetti*, this Court must then resolve this sufficiency claim without applying the constraints on habeas relief contained in 28 U.S.C. § 2254(d).  *Panetti*, 127 S. Ct. at 2858.

C.   **Argument**

537.   In addition to the law of the parties instruction, the jury was instructed that with respect to the Petrey murder, David Page was an accomplice as a matter of law and his testimony, alone, could not be used to convict Mr. Young

of Petrey's murder:

> With respect to the alleged killing of Samuel Petrey . . .
> you are charged that DAVID PAGE was an accomplice
> if any offense was committed . . . and . . . you cannot find
> [Mr. Young] guilty upon the testimony of DAVID PAGE
> unless you first believe beyond a reasonable doubt that
> the testimony of DAVID PAGE is true. . . . [and] that
> there is other evidence in this case, outside the testimony
> of DAVID PAGE and outside the testimony of any other
> accomplice witness, tending to connect [Mr. Young]
> with the commission of the offense charged in the
> indictment and then from all the evidence you must
> believe beyond a reasonable doubt that the defendant is
> guilty.

(CR at 828-29.) Assuming, arguendo, there was sufficient evidence presented at trial to show Young either kidnapped or robbed Petrey, or did so as an accomplice, without Page's testimony regarding the Petrey murder, there is insufficient evidence to show Mr. Young's intent to murder Petrey at the time Petrey was kidnapped or robbed.

538.   The crime of murder in the course of committing or attempting to commit a kidnapping, burglary, robbery, aggravated sexual assault or arson is the only capital offense in Texas that requires intent to kill.  Intent to kill is defined as a conscious desire or objective to cause the death of the victim.  *See* Tex. Penal Code §§ 6.03(a), 19.02(a), 19.02(a)(1).

539.   Murder in the course of a designated felony is a "result of conduct" crime. This means the defendant must have the specific intent to cause the victim's

death, rather than the mere intent to engage in the conduct that caused his death. *Gardner v. State*, 730 S.W.2d 675, 687 (Tex. Crim. App. 1987).

540.   Here, according to the prosecutor during closing argument, the only evidence linking Mr. Young to the Petrey murder, without Page's testimony, was the following: Mr. Young was arrested driving Petrey's truck, and the gun used to kill Petrey was found in that truck. (29 RR at 19, 29.) However, neither of those facts establishes Mr. Young's intent.

541.   Without Page's testimony, there was no evidence regarding the shooting of Petrey except for the ballistics evidence that showed that a shooting occurred, but not who committed it. Without Page's testimony, there was no evidence about the time Petrey's car was taken, or about the time Page and Mr. Young were with Petrey before his murder. Thus, without Page's testimony, there was no evidence regarding Mr. Young's intent.[48]

542.   In its opinion regarding this claim, the CCA relied entirely, and most improperly, upon Page's testimony to find the evidence was sufficient to support this capital murder conviction. *Young*, 2005 WL 2374669, *1-2. In short, without the accomplice testimony of Page, there was insufficient evidence to support Mr. Young's capital conviction for the murder of Petrey in the commission of robbery and kidnapping.

---

[48]   The only other evidence the State presented which even remotely connected Mr. Young to Petrey's murder was a trace metal test conducted by Paul Hallmark, which showed that Mr. Young held a gun at some point within hours of his arrest. However, even Hallmark admitted the test he ran was not definitive, was not a test that was recommended for court use - only for investigative purposes, and that he did not even conduct the test correctly. (25 RR at 94-118.) Moreover, Hallmark's testimony was so discredited, that the prosecutor did not even mention it during his closing argument. Further, the jurors informed the prosecutor during the punishment phase that they had serious concerns about Hallmark's testimony and performance as an investigator. (38 RR at 135, 141-42.)

543.   The foregoing violations of Mr. Young's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht*, 507 U.S. at 637-38 & n.9; *Holloway*, 435 U.S. at 489.

544.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

**CLAIM EIGHT**

**THE COURT VIOLATED MR. YOUNG'S CONSTITUTIONAL RIGHTS BY DISALLOWING IMPEACHMENT EVIDENCE OF DAVID PAGE**

545.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the trial court erroneously denied Mr. Young his right to present a defense and to confront witnesses when it excluded evidence that Page failed his polygraph examination.

546.   *Exhaustion of Claim*:  This claim was presented as Point Thirty-Two in the direct appeal.  (AOB at 95-96.)

