harmless. The foregoing violation of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

614.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

615.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668. Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM THIRTEEN

### THE EVIDENCE WAS INSUFFICIENT AT THE PUNISHMENT PHASE TO WARRANT AN AFFIRMATIVE FINDING BY THE JURY AS TO SPECIAL ISSUE NO. 2

616.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because at the punishment phase, there was insufficient evidence to warrant an affirmative finding by the jury as to Special Issue No. 2, i.e., that Mr. Young caused the death of both Petrey and Douglas, or if he did not actually cause their deaths, that he intended to kill them or anticipated that human life would be taken.

617.   *Exhaustion*:  This claim was presented as Points Nineteen and Twenty in the direct appeal.  (AOB at 16, 73-75.)

618.   AEDPA:  This claim was rejected in a reasoned opinion by the CCA.

199

*Young v. State*, 2005 WL 2374669, at *5. The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.[50]

 619. In this case, the jury was asked to answer Special Issue No. 2:

> Do you find from the evidence beyond a reasonable doubt that the defendant, himself, actually caused the death of the deceased individuals or he did not himself actually cause the death of the individuals, but he intended to kill the deceased individuals or anticipated that human life would be taken?

(CR at 861.) The jury answered "Yes" to this question. (*Id.*) Mr. Young submits that there was insufficient evidence in the record to demonstrate who killed Petrey and/or whether Mr. Young anticipated that Petrey would be killed, or knew that Petrey's death would result. Thus, without evidence regarding Petrey's murder, there was insufficient evidence to warrant an affirmative finding as to Special Issue No. 2.

 620. With regard to the Petrey murder, no DNA belonging to Petrey was found on Mr. Young or any articles of clothing belonging to Mr. Young. Moreover, the only evidence suggesting that Mr. Young shot Petrey, or intended Petrey's death, came from the testimony of David Page. (26 RR at 128, 246-47.) However, Page was a charged co-defendant in this offense and clearly held a motive to shift his culpability to Mr. Young, as is evident from the several conflicting confessions he gave to the police. For example, Page attempted to portray himself as a "hostage" in this case, along with Petrey. The record here,

---

[50] The relevant law governing this Claim is the same that governs, and was discussed, in Claims Six and Seven, *ante.*

however, clearly demonstrates this was not true as there were numerous instances in the record where Page was left alone with Petrey in Petrey's vehicle, and Page did not try to escape. (*See* 27 RR at 165-67.)

621.   Further, and perhaps more importantly, as discussed in Claim Seven, *ante*, under Texas law, Page's testimony was to be judged without credibility unless there was additional evidence in support. Tex. Code. Crim. Proc. § 38.1. That section provides:

> A conviction cannot be had upon the testimony of an
> accomplice unless corroborated by other evidence tending
> to connect the defendant with the offense committed; and
> the corroboration is not sufficient if it merely shows the
> commission of the offense.

In *Walker v. State,* 615 S.W.2d 728, 731 (Tex. Crim. App. 1981), the CCA recognized the inherent danger in accomplice testimony and held that an accomplice witness is a *discredited witness.* Thus, Page's testimony, standing alone, was insufficient to support a finding on Special Issue No. 2.   However, without Page's testimony, there was virtually no evidence showing who killed Petrey, that Mr. Young intended to kill Petrey, or that Mr. Young anticipated that Petrey's life would be taken.

622.   The jury obviously had difficulty with Special Issue No. 2 as they asked for clarification from the court regarding whether they had to find Mr. Young intended to cause the death of *both* Douglas and Petrey (*see* Claim Fourteen, *post*).[51]   (36 RR at 134-35.)

---

[51]   Specifically, the jury asked:
> Regarding Issue Number 2, cause the death of deceased
> individuals, intended to kill the deceased individuals.
> Question:  Do you have to believe both or at least one?

(36 RR at 135.)

623.   Therefore, in light of the jury's question to the court, the court's erroneous supplemental jury instruction, and fact that the jury could not use Page's testimony to show he killed or intended to kill Petrey without other supporting evidence, there was insufficient evidence to support the finding on Special Issue No. 2.

624.   The foregoing violation of Mr. Young's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9; *Holloway*, 435 U.S. at 489.

625.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

626.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668. Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

### CLAIM FOURTEEN

### THE COURT'S SUPPLEMENTAL INSTRUCTION ON SPECIAL ISSUE NO. 2 VIOLATED MR. YOUNG'S CONSTITUTIONAL RIGHTS

627.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the court's supplemental instruction directed the jury to answer "yes" to

Special Issue No. 2. regarding his intent to kill.

628.    *Exhaustion of Claim*: This claim was presented as Points One through Four in the direct appeal.  (AOB at 22-25.)

629.    *AEDPA*:  Generally this claim was rejected by the CCA after finding that trial counsel failed to contemporaneously object.  *Young v. State*, 2005 WL 2374669, *7.  The CCA's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.  To the extent that any portions of the claim were not properly preserved by trial counsel's acts or omission, cause and prejudice exists to excuse the default under *Strickland*, 466 U.S. at 668.  To the extent the CCA erred in finding that this claim was not properly preserved, Mr. Young submits that this Court has the authority to correct a state court's erroneous finding of procedural default.  *See Cone v. Bell*, 128 S. Ct. 2961 (Cert. granted June 23, 2008) (deciding whether a federal habeas court is powerless to recognize that a state court erred in holding that state law precludes reviewing a claim).

## A.    Facts Supporting the Claim

630.    At the punishment phase of the trial, the jury was asked to consider Special Issue No. 2, *i.e.* whether Mr. Young "actually caused the death of the deceased or intended to kill the deceased or another or anticipated that a human life would be taken." Tex. Code Crim. Proc. § 37.071(2)(b)(2)(c).  During their deliberations, the jury sent the following note to the court:

> Regarding Issue Number 2 cause the death of deceased
>
> individuals, intended to kill the deceased individuals. Question:
>
> Do you have to believe both or at least one?

