(AOB at 76-77.) The CCA, in turned, refused to reach the merits of Mr. Young's claims, stating, instead:

> In his twenty-first and twenty-second points of error, appellant challenges the legal and factual sufficiency of the evidence to support the jury's finding on the mitigation special issue. This Court does not review the sufficiency of the evidence to support the mitigation special issue. *McGinn v. State*, 961 S.W.2d 161, 166 (Tex. Crim. App. 1998). Appellant's twenty-first and twenty-second points of error are overruled.

*Young v. State*, 2005 WL 2374669, at *5.

## B.    Argument

734.   Texas Code of Criminal Procedure section 37.071 permits a jury to consider any relevant mitigating evidence -- that is any evidence about the circumstances of the offense, the defendant's character or background, and his personal moral culpability that might justify a life sentence instead of a death sentence. § 37.071 2(e). Further, the Texas Legislature enacted a statute which mandates appellate review of the mitigation issue. *See* Tex. Code  Crim. Proc. § 44.251.[53]

735.   There are two issues at stake in any death sentence: the eligibility decision and the selection decision. *See Tuilaepa v California*, 512 U.S. 967, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994); *Coker v Georgia*, 433 U.S. 584, 97 S. Ct.

---

[53]  That section states in relevant part:
       (a)  The court of criminal appeal shall reform a sentence of death to a sentence of confinement . . . for life if the court finds that there is insufficient evidence to support . . . a negative answer to an issue submitted to a jury under Section 2(e), Article 37.071. . . .

2861, 53 L. Ed. 2d 982 (1977). The selection decision requires an individualized sentencing consideration and must be sufficiently broad to accommodate all relevant mitigating evidence. The State must ensure the process is neutral and principled so as to guard against bias or caprice. *Tuilaepa*, 512 U.S. at 972-73; *see also Gregg*, 428 U.S. 153 (capital sentencing schemes and procedures must minimize the risk of wholly arbitrary and capricious action). To insure such a process, the decisions must be subject to appellate review. *Furman*, 408 U.S. 238; *Parker*, 498 U.S. 308. The meaningful review of death sentences and their procedures promotes reliability and consistency. *Clemons v. Mississippi*, 494 U.S. 738, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990).

736. In *Jurek*, 428 U.S. 262, the Supreme Court held the Texas capital sentencing scheme to be constitutional:

> By providing prompt judicial review of the jury's
> decision in a court with statewide jurisdiction, Texas has
> provided a means to promote the evenhanded, rational,
> and consistent imposition of death sentences under law.
> Because this system serves to assure that sentences of
> death will not be "wantonly" or "freakishly" imposed, it
> does not violate the Constitution.

428 U.S. at 276. The Legislature has since modified section 37.071 to include a general mitigation instruction. § 37.0712(e). Concurrently with this amendment, the Texas Legislature enacted section 44.251 allowing the Texas Court to reform a death sentence to life if the evidence is insufficient to support a negative answer to Sec. 2(e). It is only the CCA which refuses to review the sufficiency of mitigating evidence. *McFarland v. State*, 928 S.W.2d 482, 510 (Tex. Crim. App. 1996).

737.   The Eighth Amendment and the Due Process Clause of the Fifth and Fourteenth Amendments mandate appellate review.  The Supreme Court has consistently held the decision which give rise to a death sentence must be subject to appellate review. *Furman*, 408 U.S. at 310 (Stewart, J., concurring); *Lockett*, 438 U.S. at 604; *Clemons*, 494 U.S. 738.  In *Clemons*, the Supreme Court espoused the necessity of meaningful appellate review, a process consistent with pursuit of the Eighth Amendment's objectives of measured consistent application of the death penalty and fairness to the accused:

> We see no reason to believe that careful appellate weighing of aggravating against mitigating circumstances in cases such as this would not produce "measured consistent application" of the death penalty or in any way be unfair to the defendant.  It is a routine task of appellate courts to decide whether the evidence supports a jury verdict and in capital cases in "weighing" states, to consider whether the evidence is such that the sentencer could have arrived at the death penalty that was imposed.  And, as the opinion below indicates, a similar process of weighing aggravating and mitigating evidence is involved in an appellate court's proportionality review.  Furthermore, this Court has repeatedly emphasized that meaningful appellate review promotes reliability and consistency. (Citations omitted).  It is also important to note that state supreme courts in States authorizing the death penalty may well review many death sentences and that typical jurors, in

236

> contrast, will serve on only one such case during their
> lifetimes....There is nothing in appellate weighing or
> reweighing of the aggravating and mitigating
> circumstances that is at odds with contemporary
> standards of fairness or that is inherently unreliable and
> likely to result in arbitrary imposition of the death
> sentence.

494 U.S. at 748-49. The Supreme Court noted the failure to perform meaningful appellate review would result in an automatic rule of affirmance, invalid under the Court's opinion in *Lockett*.

738.   Likewise, in *Parker*, 498 U.S. 308, the Court noted that appellate review of mitigating evidence by the Florida Supreme Court was so deficient as to be arbitrary.  Thus, in virtually every analysis of state capital sentencing schemes, the Supreme Court has noted the importance of appellate review in upholding the statutes' constitutionality.

739.   Further, other jurisdictions have not experienced difficulty in evaluating appellate claims of sufficiency of the evidence to sustain mitigation finding. *See e.g., State v. Breton*, 663 A.2d 1026 (Conn. 1995); *State v. Richardson*, 463 S.E.2d 492 (N.C. 1995); *Sheridan v. State*, 852 S.W.2d 772 (Ark. 1993); *State v. Hernandez*, 562 N.E.2d 219 (Ill. App. 2 Dist. 1990); *Lowery v. State*, 547 N.E.2d 1046 (Ind. 1989); *Fisher v. State*, 736 P.2d 1003 (Okla. Crim. App. 1987).  Oregon has a mitigation punishment issue similar to the Texas issue but its courts review the sufficiency of evidence to support the jury's finding regarding mitigation. *See State v. Moore*, 927 P.2d 1073 (Ore. Sup. Ct. 1996) (jury's answer to the special issue was subject to judicial review and that a court could review the jury's answer under a rational juror standard).

