not make clear that its decision rested on an independent state ground[58] opens the merits of Ruiz's *Wiggins* claim to federal review.  At best, the CCA did not make clear whether it relied on state or federal law in dismissing Ruiz's application.  As the CCA is keenly aware, its choice of language was made against a background legal standard-which directs the CCA in either granting an application for consideration of subsequent claims or dismissing that application as an abuse of the writ-that is interwoven with federal law.

The Texas Code of Criminal Procedure, as interpreted by the CCA, provides for subsequent applications where (1) the factual or legal basis for the subsequent claim was previously unavailable and (2) where the facts alleged would constitute a federal constitutional violation that would likely require relief from either the conviction or sentence. The boilerplate dismissal by the CCA of an application for abuse of the writ is itself uncertain on this point, being unclear whether the CCA decision was based on the first element, a state-law question, or on the second element, a question of federal constitutional law.

*Id.* at 527 (internal citations omitted).

---

[58] In *Ex Parte Ruiz*, the CCA stated:  "This application is dismissed as an abuse of the writ and the motion for stay of execution is denied."

830.   Mr. Young argued to the CCA and the state habeas court that he should be allowed to proceed in state court on his various claims because they were either previously factually or legally unavailable to him and he alleged facts which, if proven, would establish violations of the United States Constitution. (Exs. 54 [March 9, 2006, Pro Se Complaints]; 53 [Ground 15 - January 17, 2006, Clinton Lee Young's Additional Grounds and Memorandum Showing Entitlement to Relief Due to Ineffective Assistance of Counsel]; 34 [Grounds 15-22 June 21, 2006, Clinton Young's Request for Permission to Supplement Writ to Allow the Possible Considerations of Additional Grounds]; CR at 1136-41.)  Mr. Young's Application was, in fact, dismissed pursuant to Section 5.[59]  However, because Section 5 includes a federal component and because characterizing the dismissal as an abuse of the writ does not of its own force constitute an independent and adequate state law ground, this order does not end the inquiry.  As discussed above, federal law places the burden on the state court to clearly and expressly show the state law ground of decision if federal review of a claim is to be precluded.  By issuing a brief order that simply stated Mr. Young's claims were barred by Section 5, the CCA failed to "clearly and expressly" demonstrate that the basis of its decision was a state procedural rule rather than the federal

_____

[59]   Section 5 of Article 11.071, which governs the filing and consideration of subsequent applications for habeas corpus relief provides, in relevant part, as follows:

> If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application.

component of Section 5 acknowledged in *Ruiz, supra.*

831.   As the Fifth Circuit noted in *Ruiz*, the CCA in Mr. Young's case could have clearly stated, if it choose to do so, that it was rejecting Mr. Young's claims on an independent state law basis.  It did not, however, and merely issued a boilerplate order that failed to clearly and expressly state the basis of the dismissal.  Because a Section 5 dismissal is, by the CCA's own explanation in *Ex parte Campbell*, 226 S.W.3d 418 (Tex. Crim. App. 2007),[60] necessarily interwoven with federal law, this Court must presume the dismissal is not independent and must therefore review the merits of all the claims dismissed by the CCA as an abuse of the writ.  As it was the case in *Ruiz*, "Texas has had the opportunity to review the claim[s] and did so on [their] merits, *Ruiz*, 504 F.3d at 531, as such, the following claims have been exhausted and are properly in front of this Court:

### ORI WHITE'S SUPPLEMENTAL APPLICATION CLAIMS

### Raised in the Supplemental State Application as Ground 15

832.   Mr. Young's right to effective assistance of counsel was violated by his counsel's failure to object to the court's supplemental jury charge being: (a) a

---

[60]   In *Ex parte Campbell*, 226 S.W.3d 418 (Tex. Crim. App. 2007), the CCA explicated how it conducts a Section 5(a) assessment of a subsequent application where it is alleged that the facts were not available at the time the prior application was filed:

> To satisfy section 5(a)(1), a subsequent application must contain sufficient specific facts establishing that "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application."  We have interpreted this to mean that, to satisfy Art. 11.071, § 5(a), 1) the factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications; and 2) the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence.

*Id.* at 421.

comment on the weight of the evidence; (b) allowing the jury to answer the second special issue in the affirmative without requiring all twelve jurors to answer "yes"; and (c) that the instruction prevented the jury from considering circumstances of the offense favorable to Mr. Young that might have been considered mitigating evidence.

833.   Mr. Young was charged by amended indictment with causing the death of Douglas and Petrey.  The jury found Mr. Young guilty of the capital murder alleged in paragraph one of the amended indictment (murder of Douglas and Petrey during the same criminal transaction or in different criminal transactions but pursuant to the same scheme and course of conduct) and paragraph two of the amended indictment (murder of Petrey in the course of committing or attempting to commit the offense of kidnapping and robbery).  (CR at 5.)

834.   During the punishment phase, the jury asked the following question: "Regarding Issue Number 2 cause the death of deceased individuals, intended to kill the deceased individuals.  Question:  Do you have to believe both or at least one?"  (36 RR at 135.)  In response, the court answered the jury as follows:

> Members of the jury.  Paragraph 1 of the indictment
> charged capital murder by the death of two individuals
> pursuant to the same scheme or course of conduct.
> Paragraph 2 of the indictment charged capital murder by
> the death of an individual during the course of
> kidnapping and robbery.  If you consideration of Issue
> No. 2 on punishment is as to Paragraph 1 of the
> indictment, the death of two individuals is required to be
> found by the jury.  If your consideration is as to the

second paragraph of the indictment, the death of an

individual, Samuel Petrey, is required.

(36 RR at 135.)

835.   On appeal, counsel presented four points of error concerning the

above supplemental instruction:  (1) it improperly coerced the jury to answer the

second special issue in the affirmative; (2) that the instruction allowed the jury to

answer the second special issue in the affirmative without requiring all twelve

jurors to answer "yes"; (3) that the instruction was an improper comment on the

weight of the evidence; and (4) that the instruction prevented the jury from

considering circumstances of the offense favorable to Mr. Young that might have

been considered mitigating evidence.  (AOB at 11, 22-25.)  The CCA denied the

claims: "Because appellant's objections at trial do not comport with the claims he

now raises, he has failed to preserve those claims for appeal.  *Young v. State*, 2005

WL 2374669, * 7.

