court is powerless to recognize that a state court erred in holding that state law precludes reviewing a claim).

## CLAIM TWENTY-FOUR

## BECAUSE MR. YOUNG CAN SHOW CAUSE AND PREJUDICE, THE CLAIMS WHICH WERE DEEMED PROCEDURALLY BARRED BY THE CCA SHOULD BE HEARD BY THIS COURT ON THE MERITS

925.    In the alternative, Mr. Young meets the cause and prejudice exception, as articulated under *Coleman* and it progeny, for his failure to properly present these procedurally barred claims at the state level, as discussed above, as well as those claims Mr. Young attempted to present to the state habeas court. Thus, these claims are properly before this Court for adjudication, and § 2254(d) does not apply to these claims.

926.    The entire state post-conviction procedure in Mr. Young's case violated due process because the convicting court appointed incompetent state habeas counsel and because the judge who presided over the state post-conviction litigation was biased.  Thus, this Court should not be precluded from reaching the merits of these claims.

## A.    Relevant Legal Authority: Cause and Prejudice

927.    A federal court may reach the merits of an otherwise procedurally defaulted claim when a federal habeas corpus petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law" or that the failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice."  *Coleman  v. Thompson*, 501 U.S. at 750; *Harris v. Reed*, 489 U.S. 255, 262, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989).

928.   While the Supreme Court has yet to "identif[y] with precision exactly what constitutes 'cause' to excuse a procedural default," *Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S. Ct. 1587, 146 L. Ed. 2d 518 (2000), the Court has found that "cause" in this context, "must be something *external* to the petitioner, something that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 753 (emphasis in original); *Strickler*, 527 U.S. at 283 n.24 ("Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel, *see Reed v. Ross*, 468 U.S. [1], 16, 104 S. Ct. 2901, [82 L. Ed. 2d 1 1984)] or that 'some interference by officials,' *Brown v. Allen*, 344 U.S. 443, 486, 73 S. Ct. 397, 97 L. Ed. 469 (1953), made compliance impracticable, would constitute cause under this standard." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986), *see also Amadeo v. Zant*, 486 U.S. 214, 222, 108 S. Ct. 1771, 100 L. Ed. 2d 249 (1988).").

929.   The question in this case is whether the appointment by the State of Texas of incompetent counsel, the State's unwillingness to promulgate rules to ensure appointed counsel is indeed competent, and the presiding of a biased judge during state post-conviction proceedings, individually or in combination, constitute the "external," "objective' factors," which cannot fairly be attributed to Mr. Young, thus providing the "cause" for Mr. Young's inability to properly raise the plethora of meritorious claims not previously presented to the state courts.

930.   Similarly, the Supreme Court has yet to define the precise contours of the "prejudice" required to meet the prejudice prong of the exception to the procedural default doctrine. *Amadeo*, 486 U.S. at 221 ("The *Sykes* Court did not elaborate upon this requirement, but rather left open 'for resolution in future decisions the precise definition of the 'cause'-and-'prejudice' standard.'")

(*quoting Wainwright v. Sykes*, 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977)).  While the Supreme Court has held that at a minimum, prejudice requires more than the *possibility* of prejudice, and that the error "worked to [the petitioner's] actual and substantial disadvantage," *United States v. Frady*,  456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982), the concept of harmful error applicable to habeas corpus proceedings may be equated with the term "prejudice" as used in the procedural default context.  *See* JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 26.3(c), at 1353 (5th ed. 2005).

**B.      Incompetence of State Habeas Counsel**

   **1.      The CCA's Failure to Appoint Competent Counsel and to Monitor Counsel Once Appointed Constitute an External, Objective Factor, Which Cannot Fairly Be Attributed to Mr. Young, Thus Excusing Mr. Young's Inability from Previously Presenting His Numerous Valid Claims**

931.   In *Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002), the court held that the statutory mandate of "competent counsel" concerned only "habeas counsel's qualifications, experience, and abilities at the time of his appointment," and not "the final product of representation." *Graves*, 70 S.W.3d at 114.  *Graves* thus established that an indigent death row prisoner was entitled, at a minimum, to competent counsel at the time of appointment. *Id.*

932.   Likewise, the Fifth Circuit has found that state habeas counsel's ineffective performance cannot constitute 'cause' for purposes of avoiding a procedural default, *see, eg., Blanton v. Quarterman,* 489 F. Supp. 2d 621, 655-56

(W. D. Tex. 2007),[63] but has yet to address whether the appointment of incompetent counsel, within the meaning of *Ex Parte Graves*, constitutes such cause, leaving the door open for future litigants. *See Ries v. Quarterman*, 522 F.3d 517, 526 n.5 (5th Cir. 2008).

933.    In *Reis*, a capital habeas petitioner argued that his state habeas counsel's *performance* was deficient, thus excusing his procedurally defaulted claim. However, acknowledging that deficient performance of habeas counsel was not a cognizable claim, the petitioner also argued that his right to competent state habeas counsel, under *Ex Parte Graves* and state statutory law, was violated and sought to establish cause on this basis. *Ries*, 522 F.3d at 526 n.5. In attempting to show his lawyers incompetence, Ries pointed to the state application filed by his habeas counsel. However, the Fifth Circuit expressly refused to reach the issue, finding that the applicant's

> claim of incompetence is based solely on the state habeas
> petition his counsel prepared, the final product of
> representation. Therefore, even assuming *arguendo* that
> *Graves* applied, an issue we expressly decline to reach,

---

[63] A sister district court, recognizing the inherent unfairness of such a situation, stated:

> Patently unfair though it may be, the reality facing a
> convicted Texas criminal defendant under current Fifth
> Circuit precedent is that either a negligent failure or a
> malicious refusal by that convicted defendant's state
> habeas counsel to present a potentially meritorious claim
> in the course of the defendant's state habeas corpus
> proceeding effectively precludes federal habeas review
> of that claim, unless the defendant can satisfy the
> fundamental miscarriage of justice exception to the
> federal procedural default doctrine.

*Blanton v. Quarterman*, 489 F. Supp. 2d at 655-56.

>       Ries has not satisfied the standard articulated in that
>
>       case.

*Id.* As will be discussed more fully below, this Court may reach the issue raised in *Ries* and *Graves* because Mr. Young, unlike Ries, makes the requisite showing that his counsel was incompetent at the time of appointment.

## 2.   Statutory Right to Representation by Competent Counsel

934.   Under State law, at a minimum, Mr. Young has a statutory right to representation by competent counsel.  Texas Code of Criminal Procedure, Art. 11.071, Section 2, in effect at the time in question, stated that:

> (a) An applicant shall be represented by competent
> counsel unless the applicant has elected to proceed *pro*
> *se* and the convicting trial court finds, after a hearing on
> the record, that the applicant's election is intelligent and
> voluntary.
>
> . . . .
>
> (c) At the earliest practical time . . . the convicting court
> shall appoint competent counsel, unless the applicant
> elects to proceed pro se or is represented by retained
> counsel.
>
> (d)  The court of criminal appeals shall adopt rules for
> the appointment of attorneys  as counsel under this
> section and the convicting court may appoint an attorney
> as counsel under this section only if the appointment is
> approved by the court of criminal appeals in any manner
> provided by those rules.

Act of June 18, 1999, Ch. 803, § 1, 1999 Tex. Sess. Law Serv. Ch. 803 (H.B. 1516 (effective Sept. 1, 1999 (codified as Tex.Code Crim. Proc. Ann. art. 11.071).

> 935.   Section 3 of the same article stated:
>
> > (a) On appointment, counsel shall investigate
> > expeditiously, before and after the appellate record is
> > filed in the court of criminal appeals, the factual and
> > legal grounds for the filing of an application for a writ of
> > habeas corpus.

