he was the victim of sexual abuse.[80]  (5 RWR at 89-90, 99-100.)  Crystal also denied that Dylan had stated in a narrative form what Bill Young had done to him. Rather, on the tape, Dylan answered Milstein's questions with "yes" or "no" answers.  (5 SRW at 79.)

1037.  Crystal also testified that Milstein interviewed Dylan for about three hours outside the family home. After the interview, Milstein let Crystal listen to a recording Milstein had done on her cellphone.  The recording was not three hours long and only contained "snippets" of the interview.[81]  Milstein then left the house to get some money which had been wired to her.  When Milstein returned, she had a computer with her and took down Crystal's affidavit, which Crystal signed.  At the time she signed the affidavit, Crystal was upset as she believed her son had been molested.  Further, Crystal did not read the entire affidavit at the time she signed it.  (5 RWR at 76-84, 93-94.)  Before Milstein's visit, Crystal had no reason to believe that her son had been molested.  (5 RWR at 84.)

1038.  Patricia McCoy also testified at the state hearing.[82]  McCoy was likewise interviewed by Milstein in preparation for Mr. Young's state application. McCoy signed a two-page affidavit, which was notarized by Milstein.  The second page contained only the signature block.  However, what was introduced for purposes of the state application was a four-page declaration.  McCoy did not recognize the second and third pages of the affidavit introduced into evidence. (Ex. 44 at 6-10, 29-30 [McCoy Depo.].)

---

[80]  The affidavit that Crystal signed also alleged that Dano's sister, Renee , told Crystal that Bill Young raped her.  Crystal denied that Renee had ever told her that, as Renee and Crystal did not get along.  (5 RWR at 103.)

[81]  Apparently when Milstein returned home, the cellphone had not saved the recording, and the phone company was not able to retrieve it.  (5 RWR at 81.)

[82]  McCoy's testimony was admitted by way of a telephone deposition.  (Ex. 44 [Deposition of Patricia McCoy dated March 24, 2006].)

1039. While the third page of the affidavit stated that Mr. Young told McCoy that he was sexually abused by his father (Ex. 48 Affidavit of P. McCoy), Mr. Young only told McCoy that he was physically abused by his father. (Ex. 44 at 18 [McCoy Depo.].) Many other portions of the affidavit were incorrect including: that Douglas was a pedophile; Mr. Young found a pair of young girls' panties in Douglas's car; when Douglas was on drugs, he tried to touch people in a sexual manner and that he was disgusting; Douglas let Mr. Young drive his car all the time; and, McCoy had never seen Mr. Young act in a violent manner. (Ex. 44 at 19-30 [McCoy Depo.].)

1040. During the interview, Milstein was taking Xanax. At one point, Milstein asked McCoy if she knew where to purchase Xanax. Milstein also asked McCoy if she had any marijuana. (Ex. 44 at 11 [McCoy Depo.].) McCoy believed that Milstein was on some sort of drug, like "uppers." (*Id.* at 29.)

1041. Taylor testified that he did not know that the affidavits filed by Milstein were false as Taylor never had any indication that Milstein would make false statements in any of her cases. (*Id.* at 17, 34, 40.)

1042. On advice of counsel, Milstein made herself unavailable to testify at Mr. Young's state hearing.[83] (Ex. 42 at 23-25 [Taylor Depo.].)

1043. By Taylor's own admission at the state habeas hearing, the investigation into the alleged molestation issue foreclosed the investigation and presentation of other claims in Mr. Young's application due to time and resources. (Ex. 42 at 32, 35-36 [Taylor Depo.].) Taylor's failure to adequately supervise Milstein, despite being on notice of her personal problems and inadequate

---

[83]   Current federal habeas counsel attempted to interview Milstein in preparation of the current Petition. On the advice of her lawyer, Milstein would not talk with current counsel.

performance at the time he was appointed to represent Mr. Young, resulted in meritorious claims not being investigated and presented.

**4.** **By Appointing Incompetent Counsel and Not Adopting Proper Standards to Evaluate Counsel's Competency, the CCA Denied Mr. Young of His Opportunity to Properly Challenge His Conviction and Sentence of Death at the State Level, in Violation of Mr. Young's Procedural Due Process Rights under the Fourteenth Amendment**

1044. Taylor's failure to properly direct and supervise his primary investigator in prior cases and in this case, made him not competent to be appointed as counsel for a state habeas petition. Although Art. 11.071 states that "on appointment, counsel shall investigate expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for a writ of habeas corpus," Taylor relied on an investigator who used drugs, was emotionally unstable, and who obtained false declarations (declarants later renounced statements in their declarations in court). This pattern and practice also continued after Taylor's appointment in Mr. Young's case. (Exs. 99, 122, 120, 121, 106, 102, 105, 98, 118, 113, 124, 108, 44, [Decls. of Bacci at ¶¶ 5-10; Vaughn Ross at ¶ 5;  Michelle Ross at ¶¶ 4, 7; Tiffany Ross at ¶ 5; Green at ¶¶ 3-12; Calhoun at ¶ 6; Francis at ¶¶ 12-17; Anton at ¶¶ 5-8; Rodriguez at ¶¶ 3-6; Martin at ¶¶ 3-9; Trenticosta at ¶¶ 4-10; Herrero at ¶¶ 5-8; McCoy Depo. at 6-11, 29-30; 3 RWR at 180-93 [Amber Lynch Harrison]; 3 RWR at 130, 142-43, 149-50, 4 RWR at 115, 126 [Dano Young]; 5 RWR at 89-90, 99-100 [Crystal Deshotel];  3 RWR at 125-43, 148-53, 164, 5 RWR at 118, 133 [Dano Young].)

1045. As early as 1997, Taylor should have, at a minimum, been independently directing and supervising Milstein's work and in particular, with respect to allegations related to sexual abuse.

1046. With regard to the Dominque Green case, Taylor was informed that Milstein was having personal problems, had little working knowledge of the death penalty, and was so easily upset that any attempts to focus her work would bring her to tears. (Ex. 99 [Decl. of Bacci].)

1047. According to Michael Rodriguez, even though Taylor presented a claim that Rodriguez was molested by a priest, Taylor never talked to Rodriguez about the claim before it was presented at trial. If he had spoken to Rodriguez prior to trial, adequately supervised Milstein, and/or done his own independent evaluation of Rodriguez's case in mitigation, it would have become apparent to Taylor that the molestation charge, based upon the facts as represented by Milstein, would be renounced by the client. (Ex. 118 at ¶¶ 4-6 [Decl. of Rodriguez]; *see* Guideline 10.4 (lead counsel bears overall responsibility for performance of defense team, and should direct and supervise its work).)

