Exhibit 45

**Statement**
**of**
**Dano Young**

STATE OF TEXAS

COUNTY OF

BEFORE ME, the undersigned official, personally appeared Dano Young, a person known to me, who, after being sworn upon his oath deposed and stated:

My name is Dano Young. I am Clint Young's brother and Clint was convicted of capital murder. I am familiar with most of the witnesses in this trial and with the people who were living in or hanging around the Fisherman's Hotel near Shady Shores in East Texas. I lived down the street from the Fisherman's Hotel at the time Doyle Douglas was killed. My girlfriend was Deborah Sanders and Doyle Douglas was her uncle. Deborah told me that Doyle Douglas was a pedophile and I know that she refused to allow him to either watch or be alone with her children. Doyle Douglas lived in a house in the same area.

I met Bart Lynch through Deborah Sanders. Bart Lynch used methamphetamine all the time and stayed loaded day and night. I saw Deborah Sanders shoot dope with him all the time.

Clint Young and I had the same father. We had an uncle (Daryl) who was an alcoholic and has since died. I remember one time when Daryl was watching pornography on the television at his friend's house. Daryl told me to come in the room and take off my pants and show my penis. I was around 13 or 14 years old. I ran out of his friend's house. I can remember many times that Clint was left alone with my uncles or my father.

When we were young all the kids slept together in the same room and bed. My father came into our room on many occasions and would touch and hold my penis. This started to happen when I was about four years of age and continued for a long time—at least until he married Carla. When I would cry my father would make me hush. I don't know what he did to my brothers and sisters, but I know they were in the same room with me when he touched me.

STATEMENT OF DANO YOUNG                                    PAGE 1 OF 3 PAGES

000128

My father drank all the time and used cocaine. When he was drunk, he beat all the kids. I think his father (my grandfather) was the same. My dad's father has thrown his kids from a moving car and made them steal in order to eat.

My girlfriend Krystal does not allow our children to visit my father because we suspect he has abused our children. Our daughter has come home on several occasions after being at relatives home and the area around her vagina was red. My son Dylan after visiting my father would come home and complained of his bottom hurting on a few occasions.

Anything seemed to set my father off. It was really bad when he was drunk. My father smoked marijuana with me when I was fourteen years of age. Later we used cocaine together. We really did not get along.

My father was with a woman named Francis for awhile and she was really mean to everyone. She burned my brother and I with hot water, and made us stay outside in the winter in our underwear. She used duct tape across our mouth so we would not talk.

I remember that my father either sexually molested or attempted to sexually molest my sister (Renee). I remember the police showing up and arresting my father for this. I think we lived in either Ohio or West Virginia at the time.

I spoke with Clint's attorneys. However, they did not spend much time asking about how we grew up. We talked in the hall at the courthouse during the trial. I vaguely remember speaking to an investigator in the jail who might have been working for Clint's lawyers. He asked me some general questions about growing up, but never questioned me about any specific events. He never discussed with my any potential sexual abuse. He did not spend very long with me and I did not really understand how discussing our childhood and the bad things in our life could help Clint. Now that I understand, I know that there is much more I could tell them and would have told them.

The District Attorney and police went over my statement from when I was arrested. They kept telling me to say things in a different way. They insisted it be said their way when I testified. At the time this occurred I was on parole and facing

additional charges.  The DA and police used this situation to persuade me to do as they asked.

Dano Young

SWORN TO, and subscribed, before me, the undersigned official, on this the ___ day of April, 2005.

Notary Public in and for
THE STATE OF TEXAS
my comm expires:

LISA NILSEN
My Commission Expires
April 18, 2009

000130

Ex. 45 - Page 607

Exhibit 46

**Statement**
**of**
**Crystal Deshotel**

STATE OF TEXAS

COUNTY OF UPSHER

BEFORE ME, the undersigned official, personally appeared Crystal Deshotel, a

person known to me, who, after being sworn upon her oath deposed and stated:

My name is Crystal Deshotel. I live with Dano Young, Clint Young's brother.
We have been together for almost four years.

I met Lisa Milstein a couple of weeks ago when she came to speak to Dano. Lisa
Milstein also returned on April 18th 2005 to speak to my husband.

I have never liked William Young who is Dano's father. William went by Bill. I
always felt weird around him.

Dano, my son Dylan and I lived with Bill in Beaumont a few years ago. We
wanted a new start and get away from the drugs around here. I remember a few times my
son came inside after being outside with Bill and told me his butt hole hurt. I would talk
to my son and check him but didn't see anything. I don't know what it's supposed to look
like when something like that happens. My husband told me after he talked to Lisa
Milstein that his father used to beat he and his brother and sisters and afterwards
sometimes took him and fondled him.

I gave Lisa Milstein permission to speak to my son Dylan. Afterwards Lisa
Milstein let me listen to their recorded conversation. That is my son Dylan's voice and I
listened to the entire recording. I heard my son tell Lisa Milstein that Bill would undress
him, make him spread his butt cheeks apart and would stick a tree branch in his butt and
that afterwards he would have to glue his butt back together.

Dano's sister Christy has told me that when she would have friends spend the
night they would sleep on the trampoline outside. Her uncle Tony, Gary or Daryl would
come out there and undo their pants. This happened on more than one occasion.

STATEMENT OF CRYSTAL DESHOTEL

PAGE 1 OF 2 PAGES

**000136**

Dano's sister Renee will tell anyone that Bill raped her. She doesn't care who knows.

Not long ago Dano, my kids and I were on Bills property. Dano left to use the bathroom; I believe he went to Renee's house because Bill had not built a house yet. While Dano was gone my daughter Kariann who was six at time was sitting on my lap and Dylan was sitting across a table from me. I had shorts on. Bill reached over and stuck his hands up my shorts and said "Let me lick that pussy, I know you will like that, just give me some of that." I kept pushing his hand away and told him to stop, my daughter kept saying "Stop that is my momma." I was pregnant with Dano's child. Bill said he didn't care and Dano wouldn't know or care. He tried to stick his hand there several times. I told Renee and Dano but they didn't believe it. Not until later that night Renee went out there because Bill's truck stereo was blaring. Bill had stripped down naked and was asleep on a lawn chair. Renee called Dano to come wake him up. They believed me then.