547.   *AEDPA*:  Mr. Young raised this claim on direct appeal as a challenge to both the state and federal Constitutions.  The CCA, however, only addressed this claim with respect to Texas law.  *Young v. State*, 2005 WL 2374669, at * 10. Because the State court did not adjudicate the federal claim, § 2254(d) does not apply.  Thus, this Court may review the claim de novo.

180

548.   At trial, counsel's attempt to impeach witness David Page with the negative results of Page's February 2002 polygraph examination was not allowed by the court. (27 RR at 243.) Irma Rodriguez was the licensed polygraph operator who reported the results of her polygraph examination of Page. The examination found that Page was deceptive when answering the questions "did you shoot Sam Petrey" and "did you fire bullets into either Doyle Douglas or Sam Petrey." (27 RR at 237, 241). The testimony and the polygraph report should have been allowed into evidence. (*See* Ex. 62 [Polygraph Report].)

549.   Citing Texas Rules of Evidence 703 and 403, the court overruled trial counsel's proffer of the polygraph examination of Page. (27 RR at 243.) However, the State did not specifically challenge the admissibility of the polygraph by anything other than a general objection to its admissibility.

550.   Although the Texas state court has held that polygraph examinations are inadmissible for all purposes in criminal proceedings, *Nethery v. State*, 692 S.W. 2d 686, 700 (Tex. Crim. App. 1985), the Fifth Circuit Court of Appeals has not followed a per se rule of exclusion for all polygraph results. *United States v. Posado*, 57 F.3d 428, 429 (5th Cir. 1995). To the extent that federal law has not recognized the admissibility of polygraph results in criminal trials, Mr. Young presents a good faith basis to change that law.

551.   The trial court's action violates Mr. Young's Fifth, Sixth and Fourteenth Amendment rights to present a defense and to confront witnesses. The trial court's error in failing to allow the polygraph evidence prejudiced Mr. Young because the central issue in the case was whether Page was the actual shooter of Petrey, which trial counsel attempted to show through the impeachment of witnesses and argument.

552.   The court's denial of admission of important impeachment evidence that could have persuaded the jury that Page shot Petrey instead of Mr. Young, is highly prejudicial.  Further, Mr. Young's Sixth Amendment right to the effective assistance of counsel was violated when his trial counsel failed to cross examine Page on his statement that he knew what "it" was when he was told that he had not given investigators and attorneys complete details about what had happened or his direct involvement in the murders.  (*See* Ex. 62 [Polygraph Report].)

553.   The foregoing violations of Mr. Young's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

554.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

555.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the

foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM NINE

## MR. YOUNG WAS DENIED A TRIAL BY AN IMPARTIAL JURY WHEN VENIRE PERSON DANIE LYNN ROBERTS WAS EXCLUDED SIMPLY BECAUSE SHE EXPRESSED RESERVATIONS ABOUT THE DEATH PENALTY

556.   Mr. Young's convictions, confinement, and sentence violate the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because venire person Danie Lynn Roberts was excluded from the jury simply because she expressed reservations about the death penalty.

557.   *Exhaustion of Claim*:  This claim was presented as Point Sixteen in the direct appeal. (AOB at 64-65.)

558.   *AEDPA*:  Ths claim was rejected in a reasoned opinion by the Texas CCA.  *Young v. State*, 2005 WL 2374669, at *5-6.  The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

559.   If Respondent disputes any of the facts alleged below, Mr. Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Mr. Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

560.   The declarations and other exhibits accompanying this Petition, as well as the allegations set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

561.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

**A.     Relevant Facts**

562.   On February 24, 2003, Danie Lynn Roberts appeared for voir dire examination. (19 RR at 4.)  When asked her opinion of the death penalty, Roberts stated: "I don't have anything against it, but I don't know if I have the right to say whether or not a person should live or die." (19 RR at 13.)  When questioned further, Roberts stated that she did not have anything against the death penalty, and that the appropriateness of the death penalty depended on the individual charged and the evidence presented.  (*Id.* at 13-14.)

563.   The prosecutor then asked Roberts about specific cases and whether the death penalty was appropriate.  Roberts agreed that death was an appropriate punishment in the Oklahoma City bombing case, and the "whole September 11th thing." (19 RR at 14-16.)  When the prosecutor pointed out Mr. Young was the person who was eligible for the death penalty, Roberts initially said, "I don't think I could do it." (19 RR at 16-17.)