(36 RR at 135.)

The court responded as follows:

Members of the Jury.  Paragraph 1 of the indictment charged

capital murder by the death of two individuals pursuant to the

same scheme or course of conduct. Paragraph 2 of the

indictment charged capital murder by the death of an individual

during the course of kidnapping and robbery.  If your

consideration of Issue No. 2 on punishment is as to Paragraph 1

of the indictment, **the death of two individuals is required to**

**be found by the jury**.  If your consideration is as to the second

paragraph of the indictment, **the death of an individual,**

**Samuel Petrey, is required**.

(36 RR at 135, emphasis added.)

Trial counsel objected on several constitutional grounds.  (36 RR at 136.)

The court overruled the defense's objection, telling Mr. Young "I understand your

objections . . . . Your attorneys have protected the record for you." (36 RR at 137-

38.)

**B.     Legal Argument**

631.   The trial court's supplemental instruction, which stated that "the

death[s] of [the victims] is required to be found by the jury," deprived Mr. Young

of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the

Constitution.

**1.     The Supplemental Instruction Relieved the State of its Burden to**
**        Prove Intent to Kill**

The Due Process Clause of the Fourteenth Amendment "protects the

accused against conviction except upon proof beyond a reasonable doubt of every

fact necessary to constitute the crime with which he is charged." *In re Winship*,

397 U.S. at 364.  This principle prohibits the use of jury instructions which have

the effect of relieving the state of its burden of persuasion beyond a reasonable doubt of every essential element of a crime. *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed.2d 39 (1979). In capital cases, the death penalty may not be imposed upon a person who neither killed, attempted to kill, intended to kill nor contemplated that life would be taken. *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982).

632.   The Supreme Court has twice found that instructions which allow a jury to presume intent to kill violate Due Process. In *Sandstrom*, where the defendant was tried for a killing he claimed was accidental, the court instructed the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts." 422 U.S. at 513. In *Francis v. Franklin*, 471 U.S. 307, 312, 105 S. Ct. 1965, 85 L. Ed.2d 344 (1985), the jury was instructed that "the acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted" and that "person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted." In both cases, the Court found that a reasonable juror could have interpreted the instructions as a mandatory directive from the court, thereby relieving the State of its burden to prove intent to kill beyond a reasonable doubt. *Sandstrom*, 422 U.S. at 517; *Franklin*, 471 U.S. at 325; *see also United States v. Chiantese*, 560 F. 2d 1244, 1255 (5th Cir. 1977) (En banc court used its supervisory power to issue a directive forbidding trial courts to use any "instruction on proof of intent which is couched in language which could reasonably be interpreted as shifting the burden to the accused to produce proof of innocence.").

633.   In this case, the jury's note revealed the difficulty they were having finding intent to kill with regard to at least one of the victims. The judge's

205

supplemental instruction, however, stated that "the death of two individuals *is required to be found by the jury*" with regard to Count 1 of the indictment, and that "the death of an individual, Samuel Petrey, *is required*" with regard to Count 2. (36 RR at 135.)

634. This instruction, like that found unconstitutional in *Franklin*, is "cast in the language of command" and gave jurors the impression that they were required to make the finding described in the supplemental instruction. *See Franklin*, 471 U.S. at 316. Even if this was not what the trial court intended to communicate, the focus of federal court's inquiry is not on the state court's interpretation of the instruction. *Id.* Rather, the question is whether a reasonable juror could have understood the instruction as mandatory. *Id.* Given that the instruction stated that the "death[s] of [the victims] is required to be found by the jury," without referencing the state's burden of proof, a reasonable juror could have believed that the instruction was a command from the judge.

635. The fact that the command came in a supplemental instruction, rather than part of the standard instructions, also increased the likelihood that it improperly influenced the jury. *See Bollenbach v. United States*, 326 U.S. 607, 66 S. Ct. 402, 90 L. Ed. 350 (1946) (regarding supplemental instructions in a criminal trial, "the judge's last word is apt to be the decisive word."). Given that the jury returned an affirmative answer on this special issue less than twenty-four hours after this instruction was rendered indicates that jurors did view it as a directive from the court.

**2.     The Supplemental Instruction Violated Mr. Young's Rights Under *Apprendi* to Have All Sentencing Facts Found By a Jury Beyond a Reasonable Doubt**

636. In *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147

L. Ed.2d 435 (2000), the Supreme Court held that the Fifth and Sixth Amendments require "any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt." In *Ring v. Arizona*, 536 U.S. 584, 609, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), the Court applied *Apprendi* to the capital sentencing context, requiring that a jury, not a judge, find all facts necessary for a death sentence beyond a reasonable doubt.

637.    In Texas, a unanimous jury must answer "yes" to Special Issue No. 2. in order for a defendant to be sentenced to death.  Tex. Code Crim. Pro. § 37.071 2(c)(1).  If the jury returns a negative answer on that special issue, the defendant must be sentenced to life imprisonment without parole.  *Id.* § 2(g).  Therefore, *Apprendi's* guarantee of a jury finding applies to the factual issues contained in Special Issue No. 2.

638.    Here, the judge's supplemental instruction commanded that the "death[s] of [the victim[s]] is required to be found by the jury."  This instruction violated *Apprendi* and *Ring* in two ways.  First, the judge's command improperly usurped the jury's role as factfinder.  And second, because the instruction directed an affirmative finding, Mr. Young was deprived of his right to have the issue decided by the correct standard of proof, *i.e.* beyond a reasonable doubt.  Under these circumstances, Mr. Young's Sixth Amendment right to a jury trial on all facts necessary for a death sentence was violated.