740.   Here, any rational juror would find that the mitigating evidence before Mr. Young's jury reduced his moral culpability.  The evidence at trial established beyond all doubt the existence of Mr. Young's mental illness (ADHD), which began even before Mr. Young started kindergarten.  This condition rendered Mr. Young impulsive and hampered his abilities to control negative impulses.  This condition was also aggravated with the use of methamphetamines.  (*See* Exs. 96 at ¶¶ 8, 116-17, 130, 180 [Decl. of Knox]; 97 at ¶¶ 13, 17-21, 29 [Decl. of Milam].)

741.   Further, the evidence portrayed a young boy caught between divorced parents -- a father who was an alcoholic who beat Mr. Young, and a mother who could not handle the medical and mental conditions her son suffered.  Mr. Young was also faced with a step father who was an alcoholic and who was physically abusive.  (*See* Ex. 96 at ¶¶ 26, 33-34, 47, 48, 64, 66, 77, 79, 97, 137 [Decl. of Knox].)

742.   The circumstances in Mr. Young's life were difficult, at best.  But the circumstances ultimately defied intervention.  While Mr. Young's mother did seek professional help on occasion, her frustration and family situation prevented continued treatment and, for that matter, the proper treatment.  (*See* Ex. 96 at ¶¶ 71-72, 74, 157-58, 169, 173-74 [Decl. of Knox].)

743.   Often, when Mr. Young needed professional help the most, he was shuffled off to his physically abusive father, who, on occasion, would beat him with a two by four.  As the mental and emotional conditions became critical, Mr. Young was finally placed in a mental health facility.  However, Mr. Young still did not get the  type of treatment which was recommended, and did not receive the type of attention that was required.  Ultimately, Mr. Young was discharged from these facilities for exhibiting symptoms of the condition for which he sought

treatment. (*See* Exs. 96 at ¶¶ 48, 83, 153-54, 177, 181-84 [Decl. of Knox]; 97 at ¶ 14 [Decl. of Milam].)

744.   The evidence at trial showed that, over a period of trial and error, TYC psychiatrists discovered a combination of drugs which alleviated Mr. Young's condition. Once this medication was regulated, Mr. Young's referrals dropped dramatically and he successfully completed the TYC program.  (34 RR at 91-92.)

745.   Indeed, the uncontradicted evidence is that, had Mr. Young maintained mental health treatment and medication after his parole from TYC, this offense would not have happened.  (*See* Exs. 96 at ¶¶ 111-18 [Decl. of Knox]; 97 at  ¶¶ 14-17 [Decl. of Milam].)

746.   When all of the mitigating evidence is reviewed and weighed, it is clear that no rational juror could have answered the third punishment issue in the negative.

747.   The foregoing violation of Mr. Young's constitutional rights constitutes  structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

748.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is

considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

749.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM NINETEEN

## THE EVIDENCE WAS INSUFFICIENT TO FIND, BEYOND A REASONABLE DOUBT, THAT THERE WAS A PROBABILITY THAT MR. YOUNG WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUED THREAT TO SOCIETY

750.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because there is insufficient evidence to find that there was a probability Mr. Young would commit criminal acts of violence that would constitute a continue threat to society.

751.   *Exhaustion of Claim*:  This claim was presented as Points Seventeen and Eighteen in the direct appeal.  (AOB at 66-72.)

752.   *AEDPA*:  Because the CCA reached the merits of this claims, relief is warranted if this Court finds that the state court's application of legal principles from the Supreme Court's decisions to the facts of Mr. Young's case was objectively unreasonable.  *Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438, 161 L. Ed. 2d 334 (2005).

## A.    Legal Standard

753.   As discussed in Claim Six,  evidence is sufficient to support a
conviction if, viewing all the record evidence in the light most favorable to the
prosecution, any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.  The same
standard is used by Texas courts in determining the sufficiency of evidence.
*Hooper*, 214 S.W.2d at 13.

## B.    Relevant Facts

754.   In responding to Mr. Young's mitigating evidence concerning his
ADHD-induced behavior and his ability to control such behavior, the State argued
that Mr. Young was a future danger because there was no guarantee he would
receive adequate treatment within the prison system.  In making that argument, the
State presented no evidence showing, beyond a reasonable doubt, that treatment
would not be available at the prison, nor that Mr. Young, if given his medication,
would stop taking it in a structured setting.

755.   Over Mr. Young's objection, the court allowed A. P. Merillat to
testify as a State witness on prison conditions based upon his experience and
personal knowledge.[54]  (35 RR at 51.)   Merillat testified about prison conditions
in the State of Texas.  (35 RR at 58.)  Over objection by Mr. Young's trial counsel
regarding Merillat's qualifications to testify as to the distribution of pychotropic
medication (*id.* at 71-72), Merillat testified that in other housing classifications,
there were opportunities for inmates to not actually take their pills, and that after
the inmate is given the pills:

Merillat:     Whether or not he swallows them into his throat is up to him,

---

[54]   See Claim Three, *ante*, discussing the State's suppression of evidence
regarding Merillat.

or unless somebody pushes it down his throat.

Q.          And they don't do that [push them down the throat], do they?

Merillat:    No, they don't.