836.   Assuming, arguendo, the CCA was correct (*see* Claim Thirteen, *ante*),

trial counsel was ineffective for failing to make the appropriate objections to

preserve the issues for appeal.  *Strickland*, 466 U.S. at 694.

### Raised in the Supplemental State Application as Ground 16

837.   Mr. Young's right to the effective assistance of counsel was violated

by counsel's failure to object to the court's supplemental jury charge.

838.   The supplemental jury charge, as given by the court, was an

ambiguous response to an ambiguous question which contained imperative

language depriving Mr. Young of a trial by jury on Special Issue No. 2.  (*See*

Claim Thirteen, *ante*.)

### Raised in the Supplemental State Application as Ground 17

839.   Mr. Young's right to effective assistance of counsel was violated by

271

counsel's failure to object to the court's jury charge and supplemental jury charge.

840.   Both the court's charge as to Special Issue no. 2, and the supplemental charge given by the court following the jury's question, failed to clearly instruct the jury that they would deliberate on each count of the indictment concerning Special Issue No. 2.  This created the possibility that Mr. Young received a non-unanimous verdict on Special Issue No. 2.  (*See* Claim Thirteen, *ante*.)

### Raised in the Supplemental State Application as Ground 18

841.   Mr. Young's right to the effective assistance of counsel was violated by counsel's failure to object to the court's supplemental jury charge.

842.   The court's supplemental jury charge used imperative language which forced the jury to make an affirmative response to Special Issue No. 2 and proceed to the Third Issue on Mitigation thinking that they were "required" to find Special Issue No. 2 affirmatively.  (*See* Claim Thirteen, *ante*.)

### Raised in the Supplemental State Application as Ground 19

843.   Mr. Young's right to the effective assistance of counsel was violated by counsel's failure to object to the court's jury charge and supplemental jury charge.

844.   Both the jury charge as to Special Issue No. 2, and the court's supplemental charge based upon the jury's question, failed to clearly set out the jury's need to consider and vote on their findings independently as to Count One and Count Two of the Charging Instrument.  (*See* Claim Thirteen, *ante*.)

### Raised in the Supplemental State Application as Ground 20

845.   Mr. Young's trial counsel failed to object to the admission of Mr. Young's Texas Youth Commission records on the basis of hearsay and the confrontation clause.

846.   Mr. Young incorporates by reference the argument raised in Claim Five B.10, *ante*, regarding counsel's failure to object to the admission of the TYC records on hearsay grounds.  Counsel was also ineffective in failing to object to the TYC records on the basis they violated his right to confront the evidence.

847.   The Confrontation Clause of the Sixth Amendment -- made applicable to the states by the Fourteenth Amendment -- provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI; *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *accord Crawford v. Washington*, 541 U.S. 36, 43, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *Fratta*, 536 F.3d at 499.  "The Sixth Amendment right to present a complete defense encompasses a defendant's rights under the Confrontation Clause to rebut the State's evidence through cross-examination."  *Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005); *accord Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *Webb v. Texas*, 409 U.S. 95, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972) (per curiam); *Fratta*, 536 F.3d at 499; *Burbank*, 535 F.3d at 357.

848.   Here, in one fell swoop, the prosecution introduced over 1,200 pages of TYC records under the business records exception without objection by counsel.  (CR at 224; 30 RR at 194-95.)  By doing so, the prosecution was able to introduce, without calling a single witness, information containing Mr. Young's diagnosis and treatment while at TYC; information concerning his involuntary commitment to TYC; incidents preceding his commitment to TYC; alcohol and drug abuse information; and Mr. Young's mental health impressions.  Further, the TYC records revealed alleged behavioral problems that Mr. Young encountered while at TYC.  (Ex. 21 at 213-14 [State Trial Exhibit 147, at 285, 287].)

849.   However, Mr. Young was not able to confront any of these charges as the evidence came in through records, not witnesses.  Moreover, it would have been too burdensome for Mr. Young to have called those witnesses to rebut the TYC records as it would have meant calling upward of 100 witnesses.  In sum, counsel's failure to object to the introduction of the TYC records on confrontation grounds was objectively unreasonable, and counsel's actions caused Mr. Young prejudice.

### Raised in the Supplemental State Application as Ground 21

850.   Trial counsel failed to obtain trace metal testing on the gloves belonging to David Page.  This omission constituted ineffective assistance of counsel and violated Mr. Young's Sixth Amendment right to counsel.

851.   Besides the testimony of David Page, the only other evidence the prosecution presented implicating Mr. Young in the shooting of Petrey was a presumptive trace metal test conducted by a police officer.  (25 RR at 94.)  Police officer Paul Hallmark sprayed Mr. Young's hand with a chemical and compared it to pictures in a book.  He thought the glow from Mr. Young's hand was similar to that of an automatic weapon.  (25 RR at 94-95.)  Page's hands also glowed but, in the officer's opinion, the glow was not similar to any of the pictures in his book.  (25 RR at 101-02.)  In Hallmark's opinion it appeared to be a round object but appeared to be most similar to a picture of a drill chuck.  (*Id.*)  However, the accuracy of the photographs taken were in question because Hallmark also did not use the ultraviolet filter for the camera to take pictures of Mr. Young's and Page's hands because the department did not have one.  (25 RR at 41.)  The ultraviolet filter was available for purchase locally for $10.72.  (*Id.*)  Hallmark did not use an inexpensive SEM kit because he did not have one, but testified that he would the next time.  (25 RR at 25-26, 88.)

852.    Although the evidence was clear that gloves were found at the murder scene, Hallmark did not test the gloves for trace metal or gunshot residue, which can be tested for on gloves.  (25 RR at 37, 44, 46, 51, 97.)  The evidence provided by Page and trace metal testing comes into question when viewed with the testimony of Christopher McElwee who was in jail with Page.  McElwee testified that Page admitted killing Petrey and that he wore gloves at the time he shot him.[61]  (27 RR at 271-75.)  Page's DNA was discovered in the inside of the palm area of the gloves.  (27 RR at 245-54.)