*Id.*

936.   As the CCA has recognized, under Tex. Code Crim. Pro. Art. 11.071 § 2(a), habeas petitioners have a statutory right to representation by competent counsel. *Ex parte Graves*, 70 S.W.3d at 114. While recognizing that "a potted plant appointed as counsel is no better than no counsel at all," the CCA has interpreted the statutory right as limited to counsel competency at the time of appointment. *Id.* Without explanation, the CCA stated that the statute's reference to 'competent counsel' "concerns habeas counsel's qualifications, experience, and abilities at the time of his appointment. *Id., citing Ex parte Mines*, 26 S.W.3d 910, 912 (Tex. Crim. App. 2000). *Ex parte Mines* itself, however, does not explain how the court arrives at that limitation, nor what the CCA meant by qualifications, experience, and the abilities of such counsel.

937.   In 1999, the CCA adopted rules concerning the appointment of state habeas counsel under Article 11.701. (Ex. 37 [Texas Court of Criminal Appeals' Rules for the Appointment of Attorneys as Counsel Under Article 11.701, Sec. 2(d), V.A.C.C.P., ("1999 Rules")].) The 1999 Rules state nothing concerning counsel's 'competency,' let alone what makes a particular lawyer eligible for appointment. Under the 1999 Rules, the CCA was to maintain a list of those

attorneys eligible for appointment, and the convicting courts were instructed to appoint an attorney from the list maintained by the CCA. (*Id.* at ¶¶ 1 and 2.) The 1999 Rules further state that "[t]hose attorneys seeking to be added to the list of attorneys eligible for appointment . . . shall complete and submit an 'Application for Appointment as Counsel Pursuant to Art. 11.071, V.A.C.C.P.' from the Court of Criminal Appeals. (*Id.* at ¶ 4.)

938.   The process established by the CCA in 1999 is reminiscent of the procedure found lacking in *Mata v. Johnson*, 99 F.3d. 1261, 1266-67 (5th Cir. 1996), *vac'd in part on other grounds*, 105 F.3d 209 (5th Cir. 1997). In *Mata*, the court evaluated whether the State of Texas met the then expedited procedures under the AEDPA, conditioned on a state establishing rules of court or statutes providing standards of competency for the appointment of such counsel. *Id.* In finding that Texas was not eligible to take advantage of the provisions afforded to opt-in states under AEDPA, the court reasoned that the Texas mechanism for evaluating the qualifications of prospective counsel based on a questionnaire listing counsel's qualifications did not constitute "specific, mandatory standards for capital habeas counsel." *Id.* Although the CCA adopted rules for the appointment of counsel in 1999, as stated above, those rules do not specify what constitutes competent counsel, leaving the CCA's decision to appoint counsel to the same type of questionnaire as the court found inappropriate in *Mata*.

939.   Absent the CCA's expression of any guidelines to evaluate the competency of counsel at the time of appointment,[64] and given the CCA's cryptic

_____

[64]   In June, 2005, in apparent recognition of the inadequacy of the 1999 Rules, the Texas Legislature, once again, amended Art. 11.071, this time stating explicitly that the CCA "rules must require that an attorney appointed as lead counsel under this section not have been found by a federal or state court to have rendered ineffective assistance of counsel during the trial or appeal of any capital case." Act of June 17, 2005, Ch. 787, § 13, 2005 Tex. Sess. Law Serv. Ch. 787 (S.B. 60 (effective  Sept. 1, 2005) (codified as Tex. Code Crim. Proc. Ann. art.

definition of competency in terms of counsel's "qualifications, experience, and abilities" at the time of his appointment, *Ex parte Graves*, 70 S.W.3d at 114, it is difficult to evaluate whether competent counsel has been appointed by referring solely to the state scheme.  In the absence of guidelines from the CCA, and because the findings of *Graves* and *Mines* provide no basis for analyzing whether an attorney appointed by the CCA is competent,  there is nothing to which this Court can defer.  Thus, this Court may look to other persuasive sources.

940.   At the time of Mr. Young's state habeas proceedings, his attorneys' competency was governed by the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 2003 ("Guidelines") and the ABA Standards for Criminal Justice (3d Ed. 1993) ("Standards").[65]

941.   As the Commentary to the Guidelines state: "[h]abeas corpus and other procedures for seeking collateral relief are especially important in capital cases." (ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 1.1, comment. (rev. ed.2003), reprinted in 31 Hofstra L.Rev. 913, 932 (2003) (footnotes omitted).)   "Quality representation in both state and federal court is essential if erroneous convictions are to be corrected." (*Id.*)  The Guidelines recognized that while "[c]ounsel's obligations in state collateral review proceedings are demanding," the lack of standards for the

---

11.071).  Although the Legislature commanded that the CCA "shall amend rules adopted under Section 2(d), Article 11.071, Code of Criminal Procedure, as necessary to comply with that section, as amended by this Act, not later than January 1, 2006," the CCA missed the Legislature's deadline by over twelve months, adopting the new rules on December 11, 2006.  (Ex. 38 [2006 CCA Rules].)

[65]  In April of 2006, the Texas State Bar Board of Directors adopted a Texas specific version of the ABA Guidelines, known as The Guidelines and Standards for Texas Capital Counsel.  These guidelines offer specific guideposts regarding counsel's duties with respect to state post-conviction litigation.  (Texas Guideline 12.2.)

selection of counsel, such as the case in Texas, lead to "a disturbingly large number of instances in which attorneys have failed to provide their clients meaningful assistance."[66]

> As the Guidelines state:
>
> Unless legal representation at each stage of a capital case reflects current standards of practice, there is an unacceptable risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.  Accordingly, any jurisdiction wishing to impose a death sentence must at minimum provide representation that comports with these Guidelines.

31 Hofstra L.Rev. 913, 938 (internal citations omitted).

942.    Thus, the Guidelines call for the creation of a Responsible Agency, which "should develop and publish qualification standards for defense counsel in capital cases ."  Guideline 5.1 - Qualifications of Defense Counsel; 31  Hofstra L.Rev. 913, 961.  The standards "should be construed and applied in such a way as

---

[66]    The Guidelines state, in pertinent part,

> Moreover, even in those states that nominally do provide counsel for collateral review, chronic underfunding, lack of standards, and a dearth of qualified lawyers willing to accept appointment have resulted in a disturbingly large number of instances in which attorneys have failed to provide their clients meaningful assistance. (*See, e.g.,* TEX. DEFENDER SERV., A STATE OF DENIAL: TEXAS JUSTICE AND THE DEATH PENALTY, ch. 7 (2002), available at http://www.texasdefender.org/study/study.html (reporting that a review of 103 post-conviction petitions filed by court-appointed counsel in Texas death penalty cases between 1995 and 2000 indicated that 25 percent of the petitions were 15 pages long or less, and that counsel offered no evidence outside the trial record in 40 percent of the cases reviewed).)

(*Id.* at 932 n.47.)

to further the overriding goal of providing each client with high quality legal representation." *Id.* The commentary adds,

> As described in the Commentary to Guideline 1.1, the
> abilities that death penalty defense counsel must possess
> in order to provide high quality legal representation
> differ from those required in any other area of law.
> Accordingly, quantitative measures of experience are not
> a sufficient basis to determine an attorney's
> qualifications for the task. An attorney with substantial
> prior experience in the representation of death penalty
> cases, but whose past performance does not represent the
> level of proficiency or commitment necessary for the
> adequate representation of a client in a capital case,
> should not be placed on the appointment roster.

(*Id.* Guideline 5.1, comment; 31  Hofstra L.Rev. 913, 963-964, *citing* Stephen B. Bright, *Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer,* 103 YALE L.J. 1835, 1871 n.29 (1994) ("Standards for the appointment of counsel, which are defined in terms of number of years in practice and number of trials, do very little to improve the quality of representation since many of the worst lawyers are those who have long taken criminal appointments and would meet the qualifications.").)