1048. Moreover, had Taylor adequately directed and supervised Milstein, he would have known, starting in 2001, that the affidavits collected and notarized by Milstein with respect to the Carpenter case were inaccurate and, in at least one case, possibly forged. Had Taylor, like his later federal habeas counter-part, Bruce Anton, adequately supervised and directed the performance of his defense team, he would not have presented false affidavits obtained by Milstein. (Ex. 98 [Decl. of Anton].)

1049. Had he adequately directed and supervised Milstein, in 2003, Taylor would have learned that affidavits that were submitted on behalf of Vaughn Ross were, like those in Carpenter, misleading and full of factual errors. (Exs. 122, 121,

120, 106, 113 [Decls. of Vaughn Ross, Tiffany Ross, Michelle Ross, Marcia Green, Valeria Martin].)

1050. Had Taylor followed the guidelines as set forth by the ABA, he would have been aware that his primary investigator (the same person whose work he used in Rodriguez, Carpenter, Ross, and Mr. Young's case, not to mention numerous other death cases), was suffering from substance abuse issues and mental health-related problems. (Exs. 99, 105, 102 [Decls. of Bacci, Francis, Calhoun].) However, Taylor testified at the state habeas hearing that he made a point of keeping himself at arms length from Milstein (Ex. 42 at 11, 13-14 [Taylor Depo.]), and thus, apparently, missed the signs that were obvious to others. Both Bierbaum and Calhoun, members of Taylor's practice group, were themselves aware of Milstein's drug problems. (Ex. 102 at ¶ 6 [Decl. of Calhoun.].) Even Susan Herrero, a mitigation specialist who had far less contact with Milstein than Taylor, was aware of Milstein's mental health and drug-related problems. (Ex. 108 at ¶ 7 [Decl. of Herrero].)

1051. Taylor stated in his deposition that he had no reason himself to suspect Milstein was involved in drugs (Ex. 42 at 21-22 [Taylor Depo.]), but his client, Vaughn Ross, informed him of his suspicions about Milstein in October of 2004. (Ex. 78 at 876-77 [Ross to Taylor Letter 10-26-04].) Taylor took this statement seriously enough to seek permission from the state court to hire another investigator. (Ex. 80 [Letter - Order re Milstein].)

1052. Taylor acknowledged at the state habeas hearing that he was aware of Milstein's health problems. (Ex. 42 at 8-9, 11 [Taylor Depo.].) If he had been more involved in supervising his defense team, he would have made the connection that Milstein was not able to conduct investigatory-related work, as did practice group members Calhoun, Bierbaum, and Francis, due to her drug use.

(Exs. 102 at ¶ 9 [Decl. of Calhoun]; 105at ¶¶ 12-17 [Decl. of Francis]; 43 at 19-20 [Bierbaum Depo.].)

1053. After Taylor stopped giving work to Milstein in 2004 (Ex. 42 at 9-10 [Taylor Depo.]), and informed the state court that he needed another investigator due to Milstein's personal problems (Ex. 80 [Letter - Order re Milstein]), he still permitted Milstein to conduct the most sensitive and important investigation of the Young case, that of interviewing family members. Fellow investigator Nancy Piette knew that something was wrong with Milstein during the Young investigation (Ex. 116 at ¶¶ 10-12 [Decl. of Nancy Piette]), and relayed her concern to Taylor (*id.*). Taylor nevertheless continued to allow Milstein to conduct, without adequate supervision, an investigation that resulted in presenting an unmeritorious claim in lieu of the claims identified *ante* and *post* that could and should have been presented in the state habeas application.

1054. The claim of parental sexual abuse had no merit and took valuable time away from other claims worthy of investigation and presentation.[84] Furthermore, not only was the claim doomed to failure, Mr. Young's case was prejudiced by the evidence that was brought forth at the state hearing -- evidence involving Milstein's use of drugs and sex in exchange for affidavits filled with inaccuracies and half-truths.

1055. Rather than investigate and raise meritorious claims, such as the claims that were found to be procedurally barred by the CCA, counsel instead presented a house of cards (the molestation allegation) that collapsed when light was shed upon it. Counsel failed to present an adequate state application, as mandated by Article 11.071 and the applicable ABA Guidelines.

---

[84] Had Taylor not concentrated on the claim of sexual abuse, he would have been able to investigate and present the claims as will be discussed below. (See Claim Twenty-Five, *post*.)

1056.  Mr. Young's case shows that, had the CCA not disregarded its duty under the Texas statute to adopt proper standards to appoint and monitor competent counsel, Mr. Young's habeas counsel's incompetency would have surfaced long before he could prejudicially affect Mr. Young's ability to prevent his unconstitutional and illegal execution by the State of Texas.

1057.  By failing to adopt proper rules and standards to evaluate counsel's competency at the time of appointment and failing to monitor counsel's performance before and after appointment, the CCA denied Mr. Young his 'one bite at the apple' to proper state habeas review.[85]

1058.  Had the CCA acknowledged its duty to provide proper guidelines for the appointment and monitoring of state post-conviction counsel, as the State's own bar recognized (*see* Texas Guidelines), counsel's defects would have come to light before Taylor was appointed to Mr. Young's case.  At the minimum, counsel would have known that the CCA expected him to perform a proper mitigation investigation.  Most likely, however, if the CCA had provided proper guidelines

_____

[85]  Representative Gallego, the sponsor of the abuse of the writ statute passed by the Legislature in 1995, codified in Art. 11.701, described the state's habeas procedure as a petitioner's "one bite of the apple":

> And we tell individuals that everything you can possibly raise the first time, we expect you to raise it initially, one bite of the apple, one shot . . . .  What we're attempting to do here is to say "raise everything at one time."  You get one bite of the apple.  If you have to stick the kitchen sink in there, put it all in there, and we will go through those claims one at a time and make a decision.  But none of this "every week you file a new petition" which is currently basically what happens . . . .  **The idea is this:  you're going to be able to fund counsel in these instances and we are going to give you one very well-represented run at a habeas corpus proceeding.**  And unless you meet a very fine-tuned exception, you're not going to be able to come back time after time after time.

*Ex parte Kerr*, 64 S.W.3d 414, 418-19 (Tex. Crim. App. 2002) *citing* S.B. 440, Acts 1005, 74th Leg., codified at Tex. Code Crim. Proc. Art. 11.071 (Presentation by Representative Pete Gallego at second reading of S.B. 440 on the floor of the House of Representatives, May 18, 1995) (emphasis added).

340

for the appointment and monitoring of state post-conviction counsel when it was required to, it is unlikely Taylor would have even been appointed to Mr. Young's case.