Crystal Deshotel

SWORN TO, and subscribed, before me, the undersigned official, on this the 20 day of April, 2005.

LISA MILSTEIN
My Commission Expires
April 15, 2009

Notary Public in and for
THE STATE OF TEXAS

STATEMENT OF CRYSTAL DESHOTEL

PAGE 2 OF 2 PAGES

000137

Exhibit 47

### AFFIDAVIT OF LISA MILSTEIN

STATE OF TEXAS

COUNTY OF HARRIS

My name is Lisa Milstein. My current address is ███████ Houston TX. I am above the age of eighteen and am competent to make this oath. I have personal knowledge of the following information.

I am a licensed investigator in the State of Texas. I have been assisting Gary Taylor in the investigation of Clint Young's writ of habeas corpus.

On April 20th 2005 I interviewed and recorded Dylan Keen. Dylan Keen lives in Ore City. Dylan is Crystal Deshotel's son. Crystal is living with Dano Young, Clint Young's, brother.

I used my cell phone tape recording device to tape the interview. When I got home the phone did not save the recording. I spoke to my cell phone provider and we could not recover the recording. Dano Young and Crystal Keen both listened to the recorded interview before I left their home in Ore City. Gerald Bierbaum, an attorney who often works with Mr. Taylor, spoke to Dylan on the phone; Dylan told him the same information. The following is what Dylan told me today.

Dylan is four years old. Dano Young's natural father Bill would undress him, make him pull his butt cheeks apart and stuck a stick in his behind. Bill laughed while he did this. Dylan stated that he had to glue his behind back together. Dylan further stated to me that Bill has done this three times.

On April 21st 2005 I phone interviewed and recorded Dylan Keen. Dylan told me the same information as he did on April 20th 2005. Also present during this phone interview was his mother Crystal Deshotel.

FURTHER SAYETH NOT

Lisa Milstein

4/21/05
Date

Signed and sworn on the 21 day of April ,2005

Notary Public in for the state of Texas



VENG HUNG CHAN
Notary Public, State of Texas
My Commission Exp. 05-19-2007

000134

Exhibit 48

04/20/2005  12:48 FAX  9036933598          WINGATE LONGVIEW                    ☒001/008

# AFFIDAVIT OF PATRICIA MCCOY

## STATE OF TEXAS

## COUNTY OF MARION

I am above the age of eighteen and am competent to make this oath. I have personal knowledge of the facts herein stated.

My name is Patricia McCoy. I live at ████████████ TX 75683. I am married to Darnell McCoy.

I came to know Clint Young when I lived at the Fisherman's Motel in Shady Shores. My cousin, David Page, was a close friend of Clint's. Because I lived at the Fisherman's Motel for a while, I know just about everyone involved with Clint's case. All of the people who hung out at the Fisherman's motel used illegal drugs except for my husband and Amber Lynch. The Fisherman's hotel was filthy; it was very obvious there were drug use, high crime rate, and people overdosing on drugs. It was like being in a war zone; most of the older guys walked around with guns. It was so bad one night my friend Deborah Sanders, whose father Bart Lynch owned the hotel, was dragged out her window and gone for 18 hours; my step-dad found her bleeding in a ditch and she had been raped.

Everyone in the area knew that Doyle Douglas was a pedophile and everyone talked about it. I remember hearing Deborah Sanders, Jose, and Clint talk about it. Doyle let us use his car all the time. I remember that one time, when Clint borrowed Doyle's car, Clint found a paid of young girl's panties and a police badge in the car. We all knew what Doyle had been doing with the badge and how he must have gotten the panties. When Doyle was partying (using drugs), which was a lot, he tried to touch us all in a sexual manner. He was disgusting.

Bart Lynch owned the Fisherman's Motel. He is Deborah Sanders' and Amber Lynch's father. We all had heard that Bart was a "narc" and worked for the police. Bart was real strange and stayed in his room most of the time. Bart was also real secretive. One day he gave us all eviction notices, had the electricity turned off, and left within two hours. No one knew for certain why he was suddenly in such a hurry to get out of town but we figured it had something to do with drugs.

000139

04/20/2005 12:49 FAX  8038833598          WINGATE LONGVIEW                    ☑002/006

After Clint's arrest, I was interviewed by the police and by the District Attorney about my knowledge of Clint and what had happened. I loved Clint as a dear friend and still do. I still can't believe what happened. I have never seen Clint be mean to anyone or act in a violent manner. I did not believe that Clint was a danger to anyone. I told the police and the District Attorney this.  I know something terrible had to have happened to Clint to have caused him to kill someone. I also told the police and District Attorney that I did not believe Clint should get the death penalty. I told them I do not believe in the death penalty, but they did not want to hear those sorts of things.

The police interviewed my husband, Darnell McCoy, about what had happened to Doyle Douglas. The police took a blood sample from my husband because they said they found blood on Doyle's body that was not his. We were never told whose blood it was determined to be.

Someone from Clint's defense team came by to talk to my husband and me before Clint's trial. I called the District Attorney's office because I did not know if I was allowed to speak to the defense. Hal, who worked at the District Attorney's, instructed me that I didn't have to talk and not to talk to Clint's defense attorneys or investigators.  My husband has trouble with his memory, which might be due to his mother's alcoholism during her pregnancy with him. Because my husband is "slow", I think the District Attorney was worried that someone from the defense team would trip him up or trick him.  Neither Darnell nor I spoke to the defense attorneys or investigators before Clint's trial because we thought we were not allowed to.

My husband and I were brought to Midland to testify for the District Attorney in Clint's trial. During the trial the District Attorney put us in an office located on the top floor of the courthouse. They showed us pictures of Doyle Douglas's corpse over and over again. They also gave us the videotape and written copies of my husband's statements, so we could review them together. Darnell is pretty slow, mentally, and needed help going over the statements he gave police so he would remember what he was supposed to say when he testified.  I was asked to go over the statements with Darnell even before they told me they would not use me as a witness.  Darnell testified for the District Attorney, but they decided not to use me as a witness near the end of the trial.