564.   After the prosecutor explained to Roberts how the death penalty worked in Texas, going over the three special questions asked of the jurors during the punishment phase (19 RR at 18-24), Roberts again stated she would probably vote for life in prison, rather than death (19 RR at 24).  When questioned further, Roberts stated that she would have to hear the evidence before making a decision and stated she would keep an keep an open mind and listen to the evidence.  (19 RR at 26-27.)

565.   A few moments later, Roberts again confirmed the fact that she could give the death penalty if she were "totally convinced that they deserve the death

184

penalty." (19 RR at 29.)

566.   Still later, Roberts testified that she was able to envision facts which would allow her to answer the third special issue to give life, but was unable to express in her own words a situation which would allow her to answer "no" to mitigation, other than to say she would have to be totally convinced before she would answer "no" to the mitigation issue.  (19 RR at 57-59.)  The state challenged Roberts for cause and the trial court granted that request over defense objection.  (19 RR at 63.)

**B.   Argument**

567.   In *Witherspoon v. Illinois*, 391 U.S. 510, 522-23, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), the Court held that

> A sentence of death cannot be carried out if the jury that
> imposed or recommended it was chosen by excluding
> veniremen for cause simply because they voiced general
> objections to the death penalty or expressed
> conscientious or religious scruples against its infliction.
> No defendant can constitutionally be put to death at the
> hands of a tribunal so selected.

*Accord Uttecht v. Brown*, 127 S. Ct. 2218, 2223-24, 167 L. Ed. 2d 1014 (2007).

568.   *Witherspoon's* holding is grounded in the right to a fair and impartial jury guaranteed to state criminal defendants by the Sixth and Fourteenth Amendments.  The constitutional standard applied to determine if the prospective juror is qualified is whether the juror's views "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 415, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985).  *Witt* also governs Texas capital jury selection. *Livingston v. State*, 739

S.W.2d 311, 322 (Tex. Crim. App. 1987).

569.   Here, although Roberts was equivocal in some of her answers to specific questions in that she expressed some uncertainty about being able to participate impartially where the death penalty was involved, mere equivocation is not enough to grant a challenge.  As the Court in *Witt* noted, "before it can sustain the exclusion, the judge must make a factual determination that the prospective juror would be biased." *Witt*, 469 U.S. at 428; *see also Witherspoon*, 391 U.S. 510.

570.   Roberts stated that she could follow the court's instructions and answer the three special issues to be submitted to her.  She also stated that her decision about imposing death as a punishment would be based on the evidence presented to her.  Roberts's expression of reservation about the death penalty should not have disqualified her because she at least expressed an adequate basis for the conclusion that she was willing to set aside her beliefs in deference to the rule of law. *Witt*, 469 U.S. at 424 ("determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.").

571.   In *Gray v. Mississippi*, 481 U.S. 648 , 660, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987), the Supreme Court held that exclusion of a juror for cause in a capital prosecution, who was not irrevocably committed to vote against the death penalty regardless of facts and circumstances that might emerge in course of proceedings, was reversible constitutional error which could not be subjected to harmless-error review.  The *Gray* Court also held that the exclusion even of a single juror warranted a reversal. *Gray*, 481 U.S. at 657-68; accord *Witherspoon*, 391 U.S. at 523; *Morgan v. Illinois*, 504 U.S. 719, 729, 12 S. Ct. 2222, 119 L. Ed. 2d 492 (1992); *Davis v. Georgia*, 429 U.S. 122, 97 S. Ct. 399, 50 L. Ed. 2d 339

(1976).

572.   Here, the trial court's disqualification of prospective juror Roberts was a violation of Mr. Young's constitutional right to a fair trial, as Roberts repeatedly testified she would decide the punishment on the facts presented, and the CCA's decision upholding the disqualification was contrary to and an unreasonable application of Supreme Court precedent.  Mr. Young is therefore entitled to a new trial.

573.   The foregoing violations of Mr. Young's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

574.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

575.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the

foregoing claim, this claim could not have been brought at a earlier time.

CLAIM TEN

**THE CAPITAL OFFENSE OF MURDER IN THE COURSE OF KIDNAPPING, AS SET FORTH IN THE TEXAS PENAL CODE, IS UNCONSTITUTIONAL**

576.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the capital offense of murder in the course of kidnapping, as set forth in Texas Penal Code section 19.03(a)(2), is unconstitutional.