### 3.    The Supplemental Instruction, Because it Directed a Finding of Intent to Kill, Did Not Allow the Jury to Give Effect to Mitigating Evidence

639.    Because of the unique and irrevocable nature of capital punishment, the Eighth and Fourteenth Amendments "requires consideration of the character

and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson*, 428 U.S. at 304. As a result, the Supreme Court has held that capital juries shall not be "precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

640. The mandatory language in the supplemental instruction effectively denied Mr. Young the right to have the jury consider the mitigating evidence he offered to support a "no" finding on Special Issue No. 2. Specifically, the jury should have been able to give effect to the testimony of David Page who, despite being a party to both murders, attempted to blame Mr. Young in a series of inconsistent confessions. (26 RR at 260-62; 27 RR at 629.) Page's hands also glowed in response to the presumptive trace metal test but did not match any pictures in the officer's book. (25 RR at 101-02.) It is reasonable to conclude that the jury struggled with Page's confession that he killed Petrey with gloves on, which was corroborated by Page's DNA being present in the inside of the palm area of the gloves. (27 RR at 271-75; 25 RR at 97.) All such evidence would have undermined the State's assertion that Mr. Young "actually caused the death of the deceased or intended to kill the deceased or another or anticipated that a human life would be taken." Tex. Code Crim. Proc. § 37.071(2)(b)(2), (c).

641. The foregoing violation of Mr. Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional

violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

642. The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

643. In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668. Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM FIFTEEN

## SHERIFF PAINTER'S LUNCH WITH THE JURY DENIED MR. YOUNG A FAIR AND IMPARTIAL PUNISHMENT PHASE JURY TRIAL

644. Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because Mr. Young was not tried by a fair and impartial jury when the jurors were exposed to external influences and discussed the case with head Sheriff Gary Painter, including during lunch with him during deliberations.

645. *Exhaustion of Claim*: This claim was presented as Point Five in the direct appeal. (AOB at 1-3, 11-12, 26-30.)

646.   *AEDPA*: Mr. Young raised this claim on direct appeal as a challenge to both the state and federal Constitutions.  The CCA, however, only addressed this claim with respect to Texas law.  *Young v. State*, 2005 WL 2374669, at * 8. Because the State court did not adjudicate the federal claim, § 2254(d) does not apply.  Thus, this Court may review the claim de novo.

647.   If Respondent disputes any of the facts alleged below, Mr. Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Mr. Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

648.   The declarations and other exhibits accompanying this Petition, as well as the allegations set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

649.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

**A.    Factual Background**

650.   On May 9, 2003, defense counsel filed a motion for new trial.  (CR at 901-12.)  The defense motion was based in part on the contention that Midland County Sheriff Painter impermissibly "fraternized" with the jury during punishment deliberations.  The court granted an evidentiary hearing with respect to Mr. Young's new trial motion.  (38 RR et seq., 39 RR at 5-100.)  On June 20, 2003, the motion for new trial was denied.  (CR at 922; 39 RR at 100-05.)

651.   The hearing revealed the following information:  Midland County had a population of roughly 116,000 people.  (35 RR at 102.)  Sheriff Painter had been

elected and re-elected to office on at least four previous occasions, and he was familiar to many Midland residents, including Mr. Young's jury foreman, James E. Bobo. (38 RR at 124, 133-34.)

652.   Sheriff Painter attended Mr. Young's trial mostly during the punishment phase. (38 RR at 133.)  Throughout the punishment phase, Sheriff Painter seated himself in the courtroom gallery on the State's side of the room, sitting in close proximity to the family of Sam Petrey.  (38 RR at 155-56.)

653.   From the beginning of the trial, the court was provided additional bailiffs for the security of the courtroom and the comfort of the individual jurors. (38 RR at 74-76.)  At the beginning of the punishment phase on Monday, April 7, 2003, an anonymous telephone call was received at the courthouse by Administrative Assistant Cheryl Becker.  The caller stated "Young as going out with a bang."  (38 RR at 13-14.)

654.   Since the call concerned the Young capital murder case, Becker reported the call to courthouse security, but no additional Sheriff's Office personnel were asked to monitor the courtroom.  (38 RR at 37-38, 79.)  Ronnie Bearden, the Chief bailiff for the court room in which Mr. Young's trial took place, thought the amount of security at that time was adequate and no additional assistance was required.  (38 RR at 85-86.)

655.   By Thursday, April 10, 2003, both the prosecution and defense had concluded their punishment evidence, and jury deliberations on the issue of punishment had begun.  (38 RR at 50.)  On Thursday, the jury ate lunch outside the courthouse at Luigi's Restaurant, and Sheriff Painter was not present.  (38 RR at 83-84.)

656.   The next day, Friday, April 11, 2003, the jurors informed courtroom bailiffs Charlie Bollinger and Ronnie Bearden that the jury desired to take their

lunch out of the courthouse, preferably at a restaurant called the Wall Street Bar & Grill, located approximately two blocks east of the Midland County Courthouse. (38 RR at 87-88.)

657.   As the jury was leaving for their lunch break, the jury foreman, Mr. Bobo, an acquaintance of Sheriff Painter's, asked the Sheriff to look into Deputy Paul Hallmark's testimony (25 RR at 5-118) as it had raised some concerns with the jury.  (38 RR at 135.)

658.   Without telling the trial court or counsel for either the State or Mr. Young, (38 RR at 136), Sheriff Painter accompanied Bobo, his fellow jurors, and the assigned bailiffs to the Wall Street Bar & Grill.  There, Painter ate lunch at one table with one group of jurors, with the remaining jurors seated close by.  (38 RR at 138.)  Despite the continued presence of at least three bailiffs and a courthouse security officer, Sheriff Painter stayed with the jury all during the Friday lunch. He then walked back to the courthouse behind the jurors where they returned to resume their punishment phase deliberations.  (38 RR at 139.)