756.   On cross-examination, Merillat acknowledged he had not read Mr. Young's TYC records documenting every instance that prescription medication had been provided to Mr. Young. (35 RR at 108-09.) Merillat also acknowledged that he did not dispute the fact there was not a single instance in the TYC records documenting that Mr. Young had refused to take the psychotropic medications when he was in an institutional setting. (*Id.*) Merillat also acknowledged that the Texas prison system included facilities for the criminally insane, where those who refused to take their medication and were considered dangerous could be properly housed and forced to take their medications. (*Id.* at 109-10.)

757.   Mr. Young introduced the testimony of Dessie Cherry, a retired senior prison warden with TDCJ Institutional Division, who testified about prison conditions within the State of Texas. (33 RR at 9-10.) When Cherry testified that, to a minimum, a capital life offender would be in [classification] G4 with closed custody, the prosecution responded:

Q.    And that's good until the budget process tells us
       we can't do that, you don't have -- we're not going
       to employ enough guards after this budget session
       to do that, you've got to put more of them in
       general population, and the director signs that
       order and the whole system you talked about
       changes in about 30 minutes.

A.    Can't comment on that, sir.

Q.    It's happened before, right?

242

> A.    History repeats itself.
>
> Q.    Yes.

(33 RR at 77.)

## C.    Argument

758.    Viewed in the light most favorable to the prosecution, no rational trier of fact could have found, beyond a reasonable doubt, that Mr. Young would not take his medication while in prison, or that the prison system would not provide the proper medical treatment.  At best, what the State presented were mere speculations that:  (1) because the State of Texas "could" reduce its budget at any minute, the programs instituted in prison to control the prison population, including medical treatment, "could" be reduced; and that (2) because the prison could not ensure an inmate would take his medication, there was no guarantee Mr. Young would take his medication.

759.    Thus, the State presented no evidence contradicting Mr. Young's evidence that when properly medicated, his ADHD induced behavioral problems within a prison system dropped dramatically.  Therefore, no rational jury could reach the inferences promoted by Merillat's testimony because the State presented no evidence, including circumstantial evidence,  regarding Mr. Young's refusal to take medications within an institutionalized setting. *Jackson*, 443 U.S. at 319.

760.    Furthermore, these inference the State promoted with Merillat's testimony are improper inferences under the individualized sentencing requirement that makes the death penalty constitutional under *Lockett*, 438 U.S. at 605; *Jurek*, 428 U.S. at 274; and *Eddings*, 455 U.S. at 112.  As the Supreme Court explained in *Eddings*,

> Thus, the rule in *Lockett* followed from the earlier
> decisions of the Court and from the Court's insistence

that capital punishment be imposed fairly, and with
reasonable consistency, or not at all.  By requiring that
the sentencer be permitted to focus "on the
characteristics of the person who committed the crime,"
*Gregg v. Georgia*, at 197 . . . the rule in *Lockett*
recognizes that "justice . . . requires . . . that there be
taken into account the circumstances of the offense
together with the character and propensities of the
offender." *Pennsylvania v. Ashe*, 302 U.S. 51, 55, 58 S.
Ct. 59, 60, 82 L.Ed. 43 (1937).  By holding that the
sentencer in capital cases must be permitted to consider
any relevant mitigating factor, the rule in *Lockett*
recognizes that a consistency produced by ignoring
individual differences is a false consistency.

*Eddings*, 455 U.S. at 112.

761.   Because the conclusions advocated by the State would require that
the sentencing jury reach inferences precluded by an individualized sentencing
requirement, no rational trier of fact could have reached the conclusion that Mr.
Young would be a future danger within an institutionalized setting.  Accordingly,
even while viewing all the record evidence in the light most favorable to the
prosecution, no rational trier of fact could have found that Mr. Young would
present a future danger within an institutionalized setting.

762.   The foregoing violation of Mr. Young's constitutional rights
constitutes structural error and warrants the granting of this Petition without any
determination of whether the violations substantially affected or influenced the
jury's verdict.  *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the

harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

763.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

764.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668. Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM TWENTY

## A SENTENCE OF DEATH CANNOT BE IMPOSED IF ALL OF THE FACTORS THAT WOULD PREVENT SUCH A SENTENCE ARE NOT ALLEGED IN THE INDICTMENT

765.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the State failed to plead in the indictment, and prove beyond a reasonable doubt to a unanimous jury, the facts of the Texas "future dangerousness" aggravator, and the militating factors considered in deliberation upon the mitigation issue, on which it relied to enhance a maximum life sentence to death.

766.   *Exhaustion of Claim*: This claim was presented as Points Nine and

245

Ten in the direct appeal.  (AOB at 46-52.)

767.  *AEDPA*:  These claims were rejected in a reasoned opinion by the CCA. *Young v. State*, 2005 WL 2374669, at *9.  The court's denial of these claims is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

A.    **Relevant Facts**

768.  On December 20, 2001, a Grand Jury for the County of Midland, State of Texas, indicted Mr. Young on the charge of capital murder for "intentionally and knowingly causing the death of an individual, Samuel Petrey, by shooting the said Samuel Petrey with a firearm." (CR at 3.)

769.  On Feb. 7, 2002, Mr. Young was re-indicted on two counts of capital murder. The indictment stated, in pertinent part, as follows:

> . . . CLINTON LEE YOUNG, HEREINAFTER
> STYLED Defendant, on or about the 26th Day of
> November A.D., 2001, and before the presentment of
> this indictment, in the County and State aforesaid, did
> then and there intentionally and knowingly cause the
> death of an individual, Samuel Petrey, by shooting him
> with a firearm, and on or about the 25th day of
> November A.D., 2001 in a different criminal transaction,
> the said CLINTON LEE YOUNG did then and there
> intentionally and knowingly cause the death of an
> individual, Doyle Douglas, by shooting him with a
> firearm, and the said CLINTON LEE YOUNG murdered
> the said Samuel Petrey and the said Doyle Douglas
> pursuant to the same scheme and course of conduct;

246

## COUNT II

.  .  . CLINTON LEE YOUNG, hereinafter styled
Defendant, on or about the 26th day of November A.D.
2001, and before presentment of this indictment, in the
County and State aforesaid, did then and there cause the
death of an individual, Samuel Petrey, by shooting him
with a firearm, and the said CLINTON LEE YOUNG did
then and there intentionally cause the death of the said
individual in the course of committing and attempting to
commit the offense of kidnapping and robbery directed
against Samuel Petrey.