853.    Page's claim that he was wearing work gloves that he had brought from home (26 RR at 137, 241) could have easily been refuted by testing the gloves for age, wear, and dirt.  Mr. Young informed his attorneys that Page bought the gloves during their journey.  The trial attorneys failed to follow-up and hire an expert to test these gloves for trace metal and for condition, age, and wear to further undermine Page's credibility.  As expert Richard Ernest would have testified:

> These gloves could have been tested for traces of gunshot residues using the Sodium Rhodizonate and the Modified Griess tests.  The gloves could have also been examined for condition, age and wear using conventional microscopy tests.

(Ex. 95 at ¶15 [Decl. of Ernest].)  Trial counsel failed to investigate and hire an expert to test the gloves and testify to the findings.

### Raised in the Supplemental State Application as Ground 22

854.    Mr. Young's counsel failed to object to the prosecution waving the book *Serial Killer* in front of the jury.

---

[61]  Page also confessed to Ray Villa that he, Page, shot and killed Petrey. (Ex. 125 at ¶¶ 3-4, 6 [Decl. of Villa].)

855.   During Dr. Short's testimony regarding the differences between someone who suffered from antisocial personality disorder and a person who was a psychopath, DA Schorre began waving before the jury a book entitled *Serial Killer*.  While defense counsel objected to DA Schorre's line of questioning, counsel never objected to the waving around of the book. (32 RR at 55-63.)

856.   The obvious inference of the book was that Mr. Young himself was such a serial killer.  The book itself was nothing more than a silent prop, used to get this message across to the jury.  Even the court felt the book had crossed a line. (*See* 32 RR at 62-63.)  Because the prosecutor's actions were improper, counsel's inaction was ineffective.

## MR. YOUNG'S PRO-SE CLAIMS

**Letter to Judge Hyde dated July 14, 2005 and filed July 20, 2005.**
**Ineffective Assistance of Counsel Claims:**

> **CLAIM 1:  Counsel was ineffective for failing to admit additional reports that pertained to the ballistic reports and autopsy reports which challenged the state's theory.**

857.   Mr. Young incorporates by reference the argument raised in Claim Five, *ante*.

> **CLAIM 2:  Counsel was ineffective for failing to have tests conducted on the car of victim Doyle Douglas which would have provided exculpatory evidence.**

858.   Trial counsel inexplicably failed to test Mr. Douglas's vehicle so that the defense could explain why two .22 caliber shell casings were found in the passenger side of the vehicle. (23 RR at 43-46.)  In his closing argument, the prosecutor argued that the shell casings found in Douglas's vehicle, one in the seat and one on the floorboard, were fired from Mr. Young's gun, the Colt Huntsman

.22 caliber (29 RR at 19-20, 67), and thus the shooter was inside the car at the time of the shooting. The shell casings matched the Colt Huntsman, which, by process of elimination, were responsible for two of the gunshot wounds to Douglas. (25 RR at 158-59.)

859.   Ann Hinkle, who was the FBI agent who performed a forensics inspection of Douglas's vehicle, testified that the car had been shot at and that there was a defect on the dashboard, but she did not know whether it was from a bullet. (23 RR at 74-76.) There were no tests conducted on the dash; Hinkle collected the evidence only. (23 RR at 73.) She also admitted that she refused to speak to the defense prior to the trial. (23 RR at 67-69.)

860.   Mr. Young informed his trial lawyers that the dash and steering wheel had been shot at inside the car, which is where the shell casings came from. (Ex. 52 at 625 [Letter to Gary Taylor].) Mr. Young asked his lawyers to conduct tests on the car months prior to the trial. (*Id.*) Such discovery was never conducted and no ballistics expert was ever requested.

861.   If tested, the defense would have shown that the defects that Hinkle described were in fact bullet holes, which would show an alternative explanation of how the shell casings were found in the vehicle. This evidence, along with Tim Counce's ballistics report that the trial lawyers failed to get admitted into evidence, would have cast reasonable doubt on whether the shooter was actually in the car where Douglas was shot.

//

//

//

//

**CLAIM 3:** **Counsel was ineffective for failing to object to the admission of Mr. Young's county jail records. These records contained false information that should have been challenged. Mr. Young informed his trial counsel of this and was told by trial counsel that he should not worry as the jury would not read the records.**

862.    During the punishment phase of trial, the prosecution admitted Mr. Young's Midland County jail records without objection. The jail records were admitted as State's Exhibit 145. (30 RR at 179.) Counsel's failure to object to the records constituted deficient performance as the records contained false information which should have been challenged. (*See* Ex. 4 [Excerpts of Midland County Jail Records].) As the jury was able to review unchallenged false information, Mr. Young was prejudiced by his counsel's objectively unreasonable performance.

863.    Further, the introduction of the records violated Mr. Young's confrontation rights. (*See* Supp. Claim 20, *ante*.)

**CLAIM 4:** **Counsel was ineffective for failing to investigate that Page, Ray, and McCoy conspired through an ex-girlfriend of Page to collaborate on their version of events.**

864.    During closing guilt/innocence phase argument, the State argued that Page, Ray, and McCoy testified consistently and, because Page and Ray were in jail, could not have coordinated their stories. However, the prosecutor's argument was false.

865.    In reality, Page, Ray and McCoy were coordinating their stories through Page's then girlfriend, Amanda. Page admitted as much when he testified that while he had not seen the chase video, he had heard about it. (27 RR at 220-

278

21.)

866.   Had counsel investigated and presented evidence that McCoy, Page, and Ray were coordinating their stories about the Douglas and/or Petrey murders through someone on the outside, this evidence would have undermined the credibility of all three individuals, a key part of the State's case.  Counsel's performance was objectively unreasonable, and caused Mr. Young prejudice.

**CLAIM 5:**  **Counsel was ineffective for failing to request a mistrial when it was discovered that a relative of Petrey, Cathie Huckabee, was on the jury.  Before the juror was removed, the jury had talked and prayed together.  The court erred in informing the jurors why Huckabee was removed.**

867.   On the second day of Mr. Young's trial, the court informed the parties of the following.  Juror Cathie Huckabee had just informed the court that she was distantly related to victim Samuel Petrey.  Huckabee knew that there had been a murder in her family, but had not made the connection that the family member was the same as the murder victim in Mr. Young's case until her sister had called. When the court asked Huckabee if she could still fairly assess the evidence in the case, Huckabee told the court: "I don't see how it cannot affect my evaluation of the case."  The court had asked Huckabee to remain until a decision was made. (22 RR at 5-6.)