943.  The Responsible Agency's duties do not stop at publishing proper standards and selecting qualified attorneys.  Under the Guidelines, the Responsible Agency must monitor the performance of all defense counsel, and remove from its rosters of attorneys who have been certified to accept appointments, attorneys where "there is evidence that an attorney has failed to provide high quality legal representation." (Guideline 7.1; 31  Hofstra  L. Rev. 913, 970-71.)  In addition,

308

the Guidelines also mandate the establishment of performance standards, which in turn, "should be utilized in determining the eligibility of counsel for appointment or reappointment to capital cases and when monitoring the performance of counsel." (Guideline 10.1 and commentary; 31 Hofstra L. Rev. 913, 989-92.)

944.   Among those performance standards that, in turn, should be relied upon when determining the eligibility of counsel for appointment, the Guidelines mandate that "[l]ead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with these Guidelines and professional standards. (Guideline 10.4; 31 Hofstra L. Rev. 913, 999.)[67]

945.   With the assistance of clear and enunciated guidelines, it becomes apparent that Mr. Young's state habeas counsel, Gary Taylor, was not competent at the time of his appointment.

### 3.   Relevant Facts

946.   Taylor's incompetence stems from his failure to adequately direct and supervise his primary investigator/mitigation specialist, Lisa Milstein, despite a long history, pre-dating Taylor's appointment as counsel for Mr. Young, that

---

[67] Guideline 5.03 of the Texas State Bar (Responsibilities Regarding Nonlawyer Assistants) has a similar provision:

> Lawyers generally employ assistants in their practice, including secretaries, *investigators*, law student interns, and paraprofessionals. Such assistants act for the lawyer in rendition of the lawyer's professional services. *A lawyer should give such assistants appropriate instruction and supervision* concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose information relating to representation of the client, *and should be responsible for their work product*. The measures employed in supervising non-lawyers should take account of the fact that they do not have legal training and are not subject to professional discipline.

(Italics added.)

Milstein was experiencing psychological problems, abusing drugs, and performing her job deficiently. Among other things, Milstein submitted affidavits that witnesses later renounced, to the detriment of her clients, including Mr. Young. Counsel's failure to supervise led Taylor to focus in Mr. Young's state habeas case, on a sexual molestation claim that could not be supported and was doomed to failure. The focus on that claim left insufficient time and resources to investigate and present meritorious claims that any competent counsel would have presented.

947. Even though Gary Taylor was not appointed to Mr. Young's case until 2003, the problems which arose concerning Milstein, which were or reasonably should have been known to Taylor, started years before.

### a.   Life Before Milstein Became a P.I.

948. Milstein was arrested in December of 1984 for theft and was given a probationary sentence. (Ex. 81 [Milstein Theft Record].) Before becoming an investigator, Milstein worked in various nightclubs throughout Houston as an exotic dancer. Records show that Milstein became a licensed private investigator in 1998. (Ex. 82 [Milstein Licensing File].)

### b.   The Practice Group

949. Lisa Milstein began her legal career in Houston at the capital resource center in the mid-1990s, where she was an intern. Also working with Milstein was investigator Gerald Bierbaum.[68] When the resource center lost its funding in September 1995, Bierbaum was hired by investigator Tena Francis, who worked in the Dallas area. Bierbaum moved into office space in Houston, Texas with attorney Michael Charlton. At some point, Milstein moved into the same office

---

[68] Bierbaum eventually passed the bar and became a lawyer licensed to practice in Texas in 2000. (Ex. 43 at 8 [Bierbaum Depo.].)

space. (Exs. 43 at 8-9, 27 [Gerald Bierbaum Deposition (Bierbaum Depo.) dated 3-17-06]; 105 at ¶¶ 3, 5 [Decl. of Tena Francis].)

950. Attorneys Gary Taylor and Alex Calhoun worked in the same office in Austin, Texas.[69]  (Exs. 43 at 27 [Bierbaum Depo.]; 42 at 7-8 [Gary Taylor Deposition (Taylor Depo.) dated 3-17-06]; 102  at ¶ 4 [Decl. of Alexander Calhoun].)

951. While everyone paid their own rent, and all were independent employees, Taylor, Charlton, Calhoun, Frances, Bierbaum, and Milstein worked together.  For example, if Taylor was appointed to a case, Milstein was hired as Taylor's investigator/mitigation specialist.  Milstein, in turn, often sought advice from Bierbaum, even if he was not working on that particular case.  Likewise, if Milstein was investigating a case for Charlton or Bierbaum, she turned to Taylor or Francis for guidance.  (Exs. 43 at 9, 26-27, 32 [Birebaum Depo.]; 42 at 7-8, 26 [Taylor Depo.]; 105 at ¶ 8 [Decl. of Francis].)  The attorneys, too, worked closely together, talking several times a day, and connecting through the internet and instant messaging.  (Ex. 42 at 9 [Taylor Depo.].)

952. Charlton, Bierbaum, and Milstein moved a number of times in the five or six years they shared office space together.  Their first office was located on Yoakum, the next office was located on Southwest Freeway, and the last office was at 1744 Norfolk.  The Norfolk location, a house, was owned by attorneys Herb Ritchie and Greg Glass.  (Ex. 42 at 26-27 [Bierbaum Depo.].)

### c.   Milstein's Early Career (1995-1997)

953. One of Milstein's first experiences as an investigator came in late 1995 or early 1996, before she was a licensed private investigator.  Charlton hired

---

[69]   Taylor remembers first working with Milstein and Bierbaum in 1997. (Ex. 42 at 7, 14 [Taylor Depo.].)

Milstein to conduct mitigation work on an upcoming capital trial. (Ex. 105 at ¶ 5 [Decl. of Francis].)

954.   In February 1996, Charlton was hired by international death penalty activist Barbara Bacci, a resident of Rome, Italy, to assist in the defense of Texas death row inmate, Dominique Green.  Taylor and Milstein were later brought onto the case by Charlton. (Ex. 99 at ¶¶ 1-3 [Decl. of Barbara Bacci].)

955.   In 1997, Taylor and Charlton sent Milstein to speak on their behalf at an anti-death penalty conference in Rome.  To Bacci, it was clear from Milstein's presentation at the conference that she knew little, if anything, about death penalty work. (Ex. 99 at ¶ 5 [Decl. of Bacci].)  Bacci later complained to Taylor about Milstein's lack of knowledge about the death penalty.  Taylor told Bacci that she was being too hard on Milstein.  (*Id.* at ¶ 6.)

956.   Knowing about the disappointment surrounding her presentation at the conference, Milstein told Bacci that she was going through a rough time in her personal life. (*Id.* at ¶ 7.)

957.   When Milstein returned to work on Green's case,  she engaged in behavior that Bacci considered to be inappropriate.  For example, Milstein sent Green letters on death row that smacked of a flirtatious nature. (*Id.* at ¶¶ 8-9.)

958.   Having serious doubts about Milstein's competence, on several occasions Bacci conveyed her concerns about Milstein's work on Green's case to both Taylor and Charlton via telephone calls. (*Id.* at ¶ 10.)  Bacci told both attorneys that Milstein was so easily upset that any attempts to focus her work would bring her to tears. (*Id.* at ¶ 11.)  Taylor never provided any response to Bacci's concerns. (*Id.* at ¶ 12 [Decl. of Bacci].)

### d.   Michael Rodriguez Case (2001)

959.   Had Taylor adequately directed and supervised Milstein, her problems would have been known to him as far back as 2001, during their work on

312

Michael Rodriguez's case.  Taylor was on notice of Milstein's deficient work at the time he was appointed to Mr. Young's case.