1059. Based upon the above, this Court should not be precluded from reaching the merits of the claims mentioned above and below because the State of Texas interfered with  Mr. Young's constitutional rights by appointing incompetent state habeas counsel, which establishes cause and prejudice to excuse Mr. Young's default.[86]

**C.    Judicial Bias**

**1.    Introduction**

1060. As discussed above (*see* Claim Three, *ante*), three days after the conclusion of Mr. Young's trial, Judge Hyde sent a letter to each of the jurors.  In that letter, Judge Hyde told the jurors that they had made the correct decision and he informed them of his own pre-disposed belief that Mr. Young was a dangerous man who was capable of harming someone else:

> After spending several weeks with the Defendant in jury selection before the trial began, I gained some insight into his personality and I got to hear and see much more than the jury heard.  In my view, he is a dangerous man who is fully capable of harming someone else.  Your jury made the correct decision.

---

[86]   For that matter, Mr. Young's second state habeas counsel, Ori White, was not qualified for appointment when he was first selected to replace Taylor. On August 8, 2005, Judge Hyde appointed Ori White to Mr. Young's case.  (Ex. 27.)  On October 3, 2005, the CCA informed Judge Hyde that White was not on the approved list of attorneys to be appointed to such cases.  A month later White was approved after applying for appointment.  (Ex. 56 [CCA Letters re Ori White].)  In addition, when it came to light that the molestation issue was invented by Milstein, White did little to repair the damage done, thus continuing a pattern of ineffective and incompetent counsel.

(Ex. 93 [Hyde Letter].)  The judge's opinion was based upon evidence the jury did not hear and his own personal opinion.  (*Id.*)

1061. Judge Hyde then presided over, and denied, Mr. Young's motion for new trial.  (CR at 922-23; 39 RR at 100-05.)  Later, Judge Hyde presided over, made factual findings against, and denied Mr. Young's state habeas application.  (Ex. 30 [Hyde Denial of Writ].)

### 2. Relevant Law

1062. A defendant has an unqualified right to an impartial judge.  *Gray*, 481 U.S. at 668; *accord Bracy*, 520 U.S. at 904-05; *Gomez*, 490 U.S. at 858; *Tumev*, 273 U.S. at 535; *Richardson*, 537 F.3d at 474; *Bigby*, 402 F.3d at 558.

1063. A defendant may establish the denial of this right by demonstrating actual bias.  *Taylor*, 418 U.S. at 501-04; *Withrow*, 421 U.S. at 47; *Richardson*, 537 F.3d at 474-75; *Buntion*, 524 F.3d at 672.

1064. Structural error occurs when a trial judge is biased.  *Richardson*, 537 F.3d at 473, *citing Neder*, 527 U.S. 1.  "A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him."  *Edwards v. Balisok*, 520 U.S. at 647; *Buntion*, 524 F.3d at 672.

### 3. Judge Hyde's Bias Excuses Mr. Young's Procedural Default

1065. By his letter to the jurors, it is clear that Judge Hyde believed Mr. Young was guilty of the crimes against Douglas and Petrey, and should be put to death as he was a dangerous man who was fully capable of harming someone else in the event he was ever released from prison.

1066. This same judge then presided over Mr. Young's state habeas proceeding.  In presiding over the case, Judge Hyde sat now as both judge and jury over Mr. Young's fate.  Judge Hyde decided which claims would be the subject of a state hearing.  Judge Hyde decided what evidence was admissible at that hearing.

And Judge Hyde eventually decided whether Mr. Young was to seek any type of post-conviction relief based upon the allegations raised in the state Application.

1067. Judge Hyde, however, should never have been permitted to preside over Mr. Young's state proceeding as his letter to the jurors showed a clear bias against the very person whose fate he was deciding.

1068. Based upon the above, this Court should not be precluded from reaching the merits of the claims mentioned above because Mr. Young's state proceeding was presided over by a biased jurist, which establishes cause and prejudice to excuse Mr. Young's default.

## D.   Conclusion

1069. Mr. Young was appointed incompetent counsel for purposes of state post-conviction litigation.  That counsel failed to adequately supervise and direct the actions of his primary investigator, Lisa Milstein, even though there was evidence, as far back as 1996, that Milstein had emotional, psychological and drug addiction problems.  The result of counsel's incompetence was an investigation centered around a factually unsupportable charge of parental sexual abuse, which was presented to the exclusion of other factually supportable, meritorious claims.

1070. Further, once Taylor filed Mr. Young's defective state writ application, the judge who presided over the post-conviction proceeding was biased against Mr. Young.  Therefore, all procedurally defaulted claims be excused and the claims be evaluated de novo without applying § 2254(d).

1071. Based upon the above, Mr. Young has shown cause and prejudice to excuse his default.  Therefore, the claims that were dismissed as an abuse of the writ by the state court are properly before this Court for adjudication.

//

//

# VII.

## PREVIOUSLY UNEXHAUSTED CLAIMS

## CLAIM TWENTY-FIVE

## DUE TO THE INCOMPETENCE OF STATE HABEAS COUNSEL, THE FOLLOWING CLAIMS SHOULD HAVE BEEN RAISED IN MR. YOUNG'S INITIAL STATE WRIT PROCEEDING

1072. As discussed in Claim Twenty-Four, *ante*, Mr. Young's state habeas counsel was incompetent.  Due to the incompetence of state habeas counsel, the following claims should have been previously investigated and presented to the State in Mr. Young's first state habeas proceeding.  As will be discussed in the contemporaneously filed Motion for Stay, Mr. Young intends to present these claims to the state court in an application for writ of habeas corpus.

**A.** **The State Interfered with the Defense's Investigation and Presentation of its Mitigation Case**

1073. Mr. Young's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the State interfered with the defense's selection of Gerald Byington as the mitigation specialist/bio-psychosocial historian expert in Young's case.

**1.** **Relevant Law**

1074. Unlike the lawyer who is bound only by the rules of the State Bar, it has long been recognized that a prosecutor has an even greater duty to conduct himself with propriety.  *See* A.B.A. Standards, The Prosecution Function, Section 3-1.1(d).  Although prosecutorial discretion is broad, it is not unlimited.  *United States v. Batchelder*, 442 U.S. 114, 125, 99 S. Ct. 2198, 60 L. Ed. 2d 755 (1979).  Rather, "prosecutorial discretion is subject to constitutional constraints." *United*

344

*States v. Armstrong*, 517 U.S. 456, 464, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996) (internal quotations omitted).

1075. In all cases, but most particularly during a capital trial, a prosecutor must not simply pursue a conviction, but rather, must seek to ensure that justice is done. *Kyles*, 514 U.S. at 439 (*citing Berger*, 295 U.S. at 88).

1076. A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 183, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986); *see Greer v. Miller*, 483 U.S. 756, 765, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987) (conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process); *Riddle v. Cockrell*, 288 F.3d 713, 720 (5th Cir. 2002); *United States v. Burke*, 496 F.2d 373, 377 (5th Cir. 1974) . "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). The federal habeas court must distinguish between "ordinary trial error of a prosecutor and that sort of egregious misconduct . . . amount[ing] to a denial of constitutional due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000).