There are several things I would have told the judge and jury about Clint and what was happening at the Fisherman's Motel around the time of Doyle Douglas's death.  I could have explained how strung out Clint was during the weeks and days prior to the Doyle's death.   I know (saw ) Clint using methampetamine continuously for weeks before Doyle's death.  I could have described how Clint got when he binged on methamphetamine.  Clint was really paranoid, and at times acted absolutely insane.  He was rambling, speaking gibberish, and could not understand what people would say to him.

04/20/2005 12:48 FAX  8036633586          WINGATE LONGVIEW                    ☑003/006

I could have described for the judge and jury how it feels to be dependent on methamphetamine. I know from my own experiences what might have been going on with Clint during those days. He would have been out of control, without sleep for days, full of nervous energy, seeing and hearing things that were not really there. Methamphetamine addiction is awful.

I think I understand why Clint was addicted to drugs. Clint and I were real close and would talk for hours about his childhood. Clint described how his father used to beat him all the time. He told me his father sexually molested him when he was a little boy. Clint also told my friend Trisha Patrick about this. Trisha and I discussed about what Clint had told us; we both believed him. Clint had a horrible childhood and many people I know who come from families like that use drugs.

Clint was not really obsessed with guns. He carried a gun but it didn't work. The gun did not have a barrel in it. Honestly, I don't blame Clint for carrying the gun because Fisherman's Motel was filled with criminals and drug users. We had to always watch out for people or else we got robbed or worse.

I wish I could have told the judge and jury about Clint, his background, his drug addiction, and that he is not violent or dangerous person. I also wish I could have told the judge and jury what I knew about Doyle Douglas's reputation as a pedophile and how he tried to touch everyone. I believe that if the judge and jury heard the whole story about the things that went on in Shady Shores, and what kind of person Clint really is, they would not have given him the death penalty.

After my husband Darnell testified in this case, he attempted suicide. He suffered mental problems as a result of the stress of the trial and the event. He was diagnosed with post-traumatic stress disorder and manic-depressive. I was present when Lisa Milstein, the investigator who is working on Clint's case, interviewed Darnell. Darnell spent a lot of time discussing the trial and the case with Ms. Milstein. It really bothered him a lot, made him more depressed and Darnell recently left town.

000141

**Ex. 48 - Page 613**

I have read through the statement, which was prepared for Darnell based upon his interviews with Lisa Milstein. It is attached to my statement herein. This statement accurately reflects Darnell's conversation with Ms. Milstein. Additionally, I know the truth of most of the matters in Darnell's statement from my own personal knowledge. Clint Young was never violent in my presence and I never heard anyone accuse him of being mean or violent. I never saw Clint get into a fight. I know that Clint and Darnell were good friends. I know that Doyle Douglas let Clint drive his car all the time. I know and observed all the people who hung around the Fisherman's Hotel use drugs.   I was present when the police showed Darnell pictures of Doyle Douglas over and over.

_Patricia McCoy_
Patricia McCoy

_4-19-05_
Date

Signed and sworn on this _19_ day of _April_, 2005

_[signature]_
Notary Public in and for
the State Of Texas

LISA MILSTEIN
My Commission Expires
April 16, 2009

000142

Exhibit 49



**JOHN G. HYDE**

238ᵀᴴ DISTRICT COURT
MIDLAND COUNTY COURTHOUSE
200 WEST WALL, SUITE 400
**MIDLAND, TEXAS 79701**

(915) 688-1142
(915) 688-1866 – Fax

October 29, 2002

Mr. Al Schorre
District Attorney
200 W Wall, Suite 201
Midland, Texas 79701

Mr. Paul Williams
Attorney at Law
200 N. Loraine, Suite 1125
Midland, Texas 79701

Mr. Ian Cantacuzene
Attorney at Law
203 W Wall, Suite 1107
Midland, Texas 79701

    Re:    Cause Number CR27181; State of Texas vs. Clinton Young, III

Dear Counsel:

    The letter of October 17, 2002 from Mr. Dan Meador, Assistant General Counsel, Texas Department of Health, clearly indicates that the complaint filed by the District Attorney against Mr. Byington is without merit. Although persuasive, the letter does not ultimately resolve the pending complaint and it does not conclude the question before the trial court initiated by Mr. Schorre's complaint against Mr. Byington. Another pre-trial conference will be scheduled on December 6 to finally resolve the District Attorney's challenge to Midland County paying for Mr. Byington's work on behalf of the Defendant.

    Very truly yours,

John G. Hyde

JGH/ch

Exhibit 50

Westlaw.

22 TX ADC § 781.102                                                                                   Page 1
22 TAC § 781.102

Tex. Admin. Code tit. 22, § 781.102

**TEXAS ADMINISTRATIVE CODE**
**TITLE 22. EXAMINING BOARDS**
**PART 34. TEXAS STATE BOARD OF SOCIAL**
**WORKER EXAMINERS**
**CHAPTER 781. SOCIAL WORKER**
**LICENSURE**
**SUBCHAPTER A. GENERAL PROVISIONS**
Current through December 31, 2007

§ 781.102. Definitions

The following words and terms, when used in this chapter, shall have the following meanings, unless the context clearly indicates otherwise.

(1) Accredited colleges or universities--An educational institution that is accredited by an agency recognized by the Texas Higher Education Coordinating Board.

(2) Act--The Social Work Practice Act, Occupations Code, Chapter 505.

(3) ALJ--A person within the State Office of Administrative Hearings who conducts hearings under this chapter on behalf of the board.

(4) Agency--A public or private employer, contractor or business entity providing social work services.

(5) AMEC--alternative method of examining competency, as referenced in Occupations Code, §505.356(3).

(6) APA--The Administrative Procedure Act, Government Code, Chapter 2001.