577.   *Exhaustion of Claim*: This claim was presented as Point Fifteen in the direct appeal.  (AOB at 61-63.)

578.   *AEDPA*: Mr. Young raised this claim on direct appeal as a challenge to both the state and federal Constitutions.  The CCA, however, only addressed this claim with respect to Texas law.  *Young v. State*, 2005 WL 2374669, at * 9. Because the State court did not adjudicate the federal claim, § 2254(d) does not apply.  Thus, this Court may review the claim de novo.

579.   By motion, Mr. Young challenged the constitutionality of Texas Penal Code section 19.03(a)(2) as overly broad due to its failure to narrow the class of people eligible for the death penalty.  The court denied the motion.  (CR at 132-34, 320.)  Mr. Young raised the issue again during the charging conference on the court's guilt/innocence charge.  The motion was again denied.  (28 RR at 11-13, 16.)

580.   In order for a state's capital sentencing scheme to pass constitutional muster, it must "genuinely narrow the class of persons eligible for the death penalty."  *Zant v. Stephens*, 462 U.S. 862, 877, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983).  In addition to the offense of intentional murder, Texas has added the

statutory aggravating circumstance of intentional murder committed in the course of attempting or committing kidnapping to elevate the offense to capital murder. Tex. Pen. Code § 19.03(a)(2).

581.   The purpose of any statutory aggravating circumstance is to enable the sentencer to distinguish those who are deserving of capital punishment from those who are not.  Therefore, the circumstance must provide a principled basis for doing so.  *Lewis v. Jeffers*. 497 U.S. 764, 776, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990).

582.   The Supreme Court reminded the states that any statutory aggravating circumstance is unconstitutionally overbroad if it does not genuinely narrow the class of murderers who are eligible for the death penalty.  *Arave v. Creech*, 507 U.S. 463, 113 S. Ct. 1534, 123 L. Ed. 2d 188 (1993).

583.   Section 20.03(a) of the Texas Penal Code states that a person commits the offense of kidnapping and unlawful restraint if he intentionally or knowingly abducts another person.  Abduction is defined as restraining a person with intent to prevent his liberation by:  a) secreting him or holding him in a place where he is not likely to be found; or b) using or threatening to use deadly force. Tex. Penal Code § 20.01(2).  Restraint is further defined in section 20.01(1), as: "to restrict a person's movements without consent so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person."

584.   Every murder offense involves to some degree restraint or abduction. The only way a person with a gun could commit murder without abducting or restraining an individual would be to shoot a person instantly at the same place where he, the assailant, first comes in contact with the decedent.  Virtually every murder involves some restraint of the victim's movements and every murder by

189

definition involves using deadly force.  Thus, it is impossible to see how section 19.03(a) (2), capital murder/kidnapping, generally narrows the group who is eligible to receive the death penalty.

585.   In *Godfrey v. Georgia,* 446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980), the Supreme Court stated:

> If the state wishes to authorize capital punishment, it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty, and thus it must define the crimes for which death may be imposed in a way that obviates standardless [sentencing] discretion.

*Godfrey*, 446 US at 428.

586.   As the *Godfrey* court noted, a death penalty system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman*[49] could occur.  *Godfrey*, 446 U.S. at 428.  The Texas statutory aggravating circumstance in intentional murder in the course of committing or attempting to commit kidnapping fails to meet the guidelines as established by the Supreme Court.

587.   Other states which use kidnapping as an aggravator are more specific in narrowing the class of offenders eligible for the death penalty.  For example, Montana's homicide statutes make an offender death eligible if the offense involves aggravated kidnapping, which provides that:

> A person commits the offense of aggravated kidnapping

---

[49] *Furman v. Georgia*, 408 U.S. 238, 310, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1974).

if the person knowingly or purposely and without lawful
authority restrains another person by either secreting or
holding the other person in a place of isolation or by
using or threatening to use physical force, with any of
the following purposes:

    (a) to hold for ransom or reward or as a shield or
    hostage;

    (b) to facilitate commission of any felony or flight
    thereafter;

    (c) to inflict bodily injury on or to terrorize the
    victim or another;

    (d) to interfere with the performance of any
    governmental or political function; or

    (e) to hold another in a condition of involuntary
    servitude.