659.   After returning to the courthouse, the jurors deliberated for approximately one and a half hours before informing the court of their answers to the special issues requiring an assessment of death against Mr. Young.  (37 RR at 27; CR at 858-66.)

**B.     Legal Analysis**

660.   Sheriff Gary Painter's contact with the jury on the last day of deliberations was both unnecessary, unsanctioned and caused prejudice to Mr. Young because the sheriff's presence and conduct worked as a visible symbol of law enforcement demanding conviction and an unwarranted extraneous influence on the jury.

661.   Mr. Young's Sixth and Fourteenth Amendment rights were violated, and when a juror converses with unauthorized persons, prejudice is presumed. *Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954); *Green v. State,* 840 S.W.2d 394 (Tex. Crim. App. 1992).   Although Texas law indicates that no prejudice can be found if no discussion about the case was held, *Thomas v. State*, 699 S.W. 2d 845 (Tex. Crim. App. 1985), federal law is not in accord.

662.   The right to trial by jury guarantees a fair trial by impartial, indifferent jurors.   *In Re Oliver,* 333 US 257, 278, 68 S. Ct. 499, 92 L. Ed. 2d 682 (1948).   Sheriff Painter communicated and fraternized with the jury only hours before the jury assessed the punishment of death against Mr. Young.   "A juror must feel free to exercise his function without anyone else looking over his shoulder."   *Remmer*, 347 U.S. at 229.   While Mr. Young's record fails to identify trial facts and any specific matters discussed by Sheriff Painter and the individual jurors, prejudice can occur even when the facts of a pending case are not discussed between jurors and third parties.   *United States v. Denman*, 100 F.3d 399, 405 (5th Cir. 1996) ("In some cases, even when the pending case was not discussed, fraternizing between jurors and third parties may prejudice the defendant and require reversal").

663.   When investigating extra judicial contact, the investigation should not end merely because the case on trial was not discussed.   *United States v. Betner*, 489 F2d 116, 118 (5th Cir. 1974) (new trial granted when lower court failed to hold sufficient hearing on extra-judicial contact between prosecutor and jurors). Painter did not testify as a witness in the punishment trial, but he was present to impress the jurors visually both in the courtroom and at their lunch.   The death verdict came back at 3:24 p.m. Friday, April 11, 2003, less than two hours after

213

Painter had lunch with the jury. (37 RR at 27.)

664.   At Mr. Young's motion for new trial hearing, the State argued that the sheriff's presence with the jury was legitimate because there was a need for additional security.  If Sheriff Painter's presence with the jury at lunch was to provide security (38 RR at 143), an additional security necessity should have been identified.

665.   For Mr. Young's trial, Judge Hyde had already contracted for two additional bailiffs in addition to Ronnie Bearden.  (38 RR at 74.)  The April 7, 2003, anonymous telephone call stating that Young was "going out with a bang" received immediate attention from existing court personnel; however, Bearden thought security was already adequate at the time.  Painter told Deputy Matlock, head of courthouse security, that he, Matlock, needed to make sure there was plenty of security.  (38 RR at 76.)  On March 26, 2003, Matlock sent Deputy Glen Wells to help Bearden with the Young case.  (38 RR at 76.)  When the anonymous call was reported to Sheriff Painter, Bearden did not ask for additional assistance for courthouse security and none was forthcoming until days later when Painter on his own decided to provide additional security.  Security was always a concern in the case, but the anonymous telephone call failed to add any additional concerns.

666.   The excuse of providing more security for the jury was a red herring at the hearing and does nothing to assuage the prejudice to Mr. Young.  In *Turner v. Louisiana*, 379 U.S. 466, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965), a murder conviction was overturned because deputy sheriffs who were bailiffs testified in trial before the same jurors.  While there was no showing in *Turner* that either deputy had talked with any member of the jury about the specifics of the case, the conviction was overturned in part because the continued association fostered prejudice: "We deal here not with a brief encounter, but with a continuous and

214

intimate association . . . which gave these witnesses an opportunity to renew old friendships and make new acquaintances among the members of the jury." *Id.* at 473.

667.   The court's punishment instructions warned that jurors were not to converse with anyone about the case without the court's permission.  (CR at 865.) Foreman Bobo's conversation with Painter about the case presumes prejudice to Mr. Young. *See Remmer*, 347 U.S. at 229.  The presumption is rebuttable, but a failure to show that nothing prejudicial was discussed does not mean no harm occurred. *Turner*, 379 U.S. at 474.  "Any judge who has sat with juries knows that, in spite of forms, they are extremely likely to be impregnated by the environing atmosphere." *Frank v. Mangum*, 237 U.S. 309, 349, 35 S. Ct. 582, 59 L. Ed. 2d 969 (1915).

668.   The jury was biased and tainted by the extraneous influence of Sheriff Painter.  The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors," *Irvin v. Dodd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961), *superseded by statute on other grounds*, meaning "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).  The Sixth Amendment's guarantee of a trial by jury requires the jury to base its verdict on the evidence presented at trial. *Turner,* 379 U.S. at 472-73.  A jury's exposure to extrinsic evidence deprives a defendant of the rights to confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment. *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995); *Mattox v. United States*, 146 U.S. 140, 149, 13 S. Ct. 50, 37 L. Ed. 917 (1892) ("It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment."); *Holbrook v. Flynn*

475 U.S. 560, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986) (presence of four state troopers in the courtroom not inherently prejudicial, but the test is whether what the jurors saw was so inherently prejudicial as to pose an unacceptable threat to the defendant's right to a fair trial).