(CR at  4-5.)

770.   "Future dangerousness" and the lack of sufficient mitigating
circumstances, both of which must be found by the jury in order to impose a
penalty of death, were not pled in the indictment.  Nonetheless, during the
punishment phase of Mr. Young's trial, the prosecution introduced extraneous
adjudicated and unadjudicated misconduct, including but not limited to:  the
testimony of Ronnie Wall (30 RR at 30 et.seq.); the testimony of Carlos Torres (30
RR at 67 et.seq.); and the testimony of Patrick Lee Brook (30 RR at 151 et. seq.).

771.   During closing arguments, the prosecution relied on the extraneous
misconduct to urge the jury to return a sentence of death:  closing argument of
Teresa Clingman (36 RR at 93 et. seq.); and the closing argument of Al Schorre
(36 RR at 129 et. seq.).

## B.    Argument

772.   In *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed.
2d 311 (1999), the Supreme Court held that "under the Due Process Clause of the

Fifth Amendment and the notice and jury guarantees of the Sixth Amendment, any fact . . . that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones*, 526 U.S. at 243 n.6.

773.   In *Apprendi*, 530 U.S. at 475, the Supreme Court extended the *Jones* holding to the States through the Fourteenth Amendment.  In *Ring*, 536 U.S. 584, the Supreme Court applied the rule of *Jones* and *Apprendi* to a state capital case. Aggravating factors operate as the functional equivalent of an element of a greater offense.  *Ring*, 536 U.S. at 608-09.  "The relevant inquiry is one not of form, but of effect."  *Apprendi*, 530 U.S. at 494.  Thus, aggravating factors must be pled in the indictment, submitted to a jury and proven beyond a reasonable doubt.

774.   The failure to plead the facts of future dangerousness and other factors militating toward death, failure to submit them to a jury, and failure to prove them beyond a reasonable doubt, amount to structural error, not capable of harmless error analysis.  *Sullivan v. Louisiana*, 508 U.S. 275, 279-81, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993).

775.   In Mr.  Young's case, the extraneous unadjudicated misconduct were the "facts" upon which the prosecution relied to increase the penalty from a sentence of life to death.  As such, the prosecution was required to have given fair notice of the nature and cause of its accusations of the defendant's qualification for and deservedness of death in the indictment.  Further, the prosecution was required to  proved its accusations to the jury beyond a reasonable doubt because these facts "operate[d] as the 'functional equivalent of an element of a greater offense . . . .'"  *Ring*, 536 U.S. at 609 (*quoting Apprendi*, 530 U.S. at 494 n.19).

776.   On the contrary, prior to *Ring*, the CCA repeatedly held that aggravating circumstances in a capital murder case are not "elements" of the

248

crime. *See Studer v. State*, 799 S.W.2d 263 (Tex. Crim. App. 1990) ("In
conclusion then, the language in Art. V, § 12, 'charging a person with the
commission of an offense,' does not mean, under this analysis, that each element
of the offense must be alleged in order to have an indictment or information as
contemplated by Art. V, § 12"); *Moore v. State*, 969 S.W.2d 4, 13 (Tex. Crim.
App. 1998); *Callins v. State*, 780 S.W.2d 176, 186-87 (Tex. Crim. App. 1989).
However, as stated above, the critical inquiry is not the label, but whether the facts
increase the maximum penalty otherwise available. Indeed, as Justice Scalia noted
in his concurring opinion in *Ring,* the state could call the facts "elements of the
crime," "sentencing factors," or "Mary Jane," and the analysis would be identical:
failure to state those facts in the charging document renders the sentence
unconstitutional. *Ring*, 536 U.S. at 610-11.

777.   Indeed, on June 28, 2002, shortly after the Court's decision in *Ring*,
the death sentence imposed in *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001),
was overturned. The Supreme Court granted the writ of certiorari, vacated the
judgment of the United States Court of Appeals for the Eighth Circuit upholding
the death sentence, and remanded the case for reconsideration in light of *Ring's*
holding that aggravating factors that are prerequisites of a death sentence must be
treated as elements of the offense. *Allen v. United States*, 536 U.S. 953, 122 S. Ct.
2653, 153 L. Ed. 2d 830 (2002).

778.   The question presented in *Allen* was:

Whether aggravating factors required for a sentence of
death under the Federal Death Penalty Act of 1994, 18
U.S.C. § 3591 et. seq. are elements of a capital crime and
thus must be alleged in the indictment in order to comply
with the Due Process and Grand Jury Clauses of the Fifth

Amendment.

779.    The Eighth Circuit had rejected *Allen*'s argument because in its view, aggravating factors were not elements of federal capital murder, but rather "sentencing protections that shield a defendant from automatically receiving the statutorily authorized death sentence." *United States v. Allen*, 247 F.3d at 763.