868.   After explaining Huckabee's news to the parties, defense counsel and the prosecutor requested Huckabee be removed.  The court then dismissed Huckabee.  The court told the other jurors that Huckabee was a distant relative of a person involved in the case, and that it was no longer appropriate for her to remain as a juror.  (22 RR at 7.)

869.  Counsel was ineffective for failing to seek a mistrial when it was discovered that Huckabee was a relative of Petrey because the jurors had talked and prayed together before Huckabee's departure.  By the time Huckabee was dismissed as a juror, the jurors had bonded with one another and Huckabee's departure could have only influenced the juror's decision about Mr. Young's fate. *See United States v. Forrest*, 620 F.2d 446 (5th Cir. 1980); *Franklin v. State*, 138 S.W.3d 351(Tex. Crim. App. 2004).  Counsel's performance was ineffective, and Mr. Young's was prejudiced by their actions.

870.  Moreover, the trial court erred when it informed the jury that Huckabee was removed from the jury because she was a distant relative of someone on the case.  In giving the jurors this ambiguous reason for Huckabee's excusal, the jurors' heightened sense of loss in losing Huckabee, someone they had bonded and prayed with, only exacerbated the problem.  The court should have removed Huckabee without comment.

**CLAIM 6:  Counsel was ineffective for failing to question Debbie Sanders about her conversation with Carla Sexton in which she told her that she clearly heard Mark Ray brag to Patrick Brook that Ray shot Douglas. This would have challenged Brook's testimony.**

871.  Trial counsel was ineffective for failing to cross-examine Debbie Sanders about her conversation with Carla Sexton in which she told her that she clearly heard Mark Ray brag to Patrick Brook that Ray shot Douglas.  Sanders was called by the prosecution and testified at the punishment phase about overhearing part of the conversation between Mr. Young, Ray, Brook, and McCoy the night that Mr. Douglas was shot.  (30 RR at 107-26.)

280

872.   Trial counsel had been informed, and knew that Sanders had admitted to Carla Sexton that Mark Ray bragged about shooting Douglas that night. Trial counsel's deficiency for failing to cross-examine a witness on an important topic regarding Ray's culpability for the Douglas shooting, was prejudicial. The cross-examination would have elicited that Ray was bragging about the shooting, undermining Ray's claim that Mr. Young forced him to shoot Douglas. This would have also undermined the credibility of Patrick Brook. Trial counsel was further ineffective for failing to call Debbie Sanders to testify to the information during the guilt phase proceedings.

**CLAIM 7:   Counsel was ineffective for failing to strike Juror Haydee Guerreo from Mr. Young's jury as she did not speak or understand English well enough to fluently understand all of the testimony and evidence.**

873.   "It is well-settled that only clear evidence of a juror's incompetence to understand the issues and to deliberate requires setting aside a verdict, and that only strong evidence that the juror suffered from such incompetence will justify an inquiry into whether such incompetence in fact did exist." *United States v. Dioguardi*, 492 F.2d 70, 78 (2nd Cir. 1974). In fact, a juror's incompetence is viewed by the courts as an "internal abnormality," rather than one of improper external influence. *See Tanner v. United States*, 483 U.S. 107, 118, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987) ("The quickness with which jury findings will be set aside when there is proof of tampering or *external* influence, ... parallel the reluctance of courts to inquire into jury deliberations when a verdict is valid on its face. ... Such exceptions support rather than undermine the rationale of the rule that possible *internal* abnormalities in a jury will not be inquired into except in the gravest and most important cases") (quoting *McDonald v. Pless*, 238 U.S. 264,

281

269, 35 S. Ct. 783, 59 L. Ed. 1300 (1915) (emphasis in original)).

874.   In *McDonald*, despite describing the "general rule, that the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict," the Supreme Court recognized "that it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without violating the plainest principles of justice. This might occur in the gravest and most important cases . . . ." *McDonald*, 238 U.S. at 269.  This is one of the gravest and most important cases, it is a case where a juror, who was to decide whether a man was to live or die, could not understand the proceedings that transpired in front of him.

875.   Under Texas law, Government Code section 62.102, a prospective juror is only qualified to serve if he or she is able to read and write.  If a juror is unable to Comprehend English, they are exempted from jury service. Tex. Gov. Code § 62.109(a).

876.   The failure of trial counsel to object to Guerrero's sitting on the jury should not be held against Mr. Young because trial counsel was grossly ineffective in not asking the court to dismiss juror Guerrero for cause or using a peremptory strike.  Also, the trial court committed clear error in determining that juror Guerrero was competent to serve and by not dismissing her for cause *sua sponte*. The error denied Mr. Young his constitutional right to a fair and impartial jury, to due process of law, and to a reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

877.   Mr. Young will establish that Guerrero did not, in fact, have a sufficient understanding of the English language to serve on the jury that convicted Mr. Young and sentenced him to death.  "At times a procedure employed by the state involves such a probability that prejudice will result that it

is deemed inherently lacking in due process." *Sheppard v. Maxwell*, 384 U.S. 333, 352, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966) (quoting *Estes v. Texas*, 381 U.S. 532, 542-43, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965)).

> **CLAIM 8:   Counsel was ineffective for failing to impeach witness J. Timmons.  Counsel had possession of a report written by J. Timmons that showed her testimony to be false.**

878.   During the punishment phase, Jacqueline Timmons, a juvenile correctional officer at TYC, testified to a fight that broke out between Mr. Young and another youth.  According to Timmons, she was injured while trying to break up the fight as both Mr. Young and the other youth punched her on the upper body.  Timmons also testified that another correctional officer was injured in this same altercation.  (31 RR at 291-92.)

879.   On cross examination, defense counsel questioned Timmons about the actual January 2000 incident report.  Specifically, counsel asked Timmons whether the written report stated that she was assaulted by Mr. Young.  Timmons testified that the report counsel had was merely a synopsis, and the actual incident report contained the information that Timmons was assaulted by Mr. Young.  (31 RR at 301.)

880.   However, counsel had in their possession the full report, and that report did not contain any information which alleged that Mr. Young assaulted Timmons.  (*See* Ex. 20 [TYC - Timmons Report].)  Counsel's failure to impeach Timmons with the actual report was ineffective.  *Strickland*, 466 U.S. at 694.