960.   In January 2001, Michael Rodriguez was arrested and charged with murder.  *See Rodriguez v. State*, 2006 WL 827833 (Tex. Crim. App. 2006).  Soon thereafter, Gary Taylor was appointed as Rodriguez's lead trial counsel.  (Ex. 118 at ¶ 2 [Declaration of Michael Rodriguez].)  Taylor selected Lisa Milstein as his investigator/mitigation specialist.  (*Id.* at ¶ 3.)

961.   Rodriguez met with Milstein throughout the spring and summer of 2001.  (Ex. 118 at ¶ 6 [Decl. of Rodriguez].)  At the punishment phase of Rodriguez's trial, Taylor presented evidence that Rodriguez, as a teenager, was molested by a Catholic clergy named Eugene Morgan.[70]  The molestation, according to the defense, caused Rodriguez to suffer psychological difficulties.  *Rodriguez*, 2006 WL 827833, at *14-15.  The claim of molestation, however, was false according to Rodriguez.  (Ex. 118 at ¶ 4 [Decl. of Rodriguez].)  He states that not only did Milstein know the molestation charge was false, it was Milstein who invented the fabrication.  He also states that Taylor never asked him about the molestation claim.  (*Id.* at ¶¶ 4-5.)

**e.   David Lynn Carpenter Case (2001-2006)**

962.   Milstein's problems also should have been evident to Taylor during their work together on David Lynn Carpenter's case.  Carpenter was convicted of capital murder in March, 1999.  On August 20, 2000, Carpenter filed an initial state application.  *See Ex Parte Carpenter*, 2007 WL 678622 (Tex. Crim. App. 2007).

---

[70] Morgan's true name was Eugene Fitzsimmons.  Morgan was the name given to the priest in order to hide his identity.  (Ex. 118 at ¶ 4 [Decl. of Rodriguez].)

963.   After the filing of the state Application, Taylor was retained by Carpenter to replace original state habeas counsel.  Taylor again used Lisa Milstein as his investigator.  In the Fall of 2001, Milstein conducted interviews with a number of witnesses in the Carpenter case, including Dana Chamberlin.  Milstein memorialized these interviews into affidavits, which Milstein notarized.  These affidavits were then submitted in support of Carpenter's amended state application.

964.   In August of 2002, attorney Bruce Anton was appointed as Carpenter's federal habeas counsel (*Carpenter v. Quarterman*, CV02-1145-B)).  Carpenter requested that Anton consult with state habeas attorney Taylor.  Taylor recommended that Anton use Milstein for the federal habeas case.  Anton agreed as Carpenter had requested that he use Milstein, and because Anton believed Milstein would already be up to speed on the case due to her work on the state Application with Taylor.  Anton had never before used, nor heard of, Milstein. (Ex. 98 at ¶¶ 2-4 [Decl. of Bruce Anton].)

965.   Although Anton assigned investigatory tasks to Milstein, she never completed Anton's requests and almost never responded to his telephone calls.  Anton finally gave up on Milstein and hired new investigators.  (Ex. 98 at ¶ 5 [Decl. of Anton].)

966.   In June 2004, after securing a stay in the federal court, Anton returned to state court to litigate an actual innocence claim which was supported by declarations Milstein had filed in conjunction with Taylor's amended state Application.  In June 2005, the state sent its own investigator to talk with at least two of the affiants.  At that time, it came to light that some of the affiants found major inaccuracies in the declarations typed up and notarized by Milstein, and that they had never seen Milstein's final affidavit.  In August 2006, Anton was forced

314

to file new affidavits in support of his pending state application, excising the false information supplied by Milstein.  (Ex. 98 at ¶¶ 6-8 [Decl. of Anton].)

### f.    Milstein's Polunksy Incident (2003)

967.   In early 2003, Texas attorney Morris Moon was visiting death row clients at the Polunsky Unit in Livingston, Texas.  While there, Moon had a conversation with a female prison guard named Williams about a private investigator named Lisa Milstein.  (Ex. 115 at ¶ 2 [Decl. of Morris Moon].)

968.   As Moon was purchasing food for one of his clients, Williams asked him if he knew Milstein, and, if so, what he thought of her.  Moon asked the guard why she was inquiring about Milstein.  Williams told Moon that Milstein had recently visited the prison and her behavior had been quite bizarre.  (*Id.* at ¶¶ 3-4 [Decl. of Moon].)

969.   Williams told Moon the following story.  Milstein had finished visiting one client at Polunsky and, while waiting to meet the next client, asked permission to go out to the parking lot to her car.  To Williams, Milstein appeared to be very agitated.  When Williams told Milstein that she could not go to her car, Milstein "flipped out."  Milstein continued to press for permission to go to her car and grew more agitated and angry when she was refused.  (Id. at ¶¶ 4-5 [Decl. of Moon].)

970.   Williams told Moon that it seemed, based on Milstein's physical demeanor and emotional reaction, that Milstein wanted to go to her car because she was using drugs and needed a fix.  (*Id.* at ¶ 6 [Decl. of Moon].)

971.   Moon recalled this incident some time later when he heard that Milstein was alleged to have used drugs with a witness in Mr. Young's state habeas case.  (*Id.* at ¶ 7 [Decl. of Moon].)

972.   Moon was shocked by Milstein's alleged conduct in Mr. Young's case, but not completely surprised because, like others in the Texas death penalty

315

community, he had previously heard comments that Milstein had a drug problem.
(*Id.* at ¶¶ 7-8 [Decl. of Moon].)

### g. Taylor Appointed as Mr. Young's State Habeas Counsel (April 2003)

973.   Taylor's practice of failing to adequately supervise investigators
continued when he was appointed to Mr. Young's case, and beyond.
Unfortunately, the cases mentioned above were not isolated incidences, and the
failure to supervise Milstein continued after Taylor's appointment as Mr. Young's
counsel.

974.   On April 16, 2003, Judge Hyde appointed Taylor to represent Mr.
Young for purposes of the state Application. (Ex. 27 [Appt. Taylor].)  On April
29, 2003, Taylor requested from Judge Hyde the prepayment of investigative
expenses for Lisa Milstein, "[c]ounsel's primary investigator," representing to the
court that Milstein was capable of undertaking the required investigation in a
death penalty case. (Ex. 40 [Taylor Request for Funding 2003].)  On May 6, 2003,
the CCA officially appointed Taylor as Mr. Young's habeas counsel. (Ex. 28
[CCA Appointment].)

### h. Walter Sorto Case (2003)

975.   Milstein's problems surfaced with other legal teams as well as it did
in the capital murder case of Walter A. Sorto.  Sorto was charged with the May 31,
2002, capital murders of Maria Rangel and Roxana Capulin. *Sorto v. State*, 173
S.W.3d 469, 471 (Tex. Crim. App. 2005).  Sorto was a citizen of El Salvador. *Id.*
at 477.

976.   Sorto's state legal team consisted of attorneys Alvin Nunnery, Cruz
Cervantes, and Gerald McCann, and investigator Milstein.  Criminal defense
attorney Nicholas Trenticosta, and his wife, attorney/mitigation specialist Susana
Herrero, in cooperation with the El Salvadorian Capital Assistance Project, were

hired by the El Salvadorian Government to monitor and assist Sorto in his mitigation defense. (Exs. 124 at ¶¶ 1-2 [Decl. of Nicholas Trenticosta]; 108 at ¶¶ 1-2 [Decl. of Susana Herrero].)

977.   Trenticosta and Milstein spoke by telephone before their September, 2003 trip to El Salvador.  From his first conversation with Milstein, it was apparent to Trenticosta that the Sorto defense case was heading for a "train wreck."  After talking to Milstein about the development of the mitigation case on Sorto's behalf, it appeared to Trenticosta that Milstein was throughly unprepared to help develop mitigation in this case due to her lack of knowledge of the case. (Ex. 124 at ¶¶ 3-4 [Decl. of Trenticosta].)