### 2.    The Prosecutor Interfered with the Investigation and Presentation of Mitigating Evidence

1077. After improperly receiving the sealed billing records of the defense's mitigation specialist/social historian, Gerald Byington, the State reported Byington to the Texas Commission on Private Security alleging Byington was conducting investigatory work illegally. (Ex. 49 [Judge Hyde Letter dated October 29, 2002]; 8 RR at 6-7.) The result of the prosecutor's actions was to foreclose the defense from properly investigating and presenting a bio-psychosocial history of Mr.

Young, which should have been presented at trial.  The prosecutor's actions constituted misconduct and violated Mr. Young's constitutional rights to due process, a fair trial, and the effective assistance of counsel.

### a.    Relevant Facts

1078. In late summer 2001, the defense contacted Gerald Byington to work as their mitigation specialist.  Byington was to assist the defense in investigating and presenting mitigation evidence at trial.  Byington's duties included preparing a bio-psychosocial history of Mr. Young.  (Ex. 94 at ¶ 3 [Decl. of Gerald Byington].)

1079. Byington, who was a Licensed Clinical Social Worker and a certified expert in social history, had participated in the development of mitigation witnesses, experts, and strategies in more than 200 felony criminal trials in Texas.  Of those cases, at least half of them involved death penalty defendants.  (*Id.* at ¶¶ 1-2.)

1080. In preparation for his appointment by the court to Mr. Young's case, Byington prepared a detailed ex-parte affidavit outlining his anticipated investigation of Mr. Young's history and the amount of funding that would be required to complete the task.  Byington anticipated requiring 139 hours of time to prepare Mr. Young's  bio-psychosocial history, at a cost of $10,843.20.  (*Id.* at ¶ 4; Ex. 76 [August 2002 Affidavit of Byington].)

1081. In a sealed order by the Court in early 2002, Byington was appointed to Mr. Young's case, and was granted initial funding in the amount of $5,000. (Ex. 32 [April 02 Appointment of Byington]; 94 at ¶ 5 [Decl. of Byington].)

1082. Based upon his past experiences as a social historian, Byington formulated a precise and detailed vision of how Mr. Young's bio-spychosocial history should be investigated and presented.  This included investigating and presenting evidence related to the client's family history, medical history --

including mental and physical health, educational history, employment history, and history as it related to incarceration. To accomplish this task, Byington would gather and review records as well as conduct interviews with family members, friends, teachers, and others who knew Mr. Young. (Ex. 94 at ¶ 6 [Decl. of Byington].)

1083. Byington submitted his first bill in late April, 2002. That bill, which included work from February 11 to April 16, 2002, was in the amount of $5,033.91. (Exs. 94 at ¶ 7 [Decl. of Byington]; 64 [Byington's first billing statement].) The Court paid the bill in late June 2002. (Ex. 94 at ¶ 8 [Decl. of Byington].)

1084. In a letter to defense counsel dated June 26, 2002, Byington requested additional funds for further specified mitigation services including, but not limited to, the collection of additional family history documents in order to develop a genogram for display at trial, and further neuropsychological, EEG and SPECT scan testing. (Exs. 94 at ¶ 8 [Decl. of Byington]; 64 [June 26 Letter].) The funding request was submitted to the court.

1085. Byington informed defense counsel that no further services would be provided by him until such time as additional funding by the court was authorized. Byington agreed to continue to consult with the attorneys regarding information that had already been obtained however, Byington stated he would not gather any additional information. (Ex. 94 at ¶ 9 [Decl. of Byington].)

1086. On September 9, 2002, Byington received a letter from the Texas Commission on Private Security. The letter explained that someone had filed an anonymous complaint against Byington alleging that he had been doing the work of a private investigator, and that he was not licensed to do such work in the state of Texas. (Ex. 94 at ¶ 10 [Decl. of Byington].)

1087. A court hearing on this matter, presided over by Judge Hyde, was held on September 19, 2002. When Byington arrived at the hearing, he was surprised to find that besides the defense attorneys who had hired him, also present was Midland County District Attorney Al Schorre, who was prosecuting Mr. Young. Byington felt the presence of the prosecutor was highly unusual because, in his experience, the prosecution was never involved in the preparation of the defense mitigation case. (Ex. 94 at ¶ 11 [Decl. of Byington].)

1088. Byington also noticed that DA Schorre had a copy of Byington's initial ex-parte request for funding, the court order granting the funding, a copy of Byington's billing records, as well as a copy of the "anonymous" complaint that had been filed against Byington. (Ex. 94 at ¶ 12 [Decl. of Byington].)

1089. At the hearing, DA Schorre told the court that he objected to the request for Byington's additional funding. According to DA Schorre, the court had not funded investigation into mitigation, but rather, had approved funds for someone who would investigate the facts of the case, and that Byington was not licensed to do this type of investigation. (8 RR at 5-7.)

1090. Defense counsel argued that while Jeff Marugg was the defense investigator for guilt, Byington was hired as a mitigation specialist, and was trained to conduct the type of investigation he was undertaking. Defense counsel also argued that Byington was not only funded for the mitigation investigation, but also to assist counsel in the presentation of a "knowledgeable and informative" mitigation case to the jury including explaining to the jury and helping them understand the issues surrounding Special Issue No. 3 under Texas Criminal Procedure Code section 37.07(1). (8 RR at 8-11.) Counsel also argued that Byington was a critical member of the defense team. (8 RR at 12.)

1091. At the hearing, Byington testified about the significance of a mitigation specialist, and explained the work he had performed to date in Mr.

348

Young's case. Byington also testified that the type of services he provided as a mitigation specialist were clearly covered by his licensure as a Clinical Social Worker. Byington provided the court with a copy of those rules. (8 RR at 14-24; Exs. 94 at ¶ 15 [Decl. of Byington]; Ex. 50 [Texas Adminisrative Code, Title 22].) Rusty Wall, Mr. Young's appellate counsel, also testified at the hearing regarding the importance of the defense hiring and working with a mitigation specialist in a case such as Mr. Young's. (8 RR at 24-28.)

1092. Following the testimony of Byington and Wall, defense counsel alerted the court that it had previously, as had another local court, appointed a mitigation specialist that was not a private investigator and that no one had lodged a complaint. (8 RR at 37-38.) At the conclusion of the hearing, Judge Hyde stated he would render a decision regarding Byington's work after contacting the Commission on Private Security. (8 RR at 38-39.)

1093. A second hearing was held on this matter in November 2002. At that hearing, the court heard evidence from Cliff Grumbles of the Private Securities Board and Andrew Marks, the Executive Director of the Texas State Board of Social Worker Examiners. (10 RR at 7-8, 12.)