(7) Association of Social Work Boards (ASWB)--National organization representing regulatory boards of social work. Administers the national examinations utilized in the assessment for licensure.

(8) Board--Texas State Board of Social Worker Examiners.

(9) Case record--Any information related to a client and the services provided to that client, however recorded and stored.

(10) Client--An individual, family, couple, group or organization that seeks or receives social work services from a person identified as a social worker who is either licensed or unlicensed by the board. An individual, family, couple, group or organization remains a client until the formal termination of services.

(11) Clinical social work--A specialty within the practice of social work that requires the application of social work theory, knowledge, methods, ethics, and the professional use of self to restore or enhance social, psychosocial, or biopsychosocial functioning of individuals, couples, families, groups, and/or persons who are adversely affected by social or psychosocial stress or health impairment. The practice of Clinical Social Work requires the application of specialized clinical knowledge and advanced clinical skills in the areas of assessment, diagnosis, and treatment of mental, emotional, and behavioral disorders, conditions and addictions, including severe mental illness in adults and serious emotional disturbances in children. Treatment methods include the provision of individual, marital, couple, family, and group therapy and psychotherapy. Clinical social workers are qualified to use the Diagnostic and Statistical Manual of Mental Disorders (DSM), the International Classification of Diseases (ICD), and other diagnostic classification systems in assessment, diagnosis, and other activities.

(12) Clinical supervision--An interactional professional relationship between a supervisor and a social worker that provides evaluation and direction over the supervisee's practice of clinical social work and promotes continued development of the social worker's knowledge, skills, and abilities to engage in the practice of clinical social work in an ethical and competent manner.

(13) Confidential information--Individually identifiable information obtained from a client or records relating to a client, including the client's identity, demographic information collected from an

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Tex. Admin. Code tit. 22, § 781.102

individual, that relates to the past, present, or future physical or mental health or condition of an individual; the provision of social work services to an individual; the past, present, or future payment for the provision of social work services to an individual; and identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual which is not discloseable under applicable law or court rules of evidence. Client information is "confidential" if it is intended to be disclosed to third persons to further the interest of the client in the diagnosis, examination, evaluation, or treatment, or those reasonably necessary for the transmission of the communication, or those who are participating in the diagnosis, examination, evaluation, or treatment under the direction of the professional, including members of the patient's family.

(14) Completed application--The official social work application form, fees and all supporting documentation which meets the criteria set out in this title (relating to Required Application Materials).

(15) Conditions of exchange--The setting of rates of reimbursement or fee structure and business rules or policies involving issues such as cancellation of appointments, office hours, and management of insurance claims.

(16) Contested case--A proceeding in accordance with the APA and this chapter, including, but not limited to, rule enforcement and licensing, in which the legal rights, duties, or privileges of a party are to be determined by the board after an opportunity for an adjudicative hearing.

(17) Counseling--A method used by social workers to assist individuals, couples, families or groups in learning how to solve problems and make decisions about personal, health, social, educational, vocational, financial, and other interpersonal concerns.

(18) Consultation--To provide advice, opinions and to confer with other professionals regarding social work practice.

(19) Continuing education--Formal or informal education or trainings, which are oriented to maintain, improve or enhance social work practice.

(20) Council on Social Work Education (CSWE)--The national organization that accredits social work education schools and programs.

(21) Department--Department of State Health Services.

(22) Detrimental to the client--An act or omission of a professional responsibility that is damaging to the physical, mental, or financial status of the client.

(23) Direct practice--The provision of services, research, system linkage, system development, maintenance and enhancement of social and psychosocial functioning of clients.

(24) Dual relationship--Dual or multiple relationships occur when social workers relate to clients in more than one capacity, whether it be before, during or after the professional, social, or business relationship. Dual or multiple relationships can occur simultaneously or consecutively.

(25) Endorsement--The process whereby the board reviews requirements for licensure completed while under the jurisdiction of a different regulatory board from another state. The board may accept, deny or grant partial credit for requirements completed in a different jurisdiction.

(26) Examination--A standardized test or examination of social work knowledge, skills and abilities, which has been approved by the board.

(27) Exploitation--An unequal balance is inherent in the client/professional relationship and may be present in the professional/professional relationship. To use this power imbalance for the personal benefit of the professional at the expense of the client or another professional is exploitation. Exploitation may take financial, business, emotional, sexual, verbal, religious and/or relational forms.

(28) Exploitive behavior--A pattern, practice or scheme of conduct that can reasonably be construed as being primarily for the purposes of meeting the needs or being to the benefit of the social worker rather than in the best interest of the client or at the expense of another professional. Exploitation may take financial,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

22 TX ADC § 781.102                                          Page 3
22 TAC § 781.102

Tex. Admin. Code tit. 22, § 781.102

business, emotional, sexual, verbal, religious and/or relational forms.

(29) Family systems--An open, on-going, goal-seeking, self-regulating, social system. Certain features such as its unique structuring of gender, race, nationality and generation set it apart from other social systems. Each individual family system is shaped by its own particular structural features (size, complexity, composition, life stage), the psychobiological characteristics of its individual members (age, race, nationality, gender, fertility, sexual orientation, health and temperament) and its socio-cultural and historic position in its larger environment.

(30) Formal hearing--A hearing or proceeding in accordance with this chapter, including a contested case as defined in this section to address the issues of a contested case.

(31) Flagrant--Obviously inconsistent with what is right or proper as to appear to be a flouting of law or morality.

(32) Fraud--Any misrepresentation or omission by a social worker related to professional qualifications, services, or related activities or information that benefits the social worker.

(33) Full-time experience--Social work services totaling 30 or more hours per week.

(34) Group supervision--Supervision that involves a minimum of two and no more than six supervisees in a supervision hour.

(35) Health care professional--A licensee or any other person licensed, certified, or registered by the State of Texas in a health related profession.

(36) Home study--A formal written evaluation or social study to determine what is the best interest of a minor child or other dependent person.

(37) Independent clinical practice--The provision of clinical social work in independent practice in which the social worker assumes responsibility and accountability for the nature and quality of the services provided to clients, pro bono or in exchange for direct payment or third party reimbursement.