Mont. Code Ann. § 45-5-303.

588.    In sum, the Texas capital murder in the course of kidnapping statute
is unconstitutional because the statute has not appropriately narrowed the exposure
of those who may receive the death penalty thereby allowing the infliction of the
ultimate sanction without due process of law.

589.    The foregoing violation of Mr. Young's constitutional rights
constitutes structural error and warrants the granting of this Petition without any
determination of whether the violations substantially affected or influenced the
jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the
harmless error doctrine applies to this claim, the foregoing constitutional
violations so infected the integrity of the proceedings that the error cannot be

deemed harmless. The foregoing violation of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

590.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

591.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668. Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

**CLAIM ELEVEN**

**MR. YOUNG'S DUE PROCESS RIGHTS WERE VIOLATED BECAUSE OF THE PROSECUTOR'S UNFETTERED DISCRETION IN CHARGING HIS CASE CAPITALLY**

592.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the Texas statutory scheme allowing unfettered prosecutorial discretion in deciding which murder cases should be worthy of the death penalty denies Mr. Young due process of law and equal protection.

593.   *Exhaustion of Claim*: This claim was presented as Point Six in the direct appeal. (AOB at 12, 31-37.)

594.   *AEDPA*: Portions of this claim were rejected in a reasoned opinion by the CCA. *Young v. State*, 2005 WL 2374669, at *9. The court's denial of this

192

claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

**A.     Factual Basis**

595.   In an attempt to make a record in support of a pre-trial motion that Mr. Young was capitally charged without uniform and specific charging standards (CR at 116-18), trial counsel attempted to subpoena numerous Texas prosecutors and their records by issuance of subpoenas duces tecum.  Reacting to numerous motions to quash these subpoenas, the trial court considered Mr. Young's challenge to death eligibility in two proceedings held on August 23, 2002 and October 16, 2002. At the conclusion of those hearings, the court announced by letter to the parties its intention to quash the subpoenas.  (CR at 618-19.)  The court indicated that it would rule on the Mr. Young's motion.  (10 RR at 31.)  The court's later denied Mr. Young's motion.  (CR at 890, 893.)

596.   At a pre-trial hearing, Mr. Young called DA Al Schorre.  Schorre was questioned about Midland County's decision-making mechanism to determine which murder cases should be charged capitally.  At the time of this hearing, Mr. Young had already been arraigned and informed that the State would seek the death penalty. (2 RR at 6.) Schorre testified that his office had a written policy on death cases and a written policy authorizing only the District Attorney to make the decision on seeking the death penalty.  (5 RR at 96 [Appendix Ex.  D-8].)  The policy stated in part:

> In considering the decision, the District Attorney will
> review factors including, but not limited to, the
> following:
>
>> A.     Aggravating and mitigating facts of the
>>        offense;

        B.      The age, criminal history, intellectual

                  capabilities and the mental/physical status

                  of the offender; to determine the likelihood

                  that a jury would render an affirmative

                  finding of "future dangerousness."

Schorre admitted that since 1992, his office had looked more into the defendant's background; for capital murders such as Young's case, premeditation was a factor to be considered. (5 RR at 102, 110.)

      597.   Mr. Young also offered evidence compiled by a third-year Texas Tech law student, Elena Roberts, about prosecutorial discretion in seeking the death penalty. (7 RR at 88.) Roberts related that she had received about seventy-nine responses to her survey and had determined that at least three of the responding counties (Harris, Midland, and Trinity) had written policies concerning death penalty eligibility, while at least seventy-five other counties had no written policy, and one county (Travis) had an internal reviewing committee to make non-binding recommendations to the District Attorney. (7 RR at 100 [Appendix Ex. D-2].)

      598.   Adding to the arbitrary decision-making in this case, during the trial-in-chief, prosecution investigator Todd Smith admitted that the decision to indict in Midland county for both crimes in Mr. Young's indictment was based upon expediency, and not based upon legal criteria. (26 RR at 57-58.)