669.   Painter was a well-known public figure and symbol of law enforcement in Midland for more than twenty years.  (38 RR at 67-68.)  Painter's decision to attend the Friday lunch with deliberating jurors was made without informing either the trial judge, his head of security, or the working bailiffs of the court.  Painter was using his presence in the courtroom as a symbol to show that law enforcement sided with the victim's family, making conviction and death appropriate for Mr. Young.  Additionally, by speaking with Juror Bobo and eating lunch with the jury, Sheriff Painter imposed extraneous influence on the jurors who therefore committed misconduct.  Mr. Young has a right to a fair and impartial jury trial guaranteed by the Sixth and Fourteenth Amendments, which was violated by these actions. *In Re Oliver*, 333 U.S. at 260.

## C.    Conclusion

670.   The foregoing violation of Mr. Young's constitutional rights constitutes  structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at  637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violation so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

671.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

672.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM SIXTEEN

### TO EXECUTE MR. YOUNG, BASED ON HIS MENTAL ILLNESS OF ADHD, WOULD VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE FEDERAL CONSTITUTION

673.   Mr. Young's death sentence violates the Eighth and Fourteenth Amendments of the United States Constitution, due to Mr. Young's mental age, immaturity, and mental illness at the time of the crimes, under the principles of *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

674.   *Exhaustion of Claim*:  This claim was presented as Point Thirty-Three in the direct appeal (AOB at 97-99), and Ground for Review Nine in the state Application (State Appl. at 57-67).

675.   *AEDPA*:  This claim was rejected in a reasoned opinion by the CCA on direct appeal (2005 WL 2374669, at * 9), the Midland County District Court (Ex. 30 [Hyde's Denial of Writ]), and by a boilerplate denial by the CCA  (2006 WL 3735395).  The courts' denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an

unreasonable determination of the facts.

676.   If Respondent disputes any of the facts alleged below, Mr. Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Mr. Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

677.   The declarations and other exhibits accompanying this Petition, as well as the allegations set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

678.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

**A.    Relevant Facts**

679.   Mr. Young was born on July 19, 1983.  The capital crime which he stands convicted occurred on November 26, 2001. At the time of his offense, Mr. Young was approximately eighteen years, four months old.

**B.    Legal Standard**

680.   In *Roper v. Simmons*, 543 U.S. 551, the Supreme Court looked at "evolving standards of decency," holding that the death penalty should be limited only to offenders who commit "a narrow category of the most serious crimes." *Roper*, 543 U.S. at 568; *see Kennedy v. Louisana*, 128 S. Ct. 2641, 2649-50, 171 L. Ed. 2d 525 (2008) (opinion amended by 2008 WL 4414670 (Oct. 1, 2008)) (Eighth Amendment prohibits death where the crime did not result, and was not intended to result, in death of victim); *Atkins v. Virginia*, 536 U.S. 304, 316-17, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (execution of mentally retarded is cruel

and unusual punishment). In so holding, the Supreme Court overruled its previous ruling in *Stanford v. Kentucky*, 492 U.S. 361, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989), and held that the Eighth and the Fourteenth Amendments forbade the execution of individuals who were under the age of eighteen at the time of their alleged offenses. *Roper*, 543 U.S. at 574.

681.   According to *Roper*, there are three general differences between juveniles under the age of eighteen and adults for purposes of imposing the death penalty. First, "a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. . . . It has been noted that adolescents are overrepresented statistically in virtually every category of reckless behavior." *Roper*, 543 U.S. at 569 (internal italics omitted). Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. . . . This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment." *Id.* And third, "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* at 570.

C.   **Mr. Young's Mental Age and Immaturity, Brought about by His ADHD, Make Him Ineligible for the Death Penalty**

682.   While Mr. Young was four months over eighteen years when the crimes were committed, his mental age and immaturity, brought about by his ADHD, made him the equivalent of the type of juvenile described in *Roper*.

683.   The person described throughout the trial, through the testimony of lay witnesses and experts, established a personality indistinguishable from the descriptions of juveniles whom the Supreme Court described as being less morally culpable individuals. *Roper*, 543 U.S. at 569-70. Mr. Young, based upon his

ADHD, was impulsive, immature, and had an underdeveloped sense of responsibility.

684.    Many of the witnesses at trial testified about Mr. Young's ADHD. (31 RR at 37 [Richard McMullin]; 31 RR at 126 [Dr. Don Walker]; 32 RR at 14, 27 [Dr. Helen Short]; 33 RR at 90-91 [Carla Sexton]; 32 RR at 206, 208 [Dr. Meyer Proler]; 34 RR at 20, 48 [Daneen A. Milam];  34 RR at 173-74, 177 [Dr. Roy Mathew]; 36 RT at 18 [Dr. Ross Green].)

685.    Psychologist Daneen Milam testified that ADHD prevented regular inhibitors of conduct from developing normally, thereby creating an inability to inhibit behavior. (34 RR at 24.) Dr. Milam also testified that ADHD affected a person's ability to pick up or perceive social clues due to an inability to focus. (34 RR at 48.) Dr. Milan concluded that most of the conduct identified as problematic in Mr. Young's life emanated from the severe ADHD. (34 RT at 27.) By way of analogy, Dr. Milan described Mr. Young as a "Mercedes-Benz with this great motor and no brakes, no brakes at all." (34 RR at 25.)

686.    Psychiatrist Roy Mathew testified "there is no question" Mr. Young had very severe ADHD, which Dr. Mathew described as a brain disorder with physical differences in the brain. (34 RR at 173-74, 177.) Dr. Mathew described Mr. Young's ADHD as a computer with a faulty electric generator unable to regulate the amount of energy the brain received with the amount of activity it produced. (34 RR at 181-82.) According to Dr. Mathew, the faulty electric generator produced a person who could not focus on any one thing when there were a number of stimuli around him. (*Id.* at 183-84.)

687.    Dr. Ross Green, a child psychologist, testified that Mr. Young was the "poster child for ADHD," describing his behavior as exceedingly hyperactive, impulsive, and inattentive. (36 RR at 18.)

688.   Connected to the ADHD, Dr. Meyer Proler testified to qEEG (quantitative EEG) scans on Mr. Young's brain.  According to Dr. Proler, there were identified abnormalities in Mr. Young's brain involving the frontal lobe, the area which involved impulse control.  Further, the two sides of Mr. Young's brain were electrically "out of phase" with one another.  (32 RR at 175, 183-89, 206.)

689.   Even State's witness Dr. Helen Short of the Waco Center for Youth diagnosed Mr. Young with ADHD, and testified he was impulsive with control problems.  (32 RR at 17, 51.)  Dr. Short also explained that the brain was not fully formed until an individual reaches twenty or twenty-one years of age.  (32 RR at 158-59; *accord* Ex. 97 at ¶ 22 [Decl. of Dr. Milam].)

690.   Lay witnesses also described Mr. Young  as "hyper," someone who would go from one extreme to the next, and a person who had a very short attention span.  (31 RR at 37; 33 RR at 84-90; 35 RR at 9, 26, 40-44.)

691.   As the testimony at trial showed, at age eighteen years four months, due in large part to his ADHD, Mr. Young's brain could still be described as adolescent, with Mr. Young continuing to function as a person who acted under eighteen years of age.

692.   Based upon his ADHD, for his entire life Mr. Young consistently displayed distractibility and impulsive behavior, often to the extent that he endangered his own or others' physical safety.  Due to his mental regulation deficits, Mr. Young  has an impaired ability to perceive the consequences of his actions.  (Ex. 97 at ¶ 19 [Decl. of Dr. Milam].)  To that end, Mr. Young has been described as a follower, not a leader.  (*Id.* at ¶ 20.)

693.   Based upon his ADHD, Mr. Young has demonstrated a pattern of regulation deficits that led to an inability to act "normal."  His ADHD symptoms were intensified by characteristics that included depression, immaturity, poor

problem solving, and poor coping mechanisms for his negative of thoughts, feelings and for his limitations as an "abnormal" kid.  To that end, Mr. Young has often been described as uncontrollable, a direct symptom of his ADHD.  (Ex. 97 at ¶ 21 [Decl. of Dr. Milam].)

694.  As shown above, Mr. Young's "lack of maturity and underdeveloped sense of responsibility," "reckless behavior," "susceptibility to negative influences" and lack of a well formed character, all described in *Roper* as traits separating juveniles from adults (*Roper*, 543 U.S. at 569-70), were a product of Mr. Young's ADHD.  Thus, it should be clear that Mr. Young's age of slightly over eighteen should have been treated synonymously with mental functioning and brain development, not by time measurement.  (Ex. 97 at ¶¶ 22-23 [Decl. of Dr. Milam].)

695.  From a moral standpoint, it would be misguided to equate the failings of Mr. Young with those of an adult.  As the Supreme Court stated in *Roper*, "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Rope*r, 543 U.S. at 574.  Despite Mr. Young being officially over eighteen years of age, due to his mental illness he was still an adolescent lacking complete mental development.  Thus, "evolving standards of decency" would indicate that an eighteen and four month old individual who suffered from mental illness would be entitled to the same protections of those under the age of eighteen as described in *Roper*.

696.  The foregoing violation of Mr. Young's constitutional rights constitutes  structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at  637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violation

so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

697. The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

698. In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668. Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

### CLAIM SEVENTEEN

**MR. YOUNG'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE TRIAL COURT FAILED TO INSTRUCT THE JURY REGARDING THE BURDEN OF PROOF ON THE MITIGATION ISSUE; THE PUNISHMENT CHARGE ALSO FAILED TO GIVE PROPER GUIDANCE TO THE JURY REGARDING THE HEIGHTENED STANDARD REQUIRED FOR A DEATH PENALTY CASE**

699. Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the trial court failed to instruct the jury that the burden of proof was on the prosecution to prove beyond a reasonable doubt that there were no sufficient

mitigating circumstances to warrant a life sentence.  The punishment charge also failed to give proper guidance to the jury regarding the heightened standard required for a death penalty case.

700.   *Exhaustion of Claim*:  This claim was presented as Points Twenty-Six and Twenty-Eight in the direct appeal. (AOB at 81-87.)

701.   *AEDPA*:  This claim was rejected in a reasoned opinion by the CCA. *Young v. State*, 2005 WL 2374669, at *9-10.  The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established Federal law and based on an unreasonable determination of the facts.

702.   At the punishment phase, the jury was instructed as to the three special issues.  With regard to Special Issue No. 1 (that Mr. Young would commit criminal acts of violence that would constitute a continuing threat to society), the jury was instructed that the State had the burden to prove beyond a reasonable doubt that the answer should be "yes."  (CR at 860.)  With regard to Special Issue No. 2 (Mr. Young actually caused the death of Petrey and Douglas or Mr. Young did not himself actually caused the death of Petrey and Douglas but he intended to kill the deceased individuals or anticipated that human life would be taken) the jury was instructed that the State had the burden to prove beyond a reasonable doubt that the answer should be "yes."  (CR at 861.)

703.   However, with regard to Special Issue No. 3 (there were sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed), the jury was instructed that there was no burden of proof on either side.  (CR at 861-62.)

704.   In Number 32 of the objections to the punishment charge, Mr. Young argued that the charge with respect to Special Issue No. 3 failed to instruct the jury

that the burden of proof should have been upon the State to prove beyond a reasonable doubt that there was not sufficient mitigation to warrant a sentence less than death. (CR at 881; 36 RR at 74, 80, 81.) This objection was overruled by the trial court. (CR at 890.)

705.   The Texas system fails to provide the constitutional minimum level of due process, resulting in a diminished, rather than a heightened reliability in the capital sentencing process.

706.   The Texas capital sentencing system abruptly abandons the adversarial process at the point where the jury decides whether mitigating circumstances warrant a life sentence. In order to reach the special issue regarding mitigating circumstances, Texas capital sentencing juries must first determine whether the defendant has been proven guilty of a capital crime beyond a reasonable doubt. If the defendant is found guilty, the jury will hear additional evidence and argument before considering a series of special issues.

707.   The first special issue inquires whether the defendant is a future danger and a continuing threat to society. If the defendant is convicted on a law of the parties theory, the jury will consider whether the defendant is eligible for death by reason of his individual conduct in the commission of the crime. Only if these special issues are returned in the affirmative, beyond a reasonable doubt, does the jury even consider the special issue inquiring about mitigating circumstances.

708.   By the time that the jury takes up the special issue on mitigating circumstances, the capital defendant is already deemed a murderer under circumstances elevating the crime to a capital one, a continuing threat to society, and a major participant in the capital crime. The charge will have told the jurors that they are to take the law that applies in the case from the court and no other source. All Texas jurors deliberating these issues have taken an oath to render a

true verdict according to the law and the evidence.  Tex. Code of Crim. Proc. § 35.22.

709.   The main constitutional trouble with the mitigation special issue lies in the failure of the court to assign a burden of proof and persuasion to either party for any purpose. Entirely within their solemn oaths, jurors may place an extremely high burden on the defendant to establish facts critical to his defense from the imposition of death as a penalty.  In the Texas scheme, these will fall into three general categories.  First, are the facts offered in mitigation true?  Second, are these facts or circumstances mitigating in the eyes of at least one the jurors?  And finally, are the mitigating circumstances proven by the evidence sufficient to warrant a life sentence?

710.   Even a casual examination of the special issue and all the court's instructions reveals that a law abiding juror could well place the burden of proof and persuasion with respect to mitigating circumstances on the capital defendant. Moreover, such a juror could -- without violating his oath to render a true verdict according to the law -- place an impossibly high burden of persuasion on the defendant. Nothing in the court's instructions precludes the jurors from requiring 99.9% certainty with respect to facts favorable to the defendant.  Further, under Texas law, absent jury misconduct, the jurors need not ever reveal the degree of certainty they required of the defendant in making his mitigation case.  *See* Tex. Rule of Evid. 606(b) (restricting juror testimony to jury misconduct); *see, e.g.*, *Glover v. State*, 110 S.W.3d 549 (App. 10 Dist. 2003); *Sanders v. State* 1 S.W.3d 885 (App. 3 Dist. 1999).  Of course,  the placement of such a high burden on the capital defendant would not constitute jury misconduct because it does not violate the law given the jury by the trial judge.

226

711.   Another problem with the Texas mitigation special issue is that it relieves the prosecution of any burden of proof with respect to facts it advocates as true and relevant with respect to the jury's ultimate response to the life or death mitigation issue.  Law abiding jurors, who have decided in favor of the prosecution thus far, are free to believe the truth of facts advocated by the prosecution without any standard of proof or persuasion.  The jurors may set and apply any standard they choose on facts the prosecutors advocate as true.  For example, the prosecutors may argue that the defendant has an anti-social personality and is simply malingering mental illness to avoid the consequences of his misconduct.  Completely within their oaths, Texas capital sentencing jurors may accept such arguments as true on 1% certainty that the underlying facts are actually true.

712.   Failure to assign a burden of proof and persuasion in a criminal proceeding is contrary to clearly established constitutional law.  Due process "is not a technical conception with a fixed  content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961) (internal quotations omitted).  Instead, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).  The function of the standard of proof  in providing one such  procedural protection is to "instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington v. Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979) (internal quotations omitted).  The standard of proof, therefore, serves "[I] to allocate the risk of error between the litigants  and [ii] to indicate the relative

importance attached to the ultimate decision." *Id.*

713.  At capital sentencing, all facts adverse to the defendant must be proved by the state beyond a reasonable doubt.  Only that standard can adequately allocate the risk of error between a defendant and the State.  Death, after all, is unique.  As the Supreme Court has noted, "[t]he penalty of death differs from all other forms of criminal punishment, not in degree but in kind.  It is unique in its total irrevocability.  It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice.  And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity." *Furman*, 408 U.S. at 306.

714.  Further, an overarching principle of constitutional death penalty jurisprudence is that, "[b]ecause of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305 (footnote omitted).  The Eighth Amendment requires "heightened reliability . . . in the determination whether the death penalty is appropriate." *Sumner v. Shuman,* 483 U.S. 66, 72, 107 S. Ct. 2716, 97 L. Ed. 2d 56 (1987).

715.  Only the reasonable doubt standard can adequately impress upon jurors the significance and solemnity of their decision between life and death.  As the Supreme Court has pointed out, the reasonable doubt standard is "indispensable" to due process in criminal proceedings, because "it impresses on the trier of fact the necessity of reaching a subjective state or certitude of the facts in issue." *In re Winship*, 397 U.S. at 364 (internal quotations omitted; emphasis added).  The court also noted that the standard was "indispensable to command the respect and confidence of the community in applications of the criminal law" since the moral force of the law could be "diluted by a standard of proof that leaves

people in doubt whether innocent men are being condemned." *Id.*

716.   In other opinions, the CCA has justified the absence of a standard of proof on the grounds that the *Penry* "issue is a moral, normative one . . . which [calls for] the jurors themselves [to] decide what is mitigating evidence and the extent to which that evidence is mitigating." *Eldridge v. State*, 940 S.W.2d 646, 654 (Tex. Crim. App. 1996). According to the Texas court, a standard of proof cannot be applied to a moral judgment. The subjectivity of the *Penry* issue, however, does not exempt it from the protections of due process. That point was decisively made by the Supreme Court in *Santosky v. Kramer,* 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). There, the Court considered what burden of proof was necessary in parental termination proceedings which "employ imprecise substantive standards that leave determinations unusually open to the subjective values of the judge." *Id.* at 762. As a result, the trial court possesses unusual discretion to under weigh probative facts that might favor the parent. *Id.* at 784 n.11.

717.   The Supreme Court safeguards the traditional adversary process in capital sentencing proceedings. In *Furman,* 408 U.S. at 313, the Court recognized that the penalty of death is different from any other punishment imposed under our system of criminal justice. Because of this unique quality, death cannot be imposed under sentencing procedures that create a substantial risk that the death penalty will "be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Furman,* 408 U.S. at 313. Because the Court found that the capital sentencing procedures then being utilized did create such a risk, the *Furman* Court invalidated those procedures as incompatible with contemporary standards of decency.

718.   To avoid creating a substantial risk of arbitrary and capricious infliction of the death penalty, capital sentencing schemes have been required to meet "twin objectives" to be "at once consistent and principled but also humane and sensible to the uniqueness of the individual." *Eddings*, 455 U.S. at 110.  In *Gregg*, 428 U.S. 153, the Court determined that these objectives are "best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Id.* at 195.

719.   There is nothing in our Supreme Court's post-*Furman* capital sentencing jurisprudence that would justify a re-alignment of the traditional burden of proof or persuasion with respect to facts adverse to the capital defendant at either stage of a bifurcated proceeding.  Furthermore, the Supreme Court's recommendation that capital sentencing be taken up in a hearing separate from the issue of guilt provides no excuse for a dismantling of our traditional adversarial process for the finding of important controverted facts.  Indeed, the guidance to be provided the jury in the punishment phase is sufficient only if it "channel[s] the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'"  *Godfrey,* 446 U.S. at 428 (quoting *Gregg,* 428 U.S. at 198).

720.   As stated, the Supreme Court requires heightened reliability in the decisions made in a capital trial.  *See, e.g., Thompson v. Oklahoma*, 487 U.S. 815, 856, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988); *Zant*, 462 U.S. at 884; *Woodson*, 428 U.S. at 305.  The instructions given capital sentencing juries must be sufficient to provide the jury "with a vehicle for expressing its reasoned moral response to mitigating evidence in rendering its sentencing decision." *Penry I*, 492

U.S. at 318.

721.   The failure to assign a burden of proof and persuasion to any party renders a post-*Penry* Texas death sentence incapable of judicial review, especially for the sufficiency of the evidence to support a death verdict where mitigating evidence is also present in the record.  There simply are no guidelines for the jurors or the reviewing courts to follow and apply with respect to the sufficiency of the mitigation case to warrant a life sentence, rather than a death sentence.

722.   The capital sentencing process must accord proper significance to the relevant facts of the character and record of the individual offender, especially the compassionate or mitigating factors stemming from the diverse frailties of human kind.  *Woodson*, 428 U.S. at 304.  The Texas system also fails this test by simply allowing jurors -- completely within their oaths to follow Texas law -- to assign an impossibly high burden of proof of facts and persuasion toward life to the defendant while relieving the prosecution of any substantial burden of proof or persuasion at all.

723.   The foregoing violation of Mr. Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

724.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not

231

mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

725. In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668. Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

**CLAIM EIGHTEEN**

**THE REFUSAL BY THE CCA TO REVIEW THE SUFFICIENCY OF THE MITIGATING EVIDENCE VIOLATES MR. YOUNG'S CONSTITUTIONAL RIGHTS**

726. Mr. Young's convictions, confinement, and sentence violate the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution because by refusing to review the sufficiency of Mr. Young's mitigating evidence, Mr. Young was denied a meaningful appellate review of his sentence of death.

727. *Exhaustion of Claim*: This claim was presented as Points Twenty-One and Twenty-Two in the direct appeal (AOB at 76-77), and Grounds for Review Six and Seven of the state habeas application (State Appl. at 45-51).

728. *AEDPA*: As the CCA refused to review the sufficiency of the mitigating evidence, de novo review is warranted with regard to this claim. *Panetti*, 127 S. Ct. at 2858.

729. If Respondent disputes any of the facts alleged below, Mr. Young requests an evidentiary hearing so that the factual disputes may be resolved. After Mr. Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to

investigate fully, counsel requests an opportunity to supplement or amend this
Petition.

730.   The declarations and other exhibits accompanying this Petition, as
well as the allegations set forth elsewhere in this Petition, are hereby incorporated
by reference into this claim as though set forth in full.

731.   The facts in support of this claim, among others to be presented after
full investigation, discovery, access to this Court's subpoena power, and an
evidentiary hearing, include the following.

A.    **Relevant Facts**

732.   In response to the State's evidence in aggravation, Mr. Young
presented two categories of mitigating evidence.[52]  The first consisted of testimony
from Mr. Young's mother, stepbrothers, stepsisters, and neighbors, who described
Mr. Young's unhappy childhood as one plagued by his severe ADHD, his family's
inability to deal with such brain dysfunction, and the dysfunctional family into
which Mr. Young was born.  The second category of mitigating evidence came
from expert witnesses who discussed Mr. Young's brain dysfunctions, the
consequences of Mr. Young's abused and troubled childhood, and the
repercussions Mr. Young's ADHD had on his development and problematic
upbringing.  In rebutting the State's theory that Mr. Young would present a future
danger, Mr. Young argued that under proper medication, his ADHD behavior
could be controlled and thus, he presented no future danger within an
institutionalized setting.

733.   On direct appeal, Mr. Young argued that the jury's negative answer to
the Third Special issue was not supported by Mr. Young's mitigating evidence.

---

[52]  Mr. Young's mitigating evidence is described in more detailed in Claim
Four, in which Mr. Young alleges a *Penry* violation.