780.    Like in *Allen*, the notice requirements of the Sixth and Fourteenth Amendments, applicable to the States, require the inclusion of every element of the crime in the charging document. *Cole v. Arkansas,* 333 U.S. 196, 201, 68 S. Ct. 514, 92 L. Ed. 2d 644 (1948); *United States v. Gaytan*, 74 F.3d 545 (5th Cir. 1996) ("the Sixth Amendment requires that an indictment . . . enumerate each prima facie element of the charged offense"). The failure of Mr. Young's indictment to include the necessary elements that elevated his sentence to death mandates habeas relief. *Ball v. United States*, 140 U.S. 118, 136, 11 S. Ct. 761, 35 L. Ed. 377 (1891); *United States v. DuBo*, 186 F.3d 1177 (9th Cir. 1999).

781.    Habeas relief is also required because only Mr. Young's grand jury had the authority to decide whether the indictment should include these elements of capital murder required to seek the death penalty. Like the Fifth Amendment to the United States Constitution, the Texas State Constitution guarantees that "no one shall be held to answer for a criminal offense, unless on an indictment of a grand jury . . . ." Tex. Const. Art. I § 20; *see also* Tex. Const. Art. V § 12 (b); Tex. Code Crim. Proc. § 1.141 (2002) (prohibiting waiver of right to be accused by indictment of a capital offense).

782.    The most "celebrated purpose" of the grand jury "is to stand between the government and the citizen" and protect individuals from the abuse of arbitrary prosecution. *United States v. Dionisio*, 410 U.S. 19, 33, 93 S. Ct. 777, 35 L. Ed. 2d 67 (1973) (Dis. by Douglas, J). It is the shielding and screening function,

afforded by neutral review by a grand jury, that authorizes the State to seek the execution of an individual charged with a capital crime.

783.   The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall . . . be informed of the nature and cause of the accusation . . . . " A conviction on a charge not made by the indictment is a denial of due process. *Thornhill v. Alabama*, 310 U.S. 88, 60 S. Ct. 736, 84 L. Ed. 2d 1093 (1940). Because the State did not submit to the grand jury, and the indictment did not state the elements necessary to return a death sentence, Mr. Young may not be put to death as a result of his flawed sentencing proceeding.

784.   The foregoing violation of Mr. Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

785.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

786.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*,

466 U.S. 668. Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM TWENTY-ONE

## MR. YOUNG'S CONSTITUTIONAL RIGHTS WERE
## VIOLATED BY THE "12/10" PUNISHMENT CHARGE

787.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the "12/10" punishment charge inherently produces a chilling effect on the jury's deliberating process.

788.   *Exhaustion of Claim*:  This claim was presented as Point Thirty-One in the direct appeal. (AOB at 93-94.)

789.   *AEDPA*:  Mr. Young raised this claim on direct appeal as a challenge to both the state and federal Constitutions.  The CCA, however, only addressed this claim with respect to Texas law.  *Young v. State*, 2005 WL 2374669, at * 10. Because the State court did not adjudicate the federal claim, § 2254(d) does not apply.  Thus, this Court may review the claim de novo.

790.   The jury in this case was charged within the meaning of Texas Code of Criminal Procedure Article 37.071, which states, in relevant part:

> Section 2.(2)(b): On conclusion of the presentation of the
> [punishment] evidence, the court shall submit the
> following issues to the jury:
> (1) whether there is a probability that the defendant
> would commit criminal acts of violence that would
> constitute a continuing threat to society; and
> (2) in cases in which the jury charge at the guilt or
> innocence stage permitted the jury to find the defendant

guilty as a party under Sections 7.01 and 7.02, Penal

Code, whether the defendant actually caused the death of

the deceased or did not actually cause the death of the

deceased but intended to kill the deceased or another or

anticipated that a human life would be taken.

. . . .

(d) The court shall charge the jury that:

. . . .

(2) it may not answer any issue submitted under

Subsection (b) of this article "yes" unless it agrees

unanimously and it may not answer any issue "no"

unless 10 or more jurors agree; and

(3) members of the jury need not agree on what

particular evidence supports a negative answer to any

issue submitted under Subsection (b) of this article.

791.   Before the start of trial, Mr. Young challenged the less-than-
unanimous provision of section 37.071. (CR at 47.)  The trial court denied the
motion. (CR at 318.)  The jury was ultimately charged pursuant to section 37.071
with regard to Special Issues Nos. 1 and 2:

You are instructed that in answering [Issue No. 1] [Issue

No. 2] the State has the burden to prove beyond a

reasonable doubt that the answer should be "yes."  The

jury may not answer [Issue No. 1] [Issue No. 2] "yes"

unless the jury agrees unanimously on the answer, AND

the jury may not answer [Issue No. 1] [Issue No. 2] "no"

unless ten or more jurors agree.  The members of the jury

253

need not agree on what particular evidence supports a

negative answer.  If any juror has a reasonable doubt as

to his or her answer to [Issue No. 1] [Issue No. 2] , the

juror shall vote "no" to that issue.

(CR at 860-61.)

792.   With regard to Special Issue No. 3, the jury was instructed:

You are instructed that in answering Issue No. 3, the jury shall answer

the issue by stating "yes" (there is a sufficient mitigating

circumstance or circumstances) or "no" (there is not a sufficient

mitigating circumstance or circumstances).  The jury may not answer

Issue No. 3 "no" unless the jury agrees unanimously, AND the jury

may not answer Issue No. 3 "yes" unless ten of more jurors agree.

(CR at 861-62.)

793.   As is evident in the jury instructions on Special Issue Nos. 1, 2, and 3,

the jurors are kept ignorant of the fact that each of them has the power to force the

trial court to sentence the defendant to life in prison.  All the special questions

must be answered unanimously in order for the defendant to be sentenced to death.

However, the jury instructions inform the jury that ten jurors must agree to vote in

the favor of the defendant on any special issue in order for a life sentence to result.

The charge is silent, however, about the consequences of a deadlocked jury, and

defense counsel is not allowed to disclose the truth to the jurors during voir dire or

closing argument.  *Draughon v. State*, 831 S.W.2d 331, 337 (Tex. Crim. App.

1991).

794.   It is also error for the trial judge or the prosecutor to tell the jurors

about the effect of a failure to agree about the special issues.  *Clark v. State*, 881

S.W.2d 682, 690-92 (Tex. Crim. App. 1994); *Sattiewhite v. State*, 786 S.W.2d 271,

277-79 (Tex. Crim. App. 1989). In essence, the jurors are misled because the instructions obfuscate the fact that only one hold-out juror is necessary to compel the court to impose a life sentence. Tex. Code Crim. Proc. §§ 37.071(d)(e), 37.071(2)(d)(e); 37.071(3)(f). Moreover, the rule that a lone hold-out juror can prevent the imposition of the death penalty is constitutionally required. *See Wiggins*, 539 U.S. 510 (had the jury been able to place the petitioner's excruciating life history on the mitigating side of the scale, there was a reasonable probability at least one juror would have struck a different balance).

795. The "12-10" Rule violates the constitutional principles discussed in *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988) (remand for resentencing required where substantial probability jurors thought they were precluded from considering any mitigating evidence unless they unanimously agreed on existence of particular mitigating circumstance) and *McKoy v. North Carolina*, 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990) (state's sentencing scheme allowing jury to consider only mitigating circumstances found unanimously in determining whether aggravating circumstances were sufficient to justify imposition of death penalty impermissibly limited jurors' consideration of mitigating evidence in violation of Eighth Amendment). Further, the "12-10" Rule violates the Eighth and Fourteenth Amendments because there is a reasonable possibility that, under the present Texas capital sentencing scheme, all twelve jurors in a capital case could believe that a life sentence would be appropriate under state law, but, because at least ten jurors could not collectively agree on their answer to any one of the special issues, the jury could not return a life sentence. Such a "majority rules" mentality could lead jurors to change their potential hold-out votes for life to a vote for the death penalty.

796.   For example:  at trial, four of the twelve jurors conclude that, as consequence of a capital defendant's positive character traits, he would not pose a future threat to society; thus, those jurors individually vote to answer the first special issue negatively.[55]

797.   Assume that those four jurors also believe, however, that the defendant possessed the requisite mens rea under the second special issue (the "parties" special issue) and that there is insufficient mitigating evidence as a whole to result in an affirmative answer to the third special issue (the "*Penry*" special issue).

798.   Further suppose that four other jurors believe that the same capital defendant did not possess the requisite mens rea under the second special issue and, thus, those four jurors individually vote to answer the "parties" special issue negatively.[56]  Assume, however, that those four jurors believe that the capital defendant does pose a future danger to society and that those four jurors also believe that the defendant's mitigating evidence, as a whole, is insufficient to result in a "no" vote to the statutory "*Penry*" special issue.

799.   Finally, suppose that the four remaining members of the jury conclude, as a result of the capital defendant's mitigating evidence of a troubled childhood,[57] that the statutory *Penry* special issue should be answered

---

[55]  Of course, a "no" answer to the "future dangerousness" special issue -- a finding that a capital defendant does not pose a future threat to society -- is a constitutionally recognized mitigating factor.  *See Franklin*, 487 U.S. 164; *Skipper*, 476 U.S. 1.

[56]  A capital defendant's lack of such a mens rea is, of course, a constitutionally relevant circumstance.  *Cf. Tison v. Arizona*, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987).

[57]  Of course, the third ("*Penry*") special issue also implicates a potentially limitless range of mitigating factors, including "troubled background" evidence.  *See Penry I*, 492 U.S. 302.

affirmatively. However, for whatever reason, assume that those four jurors also believe that the capital defendant would pose a future threat to society and also that the defendant possessed the requisite mens rea under the "parties" special issue. Thus, those four remaining jurors only vote in the defendant's favor on the third special issue.

800.    Such a breakdown can be graphically illustrated:

*1st SPECIAL ISSUE 2nd SPECIAL ISSUE 3rd SPECIAL ISSUE*

| | 1st SPECIAL ISSUE | 2nd SPECIAL ISSUE | 3rd SPECIAL ISSUE |
|---|---|---|---|
| Juror 1: | **NO (life)** | YES (death) | NO (death) |
| Juror 2: | **NO (life)** | YES (death) | NO (death) |
| Juror 3: | **NO (life)** | YES (death) | NO (death) |
| Juror 4: | **NO (life)** | YES (death) | NO (death) |
| Juror 5: | YES (death) | **NO (life)** | NO (death) |
| Juror 6: | YES (death) | **NO (life)** | NO (death) |
| Juror 7: | YES (death) | **NO (life)** | NO (death) |
| Juror 8: | YES (death) | **NO (life)** | NO (death) |
| Juror 9: | YES (death) | YES (death) | **YES (life)** |
| Juror 10: | YES (death) | YES (death) | **YES (life)** |
| Juror 11: | YES (death) | YES (death) | **YES (life)** |
| Juror 12: | YES (death) | YES (death) | **YES (life)** |

801.    Hypothetically speaking, all twelve members of the jury in such a case individually agree that *one of the three statutory mitigating factors* has been established and that, under state law, a life sentence is appropriate. That is, all twelve jurors could have believed that a mitigating factor exists which, under state law, should have caused the capital defendant to be sentenced to life. However, jurors are given the impression, by the jury instructions, that Texas law forbids the imposition of a death sentence *only if* ten members of a capital sentencing jury

257

agree collectively as to *which* statutory mitigating factor has been established. Because such jurors could disagree about which of the three factors has been established, however, they are left without guidance as to how to proceed. In the absence of such guidance, there is a constitutionally unacceptable risk that Texas capital sentencing juries may feel coerced by a "majority rules" mentality into returning answers to the special issues that would result in a death sentence. A death sentence imposed by a jury so instructed is too likely a product of arbitrary decision-making for the Constitution to tolerate. *See McKoy v. North Carolina*, 494 U.S. 433; *Mills*, 486 U.S. 367. Accordingly, Mr. Young's sentence of death must be vacated and the cause remanded for a new trial.

802.   The foregoing violation of Mr. Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

803.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

804.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

**CLAIM TWENTY-TWO**

**MR. YOUNG'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE COURT REFUSED TO ALLOW THE SENTENCING JURY TO FULLY CONSIDER AND GIVE EFFECT TO MR. YOUNG'S MITIGATING EVIDENCE**

805.   Mr. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the trial court prevented the attorneys representing the State, Mr. Young, and Mr. Young's counsel from informing the jurors or the prospective jurors of the effect of the failure of the jury to agree on the issues submitted.

806.   *Exhaustion of Claim*:  This claim was presented as Point Twenty-Nine in the direct appeal.  (AOB at 88-89.)

807.   *AEDPA*:  Mr. Young raised this claim on direct appeal as a challenge to both the state and federal Constitutions.  The CCA, however, only addressed this claim with respect to Texas law. *Young v. State*, 2005 WL 2374669, at * 10. Because the State court did not adjudicate the federal claim, § 2254(d) does not apply.  Thus, this Court may review the claim de novo.

808.   Texas refuses to tell its capital sentencing jurors the whole truth about how to give life to a capital defendant.  In the same manner as in his claim about the 10-12 rule (*see* Claim Twenty-One, *ante*), Texas also interferes with the full consideration of mitigating circumstances.

259

809.   The Texas prohibition against revealing the fact that a single holdout juror could cause the prosecution to result in a life sentence, rather than a mistrial followed by a new sentencing hearing, is clearly intended to prevent a minority of life giving jurors, or even a single juror, from actually exercising a veto of the majority's decision  for death.

810.   *Penry I*, 492 U.S. 302,  *Tennard*, 542 U.S. 274, and  *Smith*, 543 U.S. 37, clearly established that the Texas capital sentencing system must:  afford full jury consideration, not just some consideration, of mitigating circumstances; and provide any life giving jurors an adequate vehicle to actually give effect to the defendant's mitigation case.  The Texas statutory prohibition interfered with Mr. Young's jury's ability to give effect to his mitigation case in a substantial enough way to undermine confidence in the outcome of his trial.

811.   Although the CCA rejected this argument in Mr. Young's case, that decision is not controlling because the state court's decision directly conflicts with the Supreme Court's decisions in *Penry I*, *Tennard*, and  *Smith*.  Therefore, the state court's decision on this claim "was contrary to, [and] involved an unreasonable application of, clearly established Federal law,  as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

812.   The foregoing violation of Mr. Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Mr. Young's rights had a substantial and injurious effect or influence on Mr. Young's convictions and sentence,

rendering them fundamentally unfair and resulting in a miscarriage of justice.

813.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

814.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## VI.

## CLAIMS FOUND PROCEDURALLY BARRED BY THE CCA
## INTRODUCTION

815.   The CCA procedurally barred two different types of claims:  (1) those raised by Ori White, Mr. Young's second state habeas counsel; and (2) those Mr. Young attempted to get before the state court because they were not raised by either state habeas counsel.

816.   As will be discussed in Claim Twenty-Three, *post*, the CCA dismissed Mr. Young's claims in a boiler plate denial.  As the State has failed to show that its decision was independent of federal law, the claims presented to the CCA which were dismissed on grounds of abuse of the writ have been exhausted and are properly before this Court.

817.   In the alternative, as will be discussed in Claim Twenty-Four, *post*, Mr. Young meets the cause and prejudice exception, as articulated under *Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991) and it

progeny, for the claims which were denied on grounds of abuse of the writ. Thus,

for this reason as well, those claims are properly before this Court for

adjudication.  And because the CCA did not adjudicate these claims on the merits,

section 2254(d) does not apply and this Court can review the claims de novo.

### CLAIM TWENTY-THREE

### MR. YOUNG'S STATE HABEAS CLAIMS 15 THROUGH 22, AND NUMEROUS PRO SE CLAIMS, WHICH WERE DEEMED PROCEDURALLY BARRED BY THE STATE COURT, ARE PROPERLY BEFORE THIS COURT BECAUSE THE STATE BAR WAS NOT INDEPENDENT OF FEDERAL LAW

818.   Counsel for Mr. Young filed two supplemental state applications, part

of which were addressed on the merits by Judge Hyde.  The CCA later denied all

of the claims on procedural grounds under its abuse of the writ doctrine.

However, in making that determination, it is uncertain by its decision whether the

CCA dismissed the claims solely on state grounds or in its interpretation of federal

constitutional law. As the State has failed to show that its decision was

independent of federal law, the above-mentioned claims presented to the CCA

have been exhausted and are properly before this Court.

**A.     Relevant Law**

819.   A federal court reviewing a state court judgment may not reach the

merits of the claim where a prior state reviewing court applied an independent and

adequate state law ground to deny relief. *Coleman*, 501 U.S. 722; *Ruiz v.*

*Quarterman*, 504 F.3d 523 (5th Cir. 2007).

820.   To make the determination of whether a state court's resolution of a

claim is based on an independent and adequate state ground, a federal court

naturally looks to the state court's decision.

> When a state court decision fairly appears to rest
> primarily on federal law, or to be interwoven with
> federal law, and when the adequacy and independence of
> any possible state law ground is not clear from the face
> of the opinion, we will accept as the most reasonable
> explanation that the state court decided the case the way
> it did because it believed that federal law required it to
> do so.

*Michigan v. Long*, 463 U.S. 1032, 1040-41, 103 S. Ct. 3469, 77 L. Ed. 2d 1201
(1983) (emphasis added); *see also* Coleman, 501 U.S. at 733 (reaffirming the *Long*
principle); *Ruiz v. Quarterman*, 504 F.3d at 527 (holding that boilerplate dismissal
by the CCA of an application for abuse of the writ is itself uncertain on whether
the CCA based its opinion on a state-law question or a question of federal
constitutional law).

821.   When resolution of a state procedural law question depends upon a
predicate federal constitutional ruling, the state-law prong of the court's holding is
not independent of federal law, and a federal court may address the merits of the
claim. *Ake v. Oklahoma,* 470 U.S. 68, 75, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985);
*Smith v. Texas,*  550 U.S. 297, 127 S. Ct. 1686, 167 L. Ed. 2d 632 (2007) (a state
court's predicate "error of federal law" in resolving a state procedural question
does not preclude federal review); *Delaware v. Prouse,* 440 U.S. 648, 652-53, 99
S. Ct. 1391, 59 L. Ed. 2d 660 (1979) (state court decision is not based on an
independent state ground where the resolution of a state law question involves an
interpretation of what federal law requires to state a claim for relief).  Under these
circumstances, the federal court may review the claim because "[i]f the state court

misapprehended federal law, '[i]t should be freed to decide . . . these suits according to its own local law,'" and not under a mistaken interpretation of federal law. *Prouse*, 440 U.S. at 653 (quoting *Missouri ex rel. Southern R. Co. v. Mayfield*, 340 U.S.1, 5, 71 S. Ct. 1, 95 L. Ed. 3 (1950)).

    822.   Thus, when a state procedural law question depends, in part, on resolution of a federal constitutional question, a presumption exists that a state court decision is not based upon an independent and adequate state ground if the state court does not clearly and expressly state that its decision is "based on bona fide separate, adequate, and independent grounds." *Long*, 463 U.S. at 1041; *see also Coleman*, 501 U.S. at 733; *Harris v. Reed*, 489 U.S. 255, 266, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989); *Caldwell v. Mississippi*, 472 U.S. 320, 327, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985). As the Supreme Court explained in *Coleman*:

> [F]ederal courts on habeas corpus review of state
> prisoner claims, will conclusively presume that there is
> no independent and adequate state ground for a state
> court decision when the decision "fairly appears to rest
> primarily on federal law, or to be interwoven with the
> federal law, and when the adequacy and independence of
> any possible state law ground is not clear from the face
> of the opinion." In habeas, if the decision of the last
> state court to which the petitioner presented his federal
> claims fairly appeared to rest primarily on resolution of
> those claims, or to be interwoven with those claims, and
> did not clearly and expressly rely on an independent and

264

adequate state ground, a federal court may address the petition.
*Coleman*, 501 U.S. at 734-35 (citations omitted and emphasis added).

823.   Federal law thus places the burden on the state court to clearly and
expressly show the state-law ground of decision if federal review of a claim is to
be precluded.

## B.    Relevant Facts

824.   Mr. Young's initial state Application was due on January 22, 2005
(CWR at 321.).   That application was filed by Gary Taylor, Mr. Young's initial
state habeas counsel.   On July 11, 2005, Taylor asked to be relieved as Mr.
Young's counsel,  Taylor was granted permission to withdraw on August 8, 2005.
Ori White was appointed to replace him on the same day.  (CWR at 359-65)

825.   On January 17, 2006, before the start of the evidentiary hearing, Mr.
White filed a supplemental state writ alleging one claim, Ground 15 (CWR at 674-
710).  (*See* Section C, *post.*)  The state hearing in this case began on March 1,
2006.  During that hearing, as will be explained in more detail below, it came to
light that Lisa Milstein, the defense investigator/mitigation specialist hired by
Gary Taylor, had engaged in inappropriate behavior with at least one witness and
had encouraged at least one witness to falsify an affidavit, alleging facts which
were not true.  (*See* Claim Twenty-Four, *post.*)

826.   Once this came to light, White requested a continuance of the
hearing.  On June 21, 2006, White filed another supplemental petition, alleging
Grounds 16 through 22 (CWR at 1136-41). (See Section C, *post.*)

827.   Before his state Application was even filed, Mr. Young asked Taylor
to raise various claims in the state Application.  Taylor did not do so.

C.   **The CCA's Dismissal of Mr. Young's Claims Is Not Independent and Does Not Preclude this Court from Reaching His Claims**

828.   In an unsigned *per curiam* order, the CCA disposed of all the claims raised by both White and by Mr. Young in pro se, by simply stating:

> We have considered all of these additional claims and find that they constitute, *in toto*, a subsequent writ application. *See* Tex. Code Crim. Proc. art. 11.071 § 5. We further find that the claims in the subsequent application fail to meet one of the exceptions provided for in Section 5 of Article 11.071, and thus, we dismiss the subsequent application as an abuse of the writ.

*Ex parte Young*, 2006 WL 3735395.

829.   Such a boiler plate denial has been found not to be an independent state procedural bar, since it is unclear whether the CCA decision to dismiss the claims as successive was based on a state-law question, or on a question of federal constitutional law.  As the Fifth Circuit explained in *Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007):

> This settled principle [of adequate and independent state procedural bars] gives to state courts control over the federal review of their opinions. It has become a rote rule at the fingertips of every writing member of state courts of last resort-where studied ambiguity or clarity in the decisional footing is an art form and an absence of clarity in an opinion is seldom inadvertent. Calibrated uncertainty can play a mediating role in garnering support for an outcome. To the point, that the CCA did

266