881.   The prejudice is clear.  Without the impeachment of Timmons, the jurors were left with the impression that Mr. Young was a dangerous person who would be a threat to guards in prison, which supported the prosecutor's future dangerousness argument.

**CLAIM 9:** **Counsel was ineffective for failing to object when Assistant District Attorney Teresa Clingman argued to the jury that Mr. Young had admitted to the Douglas murder, and had not expressed any remorse.**

882.   At the punishment phase, prosecutor Teresa Clingman successfully objected when defense counsel attempted to elicit evidence from witnesses that Mr. Young was remorseful about the crimes.  (*See* 33 RR at 138, 142-43.) However, in closing, Clingman argued to the jury that Mr. Young never showed remorse:

> Did you ever once hear from any witness any remorse for
> the death of these men at this punishment phase?  No,
> you didn't.  Not any.  Not from a single witness that
> testified.

(36 RR at 94.)  A short time later, the prosecutor also argued that Mr. Young admitted to killing Douglas.  However, no such evidence had ever been introduced at trial.  (*See* 36 RR at 95.)

883.   Clingmans's actions amounted to misconduct, and counsel's performance was objectively unreasonable when he failed to object to the misconduct.  *See Commonwealth v. Mosby*, 11 Mass.App. 1 (App. Suffolk 1980) ("it is particularly improper for a prosecutor to call the jury's attention to an absence of evidence when the absence is a result of the prosecutor's objection to the introduction of that evidence"); *Thomas v. State*, 519 S.W.2d 430 (Tex. Crim. App. 1975) (prosecutor's argument that the defendant's niece did not testify because she was afraid of her uncle was not supported by the record and therefore constituted an improper argument).

884.   The prejudice which resulted is real.  Without an objection, the jury was left surmising that Mr. Young had confessed to someone about killing Douglas.  Morever, the jury was also left with the impression that Mr. Young was not remorseful regarding his actions.  Together, both comments were prejudicial to Mr. Young's case.

**CLAIM 10:**      **Counsel was ineffective for failing to admit into evidence, during both the guilt and punishment phases, evidence that Mr. Young suffered from severe ADHD, and in his state of mind at the time of the offense was incapable of anticipating his co-defendants's actions.**

885.   As stated previously in Claim Seven, *ante*, a defendant who did not actually cause the death of the deceased can be convicted of any capital offense in Texas under a "law of the parties" theory.  Here, counsel was ineffective for failing to admit into evidence that Mr. Young suffered from severe ADHD, and in his state of mind at the time of the offense was incapable of anticipating his co-defendants's actions.

886.   There was no doubt that Mr. Young suffered from ADHD.  He was diagnosed with the illness in childhood.  (Exs. 97 at ¶ 13 [Decl. of Milam]; 96 at ¶ 70 [Decl. of Knox].)  However, what was not presented by counsel was how Mr. Young's ADHD would have made it impossible for Mr. Young to have been convicted for capital murder under a law of the parties theory.

887.   Because of his ADHD, which causes low levels of dopamine to be present in the frontal lobes, Mr. Young had difficulty effectively shifting mental organization from one event to another.  In other words, Mr. Young suffered from a "disregulated" mind.  (Ex. 97 at ¶ 11 [Decl. of Milam].)

285

888.   Based upon his ADHD, Mr. Young has consistently displayed distractibility and impulsive behavior.  Due to his mental regulation deficits, he has had an impaired ability to perceive the consequences of his actions. (Ex. 97 at ¶ 19 [Decl. of Milam].)  Further, Mr. Young is an individual who was incapable of assessing and responding to a rapidly changing situation due to his poor ability to think and plan.  (*Id*. at ¶ 25.)

889.   This information was crucial at the guilt phase to show that Mr. Young's state of mind, due to his ADHD, was mostly incapable of anticipating Page's, Ray's, or McCoy's actions the night of the crimes.  This information would have rebutted the prosecution's argument that Mr. Young was the ring leader of the events concerning Douglas and Petrey.

890.   None of this information was presented at Mr. Young's trial in the guilt phase.  Defense counsel unreasonably and prejudicially failed to present competent testimony regarding the nature and effect of Mr. Young's ADHD. *Wiggins v. Smith*, 539 U.S. at 526 (unreasonableness of counsel's conduct resulted from *inattention*, not reasoned strategic judgment).

**Prosecutorial Misconduct Claims:**

**CLAIM 11:**       **The prosecutor was in possession of a report written by J. Timmons that would have proven her testimony to be false and biased.  The district attorney knowingly allowed her to testify falsely.**

891.   For the same reasons as articulated in pro se Claim 8, *ante*, the prosecutor committed misconduct by knowingly permitting J. Timmons to testify falsely as the prosecutor was in possession of a report written by J. Timmons that would have proven Timmons testimony to be false and biased.  *See Faulder*, 81 F.3d at 519.

**CLAIM 12:**    **Prosecutor Teresa Clingman improperly told the jury that Mr. Young confessed to the Douglas murder even though there was nothing in the record and no one testified to this fact.**

892.   For the same reasons as articulated in pro se Claim 9, *ante*, the prosecutor committed misconduct when she improperly told the jury that Mr. Young confessed to the Douglas murder even though there was nothing in the record and no one testified to this fact. *See Mosby*, 11 Mass.App. 1.

**CLAIM 13:**    **District Attorney Rick Berry improperly presented a victim impact statement by Mark Ray, who was a co-defendant in the case.  This statement likely influenced the jury to hold Ray less accountable and add weight to his testimony.**

893.   District Attorney Rick Berry improperly presented a victim impact statement by co-defendant Mark Ray.  This statement could have influenced the jury to hold Ray less accountable and add weight to his testimony.

894.   During his direct examination, Ray testified about the impact that shooting Doyle Douglas had on his life.  The district attorney asked him how "did that make you feel, shooting a man in a muddy ditch in the head?"  (22 RR at 128.) Ray testified that it made him "feel low," that he had to "think about it every day," that he could not sleep, that he has to "live with it," and it's something that he wouldn't wish on anyone.  (*Id.*)  The district attorney asked him again, "how were you feeling" and Ray answered that it was the "worst tragedy" that had ever happened to him.  (22 RR at 129.)

895.   The prosecutor also later asked Ray, "How has this affected you since November 21st, Mark?"  (22 RR at 148.)  Ray answered: "mentally it's been a

287

downhill slide since that night occurred." (*Id.*)  Trial counsel objected to this last question after Ray answered it on relevance grounds.  The trial court sustained the objection. (*Id.*)

896.   The district attorney tried to defend this question, saying that Ray was "in some respects a victim of the actions of the Defendant and I think that's pertinent here to show that he's been cooperative and how this has affected him." (*Id.*) However, Ray was not a victim; he was charged as a co-perpetrator of the Douglas shooting and ultimately pled guilty to kidnapping, a second degree felony, and got a fifteen year prison term in exchange for testifying against Mr. Young. Mr. Young incorporates herein by reference Claim One.

897.   Although victim impact testimony is generally admissible, Ray was not a victim in this case and the trial court violated Mr. Young's due process rights by allowing all of the above-referenced impact testimony into evidence.  Further, trial counsel was ineffective for failing to continuously object to this line of questioning by the district attorney.  Mr. Young was prejudiced by this testimony because it lent credibility to Ray's story and unfairly influenced the jury to feel that Ray was not responsible for the shooting of Douglas.

**CLAIM 14:**     **Prosecutor Teresa Clingman violated the judge's ruling on hearsay, when she told the jury that Mr. Young had not expressed remorse even though Clingman objected each time a defense witness was asked whether Mr. Young had ever expressed remorse.**

898.   For the same reasons as articulated in pro se Claim 9, *ante*, the prosecutor committed misconduct when she objected each time a defense witness was asked whether Mr. Young had ever expressed remorse, and then argued to the

jury that Mr. Young never expressed remorse. *See Thomas v. State*, 519 S.W.2d 430 (Tex. Crim. App. 1975).

**Letter to Judge Hyde dated January 10, 2006, filed date unknown.**

> **CLAIM:** **Counsel failed to locate, investigate, and test items that would have provided exculpatory evidence.**

899.   The homicides of Doyle Douglas and Sam Petrey took place roughly thirty plus hours and 525 miles apart.  To make the offense eligible for capital murder, the prosecution had to charge Mr. Young with the murder of Petrey. Without a finding that Mr. Young shot Petrey, capital murder could not be found, and the death penalty would not have been an option for the jury.[62]  (*See* Claim Twenty-Five, subd. (F), *post.*)

**1.     The State's Bungled Crime-Scene Processing**

900.   The State conducted sloppy police work at the Petrey murder scene. Paul Hallmark was the only Crime Scene Investigator at Midland County Sheriff's Office.  (24 RR at 305; 25 RR at 31.)  He failed to secure and analyze the Petrey murder scene and overlooked evidence in plain view at the pump jack site. Hallmark saw Petrey's body and found a red cotton rag on top.  (24 RR at 311, 321.)  He noticed tire tread marks, but admitted that he was "just a layman as far as

---

[62]   There was plenty of evidence to show that Mr. Young did not shoot Petrey, some of which trial counsel did not present to the jury.  As is addressed in Claim Eight, the trial court would not allow Irma Rodriguez to testify about the polygraph test that she administered to David Page.  At a hearing outside the presence of the jury, she testified that Page's answers were deceptive.  (27 RR at 240-41.)  When informed that he failed he stated "I know what it is."  (27 RR at 242; Ex. 62 at 718 [Report].)  Further, Christopher MCelwee, a cell mate of David Page's, testified that Page had confessed the second murder to him, and that he also confessed to a "Spanish guy" that he killed Samuel Petrey.  (27 RR at 272-75.)  The "Spanish guy" who Page confessed to was Raynaldo Ray Villa.  He would have also testified that he overheard Page tell another inmate that he "had shot a man named Petrey."  Villa would have also testified that Page told him directly that "he, and not Clinton Young, had shot Petrey outside of Petrey's truck."  (Exs.125 at ¶¶ 2-4, 6 [Decl. of Villa]; 95 at ¶¶ 3-4 [Decl. of Richard Ernest].)

tire prints go" and not a scientist.  (24 RR at 313; 25 RR at 18.)  He made no casts of tires and did not collect rubber.

901.   Hallmark also recovered two shell casings and a cigarette butt near the body.  (24 RR at 316-20.)  Paul Hallmark did not find any gloves during his search of the crime scene despite walking the entire caliche pad.  (24 RR at 321; 25 RR at 45, 56.)  Officer Spencer found Page's gloves on a subsequent search right on the caliche pad of the pump jack site.  (24 RR at 322-23; 25 RR at 56.)  Hallmark also missed the tire iron tool that was later found at the crime scene.  (25 RR at 57.)

902.   Additionally, Hallmark did not notice that there was a bullet in one of the fingers of one of the gloves, and admitted that he made a mistake.  (25 RR at 63-64.)  Much of the evidence collected in the Petrey case, ended up stacked on a desk in the Sheriff's Office with other items with no guarantee of cross-contamination, which, according to Hallmark, was a mistake.  (25 RR at 65-68.)  Further, Hallmark did not use the camcorder that he brought with him to the Petrey crime scene and opted to use a camera instead.  (25 RR at 66.)  Even though the FBI uses photo logs, Hallmark did not make a photo log of everything that he collected in the case because he thought it was passe.  (25 RR at 72.)

903.   Trial counsel was on notice of the problems with the Petrey investigation and should have hired their own expert to testify for the defense.

## 2.   Ballistics Evidence Regarding the Gun Shots To Mr. Petrey

904.   Trial counsel failed to present a ballistics expert to show that Mr. Young did not shoot Mr. Petrey.  David Page, in all his statements after he was first arrested, stated that he, Petrey and Young were standing around Petrey's truck at the pump jack site.  Page stated that he was to the left of Petrey and that Mr. Young was to the right of Petrey.  (27 RR at 208-09.)  Page testified that Mr.

Young was from six to ten feet away from Petrey. (27 RR at 42.) In Page's first statements, he says that Mr. Young was to the right of Petrey and Petrey was facing away from the back of the truck. (27 RR at 42-44, 92.) This is also what Page said in his video statement that was played during trial. (27 RR at 208-09.) Page also said that Mr. Young came up to Petrey and shot him in the right side of the head. (27 RR at 46.)

905.   Because Petrey was standing at the back of the truck facing away from the truck, and was shot in the left side of the head, Mr. Young could not have shot him from where he was standing on the right. At trial, Page changed his story to show that Petrey was facing toward the back of the truck looking toward Page and was shot in the left side of the head. (27 RR at 46, 209.)

906.   David Page admitted that he changed his story about the way that the victim was facing after speaking to the prosecutor's investigator. (27 RR at 43-44, 46-47, 147.) Page was informed that his version of the events did not support the physical evidence, and then he changed his story so that it did fit the physical evidence. (*Id.*)

907.   Trial counsel should have called a ballistics expert to explain why the shooting of Petrey could not have occurred the way Page said that it did. During cross examination David Page stated that Mr. Young was standing from six to ten away from Petrey when he was shot. (27 RR at 42.) An expert such as Richard Ernest could have testified to the following:

> In reference to the victim, Sam Petrey, it is noted in the cross
> examination testimony of David Lee Page (27 RR at 42) that he states
> that the victim was shot by Clinton Young at a distance of 6 to 10 feet
> away. In opposition to this statement, the autopsy report reveals that
> the victim, Sam Petrey, was shot at close range. In opposition to this

statement, the autopsy report reveals that Petrey was shot at close range.  Gunshot Wound #1, as enumerated by the autopsy report, is described as exhibiting both gunpowder stippling and faint soot. These are the characteristics of close range gunshot wounds.  (26 RR at 28).

Because these shots were fired in rapid manner, it is also likely that Gunshot Wound #2, as characterized by the autopsy report, was fired at close range.  The reason gunshot residues and gunpowder stippling is not seen in this gunshot wound is most likely caused by the well known sifting effect of hair upon gunshot residues.

(Ex. 95 at ¶¶ 10-11[Decl. of Ernest].)

908.   Further, the weapon used was a small caliber weapon, which adds to the conclusion that it was a close range shot.  As Ernest would have testified:

Given the fact that the gunshots to the victim in this case were reportedly produced by a Colt brand .22 LR pistol, it is even more likely that this gunshot wound was produced by a muzzle to skin distance of approximately less than two feet.  This is because the Colt weapon used was a small caliber weapon which is capable of producing gunpowder tattooing (stippling) only at very short distances from the muzzle of approximately two feet or less. Again, for those unfamiliar with gunshot residue issues involving a .22 LR caliber cartridge, the cartridge itself has a very small gunpowder charge in the unfired cartridge. Upon firing the remaining unburned gunpowder particles, partially burned gunpowder particles and carbonaceous residues will only travel a very short distance from the muzzle of the firearm barrel with sufficient velocity to cause

292

gunpowder stippling and powder burns. This distance is

approximately two feet or less.

(Ex. 95 at ¶ 12 [Decl. of Ernest].)

909.   Even the coroner, Dr. Townsend-Parchman, testified that Petrey was

shot at a range of about six inches to a foot away because of the presence of soot.

(26 RR at 28.)  Dr. Ernest would have elaborated further that:

> Mr. Page originally told police officers that Samuel Petrey was
> standing with his back to the end of the truck looking away from the
> truck and Young came up to Petrey on his right and shot him in the
> right side of the head.  (27 RR at 46, 209).  He also testified that Page
> was standing on the right, passenger side of the truck and that Mr.
> Young was standing on the left driver's side of the truck.  (27 RR at
> 40, 59).   The two shell casings were found to the left of Mr. Petrey's
> body at a distance of 2', 11" and 5' 11" from the midline of his body.
> I agree with Tim Counce's testimony that this particular Colt brand
> .22LR pistol ejects the fired shell casings to the back and right of the
> shooter.  (25 RR at 149).  This, taken together with the gun shot
> location to the left side of the head and the residue and stippling of
> gunshot wound #1, the shooter had to be standing relatively close to
> the left side of Mr. Petrey holding the muzzle end of the pistol at a
> close range.  I agree with the coroner, Dr. Janice Townsend-
> Parchman, that the distance was approximately six inches to two feet
> away from the victim's head.  (26 RR 28).  ¶  Therefore, the statement
> by David Lee Page, that the victim was shot by Mr. Young at a
> distance of 6 to 10 feet is not consistent with the physical evidence,

and the manner of this shooting simply cannot be as described by
David Lee Page.

(Ex. 95 at ¶¶ 13-14 [Decl. of Ernest].)

910.   Trial counsel was ineffective for failing to present expert testimony at trial. *See Draughon v. Dretke*, 427 F.3d 286, 296-97 (5th Cir. 2005) (counsel ineffective for failing to obtain forensic examination of the path of the fatal bullet and the absence of forensic evidence facilitated the states portrait of defendant as a violent young man; without forensic testimony only defendant could counter state's theory that there had been a short distance between defendant and the victim).

911.   Further, Mr. Young told trial counsel that there were no bullets left for the Colt Huntsman gun because they were left behind in Doyle Douglas's car. Trial counsel failed to cross-examine Mr. Page on the fact that Mr. Young had no bullets for the gun at the time they picked up Mr. Petrey, and that Page was the one who either stole or purchased the bullets for the gun.  This would have undermined Page's credibility and strengthened the theory that Page was the triggerman who premeditated the necessity to get bullets in order to shoot Petrey.

### 3.    Page's Gloves and Trace Metal Testing

912.   Trial counsel failed to obtain trace metal testing on the gloves belonging to Page.  This omission constituted ineffective assistance of counsel.

913.   Besides the testimony of David Page, the only other evidence the prosecution presented implicating Mr. Young in the shooting of Petrey was a presumptive trace metal test conducted by a police officer.  (25 RR at 94.)  Police officer Paul Hallmark sprayed Mr. Young's hand with a chemical and compared it to pictures in a book.  He thought the glow from Mr. Young's hand was similar to that of an automatic weapon.  (25 RR at 94-95.)  Page's hands also glowed but, in

the officer's opinion, the glow was not similar to any of the pictures in his book. (25 RR at 101-02.)  In Hallmark's opinion it appeared to be a round object but appeared to be most similar to a picture of a drill chuck.  (*Id.*)  However, the accuracy of the photographs taken were in question because Hallmark also did not use the ultraviolet filter for the camera to take pictures of Mr. Young's and Mr. Page's hand because the department did not have one.  (25 RR at 41.)  The ultraviolet filter was available for purchase locally for $10.72.  (*Id.*)  Hallmark did not use an inexpensive SEM kit because he did not have one, but testified that he would the next time.  (25 RR at 25-26, 88.)

914.    Although the evidence was clear that gloves were found at the murder scene, Hallmark did not test the gloves for trace metal or gunshot residue, which can be tested for on gloves.  (25 RR at 37, 44, 46, 51, 97.)  The evidence provided by Page and trace metal testing comes into question by the testimony of Christopher McElwee who was in jail with Page.  McElwee testified that Page admitted killing Mr. Petrey and that he wore gloves at the time he shot him.  (27 RR at 271-75.)  Page's DNA was discovered in the inside of the palm area of the gloves.  (27 RR at 245-54.)

915.    Page's claim that he was wearing work gloves that he had brought from home (26 RR at 137, 241) could have easily been refuted by testing the gloves for age, wear, and dirt.  Mr. Young informed his attorneys that Page bought the gloves the during their journey.  The trial attorneys failed to follow-up and hire an expert to test these gloves for trace metal and for condition, age, and wear to further undermine Page's credibility.  As Mr. Ernest would have testified:

> These gloves could have been tested for traces of gunshot residues
> using the Sodium Rhodizonate and the Modified Griess tests.  The

gloves could have also been examined for condition, age and wear
using conventional microscopy tests.

(Ex. 95 at ¶15 [Decl. of Ernest].)  Trial counsel failed to investigate and hire an
expert to test the gloves and testify to the findings.

> **4.     The Failure to Present a Ballistics Expert and Argue Against the
> State's Evidence Was Prejudicial to Mr. Young**

916.   The failure of trial counsel to put on their own ballistics expert in the
guilt phase was prejudicial to Mr. Young's case.  The jury never heard from an
expert that:

> the physical evidence associated with this shooting incident and the
> sworn testimony at trial by . . . David Lee Page should cast doubt on
> the truthfulness of the account(s) rendered by Mark Ray and David
> Lee Page in the matter of this case.

(Ex. 95 at ¶ 16 [Decl. of Ernest].)

917.   The jurors would have listened to the expert as Juror James Bobo has
stated:  "If the defense had presented its own ballistics expert to convincingly
challenge the State's evidence and the testimony of government witness David
Page, it certainly would have raised questions for me about Mr. Page's credibility
and his own involvement in the shooting of Mr. Petrey."  (Ex. 100 at ¶ 3 [Decl. of
James Bobo].)  Another juror, Michael Byrne similarly said:  "If the defense had
convincingly countered the State's ballistics evidence with regard to the Petrey
murder, I would have been less likely to convict Young of killing Petrey."  (Ex.
101 at ¶ 4 [Decl. of Michael Byrne].)

918.   The omitted evidence was so compelling that there was a reasonable
probability that at least one juror would have changed his or her mind about
convicting Mr. Young of capital murder.  *Williams*, 529 U.S. at 394; *Strickland*,

296

466 U.S. at 693; *Neal*, 286 F.3d at 241.  Additionally, there is a reasonably probability that the ballistics evidence would have caused the jury to vote "no" on special issue number 2, whether the "defendant actually caused the death of the deceased individuals," (CR at 861), which would have resulted in a life sentence.

> **CLAIM:** **Newly discovered evidence.  A witness was willing to come forward with information that a co-defendant confessed to one of the murders.**

919.   Raynaldo Ray Villa was in custody with David Page before Mr. Young's trial.  The two were housed at the new county jail. (Exs. 125 at ¶ 2; 67 [Villa jail records].)  Villa overheard Page tell another inmate that Page had shot a man named Petrey.  The next day, Villa asked Page about the Petrey murder.  Page told Villa that he, and not Mr. Young, had shot Petrey.  The two talked over a game of cards and dominos. (Ex. 125 at ¶ 4 [Decl. of Raynaldo Villa].)  Later, Villa overheard Page tell others that he had killed Petrey. (*Id.* at ¶ 6.)

920.   Villa was eventually transferred to the old county jail where Mr. Young was housed.  The two began talking about why each was in custody.  At some point, Villa realized that Mr. Young was the person who had been arrested with Page.  Villa told Mr. Young he was willing to do whatever he could to help Mr. Young prove his innocence. (*Id.* at ¶¶ 7-10.)  In March 2003, while still in custody, Villa wrote Young a letter about his conversation with Page.  In that letter, Villa told Mr. Young that Page confessed to killing Petrey but was blaming it on Young because Page did not want to get sentenced to life in prison. (*Id.* at ¶ 11.)  In April 2003, Villa signed an affidavit for Young's defense about Page's confession. (*Id.* at ¶ 12.)

921.   Villa was willing to testify at Mr. Young's trial and should have been called as a witness.

297

**CLAIM:**     **Ground for Review 11 and 12 of the state Application filed by Gary Taylor, trial counsel was ineffective for failing to adequately investigate and preserve the ballistics and all other reports associated with the ballistics. These reports would have provided exculpatory evidence proving that David Page was the shooter in the Douglas murder. These reports could have also been used to impeach direct testimony at trial.**

922.   Mr. Young incorporates by reference the argument raised in Claim Five, *ante*.

**D.**    **Conclusion**

923.   As stated in *Ruiz*, in addressing the applicant's claims dismissed as an abuse of the writ by the CCA through a boiler-plate denial:

> We are not dealing with the equities of considering an unexhausted claim. Rather, we examine the equities of re-considering a dismissal of a claim now freed of the baggage threatening the jurisdiction of the court.

*Ruiz*, 504 F.3d at 531. Here, like *Ruiz*, Mr. Young presented his claims to the CCA and was met with a boiler-plate denial. And like Ruiz, the CCA reached the merits of Mr. Young's constitutional claims when it dismissed them as an abuse of the writ. Thus, like *Ruiz*, Mr. Young's claims, as articulated above, are exhausted and thus properly before this Court.

924.   Finally, to the extent the CCA erred in finding that these claims were not properly preserved, Mr. Young submits that this Court has the authority to correct a state court's erroneous finding of procedural default. *See Cone v. Bell*, 128 S. Ct. 2961 (Cert. granted June 23, 2008) (deciding whether a federal habeas