978.   Trenticosta conveyed his concerns about Milstein to attorney Gerald Bierbaum, an associate of Milstein's.  During several telephone calls with Bierbaum, Trenticosta told him that Milstein did not understand mitigation defense in general, and that in particular, Milstein seemed unqualified for the type of investigation she would be expected to conduct in El Salvador.  (Ex. 124 at ¶¶ 5-6 [Decl. of Trenticosta].)  Bierbaum was closed mouth about Milstein and never responded to any of Trenticosta's stated concerns about Milstein's abilities.  (*Id.* at ¶ 7.)

979.   The Trenticostas and Milstein arrived in El Salvador on September 3, 2003.  The first face to face meeting with Trenticosta and Milstein got off to a bad start.  Milstein disregarded Trenticosta's suggestions for investigation questions specific to El Salvador even though Milstein was unfamiliar with the culture and language of the country.  (Ex. 124 at ¶ 8 [Decl. of Trenticosta].).  Because of the friction between Trenticosta and Milstein, Herrero stepped in to coordinate the work with Milstein.  (*Id.* at ¶ 9.)

980.   Herrero met Milstein for the first time in the lobby of the hotel where they were all staying.  During their first meeting, Herrero encouraged Milstein to

allow Herrero to accompany her the following day to meet the Sorto family.
Milstein had hired two interpreters-photographers for the trip.  During the
meeting, Milstein told Herrero that she did not speak Spanish, had never met the
client, and that she had accepted the case at the last minute because she was
friends with the trial attorney.  (Ex. 108 at ¶¶ 4-5 [Decl. of Herrero].)  During the
meeting, Milstein became visibly upset because pigs had run through the Sorto
shack that day and had gotten her shoes dirty.  Milstein cried as she showed
Herrero her dirty sneakers.  (Ex. 108 at ¶ 5 [Decl. of Herrero].)

981.   The following morning, Herrero accompanied Milstein to interview
Sorto's relatives and neighbors, including his mother.   The two
interpreters/photographers rode in the front, and Milstein and Herrero sat in the
back.  During the three-hour drive, Milstein told Herrero she was going through a
rough time and that she was taking psychotropic medications for anxiety and
depression.  To Herrero, Milstein was clearly in a personal crisis.  (Ex. 108 at ¶¶ 6-
7 [Decl. of Herrero].)

982.   As Milstein spoke about her minimal time and experience on the
Sorto case, combined with her personal problems, it became obvious to Herrero
that Milstein should not have been working at that time on any case as complex
and significant as a death penalty case.  Trenticosta felt the same way as his wife.
(Exs. 108 at ¶ 8 [Decl of Herrero]; 124 at ¶ 10 [Decl. of Trenticosta].)

### I.   Vaughn Ross Case (2003-2004)

983.   Milstein's problems surfaced again during Taylor's representation of
death row inmate Vaughn Ross.

984.   In September, 2002, Vaughn Ross was convicted of capital murder
*See Ross v. State*, 133 S.W.3d 618 (Tex. Crim. App. 2004).  In February of 2003,
Taylor was appointed to represent Ross on Ross's state habeas petition.  (Exs. 85
[CCA Appointment for Ross];  122 at ¶ 2 [Decl. of Vaughn Ross].)  In turn, as he

had done in numerous cases before, Taylor selected Milstein as his investigator/mitigation specialist. (Ex. 122 at ¶ 3.)

985.   Milstein first visited Ross in prison in April, early 2003.  It was during that visit that Ross spoke with Milstein about areas of investigation he wished conducted. (Ex. 122 at ¶ 4 [Decl. of Ross].)

986.   Later in 2003, Milstein went to St. Louis and interviewed members of Ross's family, Ross's former girlfriend, and Ross's friends.  Ross's younger sister, Michelle Ross, was one of those family members interviewed by Milstein. (Ex. 120 at ¶ 3 [Decl. of Michelle Ross].)  To Michelle, Milstein appeared to be under the influence of cocaine as Milstein's eyes were red, she was sniffling, she appeared jittery, and she was not focused in her questioning.  Michelle had seen people on cocaine, and Milstein exhibited the same physical symptoms and characteristics of someone on cocaine. (Ex. 120 at ¶ 4.)  In addition, Michelle did not think Milstein was listening to the answers given during the interview. Michelle felt that Milstein was only interested in turning Michelle's comments into negative statements about Vaughn and the family. (Ex. 120 at ¶ 5.)

987.   Milstein also interviewed Ross's older sister, Valeria Martin. Throughout that interview, Milstein seemed "jumpy" and "jittery" in her movements.  Valeria thought Milstein's skin looked pasty, and noticed that Milstein's appearance was "scraggly and unpresentable." (Ex. 113 at ¶¶ 3-4 [Decl. of Valeria Martin].)  According to Valeria, Milstein spent the first half of the interview talking about her own personal life including the fact she was a recovering alcoholic who was going through periods of depression for hich she was seeking medical help.  Milstein also talked to Valeria about being estranged from her mother. (*Id*. at ¶ 5.)

988.   Valeria did not understand why Milstein was talking about these personal things as they were out of context to the interview.  During the second

half of the interview, Milstein focused on the Ross family.  Milstein repeatedly asked Valeria if Ross had been abusive to women.  When Valeria told Milstein that she did not know of any such behavior, Milstein persisted in the questioning as if Valeria was hiding something.  (Ex. 113 at ¶¶ 6-7 [Decl. of Valeria Martin].)

989.   Milstein also interviewed Tiffany Ross.  Tiffany was Ross's middle sister.  Tiffany only met with Milstein for approximately forty minutes because she felt Milstein wanted her to say things about Ross which were untrue, like that Ross was violent with former girlfriends.  (Ex. 121 at ¶¶ 2-3 [Decl. of Tiffany Ross].)  To Tiffany, Milstein seemed very anxious during the interview:

> Her behavior did not sit right me.  I can normally tell
> from a person's eyes how genuine they are.  There was
> something shifty about her that I did not trust.  I knew
> something was not right about her.

(*Id.* at ¶ 4.)

990.   Milstein made two appointments to interview Ross's mother, Johnnie, but Milstein cancelled both appointments.  Johnnie called Taylor at least five or six times and left voicemail messages.  In the messages, Johnnie notified Taylor that she wanted to talk about Vaughn's case and the fact that Milstein had cancelled the appointments.  Taylor never returned Johnnie's calls.  (Ex. 119 at ¶¶ 2-4 [Decl. of Johnnie Ross].)

991.   Milstein also interviewed Marcia Green, Ross's former girlfriend.  In 2003, Milstein came to St. Louis and asked to interview Green about Ross.  Green was prepared to tell Milstein that she, Green, had never seen a bad side to Ross and that she and Ross had never fought during their relationship.  (Ex. 106 at ¶ 2 [Decl. of Marcia Green].)

992.   During the interview, Milstein asked Green the same questions in different ways, trying to get Green to provide answers that would make it appear

that Ross and Green argued a lot, saying things like, "Come on, you can do better than that." (Ex. 106 at ¶ 4 [Decl. of Green].)

993.   Milstein then asked Green questions like:  if she had ever been stalked by Ross; if Ross had ever come to Green's place of work; if Ross ever appeared jealous; had Ross been controlling; and, whether Ross had ever become physically abusive to Green.  (Ex. 106 at ¶ 5 [Decl. of Green].)

994.   Green responded that during the two years she and Ross dated, Green had never found him to be any of those things.  Green remembered telling Milstein something to the effect that she did not recognize the man Milstein was attempting to describe.  (Ex. 106 at ¶ 6 [Decl. of Green].)

995.   Milstein then asked Green to close her eyes and imagine the following scenario:

> Green was coming home to an empty house and was
> suddenly surprised by a man who had a knife.  The man
> held Green tight and began cutting at her face and
> breasts so viciously that the man almost cut off Green's
> nipple.  Green was terrified as she listened to the story.
> Milstein told Green to open her eyes and then said, "That
> woman could have been you."

(Ex. 106 at ¶¶ 7-8 [Decl. of Green].)

996.   Milstein told Green that Ross had attacked a former girlfriend in the just the way she had just described.  Milstein again pressed Green to say negative things about her relationship with Ross.  (Ex. 116 at ¶ 9 [Decl. of Green].)

997.   Green was really uncomfortable at that point and ended the interview. Green thought that Milstein was "off her rocker" as her questions appeared more likely to hurt Vaughn's case than to help.  (Ex.116 at ¶¶ 10-11 [Decl. of Green].)

998.   Ross's state application was filed in March, 2004.

999.   At some point after the filing, Taylor sent Ross the state application, and, among other things, an affidavit Milstein signed and notarized.  That affidavit summarized interviews Milstein had conducted in St. Louis.  After speaking to some of the people interviewed and included in Milstein's affidavit, Ross concluded that the contents of Milstein's summary was exaggerated and/or witnesses were wrongly quoted.  (Ex. 122 at ¶ 5 [Decl. of Vaughn Ross].)

1000.  Ross expressed those concerns to Taylor in a letter dated September 1, 2004.  (*Id.* at ¶ 5.)  In that letter, Ross discussed with Taylor Milstein's affidavit:

> It has come to my knowledge that [Milstein] misquoted
> and or exaggerated the things that were told to her during
> the few interviews that she did do, which you submitted
> a summary of in the state writ of habeas corpus that I had
> no idea was filed for me.  The various people I spoke
> with said [Milstein] was more interested in any negative
> feedback about me that they could provide against me.

(Ex. 78 at 874-75 [Letter dated 9-1-04].)

1001.  Milstein again visited Ross on October 19, 2004.  Before that visit, Milstein had cancelled two prior scheduled visits.  (Ex. 122 at ¶ 6 [Decl. of Ross].)  At that October visit, Ross thought Milstein displayed signs of being under the influence of drugs.  For example, Milstein could not keep her train of thought, and was jumping from one subject to another.  She also could not stay focused on what she was discussing with Ross.  (*Id.* at ¶ 7.)

1002.  Ross also noted that Ms. Milstein's eyes were dilated.  Milstein tried to hide her eyes from Ross during the interview.  Ross also noticed that Milstein's complexion was very pale, and she had a sore on her face that looked as if she had

been picking and scratching at. During the interview, Milstein constantly scratched herself as if she was itching uncontrollably. Milstein also fell asleep in the middle of her sentences. Further, Milstein was dressed in multi-layers of clothing, even though the outside temperature was quite warm. (Ex. 122 at ¶¶ 7-8 [Decl. of Ross].)

1003. When Ross questioned Milstein about the interviews she had conducted in St. Louis, she told Ross facts that he believed to be untrue. For example, Milstein told Ross that she had spoken with a Liza McVade at Liza's grandmother's house. However, Ross knew that Liza was in prison. When Ross confronted Milstein with this and other inconsistencies in her reports, she became very loud and made a scene in the prison visitation room. (Ex. 122 at ¶ 9 [Decl. of Ross].)

1004. Officer Williams, who was monitoring the visitation room at the time, attempted to calm Milstein. When that did not work, Ross asked for the visit to be cancelled. (Ex. 122 at ¶ 10 [Decl. of Ross].) Officer Vaness, who escorted Ross out of the visitation room, remarked to Ross that Milstein appeared to be under the influence of drugs. (*Id.* at ¶ 10.)

1005. On October 26, 2004, Ross wrote Taylor a letter, narrating the events that had transpired during Ms. Milstein's visit. In that letter, Ross discussed Milstein's apparent drug induced state and strange behavior, and expressed concern about Ms. Milstein's performance in this case. (Exs. 78 [Letter dated 10-26-04]; 122 at ¶ 11 [Decl. of Ross].)

1006. Apparently in response to Ross's letter outlining Milstein's drug problems and bizarre behavior, on November 13, 2004, Taylor filed in Mr. Young's case an under seal letter to Judge Hyde. In that letter, Taylor stated, in relevant part:

> I originally informed the Court that Ms. Lisa Milstein
> will be my primary investigator.  However, *due to*
> *personal issues which have arisen for Ms. Milstein*, I
> may be required to use different investigators for
> different parts of the investigation.

(Ex. 80 [Letter- Order re Milstein], emphasis added.)[71]

1007. Taylor replied to Ross on December 9, 2004.  Taylor acknowledged receiving Ross's letter and having talked to Milstein about Ross's concerns. Taylor suggested that Ross and Milstein again meet.  Ross never heard from Ms. Milstein. (Exs. 77 [Taylor to Ross Letter]; 122 at ¶ 12 [Decl. of Ross].)

1008. The affidavit that Milstein signed and notarized, which allegedly memorialized the interviews Milstein conducted in St. Louis, contained numerous factual errors.  (*See* Exs. 121 at ¶ 5 [Decl. of Tiffany Ross]; 120 at ¶ 7 [Decl. of Michelle Ross]; 113 at ¶ 9 [Decl. of Valeria Martin].)

### j.    Alfred Bourgeois Case (Fall 2004 - Winter 2005)

1009. Bierbaum noticed Milstein's problems as early as 2004.  Bierbaum and Milstein were appointed to work as mitigation specialists on the federal capital habeas trial of *United States v. Alfred Bourgeois* (CR02-00216).  Bierbaum and Milstein were assigned to interview more than thirty witnesses in the case. According to Bierbaum, Milstein never completed any of her witness interviews in the case, leaving all the work to Bierbaum.  (Ex. 43 at 11-12, 25 [Bierbaum Depo.].)

---

[71] On November 24, 2004, Judge Hyde approved the amount requested for investigative expenses.  (Ex. 80[Letter- Order re Milstein].)  The Order stated that "[a]fter reviewing the request which came to the Court by letter from applicant's post-conviction counsel[,] the Court is of the opinion that the motion should be granted." ( *Id.*)   The court did not mention Taylor's request from April 29, 2003, nor does the record reflect the court took any action based on such request prior to November 24, 2004.

### k.   The Practice Group Talks About Milstein's Problems

1010. According to his state habeas deposition, Taylor did not became aware that Milstein had "problems" until late 2004. Taylor thought Milstein's "problems" stemmed from her brother being in the hospital and Milstein suffering from neurological issues. (Ex. 42 at 8-9, 11 [Taylor Depo.].) Taylor admitted that he tried to limit his contact with Milstein because she "would drive you crazy with phone calls and stuff like that." (*Id.* at 11.)[72] Taylor scaled back on the work he gave to Milstein. However, Taylor "pushed" Milstein to complete the work he had already given her. (*Id.* at 9-10.)

1011. At some point, Taylor, Charlton, Bierbaum, and Francis had a telephone conference with Milstein about the fact she was not getting her work done. Taylor believed the group asked Milstein whether she was on drugs. Milstein denied she was on drugs. According to Taylor, he had no other evidence at that time to substantiate Milstein's drug use. (Ex. 42 at 21-22, 34 [Taylor Depo.].)

1012. In late 2004, while working on a case, Francis stayed at Milstein's apartment in Houston. Francis felt that something was amiss with Milstein during this visit. On the night Francis stayed over, Milstein stayed up all night. Francis did not know what was going on with Milstein, and did not ask. (Ex. 105 at ¶ 11 [Decl. of Francis].)

1013. A few weeks later, Francis returned to Houston and again stayed with Milstein. It was during this stay that Milstein told Francis that she had become addicted to crack cocaine. Milstein acknowledged that she had a real problem with the drug and that she needed treatment. (Ex. 105 at ¶ 12 [Decl. of Francis].)

---

[72] Milstein's friend, Tena Francis, described Milstein as having a life full of drama. According to Francis, Milstein always had her share of problems, whether it was with boyfriends or family members. (Ex. 105 at ¶ 7 [Decl. of Francis].)

1014. A short time later, Milstein checked herself into a short-term treatment facility in Houston. Milstein was encouraged to find a longer-term treatment facility due to the nature of her drug addiction. (*Id.* at ¶ 13.)

1015. By this time, however, Milstein was already working on Mr. Young's case. (*Id.* at ¶ 14.) In December of 2004, because of Milstein's problems, Taylor asked Francis to assist him in completing the Young investigation. (Ex. 42 at 12-13 [Taylor Depo.].)

1016. Around this same time, Milstein told Taylor that she was going to a psychologist. She might have also told Taylor she had been diagnosed with a tumor. When it came to Milstein's "personal stuff, [Taylor] tried [his] best to not be involved." Taylor testified he was only concerned with Milstein as it related to his cases. (Ex. 42 at 13-14 [Taylor Depo.].) However, by ignoring Milstein's personal problems, Taylor turned a blind eye to Milstein's inability to perform her investigatory work.

### l.    Taylor Puts the Court on Further Notice Regarding Milstein's Problems

1017. On January 5, 2005, Taylor asked the state court for additional time to file Mr. Young's petition. Among the reasons given by Taylor was that Milstein had reported her brother was hospitalized in serious condition in Houston, which was requiring "a great deal of her attention." The court granted the request, giving Taylor until April 21, 2005 in which to file the state Application. (Ex. 39 [Request Extension - Order '05].)

### m.    Milstein Loses Her Office Space (2005)

1018. In February, 2005, Milstein stopped paying rent for the office space she shared on Norfolk. Milstein also did not pay her rent for March, 2005. On March 31, 2005, attorney Herb Ritchie, one of the owners of the Norfolk property, gave Milstein her lease termination notice. Richie told Milstein that the locks to

the building had been changed and that she could only enter the house during normal business hours.  (Ex. 83 [Eviction Letter].)  When Milstein received notice of the lease termination, she told building management that Charlton and Bierbaum had promised to pay her rent.  (Ex. 84 [Relleboso Statement].)  Milstein stated she would come in and remove her belongings.  Milstein also stated that she was moving out of her apartment.  (*Id.*)

    1019. Bierbaum knew that Milstein was removed from her office space for not paying her rent and telephone bill.  (Ex. 43 at 10, 31 [Bierbaum Depo.].)  According to Bierbaum, Milstein had complained about "neurological problems" concerning "seizures and stuff" and that she was not going to work anymore.  (*Id.* at 10, 20.)  According to Bierbaum, Milstein stopped paying her rent because she was not working on cases and thus, not receiving work assignments:

> we'd get a case -- get appointed to a case.  And we'd go
> through the records and say go interview those people,
> and it just wouldn't happen.  I mean, three months later it
> still wouldn't happen.  And so at some point, you know,
> we decided enough was enough and we weren't going to
> work with her anymore.  And in that process, she
> stopped paying rent as well . . . .

(Ex.43 at 10 [Bierbaum Depo.].)  Bierbaum also knew that Milstein had a cocaine problem.  (Ex. 102 at ¶ 6 [Decl. of Calhoun].)

### n.    Rafael Holiday Case (April 2005)

    1020. Attorney Calhoun, who shared office space with Taylor in Austin, was appointed to the state habeas case of Rafael Holiday.  As they had in the past, Calhoun consulted with Bierbaum.  In the Spring of 2005, Bierbaum told Calhoun that Milstein had a cocaine problem.  (Ex. 102 at ¶ 5 [Decl. of Calhoun].)  It was Calhoun's understanding that Milstein had been in a drug rehabilitation program

and was getting back on her feet. (Ex. 102 at ¶ 6.)  Calhoun assigned Milstein a few juror interviews to see if she was able to work on the case.  Milstein never completed this task nor did she timely advise Calhoun of her inability to do the investigation and permit him to make alternative arrangements. (Exs. 102 at 7 [Decl. of Calhoun]; 43 at 19-20 [Bierbaum Depo.].)  Calhoun confronted Milstein about this failure.  Milstein became tearful and apologized.  As a consequence of Milstein's failure, Calhoun did not want to use any affidavits Milstein had obtained in her other cases.  Calhoun and Bierbaum stopped recommending Milstein as a habeas investigator by April, 2005.  (Exs. 43 at 19-20 [Bierbaum Depo.]; 102 at ¶ 9 [Decl. of Calhoun].)

### o.   Mr. Young's Case

1021. During this same time period (April of 2005), while Milstein was working on Mr. Young's state Application, Francis and Milstein had frequent telephone conversations.  On one occasion, Milstein asked Francis for money. Francis did not give her money directly for fear Milstein would use it to purchase drugs.  Francis did put gasoline into Milstein's car before Milstein left for East Texas to interview Young witnesses.  (Ex. 105 at ¶ 15 [Decl. of Francis].)

1022. In East Texas, Milstein interviewed, among others, Dano and Dino Young, Patricia McCoy, Christy Jetton, Crystal Deshotel, and Dylan Keen. Milstein collected affidavits from witnesses and notarized them during April, 2005.[73]  (Exs. 45, 46, 48 [Affidavits of Young, Deshotel and McCoy])[74]

---

[73] Although funding for Milstein was requested by Taylor in April 2003, Milstein apparently did not do any substantial work on this case until April of 2005, days before the actual state application was filed.

[74] In general, after Milstein drafted an affidavit, she electronically sent it to Taylor.  Taylor and Milstein rarely met in person.  (Ex. 42 at 15-16 [Taylor Depo.].)

1023.  That month, while Milstein was in East Texas conducting witness interviews in Mr. Young's case, Milstein telephoned Nancy Piette, another investigator that Taylor was using on Young's case.  Milstein told Piette that she was lost and had forgotten all her psychiatric medication in Houston.  Milstein sounded like she was "losing it."  Piette called Gary Taylor and left him a voice mail message that Milstein was having a nervous breakdown.  After the telephone message, Piette never talked to Taylor again, only Bierbaum.  (Ex. 116 at ¶¶ 10-13 [Decl. of Nancy Piette].)

### p.    The Practice Group Breaks Apart

1024.  In early 2002, Charlton left Houston and moved to New Mexico, but still maintained his presence in the practice group.  (Ex. 43 at 16 [Bierbaum Depo.].)  In July of 2005, Taylor quit his Texas practice and moved to Las Vegas, accepting employment at the Federal Public Defender's Office.  (Ex. 42 at 5, 16 [Taylor Depo.].)  Bierbaum followed Taylor to Las Vegas in July, 2005.  (Ex. 43 at 18, 30 [Bierbaum Depo.].)  Francis joined Taylor and Bierbaum in September 2005.  (Ex. 105 at ¶ 16 [Decl. of Francis].)  Charlton joined Taylor, Bierbaum, and Francis in Las Vegas in July 2006.

### q.    Milstein Enters Drug Rehab

1025. Sometime after September 2005, Milstein entered a long-term drug treatment facility in Southern California, and was there for several months.  (Ex. 105 at ¶ 16 [Decl. of Francis].)  In June, 2006, Milstein checked herself into Awakenings, a substance abuse recovery facility for woman located in Boca Raton, Florida.  She was a resident there from June 2006 to November 2006.  On November 4, 2006, Milstein was asked to leave the program for abusing her medication.  (Exs. 103 [Decl. of Christine De Camille]; 105 at ¶ 17 [Decl. of Francis].)

### r.   Mr. Young's Hearing

1026. The main issue raised by Taylor in Mr. Young's state Application was the failure of defense counsel to investigate and present evidence that Mr. Young had been sexually abused by his father.[75]  This was also the main issue to be litigated at Mr. Young's state hearing.  The evidence to support this claim was collected solely by Milstein.  When this evidence was presented at the hearing, it fell like a house of cards.

1027. By the time the actual hearing started, Taylor had withdrawn from the case and Ori White, a former District Attorney of Upton and Reagan Counties, had taken over the representation of Mr. Young.[76]

1028. The first indication of inaccuracies at the hearing came during the testimony of Amber Lynch Harrison, Mr. Young's former girlfriend.  Harrison testified that she had talked with Taylor and Milstein.  (2 RWR at 176-77.)  At some point, "a lady" had faxed her a declaration to sign.  Harrison could not read the fax but signed it and sent it back.  (2 RWR at 177-80.)

1029. When White began to go over the declaration with Harrison, it became obvious that some of the contents of the document were inaccurate.  (2 RWR at 180-92.)  In all, over half of the statements in the declaration were inaccurate, according to Harrison.  While some of the inconsistencies were small (Harrison's father did not approve of her relationship with Young), others were more pronounced like whether Mr. Young would present a future danger to society, whether Young was always protective of Harrison, whether Harrison

---

[75]  Neither Taylor nor Milstein discussed the molestation claim with either of Mr. Young's trial counsel.  (2 RWR at 201-02).

[76]  While the District Attorney of Upton and Reagan Counties, White had personally opposed defense counsel's issuance of a subpoena seeking records regarding how the death penalty was charged in particular cases in Midland County.

recalled hearing rumors that Douglas was a police informant, what type of clothing
Mr. Young was wearing when she saw him in Midland, and whether the District
Attorney was not interested in hearing anything good about Mr. Young.  (2 RWR
at 182-93.)

1030. The problems with Milstein's investigation became more pronounced
during the testimony of Dano Young, Mr. Young's older brother.  Dano's
affidavit, notarized by Milstein, dated April, 2005, contained the following
information pertinent to Mr. Young's molestation claim:  when Dano and his
siblings were younger, they all slept in the same room; Dano and Mr. Young's
father, Bill Young, came into that room on many occasions and touched Dano's
penis; this started happening when Dano was four years old; and when Dano cried,
his father made him "hush."  (Ex. 45 [April 2005 Affidavit of Dano Young].)

1031. However, at the state hearing, Dano vehemently disavowed the
molestation allegation (3 RWR at 130, 149-50; 4 RWR at 115, 126) and testified,
in pertinent part, as follows:  Dano drove around for two days smoking crack
cocaine and drinking beer with Milstein; Dano was high when he signed the
affidavit; he signed the affidavit so Milstein would continue to buy drugs for him;
Milstein tried to get Dano to sleep with her at her hotel room; Milstein drove Dano
to a crack house and purchased drugs for Dano's use; Dano smoked about $400 of
crack with Milstein; Milstein told Dano not to tell anyone about the crack cocaine
because she could lose her investigator's license; and Dano lied in his affidavit
about being molested by his father so that Dano would continue to get cocaine
from Milstein. (3 RWR at 125-43, 148-53, 164; 5 RWR at 118-33.)

1032. Dano also testified that Milstein started crying at some point during
the interview saying that she felt Mr. Young had been molested but no one would
tell her who was the molester.  Dano, at first, denied that their father was the
molester.  Milstein then brought up the *idea* that Dano and/or his siblings were

331

sexually abused by Bill Young. Dano eventually agreed to say that Dano himself was molested because Milstein had gotten him high and he wanted to continue to get more crack cocaine from Milstein. Milstein assured Dano that he would not get into trouble for saying he was molested by his father. (3 RWR 148-49, 153-55; 5 RWR at 125-26.) At one point, while Dano was smoking crack cocaine, Milstein put Dano on the telephone with someone Milstein said was a lawyer.[77] (3 RWR at 138.)

1033. Dano also testified that the first time Milstein interviewed him, she picked him up at their home around midnight, and did not return him home until around 3 a.m. Dano also described Milstein buying beer at a convenience store and then driving to Daingerfield, Texas to purchase crack cocaine. (5 RWR at 118-21.) Dano also described smoking crack cocaine with Milstein in her hotel room. (5 RWR at 132-33.)

1034. Dano also testified about Milstein interviewing his four-year-old stepson, Dylan Keen. According to Dano, Milstein interviewed Dylan out of the presence of Dano and Crystal Deshotel, Dano's wife and Dylan's mother. Milstein got Dylan to say untrue things about being molested by Bill Young.[78] (3 RWR at 126, 143, 159.) Based upon Milstein's interview with Dylan, Crystal and Dano took Dylan to the Child Advocacy Center in Winnsboro, Texas. Dylan was evaluated at the Center for about three hours. Following the evaluation, Dano and

---

[77] Dano testified at the state habeas hearing that he remembered speaking to someone on the telephone, but was so "high," he was not certain who it was, although it could have been Taylor. (3 RWR at 138; 5 RWR at 130-31.) At some point, Milstein put Dano on speaker phone with the person on the other end of the call. While on speaker phone, Milstein would ask Dano "yes" or "no" questions, and Dano would respond for the person on the other end of the call. During the phone call, Milstein did not ask Dano all the information which was the subject of his later affidavit. (5 RWR at 130-31.) Taylor testified that he was not certain he spoke to Dano Young on the telephone. (Ex. 42 at 17-20, 27-28 [Taylor Depo.].)

[78] The general import of Dylan's statement was that Bill Young anally abused him. (3 RWR at 159.)

Crystal were told that it did not appear that anybody had molested their son.  (3 RWR at 126, 142-43, 164-65; 4 RWR at 137-38.)  When Dano asked Dylan if he had been molested by Bill Young, Dylan responded, "No."  When Crystal asked Dylan why he had said he was molested, Dylan replied,  "That lady told me to."  (3 RWR at 143.)[79]

1035.  Crystal Deshotel later confirmed Dano's testimony regarding Milstein.  Before the hearing, Crystal had supplied an affidavit for Milstein, this one dated April 20, 2005.  (*See* Ex. 46 [Affidavit of Deshotel].)  The affidavit stated, in relevant part, the following:  for a short time, Dano, Crystal, and Dylan lived with Bill Young in Beaumont, Texas; while living there, Dylan came inside the house, after being outside with Bill Young, and stated that his "butt hole hurt;" Crystal checked her son but never found anything unusual; after Dano told Milstein that Bill Young had molested him as a child, Crystal gave Milstein permission to interview Dylan; on the recording, Dylan told Milstein that Bill undressed him, made him spread his butt cheeks and stuck a tree branch in his butt, and afterwards, Bill glued Dylan's butt back together.  (Ex. 47 [Affidavit of Milstein].)

1036.  At the state hearing, Crystal denied the contents of the affidavit drafted by Milstein.  To that end, Crystal denied that Dylan had ever told her his butt hurt after coming from being outside with Bill Young.  Crystal also denied that she had ever checked Dylan for sexual abuse as she never had cause to believe

---

[79]  Dino Young was also visited by Milstein and questioned about being molested by Bill Young.  Dino denied being molested by his father and never supplied a statement to Milstein.  (3 RWR at 167-69, 175-76.)  Dano went to see Dino a few weeks after Milstein's visit.  Dano told Dino about riding around with Milstein smoking crack cocaine.  (3 RWR at 168, 177.)  Christy Jetton, Mr. Young's older sister, was contacted by Milstein by telephone.  Milstein set up a time to meet with Christy in Gilmore, Texas.  Christy went to Gilmore with her six children, but Milstein failed to show up and never rescheduled.  (3 RWR at 227-28.)  Christy was not molested by her father.  (3 RWR at 226-27.)