1094. Marks testified that the work conducted by Byington was within the normal duties of social workers, and "absolutely" within the duties of a LMSW. (10 RR at 8-11.) Grumbles, on the other hand, testified that Byington's work, as far as conducting interviews, was outside the bounds of a private investigator. (10 RR at 13-17.)

1095. Judge Hyde took the matter under submission and did not issue an order for additional funding for mitigation services. (10 RR at 29-30; Ex. 94 at ¶ 17 [Decl. of Byington].) With no authority to interview witnesses, Byington's work as a mitigation specialist was severely curtailed. (Ex. 94 at ¶ 19 [Decl. of Byington].) At the time Byington stopped receiving court funding, he had

349

completed no more than half the research he would have considered mandatory for a proper mitigation defense of Mr. Young. (*Id.* at ¶ 22.)

1096. Judge Hyde never rendered a decision regarding Byington's ability to work on Mr. Young's case. In June 2003, *after* the completion of the trial, the court approved some of Byington's previous incurred expenses. (Ex. 65 [Final funding approval for Byington].)

### b.   Argument

1097. Prosecutor's and law enforcement are prohibited from invading the defendant's Sixth Amendment zone of privacy. *See Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995); *see also United States v. Levy*, 577 F.2d 200, 210 (3rd Cir. 1978); *United States v. Kelly*, 790 F.2d 130, 138 (D.C. Cir. 1980). Here, the prosecution deliberately interfered with Mr. Young's investigation and presentation of mitigation evidence.

1098. At the time of Mr. Young's trial in 2003, counsel's duty to investigate and present mitigating evidence was well established. *Williams v. Taylor*, 529 U.S. at 395-96. Mr. Young's attorneys' obligations were governed by the 2003 ABA Guidelines.

1099. The ABA Guidelines require defense counsel to retain a mitigation specialist as part of the capital defense team. Guideline § 4.1. The Commentary to the Guidelines discuss the role of the mitigation specialist with regard to the social history document: "The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation." The Commentary to § 4.1 also explains that the mitigation specialist is an "indispensable member of the defense team as they have "the time and ability to elicit sensitive, embarrassing and often humiliating evidence . . . that the defendant may have never disclosed."

1100. Based upon the Commentary to Guideline 10.7 [Investigation], defense counsel had an obligation at the punishment phase to conduct an extensive and unparalleled investigation into Mr. Young's personal and family history including: mental history, family and social history, educational history, military service, employment and training history, and prior juvenile and adult correctional experience. The Commentary also states that it is necessary to locate and interview the client's family members, and virtually anyone else who knew the client and his family including, but not limited to teachers, neighbors, clergy, case workers, doctors, correctional, probation or parole officers.

1101. A sampling of contemporary Texas cases demonstrate the prevalence of mitigation specialists. *Scheanette v. Quarterman*, 482 F.3d 815 (5th Cir. 2007) (mitigation specialist retained for 1996 trial); *United States v. Hall*, 455 F.3d 508, 517 (5th Cir. 2006) (mitigation specialist retained in 1995); *United States v. Webster*, 392 F.3d 787, 795 (5th Cir. 2004) (mitigation specialist retained for 1996 trial); *Rosales v. Cockrell*, 220 F. Supp. 2d 593, 611 (N. D. Tex. 2001); *Shields v. Dretke*, 122 Fed. Appx. 133, 136 (5th Cir. 2005) (use of a mitigation specialist in a 1995 trial); *see also Watts v. Quarterman*, 448 F. Supp. 2d 786, 796 (W.D. Tex. 2006) (defense introduced testimony of mitigation specialist in 2003 trial); *Roberts v. State*, 220 S.W. 3d 521 (Tex. Crim. App. 2007).

1102. In this case, however, the prosecution prohibited counsel from fulfilling their defense obligations when it interfered with counsel's ability to investigate and present a mitigation case through the use of their chosen mitigation specialist.

1103. As discussed above, the prosecution improperly received the sealed billing records of Byington, and then contacted the Texas Commission on Private Security alleging that the work Byington was conducting was illegal. This interference caused the court to question its continued funding of Byington, and

351

the defense was left without a mitigation specialist to assist them in investigating and presenting a comprehensive mitigation case.

1104. To that end, at the time Byington's services were brought into question by the State, Byington had only completed half the research into Mr. Young's history that Byington would have considered mandatory for a proper mitigation presentation. (Ex. 94 at ¶ 22 [Decl. of Byington].)  Further, while Byington continued to discuss the case from time to time with Mr. Young's defense team, the discussions were all based on the incomplete information that Byington had obtained prior to June 2002, almost a full year before Mr. Young's trial began. (*Id.* at ¶ 23.)

1105. Without Byington's services, there were a number of important areas that were left unexamined by Mr. Young's defense counsel.  To that end, Byington would have presented far more information culled from Mr. Young's family, key teachers, treatment providers and others to help differentiate between Clinton Young as a person and the problems he manifested, from his infancy on. (Ex. 94 at ¶ 24 [Decl. of Byington].)  Further, Byington would have identified and interviewed additional lay witnesses who could have presented testimony about Mr. Young's attempts at being a "normal" child and teenager. (*Id.* at ¶ 25.)

1106. Byington would have developed a family genogram for both the maternal and paternal families, which could have been presented at trial.  Byington also would have provided evidence that Mr. Young's behavior was sometimes intentional, while at other times it was the result of his mental disorders.  With his assistance, Byington could have collected such evidence and prepared expert testimony which would have provided the jury with specific, clear examples Young's intentional behavior in contrast with behavior that was an expression of his disability. (Ex. 94 at ¶¶ 26-27 [Decl. of Byington].)

1107. However, without Byington's authority to perform his task as a mitigation specialist/bio-psychosocial historian, the defense was left rudderless with regard to the investigation and presentation of a mitigation case. More important, the jury was left without a clear idea who Mr. Young was, and how his problems affected his life.

1108. For example, the jury was confused as to why Mr. Young, who suffered from ADHD, could sit quietly throughout his trial without medication. (37 RR at 5.) If the defense had been permitted to use a mitigation specialist, like Byington, this type of potential problem could have been addressed either before or at trial. (Ex. 97 at ¶¶ 5, 10-12 [Decl. of Dr. Milam].) A mitigation specialist like Byington could also have foreseen the jurors struggle regarding Mr. Young's purported "choice" to return to drugs after his release from TYC. (*Id.* at ¶¶ 13-19; Ex. 96 at ¶¶ 111-19 [Decl. of Toni Knox].)

1109. If the defense had been permitted to use their mitigation specialist, instead of losing him through prosecutorial interference, the defense could have presented a more accurate portrait of their client through the presentation of both lay and expert witnesses, and by Byington's own testimony. Such a portrait, like that presented by Toni Knox, the mitigation specialist/social historian retained by current federal habeas counsel, would have shown the jury that:

> In addition to Clint being genetically loaded toward mental illness and chemical dependency, there were numerous social and family problems which contributed to Clint's development. These factors affected his social functioning, impulse control and lack of appropriate coping skills from a young age.

(Ex. 96 at ¶ 8 [Decl. of Toni Knox].)

1110. Had the defense been permitted to investigate and present the mitigation case they wanted, the jury would have learned that Mr. Young was harmed in utero by his father's assaults upon his mother during her pregnancy. (*Id.* at ¶ 167.)

1111. The jury would have heard about the interplay between Mr. Young's chemical dependency and mental illness; the systemic failure of the institutions which were supposed to help Mr. Young with his drug and alcohol dependence; the family dysfunction which invaded all aspects of Mr. Young's life; and the psychological barriers which delayed Mr. Young's mental and emotional development. (*Id.*)

1112. The jury would have heard testimony about Mr. Young's maternal family history including information about Carla Sexton's adoption and her own distant relationship with her adopted mother. This information would have given the jurors context to why Carla had such trouble parenting her own child, especially one that required so much attention as Mr. Young did due to his ADHD. The jury also would have understood the unstable environment Mr. Young was born into. (*Id.* at ¶¶ 9-12, 168.) The jury also would have heard evidence about Mr. Young being genetically predisposed to addiction and mental illness based upon his maternal family background. (*Id.* at ¶ 13.)

1113. Had the prosecution not interfered with Mr. Young's mitigation presentation, the jury also would have heard information about Mr. Young's paternal family history. This information would have given context to the abuse suffered by Mr. Young by his father Billy when viewed in light of the rampant abuse which permeated Billy's own family history. A view of Mr. Young's paternal family history also would have added to the evidence of Mr. Young's own genetic predisposition to addiction. (*See id.* at ¶¶ 14-23.)

1114. Had the prosecution not interfered with Mr. Young's case, the jury would have learned that Carla Young was ill-equipped to raise Mr. Young at the age of eighteen, and especially ill-equipped to raise five children, four of whom belonged to a new husband who was abusing her. (*Id.* at ¶¶ 25-26.) The jury would have heard of the neonatal abuse suffered by Carla at the hands of Billy, abuse which caused the premature birth of Mr. Young. (*Id.* at ¶¶ 27, 168.)

1115. The jury would have heard evidence about the familiar interplay between Mr. Young's half-brothers and -sisters, and how those relationships colored Mr. Young's own upbringing and development. (*Id.* at ¶¶ 28-50.) The jury would have learned of the chaos the surrounded Mr. Young's early years including Mr. Young being shuttled back and forth between his mother and father. The jury too would have received evidence regarding Carla's courtship and marriage to Quentin Sexton, how Quentin could not accept or love Mr. Young as his own biological child, and how Mr. Young was very aware that Quentin did not love him and often rebelled against Quentin's rigid rules and abusive treatment. The jury also would have learned that Mr. Young constantly felt like an "outsider," as he was shuttled between the families, and how Mr. Young was made to feel like he was a "problem child." (*Id.* at ¶¶ 51-60, 63, 169-70, 173.)

1116. Had Byington been permitted to complete his work as a mitigation specialist, the jury would have learned that not only did Mr. Young not fit in with both his maternal and paternal families, he also did not fit in at school because of his hyperactivity which often led to behavioral problems. The jury would have had enough information to understand how Mr. Young's hyperactivity led to his feelings of frustration. (*Id.* at ¶ 172.)

1117. The jury would have been informed about the acrimony between Carla and Billy and how that affected Mr. Young emotionally and physically. The jury would have had explained how the increasing level of chaos in Mr. Young's

355

family, coupled with Mr. Young's ADHD, led to problematic behavior that Carla did not know how to control. The jury would have been better able to understand how the institutions, which were meant to assist Mr. Young with his behavioral problems, did nothing more than house Mr. Young until the institution grew tired of Mr. Young and kicked him out. (*Id.* at ¶¶ 60-81.)

1118. The jury would have been given a roadmap regarding Mr. Young's rapid mental and emotional decline that occurred without the treatment that he so badly required. The jury would have had a better understanding of why the treatments that were prescribed to Mr. Young failed. The jury also would have learned that while successful treatment required Mr. Young's family to be involved so that unhealthy familiar interactions could change, this type of treatment never took place. (*Id.* at ¶¶ 82-100, 173.)

1119. And had a mitigation specialist been permitted to do the job he was appointed to do, the jury would have learned that Mr. Young was discharged from TYC without any provisions for chemical dependency or psychiatric treatment. The jury also would have learned that Mr. Young returned to the same "unhealthy" environment that had exacerbated his previous problems. (*Id.* at ¶ 175; Ex. 97 at ¶¶ 15-17 [Decl. of Milam].)

1120. Had a mitigation specialist like Byington been permitted to conduct the investigation he was hired to do, the jury would have been given a comprehensive overview of Mr. Young's chemical dependency and it's genetic component (Ex. 96 at ¶¶ 121-27); psychiatric treatment history and including medications (*id.* at ¶¶ 128-36); educational history (*id.* at ¶¶ 148-52); physical and emotional abuse since childhood (*id.* at ¶¶ 153-58), and possible bi-polar disorder.

1121. The jury would have learned that had Mr. Young been given proper long term treatment, including family therapy and appropriate medications, he could have led a productive life. And although Mr. Young was assessed by a

myriad of professionals over the years, and recommendations were made regarding treatment, those recommendations were not carried out in any real or logical way. (*Id.* at ¶ 174.)

1122. Had the defense been permitted to investigate and present the mitigation case they had desired, with the help of a mitigation specialist, the jury would have learned that Mr. Young could not overcome the risk factors which stemmed from family dysfunction. The jury would have heard evidence that Mr. Young was never able to develop the appropriate coping skills and, upon release from TYC, attempted to use the survivor skills he had learned in the prison system. (*Id.* at ¶ 177.)

1123. Without a mitigation specialist/bio-psychosocial historian, the jury did not hear that Mr. Young's bad behavior was often the result of his hyperactivity and impulsivity, which he struggled throughout his life to contain. From outward appearances, Mr. Young was a nice looking intelligent young man, which made it more difficult for a jury to understand his feelings of alienation. (*Id.* at ¶ 180.) A mitigation specialist could also have helped the jury to understand that over the years, Mr. Young experienced numerous side effects and frequent disappointment from the various medications he was prescribed, causing him to lose hope and thus, reinforcing his reluctance to take any medication. (Ex. 96 at ¶ 181 [Decl. of Knox].)

1124. In sum, without a mitigation specialist/bio-psychosocial historian, the defense was unable to present to the jury a comprehensive, linear, and cohesive story about Mr. Young. This portrait would have shown what can and will go wrong when a young person is born into, and travels through a life filled with emotional and physical abuse, lack of stability and support, and a lack of positive role models. (*Id.* at ¶ 183.)

As social historian Toni Knox states in her declaration:

357

It is my strong professional opinion that the findings contained in this declaration were absolutely necessary for the jury to hear through the testimony of an expert such as myself, in order for the jury members to get some idea of how Clinton Young became involved with the criminal element, and to give them a firm basis for finding the mitigating factors necessary to impose a judgment of life without parole instead of death. Various pieces of the information contained herein were presented through competent witnesses, but there was not an expert that was able to "tie" all of the pieces together to give the jury the full story of Clint's life. It is this "full story" that could have helped the jury understand everything that affected Clint throughout his life.

Had I or some other competent expert been asked by counsel to present this story to the jury in the form of trial testimony at the penalty phase, and had the jury been presented with this evidence by competent counsel and a competent expert, there is a reasonable probability that the jury would have returned a verdict of life without parole instead of a death sentence.

(Ex. 96 at ¶¶ 185-86 [Decl. of Knox].)

1125. Based upon the above, this error is structural, deserving of habeas relief without regard to harmless error. At a minimum, the direct interference in the defense punishment case, by the prosecution, rendered Mr. Young's trial fundamentally unfair. *Wainwright*, 477 U.S. at 183. Had the defense been

permitted to present Mr. Young's social history to the jury, one juror may have voted for life imprisonment. *Wiggins,* 539 U.S. at 537 (relief required when "there is a reasonable probability that at least one juror would have struck a different balance"); *Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) ("A reasonable probability that . . . one juror considering the original and newly raised evidence together would have voted for life imprisonment satisfies this [prejudice] standard."); *Foster v. Johnson*, 293 F.3d 766, 784 (5th Cir. 2002) (discussing whether the defense mitigation evidence "would have altered at least one juror's balancing determination in favor of life").

1126. Moreover, independent of the prosecutorial misconduct claim, the trial court's failure to rule on Byington's ability to conduct the investigation he was appointed to do was a violation of Mr. Young's due process rights. As stated above, the trial court only funded Byington for work completed from February through April of 2002. And while Byington submitted further billing requests, and the court held two hearings on Byington's ability to act as a mitigation specialist on this case, the court never made a ruling as to this issue. This, despite the fact the court acknowledged at the conclusion of the November 2002 hearing that it would "report to you as quickly as I can. . . . I know it's of -- time is growing of [sic] essence in this matter. I'll try to get it resolved as quickly as I can for you." (10 RR at 29-30.) However, the court made no ruling, and only partially funded Byington's work *after* the conclusion of trial. (Ex. 65 [Final Payment].)

1127. Finally, independent of the prosecutor's improper interference, and the trial court's failure to rule on the issue, Mr. Young's trial counsel was ineffective for failing to press the court for a ruling. At a minimum, counsel should have either: (1) hired a mitigation specialist who was a licensed private investigator or: (2) hired a private investigator to conduct the interviews and then have given that information to Byington so he could complete his bio-

psychosocial history. *See Johnson v, Bagley*, __ F.3d __, 2008 WL 4527345, at *
13 (6th Cir. Oct. 10, 2008) (although there some investigation done of the
petitioner's childhood, it lacked structure, coherence and supervision and was not
effectively put into a trial theme).

1128. It was incumbent upon trial counsel "to locate and interview the
client's family members, and virtually everyone else who knew the client and his
family." Guideline § 10.7; *see Wiggins*, 539 U.S. at 516. But despite the fact that
"in the context of a capital sentencing proceeding, defense counsel has the
obligation to conduct a 'reasonably substantial, independent investigation' into
potential mitigating circumstances," *Neal*, 286 F.3d at 236, the defense was
without a mitigation expert/bio-psychosocial historian from June of 2002 until the
conclusion of trial.

1129. Because trial counsel failed to press the court for a ruling, or, at a
minimum, hire a licensed private investigator to complete that portion of
Byington's work, counsel's performance was objectively unreasonable. *See
Wiggins*, 539 U.S. at 527-28 ("counsel chose to abandon their investigation at
an unreasonable juncture, making a fully informed decision with respect
to sentencing strategy impossible"); *Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir.
2008) (prejudicial failure to conduct timely and complete mitigation
investigation); *Sonnier*, 476 F.3d at 358 (finding trial counsel provided deficient
performance by conducting only cursory interviews of some family members
because "the trial attorneys stopped short of making a reasonable investigation for
purposes of uncovering relevant mitigating evidence").

**B.    Counsel's Failure to Present Key Evidence in Mitigation**

1130. Mr. Young's counsel failed to present two key pieces of mitigation
evidence at the punishment phase:  (1) evidence explaining why Mr. Young would
stop taking his ADHD medication upon his discharge from TYC; and (2) evidence

explaining why Mr. Young, who was apparently unmedicated at the time of the trial, seemed to be able to sit still and converse with his trial counsel. Trial counsel presented several experts at the punishment phase, but they did not elicit testimony to explain these two important concepts.

### 1.    Relevant Law

1131. The United States Supreme Court, in *Wiggins*, 539 U.S. 510, stated that, among the topics counsel should investigate are "medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences. . . ." *Id.* (emphasis in original); *see Sonnier*, 476 F.3d at 358; *Lewis*, 355 F.3d at 367. In this case, the limited evidence that trial counsel presented regarding Mr. Young's ADHD was clearly not enough. But for counsel's failure to present further evidence, Mr. Young would not have been sentenced to death. *Strickland*, 466 U.S. at 694.

### 2.    Facts and Analysis

1132. The jury knew that, by the time Mr. Young was released from TYC, he was on a combination of Depakote (a mood stabilizer), Clonidine (a blood pressure medication with a sedative effect), and Ritalin (an amphetamine). (36 RR at 40-41.) The jury was clearly concerned about the issue of Mr. Young's ADHD and whether he was on the medication at the time of trial. During punishment deliberations, the jurors sent a note to the judge asking the following question: "We find no record of his current medication for ADHD during his stay in Midland county. Is this in the record or are we just not finding it." (37 RR at 5.) The judge's response to the note did not answer the jury's question: "Members of the jury, the documents before you are the only documentary exhibits in evidence." (*Id.*)

361

1133. Although Dr. Daneen Milam testified in the punishment phase, she was never asked: (1) why Mr. Young would stop taking his ADHD medication upon his discharge from TYC; and (2) why Mr. Young, who was apparently unmedicated at the time of the trial, seemed to be able to sit still and converse with his trial counsel.[87]

1134. First, if asked, Dr. Milam could have explained that Mr. Young was dependent on drugs before he went to TYC. (Ex. 97 at ¶ 13 [Decl. of Milam].) Drugs were part of Mr. Young's life early on partially because of his father's own dependency issues. (Ex. 96 at ¶¶ 8, 137 [Decl. of Knox].) As trial counsel knew at the time of trial and explained at the state writ hearing, Mr. Young's father had introduced his child to crack cocaine. (33 RR at 245-46; 2 RWR at 208-09.) Further, Mr. Young never received any treatment for drug or alcohol abuse. (Ex. 96 at ¶ 175 [Decl. of Knox].) The chances were high that Mr. Young would abuse drugs as soon as he faced a trigger, i.e., outside of TYC and in a place where drugs were prevalent. (Ex. 97 at ¶¶ 14, 17 [Decl. of Milam].) Taking street drugs outside of the TYC was not so much a decision to take drugs, it was behavior consistent with Mr. Young's dependency on drugs. (*Id.* at ¶ 16.)

1135. Dr. Milam could have explained that Mr. Young was referred to the Mental Health Mental Retardation Centers, but had limited access and transportation. (Ex. 97 at ¶ 15 [Decl. of Milam].) She could have testified further that:

> In itself, a question about Mr. Young's "decision"
> to not take his medicine upon his release indicates the

---

[87]   During the state habeas investigation, Nancy Piette interviewed some of Mr. Young's jurors. One juror noted that while the defense attorneys made a "big deal" of Mr. Young's ADHD, in court it was obvious Mr. Young could listen, pay attention, assist the attorneys, write notes, and behave, without medication. Another juror remarked that Mr. Young's decision to stop taking his medication upon his release from TYC, was voluntary.

jury was not presented with a fully detailed explanation of Young's problem. At trial the jury was told Mr. Young had been up for days using "meth" before and during the time of the crimes. But a clear progression was not drawn between the legal stimulants he used since childhood and methamphetamine, which he used for a couple of months at most. A fully informed jury would have readily understood why a subject such as Young, under these circumstances, *would be more likely to fail* to maintain his medication regime than not.

Without a structured therapy or medication plan, Mr. Young's turning to self-medication via other stimulants was almost inevitable. When he was released from TYC with no external regulators to keep him on track, and instead surrounded by an abundance of street drugs, he transitioned to methamphetamine. Methamphetamine, also known as "speed" or "meth" or "crystal meth," albeit illegal, has properties similar to the FDA-approved medicine Young had been taking all his life. Despite its highly addictive nature and extremely dangerous side effects, it was a simple conversion for Young because of his long-term use of a chemically similar drug.

(Ex. 97 at ¶¶ 16-17 [Decl. of Milam].)

1136. Second, if asked, Dr. Milam could have explained why, even unmedicated, Mr. Young was able to sit still through his trial and converse with trial counsel. She would have testified that:

363

While Clinton Young's long history of ADHD was presented to the jury, neither this expert, nor any other expert, explained the concept of hyperfocusing. Had the neurological basis for ADHD been adequately explained, including the concept of "hyperfocusing," the jury may have understood Mr. Young's ability to sit quietly throughout his trial. A more detailed explanation, including these disparate effects of being un-focused or overly-focused, would have not only allowed the jury to understand the peculiarities of Mr. Young's ADHD, they likely would have been able to observe it as such.

(Ex. 97 at ¶ 12 [Decl. of Milam].)

1137. Finally, if asked, Dr. Milam could have pulled together all aspects of Mr. Young's drug dependency, ADHD and social history, which would have given the most persuasive and complete testimony in mitigation:

Mr. Young's ADHD was and is a medical problem and was not the result of a lack of will power. ADHD is a biological and chemical malfunction in an immature brain. The effects of Mr. Young's genetically and biologically determined impulsive and distractible response style was aggravated, no doubt, by the chaotic, traumatic home environment in which he spent his formative years. Children who suffer from severe ADHD disorder require intensive limit setting and a stable environment. The impact of positive structure on Mr. Young is clearly demonstrated by his good behavior and good reviews by several of his teachers and

counselors at TYC.  It appears extremely unlikely that
any adult in Mr. Young's home could have provided
such a structure or stability.

The fact that biological deficits would cause Mr.
Young to behave even younger than his chronological
age is corroborated by the comments of his teachers,
counselors, and family members who consistently stated
he was impulsive, and a follower.   A review of the
sequence of events of the crime is consistent with a
poorly planned and executed event.  Mr. Young is an
individual who was incapable of assessing and
responding to a rapidly changing situation.  His poor
ability to think and plan, lack of cognitive and practical
skills sent him and his life spiraling out of his control.

(Ex. 97 at ¶¶ 24-25 [Decl. of Milam].)  The jurors also could have been informed
of Mr. Young's bi-polar disorder.

1138. Counsel also failed to present evidence that some of the medications
that Mr. Young was prescribed were later found to have caused psychosis in
patients.

**C.    The State Lost or Destroyed Key Evidence**

1139. The State lost or destroyed evidence that was exculpatory in nature,
including shell casings left in front of the house where Douglas was first shot; the
7-Eleven video tape of Mr. Young shopping in the convenience store; and
eyewitness evidence from persons at Brookshire's Grocery Store on the day that
Mr. Petrey was kidnapped.

//

//

1.    **Factual Background**

1140. As revealed during trial, Kent Spencer, Midland County Sheriff Investigator, testified that the district attorney's office lost the tape of Mr. Young in Midland at the Midkiff and Loop 250 7-Eleven on November 26, 2001.  (24 RR at 232-33; *see also* Ex. 75 [Spencer 7-11 Report].)  The tape that the jury never saw showed Mr. Young walking around the store for eleven minutes, without a weapon, while Page and Petrey stayed in the car.  Thereafter, Mr. Young returned to the car and to the passenger side.  (24 RR at 217-19; Ex. 75 at 847-48 [Spencer 7-11 Report].)

1141. Further, the State lost or destroyed the shell casings that could have been found on the ground outside of the house where Douglas was first shot.  This evidence was lost by the failure of the authorities to search the area where Douglas was first shot.  They could have easily found the location because Page, in a statement to authorities, said that he knew the people who lived at the house in front of which Douglas was shot.  Douglas was shot twice by Page who was standing to his left by the passenger side door.  Therefore the shell casings would have been left at that scene on the ground.  The State was in possession of such shell casings, but has since lost or destroyed this evidence.

1142. Finally, the State failed to investigate the scene where Petrey was kidnapped.  Had they done so, they could have interviewed eyewitnesses, including a woman in a white vehicle, who would have identified Page as the person who kidnapped Petrey.

2.    **Analysis**

1143. In *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984), the Supreme Court applied a standard for determining the materiality of lost evidence:  the High Court concluded that nonmalicious destruction of evidence does not involve a violation of the federal Constitution