(38) Independent non-clinical practice--The practice of non-clinical social work outside the jurisdiction of an organizational setting, after completion of all applicable supervision requirements, in which the social worker assumes responsibility and accountability for the nature and quality of the services provided to clients, pro bono or in exchange for direct payment or third party reimbursement.

(39) Independent practice--The practice of social work services outside the jurisdiction of an organizational setting, after completion of all applicable supervision requirements, in which the social worker assumes responsibility and accountability for the nature and quality of the services provided to clients, pro bono or in exchange for direct payment or third party reimbursement.

(40) Indirect practice--Work on behalf of the client utilizing negotiation, education, advocacy, administration, research, policy development and resource location that does not involve immediate or personal contact with the clients being served.

(41) Individual supervision--Supervision of one supervisee during the supervision session.

(42) Investigator--A professional utilized by the board in the investigation of allegations of professional misconduct.

(43) LBSW--Licensed Baccalaureate Social Worker.

(44) LCSW--Licensed Clinical Social Worker.

(45) License--A regular, provisional, or temporary license or recognition issued by the board unless the content of the rule indicates otherwise.

(46) Licensee--A person licensed or recognized by the board to perform professional social work practice.

(47) LMSW--Licensed Master Social Worker.

(48) LMSW-AP--Licensed master social worker-advanced practitioner.

(49) Non-clinical social work--The areas of social

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Tex. Admin. Code tit. 22, § 781.102

work practice that include community organization, planning, administration, teaching, research, administrative supervision, non-clinical consultation and other related social work activities.

(50) Part-time--Social work services totaling less than 30 hours per week.

(51) Party--Each person, governmental agency, or officer or employee of a governmental agency named by the ALJ as having a justiciable interest in the matter being considered, or any person, governmental agency, or officer or employee of a governmental agency meeting the requirements of a party as prescribed by applicable law.

(52) Persistently--Existing for a long or longer than usual time or continuously.

(53) Person--An individual, corporation, partnership, or other legal entity.

(54) Pleading--Any written allegation filed by a party concerning its claim or position.

(55) Psychotherapy--The use of treatment methods utilizing a specialized, formal interaction between a clinical social worker and an individual, couple, family, or group in which a therapeutic relationship is established, maintained and sustained to understand intrapersonal, interpersonal and psychosocial dynamics, and the diagnosis and treatment of mental, emotional, and behavioral disorders, conditions and addictions.

(56) Reciprocity--The granting of an official license based on the current status of licensure in a different jurisdiction. Reciprocity is granted based on the formal written agreement between the board and regulatory body in the other jurisdiction.

(57) Recognition--Authorization from the board to engage in the independent or specialty practice of social work services.

(58) Rules--Provisions in this chapter specifying the implementation of statute and operations of the board and individuals affected by the Act.

(59) Sexual contact--Any touching or behavior that

can be construed as sexual in nature.

(60) Sexual exploitation--A pattern, practice or scheme of exploitative behavior, which may include sexual contact.

(61) Social Work Case Management--The use of a biopsychosocial perspective to assess, evaluate, implement, monitor and advocate for services on behalf of and in collaboration with the identified client.

(62) Social worker--A person licensed under the Act.

(63) Social work practice--Services and actions performed as an employee, independent practitioner, consultant, or volunteer for compensation or pro bono to effect changes in human behavior, a person's emotional responses, interpersonal relationships, and the social conditions of individuals, families, groups, organizations, and communities. For the purpose of this definition, the practice of social work is guided by special knowledge, acquired through formal social work education development and behavior within the context of the social environment, and methods to enhance the functioning of individuals, families, groups, communities, and social welfare organizations. Social work practice involves the disciplined application of social work values, principles, and methods, including psychotherapy, marriage and family therapy, couples therapy, group therapy, case management, supervision of social work services, counseling, assessment, and evaluation. Social work practice may also be referred to as social work services, of social welfare policies and services, social welfare systems and resources, human services.

(64) Supportive counseling--The methods used by social worker to help individuals create and maintain adaptive patterns. Such methods may include building community resources and networks, linking clients with services and resources, educating clients and informing the public, helping clients identify and build strengths, leading community groups, and providing reassurance and support. This type of social work is not considered clinical social work.

(65) Supervisor, board approved--A person meeting the requirements set out in §781.302 of this title (relating to Clinical Supervision for LCSW and Non-Clinical Supervision for LMSW-AP and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

22 TX ADC § 781.102                                                                    Page 5
22 TAC § 781.102

Tex. Admin. Code tit. 22, § 781.102

Independent Practice Recognition), to supervise a
licensee towards the LCSW, LMSW-AP or
Independent Practice recognition.

(66)   Supervision--The   professional   interaction
between a supervisor and a social worker in which the
supervisor evaluates and directs the services provided
by the social worker and promotes continued
development of the social worker's knowledge, skills
and abilities to provide social work services in an
ethical and competent manner.

(67)  Supervision hour--A supervision hour is a
minimum of 60 minutes in length.

(68) Telepractice--Interactive service delivery where
the client resides in one location and the professional
in another.

(69) Termination--The end of professional services,
meetings, and billing for services.

(70) Texas Open Meetings Act--Government Code,
Chapter 551.

(71)  Texas  Public  Information  Act--Government
Code, Chapter 552.

(72)  Waiver--The   suspension   of   educational,
professional, and/or examination requirements for
applicants who meet the criteria for licensure under
special conditions based on appeal to the board.

Source: The provisions of this §781.102 adopted to be
effective August 24, 2005, 30 TexReg 4836; amended
to be effective May 4, 2006, 31 TexReg 3537;
amended to be effective March 4, 2007, 32 TexReg
890.

22 TAC § 781.102, 22 TX ADC § 781.102

22 TX ADC § 781.102
END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 51

July 14. 2005

To the Court:

Re: Clinton Lee Young   cause No. 27,181

Greetings,

I am writing this in the matter of Clinton Lee Young vs. the State of Texas Trial court case no. AP-74,643. I am submitting the issues I wanted raised in the writ of Habeas Corpus for cause no. CR-27,181 filed under Tex. Code. Crim. Proc. Art. 11.071. These are the issues that I requested my State Writ of Habeas Corpus counsel to file, which he did not do. I want the issues filed on my behalf so that they are not procedurally barred from review.

#1) Ineffective assistance of trial counsel, for failing to admit additional reports that pertained to the ballistic reports and autopsy reports, which challenged states theory.
#2) Ineffective assistance of trial counsel for failing to have tests conducted on the car of victim Doyle Douglas which would have provided exculpatory evidence.
#3) Ineffective assistance of trial counsel for failing to object to the admission of my county jail records. These records contained false information that should have been challenged. I informed my trial lawyer of this and he told me not to worry about it, that the jury would not read it.
#4) Ineffective assistance of trial counsel. My trial counsel failed to investigate claims of the co-defendants conspiring through an ex-girlfriend of David Page. The D.A. in closing arguments stated that the co-defendants could not have collaborated this story. The co-defendants did collaborate their story through a mutual friend. This claim was never investigated.
#5) Ineffective assistance of trial counsel for failing to request a mis-trial when it was discovered that a relative of the victim was on my jury. The jury had talked together and well as prayed together before the juror was dismissed.
#6) Ineffective assistance of trial counsel for failing to question Debbie Sanders about her conversation with Carla Sexton in which she told her that she clearly heard Mary Ray brag to Patrick Brooks that he shot Doyle Douglas. This also would have challenged Patrick Brooks's testimony.
#7) Ineffective assistance of trial counsel for failing to strike Mrs. Haydee Guerrero from my jury. She did not speak or understand English well enough to fluently understand all of the testimony and evidence. I did not want her on my jury because she would have trouble understanding the scientific and legal terms as well as evidence. If she would have been struck Mrs. Gentry would have been on my jury. It has been said that following my conviction she made a statement to the fact that she never would have convicted me of capitol murder.
#8) Ineffective assistance of trial counsel for not impeaching J. Timmons who testified against me. My counsel was in possession of a report that was written by J. Timmons that would have shown her testimony to be false.

#1 of 2 pgs

#9) Ineffective assistance of trial counsel for failing to object when assistant D.A. Teresa Clingman lied to the jury  in closing arguments, by stating to the jury that I admitted to the murder to a defense witness when no such evidence was proven  or brought up in the trial.  The D.A. further added that I never expressed remorse which is not true and my counsel failed to get this across to the jury.

#10) Ineffective assistance of counsel by failing to admit into evidence during the innocent/guilt phase of the trial that due to appellate severe A.D.H.D. , mental illness, and current state of mind that he could not have <u>anticipated</u> other defendants actions.

#1) Prosecutor misconduct.  The D.A. was in possession of a report written by J. Timmons of T.Y.C. that would have proven her testimony false and biased, the D.A. knowingly allowed J. Timmons to testify falsely.

#2) Prosecutor misconduct.    The assistant D.A. Teresa Clingman told the jury that I confessed to the murder to a defense witness which is a completely false statement. There is nothing in the records or in the testimony that indicated this could be true. This false statement was made in an attempt to confuse and mislead my jury.

#3) Prosecutor misconduct.  D.A. Rick Berry had Mark Ray give a victim impact statement against me.   Mark Ray was a co-defendant who admitted to shooting Doyle Douglas and was given special consideration for his testimony against me, he was <u>not</u> a victim as the D.A. led my jury to believe.  This victim impact statement could have caused the jury to hold Mark Ray in a light of less guilt and place more belief in his testimony.

#4) Prosecutor misconduct.  Assistant D.A. Teresa Clingman stated that I did not express remorse when she was aware of the Judges ruling on hearsay.  Every time my counsel asked a defense witness about whether or not I had expressed remorse, Mrs. Clingman objected.

I am writing these issues out in my letter to the court because I would like these issues raised so that the record is preserved and these issues not procedurally barred.  I informed my State Writ of Habeas Corpus counsel Mr. Gary Taylor that I wanted these issues filed in my Writ.  He failed to do so.  So I am filing them Pro se.  On June 1, 2005,  I mailed Gary Taylor a copy of the letter to the court.  He has not responded to advise me whether I am to file it or not.

These issues that I have brought to light all violate my state and federal constitutional rights.  I appreciate your assistance in this matter.

Respectfully submitted,

s.  _____

Clinton Young #999447
Polunsky Unit
3872 F.M. 350 South
Livingston, Texas  77351

FILED

2005 AUG 25  PM 12: 33

VIVIAN ... DISTRICT CLERK
MIDLAND COUNTY, TEXAS
BY_____ DEPUTY

August 15, 2005

Honorable John G. Hyde
RE: Pro se letter to the court in cause No. CR-27,181
State of Texas vs Young

I would like to file an additional Ineffective Assistance of Trial Counsel Claim.

1.   The trial counsel in Cause No. CR-27,181 was ineffective by failing to introduce David Page
     as a defendant in the guilt innocence jury instructions pertaining to the murder of Doyle
     Douglas.

Facts: The ballistic report, autopsy report, and other reports in relation to the ballistic and autopsy
reports, show that the person responsible for the first two shots to Doyle Douglas is David Page.
This claim is made stronger by David Page's own admission of his location at the time Doyle
Douglas was shot ▪▪▪▪▪▪▪▪. The jury was not provided with an opportunity to consider this
evidence that exonerates appellant in the shooting of Doyle Douglas. The Instructions to the jury
hindered the appellant's ability to have a fair trial by jury, thus violating appellant's 6th and 14th
amendment rights. Due to this violation appellant's incarceration and execution would and does
violate appellant's 8th amendment rights.
I am not a lawyer, therefore I do not know how to judiciously research and cite case law pertaining
to this case. I am a concerned citizen, however, that is fully capable of recognizing blatant human
rights violations, such as these.
The only case law I was able to locate is:
Wiggins vs. Smith 539 US 510,522 (2003)
Williams vs. Taylor 529 US 362,396 (2000)
Butler s. State 719 S.W. 2D 48, 54 (TX.CR.APP/1986)
I continue to research case law directly pertaining to error in introducing additional suspect and
defendants in the jury instructions. However, I feel confident Your Honor is well versed in these
matters, and furthermore holds the law in such sanctity that to allow such gross negligence to go
unanswered would be in direct conflict with the stature and morals your position demands.

Thank you for your time and effort in this matter. I filed this claim in order to preserve the record
for review.

Respectfully Submitted,

/s/ _____

Clinton L. Young
TDCJ-ID#999447
Pro se

Exhibit 52

March 21, 2005

From: Clinton Young #999447
      Polunsky Unit
      Death Row



To: Attorney at Law
    Gary Taylor
    P.O. Box 90212
    Austin, Tx 78709

This letter is pertaining to State Writ of Habeas Corpus 2/26/05

Greetings. I am writing this in regards to the issues, that I would like raised in my State Writ of Habeas Corpus. These issues pertain to misconduct during my trial and absolute scientific evidentiary proof of my innocence. If all of these issues that pertain to innocence was presented at my trial, it could have lead to a reasonable peson on my jury having doubt and voting not guilty. At the least it could have resulted in a vote of no for special issue #1, #2 or #3 which would have resulted in a life sentence. These issues are:

1. The ballistics reports that line out the numbers used to identify all the bullets, from victim #1 being Doyle Douglas, was not admitted into evidence. These reports when matched with the personal records of the forensic pathologists that conducted the autopsy on Doyle Douglas shows that I could not have been the shooter. They show this fact by indicating that the gun that Mark Ray "admitted" to shooting Doyle Douglas with, was responsible for the gunshot wound on the right side of Doyle Douglas's head. In the ballistics report of Mr. Tim Counce, he states that the .22 revolver handgun Mark Ray used was not responsible for the other two bullets. In his report he identifies the bullet "not" fired by the Colt huntsman .22 pistol as #16 I. He states that "they are unable to identify or eliminate the submitted .22 caliber class projectile item #16 I as being fired from the submitted RG revolver ⟨Mark Ray's gun⟩. He then goes on to say "it is our opinion that the above mentioned projectile "was not" fired from the submitted colt pistol. In the autopsy report this gunshot projectile is described as gunshot wound #3, which was to the right side of Doyle Douglas's head. The other 2 projectiles which was identified in the ballistics report by Tim Counce as #16 G and # 16 H. Tim Counce determined this fact. "We were unable to identify or eliminate the submitted .22 caliber projectiles item #16 G and #16 H as being fired from the submitted Colt pistol. It is our opinion that the above mentioned projectile s "were not" fired from the submitted RG revolver" These projectiles are described in the autopsy report as gunshot wound #1 and #2. The forensic pathologist was just using # 1, # 2, and # 3 as reference numbers for this report. However, in her actual identifying of the bullets by way of labeling them for when she sent them to Mr. Counce to conduct his test, gunshot wound # 3, which was to the right side of Doyle Douglas's head, lines up with projectile #16 I. Gunshots # 1 and # 2 lined up with the projectiles #16 G and #16 H. Meaning it is clear by unbiased scientific evidence that Mark Ray is responsible for the gunshot to the right side of Doyle Douglas's head. ⟨It is a fact that he admitted to shooting Mr. Douglas.⟩ Now throughout the trial the co-defendants all said I was sitting in the passenger side of the car and that Doyle Douglas was in the drivers seat. They said I shot Mr. Douglas twice and then when he was placed inthe creek that Mark Ray shot him once. The D.A. indicated that Mark Ray shot Doyle Douglas in the left side of the head and that I supposedly



shot him in the right side and back of the head which according to the words of the co-defendants would have been the only way I could have shot Mr. Douglas in the car. However, the scientific reports clearly show that the gun Mark Ray used is responsible for the wound to the right side of Mr. Douglas's head. The other gun that David Page and Mark Ray indicated that I used was responsible for the gunshot wounds to the left and back of Mr. Douglas's head. Now, if I am sitting inside of a small car, to the right side of a person, there is no way that I could have shot that person in the left side of the head. There was no gunshot residue on skin, meaning the shot was fired at 3 feet or greater. There was no gunshot residue on any of the three wounds. All of this information, if presented properly and with the reports of Tim Counce and Jill Urban, the forensic pathologist, admitted for the jury to see, shows that I could not have shot Doyle Douglas and that the shots to the left and back of the head are consistent as being fired by David Page, whom was standing to the left of Mr. Douglas outside the car on the drivers side with the door open. The wound to the right side along with the reports and Mark Rays admission of guilt, clearly shows that it was Mark Ray that was responsible for that wound. If all this evidence would have been presented to the jury, it could have caused a reasonable person to have a doubt and voted not guilty to the murder of Doyle Douglas, or it could have caused a vote of no to special issue # 2 which would have resulted in a life sentence.

My lawyer, Paul Williams, was aware of this evidence, but chose not to admit it by calling Tim Counce back to the stand in order to explain and admit all of his reports, so that the jury could have a full understanding as to what happened.

#2 The car that belonged to Doyle Douglas was never tested. There were 2 shell casings found in the car. The D.A. presented the theory that these shell casings show that the shooter was in the car. The shell casings matched the colt pistol, which is supposedly responsible for 2 of the gunshot wounds to Doyle Douglas. The D.A. was trying to present the fact that the shell casing was in the car as evidence that I shot Doyle Douglas. However, I informed both of my attorney's that the dash and steering wheel was shot inside the car, which is where the shell casings came from.

Ann Hinkle, whom is a FBI agent performed evidentiary work on Mr. Douglas 's car. She described a defect on the dash that had burn marks on it. She never did a test on this defect. I informed my attorney's that the car needed to be tested and that if tested the defects would prove to be bullet holes, and would show that the shell casings was from when the dash was shot. This evidence along with the ballistics report would show that the shooter was most likely from the outside of the car and that I could not have been the shooter. I told my lawyers to conduct the test on the car months prior to my trial. The tests were never conducted, nothing was done. My lawyers did try to contact Mrs. Ann Hinkle to discuss the case, yet she would not return the call. This evidence would have disproved the states theory that I shot Doyle Douglas in the car. This would lead the jury to concluede that I did not and could not have shot Mr. Dougla

#3 Ineffective assistance of counsel.

When the D.A. admitted the Texas Youth Commisions records into evidence, my attorney failed to object. They should have done so because they know that the record contained reports on other inmates regarding violent threats. The jury might have read the reports and assumed it was on me. Since the records was said to be mine which might have caused them to vote yes for special issue #1, regarding future violence. I told my attorneys that I wanted them to object to the admission of this record due to it being "tainted". They told me " don't worry about it, they won't read that record it is too thick". They took a gamble on my life.

#4  Ineffective assistance of cousel.

My attorneys failed to investigate claims of the co-defendants conspiring through an ex-girlfriend of David Page.  The District Attorny in closing aruguments stated that they could not have colaberated their story because both were locked up.  They did colaberate through a mutual friend.  If this claim would have been investigated and presented to the jury then it might have caused some or all to have enough doubt  to vote not  guilty to capitol murder.

#5 Ineffective assistance of counsel.

My attorneys did not  request a mis-trial when it  was discovered that a relative of  Sam Petry (sp.?)  was on my jury.  She was an alternate jury member but she was in direct contact with my  jury and was even in the jury room with them during court  breaks.  She was there when the jury asked if it was okay  to pray, so she had a chance to bond with the jury.  This might have caused the jury to want to convict me due to the relatives influence.  I  requested that they request a mis-trial.  My request was ignored.

#6  J. Timmons testified that I assaulted her while fighting another student at the Texas Youth Commission.  She stated that  when she tried to break up the fight I started to hit her.  At the time of trial we did not have her 225 incident report which gave a detailed descrption of the fight.  Upon coming to death row, I was sent some of the paperwork  from my case and history.  I located the 225 incident report that was written by J. Timmons.  No where in this report does she say that I hit her!  If I would have hit her, it would have been written  in her incident report.  Mrs. Timmons lied to my jury.  I would like something filed to show that she lied on the stand.  If the jury would have seen this incident report, it would have discredited J. Timmons and since I had no other assaults against an officer, it could of had an impact on how they voted for special issue # 1 dealing with future dangerousness.

#7  Ineffective assistance of counsel.

My attorneys failed to call Margaret Ann Font and Mary Hall both whom was teachers of mine.  Both could have and would have spoken good about me.  The only teachers called from schools that I attended outside of T.Y.C.  was teachers that spoke negative about me, so both should have been called to show that I was a good person and if they was called it could have had an influence on the jury for special issue # 3.

#8  I never got a chance to show the jury that I expressed remorse.  When my lawyers went to ask my Mother, the D.A. objected and the judge upheld this objection.  The judge  later sited a case that said people could say that the defendant expressed remorse but could not say what he said.  My lawyers failed to get this important detail in.  So the jury could have thought that I did not have any remorse.  This could have influenced their vote on special issue # 1 and # 3.

#9  In closing arguments District Attorny Clingman told the jury that I admitted to the murders to a defense witness.  This is  incorrect.  There is nothing on record about this.  My lawyers failed to object to the prosecuters misconduct  for lying to the jury.  This "false" statement could have mislead the jury into convicting me.  I would like prosecutorial misconduct filed.  I would also like to have ineffective assistance of counsel filed because my lawyers failed to object to this false statement.

#10  Ineffective assistance of counsel.

My lawyers failed to impeach Debbie Sanders by failing to question her about the conversation she had



with Carla Sexton, in which she told her that she clearly heard MarK Ray brag to Patrick Brooks that he shot Doyle Douglas. This also would have affected Patrick Brooks testimony because he did lied and told the jury that I was the one that admitted the killing of Doyle Douglas to him

#11 I did not want Mrs. Guerreo on my jury. I informed my lawyers of this. I asked that she be struck from my jury due to the fact she had trouble speaking English and ran the risk of not fully understanding the scientific evidence presented She was also seen dozing off while in the jury box with a witness on the stand. I informed my lawyer of this, he told me not to worry about it. He didn't want to say anything to embarrass Mrs. Guerreo. If she would have been struck, Mrs. Gentry would have been on my jury. It was reported that she said that she would never convict me of capitol murder.

#12 My lawyers failed to challenge my county jail records. There were reports that had a negative impact on me. One of which being a report that I had the information to all the jury members and was going to get a hung jury. This is not what was said. I told an inmate that they gave me all the potential jury members info and"he" said "that sounds like a hung jury to me". Because this report was never challenged it could have caused the jury to feel threatened and want to sentence me to death.

#13 My lawyers failed to present evidence of my being sexually abused at the age of 5 and 13. This evidence could have had an impact on the jury and could have caused them to vote yes on special issue # 3.

#14 I also want something filed on prosecutorial misconduct on Rick Berry. He had Mark Ray give a "victim" impact statement against me. Mark Ray admitted to shooting Doyle Douglas. He was not a "victim" and should not have been allowed to give a victim impact statement against me. This could have caused the jury to lessen his guilt and be more inclined to convict me.  If the prosecution believed Mark Ray to be a victim, then he would not have been in jail for capitol murder. Also Mrs. Clingman stated that I did not show any remorse, knowing that the judge had previously upheld <u>her</u> objection to my family and friends saying that I showed remorse. Mrs. Clingman was also in possession of a letter that was not turned over to the defense. I saw this letter in her file on the D.A.'s desk. It was a copy of an envelope that was mailed to me. I informed my lawyer and he never mentioned it to the judge.

In closing, I would like something raised in my State Writ of Habeas Corpus on each of these issues. I want to see a final draft of my brief before it is filed to insure that all claims are raised at state level, so as not to be procedurally defaulted.

Each of these issues can be proven. I look forward to your response.

Sincerely,

Clinton Young