**B.    Argument**

      599.   The Due Process Clause prohibits vindictive prosecutorial charging and sentencing decisions made in bad faith to carry out a personal vendetta, achieve a political advantage, or reap a profit. *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971). Vindictive prosecutorial decisions to indict a defendant, reject his plea offer, pursue a higher charge or seek a harsher sentence in

retaliation for his exercise of a constitutional right are also constitutionally prohibited. *Blackledge v. Allison*, 431 U.S. 63, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977); *North Carolina v. Pearce*, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656, (1969). As it stands, Texas law lacks any uniform standards with respect to when prosecutors should seek the death penalty.

600.   Under *Furman*, 408 U.S. at 310, in the application of the death penalty, the state must minimize the risk that the death penalty will be imposed on a capriciously selected group of offenders by imposing standards whereby the sentencing authority focuses on the particular circumstances of the crime and the defendant. The Supreme Court in *Bush v. Gore*, 531 US 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000), held that when fundamental rights were involved, the equal protection clause of the Fourteenth Amendment requires there to be "uniform" and "specific" standards to prevent the arbitrary and the separate treatment of similarly situated people. *Bush*, 531 U.S. at 106. The fundamental nature of the right to life suggests that the equal protection principle in *Bush* equally applies to the administration of the death penalty.

601.   Texas law provides no such standards. Instead, a prosecutor is able to make that decision on his own, according to either a written or unwritten standard or standards which may vary widely from county to county. (7 RR at 100.) Whether the person charged with a capital crime will face the death penalty depends largely on arbitrary factors such as the county in which the crime occurred. Despite Texas law implementing provisions to limit the class of offenders eligible for the death penalty, and Texas's attempts to allow individualized sentencing determination by juries, the absence of standards to guide a prosecutor's decision whether or not to seek the death penalty literally reeks of arbitrariness. Worse, Texas law does not even provide an abstract proposition or a starting principle as to

how local prosecutors ought to make the decision of whether or not to seek death in a homicide case.

## C.    Conclusion

602.    Without uniform standards, charging a person with a capital crime in Texas becomes dependent largely upon arbitrary factors such as the county in which the crime occurs.  The Texas system violates the principles of due process, equal protection, and reliable capital sentencing because there are no specific standards to ensure the non-arbitrary treatment of capital offenders by prosecutors who are the only source of decision-making as to the death worthiness in each particular case.

603.    The foregoing violation of Mr. Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

604.    The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

196

605.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

CLAIM TWELVE

## MR. YOUNG'S RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED BECAUSE OF THE PROSECUTOR'S UNFETTERED DISCRETION IN CHARGING HIS CASE CAPITALLY

606.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the Texas statutory scheme allows unfettered prosecutorial discretion in deciding which murder cases should be worthy of the death penalty in violation of the prohibition on cruel and unusual punishment and the requirement of reliable capital sentencing.

607.   *Exhaustion of Claim*:  This claim was presented as Point Seven in the direct appeal.  (AOB at 12, 38-39.)

608.   *AEDPA*:  Portions of this claim were rejected in a reasoned opinion by the Texas CCA. *Young v. State*, 2005 WL 2374669, at *9.  The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

**A.     Factual Basis**

609.   Mr. Young incorporates herein by reference the facts pleaded above in Claim Eleven, *ante*.

**B.     Argument**

610.   Since *Furman*, the system that existed prior to *Furman* has been

197

described as one where the death penalty was inflicted in a wanton and freakish manner. *Furman* was designed to eliminate existing capital punishment schemes where there was no meaningful basis to distinguish between the case in which the death penalty is to be applied and those situations in which the death penalty is not to be applied. *Furman*, 408 U.S. at 313. In *Jurek*, 428 U.S. 262, the Supreme Court approved the new Texas scheme even though that scheme did not require standards to guide prosecutors' decisions as to when to seek the death penalty.

611.   The pre-*Furman* imposition of the death penalty was a system where the Eighth Amendment was violated because prosecutors could choose without any governing standards whatsoever which of those accused of capital murder would face the death penalty. The post-*Furman* imposition of the death penalty is equally arbitrary and random and therefore is still unconstitutional under the Eighth Amendment. In short, the Texas statutes allow for arbitrary and inconsistent treatment of similarly situated defendants.

612.   The present statutes are no less unconstitutional under the Eighth Amendment than would be a system mandating that prosecutors seek the death penalty in every death eligible case. Therefore under the Eighth Amendment, the present Texas system, which is based on unfettered prosecutorial decision making, violates the constitution.

## C.   Conclusion

613.   The foregoing violation of Mr. Young's constitutional rights constitutes  structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed