SEAN K. KENNEDY (California Bar No. 145632)
Federal Public Defender
MARGO A. ROCCONI (California Bar No. 156805)
(E-mail:  Margo_Rocconi@fd.org)
JOSEPH A. TRIGILIO (California Bar No. 245373)
(E-Mail:  Joseph_Trigilio@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California  90012-4202
Telephone: (213) 894-2854
Facsimile:  (213) 894-0036

Attorneys for Petitioner
CLINTON LEE YOUNG

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

MIDLAND DIVISION

| | | |
|---|---|---|
| CLINTON LEE YOUNG,<br><br>            Petitioner,<br><br>     v.<br><br>RICK THALER, Director, Texas<br>Department of Criminal Justice,<br>Correctional Institutions Division,<br><br>            Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NO. 7:07-CV-00002-RAJ<br><br>**DEATH PENALTY CASE**<br><br>**SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBITS**<br><br>[28 U.S.C. § 2254] |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION................................................... 1

II.    STATEMENT OF FACTS....................................... 5

    A.    The Life History of Clinton Lee Young........................ 5

        1.    Introduction.......................................... 5

        2.    The Family Young Was Born into....................... 6

        3.    Young's Pre-disposition for Addiction and Mental Illness. ... 7

        4.    Young's Early Years................................... 7

        5.    Family Life and School................................ 8

        6.    Early Diagnosis and Treatment........................ 10

        7.    Young Enters the World of Institutionalization ........... 12

        8.    Years at TYC. ....................................... 15

        9.    Young's Return to the Free World....................... 16

    B.    Young's Trial. ........................................... 19

        1.    Guilt/Innocence  Phase - Prosecution Case............... 19

        2.    Guilt/Innocence Phase  -- Defense Case.................. 20

        3.    Punishment Phase -- Prosecution Case................... 21

        4.    Punishment Phase -- Defense Case...................... 22

    C.    Preparation of Young's Initial State Habeas Application......... 22

        1.    Life Before Milstein Became a P.I...................... 23

        2.    The Practice Group.. ................................. 23

        3.    Milstein's Early Career (1995-1997). .................. 24

        4.    Michael Rodriguez Case (2001)....................... 25

        5.    David Lynn Carpenter Case (2001-2006) ............... 26

        6.    Milstein's Polunksy Incident (2003).................... 27

        7.    Taylor Appointed as Young's State Habeas Counsel (April 2003)........................................ 28

i

# TABLE OF CONTENTS

Page

    8.    Walter Sorto Case (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    9.    Vaughn Ross Case (2003-2004). . . . . . . . . . . . . . . . . . . . . . . . 31

    10.   Alfred Bourgeois Case (Fall 2004 - Winter 2005). . . . . . . . . 36

    11.   The Practice Group Talks About Milstein's Problems. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    12.   Taylor Puts the Court on Further Notice Regarding Milstein's Problems. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    13.   Milstein Loses Her Office Space (2005). . . . . . . . . . . . . . . . . 38

    14.   Rafael Holiday Case (April 2005). . . . . . . . . . . . . . . . . . . . . . 39

    15.   Young's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    16.   The Practice Group Breaks Apart. . . . . . . . . . . . . . . . . . . . . . . 41

    17.   Milstein Enters Drug Rehab. . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    18.   Young's Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

III.   PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    A.   Trial Court Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        1.    Appointment of Counsel. . . . . . . . . . . . . . . . . . . . . . . . 48

        2.    Indictment and Re-Indictment. . . . . . . . . . . . . . . . . . . 48

        3.    Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        4.    Motion for New Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    B.   State Appellate Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    C.   State Habeas Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    D.   Federal Court Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

IV.   AEDPA STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

V.    CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CLAIM ONE:  THE PROSECUTION'S FAILURE TO PRODUCE EXCULPATORY EVIDENCE AND PRESENTATION OF FALSE TESTIMONY VIOLATED YOUNG'S CONSTITUTIONAL RIGHTS. . 58

    A.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

## TABLE OF CONTENTS

**Page**

B.   FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    1.   Trial Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

    2.   Postconviction Evidence of Inducements to Ray and Page. . . 62

        a.   Mark Ray. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

        b.   David Page. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

        c.   The State Court's Adjudication of Young's Claims. . . . 68

C.   THE NON-DISCLOSURE OF INDUCEMENTS OFFERED TO RAY AND PAGE VIOLATED YOUNG'S RIGHT TO DUE PROCESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

    1.   Legal Framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    2.   Inducements were Offered to Ray and Page that Constituted Impeachment Material Under *Brady*. . . . . . . . . . . . . . . . . . . 74

        a.   Mark Ray. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

        b.   David Page. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

    3.   The State Withheld Evidence of the Plea Negotiations . . . . . . 78

    4.   The Withholding of the Impeachment Material was Prejudicial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

        a.   The Withholding of the Inducements Offered to Ray and Page Adversely Affected the Defense Preparation. . . . . 82

        b.   Young was Prejudiced at the Guilt Phase. . . . . . . . . . . 84

        c.   Young was Prejudiced at the Punishment Phase. . . . . . 89

    5.   The State Court Order Is Unreasonable and Contrary to Clearly-Established Federal Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

        a.   The State Court Order is Contrary to Clearly-Established Federal Law. . . . . . . . . . . . . . . . . . . . . . . . 93

            i.   The Clearly-Established Federal Law. . . . . . . . . 93

            ii.   The State Court's Contrary Rulings. . . . . . . . . . . 95

                (1).   The State Misapplied *Brady*'s Standard for what Evidence Must be Disclosed. . . . 95

# TABLE OF CONTENTS

**Page**

   (2). The State Court Failed to Analyze the Effect the Undisclosed Evidence Would Have had on the Entire Trial. . . . . . . . . . . 96

   (3). The State Court Erroneously Focused on Whether Sufficient Evidence Existed to Convict Young, Absent Ray's and Page's Testimony. . . . . . . . . . . . . . . . . . . . 97

   (4). The State Court Improperly Attempted to Assess the Ultimate Truth or Falsity of Ray's and Page's Statements. . . . . . . . . 98

b. The State Court Order Involves an Unreasonable Application of Clearly Established Federal Law. . . . . . . 99

c. The State Court's Order Rests on Unreasonable Determinations of the Facts. . . . . . . . . . . . . . . . . . . . . 102

  i. The State Court Failed To Make Findings On Crucial Factual Issues. . . . . . . . . . . . . . . . . . . . 103

  ii. The State Court Made its Factual Determinations Under a Misapprehension as to the Correct Legal Standard. . . . . . . . . . . . . 104

  iii. The State Court's Order is Internally Contradictory. . . . . . . . . . . . . . . . . . . . . . . . . . . 104

  iv. The State Court 's Order Ignored Evidence Regarding Mark Ray's Dealings with the Prosecution, and was Against the Clear and Convincing Weight of the Evidence. . . . . . . . . . 106

  v. The State Court Unreasonably Relied on Hurlburt's Characterization of the Prosecutor's Statements. . . . . . . . . . . . . . . . . . . 110

  vi. The State Court Ignored Facts Regarding David Page. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

  vii. The State Court Made Unsupported Findings Regarding Materiality. . . . . . . . . . . . . . . . . . . . 111

  viii. The State Court Ignored Evidence Relevant to the Materiality Analysis. . . . . . . . . . . . . . . . . 115

d. The State Court failed to Address Young's Separate Confrontation Clause Claim. . . . . . . . . . . . . . . . . . . . . . 115

iv

# TABLE OF CONTENTS

**Page**

D.   THE PROSECUTOR KNOWINGLY PRESENTED FALSE TESTIMONY THAT THERE WERE NO DEALS OFFERED TO MARK RAY OR DAVID PAGE . . . . . . . . . . . . . . . . . . . . . . . . 116

E.   THE PROSECUTOR VIOLATED YOUNG'S CONFRONTATION CLAUSE RIGHTS BY DELAYING THE SIGNING OF PLEA AGREEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

    1.   Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

    2.   The Limitation of Young's Confrontation Clause Rights. . . . 120

    3.   Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

CLAIM TWO:  THE JUDGE WHO PRESIDED OVER  YOUNG'S TRIAL WAS NOT IMPARTIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

A.   Underlying Facts Related to this Claim. . . . . . . . . . . . . . . . . . . . 124

B.   Relevant Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

C.   Judge Hyde Was Actually Biased Against Young and Young's Conviction Must Be Reversed. . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

D.   Because of Judge Hyde's Bias Against Young, Any Claim Ruled upon by Judge Hyde During the State Post-Conviction Proceeding Should Be Reviewed De Novo by this Court. . . . . . . . . 128

CLAIM THREE:  YOUNG'S CAPITAL SENTENCING JURY WAS DENIED A VEHICLE FOR EXPRESSING ITS REASONED MORAL RESPONSE TO YOUNG'S MITIGATING EVIDENCE, IN VIOLATION OF THE SUPREME COURT *PENRY* LINE OF CASES. . . . . . . . . . . . . . . . . . . . . 129

A.   Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

B.   State's Evidence in Aggravation. . . . . . . . . . . . . . . . . . . . . . . . . 130

    1.   The State's Evidence of "Pattern of Criminal Conduct" Through State Agencies. . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

    2.   State's Evidence of "Pattern of Criminal Conduct" Through School Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

    3.   State's Evidence of "Pattern of Criminal Conduct" Through Testimony of Doctors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

C.   Young's Evidence in Mitigation. . . . . . . . . . . . . . . . . . . . . . . . . . 136

D.   State's Rebuttal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

E.   Jury Instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

# TABLE OF CONTENTS

Page

F.  Relevant Legal Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

G.  The CCA Adjudication of Young's Claim on the Merits Resulted in a Decision That Was Contrary To, or Involved an Unreasonable Application Of, Clearly Established Federal Law, as Determined by the Supreme Court of the United States. . . . . . . . . . . . . . . . . . 165

H.  Young's Capital Sentencing Jury Was Denied a Vehicle to Express its Reasoned Moral Response to Young's Mitigating Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

I.  The Trial Court Improperly Limited the Type of Evidence the Jury Could Consider as Mitigating. . . . . . . . . . . . . . . . . . . . . . . . . . . 168

J.  Improper Nexus Required. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

K.  Confining Young's Mitigation to its Harmful Effect . . . . . . . . . . . 178

L.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

CLAIM FOUR:  YOUNG WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT AND PENALTY PHASES OF HIS CAPITAL TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

A.  Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

    1.  Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

    2.  Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

B.  INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT AND PRE-TRIAL PHASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

    1.  Failure to Present Exculpatory Evidence Establishing that Young did Not Shoot Petrey. . . . . . . . . . . . . . . . . . . . . . . . 188

    2.  Counsel's Failure to Object to the TYC Records. . . . . . . . . 190

        a.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . 191

        b.  State Habeas Hearing. . . . . . . . . . . . . . . . . . . . . . . . . 195

        c.  Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . 196

            i.  An Objection to the TYC Records Would have Been Sustained. . . . . . . . . . . . . . . . . . . . . . . . 196

# TABLE OF CONTENTS

Page

ii.    The Failure to Object to the TYC Records Was Not Reasonable or Strategic. . . . . . . . . . . 206

d.    Prejudice from Failing to Investigate and Challenge the State's Seizure of Young's TYC Records. . . . . . 206

e.    Trial Counsel Also Failed to Object to the TYC Records on Hearsay and Confrontation Clause Grounds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

2.    Trial Counsel's Failure to Utilize Available Ballistics Evidence That Would Have Shown that Someone Other than Young Shot Doyle Douglas. . . . . . . . . . . . . . . . . . . . . . 212

a.    The Relevant Trial Testimony. . . . . . . . . . . . . . . . . . 213

b.    The Relevant State Writ Testimony. . . . . . . . . . . . . . 215

c.    Trial Counsel Should Have Argued and Presented Ballistics Evidence at Trial. . . . . . . . . . . . . . . . . . . . . . 216

d.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

3.    Counsel Failed to Test Doyle Douglas's Vehicle for an Alternate Explanation of How the Shell Casings Were Found in the Car. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

4.    Trial Counsel Failed to Obtain Metal Testing on Page's Gloves Raised in the Supplemental State Petition as Ground 21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

5.    Counsel was ineffective for failing to investigate that Page, Ray, and McCoy conspired through an ex-girlfriend of Page to collaborate on their version of events. . . . . . . . . . . . . 222

6.    Counsel was ineffective for failing to request a mistrial when it was discovered that a relative of Petrey, Cathie Huckabee, was on the jury. Before the juror was removed, the jury had talked and prayed together. The court erred in informing the jurors why Huckabee was removed. . . . . . . 223

7.    Counsel was ineffective for failing to Question Debbie Sanders about her conversation with Carla Sexton in which she told her that she clearly heard Mark Ray brag to Patrick Brook that Ray shot Douglas. This would have challenged Brook's testimony. . . . . . . . . . . . . . . . . . . . . . . 225

8.    Counsel was ineffective for failing to strike Juror Haydee Guerreo from Young's jury as she did not speak or understand English well enough to fluently understand all of the testimony and evidence. . . . . . . . . . . . . . . . . . . . . . 226

## TABLE OF CONTENTS

Page

9. Counsel Was Ineffective for Failing to Admit Into Evidence That Young Was Incapable of Anticipating His Co-Defendant's Actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

C. Ineffective Assistance of Counsel at the Punishment Phase. . . . . . . 229

1. Counsel's Failure to Present the Testimony of Young's Former Teachers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

a. Fant and Hall. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

b. State Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

c. Counsel Had No Tactical Reasoning in Not Calling Fant or Hall as Witnesses at the Punishment Phase. . . 232

2. Counsel's Failure to Present Key Evidence in Mitigation. . . 234

a. Relevant Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 234

b. Facts and Analysis. . . . . . . . . . . . . . . . . . . . . . . . . 235

3. Trial Counsel's Failure to Object to the Court's Supplemental Jury Charge. . . . . . . . . . . . . . . . . . . . . . . . . 239

4. Failure to Object to Prosecutor's Inflammatory Waiving Around of "Serial Killer" Book in Front of Young's Jury. . 242

5. Counsel Was Ineffective for Failing to Object to the Admission of Young's County Jail Records.. . . . . . . . . . . . 242

6. Counsel was ineffective for failing to impeach witness J. Timmons Based On Her False Testimony. . . . . . . . . . . . . . 243

7. Counsel was ineffective for failing to object to the prosecution's false assertion that Young admitted to the Douglas murder and had no remorse. . . . . . . . . . . . . . . . . 244

D. Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

CLAIM FIVE: YOUNG'S CONSTITUTIONAL RIGHTS WERE VIOLATED BECAUSE THE EVIDENCE WAS INSUFFICIENT TO FIND THAT THE KILLINGS OCCURRED IN THE SAME CRIMINAL TRANSACTION OR IN DIFFERENT CRIMINAL TRANSACTIONS COMMITTED PURSUANT TO THE SAME SCHEME OR COURSE OF CONDUCT. 246

A. Legal Standard.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

B. Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

C. Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249

# TABLE OF CONTENTS

Page

CLAIM SIX:  YOUNG'S CONSTITUTIONAL RIGHTS WERE VIOLATED
    BECAUSE THE EVIDENCE WAS INSUFFICIENT TO FIND THAT
    THE PETREY MURDER OCCURRED IN COMMISSION OF
    ROBBERY OR KIDNAPPING. ............................... 254

    A.    Legal Standard........................................ 254

    B.    28 U.S.C. Section 2254(d) Does Not Apply.................... 255

    C.    Argument........................................... 256

CLAIM SEVEN:  THE COURT VIOLATED YOUNG'S CONSTITUTIONAL
    RIGHTS BY DISALLOWING IMPEACHMENT EVIDENCE OF
    DAVID PAGE........................................... 259

CLAIM EIGHT:  YOUNG WAS DENIED A TRIAL BY AN IMPARTIAL JURY
    WHEN VENIRE PERSON DANIE LYNN ROBERTS WAS EXCLUDED
    SIMPLY BECAUSE SHE EXPRESSED RESERVATIONS ABOUT THE
    DEATH PENALTY ....................................... 261

    A.    Relevant Facts....................................... 262

    B.    Argument........................................... 263

CLAIM NINE:  THE CAPITAL OFFENSE OF MURDER IN THE COURSE OF
    KIDNAPPING, AS SET FORTH IN THE TEXAS PENAL CODE, IS
    UNCONSTITUTIONAL................................... 266

CLAIM TEN:  YOUNG'S DUE PROCESS RIGHTS WERE VIOLATED
    BECAUSE OF THE PROSECUTOR'S UNFETTERED DISCRETION IN
    CHARGING HIS CASE CAPITALLY. ......................... 270

    A.    Factual Basis........................................ 271

    B.    Argument........................................... 273

    C.    Conclusion.......................................... 274

CLAIM ELEVEN:  YOUNG'S RIGHT TO BE FREE FROM CRUEL AND
    UNUSUAL PUNISHMENT WAS VIOLATED BECAUSE OF THE
    PROSECUTOR'S UNFETTERED DISCRETION IN CHARGING HIS
    CASE CAPITALLY...................................... 275

    A.    Factual Basis........................................ 276

    B.    Argument........................................... 276

    C.    Conclusion.......................................... 277

## TABLE OF CONTENTS

Page

CLAIM TWELVE:  THE EVIDENCE WAS INSUFFICIENT AT THE
    PUNISHMENT PHASE TO WARRANT AN AFFIRMATIVE FINDING
    BY THE JURY AS TO SPECIAL ISSUE NO. 2................... 277

CLAIM THIRTEEN:  THE COURT'S SUPPLEMENTAL INSTRUCTION ON
    SPECIAL ISSUE NO. 2 VIOLATED YOUNG'S CONSTITUTIONAL
    RIGHTS.................................................. 281

    A.    Facts Supporting the Claim.............................. 281

    B.    Legal Argument........................................ 282

        1.    The Supplemental Instruction Relieved the State of its
            Burden to Prove Intent to Kill........................ 283

        2.    The Supplemental Instruction Violated Young's Rights
            Under *Apprendi* to Have All Sentencing Facts Found By
            a Jury Beyond a Reasonable Doubt.................... 285

        3.    The Supplemental Instruction, Because it Directed a
            Finding of Intent to Kill, Did Not Allow the Jury to Give
            Effect to Mitigating Evidence........................ 286

CLAIM FOURTEEN:  SHERIFF PAINTER'S LUNCH WITH THE JURY
    DENIED YOUNG A FAIR AND IMPARTIAL PUNISHMENT PHASE
    JURY TRIAL............................................. 287

    A.    Factual Background..................................... 288

    B.    Legal Analysis......................................... 290

    C.    Conclusion............................................ 294

CLAIM FIFTEEN:  TO EXECUTE YOUNG, BASED ON HIS MENTAL
    ILLNESS OF ADHD, WOULD VIOLATE THE EIGHTH AND
    FOURTEENTH AMENDMENTS OF THE FEDERAL
    CONSTITUTION ........................................ 295

    A.    Relevant Facts......................................... 296

    B.    Legal Standard........................................ 296

    C.    Young's Mental Age and Immaturity, Brought about by His
        ADHD, Make Him Ineligible for the Death Penalty............. 297

CLAIM SIXTEEN:  YOUNG'S CONSTITUTIONAL RIGHTS WERE
    VIOLATED WHEN THE TRIAL COURT FAILED TO INSTRUCT THE
    JURY REGARDING THE BURDEN OF PROOF ON THE MITIGATION
    ISSUE; THE PUNISHMENT CHARGE ALSO FAILED TO GIVE
    PROPER GUIDANCE TO THE JURY REGARDING THE HEIGHTENED
    STANDARD REQUIRED FOR A DEATH PENALTY CASE. ........ 30

# TABLE OF CONTENTS

**Page**

CLAIM SEVENTEEN:  THE REFUSAL BY THE CCA TO REVIEW THE
    SUFFICIENCY OF THE MITIGATING EVIDENCE VIOLATES
    YOUNG'S CONSTITUTIONAL RIGHTS. . . . . . . . . . . . . . . . . . . . . . . 309

    A.    Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 310

    B.    Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 311

CLAIM EIGHTEEN:  THE EVIDENCE WAS INSUFFICIENT TO FIND,
    BEYOND A REASONABLE DOUBT, THAT THERE WAS A
    PROBABILITY THAT YOUNG WOULD COMMIT CRIMINAL ACTS
    OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUED
    THREAT TO SOCIETY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 317

    A.    Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 317

    B.    Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

    C.    Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 320

CLAIM NINETEEN:  A SENTENCE OF DEATH CANNOT BE IMPOSED IF
    ALL OF THE FACTORS THAT WOULD PREVENT SUCH A
    SENTENCE ARE NOT ALLEGED IN THE INDICTMENT. . . . . . . . . . 322

    A.    Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

    B.    Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

CLAIM TWENTY:  YOUNG'S CONSTITUTIONAL RIGHTS WERE
    VIOLATED BY THE "12/10" PUNISHMENT CHARGE. . . . . . . . . . . 329

CLAIM TWENTY-ONE:  YOUNG'S CONSTITUTIONAL RIGHTS WERE
    VIOLATED WHEN THE COURT REFUSED TO ALLOW THE
    SENTENCING JURY TO FULLY CONSIDER AND GIVE EFFECT TO
    Young'S MITIGATING EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . 336

CLAIM TWENTY-TWO:  YOUNG WAS DENIED THE EFFECTIVE
    ASSISTANCE OF APPELLATE COUNSEL. . . . . . . . . . . . . . . . . . . . 338

CLAIM TWENTY-THREE:  THE CUMULATIVE EFFECT RENDERS ALL
    PHASES OF YOUNG'S TRIAL FUNDAMENTALLY UNFAIR. . . . . . 340

CLAIM TWENTY-FOUR:  YOUNG IS INNOCENT OF CAPITAL
    MURDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342

CLAIM TWENTY-FIVE:  THE PROSECUTION'S  SUPPRESSION OF
    EVIDENCE CONCERNING STATE'S WITNESS A. P. MERILLAT
    VIOLATED YOUNG'S CONSTITUTIONAL RIGHTS. . . . . . . . . . . . . 343

# TABLE OF CONTENTS

**Page**

A.      Relevant Facts - Merillat's Testimony at Young's Trial.......... 344

B.      Suppressed Evidence...................................... 349

C.      Relevant Law............................................ 351

D.      The Prosecution Suppressed Evidence Concerning A. P. Merillat.. 351

E.      Evidence That Could Be Used to Impeach Merillat Was
        Favorable to Young...................................... 354

F.      The Suppressed and Favorable Evidence Was Material for
        Young's Sentence to the Death Penalty. ..................... 355

G.      The State Deprived Young of His Right to Confront Merillat. .... 359

H.      Conclusion.............................................. 359

CLAIM TWENTY-SIX:  THE STATE LOST OR DESTROYED KEY
EVIDENCE......................................................... 360

A.      Factual Background...................................... 361

B.      Analysis................................................ 362

C.      Conclusion.............................................. 364

CLAIM TWENTY-SEVEN:  THE STATE INTERFERED WITH THE
DEFENSE'S INVESTIGATION AND PRESENTATION OF  ITS
MITIGATION CASE. ................................................ 365

A.      Relevant Law............................................ 366

B.      The Prosecutor Interfered with the Investigation and Presentation
        of Mitigating Evidence. ................................... 367

        1.      Relevant Facts.................................... 367

        2.      Argument. ....................................... 371

CLAIM TWENTY-EIGHT:  THE PROSECUTOR ENGAGED IN MULTIPLE
INSTANCES OF MISCONDUCT THROUGHOUT THE PUNISHMENT
PHASE. ......................................................... 382

A.      The Prosecutor Improperly Stated that Young Confessed to the
        Douglas Murder......................................... 384

B.      The Prosecutor Improperly Presented a Victim Impact Statement
        by Mark Ray............................................ 384

xii

# TABLE OF CONTENTS

**Page**

C.     The Prosecutor Violated the Judge's Ruling, and her own
        Objections, on Hearsay When She Told the Jury That Young
        Had Not Expressed Remorse.. . . . . . . . . . . . . . . . . . . . . . . . . . 385

CLAIM TWENTY-NINE:  THE PROSECUTOR KNOWINGLY PRESENTED
THE FALSE TESTIMONY OF WITNESS TIMMONS. . . . . . . . . . . . . . . . . 386

VI.    PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 388

VII.   VERIFICATION OF PETITION. . . . . . . . . . . . . . . . . . . . . . . . . . 390

VIII.  VERIFICATION REGARDING AUTHENTICITY OF EXHIBITS. . . . 391

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                          **PAGE(S)**

*Abdul-Kabir v. Quarterman*,
　　550 U.S. 233, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007). . 56, 162, 179, 180

*Addington v. Texas*,
　　441 U.S. 418, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). . . . . . . . . . . . . . 305

*Aetna Life Insurance Co. v. Lavoie*,
　　475 U.S. 813, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986). . . . . . . . . . . . . 125

*Alcorta v. Texas*,
　　355 U.S. 28, 78 S. Ct. 103, 2 L. Ed. 2d 9 (1957). . . . . . . . . . . . . . . . . . 116

*Alexander v. Primerica Holdings*,
　　10 F.3d 155 (3d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*Allen v. United States*,
　　536 U.S. 953, 122 S. Ct. 2653, 153 L. Ed. 2d 830 (2002). . . . . . . . . 326, 327

*Amdor v. Quarterman*,
　　458 F.3d 397 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339

*Apprendi v. New Jersey*,
　　530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). . . . . . . . . . *passim*

*Arave v. Creech*,
　　507 U.S. 463, 113 S. Ct. 1534, 123 L. Ed. 2d 188 (1993). . . . . . . . . . . . 267

*Arizona v. Youngblood*,
　　488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988). . . . . . . . . . . . . . 364

*Atkins v. Virginia*,
　　536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002). . . . . . . . . . . . 296

*Ball v. United States*,
　　140 U.S. 118, 11 S. Ct. 761, 35 L. Ed. 377 (1891). . . . . . . . . . . . . . . . . 327

*Barrientes v. Johnson*,
　　221 F.3d 741 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 367

*Bauder v. Department of Corrections*,
　　619 F.3d 1272 (11th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Beck v. Alabama*,
　　447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980). . . . . . . . . . . . . 386

*Bell v. Bell*,
　　512 F.3d 223 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 94

*Bell v. Cone*,
　　535 U.S. 685, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). . . . . . . . . . . . . 55

# TABLE OF AUTHORITIES

## FEDERAL CASES                                                     PAGE(S)

*Bell v. Ohio*,
  438 U.S. 637, 98 S. Ct. 2977, 57 L. Ed. 2d 1010 (1978). . . . . . . . . . . . . . 178

*Belmontes v. Brown*,
  414 F.3d 1094 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382

*Benn v. Lambert*,
  283 F.3d 1040 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 98

*Berger v. United States*,
  295 U.S. 78, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). . . . . . . . . . 358, 366, 383

*Berryman v. Morton*,
  100 F.3d 1089 (3d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Bigby v. Dretke*,
  402 F.3d 551 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*Blackledge v. Allison*,
  431 U.S. 63, 97 S. Ct. 1621, 52 L. Ed. 2d 136  (1977). . . . . . . . . . . . . . . 273

*Bollenbach v. United States*,
  326 U.S. 607, 66 S. Ct. 402, 90 L. Ed. 350 (1946). . . . . . . . . . . . . . . . . . 284

*Boyde v. California*,
  494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). . . . . . . . . . . . 164

*Bracy v. Gramley*,
  520 U.S. 899, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997). . . . . . . . . 125, 126

*Brady v. Maryland*,
  373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). . . . . . . . . . . . *passim*

*Brecht v. Abrahamson*,
  507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). . . . . . . . . *passim*

*Brown v. Payton*,
  544 U.S. 133, 125 S. Ct. 1432, 161 L. Ed. 2d 334 (2005). . . . . . . . . . . . 317

*Buckner v. Polk*,
  453 F.3d 195 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 380

*Buntion v. Quarterman*,
  524 F.3d 664 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 125, 126

*Burbank v. Cain*,
  535 F.3d 350 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211, 359

*Burgess v. Dretke*,
  350 F.3d 461 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

xv

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                              **PAGE(S)**

*Bush v. Gore,*
          531 U.S. 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000). . . . . . . . . . . . . . 273

*Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy,*
          367 U.S. 886, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961). . . . . . . . . . . . . . 305

*California v. Brown,*
          479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987). . . . . . . . . . . 168, 235

*California v. Trombetta,*
          467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984). . . . . . . . . 362, 363

*Carey v. Musladin,*
          549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006). . . . . . . . . . . . 55, 56

*Chambers v. Mississippi,*
          410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). . . . . . 211, 340, 386

*Clemons v. Mississippi,*
          494 U.S. 738, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990). . . . 312, 313, 314

*Coble v. Quarterman,*
          496 F.3d 430 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

*Coker v Georgia,*
          433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977). . . . . . . . . . . . . . 312

*Cole v. Arkansas,*
          333 U.S. 196, 68 S. Ct.  514, 92 L. Ed. 2d 644 (1948). . . . . . . . . . . . . . . 327

*Collier v. Turpin,*
          177 F.3d 1184 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*Crawford v. Washington,*
          541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). . . . . . . . . . . . . 211

*Crivens v. Roth,*
          172 F.3d 991 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352, 353

*Cullen v. Pinholster,*
          563 U.S. ___, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011). . . . . . 116, 118, 185

*Darden v. Wainwright,*
          477 U.S. 168, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). . . . . . 366, 380, 383

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                    **PAGE(S)**

*Davis v. Alaska,*
    415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). . . . . . . 119, 120, 121

*Davis v. Georgia,*
    429 U.S. 122, 97 S. Ct. 399, 50 L. Ed. 2d 339 (1976). . . . . . . . . . . . . . . 265

*Delaware v. Van Arsdall,*
    475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). . 119, 120, 121, 122

*Derden v. McNeel,*
    978 F.2d 1453 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342

*Donnelly v. DeChristoforo,*
    416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). . . . . . . 368, 385, 386

*Douglas v. Alabama,*
    380 U.S. 415, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965). . . . . . . . . . . . . . 118

*Douglas v. Workman,*
    560 F.3d 1156 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 94

*Draughon v. Dretke,*
    427 F.3d 286 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

*Drayden v. White,*
    232 F.3d 704 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 383

*Duhaime v. Ducharme,*
    200 F.3d 597 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*East v. Johnson,*
    123 F.3d 235 (5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89, 90

*Eddings v. Oklahoma,*
    455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). . . . . . . . . . . . . . *passim*

*Edwards v. Balisok,*
    520 U.S. 641, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997). . . . . . . . . . 3, 126

*Enmund v. Florida,*
    458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982). . . . . . . . 174, 283

*Estes v. Texas,*
    381 U.S. 532, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965). . . . . . . . . . . . . . 227

*Evitts v. Lucey,*
    469 U.S. 387, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985). . . . . . . . . . 338, 339

*Faulder v. Johnson,*
    81 F.3d 515 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

# TABLE OF AUTHORITIES

## FEDERAL CASES                                                    PAGE(S)

*Fisher v. Gibson,*
　　282 F.3d 1283 (10th Cir. 2002)................................... 188

*Florida v. Nixon,*
　　543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004). ............. 186

*Foster v. Johnson,*
　　293 F.3d 766 (5th Cir. 2002)................................... 380

*Francis v. Franklin,*
　　471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985). ..... 180, 283, 284

*Frank v. Mangum,*
　　237 U.S. 309, 35 S. Ct. 582, 59 L. Ed. 2d 969 (1915). ............... 293

*Franklin v. Lynaugh,*
　　487 U.S. 164, 108 S. Ct. 2320, 101 L. Ed. 2d 155 (1988). ........ 179, 333

*Franklin v. McCaughtry,*
　　398 F.3d 955 (7th Cir. 2005).................................. 127

*Fratta v. Quarterman,*
　　536 F.3d 485 (5th Cir. 2008)................................. 55, 211

*Furman v. Georgia,*
　　408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1974). ........... *passim*

*Gardner v. Johnson,*
　　247 F.3d 551 (5th Cir. 2001).................................. 55

*Giglio v. United States,*
　　405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). ........... *passim*

*Glasser v. United States,*
　　315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1942).................... 341

*Godfrey v. Georgia,*
　　446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980). ........ 268, 308

*Gomez v. United States,*
　　490 U.S. 858, 109 S. Ct. 2237, 104 L. Ed. 2d 923 (1989). ........... 125

*Goodwin v. Johnson,*
　　132 F.3d 162 (5th Cir. 1997).................................. 117

*Goudy v. Basinger,*
　　604 F.3d 394 (7th Cir. 2010)........................... 94, 95, 97, 98

*Gray v. Mississippi,*
　　481 U.S. 648, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987). ..... 124, 128, 265

xviii

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                        **PAGE(S)**

*Greer v. Miller*,
    483 U.S. 756, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987). . . . . . . . . . 366, 383

*Gregg v. Georgia*,
    428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). . . . . . . 308, 313, 321

*Harrington v. Richter*,
    131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). . . . . . . . . . . . . . . . . 1, 57, 185, 188

*Harris v. Reed*,
    894 F.2d 871 (7th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

*Harris v. Wood*,
    64 F.3d 1432 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Henderson v. Quarterman*,
    460 F.3d 654 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Herrera v. Collins*,
    506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993). . . . . . . . . . . . . . 342

*Hitchcock v. Dugger*,
    481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987). . . . . . . . . . . . . . 179

*Holbrook v. Flynn*,
    475 U.S. 560, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986). . . . . . . . . . . . . . 293

*Holloway v. Arkansas*,
    435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978). . . . . . . 253, 258, 280

*Hudson v. Palmer*,
    468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). . . . . . . . . . 200, 201

*Irvin v. Dodd*,
    366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). . . . . . . . . . . . . . . . 293

*Jackson v. Virginia*,
    443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). . . . . . . . . . . . *passim*

*Jells v. Mitchell*,
    538 F.3d 478 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381

*Johnson v. Mississippi*,
    486 U.S. 578, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988). . . . . . . . . . . . . 342

*Johnson v. Texas*,
    509 U.S. 350, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993). . . . . . . . 163, 164

*Jones v. United States*,
    526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999). . . . . . . . 324, 325

# TABLE OF AUTHORITIES

**FEDERAL CASES** **PAGE(S)**

*Jurek v. Texas,*
    428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976). . . . . . . . . . . . *passim*

*Katz v. United States,*
    389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). . . . . . . . . . . . . . . 197

*Kennedy v. Louisana,*
    128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008). . . . . . . . . . . . . . . . . . . . . . . . 296

*Kentucky v. Stincer,*
    482 U.S. 730, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987). . . . . . . . . 119, 120

*Kimmelman v. Morrison,*
    477 U.S. 365, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). . 185, 191, 192, 193

*Kirkpatrick v. Whitley,*
    992 F.2d 491 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

*Kittelson v. Dretke,*
    426 F.3d 306 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 119, 120, 211

*Knighton v. Maggio,*
    740 F.2d 1344 (5th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

*Knox v. Johnson,*
    224 F.3d 470 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 387

*Kopycinski v. Scott,*
    64 F.3d 223 (5th Cir.1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 351, 354, 355

*Kyles v. Whitley,*
    514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). . . . . . . . . . *passim*

*LaCaze v. Warden of Louisiana Correctional Institute for Women,*
    645 F.3d 728 (5th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Lawrence v. Lensing,*
    42 F.3d 255 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 351

*Lawson v. Borg,*
    60 F.3d 608 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293

*Lewis v. Dretke,*
    355 F.3d 364 (5th Cir.  2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187, 235

*Lewis v. Jeffers,*
    497 U.S. 764, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990). . . . . . . . . . . . 267

*Lindh v. Murphy,*
    521 U.S. 320, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997). . . . . . . . . . . . . 55

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                    **PAGE(S)**

*Lindstadt v. Keane*,
    239 F.3d 191 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Liteky v. United States*,
    510 U.S. 540, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994). . . . . . . . . . *passim*

*Lockett v. Ohio*,
    438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). . . . . . . . . . . . *passim*

*Magill v. Dugger*,
    824 F.2d 879 (11th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342

*Mahler v. Kaylo*,
    537 F.3d 494 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 351

*Marshall v. Jerrico, Inc.*,
    446 U.S. 238, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980). . . . . . . . . . . . . 126

*Martinez v. Ryan*,
    __ U.S. __, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012). . . . . . . . . . . . . . . 47

*Martinez v. Wainwright*,
    621 F.2d 184 (5th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352, 353

*Massiah v. United States*,
    377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964). . . . . . . . . . . . . . 351

*Mattox v. United States*,
    146 U.S. 140, 13 S. Ct. 50, 37 L. Ed. 917 (1892). . . . . . . . . . . . . . . . . . 293

*McCleskey v. Kemp*,
    481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). . . . . . . . . . . . . 383

*McDonald v. Pless*,
    238 U.S. 264, 269, 35 S. Ct. 783, 59 L. Ed. 1300 (1915). . . . . . . . . . . . 226

*McKoy v. North Carolina*,
    494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990). . . . . . . . 332, 335

*Mercadel v. Cain*,
    179 F.3d 271 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Miller-El v. Cockrell (Miller-El I)*,
    537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003). . . . . . . . . . *passim*

*Miller-El v. Dretke (Miller-El II)*,
    545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005). . . . . . . . . . . . . 56

*Mills v. Maryland*,
    486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988). . . . . . . . 332, 335

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                  **PAGE(S)**

*Mooney v. Holohan,*
    294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935). . . . . . . . . . . . . . . . . . . 116

*Moore v. Johnson,*
    194 F.3d 586 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188, 190

*Moreno v. Dretke,*
    450 F.3d 158 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

*Morgan v. Hardy,*
    662 F.3d 790 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102, 109

*Morgan v. Illinois,*
    504 U.S. 719, 12 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). . . . . . . . . . . . . 265

*Morrissey v. Brewer,*
    408 U.S.  471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). . . . . . . . . . . . . . 305

*In re Murchison,*
    349 U.S. 133, 75 S. Ct. 623, 99 L. Ed. 942 (1955). . . . . . . . . . . . . . 125, 128

*Napue v. Illinois,*
    360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). . . . . . . . . . . . *passim*

*Neal v. Puckett,*
    286 F.3d 230 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219, 381

*Nelson v. Quarterman,*
    472 F.3d 287 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*North Carolina v. Pearce,*
    395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969). . . . . . . . . . . . . . 273

*In Re Oliver,*
    333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 2d 682 (1948). . . . . . . . . . . 291, 294

*Oliver v. Scott,*
    276 F.3d 736 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

*Panetti v. Quarterman,*
    127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007). . . . . . . . . . . . . . . . . . . . *passim*

*Parker v. Dugger,*
    498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). . . . . . 179, 312, 314

*Pavel v. Hollins,*
    261 F.3d 210 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*Pennsylvania v. Ashe,*
    302 U.S. 51, 58 S. Ct. 59, 82 L. Ed. 43 (1937). . . . . . . . . . . . . . . . . . . . 321

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                    **PAGE(S)**

*Pennsylvania v. Ritchie*,
      480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987). . . . . . . . . . . . . . . . 120

*Penry v. Johnson*,
      532 U.S. 782, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001). . . . . . . . . . . *passim*

*Penry v. Lynaugh*,
      492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989). . . . . . . . . *passim*

*Pointer v. Texas*,
      380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). . . . . . . . . . 118, 211

*Porter v. McCollum*,
      130 S. Ct. 447, 175 L. Ed. 2d 398 (2009). . . . . . . . . . . . . . . . . . . . . . 57, 229

*Proffitt v. Florida*,
      428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976). . . . . . . . . . . . . . 162

*Pyles v. Johnson*,
      136 F.3d 986 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

*Ramdass v. Angelone*,
      530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000). . . . . . . . . . . . . 96

*Reed v. Quarterman*,
      504 F.3d 465 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

*Reis v. Quarterman*,
      522 F.3d 522 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 184

*Remmer v. United States*,
      347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654 (1954). . . . . . . . . . . . . 291, 293

*Richardson v. Quarterman*,
      537 F.3d 466 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 125, 126

*Riddle v. Cockrell*,
      288 F.3d 713 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 366

*Ring v. Arizona*,
      536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). . . . . . . . . *passim*

*Rompilla v. Beard*,
      545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005). . . . . 57, 186, 190

*Roper v. Simmons*,
      543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). . . . . . . . . . . *passim*

*Rosales v. Cockrell*,
      220 F. Supp. 2d 593 (N. D. Tex. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . 372

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                        **PAGE(S)**

*Salazar v. Dretke,*
419 F.3d 384 (9th Cir. 2005)................................. 56

*Sandstrom v. Montana,*
442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). ............... 283

*Santosky v. Kramer,*
455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). ......... 306, 307

*Sawyer v. Whitley,*
505 U.S. 333, 112 S. Ct. 2514, 120 L. Ed. 2d 279 (1992). ............ 342

*Scheanette v. Quarterman,*
482 F.3d 815 (5th Cir. 2007)................................. 372

*Schlup v. Delo,*
513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). ............. 343

*Shields v. Dretke,*
122 Fed. Appx. 133, 136 (5th Cir. 2005). ......................... 374

*Sheppard v. Maxwell,*
384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). .............. 227

*Shillinger v. Haworth,*
70 F.3d 1132 (10th Cir. 1995)................................ 371

*Silva v. Woodford,*
279 F.3d 825 (9th Cir. 2002)................................. 188

*Simmons v. Beard,*
590 F.3d 223 (3d Cir. 2009). ................................ 102

*Skipper v. South Carolina,*
476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986). ............ 178, 333

*Smith v. Bennett,*
365 U.S. 708, 81 S. Ct. 895, 6 L. Ed. 39 (1961)..................... 1

*Smith v. Dretke,*
422 F.3d 269 (5th Cir. 2005)............................. 186, 187

*Smith v. Maryland,*
442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979). ............. 197

*Smith v. Phillips,*
455 U.S. 209, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). ... 294, 338, 368, 385

*Smith v. Robbins,*
528 U.S. 259, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000). ............. 339

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                 **PAGE(S)**

*Smith v. Texas,*
    543 U.S. 37, 125 S. Ct. 400, 160 L. Ed. 2d 303 (2004). . . . . . . . . . . 167, 336

*Smith v. Zant,*
    855 F.2d 712 (11th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

*Soffar v. Dretke,*
    368 F.3d 441 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

*Sonnier v. Quarterman,*
    476 F.3d 349 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . 186, 187, 235, 383

*Spaziano v. Florida, ,*
    468 U.S. 447, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984). . . . . . . . . . . . . . 127

*Stanford v. Kentucky,*
    492 U.S. 361, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989). . . . . . . . . . . . . 296

*Strickland v. Washington,*
    466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). . . . . . . . . . . *passim*

*Strickler v. Greene,*
    527 U.S. 263, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). . . . . . . . . . *passim*

*Sullivan v. Louisiana,*
    508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). . . . . . . . . . . . . 325

*Sumner v. Shuman,*
    483 U.S. 66, 107 S. Ct. 2716, 97 L. Ed. 2d 56 (1987). . . . . . . . . . . . . . . . 306

*Tanner v. United States,*
    483 U.S. 107, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987). . . . . . . . . . . . . . . 226

*Tassin v. Cain,*
    517 F.3d 770 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Taylor v. Hayes,*
    418 U.S. 488, 94 S. Ct. 2697, 41 L. Ed. 2d 897 (1974). . . . . . . . . . . 125, 126

*Taylor v. Kentucky,*
    436 U.S. 478, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978) . . . . . . . . . . 340, 342

*Taylor v. Maddox,*
    366 F.3d 992 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Tennard v. Dretke,*
    542 U.S. 274, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004). . . . . 167, 178, 337

*Thomas v. Calderon,*
    151 F.3d 918 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                  **PAGE(S)**

*Thompson v. Oklahoma*,
 487 U.S. 815, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988). . . . . . . . . . . . 308

*Thornhill v. Alabama*,
 310 U.S. 88, 60 S. Ct. 736, 84 L. Ed. 2d 1093 (1940). . . . . . . . . . . . . . . 328

*Tison v. Arizona*,
 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987). . . . . . . . . . . . 333

*Titsworth v. Dretke*,
 401 F.3d 301 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 353

*Tuilaepa v California*,
 512 U.S. 967, 114  S. Ct. 2630, 129 L. Ed. 2d 750 (1994). . . . . . . . . . . . 312

*Tumev v. Ohio*,
 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927). . . . . . . . . . . . . . 125, 127

*Turner v. Louisiana*,
 379 U.S. 466, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965). . . . . . . . . . . 292, 293

*In re United States*,
 345 F.3d 450 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*United States v. Agurs*,
 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). . . . . . . . . . . . . . . 81

*United States v. Allen*,
 247 F.3d 741 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 326, 327

*United States v. Antone*,
 603 F.2d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

*United States v. Armstrong*,
 517 U.S. 456, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996). . . . . . . . . 366, 383

*United States v. Auten*,
 632 F.2d 478 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352, 353

*United States v. Bagley*,
 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). . . . . . . . . . *passim*

*United States v. Barnham*,
 595 F.2d 231 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

*United States v. Batchelder*,
 442 U.S. 114, 99 S. Ct. 2198, 60 L. Ed. 2d 755 (1979). . . . . . . . . . 366, 383

*United States v. Betner*,
 489 F.2d 116 (5th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                      **PAGE(S)**

*United States v. Burke,*
    496 F.2d 373 (5th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 367

*United States v. Chiantese,*
    560 F.2d 1244 (5th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 284

*United States v. Denman,*
    100 F.3d 399 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

*United States v. Deutsch,*
    475 F.2d 55 (5th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

*United States v. Dioguardi,*
    492 F.2d 70 (2nd Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

*United States v. Dionisio,*
    410 U.S. 19, 93 S. Ct. 777, 35 L. Ed. 2d 67 (1973). . . . . . . . . . . . . . . . . 327

*United States v. DuBo,*
    186 F.3d 1177 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 327

*United States v. Forrest,*
    620 F.2d 446 (5th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

*United States v. Gaytan,*
    74 F.3d 545 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 327

*United States v. Hall,*
    455 F.3d 508 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 372

*United States v. Hernandez,*
    109 F.3d 1450 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

*United States v. Jacobsen,*
    466 U.S. 109, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). . . . . . . . . . 186, 202

*United States v. Jimenez,*
    464 F.3d 555 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

*United States v. Kelly,*
    790 F.2d 130 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

*United States v. Levy,*
    577 F.2d 200 (3rd Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 371

*United States v. Miller,*
    425 U.S. 435, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976). . . . . . . . . . . . . . . 199

*United States v. Perdomo,*
    929 F.2d 967 (3d Cir.1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                              **PAGE(S)**

*United States v. Posado*,
   57 F.3d 428 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

*United States v. Ruiz*,
   536 U.S. 622, 122 S. Ct. 2450, 153 L. Ed. 2d 586 (2002). . . . . . . . . . . . . . 73

*United States v. Shaffer*,
   789 F.2d 682 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*United States v. Webster*,
   392 F.3d 787 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 351, 372

*Uttecht v. Brown*,
   127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007). . . . . . . . . . . . . . . 168, 169, 264

*Valdez v. Johnson*,
   93 F. Supp. 2d 769 (S.D. Tex. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

*Vasquez-Ramirez v. United States District Court (In re Vasquez-Ramirez)*,
   443 F.3d 692 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Wainwright v. Witt*,
   469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985). . . . . . . . . . . 264, 265

*Watts v. Quarterman*,
   448 F. Supp. 2d 786 (W.D. Tex. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 373

*Webb v. Texas*,
   409 U.S. 95, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972). . . . . . . . . . . . . . . . . 211

*Wiggins v. Smith*,
   539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). . . . . . . . . . *passim*

*Wilkerson v. Cain*,
   233 F.3d 886 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Williams v. Taylor*,
   529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). . . . . . . . . . *passim*

*Williams v. Whitley*,
   940 F.2d 132 (5th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352

*In re Winship*,
   397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). . . . . . . 247, 283, 306

*Wisehart v. Davis*,
   408 F.3d 321 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 94

*Witherspoon v. Illinois*,
   391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). . . . . . . 263, 264, 265

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                      **PAGE(S)**

*Withrow v. Larkin,*
    421 U.S. 35, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975). . . . . . . . . . . . . . . . 125

*Wood v. Allen,*
    588 U.S. 290, 130 S. Ct. 841, 175 L. Ed. 2d 738 (2010). . . . . . . . . . . . . 189

*Wood v. Quarterman,*
    503 F.3d 408 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

*Woodson v. North Carolina,*
    428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976). . . . . . . . . . . . *passim*

*Ylst v. Nunnemaker,*
    501 U.S. 797, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991). . . . . . . . . . . . . . 72

*Young v. Texas,*
    547 U.S. 1056, 126 S. Ct. 1652, 164 L. Ed. 2d 398 (2006). . . . . . . . . . . . 51

*Younger v. Harris,*
    401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971). . . . . . . . . . . . . . . . 273

*Zant v. Stephens,*
    462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983). . . . . . 267, 308, 342

**STATE CASES**

*Burns v. State,*
    761 S.W.2d 353 (Tex. Crim. App. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . 168

*Callins v. State,*
    780 S.W.2d 176 (Tex. Crim. App. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . 326

*Canales v. State,*
    98 S.W.3d 690 (Tex. Crim. App. 2003). . . . . . . . . . . . . . . . . . . . . . 353, 357

*Cantu v. State,*
    939 S.W.2d 627 (Tex. Crim. App.1996). . . . . . . . . . . . . . . . . . 165, 166, 167

*Ex Parte Carpenter,*
    2007 WL 678622 (Tex. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 26

*Carroll v. State,*
    916 S.W.2d 494 (Tex. Crim. App. 1996). . . . . . . . . . . . . . . . . . . . . . . . . 121

*Clark v. State,*
    881 S.W.2d 682 (Tex. Crim. App. 1994). . . . . . . . . . . . . . . . . . . . . . . . . 331

*Young v. State of Texas,*
    2005 WL 2374669 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

# TABLE OF AUTHORITIES

**STATE CASES**                                                **PAGE(S)**

*Coble v. State,*
   871 S.W.2d 192 (Tex. Crim. App. 1993). . . . . . . . . . . . . . . . . . . . . . 250, 251

*Commonwealth v. Mosby,*
   11 Mass. App. 1 (App. Suffolk 1980). . . . . . . . . . . . . . . . . . . . . . . . 244, 385

*Corwin v. State,*
   870 S.W.2d 23 (Tex. Crim. App. 1993). . . . . . . . . . . . . . . . . . 250, 252, 253

*In re Dolezal,*
   970 S.W.2d 650 (Tex. Crim. App. 1998). . . . . . . . . . . . . . . . . . . . . . . . 203

*Draughon v. State,*
   831 S.W.2d 331 (Tex. Crim. App. 1991). . . . . . . . . . . . . . . . . . . . . . . . 331

*Duggan v. State,*
   778 S.W.2d 465 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Eldridge v. State,*
   940 S.W.2d 646 (Tex. Crim. App. 1996). . . . . . . . . . . . . . . . . . . . . . . . 306

*Feldman v. State,*
   71 S.W.3d 738 (Tex. Crim. App. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 251

*Fisher v. State,*
   736 P.2d 1003 (Okla. Crim. App. 1987). . . . . . . . . . . . . . . . . . . . . . . . . 314

*Franklin v. State,*
   138 S.W.3d 351 (Tex. Crim. App. 2004). . . . . . . . . . . . . . . . . . . . . . . . 224

*Gardner v. State,*
   730 S.W.2d 675 (Tex. Crim. App. 1987). . . . . . . . . . . . . . . . . . . . . . . . 257

*Glover v. State,*
   110 S.W.3d 549 (App. 10 Dist. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 304

*Green v. State,*
   566 S.W.2d 578 (Tex. Crim. App. 1978). . . . . . . . . . . . . . . . . . . . . . . . 197

*Green v. State,*
   840 S.W.2d 394 (Tex. Crim. App. 1992). . . . . . . . . . . . . . . . . . . . . . . . 291

*Hooper v. State,*
   214 S.W.3d 9 (Tex. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . *passim*

*Jackson v. State,*
   17 S.W.3d 664 (Tex. Crim. App. 2000). . . . . . . . . . . . . . . . . . . . . 247, 251

*Livingston v. State,*
   739 S.W.2d 311 (Tex. Crim. App. 1987). . . . . . . . . . . . . . . . . . . . . . . . 264

# TABLE OF AUTHORITIES

**STATE CASES**                                                    **PAGE(S)**

*Lowery v. State,*
547 N.E.2d 1046 (Ind. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

*McFarland v. State,*
928 S.W.2d 482 (Tex. Crim. App. 1996). . . . . . . . . . . . . . . . . . . . . . . 313

*McGinn v. State,*
961 S.W.2d 161 (Tex. Crim. App. 1998). . . . . . . . . . . . . . . . . . . . . . . 311

*Moore v. State,*
969 S.W.2d 4 (Tex. Crim. App. 1998). . . . . . . . . . . . . . . . . . . . . . . . 326

*Nethery v. State,*
692 S.W.2d 686 (Tex. Crim. App. 1985). . . . . . . . . . . . . . . . . . . . . . . 260

*Pesina v. State,*
949 S.W.2d 374 (Tex. App. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Richardson v. State,*
865 S.W.2d 944 (Tex. Crim. App. 1993). . . . . . . . . . . . . . . . . . . . 197, 199

*Rios v. State,*
846 S.W.2d 310 (Tex. Crim. App. 1992). . . . . . . . . . . . . . . . . . . . 250, 251

*Roberts v. State,*
220 S.W.3d 521 (Tex. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . 373

*Rodriguez v. State,*
2006 WL 827833 (Tex. Crim. App. 2006). . . . . . . . . . . . . . . . . . . . 25, 26

*Ross v. State,*
133 S.W.3d 618 (Tex. Crim. App. 2004). . . . . . . . . . . . . . . . . . . . . . . 31

*Sanders v. State,*
1 S.W.3d 885 (App. 3 Dist. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

*Sattiewhite v. State,*
786 S.W.2d 271 (Tex. Crim. App. 1989). . . . . . . . . . . . . . . . . . . . . . . 331

*Sells v. State,*
121 S.W.3d 748 (Tex. Crim. App. 2003). . . . . . . . . . . . . . . . . . . . . . . 247

*Sheridan v. State,*
852 S.W.2d 772 (Ark. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

*Sorto v. State,*
173 S.W.3d 469 (Tex. Crim. App. 2005). . . . . . . . . . . . . . . . . . . . . . . 29

*State v. Breton,*
663 A.2d 1026 (Conn. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

# TABLE OF AUTHORITIES

**STATE CASES**                                                    **PAGE(S)**

*State v. Comeaux*,
      818 S.W.2d 46 (Tex. Crim. App. 1991). . . . . . . . . . . . . . . . . . . 197, 198, 199

*State v. Hardy*,
      963 S.W.2d 516 (Tex. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . . . . *passim*

*State v. Hernandez*,
      562 N.E.2d 219 (Ill. App. 2 Dist. 1990). . . . . . . . . . . . . . . . . . . . . . . . 314

*State v. Moore*,
      927 P.2d 1073 (Ore. Sup. Ct. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . 315

*State v. Richardson*,
      463 S.E.2d 492 (N.C. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 314

*State v Schieneman*,
      77 S.W.3d 810 (Tex. Crim. App. 2002). . . . . . . . . . . . . . . . . . . . . . . . 200

*Studer v. State*,
      799 S.W.2d 263 (Tex. Crim. App. 1990). . . . . . . . . . . . . . . . . . . . . . . 325

*Thomas v. State*,
      519 S.W.2d 430 (Tex. Crim. App. 1975). . . . . . . . . . . . . . . . . 244 385 386

*Thomas v. State*,
      699 S.W.2d 845 (Tex. Crim. App. 1985). . . . . . . . . . . . . . . . . . . . . . . 291

*Virts v. State*,
      739 S.W.2d 25 (Tex. Crim. App. 1987). . . . . . . . . . . . . . . . . . . . . 121, 264

*Vuoung v. State*,
      830 S.W.2d 929 (Tex. Crim. App. 1992). . . . . . . . . . . . . . . . . . . . 250, 251

*Walker v. State*,
      615 S.W.2d 728 (Tex. Crim. App. 1981). . . . . . . . . . . . . . . . . . . . . . . 279

**DOCKETED CASES**

*Anibal Canales Jr. v. Quarterman*,
      CV No. 03-69-TJW  (E. Dist. Tex). . . . . . . . . . . . . . . . . . . . . . . . . . . . 351

**FEDERAL STATUTES AND CONSTITUTIONAL PROVISIONS**

18 U.S.C. § 3591. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 326

28 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

U.S. Const. amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

# TABLE OF AUTHORITIES

**STATE STATUTES** **PAGE(S)**

1 ABA Standards for Criminal Justice 4-4.1. . . . . . . . . . . . . . . . . . . . . . . . . . 228

Article 35.16(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Article 37.071. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 166, 311, 329

Mont. Code Ann. § 45-5-303. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 269

Tex. Code Crim. Pro. § 37.071 2(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

Tex. Code Crim. Proc. § 37.071(d)(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . 331

Tex. Code Crim. Proc. § 38.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Tex. Code Crim. Proc. Art. 11.071. . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 70

Tex. Code Crim. Proc. Art. 37.071(2)(b)(2). . . . . . . . . . . . . . . . . . . . . . . . 90

Tex. Code of Crim. Proc. § 35.22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 303

Tex. Const. Art. I § 20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 327

Tex. Const. Art. V § 12 (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325, 327

Tex. Crim. Proc. Code Ann. art. 37.071(2)(b)(2). . . . . . . . . . . . . . . 161, 162, 173

Tex. Code Fam. § 58.005 (a)(4) and (7). . . . . . . . . . . . . . . . . . . . . . . . . . 204

Tex. Code  Fam. § 58.007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Tex. Gov. Code § 62.109(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

Tex. Hum. Res. § 61.095. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Tex. Occ. Code, § 159.002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

Tex. Pen. Code § 7.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Tex. Pen. Code § 7.02(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Tex. Penal Code § 6.03(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

Tex. Penal Code § 19.02. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

Tex. R. of Civ. Proc. 18(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Tex. R. of Evid. 606(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 304

Clinton Lee Young (Petitioner or Young), through his attorneys, files this Second Amended Petition for Writ of Habeas Corpus on the ground that he is unlawfully held in custody, in violation of the laws and constitutions of the United States of America and the State of Texas, by the Texas Department of Criminal Justice, Rick Thaler, Director.

# I.

# INTRODUCTION

1.      The federal writ of habeas corpus was "[c]onsidered by the Founders as the highest safeguard of liberty[.]"  *Smith v. Bennett*, 365 U.S. 708, 712, 81 S. Ct. 895, 6 L. Ed. 39 2d (1961).  States are provided the judicial space to ensure that prisoners held in their custody have had their constitutional rights respected, a policy codified with the Antiterrorism and Effective Death Penalty Act (AEDPA). But that space has boundaries.  Where a state court refuses to reasonably adjudicate a prisoner's claim of constitutional violations; where the state court erects insurmountable procedural hurdles that erroneously prevent a prisoner's claims from being heard; where a prisoner is deprived of a meaningful opportunity to present his claims to a state court, the federal courts must act to affirm and enforce the Constitution of the United States of America.  Indeed, as the Supreme Court stated just two terms ago, the federal writ of habeas corpus continues to stand "as a safeguard against imprisonment of those held in violation of the law."  *Harrington v. Richter*, 131 S. Ct. 770, 780, 178 L. Ed 2d 624 (2011).

2.      The Great Writ is now necessary to remedy the constitutional Violations that have been ignored or left to stand due to the Texas Court of Criminal Appeals' unreasonable treatment of Young's claims and Young's inability to fairly present the merits of his claims to that Court.

3.      In order to secure Young's conviction and death sentence, the State failed to turn over material exculpatory evidence and further, knowingly presented false testimony at Young's trial.  Unbeknownst to the defense, David Page, the

1

only person who was with Young at the time of both the Douglas and Petrey murders, and Mark Ray, the individual who fired the final (and perhaps fatal) shot into Douglas's head the night of the crimes, secretly negotiated with the State for reduced charges and sentences in exchange for their testimony against Young.  Not only did the State fail to turn over this material, exculpatory evidence, the State knowingly testified at a pre-trial hearing that no such deals existed.  The withholding of the evidence regarding Page's and Ray's plea negotiations, and the knowing presentation of perjured testimony, mandate that Young's conviction be overturned.  *See Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).

4.     The State also interfered with Young's investigation and presentation of mitigating evidence in the punishment phase.  After improperly receiving the sealed billing records of the defense's mitigation specialist/social historian, Gerald Byington, the State reported Byington to the Texas Commission on Private Security alleging Byington was conducting investigatory work illegally.  The result of the prosecutor's actions was to foreclose the defense from properly investigating and presenting a bio-psychosocial history of Young, which should have been presented at trial.

5.     The State also failed to investigate two of the major crime scenes, and the police work at the Petrey murder scene was sloppy, at best.  Specifically, the State never investigated the location where Douglas was originally shot (where authorities would have found shell casings on the ground which were fired from Page's gun, proving Page, not Young shoot Douglas), nor the place where Petrey was originally kidnapped (where eyewitnesses would have identified Page as the kidnapper, not Young).

6.     Further, the State conducted sloppy police work at the Petrey murder

2

scene including, but not limited to: failing to secure and analyze the Petrey murder scene; overlooking evidence in plain view including tire marks, a tire iron, and Pages's gloves; and failing to make a photo log of everything that was collected at the scene.

7.      Not only was Young the victim of rampant prosecutorial misconduct, Young was tried by a biased judge.  Judge John C. Hyde, of the 385th District Court in Midland County, Texas, made up his mind about Young's guilt and punishment of death before the trial even began.  Before the commencement of opening statements, before any evidence was introduced to the jury, and even before the adversarial process had commenced, the trier of fact had "pre-judged" Young as a dangerous man, worthy of the death penalty.  Judge Hyde believed that not only was Young dangerous, but he was "fully capable" of harming other people if he was not convicted of capital murder.  This same judge then sat as both judge and jury over Young's motion for new trial, and state post-conviction litigation.  Judge Hyde's actual bias is structural error warranting a new trial.  *Richardson v. Quarterman*, 537 F.3d 466, 473 (5th Cir. 2008), *citing Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35 (1999); *see Edwards v. Balisok*, 520 U.S. 641, 647, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997).

8.      Moreover, while Young's trial counsel tried hard to defend their client, their performance in key areas fell below minimum standards of competency in place at the time of Young's trial.  But for counsel's deficient performance, Young's trial would have turned out differently.  *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  For example, trial counsel failed to investigate how the State obtained Young's Texas Youth Commission's records before any charges against Young were filed.  Had they investigated, counsel would have discovered the records were not only illegally obtained by the State, but also that, as District Attorney Schorre admitted at a pre-trial hearing, those records were used by the State in deciding to charge

3

Young with the death penalty. Counsel further failed to object to the records on hearsay and confrontation grounds.

9.     Trial counsel further failed to present ballistics evidence that conclusively would have demonstrated that Young did not shoot Petrey, as testified to by David Page.  The ballistics evidence also would have raised reasonable doubt as to Young's participation in the Douglas murder.

10.     Trial counsel also failed to investigate and present a complete bio-psychosocial history of their client, despite the prosecution's interference with the mitigation investigation.  By only conducting cursory interviews of some family members, defense counsel stopped short of making a reasonable investigation for purposes of uncovering relevant mitigating evidence.

11.     The numerous abdications of Young's rights to due process and effective counsel continued into his state habeas proceedings.  While the state and federal legislatures permit an individual sentenced to death an opportunity to collaterally challenge the conviction with the assistance of counsel, Young was denied such assistance when the preparation of his state habeas case went shockingly awry.  As explained below, Young's habeas counsel myopically focused the limited resources available to state habeas practitioners on meritless claims "developed" by an incompetent investigator who, the attorney had reason to know, abused drugs with witnesses, elicited false testimony, and engaged in numerous unethical and ineffective acts before and during her work on Young's case.  The result of state habeas counsel's resulting and effective abandonment of Young was a state habeas application that was inadequate and incomplete.

12.     Even so, the state court unreasonably failed to acknowledge the numerous constitutional violations infecting Young's trial.  As a result, there can be no confidence in the reliability of his conviction or death-sentence.

**II.**

**STATEMENT OF FACTS**

**A.    The Life History of Clinton Lee Young**

    **1.    Introduction**

    13.    Young's life is a portrait of what can go wrong when a young person is born into, and travels through, a life filled with emotional and physical abuse, lack of stability, structure, and support, and no role models to emulate.  At almost every turn, Young experienced failure -- at home, in school, with relationships, and at various community based systems like the Waco Center for Youth and the Texas Youth Commission.  Although these systems were established to provide treatment and structure to aid Young, they instead contributed to his continued failure because, although they identified his problems, they failed to implement treatment. (Ex. 96 [Decl. of Toni Knox at ¶ 183].)

    14.    Young was born genetically loaded toward mental illness and chemical dependency.  To complicate matters, Young's educational and social development were affected by numerous social and familiar problems which surrounded him.  These combined factors affected Young's social functioning, impulse control, and lack of appropriate skills from a very young age.  (Ex. 96 at ¶ 8 [Decl. of Knox].)

    15.    Young suffers from Attention Deficit Hyperactivity Disorder (ADHD), which was diagnosed at an early age.  Young's ADHD was and is a medical problem.  ADHD is a biological and chemical malfunction in an immature brain.  The effects of Young's genetically and biologically determined impulsive and distractible response style was aggravated by the chaotic, traumatic home environment in which he spent his formative years.  Children who suffer from severe ADHD disorder require intensive limit setting and a stable environment.  It was unlikely that any adult in Young's home could have provided such structure or stability.  (Ex. 97 at ¶ 24 [Decl. of Dr. Daneen Milam].)

5

**2.     The Family Young Was Born into**

16.     Unborn children have the ability to understand and "feel" the environment they are about to be born into.  That is to say, children begin to be aware of what is going on "outside" while still in the mother's womb.  Young experienced both stress and violence before he was even born.  (Ex. 96 at ¶ 167 [Decl. of Knox].)

17.     Young's mother, Carla Lynn Wade, was abandoned by her own biological mother who could not care for her.[1]  And although Carla had a good relationship with her adoptive father, who was also her great uncle, she did not have a good relationship with her adopted mother, who was not nurturing.  (Exs. 96 at ¶¶ 10, 12, 24-26 [Decl. of Knox]; 123 at ¶¶ 2-4 [Decl. of Carla Sexton].)

18.     Young's father, Billy Young, was a womanizer who abused his wives.  Billy had three children with his first wife, Rebecca.  Those children were Sharon Renee, and twin boys, Dino and Dano.  Billy was physically abusive to Rebecca and after he divorced her, soon after the birth of the twins, Rebecca "disappeared" and subsequently had very little contact with her children.  (Ex. 96 at ¶¶ 18, 29 [Decl. of Knox].)

19.     Billy next met and married Frances May, a sixteen year old waitress.  Billy was ten years older than Frances May when they met.  Billy and Francis May had one child together, Christy Lynn.  Billy was physically abusive to Francis May, and the two separated soon after the birth of their daughter.  (Ex. 96 at ¶¶ 19-20 [Decl. of Knox].)

20.     Carla was seventeen when she met Billy in 1982.  The two married in 1983.  And while she loved Billy's children, they all were all "train wrecks," and she was ill equipped to handle the responsibility of raising four children.  Further, Billy was physically abusive to Carla, as he was with his previous wives.  Carla

---

[1]  When the two meet and reconciled years later, Carla's biological mother would introduce Carla as her cousin.  (Ex. 123 at ¶ 5 [Decl. of  Carla Sexton].)

was even abused by Billy when she was pregnant with Clint.  (Exs. 96 at ¶¶ 25-26 [Decl. of Knox]; 123 at ¶¶ 8, 10-11 [Decl. of Sexton].)

### 3.    Young's Pre-disposition for Addiction and Mental Illness

21.    A person can be predisposed to mental illness and addiction through genetics.  By all accounts, alcoholism and mental illness were present in Young's maternal family.  It is reported that Carla's biological grandfather suffered from alcoholism, and Carla had an aunt with serious mental illness.  (Exs. 96 at ¶ 13 [Decl. of Knox]; 123 at ¶¶ 5, 7 [Decl. of Sexton].)

22.    In Young's paternal family, both his father, Billy, and grandfather, William, were alcoholics.  (Ex. 96 at ¶¶ 16, 21, 33, 46, 137, 139 [Decl. of Knox].) Billy also was into marijuana and cocaine.  (Ex. 96 at ¶¶ 23, 35, 46, 137-38 [Decl. of Knox].)  Billy's family also suffered from manic depression.  (Ex. 96 at ¶ 139 [Decl. of Knox].)

### 4.    Young's Early Years

23.    In a hospital in Titus County, Texas, Young was born on July 18, 1983, three weeks prematurely due to induced labor brought about by Carla's hypertension.  Almost certainly Billy's physical abuse and the burden of caring for Billy's children contributed to Young's early birth.  (Exs. 96 at ¶ 27 [Decl. of Knox]; 123 at ¶ 11 [Decl. of Sexton].)

24.    After enduring Billy's drinking and physical abuse, Carla separated from Billy in 1984.  Carla first went to live with her family, who she had been estranged from, and then moved to a friend's house.  Young celebrated his first birthday in this chaotic time.  (Exs. 96 at ¶¶ 51-52 [Decl. of Knox]; 123 at ¶ 13 [Decl. of Sexton].)

25.    On April 5, 1985, Young suffered a febrile seizure.  Less than two months later, Young suffered a second seizure.  Both times, a spinal tap and other tests were performed on Young.  During this time period, Carla met and began dating Quentin Sexton.  (Exs. 96 at ¶¶ 52-53, 119 [Decl. of Knox]; 123 at ¶¶ 14, 16

[Decl. of Sexton].)

26.     In 1986, while Carla and Quentin were engaging in an on-again, off-again relationship, Billy took Young from Carla and refused to give him back unless she signed papers relinquishing her custodial rights.  Billy wanted custody rights over Young not because he wanted to raise his son, but because he wanted to avoid child support payments.  Only when Carla signed the legal paperwork did Billy return Young.  (Exs. 96 at ¶ 56 [Decl. of Knox]; 123 at ¶ 15 [Decl. of Sexton].)

27.     Despite the constant fighting and instability in their relationship, Quentin and Carla married in March 1987 when Young was three years old.  (Exs. 96 at ¶ 58 [Decl. of Knox]; 123 at ¶ 16 [Decl. of Sexton].)  By the age of four, Young's hyperactivity was noticeable to Carla and others.  The initial diagnosis was ADHD, an illness that plagues Young to this day.  (Ex. 96 at ¶¶ 128-29 [Decl. of Knox].)  At first, Young was prescribed medication exclusively from the stimulant family.  The popular drug for ADHD for many years was Ritalin.  Young was started on Ritalin in October 1989.  He frequently reported "stomach aches" related to the drug.  Later, school and medical records indicated that Young frequently ran out of medication and that Carla did not always follow the prescribing instructions.  (Ex. 96 at ¶ 129 [Decl. of Knox].)

### 5.     Family Life and School

28.     Billy was an uninvolved parent, and did not provide his children with parenting support or advice.  (Ex. 96 at ¶ 31 [Decl. of Knox].)  Billy was abusive to all his children, but especially to Young.  When Young was between four and six years old, Billy threw Clint against a bathroom wall and began to "beat[] the hell out of [him]."  (Exs. 96 at ¶¶ 33-34 [Decl. of Knox]; 123 at ¶ 10 [Decl. of Sexton].)  On a couple of occasions, Billy hit Young with a wooden board.  On still another occasion, Billy knocked Young to the floor and dragged and beat him.  Young would be left with bruises.  (Ex. 96 at ¶¶ 47-48, 153, 155 [Decl. of Knox].)   Billy

8

was also emotionally abusive to Young.  (Ex. 96 at ¶ 157 [Decl. of Knox].)

29.    Carla became so angry with Billy's unsupportive attitude that when Young was around five years old, she changed his name from William Clifton Young, III to Clinton Lee Young.  (Exs. 96 at ¶ 60 [Decl. of Knox]; 123 at ¶¶ 21-22 [Decl. of Sexton].)

30.    Carla frequently felt torn between Quentin and her son.  On the other hand, Quentin was forced to take on the care of Young, who was not his biological child.  Young was very aware that Quentin did not love him and often rebelled against his rigid rules and treatment.  (Ex. 96 at ¶ 169 [Decl. of Knox].)  Young was also physically and emotionally abused by Quentin.  (Ex. 96 at ¶¶ 77, 97, 157-58 [Decl. of Knox].)

31.    Under this backdrop, Young found himself constantly getting into trouble at home and school, whether he was defacing a text book or dropping a match into the lawnmower burning his eyebrows and eyelashes.  (Exs. 96 at ¶¶ 61-62 [Decl. of Knox]; 123 at ¶ 24 [Decl. of Sexton].)

32.    Carla became so frustrated with her son's behavior that in 1993, she took him to a doctor for an EEG and CT scan.  The EEG indicated slower brain waves for someone Young's age.  (Ex. 96 at ¶¶ 65, 128, 162 [Decl. of Knox].)

33.    Two days later, Young took an unloaded antique collector's item gun to school.  Carla was arrested for "endangering a child" because the gun was left so that Young had access to it.  Shortly after this incident, Young was evaluated at the school to determine if he met the criteria for "Emotionally Disturbed Special Education Services."  Dr. Walker determined that Young met the criteria for special education services because of his behavior.   Young was administered the Wechsler Intelligence Scale for Children III (WISC III).  Young's Full Scale IQ was 112.  (Ex. 96 at ¶ 65 [Decl. of Knox].)  After the incident at school and her arrest, and without waiting for the school year to end, Carla sent Young to live with his father in Wyoming.  (Exs. 96 at ¶¶ 65-66 [Decl. of Knox];  123 at ¶ 27

9

[Decl. of Sexton].)

34.    A few weeks later, while registered in the fourth grade at a school in Gillette, Wyoming, Young was administered a Test of Conduct and Emotional Problems.  This test indicated Young suffered from a high level of dysfunction. (Ex. 96 at ¶ 67 [Decl. of Knox].)

35.    By the Fall of 1993, Young was sent back to live with his mother. Carla enrolled Young into a Special Education program at Avinger Elementary. (Ex. 96 at ¶ 69 [Decl. of Knox].)

**6.    Early Diagnosis and Treatment**

36.    Young was charged with theft at the age of ten, and was seen by Dr. Ray Scardino at the Tyler Psychiatric Clinic.  Young was again diagnosed with ADHD.   (Ex. 96 at ¶¶ 70, 129 [Decl. of Knox].)

37.    At age nine, Young was switched from Ritalin to a different stimulant, Cylert.  Also in 1994, Young was started on a trial of Thorazine, an anti-psychotic, sedating drug.  The Thorazine was stopped quickly because it caused Young to suffer breathing problems and palpitations.  Young remained on Cylert for about three years.  (Ex. 96 at ¶ 130 [Decl. of Knox].)

38.    It was recommend that Young be admitted to a residential treatment facility where he would receive structure, medication, and individual and family therapy.  However, instead of receiving the recommended treatment, Young was placed in a group home called Triangle Pines. While there, Young frequently begged to come home and promised his behavior would be better if he could return to living with Carla.  (Exs. 96 at ¶¶ 71-72 [Decl. of Knox];  123 at ¶ 28 [Decl. of Sexton].)

39.    Young's placement at Triangle Pines provided only a displacement of his problems, although it offered a respite for Carla, who was growing weary of reacting and struggling to care for her troubled child.   Young's placement at this particular group home was a stark mismatch.  Most such homes served as foster

care facilities and/or re-entry and step-down type facilities for adolescents who had long term residential treatment, which was not the case with Young.  He did not fit in at Triangle Pines, and ended up an outstanding problem.  (Ex. 96 at ¶ 73 [Decl. of Knox].)

40.    For Young to have been properly treated at Triangle Pines, the entire family, including Carla, Quentin, and Billy, would have had to be involved.  They would have had to make some sacrifices, which at the time, given their own personal and interpersonal challenges, they simply could not, or would not, do. (Ex. 96 at ¶¶ 74, 169 [Decl. of Knox].)

41.    Given that there was no adequate treatment for Young at Triangle Pines, there was no significant improvement in Young's mental health.   The day before his eleventh birthday, Young was removed from the group home because he showed no signs of progress.   (Ex. 96 at ¶ 75 [Decl. of Knox].)

42.    In the fall of 1994, prior to being enrolled in public school, Young was re-evaluated by Dr. Scardina, who again diagnosed Young as suffering from ADHD, Severe, Conduct Disorder, Undifferentiated; Developmental Written Language Disorder, and History of Febrile Seizures. (Ex. 96 at ¶¶ 76, 130 [Decl. of Knox].)  In addition to his problems at school, Young was also reacting to the worsening problems at home.  Quentin's drinking had become heavy, and he was becoming increasingly verbally abusive to both Carla and Young.  (Ex. 96 at ¶ 77 [Decl. of Knox].)

43.    Young received further school testing in the winter of 1996.  He was again administered the WISC-III.  Young's scores were similar to his original scores:  his Full Scale IQ was 115, and he was again diagnosed with ADHD.  (Ex. 96 at ¶ 78 [Decl. of Knox].)

44.    At age thirteen, with Carla working extensive hours, supervision of Young was badly compromised.  On August 8, 1996, Young was arrested and charged with burglary.  Young was enrolled in the eighth grade but was withdrawn

five days later and sent to live with his father in North Carolina.  Subject again to the family's emotionally charged twists and turns, destabilization and disruption had become the norm in Young's life.  (Ex. 96 at ¶ 79 [Decl. of Knox].)

45.    Young always felt like an "outsider" due to the fact he was tossed back and forth between these families.  When Young went to stay with Billy, it was not because his father was anxious to have him, it was because his mother was usually frustrated with her son's behavior.  Each time Young was thrust into another family setting, there was little planning or thought about his feelings.  (Ex. 96 at ¶ 170 [Decl. of Knox].)

46.    While in North Carolina, Young had minimal supervision, smoked marijuana, and also tried crack cocaine and acid.  Young also drank alcohol on the weekends.  When Young's father relocated from North Carolina to Daingerfield, Texas, Young was again withdrawn from school.  (Ex. 96 at ¶¶ 79-80 [Decl. of Knox].)

47.    During this last period that Young was living with Billy in Texas, Billy was arrested for injury to a child after he assaulted Young.  Billy assaulted Young with his fists, neck, and body.  Billy's sister finally stopped Billy from further hurting Young.  (Ex. 96 ¶ 154 [Decl. of Knox].)

### 7.    Young Enters the World of Institutionalization

48.    When Young was fourteen years old, while Carla and Quentin were out of town, Young stole a friend's car and took an eight-year-old boy and twelve-year-old girl to Louisiana with him.  Soon after this incident, Young was withdrawn from Jefferson High School, which would be his last opportunity to interact as a teenager in a non-correctional school. (Ex. 96 at ¶ 82 [Decl. of Knox].)

49.    In December 1997, Young was charged with burglary of a habitation.  After his arrest, he was incarcerated at the juvenile detention center for more than a month until he could be placed.  In January 1998, Young was admitted to the Waco

Center for Youth by the Texas Department of Mental Health and Mental Retardation.  (Ex. 96 at ¶ 83 [Decl. of Knox].)

50.    The Waco Center for Youth was the only state-funded residential program for adolescents age thirteen to eighteen in Texas.  Admission to the eighty-two bed unit required a mental health diagnosis.  Dr. Helen Short was the only psychiatrist responsible for seeing the patients at the Waco Center.   Dr. Short initially diagnosed Young with ADHD, Primarily Inattentive, Conduct Disorder and a Disorder of Written Expression.   (Ex. 96 at ¶¶ 83-85 [Decl. of Knox].)

51.    When Young arrived at the Waco Center, he was taking Adderral. Although the drug had not appeared to be helpful for Young, Dr. Short decided to continue to treat Young with the drug.  Young continued to exhibit hyperactive and impulsive behavior.  After Young was involved in an altercation with a peer, Dr. Short doubled the dose of the same medication.  Young became even more aggressive.  Dr. Short eventually changed Young to another stimulant and he continued to exhibit aggressive behavior.  When Young did not respond to the next stimulant drug, he was kept from all activities, including school and the cafeteria. While on total restriction, Young's behavior worsened and, on one occasion, he was put into restraints. (Ex. 96 at ¶¶ 86, 131 [Decl. of Knox].)

52.    While being housed at Waco for several months, Young had received little in the way of treatment.  On restriction, he was unable to attend group therapy or any other therapeutic activities.  After two months, Dr. Short changed Young's medication from a stimulant to an anti-depressant:  Wellbutrin.  Young did not respond to the Wellbutrin and got into an altercation with a peer.  (Ex. 96 at ¶¶ 87, 131-32 [Decl. of Knox].)

53.    Despite Waco's mission statement, "It is our responsibility to provide a long-term treatment environment that supports behavior change," Young's stay at Waco represented a worst-case scenario for a severe ADHD patient.  He received no more than three hours per week of therapeutic activities, he was restricted from

13

school, and confined to an unstructured and punitive setting.  Inevitably, the pure disciplinarian approach failed.  (Ex. 96 at ¶¶ 88-89 [Decl. of Knox].)

54.     In April 1998, Young was found to have committed an assault and indecency against another youth.  The incident involved what was initially horseplay between Young and another Waco resident.  The horseplay got out of hand, with both participants becoming angry, and it was alleged that Young pulled his penis from his pants and attempted to stick it in the other youth's ear.  (Ex. 96 at ¶ 90 [Decl. of Knox].)

55.     Young was charged with Indecent Exposure to a Child and labeled a "sex offender."  Due to the nature of the charges, Young was required to register on the State of Texas Sexual Offender list.  Although this requirement was later lifted in October 2001, it was yet another instance where Young was made to feel even more like a criminal and re-enforced to him his sense of failure.  (Ex. 96 at ¶ 91 [Decl. of Knox].)

56.     Throughout the years, Young has steadfastly denied that he is not a sexual predator.  However, it became a focal point in many of the conversations and interviews he has had with mental health professionals. The valuable time spent addressing this "problem" might well have been used to work with Young on tangible problems including his chemical dependency and mental health issues.  (Ex. 96 at ¶ 92 [Decl. of Knox].)

57.     In May 1998, after spending nearly five months at Waco, Young was given a psychological evaluation by Deborah Kintner.  Young's Full Scale IQ was 112, but it appeared that Young might have been suffering from a mood disorder and that he had difficulty with impulse control.  Projective testing revealed Young's feelings of inadequacy, insecurity, and inferiority.  Ms. Kintner reported it was likely that Young compensated for his feelings of inadequacy with hostility and aggression.  The tests also revealed that Young viewed himself as a failure and was having feelings of hopelessness, perhaps a result of his childhood full of

14

placements and replacements, dismissals and expulsions.  Failing out of Waco, Young was placed at the Texas Youth Commission (TYC). (Ex. 96 at ¶¶ 95-96 [Decl. of Knox].)

### 8.  Years at TYC

58.    A TYC facility is a highly structured and consequence-based environment.  Youths are monitored twenty-four hours a day, seven days a week. Routine evaluations are based on a youth's ability to follow the rules, maintain self-discipline, and integrate with others.  Young's initial mental needs assessment at TYC was rated as having moderate needs and was described as having a mood disorder.  Young's assessment also indicated he was likely to have been subject to physical and emotional abuse and neglect.  (Ex. 96 at ¶¶ 97-98 [Decl. of Knox].)

59.    In August 1998, a psychiatrist, Dr. Groves, noted Young was having trouble with anger, impulsivity, and restlessness, as well as difficulty focusing and was easily distracted.  Dr. Groves diagnosed Young with ADHD, Combined and Conduct Disorder.  Young was prescribed Wellbutrin.  (Ex. 96 ¶ 135 [Decl. of Knox].)

60.    In September 1999, in yet another attempt to properly medicate him, Young was prescribed Depakote, a mood stabilizer used to treat bi-polar disorder. Young remained on Depakote until February 2001, when he was discharged from TYC.  Young had also been restarted on Clonidine.  While taking the combination of Depakote and Clonidine, Young's behavior, and his symptoms, significantly improved.  (Ex. 96 at ¶ 136 [Decl. of Knox].)

61.    Although during his stay at TYC Young had numerous incidents of failure to comply with rules, there is evidence that Young attempted to adapt by working with his psychiatrist to evaluate and improve his therapy.  Young also imposed sanctions upon himself in order to avoid conflicts with the rules, TYC staff, and other youths.  (Ex. 96 at ¶ 105 [Decl. of Knox].)

62.    Young was also able to form good relationships with several of the

guards at TYC.  A female guard that knew Young for his entire stay at TYC realized that Young was hyper and in turn, she tried to keep him busy, which usually kept him out of trouble, and subsequently, she had no problems with him. This guard, recognizing Young's restlessness, would allow him to come out of his "personal area" and help with chores.  The correctional officer even had a pet name for Young, calling him "her boy."  Young's behavior with this guard exemplifies how well he responded to someone who furnished the positive attention and support he needed.  (Exs. 96 at ¶ 106 [Decl. of Knox]; 97 at ¶ 20 [Decl. of Milam].)

63.     Young spent his sixteenth and seventeenth birthdays at TYC.  In fact, Young spent the majority of his teenage years away from typical teenage activities and socialization.  (Ex. 96 at ¶ 107 [Decl. of Knox].)

64.     The main purpose for sending Young to TYC was to promote his rehabilitation in order for him to return to the free world and lead a productive life. However, due to the myriad of problems that plagued TYC during this time, most of Young's needs were not met or even addressed.  For example, Young was assessed as chemically dependent, but received no treatment for chemical dependency while at the facility.  (Ex. 96 at ¶¶ 99-100, 108-10, 126-27 [Decl. of Knox].)

### 9.     Young's Return to the Free World

65.     On February 22, 2001, Young was released from TYC.  As a youth, Young entered the prison-type environment without a mature identity or the ability to make sound independent judgments.  When the controls of TYC were removed, Young lacked an internal structure to revert to or rely upon.  Accordingly, institutionalized at age seventeen, Young struggled to find a place he fit in the world.  (Exs. 96 at ¶ 111 [Decl. of Knox]; 97 at ¶ 23 [Decl. of Milam].)

66.     Prior to his release, Young had been surrounded by external limits on his behavior, and he was accustomed to the structure of the environment

16

controlling his behavior.  Accordingly, Young's own internal control system remained undeveloped.  Some development may have been possible after his discharge, had he been released to a structured, supportive environment that included stable family relationships, work opportunities, helpful forms of parole supervision, support from the community, and provisions for chemical dependency and psychiatric treatment.  But this was not the case with Young.  (Ex. 96 at ¶¶ 112, 175 [Decl. of Knox].)

> 67.    Carla was initially supportive and welcomed Young home, but Young was again exposed to the poor relationship with his stepfather and other negative influences.  (Ex. 96 at ¶ 112 [Decl. of Knox]; 123 at ¶¶ 32-33 [Decl. of Sexton].)

> 68.    Following his release from TYC, Young was referred to the Texas Mental Health Mental Retardation (MHMR) Centers.  But those facilities were overwhelmed, understaffed, and underfunded and appointments with psychiatrists were not easy to get.  Further, Young had limited transportation and no driver's license, which made getting to MHMR difficult, especially from the rural area in which he lived.  (Ex. 97 at ¶ 15 [Decl. of Milam].)

> 69.    For the first few months of his release, Young did well.  He had a new sense of discipline, was working, and was fastidious about his appearance to the point he would always make his bed and keep his tennis shoes sparkling clean. (Ex. 123 at ¶ 32 [Decl. of Sexton].)

> 70.    Young got a job as a dishwasher at a restaurant, but was immediately off balance emotionally and psychologically.  He soon fared poorly at his job and was terminated in the middle of April 2001.  Young then started work at J. R. Construction with his father.  By this time, Young had met Amber Lynch and was starting to hang out at the Shady Shores Motel, where Amber lived.  (Exs. 96 at ¶¶ 113, 141-42, 176 [Decl. of Knox]; 123 at ¶ 33 [Decl. of Sexton].)

> 71.    Without a structured therapy or medication plan, Young's turning to self-medication, via other stimulants, was almost inevitable. When he was released

from TYC with no external regulators to keep him on track, and instead surrounded by an abundance of street drugs, Young transitioned to methamphetamine, also known as "speed," "meth," or "crystal meth." Methamphetamine, albeit illegal, has properties similar to the FDA-approved medicine Young had been taking all his life. Despite its highly addictive nature and extremely dangerous side effects, it was a simple conversion for Young because of his long-term use of a chemically similar drug. (Ex. 97 at ¶ 17 [Decl. of Milam].)

72.    After losing his job and doing drugs with his half brothers, Young began to deteriorate and became more vulnerable to re-offending. The initial negative psychological factors affecting Young as a newly released prisoner manifested, and Young experienced internal chaos, disorganization, stress, and fear. (Ex. 96 at ¶¶ 114, 145 [Decl. of Knox].)

73.    Young had been considering other options for his future and met with a recruiter for the armed forces. (Ex. 96 at ¶ 115 [Decl. of Knox].)

74.    Young celebrated his eighteenth birthday on July 19, 2001 in the free world. However, Young's drug use caused increased problems between him and Amber and frequently made him more aggressive. It was at this time that Young met David Page, Darnell McCoy, and Mark Ray. The combination of hanging out with his brother Dano, who was using drugs, and other drug users hanging around the Shady Shores area, contributed to Young's relapse and mental decompensation. Not only did Young's prior social history events and past experiences influence and affect his behavior, but here they would "elicit, shape, and modify [his] thoughts and actions." (Ex. 96 at ¶ 117 [Decl. of Knox].)

75.    Young's mother was also aware of the effect that Shady Shores was having on her son. Carla noticed that Young's behavior and even his appearance were changing, which she specifically recognized as clear signs of trouble. Carla attempted to contact Young's parole officer to encourage him to monitor Young more closely. (Exs. 96 at ¶¶ 118, 146 [Decl. of Knox]; 123 at ¶¶ 33-36 [Decl. of

18

Sexton].)

76.     In November 2001, Amber went to spend the Thanksgiving holidays with her grandmother in Midland, Texas.  With Amber gone, Young became more involved in various illegal activities which culminated in his arrest for the murders of Doyle Douglas and Samuel Petrey.  (Ex. 96 at ¶ 119 [Decl. of Knox].)

77.     Young was continually told by his mother, step-father, father, and others that he would never amount to anything and would end up in prison. (Ex. 96 ¶ 147 [Decl. of Knox].)  "Ultimately, Young's environmental factors of severe negligence and abuse led to his identification and fulfillment of his father's discouraging prediction."  (Ex. 97 at ¶ 21 [Decl. of Milam].)

**B.     Young's Trial**

   **1.     Guilt/Innocence  Phase - Prosecution Case**

78.     The prosecution presented evidence that Young and three others, David Page, Mark Ray, and Darnell McCoy, rode with Doyle Douglas, in his car, from Marshall to Longview, Texas, to buy marijuana.  Page, Ray, and McCoy testified that once there, Young shot Douglas twice in the head and commanded them to put Douglas in the trunk.  Young then drove to a remote wooded area, where he ordered the group to push Douglas face down in a creek and forced Ray, at gunpoint, to shoot Douglas for the third time.

79.     According to the State's witnesses, Young, now driving Douglas's car, dropped Ray and McCoy at their homes.  Page volunteered to ride with Young to Midland, where Young planned to see his girlfriend, Amber, who was at her grandmother's for Thanksgiving.  Along the way, Young and Page abducted the second victim, Samuel Petrey, in his pick-up truck, and abandoned the Douglas car.  With Petrey sitting in the rear cab, Young and Page then drove to Midland.

80.     Page testified that just south of Midland at an oil pump site, Young directed Page and Petrey to dispel evidence from the truck.  Young then shot Petrey twice in the head, and Young and Page drove off.  Aware now that they

were wanted by the police for the Douglas murder, Young dropped Page in
Midland, where Page turned himself in.  Young met briefly with Amber outside a
grocery store, then set out to return to east Texas.  He was arrested along Interstate
20.

81.    Young was indicted by a Grand Jury for capital murder, which alleged
that he intentionally murdered two people in the course of the same criminal
scheme and/or committed murder in the course of kidnaping and robbery.  Ray and
Page were held on murder charges and later pled guilty to lesser charges.  McCoy,
who had by his own volition directed the police to Douglas's body, was never
taken into custody nor charged.

82.    The State's case against Young relied primarily on the testimony of
Ray, Page, and McCoy.  The State maintained that Young was the driving force in
the murders and kidnaping, and that the others' involvement was the result of
duress.  Ray, for example, testified that he only shot Douglas because Young
threatened to harm him or his family.  Likewise, Page, who participated in the
crimes from start to finish, said he did so only out of fear.  Young's sole purpose
over the course of the two murders, according to the State, was to travel to Midland
to see his girlfriend.

### 2.    Guilt/Innocence Phase  -- Defense Case

83.    The defense's case focused mainly on three problems with the State's
case:  conflicting testimony of the three eyewitnesses, inconsistent ballistic
evidence, and signs of complicity among those who claimed to be threatened by
Young.  Cross-examination of McCoy, Ray, and Page raised questions as to who
among them was telling the truth.  Ray had initially told police Young fired all
three shots at Douglas, then recanted when he learned McCoy had told police Ray
shot Douglas at the creek.  Page, on the other hand, re-enacted the Petrey murder
on videotape, then reversed his staging of the scene when he learned the coroner's
report rendered his prior version implausible.

20

84.     Page, Ray, and McCoy had trouble identifying who was sitting in which position in the Douglas car at the time of the murder.  The three men never identified with any credibility whether they also carried weapons during the crime (there were several handguns recovered, two of which had been fired).  The defense also highlighted the numerous occasions on which Page, who claimed to be a hostage of Young, could have easily parted company.  Similarly, Petrey had numerous opportunities to separate from his captors but chose to stay with them.

### 3.     Punishment Phase -- Prosecution Case

85.     The State put on evidence that Young had wanted to kill a drug dealer before the murders for which he had been convicted, in addition to burglarizing a gun shop to acquire murder weapons found in the instant case.  The State also presented evidence that Young was an unstoppable offender, whose life of crime had started as early as age nine, when he brought a gun to school, and that he only showed signs of worsening.  At age fourteen, he stole a car and drove it to Louisiana with a young girl.

86.     The State's key witness at punishment was the medical director at Waco Center for Youth, who testified that her attempts to treat Young for severe Attention Deficit and Hyperactivity Disorder (ADHD) had failed, and she opined Young was suffering from Anti-Social Personality Disorder.  She eventually concluded Young was irredeemable, and that he left her with no choice but to commit him to the Texas Youth Commission ("TYC") after an alleged "sexual" assault on another young male. The State presented over 1,200 pages of records from the TYC, which represented countless attempts to medicate, discipline, and punish Young.  One juvenile officer testified that Young was "the worst [she] ha[d] ever seen."

87.     The State also presented evidence by way of psychiatry experts and correctional experts that Young could not be fixed.  Over objection, the prosecutor elicited testimony from one doctor that likened Young to a "serial killer" and a

21

"psychopath."  Experts from the special prosecution division of the Department of Criminal Justice testified that a "Life Without Parole" sentence would not provide any guarantee that Young would not harm or kill again.  The State's proposition to the jury was that the only way to stop Young from harming others again would be by a sentence of death.

### 4.    Punishment Phase -- Defense Case

88.    Trial counsel presented evidence that Young came from a broken and transitory family.  Experts and medical professionals for the defense illustrated the long battle Young had endured with ADHD.  On cross examination, many of the State's witnesses agreed that Young had been mishandled or ignored while he was in various therapeutic/correctional institutions, or that the facilities were altogether ill-equipped for a case such as his.

89.    The defense presented expert testimony by a neurologist who examined Young's brain function with an EEG, once at age nine, and again at trial. The doctor testified that both test results indicated an abnormality in Young's brain.  Further expert testimony was presented to educate the jury on the nature of ADHD, and how it could be treated.

## C.    Preparation of Young's Initial State Habeas Application

90.    On May 6, 2003, the Texas CCA appointed Gary Taylor as Young's state habeas counsel. Taylor worked with an investigator/mitigation specialist named Lisa Milstein to prepare Young's initial state habeas application -- a decision that proved disastrous.  Milstein had a long history, pre-dating Taylor's appointment to Young's case, of psychological problems, drug abuse, and deficient performance, of which Taylor was on notice.  Among other things, Milstein had a history of submitting affidavits that witnesses later renounced, to the detriment of her clients -- a practice she continued in Young's case.  Despite these issues, Taylor failed to adequately direct or supervise Milstein's work on Young's case, and relied on her as his primary investigator/mitigation specialist.  Taylor's failure

22

to supervise Milstein led him to focus the scarce resources and time available during state habeas proceedings on a sexual molestation claim that could not be supported and was doomed to failure.  The focus on that claim left insufficient time and resources to investigate and present meritorious claims that any competent counsel would have presented.

91.    Even though Gary Taylor was not appointed to Young's case until 2003, the problems which arose concerning Milstein, which were or reasonably should have been known to Taylor, started years before.

**1.    Life Before Milstein Became a P.I.**

92.    Milstein was arrested in December of 1984 for theft and was given a probationary sentence.  (Ex. 81 [Milstein Theft Record].)  Before becoming an investigator, Milstein worked in various nightclubs throughout Houston as an exotic dancer.  Records show that Milstein became a licensed private investigator in 1998.  (Ex. 82 [Milstein Licensing File].)

**2.    The Practice Group**

93.    Lisa Milstein began her legal career in Houston at the capital resource center in the mid-1990s, where she was an intern.  Also working with Milstein was investigator Gerald Bierbaum.[2]  When the resource center lost its funding in September 1995, Bierbaum was hired by investigator Tena Francis, who worked in the Dallas area.  Bierbaum moved into office space in Houston, Texas with attorney Michael Charlton.  At some point, Milstein moved into the same office space.  (Exs. 43 at 8-9, 27 [Gerald Bierbaum Deposition (Bierbaum Depo.) dated 3-17-06]; 105 at ¶¶ 3, 5 [Decl. of Tena Francis].)

94.    Attorneys Gary Taylor and Alex Calhoun worked in the same office in

---

[2]  Bierbaum eventually passed the bar and became a lawyer licensed to practice in Texas in 2000.  (Ex. 43 at 8 [Bierbaum Depo.].)

Austin, Texas.[3]  (Exs. 43 at 27 [Bierbaum Depo.]; 42 at 7-8 [Gary Taylor Deposition (Taylor Depo.) dated 3-17-06]; 102  at ¶ 4 [Decl. of Alexander Calhoun].)

95.     While everyone paid their own rent, and all were independent employees, Taylor, Charlton, Calhoun, Frances, Bierbaum, and Milstein worked together.  For example, if Taylor was appointed to a case, Milstein was hired as Taylor's investigator/mitigation specialist.  Milstein, in turn, often sought advice from Bierbaum, even if he was not working on that particular case.  Likewise, if Milstein was investigating a case for Charlton or Bierbaum, she turned to Taylor or Francis for guidance.  (Exs. 43 at 9, 26-27, 32 [Birebaum Depo.]; 42 at 7-8, 26 [Taylor Depo.]; 105 at ¶ 8 [Decl. of Francis].)  The attorneys, too, worked closely together, talking several times a day, and connecting through the internet and instant messaging.  (Ex. 42 at 9 [Taylor Depo.].)

96.     Charlton, Bierbaum, and Milstein moved a number of times in the five or six years they shared office space together.  Their first office was located on Yoakum, the next office was located on Southwest Freeway, and the last office was at 1744 Norfolk.  The Norfolk location, a house, was owned by attorneys Herb Ritchie and Greg Glass.  (Ex. 42 at 26-27 [Bierbaum Depo.].)

**3.     Milstein's Early Career (1995-1997)**

97.     One of Milstein's first experiences as an investigator came in late 1995 or early 1996, before she was a licensed private investigator.  Charlton hired Milstein to conduct mitigation work on an upcoming capital trial.  (Ex. 105 at ¶ 5 [Decl. of Francis].)

98.     In February 1996, Charlton was hired by international death penalty activist Barbara Bacci, a resident of Rome, Italy, to assist in the defense of Texas death row inmate, Dominique Green.  Taylor and Milstein were later brought onto

_____

[3] Taylor remembers first working with Milstein and Bierbaum in 1997.  (Ex. 42 at 7, 14 [Taylor Depo.].)

the case by Charlton.  (Ex. 99 at ¶¶ 1-3 [Decl. of Barbara Bacci].)

99.    In 1997, Taylor and Charlton sent Milstein to speak on their behalf at an anti-death penalty conference in Rome.  To Bacci, it was clear from Milstein's presentation at the conference that she knew little, if anything, about death penalty work.  (Ex. 99 at ¶ 5 [Decl. of Bacci].)  Bacci later complained to Taylor about Milstein's lack of knowledge about the death penalty.  Taylor told Bacci that she was being too hard on Milstein.  (*Id*. at ¶ 6.)

100.    Knowing about the disappointment surrounding her presentation at the conference, Milstein told Bacci that she was going through a rough time in her personal life.  (*Id*. at ¶ 7.)

101.    When Milstein returned to work on Green's case,  she engaged in behavior that Bacci considered to be inappropriate.  For example, Milstein sent Green letters on death row that smacked of a flirtatious nature.  (*Id*. at ¶¶ 8-9.)

102.    Having serious doubts about Milstein's competence, on several occasions Bacci conveyed her concerns about Milstein's work on Green's case to both Taylor and Charlton via telephone calls.  (*Id*. at ¶ 10.)  Bacci told both attorneys that Milstein was so easily upset that any attempts to focus her work would bring her to tears.  (*Id*. at ¶ 11.)  Taylor never provided any response to Bacci's concerns.  (*Id*. at ¶ 12 [Decl. of Bacci].)

### 4.    Michael Rodriguez Case (2001)

103.    Had Taylor adequately directed and supervised Milstein, her problems would have been known to him as far back as 2001, during their work on Michael Rodriguez's case.  Taylor was on notice of Milstein's deficient work at the time he was appointed to Young's case.

104.    In January 2001, Michael Rodriguez was arrested and charged with murder.  *See Rodriguez v. State*, 2006 WL 827833 (Tex. Crim. App. 2006).  Soon thereafter, Gary Taylor was appointed as Rodriguez's lead trial counsel.  (Ex. 118 at ¶ 2 [Declaration of Michael Rodriguez].)  Taylor selected Lisa Milstein as his

investigator/mitigation specialist.  (*Id.* at ¶ 3.)

105.   Rodriguez met with Milstein throughout the spring and summer of 2001.  (Ex. 118 at ¶ 6 [Decl. of Rodriguez].)  At the punishment phase of Rodriguez's trial, Taylor presented evidence that Rodriguez, as a teenager, was molested by a Catholic clergy named Eugene Morgan.[4]  The molestation, according to the defense, caused Rodriguez to suffer psychological difficulties. *Rodriguez*, 2006 WL 827833, at *14-15.  The claim of molestation, however, was false according to Rodriguez.  (Ex. 118 at ¶ 4 [Decl. of Rodriguez].)  He states that not only did Milstein know the molestation charge was false, it was Milstein who invented the fabrication.  He also states that Taylor never asked him about the molestation claim. (*Id.* at ¶¶ 4-5.)

**5.     David Lynn Carpenter Case (2001-2006)**

106.   Milstein's problems also should have been evident to Taylor during their work together on David Lynn Carpenter's case.  Carpenter was convicted of capital murder in March, 1999.  On August 20, 2000, Carpenter filed an initial state application. *See Ex Parte Carpenter*, 2007 WL 678622 (Tex. Crim. App. 2007).

107.   After the filing of the state Application, Taylor was retained by Carpenter to replace original state habeas counsel.  Taylor again used Lisa Milstein as his investigator.  In the Fall of 2001, Milstein conducted interviews with a number of witnesses in the Carpenter case, including Dana Chamberlin.  Milstein memorialized these interviews into affidavits, which Milstein notarized.  These affidavits were then submitted in support of Carpenter's amended state application.

108.   In August of 2002, attorney Bruce Anton was appointed as Carpenter's federal habeas counsel (*Carpenter v. Quarterman*, CV02-1145-B)).

---

[4]  Morgan's true name was Eugene Fitzsimmons.  Morgan was the name given to the priest in order to hide his identity.  (Ex. 118 at ¶ 4 [Decl. of Rodriguez].)

Carpenter requested that Anton consult with state habeas attorney Taylor.  Taylor recommended that Anton use Milstein for the federal habeas case.  Anton agreed as Carpenter had requested that he use Milstein, and because Anton believed Milstein would already be up to speed on the case due to her work on the state Application with Taylor.  Anton had never before used, nor heard of, Milstein. (Ex. 98 at ¶¶ 2-4 [Decl. of Bruce Anton].)

109.   Although Anton assigned investigatory tasks to Milstein, she never completed Anton's requests and almost never responded to his telephone calls.  Anton finally gave up on Milstein and hired new investigators.  (Ex. 98 at ¶ 5 [Decl. of  Anton].)

110.   In June 2004, after securing a stay in the federal court, Anton returned to state court to litigate an actual innocence claim which was supported by declarations Milstein had filed in conjunction with Taylor's amended state Application.  In June 2005, the state sent its own investigator to talk with at least two of the affiants.  At that time, it came to light that some of the affiants found major inaccuracies in the declarations typed up and notarized by Milstein, and that they had never seen Milstein's final affidavit.  In August 2006, Anton was forced to file new affidavits in support of his pending state application, excising the false information supplied by Milstein.  (Ex. 98 at ¶¶ 6-8 [Decl. of Anton].)

**6.     Milstein's Polunksy Incident (2003)**

111.   In early 2003, Texas attorney Morris Moon was visiting death row clients at the Polunsky Unit in Livingston, Texas.  While there, Moon had a conversation with a female prison guard named Williams about a private investigator named Lisa Milstein.  (Ex. 115 at ¶ 2 [Decl. of Morris Moon].)

112.   As Moon was purchasing food for one of his clients, Williams asked him if he knew Milstein, and, if so, what he thought of her.  Moon asked the guard why she was inquiring about Milstein.  Williams told Moon that Milstein had recently visited the prison and her behavior had been quite bizarre.  (*Id*. at ¶¶ 3-4

27

[Decl. of Moon].)

113.   Williams told Moon the following story.  Milstein had finished visiting one client at Polunsky and, while waiting to meet the next client, asked permission to go out to the parking lot to her car.  To Williams, Milstein appeared to be very agitated.  When Williams told Milstein that she could not go to her car, Milstein "flipped out."  Milstein continued to press for permission to go to her car and grew more agitated and angry when she was refused.  (Id. at ¶¶ 4-5 [Decl. of Moon].)

114.   Williams told Moon that it seemed, based on Milstein's physical demeanor and emotional reaction, that Milstein wanted to go to her car because she was using drugs and needed a fix.  (*Id*. at ¶ 6 [Decl. of Moon].)

115.   Moon recalled this incident some time later when he heard that Milstein was alleged to have used drugs with a witness in Young's state habeas case.  (*Id*. at ¶ 7 [Decl. of Moon].)

116.   Moon was shocked by Milstein's alleged conduct in Young's case, but not completely surprised because, like others in the Texas death penalty community, he had previously heard comments that Milstein had a drug problem.  (*Id*. at ¶¶ 7-8 [Decl. of Moon].)

**7.   Taylor Appointed as Young's State Habeas Counsel (April 2003)**

117.   Taylor's practice of failing to adequately supervise investigators continued when he was appointed to Young's case, and beyond.  Unfortunately, the cases mentioned above were not isolated incidences, and the failure to supervise Milstein continued after Taylor's appointment as Young's counsel.

118.   On April 16, 2003, Judge Hyde appointed Taylor to represent Young for purposes of the state Application.  (Ex. 27 [Appt. Taylor].)  On April 29, 2003, Taylor requested from Judge Hyde the prepayment of investigative expenses for Lisa Milstein, "[c]ounsel's primary investigator," representing to the court that Milstein was capable of undertaking the required investigation in a death penalty

case.  (Ex. 40 [Taylor Request for Funding 2003].)  On May 6, 2003, the CCA officially appointed Taylor as Young's habeas counsel.  (Ex. 28 [CCA Appointment].)

### 8.   Walter Sorto Case (2003)

119.   Milstein's problems surfaced with other legal teams as well as it did in the capital murder case of Walter A. Sorto.  Sorto was charged with the May 31, 2002, capital murders of Maria Rangel and Roxana Capulin.  *Sorto v. State*, 173 S.W.3d 469, 471 (Tex. Crim. App. 2005).  Sorto was a citizen of El Salvador.  *Id*. at 477.

120.   Sorto's state legal team consisted of attorneys Alvin Nunnery, Cruz Cervantes, and Gerald McCann, and investigator Milstein.  Criminal defense attorney Nicholas Trenticosta, and his wife, attorney/mitigation specialist Susana Herrero, in cooperation with the El Salvadorian Capital Assistance Project, were hired by the El Salvadorian Government to monitor and assist Sorto in his mitigation defense.  (Exs. 124 at ¶¶ 1-2 [Decl. of Nicholas Trenticosta]; 108 at ¶¶ 1-2 [Decl. of Susana Herrero].)

121.   Trenticosta and Milstein spoke by telephone before their September, 2003 trip to El Salvador.  From his first conversation with Milstein, it was apparent to Trenticosta that the Sorto defense case was heading for a "train wreck."  After talking to Milstein about the development of the mitigation case on Sorto's behalf, it appeared to Trenticosta that Milstein was throughly unprepared to help develop mitigation in this case due to her lack of knowledge of the case.  (Ex. 124 at ¶¶ 3-4 [Decl. of Trenticosta].)

122.   Trenticosta conveyed his concerns about Milstein to attorney Gerald Bierbaum, an associate of Milstein's.  During several telephone calls with Bierbaum, Trenticosta told him that Milstein did not understand mitigation defense in general, and that in particular, Milstein seemed unqualified for the type of investigation she would be expected to conduct in El Salvador.  (Ex. 124 at ¶¶ 5-6

[Decl. of Trenticosta].)  Bierbaum was closed mouth about Milstein and never responded to any of Trenticosta's stated concerns about Milstein's abilities.  (*Id*. at ¶ 7.)

123.    The Trenticostas and Milstein arrived in El Salvador on September 3, 2003.   The first face to face meeting with Trenticosta and Milstein got off to a bad start.  Milstein disregarded Trenticosta's suggestions for investigation questions specific to El Salvador even though Milstein was unfamiliar with the culture and language of the country.  (Ex. 124 at ¶ 8 [Decl. of Trenticosta].).  Because of the friction between Trenticosta and Milstein, Herrero stepped in to coordinate the work with Milstein.  (*Id*. at ¶ 9.)

124.    Herrero met Milstein for the first time in the lobby of the hotel where they were all staying.  During their first meeting, Herrero encouraged Milstein to allow Herrero to accompany her the following day to meet the Sorto family.  Milstein had hired two interpreters-photographers for the trip.  During the meeting, Milstein told Herrero that she did not speak Spanish, had never met the client, and that she had accepted the case at the last minute because she was friends with the trial attorney.  (Ex. 108 at ¶¶ 4-5 [Decl. of Herrero].)  During the meeting, Milstein became visibly upset because pigs had run through the Sorto shack that day and had gotten her shoes dirty.  Milstein cried as she showed Herrero her dirty sneakers.  (Ex. 108 at ¶ 5 [Decl. of Herrero].)

125.    The following morning, Herrero accompanied Milstein to interview Sorto's relatives and neighbors, including his mother.   The two interpreters/photographers rode in the front, and Milstein and Herrero sat in the back.  During the three-hour drive, Milstein told Herrero she was going through a rough time and that she was taking psychotropic medications for anxiety and depression.  To Herrero, Milstein was clearly in a personal crisis.  (Ex. 108 at ¶¶ 6-7 [Decl. of Herrero].)

126.    As Milstein spoke about her minimal time and experience on the Sorto

case, combined with her personal problems, it became obvious to Herrero that Milstein should not have been working at that time on any case as complex and significant as a death penalty case.  Trenticosta felt the same way as his wife. (Exs. 108 at ¶ 8 [Decl of Herrero]; 124 at ¶ 10 [Decl. of Trenticosta].)

> **9.    Vaughn Ross Case (2003-2004)**

127.    Milstein's problems surfaced again during Taylor's representation of death row inmate Vaughn Ross.

128.    In September, 2002, Vaughn Ross was convicted of capital murder *See Ross v. State*, 133 S.W.3d 618 (Tex. Crim. App. 2004).  In February of 2003, Taylor was appointed to represent Ross on Ross's state habeas petition.  (Exs. 85 [CCA Appointment for Ross];  122 at ¶ 2 [Decl. of Vaughn Ross].)  In turn, as he had done in numerous cases before, Taylor selected Milstein as his investigator/mitigation specialist.  (Ex. 122 at ¶ 3.)

129.    Milstein first visited Ross in prison in April, early 2003.  It was during that visit that Ross spoke with Milstein about areas of investigation he wished conducted.  (Ex. 122 at ¶ 4 [Decl. of Ross].)

130.    Later in 2003, Milstein went to St. Louis and interviewed members of Ross's family, Ross's former girlfriend, and Ross's friends.  Ross's  younger sister, Michelle Ross, was one of those family members interviewed by Milstein.  (Ex. 120 at ¶ 3 [Decl. of Michelle Ross].)  To Michelle, Milstein appeared to be under the influence of cocaine as Milstein's eyes were red, she was sniffling, she appeared jittery, and she was not focused in her questioning.  Michelle had seen people on cocaine, and Milstein exhibited the same physical symptoms and characteristics of someone on cocaine.  (Ex. 120 at ¶ 4.)  In addition, Michelle did not think Milstein was listening to the answers given during the interview. Michelle felt that Milstein was only interested in turning Michelle's comments into negative statements about Vaughn and the family.  (Ex. 120 at ¶ 5.)

131.    Milstein also interviewed Ross's older sister, Valeria Martin.

Throughout that interview, Milstein seemed "jumpy" and "jittery" in her movements.  Valeria thought Milstein's skin looked pasty, and noticed that Milstein's appearance was "scraggly and unpresentable."  (Ex. 113 at ¶¶ 3-4 [Decl. of Valeria Martin].)  According to Valeria, Milstein spent the first half of the interview talking about her own personal life including the fact she was a recovering alcoholic who was going through periods of depression for which she was seeking medical help.  Milstein also talked to Valeria about being estranged from her mother.  (*Id*. at ¶ 5.)

132.  Valeria did not understand why Milstein was talking about these personal things as they were out of context to the interview.  During the second half of the interview, Milstein focused on the Ross family.  Milstein repeatedly asked Valeria if Ross had been abusive to women.  When Valeria told Milstein that she did not know of any such behavior, Milstein persisted in the questioning as if Valeria was hiding something.  (Ex. 113 at ¶¶ 6-7 [Decl. of Valeria Martin].)

133.  Milstein also interviewed Tiffany Ross.  Tiffany was Ross's middle sister.  Tiffany only met with Milstein for approximately forty minutes because she felt Milstein wanted her to say things about Ross which were untrue, like that Ross was violent with former girlfriends.  (Ex. 121 at ¶¶ 2-3 [Decl. of Tiffany Ross].)  To Tiffany, Milstein seemed very anxious during the interview:

> Her behavior did not sit right me.  I can normally tell from a person's eyes how genuine they are.  There was something shifty about her that I did not trust.  I knew something was not right about her.

(*Id*. at ¶ 4.)

134.  Milstein made two appointments to interview Ross's mother, Johnnie, but Milstein cancelled both appointments.  Johnnie called Taylor at least five or six times and left voicemail messages.  In the messages, Johnnie notified Taylor that she wanted to talk about Vaughn's case and the fact that Milstein had cancelled the

appointments.  Taylor never returned Johnnie's calls.  (Ex. 119 at ¶¶ 2-4 [Decl. of Johnnie Ross].)

135.   Milstein also interviewed Marcia Green, Ross's former girlfriend.  In 2003, Milstein came to St. Louis and asked to interview Green about Ross.  Green was prepared to tell Milstein that she, Green, had never seen a bad side to Ross and that she and Ross had never fought during their relationship.  (Ex. 106 at ¶ 2 [Decl. of Marcia Green].)

136.   During the interview, Milstein asked Green the same questions in different ways, trying to get Green to provide answers that would make it appear that Ross and Green argued a lot, saying things like, "Come on, you can do better than that."  (Ex. 106 at ¶ 4 [Decl. of Green].)

137.   Milstein then asked Green questions like:  if she had ever been stalked by Ross; if Ross had ever come to Green's place of work; if Ross ever appeared jealous; had Ross been controlling; and, whether Ross had ever become  physically abusive to Green.  (Ex. 106 at ¶ 5 [Decl. of Green].)

138.   Green responded that during the two years she and Ross dated, Green had never found him to be any of those things.  Green remembered telling Milstein something to the effect that she did not recognize the man Milstein was attempting to describe.  (Ex. 106 at ¶ 6 [Decl. of Green].)

139.  Milstein then asked Green to close her eyes and imagine the following scenario:

> Green was coming home to an empty house and was
> suddenly surprised by a man who had a knife.  The man
> held Green tight and began cutting at her face and breasts
> so viciously that the man almost cut off Green's nipple.
> Green was terrified as she listened to the story.  Milstein
> told Green to open her eyes and then said, "That woman
> could have been you."

(Ex. 106 at ¶¶ 7-8 [Decl. of Green].)

140.    Milstein told Green that Ross had attacked a former girlfriend in the just the way she had just described.  Milstein again pressed Green to say negative things about her relationship with Ross.  (Ex. 116 at ¶ 9 [Decl. of Green].)

141.    Green was really uncomfortable at that point and ended the interview. Green thought that Milstein was "off her rocker" as her questions appeared more likely to hurt Vaughn's case than to help.  (Ex.116 at ¶¶ 10-11 [Decl. of Green].)

142.    Ross's state application was filed in March, 2004.

143.    At some point after the filing, Taylor sent Ross the state application, and, among other things, an affidavit Milstein signed and notarized.  That affidavit summarized interviews Milstein had conducted in St. Louis.  After speaking to some of the people interviewed and included in Milstein's affidavit, Ross concluded that the contents of Milstein's summary was exaggerated and/or witnesses were wrongly quoted.  (Ex. 122 at ¶ 5 [Decl. of Vaughn Ross].)

144.    Ross expressed those concerns to Taylor in a letter dated September 1, 2004.  (*Id*. at ¶ 5.)  In that letter, Ross discussed with Taylor Milstein's affidavit:

> It has come to my knowledge that [Milstein] misquoted
> and or exaggerated the things that were told to her during
> the few interviews that she did do, which you submitted a
> summary of in the state writ of habeas corpus that I had
> no idea was filed for me.  The various people I spoke
> with said [Milstein] was more interested in any negative
> feedback about me that they could provide against me.

(Ex. 78 at 874-75 [Letter dated 9-1-04].)

145.    Milstein again visited Ross on October 19, 2004.  Before that visit, Milstein had cancelled two prior scheduled visits.  (Ex. 122 at ¶ 6 [Decl. of Ross].) At that October visit, Ross thought Milstein displayed signs of being under the influence of drugs.  For example, Milstein could not keep her train of thought, and

was jumping from one subject to another.  She also could not stay focused on what she was discussing with Ross.  (*Id*. at ¶ 7.)

146.   Ross also noted that Ms. Milstein's eyes were dilated.  Milstein tried to hide her eyes from Ross during the interview.  Ross also noticed that Milstein's complexion was very pale, and she had a sore on her face that looked as if she had been picking and scratching at.  During the interview, Milstein constantly scratched herself as if she was itching uncontrollably.  Milstein also fell asleep in the middle of her sentences.  Further, Milstein was dressed in multi-layers of clothing, even though the outside temperature was quite warm.  (Ex. 122 at ¶¶ 7-8 [Decl. of Ross].)

147.   When Ross questioned Milstein about the interviews she had conducted in St. Louis, she told Ross facts that he believed to be untrue.  For example, Milstein told Ross that she had spoken with a Liza McVade at Liza's grandmother's house.  However, Ross knew that Liza was in prison.  When Ross confronted Milstein with this and other inconsistencies in her reports, she became very loud and made a scene in the prison visitation room.  (Ex. 122 at ¶ 9 [Decl. of Ross].)

148.   Officer Williams, who was monitoring the visitation room at the time, attempted to calm Milstein.  When that did not work, Ross asked for the visit to be cancelled.  (Ex. 122 at ¶ 10 [Decl. of Ross].)  Officer Vaness, who escorted Ross out of the visitation room, remarked to Ross that Milstein appeared to be under the influence of drugs.  (*Id*. at ¶ 10.)

149.   On October 26, 2004, Ross wrote Taylor a letter, narrating the events that had transpired during Ms. Milstein's visit.  In that letter, Ross discussed Milstein's apparent drug induced state and strange behavior, and expressed concern about Ms. Milstein's performance in this case.  (Exs. 78 [Letter dated 10-26-04]; 122 at ¶ 11 [Decl. of Ross].)

150.   Apparently in response to Ross's letter outlining Milstein's drug

35

problems and bizarre behavior, on November 13, 2004, Taylor filed in Young's case an under seal letter to Judge Hyde.  In that letter, Taylor stated, in relevant part:

> I originally informed the Court that Ms. Lisa Milstein
> will be my primary investigator.  However, *due to*
> *personal issues which have arisen for Ms. Milstein*, I may
> be required to use different investigators for different
> parts of the investigation.

(Ex. 80 [Letter- Order re Milstein], emphasis added.)[5]

151.    Taylor replied to Ross on December 9, 2004.  Taylor acknowledged receiving Ross's letter and having talked to Milstein about Ross's concerns. Taylor suggested that Ross and Milstein again meet.  Ross never heard from Ms. Milstein. (Exs. 77 [Taylor to Ross Letter]; 122 at ¶ 12 [Decl. of Ross].)

152.    The affidavit that Milstein signed and notarized, which allegedly memorialized the interviews Milstein conducted in St. Louis, contained numerous factual errors.  (*See* Exs. 121 at ¶ 5 [Decl. of Tiffany Ross]; 120 at ¶ 7 [Decl. of Michelle Ross]; 113 at ¶ 9 [Decl. of Valeria Martin].)

**10.    Alfred Bourgeois Case (Fall 2004 - Winter 2005)**

153.    Bierbaum noticed Milstein's problems as early as 2004.  Bierbaum and Milstein were appointed to work as mitigation specialists on the federal capital habeas trial of *United States v. Alfred Bourgeois* (CR02-00216).  Bierbaum and Milstein were assigned to interview more than thirty witnesses in the case. According to Bierbaum, Milstein never completed any of her witness interviews in

---

[5]  On November 24, 2004, Judge Hyde approved the amount requested for investigative expenses.  (Ex. 80[Letter- Order re Milstein].)  The Order stated that "[a]fter reviewing the request which came to the Court by letter from applicant's post-conviction counsel[,] the Court is of the opinion that the motion should be granted." ( *Id.*)   The court did not mention Taylor's request from April 29, 2003, nor does the record reflect the court took any action based on such request prior to November 24, 2004.

the case, leaving all the work to Bierbaum.  (Ex. 43 at 11-12, 25 [Bierbaum Depo.].)

### 11.   The Practice Group Talks About Milstein's Problems

154.   According to his state habeas deposition, Taylor did not became aware that Milstein had "problems" until late 2004.  Taylor thought Milstein's "problems" stemmed from her brother being in the hospital and Milstein suffering from neurological issues.  (Ex. 42 at 8-9, 11 [Taylor Depo.].)  Taylor admitted that he tried to limit his contact with Milstein because she "would drive you crazy with phone calls and stuff like that."  (*Id.* at 11.)[6]  Taylor scaled back on the work he gave to Milstein.  However, Taylor "pushed" Milstein to complete the work he had already given her.  (*Id.* at 9-10.)

155.   At some point, Taylor, Charlton, Bierbaum, and Francis had a telephone conference with Milstein about the fact she was not getting her work done.  Taylor believed the group asked Milstein whether she was on drugs.  Milstein denied she was on drugs.  According to Taylor, he had no other evidence at that time to substantiate Milstein's drug use.  (Ex. 42 at 21-22, 34 [Taylor Depo.].)

156.   In late 2004, while working on a case, Francis stayed at Milstein's apartment in Houston.  Francis felt that something was amiss with Milstein during this visit.  On the night Francis stayed over, Milstein stayed up all night.  Francis did not know what was going on with Milstein, and did not ask.  (Ex. 105 at ¶ 11 [Decl. of Francis].)

157.   A few weeks later, Francis returned to Houston and again stayed with Milstein.  It was during this stay that Milstein told Francis that she had become addicted to crack cocaine.  Milstein acknowledged that she had a real problem with

---

[6]  Milstein's friend, Tena Francis, described Milstein as having a life full of drama.  According to Francis, Milstein always had her share of problems, whether it was with boyfriends or family members.  (Ex. 105 at ¶ 7 [Decl. of Francis].)

the drug and that she needed treatment.  (Ex. 105 at ¶ 12 [Decl. of Francis].)

158.   A short time later, Milstein checked herself into a short-term treatment facility in Houston.  Milstein was encouraged to find a longer-term treatment facility due to the nature of her drug addiction.  (*Id*. at ¶ 13.)

159.   By this time, however, Milstein was already working on Young's case.  (*Id*. at ¶ 14.)  In December of 2004, because of Milstein's problems, Taylor asked Francis to assist him in completing the Young investigation.  (Ex. 42 at 12-13 [Taylor Depo.].)

160.   Around this same time, Milstein told Taylor that she was going to a psychologist.  She might have also told Taylor she had been diagnosed with a tumor.  When it came to Milstein's "personal stuff, [Taylor] tried [his] best to not be involved."  Taylor testified he was only concerned with Milstein as it related to his cases.  (Ex. 42 at 13-14 [Taylor Depo.].)  However, by ignoring Milstein's personal problems, Taylor turned a blind eye to Milstein's inability to perform her investigatory work.

### 12.   Taylor Puts the Court on Further Notice Regarding Milstein's Problems

161.   On January 5, 2005, Taylor asked the state court for additional time to file Young's petition.  Among the reasons given by Taylor was that Milstein had reported her brother was hospitalized in serious condition in Houston, which was requiring "a great deal of her attention."  The court granted the request, giving Taylor until April 21, 2005 in which to file the state Application.  (Ex. 39 [Request Extension - Order '05].)

### 13.   Milstein Loses Her Office Space (2005)

162.   In February, 2005, Milstein stopped paying rent for the office space she shared on Norfolk.  Milstein also did not pay her rent for March, 2005.  On March 31, 2005, attorney Herb Ritchie, one of the owners of the Norfolk property, gave Milstein her lease termination notice.  Richie told Milstein that the locks to

the building had been changed and that she could only enter the house during normal business hours.  (Ex. 83 [Eviction Letter].)  When Milstein received notice of the lease termination, she told building management that Charlton and Bierbaum had promised to pay her rent.  (Ex. 84  [Relleboso Statement].)  Milstein stated she would come in and remove her belongings.  Milstein also stated that she was moving out of her apartment.  (*Id*.)

163.   Bierbaum knew that Milstein was removed from her office space for not paying her rent and telephone bill.  (Ex. 43 at 10, 31 [Bierbaum Depo.].)  According to Bierbaum, Milstein had complained about "neurological problems" concerning "seizures and stuff" and that she was not going to work anymore.  (*Id*. at 10, 20.)  According to Bierbaum, Milstein stopped paying her rent because she was not working on cases and thus, not receiving work assignments:

> we'd get a case -- get appointed to a case.  And we'd go
> through the records and say go interview those people,
> and it just wouldn't happen.  I mean, three months later it
> still wouldn't happen.  And so at some point, you know,
> we decided enough was enough and we weren't going to
> work with her anymore.  And in that process, she stopped
> paying rent as well . . . .

(Ex.43 at 10 [Bierbaum Depo.].)  Bierbaum also knew that Milstein had a cocaine problem.  (Ex. 102 at ¶ 6 [Decl. of Calhoun].)

### 14.   Rafael Holiday Case (April 2005)

164.   Attorney Calhoun, who shared office space with Taylor in Austin, was appointed to the state habeas case of Rafael Holiday.  As they had in the past, Calhoun consulted with Bierbaum.  In the Spring of 2005, Bierbaum told Calhoun that Milstein had a cocaine problem.  (Ex. 102 at ¶ 5 [Decl. of Calhoun].)  It was Calhoun's understanding that Milstein had been in a drug rehabilitation program and was getting back on her feet.  (Ex. 102 at ¶ 6.)  Calhoun assigned Milstein a

few juror interviews to see if she was able to work on the case. Milstein never completed this task nor did she timely advise Calhoun of her inability to do the investigation and permit him to make alternative arrangements. (Exs. 102 at 7 [Decl. of Calhoun]; 43 at 19-20 [Bierbaum Depo.].) Calhoun confronted Milstein about this failure. Milstein became tearful and apologized. As a consequence of Milstein's failure, Calhoun did not want to use any affidavits Milstein had obtained in her other cases. Calhoun and Bierbaum stopped recommending Milstein as a habeas investigator by April, 2005. (Exs. 43 at 19-20 [Bierbaum Depo.]; 102 at ¶ 9 [Decl. of Calhoun].)

### 15. Young's Case

165. During this same time period (April of 2005), while Milstein was working on Young's state Application, Francis and Milstein had frequent telephone conversations. On one occasion, Milstein asked Francis for money. Francis did not give her money directly for fear Milstein would use it to purchase drugs. Francis did put gasoline into Milstein's car before Milstein left for East Texas to interview Young witnesses. (Ex. 105 at ¶ 15 [Decl. of Francis].)

166. In East Texas, Milstein interviewed, among others, Dano and Dino Young, Patricia McCoy, Christy Jetton, Crystal Deshotel, and Dylan Keen. Milstein collected affidavits from witnesses and notarized them during April, 2005.[7] (Exs. 45, 46, 48 [Affidavits of Young, Deshotel and McCoy])[8]

167. That month, while Milstein was in East Texas conducting witness interviews in Young's case, Milstein telephoned Nancy Piette, another investigator that Taylor was using on Young's case. Milstein told Piette that she was lost and

---

[7] Although funding for Milstein was requested by Taylor in April 2003, Milstein apparently did not do any substantial work on this case until April of 2005, days before the actual state application was filed.

[8] In general, after Milstein drafted an affidavit, she electronically sent it to Taylor. Taylor and Milstein rarely met in person. (Ex. 42 at 15-16 [Taylor Depo.].)

had forgotten all her psychiatric medication in Houston.  Milstein sounded like she was "losing it."  Piette called Gary Taylor and left him a voice mail message that Milstein was having a nervous breakdown.  After the telephone message, Piette never talked to Taylor again, only Bierbaum.  (Ex. 116 at ¶¶ 10-13  [Decl. of Nancy Piette].)

### 16.   The Practice Group Breaks Apart

168.   In early 2002, Charlton left Houston and moved to New Mexico, but still maintained his presence in the practice group.  (Ex. 43 at 16 [Bierbaum Depo.].)  In July of 2005, Taylor quit his Texas practice and moved to Las Vegas, accepting employment at the Federal Public Defender's Office.  (Ex. 42 at 5, 16 [Taylor Depo.].)  Bierbaum followed Taylor to Las Vegas in July, 2005.  (Ex. 43 at 18, 30 [Bierbaum Depo.].)  Francis joined Taylor and Bierbaum in September 2005.  (Ex. 105 at ¶ 16 [Decl. of Francis].)  Charlton joined Taylor, Bierbaum, and Francis in Las Vegas in July 2006.

### 17.   Milstein Enters Drug Rehab

169.   Sometime after September 2005, Milstein entered a long-term drug treatment facility in Southern California, and was there for several months.  (Ex. 105 at ¶ 16 [Decl. of Francis].)  In June, 2006, Milstein checked herself into Awakenings, a substance abuse recovery facility for woman located in Boca Raton, Florida.  She was a resident there from June 2006 to November 2006.  On November 4, 2006, Milstein was asked to leave the program for abusing her medication.  (Exs. 103 [Decl. of Christine De Camille]; 105 at ¶ 17 [Decl. of Francis].)

### 18.   Young's Hearing

170.   The main issue raised by Taylor in Young's state Application was the failure of defense counsel to investigate and present evidence that Young had been

sexually abused by his father.[9]  This was also the main issue to be litigated at Young's state hearing.  The evidence to support this claim was collected solely by Milstein.  When this evidence was presented at the hearing, it fell like a house of cards.

171.   By the time the actual hearing started, Taylor had withdrawn from the case and Ori White, a former District Attorney of Upton and Reagan Counties, had taken over the representation of Young.[10]

172.   The first indication of inaccuracies at the hearing came during the testimony of Amber Lynch Harrison, Young's former girlfriend.  Harrison testified that she had talked with Taylor and Milstein.  (2 RWR at 176-77.)  At some point, "a lady" had faxed her a declaration to sign.  Harrison could not read the fax but signed it and sent it back.  (2 RWR at 177-80.)

173.   When White began to go over the declaration with Harrison, it became obvious that some of the contents of the document were inaccurate.  (2 RWR at 180-92.)  In all, over half of the statements in the declaration were inaccurate, according to Harrison.  While some of the inconsistencies were small (Harrison's father did not approve of her relationship with Young), others were more pronounced, such as whether Young would present a future danger to society, whether Young was always protective of Harrison, whether Harrison recalled hearing rumors that Douglas was a police informant, what type of clothing Young was wearing when she saw him in Midland, and whether the District Attorney was not interested in hearing anything good about Young.  (2 RWR at 182-93.)

174.   The problems with Milstein's investigation became more pronounced

---

[9]  Neither Taylor nor Milstein discussed the molestation claim with either of Young's trial counsel.  (2 RWR at 201-02).

[10]  While the District Attorney of Upton and Reagan Counties, White had personally opposed defense counsel's issuance of a subpoena seeking records regarding how the death penalty was charged in particular cases in Midland County.

during the testimony of Dano Young, Young's older brother.  Dano's affidavit, notarized by Milstein, dated April, 2005, contained the following information pertinent to Young's molestation claim:  when Dano and his siblings were younger, they all slept in the same room; Dano and Young's father, Bill Young, came into that room on many occasions and touched Dano's penis; this started happening when Dano was four years old; and when Dano cried, his father made him "hush."  (Ex. 45 [April 2005 Affidavit of Dano Young].)

175.    However, at the state hearing, Dano vehemently disavowed the molestation allegation (3 RWR at 130, 149-50; 4 RWR at 115, 126) and testified, in pertinent part, as follows:  Dano drove around for two days smoking crack cocaine and drinking beer with Milstein; Dano was high when he signed the affidavit; he signed the affidavit so Milstein would continue to buy drugs for him; Milstein tried to get Dano to sleep with her at her hotel room; Milstein drove Dano to a crack house and purchased drugs for Dano's use; Dano smoked about $400 of crack with Milstein; Milstein told Dano not to tell anyone about the crack cocaine because she could lose her investigator's license; and Dano lied in his affidavit about being molested by his father so that Dano would continue to get cocaine from Milstein. (3 RWR at 125-43, 148-53, 164; 5 RWR at 118-33.)

176.    Dano also testified that Milstein started crying at some point during the interview saying that she felt Young had been molested but no one would tell her who was the molester.  Dano, at first, denied that their father was the molester. Milstein then brought up the *idea* that Dano and/or his siblings were sexually abused by Bill Young.  Dano eventually agreed to say that Dano himself was molested because Milstein had gotten him high and he wanted to continue to get more crack cocaine from Milstein.  Milstein assured Dano that he would not get into trouble for saying he was molested by his father.  (3 RWR 148-49, 153-55; 5 RWR at 125-26.)  At one point, while Dano was smoking crack cocaine, Milstein

put Dano on the telephone with someone Milstein said was a lawyer.[11]  (3 RWR at 138.)

177.    Dano also testified that the first time Milstein interviewed him, she picked him up at their home around midnight, and did not return him home until around 3 a.m.  Dano also described Milstein buying beer at a convenience store and then driving to Daingerfield, Texas to purchase crack cocaine.  (5 RWR at 118-21.)  Dano also described smoking crack cocaine with Milstein in her hotel room.  (5 RWR at 132-33.)

178.    Dano also testified about Milstein interviewing his four-year-old stepson, Dylan Keen.  According to Dano, Milstein interviewed Dylan out of the presence of Dano and Crystal Deshotel, Dano's wife and Dylan's mother.  Milstein got Dylan to say untrue things about being molested by Bill Young.[12]  (3 RWR at 126, 143, 159.)  Based upon Milstein's interview with Dylan, Crystal and Dano took Dylan to the Child Advocacy Center in Winnsboro, Texas.  Dylan was evaluated at the Center for about three hours.  Following the evaluation, Dano and Crystal were told that it did not appear that anybody had molested their son.  (3 RWR at 126, 142-43, 164-65; 4 RWR at 137-38.)  When Dano asked Dylan if he had been molested by Bill Young, Dylan responded, "No."  When Crystal asked Dylan why he had said he was molested, Dylan replied,  "That lady told me to."  (3

---

[11]    Dano testified at the state habeas hearing that he remembered speaking to someone on the telephone, but was so "high," he was not certain who it was, although it could have been Taylor.  (3 RWR at 138; 5 RWR at 130-31.)  At some point, Milstein put Dano on speaker phone with the person on the other end of the call.  While on speaker phone, Milstein would ask Dano "yes" or "no" questions, and Dano would respond for the person on the other end of the call.  During the phone call, Mistein did not ask Dano all the information which was the subject of his later affidavit.  (5 RWR at 130-31.)  Taylor testified that he was not certain he spoke to Dano Young on the telephone.  (Ex. 42 at 17-20, 27-28 [Taylor Depo.].)

[12]  The general import of Dylan's statement was that Bill Young anally abused him.  (3 RWR at 159.)

44

RWR at 143.)[13]

179.   Crystal Deshotel later confirmed Dano's testimony regarding Milstein.  Before the hearing, Crystal had supplied an affidavit for Milstein, this one dated April 20, 2005.  (*See* Ex. 46 [Affidavit of Deshotel].)  The affidavit stated, in relevant part, the following:  for a short time, Dano, Crystal, and Dylan lived with Bill Young in Beaumont, Texas; while living there, Dylan came inside the house, after being outside with Bill Young, and stated that his "butt hole hurt;" Crystal checked her son but never found anything unusual; after Dano told Milstein that Bill Young had molested him as a child, Crystal gave Milstein permission to interview Dylan; on the recording, Dylan told Milstein that Bill undressed him, made him spread his butt cheeks and stuck a tree branch in his butt, and afterwards, Bill glued Dylan's butt back together.  (Ex. 47 [Affidavit of Milstein].)

180.   At the state hearing, Crystal denied the contents of the affidavit drafted by Milstein.  To that end, Crystal denied that Dylan had ever told her his butt hurt after coming from being outside with Bill Young.  Crystal also denied that she had ever checked Dylan for sexual abuse as she never had cause to believe he was the victim of sexual abuse.[14]  (5 RWR at 89-90, 99-100.)  Crystal also denied that Dylan had stated in a narrative form what Bill Young had done to him.  Rather, on the tape, Dylan answered Milstein's questions with "yes" or "no"

---

[13]   Dino Young was also visited by Milstein and questioned about being molested by Bill Young.  Dino denied being molested by his father and never supplied a statement to Milstein.  (3 RWR at 167-69, 175-76.)  Dano went to see Dino a few weeks after Milstein's visit.  Dano told Dino about riding around with Milstein smoking crack cocaine.  (3 RWR at 168, 177.)  Christy Jetton, Young's older sister, was contacted by Milstein by telephone.  Milstein set up a time to meet with Christy in Gilmore, Texas.  Christy went to Gilmore with her six children, but Milstein failed to show up and never rescheduled.  (3 RWR at 227-28.)  Christy was not molested by her father.  (3 RWR at 226-27.)

[14]   The affidavit that Crystal signed also alleged that Dano's sister, Renee , told Crystal that Bill Young raped her.  Crystal denied that Renee had ever told her that, as Renee and Crystal did not get along.  (5 RWR at 103.)

answers.  (5 SRW at 79.)

181.   Crystal also testified that Milstein interviewed Dylan for about three hours outside the family home. After the interview, Milstein let Crystal listen to a recording Milstein had done on her cellphone.  The recording was not three hours long and only contained "snippets" of the interview.[15]  Milstein then left the house to get some money which had been wired to her.  When Milstein returned, she had a computer with her and took down Crystal's affidavit, which Crystal signed.  At the time she signed the affidavit, Crystal was upset as she believed her son had been molested.  Further, Crystal did not read the entire affidavit at the time she signed it.  (5 RWR at 76-84, 93-94.)  Before Milstein's visit, Crystal had no reason to believe that her son had been molested.  (5 RWR at 84.)

182.   Patricia McCoy also testified at the state hearing.[16]  McCoy was likewise interviewed by Milstein in preparation for Young's state application. McCoy signed a two-page affidavit, which was notarized by Milstein.  The second page contained only the signature block.  However, what was introduced for purposes of the state application was a four-page declaration.  McCoy did not recognize the second and third pages of the affidavit introduced into evidence. (Ex. 44 at 6-10, 29-30 [McCoy Depo.].)

183.   While the third page of the affidavit stated that Young told McCoy that he was sexually abused by his father (Ex. 48 Affidavit of P. McCoy), Young only told McCoy that he was physically abused by his father.  (Ex. 44 at 18 [McCoy Depo.].)  Many other portions of the affidavit were incorrect including: that Douglas was a pedophile; Young found a pair of young girls' panties in Douglas's car; when Douglas was on drugs, he tried to touch people in a sexual

---

[15]   Apparently when Milstein returned home, the cellphone had not saved the recording, and the phone company was not able to retrieve it.  (5 RWR at 81.)

[16]   McCoy's testimony was admitted by way of a telephone deposition.  (Ex. 44 [Deposition of Patricia McCoy dated March 24, 2006].)

manner and that he was disgusting; Douglas let Young drive his car all the time; and, McCoy had never seen Young act in a violent manner. (Ex. 44 at 19-30 [McCoy Depo.].)

184.   During the interview, Milstein was taking Xanax.  At one point, Milstein asked McCoy if she knew where to purchase Xanax.  Milstein also asked McCoy if she had any marijuana. (Ex. 44 at 11 [McCoy Depo.].)  McCoy believed that Milstein was on some sort of drug, like "uppers." (*Id*. at 29.)

185.   Taylor testified that he did not know that the affidavits filed by Milstein were false as Taylor never had any indication that Milstein would make false statements in any of her cases. (*Id*. at 17, 34, 40.)

186.   On advice of counsel, Milstein made herself unavailable to testify at Young's state hearing.[17]  (Ex. 42 at 23-25 [Taylor Depo.].)

187.   By Taylor's own admission at the state habeas hearing, the investigation into the alleged molestation issue foreclosed the investigation and presentation of other claims in Young's application due to time and resources. (Ex. 42 at 32, 35-36 [Taylor Depo.].)  Taylor's failure to adequately supervise Milstein, despite being on notice of her personal problems and inadequate performance at the time he was appointed to represent Young, resulted in meritorious claims not being investigated and presented. *See Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309, 1318-19, 182 L. Ed. 2d 272 (2012).

### III.

### PROCEDURAL HISTORY

188.   Young is confined under a sentence of death pursuant to the judgment of the 385th District Court, Midland County, Texas, case number CR27181, which

---

[17]   Current federal habeas counsel attempted to interview Milstein in preparation of the current Petition.  On the advice of her lawyer, Milstein would not talk with current counsel.

was rendered on April 11, 2003 and entered on April 14, 2003.[18]  (5 CR at 866; 37 RR at 29.)[19]

## A.   Trial Court Proceedings

### 1.   Appointment of Counsel

189.   On December 10, 2001, Paul Williams was appointed to represent Young.  On December 20, 2001, Ian Cantacuzene was appointed as co-counsel for Young.  (1 CR at 8, 9.)  On December 26, 2002, J. K. (Rusty) Wall was appointed as appellate counsel on Young's behalf.  (4 CR at 691.)

### 2.   Indictment and Re-Indictment

190.   On December 20, 2001, a grand jury indictment was filed charging Young with the capital murder of Samuel Petrey.  (1 CR at 3.)  On February 7, 2002, Young was re-indicted.  In the first count of the re-indictment, it was alleged that Young murdered both Samuel Petrey and Doyle Douglas pursuant to the same scheme and course of conduct, within the meaning of Texas Penal Code 19.03(a)(7).  In the second paragraph of the re-indictment, it was alleged that Young intentionally murdered Mr. Petrey during the commission of robbery and kidnaping, within the meaning of  Texas Penal Code 19.03(a)(2). (1 CR at 4-5.)

### 3.   Trial

191.   The First Amended Indictment was read to the defendant on March 17, 2003.  (21 RR at 14-16.)  Opening statements in the guilt/innocence phase commenced on March 17, 2003.  (21 RR at 16-42.)  On March 25, 2003, both sides rested their presentation of evidence.  (27 RR at 296.)  The case was submitted to

---

[18]  Judge John G. Hyde presided over Young's trial.

[19]  "CR" "RR" and "SRR" respectively refer to the Clerk's Record, the Reporter's Record, and the Supplemental Reporter's Record of Young's trial. "CWR" and "RWR" respectively refer to the Clerk's Writ Record and Reporter's Writ Record of Young's first state writ proceeding.  "CWR2d" and "RWR2d," respectively, refer to the Clerk's Writ Record and Reporter's Writ Record of Young's second state writ proceeding.  Exhibits will be referred to in an abbreviated manner, such as, "Ex."

the jury for guilt/innocence deliberations on March 27, 2003.  (29 RR at 72.)   The jury returned guilty verdicts as to both paragraphs of the first amended indictment the same day.  (29 RR at 72-73.)

192.   On March 28, 2003, the punishment phase began.  (30 RR at 11-22.) The punishment phase was completed on April 10, 2003.  (36 RR at 71.)  The jury commenced deliberations in the afternoon of April 10, 2003.  (36 RR at 134.)  A few hours later, the jurors sent a note to the judge asking for clarification on Special Issue number two.[20]  (36 RR at 134-35.)  The following morning the jurors sent another note, this one regarding whether Young was medicated while in the custody of the Midland County jail.[21]  (37 RR at 5.)  That afternoon, a hearing was held in open court, outside the presence of the jury, regarding the fact that Sheriff Painter had eaten lunch with the jurors during the recent break.  (37 RR at 6-27.) Soon after that lunch break, the jurors returned their answers to the special questions, answering questions one and two in the affirmative, and question three in the negative.  The court sentenced Young to death.  (5 CR at 866-71; 37 RR at 29.)

### 4.   Motion for New Trial

193.   On May 9, 2003, Young filed a motion for new trial based upon the following claims:  (1) Sheriff Painter's improper fraternization with the jury; (2) insufficiency of the evidence concerning paragraph one of the amended indictment - murder of more than one person in the same course or scheme of conduct; (3) insufficiency of the evidence concerning paragraph two of the amended indictment - robbery and kidnaping of Mr. Petrey; (4) insufficiency of the evidence

---

[20]  Specifically, the jury asked: "Regarding Issue No.2... 'cause the death of deceased individuals,' 'intended to kill the deceased individuals.'  Question:  Do you have to believe both or at least one?"  (36 RR at 134-35.)

[21]  Specifically, the jury asked:  "We find no record of his current medication for ADHD during his stay in Midland.  Is this in the record or are we just not finding it?"  (37 RR at 5.)

concerning the special issues at the punishment phase; and (5) ineffective assistance of trial counsel at both phases of trial.  (5 CR at 901-12.)  The court granted an evidentiary hearing with respect to Young's new trial motion.  (38 RR et seq., 39 RR at 100.)  On June 20, 2003, the motion for new trial was denied.  (5 CR at 922; 39 RR at 100-05.)

## B.     State Appellate Proceedings

194.    On June 8, 2004, Mr. Wall filed an opening brief on appeal, *Clinton Lee Young v. The State of Texas*, Texas Court of Criminal Appeals (CCA) cause number AP-74,643.[22]  On December 8, 2004, the Attorney General filed the

---

[22]  The grounds raised in Young's appeal included, but were not limited to:

(Point One) The trial court's supplementary instruction improperly coerced the jury to answer issue number two.

(Point Two) The trial court's supplementary instruction allowed the jury to answer "yes" to special issue number two without requiring all twelve jurors to answer in the affirmative.

(Point Three) The trial court's supplementary instruction directed the jury's answer to issue number two and was an impermissible comment on the weight of the evidence by the trial court.

(Point Four) The trial court's supplementary instruction prevented the jury from considering circumstances of the offense favorable to Young that might have been considered mitigation evidence.

(Point Five) The jury's fraternization with Sheriff Painter during deliberations was improper.

(Point Six) The Texas statutory scheme, allowing prosecutorial discretion in deciding which capital murders will involve seeking the death penalty, denies due process.

(Point Seven) The Texas statutory scheme allows prosecutorial discretion in determining those who are death penalty eligible in violation of the Eighth Amendment.

(Point Eight) Young's jury had no vehicle to give effect to Young's ADHD and other mitigating evidence.

(Point Nine) The trial court erred in overruling Young's motion to quash the indictment.

(Point Ten) The trial court committed reversible error by failing to require the third special issue to be submitted in accordance with *Apprendi v. New Jersey*.

(Points Eleven and Twelve) There was insufficient evidence, both factually and legally, to prove capital murder by committing multiple murders in the same criminal transaction or in the same scheme or course of conduct.

(Points Thirteen and Fourteen) The evidence was insufficient, both factually and legally, to sustain the jury verdict on the theory of an intentional murder in the course of the commission of a robbery.

(Point Fifteen) Texas Penal Code section 19.03(a)(2) is unconstitutional.

(Point Sixteen) The trial court erred in granting the state's challenge for cause to prospective juror Danie Lynn Roberts.

State's Brief.  Young filed a supplemental brief on January 25, 2005.  On September 28, 2005, the CCA, in an unpublished opinion, denied Young's appeal. *Clinton Lee Young v. State of Texas*, 2005 WL 2374669 (2005).

195.   The Supreme Court denied a petition for writ of certiorari from the affirmance of judgments on April 3, 2006.  *Clinton Lee Young v. Texas*, 547 U.S. 1056, 126 S. Ct. 1652, 164 L. Ed. 2d 398 (2006).

**C.   State Habeas Proceedings**

196.   On April 16, 2003, Gary Taylor was appointed to represent Young for purposes of the state application for writ of habeas corpus.  (5 CR at 876(a).)  On January 5, 2005, Mr. Taylor filed a request for an extension of time to file the application for writ of habeas corpus.  (3 CWR at 351.)  The court (Judge Hyde again presiding) granted the motion the following day, giving Mr. Taylor an additional ninety days to file the application.  (3 CWR at 355.)  On April 22, 2005, Mr. Taylor filed a state application for writ of habeas corpus on behalf of Young.

---

(Points Seventeen and Eighteen) The evidence is legally and factually insufficient to warrant an affirmative finding by the jury to special issue number one.

(Points Nineteen and Twenty) The evidence was legally and factually insufficient to warrant an affirmative finding by the jury to the anti-parties issue.

(Points Twenty-One and Twenty-Two) The evidence was factually and legally insufficient to warrant a "no" answer to the mitigation special issue.

(Points Twenty-Three to Twenty-Five) The trial court erred when it denied Young's request to include the *Gessa* reasonable doubt instruction in its punishment charge.

(Point Twenty-Six) The court failed to instruct the jury as to the meaning of "probability," "criminal acts of violence," and "a continuing threat to society."

(Point Twenty-Seven) The trial court erred by denying Young's motion requesting the court to define that "probability" means "more likely than not."

(Point Twenty-Eight)  The trial court erred in failing to instruct that the burden of proof on the mitigation issue was on the state to prove beyond a reasonable doubt that there was not sufficient mitigating evidence to warrant a life sentence.

(Points Twenty-Nine to Thirty-One) Article 37.071 is unconstitutional.

(Point Thirty-Two) The court committed reversible error by disallowing Young's polygraph impeachment of David Page.

(Point Thirty-Three) Texas Penal Code section 8.07 violates the federal Constitution.

(Point Thirty-Four) Article 35.16(b)(1) specifically establishes a challenge for cause which violates the First Amendment.

The Application raised fourteen grounds for relief.[23]  (1 and 2 CWR 001-162.)  On July 13, 2005, Mr. Taylor moved to withdraw as Young's counsel.  (3 CWR at 359-61.)  Young, in pro se, filed various letters with the state writ court raising additional claims not raised in Mr. Taylor's state Application.  (Exs. 51, 52 [Pro Se Letters of Jul./Aug. 2005] .)  On August 8, 2005, the court relieved Mr. Taylor and appointed Ori White to represent Young.  (3 CWR at 365.)  On August 19, 2005, the State filed its answer to the Young's Application.  (3 CWR at 366.)

197.   On November 7, 2005, Mr. White requested permission to file supplemental claims to the Application.  On February 6, 2006, the Court ordered an evidentiary hearing in this case.  (5 CWR at 738.)  The evidentiary hearing was

---

[23]  In summary, the grounds included, but were not limited to:

(Ground One) The trial judge's assessment of costs associated with trial constituted a due process violation.

(Ground Two) The trial judge's assessment of costs associated with trial constituted an equal protection violation.

(Ground Three)  The trial judge's assessment of costs associated with trial violated the Eighth Amendment.

(Ground Four)  The trial judge's assessment of costs associated with trial is not supported by Texas law or any constitutional provision.

(Ground Five)  The trial judge's assessment of costs associated with this proceeding was an unconstitutional taking without due process.

(Ground Six)  The Texas Court of Criminal Appeals' refusal to review the sufficiency of the mitigating evidence constituted a violation of due process under the Fifth and Fourteenth amendments.

(Ground Seven) The Texas Court of Criminal Appeals' refusal to review the sufficiency of the mitigating evidence constituted a violation of the Eighth Amendment.

(Ground Eight) The execution of Young would constitute a violation of the Eighth and Fourteenth amendments.

(Ground Nine)  The Eighth and Fourteenth Amendments prohibit execution of Young based on his age and immaturity.

(Ground Ten)  Young's right to the effective assistance of counsel under the Sixth Amendment was violated by trial counsel's failure to discover and present evidence of physical, emotional, and sexual abuse.

(Ground Eleven) Additional evidence discovered since conviction, and not heard by the jury, would make any execution a violation of Young's Due Process rights.

(Ground Twelve)  Young's rights to the effective assistance of trial counsel was violated.

(Ground Thirteen) Young's right to Due Process under the Fourteenth Amendment was violated by the actions of the prosecutor in this case.

(Ground Fourteen) The prosecutor and police interfered with Young's right to the effective assistance of counsel.

held on March 1, 2, 3, 9, and 10, 2006.  (RWR at Vols. 1-7.)   Telephonic

depositions, which became part of the evidentiary record, were held on March 17

and March 24, 2006.  (Exs. 42-44)

198.    The State filed its findings of fact and conclusions of law on June 1,

2006.  Young's proposed findings were filed on June 6, 2006.  The state court

denied Young's Application on June 26, 2006.  (Ex. 30.)  The CCA denied the

Application in an unpublished boiler plate denial on December 20, 2006.  *See Ex*

*Parte Young*, 2006 WL 3735395 (Tex. Crim. App. 2006).

199.    On March 25, 2009, by leave of this Court, Young filed a Second

Subsequent Application in the 385th Judicial District of Midland County, Texas.

The application raised two claims:  (1) The prosecution's failure to produce

exculpatory evidence, and presentation of false claims, violated Young's

constitutional rights; and (2) The prosecution's suppression of evidence concerning

state's witness A.P. Merillat violated Young's constitutional rights.  The first claim

alleged that the state had violated Young's Due Process and Confrontation Clause

rights by failing to inform the defense that it had offered favorable plea agreements

to Ray and Page before they testified against Young. The claim further alleged that

the state had knowingly presented perjured testimony that Ray and Page had not

engaged in plea deals with the prosecutor. Young subsequently withdrew his

second claim, regarding  witness A.P. Merilat.

200.    The District Court held a hearing on the Second Subsequent

Application on January 11-13, 2010, and July 22, 2010 in Midland, Texas.  On

July 23, 2010, the District Court ordered both parties to file Proposed Findings of

Fact and Conclusions of Law within sixty days after the court reporter filed the

transcript of the hearing.  (Applicant's Motion to Strike Untimely-Filed "State's

Summary of the Testimony," Rocconi Decl., Ex. A.)  The District Court instructed

the parties not to request  extensions of time, and stated that it was "not interested

in hearing any arguments about the law."

201.   The Court reporter filed the transcript on August 20, 2010.  Young filed his Proposed Findings on October 19, 2010, within the 60 days allotted.  The state, however, filed its conclusions over three weeks late:  on November 9, 2010. On May 18, 2011, the District Court issued its Order on Young's Second Subsequent Application, which largely mirrored the state's Proposed Findings. Young filed objections to the District Court's findings of fact in the Texas Court of Criminal Appeals (TCCA) on June 23, 2011.  On June 20, 2012, the TCCA denied "relief on Appellant's Claim I pertaining to the prosecution's alleged failure to disclose exculpatory evidence, and dismisse[ed] Claim II pertaining to witness Merillat."  (6/20/12 TCCA Order.)

## D.   Federal Court Proceedings

202.   On January 3, 2007, Ori White filed in this Court a motion for appointment of counsel on behalf of Young. (Docket no. 1.)  On January 17, 2007, this Court appointed Mr. White and Mr. Wall to represent Young.  (Docket no. 2.) Young's Petition was filed in this Court on December 20, 2007.  (Docket no. 18.)

203.   On January 24, 2008, this Court conducted a hearing regarding Young's request for appointment of new federal habeas counsel.  (Docket no. 23; Ex. 57.)  On  January 30, 2008, this Court granted Young's request for new counsel.  (Docket. no. 24.)  On March 3, 2008, this Court appointed present counsel to represent Young.  (Docket. no. 29.)  On March 13, 2008, present counsel requested until October 18, 2008 to file an amended federal petition. (Docket no. 31.)  On March 25, 2008, this Court granted Young until October 20, 2008 to file the amended petition.  (Docket no. 37.)  Respondent filed a motion for summary judgment on March 20, 2008.  (Docket no. 34.)

204.   On February 25, 2009, this Court granted Young's motion to stay the federal proceeding while his Second Subsequent Application was pending in state court.  On June 25, 2012, this Court lifted that stay, and ordered Young to file the instant Amended Petition.

54

# IV.

## AEDPA STANDARDS

205.   Because this Petition is filed after April 16, 1996, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. *Lindh v. Murphy*, 521 U.S. 320, 117 S. Ct. 2059, 138 L. Ed. 2d. 481 (1997); *Ries v. Quarterman*, 522 F.3d 517, 522 (5th Cir. 2008.)  Under AEDPA, a habeas corpus application may not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:  (1) resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding."  28 U.S.C. § 2254(d) (2006); *Fratta v. Quarterman*, 536 F.3d 485, 499 (5th Cir. 2008). Section 2254(e)(1) states that "a determination of a factual issue made by a State court shall be presumed to be correct" and that the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

206.   The terms "contrary to" and "unreasonable application" have independent meanings.  *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Fratta*, 536 F.3d at 504; *Henderson v. Quarterman*, 460 F.3d 654, 659 (5th Cir. 2006).  A state court decision is "contrary to" clearly established federal law if it arrives at a conclusion opposite to that of the Supreme Court on a question of law, or decides the case differently than the Supreme Court on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); *accord Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 653, 166 L. Ed. 2d 482 (2006); *Gardner v. Johnson*, 247 F.3d 551, 557 (5th Cir. 2001).  To be an "unreasonable application of" clearly established federal law, the state court decision must have identified the correct legal rule but

unreasonably applied it to the facts at hand. *Williams,* 529 U.S. at 406; *Buntion v. Quarterman*, 524 F.3d 664, 670 (5th Cir. 2008).

207.   "Supreme Court holdings at the time of the state court's last reasoned decision are the source of clearly established Federal law for the purposes of AEDPA," *citing Williams*, 529 U.S. at 412; *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007) (granting habeas relief under AEDPA because state court decision ignored "fundamental principles established by [the Supreme Court's] most relevant precedents"); *Nelson v. Quarterman*, 472 F.3d 287, 293 (5th Cir. 2006).   "[A] decision by this court or one of our sister circuits, even if compelling and well-reasoned, cannot satisfy the clearly established federal law requirement under § 2254(d)(1)." *Salazar v. Dretke*, 419 F.3d 384, 399 (9th Cir. 2005); *accord Burgess v. Dretke*, 350 F.3d 461, 469 (5th Cir. 2003).

208.   As the Supreme Court has stated, "in the context of federal habeas" "[d]eference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003).  To that end, while the standard as articulated in section 2254 is demanding, it is "not insatiable; as we said the last time this case was here, "'[d]eference does not by definition preclude relief.'"  *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 240, 125 S. Ct. 2317, 162  L. Ed. 2d 196 (2005) (granting habeas relief under AEDPA), *citing Miller-El I*, 537 U.S. at 340; *see Panetti v. Quarterman*, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007) ("AEDPA does not "'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'"), *citing Carey*, 127 S. Ct. at 656 (Kennedy, J., concurring in judgment).

209.   In the Fifth Circuit, "the question of whether a state court's decision is an adjudication on the merits turns on the court's disposition of the case -- whether substantive or procedural." *Salazar*, 419 F.3d at 395 (*quoting Mercadel v. Cain*,

179 F.3d 271, 274 (5th Cir. 1999) (*per curiam*) (internal quotations omitted).

210.   While a state court's summary denial is considered an adjudication on the merits subject to § 2254(d), *see Harrington v. Richter*, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011), "[i]t is well-established that when the state courts do not make findings at all, no presumption of correctness attaches, and [a federal court] must make [its] own finding." *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 2540, 156 L. Ed. 2d 471 (2003)).

211.   The limits on habeas relief contained in § 2254(d) do not apply, and the federal habeas court reviews a claim de novo when:

> (a)  the state court did not adjudicate the merits of the claim but instead denied the claim solely on procedural grounds.  *Cone v. Bell*, 129 S. Ct. 1769, 1784 (2009);

> (b)  the state court misperceived or mischaracterized the claim, and did not address it, or ruled solely on a state law claim and did not address a corollary federal claim. *Bauder v. Department of Corrections*, 619 F.3d 1272, 1273, 1274 n.3 (11th Cir. 2010) (per curiam);

> (c)  the state court did not adjudicate elements of the claim, in which case those elements are reviewed de novo.  *Wiggins*, 539 U.S. at 534*; Rompilla v. Beard*, 545 U.S. 374, 390, 125 S. Ct. 2456, 162 L.Ed. 2d 360 (2005); *Porter v. McCollum*, 558 U.S. 301, 130 S. Ct. 447, 452, 175 L. Ed. 2d 398 (2009) (per curiam)); and

> (d)  when the state court decision is contrary to or unreasonable application of federal law (2254(d)(1)) or based on an unreasonable determination of the facts

(2254(d)(2)).  *Panetti*, 551 U.S. 930; *Wiggins*, 539 U.S.
at 528-29.

## V.

## CLAIM ONE:  THE PROSECUTION'S FAILURE TO PRODUCE EXCULPATORY EVIDENCE AND PRESENTATION OF FALSE TESTIMONY VIOLATED YOUNG'S CONSTITUTIONAL RIGHTS

212.   Young's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecution violated its duty to disclose impeachment evidence that David Page and Mark Ray were offered deals by the State, and knowingly presented perjured testimony that Page and Ray had not engaged in plea negotiations with the district attorney.  This allowed Page and Ray to give a false impression of the evidence to the jury and allowed false evidence to go uncorrected.

213.   *Exhaustion*:  This claim was presented to the state court as Claim One in Young's Second Subsequent Application.  The state court held a hearing on this claim and issued a reasoned decision denying relief, which was summarily affirmed by the Texas Court of Criminal Appeals on June 20, 2012.

214.   If Respondent disputes any of the facts alleged below, Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

215.   The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

216.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

## A.     INTRODUCTION

217.   The prosecution's case against Young rested largely upon the testimony of three key witnesses:  Mark Ray, David Page, and Darnell McCoy.  All three men were with Young when the shootings occurred, with Ray, Page and McCoy at the scene of the Douglas shooting and Page present during the Petrey shooting.  Their testimony allowed the prosecution to assert that Young was the ringleader, mastermind, and shooter in both murders.  Accordingly, the credibility of these witnesses' testimony was central to the prosecution's case, while impeaching that credibility was the primary objective of the defense.

218.   The state offered Ray and Page inducements to testify against Young. The inducements took the form of informal promises of leniency and of favorable plea agreements.  These inducements were not disclosed to Young's trial counsel or to the jury.  Instead, the state repeatedly represented in open court that no deals had been made, and allowed Ray and Page to testify, without correction, that they were offered nothing in exchange for their testimony.  As a result, Ray's and Page's credibility, bias, and motives to testify went unexplored and unexposed. Had the state disclosed to the defense its inducements to Ray and Page, the trial and its outcome would have looked dramatically different.  As it stands now, the state's nondisclosure of these agreements undermines any reliability in Young's conviction and sentence of death.

219.   The state court's rejection of this claim, following an evidentiary hearing, is the result of an unreasonable application of clearly-established Supreme Court precedent, an unreasonable determination of the facts, and the application of a legal standard that is contrary to clearly established Supreme Court law.  *See* 28 U.S.C. § 2254(d).

B.     **FACTUAL BACKGROUND**

1.     **Trial Testimony**

220.   The state's case against Young relied primarily on the testimony of the three individuals who were with Young at the time of the shootings.  Ray and McCoy were present only at the Douglas murder, and Page was with Young during both murders.  These witnesses testified that Young shot Douglas, dropped off Ray and McCoy at their homes, and then forced Page to accompany him on a car trip to Midland during which Young kidnapped and shot Petrey.  (21 RR 82-231 (McCoy); 22 RR 37-258 (Ray); 26 RR 128, *et seq*., 27 RR 6-235 (Page).)

221.   During pretrial proceedings, trial counsel attempted to find out whether these crucial witnesses had any deals or agreements secured in exchange for their testimony.  Prosecutor Rick Berry testified that he was "unaware of any deals with any witnesses either that I have done or anyone else has done, either during the time I was District Attorney or during the time I've been in private practice."  (2 SRR 109-10.)  Similarly, Harrison County District Attorney Joe Black and Harrison County investigator Hall Reavis testified that they were not aware of any deals having been made.  (2 SRR 124, 127, 130-31.)  With no deals disclosed, Young's trial began.

222.   At trial, the state presented the testimony of Ray, Page and McCoy.  According to the state's testimony, Ray, Page, Young, McCoy, and Doyle Douglas rode together in Douglas's car towards Longview, Texas to buy marijuana.  (22 RR 66-67 (Ray); 26 RR 149-51 (Page).)  At some point they stopped the car and Page got out.  Ray and Page both testified that as Page was approaching the driver's side of Douglas's car, Douglas leaned forward to move his seat so that Page could enter, and Young, in the front passenger seat next to Douglas, shot Douglas once or twice in the head.  (22 RR 63, 82-89 (Ray); 26 RR 157-58 (Page).)  Ray testified that Young held the gun six to eight inches from Douglas's head.  (22 RR 166-67.)  That testimony contradicted the testimony of McCoy's testimony, who said that

Young "hid" the gun in his lap and shot upward.  (21 RR 164-66.)  Another witness at trial testified that Ray confessed that "they all" shot Douglas.  (21 RR 314-15.)

223.   Ray and Page both testified that Young then forced all three men to put the body in the trunk.  (22 RR 91-98 (Ray); 26 RR 162-65 (Page).)  Ray and Page testified that, at Young's direction, the three men took the body from the trunk and put it next to a creek.  (22 RR 117-20 (Ray); 26 RR 174-76 (Page).)  Ray told the jury that Young ordered Ray to shoot Douglas again after no one volunteered to do it.  (22 RR 120-21.)  Page, by contrast, testified that Young told Ray that Ray had to "prove [him]self," and ordered Ray to shoot Douglas.  (26 RR 176-77.)  Ray testified that he shot Douglas in the back of the head through a pillow because he was afraid Young would shoot him if he did not comply.  (22 RR 120-26, 129, 178.)

224.   Ray testified that he, Young and McCoy went to a hotel room while Page stayed in the car.  (22 RR 131-34.)  According to Ray, at the motel Young told another witness, Pat Brook, that he had killed Douglas.  (22 RR 134.)  Ray and Page testified that after leaving the motel, Young dropped Ray and McCoy off near Marshall, Texas.  (22 RR 191 (Ray); 26 RR 181 (Page).)

225.   Page claimed at trial that Young forced him to ride with him in Douglas's car towards Midland, Texas.  (26 RR 183-87.)  Page testified that Young car-jacked Sam Petrey after which Petrey and Young drove together in Petrey's truck while Page drove Douglas's car.  (26 RR 201-06.)  Page drove Douglas's car for some distance longer before abandoning it, then the three men drove together in Petrey's truck.  (26 RR 190-214.)

226.   Page testified that just south of Midland at an oil pump jack site, Young shot Petrey twice in the head.  (26 RR 239, 246-47.)  According to Page, immediately before shooting Petrey, Young said to him, "Sorry, Sam... you got to die."  (26 RR 246.)  Page claimed that Young let Page out of the truck in front of

an IHOP restaurant, and Page went to a courthouse to turn himself in.  (26 RR 248-55.)

227.   During direct examination, the prosecutor asked Ray whether he had "received any kind of deal, any kind of promise, any kind of favor from any District Attorney's Office or anyone in exchange for your testimony today?"  Ray answered, "None whatsoever, sir."  (22 RR 147.)  The defense asked Ray on cross-examination whether the state had any leverage over him with respect to his testimony, and Ray denied any such leverage (*See* 22 RR 240.)

228.   Similarly, the prosecutor asked Page whether he had received "any kind of an agreement to give you any particular sentence," to which Page responded, "No, ma'am."  (26 RR 257.)  On cross-examination, Page further testified that he had not been offered any type of deal or agreement by the state in exchange for his testimony.  At one point, Page testified that "[t]hey haven't came [sic] to me with anything."  (27 RR 127, 130-31.)

229.   Following Young's trial, Ray pled guilty to non-aggravated kidnapping and received a fifteen-year prison sentence.  Page agreed to a thirty-year plea agreement for aggravated kidnapping.  Page's attorney, Woody Leverett, was angry with Midland prosecutor Al Schorre because he believed Page testified for the State exactly as Page had been expected to, and Leverett felt "we had been led to believe we could very likely receive a plea offer well below thirty years." (Second Writ Hearing, app. ex. 6 (W. Leverett Decl.), at ¶ 9.)[24]

**2.   Postconviction Evidence of Inducements to Ray and Page**

230.   In his postconviction hearing before the state trial court, Young presented voluminous evidence that, despite the prosecution's assertions at trial, the state offered Ray and Page inducements in exchange for their testimony against

---

[24]  Exhibits admitted by Young and the state at the second writ hearing are cited in this claim as, respectively, "Second Writ Hearing, app. ex. __," and "Second Writ Hearing, state's ex. __."

Young, which were not disclosed to the defense.

### a.   Mark Ray

231.   Ray was arrested on November 25, 2001 and charged with the first-degree murder of Doyle Douglas.  Three days later Richard Hurlburt was appointed to represent him. (2 RWR2d 135-36.)[25]  Hurlburt assigned James Maxwell to be an investigator on Ray's case; Maxwell began working on the case on December 3, 2001.  (2 RWR2d 15.)  Sometime around December of 2001, Harrison County prosecutor Rick Berry suggested to Hurlburt that Ray enter a plea deal for sixty years to aggravated first degree murder; Ray rejected that offer.  (2 RWR2d 138-39.)

232.   In January of 2002, Berry told Hurlburt that he wanted to make Ray an offer that Ray "could not refuse." (2 RWR2d 17.)  In exchange, Ray needed to testify against Young.  (*Id.*)[26]  Maxwell's investigative log contained an entry for January 29, 2002 that stated he was contacted by Hurlburt and advised "that the Harrison County District Attorney's Office had told him they wanted to make his client a deal he could not refuse.  They were trying their murder case . . . on CLINT.  And were going to need MARK to testify for them." (Second Writ Hearing, app. ex. 1 (Maxwell log entry).)  Hurlburt and Maxwell must have thought the prosecution's promise was real, as Maxwell performed no further work on Ray's case after January 29, 2002.  (2 RWR2d 17; 3 RWR2d 109.)  In fact, Hurlburt himself spent just fifteen and a half hours working on Ray's case altogether.  (3 RWR2d 124-25.)

233.   Between January 2002 and Young's trial in March 2003, Hurlburt, Ray, and Berry engaged in extensive plea negotiations.  Following Ray's rejection

---

[25]  The transcript of the second writ hearing is cited as [Vol] RWR2d [Page] throughout this claim.

[26]  At the state evidentiary hearing, Hurlburt testified that Berry had told him he "probably would make [Ray] an offer that he could not refuse."  (3 RWR2d 76.)

of the 60-year offer, Hurlburt told Ray that Berry had offered him a deal for between forty and forty-five years.  (2 RWR2d 139-40, 161.)  Ray did not accept that offer.  (Second Writ Hearing, app. ex. 2 (M. Ray Decl.), ¶ 7.)  Berry then offered Hurlburt a thirty-year plea deal, which Ray also did not accept.  (2 RWR2d 140; Second Writ Hearing, app. ex. 2 (M. Ray Decl.), ¶ 8.)  Then, Berry and Hurlburt met with Ray at the Harrison County Jail.  (2 RWR2d 141.)  During that meeting, Berry told Ray that he did not want to prosecute Ray, and that Young was the person he wanted to prosecute.  Berry told Ray that he could receive a twenty-year deal by pleading guilty to kidnapping, but Ray rejected that offer also.  (2 RWR2d 141].)  At some point before Young's trial, Ray rejected another offer, this time for a ten year sentence if Ray would plead guilty to kidnapping.  (2 RWR2d 144.)

234.    In 2002 Rick Berry was challenged by Joe Black for the Democratic nomination for Harrison County District Attorney.  Black won the nomination on March 12, 2002.  Black also won the November general election. (http://www.sos.state.tx.us/elections/historical/index.shtml.)  Berry remained the District Attorney until January 1, 2003, when Black was sworn in.  (2 SRR 114-16, Second Writ Hearing, app. ex. 4.)

235.    Before the general election for Harrison County District Attorney, Berry offered Ray a deal of five years for a reduced charge of non-aggravated kidnapping in exchange for Ray's testimony at Young's trial.  (Second Writ Hearing, app. ex. 2 (M. Ray Decl.), ¶ ¶ 10, 11; 2 RWR2d 144-45.)  Berry told Hurlburt and Ray that the five-year deal could not be memorialized in writing until after the trial, because to do so before the trial would jeopardize the State's case against Young.  (Second Writ Hearing, app. ex. 2 (M. Ray Decl.), ¶11; 2 RWR2d 145.)  Ray accepted Berry's offer of a five-year plea deal, and understood it to mean that, in exchange for his testimony at Young's trial, he would receive a five-year sentence for non-aggravated kidnapping.  (2 RWR2d 145-46.)

236.   On October 29, 2002, Ray wrote a letter to Berry asking Berry to "come up here and discuss my case with me," and saying "I am ready to plea bargain with you." (Second Writ Hearing, app. ex. 5 at 2.)  Ray wrote this letter because he hoped to obtain a plea agreement from Berry in writing. (2 RWR2d 186.)  This letter, which itself constitutes impeachment material, was never turned over to Young's defense lawyers at the time of trial and was not in the prosecutor's file.

237.   Despite not having the agreement in writing, however, Ray felt that the deal was firm.  Ray's mother, Carolyn Ray, testified in state court that Ray told her about the five-year deal two or three times before Young's trial. (2 RWR2d 146; 5 RWR2d 23-24, 26-32.)

238.   Ray testified at Young's trial on March 18, 2003. (22 RR 37.)  In the morning or early afternoon of March 17, 2003, a deputy sheriff took Ray out of his jail cell and transported him to the courthouse in which Young's trial was taking place.  Ray then walked with an escort to a nearby diner, called Jo Jo's, with Hurlburt. (2 RWR2d 148-49.)  Ray's parents and Berry were seated in a side-room. (2 RWR2d 149 (Ray), 5 RWR2d 8-9 (Carolyn Ray).)  Also present were the Harrison County District Attorney investigator Hall Reavis, Midland County District Attorney Investigator J.D. Luckie, and Harrison County Deputy Sheriff investigator Todd Smith. (2 RWR2d 148-72 (Ray); 5 RWR2d 9-10 (Carolyn Ray); 6 RWR2d 16-19, 33-35 (Smith); 6 RWR2d 43 (Reavis).)  During the lunch, either Berry or Hurlburt told Ray and his parents that Ray would receive five years. (2 RWR2d 149-50 (Ray); 5 RWR2d 10, 15 (Carolyn Ray)].)

239.   The next day, Luckie met with Ray and his parents inside the courthouse in a room or suite of rooms.  Luckie assured Ray and his parents that the plea bargain was still good, but warned Ray not to say anything about it because it could jeopardize the outcome of the trial. (2 RWR2d 150; 5 RWR2d 11.)

240.   After Young's trial, Joe Black, the new Harrison County District Attorney, told Ray that he was not going to honor the plea agreement that Ray had struck with Berry.  (2 RWR2d 153, 183-84.)  As a result, Ray entered into a plea deal with Black whereby he would serve a fifteen-year sentence.  (Second Writ Hearing, state's ex. 5.)  Ray's mother was extremely upset as she believed that law enforcement had failed to fulfill their promise to Ray.  (5 RWR2d 11-12.)  Ray ultimately served six years and nine months in prison and was released on August 5, 2008.  (2 RWR2d 154-55.)

### b.   David Page

241.   On November 27, 2001, Midland County charged David Page with capital murder for the killing of Samuel Petrey in the course of committing aggravated kidnapping and the theft of the victim's car.  (Second Writ Hearing, state's ex. 8; 2 RWR2d 50.)  Woody Leverett was appointed to represent Page in December 2001, and began working on securing a favorable disposition for his client.  (Second Writ Hearing, state's ex. 10, app. ex. 7.)

242.   Al Schorre, the District Attorney for Midland County, handled Page's case.  J.D. Luckie was Schorre's investigator.  (2 RWR2d 30, 32.)  Beginning in early February of 2002, Leverett had a series of discussions with Schorre and Luckie about resolving Page's case.  During the first meeting, on February 5, 2002, Schorre told Leverett that a potential resolution to the case would involve "around thirty years, and in any event, no less than fifteen years[.]"  (2 RWR2d 31.)  Schorre conditioned this plea on two events:  (1) that Page pass a polygraph examination absolving him of culpability and (2) that he testify against Young.  (Second Writ Hearing, app. ex. 6, ¶ 4, 2 RWR2d 31.)[27]  Two days after this offer, the state formally dropped the change of capital murder, choosing instead to indict

---

[27]  This agreement was not placed in writing, which was not unusual.  As Leverett testified to at the state evidentiary hearing, "around that time, prosecutors and defense lawyers did not put anything in writing" regarding plea negotiations. (2 RWR2d 100.)

Page for the lesser offense of murder.  (Second Writ Hearing, state's ex. 11.)
Leverett's notes, which appear to have been created on February 5, 2002,
corroborate the existence of such an agreement, stating that Leverett "discuss[ed]
plea bargain with client" along with the conference with the "D.A. re plea bargain,
polygraph, State's witness."  (Second Writ Hearing, app. ex. 26.)

243.    Pursuant to the February 5th agreement, Page took a polygraph exam
on February 25, 2002.  Leverett testified at the state evidentiary hearing that he
would never have let a client submit to a polygraph examination wherein the client
could incriminate himself unless he felt it would benefit the client significantly.  (2
RWR2d 45-46].)  Page failed the polygraph: the results indicated that Page was
deceptive when he denied shooting Doyle Douglas and Sam Petrey.  (*See* 27 RR
239-40; Second Writ Hearing, state's ex. 33.)  Schorre told Leverett that he was
disappointed in the result of the polygraph, and that he was considering re-
indicting Page with capital murder.  (3 RWR2d 232-33.)

244.    Schorre, however, did not abandon his prior offer of fifteen to thirty
years because of the polygraph examination, and as of March 15, 2003, the deal
was still on.  As a result, Leverett assumed that the polygraph results "ceased to be
a condition of the deal," (2 RWR2d 91), and "the only open questions [were] what
the final offer would be, in terms of years, and whether Page would accept that
plea offer."  (Second Writ Hearing, app. ex. 6, ¶ 5.)  Before Young's trial, Leverett
even noted the plea agreement as he understood it:  "Al Schorre discussed a plea
bargain *offer* 'in the thirty-five year range,' in exchange for Page's testimony as a
state's witness against Clint Young."  (Second Writ Hearing, app. ex. 8 (emphasis
added).)  Indeed, Schorre never did re-indict Page for capital murder.  Accordingly,
because of the failed polygraph, Page knew that it was even more important for
him to follow-through on his testimony against Young.

245.    On March 24 and 25, 2003, Page testified for the prosecution at
Young's trial.  He was granted limited use immunity to prevent his testimony from

being used against him in a subsequent action.  During a recess in Page's testimony, Schorre assured Page that he was doing well and should keep it up.  (Second Writ Hearing, app's ex. 25 (Page Declaration), ¶ 5; 4 RWR2d 48.)  Then, removing any doubt in Page's mind that a favorable sentence hinged upon his testimony, Schorre's investigator told Page at another recess that he was doing well and that "this could possibly help [him] with [his] sentence."  (Second Writ Hearing, app. ex. 25 (Page Declaration), ¶ 6.)

246.  Following Young's trial, Schorre offered Page a sentence of thirty-five years instead of the fifteen-to-thirty discussed with Leverett.  (2 RWR2d 42; 3 RWR2d 235.)  Leverett "kind of felt offended" by this deal because Schorre reneged on his verbal promise.  (2 RWR2d 43.)

247.  One of the strongest indications that Page received an inducement to testify comes from a letter Page wrote to his step-mother after Young's trial.  He told her that he did not accept a *formal* deal because "it would have made my testimony [at Clinton Young's trial] no good."  (Second Writ Hearing, app. ex. 39.)  However, he implied the existence of a less-formal inducement for him to testify.  He lamented the thirty-five year offer to his step-mother, exclaiming, "I helped them *and they said they would help me* but if this is what they call help they can stick it up their ass."  (*Id*.) (emphasis added.)

248.  Page ultimately rejected the thirty-five year offer, but accepted a new thirty-year offer, which fell within the original agreement offered on February 5, 2002.  (2 RWR2d 42-43.)

### c.    The State Court's Adjudication of Young's Claims

249.  After Young's first postconviction proceeding had concluded, and while Young was in federal court, newly discovered evidence surfaced suggesting that Page and Ray were offered plea deals.  This evidence included a declaration from Ray wherein he admitted to striking a bargain with prosecutors, (Second Writ Hearing, app. exs. 2, 3), and a declaration from Leverett, who admitted engaging in

plea negotiations with the prosecution.  (Second Writ Hearing, app. ex. 6 (Leverett Decl.) ¶¶ 5, 8-9.)  Young returned to state court with a successor petition - his "Second Subsequent Application" -- raising, *inter alia*, the newly discovered claims that the prosecution withheld material and exculpatory information from the defense, and that the prosecution deliberately presented false testimony.

250.   The Texas Court of Criminal Appeals (TCCA) found that Young's allegations in the Second Subsequent Application satisfied "the requirements for consideration of a subsequent application under Texas Code of Criminal Procedure Article 11.071, § 5[,]" and ordered the trial court to consider Young's claims that the prosecution withheld evidence and presented false testimony.  (6/3/09 TCCA Order).

251.   The trial court held a hearing on the Second Subsequent Application on January 11-13, 2010, and July 22 and 23, 2010.  On May 18, 2011, the trial court issued a 149-page order concluding that Young's constitutional rights were not violated. (5/18/11 Trial Court Order).[28]  With respect to Ray, the trial court found that prosecutor Rick Berry told Ray's attorney, Richard Hurlburt, that "'he probably would make him [Ray] an offer that he could not refuse' on the Mark Ray case before the trial of Clinton Young."  (Order at 63).  The trial court further found "as a matter of fact" the following:

> [T]hat Richard Hurlburt communicated the statement by
> Rick Berry to Mark Ray before the trial of Clinton
> Young.  The Court further finds that the statement by
> Rick Berry to Richard Hurlburt and communicated to
> Mark Ray could have constituted a motive or inducement
> on the part of Mark Ray for his testimony against Clinton
> Young.  The Court finds that the statement was not

---

[28]   Throughout the rest of this claim, the trial court's order on Young's claim will be cited simply as "Order at __."

disclosed to the defense.

*Id*; *see* 28 U.S.C. § 2254(e)(1) ("a determination of a factual issue made by a State court shall be presumed to be correct").

252.   Despite finding that the prosecutor offered Ray an inducement to testify, the trial court found "that there was no express or implied plea agreement or understanding between Mark Ray and the State" or any "express or implied agreement . . . that the State would give Mark Ray any reward or leniency for his testimony against Clinton Young."  (*Id*.)  Thus, the trial court concluded, "the testimony of Mark Ray at the trial of Clinton Young that 'he has not received any kind of deal, any kind of promise, any kind of favor from any District Attorney's Office or anyone in exchange for [his] testimony [at Young's trial] (22 RR146) was true."  (*Id*. at 63.)

253.   With respect to Page, the trial court concluded that "there was no express or implied plea agreement or understanding between David Page and the State with respect to the charges pending against [Page] in Midland County, Texas or Harrison County, Texas or elsewhere at the time that David Page testified against Clinton Young;" (*Id*. at 123-24).  The trial court further concluded that "there was no express or implied agreement or understanding between the State and David Page at the time that David Page testified against Clinton Young that the State would give Page any reward or leniency for his testimony against Clinton Young;" (*Id*. at 124). The trial court concluded that "the testimony of David Page at the trial of Clinton Young that there was 'no kind of deal' or 'any kind of offer' or plea agreement with the prosecution for his testimony against Clinton Young was true."  (*Id*.)  The trial court did not, however, make any finding as to whether or not Page received any inducement from the prosecution for his testimony.

254.   The trial court also made findings regarding the materiality of any agreements offered to Ray and Page.  After purporting to eliminate both witnesses' testimony, the trial court considered the remainder of the trial record and found

what it considered substantial evidence of Young's guilt of the Douglas and Petrey murders. (*Id*. at 100-04 (prejudice as to Ray); 140-141 (prejudice as to Page)). To support its finding, the trial court listed various items of evidence presented by the prosecution, some of which did not even inculpate Young. For example, the trial court included in its analysis evidence that "[i]n November 2001 Clinton Young, age 18, and Amber Lynch . . . were romantically involved . . ."; that "Clinton Young did not have a vehicle. . . ." and that "Samuel Petrey was shot dead at an oil lease in Midland County, Texas on November 26, 2001." (*Id*. at 104-09.)

255.   In addition to listing this evidence, the trial court rested its non-materiality ruling on a conclusion that  Page and Ray's substantive testimony was not false and thus did not "inevitabl[y] and inescapabl[y]" show that the jury would have believed Young's version of events. (*Id*. at 147.) The trial court reasoned that "the fact . . . that the State had an agreement with a witness for his testimony, does not lead to the inevitable and inescapable conclusion that the purpose was to induce or had the effect of prompting or motivating a witness to testify falsely and that without more, a jury would conclude that the witness testified falsely." (*Id*. at 147). Because Ray and Page had made statements implicating Young before any of the plea deals or inducements were made, the trial court concluded, "it is impossible to rationally infer that the witnesses' trial testimony was falsely fashioned to assist the State in an effort to claim and secure the benefits of an agreement with the State." (*Id*. at 148.) The trial court then undermined that conclusion, however, by acknowledging that the inducements *could* give rise to an "inference . . . that [Ray and Page] early on gave statements designed to cast [Young] in the worst possible light and to minimize their own culpability and toward that purpose gave false statements and thereafter pursuant to an agreement with the State persisted in testifying falsely during their trial testimony." (*Id*. at 149.) However, the trial court dismissed that interpretation on the basis that Ray's and Page's testimony was "consistent with all of the other

evidence and testimony admitted in the trial." (*Id*.)

256.   Finally, the trial court supported its finding of no materiality by noting that the jury had already been given the standard accomplice testimony instruction, which instructs the jury to view accomplice testimony with suspicion. (*Id*. at 105, 144).

257.   The trial court's order failed to address a separate claim asserted by Young in his state petition, that "the State deprived [] Young of his right to confront witnesses when it instructed Mark Ray not to reveal his plea agreement when he testified at Young's trial." (Second Subsequent Application at Claim IE, page 47.)  Young made the same allegation as to Page, but the trial court did not address that portion of the claim either. (*Id*. at 47 n.17.)

258.   On June 23, 2011, Young filed in the TCCA objections to the trial court's order. (Objections to the Court's Findings of Fact and Conclusions of Law).  On June 20, 2012, the TCCA, after purporting to review "the record of the hearing and the trial court's finding of fact and conclusions of law[,]" summarily denied relief on Young's claims "pertaining to the prosecution's alleged failure to disclose exculpatory evidence[.]" (6/20/12 TCCA Order.)  Because the TCCA issued a summary denial of Young's claims, the denial is presumed to have rested upon the same grounds as the last reasoned decision addressing those claims -- that of the trial court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991).

## C.   THE NON-DISCLOSURE OF INDUCEMENTS OFFERED TO RAY AND PAGE VIOLATED YOUNG'S RIGHT TO DUE PROCESS

259.   Young has developed facts demonstrating that the prosecution induced two witnesses to testify against Young by offering those witnesses, even if informally, favorable dispositions of their own pending cases.  These inducements were not disclosed to the defense even though they would have provided favorable evidence by way of impeaching the witnesses' credibility.  Had these inducements

been disclosed, there is at least a reasonable probability that the outcome of Young's trial would have been different such that his conviction and/or sentence of death is unreliable. The TCCA's conclusion to the contrary was the result of an unreasonable application of federal law, an unreasonable determination of facts, and an application of a standard that is contrary to Supreme Court precedent.

### 1.    Legal Framework

260.    "The Constitution provides as part of its basic 'fair trial' guarantee," "the right to receive from prosecutors exculpatory impeachment material." *United States v. Ruiz*, 536 U.S. 622, 628, 122 S. Ct. 2450, 153 L. Ed. 2d 586 (2002) (citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)). To establish a violation under *Brady*, a petitioner must demonstrate three elements: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently[;]" and (3) prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999).

261.    The facts alleged by Young, and developed and proven at the state court evidentiary hearing, demonstrate that his conviction and death sentence stem from the *Brady* violation at trial. The prosecution withheld evidence that would have impeached and undermined its key witnesses' testimony. This evidence included inducements offered to Ray and Page in exchange for their testimony against Young. The fact that the evidence was withheld from the defense, and hence the jury, undermines confidence in the jury's verdict. Accordingly, Young has demonstrated that his Fourteenth Amendment right to a fair trial, pursuant to *Brady*, has been violated.

2.     **Inducements were Offered to Ray and Page that Constituted Impeachment Material Under *Brady***

262.   The first element of *Brady* is that exculpatory or favorable evidence must have existed at the time of trial.  Impeachment evidence impacting a witness's credibility is deemed favorable and, hence, falls within *Brady*'s general rule.  *Giglio v. United States*, 405 U.S. 150, 155, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) ("evidence of any understanding or agreement as to a future prosecution would be relevant to" the "credibility" of a prosecution witness "and the jury [is] entitled to know of it").  Even if not formal or binding, statements by prosecutors to witnesses that suggest a "possibility of a reward" in exchange for testimony are considered impeachment material and, therefore, must be disclosed pursuant to *Brady*.  *United States v. Bagley*, 473 U.S. 667, 684, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).  Indeed, "the crux of a Fourteenth Amendment [*Brady*] violation is deception.  A promise is unnecessary." *Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008); *see also Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) ("The existence of a less formal, unwritten or tacit agreement is also subject to *Brady*'s disclosure mandate."); *Wisehart v. Davis*, 408 F.3d 321, 323 (7th Cir. 2005); *Douglas v. Workman*, 560 F.3d 1156, 1186 (10th Cir. 2009) ( "A deal is a deal - explicit or tacit."); *LaCaze v. Warden of Louisiana Correctional Institute for Women*, 645 F.3d 728, 738 (5th Cir. 2011) (*Brady* violation despite the trial court's finding that "there was no written 'deal'").

263.   Here, despite the prosecution's assertions at trial, both Ray and Plea were offered inducements by the state to testify against Young that fell within *Brady*'s general disclosure requirement.

   a.     **Mark Ray**

264.   As detailed in the factual background of this claim, Ray and his counsel were involved in numerous plea negotiations prior to Young's trial.  After rejecting a number of the prosecutor's offers, Ray wrote a letter to prosecutor

Berry on October 29, 2002 asking Berry to "come up here and discuss my case with me," and saying, "I am ready to plea bargain with you."  (Second Writ Hearing, app. ex. 5.)  This letter, on its own, establishes that Ray was under the impression that plea negotiations would take place.  The letter was not provided to Young's trial counsel, nor was it in the prosecutor's file.

265.   As explained at the state evidentiary hearing on this claim, shortly after Ray sent that letter, his lawyer Hurlburt told Ray that he (Hurlburt) had been "chewed out" by the prosecutor because Ray had written Berry directly.  (2 RWR2d 143-44.)  Nevertheless, Berry ultimately offered Ray, through his attorney, a five-year plea deal in exchange for his testimony against Young.  (2 RWR2d 144-45.)  Tellingly, Ray was told that the deal could not be memorialized in writing until after Young's trial so as not to jeopardize the case against Young. (2 RWR2d 145; Second Writ Hearing, app. ex. 2, at ¶¶ 11, 14.)[29]

266.   Indeed, the state court has found as a fact that Young received an inducement to testify.  The court found that Berry told Ray's attorney that "'he probably would make [Ray] an offer that he could not refuse' on the Mark Ray case before the trial of Clinton Young."  (Order at 63.)  The trial court further found "as a matter of fact":

> [T]hat Richard Hurlburt communicated the statement by
> Rick Berry to Mark Ray before the trial of Clinton
> Young. The Court further finds that the statement by
> Rick Berry to Richard Hurlburt and communicated to
> Mark Ray could have constituted a motive or inducement
> on the part of Mark Ray for his testimony against Clinton

---

[29]  Ray's account of the prosecutor's offer was corroborated at the state evidentiary hearing by Ray's mother, Caroline Ray.  Mrs. Ray, who had no incentive to testify falsely or assist Young, testified that Ray told his mother multiple times not to worry because he was going to enter a plea agreement for five years.  (5 RWR2d 23-24, 26-32.)  Ray was telling his mother about these details as late as March of 2002.  (5 RWR2d 31.)

Young. The Court finds that the statement was not

disclosed to the defense.

*Id*. These factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

267.   The influence of the prosecutor's plea offer on Ray's testimony at

Young's trial was strong -- adding to the exculpatory value of the negotiations.

*See Wilkerson v. Cain*, 233 F.3d 886, 890-91 (5th Cir. 2000) ("[w]hat [matters], of

course, is not the actual existence of a deal but the witnesses' belief or disbelief

that a deal exists.").  At trial, Ray, his mother, and his attorney, met with Young's

prosecutors at a nearby café.  There, Ray was assured that his deal was intact if he

continued to testify against Young.  At the state evidentiary hearing on this claim, a

number of witnesses testified that this lunch did, in fact, take place.  These

witnesses included Ray (2 RWR2d 149), his mother (5 RWR2d 8-9), a district

attorney investigator (6 RWR2d 43), and a Sheriff's investigator who saw the

group at the café.  (6 RWR2d 16-19, 33-35.)  Finally, a prosecutor investigator

assured Ray during trial that his deal was firm but warned Ray not to say anything

about the deal because it could jeopardize the outcome of the trial.  (2 RWR2d

150.)  This exchange demonstrated that prosecutors knew a deal had to be kept

quiet and informal until after Young's trial.

268.   The prosecutor's continuous plea negotiations, and ultimate

insinuation to Ray that he would be given a favorable deal if he testified against

Young, constituted impeachment evidence that should have been disclosed to the

defense.  As the state court determined, however, the evidence was not disclosed.

### b.    David Page

269.   Page was also engaged in extensive plea negotiations with the state

that provided him an inducement to testify against Young.  As with Young, the

offer to Page was not formal or binding.  Instead, as a letter admitted at the state

evidentiary hearing indicates, the prosecutor indicated that he was "talking about,

but not committing to a 30 year plea offer in [Page's] case."  (Second Writ

Hearing, state's ex. 34.)  The letter from Page's attorney to Page indicating that the prosecutor was talking about a plea offer post-dated the prosecutor's offer of around thirty years if Page passed a polygraph examination and testified against Young.  (*See* 2 RWR2d 31.)  The letter also post-dated Page's failure of the polygraph examination.  Accordingly, because plea negotiations were still open notwithstanding the failed polygraph, Page must have believed that the only condition for a plea offer was his testimony against Young.[30]  Indeed, his attorney testified at the state evidentiary hearing that the polygraph results "ceased to be a condition of the deal, (2 RWR2d 91), with "the only open questions [being] what the final offer would be, in terms of years, and whether Page would accept that plea offer."  (Second Writ Hearing, app. ex. 6, ¶ 5.)

270.   The state court found that there was not a firm, binding, contractual plea agreement firmly in place at the time Page testified against Young.  (Order at 127).  It found that "there is a difference between a promise by the State and a hope by a witness."  (Order at 130.)  However, Page's hope of a deal was premised on "the existence of some understanding for leniency" by the prosecution that would be offered if Page testified against Young.  *Duggan v. State*, 778 S.W. 2d 465, 467 (1989).

271.   Page was objectively reasonable in his understanding that the prosecution would offer him a favorable disposition if he testified against Young to their satisfaction.  The prosecution initially offered Page a deal on two conditions: passing a polygraph and testifying against Young.  (2 RWR2d 31; Second Writ Hearing, app. ex. 6, ¶ 4.)  The prosecutor, after the failed polygraph, told Page's attorney that he was considering re-indicting Page with capital murder.  (3 RWR2d 232-33.)  However, the prosecutor did not follow through with that threat, and

---

[30]  Page was also not re-indicted with capital murder after he failed the polygraph, further demonstrating that the State was willing to engage in plea negotiations with Page.  (2 RWR2d 91.)

Page was not re-indicted for capital murder.  (2 RWR2d 91.)  Accordingly, the
original deal was not nullified.  This is shown by Page's attorney's March 15, 2002
letter to Page about the prosecutor's threat to re-indict.  There, Leverett implies
that the *quid pro quo* is still in place, stating that "as you known, the D.A. is
'talking about,' but not committing to a thirty-year offer in your case."  (Second
Writ Hearing, state's ex. 34.)  The letter could only reasonably have served to
emphasize to Page the necessity of testifying favorably for the State, especially
after Page missed the mark on the first condition of the deal.  Such an
understanding of leniency falls squarely within *Brady*'s reach and should have
been disclosed to the defense.

272.   Further, Page's belief he would be given leniency if he testified
against Young is demonstrated by a letter he wrote to his stepmother after he
completed his testimony.  In that letter, Page states that no formal deal was made
prior to his testimony because "it would have made my testimony [at Young's
trial] no good."  (Second Writ Hearing, app. ex. 39.)  However, he laments that the
offer he ultimately received was not what he expected, exclaiming, "I helped them
and *they said they would help me but if this is what they call help they can stick it
up their ass.*"  (*Id*.) (emphasis added.)   The only reasonable interpretation of this
letter is that Page felt that there was a *quid pro quo* arrangement between the State
and him at the time of his testimony.  *Wilkerson*, 233 F.3d at 890-91 ("[w]hat
[matters], of course, is not the actual existence of a deal but the witnesses' belief or
disbelief that a deal exists.").  Accordingly, the existence of such an agreement,
however informal, should have been disclosed to the defense.

### 3.    The State Withheld Evidence of the Plea Negotiations

273.   The next element of *Brady* is that favorable evidence was suppressed
by the state.  Here, there is no dispute that, despite repeated requests at trial, the
prosecution never disclosed to the defense any inducements offered to any
prosecution witness in exchange for their testimony.  The prosecution made its file

available to the defense, but trial counsel found nothing there that indicated the existence of any inducements.  (2 RWR2d 107, 192-93.)  Young's trial counsel were entitled to rely on the prosecutor's open file policy and to conclude, from the absence of evidence of the plea agreements, that no such evidence existed. *Strickler*, 527 U.S. 263, 283 n.23, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (where the prosecution has an open file policy, "defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*.")  Moreover, the state failed to disclose the October 29, 2002 letter from Ray to Berry, telling Berry that he was "ready to plea bargain." (Second Writ Hearing, app. ex. 5.)  This letter on its own indicates that Ray was looking for an offer, and in the context of the prior attempts at plea negotiations by the prosecutor with Ray, demonstrates that the prosecution was interested in providing Ray with an inducement.

274.   The state's suppression of the evidence went beyond a mere failure to disclose and instead took the form of active and deliberate deceit, exacerbating the prejudice from the non-disclosure.  The prosecution actively concealed the plea agreements by refusing to memorialize them in writing, and by telling Ray not to reveal them.  Berry specifically told Ray's attorney that he was not writing down the agreement so as not to jeopardize the State's case against Young.  (2 RWR2d 145, 180.)  The prosecutor's investigator, J.D. Luckie, reaffirmed this strategy by urging Ray to "keep quiet" about the plea offer and not discuss it publicly.  (2 RWR2d 166-67, 180; *see also* Second Writ Hearing, app. ex. 2 (M. Ray Decl.), at ¶ 13.)

275.   The withholding of the plea negotiations and inducements offered to Ray and Page occurred despite repeated defense efforts and court orders to disclose the evidence.  On February 19, 2002, the defense filed a "Motion for Discovery and Inspection," asking for various categories of evidence, including any "agreements with" Page or Ray (Second Writ Hearing, app. ex. 14) and on March

21, 2002 filed a "Motion to Require State to Reveal Agreement," asking for disclosure of "the existence and contents of any agreement entered into between the Prosecuting Attorney or any other law enforcement agency and any Prosecution Witness that can conceivably influence the testimony of any witness." (Second Writ Hearing, app. ex. 15.)  On September 24, 2002, the Court issued an Order Granting the Motion for Discovery of Agreements with Witnesses, ordering the state to "disclose to the defense the existence of any agreement, written or unwritten, express or implied, with" any witness that "could possibly influence the witness's testimony" in Young's case, including Ray and Page.  (Second Writ Hearing, app. ex. 16.)  The Court also signed Young's Proposed Order on the Motion to Require State to Reveal Agreement.  (Second Writ Hearing, app. ex. 17.)  Moreover, the prosecutors in the case testified at a pre-trial hearing that no such inducements existed.  (*See* 2 SRR at 109-10 (Prosecutor Rick Berry testifying that he was unaware of any deals with any witnesses); 2 SRR at 124, 127, 130-31 (prosecutor Hall Reavis testifying to the same).)  Finally, at trial, Ray and Page each falsely testified that they had not received any kind of deal or promise in exchange for their testimony.  (22 RR 147, 240 (Ray); 26 RR 257, 27 RR 127, 130-31 (Page).)

### 4.      The Withholding of the Impeachment Material was Prejudicial

276.    The final element of *Brady* is prejudice to the defense from the prosecution's nondisclosure.  Withheld materials will be deemed prejudicial when that evidence is "material either to guilt or to punishment . . . ."  *Brady*, 373 U.S. at 87.  "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ."  *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).  Instead, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Bagley*, 473 U.S.

at 682.  "A 'reasonable probability' is a probability sufficient to undermine
confidence in the outcome." *Id*.

277.   To determine if withheld items are material, a reviewing court should
not merely add in the withheld evidence or subtract the testimony by a witness who
could have been impeached by with it.  Rather, "omitted evidence creates a
reasonable doubt that did not otherwise exist," *Bagley*, 473 U.S. at 711, and any
"omission must be evaluated in the context of the entire record."  *United States v.
Agurs*, 427 U.S. 97, 112, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).  Further,
"suppressed evidence [is to be] considered collectively, not item by item." *Kyles*,
514 U.S. at 436.  This collective evaluation means that it is not necessary that
"every item of the State's case would have been directly undercut if the *Brady*
evidence had been disclosed" because "[o]ne does not show a *Brady* violation by
demonstrating that some of the inculpatory evidence should have been excluded."
*Id*. at 451, 435.  Instead, one demonstrates a *Brady* violation "by showing that the
favorable evidence could reasonably be taken to put the whole case in such a
different light as to undermine confidence in the verdict."  *Id*. at 435.

278.   In assessing materiality, a reviewing court should also determine
whether the withheld evidence was specifically requested by the defense.  If so, the
United States Supreme Court has instructed that "[t]he reviewing court should
assess the possibility" that the nondisclosure might have had an "adverse affect" on
the preparation or presentation of the defendant's case "in light of the totality of
the circumstances and with an awareness of the difficulty of reconstructing in a
post-trial proceeding the course that the defense and the trial would have taken had
the defense not been misled by the prosecutor's incomplete response." *Bagley*, 473
U.S. at 683.  These considerations are necessary because, when the defense
requests evidence but is not provided with that evidence, it is reasonable "for the
defense to assume from the nondisclosure that the evidence does not exist, and to
make pretrial and trial decisions on the basis of this assumption."  *Id*. at 682-83.

279.   Here, the evidence of inducements offered to Ray and Page in exchange for their testimony was material to both the guilt and punishment phases of Young's trial.  Had Ray and Page's credibility been impeached, there is at least a reasonable probability that the outcome of trial would have been different. Moreover, the withholding of that evidence impacted all facets of the defense preparation of Young's trial, thereby further undermining confidence in the outcome.  *See Kyles*, 514 U.S. at 435 (prejudice exists where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

> **a.   The Withholding of the Inducements Offered to Ray and Page Adversely Affected the Defense Preparation**

280.   Because the defense made a specific request for the evidence that the prosecution withheld, this Court must examine the impact of the non-disclosure on the preparation or presentation of Young's case, "with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." *Bagley*, 473 U.S. at 683.

281.   Here, the impact of the prosecution's withholding of the inducements offered to Ray and Page severely and adversely affected Young's defense preparation and strategy before trial and even during voir dire.  At the state evidentiary hearing on this claim, Young's trial counsel, Ian Cantacuzene, testified that "if we had known there were plea agreements . . . I think it would have changed a lot of the presentation of the case" including "how the individual voir dire was conducted in this case."  (2 RWR2d 195.)  He explained that "[m]ore emphasis could have been placed on trying to pick a jury that was more geared towards people who might be more skeptical of the accomplice witness or a codefendant's testimony . . . especially if you knew there was . . . remuneration by a better plea agreement[.]"  (2 RWR2d 195-96.)

282.    Beyond jury selection, Cantacuzene also explained at the state
evidentiary hearing that the nondisclosed evidence would have had a significant
impact on the trial themes developed by the defense:

> Too I think it's important when you have a theme in a
> case as critical to begin talking about your theme early,
> so in the individual voir dire, to come back to if often,
> whether that's in the opening statement, they way you
> question all the witnesses, I mean, because I think you
> can use one witness to impeach another witness or to set
> up your themes . . .. [the nondisclosed evidence of plea
> agreements] would have been critical at the -- and would
> have taken a front seat in the . . . closing argument on the
> first stage of the trial.

(2 RWR2d 196-97.)

283.    Similarly, Young's other trial counsel, Paul Williams, testified at the
hearing that if he had known of any plea discussions between the state and Ray or
Page, his approach to the trial would have been different on a number of fronts:
First, Williams would have "voir dired the potential jurors on how they would feel
if they found out that I had paid a witness to testify ... [and then] voir dire them on
how they would feel if the State of Texas had paid, not with money, but with
freedom and/or a person's life, how they would feel about the credibility of that
witness."  (2 RWR2d 108-09.)  Second, he would have "cross-examined
vigorously" the people who were offered any inducements.  (2 RWR2d 109.)
Third, Williams "would have argued the case differently to the jury on final
argument if there had been evidence of some sort of an agreement between the
witnesses and the State." (*Id*.)

### b.    Young was Prejudiced at the Guilt Phase

284.    The state's failure to disclose the inducements offered to Ray and Page undermines confidence in the outcome of the guilt phase of Young's trial because it prevented the jury from accurately assessing Ray's and Page's credibility.  Indeed, even without evidence of the inducements, the jury had doubts as to Young's guilt of both murders.  For example, during punishment deliberations, the jury asked the Court whether they must determine that Young must have caused the death or intended to  kill "both or at least one" of the victims in order to answer one of three Special Issue questions in the affirmative.  (36 RR 135.)  The jury's inquiry suggests that at least some members of the jury believed Young did not actually cause the death or intend to kill at least one of the victims.  Accordingly, it is at least reasonably likely that impeaching Ray and Page would have tilted the balance of evidence and caused a different outcome at the guilt phase of Young's trial.

285.    The inducements could also have caused the jury to believe other evidence that contradicted Ray's and Page's accounts.  Ample contrary evidence was presented, including forensic evidence.  As to the Douglas shooting, the evidence suggested two different scenarios from two different sources:  (1) that Young shot Douglas multiple times from the right side at close range as recounted by Ray's, Page's, and McCoy's testimony; and (2) that Douglas was shot once in the right side, once in the left side, and once in the back of the head, and that the absence of gunshot residue suggested the shots were fired from more than three or four feet away, as shown by the forensic evidence from Dr. Urban.  (22 RR 264-70, 288-96; State's Trial Ex. 12 (diagram of bullet wounds).)  Whereas Ray testified that Young shot Douglas from about six or eight inches away (22 RR 166-67), Dr. Urban testified that the lack of smoke and powder residue or stippling around the wounds suggested a distance of at least three feet.  (22 RR 268-70, 288-93, 303-04.)  Dr. Urban also testified that the shot to the left of  Douglas' head

could have been fired from outside the vehicle (such as by Page, who testified he was standing to Douglas's left when he was shot) and that the shot on the right could have been fired from the back seat (where Ray and McCoy were sitting).  (22 RR 290-96.)  Indeed, Dano Young testified at trial that Ray confessed that "they all" shot Douglas.  (21 RR 315.)  Yet, the jury apparently credited Ray's and Page's testimony.  Had the jury known that the State was bargaining with Ray and Page, it could well have viewed the Ray/Page/McCoy story much more skeptically; thus giving increased weight to the contrary version of events suggested by the forensic evidence and Dano Young's testimony.

286.   Substantial trial evidence suggested that all of the suspects were involved, not just Young, and that Young was not the triggerman or ringleader in the homicides.  McCoy, for instance, testified that Page, not Young, took Douglas's money out of his wallet, burnt Douglas's ID and threw the wallet out of the car window after Douglas was killed, and then proceeded to confer with Young about where to dispose of the body.  (21 RT 118-20 (McCoy).)  This account suggests Page was much more involved in the Douglas homicide than he admitted.

287.   As to the Petrey shooting, Page was the only witness to the events in question.  Page claimed that he acted under duress from Young, but his account of Petrey's death was questionable.  Page admitted that he had multiple opportunities to escape from Young before and during the Petrey incident by driving away or calling the police, but he made no attempt to do so.  For instance, evidence showed that Page could have escaped during a thirty-minute interval while Young, Ray, and McCoy were inside a motel visiting an acquaintance, (26 RR 169-70 (Page), driven away in Douglas's car while Young drove Petrey's truck, or driven away while Young shopped in a 7-Eleven store and Page sat alone with the gun and the keys.  (24 RR 216-220 ; 275-278 (Kent Spencer); 26 RR 223-24 (Page).)  Moreover, Page's assertion that Petrey was shot from the right, and from a distance

of six to ten feet (27 RR 42, 96-98), contradicted forensic testimony that he was shot from the left from about six to eighteen inches away.  (26 RR 27-31 (Dr. Janice Townsend-Parchman).)[31]  Indeed, Dr. Townsend-Parchman testified that Petrey's head wound showed stippling and soot indicating a close-range shot.  (26 RR 34-36; State's Trial Exs. 100-101.)  Finally, Page's testimony that Young let him out of the car to turn himself in to the police, after Young, according to Page, just shot Petrey because Petrey "knew [their] names," (26 RR 248), is implausible on its face.  However, the jury must have credited Page's testimony over the forensic evidence.  It is at least reasonably likely that a different outcome would have occurred if the jury had reason to suspect Page's testimony was the result of self-serving hopes of a plea deal.[32]

288.   Accordingly, given the totality of evidence regarding the Petrey shooting, impeaching Petrey's credibility would have undermined the only evidence of the prosecution's version of how Petrey was shot and by whom.  Even aside from the fact that Page failed a polygraph examination where he denied shooting Petrey, (see Ex. 62 (Page Polygraph Test Results)), a jury disbelieving Page could have concluded that his implausible testimony was an attempt to cover

---

[31]  Moreover, Page's testimony that Young told Petrey "you got to die" before shooting him is inconsistent with crime scene photographs.  Had Young said this to Petrey, one would expect Petrey to have tensed up in the moment before he was shot.  Instead, the evidence showed Petrey's body lying perfectly relaxed on the ground, with one hand in his pocket. (State's Trial Exs. 80-82.) Even prosecutor Schorre noted that Petrey "apparently didn't flinch or reflex."  (26 RR 32.)

[32]  Additional evidence at trial showed that the state's investigation of the Petrey crime scene was shoddy, and could have further convinced the jury to reject Ray's and Page's testimony.   Midland County Sheriffs Office investigator Paul Hallmark, who handled the investigation, failed to secure the scene and overlooked evidence in plain view.  He noticed tire tread marks, but admitted that he was "just a layman as far as tire prints go" and not a scientist.  (24 RR 313; 25 RR 18.)  He made no casts of tires and did not collect rubber.  (25 RR 73-74.)  Although Hallmark did not find any gloves during his search of the crime scene, another officer later found gloves in a conspicuous location at the site.  (24 RR at 321-23; 25 RR 45,56.)  Hallmark missed a tire iron tool that was later found at the crime scene, (25 RR 57), failed to notice that there was a bullet in one of the fingers of one of the gloves, and admitted he made a mistake.  (25 RR 63-64.)

up his own involvement in the shooting.

289.   Second, because McCoy was not charged with any crime associated with the Douglas murder, it is reasonably likely that the evidence of inducements to Ray and Page would have led the jury to suspect that McCoy, too, had bargained with the State in exchange for his testimony.  Had Young's lawyers known of the inducements, they could have persuasively argued that a reasonable inference was that the State had given deals all around, including to McCoy.  Such an inference would have cast doubt on McCoy's testimony.  Indeed, Young's lawyers testified at the state evidentiary hearing on this claim that this is exactly what they would have attempted to show.  (2 RWR2d 108-09 (Williams); 2 RWR2d 195-99, 209 (Cantacuzene).)  The plea agreements would have been the centerpiece of both the defense's cross examination of McCoy and the defense closing argument:  all of the accomplices were lying to save themselves, and the State was complicit by granting them favors in exchange for their testimony.  With the prosecution's case resting on the three eyewitnesses (Ray, Page, and McCoy), the withheld impeachment evidence significantly undermines confidence in the jury's verdict against Young.

290.   Third, although McCoy's testimony about the Douglas homicide was largely similar to Page's and Ray's, there were some contradictions that the defense could have exploited had it known of the plea agreements.  For example, McCoy testified that Young held the gun in his lap, and shot Douglas from the right, which was inconsistent with Dr. Urban's testimony that the bullet that entered Douglas from the right did not have an upward trajectory.  (22 RR 298-99.)  Ray's contrary testimony was that Young held the gun aloft.  (22 RR 89, 91, 164, 166.)  Had the jury not believed Ray on this point because of his plea deal, the State's case would have hung more heavily on McCoy's much less plausible version of events.  McCoy also initially told police that the gun Young used was a chrome pistol, but changed his story at trial to say that the gun had a long barrel

and clip. (21 RR 161-62 (small chrome pistol), 21 RR 113 (long barrel and clip); 21 RR 163-64 (black pistol).)

291.    McCoy also testified at trial that, after Young shot Douglas, Young gave guns to the other occupants of the car -- a story that Ray flatly denied. McCoy's version supported the theory that the accomplices participated willingly. It also contradicted the prosecution's theory that Young supposedly held the other three men at gunpoint.  If true, Young presumably would not have handed out guns, which would have given them a chance to shoot him and escape. (21 RR 156 (McCoy); see also 22 RR 181-82 (Ray).)[33]

292.    Fourth, beyond impeaching Ray and Page, the plea agreements would have cast doubt on the reliability of *all* the State's witnesses against Young by raising the possibility that they, too, were negotiating deals with the prosecution. Patrick  Brook, who testified at the guilt phase that Young said he had killed Douglas (21 RR 246-254) faced criminal charges of his own, and had outstanding warrants at the time of the Douglas murder.  (*See* 21 RR 234 (Brook received a thirty-five-year sentence for armed robbery in summer 2002). At the time of the Douglas shooting, Brook was concerned about "a warrant that was going to send me to the penitentiary" and "warrants I already had." (21 RR 270.)

293.    The prosecutor compounded the prejudice from its withholding evidence of the plea negotiations by misrepresenting to the jury in closing argument that Page and Ray were also facing trial on charges against them. Despite knowing that Page and Ray planned to plead guilty, the prosecutor told the jury that Page was "charged with murder," that Ray was "looking at capital murder over in East Texas," and that both men were "going to have their day [in court]." (29 RR 25.)  The prosecution knew that none of these facts were true.  Yet, the

---

[33]  McCoy had also recently been investigated by law enforcement for sexually assaulting a fourteen-year-old girl, which undercut his credibility. (21 RR 193-94.)

prosecution's argument allowed the jury to credit Ray's and Page's testimony by thinking that they were gaining nothing from it.  Further, the jury felt more secure in convicting Young based on Ray's and Page's testimony because it they knew Young would not be the only accomplice to face the death penalty.[34]

294.   The undisclosed plea agreements with Ray and Page had a significant effect on the jury's overall impression of the evidence.  Even considered individually, Ray's and Page's dealings with the State each would have "seriously undermine[d] the testimony of a key witness on an essential issue." *East v. Johnson*, 123 F.3d 235, 239 (5th Cir. 1997) ("[W]hen 'the withheld evidence would seriously undermine the testimony of a key witness on an essential issue, or there is no strong corroboration, the withheld evidence has been found to be material.'").)  Because the undisclosed evidence could have reasonably cast the State's guilt phase case in an entirely different light, so as to undermine confidence in the verdict, *Kyles*, 514 U.S. at 435, Young is entitled to relief.

### c. Young was Prejudiced at the Punishment Phase

295.   The withholding of the plea agreements also prejudiced Young at the punishment phase.  Ray's and Page's guilt phase testimony, combined with that of

---

[34]   The law of parties does nothing to lessen the prejudice to Young from the state's nondisclosure of the inducements to Ray and Page.  Young's jury was instructed that, to find Young guilty of capital murder or murder of either Douglas or Petrey, it had to conclude that Young either (1) "intentionally or knowingly cause[d] the death" of the victims; or  (2) if another person actually killed the victims, Young "act[ed] with the intent to promote or assist the commission of" the murders.  *See* Jury Instructions, 5 CR 808-817 (requiring intentional or knowing killing, or "intent to promote or assist" another person in the offense of murder); Texas Penal Code § 7.02(a)(2) (requiring "intent to promote or assist the commission of the offense" to impose guilt for the conduct of another); *Pesina v. State*, 949 S.W. 2d 374, 382 (Tex. App. 1997) ("In order to establish liability as a party in addition to the illegal conduct by the primary actor, it must be shown that the accused harbored the specific intent to promote or assist the commission of the offense, *i.e.*, intentional murder.")  The jury was not instructed that it could find Young guilty of capital murder or murder on the basis of a conspiracy under Penal Code § 7.02(b).  Because the only evidence that Young intended to murder Douglas or Petrey, or knew they would be murdered, came from accomplices Ray, Page, and McCoy, the plea agreements would have constituted crucial impeachment evidence undermining that conclusion.

other witnesses whose testimony would have been called into question by the undisclosed inducements, painted Young as the actual shooter who forced his cohorts to participate by threatening them at gunpoint.  Such evidence was highly aggravating and relevant to the jury's assessment of the circumstances of the crime when it was deciding on the appropriate punishment.  The undisclosed plea agreements were thus material to the punishment phase.  *East*, 123 F.3d at 237-38 (failure to disclose criminal record of witness was *Brady* violation where the witnesses's testimony was a critical part of the State's case at the punishment phase).

296.   One of the questions the jury had to answer before sentencing Young to death was whether he actually killed Douglas or Petrey.  *See* Tex. Code Crim. Proc. Art. 37.071(2)(b)(2).  Additionally, the jury was obligated to "consider all evidence admitted at the guilt or innocence stage," including "the circumstances of the offense[.]"  Tex. Code Crim. Proc. Art. 37.071(2)(d)(1).  During the guilt phase Page, Ray and McCoy[35] painted a picture of Young as the ringleader behind their criminal activity: a cold-blooded killer who murdered his victims for no apparent reason and then essentially held his cohorts hostage to ensure they complied with his demands.

297.   Yet Young was the youngest of the four, and something of an outsider.  (22 RR 154 (Ray).)  Page was twenty-one, McCoy twenty-three or twenty-four, and Ray nineteen or twenty, while Young was just eighteen.  (21 RR 143 (McCoy); 22 RR 154 (Ray).)  Had the jury been given additional impeachment evidence, it is at least reasonably likely that it would have discredited Page and Ray and accepted the defense's argument that the accomplices blamed Young

---

[35]  McCoy testified to the events surrounding the Douglas shooting. As discussed above, McCoy's testimony was undercut on cross-examination and his credibility would have further been tarnished had the withheld evidence of the inducements to Ray and Page been disclosed. Therefore, his testimony would have had only minimal value as corroboration for that of Ray and Page.

because he had the lowest status in their group.[36]   Indeed, substantial mitigation evidence presented at trial -- including that Young lacked a positive father figure or role models growing up (*see, e.g.,* 30 RR 17, 22-23; 31 RR 226-27; 33 RR 129) -- demonstrated Young's susceptibility to manipulation and influence by older men, such as Page, McCoy, and Ray.

298.   As discussed above, Ray, Page and McCoy were the only witnesses other than Young who were at the scene when the murders of Douglas and Petrey occurred.  Throughout Ray's testimony, he depicts Young as the murderer and mastermind behind their journey.  (*See, e.g.*, 22 RR 89-126.)  Ray testified that Young shot Douglas in the head twice after saying, "Doyle, I need your car." (22 RR 89-90.)  According to Ray, Young then violently ordered the others to move Douglas's body into the trunk.  (22 RR 93-98.)  Ray also testified that Young forced him to kneel down and shoot Douglas in the head, claiming, "I was in a hostage situation." (22 RR 127, 177.)  The evidence that Ray's testimony was the product of inducements could have powerfully impeached this aggravating account.

299.   Page's testimony was also critical to demonstrating Young's conduct and the circumstances of the crime.  Page testified that Young shot Douglas in the head after saying he needed his car.  (26 RR 158.)  According to Page, Young began waiving his gun around and threatening Page, Ray and McCoy, saying "you're all in it as much as I am." (26 RR 162-63.)  Page corroborated Ray's testimony that Young forced Ray to shoot Douglas in the head.  (26 RR 176.)  Page then provided the only evidence that it was Young who shot Petrey.  (26 RR 246-48.)  As Young's attorney, Ian Cantacuzene, stated at the state evidentiary hearing

---

[36]   The State's withholding of impeaching evidence was particularly material given the weaknesses in some punishment phase evidence.  For example, the State presented testimony from Carlos Torres, who was the victim of a home invasion and robbery allegedly involving Young and Pat Brook.  On cross-examination, Torres admitted that "only one of them had a pistol" and that he told police only Brook carried a weapon.  (30 RR 83.)

on this claim, "David Page . . . was the critical witness in [the Petrey] case."  (2 RWR2d 195.)  The withheld impeachment evidence against Page was particularly material given that the trial court excluded evidence that Page had failed a polygraph exam when he was asked questions about who killed Petrey.  Had the jury been provided with evidence that an essential witness to both murders, and the only witness to one murder, had a strong incentive to give favorable testimony against Young, the Jury may have decided that the prosecution did not have credible evidence to establish that Young was responsible for both murders.  There is at least a reasonable probability that, had the Jury made such a finding, they would not have answered Special Issue Number 2 affirmatively and would not have sentenced Young to death.

300.   Similarly, had the jury learned Page and Ray were facing non-capital sentences (and Ray just five years), it might well have concluded that Young was being treated too harshly in comparison.  It was clear that Ray and Page shared at least some culpability for the crimes: indeed, Ray admitted to shooting Doyle Douglas in the head.  (22 RR 121-27, 178.)  Although Page denied shooting anyone, the prosecutor admitted that "all of them are hedging . . . to some degree," and that "[t]hey're all trying to cut down on their responsibility to some degree to make themselves look better."  (29 RR 25.)  The prosecutor even admitted that "David Page is up to his eyeballs in this case.  He was an actor from beginning to end with it."  (29 RR 18.)  Yet, by falsely telling the jury that Ray and Page would each "have their day" in court, the prosecutor prevented the jury from taking Ray's and Page's probable sentences into account when imposing punishment on Young.  (29 RR 25.)  Had the jury learned that the state had offered Mark Ray a deal of just five years, and Page just fifteen to thirty years, it is reasonably probable that it would have believed, as Juror Michael Byrne did, "that Mr. Young was being treated too harshly" in comparison, and that "Mr. Young was made the scapegoat for crimes that the others were also involved in."  (Ex. 101, Decl. of Michael

Duane Byrne, at ¶3.)  Such a conclusion by the jury would likely have affected their verdict at the punishment stage.

**5.     The State Court Order Is Unreasonable and Contrary to Clearly-Established Federal Law**

301.    The state court order meets the requirements of 28 U.S.C. § 2254(d), and should be reviewed by this Court *de novo*, because it is contrary to, and involves an unreasonable application of, clearly-established Supreme Court law, and rests on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d)(1), (d)(2).

**a.     The State Court Order is Contrary to Clearly-Established Federal Law**

**I.     The Clearly-Established Federal Law**

302.    Clearly-established Supreme Court case law holds that *Brady's* disclosure rule extends not only to formal agreements or "deals" between prosecuting attorneys and witnesses, but also to informal promises by a prosecutor that a potential prosecution witness may receive a benefit in exchange for his testimony.  *Bagley*, 473 U.S. at 683.  Such statements must be disclosed to the defense, because even an uncertain "possibility of a reward g[ives] [the witnesses] a direct, personal stake in [the defendant's] conviction."  *Id.*; *see also Giglio*, 405 U.S. at 154 ("evidence of any understanding or agreement as to a future prosecution would be relevant to" the "credibility" of a prosecution witness "and the jury [is] entitled to know of it").  In *Bagley*, the Supreme Court applied that rule to hold that the state was obligated to inform the defense that two government witnesses had been offered, but not promised, money for their testimony.  *Bagley*, 473 U.S. at 683-84.

303.    Circuit courts have similarly focused on whether a prosecutor's statement gives rise to a "possibility of reward," not whether an actual agreement has been reached.  The Fifth Circuit has held that "the crux of a Fourteenth

Amendment violation is deception.  A promise is unnecessary." *Tassin*, 517 F.3d at 778.  Not only is "an express agreement between the prosecution and a witness . . . possible impeachment material that must be turned over under *Brady*," but "[t]he existence of a less formal, unwritten or tacit agreement is also subject to *Brady*'s disclosure mandate."  *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008).  As such, *Brady* requires the disclosure of even "unspoken" mutual understandings between the prosecution and a witness that the prosecutor will "intervene[]" in the witness's pending criminal case, *id.*, or "give [the witness] a break on some pending criminal charge."  *Wisehart*, 408 F.3d at 323.  *See also Douglas v. Workman*, 560 F.3d 1156, 1186 (10th Cir. 2009) ("A deal is a deal - explicit or tacit.");  *Reutter*, 888 F.2d at 582 ("The fact that there was no agreement [between the prosecutor and prosecution witness] . . . is not determinative of whether the prosecution's actions constituted a *Brady* violation requiring reversal under the *Bagley* standard.")

304.   Additional clearly-established Supreme Court law requires courts to apply *Brady*'s materiality standard broadly when, as at Young's trial, the defense makes a specific request for the nondisclosed materials.  *Bagley*, 473 U.S. at 683.  In such situations, "[t]he reviewing court should assess the possibility" that the nondisclosure might have had an "adverse affect" on the preparation or presentation of the defendant's case "in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response."  *Id*.

305.   The Supreme Court has also set forth a standard for evaluating the materiality of suppressed evidence.  Under *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), the reviewing court must consider "whether the cumulative effect of the new evidence creates a reasonable probability of a different result at trial."  *Goudy v. Basinger*, 604 F.3d 394, 400 (7th Cir. 2010).  "A defendant need not demonstrate that after discounting the

94

inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* (quoting *Kyles*, 514 U.S. at 434.)

### ii.     The State Court's Contrary Rulings

### (1).     The State Misapplied *Brady*'s Standard for what Evidence Must be Disclosed

306.   The state court order on Young's claim is contrary to all three of the above rules.  First, the state court apparently concluded that *Brady* does not require disclosure of a prosecutor's statement to a potential witness regarding a possible plea deal unless the statement gives rise to an "express or implied plea agreement or understanding" with that witness.  (Order at 63.)  But the Supreme Court has made clear that *Brady*'s application does not hinge on an artificial distinction between "agreements" or "understanding[s]," on the one hand, and other types of statements on the other hand, but on whether the prosecutor's statements "held out the possibility of reward to its witnesses." *Bagley*, 473 U.S. at 683.

307.   Here, the state court found that Harrison County prosecutor Berry told Ray's defense attorney that Berry "probably would make [Ray] an offer that [Ray] could not refuse' on [Ray's pending criminal case] before [Young's] trial,"  (Order at 63), and that the statement "could have constituted a motive or inducement on the part of [] Ray for his testimony against Clinton Young."  (*Id.*)  Yet the state court apparently concluded that Berry's statement did not need to be disclosed under *Brady* because, in the court's view, it did not give rise to an "express or implied plea agreement or understanding."[37]  (*Id.*)  That conclusion contradicts *Bagley*'s rule that even noncommittal statements that a witness may benefit from his testimony create a "possibility of a reward [that] g[ive] [the witnesses] a direct,

---

[37]   The evidence presented at the evidentiary hearing established that Ray had an express agreement with the prosecution before Young's trial that he would receive a five-year plea deal in exchange for his testimony.  However, the state court unreasonably failed to credit this testimony, and did not make a factual finding to that effect.

personal stake in [the defendant's] conviction."   *Bagley*, 473 U.S. at 683.  Because the state court order applies a legal rule that contradicts the Supreme Court's prior holdings, it is "contrary to" clearly established federal law under 28 U.S.C. § 2254(d)(1).  *Ramdass v. Angelone*, 530 U.S. 156, 165-66, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).

> **(2).    The State Court Failed to Analyze the Effect the Undisclosed Evidence Would Have had on the Entire Trial**

308.    The state court order is also contrary to *Bagley's* separate requirement that courts analyze the effect the undisclosed evidence would have had on the preparation and presentation of the defense's case when the defense makes a specific, pre-trial request for exculpatory information.  Under the AEDPA, a state court acts contrary to federal law when it "add[s], delete[s], or alter[s] . . . a factor in a test established by the Supreme Court."  *Benn v. Lambert*, 283 F.3d 1040, 1052 n.5 (9th Cir. 2002).  Here, the state court effectively "delete[d]" a factor in the *Bagley* materiality test by failing to consider what effect disclosure of the inducements to Ray and Page would have had on the defense's approach to trial. In analyzing materiality, the state court simply purported to "eliminat[e] the [trial] testimony" of Ray and Page and list the remaining prosecution evidence presented. (*Id.*)   The state court failed to consider evidence that Young's trial counsel would have radically changed their entire trial strategy had they known about the inducements.  Young's trial counsel, Ian Cantacuzene, testified that the defense would have made the inducements a major theme at trial.  (2 RWR2d 197.)  For instance, the defense would have tried to "pick a jury that was more geared towards people who might be more skeptical of the accomplice witness," and changed the way it worked with its retained jury consultant expert.  (2 RWR2d 195-96).  *See also* (2 RWR2d 109) (similar testimony by co-defense counsel Paul Williams.)  The inducements would also "have taken a front seat in the . . .

[defense's] closing argument on the first stage of the trial."  (2 RWR2d 197).  The state court failed to consider this information, thus failing to apply the analysis required by *Bagley*.

**(3).**   **The State Court Erroneously Focused on Whether Sufficient Evidence Existed to Convict Young, Absent Ray's and Page's Testimony**

309.   The state court order also applied an incorrect standard by focusing on whether sufficient evidence existed to convict Young apart from the induced witnesses' testimony.  *Kyles*, 514 U.S. at 434.  (Order at 100-106.)  This is precisely what *Kyles* says courts should not do:   under *Kyles*, it is not necessary for a defendant to show that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Goudy*, 604 F.3d at 400.  By purporting to "eliminate" Ray's and Page's testimony and seeing what was left, the state court improperly focused on whether there was sufficient other evidence in the record to convict Young.  That approach is much different from considering what effect the inducements would have had on the jury's overall view of the case.  Indeed, evidence that the prosecution was offering inducements to two of its primary witnesses could have caused the jury to view the state's entire case with skepticism, and/or to suspect that additional prosecution witnesses had also been offered deals.  The state court's failure to apply the *Kyles* standard renders it contrary to clearly-established federal law under § 2254(d)(1). *Goudy*, 604 F.3d at 400 (state court opinion contravened *Kyle*s's cumulative materiality standard by focusing on whether the withheld evidence "conclusively establish[ed] [the defendant's] innocence.")

310.   The state court opinion also violates *Kyles*'s separate requirement that the reviewing court analyze prejudice from the suppressed evidence cumulatively, rather than item by item.  *Kyles*, 514 U.S. at 440; *Goudy*, 604 F.3d at 400.  In the portion of its order assessing prejudice from nondisclosure of the inducements to

Ray, the state court purported to "eliminat[e]" Ray's and Page's testimony, but actually continued to include Page's testimony in setting forth the remaining record evidence. (Order at 100-101.) Under a cumulative analysis, the state court should have concentrated on Ray's and Page's testimony together, and simultaneously assessed the prejudice from nondisclosure from inducements to both witnesses. *Goudy*, 604 F.3d at 400 (state court misapplied *Kyles* by analyzing the effect of each suppressed piece of evidence "in seriatim.")

> **(4).** **The State Court Improperly Attempted to Assess the Ultimate Truth or Falsity of Ray's and Page's Statements**

311.   The state court's materiality analysis further contravenes federal law by undertaking a post-hoc assessment of the truthfulness of the induced witnesses' trial testimony. According to the state court, the impeachment evidence was immaterial because Ray and Page's trial testimony implicating Young was, in the state court's view, consistent with their initial statements to police -- a fact that the state court concluded showed their testimony was truthful. (Order at 146-149.)[38] But under *Bagley*, whether or not information is material depends on how it would have affected the presentation of evidence at trial -- not on whether or not the reviewing court believes an induced witness testified truthfully as an absolute matter. Under such a standard, the prosecution could withhold information about plea deals offered to key witnesses, so long as, on habeas, it could present some other evidence to bolster the substantive truth of those witnesses' trial testimony. Neither *Bagley* nor its progeny employs such an analysis. By effectively "add[ing] a factor" -- ultimate truth or falsity -- to the *Brady/Bagley* materiality analysis, the state court acted contrary to clearly-established federal law. *Benn*, 283 F.3d at

---

[38]   As explained in subsection (E)(3)(g), below, this reasoning was incorrect even on its own terms, since both Ray's and Page's trial testimony differed significantly from their initial statements to law enforcement.

1052 n.5 ("[A]ddition" of a factor to a relevant legal test "constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of AEDPA.")

### b.  The State Court Order Involves an Unreasonable Application of Clearly Established Federal Law.

312.    Even assuming that the state court applied the correct legal standard under *Brady* and *Bagley* for when the prosecution must disclose inducements to potential witnesses, the state court unreasonably applied that clearly-established law to the facts of this case.  As a result, 28 U.S.C. § 2254(d)(1) does not constrain this Court from granting relief on the claim.

313.    A state court decision involves an "unreasonable application" of clearly established federal law if it identifies the correct legal principle but applies it to the facts in an "objectively unreasonable" manner.  *Williams (Terry) v. Taylor*, 529 U.S. 362, 409, 413, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  Here, the state court's determination that Berry's statements to Ray, and Schorre's statements to Page, were not inducements subject to *Brady*'s general disclosure rule cannot be reconciled with the Supreme Court's application of its own doctrine in *Bagley*, or with subsequent circuit court opinions.[39]

314.    In *Bagley*, the Supreme Court held that the prosecution must disclose any statement setting forth a "*possibility* of a reward," regardless of whether the statement constitutes an actual "promise."  *Bagley*, 473 U.S. at 683 (emphasis added).  Applying that rule, the Supreme Court held that the state was obligated to inform the defense that two government witnesses had been offered, but not promised, money for their testimony.  *Id.*  "The fact that the [witnesses'] stake [in the defendant's conviction] was not guaranteed through a promise or binding

---

[39]  Although the Supreme Court has stated that clearly established federal law refers to its own precedents, *see Williams (Terry)*, 529 U.S. at 412, circuit decisions remain relevant persuasive authority in determining whether a state court decision is objectively unreasonable under § 2254(d)(1).  *Duhaime v. Ducharme,* 200 F.3d 597, 600 (9th Cir. 1999).

contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction," the Court held.  *Id.*

315.   The Fifth Circuit applied the same reasoning in *Tassin*. 517 F.3d at 779.  There, the Fifth Circuit held that *Brady* was triggered where the trial judge told a  prosecution witness that he "typically gave defendants in [the witness's] position a fifteen-to-thirty-year sentence, but that he might shorten that sentence to ten years if [the witness] testified consistently [with her prior statements]."  *Tassin*, 517 F.3d at 779.  The witness's attorney, however, "emphasiz[ed] [to her] that nothing was guaranteed."  *Id.* at 779.   Similarly, in *United States v. Shaffer*, the Ninth Circuit held that a "tacit agreement" allowing a witness to avoid asset forfeiture liability in exchange for his cooperation with the government was "impli[ed]" by the government's failure to disclose that it knew he had acquired assets through drug profiteering, combined with its failure to pursue asset forfeiture proceedings against him.  *United States v. Shaffer*, 789 F.2d 682, 689 (9th Cir. 1986).

316.   Here, Berry's statement that he "probably" would make a Ray a favorable offer fits squarely within these holdings, because it held out the possibility of reward to Ray in exchange for his testimony.  Like the judge's statement in *Tassin* that he "might" shorten the witness's sentence, Berry's statement to Ray that he would "probably" make him a favorable offer provided an incentive for Ray to assist in Young's prosecution.  As in *Bagley*, the fact that the government's promise to Ray was not guaranteed only strengthened the incentive to Ray to aid the government's case.  *Bagley*, 473 U.S. at 683.  Because Berry's statement "contain[ed] at least an implication that the Government would reward the cooperation of the witness," *Giglio*, 405 U.S. at 153 n.4, the state court acted unreasonably by failing to conclude that the state was required to disclose it under

100

*Brady*.[40]

317.   The same is true of Schorre's statements to Page and his attorney, Leverett, that Page might receive a deal for fifteen to thirty years if he testified against Young.  (Order at 126.)  The evidence showed that Schorre told Leverett that the case against Page could be resolved "around thirty years, and in any event, no less than fifteen years[.]," (2 RWR2d 31) on two conditions:  that Page pass a polygraph examination absolving him of culpability, and that he testify against Young.  (*Id.*)  After Page failed the polygraph exam, the District Attorney informed Page's attorney that to now avoid a capital murder charge Page must "come clean." (Order, at 129, citing Second Writ Hearing, state's ex. 34)  The parties then continued to discuss the case and Page's testimony against Young.  (*See* 2 RWR2d 91.)  Indeed, even though Page failed the polygraph Leverett reported to Page that "the D.A. is 'talking about,' but not committing to a 30 year plea offer in your case."  (Order at 128-29.)  Accordingly, as Leverett testified at the hearing, the polygraph results "ceased to be a condition of the deal," (2 RWR2d 91), with "the only open questions [being] what the final offer would be, in terms of years, and whether Page would accept that plea offer."  (Second Writ Hearing, app. ex. 6, ¶ 5.)  Corroborating Leverett's hearing testimony, and not mentioned by the state court, is a letter drafted by Leverett before Young's trial, stating that "Al Schorre discussed a plea bargain offer 'in the thirty-five year range,' in exchange for Page's testimony as a State's witness against Clint Young."  (Second Writ Hearing, app. ex. 8.)

318.   All the evidence relied on by the state court, including the above, shows that Page testified against Young under a belief -- created by the

---

[40]   Although an actual "understanding" between Ray and the government is not required to bring the prosecutor's statements within *Brady*'s disclosure requirement, see subsection (E)(1)(a), above, Berry's statements to Ray did give rise to an understanding with Ray that Ray stood to benefit from his testimony for the prosecution at Young's trial.

prosecutor's statements -- that he might receive a favorable plea offer in exchange for his testimony.  The fact that there was no firm promise is irrelevant.  Indeed, as in *Bagley*, the fact that the state delayed making Page a concrete offer until after Page testified against Young only strengthened Page's incentive to testify favorably for the state.   Schorre's statement that "we could look at 30 years . . . [depending] on how the case unfolds," (Order at 126), is similar to the judge's statement in *Tassin* that he "typically gave defendants in [the witness's] position a fifteen-to-thirty-year sentence, but that he might shorten that sentence to ten years if [the witness] testified consistently [with her prior statements]."  *Tassin*, 517 F.3d at 779.  By focusing on whether a firm offer or "deal" was made before Young's trial, (*see, e.g.*, Order at 127), the state court unreasonably misapplied *Bagley*.

### c.    The State Court's Order Rests on Unreasonable Determinations of the Facts

319.    The state court's order also rests on several unreasonable factual determinations.  Under 28 U.S.C. § 2254(d)(2), a factual finding is unreasonable when the state court fails to make any finding at all on a particular issue.  *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  Section 2254(d)(2) is also satisfied when "the state court does make factual findings, but does so under a misapprehension as to the correct legal standard."  *Id.* at 1001.  Finally, § 2254(d)(2) is satisfied when the state court's opinion is unsupported by sufficient record evidence, such that its factual findings are "objectively unreasonable in light of the evidence presented in the state-court proceeding."  *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); 28 U.S.C. § 2254(d)(2).  Section (d)(2) is similarly satisfied when the state court's decision "rests upon fact-finding that ignores the clear and convincing weight of the evidence."  *Morgan v. Hardy*, 662 F.3d 790, 801 (7th Cir. 2011).  "A state court's fact-finding may qualify as unreasonable where 'the state court . . . had before it, and apparently ignored,' evidence supporting the habeas petitioner's claim."  *Simmons v. Beard*,

590 F.3d 223, 237 (3d Cir. 2009)  (citing *Miller El*, 537 U.S. at 346); *see also*
*Taylor*, 366 F.3d at 1008 (same).  Here, the state court's factual determinations are
unreasonable on each of these grounds.

> ### i.   The State Court Failed To Make Findings On Crucial Factual Issues.

320.   The state court issued only ten factual findings -- seven as to Ray and
three as to Page -- each of which addressed the ultimate issues of whether Ray and
Page had "agreement[s] or understanding[s]" with the state and whether they
testified falsely that they had none.  (Order at 63, 123-24.)  The trial court failed to
make any factual findings as to most of the specific evidence presented at the
hearing on Young's claim, including whether Berry offered Ray a series of plea
deals ranging from sixty years to five years, whether Ray accepted a five-year plea
deal before Young's trial, whether Berry affirmed that five-year deal at a lunch
during the trial, whether prosecution investigator J.D. Luckie told Ray his five-year
deal was still in effect the morning before Ray testified, and whether prosecutors
offered to "help" David Page in connection with his criminal case, as Page said
they did in a letter to his mother.  Nor did the state court make any findings
regarding witnesses' credibility.

321.   While "the state courts are not required to address every jot and tittle
of proof suggested to them," or "make detailed findings addressing all of the
evidence before [them]," they cannot "overlook[] or ignore[] evidence [that is]
highly probative and central to [the] petitioner's claim." *Taylor*, 366 F.3d at 1001.
Here, the state court  failed to make any findings on key categories of evidence on
which Young's *Brady* claim hinged.  Indeed, the state court's conclusion that Ray
had no "agreement or understanding" with the state flatly contradicted its
concurrent finding that Berry told Ray that he would probably make Ray an offer
he couldn't refuse, and that this offer "could have constituted a motive or
inducement" on Ray's part for his testimony against Young.  (Order at 63.)  These

deficiencies render the state court order unreasonable under 28 U.S.C. § 2254(d)(2).

> ## ii.  The State Court Made its Factual Determinations Under a Misapprehension as to the Correct Legal Standard.

322.   The state court's factual findings are also unreasonable under 28 U.S.C. § 2254(d)(2) for the separate reason that they are based on an incorrect legal standard.  "Where the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable and no presumption of correctness can attach to it." *Taylor*, 366 F.3d at 1001.  As explained at subsection (D)(1)(a), above, the state court apparently believed that any statement by the prosecution to a potential prosecution witness cannot violate *Brady* or *Bagley* unless it constitutes an "express or implied plea agreement or understanding." (Order at 63.)  The Supreme Court has made clear, however, that *Brady*'s application does not hinge on an artificial distinction between "agreements," "understanding[s]," and other types of statements, but on whether the prosecutor's statements imply that the witness will receive a reward in exchange for his testimony.  *Bagley*, 473 U.S. at 683.  This legal error pervades the state court's factual findings and renders them unreasonable under § 2254(d)(2).

> ## iii.  The State Court's Order is Internally Contradictory

323.   The state court order is also internally inconsistent.  The state court found that "there was no express or implied plea agreement or understanding between Mark Ray and the State with respect to the charges pending against [Ray] in Harrison County[, Texas,] at the time that Mark Ray testified against Clinton Young." (Order at 63).  That conclusion contradicts the state court's own, separate, findings that Berry told Ray that "he probably would make [Ray] an offer that he could not refuse' on [Ray's pending criminal case] before the trial of Clinton Young," and that this statement could have constituted a "motive or

inducement" for Ray's testimony against Young.  (Order at 63.)  Having found that Berry made the statement, the state court could not logically conclude that Ray did not have any "express or implied plea agreement or understanding" with the prosecution at the time of Young's trial.  Berry's statement clearly established such an understanding.  Indeed, the fact that Maxwell's log entry recorded that statement along with a simultaneous statement from Berry that the prosecution "[was] going to need MARK to testify for them" shows that the potential for a favorable deal was conditioned on Ray aiding the state's case at Young's trial.  (Second Writ Hearing, app. ex. 1.)

324.  Equally illogical is the state court's finding "that the testimony of Mark Ray at the trial of Clinton Young that 'he has not received any kind of deal, any kind of promise, an[y] kind of favor from any District Attorney's Office or anyone in exchange for [his] testimony today' (R.R. 22 p.146) was true."  (Order at 63.)  This finding contradicts the evidence.  Ray himself testified at the evidentiary hearing that he did not tell the truth at Young's trial when he testified that he had not received any deal, promise, or favor in exchange for his testimony.  (3 RWR2d 214.)  There is no plausible reason Ray would falsely admit to committing perjury.  Ray's mother also testified that her son's testimony that he had not "received any kind of deal, any kind of promise, any kind of favor from any district attorney's office or anyone in exchange for [his] testimony" was inconsistent with the information she had received about Ray having a plea deal for five years.  (5 RWR2d 21.)

325.  Moreover, the state court's finding that Ray did not testify untruthfully squarely contradicts its own finding that Berry told Hurlburt he would "probably would make [Ray] an offer that [Ray] could not refuse."  (Order at 63.)  If, as the state court found, that statement was conveyed to Ray, then it was not true that Ray had not received any "deal, promise, or favor" in exchange for his testimony.

iv.   **The State Court 's Order Ignored Evidence Regarding Mark Ray's Dealings with the Prosecution, and was Against the Clear and Convincing Weight of the Evidence.**

326.   The state court also ignored significant evidence, including testimony by the state's own witnesses, that cast doubt on Berry's testimony that he never extended plea offers to Ray before Young's trial.  Given Berry's strong motive to lie, and the significant evidence contradicting his account, it was unreasonable for the state to simply accept his testimony without explanation.

327.   Mark Ray testified, and Berry denied, that the state made Ray a series of plea offers ranging from 60 years to 5 years.  Ray testified that those negotiations culminated, before Young's trial, in an agreement that Ray would receive a five-year prison sentence in exchange for his testimony.  (2 RWR2d 138-146, 186, *see also* Second Writ Hearing, app. ex. 2 (Ray Declaration).)  Ray's testimony was corroborated by his mother, as well as his defense attorney's investigator, James Maxwell.  Maxwell testified that he (Maxwell) stopped working on the case after Ray's attorney, Hurlburt, told Maxwell to cease the investigation because the prosecutor's office had told him it was going to offer Ray a plea deal.  Maxwell's testimony and investigation log, as well as testimony from Ray's attorney, Hurlburt, confirm this account. (2 RWR2d 15-17; 3 RWR2d 74; Second Writ Hearing, app. ex. 1, at 3.)

328.   Berry testified that he never made Ray the plea offers to which Ray testified.  The state court apparently credited this testimony.  In the section of its order entitled "The Basis of the Court's Findings on the Alleged Plea Agreement or Deal with Mark Ray," the state court sets forth Berry's testimony that he did not have plea discussions with Ray or Hurlburt (Order at 85, 87), that he did not have discussions with Hurlburt "about any kind of deal or about this situation," and that he never spoke to Mark Ray about testifying before Young's trial. (Order at 84, 85-

106

88, 90).

329.   In crediting Berry's testimony, the state court failed to consider or mention contrary testimony from a key state witness, Joe Black.  Black testified that Berry admitted to having met with Ray and Hurlburt before Young's trial -- something Berry testified at the evidentiary hearing he did not do. (3 RWR2d 64-65.)  The fact that Black, who had every incentive to rebut Ray's account, actually impeached Berry lends powerful support to Ray's version of events. The state court did not set forth any of Black's testimony in reciting the basis for its findings regarding Ray.

330.   The state court also ignored contradictions between Berry's testimony and that of Hall Reavis, a Harrison County Sheriff's Department investigator who worked on Young's case.  Berry testified that he had only minimal involvement in Young's case during the pre-2003 time period when Ray says Berry made him plea offers.  (5 RWR2d 61, 114-115.)  Yet Reavis testified that Berry did work on Ray's case during that period. (6 RWR2d 58-59.)   Indeed, it is undisputed that Berry himself prosecuted part of  Young's case in 2003.  The state court did not address or mention Reavis's testimony on this point in setting forth the basis for its conclusions.

331.   The state court also failed to mention or discuss evidence that Ray's attorney, Hurlburt, did only minimal work on Ray's case -- a fact that strongly suggests Hurlburt received early assurance from Berry that Ray would not go to trial.  (2 RWR2d 18; 3 RWR2d 124-25.)  Evidence at the evidentiary hearing showed  that Hurlburt only spent fifteen and a half hours working on Ray's case between December 3, 2001 and March 22, 2002.  (3 RWR2d 124-25.)  In addition, Maxwell testified that the two months he spent on the case was atypically short for a murder case.  (2 RWR2d 18.)  In a typical murder case, Maxwell would have conducted a more in-depth investigation.  (2 RWR2d 17-18.)  Maxwell's log shows that Maxwell conducted only a handful of interviews on Ray's case:  he

interviewed Ray and his parents, McCoy, and Ray's sister, Beth.  He also made a copy of the Harrison County District Attorney's case file, met with Hurlburt, and watched video statements by Ray.  (Second Writ Hearing, app. ex. 1.)  The log did not indicate that Maxwell talked with Page or interviewed any other witnesses. (Second Writ Hearing, app. ex. 1.)  Ray testified that, in a later visit, Hurlburt told Ray that Maxwell's services were no longer needed because Maxwell had "done his job" and "we're going to plea bargain him." (2 RWR2d 137.)  The state court failed to include any of this evidence in the basis for its findings regarding Mark Ray's agreement or deal with the state.  (Order at 63-99.)

332.    The state court's omissions are particularly significant because Berry, as the state court acknowledged, had a significant motive to testify falsely in order to preserve the state's victory at Young's trial and avoid a scandal.  Berry admitted at the evidentiary hearing that, if he were found to have made a deal with Ray that he failed to disclose to the defense, it could be the basis for a referral to the State Bar of Texas and he could lose his law license, be disciplined, and face prosecution for perjury.  (Order at 86.)  His professional and personal reputation could suffer. (*Id.*)  Ray, by contrast, had no incentive to testify falsely because, by the time of the evidentiary hearing, he had already been released from prison.  (2 RWR2d 155.)  Ray's mother, who corroborated Ray's testimony, also lacked any incentive to testify falsely.  In light of the conflicts between Berry's testimony and that of other state witnesses with no incentive to lie, it was unreasonable for the state court to credit Berry's testimony without explanation or discussion.

333.    Additional inconsistencies, ignored by the state court, were provided by Midland County District Attorney Al Schorre.  Schorre testified for the state that Harrison and Midland County prosecutors agreed before Young's trial that "we were not making any deals or any offers [to any witnesses] on [Young's, Ray's, and Page's] cases." (3 RWR2d 252.)  The state court set forth that testimony as fact.  (Order at 125 ("A meeting was held between the prosecutors of

Midland County and the prosecutors of Harrison County, Texas and Rick Berry in March 2002 after the election for District Attorney in Harrison County, Texas . . . in which the prosecutors agreed that they were not going to make or offer any plea deals to witnesses.").)  But the record shows otherwise.  Black, the Harrison County District Attorney who took office after Berry, testified at a pretrial hearing that he *had* offered a different guilt phase witness, Patrick Brook, a twenty-year plea deal in exchange for his testimony against Young.  (2 SRR 130; Order at 52.)  Josh Tucker, a punishment phase witness against Young, also received a plea deal.  (Order at 52.)   Indeed, Berry himself testified that after Black won election as Harrison County District Attorney, Berry and Black agreed that "any type of negotiations or planning would be . . . between Mr. Black and Mr. Schorre about what type of dispositions would be taking place" with respect to Mark Ray.  (5 RWR2d 92-93.)  That statement flatly contradicts Schorre's assertion that the prosecutors agreed not to extend any deals.  The state court's order fails to mention this conflict, or the fact that the evidence clearly shows that prosecutors did have a strategy of negotiating with potential state's witnesses.

334.   "Failure to consider key aspects of the record is a defect in the fact-finding process." *Taylor*, 366 F.3d at 1008 (citing *Miller El*, 537 U.S. at 346).  When evidence supports one of two conflicting versions of events, "[a] rational fact-finder might discount [the evidence] or, conceivably, find it incredible, but no rational fact-finder would simply ignore it." *Id.* at 1006.  Moreover, a state court decision is unreasonable under § 2254(d)(2) if it "rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Morgan*, 662 F.3d at 801.  Here, it was objectively unreasonable for the state court to credit Berry's testimony without addressing -- or even mentioning -- the substantial evidence that undermined it.  The state court's conclusion that Ray did not have any "express or implied agreement or understanding" with the State ignored the clear and convincing weight of the evidence to the contrary, including testimony by multiple

witnesses -- Mark Ray, Carolyn Ray, and Maxwell -- who had no incentive to lie.

> **v.    The State Court Unreasonably Relied on Hurlburt's Characterization of the Prosecutor's Statements**

335.    In the section of its order titled "The Basis of the Court's Findings on the Alleged Plea Agreement or Deal with Mark Ray," the state court set forth at length the testimony of Ray's attorney, Richard Hurlburt, that Hurlburt did not regard Berry's statement about an "offer that [Ray] could not refuse" as a "plea bargain agreement," "offer," or "promise" because it did not contain details:   it did not specify "whether the offer was going to be aggravated or not aggravated or how many years," and Berry did not "make any promises."  (Order at 65, 79-82  .)  The state court apparently relied heavily on Hurlburt's belief that the vagueness of Berry's statement precluded it from being a deal, offer, or promise.  Indeed, the state court set forth that testimony multiple times, in two separate places in the same section of its order.  (Order at 65, 79-82.)

336.    It was unreasonable for the state court to rely on Hurlburt's subjective characterization of Berry's statement.  Whether or not Hurlburt characterized Berry's statement as a "plea bargain agreement," "offer," or "promise" is irrelevant to the fact that the statement held out the possibility of a benefit on Ray -- which is all that is needed to bring the statement within *Brady*'s disclosure rule.. *See, e.g.*, *Bagley*, 473 U.S. at 683 (absence of "promise or binding contract" did not remove the state's duty to disclose its suggestion that witnesses would benefit in exchange for their testimony); *Tassin*, 517 F.3d at 778 ("A promise is unnecessary.")  Moreover, as explained above, Hurlburt's belief that a lack of specific terms meant that there was no deal or offer in the *Brady* sense contradicts well-established federal case law.  *Bagley*, 473 U.S. at 683; *Tassin*, 517 F.3d at 778.  By relying on Hurlburt's erroneous judgment as to the legal significance of Berry's statements, the state court acted unreasonably under § 2254(d)(1) and (d)(2).

> **vi.    The State Court Ignored Facts Regarding David Page**

337.   The state court also failed to consider evidence bearing on inducements from the prosecution to Page.  In its order, the state court concluded "that there was no express or implied plea agreement or understanding between David Page and the State with respect to the charges pending against [Page] in Midland County, Texas or Harrison County, Texas or elsewhere at the time that David Page testified against Clinton Young."  (Order at 123.)  In doing so, the state court apparently relied on Schorre's testimony that, in a February 2002 meeting -- more than a year before Young's trial -- "Mr. Schorre neither said anything or did anything that 'would reasonably imply' that he was going to offer David Page 30 years in prison for the offense of aggravated kidnapping."  (Order at 126-127.)

338.   In reaching this conclusion, the state court ignored a letter drafted pre-trial by Leverett stating that "Al Schorre discussed a plea bargain offer 'in the thirty-five year range,' in exchange for Page's testimony as a State's witness against Clint Young."  (Second Writ Hearing, app. ex. 8.)  This letter makes clear that, by the time of Young's trial, there was a quid pro quo understanding between the prosecution and Page that Page stood to benefit from his testimony.  The state court's order does not mention this letter -- an omission that renders its findings regarding Page unreasonable under § 2254(d)(2).  *Taylor*, 366 F.3d at 1008.

## vii.   The State Court Made Unsupported Findings Regarding Materiality.

339.   The state court's findings on materiality are equally unsupported.  As to both Ray and Page, the state court found "no reasonable probability that had [evidence of the prosecutor's inducements] been disclosed to the jury, the outcome of the trial would have been different."  (Order at 100, 140.)  In reaching this conclusion, the state court found "no other evidence or indication that [Page's and Ray's] trial testimony was false" and that their testimony was "consistent with all of the other evidence and testimony admitted in the trial."  (Order at 149.)  That finding contradicts the record.

340.    Contrary to the state court order, "all of the other evidence and testimony" at Young's trial did not support Ray's and Page's accounts.  As to the Douglas killing, Ray's and Page's testimony conflicted with abundant forensic evidence that Young's jury could have chosen to believe had it learned of the inducements to Ray and Page.  Whereas Ray and Page testified that Young shot Douglas inside a car from the right, at close range, forensic data showed Douglas was shot once in the right side, once in the left side, and once in the back of the head, from more than three or four feet away.  (22 RR 264-70; 288-96; 303-04; State's Trial Ex. 12.)  An expert testified that the shots from the right and the left could have been fired from locations where people other than Young were located.  (22 RR 290-96.)  A lay witness, Dano Young, further supported this scenario by testifying that Ray confessed that "they all" -- not just Young -- shot Douglas.  (21 RR 315.)  Ballistics evidence cast further doubt on Ray's and Page's testimony.  (22 RR 285; 25 RR 161-62.)

341.    Page's testimony as to the Petry killing also conflicted with other evidence presented at trial.  Although Page claimed that he acted under duress from Young, he admitted he had multiple opportunities to escape from Young before Petry was killed, but made no attempt to do so.  (26 RR 169-70.)  Page's assertion that Petrey was shot from the right, and from a distance of six to ten feet (27 RR 42, 96-98), contradicted forensic testimony that he was shot from the left from about six to eighteen inches away.  (26 RR 27-31 (Dr. Janice Townsend-Parchman).)  In addition, Page's testimony that Young told Petrey "you got to die" just before pulling the trigger contradicted forensic testimony, (26 RR 34-36, 48-49; 27 RR 42, 96-98, State's Trial Exs. 100-101) as well as a crime scene photograph showing Petrey's body lying perfectly relaxed on the ground, with one hand in his pocket.  (State's Trial Exs. 80-82.)  Even prosecutor Schorre noted that Petrey "apparently didn't flinch or reflex," as he would have done if, as Page testified, Young had told Petrey "you got to die" before shooting him.  (26 RR 32.)

342.   The state court's determination that no prejudice existed because there was overwhelming evidence of Young's guilt absent Ray's and Page's testimony is, therefore, unsupported by the record.  In fact, without Ray's and Page's testimony, the State's case would have relied heavily on the questionable testimony of McCoy, which conflicted with other evidence.  While McCoy testified that Young held the gun in his lap and shot upwards from the right, an expert testified that the bullet that entered Douglas from the right did not have an upward trajectory.  (22 RR 299.)  McCoy's credibility was also highly suspect.  (21 RR 161-62, 21 RR 113; 163-64, 193-94.) Had evidence of Ray's and Page's plea agreements been disclosed, Young's counsel could have persuasively argued that a reasonable inference was that the State had given deals to each accomplice, including McCoy, who was never even charged with a crime related to the Douglas or Petrey homicides.  (*See* 2 RWR2d 108-09; 2 RWR2d 195-99, 209.)

343.   Regarding the Petrey killing, the only evidence cited by the state court outside of Page's testimony is the fact that two of the bullet fragments found in Petrey were consistent with the gun found in Young's possession.  (Order at 142-43.)  But the evidence at trial showed that the gun changed hands among the accomplices throughout the day in question.  Indeed, this single piece of circumstantial evidence would not have sufficed to meet the state's burden of proof as to the Petrey homicide.  An equally plausible inference from this fact alone is that Page, when he exited the scene after Petrey was shot, left the murder weapon with Young, who was later apprehended with it in his possession.

344.   Finally, the state court opined that the undisclosed plea bargains were not material because "with no material exceptions, [Ray's and Page's] trial testimony remained consistent with their earlier statements."  (Order at 148.)  But that, too, is incorrect.  As the state court acknowledged, Page's initial statement to authorities "was a lie."  (Order at 119.)  Page initially said that Young shot

Douglas in his head by the creek, but later changed his story to implicate Ray. (*Id.*)  Page also admitted at trial that he "lied" to the police by saying Young was the only one who had the gun, when Ray and McCoy each had guns as well.  (27 RR 110-11.)  And Page did not mention in his initial November 26, 2001 statement that Young had supposedly threatened him (27 RR 27, 29), but he changed his story on this point at trial.  (27 RR 28.)  Finally, Page told investigators that Young shot Petrey in the right side of his head, but later said he was wrong when confronted with evidence that Petrey was shot in the left side of the head.  (27 RR 43-44.)

345.   Ray's trial testimony also diverged significantly from his initial statements.  Ray initially told police four times that Young shot Douglas at the creek, before finally admitting that he himself was the shooter.  (22 RR 228.)  Ray also told police that Young was the only accomplice with a gun while acknowledging at trial that this was a lie.  (22 RR 234.)  The state court's finding that Ray and Page stuck by the truth of their initial statements was thus unreasonable in light of the evidence presented.

346.   Finally, the state court's discussion of what evidence would have supported Young's guilt after "eliminating" Ray's and Page's testimony is invalid and unreasonable even on its own terms.  In the portion of its Order that purports to discuss the prosecution evidence that would remain after "eliminating" Page's testimony, the state court continues to rely on Page's testimony to show that Young would still be found guilty.  (Order at 100-102.)  Thus, the state court not only failed to consider relevant materiality factors under *Bagley* (see section D(1)(b), above), but it failed to correctly apply its own erroneous standard.

347.   For these reasons, the state court's conclusion that nondisclosure of any plea agreements was not material was incorrect and unreasonable.

###### viii.   The State Court Ignored Evidence Relevant to the Materiality Analysis

348.   The state court order is further unreasonable because it ignored testimony by Young's trial lawyers about the effect that the undisclosed information would have had on their trial preparation and strategy.  At the state evidentiary hearing, trial counsel Williams and Cantacuzene testified that, had they known of the inducements to Ray and Page, the defense would have changed its entire approach to the trial.  In voir dire the defense would have tried to " pick a jury that was more geared towards people who might be more skeptical of the accomplice witness," and that the inducements would have changed the way the defense worked with its retained jury consultant expert.  (2 RWR2d 195-96; s*ee also* 2 RWR2d 109 (similar testimony by co-defense counsel Paul Williams).)  The inducements would also "have taken a front seat in the . . . [defense's] closing argument on the first stage of the trial."  (2 RWR2d 197).  The state court ignored this information, which it was obligated to consider in its materiality analysis under Bagley.  Consequently, the state court's materiality findings are based on unreasonable determinations of fact under section 2254(d)(2).  *Taylor*, 366 F.3d at 1008 (*citing Miller El*, 537 U.S. at 346.)

###### d.   The State Court failed to Address Young's Separate Confrontation Clause Claim

349.   In Claim IE of his Second Subsequent Application, Young alleged that "the State deprived [] Young of his right to confront witnesses when it instructed Mark Ray not to reveal his plea agreement when he testified at Young's trial."  (Second Subsequent Application at Claim IE, page 47.)  He made the same allegation as to Page.  (*Id.* at page 47 n. 17.)  Young addressed this claim in an Amended Proposed Findings of Fact and Conclusions of law, which he filed with the state court on or about December 22, 2010.  The state court made no ruling on this claim, and did not address it in its order.  Consequently, the state court did not

115

adjudicate this claim on the merits and the claim is not subject to §2254(d).  *See*
*Cullen v. Pinholster*, 563 U.S. __, 131 S. Ct. 1388, 1400, 179 L. Ed. 2d 557
(2011).

## D.   THE PROSECUTOR KNOWINGLY PRESENTED FALSE TESTIMONY THAT THERE WERE NO DEALS OFFERED TO MARK RAY OR DAVID PAGE

350.   As discussed above, the prosecution went beyond just failing to
disclose evidence that Ray and Page were offered inducements for their testimony.
Rather, the prosecution affirmatively and knowingly presented, and failed to
correct, false evidence by eliciting from Ray and Page that they had received no
favors, promises, or inducements in exchange for their testimony.  As a result,
Young's conviction was obtained using false testimony that the prosecution knew
was erroneous.

351.   A conviction obtained using knowingly perjured testimony violates
due process.  *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 79 L. Ed. 791
(1935); *Alcorta v. Texas*, 355 U.S. 28, 31, 78 S. Ct. 103, 2 L. Ed. 2d 9 (1957) (due
process violated when prosecution allows jury to be presented with a materially
false impression).  A state denies a criminal defendant due process when it
knowingly uses perjured testimony at trial or allows false testimony to go
uncorrected.  *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996) (citing *Giglio*,
405 U.S. 150); *United States v. Barnham*, 595 F.2d 231, 240-41 (5th Cir. 1979).

352.   The prohibition against the use of false testimony applies even when
the testimony in question is relevant only to the witness's credibility.  *Napue*, 360
U.S. at 269.  Indeed, "[t] he jury's estimate of the truthfulness and reliability of a
given witness may well be determinative of guilt or innocence, and it is upon such
subtle factors as the possible interest of the witness in testifying falsely that a
defendant's life or liberty may depend."  *Id*.

353.   To prevail on a claim based on *Napue*, the applicant must show (1) the

testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material.  *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007); *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998).  False evidence is material if "there is any reasonable likelihood that [it] could have affected the jury's verdict." *Goodwin v. Johnson*, 132 F.3d 162, 185 (5th Cir. 1997).

354.    The State wilfully presented false testimony at Young's trial and pretrial  hearing, in violation of *Napue*.  At the January 21, 2003 pretrial hearing, Berry falsely testified that he was "unaware of any deals with any witnesses," and "ha[ d] not participated in any type of plea negotiations" with Ray.  (2 SRR at 109-10.) Later on January 21, 2003, Harrison County District Attorney Joe Black testified that he was not aware of any deals being made with Ray.  (2 SRR at 124, 127, 130-31.)  Berry, as an agent of the state, had a duty to correct the false impression created by Black's testimony.  Indeed, Berry was well aware that the Harrison County District Attorney's office had been engaging in plea negotiations, and making plea offers, to Ray for several months, and had reached an unwritten plea agreement with him.  Yet Berry failed to set the record straight before the jury and allowed the misleading testimony to stand.

355.    The prosecution continued to elicit false testimony at trial.  During Ray's direct examination, he was asked by the prosecutor whether he had "received any kind of deal, any kind of promise, any kind of favor from any District Attorney's Office or anyone in exchange for your testimony today?"  Ray answered, "None whatsoever, sir."  (22 RR 147.)  The defense then asked Ray on cross-examination whether the state had any leverage over him with respect to his testimony, and Ray denied any such leverage.  (22 RR 240.)

356.    Similarly, the prosecutor asked Page whether he had received "any kind of an agreement to give you any particular sentence," to which Page responded, "No, ma'am."  (26 RR 257.)  On cross-examination, Page further

117

testified that he had not been offered any type of deal or agreement by the state in exchange for his testimony.  At one point, Page testified that "[t]hey haven't came [sic] to me with anything." (27 RR 127, 130-31.)

357.   For the reasons set forth above and incorporated herein by reference, these assertions were false; because the prosecutors knew that they had bargained with Ray and Page, the elicitation of the false testimony was willful.  *See Supra* at Sec. II(A), II(B).  Moreover, for the reasons set forth above at subsection II(D), had the prosecution not deliberately presented the false evidence that Ray and Page had no inducements offered by the State to testify against Young, it is at least reasonably probable that the outcome of Young's trial would have been different.

## E.   THE PROSECUTOR VIOLATED YOUNG'S CONFRONTATION CLAUSE RIGHTS BY DELAYING THE SIGNING OF PLEA AGREEMENT[41]

358.   The State's decision to delay the signing of Ray's and Page's plea agreements with the prosecution until after Young's trial, and its express instructions to Ray not to disclose the plea deal he had entered into, deprived Young of his Sixth and Fourteenth Amendment right to rebut the State's evidence through cross-examination.

### 1.   Legal Standard

359.   The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to be confronted with the witnesses against him.  *See Pointer v. Texas*, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).  Included in the Sixth Amendment is the "right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965).  Indeed, clearly

---

[41]   The state court never adjudicated the merits of Young's confrontation clause claim despite the claim being fairly before the state court.  As a result, this Court's ability to grant relief on this Claim is not constrained by 28 U.S.C. § 2254(d).  *See Cullen v. Pinholster*, 563 U.S. __, 131 S. Ct. 1388, 1400-01, 179 L. Ed. 2d 557 (2011).

established Supreme Court precedent instructs that "[c]ross examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *see also Kentucky v. Stincer*, 482 U.S. 730, 739, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987). Cross examination may include a broad array of impeachment, including areas "directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Davis*, 415 U.S. at 316.

360. "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) (quoting *Davis*, 415 U.S. at 318); *see also Kittelson v. Dretke*, 426 F.3d 306, 319 (5th Cir. 2005) (also quoting *Davis*). In *Davis*, the Supreme Court held that it was a violation of the Confrontation Clause for the trial court to rule, on the prosecutor's urging, that the defense could not present evidence that a key prosecution witness had been on probation at the time he assisted the state at petitioner's trial. *Davis*, 415 U.S. at 316-18. The Court held that "to make [cross-examination into the witness's bias] effective, defense counsel should have been permitted to expose to the jury" the fact that the witness was on probation when he testified, and thus had a motive to "shift suspicion away from himself" and "might have been subject to undue pressure from the police" from a possible threat of probation revocation. *Id*. at 311, 318.

361. Similarly, in *Van Arsdall*, the Court held that the defendant's Confrontation Clause rights were violated by a court ruling prohibiting the defense from cross-examining a key prosecution witness about an agreement the witness

119

had reached with prosecutors that his prior criminal charge would be dropped in exchange for his testimony at the trial. *Van Arsdall*, 475 U.S. at 679. The Fifth Circuit reached an analogous result in *Wilkerson v. Cain*, 233 F.3d 886 (5th Cir. 2000), finding a Confrontation Clause violation where defense counsel was prohibited from cross-examining a prosecution witness about letters the witness had written to prison officials before defendant's trial. *Id*. at 891-92. The Court reasoned that "[h]ad the jury believed that [the witness] was testifying to curry favor with the state, or that he expected some real or perceived benefit in return, the state's case would have been seriously undermined." *Id*. at 892. And in *Kittelson*, the Fifth Circuit found a Confrontation Clause violation where the trial court prevented the defendant from eliciting evidence that would have shown that a witness who had accused him of sexual abuse had recanted her testimony. *Kittelson*, 426 F.3d at 321-23.

## 2.   The Limitation of Young's Confrontation Clause Rights

362.   Here, as in *Davis*, *Van Arsdall*, and *Wilkerson*, the State violated the Confrontation Clause by preventing delaying the signing of the plea agreements until after Young's trial had concluded, thereby depriving the defense from any opportunity to expose key witnesses' bias to testify favorably for the prosecution. Berry's and Luckie's instructions to Ray not to reveal the plea agreement until after the trial, and the State's failure to divulge the plea agreements or negotiations with Ray or Page, had the same effect as a trial court ruling excluding the evidence: the evidence never reached the jury.[42] The fact that Ray and Page had

---

[42] Although a plurality of the Supreme Court has opined that the Confrontation Clause does not extend to a state's nondisclosure of evidence before trial, Justice Blackmun has stated that there may be a Confrontation Clause violation where the State prevents the defense from obtaining, before trial, information that would enable effective cross-examination of a crucial prosecution witness. *Pennsylvania v. Ritchie*, 480 U.S. 39, 52-54 (plurality opinion), 64-65 (concurring opinion by Blackmun, J.),107 S.Ct. 989, 94 L. Ed. 2d 40 (1987). *See also Stincer*, 482 U.S. at 738 n.9 (Blackmun, J.) (expressing the "personal view" that "there are cases in which a state rule that precludes a defendant from access to information before trial may hinder that defendant's opportunity for *effective* cross-

express or implied agreements with the State that they would receive leniency in exchange for their testimony indicated a "prototypical form of bias." *Van Arsdall*, 475 U.S. at 680. Indeed, it is the very same type of bias -- expectation of reward in exchange for testimony -- that was found to be material in *Van Arsdall* and *Wilkerson*. Ray's and Page's plea agreements and negotiations with the State, if disclosed to Young and revealed at trial, would have permitted the "jurors . . . [to] appropriately draw inferences relating to the reliability of the witness[es]'" against Young. *Van Arsdall*, 475 U.S. at 680 (quoting *Davis*, 415 U.S. at 318), *see also Carroll v. State*, 916 S.W. 2d 494, 501 (Tex. Crim. App. 1996) (Confrontation Clause violated by exclusion of evidence regarding prosecution witness's pending criminal charges); *Virts v. State*, 739 S.W. 2d 25, 30 (Tex. Crim. App. 1987) (Confrontation Clause violated by preclusion of cross-examination of prosecution witness regarding her pretrial plea agreement). Young's Confrontation Clause rights were therefore violated.

### 3.    Prejudice

363.   The prosecution's deception and stymying of Young's ability to effectively confront the witnesses against him prejudiced him at trial. In determining whether the denial of a defendant's Confrontation Clause rights is prejudicial, the court must "look primarily at the specific testimony omitted, rather than the weight of the evidence notwithstanding the omitted testimony." *United States v. Jimenez*, 464 F.3d 555, 563 (5th Cir. 2006). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684. This inquiry "depends upon a host of factors," including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence

---

examination at trial, and thus . . . such a rule . . . may violate the Confrontation Clause.").

of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

364.    Here, the *Van Arsdall* factors establish that the State's conduct was not harmless error.  As explained above, Ray and Page were crucial prosecution witnesses:  they provided eyewitness testimony on the Douglas homicide, and Page constituted the only witness to the Petrey homicide.  "Had the jury believed that [Ray and Page were] testifying to curry favor with the state, or that [they] expected some real or perceived benefit in return, the state's case would have been seriously undermined." *Wilkerson*, 233 F.3d at 892.  Their testimony was not cumulative -- indeed, as explained above, there were crucial inconsistencies between Ray's, Page's and McCoy's accounts of the Douglas killing.  Also, as discussed above, forensic and ballistics evidence contradicted Ray's and Page's accounts of both killings, as did Page's highly questionable assertion that he was coerced into participating in the Petrey homicide despite ample opportunity to escape.  Moreover, had the jury learned of Ray's and Page's plea agreements and negotiations with the prosecution, it could well have concluded that other State's witnesses were testifying due to similar agreements.  Indeed, Young's trial counsel testified that, had the prosecution disclosed the plea agreements, the defense would have changed their entire presentation of the case and used the plea agreements to question jurors and conduct extensive cross-examination.  (2 RWR2d 108-09 (Williams); 2 RWR2d 195-99, 209 (Cantacuzene).)

365.    The final *Van Arsdall* factor -- the overall strength of the prosecution's case -- also shows that the State's conduct prejudiced Young:  the State's case rested almost completely on the questionable testimony of accomplices who were present with Young during the homicides and had every incentive to deflect blame from themselves.  Although cross-examination was otherwise permitted, the plea agreements and  negotiations would have constituted by far the

most significant area of cross-examination of Ray and Page:  absent inquiry on that issue, cross-examination was effectively meaningless.  The State's violation of Young's Confrontation Clause rights therefore "had substantial and injurious effect or influence in determining the jury's verdict," under *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), and cannot be considered harmless.  *See Wilkerson*, 233 F.3d at 892 (defendant's inability fully to cross-examine the credibility of a crucial prosecution witness was not harmless under *Brecht*).  Accordingly, Young is entitled to relief on this claim.

## CLAIM TWO:  THE JUDGE WHO PRESIDED OVER  YOUNG'S TRIAL WAS NOT IMPARTIAL

366.   Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because Judge Hyde was biased, and if counsel had known of this bias, they would have moved to recuse the judge from presiding over Young's trial, motion for new trial, and state writ hearing.

367.   *Exhaustion*:  This claim was presented to the state court in Young's Second Subsequent Application.

368.   If Respondent disputes any of the facts alleged below, Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

369.   The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

370.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an

123

evidentiary hearing, include the following.

**A.    Underlying Facts Related to this Claim**

371.   The jury in this case returned its verdict of death on April 11, 2003. Judge Hyde, who presided over Young's trial, sentenced Young to death that same day.  (CR at 866-71; 37 RR at 29.)

372.   Three days later, Judge Hyde sent a letter to each of the jurors.  (*See* Ex. 101 at ¶ 5 [Decl. of Michael Byrne].)[43]  In that letter, Judge Hyde told the jurors that they had made the correct decision informing them of his own belief that Young was a dangerous man who was capable of harming someone else:

> After spending several weeks with the Defendant in jury
> selection before the trial began, I gained some insight
> into his personality and I got to hear and see much more
> than the jury heard.  In my view, he is a dangerous man
> who is fully capable of harming someone else.  Your jury
> made the correct decision.

(Ex. 93 [Juror Letters from Judge Hyde].)  According to the letter, the judge's opinion was based upon evidence the jury did not hear and his own personal opinion.  (*Id.*)

373.   Judge Hyde then presided over, and denied, Young's motion for new trial.  (38 RR at 6, et. seq.)  Later, Judge Hyde presided over, made factual findings against, and denied Young's state habeas application.  (Ex. 30 at 424 [Hyde's Denial of Writ of Habeas Corpus])

**B.    Relevant Law**

374.   Among those basic fair trial rights that cannot ever be treated as harmless is a defendant's right to an impartial judge.  *Gray v. Mississippi*, 481 U.S.

---

[43]  Since they were written, the letters had been stored in Judge Hyde's chambers and had never been made available to the defense.  (Ex. 140 [Decl. of John Beaver].)

648, 668, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987); *accord Gomez v. United States*, 490 U.S. 858, 876, 109 S. Ct. 2237, 104 L. Ed. 2d 923 (1989).  It is well settled that "[n]o matter what the evidence against [a defendant], he had the right to have an impartial judge." *Tumev v. Ohio*, 273 U.S. 510, 535, 47 S. Ct. 437, 71 L. Ed. 749 (1927); *accord Bracy v. Gramley*, 520 U.S. 899, 904-05, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997) ("the floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal . . . before a judge with no actual bias against the defendant . . .", internal quotations omitted); *accord Withrow v. Larkin*, 421 U.S. 35, 46-47, 95 S. Ct. 1456, 43 L. Ed. 2d 712  (1975); *In  re  Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955); *Richardson*, 537 F.3d at 474; *Buntion*, 524 F.3d at 672; *Bigby v. Dretke*, 402 F.3d 551, 558 (5th Cir. 2005) (cornerstone of American judicial system is right to fair and impartial process).

375.   A  defendant may establish denial of this right by demonstrating actual bias or merely the appearance of bias. *Taylor v. Hayes*, 418 U.S. 488, 501-04, 94 S. Ct. 2697, 41 L. Ed. 2d 897 (1974); *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1972); *Richardson*, 537 F.3d at 474-75. Actual bias occurs when the judge harbors personal animosity toward the defendant or has a personal interest in the outcome of the particular case. *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994); *Aetna Life  Ins. Co. v. Lavoie*, 475  U.S. 813, 823, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986) (calling for recusal where state supreme court  justice's interest was "direct, personal, substantial, [and] pecuniary"); *Tumey*, 273  U.S. at 523; *In re Murchison*, 349 U.S. at 138 (finding bias where judge acting as one-man grand jury in secret hearings charged two witnesses with contempt and then presided over witnesses' contempt hearings); *Taylor  v. Hayes*, 418  U.S. at 501-03 (finding bias where judge was subject to litigant's direct personal insults).

376.   The standard for determining implied bias requires a petitioner to establish that a "genuine question exists" concerning the judge's impartiality.

*Buntion*, 524 F.3d at 669; *United States  v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir. 1997) ("'whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'"); *see Marshall  v. Jerrico, Inc.*, 446  U.S. 238, 242, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980).

377.   Structural error occurs when a trial judge is biased.  *Richardson*, 537 F.3d at 473, *citing Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35 (1999).  "A criminal defendant who is tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him." *Edwards v. Balisok*, 520 U.S. 641, 647, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997); *Buntion*, 524 F.3d at 672.

## C.    Judge Hyde Was Actually Biased Against Young and Young's Conviction Must Be Reversed

378.   Here, there is clear evidence that Judge Hyde was actually biased against Young.  According to the letter he sent to each of the jurors, Judge Hyde made up his mind about Young's guilt before the trial even began.  Even before any evidence was introduced at trial, before opening statements were presented, and before the adversarial process had commenced, this trier of fact had "pre-judged" Young as a dangerous man, worthy of the death penalty.  Judge Hyde believed that not only was Young dangerous, but he was "fully capable" of harming other people had he not been convicted of capital murder.  (Ex. 93 [Juror Letters from Judge Hyde].)  These statements show that Judge Hyde was not an impartial judicial officer who should have been removed from Young's case.  *See Bracy*, 520 U.S. at 909 (petitioner needs evidence that the judge was actually biased in petitioner's *own* case); *Taylor*, 418 U.S. at 501 (bias shown where there is a mounting display of unfavorable personal attitude toward the petitioner); Tex. R. of Civ. Proc. 18(b).

379.   For purposes of the trial, as the proverbial gate keeper, Judge Hyde

was entrusted with the responsibility of deciding what evidence the trier of fact would be permitted to see and hear in this case.  However, Judge Hyde himself had already decided, before the trial had even begun, that Young was a dangerous person worthy of the death penalty.  Any rulings made by the judge with respect to evidence admitted or excluded was tainted by the judge's personal animosity toward Young.  Such bias clearly violated Young's due process rights.  *Tumev*, 273 U.S. at 535; *see Franklin v. McCaughtry*, 398 F.3d 955 (7th Cir. 2005); *see also* Texas Code of Judicial Conduct, Canon 3.B.(5) ("A judge shall perform judicial duties without bias or prejudice"), (6) ( A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not knowingly permit staff, court officials and others subject to the judge's direction and control to do so").

380.   To make matters more improper, Judge Hyde sat as both judge and jury during Young's motion for new trial.  With the jury's job now complete, Judge Hyde alone decided Young's fate while presiding over the motion for new trial.  Judge Hyde, however, had already made up his mind that Young was worthy of the death penalty, a sentiment he did not hesitate to convey to the jurors in his letter.  Judge Hyde's bias most probably led him to protect the juror's verdict of guilt, a verdict the judge agreed with, and tainted his rulings during Young's motion.

381.   The prospect of judicial bias is intolerable in any case, let alone one where the ultimate sentence, death, has been imposed.  *See Spaziano v. Florida*, 468 U.S. 447, 468, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984).

> [B]ecause the impartiality of the adjudicator goes to the
> very integrity of the legal system, the *Chapman*
> harmless-error analysis cannot apply. We have

recognized that "some constitutional rights [are] so basic
to a fair trial that their infraction can never be treated as
harmless error." [Citation omitted.]  The right to an
impartial adjudicator, be it judge or jury, is such a right.
[Citations omitted.]

. . . [A] capital defendant's constitutional right not to be
sentenced by a tribunal organized to return a verdict of
death surely equates with a criminal defendant's right not
to have his culpability determined by a tribunal organized
to convict.

*Gray*, 481 U.S. at 668, internal quotations omitted.  As Young has shown that
Judge Hyde was biased against him, his conviction and sentence must be
overturned.  "[W]hat matters is not the reality of bias or prejudice but its
appearance."  *Liteky*, 510 U.S. at 548.

**D.**     **Because of Judge Hyde's Bias Against Young, Any Claim Ruled upon
by Judge Hyde During the State Post-Conviction Proceeding Should Be
Reviewed De Novo by this Court**

382.   Not only did Judge Hyde preside over Young's trial and motion for
new trial, the judge presided over Young's state writ hearing.  The appearance of
bias is heightened by the fact that Judge Hyde served as the sole trier of fact in the
state writ hearing.  As a result, Young was forced to have all substantive and
procedural issues decided by the same  judge who had a bias against him.  *See
Alexander  v. Primerica Holdings*, 10  F.3d 155, 163 (3d Cir. 1993) (granting
recusal motion based in part  on "the fact that this is a non-jury case, and that Judge
Lechner will be deciding each and every substantive issue at  trial"); *see In re
Murchison*, 349 U.S. at 133 (judge disqualified because he acted as both a one-man
grand jury and trial judge).  Every decision Judge Hyde rendered was tainted by his
desire to protect the death verdict against Young.  Every ruling he made was to

keep "a dangerous man" from "harming someone else." (Ex. 93.) By word and by deed, the judge assumed the role of the prosecutor. *Vasquez-Ramirez v. United States Dist. Court (In re Vasquez-Ramirez)*, 443 F.3d 692, 701 (9th Cir. 2006) ("the judge oversteps his bounds when he forces the prosecutor to pursue charges the prosecutor would rather not"). "It is no doubt a position that he could fill with distinction, but it is occupied by another person." *In re United States*, 345 F.3d 450, 453 (7th Cir. 2003). Because Judge Hyde was biased against Young, any claim ruled upon by Judge Hyde during the state post-conviction proceeding should be reviewed de novo by this Court.[44] *Liteky*, 510 U.S. at 548.

## CLAIM THREE: YOUNG'S CAPITAL SENTENCING JURY WAS DENIED A VEHICLE FOR EXPRESSING ITS REASONED MORAL RESPONSE TO YOUNG'S MITIGATING EVIDENCE, IN VIOLATION OF THE SUPREME COURT *PENRY* LINE OF CASES

383. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because Young's jury was denied a vehicle for expressing its reasoned moral response to Young's mitigating evidence; the jury was prevented from giving *full* consideration and *full* effect to Young's mitigating circumstances.

384. *Exhaustion*: This claim was presented as Point Eight in Young's direct appeal. (AOB at 12-13, 40-45.)

## A. Introduction

385. Long before the jury began to hear any evidence as to whether Young should be put to death by the State of Texas, the State made its view to the court known that mitigation evidence was nothing more than "touchy-feely stuff . . . ." (8 RR at 7.) The State's dismissive and derisive definition of mitigation, in spite of

---

[44] Based upon the incompetence of state habeas counsel, discussed *supra*, *see* Sec I.C., and the bias of Judge Hyde, the proper remedy here is for Young to receive an entirely new state habeas proceeding, including the filing of a new state writ application.

over thirty years of Supreme Court history, drove and ultimately concluded in Young's capital sentencing jury being deprived a vehicle to give its reasoned moral response to Young's mitigating evidence.

**B.     State's Evidence in Aggravation**

386.   At the sentencing phase of Young's trial, the State introduced evidence of  Young's prior offenses and what the State described as "a pattern of criminal conduct that started when [Young] was very young."  (30 RR at 14.) According to the State, it would show that "pattern of criminal conduct" through "school records,  . . . in the way of doctors, . . .  [and]  in the way of other state agencies that had contact with [Young] over the years."  (*Id.*)

387.   The State began its case in punishment by introducing evidence of prior criminal acts in which Young had participated after his release from the Texas Youth Commission.[45]   The State then turned to Young's so called "pattern of criminal conduct" that would establish, according to the State, Young's propensity for future dangerousness.

**1.     The State's Evidence of "Pattern of Criminal Conduct" Through State Agencies**

388.   The State brought in Teresa Candelaria, a lieutenant in the Midland County Central Detention Center, who testified that Young was manipulative because Young had convinced an officer to give him extra food.  (30 RR at 199.)

389.   The State then called Nathan Wendell, who testified that an altercation had ensued while both Wendell, then sixteen years old, and Young, then fourteen years old, were residents at the Waco Center for Youth.  (31 RR at 19-20.) Wendell testified that what began as 'horseplaying' between Wendell, Young and another boy (31 RR at 13), had ended up with Young "infuriated" when a necklace

---

[45]  The incidents included the burglary of a gun shop; the burglary of the residence of someone Young and cohorts thought kept proceedings of narcotic sales at his home; and, testimony that Young may have planned to stage the robbery of a local store.  (30 RR at 30-197.)

given to him by his girlfriend got broken during the horseplaying.  Wendell described how Young then frantically began hitting and punching and kicking Wendell in the head, who refused to hit back.  (*Id.* at 13-14.)   Wendell testified that when he began to cry, Young then "pulled his pants down" and put his penis in Wendell's face, and said "Suck, you bitch, suck it."  (*Id.* at 15.)  Wendell testified that he then turned his head, deflecting the penis, which touched Wendell's ear.  (*Id.* at 16.)  Wendell clarified that Young had not tried to force his penis into Wendell's mouth or rape him, but that Young had "just exposed himself to [him] and touched [his] ear." (31 RR at 25.)

390.   The State then called Richard McMullin, who worked at the Waco Center for Youth for over twelve years.  (31 RR at 32-35.)  Mr. McMullin described the Center's goal as "giv[ing] each youth a chance for change . . . [by] provid[ing] them with services that give them opportunity to make some improvements in their life."  (*Id.* at 35.)  McMullin testified that Young had been sent to the Center because of "behaviors related to ADHD and some behaviors related to violating some laws and, you know, opposition to the authority."  (*Id.* at 37.)  McMullin testified that while Young was originally likeable, over the course of his stay at Waco, he "started having more problems with depression and things that were disruptive."  Mr. McMullin attributed this to Young's ADHD, which eventually led Mr. McMullin to start "feeling concern about if I could keep other kids safe from him."  (*Id.* at 42-43.)

391.   The State called Probation Office Clems, who was first assigned to supervise a then ten-year old Young over the theft of a flute. (31 RR at 215-16.)  Clems testified that she supervised Young for a number of adjudications from 1996 through 1998, including burglary of a building, unauthorized used of a motor vehicle, theft of a firearm from his mother, burglary of a habitation, and indecency with a child and assault causing bodily injury over the incident with Wendell.  (*Id.* at 220-21.)  Clems testified that after the last two incidents, Young was committed

131

to the jurisdiction of the Texas Youth Commission ("TYC") on July 8th, 1998.
(*Id.*)  Clems described Young as bright, impulsive, aggressive, and manipulative.
(*Id.* at 222.)  She described Young as the "worst" child under her supervision in
terms of violence and dangerousness in her eighteen year career as a probation
officer.  (*Id*. at 223.)

392.   The State called Garrett Gilliam, a caseworker at TYC during
Young's imprisonment at the facility.  (31 RR at 257-58.)  Mr. Gilliam testified
that he was struck by Young while Gilliam was trying to break up a fight with
another inmate.  (31 RR at 262-64.)  Gilliam testified that in some occasions, the
kids in the TYC dorms, including Young, would try to take control by rioting.  (31
RR at 266.)  Gilliam described Young as aggressive, dangerous, impulsive, and
sometimes deliberate.  (*Id*. at 267-68.)

393.   On cross-examination, Mr. Gilliam acknowledge that TYC was
basically a prison, where "any attempts at rehabilitation are basically a joke
because of the myriad of problems going on inside TYC."  (*Id.* at 270.)  He also
acknowledged that Young was found in a subsequent administrative hearing not to
have "intentionally or knowingly or recklessly" hit Mr. Gilliam in the jaw  (*id.* at
276-77), and that Young had written him a letter apologizing for the incident.  (*Id*.
at 278.)[46]

394.   The State called Jacqueline Timmons, a guard at TYC.  Timmons
testified that she had received several blows by Young when she tried to break up a
fight. (31 RR at 291-92.)  She also testified she considered Young aggressive,
violent, and a dangerous person.  (*Id.* at 292-93.)

---

[46]  When Mr. Gilliam explained that the juveniles were assigned to write
letters after incidents in order to teach them empathy, DA Schorre stated:  "I don't
think their program's working, because I've got two dead people in this case and
another guy who he did his best to kill."  (*Id*. at 285.)  The court sustained the
defense's objection to the remarks, and instructed the prosecutor to direct his
questions to the witness.  The court did not instruct the jury to disregard the
remark.  (*Id*. at 285-86.)

## 2.   State's Evidence of "Pattern of Criminal Conduct" Through School Records

395.   The State introduced the testimony of Debbie Barton, Young's first grade school teacher, who testified as to Young's misbehavior in first grade.   (31 RR at 101.)   According to Barton, Young was suspended multiple times for biting and hitting children and damaging books in class (*Id.* at 101-04), cutting children with scissors, and while in kindergarten and first grade repeatedly talking about guns.   (*Id.* at 118.)   According to Barton, due to his behavior, she requested Young be withdrawn from school.   (*Id.*)

396.   Crystal Stokley, a teacher at Young's middle school, testified that when she asked Young to give over his wallet chain because it was a prohibited item, Young became very angry, slammed a door, and gave her "a look that I felt if he could have, he would have killed me."   (31 RR at 164.)   Stokley then avoided Young and thought of him as a "Jekyll and Hyde type."   (*Id.* at 165.)

## 3.   State's Evidence of "Pattern of Criminal Conduct" Through Testimony of Doctors

397.   The State elicited testimony from Dr. Don Walker, who examined Young after he brought a gun to school in the fourth grade.   (31 RR at 120-26.) Dr. Walker testified that what he remembered most about Young was his "extremely strong almost obsession with Rambo like personalities, movie personalities, . . .   lots of guns, lot of violence."   (*Id.* at 124-25.)   Dr. Walker recommended that Young be referred to a psychiatrist, which he considered a rare referral in his career.   (*Id.* at 126.)   Dr. Walker tentatively diagnosed Young with ADHD and with "conduct disorder under undersocialized aggressive." (*Id.*)   Dr. Walker clarified that although "there may be a higher percentage of ADHD people who kill people than non ADHD people, . . . [he did ] not see one as an excuse for the other."   (*Id.* at 156.)   When the State asked Dr. Walker if he was surprised that he was testifying at Young's punishment phase trial, Dr. Walker responded "I wish

I could tell you yes, but I'm really not." (*Id.*)  Dr. Walker explained that when he examined Young as a nine-year old, he feared that Young "had two strikes against him and a fast-breaking third strike that was over the edge of the plate." (*Id.* at 157.)  Dr. Walker then elaborated:

> I've got to come back and say that the literature does not support us in being able to make predictions about who's going to do what in the future . . . It would be unethical, it would be unrealistic.  My crystal ball broke a long time.  The bearings were out many years ago.  You never know, but I'll tell you what, I thought he was high enough risk that suggested Ray Scardina see him, because I have a lot of regard for Ray's ability.  I've never seen his report, so I don't know what he said, but I wanted him to see him, because I thought he might hurt - - I said himself or somebody else, but I was fearful it might be somebody else more than himself.

(31 RR 157-58.)

398.    The State called Dr. Helen Short, the psychiatrist at the Waco Center for Youth after Young was committed there involuntarily through a civil, psychiatric hold.  (32 RR at 1-8.)  Dr. Short testified that when she admitted Young to the Waco Center, when he was fourteen and a half years old, she noticed signs of his mental illness, mainly ADHD and hyperactivity.  (*Id.* at 14.)  In admitting Young to Waco, Dr. Short testified she reviewed Young's prior records from other facilities, including Triangle Pines, which led her to the conclusion Young was "oppositional," defiant, rebellious, argumentative, impulsive, uncooperative, whining, demanding, a liar, someone who steals, without any insight into his behavior, and showed no remorse for his behavior." (*Id*. at 17-18.)

399.    According to Dr. Short, although Young reported that he did not care

what happened to him, she noted Young stated that "[I]f I keep going down the path I am on now, I may end up in prison." (*Id.* at 20.) When Dr. Short asked Young about his drug usage, Young revealed "pretty heavy drug use" for a fourteen-year-old, including as many cigarettes as he could get ahold of, alcohol to the point of being "totally plastered" seven to ten times, marijuana almost daily for a month, using cocaine four times and crystal meth twice, acid five times, and mushrooms twice. (*Id.* at 21-22.) Most of this drug consumption occurred while Young lived with his father in North Carolina. (*Id.*)

400.   In reviewing his social history, Dr. Short testified she discovered "that Clint comes from a long line of people with heavy legal problems," including alcohol and drug abuse on the father's side. (*Id.* at 23.) Dr. Short reported that according to Young's mother, the "paternal side of the family is a pretty violent, 'rowdy,' bunch." (*Id.* at 24) The mother also reported that "[f]ourteen of 16 of the cousins on the paternal side of the family have gone to prison." (*Id.*) Dr. Short testified that although Waco was mandated to do follow-up psychological testing within ninety days after Young was admitted, the Waco psychologist "just didn't get to it." (*Id.* at 26.)

401.   When specifically asked about her diagnosis of Young, Dr. Short testified that she had diagnosed Young as having "Attention Deficit Disorder, ADHD . . .  primarily inattentive, conduct disorder and a disorder of written expression." (*Id.* at 27.) After diagnosing Young, Dr. Short prescribed medication the same medication Young was taking upon arrival, which she changed according to Young's incident reports, placed him in the Behavior Management Program, put him in school, in essence, the "usual stuff" that was done at Waco. (*Id.* at 34, 38-39, 44.)

402.   Dr. Short testified that on May 4th, she put Young on homicide precautions over the Wendell incident. (*Id.* at 45-46.) Dr. Short testified that after the Wendell incident, she "kind of had enough" and decided that Young be sent to

TYC because Waco was not equipped to handle "that kind of aggressive troubled kids." (*Id.* at 47.) Dr. Short testified that her diagnosis of Young had changed:

> [W]hen he left, I still gave him a diagnosis of ADHD and conduct disorder, but I included, in looking at the record, I included a diagnosis of antisocial personality disorder, which I shouldn't have, because legally or technically I can't but I think, you know, thinking back on it, wondering why I did that, I think that I was so convinced at that point by the persistent and pervasive pattern with Clint, since he was a young child, that that's what was wrong.

(*Id.* at 48.)

403.    When asked what was the best predictor of possible future conduct, Dr. Short responded: "In my opinion and in the opinion of many others and in research, the best predictor of future behavior is past behavior." (*Id.* at 54.) She went on to state that Young "was very dangerous . . . easily in the tope five percent" among other kids she had seen. (*Id.* at 55.) Over an objection by the defense, Dr. Short was asked what would move her evaluation from antisocial personality disorder to "being a psychopathic." (*Id.* at 58.) From psychopathic, the State elicited Dr. Short's opinion as to 'serial killers.' (*Id.* at 60.)

404.    Dr. Short testified that although Young had suffered febrile seizures when he was eighteen months old, she did not think those seizures were the cause of Young's problems. (*Id.* at 167.) She repeated that there was no treatment for a person with a personality disorder, that the "best you could do is protect other people from them," that "statistically, the younger they begin to criminally act out, the worse the prognosis is." (*Id.* at 169-70.)

## C.    Young's Evidence in Mitigation

405.    In response, Young presented two categories of mitigating evidence.

The first consisted of testimony from Young's mother, stepbrothers, stepsisters, and neighbors, who described Young's unhappy childhood as one plagued by his severe ADHD, his family's inability to deal with such brain dysfunction, and the dysfunctional family into which Young was born.

406.   Carla Sexton, Young's mother, described Young's traumatic childhood as well as her own less than ideal childhood.  Carla testified that she had been raised by her uncle when her mother abandoned her, and that she had married Young's father, William Young, or "Billy," to get out of her home. (33 RR at 80.) Carla testified that she lived with Billy less than a year or so because he was mentally and physically abusive, and that his abuse affected her pregnancy with Young, who was born a month before full term.  (*Id*. at 81.)   Carla testified that Billy was also physically abusive of his other four children, of whom he had custody, and that Carla would get between Billy and his children so "he would take it out on [her] instead of them."  (*Id*. at 81-82)

407.   Ashamed of what she considered her own fault, she only left Billy after her mother came to her house, saw her swollen face, and asked her if Billy had been hitting her.  With the help of her family, Carla, with her nine-month-old child, left.  (*Id*. at 82.)  Carla did not receive any child support from Billy.  (*Id*. at 83.)  When Young was eighteen months old, he had his first seizure while visiting with Billy; and a second seizure when he was about twenty-four months old.  (*Id*. at 84; Ex. 2 at 7, 12-15 [Pediatric-Seizure Records].)

408.   At that time, on the sporadic occasions when Young would visit his father, Young would come back "real tight, just hyper, dirty, hungry."  (*Id*. at 84.) After the febrile seizures, Carla noticed something different about Young.  She began to notice his hyperactivity, how he could not sit and watch cartoons like normal kids.  (*Id*. at 85.)  Carla described that around this time, Young got "caught in the middle" between her and Billy.  First, Billy would come around to see Young when it was easy for him, and at one point, Billy took Young with him.

137

When Carla went to get her son back,

> [I]t got physical and Clint was in the house screaming
> that he wanted his mama, and several months went on
> and he wouldn't let me have him . . . and [Billy] went and
> filed for divorce and he called me, and he said, 'if you'll
> come sign these papers, I'll let you have him and you can
> take him, but I don't pay any child support," so I met him
> at a gas station in Pittsburgh and signed them, never read
> them, and he let me have him and had him ever since.

(33 RR at 86.)

409.   Only years later, when Carla was finally able to modify the forced divorce decree, was she able to collect child support from Billy, about two to three years' worth, although Billy never provided health insurance for Young.  (*Id*. at 87.)  To support her child, Carla worked up to three jobs at the time, and never sought public assistance because Young "was for [her] to take care of." (*Id*. at 88.)

410.   Although both Young and Carla were looking forward to his attending kindergarten, Carla began getting calls from the school early on.  (*Id*. at 90.)  He began to have problems being still in the classroom, paying attention, and focusing.  (*Id*.)  She first heard about ADHD when she went to Young's kindergarten to discuss his problems.  Upon the suggestion from the school, Carla took Young to the doctor. From there Young began what would become a long history of prescription psycothropic medications.  (33 RR at 91.)

411.   Young's problems worsened when he entered the first grade, and Carla discontinued the Ritalin because she saw no improvement and he continued to have side effects.  (*Id*. at 93.)  Caring for Young became very frustrating as Carla was going to school to become a hairdresser and she continued getting calls from school.  (*Id*. at 94.)  Young began refusing to go to school, and many times, Young would come back from school crying. (*Id*. at 94.)

412.   When Young was around four years old, Carla married her current husband, Quentin Sexton.  (33 RR at 88-89.)  Soon after, while Young was having problems with school, Carla became pregnant with her second child, Jesse.  (*Id*. at 95.)  Around this time, as their house had burned down, the Sexton family -- Young, Carla and Quentin, and Brandy, Quentin's daughter -- all lived in a trailer next to the destroyed property.  During this time, Quentin was drinking an average of twelve to eighteen beers a day.  As Quentin's patience with Young began wearing thin, Carla began fighting with Quentin over how to discipline Young. (*Id*. at 96.)

413.   When Young began the second grade, Carla reinitiated medicating him again, to no avail.  It was in second grade that Young was assessed and labeled emotionally disturbed.  (*Id*. at 97.)  After the diagnosis, Carla  was "totally lost," and without any help from Young's father, she did what she could do:  "I took him to doctor after doctor . . . trying to find out what was wrong."  (*Id*. at 97.)  She took him to too many doctors to keep track of.  (*Id*. at 98.)  As the home situation became worst, Carla argued with her husband "all the time, the stress, no home, my son, job, school," to the point where she took it out on Young.  (33 RR at 99.)

414.   When Young was nine years old, he took and old antique gun that the Sextons kept as a "knicknack."  When Young was caught at school with the antique gun, charges were filed against both Carla and Quentin for endangerment to a child.  (*Id*. at 100.)  After that incident, Carla sent Young to live with Billy in Wyoming for three months, "a bad mistake" on her part.  (*Id*. at 101.)

415.   At that point, because Carla did not know what else to do, Young was sent to Triangle Pines Group Home, the first of what would become a long list of agencies failing to address Young's special needs.  There, Young was prescribed a number of medications, including, but not limited to, Ritalin, Cylert, Zoloft, and Thorazine. (*Id*. at 103.)

416.   Triangle Pines was a  brand new facility, with Young being the second

139

student there.  (*Id*. at 105.)  Although Carla was very hopeful at the beginning about Triangle Pines, for which Young's elementary school was paying (Ex 5; Placement Contract Jefferson  School ), she later acknowledged it was a bad decision.  (*Id*. at 106.)  Young stayed at Triangle Pines for only two or three months.  Upon Young's return from Triangle Pines, Carla took her son to be examined by Dr. Scardina.  (*Id*. at 107.)  Again, the stress at home was mounting, with Quentin drinking excessively, to the point of passing out.  (*Id*. at 108.)  Carla continued taking Young to doctors hoping they would help her get her "baby" back,  and continued trying different medications.  (*Id*. at 107.)

417.   As the medications changed, so would Young's behavior.  (33 RR at 109.)  "[D]epending on which medication it was[,] [s]ometimes he would be wound up real tight, just very hyper, and then sometimes it depended on what it was, he just wanted to sleep."  (*Id*.)

418.   Once Young returned from his father's house in Wyoming, his run-ins with the law became worse.  (*Id*. at 103.)  Young's first formal incident was at ten years old, when he and his older stepsister brought home a flute from school.  (*Id*. at 103-04.)  Although Carla returned the flute undamaged, Young was put on juvenile probation.  At thirteen or fourteen, although not prosecuted, Young and other boys were caught stealing wine coolers from the local store.  (*Id*. at 104-05.)

419.   In the winter of 1996, Carla reluctantly sent Young to North Carolina to live with his father.  (*Id*. at 110, 112.)  Towards the end of the fall, Carla received a telephone call from a frantic and scared Young in North Carolina.  (*Id*. at 112-13.)  When she went to pick up her son at the sheriff's station where he was being held, Carla saw bruises on Young's neck, stomach, and back.  (*Id*. at 114.)  She would later find out that Young, then thirteen years old, had been assaulted by his own father. Billy was later charged for assaulting his own son. (35 RR at 136-37.)

420.   The problems continued once Carla brought Young back home.

During a short weekend vacation with her husband, upon leaving Young at a friend's house, Carla received a call informing her that Young had taken the friend's car and driven away.  (33 RR at 116.)  Carla first drove her husband home, who told her she had to do something with her son.  She then picked her son up at the sheriff's station in Minden, Louisiana.  On the ride back, Young, in anger, demanded that her mother let him go.  (*Id*. at 117.)  Every time she would stop at a red light, he would try to get out of the car.  Not knowing what else to do, Carla drove her own son to the Marion County Sheriff's Department, to file charges against him because she "didn't want him on the street."  (*Id*. at 118-19.)

421.    Young was then declared mentally ill and was committed to the Waco Center for Youth. (*Id*.)  Again, Carla was hopeful Young would get some assistance at Waco. (*Id*. at 119.)  During an outing while Young was in Waco, Carla took Young to the zoo, the baseball museum in Waco, and spent a good day together.  (*Id*. at 120.)  During the outing, upon Young's insistence, Carla bought a necklace Young wanted to buy for a little girl that was also at Waco, a "little girlfriend."  Once Young had been expelled from Waco, he was sent to TYC.  (*Id*. at 121.)  He was supposed to stay at TYC for thirteen months, but ended up being detained there for almost three years.  (*Id*. at 122.)

422.    Toward the end of Young's stay at TYC, for the first time in a long time, Carla noticed a drastic change, this time for the better.  "He was more calm and settled and not as rambunctious and seemed like he had the ability to think things through more."  (33 RR at 122.)  While at TYC, Young obtained his GED.  (*Id*.)  Carla, however, did not attend his graduation.  When he was released from TYC, although Carla wanted to pick him up, Young insisted on taking the bus back home.  (*Id*. at 122-23.)

423.    When Young came home, now almost eighteen years old, he was "wonderful."  He had matured a lot while at TYC although he was still on medication.  At first, Young dutifully took his medication, and apologized to Carla

for all the things he had put her through.  (*Id*. at 124.)

424.   Young was "like a different kid" when he came home.  (*Id*. at 123.)
He had goals, wanted to go to the Army and had a positive attitude.  (*Id*. at 123-
24.)  However, Carla never met with Young's parole officer, and at no
time did a parole officer meet with her and tell her the conditions of Young's
juvenile parole.  (*Id*.)

425.   At first,  Young successfully maintained employment and was going
to school.  Carla put rules in place to limit the people with whom he could
associate, in particular, his older brothers, because of their drug activity.  (*Id*. at
125-26.)  Once Young lost his job, and although Carla begged and pleaded with
Young against it, Young went to work with his father in Wichita Falls, and then
laying carpet with Dino and Dano, his older twin brothers.  (*Id*. at 126.)

426.   When he came back form Wichita Falls, Young had drastically
changed, this time not for the better.  (*Id*. at 126-27.)  He was no longer taking his
medication, he was not clean, he was no longer going to school, and his interest in
the Army no longer seemed genuine.  Carla begged and pleaded with him to stay
on the medication, but Young told her he just wanted everybody to think he was
normal.  (*Id*. at 125.)  Young also insisted on staying with his stepbrothers, and left
Carla's home to go live with Dano at Shady Shores.  (*Id*.  at 127.)

427.   Since Carla was under the impression the parole officer had the ability
to do so, she called Young's parole officer to ask for help, to "put him back if
nothing else, make him take these meds."  (*Id*. at 128.)  Every once in a while,
Young would pop in to see his mother.  He would go to her home and ask her for
money, since he had already sold his car.  Carla worried that he was doing drugs,
whether he was eating, or whether he had a place to sleep.  (*Id*. at 129.)

428.   On Thanksgiving of 2001, Carla went to get her son, took him home
and made him something to eat.  (*Id*. at 129.)  When she asked him to let her wash
his clothes because he was "filthy dirty," Young said he could not stay.  When he

142

asked Carla to take him back to Shady Shores, Carla refused, so Young left.  That was the last time Carla saw her son before he was arrested in Midland County. (*Id*.)

429.    In spite of all his problems, Carla described her son as kind.  (33 RR at 130-33.)  He was very protective of his little sister, holding her, playing with her, and helping Carla give her baths.  When he was sent to TYC, he wrote letters to Quentin asking him to stop drinking.  Young loved to be outside, helping his mother in the garden.  As a child, Carla never saw her son being cruel toward any animal in any way.  Young was a very accident prone child.  (*Id*. at 132)

430.    Carla testified that once Young was arrested for the murders, she had visited, written, and kept in contact with him through telephone calls.  (*Id*. at 137.)  She also accompanied him to court and had seen a change in him, making her believe that to a certain degree, he understood what was going on.  Carla ended her direct testimony by asking the jury to spare her son's life.  (*Id*. at 143.)

431.    On cross-examination, Carla did not agree with the State's description of Young as being obsessed with guns nor that he had an unusual fascination with guns.  (*Id*. at 146.)

432.    Other family members  and neighbors testified as to Young's painful childhood.  Young's father, Billy Young, was a severe alcoholic, who would drink to the point of passing out, then wake up and drink some more.  (33 RR at 157, 190, 245, 257. )  Billy would drink "from the time he got up to the time he came home."  (33 RR at 245.)  His children would have to take cigarettes out of his hand because he would pass out, scared he would burn the house down.  (33 RR at 245-46.)  In addition to alcohol, Billy abused drugs, sometimes spending hundreds of dollars on crack cocaine (33 RR at 253), and sometimes sharing drugs with at least one of his sons.  (33 RR at 266.)  Billy was a "mean" person, even when he was not drinking, whose children lived in fear of him.  (33 RR at 193.)

433.    His children feared him so much that when he passed out, the children

would feel "relieved  . . . [b]ecause [they] knew [they] were safe for one more day, or until the next time.  (*Id*. at 261.)  Billy was also abusive toward the women with whom he lived.  (33 RR at 197.)

434.   Though Billy hit all his children, he was particularly abusive towards Young, whom he severely and repeatedly beat.  (33 RR at 265-66.)  When Young was four or five, Billy picked Young up and threw him against the bathroom wall.  (*Id*. at 259.)  On another occasion, after apparently receiving a note from Young's school, Billy took Young to a shed and hit him with a two by four.  (33 RR at 155, 247-48.)  When Young, as he was being hit, called Billy "a mother fucker," Billy began hitting Young with "his fists, neck, face, body."  (*Id*. at 248-49.)  Billy was placed under arrest and given probation for this assault on Young.  (*Id*. at 215, 248.)

435.   In addition to the physical abuse, Billy was also verbally abusive towards Young, calling him "'sorry little son of a bitch' and call[ing] him all kinds of foul, vulgar language and . . . always on him, talking down to him."  (33 RR at 258.)  Billy would call his son "worthless" through all of Young's childhood.  (*Id*.)  Yet, although Young would usually come back home upset from visiting Billy, and sometimes with bruises on his legs and the lower part of his body, Young loved going to see his father.  (34 RR at 121-22. )

436.   Young's treatment by his stepfather was also far from ideal.  Quentin Sexton, also an alcoholic (34 RR at 119, 127-29), would lose his temper with Young, once hitting Young repeatedly with his steel-toed boots.  (34 RR at 119-20.)  When six-year-old Clinton complained of Quentin's rough play with him, Quentin would call him a "pussy," and tell him to "go cry on his mom's tit."  (34 RR at 120.)

437.   Quentin once broke a broom over Young's head.  (35 RR at 140.)  At the Sexton household, Young would be punished with paddles and belts, and his screams and could be heard by his stepsister in another room.  (34 RR at 121.)

144

Yet, Young's desire to please Quentin, or perhaps fear of him, made Young walk about a half a mile away to a store to get a beer for Quentin, when Quentin asked Young to get him a beer from the refrigerator and there was none.  (33 RR at 188.)

438.   Lay witnesses also testified as to Young's ADHD and the repercussion his ADHD had on him.  Almost all of Young's mitigation witnesses remember how 'hyper' he was as a child.  He was more active than other boys.  (33 RR at 159.)  Young would go from one extreme to the next:  he would be hyper for a little bit and then he would be real calm.  (33 RR at 264.)  He had a very short attention span.  (*Id*. at 263.)

439.   Paula Pettingale, who had a lake house near the Sextons' and who knew Young since he was about three years old,  remembers Young being hyperactive even as a young child.  (34 RR at 127-30.)  Young would throw tantrums and on at least one occasion, cried and screamed for about an hour.  (*Id*. at 133.)  He was also impulsive.  Once, when Young was around five years old, he tried to ignite a Christmas tree because the tree had no lights.  (*Id*. at 198.)

440.   In order to deal with his hyperactivity, some correctional officers allowed him to volunteer to clean the dorm so that he could work off some of his energy.   (35 RR at 8-9, 33.)  To deal with Young standing up during class, one of his teachers asked Young to help other students, straighten books, or sweep the floor, something to help him transfer some of his energy.  (35 RR at 27.)

441.   In spite of his ADHD and his behavioral problems, his siblings, friends, teachers and even some correctional officers thought fondly of Young, remembering him as a "good kid."  (35 RR at 27, 34.)  Young was great to have around as a little brother (33 RR at 195), really kind, loving and smart.  (33 RR at 182, 195; 34 RR at 123, 155.)  He was particularly attached to Jessie, his youngest sister, helping her get dressed, playing with her, and never acting hurtful towards her.  (34 RR at 124-25.)

442.   His siblings and neighbors testified they never saw Young being cruel

to animals.  (34 RR at 124, 132, 149.)  Although he was hyperactive, siblings, neighbors, teachers and correctional officers remembered him as neither violent nor aggressive.  (34 RR at 132; 35 RR at 10.)  Others remember that Young seemed to have a need for approval, and a need to please.  (34 RR at 132.)

443.    Although teachers and correctional officers recognized he was hyperactive, they testified they did not think of him as a problem.  (34 RR at 149; 35 RR at 8-9, 34, 40.)  A correctional officer called him "my little boy."  (35 RR at 12.)  One of his teachers while Young was incarcerated at TYC, referred to Young as "Tigger," as in Tigger and Pooh, because he bounced around a lot, kind of hyper, and his uniform then was orange, like Tigger.  (35 RR at 29.)  Another correctional officer testified that she liked Young so much that she could have taken him home as a foster child.  (35 RR at 43.)

444.    Lay witnesses also remarked on the change they saw in him once Young received the adequate medication to treat his ADHD.  Toward the end of his incarceration at TYC, his teachers rejoiced with him in the remarkable change in his behavior - some describing the change as "miraculous."  (35 RR at 27-28.)

445.    Lay witnesses testified about the hopeful outlook and optimism Young had when he was first released from TYC.  He seemed genuinely happy to reconnect with people with whom he had shared happy moments, and seemed melancholic at the things he had to forgo, like playing ball, while incarcerated as a juvenile.[47]  (33 RR at 180-82.)  He seemed to rejoice in helping his sister with her gardening, and playing with her kids.  (33 RR at 210.)  He was a good worker who an employer described as "terrific," never stealing from the store or destructive in the store, never rude or impolite or aggressive toward customers.  (33 RR at 223-26.)  Young encouraged his employer's daughter to continue with her education,

---

[47]   The court sustained the State's objection as to hearsay when Ms. Kelly Sexton began testifying that, upon seeing boys playing ball, Young had said "You know, I missed all that . . ."  (33 RR at 180.)

treating her and her brothers as if they were Young's own little siblings, helping with their homework and caring for them.  (33 RR at 233-35.)

446.   Lay witnesses also testified, as his mother had, about the deteriorating circumstance surrounding Young before the murders.  By August 18, 2001, his stepsister, Sharon Renee Gentry, told him to leave the premises and get clean when he first arrived home in preparation to attend her wedding.  (33 RR at 207-09.) Gentry told him to leave because he was not himself and seemed in need of a shower.  As someone who had herself experimented with drugs, Gentry considered Young's behavior as consistent with someone who has been using methamphetamine.  (*Id*. at 208.)

447.   After hearing about the murders for which Young stood accused and convicted of, lay witnesses testified about their sorrow over the events, but also professed continued love towards Young and their intention to continue their valued friendship.  (33 RR at 230, 238; 34 RR at 137, 155).  Though they were aware of the murders, their love for Young did not waiver.  Such was the case of Paula Pettingale, who knowing about the crimes, decided to keep the childhood pictures she had of Young up in her home by the lake.  (34 RR at 137.)

448.   Two lay ministers testified about Young's spiritual beliefs while in detention awaiting trial, testifying about his devotion while they ministered to him, and that, in spite knowing he was accused of murders, never felt threatened by Young during their face- to- face prayer meetings.  (34 RR at 244-46, 254, 258.) Siblings, friends, teachers, correctional officers and neighbors all asked the jury to spare Young's life.  (33 RR at 203; 34 RR at 126, 137.)

449.   The second category of mitigating evidence came from expert witnesses who discussed Young's brain dysfunctions, the consequences of Young's abused and troubled childhood, and the repercussions Young's ADHD had on his development.  They also described the unfortunate, long history of improper and inadequate treatment Young received at the hands of state- run

147

agencies entrusted with his well-being, which instead of providing adequate treatment, gave up on him and passed him on to other agencies.  (34 RR 44-45, 48; 36 RR at 23, 37- 40.)

450.   Dr. Meyer Proler, a physician with a specialization in clinical neurophysiology, testified that a recent electroencephalogram or "EEG" given to Young, and a qEEG (quantitative EEG), were abnormal.  (32 RR at 180-87, 203.) In comparing the EEG done on Young in 2003, to the one done in 1993, Dr. Proler testified that not only was the 1993 exam also abnormal, but that the comparison showed the abnormality had become more severe.  (*Id*. at 206.)  Dr. Proler testified that the 2003 EEG was consistent with severe ADHD and that while the EEG showed abnormality that denoted a disturbance in physiology, it was still possible to treat Young's condition.  (*Id*. at 206, 208.)

451.   Doctor Daneen A. Milam, a chemical psychologist, spent from ten to twelve hours with Young and administered a series of neuropsychological tests. (34 RR at 14.)  She testified that while Young's I.Q. was in the 85th or 90th percentile, his brain functioning was only within the normal limits, what she would expect from someone with an I.Q. in the 50th percentile.  (*Id*. at 16-17.)  Dr. Milam testified that she saw a consistent pattern of ADHD in Young based upon her review of the records and interviews she conducted.  (*Id*. at 20.)  She testified that ADHD prevents regular inhibitors of conduct from developing normally, creating an inability to inhibit behavior across the board (*id*. at 24), she also noted that ADHD affects a person's ability to pick up or perceive social clues, because a person with a ADHD cannot focus.  (34 RR at 48.)  She indicated that a person's behavior is part genetics, in this case the ADHD – contributing to poor impulse control -- and part shaped by the environment surrounding the person when developing -- in the case of Young, his family dysfunction.  (*Id*. at 25.)  Providing an analogy for Young's early development, or lack thereof, Dr. Milam described Young as a "Mercedes-Benz with this great motor and no brakes, no brakes at all."

(*Id*.)

452.   After reviewing Young's records, from kindergarten to the day he left TYC, Dr. Milam concluded that most of the conduct identified as problematic emanated from Young's severe ADHD.  (34 RR at 27.)  She testified that a five-year-old child does not choose to be bad.  (*Id*. at 30.)  When Young was diagnosed with ADHD and began being medicated, in her opinion, no one "ever looked across [the] records before" and noticed that Young did not respond well to stimulants such as Ritalin, to control his ADHD.  (*Id*. at 31.)

453.   When Young was in first grade, the stressors in Young's early life increased, especially around the time his house burned down.  (*Id*. at 34.)  As the continuous stressors mounted, Young's behavior continued being inappropriate, the same type of behavior other children normally have, "just more of it." (*Id*. at 35.)  By second grade, Dr. Milam testified that Young was deemed "at risk" because of his low performance in mathematics and writing.  (*Id*. at 36.)  At this time, although Young was seeing a child psychiatrist and a child psychologist, leading to remarkable improvement, the visits were discontinued because of their expense.  (*Id*. at 37.)

454.   By the third grade, Young's grades were below average, and his school records described him as having poor judgment, impulsiveness.  (*Id*. at 38.)  Dr. Milam testified that these records reflected some disruptive behavior and that she was concerned with the decisions on how Young was handled at that time. (*Id*.)  Dr. Milam concluded that at this time, there was enough hostility against Young at home that led to him being sent to live with his father.  (*Id*. at 39.)

455.   Dr. Milam testified that Young's constant complaining about having stomachaches was really tied to the stimulants he was being prescribed to control his ADHD.  (*Id*. at 40.)  While he continued to have problems at school during the forth grade, Dr. Milam concluded that it was "very difficult for him to do his homework when his mother is working from 4:00 until 1:00 in the morning." (*Id*.

at 41.)  Dr. Milam testified that the label Young received as "emotionally disturbed" indicated family dysfunction in Young's life.  (*Id*. at 44.)  Given the diagnoses by Dr. Walker when Young was in fourth grade, Dr. Milam testified that Young should have received follow-up psychiatric evaluation.  (*Id*.)  Instead, he was sent to Wyoming to live with his father, which had a devastating effect on Young.  (*Id*. at 45.)

456.    Unlike other children who were developing proper inhibitors, Young was unable to do so, thus "growing into his deficits," and becoming more and more identified as a problem.  (*Id*. at 46.)  Dr. Milam characterized as "a lost year" the year it took for Young to see a psychiatrist from the time he was identified as needing to see one.  (*Id*. at 48.)  By the fifth grade, Young instead was sent to Triangle Pines, which according to Dr. Milam, was a "disaster."  (*Id*. at 49.)  Instead of properly evaluating and treating him, Young was discharged from Triangle Pines for exhibiting the same behavior he was sent to Triangle Pines to modify.  (*Id*. at 49-50.)  Instead of the structured environment he needed to deal with his ADHD, Young was once again sent to live with his father, an unstructured environment where there were an abundance of drugs.  (*Id*. at 51-52.)  Once at Waco, Young's history of receiving inappropriate treatment continued.  (*Id*. at 53.)  The medication given to Young was totally ineffective in controlling the behavior cause by his ADHD.  (*Id*. at 53-54.)

457.    Young was also expelled from Waco for exhibiting the same type of behavior he was sent there to learn how to control.  (*Id*. at 56.)  Dr. Milam characterized the incident with Mr. Wendell as indecency to a child as "totally bogus."  (*Id.* at 56.)

458.    As had been the case at school, at Triangle Pines, and at Waco, Young again received inappropriate treatment once he was sent to TYC.  (34 RR at 59-60.)  As a child who had received stimulants since the age of six, Dr. Milam did not have an explanation why TYC would determine that Young had "no known

medical needs" upon admission.  (*Id.*)  Neither could Dr. Milam explain why, although upon admission TYC recommended that Young receive a high level of care, where he "require[d] supervision by multiple staff in limited access setting," Young was placed in a level of care with minimal supervision.  (*Id.* at 59-60.)

459.   Dr. Milam could not explain either why a child of fourteen years old who, during his admission intake at TYC  reported extensive drug and alcohol consumption, expressing that he felt hooked on alcohol, and in spite of reporting a family history of intensive drug and alcohol abuse, for the two years and nine months that Young was at TYC, never received any drug treatment whatsoever. (34 RR at 62-63.)

460.   Reminiscent of what others had testified about his father, Young reported "that he would awake in the mornings drinking to relieve the withdrawal symptoms due to his alcohol abuse."  (Ex. 3 at 28 [Chem. Dep. SASSI]). To Dr. Milam, it did not make sense that TYC, having Young's records, and having found Young to easily meet the criteria as a chemically dependent patient, did not provide Young with any chemical dependency treatment. (*Id*. at 64, 96.)

461.   The limited treatment that Young received outside of the standard group program that TYC offered, an anger management program, was self-initiated.  (34 RR at 68.)  Again, Young was expelled from that treatment because he could not control his anger.  (*Id*.  at 69.)  As Dr. Milam testified, "[h]e got angry at anger management class and they kicked him out . . . [j]ust like Triangle Pines." (*Id*.)

462.   Dr. Milam testified she could not explain why the Treatment Needs Assessment given to Young a month before he was released from TYC, and where Young had been given psychoactive drugs while at TYC, stated he had no known medical needs.  (*Id*. at 72.)  Nor could Dr. Milam explain that once released from TYC, and when he was on parole, Young was not ordered to go to mental health programs, and continue his medication regime.  (*Id*. at 74-75.)

463.   Dr. Milam described the substantial disruptions of program incidents memorialized in the TYC records as "hauntingly familiar" with Young's records as a first grade student: talking back, cursing, getting out of his personal area, shooting rubber bands.  (34 RR at 77.)  Most of the incidents describing assault on students referred to trivial incidents like popping students with rubber bands and shoving.  (*Id.* at 79.)  Of the fourteen incidents categorized as a danger to others, some involved food fights and beating on the cafeteria table.  (*Id.*)  Because everything needed to be written down, some of the incidents were written down even though they were just allegations.  (*Id.* at 80.)

464.   The problems that Dr. Milam considered serious, by comparison, were few.  There were only two "possession of a weapon" incidents, one when Young was found to possess a tattoo machine, and when he was found with a needle which could be used to create tattoos.  (*Id.* at 82.)  There were two "assault to staff" incidents, where a staff member was hit while trying to separate Young and another youth, and an incident of which Young was acquitted because it could not be shown that Young had intended to hit the staff member.  (*Id.* at 83.)  The single incident categorized as destruction of property entailed Young writing on his jacket.  The single incident classified as "injury to self" entailed Young tattooing himself.  (*Id.*)

465.   Dr. Milam testified that Young's long internment in TYC meant that Young's incident-prone behavior was not voluntary, not a product of choice, but rather, involuntary.  (34 RR at 87-88.)

466.   Comparing the psychiatric follow-ups to the incident summary, Dr. Milam was able to conclude that once the TYC psychiatrist found the adequate doses of the medication that worked for Young, the number of incidents dropped dramatically.  (*Id.* at 92.)  Dr. Milam testified that the TYC psychiatrist continued trying different medications and different combinations until, towards the end of Summer of 2000, "[t]hey got it right.  No doubt they got it right.  (*Id.* at 93.)

467.   Once Young was paroled, however, continuing medication was not made a condition of his parole.  (*Id*. at 93.)

468.   Dr. Milam testified that although Young was a bright boy, there was something significantly wrong with his brain, a condition for which Dr. Milam opined he was never actually treated.  (*Id*. at 95.)  Although the symptoms of his ADHD – his behavior -- were treated, Young never received treatment for the underlying problem, his ADHD.  (*Id*. at 96.)

469.   On cross-examination, Dr. Milam testified that her diagnosis of Young was mild brain damage, severe attention deficit disorder and severe behavioral problems.  (*Id*. at 103.)  During cross-examination, the State minimized the role of Dr. Milam's testimony by chastising her for not reviewing the records of the crimes for which Young was convicted, thus implying that Dr. Milam's testimony should be confined to the crimes in question, rather than as mitigating evidence outside of the confines of the crimes and only concerning future dangerousness.  (34 RR at 105-08.)

> Q.    As the defense witness which you regularly appear
>        as, that's true, the mitigating factors, you're
>        supposed to bring out those things that will try to
>        convince a jury that they should not assess the
>        death penalty.  And I understand, but now you've
>        made yourself, instead of an independent witness,
>        an advocate for the Defendant?
>
> A.    How?
>
> Q.    Well, you've already said you're supposed to bring
>        out just the mitigating factors?
>
> A.    Pro and con.  I'm just supposed to tell the truth.
>
> Q.    Well, yes, ma'am, but part of the truth is what
>        happened during the crime, what his conduct was,

what may've motivated him to do it, why he

reacted that way under certain circumstances?

(34 RR at 105.)

> Q.   I mean, the jury is looking at you for a diagnosis,
> which you gave us a moment ago, and now a
> prognosis, okay.  What is your prognosis as a
> defense expert who regularly appears in capital
> murder cases on behalf of the Defendant, what is
> your prognosis for this Young Defendant?
>
> A.   That he will probably have to be incarcerated the
> rest of his life.
>
> Q.   You don't see -- I mean, are you telling this jury
> that -- that he can't be fixed, is that what you're
> saying?
>
> A.   He can't be fixed.
>
> Q.   Cannot be fixed?
>
> A.   He could have.
>
> Q.   Well, if ifs and buts were candy and nuts, we
> would all have a very merry Christmas.
>
> A.   That's true.

(34 RR at 107-08.)

470.   When Dr. Milam explained that Young's actions during the crimes were the result of a combinations of several factors, including his ADHD, his substance abuse problems, his genetics, his environment and a series of circumstances, the State went back to the future dangerousness aspect of Young's behavior:

> Q.   This Defendant is fixed, and as far as psychology
> or psychiatry is concerned, y'all can't fix him.

154

He's broken and you can't fix him?

A.    He can be controlled, that the meds – he can be controlled by medication and they proved that at TYC.

Q.    That's your opinion?

A.    Yes, sir.

(34 RR at 109-10.)

471.    Dr. Roy Mathew, a psychiatrist and an adviser on the advisory board of the Diagnostic and Statistical Manual, Fourth edition ("DSM IV") in the area of drug abuse, interviewed Young twice, for about four and a half hours, and reviewed over twenty-four documents, including reports from Deputy Kent Spencer and Deputy Reba Beam.  (34 RR at 165.)   Based upon the review of the records, Dr. Mathew testified that Young was prescribed a number of psychotropic medications throughout his life, including Ritalin, Thorazine, Cylert, Zoloft, Wellbutrin, Adderall, Dexedrine, Denadryl, Depakote, and Mellaril. (*Id*. at 166.)  Dr. Mathew, noticing that Young had been civilly committed to Waco Center, testified that by finding that a person can no longer manage his own affairs, the responsibility of caring for that person becomes the psychiatrist's.  (*Id*. at 167-68.)

472.    Dr. Mathew testified that Dr. Short's diagnosis of Young as having antisocial personality disorder as a fourteen-year-old child was improper.  (*Id*. at 171.)  Because of the extremely negative connotation of that term, and because personality is not fully formed at that age, the standard practice in psychiatry was not to make this diagnosis before the patient turned eighteen.  (*Id*. at 172.)

473.    Dr. Mathew testified "there is no question" Young has very severe ADHD, which Dr. Mathew described as a brain disorder with physical differences in the brain.  (*Id*. at 173-74, 177.)  According to Dr. Mathew, the development of a child with ADHD would also be influenced by the environment surrounding him

155

"so that if an attention deficit disorder child is born into a dysfunctional family where parents themselves have problems, then that child grows up, that child's personality and attention deficit disorder will be very different compared to the child who was born into a good family." (34 RR at 178-79.)

474.   Providing an analogy for Young's brain disorder, Dr. Mathew described Young's ADHD as a computer with a faulty electric generator, unable to regulate the amount of energy the brain received with the amount of activity it produced. (*Id*. at 181-82.) The faulty electric generator produced a child who could not focus on any one thing when there were a number of stimuli around him. (*Id*. at 183-84.)

475.   Dr. Mathew testified that there was a great correlation between ADD and drug abuse, with some researchers concluding that as many as forty percent of ADD patients start using drugs at a very early age. (*Id*. at 186-87.) While amphetamine was used to treat two conditions, narcolepsy and attention deficit disorder, methamphetamine is not clinically used because it is highly addictive. (*Id*. at 188.) Methamphetamine, as all amphetamines, can produce delusions or psychosis that are indistinguishable form paranoid schizophrenia. (*Id*. at 189-90.)

476.   Dr. Mathew testified that, based upon his review of the records and his interview with Young, in his opinion, Young was intoxicated with methamphetamine during the first murder and psychotic at the time, and thus out of touch with reality. (34 RR at 196-97.) At the time of the second murder, Dr. Mathew testified that Young was in methamphetamine withdrawal. (*Id*. at 198.) Dr. Mathew further explained his testimony by saying that the inference as to Young's state of mind while the murders took place did not mean that Young had been the triggerman that caused the murders. (*Id*. at 199.)

477.   Dr. Mathew testified that it was his opinion Young was treatable with cognitive therapy, identifying false beliefs and correcting them, in addition to medication. (*Id*. at 203-04.)

156

478.   Upon release from TYC, Dr. Mathew testified that Young should have been placed in something similar to outpatient commitment, where a discharged patient is required by court to attend a clinic.  (34 RR at 207.)  According to Dr. Mathew, although acknowledging that nobody could predict the future, it was his opinion that if Young "had been on that medication and then somebody kept an eye on him and made sure he took that treatment, two people would not have died unnecessarily and he wouldn't be in the predicament he's in." (*Id*.)

479.   On cross-examination, Dr. Mathew acknowledged that the incident with criminal activity was quite high in patients with ADD, "so if I get a youngster with severe ADD at the age of 14, I would probably say that this person can be always a danger to the society." (*Id*. at 212.)  Dr. Mathew testified that unlike others, he thought Young was treatable because he thought he could connect with Young.  (34 RR at 236.)

480.   When specifically asked about future dangerousness, Dr. Mathew acknowledged that with attention deficit disorder "and poor impulse control, and if put in a situation where he is constantly provoked by other people and he does not have any treatment, that Young may get into fights." (*Id*. at 238.)  While acknowledging that he could not predict the future, he testified that in a good environment with some medical care, he would expect Young to do reasonably well.  (*Id*. at 238.)  He also testified that he saw no relationship between Young and a serial killer, as previously described by the State.  (*Id*. at 240.)

481.   Dr. Ross Green, a child psychologist, testified that Young was the "poster child for ADHD" (36 RR at 18), because report after report described him as "exceedingly hyperactive, impulsive, inattentive." (*Id*. at 23.)  According to Dr. Green, Young was a stimulant non-responder, and as such, the stimulants he was prescribed throughout ten to twelve years of his life were not treating his ADHD. (*Id*. at 19.)

482.   To Dr. Green, six months, rather than the ten to twelve years it took,

157

should have been enough time to reach the conclusion that Young was a stimulant non-responder.  (*Id*. at 19-20.)  Instead of continuously giving Young stimulants, he should have been treated with other types of medication such as  mood stabilizers.  (*Id*. at 23.)   Dr. Green concluded that most forms of treatment applied to Young as he entered adolescence were ineffective, referring to them as "poor treatment," until he received the proper cocktail medication toward the end of his imprisonment at TYC.  (*Id*. at 23, 37- 40.)

483.   Like his colleagues, Dr. Green testified that he did not consider the Wendell incident as sexual deviance.  (*Id*. at 39.)  He testified that ADHD and cognitive disorder were highly treatable through proper medication and cognitive training, and that Young was highly treatable.  (*Id*. at 41, 43.)  When asked specifically if a child would choose to be impulsive, hyperactive and inattentive, or whether those children were "born evil," Dr. Green responded that:

> Clint's hyperactivity, poor impulse control and
> inattention never brought him anything but misery.  It's
> really an extremely sad tale of a child who I believe was
> highly treatable, continued to be highly treatable and is
> still highly treatable.  Nobody chooses to be inattentive,
> hyperactive and impulsive if they can do it differently.

(36 RR at 44.)

## D.    State's Rebuttal

484.   On rebuttal, the State called Dr. George Herman Cirkovic, a neurologist not board certified in psychiatry (35 RR at 172).  Dr. Cirkovic testified that he disagreed with the conclusion that Young's qEEG was "abnormal" (35 RR at 146-47); that he considered the seizures Young suffered as a child as "benign febrile convulsions" with no effect to brain function itself (*Id*. at 155); and that ADD, in his opinion, was not a real diagnosis (*Id*. at 163), although he considered

it a "brain dysfunction."[48]  (*Id*. at 181.)

485.   Dr. Cirkovic testified that after administering a neurological exam on Young lasting about one hour and forty minutes (*id*. at 184), he did not find any neurological impairments.  (*Id*. at 157.)  He diagnosed Young as having "mania," which he described as individuals exhibiting personality traits as tremendously impulsive, grandiose, aggressive, antisocial, cruelty towards others, who can not learn from their mistakes and whose inattention is caused by the fact that they have millions thoughts getting into their heads and are trying to consider what to do next. (*Id*. at 165.)

486.   Though he did not have a name for it, Dr. Cirkovic thought that the type of mania Young had was "sociopathy with mania and homicidal behavior." (*Id*. at 165.)  Dr. Cirkovic opined that Young could not be "fixed" and thought that Young was "extremely dangerous" (*id*. at 166-67); whose lack of impulse control would get the better of him while in the prison system (*id*. at 168); and that the prison system would be "bad" for Young's condition.  (*Id*. at 170-71.)  According to Dr. Cirkovic, while Young's mania could be treated, his conduct disorder and whatever caused the "homicide part" could not be treated, the same way a serial killer could not be treated.  (*Id*. at 196-97.)

**E.   Jury Instructions**

487.   Young's jury was instructed as follows at the punishment phase:

> In answering the issues submitted to you, the jury
> must not be swayed by mere sentiment, conjecture,
> sympathy, passion, prejudice, public opinion or public

---

[48]  While Dr. Cirkovic opined that ADD was not "real" diagnosis, his telephone number was 1-800-755-ADHD and specifically treated individuals with ADHD.  (35 RR at 179-80.)

feelings.[49]

(CT at 858.)

> In deliberating on issues in this case except as provided in the following paragraph, the jury shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or circumstances of the offense that militate for or mitigate against the imposition of the death penalty.

> The Jury's answer or answers to the issues must be directly related to the defendant's personal culpability. You are instructed in answering Issue No. 1 and Issue No. 2 that only the conduct of the defendant can be considered and that the instructions pertaining to the conduct of other persons under the law of parties heretofore given you on guilt/innocence cannot be considered in answering Issue No.1 or in answering Issue No.2.[50]

(CR at 859.)

**ISSUE NO 1.**

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that

---

[49]  This instruction is usually known as the "anti-sympathy" instruction. Young objected to this instruction, (36 RR at 79), and proposed that the jury be instructed that "not all sympathy is out of the range of consideration to this jury." (*Id*. at 80; CR at 877-88.)

[50]  Young's counsel objected to this instruction.  (CR at 880.)  Young's objections to this instruction were overruled.  (36 RR at 75-76; CR at 877-88.)

would constitute a continuing threat to society? Answer by stating, "yes," (there is a probability) or "no," (there is not a probability). Answer by stating "yes" or "no."[51]

(CR at 860.)

### ISSUE NO. 2

Do you find from the evidence beyond a reasonable doubt that the defendant, himself, actually caused the death of the deceased individuals or he did not himself actually cause the death of the deceased individuals, but he intended to kill the deceased individuals or anticipated that human life would be taken?  Answer by stating "yes" or "no."[52]

(CR at 861.)

The jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness or which would make a death sentence inappropriate in this case.[53]

(CR at 862-63.)

### ISSUE NO. 3

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the circumstances of the

---

[51]  This instruction is usually referred to as the "future dangerousness" special issue.  Young's requests to provide the jury with definitions of "probability," "criminal acts of violence" and "continuing threat to society" were denied.  (36 RR at 77-79; CR at 877-88.)

[52]  This instruction is usually refereed to as the "anti-parties" special issue, and it is applicable only to persons convicted under the "law of the parties."  *See* Tex. Crim. Proc. Code Ann. art. 37.071(2)(b)(2).

[53]  Young objected to this instruction.  (CR at 877-80)

> defendant, his character and background, and the
>
> personal moral culpability of the defendant, that there is a
>
> sufficient mitigating circumstance or circumstances to
>
> warrant that a sentence of life imprisonment rather than a
>
> death sentence be imposed? Answer by stating "yes" or
>
> "no."[54]

(*Id.*)

## F.    Relevant Legal Authority

488.    Long before the Supreme Court decided *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (*Penry I*), it was already clearly and firmly established federal law that:

> [S]entencing juries must be able to give meaningful
>
> consideration and effect to all mitigating evidence that
>
> might provide a basis for refusing to impose the death
>
> penalty on a particular individual, notwithstanding the
>
> severity of his crime or his potential to commit similar
>
> offenses in the future.

*Abdul-Kabir,* 127 S. Ct. at 1664, *citing Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976), *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), and *Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976).

489.    In *Penry v. Johnson*, 532 U.S. 782, 797, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001) (*Penry II*), the Court further explained the importance of a sentencing juror's ability to give full consideration and full effect to the mitigation evidence a defendant facing the ultimate punishment proffers:

> *Penry I* did not hold that the mere mention of

---

[54]  Young objected to this instruction as it related to the other instructions. (CR at 877-80.)

"mitigating circumstances" to a capital sentencing jury
satisfies the Eighth Amendment. Nor does it stand for the
proposition that it is constitutionally sufficient to inform
the jury that it may "consider" mitigating circumstances
in deciding the appropriate sentence.  Rather, the key
under *Penry I* is that the jury be able to "consider and
give effect to [a defendant's mitigating] evidence in
imposing sentence." 492 U.S., at 319, 109 S.Ct. 2934
(emphasis added).  *See also Johnson v. Texas,* 509 U.S.
350, 381, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)
(O'Connor, J., dissenting) ("[A] sentencer [must] be
allowed to give *full* consideration and *full* effect to
mitigating circumstances" (emphasis in original)). For it
is only when the jury is given a "vehicle for expressing
its 'reasoned moral response' to that evidence in
rendering its sentencing decision," *Penry I*, 492 U.S., at
328, 109 S.Ct. 2934, that we can be sure that the jury
"has treated the defendant as a 'uniquely individual
human bein [g]' and has made a reliable determination
that death is the appropriate sentence," *Id*. at 319, 109
S.Ct. 2934 (*quoting Woodson v. North Carolina*, 428
U.S. 280, 304, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944
(1976)).

*Penry II*, 532 U.S. at 797; *cited in Abdul-Kabir*, 127 S. Ct. at 1674.

490.   In other words, "the jury must be permitted to 'consider fully' such
mitigating evidence and . . .  such consideration 'would be meaningless' unless the
jury not only ha[s] such evidence available to it, but also [is] permitted to give that
evidence meaningful, mitigating effect in imposing the ultimate sentence."

*Abdul-Kabir*, 127 S. Ct. at 1672.

491.   A jury may be precluded from giving full consideration to the relevant mitigating qualitites of a petitioner's proffered evidence "not only as a result of the instructions given, but also as a result of prosecutorial argument dictating that such consideration is forbidden. *Abdul-Kabir*, 127 S. Ct. at 1671 n.21, 1672-74.

492.   In reviewing a habeas petitioner's claim challenging the propriety of a jury instruction under *Penry I* and its progeny, a reviewing court must determine whether there is a reasonable likelihood that the state trial court's instructions and prosecutorial argument to the jury that sentenced a petitioner to death prevented the petitioner's jurors from giving meaningful consideration to constitutionally relevant mitigating evidence. *Abdul-Kabir*, 127 S.Ct. at 1674.  While the reasonable standard requires that a petitioner show "more than a mere possibility" that his jury was prevented from giving full consideration and full effect to the evidence, a petitioner is not required to prove "that it was more likely than not" that the jury was prevented from doing so. *Johnson*, 509 U.S. at 367; *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990).

493.   Constitutionally relevant mitigating evidence under the Eighth and Fourteenth Amendment "in all but the rarest kind of capital case must not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) ("We are now faced with those questions and we conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in original).

494.   A reviewing court must "approach jury instructions in the same way a

164

jury would - with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Penry II*, 532 U.S. at 800, *citing Boyde*, 494 U.S. at 381.

495.   Under the AEDPA, a federal court may grant habeas relief when the state court's "adjudication of a claim on the merits resulted in a decision that involved an unreasonable application of the relevant law.  When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied." *Panetti v. Quarterman*,  127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007) (internal citation omitted).  "A federal court must then resolve the claim without the deference AEDPA otherwise requires." *Id*.

**G.     The CCA Adjudication of Young's Claim on the Merits Resulted in a Decision That Was Contrary To, or Involved an Unreasonable Application Of, Clearly Established Federal Law, as Determined by the Supreme Court of the United States**

496.   In Young's case, the CCA based its decision solely on the fact that Young's jury had been given the new Texas statutory mitigation instruction, which according to the CCA allows the jury to consider all of the evidence presented at trial in answering the mitigation special issue.[55]  *Young v. State,* 2005 WL

---

[55]   In denying Young's claim on direct appeal, the CCA simply stated, in pertinent part:

> The jury in this case was given the statutory mitigation instruction. See Art. 37.071 §2(e)(1).  The statutory instruction allows the jury to consider all of the evidence presented at trial in answering the mitigation special issue. *Cantu v. State*, 939 S.W.2d 627, 639-40 (Tex. Crim. App.1996)).  Appellant presented evidence of his ADHD and other mitigating evidence, and the jury was given a vehicle through which it could consider and give effect to that evidence.  Appellant's eighth point of error is overruled.

*Young v. State,* 2005 WL 2374669, *8 (2005 Tex. Crim. App.)

2374669, *8 (Tex. Crim. App. 2005). As its authority, the CCA cited to *Cantu v. State*, 939 S.W.2d 627, 639-40 (Tex. Crim. App. 1997). *Id. Cantu*, however, is an unreasonable interpretation and application of *Penry I* and its progeny and is, itself, not applicable to Young's case.

497.    Although the CCA noted in *Cantu* that the pre-1991 version of Article 37.071 "ha[d] been amended, at least in part, to address concerns raised [by *Penry I*] with respect to mitigating evidence," *Cantu*, 939 S.W.2d at 639, the Supreme Court is yet to hold that Article 37.071 meets the requirements enunciated in *Penry I* and its progeny.[56] Although in *Cantu* the CCA was correct in noting that "the Texas death penalty scheme was found constitutional by the Supreme Court in *Jurek*, 428 U.S. at 270-72, the CCA failed to recognize the conditional nature of such finding, a finding that was "resting fundamentally" on the assurance that the special instructions would permit the jury to fully consider a petitioner's mitigating evidence, and that such special instructions would be interpreted broadly enough to allow the jury to play its proper role. *Abdul-Kabir*, 127 S. Ct. at 1668 n.15, *citing Penry I*, 492 U.S. at 318, 320-21.

498.    Moreover, in *Cantu*, the CCA failed to properly recognize that prosecutorial arguments, in addition to jury instructions, may preclude a capital sentencing jury from giving full consideration to the relevant mitigating qualitites of a petitioner's proffered evidence when prosecutorial arguments dictate such consideration is forbidden.[57]

499.    Finally, the *Cantu* court refused to reach the issue, raised by Cantu, that the requirement of a "nexus" between mitigating evidence and the crime was

---

[56] In passing, the Supreme Court has noted that the new Texas capital sentencing scheme provides a "helpful frame of reference" for a catchall instruction that "might" comply with *Penry I. Penry II*, 532 U.S. at 803.

[57] The *Cantu* court analyzed the impropriety of the prosecutorial arguments under a Texas statute and finding "no bad faith" on the part of the prosecutor. Nothing in *Penry I* and its progeny suggest that a finding of "bad faith" is required when analyzing a prosecutor's statements in this line of cases.

no longer valid under the post-*Penry I* Texas capital penalty scheme.  *Cantu*, 939
S.W.2d at 633.  As the Supreme Court has repeatedly stated, a petitioner need not
establish a 'nexus' between the mitigating evidence and the crime committed for
such mitigation to be constitutionally relevant under the auspices of *Penry I* and its
progeny.  *Tennard v. Dretke*, 542 U.S. 274, 287, 124 S. Ct. 2562, 159 L. Ed. 2d
384 (2004) ("As we have explained, the Fifth Circuit's screening test has no basis
in our precedents and, indeed, is inconsistent with the standard we have adopted
for relevance in the capital sentencing context. We therefore hold that the Fifth
Circuit assessed Tennard's *Penry* claim under an improper legal standard."); *Smith
v. Texas*, 543 U.S. 37, 44, 125 S. Ct. 400, 160 L. Ed. 2d 303 (2004) ("The Texas
Court of Criminal Appeals relied on precisely the same "screening test" we held
constitutionally inadequate in *Tennard.*").

500.   For all the aforementioned reasons, the CCA assessed Young's *Penry*
claim under an improper legal standard.  As such, this Court must evaluate
Young's *Penry* claim de novo, rather than applying the objective reasonableness
standard of 298 U.S.C. § 2254(d).

## H.   Young's Capital Sentencing Jury Was Denied a Vehicle to Express its Reasoned Moral Response to Young's Mitigating Evidence

501.   While Young was allowed to introduce mitigating evidence, the jury
that sentenced him to death was not allowed to fully consider Young's evidence in
mitigation, or to give full effect to such mitigation.  Instead, the jury instructions,
as well as the argument by the State:  (1) improperly limited the type of evidence
the jury could consider as mitigating; (2) improperly required a nexus between
Young's mitigating evidence and the crime; (3) prevented the jury from giving
Young an individualized sentencing process; and (4) prevented the jury from
considering  Young's mitigating evidence beyond the scope of either the future
dangerousness special issue and Young's personal conduct in the criminal acts.

502.   Under these circumstances, there is more than a reasonable likelihood

that the State instructions and prosecutorial argument prevented Young's jurors from giving meaningful consideration to the constitutionally relevant mitigating evidence presented to his capital sentencing jury.  As a result, the jury that sentenced Young to death lacked a vehicle for expressing its reasoned moral response, thus raising the prospect that the jury did not treat Young as a uniquely individual human being, and therefore, reducing the confidence that the jury made a reliable determination that death is the appropriate sentence in this instant.  As such, Young's sentence of death cannot stand.

**I.    The Trial Court Improperly Limited the Type of Evidence the Jury Could Consider as Mitigating**

503.   Over Young's objection, the trial court gave Young's jury the so called "anti-sympathy" instruction.  (CR at 858.)  The court instructed Young's capital sentencing jury that it must not be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feelings."  (*Id*.)  Because the finding of future dangerousness requires that the jury engage in what the CCA itself has called a "necessarily speculative enterprise,"[58] a jury could have reasonably interpreted this instruction as limiting only the jury's ability to evaluate Young's mitigation evidence, and not similarly restricting the jury's discretion when it came to future dangerousness.[59]

---

[58]   *Burns v. State*, 761 S.W.2d 353, 358 (Tex. Crim. App. 1988) (recognizing that assessing a defendant's ability to coexist peacefully in society is a "necessarily speculative enterprise.").

[59]   Because the jury instructions given to Young's jury are not similar to the instructions analyzed in *California v. Brown*, 479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987), *Brown* is not controlling in this situation.  In *Brown*, the jury was instructed that it "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling," *id*. at 540, but also was given an instruction that listed "specific aggravating and mitigating factors the sentencer is to consider in determining punishment."  *Id*. at 546 (O'Connor, J., concurring).  Unlike *Brown*, here in Young's case, Special Issue No. 1 as to whether there is a "probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" is not similarly specific as the instructions in *Brown*.  Because the 'aggravating' instruction in Young's case is not nearly as specific as the instruction involved in *Brown*, in

168

504.   The prosecutors' argument most likely had the effect of further leading the jury to consider Young's mitigation evidence precisely as evidence based on "mere sympathy" that the jury was instructed to disregard.  The prosecutors repeatedly told the jury that the decisive factor in sentencing Young was his future dangerousness and that Young's mitigating evidence were mere excuses.

> They promised you they would explain to you why. Now,
> they've explained real well why he doesn't sit well in a
> chair when he was in school and why he had a lot of
> difficulty with getting his work done and not being able
> to make his teachers happy and what not, but there hasn't
> been a single person to come into this courtroom for the
> defense or for the state that has testified that there is any
> correlation between his behavior, the killing of these two
> men, and having ADD.  No one.  Not a single person.

(36 RR at 98.)

505.   The prosecutor continued:

> There's no question he had ADD.  No question at all, and
> it certainly affected him when he was a younger man, and
> it is a true shame that things were not advanced enough
> in the Texas system to get him quickly on to that magic
> cocktail and to get his behavior under control, but, ladies
> and gentlemen, when he had that opportunity, as I've
> already said to you, he chose not to take the medicine.
> He chose to go his own way.  Well, then, make him

---

Young's case the reasonable likelihood that the anti-sympathy instruction, coupled with prosecutorial argument, prevented the jury from giving full consideration and full effect to Young's mitigating evidence is considerably higher than it was the case in *Brown*.

responsible for the way that he chose, because that's

really what this is about is responsibility.  Has there been

anything in his character or his background that forgives

his blameworthiness for this crime?  There's not.

There's simply not.

(36 RR at 98-99.)

506.    Although defense counsel attempted to remind the jury that Young

was not seeking forgiveness, but rather, mercy from his sentencing given his

disadvantaged background and emotional and mental problems, as *Penry I* and its

progeny required,[60] the prosecutor led the jury to believe such consideration was

forbidden.  The State, given the last word before the jury retired for deliberations,

stated:

---

[60]  During his closing argument, Young's trial counsel addressed the State's
remarks concerning forgiveness.  Trial counsel stated, in pertinent part:

> Ms. Clingman said that there is no forgiveness for Clint
> Young, and I agree with her on that.  We're not talking
> about forgiveness.  This young man is going to spend the
> rest of his life in the penitentiary.  No one here is talking
> about forgiveness.  What we are talking about is
> mitigating circumstances . . . mitigating circumstances is
> not forgiveness. . . . mitigating circumstance is something
> that someone has no control over. . . .  [T]he State is
> going to want you to look at the evidence through the
> filter of the darkest areas of your soul, hatred and fear.
> We are asking you to look at the evidence in the light of
> the better angels of your nature, compassion and life.

(36 RR at 111.)

> So what we have to do is we have to follow the law.  We
> have to think, "For me as an individual, one who has to
> make a decision that I can live with for the rest of my
> life, is there some reason in looking at this 19 year old
> boy, this teenager, that I can find mercy and compassion,
> that I can vote for a sentence of life," and you know
> what, it's easy to do something when you're scared.  It's
> easy to respond to fear and hatred, all right?  It is hard to
> do the right thing, to show mercy to people.

(36 RR at 123-24.)

Compassion.  Compassion's wonderful.  Mercy's wonderful, but we're supposed to save it for the right people.  Certainly we have compassion and I know you do for the families sitting out here, but what he asked you to do is set aside your total sense of compassion for future victims, and that's what we're talking about. This is -- this is reality, folks, okay?  You are our shot, the 12 of you are our only shot at facing reality and making a decision in this case that's not only going to bring a sense of justice to these people, but protection for other people, the future Sam Petreys, the future Doyle Douglases. That's what we're asking, is this guy going to be dangerous, is this guy going to hurt other people? And we have to look at that reality and then take action, as difficult as it may be, to ensure we protect the other people.

The defense has done or tried to do a good makeover in this case.  You saw his mugshot.  You can go dig it out of the box later on, the way he looked, his presentation back at the time of his arrest, they've done all they can do to clean him up, make him look presentable, pat on him a little bit once in a while, try to keep him calm, put on a show, and they've engaged in the blame game.  They've told you they were going to bring you reasons, but all they've done is bring excuses and play the blame game for you for over the last week. Crummy mama, crummy doctors, everybody else is at fault.  Tried to play -- then they want to play the guilt trip

171

> on you, okay?  Oh, you be able to live with yourself?
>
> Okay?

(36 RR at 126-27.)

507.   It is more likely than not that the jury would have concluded that "compassion" toward Young, that mercy towards the individual person facing the death penalty, was not encompassed by the prosecutor's definition of  "reality," whereas the only proper evidence the jury could consider "real" under the prosecutor's definition of what is real, was that which established Young's future dangerousness.

508.   Part of the strength of Young's mitigating evidence was that in spite of his high potential, the lack of proper treatment meant that Young was never able to, as it were, achieve his whole potential.  As Dr. Green testified, the strength of Young's mitigation was that Clint's hyperactivity, poor impulse control and inattention never brought him anything but misery.  It's really an extremely sad tale of a child who . . . was highly treatable, continued to be highly treatable and is still highly treatable.  Nobody chooses to be inattentive, hyperactive and impulsive if they can do it differently.

(36 RR at 44.)

509.    In its closing remarks, the prosecution told Young's capital sentencing jury it was forbidden to heed Dr. Green's statement that Young's life was truly "an extremely sad tale" of a child who, in spite of his high I.Q. level, was never properly treated for his brain dysfunction.  Instead, as the prosecution said during trial, "if ifs and buts were candy and nuts, we would all have a very merry Christmas."  (34 RR at 108.)

> Too bad, and I think all of us agree, too bad that he came
>
> from a genetically defective family, and you got to see
>
> them, and it's sad to see.  Two brothers are up here in
>
> prison outfits, I got to listen to his sisters that didn't give

me a lot of reassurance on some of it, but it's too bad.

It's too bad he had a hard childhood.

(36 RR at 128.)

That offends me.  It offends my sense of justice that
there's a moral compass left in this world, that we're just
going to blame the doctors and the pill manufacturers and
the teachers and our mothers for everything that went
wrong and we're not going to have a steady course in this
society any more, because let me tell you, ladies and
gentlemen, when we get to that point in time, we have
lost it.  A people that no longer have vision in a moral
compass, that is a society that is going to fall, and that's
where a lot of folks want to head us to.  We're going to
excuse and blame and justify and pat on -- the little
darlings on the back so they never have to take any
responsibility for anything they've ever done or will do.

(36 RR at 129.)

510.   The anti-sympathy instruction told the jury it was impermissible to
feel "sad" for Young's situation, or to give effect to his predicament by sparing his
life.  The prosecutor's argument further ensured that the jury could not consider
Young's long history of inappropriate treatment under the auspices of the state as
mitigating. Instead, they were told to view such evidence as mere excuses.

511.   The confusion created by the anti-sympathy instruction, and exploited
by the prosecution in this case, was further compounded by the instruction meant
to limit the "law of the parties" instruction given during Young's guilt phase.
Because the jury was instructed that Young could be vicariously liable for the
capital murders, and because the CCA seems to recognize that the Eighth
Amendment does not permit the imposition of the death penalty on a petitioner

173

who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed" *Enmund v. Florida*, 458 U.S. 782, 797, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982), the state trial court gave the jury the so-called anti-parties instruction.[61]   In addition, however, the jury was also instructed to limit its deliberations as to Issue No. 1 (future dangerousness), by considering only Young's "conduct."   (CR 859.)

512.   The instruction meant to limit the jury's discretion as to punishment on a conviction obtained through the "law of the parties" is what "made the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation."   *Penry II*, 532 U.S. at 799.   On the one hand, the jury was commanded to consider "all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or circumstances of the offense that militate for or mitigate against the imposition of the death penalty."   (CR 859 at ¶ 1.)   On the other hand, the jury was instructed that, when it came to Issue No. 1 and  Issue No. 2, "only the conduct of the defendant can be considered and that the instructions pertaining to the conduct of other persons under the "law of the parties" heretofore given you on guilt/innocence cannot be considered in answering Issue No.1 or in answering Issue No. 2."   (CR 859 at ¶ 2.)

513.   Thus, a jury could have reasonably concluded that it could only

---

[61]   The post-*Penry* statute attempted to clarify the mens rea requirement previously addressed by the pre-1991 Texas capital question of "deliberateness." Because capital murder in Texas typically requires  an 'intentional killing,' a person convicted under Texas "law of the parties" may not necessarily have intended to kill.   *See* Tex. Pen. Code §§ 7.01, 7.02.   The post-*Penry* statute replaced the "deliberateness" *mens rea* with a question applicable only to persons convicted under the "law of the parties."   *See* Tex. Crim. Proc. Code Ann. art. 37.071(2)(b)(2).   To further complicate matters in this case, although Young's jury at the end of the guilt phase was instructed under Texas Penal Code § 7.02(a)(2), the CCA analyzed the sufficiency of the evidence supporting Young's conviction of capital murder under Tex. Pen. Code § 7.02(b), the wrong statute.   (*See* Claim Six, *post*.)

consider Young's "conduct" when evaluating whether he would be a future danger and whether Young had anticipated the death of the deceased. In determining Special Issues One and Two, the jury could have reasonably concluded that it could not consider Young's severe ADHD, his drug consumption, or the fact that he may have been unable to anticipate the reactions of his co-defendants because Young had been institutionalized by the State through his formative years. In fact, the jury manifested its confusion and unsuccessfully sought clarification from the court through a question during the first day of deliberations.[62]

514.   In Young's case, the language modifying the "anti-parties" instruction became the functional equivalent to the type of "nullification instructions" the Supreme Court has already found improper. *Penry II*, 532 U.S. at 797-800.

515.   Additionally, prosecutorial arguments had the most likely effect of making the jury further believe they could only consider Young's "conduct" in deciding Special Issues One and Two, and that his mitigating evidence was not applicable to those questions. In fact, that is precisely what the prosecutors in this case told Young's capital sentencing jury. Where as in addressing Special Issues One and Two, the prosecutor emphasized Young's conduct both during the crimes and in his previous behavioral problems, the prosecution addressed Young's mitigation apart from those issues by turning it into aggravating evidence:

> His background. From the evidence that has been
> brought to you, apparently he has an extraordinarily
> horrible genetic structure from his father's side of the
> family. His father's an alcoholic. Fourteen out of 16 of
> his cousins are in prison on that side of the family. I

---

[62]   The jury's question was read into the record as follows:
Regarding Issue Number 2, the question says, "cause the death of the deceased individuals, quote, intended to kill the deceased individuals. Question: Do you have to believe both or at least one?" (36 RR at 135.)

> wasn't a big believer in genetics until we got into this
> case, and that old saying of "blood will tell," well,
> apparently it has told way too much in this case.  With
> his genetic background, apparently he is predisposed to
> criminality, alcohol abuse and drug abuse.

(36 RR at 97.)

516.   Just as in *Penry* and its progeny, the language modifying the anti-parties instruction and the prosecutorial argument in Young's case ensured that the jury's ability to consider and give effect to Young's "two-edged sword" of mitigating evidence remained "shackled and confined within the scope of" Special Issues One and Two.  *See Abdul-Kabir*, 127 S. Ct. at 1669 ("When the evidence proffered is double edged, or is as likely to be viewed as aggravating as it is as mitigating, the [pre-1991] statute most obviously fails to provide for adequate consideration of such evidence.").

**J.    Improper Nexus Required**

517.   The definition of "mitigating evidence" provided to the jury improperly required a nexus between Young's mitigating evidence and the criminal acts for which he was convicted.  Limiting the definition of mitigating evidence to that which "a juror might regard as reducing the defendant's moral blameworthiness" not only inserted an element of capriciousness in the jury's determination, but it also linked such mitigating evidence to the crimes in question.

518.   The prosecutors' comments to the jury had the likely effect to further emphasize that the instructions required a nexus between Young's mitigating evidence and the criminal acts for which he had been convicted.  *Penry II*, 532 U.S. at 800.

> They promised you they would explain to you
> why.  Now, they've explained real well why he doesn't
> sit well in a chair when he was in school and why he had

a lot of difficulty with getting his work done and not

being able to make his teachers happy and what not, but

there hasn't been a single person to come into this

courtroom for the defense or for the state that has

testified that there is any correlation between his

behavior, the killing of these two men, and having ADD.

No one. Not a single person. . . .  It doesn't explain why.

Ladies and gentlemen, when you look at this case in total,

is there anything to reduce his personal moral

blameworthiness, and I submit to you, ladies and

gentlemen, there is not.

(36 RR at 98-99.)

519.   The state court also understood that mitigating evidence could be
mitigating only to the extent that such evidence had a nexus to the criminal acts.  In
its Order on Applicant's Application for Postconviction Writ of Habeas Corpus,
which the CCA adopted, the state court found that Young's trial counsel were not
ineffective in failing to present "additional evidence that illegal drug use and
criminal activity was rampant at the Fisherman's Motel," in part, because "[t]he
[c]ourt finds that such evidence is not mitigating evidence, and it does not reduce
or mitigate the Applicant's moral culpability for killing Doyle Douglas and Samuel
Petrey."  (Ex. 30 at 350 [Hyde's Denial of Writ].)   The state court, as well as the
CCA, failed to provide any explanation as to why such evidence did not fit into
what Texas courts, contrary to clearly and firmly established federal law, may be
considered as mitigating evidence.

520.    In the course of its closing arguments, the State of Texas reduced to a
legal insignificance more than thirty years of federal constitutional law.  As the
Supreme Court has said repeatedly, and most strenuously in *Tennard*, 542 U.S. at
287, the nexus requirement is inconsistent with the standard adopted for relevance

177

of mitigating evidence in the capital sentencing context. Although the Supreme Court has, for more than thirty years, insisted that mitigation must be broadly defined, in this case, mitigation had no place in the sentencing jury's decision whether or not to sentence, on behalf of the State of Texas, Young to death.

## K.   Confining Young's Mitigation to its Harmful Effect

521.   The court's instructions to Young's capital sentencing jury and the prosecutorial argument, as mentioned above, resulted in preventing the jury from giving full effect to Young's mitigating evidence. As the Supreme Court has most recently stated in a similar case where the petitioner presented evidence concerning mental illness, the strength of Young's mitigating evidence was not "its potential to contest his immediate dangerousness, to which end the expert's testimony was at least as harmful as it was helpful."[63] *Abdul-Kabir*, 127 S.Ct. at 1661. "Instead, its strength was its tendency to prove that his violent propensities were caused by factors beyond his control – namely," Young's brain dysfunction, childhood abuse and a history of improper treatment at the hands of state agencies entrusted with his psychiatric health.

522.   Contrary to *Lockett*, 438 U.S. at 605; *Bell v. Ohio*, 438 U.S. 637, 643, 98 S. Ct. 2977, 57 L. Ed. 2d 1010 (1978) (reversing defendant's death sentence because the Ohio death penalty statute "prevented the sentencing judges from considering the particular circumstances of his crime and aspects of his character and record as mitigating factors."); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986) ("the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'") (*citing Eddings*,

---

[63]   Indeed, Young's own counsel understood the harmful effect of Young's mitigating evidence when he told the the jury that "[i]t's when we give mercy to our enemy, the ones we're afraid of, the ones we don't trust, that is what makes us great, and that's what gives us the moral right to judge and to punish." (36 RR at 124.)

178

455 U.S. at 114); *Hitchcock v. Dugger*, 481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987) (reversing defendant's death sentence because the Florida statute limited the mitigating factors the sentencer could consider and "the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances."); *Parker v. Dugger*, 498 U.S. 308, 314-15, 321, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991); in addition to *Penry* and its progeny, the State of Texas ensured that the only manner in which the jury could consider Young's mitigation evidence was in deciding whether or not he presented a future danger.

> You've heard over and over again from these folks, "Only Doctor Mathew says 'I can fix him.'"   I think he's going to fix him with yoga, because that's the only paper I've found of his on fixing people, but everybody else says, "Look, I'm sorry, this guy is dangerous and we don't know enough in the psychiatric community to fix him."  That's the reality.  It's too bad. I wish we were smarter and I wish we knew what else to do, but what's scary is the guy's real bright and manipulative, and he's thinking all the time.

(36 RR at 131.)

523.   The State's instructions, coupled with the prosecution's arguments to the jury, were the complete opposite of the Court's opinion in *Penry I*, which the Court has described as "endorsing the views" Justice O'Connor expressed in her separate opinion in *Franklin v. Lynaugh*, 487 U.S. 164, 172, 183-85, 108 S. Ct 2320, 101 L. Ed. 2d 155 (1988) (O'Connor, J., concurring in judgment). *Abdul-Kabir*, 127 S.Ct. at 1667-68.  In *Franklin*, Justice O'Connor described the principle underlying *Lockett*, *Eddings*, and *Hithchock* as the principle that "punishment should be directly related to the personal culpability of the criminal

179

defendant." *Id*.  As the Court has previously articulated,

> [E]vidence about the defendant's background and
> character is relevant because of the belief, long held by
> this society, that defendants who commit criminal acts
> that are attributable to a disadvantaged background, or to
> emotional and mental problems, may be less culpable
> than defendants who have no such excuse  . . . .  Thus,
> the sentence imposed at the penalty stage should reflect a
> reasoned moral response to the defendant's background,
> character, and crime.
>
> In light of this principle it is clear that a State may not
> constitutionally prevent the sentencing body from giving
> effect to evidence relevant to the defendant's background
> or character or the circumstances of the offense that
> mitigates against the death penalty.  *Indeed, the right to
> have the sentencer consider and weigh relevant
> mitigating evidence would be meaningless unless the
> sentencer was also permitted to give effect to its
> consideration.*

*Abdul-Kabir,* 127 S. Ct. at 1667-68, *citing Franklin v. Lynaugh*, 487 U.S. at 184-85
(O'Connor, J., concurring in judgment) (emphasis in original).

524.   The strength of Young's mitigation evidence was that under the
proper medication, he was able to control his ADHD-induced behavior.  However,
according to the prosecutor's arguments, the only evidence the jury could consider
was that Young was a future danger and that "he could not be fixed" because 'you
heard what TDC's like. Ms. Clingman's right, we're embarrassed that TDC is like
that.  I wish it wasn't.  I hope we can do whatever we can to correct it . . ."  (36 RR

at 132.)[64]

525.   As it was the case in *Penry II*, the jury's ability to consider and give effect to Young's mitigating evidence was still shackled and confined within the scope of the issue of future dangerousness and his "deliberateness" in the offense.

**L.   Conclusion**

526.   Although the jury received the 1991 mitigating evidence instruction adopted by Texas post *Penry I*, the instructions given to Young's capital sentencing jury, as a whole, suffered from the same infirmities as others the Supreme Court has found constitutionally inadequate as applied, and did not resolve the internal conflict caused by the anti-sympathy instruction and the language modifying the anti-parties instruction. As it was in *Penry II*, although the instructions made mention of mitigating evidence, the instructions as a whole limited the scope of  Young's mitigating evidence, thus "the mechanism [the instructions] purported to create for the jurors to give effect to that evidence was ineffective and illogical."  *Penry II*, 532 U.S. at 803.

527.   Although the jury was first told they could consider such evidence in answering all the questions, the jury was then instructed to consider only Young's conduct in answering Special Issues One and Two, thus leading the jury to believe they could not consider Young's mitigating evidence in negating a finding as to those two issues.  Furthermore, to the extent the jury was able to consider Young's mitigating evidence as to the first two issues, prosecutorial comments ensured that the jurors could only give such evidence its aggravating effect, thus ensuring that Young' evidence remained shackled by the confines of such issues.  By requiring a

---

[64]   This statement was most likely in reference to the testimony by Royce Smithey, A. P. Merillat, Dessie Cherry, and Dr. Cirkovic concerning prison conditions in Texas.  Such testimony included that there was no guarantee Young would receive the proper medication during imprisonment (35 RR at 65-69, 74.); that his ADHD would worsen with the stressors of regular imprisonment (35 RR at 170-71); and because whatever good programs there were in the prison system, they would disappear as a result of a budget crisis (33 RR at 64).

nexus between Young's mitigation evidence and the criminal acts, the instructions and the prosecutorial argument prevented the jury from giving Young's mitigating evidence relevance to his moral culpability beyond the scope of future dangerousness and "deliberateness" questions.  Therefore, the instructions would have provided the jury with no vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision.

528.   As it was the case in *Penry II*, for the reasons stated above, there is a reasonable likelihood that the state trial court's instructions and prosecutorial argument deprived the jury from the vehicle to express its reasoned moral response and to give full effect to the mitigation evidence presented and return a life verdict as a result.  As a reviewing court cannot be sure that the jury treated Young as a uniquely individual human being in making its determination that death was his appropriate sentence.

## CLAIM FOUR:  YOUNG WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT AND PENALTY PHASES OF HIS CAPITAL TRIAL

529.   Young's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because his court-appointed attorneys failed to provide reasonably competent assistance at the guilt and punishment phases of trial.  But for counsel's unprofessional actions and omissions, the result of the proceeding would have been different.  *Wiggins v. Smith*, 539 U.S. 510, 521, 534, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003); *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

530.   *Exhaustion of Claim*:  Sections B.1, B.2, and C.1 of this claim were presented as Ground Twelve in the state application. (State App. at 85-91.) Sections B.3 and C.2 were raised in Ground Four for relief in the successor state application.  (Succ. App. at 112-46.)

531.   AEDPA:  Sections B.1, B.2, and C.1 of this claim were rejected in a reasoned opinion by the state district court, which was affirmed in a boiler plate denial by the CCA.  *Ex Parte Young*, 2006 WL 3735395.  The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.  *See Strickland*, 466 U.S. 668.

532.   If Respondent disputes any of the facts alleged below, Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Second Amended Petition.  The declarations and other exhibits accompanying this Second Amended Petition, as well as the allegations and facts set forth elsewhere in this First Amended Petition, are hereby incorporated by reference into this claim as though set forth in full.

533.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

A.   **Legal Standard**

534.   Ineffective-assistance-of-counsel claims are governed by *Strickland*, 466 U.S. 668.  *Strickland* stressed that in order for counsel to be effective under the Sixth Amendment, s/he must "play[] a role that is critical to the ability of the adversarial system to produce just results.  An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."  *Id*. at 685.  "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense."  *Wiggins*, 539 U.S. at 521.

1.   **Deficient Performance**

535.   In general terms, the Supreme Court has said that "[t]o establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688); *Reis v. Quarterman*, 522 F.3d 522, 526-27 (5th Cir. 2008); *Soffar v. Dretke*, 368 F.3d 441, 472 (5th Cir. 2004).  Trial counsel fail to perform according to Sixth Amendment standards when they "undermine[] the proper functioning of the adversarial process." *Strickland*, at 686.   Beyond these general principles, the Court has consistently relied upon codified and judicially recognized duties of counsel as guides to judging the reasonableness of an attorney's performance "'under prevailing professional norms.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688.)

536.   *Strickland* requires that "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689.

537.   However, "courts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Harrington v. Richter*, 131 S. Ct. 770, 790, 178 L. Ed 2d 624 (2011) (quoting *Wiggins*, 539 U.S. at 526-27).  Courts, including the Supreme Court, have repeatedly recognized that *Strickland's* focus means that "[j]ust as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)).  Indeed, the Supreme Court has specifically rejected efforts to portray a trial attorney's

conduct as the product of a strategic decision where, when considered in light of the surrounding circumstances, the alleged strategy "resemble[d] more a post-hoc rationalization of counsel's conduct than an accurate description of their deliberations." *Wiggins*, 539 U.S. at 526-27.

538.   The Supreme Court has further explained that a reviewing court should "assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance." *Kimmelman*, 477 U.S. at 386 (internal quotation marks and citations to *Strickland* omitted).  This includes an examination of counsel's performance both "before and at trial." *Id*.; see also *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403, 179 L. Ed. 2d 557 (2011).

539.   While the Supreme Court has cautioned against any "checklist" or "detailed rules for counsel's conduct," *Strickland*, 466 U.S. at 688-89, it has also identified certain basic duties that must be met in every case.  First is "the duty of loyalty, perhaps the most basic of counsel's duties," *id*. at 692, which includes "a duty to avoid conflicts of interest." *Id*. at 688.  "Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id*.  Criminal defense counsel have a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691. Capital defense counsel have an "'obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 543 (quoting *Williams v. Taylor*, 529 U.S. 362, 396, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).  This investigation must precede and inform counsel's actions, and "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support limitations on investigation." *Strickland*, 466 U.S. at 690-91.

540.   The Supreme Court has established that to determine the objective reasonableness of counsel's actions, a reviewing court should look to "[p]revailing

norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) ("[W]e have long referred [to the ABA Standards for Criminal Justice] as guides to determining what is reasonable") (*citing Wiggins*, 539 U.S. at 524); *Florida v. Nixon*, 543 U.S. 175, 191, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004); *Wiggins*, 539 U.S. at 524. Because adequacy is based upon "counsel's perspective at the time," (*Strickland*, 466 U.S. at 589), courts must look to the guidelines then in effect. *Smith v. Dretke*, 422 F.3d 269, 279 (5th Cir. 2005) (applying ABA Standards for Criminal Justice (2d Ed. 1980) which were in effect at time of trial); *see also Sonnier v. Quarterman,* 476 F.3d 349, 358 n.3 (5th Cir. 2007).

541. At the time of Young's trial, his attorneys' obligations were governed by the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 2003 (the "Guidelines") and the ABA Standards for Criminal Justice (3d Ed. 1993) (the "Standards"). "Those Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 387 n.7 (referring to 1989 Standards). Pursuant to the Guidelines, counsel has an obligation to conduct at every stage a "thorough and independent investigation( ) relating to the issues of both guilt and penalty." Guidelines 10.7(A).[65] Similarly, the Standards imposed an affirmative obligation "to conduct a prompt investigation of the circumstances of the case and to explore *all* avenues leading to facts relevant to the merits of the case ." Standards 4-4.1 (emphasis added). Most significantly,

---

[65] Because the investigation leading up to Young's trial occurred prior to the February, 2003 enactment of the 2003 Guidelines, it could be argued that the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases was controlling here. Even if that is so, there appears to be no material difference between the two. (*See* ABA Guideline 11.4.1 (1989) (counsel required to conduct "independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial.")

"[t]he duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *Id.*

542.   Once capital trial counsel completes the necessary pretrial investigation, he must then formulate a defense theory "that will be effective in connection with both guilt and penalty . . . . Guideline 10.10.1 (2003); *accord* Guideline 11.7.1 (1989). Clearly established Federal law dictates that defense counsel must conduct a *reasonable investigation* or, at a minimum, to make a reasonable decision that makes specific investigation unnecessary. *Strickland*, 466 U.S. at 691; *accord Sonnier*, 476 F.3d at 358. Trial counsel may not limit the scope of their investigation unless it determined that further investigation would be "counterproductive or fruitless." *Lewis v. Dretke*, 355 F.3d 364, 367 (5th Cir. 2003); *accord Smith v. Dretke*, 422 F.3d at 280..

543.   The determination whether counsel's performance was objectively reasonable is a mixed question of law and fact. *Id*. at 698.

**2.   Prejudice**

544.   Young "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is less than a preponderance. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Strickland's standard does not require Young to "show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. Still, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792; *Williams (Terry)*, 529 U.S. at 393. At its heart, the prejudice standard requires a showing that trial counsel's deficient performance undermines confidence in the reliability of the outcome of Young's trial. *Strickland*, 466 U.S. at 694.

545.   *Strickland's* prejudice test requires the Court to consider all of trial

counsels' unprofessional errors against "the totality of the evidence" adduced at trial and in post conviction proceedings.  *Id*. at 695; *Wiggins*, 539 U.S. at 536; *Williams (Terry)*, 529 U.S. at 397.  Additionally, it is proper to consider the cumulative prejudice resulting from trial counsel's deficiencies during penalty phase as opposed to considering the prejudice based only on each individual instance of inadequate representation by counsel, as clearly established federal law mandates that the prejudice from counsel's errors must be "considered collectively, not item-by-item*." Kyles*, 514 U.S. at 436; *see also Strickland*, 466 U.S. at 696 (holding that determinations of prejudice require a cumulative assessment of counsel's errors); accord, *Fisher v. Gibson*, 282 F.3d 1283, 1307-11 (10th Cir. 2002)*; Silva v. Woodford*, 279 F.3d 825, 834 (9th Cir. 2002); *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001); *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001); *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999); *Berryman v. Morton*, 100 F.3d 1089, 1101-02 (3d Cir. 1996); *Harris v. Wood,* 64 F.3d 1432, 1438-39 (9th Cir. 1995).

## B.   INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT AND PRE-TRIAL PHASE

546.   Young's trial counsel performed deficiently during the guilt phase of Young's capital trial.  Counsel's errors, whether considered individually, or cumulatively, resulted in Young's conviction and sentence of death.

### 1.   Failure to Present Exculpatory Evidence Establishing that Young did Not Shoot Petrey

547.   Trial counsel was, or should have been, aware of evidence that Young's accomplice, David Page, admitted to shooting Petrey while in custody. Raynaldo Ray Villa was in custody with Page before Young's trial.  The two were housed at the new county jail.  (Exs. 125 at ¶ 2 [Decl. of Raynaldo Villa]; 67 [Villa jail records].)  Villa overheard Page tell another inmate that Page had shot a man named Petrey.  The next day, Villa asked Page about the Petrey murder.  Page told

Villa that he, and not Young, had shot Petrey.  The two talked over a game of cards and dominos.  (Ex. 125 at ¶ 4 [Decl. of Villa].)  Later, Villa overheard Page tell others that he had killed Petrey.  (*Id*. at ¶ 6.)

548.   Villa was eventually transferred to the old county jail where Young was housed.  The two began talking about why each was in custody.  At some point, Villa realized that Young was the person who had been arrested with Page. Villa told Young he was willing to do whatever he could to help Young prove his innocence.  (*Id*. at ¶¶ 7-10.)  In March 2003, while still in custody, Villa  wrote Young a letter about his conversation with Page.  In that letter, Villa told Young that Page confessed to killing Petrey but was blaming it on Young because Page did not want to get sentenced to life in prison.  (*Id*. at ¶ 11.)

549.   In April 2003, Villa signed an affidavit for Young's defense about Page's confession.  (*Id*. at ¶ 12.)  The affidavit was attached to a motion for new trial, but not referenced in that motion.  (*See* 5 CR 901-910.)  Trial counsel testified at the hearing on the new trial motion that he looked "for witnesses" and "jail snitches that Page was shooting his mouth off in jail about being a big guy"  (39 RR 61.)  Accordingly, trial counsel's stated strategy was to undermine Page by identifying witnesses who he might have confessed to.  Nevertheless, the trial court (which issued the last reasoned decision on this claim) found that trial counsel was not defective because the "Court also defers to the trial strategy of the attorneys that was well designed by the attorneys for the Defendant."  (39 RR 102.)

550.   The state court's conclusion is an unreasonable application of clearly established federal law because Villla's testimony would have fallen squarely within trial counsel's stated strategy.  The failure of trial counsel was not that he lacked a strategy, but that he failed to investigate and present evidence consistent with that strategy.  *See Wood v. Allen*, 588 U.S. 290, 130 S. Ct. 841, 850 n.3, 175 L. Ed 2d. 738 (2010) (it is improper to "conflate [ ] the question whether a decision was strategic with the question whether a strategic decision was reasonable.")

Trial counsel's deficient performance, therefore, had to do with his failure to locate and interview Villa before trial. Had trial counsel done so, Young would not have been convicted for the murder of Petrey and would not have been sentenced to death. (*See* Claim One.) Accordingly, Young is entitled to relief.

### 2.    Counsel's Failure to Object to the TYC Records

551.    Where the prosecution seeks to introduce facts about a prior offense in aggravation, counsel has a "duty to make all reasonable efforts to learn what they [can] about the offense." *Rompilla*, 545 U.S. at 385; *Moore v. Johnson*, 194 F.3d 586, 608 (5th Cir. 1999) (articulating trial counsel's "affirmative duty to identify the state's witnesses to extraneous conduct and to interview those witnesses if possible"); *Valdez v. Johnson*, 93 F. Supp. 2d 769, 780 (S.D. Tex. 1999), *rev'd on other grounds*, 274 F.3d 941 (5th Cir. 2001) ("counsel has a duty to investigate the nature of defendant's prior criminal history, especially when evidence of these previous crimes is likely to be raised by the prosecution at trial.").

552.    It is clearly established federal law that counsel's failure to make an obvious and meritorious objection to illegally obtained evidence that forms the basis of the state's case amounts to ineffective assistance of counsel, where such failure was not due to trial strategy considerations, but because defense counsel was unaware of the illegality of the evidence due to a failure to conduct pretrial discovery. *Kimmelman*, 477 U.S. at 383-85; *accord Moreno v. Dretke*, 450 F.3d 158, 167-68 (5th Cir. 2006). Thus, counsel's failure to object to the TYC records, which violated Young's Fourth Amendment rights, as will be discussed below, is cognizable here. *Kimmelman*, 477 U.S. at 383-85.

553.    In this case, trial counsel failed to investigate how the State obtained the Texas Youth Commission's (TYC) records pertinent to Young's detention before any charges against Young were filed. Had counsel bothered to investigate how those records were obtained, they would have discovered the records were not only illegally obtained by the State, but also that, more likely than not, the records

were used by the State in deciding to charge Young with the death penalty. Counsel's failure to investigate how the State obtained those records, and whether the State improperly used those records in charging Young with a capital crime, was ineffective.  There could be no strategic justification for counsel's failure to object because it was not "reasoned" or informed.

### a.   Factual Background

554.   On November 29, 2001 -- three days after Young had been detained by Midland authorities for the murder of Petrey, Rick Berry, the then District Attorney for Harrison County, sought a court order from Marion County to obtained Young's juvenile records from the TYC.[66]  (Ex. 70).  The letter is all but two sentences long, stating:  "My office request [sic] a copy of the TYC records on Clint Young, DOB 7-19-83.  Thank you for your cooperation in this matter."  (*Id.*) The request was approved on the same day.[67]

555.   On December 10, 2001, TYC produced 1,209 pages of records pertinent to Young's detention in TYC, including information concerning Young's diagnosis and treatment while at TYC; information concerning his involuntary commitment to TYC; incidents preceding his commitment to TYC; alcohol and drug abuse information; and Young's mental health impressions.  Among the information revealed by the records, the TYC records revealed that Young

> Has had problems since a young age.  He is aggressive,
> had difficulty accepting responsibility for his actions, no
> remorse for negative behavior, argumentative and has a
> short attention span.  Clint's father -- abuses drugs &
> alcohol & has nothing to do with his child. - The last time

---

[66]  As alleged in other parts of this Petition, prosecutorial misconduct was not limited to this incident.  *See Brady* and *Napue* Claims 1 and 25.

[67]  As the signature on the letter is illegible, it is unclear who approved the request, and whether whomever approved the request had the authority to approve the release of those records.

> Clint saw his father, his father assaulted him. . . . Father
> is suspected abuser of drugs & alcohol -- Grandfather
> died from psorosis [sic] of the liver.

(Ex. 21 [State Trial Exhibit 147, at 285, 287].)

556.    The records obtained by the State also indicate that Young suffered from ADHD (*id.* at 293); that Young had "mental health needs requiring treatment" for which he was prescribed "psychotropic medications"(*id.* at 300); and that Young presented evidence of emotional pain (*id*. at 362):

> This client is likely to be experiencing considerable
> emotional pain, which . . . [are] part of a broad array of
> factors such as low self-esteem, suicidal . . ., history of
> trauma, and other symptoms suggestive of mood
> problems.  It is important to bear in mind that self-
> destructive behavioral  . . . .

(*Id*. at 363).  TYC records also disclosed the extensiveness of Young's alcohol problems.  (*Id.* at 367-69.)

557.    On December 20, 2001, a grand jury indictment was filed charging Young with the capital murder of Samuel Petrey.  (CR at 3.)

558.    On February 7, 2002, Young was re-indicted.  In the first count of the re-indictment, it was alleged that Young murdered both Samuel Petrey and Doyle Douglas pursuant to the same scheme and course of conduct, within the meaning of Texas Penal Code section 19.03(a)(7).  In the second paragraph of the re-indictment, it was alleged that Young intentionally murdered Mr. Petrey during the commission of robbery and kidnaping, within the meaning of  Texas Penal Code section 19.03(a)(2).  (1 CR at 4-5.)

559.    On February 12, 2002, Young was arraigned on charges of the offense of capital murder.  (2 RR at 4.)  The arraignment was based on the February 7, 2002 indictment.  (*Id*. at 5-6.)  Young was then advised the State would be seeking

the death penalty.  (*Id*. at 6.)

560.   On May 23, 2002, the trial court granted Young's motion to compel disclosure of evidence to be offered in support of the Texas' special issues on punishment and information relating to mitigating circumstances.  (2 CR at 217.) The trial court ordered the prosecution to disclose all such evidence no later that August 16, 2002.  (*Id*.)

561.   On an unspecified date, but before trial, the State served on trial counsel a copy of the TYC records.[68]  (2 RWR at 211.)

562.   On June 7, 2002, almost seven months after the State had obtained the TYC records, the State filed a "Notice of Filing of Business Records & Request for Sealing of Records," notifying the court that "the State [had] filed with the Clerk of this Court" Young's TYC records.  (2 CR at 224.)  The notice indicated that a copy of those records "were delivered to defendant's attorneys in open court on a" date prior to June 7, 2002.  (*Id*.)  The TYC records were accompanied by a Certificate of Custodian to Copy of Official Records, under Texas Rules of Civil Evidence, Rule 902 (4).  (Ex. 21 [State Trial Ex. 147]. )

563.   Also on June 7, 2002, the State filed its "Notice of Extraneous Offenses," notifying defense counsel that the State proposed to use the TYC records during the punishment phase of Young's trial.  (2 CR at 222).  In describing the relevancy of such records, the State referred to the TYC records as: "Assaults and other acts of misconduct, including prior drug use, as set out in the

---

[68]   Evidence was taken on this claim during the hearing on Young's state petition.  On direct examination, defense counsel Ian Cantacuzene, who handled the punishment phase of Young's trial, testified, in pertinent part:

> I can't remember the day it happened, but it was during a pretrial hearing, and they were allegedly brought in and dumped on a table in this courtroom, and we had them -- I don't want to guess, I think eight, 10 months before trial.

(3 RWR at 21.)

records of the Texas Youth Commission which have been previously filed in this cause with the District Clerk." (*Id*.)

564.   On July 12, 2002, DA Shorre testified at a pre-trial hearing that Midland County had a written policy concerning who should be charged with the death penalty. (5 RR at 96.) The policy stated:

> In a capital case, the decision to seek the death penalty
> will only be authorized by the District Attorney.
> In considering the decision, the District Attorney will
> review factors including, but not limited to, the
> following:
>
> > A)    aggravated and mitigating facts of the
> > offense;
> >
> > B)    the age, criminal history, intellectual
> > capabilities, and the mental/physical status
> > of the offender;
>
> to determine the likelihood that a jury would render an
> affirmative finding of "future dangerousness."

(5 RR at 155.)

565.   Acknowledging that Midland County had not obtained the death penalty on any of the four prior cases where Midland had sought the death penalty, DA Schorre testified that in comparison, at the time of Young's case, he "loo[ked] more at the Defendant's background." (*Id*. at 102.)

> I think from actually in my standpoint when I look at the
> case, besides the facts of the case and how horrific the
> case may be, I look for things that can show the jury that
> it's going to be a track record of prior antisocial conduct,
> prior criminal offenses that will help them in that
> determination on future dangerousness.

194

(5 RR at 102.)

On cross-examination, via a narrative, Schorre testified as follows:

> In the assessment in this case on whether or not to seek the death penalty, I've followed the same criteria. I looked at the nature of the offense, two people were killed, when I went and looked at the background of the Defendant, I found an extensive criminal history, both as a juvenile, as an adult, there is -- was a real long adjudication that eventually sent him to TYC, multiple offenses listed in there, multiple felonies listed in there. I went through around a thousand pages of the TYC records with multiple offense, assaults against staff as well as other juvenile inmates . . . so when I look at not only the facts of this homicide, but the Defendant's background, I'm left with a person that I can reasonably make the assessment based upon several year track records that a jury could agree with me that he is going to be dangerous in the future and would therefore fall into the death penalty worthy group, which is the same assessment I made every time we've had to decide to seek the death penalty.

(5 RR at 119-21.)

566. At the punishment phase of Young's trial, the court admitted the TYC records into evidence without any objections from the defense. (30 RR at 194.)

### b.    State Habeas Hearing

567. Evidence was taken on this claim during the hearing on Young's state application. On direct examination, defense counsel testified that it had been a strategic decision to not object to the records. (3 RWR at 27.)

568.   Trial counsel testified that there was nothing wrong with the TYC records because they were filed timely (3 RWR at 26), and that the information protected by "HIPAA had been redacted" (2 RWR at 181).  Counsel also testified that although at first he had found the documents overwhelming, he and co-counsel had "poured over" the documents, and had decided that the TYC records supported Young's case in mitigation by showing that when properly medicated for his ADHD, his behavior would improve and thus, show that he would not be a future danger in a prison setting.  (2 RWR at 212).  While recognizing the harmful potential of the records, trial counsel testified that they were more helpful than harmful to Young's case in punishment.  (*Id*. at 212-214.)

### c.   Deficient Performance

569.   To establish deficient performance for trial counsel's failure to object to the TYC records, Young must establish that the objection of the records would have been sustained, and that had counsel objected there is a reasonable probability of a different result at Young's trial.  Young meets his burden on each point.

### i.   An Objection to the TYC Records Would have Been Sustained

570.   Texas  Code of Criminal Procedure, section 38.23(a), provides that no evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

571.   Thus, the medical records illegally obtained by the district attorney's office were not admissible at the punishment phase of Young's trial.  Had trial counsel made a motion to suppress such documents, the trial court would have excluded from evidence at trial the TYC records obtained in violation of the Fourth Amendment to the United States Constitution and Article 1, Section 9 of the Texas Constitution.

196

572.   The acquisition of Young's TYC records violated his Fourth Amendment right to privacy, which provides "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated."  The attainment of Young's TYC records in which Young had a vested proprietary interest was an illegal and unconstitutional procurement in violation of the Fourth Amendment of the United States Constitution and Article I, section 9 of the Texas Constitution.

573.   Texas Constitution article I, section 9, protecting against unreasonable searches and seizures, has been held to be at least as extensive as the U.S. Constitutional Amendment IV.  *State v. Comeaux*, 818 S.W.2d 46, 49 (Tex. Crim. App. 1991).  As with the Fourth Amendment, the purpose of article I, section 9 is to safeguard an individual's legitimate expectation of privacy from unreasonable governmental intrusions.  *Green v. State*, 566 S.W.2d 578, 582 (Tex. Crim. App. 1978); *Richardson v. State*, 865 S.W.2d 944, 948 (Tex. Crim. App. 1993).  The Fourth Amendment and article I, section 9, protect "people not places."  *Green*, 566 S.W.2d at 582; *Richardson*, 865 S.W.2d at 948.

574.   A privilege stands as an absolute bar to the disclosure of evidence (absent an exception) while the Fourth Amendment merely imposes certain reasonableness requirements as a condition for obtaining the evidence.  That TYC records have not been given the absolute protection of a privilege does not mean they might not possess the qualified protections embodied by the Fourth Amendment.  *State v. Hardy,* 963 S.W.2d 516, 524 (Tex. Crim. App. 1997).

575.   In order to present a federal or state constitutional claim based on a search and seizure, Young must be within the purview of constitutional protection. He must establish that he had an actual (subjective) legitimate expectation of privacy in the invaded place or property and that the expectation of privacy is one that society is prepared to accept as objectively reasonable.  *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); *Smith v. Maryland*, 442 U.S.

197

735, 740, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979); *Comeaux*, 818 S.W.2d at 51.

576.   Young's records have not been "seized" or "searched" under the Fourth Amendment, unless Young had a legitimate expectation of privacy in them. *Hardy*, 963 S.W.2d 516.  To determine if the accused has made a showing of a legitimate right of privacy, courts may look to the totality of the circumstances. However, legitimization of expectations of privacy by law must have a source outside of the Fourth Amendment either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.  *Comeaux*, 818 S.W.2d at 51.

577.   There is a general understanding that there is an expectation of privacy in physician-patient communications.  As such Young had a reasonable expectation that his TYC records, particularly those relating to highly confidential personal information such as Young's mental health, drug and alcohol abuse, family dysfunction and the reasons for his involuntary commitment to TYC, would remain private.  Furthermore at no stage did Young have reason to contemplate that his confidential TYC records would be disclosed to others at all, least of all without notice or the intervention of a court with proper jurisdiction.  The physician-patient relationship provides an environment which ensures that a patient confides in his doctor any and all details which facilitate the provision of quality medical treatment in the best interests of the patient.  Anything less jeopardizes the health of the patient, in particular, that of a juvenile.

578.   To fairly evaluate society's expectations, a state should step beyond its boundaries and take a nationwide perspective.  *Hardy*, 963 S.W.2d at 524. Thus, had the issue been raised by trial counsel at the time of trial, the issue to be resolved in the case of Young's case was whether society has a general expectation of privacy in medical records held by a third party, namely the Texas Youth Commission of Travis County, State of Texas.

579.   As the relevant Fourth Amendment expectations are those of

American society, a court cannot unilaterally make a policy choice on the matter.
Moreover, the absence or inapplicability of a privilege does not foreclose the
existence of an expectation of privacy recognized by society.  *Hardy*, 963 S.W.2d
at 524.   Further it has been recognized that:

> [t]here are some subjective expectations of privacy that
> society does sanction as legitimate in spite of limited,
> confidential disclosure.  We would not want to say, for
> example, that society does not recognize the
> confidentiality of information imparted to a physician
> behind the closed doors of an examination room.  That
> certain facts may be revealed in the necessarily candid
> process of diagnosis and treatment does not mean we no
> longer have a collective interest in insulating them from
> public scrutiny.
>
> On the contrary, society accepts -- indeed,
> positively insists -- that such information, although of
> necessity partly exposed, should nevertheless retain its
> essentially private character.

*Comeaux*, 818 S.W.2d  at 52-53; *see also Richardson*, 865 S.W.2d at 952.

580.   The Supreme Court has on one occasion addressed society's
expectations with regard to records held by a third party.  In *United States v.
Miller*, 425 U.S. 435, 96 S. Ct. 1619, 48 L. Ed. 2d 71(1976), the Court held that a
depositor possessed no reasonable expectation of privacy in bank records relating
to his account.  *Id*. at 440-43.  In support of its holding, the Supreme Court
explained that a depositor voluntarily exposes his financial information to the
banking institution and assumes the risk that those records will be conveyed to the
government.  *Id*. at 442-43.

581.   Like the bank, TYC is a third party entrusted with personal

information.  However, release of medical information to hospitals within juvenile detention facilities to which one has been involuntarily committed is less optional than the release of financial information to banks.  A person can choose not to maintain a bank account, but it hardly seems reasonable to expect someone to forego medical attention, specially when such medical attention has been mandated through a court order involuntarily committing a juvenile to such facility.  *See Hardy*, 963 S.W.2d at 524.  As a consequence not only did Young possess a subjective expectation of a right to privacy in his medical records and information contained in his TYC records, but this was an expectation that he shared with society in general.

582.   The Supreme Court has held that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell.  The Court added that it believed that it is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.  *State v Schieneman*, 77 S.W.3d 810, 812 (Tex. Crim. App. 2002) (quoting *Hudson v. Palmer*, 468 U.S. 517, 525-26, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)).

583.   However, prisoners, including juveniles, must be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration.  *Hudson*, 468 U.S. at 523 .  At the time the records were obtained by the State, Young's reasonable expectation of privacy in his medical records, particularly those relating to his mental health, drug and alcohol abuse, family dysfunction and the reasons for his involuntary commitment to TYC, was not inconsistent with the objectives of incarceration which justify seizure (institutional security and internal order) in *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

584.   Furthermore the nature of the seizure of Young's medical records from a custodial institution does not conform with any of the accepted circumstances in which seizure has been sanctioned by the courts.  The seizure of

the medical records was not necessary to ensure the safety of the prison staff, the administrative personnel, inmates or visitors. *Hudson*, 468 U.S. at 527. In addition, the seizure of Young's medical records did not extend to preventing the flow of illicit weapons into the prison; or attempts to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize. *Id*. Society may well not be prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell; and, therefore the proscription against unreasonable searches does not apply in the confines of the prison cell. *Id*. at 526. However, when Young's TYC records were seized by the State, Young stood detained, not yet charged of the crimes of capital murder. The case law provides no suggestion for supporting the argument that Young's confidential medical records could be unreasonably seized from a custodial institution where the State had yet to carry its burden of proof to show Young was guilty of the crimes for which he remained detained.

585.    In determining in this case whether an expectation of privacy is legitimate or reasonable involves a balancing of two interests. Namely the interest of Young in the inherent privacy of his medical records and the interest of the district attorney's office in seizing the medical records before Young was charged with the crimes in question, let alone found guilty of those crimes.

586.    Because the TYC records were obtained prior to Young's indictment on this case, while Young was on probation, at the time the State seized Young's TYC records, the State's interests in institutional security and internal order were not at stake. Agreeing, without conceding, that TYC records could have become relevant if and when Young was found guilty of capital murder, Young's expectation of privacy in those records was more substantial before he was even charged with capital murder.

587.    Barely four days after the incidents in question took place, and before much investigation had already taken place, the State of Texas, in this case, cannot

assert that its interest in determining Young's so called propensity to future dangerousness outweighed Young's expectation of privacy in his TYC records. It justly follows that an individual's interest in the privacy of his medical records, a right which is understood throughout the community as applying to all citizens, should overcome the interest of a district attorney's office in illegally obtaining records which are of dubious relevance to the case at that time, specially when the U.S. Constitution mandates that the presumption of innocence still applied.

588.   "The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *United States v. Jacobsen*, 466 U.S. 109, 117, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984); *Hardy*, 963 S.W.2d at 525. There is no suggestion that Young or the medical personnel had, prior to the seizure by the district attorney, frustrated the expectation of privacy in Young's health records by disclosure of some degree.

589.   Not only did Young have a "subjective" expectation of privacy in his TYC records, Young also had an objective expectation of privacy in those records because he was yet to be charged with any crimes, let alone capital murders, at the time Young's records were seized by the State.

590.   Under Texas Occupations Code, Young's TYC records are confidential and thus generally protected from disclosure.

591.   Texas Occupations Code section 159.002 states, in pertinent part:

> (a) A communication between a physician and a patient, relative to or in connection with any professional services as a physician to the patient, is confidential and privileged and may not be disclosed except as provided by this chapter.

> (b) A record of the identity, diagnosis, evaluation, or treatment of a patient by a physician that is created or maintained by a physician is confidential and privileged

and may not be disclosed except as provided by this

chapter.

(c) A person who receives information from a

confidential communication or record as described by

this chapter, other than a person listed in Section 159.004

who is acting on the patient's behalf, may not disclose

the information except to the extent that disclosure is

consistent with the authorized purposes for which the

information was first obtained.

Tex. Occ. Code, § 159.002.

592.    The term "physician" under this code has been interpreted broadly by

the CCA to encompass other persons providing health care.  *In re Dolezal*, 970

S.W.2d 650, 652 (Tex. Crim. App. 1998) (protecting communications with a

chiropractor even though a chiropractor is "not, technically, a physician.").

593.    Texas Occupations Code section 159.003 states, in pertinent part,

(a) An exception to the privilege of confidentiality in a

court or administrative proceeding exists:

(10) in a criminal prosecution in which the patient

is a victim, witness, or defendant;

(b) This section does not authorize the release of

confidential information to investigate or substantiate

criminal charges against a patient.

(c) Records or communications are not discoverable

under Subsection (a)(10) until the court in which the

prosecution is pending makes an in camera determination

as to the relevancy of the records or communications or

any portion of the records or communications. That

determination does not constitute a determination as to

the admissibility of the information.

Tex. Occ. Code, § 159.003 (emphasis added).

594.   In Young's case, the State of Texas subverted all of the protections created by the State itself to protect Young's expectation of privacy in those documents.   Here, by its own admission, the State used the TYC records in deciding to charge Young with a capital crime and in deciding to seek the death penalty against Young, and not any of his cohorts.

> In the assessment in this case on whether or not to seek
> the death penalty . . .  when I went and looked at the
> background of the Defendant, . . . there is -- was a real
> long adjudication that eventually sent him to TYC,
> multiple offenses listed in there, multiple felonies listed
> in there.  I went through around a thousand pages of the
> TYC records with multiple offense, assaults against staff
> as well as other juvenile inmates . . .  so when I look at
> not only the facts of this homicide, but the Defendant's
> background, I'm left with a person that I can reasonably
> make the assessment based upon several year track
> record that a jury could agree with me that he is going to
> be dangerous in the future.

(5 RR at 119-21.)

595.   At the time the TYC records were seized, the Texas Family Code allowed disclosure of information to "a government agency if the disclosure is required or authorized by law," or "with leave of the juvenile court,  . . . [to a] person, agency, or institution having a legitimate interest in the proceeding or in the work of the court."  Act of 1995, Ch. 262, § 53, 1995 Tex. Sess. Law Serv. 327 (codified as Tex. Code Fam. § 58.005 (a) (4) and (7)).

596.   Here, there record is clear that the State accessed Young's confidential

TYC records precisely for the illicit purpose the laws of the state of Texas precluded such disclosure.

597.   Although at the time Young's records were seized, Section 58.007 of the Texas Family Code provided that "a prosecuting attorney may obtain the record of a defendant's adjudication," such access was premised on those records being accessed "[f]or the purpose of offering a record as evidence in the punishment phase of the criminal proceeding."  Act of 2001, Ch 1297,  Tex. Sess. Law Serv. Ch. 1297 (H.B. 1118) (codified as Tex. Fam. Code, § 58.007).

598.   Similarly, under the Human Resources Code, access to those records by a prosecuting attorney without a court order were available to a prosecutor only "[f]or the purpose of offering a record as evidence in the punishment phase of a criminal proceeding."  Tex. Hum. Res. § 61.095.

599.   Thus, because the State cannot argue that it intended to introduce those records at the punishment phase of a trial yet to occur when an indictment had not even been filed, the State cannot argue that Young's TYC records, which included confidential medical information, could be accessed at the time they were seized by the State.  Furthermore, because by its own admission, the State used the TYC records to "investigate or substantiate criminal charges against" Young, the State used the TYC records for a purpose clearly prohibited by Texas law.

600.   Here, the violation is so egregious precisely because those records were used to investigate or substantiate criminal charges against Young and to seek the death penalty against him.  In addition, the records were obtained with total disregard of the protective measures create by the state to minimize the risk of misuse of such records, mainly the requirement of "an in camera determination as to the relevancy of the records or communications or any portion of the records or communications."  Simply, the records were release because the State asked a juvenile court to release those records without the juvenile court requiring any further showing from the State.  The DA asked, and a court complied.

### ii.   The Failure to Object to the TYC Records Was Not Reasonable or Strategic

601.   Contrary to trial counsel's assertions, their refusal to object to the TYC records does not qualify as a strategic decision.  Trial counsel claims that it was better to let the TYC records come in and embrace them.  (3 RWR at 181-83.) Even accepting this contention as reasonable, this purported excuse goes only to the effectiveness of their tactics at trial, not whether trial counsel were reasonable in failing to investigate the matter entirely.  Clearly, trial counsel saw the danger in allowing the jury to learn about Young's so called "propensity" for future dangerousness by the fact trial counsel objected to the State's experts' ability to predict future dangerousness.  (32 RR at 60-61.)  Furthermore, the lack of investigation was less reasonable precisely because the State admitted the TYC records were used for an illicit purpose: to seek the death penalty against Young. Whether trial counsel would have decided to "embrace" Young's TYC records is irrelevant.  Quite simply, trial counsel "could not make a valid strategic choice because he had made no investigation."  *Knighton v. Maggio*, 740 F.2d 1344, 1350 (5th Cir. 1984).

### d.   Prejudice from Failing to Investigate and Challenge the State's Seizure of Young's TYC Records

602.   The prejudice to Young does not dissipate even were Respondent to argue that all the State had to do was follow the proper procedure to obtain Young's records in order for those records to be admissible at trial.  As DA Schorre himself testified, those records had been used in his decision to charge Young's with capital murder and seek the death penalty against him.  Although Schorre testified he based his assessment on the alleged participation of Mr Young in two other incidents, the burglary of a gun shop and the home invasion of an alleged drug dealer, Schorre emphasized what he described as Young's "several year track records that a jury could agree with me that he is going to be dangerous

in the future and would therefore fall into the death penalty worthy group."  (5 RR at 121.)  Thus, the prejudice to Young was not in admitting the records at trial, but in the State using those records to determine Young should be charged with a capital murder for which the State would seek the death penalty.  Had these "several year track record" been absent , there is a reasonable probability Schorre would not have sought the death penalty against Young.

     **e.**    **Trial Counsel Also Failed to Object to the TYC Records on Hearsay and Confrontation Clause Grounds**

603.   As previously stated, the prosecutors in this case filed a Notice of Filing of Business Records on June 7, 2002 relating to Young's records from TYC. (2 CR at 224.)  These records were later admitted in Young's trial, as State's Exhibit 147, without objection.  (30 RR at 194-95.)

604.   Rule 801(d) of the Texas Rules of Evidence defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  The TYC records  found in State's Exhibit 147 constitute hearsay.

605.   Under Rule 802 of the Texas Rules of Evidence, hearsay is not admissible except as provided by statute or rule.  Rule 803(6) of the Texas Rules of Evidence, under which State's Exhibit 147 was apparently admitted, provides:

> A memorandum, report, record, or data
> compilation, in any form, of acts, events, conditions,
> opinions, or diagnoses, made at or near the time by, or
> from information transmitted by, a person with
> knowledge, if kept in the course of a regularly conducted
> business activity, and if it was the regular practice of that
> business activity to make the memorandum, report,
> record, or data compilation, all as shown by the
> testimony of the custodian or other qualified witness, or

by affidavit  . . ., unless the source of information or the
method or circumstances of preparation indicate lack of
trustworthiness. "Business" as used in this paragraph
includes any and every kind of regular organized activity
whether conducted for profit or not.

*Id*.

606.   The TYC records contain numerous documents entitled "Incident
Report," which purport to reflect disciplinary violations or rule infractions.
However, the majority of the reports do not demonstrate that they were made by a
person with personal knowledge of the incident.

607.   Moreover, under Rules 401 and 403 of the Rules of Evidence, the
State had the burden to prove that the records were relevant and that their probative
value outweighed any prejudicial effect.  A large portion of the TYC records were
also not admissible as they were either not relevant to the issues raised at trial, or
were more prejudicial than probative.

608.   For example, incident report number 134 reflects that Young was
referred by a staff person named L. Klahsen.  While the report indicates Young
was cursing and talking during church services, the records do not demonstrate that
L. Klahsen personally observed any of these actions.  The report further indicates
that pill cups fell out of Young's shirt as he got into a security van and then the
name "Alvarez" appears in brackets.  It is impossible to discern from this report
whether L. Klahsen observed this event or that he/she was reporting what some
unknown person named Alvarez observed.  (*See* 43 RR at 103.)  Even assuming,
*arguendo*, this report was even relevant to the issues raised at trial, there was no
showing that the report was generated by someone with personal knowledge of the
events described.

609.   There are hundreds of similar reports.  Incident report number 120
notes that Young was observed turning the computer screen backwards, but does

208

not reflect that either the referring staff person, D Ardoin, or "CNP," the initials appearing at the end of the report, even observed these events. (*See* 43 RR at 116.) In incident report number 118, dated September 23, 1999, either the referring staff person, Mr. Clifton, or "CNP" observed that Young "may have been throwing gang signs at peers."  (*See* 43 RR at 119.)  The report does not demonstrate what circumstances allowed the officer to arrive at this conclusion, or whether it was personally observed by the officer.

610.   There are other reports which similarly contain such hearsay information.  (*See* 43 RR at 121 ("control" observed Young hiding contraband in his personal area - no indication who issued the report); 43 RR at 124 (Young was "checked up" for behavior but does not reflect whether this was observed by the referring staff person or if it was based on hearsay statements by others); 43 RR at 127 (Young yelled "fuck you" during his checkup and that this was a daily occurrence -- but does not reflect whether the later statement was based on personal information or hearsay); 43 RR at 133 (Young was "huddle up" earlier for excessive talking -- does not indicate whether the referring staff person observed this behavior).)

611.   A similar incident report, number 132, reflects that "M. Martin" was the referring staff person.  The report indicates only that "Youth needs time out." It does not demonstrate what circumstances prompted this report.  Moreover, following this information, the report includes the notation "CNP."  Once again, the report does not demonstrate whether Martin or "CNP" was the person who observed this incident.  Indeed, it is unclear whether or not "CNP" is an actual person or merely some other code.  To that end, this report was not relevant to any material issue in this case, and it is not clear whether the reporting person had any personal knowledge of the events described.  (*See* 43 RR at 104.)

612.   Other reports have similar issues.  (*See e.g.*, 43 RR at 105, 108, 111-15, 117-19, 124-26, 128-31, 135-37; *see also* 43 RR at 137 (report reflects that

Young became confused  --  report is not relevant to any material issue at trial); 43

RR at 139 (report reflects it is based upon hearsay statements concerning an earlier

referral); 43 RR at 146 (report reflects Young had gang related material but

contains no information demonstrating any indicia of reliability -- report also

reflects that further investigation revealed the accusation to be false thus, the report

was not relevant and more prejudicial than probative); 43 RR at 152 (report reflects

Young participated in suspected "gang related" activity but does not demonstrate

what the activity was or what training or experience the officer had to recognize

such activity -- no indicia of reliability in the statements); 43 RR at 164 (report

reflects Young had gang related drawings in his area  -- report does not describe

drawings or indicate the expertise upon which such a conclusion was based); 43

RR at 172 (report indicates Young was out of dress code -- not relevant to any

material issue at trial); 43 RR at 216 (report reflects "aggravated"  and nothing

further - report was not relevant to any material issue at trial).

613.   Some of the incident reports reflect statements made by other inmates

at TYC, which constitute hearsay and have no indicia of reliability.  (*See e.g.*, 43

RR at 109.)  The reliability of the incident reports are further questionable in light

of the testimony at trial.  TYC guard Jacqueline Timmons testified that reports in

State's Exhibit 147 were not the actual reports prepared by the person with

knowledge of the events referred to therein.  Instead, Timmons testified, the

records in States Exhibit 147 were only a synopsis of the incident reports.  (31 RR

at 301.)  Assuming the validity of her testimony, there was no evidence presented

regarding who prepared the synopsis or what information was not provided within

the synopsis.

614.   In another report, there is a "brief" description of Young's "history of

delinquency" which by its inherent nature was hearsay.  The description does not,

however, indicate who wrote it, the reliability of the statements, or who provided

the information to the person who wrote it.  (43 RR at  246.)

615.   Additionally, State's Exhibit 147 contains many psychiatric/psychological evaluations and tests which are in part based upon hearsay statements, do not demonstrate the qualifications of the person preparing the report, are not relevant to an issue at trial, and do not demonstrate indicia of reliability.  (*See e.g.*, 43 RR at 267, 275, 363-420.)

616.   The State introduced such records in an attempt to portray Young as an incorrigible delinquent and a future danger to society.  However, there was no strategical reason for trial counsel to have permitted the admission of inflammatory evidence which did not meet the requirements of the exception to the prohibition against hearsay.  Counsel's performance was deficient, and it prejudiced Young's case.

617.   Counsel was also ineffective in failing to object to the TYC records on the basis they violated his right to confront the evidence.  The Confrontation Clause of the Sixth Amendment - made applicable to the states by the Fourteenth Amendment - provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  U.S. Const. amend. VI; *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *accord Crawford v. Washington*, 541 U.S. 36, 43, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *Fratta*, 536 F.3d at 499.  "The Sixth Amendment right to present a complete defense encompasses a defendant's rights under the Confrontation Clause to rebut the State's evidence through cross-examination."  *Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005); *accord Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *Webb v. Texas*, 409 U.S. 95, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972) (per curiam); *Fratta*, 536 F.3d at 499; *Burbank v. Cain*, 535 F.3d 350, 357 (5th Cir. 2008).

618.   Here, in one fell swoop, the prosecution introduced over 1,200 pages of TYC records under the business records exception without objection by counsel.  (2 CR at 224; 30 RR at 194-95.)  By doing so, the prosecution was able to

211

introduce, without calling a single witness, information containing Young's diagnosis and treatment while at TYC; information concerning his involuntary commitment to TYC; incidents preceding his commitment to TYC; alcohol and drug abuse information; and Young's mental health impressions.  Further, the TYC records revealed alleged behavioral problems that Young encountered while at TYC.  (Ex. 21 [State Trial Exhibit 147, at 285, 287].)

619.   However, Young was not able to confront any of these charges as the evidence came in through records, not witnesses.  Moreover, it would have been too burdensome for Young to have called those witnesses to rebut the TYC records as it would have meant calling upward of 100 witnesses.  In sum, counsel's failure to object to the introduction of the TYC records on confrontation grounds was objectively unreasonable, and counsel's actions caused Young prejudice.

### 2.   Trial Counsel's Failure to Utilize Available Ballistics Evidence That Would Have Shown that Someone Other than Young Shot Doyle Douglas

620.   At the time of trial, defense counsel had a ballistics report from State's witness, Tim Counce, that cast doubt on whether the firearm in Young's possession could have been the gun that was used to shoot Doyle Douglas.  However, counsel failed to utilize this report in cross-examination of lay and expert witnesses who testified to the shooting, and failed to retain and present their own expert witness who could have testified consistently to Counce's opinion in the report and during his testimony.

621.   At trial, both Mark Ray and David Page testified that Young shot Doyle Douglas twice in the head while sitting to his left in the passenger-side front seat with State's Exhibit 3, the Colt Huntsman .22 caliber weapon.  Both also testified that Ray shot Douglas for the third time in the back of the head.  In fact, according to the ballistics, the gun that the accomplice witnesses testified Young possessed on the night of the shooting was ruled out as the gun that shot the bullet

212

into the right side of Doyle Douglas's head.  According to this report, Ray was in possession of the gun that caused the injury to the right side of Douglas's head.

### a.    The Relevant Trial Testimony

622.    Prosecution expert Tim Counce, a forensic firearms and toolmark examiner for the Texas Department of Public Safety, prepared a favorable report and testified at trial to the inconclusive nature of the ballistics evidence, but was able to rule out certain theories of the evidence that was useful to Young's case. Trial counsel failed to ask that his personal report be admitted into evidence, which defense counsel (Paul Williams) realized only during his closing argument.  (29 RR at 47-48.)  Once he realized his mistake, he asked the jury to request a read-back of Mr. Counce's testimony in order to put the pieces of evidence together. (29 RR at 48.)  The prosecutor took advantage of this mistake but arguing that the jury should not ask for a read-back and that the defense lawyer just got it wrong:

> Now, I take issue, you'll have to rely on your notes, I
> think defense counsel, Mr. Cantacuzene tried to
> straighten out Mr. Williams, but I think Mr. Williams has
> the testimony on the spent bullets, the projectiles and
> where they were recovered and what they match up to
> entirely wrong.  I think it's good faith mistake and Mr.
> Cantacuzene tried to correct him, but he's got that part
> wrong.  You go back and you look from your notes what
> Mr. Counce said.

(29 RR 67.)  Counce's ballistics report was admitted into evidence at the state writ hearing as Defense Exhibit W-5.   (3 RWR at 50.)

623.    McCoy testified that Young shot Douglas in the car with a .22 caliber firearm with a long barrel and a clip.  (21 RR at 113.)  Ray testified that the handgun Young used to shoot Douglas in the car was a semi-automatic handgun like an old styled German Ruger with a barrel four to six inches long and the

metallic nickel finish and clip, which he identified as State's Exhibit 3, the Colt Huntsman.  (22 RR at 96, 249-50.)  Page testified that the handgun Young used to shoot Douglas was a .22 caliber semi-automatic handgun.  (26 RR at 157-65.)

624.   Ray testified that State's Exhibit 5, a .22 caliber revolver/pistol with a broken handle, was the weapon he used to shoot Douglas in the head at the creek. (22 at RR 250.)  State's Exhibit 5 was described by Mr. Counce as an RG double-action .22 caliber long rifle/revolver, commonly known as a Saturday Night Special.  (25 RR at 150-51.)

625.   At the time of Young's arrest after his vehicle was stopped by officers in Midland County, Young possessed a Colt Huntsman .22 caliber semi-automatic handgun.  (24 RR at 170-71.)  This weapon was introduced and referred to as State's Trial Exhibit 3.  State's Exhibit 3 was identified as one of the firearms taken in the burglary of an East Texas business located in Diana, Texas.  (30 RR at 30-38.)

626.   Prosecution expert Jill Urban testified that she performed the autopsy of Doyle Douglas and concluded that Douglas was shot in the head three times by a small caliber weapon.  (22 RR at 263-68.)  Shell casings (.22 caliber)  were recovered from Douglas's car when it was discovered abandoned near Eastland, Texas.  (23 RR at 43-46.)  The casings found in Douglas's vehicle were connected with the .22 Colt Huntsman handgun seized from Young at the time of his arrest. (25 RR at 158-59.)

627.   Counce testified that State's Exhibit 9, which was a bullet taken from the left side of Douglas's head, was not fired from State's Exhibit 5, a .22 caliber revolver, but that he could not identify or eliminate State's Exhibit 9 as having been fired from State's Exhibit 3, which was the .22 caliber semi-automatic handgun seized from the Young.  (25 RR at 161-62.)  Counce also testified that he was unable to identify or eliminate State's Exhibit 10, the bullet recovered from the back of Douglas's head, as having been fired from State's Exhibit 3, which was the

.22 caliber semi-automatic handgun seized from the Young. (*Id.*) In his report, Counce concludes that "[i]t is our opinion that the above mentioned projectiles [9 and 10] were not fired from the RG revolver" (State's Exhibit 5). (Ex. 88 at 967 [Counce Report].)

628.   Additionally, Counce's testimony and the ballistics report by Counce stated that he was unable to identify or eliminate State's Exhibit 11, the bullet taken from the right side of Douglas's head, as having been fired from State's Exhibit 5. Counce was able to say that the bullet, State's Exhibit 11, was not fired from State's Exhibit 3, the .22 caliber semi-automatic handgun seized from Young at time of his arrest. Id . In his report he stated, "[i]t is our opinion that the mentioned projectile was not fired from the submitted Colt pistol." (*Id.*)

### b.    The Relevant State Writ Testimony

629.   At the state writ hearing, both trial lawyers, Ian Cantacuzene and Paul Williams, testified. Both lawyers testified that Williams had argued the ballistics evidence in an incorrect manner during the closing argument, and that Nancy Piette (the trial paralegal) and Canacuzene had to interrupt Williams's closing. (2 RWR at 236-37.) According to Williams, the defense team did not hire their own ballistics expert because they felt that they did not need one. (3 RWR at 102-03.) Instead, they relied upon the State's experts. (*Id.*) Williams testified that he did not cross-examine Counce with respect to their defense theory of what the ballistics showed in their favor because he did not know what the answer to the question would be. (3 RWR at 104, 107.)

630.   This line of reasoning was clearly flawed; an expert hired by the defense team would have been able to preview his testimony with the team to ensure that favorable testimony would have been elicited. Further, there was no evidence at trial that Mr. Counce would not speak to the defense team prior to his testimony, so that they could have previewed their questions. The favorable ballistics evidence should have been presented through the live testimony of a

qualified expert.

  **c.**  **Trial Counsel Should Have Argued and Presented Ballistics Evidence at Trial**

  631. All of the ballistics information detailed in section 1 was available to trial counsel at the time of trial.  Counsel failed to ask that Counce's report be admitted into evidence and failed to present independent, corroborating ballistics evidence through their own expert.  Had they done so, the expert could have testified that:

> Mark Ray testified that he fired a single shot into the back of the head of Doyle Douglas.  The assertion is not supported by the physical evidence.  The physical evidence is consistent with showing that Mark Ray, who admitted to using the R-G .22 LR Revolver, firing the shot into the right side of the victim's head.  The shot to the back of the head of Doyle Douglas is listed as Gunshot Wound # 1 in the autopsy report.  (22 RR at 268).  The shot to the left side of the head is listed as Gunshot Wound # 2 in the autopsy report.  (22 RR at 264).  Both of these shots were revealed by the autopsy report and later by laboratory examinations at the TDPS Laboratory to be consistent with being fired by the Colt Huntsman .22LR pistol, or the State's Exhibit 3.

(Ex. 95 at ¶ 7 [Decl. of  Richard Ernest].)

  632. Richard Ernest, a forensic ballistics consultant, could have testified at trial that State's Exhibits 9 and 10 would not have been consistent with the testimony that Young fired these two shots first using the Colt Huntsman .22LR pistol before Mark Ray later fired the shot into the back of the head of the victim.  Ernest could have testified that:

> Because of the physical dimensions and limitations
> involved in an automobile, it is the opinion of this
> examiner that it is unlikely that these two shots (State's
> Exhibits 9 and 10) were fired inside the automobile by
> the front seat passenger, Clinton Young, into the left side
> of the head and back of the head of the victim, Doyle
> Douglas, while he (the victim) was in the driver's
> position in the automobile.  Given this evidence, it is
> more likely that Douglas was shot by someone who was
> firing from the victim's left side (the driver's side of the
> car).

(Ex. 95 at ¶ 8 [Decl. of Ernest].)  Trial counsel was ineffective for failing to present expert testimony at trial.  *See Draughon v. Dretke*, 427 F.3d 286, 296-97 (5th Cir. 2005) (counsel ineffective for failing to obtain forensic examination of the path of the fatal bullet and the absence of forensic evidence facilitated the states portrait of defendant as a violent young man; without forensic testimony only defendant could counter state's theory that there had been a short distance between defendant and the victim).

633.   The testimony at trial was that Doyle Douglas was shot in the head three times with a small caliber weapon.  The prosecution's ballistics expert's uncertainty as to which weapon fired the bullets that killed Douglas was helpful to the defense case.  The evidence that Young shot Douglas two times in the head with a Colt Huntsman .22 caliber semi-automatic handgun in his possession at the time of arrest (State's Exhibit 3), was inconclusive, and trial counsel should have argued that this ballistics evidence showed that Ray, McCoy, and Page were not telling the truth and the State had not proven its case beyond a reasonable doubt. *See Draughon v. Dretke*, 427 F.3d at 296-97 (counsel ineffective for failing to obtain forensic examination of the path of the fatal bullet and the absence of

forensic evidence facilitated the states portrait of defendant as a violent young man; without forensic testimony only defendant could counter state's theory that there had been a short distance between defendant and the victim).

634.   The trial lawyers should have developed and presented the evidence to show that Page and Ray shot Douglas.  Young was seated in the passenger side of the car, close to Douglas and to his right.  Young could not have shot Douglas in the left side of the head because of where he was sitting.  All of this information, if presented properly and with the reports of Tim Counce and Jill Urban, would have shown that Young could not have shot Douglas and that the shots to the left and back of the head are consistent with being fired by Page, who was standing to the left of Douglas outside the car on the drivers side with the door open.  An expert could have testified that the wound to the right side of Douglas's head, along with the reports and Ray's admission of guilt, shows that Ray was responsible for that wound.  Page and Ray were equally culpable as none of the three bullet wounds were found to be post-mortem.  If all this evidence would have been presented to the jury and argued in this manner, it is reasonably probable that the jury would not have voted guilty as to the homicide of Douglas.

635.   The failure of trial counsel to put on their own ballistics expert in the guilt phase was prejudicial to Young's case.  The jury never heard from an expert that:

> the physical evidence associated with this shooting
> incident and the sworn testimony at trial by . . . David
> Lee Page should cast doubt on the truthfulness of the
> account(s) rendered by Mark Ray and David Lee Page in
> the matter of this case.

(Ex. 95 at ¶ 16 [Decl. of Ernest].)

636.   The jurors would have listened to the expert as Juror James Bobo has stated: "If the defense had presented its own ballistics expert to convincingly

challenge the State's evidence and the testimony of government witness David Page, it certainly would have raised questions for me about Mr. Page's credibility and his own involvement in the shooting of Mr. Petrey." (Ex. 100 at ¶ 3 [Decl. of James Bobo].)  Another juror, Michael Byrne similarly said: "If the defense had convincingly countered the State's ballistics evidence with regard to the Petrey murder, I would have been less likely to convict Young of killing Petrey." (Ex. 101 at ¶ 4 [Decl. of Michael Byrne].)

637.   The omitted evidence was so compelling that there was a reasonable probability that at least one juror would have changed his or her mind about convicting Young of capital murder.  *Williams*, 529 U.S. at 394; *Strickland*, 466 U.S. at 693; *Neal v. Puckett,* 286 F.3d 230, 241 (5th Cir. 2002) (en banc). Additionally, there is a reasonably probability that the ballistics evidence would have caused the jury to vote "no" on special issue number 2, whether the "defendant actually caused the death of the deceased individuals," (5 CR at 861), which would have resulted in a life sentence.

### d.   Conclusion

638.   The omitted evidence was so compelling that there was a reasonable probability that at least one juror would have changed his or her mind about convicting Young of capital murder.  *Williams*, 529 U.S. at 394; *Strickland*, 466 U.S. at 693; *Neal,* 286 F.3d at 241.  Additionally, there is a reasonably probability that the ballistics evidence would have caused the jury to vote "no" on Special Issue No. 2, whether the "defendant actually caused the death of the deceased individuals," (5 CR at 861), which would have resulted in a life sentence.

### 3.    Counsel Failed to Test Doyle Douglas's Vehicle for an Alternate Explanation of How the Shell Casings Were Found in the Car[69]

639.    Trial counsel inexplicably failed to test Douglas's vehicle so that the defense could explain why two .22 caliber shell casings were found in the passenger side of the vehicle. (23 RR at 43-46.)  In his closing argument, the prosecutor argued that the shell casings found in Douglas's vehicle, one in the seat and one on the floorboard, were fired from Young's gun, the Colt Huntsman .22 caliber (29 RR at 19-20, 67), and thus the shooter was inside the car at the time of the shooting.  The shell casings matched the Colt Huntsman, which, by process of elimination, were responsible for two of the gunshot wounds to Douglas. (25 RR at 158-59.)

640.    Ann Hinkle, who was the FBI agent who performed a forensics inspection of Douglas's vehicle, testified that the car had been shot at and that there was a defect on the dashboard, but she did not know whether it was from a bullet. (23 RR at 74-76.)  There were no tests conducted on the dash; Hinkle collected the evidence only. (23 RR at 73.)  She also admitted that she refused to speak to the defense prior to the trial. (23 RR at 67-69.)

641.    Young informed his trial lawyers that the dash and steering wheel had been shot at inside the car, which is where the shell casings came from. (Ex 52 [Letter to Gary Taylor].)  Young asked his lawyers to conduct tests on the car months prior to the trial. (*Id.*)  Such discovery was never conducted and no ballistics expert was ever requested.

642.    If tested, the defense would have shown that the defects that Hinkle described were in fact bullet holes, which would show an alternative explanation of how the shell casings were found in the vehicle.  This evidence, along with Counce's ballistics report that the trial lawyers failed to get admitted into evidence,

---

[69]  This Claim was raised in Claim 4 of the Successor Petition filed in the Texas Court of Criminal Appeals.  (*See* Exs. 51, 54.)

would have cast reasonable doubt on whether the shooter was actually in the car where Douglas was shot.

### 4. Trial Counsel Failed to Obtain Metal Testing on Page's Gloves Raised in the Supplemental State Petition as Ground 21

643.   Trial counsel failed to obtain trace metal testing on the gloves belonging to David Page.  This omission constituted ineffective assistance of counsel and violated Young's Sixth Amendment right to counsel.

644.   Besides the testimony of David Page, the only other evidence the prosecution presented implicating Young in the shooting of Petrey was a presumptive trace metal test conducted by a police officer.  (25 RR at 94.)  Police officer Paul Hallmark sprayed Young's hand with a chemical and compared it to pictures in a book.  He thought the glow from Young's hand was similar to that of an automatic weapon.  (25 RR at 94-95.)  Page's hands also glowed but, in the officer's opinion, the glow was not similar to any of the pictures in his book.  (25 RR at 101-02.)  In Hallmark's opinion it appeared to be a round object but appeared to be most similar to a picture of a drill chuck.  (*Id*.)  However, the accuracy of the photographs taken were in question because Hallmark also did not use the ultraviolet filter for the camera to take pictures of Young's and Page's hands because the department did not have one.  (25 RR at 41.)  The ultraviolet filter was available for purchase locally for $10.72.  (*Id*.)  Hallmark did not use an inexpensive SEM kit because he did not have one, but testified that he would the next time.  (25 RR at 25-26, 88.)

645.   Although the evidence was clear that gloves were found at the murder scene, Hallmark did not test the gloves for trace metal or gunshot residue, which can be tested for on gloves.  (25 RR at 37, 44, 46, 51, 97.)  The evidence provided by Page and trace metal testing comes into question when viewed with the testimony of Christopher McElwee who was in jail with Page.  McElwee testified

that Page admitted killing Petrey and that he wore gloves at the time he shot him.[70] (27 RR at 271-75.)  Page's DNA was discovered in the inside of the palm area of the gloves.  (27 RR at 245-54.)

646.   Page's claim that he was wearing work gloves that he had brought from home (26 RR at 137, 241) could have easily been refuted by testing the gloves for age, wear, and dirt.  Young informed his attorneys that Page bought the gloves during their journey.  The trial attorneys failed to follow-up and hire an expert to test these gloves for trace metal and for condition, age, and wear to further undermine Page's credibility.  As expert Richard Ernest would have testified:

> These gloves could have been tested for traces of gunshot residues using the Sodium Rhodizonate and the Modified Griess tests.  The gloves could have also been examined for condition, age and wear using conventional microscopy tests.

(Ex. 95 at  ¶15 [Decl. of Ernest].)  Trial counsel failed to investigate and hire an expert to test the gloves and testify to the findings.

### 5. Counsel was ineffective for failing to investigate that Page, Ray, and McCoy conspired through an ex-girlfriend of Page to collaborate on their version of events.[71]

647.   During closing guilt/innocence phase argument, the State argued that Page, Ray, and McCoy testified consistently and, because Page and Ray were in jail, could not have coordinated their stories.  However, the prosecutor's argument

---

[70]  Page also confessed to Ray Villa that he, Page, shot and killed Petrey. (Ex. 125 at ¶¶ 3-4, 6 [Decl. of Villa].)

[71]  This Claim was raised in state court as Claim 4 of the Successor Petition filed in the Texas Court of Criminal Appeals.  (*See* Exs. 51, 54.)

was false.

648.    In reality, Page, Ray and McCoy were coordinating their stories through Page's then girlfriend, Amanda.  Page admitted as much when he testified that while he had not seen the chase video, he had heard about it.  (27 RR at 220-21.)

649.    Had counsel investigated and presented evidence that McCoy, Page, and Ray were coordinating their stories about the Douglas and/or Petrey murders through someone on the outside, this evidence would have undermined the credibility of all three individuals, a key part of the State's case.  Counsel's performance was objectively unreasonable, and caused Young prejudice.

**6.    Counsel was ineffective for failing to request a mistrial when it was discovered that a relative of Petrey, Cathie Huckabee, was on the jury.  Before the juror was removed, the jury had talked and prayed together.  The court erred in informing the jurors why Huckabee was removed.[72]**

650.    On the second day of Young's trial, the court informed the parties of the following.  Juror Cathie Huckabee had just informed the court that she was distantly related to victim Samuel Petrey.  Huckabee knew that there had been a murder in her family, but had not made the connection that the family member was the same as the murder victim in Young's case until her sister had called.  When the court asked Huckabee if she could still fairly assess the evidence in the case, Huckabee told the court:  "I don't see how it cannot affect my evaluation of the case."  The court had asked Huckabee to remain until a decision was made.  (22 RR at 5-6.)

---

[72]  This Claim was raised in state court as Claim 5 of the Successor Petition filed in the Texas Court of Criminal Appeals.  (*See* Exs. 51, 54.)

651.   After explaining Huckabee's news to the parties, defense counsel and the prosecutor requested Huckabee be removed.  The court then dismissed Huckabee.  The court told the other jurors that Huckabee was a distant relative of a person involved in the case, and that it was no longer appropriate for her to remain as a juror.  (22 RR at 7.)

652.   Counsel was ineffective for failing to seek a mistrial when it was discovered that Huckabee was a relative of Petrey because the jurors had talked and prayed together before Huckabee's departure.  By the time Huckabee was dismissed as a juror, the jurors had bonded with one another and Huckabee's departure could have only influenced the juror's decision about Young's fate.  *See United States v. Forrest*, 620 F.2d 446 (5th Cir. 1980); *Franklin v. State*, 138 S.W.3d 351(Tex. Crim. App. 2004).  Counsel's performance was ineffective, and Young's was prejudiced by their actions.

653.   Moreover, the trial court erred when it informed the jury that Huckabee was removed from the jury because she was a distant relative of someone on the case.  In giving the jurors this ambiguous reason for Huckabee's excusal, the jurors' heightened sense of loss in losing Huckabee, someone they had bonded and prayed with, only exacerbated the problem.  The court should have removed Huckabee without comment.

224

**7.     Counsel was ineffective for failing to Question Debbie Sanders about her conversation with Carla Sexton in which she told her that she clearly heard Mark Ray brag to Patrick Brook that Ray shot Douglas. This would have challenged Brook's testimony.**[73]

654.   Trial counsel was ineffective for failing to cross-examine Debbie Sanders about her conversation with Carla Sexton in which she told her that she clearly heard Mark Ray brag to Patrick Brook that Ray shot Douglas. Sanders was called by the prosecution and testified at the punishment phase about overhearing part of the conversation between Young, Ray, Brook, and McCoy the night that Mr. Douglas was shot. (30 RR at 107-26.)

655.   Trial counsel had been informed, and knew that Sanders had admitted to Carla Sexton that Mark Ray bragged about shooting Douglas that night. Trial counsel's deficiency for failing to cross-examine a witness on an important topic regarding Ray's culpability for the Douglas shooting, was prejudicial. The cross-examination would have elicited that Ray was bragging about the shooting, undermining Ray's claim that Young forced him to shoot Douglas. This would have also undermined the credibility of Patrick Brook. Trial counsel was further ineffective for failing to call Debbie Sanders to testify to the information during the guilt phase proceedings.

---

[73]   This claim was raised in state court as Claim 6 of the Successor Petition filed in the Texas Court of Criminal Appeals. (*See* Exs. 51, 54.)

8.   **Counsel was ineffective for failing to strike Juror Haydee Guerreo from Young's jury as she did not speak or understand English well enough to fluently understand all of the testimony and evidence.**[74]

656.   "It is well-settled that only clear evidence of a juror's incompetence to understand the issues and to deliberate requires setting aside a verdict, and that only strong evidence that the juror suffered from such incompetence will justify an inquiry into whether such incompetence in fact did exist." *United States v. Dioguardi*, 492 F.2d 70, 78 (2nd Cir. 1974).  In fact, a juror's incompetence is viewed by the courts as an "internal abnormality," rather than one of improper external influence.  *See Tanner v. United States*, 483 U.S. 107, 118, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987) ("The quickness with which jury findings will be set aside when there is proof of tampering or *external* influence, ... parallel the reluctance of courts to inquire into jury deliberations when a verdict is valid on its face. ...  Such exceptions support rather than undermine the rationale of the rule that possible *internal* abnormalities in a jury will not be inquired into except in the gravest and most important cases'") (quoting *McDonald v. Pless*, 238 U.S. 264, 269, 35 S. Ct. 783, 59 L. Ed. 1300 (1915) (emphasis in original)).

657.   In *McDonald*, despite describing the "general rule, that the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict," the Supreme Court recognized "that it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without violating the plainest principles of justice. This might occur in the gravest and most important cases . . . ."  *McDonald*, 238

---

[74]  This claim was raised in state court as Claim 7 of the Successor Petition filed in the Texas Court of Criminal Appeals.  (*See* Exs. 51, 54.)

226

U.S. at 269.  This is one of the gravest and most important cases, it is a case where a juror, who was to decide whether a man was to live or die, could not understand the proceedings that transpired in front of her.

658.   Under Texas law, Government Code section 62.102, a prospective juror is only qualified to serve if he or she is able to read and write.  If a juror is unable to Comprehend English, they are exempted from jury service. Tex. Gov. Code § 62.109(a).

659.   The failure of trial counsel to object to Guerrero's sitting on the jury should not be held against Young because trial counsel was grossly ineffective in not asking the court to dismiss juror Guerrero for cause or using a peremptory strike.  Also, the trial court committed clear error in determining that juror Guerrero was competent to serve and by not dismissing her for cause *sua sponte*. The error denied Young his constitutional right to a fair and impartial jury, to due process of law, and to a reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

660.   Young will establish that Guerrero did not, in fact, have a sufficient understanding of the English language to serve on the jury that convicted Young and sentenced him to death.  "At times a procedure employed by the state involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Sheppard v. Maxwell*, 384 U.S. 333, 352, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966) (quoting *Estes v. Texas*, 381 U.S. 532, 542-43, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965)).

**9**.     **Counsel Was Ineffective for Failing to Admit Into Evidence That Young Was Incapable of Anticipating His Co-Defendant's Actions**

661.   As stated previously in Claim Five, *ante*, a defendant who did not actually cause the death of the deceased can be convicted of any capital offense in

227

Texas under a "law of the parties" theory.  A defendant is guilty of capital murder as a conspirator if he entered into an agreement to commit any felony with another person, the capital murder was committed in furtherance of the conspiracy, and the defendant should have anticipated that the capital murder would occur as a result of the felony.  Here, counsel was ineffective for failing to admit into evidence that Young suffered from severe ADHD, and in his state of mind at the time of the offense was incapable of anticipating his co-defendants's actions.

662.   There was no doubt that Young suffered from ADHD.  He was diagnosed with the illness in childhood.  (Exs. 97 at ¶ 13 [Decl. of Milam]; 96 at ¶ 70 [Decl. of Knox].)  However, what was not presented by counsel was how Young's ADHD would have made it impossible for Young to have been convicted for capital murder under a law of the parties theory.

663.   Because of his ADHD, which causes low levels of dopamine to be present in the frontal lobes, Young had difficulty effectively shifting mental organization from one event to another.  In other words, Young suffered from a "disregulated" mind.  (Ex. 97 at ¶ 11 [Decl. of Milam].)

664.   Based upon his ADHD, Young has consistently displayed distractibility and impulsive behavior.  Due to his mental regulation deficits, he has had an impaired ability to perceive the consequences of his actions. (Ex. 97 at ¶ 19 [Decl. of Milam].)  Further, Young is an individual who was incapable of assessing and responding to a rapidly changing situation due to his poor ability to think and plan.  (*Id*. at ¶ 25.)

665.   This information was crucial at the guilt phase to show that Young's state of mind, due to his ADHD, was incapable of anticipating Page's, Ray's, or McCoy's actions the night of the crimes.  This information would have rebutted the prosecution's argument that Young was the ring leader of the events concerning

228

Douglas and Petrey.

666.    None of this information was presented at Young's trial in the guilt phase.  Defense counsel unreasonably and prejudicially failed to present competent testimony regarding the nature and effect of Young's ADHD.  *Wiggins v. Smith*, 539 U.S. at 526 (unreasonableness of counsel's conduct resulted from *inattention*, not reasoned strategic judgment).

## C.    Ineffective Assistance of Counsel at the Punishment Phase

667.    Young's trial counsel also performed deficiently at the penalty phase. The prevailing and well-established standards of capital defense practice at the time of Young's trial required counsel to conduct an investigation into the facts of his life, family, and social history.  *See*, *e.g.*, *Porter v. McCollum*, 130 S. Ct. 447, 453, 175 L. Ed. 2d 398 (2009) (prejudicial error for failure to collect life history records and interview family members); *Williams v. Woodford*, 529 U.S. 362, 396, 120 S. Ct. 1495, 146 L. Ed. (2000) (defense counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background," citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1980)).

668.    This is not a case in which the defense presented no mitigating evidence.  However, the witnesses trial counsel did present were unprepared and inadequate to provide a full and accurate picture of Young's life and social history. The result was a mitigation presentation that did no more than show the jury a "hollow shell of the testimony necessary for a 'particularized consideration of relevant aspects of the character and record of [a] convicted defendant before the imposition upon him of a sentence of death.'"  *Collier v. Turpin*, 177 F.3d 1184, 1201-02 (11th Cir. 1999) (citing *Woodson v. North Carolina*, 428 U.S. 280, 303, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944 (1976)).  Young's life history mirrors that

which the United States Supreme Court has declared significant to assessing a criminal defendant's moral culpability. *See Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). Hence, had the jury seen the complete picture of Young's individualized circumstances, as the constitution requires, he would not have been sentenced to death.

### 1. Counsel's Failure to Present the Testimony of Young's Former Teachers

669. In addition to the failure to object to the introduction of the TYC records, as discussed above, counsel further failed to present the testimony of Margaret Ann Fant and Mary Hall, two of Young's former school teachers. Counsel's failure to interview the two teachers was ineffective.

#### a. Fant and Hall

670. Defense Investigator Jeff Marug interviewed both Fant and Hall before the commencement of Young's trial.

671. Margaret Fant was Young's fifth grade teacher for at least a part of that school year. Fant, who was fond of Young and knew him as a sweet and respectful child, believed he had no family guidance. According to Fant, Young never gave her any trouble and always tried to do the right things in school, although he would give up on projects faster than other children. (*See* Ex. 104 at ¶¶ 1-2 [Decl. of Fant].)

672. Fant believed that Young did well with her because he needed someone to talk to, because she treated him like a human being, and because she gave him guidance. While Fant believed that Young was troubled, she also believed he had a lot of potential. (*Id*. at ¶ 5.)

673. Mary Hall was Young's physical education teacher in kindergarten

and first grade.  Hall never had any problems with Young and he behaved himself in her class. She thought he was more of a follower than a leader.

### b.   State Hearing

674.   Evidence was taken on this claim during the hearing on Young's state petition.  On direct examination, defense counsel Cantacuzene testified that neither school teacher had been located and interviewed.  (2 RWR at 220-21.)  Later, on cross examination, defense counsel again stated that his defense team had never located these particular teachers or, if they had located them, one of the teachers ended up saying something "bad" about Young.  (3 RWR at 46-48.)  After a short break, defense counsel stated that after reviewing materials and talking to Young's mother, he wised to offer the following information regarding Fant:  (1) Fant had been interviewed after all; (2) she was Young's favorite teacher; and (3) a possible reason for not calling Fant, although counsel could not specifically remember, was that Fant would say Young had not received support at home from his mother, and that Young was able to control his behavior when he wanted to.  According to defense counsel, both of these facts were contrary to the defense presentation.  First, the defense felt that Young's mother "did try very hard . . . ."  And second, the defense theory was the Young could not control his behavior.  (3 RWR at 50-51.)  Defense counsel, however, was not certain of the reasoning behind not calling Fant:

> Q.  [Assistant District Attorney Ralph Petty]  Okay.  So
> you didn't want to chance contradicting your evidence?
> A.  [Ian Cantacuzene] It's the only think I can think of in
> talking to Mr. Williams.  That's best I could think of just
> on the break.

(3 RWR at 51.)  With regard to Hall, defense counsel stated that there were notes

231

about her in the defense file, but he could not remember why she was not called except that the notes indicate "that she did not find Clint to be hyperactive at all, and really, good golly, everybody that's ever seen him said the boy was hyperactive."  (3 RWR at 52-53.)

675.   Later, Young's lead counsel on the case, Paul Williams, testified that it did appear that defense investigator Marug interviewed Fant and Hall (habeas counsel Ori White had shown counsel Marug's report).  As to Fant, Williams stated:

> In fact, when you first brought it up to me this morning, I
> had no recollection of it whatsoever.  When we were out
> on one of the breaks and you showed me the report that
> Mr. Marug did . . .  I now do recall that Mr. Marugg and I
> met in my office and went over his report together, and
> the report on Ms. Fant was positive.  I honestly don't
> remember why we didn't call her, Mr. White.  I just
> simply don't recall.

(3 RWR at 69.)  Williams also did not have any recollection as to Hall.  (*Id*.)

### c.    Counsel Had No Tactical Reasoning in Not Calling Fant or Hall as Witnesses at the Punishment Phase

676.   The testimony of the two teachers would have presented favorable evidence from the same general time periods in which the State's witnesses observed Young, and was relevant to the jury's consideration of the first and third special punishment issues.  On the other hand, both defense attorneys offered little or no guidance on why the former teachers were not called.

677.   First, Williams had no independent recollection of either witness. And with respect to Fant, after reading Marug's interview notes, stated that the

report seemed "positive" but could not offer any reason for not calling her.  (3 RWR at 69.)

678.    And with respect to Cantacuzene, he too had no independent recollection of either witness.  And it was only after reading Marug's report that he offered some "possible" reasons for not calling Fant:  that Fant would testify that Young did not receive support at home from his mother and Young was able to control his behavior, both which were contrary to counsel's defense theory of the case. (3 RWR at 50-51.)  However, Mr. Cantacuzene's reasoning was faulty.

679.    First, Fant never laid the blame at Young's mother's feet.  Rather, Fant told Marug that Young had no family guidance, pointing the blame to all who raised him.  Second, defense witness Dr. Milam gave testimony that Young often had no supervision at home as his mother was off working from 4:00 p.m. to 1:00 a.m.  Dr. Milam also testified that when Young's EEG showed he needed serious help, Carla sent him to Wyoming instead.  (34 RR at 43-45.)  Dr. Milam also testified that no one in Young's family seemed to know how to treat their son's ADHD.  (34 RR at 52-53.)  Thus, far from being contrary to defense strategy, Fant's testimony was no different, in that one respect, from that which was presented by Dr. Milam.

680.    And with respect to Cantacuzene's reference to Fant stating that Young not being able to control his behavior, Fant never told this to Marugg.  In short, counsel's reasons for not calling either witness were neither thought out or strategic.  Thus, counsel's performance was objectively unreasonable.

681.    With regard to prejudice, the failure to call Hall is clear.  The State presented the testimony of Young's first grade teacher, Debbie Barton.  Barton painted a dismal portrait of Young including that he bit and hit other students, tore up books, fell behind in his work, did not make friends, and had to be removed

from the school district.  (31 RR at 101-05.)  Without the testimony of Hall, who taught Young in the same time period as Barton and would have testified to Young's good behavior, among other things, Barton's negative testimony was left unrebutted.

682.   And with respect to Fant, her testimony would have painted a more accurate portrait of the problems Young faced at that age - a child who was not receiving the proper guidance from his family.

683.   The failure to call these witnesses was an opportunity lost by defense counsel.  The State portrayed Young, even from his earliest years, as a trouble maker who showed a persistent pattern of criminal conduct over his lifetime.  Fant and Hall would have assisted in countering that image, certainly rebutting some of the State's more damaging testimony of Young's early years.  Counsel's performance, or lack there of, caused tremendous prejudice to Young's case.

## 2.   Counsel's Failure to Present Key Evidence in Mitigation[75]

684.   Young's counsel failed to present two key pieces of mitigation evidence at the punishment phase:  (1) why Young would stop taking his ADHD medication upon his discharge from TYC; and (2) why Young, who was apparently unmedicated at the time of the trial, seemed to be able to sit still and converse with his trial counsel.  Trial counsel presented several experts at the punishment phase, but they did not elicit testimony to explain these two important concepts.

### a.   Relevant Law

685.   The United States Supreme Court, in *Wiggins*, 539 U.S. 510, stated that, among the topics counsel should investigate are "medical history, educational

---

[75]   This Sub-Claim was raised in Claim 25 of the First Amended Petition and in Claim 4 of the Successor Petition filed in the Texas Court of Criminal Appeals.  (*See* Exs. 51, 54.)

history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences. . . ." *Id.* (emphasis in original); *see Sonnier*, 476 F.3d at 358; *Lewis*, 355 F.3d at 367. In this case, the limited evidence that trial counsel presented regarding Young's ADHD was clearly not enough. But for counsel's failure to present further evidence, Young would not have been sentenced to death. *Strickland*, 466 U.S. at 694. Indeed, the United States Supreme Court has affirmed that "[c]onsideration of [mitigating] evidence is a 'constitutionally indispensable part of the process of inflicting the penalty of death.'" *California v. Brown*, 479 U.S. 538, 561, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1967)).

### b.    Facts and Analysis

686. The jury knew that, by the time Young was released from TYC, he was on a combination of Depakote (a mood stabilizer), Clonidine (a blood pressure medication with a sedative effect), and Ritalin (an amphetamine). (36 RR at 40-41.) The jury was clearly concerned about the issue of Young's ADHD and whether he was on the medication at the time of trial. During punishment deliberations, the jurors sent a note to the judge asking the following question: "We find no record of his current medication for ADHD during his stay in Midland county. Is this in the record or are we just not finding it. (37 RR at 5.) The judge's response to the note did not answer the jury's question: "Members of the jury, the documents before you are the only documentary exhibits in evidence." (*Id.*)

687. Although Dr. Daneen Milam testified in the punishment phase, she was never asked: (1) why Young would stop taking his ADHD medication upon his discharge from TYC; and (2) why Young, who was apparently unmedicated at

235

the time of the trial, seemed to be able to sit still and converse with his trial counsel.[76]

688.   First, if asked, Dr. Milam could have explained that Young was dependent on drugs before he went to TYC.  (Ex. 97 at ¶ 13 [Decl. of Milam].) Drugs were part of Young's life early on partially because of his father's own dependency issues.  (Ex. 96 at ¶¶ 8, 137 [Decl. of Knox].)  As trial counsel knew at the time of trial and explained at the state writ hearing, Young's father had introduced his child to crack cocaine.  (33 RR at 245-46; 2 RWR at 208-09.) Further, Young never received any treatment for drug or alcohol abuse.  (Ex. 96 at ¶ 175 [Decl. of Knox].) The chances were high that Young would abuse drugs as soon as he faced a trigger, i.e., outside of TYC and in a place where drugs were prevalent.  (Ex. 97 at ¶¶ 14, 17 [Decl. of Milam].)  Taking street drugs outside of the TYC was not so much a decision to take drugs, it was behavior consistent with Young's dependency on drugs.  (*Id.* at ¶ 16.)

689.   Dr. Milam could have explained that Young was referred to the Mental Health Mental Retardation Centers, but had limited access and transportation.  (Ex. 97 at ¶ 15 [Decl. of Milam].)  She could have testified further that:

> In itself, a question about Young's "decision" to
> not take his medicine upon his release indicates the jury
> was not presented with a fully detailed explanation of
> Young's problem. At trial the jury was told Young had

---

[76] During the state habeas investigation, Nancy Piette interviewed some of Young's jurors.  One juror noted that while the defense attorneys made a "big deal" of Young's ADHD, in court it was obvious Young could listen, pay attention, assist the attorneys, write notes, and behave, without medication. Another juror remarked that Young's decision to stop taking his medication upon his release from TYC, was voluntary.

been up for days using "meth" before and during the time
of the crimes. But a clear progression was not drawn
between the legal stimulants he used since childhood and
methamphetamine, which he used for a couple of months
at most. A fully informed jury would have readily
understood why a subject such as Young, under these
circumstances, *would be more likely to fail* to maintain
his medication regime than not.

Without a structured therapy or medication plan,
Young's turning to self-medication via other stimulants
was almost inevitable. When he was released from TYC
with no external regulators to keep him on track, and
instead surrounded by an abundance of street drugs, he
transitioned to methamphetamine. Methamphetamine,
also known as "speed" or "meth" or "crystal meth," albeit
illegal, has properties similar to the FDA-approved
medicine Young had been taking all his life.  Despite its
highly addictive nature and extremely dangerous side
effects, it was a simple conversion for Young because of
his long-term use of a chemically similar drug.

(Ex. 97 at ¶¶ 16-17 [Decl. of Milam].)

690.   Second, if asked, Dr. Milam could have explained why, even
unmedicated, Young was able to sit still through his trial and converse with trial
counsel.  She would have testified that:

While Clinton Young's long history of ADHD was
presented to the jury, neither this expert, nor any other

237

> expert, explained the concept of hyperfocusing.  Had the
> neurological basis for ADHD been adequately explained,
> including the concept of "hyperfocusing," the jury may
> have understood Young's ability to sit quietly throughout
> his trial.  A more detailed explanation, including these
> disparate effects of being un-focused or overly-focused,
> would have not only allowed the jury to understand the
> peculiarities of Young's ADHD, they likely would have
> been able to observe it as such.

(Ex. 97 at ¶ 12 [Decl. of Milam].)

691.   Finally, if asked, Dr. Milam could have pulled together all aspects of
Young's drug dependency, ADHD and social history, which would have given the
most persuasive and complete testimony in mitigation:

> Young's ADHD was and is a medical problem and
> was not the result of a lack of will power.  ADHD is a
> biological and chemical malfunction in an immature
> brain.  The effects of Young's genetically and
> biologically determined impulsive and distractible
> response style was aggravated, no doubt, by the chaotic,
> traumatic home environment in which he spent his
> formative years.  Children who suffer from severe
> ADHD disorder require intensive limit setting and a
> stable environment. The impact of positive structure on
> Young is clearly demonstrated by his good behavior and
> good reviews by several of his teachers and counselors at
> TYC.  It appears extremely unlikely that any adult in

238

Young's home could have provided such a structure or
stability.

The fact that biological deficits would cause
Young to behave even younger than his chronological
age is corroborated by the comments of his teachers,
counselors, and family members who consistently stated
he was impulsive, and a follower.   A review of the
sequence of events of the crime is consistent with a
poorly planned and executed event.  Young is an
individual who was incapable of assessing and
responding to a rapidly changing situation.  His poor
ability to think and plan, lack of cognitive and practical
skills sent him and his life spiraling out of his control.

(Ex. 97 at ¶¶ 24-25 [Decl. of Milam].)  Without this testimony, the jury could not
have put Young's ADHD in the proper context, or understand the impact of
Young's impairments throughout Young's life, or how it impacted the extent of his
culpability in the underlying offenses.  Accordingly, Young's jury would not have
sentenced him to death had trial counsel performed deficiently and presented even
a minimally complete presentation of Young's background and circumstances, as
required by the Constitution.

### 3.   Trial Counsel's Failure to Object to the Court's Supplemental Jury Charge[77]

692.   Young's right to effective assistance of counsel was violated by his
counsel's failure to object to the court's supplemental jury charge: (a) being a

---

[77]  This Claim was raised in Grounds 15-19 in Young's supplemental
grounds for relief.  (*See* Ex. 53.)

comment on the weight of the evidence; (b) allowing the jury to answer the second special issue in the affirmative without requiring all twelve jurors to answer "yes"; and (c) preventing the jury from considering circumstances of the offense favorable to Young that might have been considered mitigating evidence.

693.   Young was charged by amended indictment with causing the death of Douglas and Petrey.  The jury found Young guilty of the capital murder alleged in paragraph one of the amended indictment (murder of Douglas and Petrey during the same criminal transaction or in different criminal transactions but pursuant to the same scheme and course of conduct) and paragraph two of the amended indictment (murder of Petrey in the course of committing or attempting to commit the offense of kidnapping and robbery).  (1 CR at 4-5.)

694.   During the punishment phase, the jury asked the following question: "Regarding Issue Number 2 cause the death of deceased individuals, intended to kill the deceased individuals.  Question:  Do you have to believe both or at least one?"  (36 RR at 135.)  In response, the court answered the jury as follows:

> Members of the jury.  Paragraph 1 of the indictment charged capital murder by the death of two individuals pursuant to the same scheme or course of conduct.  Paragraph 2 of the indictment charged capital murder by the death of an individual during the course of kidnapping and robbery.  If you consideration of Issue No. 2 on punishment is as to Paragraph 1 of the indictment, the death of two individuals is required to be found by the jury.  If your consideration is as to the second paragraph of the indictment, the death of an individual, Samuel Petrey, is required.

240

(36 RR at 135.)

695.   On appeal, counsel presented four points of error concerning the above supplemental instruction:  (1) it improperly coerced the jury to answer the second special issue in the affirmative; (2) that the instruction allowed the jury to answer the second special issue in the affirmative without requiring all twelve jurors to answer "yes"; (3) that the instruction was an improper comment on the weight of the evidence; and (4) that the instruction prevented the jury from considering circumstances of the offense favorable to Young that might have been considered mitigating evidence.  (AOB at 11, 22-25.)  The CCA denied the claims: "Because appellant's objections at trial do not comport with the claims he now raises, he has failed to preserve those claims for appeal.  *Young v. State*, 2005 WL 2374669, * 7.

696.   Assuming, *arguendo*, the CCA was correct (*see* Claim Twelve, *ante*), trial counsel was ineffective for failing to make the appropriate objections to preserve the issues for appeal.  *Strickland*, 466 U.S. at 694.  Young's right to the effective assistance of counsel was violated by counsel's failure to object to the court's supplemental jury charge on the following grounds:  that the charge (1) was an ambiguous response to an ambiguous question which contained imperative language depriving Young of a trial by jury on Special Issue No. 2; (2) failed to clearly instruct the jury that they would deliberate on each count of the indictment concerning Special Issue No. 2.  This created the possibility that Young received  a non-unanimous verdict on Special Issue No. 2.; (3) used imperative language which forced the jury to make an affirmative response to Special Issue No. 2 and proceed to the Third Issue on Mitigation thinking that they were "required" to find Special Issue No. 2 affirmatively; and (4) failed to clearly set out the jury's need to consider and vote on their findings independently as to Count One and Count Two

241

of the Charging Instrument.  For the reasons discussed in Claim Thirteen, and incorporated herein by reference, an objection to the charge would have been sustained, and, as a result the jury would not have sentenced Young to death.

### 4.    Failure to Object to Prosecutor's Inflammatory Waving Around of  "Serial Killer" Book in Front of Young's Jury[78]

697.    Young's counsel failed to object to the prosecution waving the book Serial Killer in front of the jury during the punishment phase of Young's trial.

698.    During Dr. Short's testimony regarding the differences between someone who suffered from antisocial personality disorder and a person who was a psychopath, DA Schorre began waving before the jury a book entitled Serial Killer. While defense counsel objected to DA Schorre's line of questioning, they never objected to the waving around of the book. (32 RR at 55-63.)

699.    The obvious inference of the book was that Young himself was such a serial killer.  The book itself was nothing more than a silent prop, used to get this message across to the jury.  Even the court felt the book had crossed a line.  (See 32 RR at 62-63.)  Because the prosecutor's actions were improper, counsel's inaction was ineffective.

### 5.    Counsel was ineffective for failing to object to the admission of Young's county jail records.[79]

700.    During the punishment phase of trial, the prosecution admitted Young's Midland County jail records without objection. The jail records were admitted as State's Exhibit 145. (30 RR at 179.)  Counsel's failure to object to the records constituted deficient performance as the records contained false

---

[78] This Claim was raised in state court as Ground 22 of Young's supplemental petition.

[79] This Claim was raised in state court as Claim 3 of the Successor Petition filed in the Texas Court of Criminal Appeals.  (See Exs. 51, 54.)

information which should have been challenged.  (*See* Ex. 4 [Excerpts of Midland County Jail Records].)  As the jury was able to review, unchallenged false information, Young was prejudiced by his counsel's objectively unreasonable performance.

**6.      Counsel was ineffective for failing to impeach witness J. Timmons Based On Her False Testimony**[80]

701.    During the punishment phase, Jacqueline Timmons, a juvenile correctional officer at TYC, testified to a fight that broke out between Young and another youth.  According to Timmons, she was injured while trying to break up the fight as both Young and the other youth punched her on the upper body.  Timmons also testified that another correctional officer was injured in this same altercation.  (31 RR at 291-92.)

702.    On cross examination, defense counsel questioned Timmons about the actual January 2000 incident report.  Specifically, counsel asked Timmons whether the written report stated that she was assaulted by Young.  Timmons testified that the report counsel had was merely a synopsis, and the actual incident report contained the information that Timmons was assaulted by Young.  (31 RR at 301.)

703.    However, counsel had in their possession the full report, and that report did not contain any information which alleged that Young assaulted Timmons.  (*See* Ex. 20 [TYC - Timmons Report].)  Counsel's failure to impeach Timmons with the actual report was ineffective.  *Strickland*, 466 U.S. at 694.

704.    The prejudice is clear.  Without the impeachment of Timmons, the jurors were left with the impression that Young was a dangerous person who would be a threat to guards in prison, which supported the prosecutor's future

---

[80]   This Claim was raised in state court as Claim 8 of the Successor Petition filed in the Texas Court of Criminal Appeals.  (*See* Exs. 51, 54.)

dangerousness argument.

### 7. Counsel was ineffective for failing to object to the prosecution's false assertion that Young admitted to the Douglas murder and had no remorse [81]

705.   At the punishment phase, prosecutor Teresa Clingman successfully objected when defense counsel attempted to elicit evidence from witnesses that Young was remorseful about the crimes.  (*See* 33 RR at 138, 142-43.)  However, in closing, Clingman argued to the jury that Young never showed remorse:

> Did you ever once hear from any witness any remorse for
> the death of these men at this punishment phase?  No,
> you didn't.  Not any.  Not from a single witness that
> testified.

(36 RR at 94.)  A short time later, the prosecutor also argued that Young admitted to killing Douglas.  However, no such evidence had ever been introduced at trial. (*See* 36 RR at 95.)

706.   Clingman's actions amounted to misconduct, and counsel's performance was objectively unreasonable when he failed to object to the misconduct.  *See Commonwealth v. Mosby*, 11 Mass.App. 1 (App. Suffolk 1980) ("it is particularly improper for a prosecutor to call the jury's attention to an absence of evidence when the absence is a result of the prosecutor's objection to the introduction of that evidence"); *Thomas v. State*, 519 S.W.2d 430 (Tex. Crim. App. 1975) (prosecutor's argument that the defendant's niece did not testify because she was afraid of her uncle was not supported by the record and therefore constituted an improper argument).

---

[81]  This Claim was raised in state court as Claim of the Successor Petition filed in the Texas Court of Criminal Appeals.  (*See* Exs. 51, 54.)

707.   The prejudice which resulted is real.  Without an objection, the jury was left surmising that Young had confessed to someone about killing Douglas. Morever, the jury was also left with the impression that Young was not remorseful regarding his actions.  Together, both comments were prejudicial to Young's case.

**D**.   **Conclusion**

708.   The foregoing violations of Young's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507  U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

709.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do  not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

710.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

**CLAIM FIVE:  YOUNG'S CONSTITUTIONAL RIGHTS WERE
VIOLATED BECAUSE THE EVIDENCE WAS INSUFFICIENT TO FIND
THAT THE KILLINGS OCCURRED IN THE SAME CRIMINAL
TRANSACTION OR IN DIFFERENT CRIMINAL TRANSACTIONS
COMMITTED PURSUANT TO THE SAME SCHEME OR COURSE OF
CONDUCT**

711.   Young's convictions, confinement, and sentence violate the Fifth,
Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution
because there is insufficient evidence to find that the shootings of Douglas and
Petrey occurred either in the same criminal transaction or in different criminal
transactions committed pursuant to the same scheme or course of conduct.

712.   *Exhaustion of Claim*:  This claim was presented as Points Eleven and
Twelve in the direct appeal.  (AOB at 13-14, 53-58.)

713.   *AEDPA*:  On appeal, Young alleged that there was insufficient
evidence to support the jury's verdict of guilt on either of the theories of which he
was indicted:  (1) Young intentionally and knowingly caused the deaths of Petrey
and Douglas during the same criminal transaction or different criminal transactions
but pursuant to the same scheme and course of conduct; and (2) Young
intentionally and knowingly caused the death of Petrey during the course of
kidnapping or robbery.  *Young v. State*, 2005 WL 2374669, at *1.  The CCA only
dealt with the second theory of guilt because "[i]f the evidence is sufficient to
support one of the theories in the indictment, we need not address the other
theories."  (*Id*.)  Because the CCA did not reach this claim on direct appeal,
although it was raised for the state court's consideration, review is de novo as there
is no decision to assess under 28 U.S.C. § 2254(d).

246

**A.    Legal Standard**

714.    Evidence is sufficient to support a conviction if, viewing all the record evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged).  The same standard is used by Texas courts in determining the sufficiency of evidence.  *Hooper v. State*, 214 S.W.2d 9, 13 (Tex. Crim. App. 2007); *Sells v. State*, 121 S.W.2d 748, 753-54 n.4 (Tex. Crim. App. 2003); *Jackson v. State*, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000).

715.    In making this determination, the jury must be free to disbelieve testimony and to infer that the truth is otherwise when such an inference is supported by circumstantial evidence regarding the actions of the accused. *Jackson*, 443 U.S. at 319.  Insufficient evidence claims are reviewed by looking at the elements of the crime under state law.  *Jackson*, 443 U.S. at 324 n.16.

**B.    Relevant Facts**

716.    The amended indictment in this case charged Young in paragraph one with the offense of the murder of Douglas and Petrey in either the same criminal transaction or in different criminal transactions committed pursuant to the same scheme or course of conduct.  (CR at 754-56.)  The jury returned a general verdict finding Young guilty of capital murder.  (CR at 866-67.)

717.    Reviewing the evidence in the light most favorable to the prosecution, the evidence showed the following.  On the evening of November 24, 2001, Young, Mark Ray, Darnell McCoy, and David Page wanted to go to Longview to

247

buy "blunts," marijuana wrapped in cigar paper.  (21 RR at 154; 22 RR at 69; 26 RR at 138.)  As no one in the group had a working car of his own, Doyle Douglas agreed to drive the group to Longview.[82]  (21 RR at 93, 99-100; 22 RR at 47, 61-62; 26 RR at 145.)  The group started out for Longview around midnight.  (22 RR at 51; 26 RR at 150.)

718.   At the location where the drugs were to be bought, Young shot Douglas twice in the head, stating something about needing Douglas's car.  (21 RR at 105-07; 22 RR at 89; 26 RR at 158.)  Young searched through Douglas's pockets, found a police type badge, and commented that he always knew Douglas was a snitch.  (26 RR at 163.)  Douglas was then put into the trunk of the car, still alive, and the group drove around for some time.  (21 RR at 120-21; 26 RR at 164-65.)  They later stopped in a secluded forest area and rolled, dragged, and/or kicked Douglas into a shallow creek bed, face down.  (21 RR at 128; 22 RR at 120; 26 RR at 172-76.)  Ray then fired the last shot into Douglas's head.  (21 RR at 129; 22 RR at 125; 26 RR at 178-79.)  After Douglas was shot, Page stole Douglas's wallet and its contents.  (21 RR at 118-19.)

719.   The group then drove  to a Longview motel to see Patrick Brook.  (22 RR at 104; 26 RR at 190.)  There, Young told Brook that Douglas was a child molester and a rapist and he deserved what happened to him.  (21 RR at 117; 22 RR at 102.)  Somewhere along the way, Young told McCoy that he needed Douglas's car to see Amber.  (21 RR at 134.)  Young then drove back to Ore City where he and Page dropped off McCoy and Ray.  (21 RR at 136; 22 RR at 232; 26 RR at 181.)  Young and Page then began driving to Midland.  (26 RR at 187.)

720.   While on the road to Midland, Young decided he needed a different

---

[82]  Douglas was the uncle of Amber Lynch, Young's girlfriend at the time of the crimes.  (24 RR at 74; 21 RR at 134; 27 RR at 79 .)

car because he could not arrive in Midland with Amber's uncle's vehicle. (26 RR at 197-98.)  In a grocery store parking lot in Eastland, Texas, Young approached Petrey as he got into his pick-up truck, and took control of the vehicle.  (26 RR at 203-05.)  Young and Page then continued on to Midland, arriving around 2:00 a.m. on November 26, 2001.  (26 RR at 217.)

721.   Once in Midland, the group went to a Walmart in Odessa, then to a hospital in Odessa, and then to a Walmart in Midland, arriving there around 7:15 a.m.  (26 RR at 225-38.)

722.   Young and Page drove to a pump-jack site to get rid of the evidence. (26 RR at 240-41.)  There,  Young telephoned Amber.  (26 RR at 238.)  Amber's father, Bart, got on the telephone and told Young that he knew what had happened to Douglas and that the police were looking for Young and Page.  Page called his father around 8:12 a.m., and then asked Young to drop him off so he could turn himself in.  (26 RR at 238-40.)

723.   Still at the pump-jack site, Young said something like, "Sorry, Sam, you know too much.  You got to die. . . . " and shot Petrey twice. (26 RR at 246.) Young then dropped off Page at a restaurant.  (26 RR at 249.)  Young was later captured after a high speed pursuit  (24 RR at 145-50.)

## C.   Argument

724.   The state's theory was that Young shot Douglas and Petrey in order to secure a car to see Amber Lynch, who was in Midland, Texas for the Thanksgiving holiday.  (29 RR at 9, 11, 25-26, 68.)  Assuming, arguendo, the evidence in the light most favorable to the prosecution shows that Young shot both Douglas and Petrey, the evidence also shows that the murders were not part of the "same criminal transaction" or "different criminal transactions committed pursuant to the same scheme or course of conduct."

725.    Under Texas state law, there are two ways to commit a capital offense by murdering two or more people:  (1) during the same criminal transaction; or (2) during different criminal transactions committed pursuant to the same scheme or course of conduct.  *Rios v. State*, 846 S.W.2d 310, 314 (Tex. Crim. App. 1992); *see* Tex. Pen. Code § 19.03(a)(7)(A), (B); *Coble v. State*, 871 S.W.2d 192 (Tex. Crim. App. 1993); *accord Wood v. Quarterman*, 503 F.3d 408, 412 (5th Cir. 2007).

726.    If a defendant is charged with murdering two or more persons during the same criminal transaction, the State must prove that he "engaged in a continuous and uninterrupted process, over a short period of time, of carrying on, or carrying out murder of more than one person."  *Id*.; *accord Vuong v. State*, 830 S.W.2d 929, 941 (Tex. Crim. App. 1992); *see Coble v. State*, 871 S.W.2d at 197-99 ("same criminal transaction" covers mass murders, such as killing people in a crowded room with a bomb).

727.    Two or more murders committed within a few hours of each other can occur during the "same criminal transaction" if the defendant engaged in a continuous and uninterrupted activity that tied them together.  *Coble*, 871 S.W.2d at 197-99.

728.    On the other hand, when a defendant is charged with murdering two or more persons during separate criminal transactions, the State must prove that the murders occurred pursuant to the "same course of conduct."  *Rios*, 846 S.W.2d at 314. the "same scheme or course of conduct" applies to "serial" murderers.  *Coble*, 871 S.W.2d at 199 n.10.  Those who commit murders pursuant to the "same scheme or course of conduct" have an "over-arching objective or motive" or engage in "a regular mode or pattern of . . . behavior."  *Corwin v. State*, 870 S.W.2d 23, 28-29 (Tex. Crim. App. 1993).

729.    Here, there was insufficient evidence to demonstrate that Young

committed the murders during the "same criminal transaction."  The evidence showed that the first murder, that of Douglas, occurred sometime in the early morning hours of November 25th.  (22 RR at 108.)  On the other hand, Petrey was murdered sometime after 8:30 a.m on November 26th, some *thirty* plus hours later.  (26 RR at 240.)  Based upon the length of time between the murders, there was insufficient evidence to support a conviction of multiple murder during the "same criminal transaction."  *See Feldman v. State*, 71 S.W.3d 738 (Tex. Crim. App. 2002) (motorcyclist killed a truck driver during road rage on a highway and killed another truck driver approximately *forty-five minutes later*); *Coble*, 871 S.W.2d at 197-99 (two or more murders committed within a *few hours* of each other can occur during the "same criminal transaction" if the defendant engaged in a continuous and uninterrupted activity that tied them together); *Vuoung*, 830 S.W.2d 929 (defendant's killing victims with semiautomatic rifle in crowded tavern in continuous and uninterrupted chain of conduct occurring over very short period of time was in same criminal transaction).

730.   Nor were the murders committed during the "same criminal transaction"  because the evidence was not sufficient to show a "continuous and uninterrupted process . . . ."  Tex. Pen. Code § 19.03(a)(7)(A).  Here, looking at the evidence in the light most favorable to the State, after Young shot Douglas, but before he shot Petrey, the following events took place:  Ray shot Douglas; the group went to see Patrick Brook; Young drove Ray and McCoy back to Shady Shores; Young and Page began driving toward Midland; and they stopped at a convenience store, two Walmart Stores, and a hospital.  (26 RR at 193, 225.)  Based upon this evidence, the murders were not committed during a continuous and uninterrupted process.  *See Jackson v. State*, 17 S.W.3d  664, 669 (Tex. Crim. App. 2000); *Rios*, 846 S.W.2d at 315.

251

731.   The evidence was also insufficient to show the murders were committed during different criminal transactions but pursuant to the "same scheme or course of conduct."[83]  As previously stated, those who commit murders pursuant to the "same scheme or course of conduct" have an "over-arching objective or motive" or engage in "a regular mode or pattern of . . . behavior."  *Corwin*, 870 S.W.2d at 28-29.

732.   Here, the State argued that Young's motive for both murders was the taking of the vehicles in order to see Amber Lynch in West Texas.  (*See* 29 RR at 9, 11, 25-26, 68.)  However, the taking of Douglas's car and Douglas's eventual murder had little to do with Young going to see his girlfriend in Midland.

733.   Viewing the evidence in the light most favorable to the State, the first objective that evening was to secure Douglas's car in order for Young to take himself and his friends to Longview, Texas, to buy "blunts."  (21 RR at 154; 22 RR at 69; 26 RR at 138.)  As no one in the group had transportation, Douglas represented the group's best chance of getting to Longview to buy drugs.  (21 RR at 93, 99-100; 22 RR at 47, 61-62; 26 RR at 145.)

734.   Viewing the evidence in the light most favorable to the State, the second objective that evening was for Young to secure Douglas's car in order to go see Patrick Brook.  (22 RR at 104; 26 RR at 190.)  Young was angry at Brook because of a gun transaction, and because Brook had "stolen" Debbie Sanders away from Young's brother, Dano.  (26 RR at 166-67.)  Young told Dano that he was going to kill Brook and get Sanders back for Dano.  (21 RR at 98.)  In order to do that, Young told Dano that he was going to ask for Douglas's car and that if Douglas refused, he was going to knock him out and take the vehicle.  (21 RR at

---

[83]  While the jury was instructed as to the meaning of "same criminal transaction," they were not instructed as to the meaning of "same scheme or course of conduct."  (CR at 808-09.)

283-91.)

735.   Viewing the evidence in the light most favorable to the State, the third objective that evening was to kill Douglas because he was a child molester, a rapist, and snitch.  After Young shot Douglas, he told McCoy that Douglas deserved what happened to him because he was a child molester and rapist.  (21 RR at 117; 26 RR at 263-64.)  Further, when the group went to see Brook after the shooting, Young told Brook that he killed Douglas because he found a law enforcement badge in Douglas's car.  (21 RR at 252; 26 RR at 163.)

736.   Moreover, if the "over-arching objective" (*Corwin*, 870 S.W.2d at 28-29) that evening was to kill Douglas and secure his car to see Amber in Midland, there was no reason for Young to have taken McCoy, Page, and Ray, and then to travel to Springhill, then to Longview, then back to Ore City, and then to Midland.  At best, Young's intent changed at some point after Douglas was shot.

737.   Thus, far from killing Douglas in order to secure his car for the purpose of seeing his girlfriend, Young's motive were far more complicated, yet completely separate from seeing Amber.  As the evidence was insufficient to sustain the verdict, relief is warranted.

738.   The foregoing violations of Young's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9; *Holloway v. Arkansas*, 435 U.S. 475, 489, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978).

739.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the

remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

740.    In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM SIX:  YOUNG'S CONSTITUTIONAL RIGHTS WERE VIOLATED BECAUSE THE EVIDENCE WAS INSUFFICIENT TO FIND THAT THE PETREY MURDER OCCURRED IN COMMISSION OF ROBBERY OR KIDNAPPING

741.    Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because there is insufficient evidence to find that the intentional murder of victim Petrey occurred in the course of the commission of robbery or kidnapping.

742.    *Exhaustion of Claim*:  This claim was presented as Points Twelve and Thirteen in the direct appeal.  (AOB at 14-15, 59-60.)

743.    *AEDPA*:  This claim was rejected in a reasoned opinion by the CCA. *Young v. State*, 2005 WL 2374669, at *1-3.  However, as will be explained more fully below, because the state court's adjudication of this claim was dependent on an unreasonable application of federal law, this Court "must then resolve the claim without the deference that AEDPA otherwise requires," i.e, applying de novo review.  *See Panetti*, 127 S. Ct. at  2858.

## A.    Legal Standard

744.    As discussed in Claim Six, evidence is sufficient to support a conviction if, viewing all the record evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. The same standard is used by Texas courts in determining the sufficiency of evidence. *Hooper*, 214 S.W.2d at 13.

**B.    28 U.S.C. Section 2254(d) Does Not Apply**

745.   Regarding the offense of the Petrey murder, the jury was instructed pursuant to paragraph two of the amended indictment in this case:

> A person also commits the offense of CAPITAL
> MURDER if he intentionally causes the death of an
> individual in the course of committing or attempting to
> commit the offense of KIDNAPPING or ROBBERY.

(CR at 5, 809.)

746.   With regard to this murder charge, the jury was instructed as to the "law of the parties." (CR at 813.) Under Texas law, a defendant who did not actually cause the death of the deceased can be convicted of any capital offense as a conspirator (Tex. Penal Code § 7.02(b)), or as a party under either an accomplice theory or a theory involving the legal duty to act (Tex. Penal Code § 7.02(a)).

747.   In this case, the jury was instructed as to an accomplice theory under section 7.02(a)(2):

> A person is criminally responsible for an offense
> committed by the conduct of another if acting with the
> intent to promote or assist the commission of the offense,
> he solicits, encourages, directs, aids, or attempts to aid
> the other person to commit the offense.

(CR at 813; *see also* 814-25.) However, without explanation the CCA, in their opinion denying Young's direct appeal, analyzed this sufficiency claim under 7.02(b):

255

> In an attempt to carry out a conspiracy to commit one
> felony, another felony is committed by one of the
> conspirators, all conspirators are guilty of the felony
> actually committed, though having no intent to commit it,
> if the offense was committed in furtherance of the
> unlawful purpose and was one that should have been
> anticipated as a result of the carrying out of the
> conspiracy.

*Young v. State*, 2005 WL 2374669, * 1.

748.   "When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law," the federal courts "must then resolve the claim without the deference that AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858.  Insufficient evidence claims are reviewed by looking at the elements of the crime under state law.  *Jackson*, 443 U.S. at 324 n.16.  Here, the CCA, in its opinion, analyzed the sufficiency of the evidence claim here under the wrong state law.  Thus, under *Panetti*, this Court must then resolve this sufficiency claim without applying the constraints on habeas relief contained in 28 U.S.C. § 2254(d).  *Panetti*, 127 S. Ct. at 2858.

**C.   Argument**

749.   In addition to the law of the parties instruction, the jury was instructed that with respect to the Petrey murder, David Page was an accomplice as a matter of law and his testimony, alone, could not be used to convict Young of Petrey's murder:

> With respect to the alleged killing of Samuel Petrey . . .
> you are charged that DAVID PAGE was an accomplice if
> any offense was committed . . . and . . . you cannot find

256

> [Young] guilty upon the testimony of DAVID PAGE
>
> unless you first believe beyond a reasonable doubt that
>
> the testimony of DAVID PAGE is true. . . . [and] that
>
> there is other evidence in this case, outside the testimony
>
> of DAVID PAGE and outside the testimony of any other
>
> accomplice witness, tending to connect [Young] with the
>
> commission of the offense charged in the indictment and
>
> then from all the evidence you must believe beyond a
>
> reasonable doubt that the defendant is guilty.

(CR at 828-29.)  Assuming, arguendo, there was sufficient evidence presented at trial to show Young either kidnapped or robbed Petrey, or did so as an accomplice, without Page's testimony regarding the Petrey murder, there is insufficient evidence to show Young's intent to murder Petrey at the time Petrey was kidnapped or robbed.

750.   The crime of murder in the course of committing or attempting to commit a kidnapping, burglary, robbery, aggravated sexual assault or arson is the only capital offense in Texas that requires intent to kill.  Intent to kill is defined as a conscious desire or objective to cause the death of the victim.  *See* Tex. Penal Code §§ 6.03(a), 19.02(a), 19.02(a)(1).

751.   Murder in the course of a designated felony is a "result of conduct" crime. This means the defendant must have the specific intent to cause the victim's death, rather than the mere intent to engage in the conduct that caused his death. *Gardner v. State*, 730 S.W.2d 675, 687 (Tex. Crim. App. 1987).

752.   Here, according to the prosecutor during closing argument, the only evidence linking Young to the Petrey murder, without Page's testimony, was the following:  Young was arrested driving Petrey's truck, and the gun used to kill

257

Petrey was found in that truck.  (29 RR at 19, 29.)  However, neither of those facts establishes Young's intent.

753.   Without Page's testimony, there was no evidence regarding the shooting of Petrey except for the ballistics evidence that showed that a shooting occurred, but not who committed it.  Without Page's testimony, there was no evidence about the time Petrey's car was taken, or about the time Page and Young were with Petrey before his murder.  Thus, without Page's testimony, there was no evidence regarding Young's intent.[84]

754.   In its opinion regarding this claim, the CCA relied entirely, and most improperly, upon Page's testimony to find the evidence was sufficient to support this capital murder conviction.  *Young*, 2005 WL 2374669, *1-2.  In short, without the accomplice testimony of Page,  there was insufficient evidence to support Young's capital conviction for the murder of Petrey in the commission of robbery and kidnapping.

755.   The foregoing violations of Young's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht*, 507 U.S. at 637-38 & n.9; *Holloway*, 435 U.S. at 489.

756.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not

---

[84]   The only other evidence the State presented which even remotely connected Young to Petrey's murder was a trace metal test conducted by Paul Hallmark, which showed that Young held a gun at some point within hours of his arrest.  However, even Hallmark admitted the test he ran was not definitive, was not a test that was recommended for court use - only for investigative purposes, and that he did not even conduct the test correctly.  (25 RR at 94-118.)  Moreover, Hallmark's testimony was so discredited, that the prosecutor did not even mention it during his closing argument.  Further, the jurors informed the prosecutor during the punishment phase that they had serious concerns about Hallmark's testimony and performance as an investigator.  (38 RR at 135, 141-42.)

mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

## CLAIM SEVEN:  THE COURT VIOLATED YOUNG'S CONSTITUTIONAL RIGHTS BY DISALLOWING IMPEACHMENT EVIDENCE OF DAVID PAGE

757.   Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because the trial court erroneously denied Young his right to present a defense and to confront witnesses when it excluded evidence that Page failed his polygraph examination.

758.   *Exhaustion of Claim*:  This claim was presented as Point Thirty-Two in the direct appeal.  (AOB at 95-96.)

759.   *AEDPA*:  Young raised this claim on direct appeal as a challenge to both the state and federal Constitutions.  The CCA, however, only addressed this claim with respect to Texas law.  *Young v. State*, 2005 WL 2374669, at * 10. Because the State court did not adjudicate the federal claim, § 2254(d) does not apply.  Thus, this Court may review the claim de novo.

760.   At trial, counsel's attempt to impeach witness David Page with the negative results of Page's February 2002 polygraph examination was not allowed by the court. (27 RR at 243.)  Irma Rodriguez was the licensed polygraph operator who reported the results of her polygraph examination of Page.  The examination found that Page was deceptive when answering the questions "did you shoot Sam Petrey" and "did you fire bullets into either Doyle Douglas or Sam Petrey."  (27 RR at 237, 241).  The testimony and the polygraph report should have been

allowed into evidence.  (*See* Ex. 62 [Polygraph Report].)

761.   Citing Texas Rules of Evidence 703 and 403, the court overruled trial counsel's proffer of the polygraph examination of Page.  (27 RR at 243.) However, the State did not specifically challenge the admissibility of the polygraph by anything other than a general objection to its admissibility.

762.   Although the Texas state court has held that polygraph examinations are inadmissible for all purposes in criminal proceedings, *Nethery v. State*, 692 S.W. 2d 686, 700 (Tex. Crim. App. 1985), the Fifth Circuit Court of Appeals has not followed a per se rule of exclusion for all polygraph results. *United States v. Posado*, 57 F.3d 428, 429 (5th Cir. 1995).  To the extent that federal law has not recognized the admissibility of polygraph results in criminal trials, Young presents a good faith basis to change that law.

763.   The trial court's action violates Young's Fifth, Sixth and Fourteenth Amendment rights to present a defense and to confront witnesses.  The trial court's error in failing to allow the polygraph evidence prejudiced Young because the central issue in the case was whether Page was the actual shooter of Petrey, which trial counsel attempted to show through the impeachment of witnesses and argument.

764.   The court's denial of admission of important impeachment evidence that could have persuaded the jury that Page shot Petrey instead of Young, is highly prejudicial.  Further, Young's Sixth Amendment right to the effective assistance of counsel was violated when his trial counsel failed to cross examine Page on his statement that he knew what "it" was when he was told that he had not given investigators and attorneys complete details about what had happened or his direct involvement in the murders.  (*See* Ex. 62 [Polygraph Report].)

765.   The foregoing violations of Young's constitutional rights constitute

260

structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

766.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

767.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

**CLAIM EIGHT:  YOUNG WAS DENIED A TRIAL BY AN IMPARTIAL JURY WHEN VENIRE PERSON DANIE LYNN ROBERTS WAS EXCLUDED SIMPLY BECAUSE SHE EXPRESSED RESERVATIONS ABOUT THE DEATH PENALTY**

768.   Young's convictions, confinement, and sentence violate the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because venire person Danie Lynn Roberts was excluded from the jury simply because she expressed reservations about the death penalty.

769.   *Exhaustion of Claim*:  This claim was presented as Point Sixteen in the direct appeal. (AOB at 64-65.)

770.   *AEDPA*:  Ths claim was rejected in a reasoned opinion by the Texas CCA.  *Young v. State*, 2005 WL 2374669, at *5-6.  The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

771.   If Respondent disputes any of the facts alleged below, Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

772.   The declarations and other exhibits accompanying this Petition, as well as the allegations set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

773.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

A.     **Relevant Facts**

774.   On February 24, 2003, Danie Lynn Roberts appeared for voir dire examination. (19 RR at 4.)  When asked her opinion of the death penalty, Roberts stated:  "I don't have anything against it, but I don't know if I have the right to say whether or not a person should live or die." (19 RR at 13.)  When questioned further, Roberts stated that she did not have anything against the death penalty, and that the appropriateness of the death penalty depended on the individual charged and the evidence presented.  (*Id*. at 13-14.)

775.   The prosecutor then asked Roberts about specific cases and whether

the death penalty was appropriate.  Roberts agreed that death was an appropriate punishment in the Oklahoma City bombing case, and the "whole September 11th thing."  (19 RR at 14-16.)  When the prosecutor pointed out Young was the person who was eligible for the death penalty, Roberts initially said, "I don't think I could do it."  (19 RR at 16-17.)

776.   After the prosecutor explained to Roberts how the death penalty worked in Texas, going over the three special questions asked of the jurors during the punishment phase (19 RR at 18-24), Roberts again stated she would probably vote for life in prison, rather than death (19 RR at 24).  When questioned further, Roberts stated that she would have to hear the evidence before making a decision and stated she would keep an keep an open mind and listen to the evidence.  (19 RR at 26-27.)

777.   A few moments later, Roberts again confirmed the fact that she could give the death penalty if she were "totally convinced that they deserve the death penalty." (19 RR at 29.)

778.   Still later, Roberts testified that she was able to envision facts which would allow her to answer the third special issue to give life, but was unable to express in her own words a situation which would allow her to answer "no" to mitigation, other than to say she would have to be totally convinced before she would answer "no" to the mitigation issue.  (19 RR at 57-59.)  The state challenged Roberts for cause and the trial court granted that request over defense objection. (19 RR at 63.)

**B.   Argument**

779.   In *Witherspoon v. Illinois*, 391 U.S. 510, 522-23, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), the Court held that

A sentence of death cannot be carried out if the jury that

> imposed or recommended it was chosen by excluding
>
> veniremen for cause simply because they voiced general
>
> objections to the death penalty or expressed
>
> conscientious or religious scruples against its infliction.
>
> No defendant can constitutionally be put to death at the
>
> hands of a tribunal so selected.

*Accord Uttecht v. Brown*, 127 S. Ct. 2218, 2223-24, 167 L. Ed. 2d 1014 (2007).

780.   *Witherspoon's* holding is grounded in the right to a fair and impartial jury guaranteed to state criminal defendants by the Sixth and Fourteenth Amendments.  The constitutional standard applied to determine if the prospective juror is qualified is whether the juror's views "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright v. Witt,* 469 U.S. 412, 415, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985).  *Witt* also governs Texas capital jury selection.  *Livingston v. State*, 739 S.W.2d 311, 322 (Tex. Crim. App. 1987).

781.   Here, although Roberts was equivocal in some of her answers to specific questions in that she expressed some uncertainty about being able to participate impartially where the death penalty was involved, mere equivocation is not enough to grant a challenge.  As the Court in *Witt* noted, "before it can sustain the exclusion, the judge must make a factual determination that the prospective juror would be biased."  *Witt*, 469 U.S. at 428; *see also Witherspoon*, 391 U.S. 510.

782.   Roberts stated that she could follow the court's instructions and answer the three special issues to be submitted to her.  She also stated that her decision about imposing death as a punishment would be based on the evidence presented to her.  Roberts's expression of reservation about the death penalty should not have disqualified her because she at least expressed an adequate basis

for the conclusion that she was willing to set aside her beliefs in deference to the rule of law.  *Witt*, 469 U.S. at 424 ("determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.").

783.   In *Gray v. Mississippi*, 481 U.S. 648 , 660, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987), the Supreme Court held that exclusion of a juror for cause in a capital prosecution, who was not irrevocably committed to vote against the death penalty regardless of facts and circumstances that might emerge in course of proceedings, was reversible constitutional error which could not be subjected to harmless-error review.  The *Gray* Court also held that the exclusion even of a single juror warranted a reversal.  *Gray*, 481 U.S. at 657-68; accord *Witherspoon*, 391 U.S. at 523; *Morgan v. Illinois*, 504 U.S. 719, 729, 12 S. Ct. 2222, 119 L. Ed. 2d 492 (1992); *Davis v. Georgia*, 429 U.S. 122, 97 S. Ct. 399, 50 L. Ed. 2d 339 (1976).

784.   Here, the trial court's disqualification of prospective juror Roberts was a violation of Young's constitutional right to a fair trial, as Roberts repeatedly testified she would decide the punishment on the facts presented, and the CCA's decision upholding the disqualification was contrary to and an unreasonable application of Supreme Court precedent.  Young is therefore entitled to a new trial.

785.   The foregoing violations of Young's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Young's rights had a substantial and injurious effect or

influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

786.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

787.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM NINE:  THE CAPITAL OFFENSE OF MURDER IN THE COURSE OF KIDNAPPING, AS SET FORTH IN THE TEXAS PENAL CODE, IS UNCONSTITUTIONAL

788.   Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the capital offense of murder in the course of kidnapping, as set forth in Texas Penal Code section 19.03(a)(2), is unconstitutional.

789.   *Exhaustion of Claim*:  This claim was presented as Point Fifteen in the direct appeal.  (AOB at 61-63.)

790.   *AEDPA*:  Young raised this claim on direct appeal as a challenge to both the state and federal Constitutions.  The CCA, however, only addressed this claim with respect to Texas law.  *Young v. State*, 2005 WL 2374669, at * 9. Because the State court did not adjudicate the federal claim, § 2254(d) does not apply.  Thus, this Court may review the claim de novo.

266

791.   By motion, Young challenged the constitutionality of Texas Penal Code section 19.03(a)(2) as overly broad due to its failure to narrow the class of people eligible for the death penalty.  The court denied the motion.  (CR at 132-34, 320.)  Young raised the issue again during the charging conference on the court's guilt/innocence charge.  The motion was again denied.  (28 RR at 11-13, 16.)

792.   In order for a state's capital sentencing scheme to pass constitutional muster, it must "genuinely narrow the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 877, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983).  In addition to the offense of intentional murder, Texas has added the statutory aggravating circumstance of intentional murder committed in the course of attempting or committing kidnapping to elevate the offense to capital murder. Tex. Pen. Code § 19.03(a)(2).

793.   The purpose of any statutory aggravating circumstance is to enable the sentencer to distinguish those who are deserving of  capital punishment from those who are not.  Therefore, the circumstance must provide a principled basis for doing so. *Lewis v. Jeffers*. 497 U.S. 764, 776, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990).

794.   The Supreme Court reminded the states that any statutory  aggravating circumstance is unconstitutionally overbroad if it does not genuinely narrow the class of murderers who are eligible for the death penalty.  *Arave v. Creech*, 507 U.S. 463, 113 S. Ct. 1534, 123 L. Ed. 2d 188 (1993).

795.   Section 20.03(a) of the Texas Penal Code states that a person commits the offense of kidnapping and unlawful restraint if he intentionally or knowingly abducts another person.  Abduction is defined as restraining a person with intent to prevent his liberation by:  a) secreting him or holding him in a place where he is not likely to be found; or b) using or threatening to use deadly force.  Tex. Penal Code § 20.01(2).  Restraint is further defined in section 20.01(1), as: "to restrict a

267

person's movements without consent so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person."

796.   Every murder offense involves to some degree restraint or abduction. The only way a person with a gun could commit murder without abducting or restraining an individual would be to shoot a person instantly at the same place where he, the assailant, first comes in contact with the decedent.  Virtually every murder involves some restraint of the victim's movements and every murder by definition involves using deadly force.  Thus, it is impossible to see how section 19.03(a) (2), capital murder/kidnapping, generally narrows the group who is eligible to receive the death penalty.

797.   In *Godfrey v. Georgia,* 446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980), the Supreme Court stated:

> If the state wishes to authorize capital punishment, it has
> a constitutional responsibility to tailor and apply its law
> in a manner that avoids the arbitrary and capricious
> infliction of the death penalty, and thus it must define the
> crimes for which death may be imposed in a way that
> obviates standardless [sentencing] discretion.

*Godfrey*, 446 US at 428.

798.   As the *Godfrey* court noted, a death penalty system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman*[85] could occur.  *Godfrey*, 446

---

[85] *Furman v. Georgia*, 408 U.S. 238, 310, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1974).

U.S. at 428.  The Texas statutory aggravating circumstance in intentional murder in the course of committing or attempting to commit kidnapping fails to meet the guidelines as established by the Supreme Court.

799.   Other states which use kidnapping as an aggravator are more specific in narrowing the class of offenders eligible for the death penalty.  For example, Montana's homicide statutes make an offender death eligible if the offense involves aggravated kidnapping, which provides that:

> A person commits the offense of aggravated kidnapping if the person knowingly or purposely and without lawful authority restrains another person by either secreting or holding the other person in a place of isolation or by using or threatening to use physical force, with any of the following purposes:
>
> > (a) to hold for ransom or reward or as a shield or hostage;
> >
> > (b) to facilitate commission of any felony or flight thereafter;
> >
> > (c) to inflict bodily injury on or to terrorize the victim or another;
> >
> > (d) to interfere with the performance of any governmental or political function; or
> >
> > (e) to hold another in a condition of involuntary servitude.

Mont. Code Ann. § 45-5-303.

800.   In sum, the Texas capital murder in the course of kidnapping statute is unconstitutional because the statute has not appropriately narrowed the exposure of

269

those who may receive the death penalty thereby allowing the infliction of the ultimate sanction without due process of law.

801.   The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

802.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

803.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM TEN:  YOUNG'S DUE PROCESS RIGHTS WERE VIOLATED BECAUSE OF THE PROSECUTOR'S UNFETTERED DISCRETION IN CHARGING HIS CASE CAPITALLY

804.   Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution

270

because the Texas statutory scheme allowing unfettered prosecutorial discretion in deciding which murder cases should be worthy of the death penalty denies Young due process of law and equal protection.

805.   *Exhaustion of Claim*:  This claim was presented as Point Six in the direct appeal.  (AOB at 12, 31-37.)

806.   *AEDPA*:  Portions of this claim were rejected in a reasoned opinion by the CCA.  *Young v. State*, 2005 WL 2374669, at *9.  The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

**A.    Factual Basis**

807.   In an attempt to make a record in support of a pre-trial motion that Young was capitally charged without uniform and specific charging standards (CR at 116-18), trial counsel attempted to subpoena numerous Texas prosecutors and their records by issuance of subpoenas duces tecum.  Reacting to numerous motions to quash these subpoenas, the trial court considered Young's challenge to death eligibility in two proceedings held on August 23, 2002 and October 16, 2002. At the conclusion of those hearings, the court announced by letter to the parties its intention to quash the subpoenas.  (CR at 618-19.)  The court indicated that it would rule on the Young's motion.  (10 RR at 31.)  The court's later denied Young's motion.  (CR at 890, 893.)

808.   At a pre-trial hearing, Young called DA Al Schorre.  Schorre was questioned about Midland County's decision-making mechanism to determine which murder cases should be charged capitally.  At the time of this hearing, Young had already been arraigned and informed that the State would seek the death penalty.  (2 RR at 6.)  Schorre testified that his office had a written policy on death cases and a written policy authorizing only the District Attorney to make the

decision on seeking the death penalty.  (5 RR at 96 [Appendix Ex.  D-8].)  The
policy stated in part:

> In considering the decision, the District Attorney will
> review factors including, but not limited to, the
> following:
>
> A.    Aggravating and mitigating facts of the
> offense;
>
> B.    The age, criminal history, intellectual
> capabilities and the mental/physical status of
> the offender; to determine the likelihood that
> a jury would render an affirmative finding of
> "future dangerousness."

Schorre admitted that since 1992, his office had looked more into the defendant's
background; for capital murders such as Young's case, premeditation was a factor
to be considered.  (5 RR at 102, 110.)

809.    Young also offered evidence compiled by a third-year Texas Tech law
student, Elena Roberts, about prosecutorial discretion in seeking the death penalty.
(7 RR at 88.)  Roberts related that she had received about seventy-nine responses to
her survey and had determined that at least three of the responding counties (Harris,
Midland, and Trinity) had written policies concerning death penalty eligibility,
while at least seventy-five other counties had no written policy, and one county
(Travis) had an internal reviewing committee to make non-binding
recommendations to the District Attorney.  (7 RR at 100 [Appendix Ex. D-2].)

810.    Adding to the arbitrary decision-making in this case, during the trial-
in-chief, prosecution investigator Todd Smith admitted that the decision to indict in
Midland county for both crimes in Young's indictment was based upon expediency,

272

and not based upon legal criteria.  (26 RR at 57-58.)

**B.    Argument**

811.   The Due Process Clause prohibits vindictive prosecutorial charging and sentencing decisions made in bad faith to carry out a personal vendetta, achieve a political advantage, or reap a profit.  *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971).  Vindictive prosecutorial decisions to indict a defendant, reject his plea offer, pursue a higher charge or seek a harsher sentence in retaliation for his exercise of a constitutional right are also constitutionally prohibited.  *Blackledge v. Allison*, 431 U.S. 63, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977); *North Carolina v. Pearce*, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656, (1969).  As it stands, Texas law lacks any uniform standards with respect to when prosecutors should seek the death penalty.

812.   Under *Furman*, 408 U.S. at 310, in the application of the death penalty, the state must minimize the risk that the death penalty will be imposed on a capriciously selected group of offenders by imposing standards whereby the sentencing authority focuses on the particular circumstances of the crime and the defendant.  The Supreme Court in *Bush v. Gore*, 531 US 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000), held that when fundamental rights were involved, the equal protection clause of the Fourteenth Amendment requires there to be "uniform" and "specific" standards to prevent the arbitrary and the separate treatment of similarly situated people.  *Bush*, 531 U.S. at 106.  The fundamental nature of the right to life suggests that the equal protection principle in *Bush* equally applies to the administration of the death penalty.

813.   Texas law provides no such standards.  Instead, a prosecutor is able to make that decision on his own, according to either a written or unwritten standard or standards which may vary widely from county to county.  (7 RR at 100.)

273

Whether the person charged with a capital crime will face the death penalty depends largely on arbitrary factors such as the county in which the crime occurred. Despite Texas law implementing provisions to limit the class of offenders eligible for the death penalty, and Texas's attempts to allow individualized sentencing determination by juries, the absence of standards to guide a prosecutor's decision whether or not to seek the death penalty literally reeks of arbitrariness. Worse, Texas law does not even provide an abstract proposition or a starting principle as to how local prosecutors ought to make the decision of whether or not to seek death in a homicide case.

## C.   Conclusion

814.   Without uniform standards, charging a person with a capital crime in Texas becomes dependent largely upon arbitrary factors such as the county in which the crime occurs. The Texas system violates the principles of due process, equal protection, and reliable capital sentencing because there are no specific standards to ensure the non-arbitrary treatment of capital offenders by prosecutors who are the only source of decision-making as to the death worthiness in each particular case.

815.   The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

274

816.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

817.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM ELEVEN:  YOUNG'S RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED BECAUSE OF THE PROSECUTOR'S UNFETTERED DISCRETION IN CHARGING HIS CASE CAPITALLY

818.   Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because the Texas statutory scheme allows unfettered prosecutorial discretion in deciding which murder cases should be worthy of the death penalty in violation of the prohibition on cruel and unusual punishment and the requirement of reliable capital sentencing.

819.   *Exhaustion of Claim*:  This claim was presented as Point Seven in the direct appeal.  (AOB at 12, 38-39.)

820.   *AEDPA*:  Portions of this claim were rejected in a reasoned opinion by the Texas CCA.  *Young v. State*, 2005 WL 2374669, at *9.  The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

275

**A.   Factual Basis**

821.   Young incorporates herein by reference the facts pleaded above in Claim Eleven, *ante*.

**B.   Argument**

822.   Since *Furman*, the system that existed prior to *Furman* has been described as one where the death penalty was inflicted in a wanton and freakish manner. *Furman* was designed to eliminate existing capital punishment schemes where there was no meaningful basis to distinguish between the case in which the death penalty is to be applied and those situations in which the death penalty is not to be applied. *Furman*, 408 U.S. at 313. In *Jurek*, 428 U.S. 262, the Supreme Court approved the new Texas scheme even though that scheme did not require standards to guide prosecutors' decisions as to when to seek the death penalty.

823.   The pre-*Furman* imposition of the death penalty was a system where the Eighth Amendment was violated because prosecutors could choose without any governing standards whatsoever which of those accused of capital murder would face the death penalty. The post-*Furman* imposition of the death penalty is equally arbitrary and random and therefore is still unconstitutional under the Eighth Amendment. In short, the Texas statutes allow for arbitrary and inconsistent treatment of similarly situated defendants.

824.   The present statutes are no less unconstitutional under the Eighth Amendment than would be a system mandating that prosecutors seek the death penalty in every death eligible case. Therefore under the Eighth Amendment, the present Texas system, which is based on unfettered prosecutorial decision making, violates the constitution.

## C.     Conclusion

825.   The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

826.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

827.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM TWELVE:  THE EVIDENCE WAS INSUFFICIENT AT THE PUNISHMENT PHASE TO WARRANT AN AFFIRMATIVE FINDING BY THE JURY AS TO SPECIAL ISSUE NO. 2

828.   Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because at the punishment phase, there was insufficient evidence to warrant an

affirmative finding by the jury as to Special Issue No. 2, i.e., that Young caused the death of both Petrey and Douglas, or if he did not actually cause their deaths, that he intended to kill them or anticipated that human life would be taken.

829.   *Exhaustion*:  This claim was presented as Points Nineteen and Twenty in the direct appeal.  (AOB at 16, 73-75.)

830.   AEDPA:  This claim was rejected in a reasoned opinion by the CCA. *Young v. State*, 2005 WL 2374669, at *5.  The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.[86]

831.   In this case, the jury was asked to answer Special Issue No. 2:

> Do you find from the evidence beyond a reasonable
> doubt that the defendant, himself, actually caused the
> death of the deceased individuals or he did not himself
> actually cause the death of the individuals, but he intended
> to kill the deceased individuals or anticipated that human
> life would be taken?

(CR at 861.)  The jury answered "Yes" to this question.  (*Id*.)  Young submits that there was insufficient evidence in the record to demonstrate who killed Petrey and/or whether Young anticipated that Petrey would be killed, or knew that Petrey's death would result.  Thus, without evidence regarding Petrey's murder, there was insufficient evidence to warrant an affirmative finding as to Special Issue No. 2.

832.   With regard to the Petrey murder, no DNA belonging to Petrey was found on Young or any articles of clothing belonging to Young.  Moreover, the only evidence suggesting that Young shot Petrey, or intended Petrey's death, came

---

[86]  The relevant law governing this Claim is the same that governs, and was discussed, in Claims Six and Seven, *ante*.

from the testimony of David Page.  (26 RR at 128, 246-47.)  However, Page was a charged co-defendant in this offense and clearly held a motive to shift his culpability to Young, as is evident from the several conflicting confessions he gave to the police.  For example, Page attempted to portray himself as a "hostage" in this case, along with  Petrey.  The record here, however, clearly demonstrates this was not true as there were numerous instances in the record where Page was left alone with Petrey in  Petrey's vehicle, and Page did not try to escape.  (*See* 27 RR at 165-67.)

833.   Further, and perhaps more importantly, as discussed in Claim Seven, *ante*, under Texas law, Page's testimony was to be judged without credibility unless there was additional evidence in support.  Tex. Code. Crim. Proc. § 38.1.  That section provides:

> A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

In *Walker v. State,* 615 S.W.2d 728, 731 (Tex. Crim. App. 1981), the CCA recognized the inherent danger in accomplice testimony and held that an accomplice witness is a *discredited witness.*  Thus, Page's testimony, standing alone, was insufficient to support a finding on Special Issue No. 2.   However, without Page's testimony, there was virtually no evidence showing who killed Petrey, that Young intended to kill Petrey, or that Young anticipated that Petrey's life would be taken.

834.   The jury obviously had difficulty with Special Issue No. 2 as they asked for clarification from the court regarding whether they had to find Young

intended to cause the death of *both* Douglas and Petrey (*see* Claim Thirteen, *post*).[87] (36 RR at 134-35.)

835.   Therefore, in light of the jury's question to the court, the court's erroneous supplemental jury instruction, and fact that the jury could not use Page's testimony to show he killed or intended to kill Petrey without other supporting evidence, there was insufficient evidence to support the finding on Special Issue No. 2.

836.   The foregoing violation of Young's constitutional rights constitute structural error and warrant the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9; *Holloway*, 435 U.S. at 489.

837.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

838.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

---

[87] Specifically, the jury asked:
> Regarding Issue Number 2, cause the death of deceased individuals, intended to kill the deceased individuals.
> Question:  Do you have to believe both or at least one?

(36 RR at 135.)

**CLAIM THIRTEEN:  THE COURT'S SUPPLEMENTAL INSTRUCTION ON SPECIAL ISSUE NO. 2 VIOLATED YOUNG'S CONSTITUTIONAL RIGHTS**

839.   Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because the court's supplemental instruction directed the jury to answer "yes" to Special Issue No. 2. regarding his intent to kill.

840.   *Exhaustion of Claim*:  This claim was presented as Points One through Four in the direct appeal.  (AOB at 22-25.)

841.   *AEDPA*:  Generally this claim was rejected by the CCA after finding that trial counsel failed to contemporaneously object.  *Young v. State*, 2005 WL 2374669, *7.  The CCA's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.  To the extent that any portions of the claim were not properly preserved by trial counsel's acts or omission, cause and prejudice exists to excuse the default under *Strickland*, 466 U.S. at 668.  To the extent the CCA erred in finding that this claim was not properly preserved, Young submits that this Court has the authority to correct a state court's erroneous finding of procedural default.  *See Cone v. Bell*, 128 S. Ct. 2961 (Cert. granted June 23, 2008) (deciding whether a federal habeas court is powerless to recognize that a state court erred in holding that state law precludes reviewing a claim).

**A.     Facts Supporting the Claim**

842.   At the punishment phase of the trial, the jury was asked to consider Special Issue No. 2, *i.e.* whether Young "actually caused the death of the deceased or intended to kill the deceased or another or anticipated that a human life would be taken." Tex. Code Crim. Proc. § 37.071(2)(b)(2)(c).  During their deliberations, the

jury sent the following note to the court:

> Regarding Issue Number 2 cause the death of deceased
>
> individuals, intended to kill the deceased individuals.
>
> Question:  Do you have to believe both or at least one?

(36 RR at 135.)

> The court responded as follows:

> Members of the Jury.  Paragraph 1 of the indictment
>
> charged capital murder by the death of two individuals
>
> pursuant to the same scheme or course of conduct.
>
> Paragraph 2 of the indictment charged capital murder by
>
> the death of an individual during the course of kidnapping
>
> and robbery.   If your consideration of Issue No. 2 on
>
> punishment is as to Paragraph 1 of the indictment, **the**
>
> **death of two individuals is required to be found by the**
>
> **jury**.  If your consideration is as to the second paragraph
>
> of the indictment, **the death of an individual, Samuel**
>
> **Petrey, is required**.

(36 RR at 135, emphasis added.)

843.   Trial counsel objected on several constitutional grounds.  (36 RR at
136.)  The court overruled the defense's objection, telling Young "I understand
your objections . . . . Your attorneys have protected the record for you." (36 RR at
137-38.)

**B.    Legal Argument**

844.   The trial court's supplemental instruction, which stated that "the
death[s] of [the victims] is required to be found by the jury," deprived Young of his
rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the

Constitution.

**1.     The Supplemental Instruction Relieved the State of its Burden to Prove Intent to Kill**

845.   The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. at 364.  This principle prohibits the use of jury instructions which have the effect of relieving the state of its burden of persuasion beyond a reasonable doubt of every essential element of a crime. *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed.2d 39 (1979).  In capital cases, the death penalty may not be imposed upon a person who neither killed, attempted to kill, intended to kill nor contemplated that life would be taken. *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982).

846.   The Supreme Court has twice found that instructions which allow a jury to presume intent to kill violate Due Process.  In *Sandstrom*, where the defendant was tried for a killing he claimed was accidental, the court instructed the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts."  422 U.S. at 513.  In *Francis v. Franklin*, 471 U.S. 307, 312, 105 S. Ct. 1965, 85 L. Ed.2d 344 (1985), the jury was instructed that "the acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted" and that "person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted."  In both cases, the Court found that a reasonable juror could have interpreted the instructions as a mandatory directive from the court, thereby relieving the State of its burden to prove intent to kill beyond a reasonable doubt. *Sandstrom*, 422 U.S. at 517; *Franklin*, 471 U.S. at 325;

*see also United States v. Chiantese*, 560 F. 2d 1244, 1255 (5th Cir. 1977) (En banc court used its supervisory power to issue a directive forbidding trial courts to use any "instruction on proof of intent which is couched in language which could reasonably be interpreted as shifting the burden to the accused to produce proof of innocence.").

847.    In this case, the jury's note revealed the difficulty they were having finding intent to kill with regard to at least one of the victims.  The judge's supplemental instruction, however, stated that "the death of two individuals *is required to be found by the jury*" with regard to Count 1 of the indictment, and that "the death of an individual, Samuel Petrey, *is required*" with regard to Count 2.  (36 RR at 135.)

848.    This instruction, like that found unconstitutional in *Franklin*, is "cast in the language of command" and gave jurors the impression that they were required to make the finding described in the supplemental instruction.  *See Franklin*, 471 U.S. at 316.  Even if this was not what the trial court intended to communicate, the focus of federal court's inquiry is not on the state court's interpretation of the instruction.  *Id.*  Rather, the question is whether a reasonable juror could have understood the instruction as mandatory.  *Id.*  Given that the instruction stated that the "death[s] of [the victims] is required to be found by the jury," without referencing the state's burden of proof, a reasonable juror could have believed that the instruction was a command from the judge.

849.    The fact that the command came in a supplemental instruction, rather than part of the standard instructions, also increased the likelihood that it improperly  influenced the jury.  *See Bollenbach v. United States*, 326 U.S. 607, 66 S. Ct. 402, 90 L. Ed. 350 (1946) (regarding supplemental instructions in a criminal trial, "the judge's last word is apt to be the decisive word.").  Given that the jury

returned an affirmative answer on this special issue less than twenty-four hours after this instruction was rendered indicates that jurors did view it as a directive from the court.

## 2.   The Supplemental Instruction Violated Young's Rights Under *Apprendi* to Have All Sentencing Facts Found By a Jury Beyond a Reasonable Doubt

850.   In *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed.2d 435 (2000), the Supreme Court held that the Fifth and Sixth Amendments require "any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt."  In *Ring v. Arizona*, 536 U.S. 584, 609, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), the Court applied *Apprendi* to the capital sentencing context, requiring that a jury, not a judge, find all facts necessary for a death sentence beyond a reasonable doubt.

851.   In Texas, a unanimous jury must answer "yes" to Special Issue No. 2. in order for a defendant to be sentenced to death.  Tex. Code Crim. Pro. § 37.071 2(c)(1).  If the jury returns a negative answer on that special issue, the defendant must be sentenced to life imprisonment without parole.  *Id.* § 2(g).  Therefore, *Apprendi's* guarantee of a jury finding applies to the factual issues contained in Special Issue No. 2.

852.   Here, the judge's supplemental instruction commanded that the "death[s] of [the victim[s]] is required to be found by the jury."  This instruction violated *Apprendi* and *Ring* in two ways.  First, the judge's command improperly usurped the jury's role as factfinder.  And second, because the instruction directed an affirmative finding, Young was deprived of his right to have the issue decided by the correct standard of proof, *i.e.* beyond a reasonable doubt.  Under these

circumstances, Young's Sixth Amendment right to a jury trial on all facts necessary for a death sentence was violated.

**3.      The Supplemental Instruction, Because it Directed a Finding of Intent to Kill, Did Not Allow the Jury to Give Effect to Mitigating Evidence**

853.    Because of the unique and irrevocable nature of capital punishment, the Eighth and Fourteenth Amendments "requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson*, 428 U.S. at 304.  As a result, the Supreme Court has held that capital juries shall not be "precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

854.    The mandatory language in the supplemental instruction effectively denied Young the right to have the jury consider the mitigating evidence he offered to support a "no" finding on Special Issue No. 2.  Specifically, the jury should have been able to give effect to the testimony of David Page who, despite being a party to both murders, attempted to blame Young in a series of inconsistent confessions. (26 RR at 260-62; 27 RR at 629.)   Page's hands also glowed in response to the presumptive trace metal test but did not match any pictures in the officer's book. (25 RR at 101-02.)   It is reasonable to conclude that the jury struggled with Page's confession that he killed Petrey with gloves on, which was corroborated by Page's DNA being present in the inside of the palm area of the gloves.  (27 RR at 271-75; 25 RR at 97.)  All such evidence would have undermined the State's assertion that Young "actually caused the death of the deceased or intended to kill the deceased or

another or anticipated that a human life would be taken." Tex. Code Crim. Proc. § 37.071(2)(b)(2), (c).

855.   The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

856.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

857.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

**CLAIM FOURTEEN:  SHERIFF PAINTER'S LUNCH WITH THE JURY DENIED YOUNG A FAIR AND IMPARTIAL PUNISHMENT PHASE JURY TRIAL**

858.   Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution

because Young was not tried by a fair and impartial jury when the jurors were exposed to external influences and discussed the case with head Sheriff Gary Painter, including during lunch with him during deliberations.

859.   *Exhaustion of Claim*:  This claim was presented as Point Five in the direct appeal.  (AOB at 1-3, 11-12, 26-30.)

860.   *AEDPA*:  Young raised this claim on direct appeal as a challenge to both the state and federal Constitutions.  The CCA, however, only addressed this claim with respect to Texas law.  *Young v. State*, 2005 WL 2374669, at * 8. Because the State court did not adjudicate the federal claim, § 2254(d) does not apply.  Thus, this Court may review the claim de novo.

861.   If Respondent disputes any of the facts alleged below, Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

862.   The declarations and other exhibits accompanying this Petition, as well as the allegations set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

863.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

**A.    Factual Background**

864.   On May 9, 2003, defense counsel filed a motion for new trial.  (CR at 901-12.)  The defense motion was based in part on the contention that Midland County Sheriff Painter impermissibly "fraternized" with the jury during punishment deliberations.  The court granted an evidentiary hearing with respect to Young's

new trial motion.  (38 RR et seq., 39 RR at 5-100.)  On June 20, 2003, the motion for new trial was denied.  (CR at 922; 39 RR at 100-05.)

865.   The hearing revealed the following information:  Midland County had a population of roughly 116,000 people.  (35 RR at 102.)  Sheriff Painter had been elected and re-elected to office on at least four previous occasions, and he was familiar to many Midland residents, including Young's jury foreman, James E. Bobo.  (38 RR at 124, 133-34.)

866.   Sheriff Painter attended Young's trial mostly during the punishment phase.  (38 RR at 133.)  Throughout the punishment phase, Sheriff Painter seated himself in the courtroom gallery on the State's side of the room, sitting in close proximity to the family of Sam Petrey.  (38 RR at 155-56.)

867.   From the beginning of the trial, the court was provided additional bailiffs for the security of the courtroom and the comfort of the individual jurors.  (38 RR at 74-76.)  At the beginning of the punishment phase on Monday, April 7, 2003, an anonymous telephone call was received at the courthouse by Administrative Assistant Cheryl Becker.  The caller stated "Young as going out with a bang."  (38 RR at 13-14.)

868.   Since the call concerned the Young capital murder case, Becker reported the call to courthouse security, but no additional Sheriff's Office personnel were asked to monitor the courtroom.  (38 RR at 37-38, 79.)  Ronnie Bearden, the Chief bailiff for the court room in which Young's trial took place, thought the amount of security at that time was adequate and no additional assistance was required.  (38 RR at 85-86.)

869.   By Thursday, April 10, 2003, both the prosecution and defense had concluded their punishment evidence, and jury deliberations on the issue of punishment had begun.  (38 RR at 50.)  On Thursday, the jury ate lunch outside the

courthouse at Luigi's Restaurant, and Sheriff Painter was not present.  (38 RR at 83-84.)

870.   The next day, Friday, April 11, 2003, the jurors informed courtroom bailiffs Charlie Bollinger and Ronnie Bearden that the jury desired to take their lunch out of the courthouse, preferably at a restaurant called the Wall Street Bar & Grill, located approximately two blocks east of the Midland County Courthouse. (38 RR at 87-88.)

871.   As the jury was leaving for their lunch break, the jury foreman, Mr. Bobo, an acquaintance of Sheriff Painter's, asked the Sheriff to look into Deputy Paul Hallmark's testimony (25 RR at 5-118) as it had raised some concerns with the jury.  (38 RR at 135.)

872.   Without telling the trial court or counsel for either the State or Young, (38 RR at 136), Sheriff Painter accompanied Bobo, his fellow jurors, and the assigned bailiffs to the Wall Street Bar & Grill.  There, Painter ate lunch at one table with one group of jurors, with the remaining jurors seated close by.  (38 RR at 138.)  Despite the continued presence of at least three bailiffs and a courthouse security officer, Sheriff Painter stayed with the jury all during the Friday lunch.  He then walked back to the courthouse behind the jurors where they returned to resume their punishment phase deliberations.  (38 RR at 139.)

873.   After returning to the courthouse, the jurors deliberated for approximately one and a half hours before informing the court of their answers to the special issues requiring an assessment of death against Young.  (37 RR at 27; CR at 858-66.)

**B.   Legal Analysis**

874.   Sheriff Gary Painter's contact with the jury on the last day of deliberations was both unnecessary, unsanctioned and caused prejudice to Young

because the sheriff's presence and conduct worked as a visible symbol of law enforcement demanding conviction and an unwarranted extraneous influence on the jury.

875.   Young's Sixth and Fourteenth Amendment rights were violated, and when a juror converses with unauthorized persons, prejudice is presumed.  *Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954); *Green v. State,* 840 S.W.2d 394 (Tex. Crim. App. 1992).  Although Texas law indicates that no prejudice can be found if no discussion about the case was held, *Thomas v. State*, 699 S.W. 2d 845 (Tex. Crim. App. 1985), federal law is not in accord.

876.   The right to trial by jury guarantees a fair trial by impartial, indifferent jurors.  *In Re Oliver,* 333 US 257, 278, 68 S. Ct. 499, 92 L. Ed. 2d 682 (1948).  Sheriff Painter communicated and fraternized with the jury only hours before the jury assessed the punishment of death against Young.  "A juror must feel free to exercise his function without anyone else looking over his shoulder." *Remmer*, 347 U.S. at 229.  While Young's record fails to identify trial facts and any specific matters discussed by Sheriff Painter and the individual jurors, prejudice can occur even when the facts of a pending case are not discussed between jurors and third parties.  *United States v. Denman*, 100 F.3d 399, 405 (5th Cir. 1996) ("In some cases, even when the pending case was not discussed, fraternizing between jurors and third parties may prejudice the defendant and require reversal").

877.   When investigating extra judicial contact, the investigation should not end merely because the case on trial was not discussed.  *United States v. Betner*, 489 F2d 116, 118 (5th Cir. 1974) (new trial granted when lower court failed to hold sufficient hearing on extra-judicial contact between prosecutor and jurors).  Painter did not testify as a witness in the punishment trial, but he was present to impress the jurors visually both in the courtroom and at their lunch.  The death verdict came

back at 3:24 p.m. Friday, April 11, 2003, less than two hours after Painter had lunch with the jury.  (37 RR at 27.)

878.   At Young's motion for new trial hearing, the State argued that the sheriff's presence with the jury was legitimate because there was a need for additional security.  If Sheriff Painter's presence with the jury at lunch was to provide security (38 RR at 143), an additional security necessity should have been identified.

879.   For Young's trial, Judge Hyde had already contracted for two additional bailiffs in addition to Ronnie Bearden.  (38 RR at 74.)  The April 7, 2003, anonymous telephone call stating that Young was "going out with a bang" received immediate attention from existing court personnel; however, Bearden thought security was already adequate at the time.  Painter told Deputy Matlock, head of courthouse security, that he, Matlock, needed to make sure there was plenty of security.  (38 RR at 76.)  On March 26, 2003, Matlock sent Deputy Glen Wells to help Bearden with the Young case.  (38 RR at 76.)  When the anonymous call was reported to Sheriff Painter, Bearden did not ask for additional assistance for courthouse security and none was forthcoming until days later when Painter on his own decided to provide additional security.  Security was always a concern in the case, but the anonymous telephone call failed to add any additional concerns.

880.   The excuse of providing more security for the jury was a red herring at the hearing and does nothing to assuage the prejudice to Young.  In *Turner v. Louisiana*, 379 U.S. 466, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965), a murder conviction was overturned because deputy sheriffs who were bailiffs testified in trial before the same jurors.  While there was no showing in *Turner* that either deputy had talked with any member of the jury about the specifics of the case, the conviction was overturned in part because the continued association fostered

292

prejudice: "We deal here not with a brief encounter, but with a continuous and intimate association . . . which gave these witnesses an opportunity to renew old friendships and make new acquaintances among the members of the jury." *Id*. at 473.

881.   The court's punishment instructions warned that jurors were not to converse with anyone about the case without the court's permission.  (CR at 865.) Foreman Bobo's conversation with Painter about the case presumes prejudice to Young. *See Remmer*, 347 U.S. at 229.  The presumption is rebuttable, but a failure to show that nothing prejudicial was discussed does not mean no harm occurred. *Turner*, 379 U.S. at 474.  "Any judge who has sat with juries knows that, in spite of forms, they are extremely likely to be impregnated by the environing atmosphere." *Frank v. Mangum*, 237 U.S. 309, 349, 35 S. Ct. 582, 59 L. Ed. 2d 969 (1915).

882.   The jury was biased and tainted by the extraneous influence of Sheriff Painter.  The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors," *Irvin v. Dodd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961), *superseded by statute on other grounds*, meaning "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).  The Sixth Amendment's guarantee of a trial by jury requires the jury to base its verdict on the evidence presented at trial.  *Turner,* 379 U.S. at 472-73.  A jury's exposure to extrinsic evidence deprives a defendant of the rights to confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment.  *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995); *Mattox v. United States*, 146 U.S. 140, 149, 13 S. Ct. 50, 37 L. Ed. 917 (1892) ("It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment."); *Holbrook v. Flynn* 475 U.S. 560, 106 S. Ct.

293

1340, 89 L. Ed. 2d 525 (1986) (presence of four state troopers in the courtroom not inherently prejudicial, but the test is whether what the jurors saw was so inherently prejudicial as to pose an unacceptable threat to the defendant's right to a fair trial).

883.   Painter was a well-known public figure and symbol of law enforcement in Midland for more than twenty years.  (38 RR at 67-68.)  Painter's decision to attend the Friday lunch with deliberating jurors was made without informing either the trial judge, his head of security, or the working bailiffs of the court.  Painter was using his presence in the courtroom as a symbol to show that law enforcement sided with the victim's family, making conviction and death appropriate for Young.  Additionally, by speaking with Juror Bobo and eating lunch with the jury, Sheriff Painter imposed extraneous influence on the jurors who therefore committed misconduct.  Young has a right to a fair and impartial jury trial guaranteed by the Sixth and Fourteenth Amendments, which was violated by these actions. *In Re Oliver*, 333 U.S. at 260.

**C.   Conclusion**

884.   The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at  637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violation so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

885.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not

294

mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

886.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

**CLAIM FIFTEEN:  TO EXECUTE YOUNG, BASED ON HIS MENTAL ILLNESS OF ADHD, WOULD VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE FEDERAL CONSTITUTION**

887.   Young's death sentence violates the Eighth and Fourteenth Amendments of  the United States Constitution, due to Young's mental age, immaturity, and mental illness at the time of the crimes, under the principles of *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

888.   *Exhaustion of Claim*:  This claim was presented as Point Thirty-Three in the direct appeal (AOB at 97-99), and Ground for Review Nine in the state Application (State Appl. at 57-67).

889.   *AEDPA*:  This claim was rejected in a reasoned opinion by the CCA on direct appeal (2005 WL 2374669, at * 9), the Midland County District Court (Ex. 30 [Hyde's Denial of Writ]), and by a boilerplate denial by the CCA  (2006 WL 3735395).  The courts' denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

890.   If Respondent disputes any of the facts alleged below, Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Young

has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

891.   The declarations and other exhibits accompanying this Petition, as well as the allegations set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

892.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

## A.   Relevant Facts

893.   Young was born on July 19, 1983.  The capital crime which he stands convicted occurred on November 26, 2001. At the time of his offense, Young was approximately eighteen years, four months old.

## B.   Legal Standard

894.   In *Roper v. Simmons*, 543 U.S. 551, the Supreme Court looked at "evolving standards of decency," holding that the death penalty should be limited only to offenders who commit "a narrow category of the most serious crimes." *Roper*, 543 U.S. at 568; *see Kennedy v. Louisana*, 128 S. Ct. 2641, 2649-50, 171 L. Ed. 2d 525 (2008) (opinion amended by 2008 WL 4414670 (Oct. 1, 2008)) (Eighth Amendment prohibits death where the crime did not result, and was not intended to result, in death of victim); *Atkins v. Virginia*, 536 U.S. 304, 316-17, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (execution of mentally retarded is cruel and unusual punishment).  In so holding, the Supreme Court overruled its previous ruling in *Stanford v. Kentucky*, 492 U.S. 361, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989), and held that the Eighth and the Fourteenth Amendments forbade the execution of individuals who were under the age of eighteen at the time of their alleged offenses.

296

*Roper*, 543 U.S. at 574.

895.   According to *Roper*, there are three general differences between juveniles under the age of eighteen and adults for purposes of imposing the death penalty.  First, "a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. . . .  It has been noted that adolescents are overrepresented statistically in virtually every category of reckless behavior."  *Roper*, 543 U.S. at 569 (internal italics omitted).  Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. . . .  This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment."  *Id*.  And third, "the character of a juvenile is not as well formed as that of an adult.  The personality traits of juveniles are more transitory, less fixed."  *Id*. at 570.

**C.**     **Young's Mental Age and Immaturity, Brought about by His ADHD, Make Him Ineligible for the Death Penalty**

896.   While Young was four months over eighteen years when the crimes were committed, his mental age and immaturity, brought about by his ADHD, made him the equivalent of the type of juvenile described in *Roper*.

897.   The person described throughout the trial, through the testimony of lay witnesses and experts, established a personality indistinguishable from the descriptions of juveniles whom the Supreme Court described as being less morally culpable individuals.  *Roper*, 543 U.S. at 569-70.  Young, based upon his ADHD, was impulsive, immature, and had an underdeveloped sense of responsibility.

898.   Many of the witnesses at trial testified about Young's ADHD. (31 RR at 37 [Richard McMullin]; 31 RR at 126 [Dr. Don Walker]; 32 RR at 14, 27 [Dr. Helen Short]; 33 RR at 90-91 [Carla Sexton]; 32 RR at 206, 208 [Dr. Meyer

Proler]; 34 RR at 20, 48 [Daneen A. Milam];  34 RR at 173-74, 177 [Dr. Roy
Mathew]; 36 RT at 18 [Dr. Ross Green].)

899.   Psychologist Daneen Milam testified that ADHD prevented regular
inhibitors of conduct from developing normally, thereby creating an inability to
inhibit behavior.  (34 RR at 24.)  Dr. Milam also testified that ADHD affected a
person's ability to pick up or perceive social clues due to an inability to focus.  (34
RR at 48.)  Dr. Milan concluded that most of the conduct identified as problematic
in Young's life emanated from the severe ADHD.  (34 RT at 27.)  By way of
analogy, Dr. Milan described Young as a "Mercedes-Benz with this great motor and
no brakes, no brakes at all."  (34 RR at 25.)

900.   Psychiatrist Roy Mathew testified "there is no question" Young had
very severe ADHD, which Dr. Mathew described as a brain disorder with physical
differences in the brain.  (34 RR at 173-74, 177.)  Dr. Mathew described Young's
ADHD as a computer with a faulty electric generator unable to regulate the amount
of energy the brain received with the amount of activity it produced.  (34 RR at
181-82.)  According to Dr. Mathew, the faulty electric generator produced a person
who could not focus on any one thing when there were a number of stimuli around
him.  (*Id*. at 183-84.)

901.   Dr. Ross Green, a child psychologist, testified that Young was the
"poster child for ADHD," describing his behavior as exceedingly hyperactive,
impulsive, and inattentive.  (36 RR at 18.)

902.   Connected to the ADHD, Dr. Meyer Proler testified to qEEG
(quantitative EEG) scans on Young's brain.  According to Dr. Proler, there were
identified abnormalities in Young's brain involving the frontal lobe, the area which
involved impulse control.  Further, the two sides of Young's brain were electrically
"out of phase" with one another.  (32 RR at 175, 183-89, 206.)

903.   Even State's witness Dr. Helen Short of the Waco Center for Youth diagnosed Young with ADHD, and testified he was impulsive with control problems.  (32 RR at 17, 51.)  Dr. Short also explained that the brain was not fully formed until an individual reaches twenty or twenty-one years of age.  (32 RR at 158-59; *accord* Ex. 97 at ¶ 22 [Decl. of Dr. Milam].)

904.   Lay witnesses also described Young  as "hyper," someone who would go from one extreme to the next, and a person who had a very short attention span. (31 RR at 37; 33 RR at 84-90; 35 RR at 9, 26, 40-44.)

905.   As the testimony at trial showed, at age eighteen years four months, due in large part to his ADHD, Young's brain could still be described as adolescent, with Young continuing to function as a person who acted under eighteen years of age.

906.   Based upon his ADHD, for his entire life Young consistently displayed distractibility and impulsive behavior, often to the extent that he endangered his own or others' physical safety.  Due to his mental regulation deficits, Young  has an impaired ability to perceive the consequences of his actions.  (Ex. 97 at ¶ 19 [Decl. of Dr. Milam].)  To that end, Young has been described as a follower, not a leader. (*Id*. at ¶ 20.)

907.   Based upon his ADHD, Young has demonstrated a pattern of regulation deficits that led to an inability to act "normal."  His ADHD symptoms were intensified by characteristics that included depression, immaturity, poor problem solving, and poor coping mechanisms for his negative of thoughts, feelings and for his limitations as an "abnormal" kid.  To that end, Young has often been described as uncontrollable, a direct symptom of his ADHD.  (Ex. 97 at ¶ 21 [Decl. of Dr. Milam].)

908.   As shown above, Young's "lack of maturity and underdeveloped sense

299

of responsibility," "reckless behavior," "susceptibility to negative influences" and lack of a well formed character, all described in *Roper* as traits separating juveniles from adults (*Roper*, 543 U.S. at 569-70), were a product of Young's ADHD.  Thus, it should be clear that Young's age of slightly over eighteen should have been treated synonymously with mental functioning and brain development, not by time measurement.  (Ex. 97 at ¶¶ 22-23 [Decl. of Dr. Milam].)

909.   From a moral standpoint, it would be misguided to equate the failings of Young with those of an adult.  As the Supreme Court stated in *Roper*, "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Rope*r, 543 U.S. at 574.  Despite Young being officially over eighteen years of age, due to his mental illness he was still an adolescent lacking complete mental development.  Thus, "evolving standards of decency" would indicate that an eighteen and four month old individual who suffered from mental illness would be entitled to the same protections of those under the age of eighteen as described in *Roper*.

910.   The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at  637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violation so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

911.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not

mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

912.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

**CLAIM SIXTEEN:  YOUNG'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE TRIAL COURT FAILED TO INSTRUCT THE JURY REGARDING THE BURDEN OF PROOF ON THE MITIGATION ISSUE; THE PUNISHMENT CHARGE ALSO FAILED TO GIVE PROPER GUIDANCE TO THE JURY REGARDING THE HEIGHTENED STANDARD REQUIRED FOR A DEATH PENALTY CASE**

913.   Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because the trial court failed to instruct the jury that the burden of proof was on the prosecution to prove beyond a reasonable doubt that there were no sufficient mitigating circumstances to warrant a life sentence.  The punishment charge also failed to give proper guidance to the jury regarding the heightened standard required for a death penalty case.

914.   *Exhaustion of Claim*:  This claim was presented as Points Twenty-Six and Twenty-Eight in the direct appeal. (AOB at 81-87.)

915.   *AEDPA*:  This claim was rejected in a reasoned opinion by the CCA. *Young v. State*, 2005 WL 2374669, at *9-10.  The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established Federal

law and based on an unreasonable determination of the facts.

916.   At the punishment phase, the jury was instructed as to the three special issues.  With regard to Special Issue No. 1 (that Young would commit criminal acts of violence that would constitute a continuing threat to society), the jury was instructed that the State had the burden to prove beyond a reasonable doubt that the answer should be "yes."  (CR at 860.)  With regard to Special Issue No. 2 (Young actually caused the death of Petrey and Douglas or Young did not himself actually caused the death of Petrey and Douglas but he intended to kill the deceased individuals or anticipated that human life would be taken) the jury was instructed that the State had the burden to prove beyond a reasonable doubt that the answer should be "yes."  (CR at 861.)

917.   However, with regard to Special Issue No. 3 (there were sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed), the jury was instructed that there was no burden of proof on either side.  (CR at 861-62.)

918.   In Number 32 of the objections to the punishment charge, Young argued that the charge with respect to Special Issue No. 3 failed to instruct the jury that the burden of proof should have been upon the State to prove beyond a reasonable doubt that there was not sufficient mitigation to warrant a sentence less than death.  (CR at 881; 36 RR at 74, 80, 81.)  This objection was overruled by the trial court.  (CR at 890.)

919.   The Texas system fails to provide the constitutional minimum level of due process, resulting in a diminished, rather than a heightened reliability in the capital sentencing process.

920.   The Texas capital sentencing system abruptly abandons the adversarial process at the point where the jury decides whether mitigating circumstances

302

warrant a life sentence.  In order to reach the special issue regarding mitigating circumstances, Texas capital sentencing juries must first determine whether the defendant has been proven guilty of a capital crime beyond a reasonable doubt.  If the defendant is found guilty, the jury will hear additional evidence and argument before considering a series of special issues.

921.   The first special issue inquires whether the defendant is a future danger and a continuing threat to society.  If the defendant is convicted on a law of the parties theory, the jury will consider whether the defendant is eligible for death by reason of his individual conduct in the commission of the crime.  Only if these special issues are returned in the affirmative, beyond a reasonable doubt, does the jury even consider the special issue inquiring about mitigating circumstances.

922.   By the time that the jury takes up the special issue on mitigating circumstances, the capital defendant is already deemed a murderer under circumstances elevating the crime to a capital one, a continuing threat to society, and a major participant in the capital crime.  The charge will have told the jurors that they are to take the law that applies in the case from the court and no other source.  All Texas jurors deliberating these issues have taken an oath to render a true verdict according to the law and the evidence.  Tex. Code of Crim. Proc. § 35.22.

923.   The main constitutional trouble with the mitigation special issue lies in the failure of the court to assign a burden of proof and persuasion to either party for any purpose. Entirely within their solemn oaths, jurors may place an extremely high burden on the defendant to establish facts critical to his defense from the imposition of death as a penalty.  In the Texas scheme, these will fall into three general categories.  First, are the facts offered in mitigation true?  Second, are these facts or circumstances mitigating in the eyes of at least one the jurors?  And

303

finally, are the mitigating circumstances proven by the evidence sufficient to warrant a life sentence?

924.    Even a casual examination of the special issue and all the court's instructions reveals that a law abiding juror could well place the burden of proof and persuasion with respect to mitigating circumstances on the capital defendant. Moreover, such a juror could -- without violating his oath to render a true verdict according to the law -- place an impossibly high burden of persuasion on the defendant. Nothing in the court's instructions precludes the jurors from requiring 99.9% certainty with respect to facts favorable to the defendant.  Further, under Texas law, absent jury misconduct, the jurors need not ever reveal the degree of certainty they required of the defendant in making his mitigation case.  *See* Tex. Rule of Evid. 606(b) (restricting juror testimony to jury misconduct); *see, e.g.*, *Glover v. State*, 110 S.W.3d 549 (App. 10 Dist. 2003); *Sanders v. State* 1 S.W.3d 885 (App. 3 Dist. 1999).  Of course,  the placement of such a high burden on the capital defendant would not constitute jury misconduct because it does not violate the law given the jury by the trial judge.

925.    Another problem with the Texas mitigation special issue is that it relieves the prosecution of any burden of proof with respect to facts it advocates as true and relevant with respect to the jury's ultimate response to the life or death mitigation issue.  Law abiding jurors, who have decided in favor of the prosecution thus far, are free to believe the truth of facts advocated by the prosecution without any standard of proof or persuasion.  The jurors may set and apply any standard they choose on facts the prosecutors advocate as true.  For example, the prosecutors may argue that the defendant has an anti-social personality and is simply malingering mental illness to avoid the consequences of his misconduct. Completely within their oaths, Texas capital sentencing jurors may accept such

304

arguments as true on 1% certainty that the underlying facts are actually true.

926.   Failure to assign a burden of proof and persuasion in a criminal proceeding is contrary to clearly established constitutional law.  Due process "is not a technical conception with a fixed  content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961) (internal quotations omitted).  Instead, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).  The function of the standard of proof in providing one such  procedural protection is to "instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington v. Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979) (internal quotations omitted).  The standard of proof, therefore, serves "[I] to allocate the risk of error between the litigants  and [ii] to indicate the relative importance attached to the  ultimate decision." *Id.*

927.   At capital sentencing, all facts adverse to the defendant must be proved by the state beyond a reasonable doubt.  Only that standard can adequately allocate the risk of error between a defendant and the State.  Death, after all, is unique.  As the Supreme Court has noted, "[t]he penalty of death differs from all other forms of criminal punishment, not in degree but in kind.   It is unique in its total irrevocability.  It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice.  And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity." *Furman*, 408 U.S. at 306.

928.   Further, an overarching principle of constitutional death penalty jurisprudence is that, "[b]ecause of that qualitative difference, there is a

305

corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305 (footnote omitted).  The Eighth Amendment requires "heightened reliability . . . in the determination whether the death penalty is appropriate." *Sumner v. Shuman,* 483 U.S. 66, 72, 107 S. Ct. 2716, 97 L. Ed. 2d 56 (1987).

929.    Only the reasonable doubt standard can adequately impress upon jurors the significance and solemnity of their decision between life and death.  As the Supreme Court has pointed out, the reasonable doubt standard is "indispensable" to due process in criminal proceedings, because "it impresses  on the trier of fact the necessity of reaching a subjective state or certitude of the  facts in issue." *In re Winship*, 397 U.S. at 364 (internal quotations omitted; emphasis added).  The court also noted that the standard was "indispensable to command the respect and confidence of the community in applications of the criminal law" since the moral force of the law could be "diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Id*.

930.    In other opinions, the CCA has justified the absence of a standard of proof on the grounds that the *Penry* "issue is a moral, normative  one . . . which [calls for] the jurors themselves [to] decide what is mitigating evidence and the extent to which that evidence is mitigating." *Eldridge v. State*, 940 S.W.2d 646, 654 (Tex. Crim. App. 1996).  According to the Texas court, a standard of proof cannot be applied to a moral judgment.  The subjectivity of the *Penry* issue, however, does not exempt it from the protections of due process.  That point was decisively made by the Supreme Court in *Santosky v. Kramer,* 455 U.S. 745*,* 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).  There, the Court considered what burden of proof was necessary in parental termination proceedings which "employ imprecise substantive standards that leave determinations unusually open to the subjective

306

values of the judge." *Id*. at 762.  As a result, the trial court possesses unusual discretion to under weigh probative facts that might favor the parent. *Id*. at 784 n.11.

931.   The Supreme Court safeguards the traditional adversary process in capital sentencing proceedings.  In *Furman,* 408 U.S. at 313, the Court recognized that the penalty of death is different from any other punishment imposed under our system of criminal justice.  Because of this unique quality, death cannot be imposed under sentencing procedures that create a substantial risk that the death penalty will "be inflicted in an arbitrary and capricious manner."  *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Furman*, 408 U.S. at 313. Because the Court found that the capital sentencing procedures then being utilized did create such a risk, the *Furman* Court invalidated those procedures as incompatible with contemporary standards of decency.

932.   To avoid creating a substantial risk of arbitrary and capricious infliction of the death penalty, capital sentencing schemes have been required to meet "twin objectives" to be "at once consistent and principled but also humane and sensible to the uniqueness of the individual." *Eddings*, 455 U.S. at 110.  In *Gregg*, 428 U.S. 153, the Court determined that these objectives are "best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information."  *Id*. at 195.

933.   There is nothing in our Supreme Court's post-*Furman* capital sentencing jurisprudence that would justify a re-alignment of the traditional burden of proof or persuasion with respect to facts adverse to the capital defendant at either stage of a bifurcated proceeding.  Furthermore, the Supreme Court's recommendation that capital sentencing be taken up in a hearing separate from the

307

issue of guilt provides no excuse for a dismantling of our traditional adversarial process for the finding of important controverted facts.  Indeed, the guidance to be provided the jury in the punishment phase is sufficient only if it "channel[s] the sentencer's discretion by 'clear and objective standards'  that provide  'specific and detailed guidance,'  and that 'make rationally reviewable the process for imposing a sentence of death.'"  *Godfrey,* 446 U.S. at 428 (quoting *Gregg,* 428 U.S. at 198).

934.   As stated, the Supreme Court requires heightened reliability in the decisions made in a capital trial.  *See, e.g.*, *Thompson v. Oklahoma*, 487 U.S. 815, 856, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988); *Zant*, 462 U.S. at 884; *Woodson*, 428 U.S. at 305.  The instructions given capital sentencing juries must be sufficient to provide the jury "with a vehicle for expressing its reasoned moral response to mitigating evidence in rendering its sentencing decision." *Penry I*, 492 U.S. at 318.

935.   The failure to assign a burden of proof and persuasion to any party renders a post-*Penry* Texas death sentence incapable of judicial review, especially for the sufficiency of the evidence to support a death verdict where mitigating evidence is also present in the record.  There simply are no guidelines for the jurors or the reviewing courts to follow and apply with respect to the sufficiency of the mitigation case to warrant a life sentence, rather than a death sentence.

936.   The capital sentencing process must accord proper significance to the relevant facts of the character and record of the individual offender, especially the compassionate or mitigating factors stemming from the diverse frailties of human kind.  *Woodson*, 428 U.S. at 304.  The Texas system also fails this test by simply allowing jurors  --  completely within their oaths to follow Texas law -- to assign an impossibly high burden of proof of facts and persuasion toward life to the defendant while relieving the prosecution of any substantial burden of proof or persuasion at all.

308

937.   The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

938.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

939.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

**CLAIM SEVENTEEN:  THE REFUSAL BY THE CCA TO REVIEW THE SUFFICIENCY OF THE MITIGATING EVIDENCE VIOLATES YOUNG'S CONSTITUTIONAL RIGHTS**

940.   Young's convictions, confinement, and sentence violate the Fifth, Eighth, and Fourteenth Amendments of  the United States Constitution because by refusing to review the sufficiency of Young's mitigating evidence, Young was denied a meaningful appellate review of his sentence of death.

309

941.   *Exhaustion of Claim*:  This claim was presented as Points Twenty-One and Twenty-Two in the direct appeal (AOB at 76-77), and Grounds for Review Six and Seven of the state habeas application (State Appl. at 45-51).

942.   *AEDPA*:  As the CCA refused to review the sufficiency of the mitigating evidence, de novo review is warranted with regard to this claim.  *Panetti*, 127 S. Ct. at 2858.

943.   If Respondent disputes any of the facts alleged below, Young requests an evidentiary hearing so that the factual disputes may be resolved.  After Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

944.   The declarations and other exhibits accompanying this Petition, as well as the allegations set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

945.   The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

## A.    Relevant Facts

946.   In response to the State's evidence in aggravation, Young presented two categories of mitigating evidence.[88]  The first consisted of testimony from Young's mother, stepbrothers, stepsisters, and neighbors, who described Young's unhappy childhood as one plagued by his severe ADHD, his family's inability to deal with such brain dysfunction, and the dysfunctional family into which Young was born.  The second category of mitigating evidence came from expert witnesses

---

[88]  Young's mitigating evidence is described in more detailed in Claim Four, in which Young alleges a *Penry* violation.

who discussed Young's brain dysfunctions, the consequences of Young's abused and troubled childhood, and the repercussions Young's ADHD had on his development and problematic upbringing.  In rebutting the State's theory that Young would present a future danger, Young argued that under proper medication, his ADHD behavior could be controlled and thus, he presented no future danger within an institutionalized setting.

947.   On direct appeal, Young argued that the jury's negative answer to the Third Special issue was not supported by Young's mitigating evidence.  (AOB at 76-77.)  The CCA, in turned, refused to reach the merits of Young's claims, stating, instead:

> In his twenty-first and twenty-second points of error,
> appellant challenges the legal and factual sufficiency of
> the evidence to support the jury's finding on the
> mitigation special issue.  This Court does not review the
> sufficiency of the evidence to support the mitigation
> special issue.  *McGinn v. State*, 961 S.W.2d 161, 166
> (Tex. Crim. App. 1998).  Appellant's twenty-first and
> twenty-second points of error are overruled.

*Young v. State*, 2005 WL 2374669, at *5.

## B.   Argument

948.   Texas Code of Criminal Procedure section 37.071 permits a jury to consider any relevant mitigating evidence -- that is any evidence about the circumstances of the offense, the defendant's character or background, and his personal moral culpability that might justify a life sentence instead of a death sentence.  § 37.071 2(e).  Further, the Texas Legislature enacted a statute which mandates appellate review of the mitigation issue.  *See* Tex. Code  Crim. Proc. §

311

44.251.[89]

949.    There are two issues at stake in any death sentence: the eligibility
decision and the selection decision.  *See Tuilaepa v California*, 512 U.S. 967, 114
S. Ct. 2630, 129 L. Ed. 2d 750 (1994); *Coker v Georgia*, 433 U.S. 584, 97 S. Ct.
2861, 53 L. Ed. 2d 982 (1977).  The selection decision requires an individualized
sentencing consideration and must be sufficiently broad to accommodate all
relevant mitigating evidence.  The State must ensure the process is neutral and
principled so as to guard against bias or caprice.  *Tuilaepa*, 512 U.S. at 972-73; *see
also Gregg*, 428 U.S. 153 (capital sentencing schemes and procedures must
minimize the risk of wholly arbitrary and capricious action).  To insure such a
process, the decisions must be subject to appellate review.  *Furman*, 408 U.S. 238;
*Parker*, 498 U.S. 308.  The meaningful review of death sentences and their
procedures promotes reliability and consistency.  *Clemons v. Mississippi*, 494 U.S.
738, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990).

950.    In  *Jurek*, 428 U.S. 262, the Supreme Court held the Texas capital
sentencing scheme to be constitutional:

> By providing prompt judicial review of the jury's decision
> in a court with statewide jurisdiction, Texas has provided
> a means to promote the evenhanded, rational, and
> consistent imposition of death sentences under law.
> Because this system serves to assure that sentences of
> death will not be "wantonly" or "freakishly" imposed, it

---

[89]  That section states in relevant part:
        (a)  The court of criminal appeal shall reform a
    sentence of death to a sentence of confinement . . . for
    life if the court finds that there is insufficient evidence to
    support . . . a negative answer to an issue submitted to a
    jury under Section 2(e), Article 37.071. . . .

does not violate the Constitution.

428 U.S. at 276.  The Legislature has since modified section 37.071 to include a general mitigation instruction.  § 37.0712(e).  Concurrently with this amendment, the Texas Legislature enacted section 44.251 allowing the Texas Court to reform a death sentence to life if the evidence is insufficient to support a negative answer to Sec. 2(e).  It is only the CCA which refuses to review the sufficiency of mitigating evidence.  *McFarland v. State*, 928 S.W.2d 482, 510 (Tex. Crim. App. 1996).

951.    The Eighth Amendment and the Due Process Clause of the Fifth and Fourteenth Amendments mandate appellate review.  The Supreme Court has consistently held the decision which give rise to a death sentence must be subject to appellate review.  *Furman*, 408 U.S. at 310 (Stewart, J., concurring); *Lockett*, 438 U.S. at 604; *Clemons*, 494 U.S. 738.  In *Clemons*, the Supreme Court espoused the necessity of meaningful appellate review, a process consistent with pursuit of the Eighth Amendment's objectives of measured consistent application of the death penalty and fairness to the accused:

> We see no reason to believe that careful appellate
> weighing of aggravating against mitigating circumstances
> in cases such as this would not produce "measured
> consistent application" of the death penalty or in any way
> be unfair to the defendant.  It is a routine task of appellate
> courts to decide whether the evidence supports a jury
> verdict and in capital cases in "weighing" states, to
> consider whether the evidence is such that the sentencer
> could have arrived at the death penalty that was imposed.
> And, as the opinion below indicates, a similar process of
> weighing aggravating and mitigating evidence is involved

313

in an appellate court's proportionality review.

Furthermore, this Court has repeatedly emphasized that

meaningful appellate review promotes reliability and

consistency. (Citations omitted). It is also important to

note that state supreme courts in States authorizing the

death penalty may well review many death sentences and

that typical jurors, in contrast, will serve on only one such

case during their lifetimes....There is nothing in appellate

weighing or reweighing of the aggravating and mitigating

circumstances that is at odds with contemporary standards

of fairness or that is inherently unreliable and likely to

result in arbitrary imposition of the death sentence.

494 U.S. at 748-49. The Supreme Court noted the failure to perform meaningful appellate review would result in an automatic rule of affirmance, invalid under the Court's opinion in *Lockett*.

952. Likewise, in *Parker*, 498 U.S. 308, the Court noted that appellate review of mitigating evidence by the Florida Supreme Court was so deficient as to be arbitrary. Thus, in virtually every analysis of state capital sentencing schemes, the Supreme Court has noted the importance of appellate review in upholding the statutes' constitutionality.

953. Further, other jurisdictions have not experienced difficulty in evaluating appellate claims of sufficiency of the evidence to sustain mitigation finding. *See e.g.*, *State v. Breton*, 663 A.2d 1026 (Conn. 1995); *State v. Richardson*, 463 S.E.2d 492 (N.C. 1995); *Sheridan v. State*, 852 S.W.2d 772 (Ark. 1993); *State v. Hernandez*, 562 N.E.2d 219 (Ill. App. 2 Dist. 1990); *Lowery v. State*, 547 N.E.2d 1046 (Ind. 1989); *Fisher v. State*, 736 P.2d 1003 (Okla. Crim. App.

314

1987). Oregon has a mitigation punishment issue similar to the Texas issue but its courts review the sufficiency of evidence to support the jury's finding regarding mitigation. *See State v. Moore*, 927 P.2d 1073 (Ore. Sup. Ct. 1996) (jury's answer to the special issue was subject to judicial review and that a court could review the jury's answer under a rational juror standard).

954. Here, any rational juror would find that the mitigating evidence before Young's jury reduced his moral culpability. The evidence at trial established beyond all doubt the existence of Young's mental illness (ADHD), which began even before Young started kindergarten. This condition rendered Young impulsive and hampered his abilities to control negative impulses. This condition was also aggravated with the use of methamphetamines. (*See* Exs. 96 at ¶¶ 8, 116-17, 130, 180 [Decl. of Knox]; 97 at ¶¶ 13, 17-21, 29 [Decl. of Milam].)

955. Further, the evidence portrayed a young boy caught between divorced parents -- a father who was an alcoholic who beat Young, and a mother who could not handle the medical and mental conditions her son suffered. Young was also faced with a step father who was an alcoholic and who was physically abusive. (*See* Ex. 96 at ¶¶ 26, 33-34, 47, 48, 64, 66, 77, 79, 97, 137 [Decl. of Knox].)

956. The circumstances in Young's life were difficult, at best. But the circumstances ultimately defied intervention. While Young's mother did seek professional help on occasion, her frustration and family situation prevented continued treatment and, for that matter, the proper treatment. (*See* Ex. 96 at ¶¶ 71-72, 74, 157-58, 169, 173-74 [Decl. of Knox].)

957. Often, when Young needed professional help the most, he was shuffled off to his physically abusive father, who, on occasion, would beat him with a two by four. As the mental and emotional conditions became critical, Young was finally placed in a mental health facility. However, Young still did not get the type

of treatment which was recommended, and did not receive the type of attention that was required.  Ultimately, Young was discharged from these facilities for exhibiting symptoms of the condition for which he sought treatment.  (*See* Exs. 96 at ¶¶ 48, 83, 153-54, 177, 181-84 [Decl. of Knox]; 97 at ¶ 14 [Decl. of Milam].)

958.   The evidence at trial showed that, over a period of trial and error, TYC psychiatrists discovered a combination of drugs which alleviated Young's condition. Once this medication was regulated, Young's referrals dropped dramatically and he successfully completed the TYC program.  (34 RR at 91-92.)

959.   Indeed, the uncontradicted evidence is that, had Young maintained mental health treatment and medication after his parole from TYC, this offense would not have happened.  (*See* Exs. 96 at ¶¶ 111-18 [Decl. of Knox]; 97 at  ¶¶ 14-17 [Decl. of Milam].)

960.   When all of the mitigating evidence is reviewed and weighed, it is clear that no rational juror could have answered the third punishment issue in the negative.

961.   The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

962.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not

mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

963.    In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

**CLAIM EIGHTEEN:  THE EVIDENCE WAS INSUFFICIENT TO FIND, BEYOND A REASONABLE DOUBT, THAT THERE WAS A PROBABILITY THAT YOUNG WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUED THREAT TO SOCIETY**

964.    Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because there is insufficient evidence to find that there was a probability Young would commit criminal acts of violence that would constitute a continue threat to society.

965.    *Exhaustion of Claim*:  This claim was presented as Points Seventeen and Eighteen in the direct appeal.  (AOB at 66-72.)

966.    *AEDPA*:  Because the CCA reached the merits of this claims, relief is warranted if this Court finds that the state court's application of legal principles from the Supreme Court's decisions to the facts of Young's case was objectively unreasonable.  *Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438, 161 L. Ed. 2d 334 (2005).

**A.    Legal Standard**

317

967.   As discussed in Claim Six,  evidence is sufficient to support a conviction if, viewing all the record evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319.  The same standard is used by Texas courts in determining the sufficiency of evidence.  *Hooper*, 214 S.W.2d at 13.

**B.     Relevant Facts**

968.   In responding to Young's mitigating evidence concerning his ADHD-induced behavior and his ability to control such behavior, the State argued that Young was a future danger because there was no guarantee he would receive adequate treatment within the prison system.  In making that argument, the State presented no evidence showing, beyond a reasonable doubt, that treatment would not be available at the prison, nor that Young, if given his medication, would stop taking it in a structured setting.

969.   Over Young's objection, the court allowed A. P. Merillat to testify as a State witness on prison conditions based upon his experience and personal knowledge.[90]  (35 RR at 51.)   Merillat testified about prison conditions in the State of Texas.  (35 RR at 58.)  Over objection by Young's trial counsel regarding Merillat's qualifications to testify as to the distribution of pychotropic medication (*id*. at 71-72), Merillat testified that in other housing classifications, there were opportunities for inmates to not actually take their pills, and that after the inmate is given the pills:

> Merillat:     Whether or not he swallows them into his throat is up to him, or
>               unless somebody pushes it down his throat.

---

[90]  See Claim Twenty-Five, *ante*, discussing the State's suppression of evidence regarding Merillat.

Q.            And they don't do that [push them down the throat], do they?

Merillat:    No, they don't.

970.    On cross-examination, Merillat acknowledged he had not read Young's TYC records documenting every instance that prescription medication had been provided to Young.  (35 RR at 108-09.)  Merillat also acknowledged that he did not dispute the fact there was not a single instance in the TYC records documenting that Young had refused to take the psychotropic medications when he was in an institutional setting.  (*Id*.)  Merillat also acknowledged that the Texas prison system included facilities for the criminally insane, where those who refused to take their medication and were considered dangerous could be properly housed and forced to take their medications.  (*Id*. at 109-10.)

971.    Young introduced the testimony of Dessie Cherry, a retired senior prison warden with TDCJ Institutional Division, who testified about prison conditions within the State of Texas.  (33 RR at 9-10.)  When Cherry testified that, to a minimum, a capital life offender would be in [classification] G4 with closed custody, the prosecution responded:

Q.    And that's good until the budget process tells us we
       can't do that, you don't have -- we're not going to
       employ enough guards after this budget session to
       do that, you've got to put more of them in general
       population, and the director signs that order and the
       whole system you talked about changes in about 30
       minutes.

A.    Can't comment on that, sir.

Q.    It's happened before, right?

A.    History repeats itself.

319

Q.    Yes.

(33 RR at 77.)

## C.    Argument

972.    Viewed in the light most favorable to the prosecution, no rational trier of fact could have found, beyond a reasonable doubt, that Young would not take his medication while in prison, or that the prison system would not provide the proper medical treatment.  At best, what the State presented were mere speculations that: (1) because the State of Texas "could" reduce its budget at any minute, the programs instituted in prison to control the prison population, including medical treatment, "could" be reduced; and that (2) because the prison could not ensure an inmate would take his medication, there was no guarantee Young would take his medication.

973.    Thus, the State presented no evidence contradicting Young's evidence that when properly medicated, his ADHD induced behavioral problems within a prison system dropped dramatically.  Therefore, no rational jury could reach the inferences promoted by Merillat's testimony because the State presented no evidence, including circumstantial evidence,  regarding Young's refusal to take medications within an institutionalized setting.  *Jackson*, 443 U.S. at 319.

974.    Furthermore, these inference the State promoted with Merillat's testimony are improper inferences under the individualized sentencing requirement that makes the death penalty constitutional under *Lockett*, 438 U.S. at 605; *Jurek*, 428 U.S. at 274; and *Eddings*, 455 U.S. at 112.  As the Supreme Court explained in *Eddings*,

> Thus, the rule in *Lockett* followed from the earlier
> decisions of the Court and from the Court's insistence that
> capital punishment be imposed fairly, and with reasonable

320

consistency, or not at all.  By requiring that the sentencer

be permitted to focus "on the characteristics of the person

who committed the crime," *Gregg v. Georgia*, at 197 . . .

the rule in *Lockett* recognizes that "justice . . . requires . . .

that there be taken into account the circumstances of the

offense together with the character and propensities of the

offender." *Pennsylvania v. Ashe*, 302 U.S. 51, 55, 58 S.

Ct. 59, 60, 82 L.Ed. 43 (1937).  By holding that the

sentencer in capital cases must be permitted to consider

any relevant mitigating factor, the rule in *Lockett*

recognizes that a consistency produced by ignoring

individual differences is a false consistency.

*Eddings*, 455 U.S. at 112.

975.   Because the conclusions advocated by the State would require that the sentencing jury reach inferences precluded by an individualized sentencing requirement, no rational trier of fact could have reached the conclusion that Young would be a future danger within an institutionalized setting.  Accordingly, even while viewing all the record evidence in the light most favorable to the prosecution, no rational trier of fact could have found that Young would present a future danger within an institutionalized setting.

976.   The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The

321

foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

977.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

978.   In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

**CLAIM NINETEEN:  A SENTENCE OF DEATH CANNOT BE IMPOSED IF ALL OF THE FACTORS THAT WOULD PREVENT SUCH A SENTENCE ARE NOT ALLEGED IN THE INDICTMENT**

979.   Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because the State failed to plead in the indictment, and prove beyond a reasonable doubt to a unanimous jury, the facts of the Texas "future dangerousness" aggravator, and the militating factors considered in deliberation upon the mitigation issue, on which it relied to enhance a maximum life sentence to death.

980.   *Exhaustion of Claim*:  This claim was presented as Points Nine and Ten in the direct appeal.  (AOB at 46-52.)

981.   *AEDPA*:  These claims were rejected in a reasoned opinion by the CCA. *Young v. State*, 2005 WL 2374669, at *9.  The court's denial of these claims

322

is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

## A.    Relevant Facts

982.   On December 20, 2001, a Grand Jury for the County of Midland, State of Texas, indicted Young on the charge of capital murder for "intentionally and knowingly causing the death of an individual, Samuel Petrey, by shooting the said Samuel Petrey with a firearm."  (CR at 3.)

983.   On Feb. 7, 2002, Young was re-indicted on two counts of capital murder. The indictment stated, in pertinent part, as follows:

> .   .   . CLINTON LEE YOUNG, HEREINAFTER
> STYLED Defendant, on or about the 26th Day of
> November A.D., 2001, and before the presentment of this
> indictment, in the County and State aforesaid, did then
> and there intentionally and knowingly cause the death of
> an individual, Samuel Petrey, by shooting him  with a
> firearm, and on or about the 25th day of November A.D.,
> 2001 in a different criminal transaction, the said
> CLINTON LEE YOUNG did then and there intentionally
> and knowingly cause the death of an individual, Doyle
> Douglas, by shooting him with a firearm, and the said
> CLINTON LEE YOUNG murdered the said Samuel
> Petrey and the said Doyle Douglas pursuant to the same
> scheme and course of conduct;
>
> COUNT II
>
> .   .   . CLINTON LEE YOUNG, hereinafter styled
> Defendant, on or about the 26th day of November A.D.

> 2001, and before presentment of this indictment, in the
> County and State aforesaid, did then and there cause the
> death of an individual, Samuel Petrey, by shooting him
> with a firearm, and the said CLINTON LEE YOUNG did
> then and there intentionally cause the death of the said
> individual in the course of committing and attempting to
> commit the offense of kidnapping and robbery directed
> against Samuel Petrey.

(CR at  4-5.)

984.    "Future dangerousness" and the lack of sufficient mitigating circumstances, both of which must be found by the jury in order to impose a penalty of death, were not pled in the indictment.  Nonetheless, during the punishment phase of Young's trial, the prosecution introduced extraneous adjudicated and unadjudicated misconduct, including but not limited to:  the testimony of Ronnie Wall (30 RR at 30 et.seq.); the testimony of Carlos Torres (30 RR at 67 et.seq.); and the testimony of Patrick Lee Brook (30 RR at 151 et. seq.).

985.    During closing arguments, the prosecution relied on the extraneous misconduct to urge the jury to return a sentence of death:  closing argument of Teresa Clingman (36 RR at 93 et. seq.); and the closing argument of Al Schorre (36 RR at 129 et. seq.).

**B.    Argument**

986.    In *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999), the Supreme Court held that "under the Due Process Clause of the Fifth Amendment and the notice and jury guarantees of the Sixth Amendment, any fact . . . that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones*, 526 U.S. at 243

324

n.6.

987.    In *Apprendi*, 530 U.S. at 475, the Supreme Court extended the *Jones* holding to the States through the Fourteenth Amendment.  In *Ring*, 536 U.S. 584, the Supreme Court applied the rule of *Jones* and *Apprendi* to a state capital case. Aggravating factors operate as the functional equivalent of an element of a greater offense.  *Ring*, 536 U.S. at 608-09.  "The relevant inquiry is one not of form, but of effect."  *Apprendi*, 530 U.S. at 494. Thus, aggravating factors must be pled in the indictment, submitted to a jury and proven beyond a reasonable doubt.

988.    The failure to plead the facts of future dangerousness and other factors militating toward death, failure to submit them to a jury, and failure to prove them beyond a reasonable doubt, amount to structural error, not capable of harmless error analysis.  *Sullivan v. Louisiana*, 508 U.S. 275, 279-81, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993).

989.    In Mr.  Young's case, the extraneous unadjudicated misconduct were the "facts" upon which the prosecution relied to increase the penalty from a sentence of life to death.  As such, the prosecution was required to have given fair notice of the nature and cause of its accusations of the defendant's qualification for and deservedness of death in the indictment.  Further, the prosecution was required to  proved its accusations to the jury beyond a reasonable doubt because these facts "operate[d] as the 'functional equivalent of an element of a greater offense . . . .'" *Ring*, 536 U.S. at 609 (*quoting Apprendi*, 530 U.S. at 494 n.19).

990.    On the contrary, prior to *Ring*, the CCA repeatedly held that aggravating circumstances in a capital murder case are not "elements" of the crime. *See  Studer v. State*, 799 S.W.2d 263 (Tex. Crim. App. 1990) ("In conclusion then, the language in Art. V, § 12, 'charging a person with the commission of an offense,' does not mean, under this analysis, that each element of the offense must be alleged

325

in order to have an indictment or information as contemplated by Art. V, § 12");
*Moore v. State*, 969 S.W.2d 4, 13 (Tex. Crim. App. 1998); *Callins v. State*, 780
S.W.2d 176, 186-87 (Tex. Crim. App. 1989).  However, as stated above, the critical
inquiry is not the label, but whether the facts increase the maximum penalty
otherwise available.  Indeed, as Justice Scalia noted in his concurring opinion in
*Ring,* the state could call the facts "elements of the crime," "sentencing factors," or
"Mary Jane," and the analysis would be identical:   failure to state those facts in the
charging document renders the sentence unconstitutional.  *Ring*, 536 U.S. at 610-11.

991.   Indeed, on June 28, 2002, shortly after the Court's decision in *Ring*,
the death sentence imposed in *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001),
was overturned.  The Supreme Court granted the writ of certiorari, vacated the
judgment of the United States Court of Appeals for the Eighth Circuit upholding the
death sentence, and remanded the case for reconsideration in light of *Ring's* holding
that aggravating factors that are prerequisites of a death sentence must be treated as
elements of the offense.  *Allen v. United States*, 536 U.S. 953, 122 S. Ct. 2653, 153
L. Ed. 2d 830 (2002).

992.   The question presented in *Allen* was:

Whether aggravating factors required for a sentence of
death under the Federal Death Penalty Act of 1994, 18
U.S.C. § 3591 et. seq. are elements of a capital crime and
thus must be alleged in the indictment in order to comply
with the Due Process and Grand Jury Clauses of the Fifth
Amendment.

993.   The Eighth Circuit had rejected *Allen*'s argument because in its view,
aggravating factors were not elements of federal capital murder, but rather

326

"sentencing protections that shield a defendant from automatically receiving the statutorily authorized death sentence." *United States v. Allen*, 247 F.3d at 763.

994.   Like in *Allen*, the notice requirements of the Sixth and Fourteenth Amendments, applicable to the States, require the inclusion of every element of the crime in the charging document. *Cole v. Arkansas,* 333 U.S. 196, 201, 68 S. Ct. 514, 92 L. Ed. 2d 644 (1948); *United States v. Gaytan*, 74 F.3d 545 (5th Cir. 1996) ("the Sixth Amendment requires that an indictment . . . enumerate each prima facie element of the charged offense"). The failure of Young's indictment to include the necessary elements that elevated his sentence to death mandates habeas relief. *Ball v. United States*, 140 U.S. 118, 136, 11 S. Ct. 761, 35 L. Ed. 377 (1891); *United States v. DuBo*, 186 F.3d 1177 (9th Cir. 1999).

995.   Habeas relief is also required because only Young's grand jury had the authority to decide whether the indictment should include these elements of capital murder required to seek the death penalty. Like the Fifth Amendment to the United States Constitution, the Texas State Constitution guarantees that "no one shall be held to answer for a criminal offense, unless on an indictment of a grand jury . . . ." Tex. Const. Art. I § 20; *see also* Tex. Const. Art. V § 12 (b); Tex. Code Crim. Proc. § 1.141 (2002) (prohibiting waiver of right to be accused by indictment of a capital offense).

996.   The most "celebrated purpose" of the grand jury "is to stand between the government and the citizen" and protect individuals from the abuse of arbitrary prosecution. *United States v. Dionisio*, 410 U.S. 19, 33, 93 S. Ct. 777, 35 L. Ed. 2d 67 (1973) (Dis. by Douglas, J). It is the shielding and screening  function, afforded by neutral review by a grand jury, that authorizes the State to seek the execution of an individual charged with a capital crime.

997.   The Sixth Amendment requires that "[i]n all criminal prosecutions, the

327

accused shall . . . be informed of the nature and cause of the accusation . . . . ”  A conviction on a charge not made by the indictment is a denial of due process. *Thornhill v. Alabama*, 310 U.S. 88, 60 S. Ct. 736, 84 L. Ed. 2d 1093 (1940). Because the State did not submit to the grand jury, and the indictment did not state the elements necessary to return a death sentence, Young may not be put to death as a result of his flawed sentencing proceeding.

998.   The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

999.   The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

1000. In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

328

**CLAIM TWENTY:  YOUNG'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE "12/10" PUNISHMENT CHARGE**

1001. Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the "12/10" punishment charge inherently produces a chilling effect on the jury's deliberating process.

1002. *Exhaustion of Claim*:  This claim was presented as Point Thirty-One in the direct appeal. (AOB at 93-94.)

1003. *AEDPA*:  Young raised this claim on direct appeal as a challenge to both the state and federal Constitutions.  The CCA, however, only addressed this claim with respect to Texas law.  *Young v. State*, 2005 WL 2374669, at * 10. Because the State court did not adjudicate the federal claim, § 2254(d) does not apply.  Thus, this Court may review the claim de novo.

1004. The jury in this case was charged within the meaning of Texas Code of Criminal Procedure Article 37.071, which states, in relevant part:

> Section 2.(2)(b): On conclusion of the presentation of the [punishment] evidence, the court shall submit the following issues to the jury:
>
> (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
>
> (2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the

329

deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

. . . .

(d) The court shall charge the jury that:

. . . .

(2) it may not answer any issue submitted under Subsection (b) of this article "yes" unless it agrees unanimously and it may not answer any issue "no" unless 10 or more jurors agree; and

(3) members of the jury need not agree on what particular evidence supports a negative answer to any issue submitted under Subsection (b) of this article.

1005.   Before the start of trial, Young challenged the less-than-unanimous provision of  section 37.071.  (CR at 47.)  The trial court denied the motion.  (CR at 318.)  The jury was ultimately charged pursuant to section 37.071 with regard to Special Issues Nos. 1 and 2:

You are instructed that in answering [Issue No. 1] [Issue No. 2] the State has the burden to prove beyond a reasonable doubt that the answer should be "yes."  The jury may not answer [Issue No. 1] [Issue No. 2] "yes" unless the jury agrees unanimously on the answer, AND the jury may not answer [Issue No. 1] [Issue No. 2] "no" unless ten or more jurors agree.  The members of the jury need not agree on what particular evidence supports a negative answer.  If any juror has a reasonable doubt as to his or her answer to [Issue No. 1] [Issue No. 2] , the juror

330

shall vote "no" to that issue.

(CR at 860-61.)

> 1006. With regard to Special Issue No. 3, the jury was instructed:
>
> You are instructed that in answering Issue No. 3, the jury
> shall answer the issue by stating "yes" (there is a
> sufficient mitigating circumstance or circumstances) or
> "no" (there is not a sufficient mitigating circumstance or
> circumstances).  The jury may not answer Issue No. 3
> "no" unless the jury agrees unanimously, AND the jury
> may not answer Issue No. 3 "yes" unless ten of more
> jurors agree.

(CR at 861-62.)

1007. As is evident in the jury instructions on Special Issue Nos. 1, 2, and 3, the jurors are kept ignorant of the fact that each of them has the power to force the trial court to sentence the defendant to life in prison.  All the special questions must be answered unanimously in order for the defendant to be sentenced to death.  However, the jury instructions inform the jury that ten jurors must agree to vote in the favor of the defendant on any special issue in order for a life sentence to result.  The charge is silent, however, about the consequences of a deadlocked jury, and defense counsel is not allowed to disclose the truth to the jurors during voir dire or closing argument.  *Draughon v. State*, 831 S.W.2d 331, 337 (Tex. Crim. App. 1991).

1008. It is also error for the trial judge or the prosecutor to tell the jurors about the effect of a failure to agree about the special issues.  *Clark v. State*, 881 S.W.2d 682, 690-92 (Tex. Crim. App. 1994); *Sattiewhite v. State*, 786 S.W.2d 271, 277-79 (Tex. Crim. App. 1989).  In essence, the jurors are misled because the

instructions obfuscate the fact that only one hold-out juror is necessary to compel the court to impose a life sentence.  Tex. Code Crim. Proc. §§ 37.071(d)(e), 37.071(2)(d)(e); 37.071(3)(f).  Moreover, the rule that a lone hold-out juror can prevent the imposition of the death penalty is constitutionally required.  *See Wiggins*, 539 U.S. 510 (had the jury been able to place the petitioner's excruciating life history on the mitigating side of the scale, there was a reasonable probability at least one juror would have struck a different balance).

1009.  The "12-10" Rule violates the constitutional principles discussed in *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d  384 (1988) (remand for resentencing required where substantial probability jurors thought they were precluded from considering any mitigating evidence unless they unanimously agreed on existence of particular mitigating circumstance) and *McKoy v. North Carolina*, 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990) (state's sentencing scheme allowing jury to consider only mitigating circumstances found unanimously in determining whether aggravating circumstances were sufficient to justify imposition of death penalty impermissibly limited jurors' consideration of mitigating evidence in violation of Eighth Amendment).  Further, the "12-10" Rule violates the Eighth and Fourteenth Amendments because there is a reasonable possibility that, under the present Texas capital sentencing scheme, all twelve jurors in a capital case could believe that a life sentence would be appropriate under state law, but, because at least ten jurors could not collectively agree on their answer to any one of the special issues, the jury could not return a life sentence.  Such a "majority rules" mentality could lead jurors to change their potential hold-out votes for life to a vote for the death penalty.

1010.  For example:  at trial, four of the twelve jurors conclude that, as consequence of a capital defendant's positive character traits, he would not pose a

332

future threat to society; thus, those jurors individually vote to answer the first special issue negatively.[91]

1011. Assume that those four jurors also believe, however, that the defendant possessed the requisite mens rea under the second special issue (the "parties" special issue) and that there is insufficient mitigating evidence as a whole to result in an affirmative answer to the third special issue (the "*Penry*" special issue).

1012. Further suppose that four other jurors believe that the same capital defendant did not possess the requisite mens rea under the second special issue and, thus, those four jurors individually vote to answer the "parties" special issue negatively.[92]  Assume, however, that those four jurors believe that the capital defendant does pose a future danger to society and that those four jurors also believe that the defendant's mitigating evidence, as a whole, is insufficient to result in a "no" vote to the statutory "*Penry*" special issue.

1013. Finally, suppose that the four remaining members of the jury conclude, as a result of the capital defendant's mitigating evidence of a troubled childhood,[93] that the statutory *Penry* special issue should be answered affirmatively.  However, for whatever reason, assume that those four jurors also believe that the capital defendant would pose a future threat to society and also that the defendant possessed the requisite mens rea under the "parties" special issue.  Thus, those four

---

[91]  Of course, a "no" answer to the "future dangerousness" special issue -- a finding that a capital defendant does not pose a future threat to society -- is a constitutionally recognized mitigating factor.  *See Franklin*, 487 U.S. 164; *Skipper*, 476 U.S. 1.

[92]  A capital defendant's lack of such a mens rea is, of course, a constitutionally relevant circumstance.  *Cf. Tison v. Arizona*, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987).

[93]  Of course, the third ("*Penry*") special issue also implicates a potentially limitless range of mitigating factors, including "troubled background" evidence. *See Penry I*, 492 U.S. 302.

remaining jurors only vote in the defendant's favor on the third special issue.

1014. Such a breakdown can be graphically illustrated:

*1st SPECIAL ISSUE 2nd SPECIAL ISSUE 3rd SPECIAL ISSUE*

| | | | |
|---|---|---|---|
| Juror 1: | **NO (life)** | YES (death) | NO (death) |
| Juror 2: | **NO (life)** | YES (death) | NO (death) |
| Juror 3: | **NO (life)** | YES (death) | NO (death) |
| Juror 4: | **NO (life)** | YES (death) | NO (death) |
| Juror 5: | YES (death) | **NO (life)** | NO (death) |
| Juror 6: | YES (death) | **NO (life)** | NO (death) |
| Juror 7: | YES (death) | **NO (life)** | NO (death) |
| Juror 8: | YES (death) | **NO (life)** | NO (death) |
| Juror 9: | YES (death) | YES (death) | **YES (life)** |
| Juror 10: | YES (death) | YES (death) | **YES (life)** |
| Juror 11: | YES (death) | YES (death) | **YES (life)** |
| Juror 12: | YES (death) | YES (death) | **YES (life)** |

1015. Hypothetically speaking, all twelve members of the jury in such a case individually agree that *one of the three statutory mitigating factors* has been established and that, under state law, a life sentence is appropriate. That is, all twelve jurors could have believed that a mitigating factor exists which, under state law, should have caused the capital defendant to be sentenced to life. However, jurors are given the impression, by the jury instructions, that Texas law forbids the imposition of a death sentence *only if* ten members of a capital sentencing jury agree collectively as to *which* statutory mitigating factor has been established. Because such jurors could disagree about which of the three factors has been established, however, they are left without guidance as to how to proceed. In the absence of such guidance, there is a constitutionally unacceptable risk that Texas

334

capital sentencing juries may feel coerced by a "majority rules" mentality into returning answers to the special issues that would result in a death sentence. A death sentence imposed by a jury so instructed is too likely a product of arbitrary decision-making for the Constitution to tolerate. *See McKoy v. North Carolina*, 494 U.S. 433; *Mills*, 486 U.S. 367. Accordingly, Young's sentence of death must be vacated and the cause remanded for a new trial.

1016. The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

1017. The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Young's convictions and sentence.

1018. In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668. Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

335

**CLAIM TWENTY-ONE:  YOUNG'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE COURT REFUSED TO ALLOW THE SENTENCING JURY TO FULLY CONSIDER AND GIVE EFFECT TO Young'S MITIGATING EVIDENCE**

1019.  Young's convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because the trial court prevented the attorneys representing the State, Young, and Young's counsel from informing the jurors or the prospective jurors of the effect of the failure of the jury to agree on the issues submitted.

1020.  *Exhaustion of Claim*:  This claim was presented as Point Twenty-Nine in the direct appeal.  (AOB at 88-89.)

1021.  *AEDPA*:  Young raised this claim on direct appeal as a challenge to both the state and federal Constitutions.  The CCA, however, only addressed this claim with respect to Texas law.  *Young v. State*, 2005 WL 2374669, at * 10. Because the State court did not adjudicate the federal claim, § 2254(d) does not apply.  Thus, this Court may review the claim de novo.

1022.  Texas refuses to tell its capital sentencing jurors the whole truth about how to give life to a capital defendant.  In the same manner as in his claim about the 10-12 rule (*see* Claim Twenty, *ante*), Texas also interferes with the full consideration of  mitigating circumstances.

1023.  The Texas prohibition against revealing the fact that a single holdout juror could cause the prosecution to result in a life sentence, rather than a mistrial followed by a new sentencing hearing, is clearly intended to prevent a minority of life giving jurors, or even a single juror, from actually exercising a veto of the majority's decision  for death.

1024.  *Penry I*, 492 U.S. 302,  *Tennard*, 542 U.S. 274, and  *Smith*, 543 U.S.

37, clearly established that the Texas capital sentencing system must: afford full jury consideration, not just some consideration, of mitigating circumstances; and provide any life giving jurors an adequate vehicle to actually give effect to the defendant's mitigation case. The Texas statutory prohibition interfered with Young's jury's ability to give effect to his mitigation case in a substantial enough way to undermine confidence in the outcome of his trial.

1025. Although the CCA rejected this argument in Young's case, that decision is not controlling because the state court's decision directly conflicts with the Supreme Court's decisions in *Penry I*, *Tennard*, and *Smith*. Therefore, the state court's decision on this claim "was contrary to, [and] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

1026. The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 637-38 & n.9. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

1027. The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Young's

convictions and sentence.

1028.  In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM TWENTY-TWO:  YOUNG WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

1029.  Young's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because Young's appellate counsel was constitutionally ineffective.

1030.  *Exhaustion*:  This claim was presented in Claim G of Young's Successor Petition to the state court.

1031.  If Respondent disputes any of the facts alleged below, Young  requests an evidentiary hearing so that the factual disputes may be resolved.  After Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

1032.  The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

1033.  The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

1034.  The Fourteenth Amendment requires the assistance of counsel to appellants for their first appeal as of right.  *Evitts v. Lucey*, 469 U.S. 387, 396-97,

105 S. Ct. 830, 83 L. Ed. 2d 821 (1985). This entitlement is not to a lawyer in name only, but rather to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000) ("the proper standard for evaluating [a petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland v. Washington*"); *Amdor v. Quarterman*, 458 F.3d 397, 411 (5th Cir. 2006). Accordingly, Young was entitled to the effective assistance of counsel for his direct appeal.

1035. J. K. (Rusty) Wall was appointed as appellate counsel on Young's behalf on December 26,2002. (4 CR at 691.) Wall failed to raise critical claims on Young's behalf, claims that were readily apparent from the record. To the extent that this Court finds that the constitutional violations noted herein were not presented to the CCA on direct review and were apparent from the trial record, then appellate counsel rendered constitutionally ineffective assistance to Young, through their failure to adequately investigate and raise these issues. See *Evitts v. Lucey*, 469 U.S. 387 (1985).

1036. The denial of his right to effective assistance of appellate counsel substantially prejudiced Young and had a substantial and injurious effect on the verdict. But for the denial of this right, it is reasonably probable that a more favorable result would have been attained.

1037. Under these circumstances, the adversarial system completely broke down, and Young was left without meaningful representation. Although many of counsel's errors were, by themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed. Even assuming a showing of prejudice is required, Young

339

has made that showing here.

## CLAIM TWENTY-THREE:  THE CUMULATIVE EFFECT RENDERS ALL PHASES OF YOUNG'S TRIAL FUNDAMENTALLY UNFAIR

1038.  Young's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because of the cumulative and inter-related errors that occurred at the guilt and penalty phases of trial.

1039.  *Exhaustion*:  This claim was presented in Claim H of Young's Successor Petition to the state court.

1040.  If Respondent disputes any of the facts alleged below, Young  requests an evidentiary hearing so that the factual disputes may be resolved.  After Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

1041.  The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

1042.  The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

1043.  The Supreme Court has established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair.  *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973).  For that matter, the cumulative effect of multiple errors violates due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal.  *Chambers*, 410 U.S. at 290 n.3; *see also Montana v. Egelhoff*, 518 U.S. 37, 53 (1996), *Taylor v. Kentucky*, 436 U.S. 478, 487

340

n.l5, (1978); *see Coble v. Quarterman*, 496 F.3d 430,440 (5th Cir. 2007) (cumulative errors of a constitutional dimension).

1044. Young refers to all of the allegations pled herein as well as claims set forth by Young in his direct appeal and state habeas application and, by this reference, incorporates them herein as though set forth in full.

1045. Each of the errors at Young's guilt and punishment trials standing alone require that he be granted relief. Moreover, reversal of the death sentence and habeas relief is mandated, because the foregoing constitutional violations had a harmful effect on the punishment phase verdict. The effect of each and all of these guilt phase issues must be added to the subsequent punishment phase errors in the evaluation of cumulative error in both guilt and punishment phases. However, because the issues resolved at the guilt phase are fundamentally different from the question resolved at the punishment phase, the possibility exists that an error might be harmless as to the guilt determination, but still prejudicial to the punishment determination. *Smith v. Zant*, 855 F.2d 712, 721-22 (11th Cir. 1998) (admission of confession harmless as to guilt but prejudicial as to sentence).

1046. The failings of the state's case must be considered because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland v. Washington*, 466 U.S. 668, 699, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see also Glasser v. United States*, 315 U.S. 60, 67, 62 S. Ct. 457, 86 L. Ed. 680 (1942) ("[Where] the scales of justice may be delicately poised between guilt and innocence ... error, which under some circumstances would not be ground for reversal, cannot be brushed aside as immaterial since there is a real chance that it might have provided the slight impetus which swung the scales toward guilt.").

1047. "Although the guilt and penalty phases are considered 'separate' proceedings, we cannot ignore the effect of events occurring during the former upon

the jury's decision in the latter." *Magill v. Dugger*, 824 F.2d 879, 888 (11th Cir. 1987).  Further, Young's sentence of death was unlawfully and unconstitutionally imposed as alleged in throughout this Petition.  Such violations mandate habeas relief and ultimate reversal of the punishment phase verdict because the cumulative effect of the punishment phase errors requires reversal of Young's death sentence. *Johnson v. Mississippi*, 486 U.S. 578, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988); *Zant v. Stephens*, 462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983).

1048.  These errors variously deprived Young of his rights to liberty, fair trial, an unbiased jury, effective assistance of counsel, due process, to present a defense, heightened capital case due process, a reliable and non-arbitrary determination of penalty, and equal protection under the law.  Taken together, these errors undoubtedly produced a fundamentally unfair trial and a new trial is required, due to cumulative error.  *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992); *cf Taylor v. Kennedy*, 436 U.S. 478, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978) (several flaws in state court proceedings combine to create reversible federal constitutional error).

## CLAIM TWENTY-FOUR:  YOUNG IS INNOCENT OF CAPITAL MURDER

1049. Young's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because he is actually innocent of the capital murder of which he was convicted.  *See Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S. Ct. 2514, 120 L. Ed. 2d 279 (1992); *Thomas v. Calderon*, 151 F3d. 918, 924 (9th Cir. 1998); *see also Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993).

1050. *Exhaustion*:  This claim was presented in Claim I of Young's Successor Petition to the state court.

1051. If Respondent disputes any of the facts alleged below, Young  requests an evidentiary hearing so that the factual disputes may be resolved.  After Young

has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

1052. The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

1053. The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

1054. Young is actually innocent of capital murder for the multiple reasons discussed above. Had the constitutional errors described above not occurred, "it is more likely than not that "no reasonable juror' would have convicted" Young. *Schlup v. Delo*, 513 U.S. 298, 329, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995).

## CLAIM TWENTY-FIVE: THE PROSECUTION'S SUPPRESSION OF EVIDENCE CONCERNING STATE'S WITNESS A. P. MERILLAT VIOLATED YOUNG'S CONSTITUTIONAL RIGHTS

1055. Young's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecution suppressed evidence that State's witness A. P. Merillat's testimony was more than questionable, and the State's suppression of the evidence prevented the defense from challenging the witnesses' credibility.

1056. *Exhaustion*:  This claim was presented as Claim Two to the Texas Court of Criminal Appeals in Young's Successor Petition.  That Court determined that Young "abandoned" this claim in open court and accordingly "dismissed" the claim.  (6/20/12 TCCA Order.)

1057. If Respondent disputes any of the facts alleged below, Young  requests

an evidentiary hearing so that the factual disputes may be resolved.  After Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

1058.  The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

1059.  The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

**A.    Relevant Facts - Merillat's Testimony at Young's Trial**

1060.  On April 21, 2003, trial counsel filed a motion to exclude the testimony of A. P. Merillat ("Merillat"), arguing, in part, that Merillat would testify as an expert on future dangerousness without being qualified to do so.  (5 CR at 844.)  Defense counsel reiterated his motion at trial, arguing that Merillat would refer to specific instances of violence within the Texas prison system, which were not relevant to the allegation that Young himself would commit acts of violence while incarcerated.  (35 RR at 48.)

1061.  In response, the State argued Merillat's testimony was relevant to Young's punishment phase because Merillat would testify as to the following:  the various levels of classifications of prisoners; opportunities for violence and types of violence that can occur in prison; opportunities inmates have to make weapons while in prison; and what types of drugs are available in prison, including psychotropic drugs, and how inmates hide those drugs.  (35 RR at 48.)  The State proffered that Merillat would not offer expert opinion as to future dangerousness.  (*Id*.)

1062.  Upon prompting by the trial court, the State assured the court Merillat

344

would testify as to events or circumstances based on his personal knowledge.  (35 RR at 50).  On those bases, the court allowed Merillat to testify.  (*Id*.)

1063.  According to his curriculum vitae ("CV"), Merillat is a Senior Criminal Investigator with the Special Prosecution Unit, whose responsibilities include investigating felonies occurring in the Texas prison system, "[p]roviding special investigative assistance to local district attorneys . . . [and] Statewide Capital Murder prosecution assistance" since 1989.  (Ex. 129 [Merillat CV]).  In his CV, Merillat describes himself as a "[c]onsultant to local Texas police departments/District Attorneys offices in major assault, homicide and child sex crimes," and as an "[i]n-court second chair with prosecutors in one hundred (100) jury trials" from 1989 through 2002.  (*Id*.)

1064.  During the punishment phase of Young's trial, Merillat testified that he considered the Special Prosecution Unit ("SPU"), an office created and funded by the Texas Governor's office since 1984, independent from the Texas prison system.  (35 RR at 56.)  Because the Governor's grant was administered through Walker County, Merillat considered himself "not a state employee [but] a county employee."  (*Id*.)

1065.  According to Merillat, the Governor of Texas created the SPU to prosecute crimes committed within the prison system which could not be prosecuted by counties where a given prison was  located.  (35 RR at 56.)  According to Merillat, his office prosecuted 794 cases, from capital murder to improper sex with an inmate, the year before Young's trial.  (*Id*. at 65.)  Merillat testified that out of those 794 cases, 130 cases were drug related.  (*Id*. at 66.)

1066.  According to Merillat, contraband, including drugs, arrived into prison though the legal mail.  (*Id*. at 67.)  Merillat testified that prison gangs controlled the trade of contraband in prison.  (*Id*. at 67-68.)  Merillat also testified that prescription drugs, including drugs distributed to a given inmate through a "pill line," could be

345

used as contraband and traded by the inmate who was prescribed that medication. Over defense objection, Merillat testified that even Ritalin could become contraband in prison.  (35 RR at 71.)

> Q:     All right.  Do pills that you receive in the pill line,
> do those ever act as currency or money, have a
> value for the inmate in prison?  In other words, can
> I, if I'm an inmate that's prescribed Ritalin, let's
> say, can I, rather than take my Ritalin pill and use it
> for something?
>
> A:     Yes, ma'am.  Drugs, medicine, narcotics, anything
> like that, it won't have the same type of value that a
> jar of foot powder will, but it will mean something
> to the person that you're trying to sell it to or who
> has ordered you to go get it, steal it, hide it and
> bring it to him, such as that, so it's valuable, but not
> -- doesn't have a dollar amount.
>
> Q:     I see.  Would you say that it's valued in a very
> positive way or just in a menial way, medication,
> pills?
>
> A:     The rare and harder to obtain an item is, the more
> value it has, so if it's an aspirin, it's not very
> valuable, but if it's a pill or something that nobody
> knows what it is, it looks like something from a
> drugstore, well, it's going to be worth a lot of
> money to somebody, or a lot of value, we'll say.
>
> Q:     Do inmates ever use things of that nature, such as
> pills, to curry favor with other inmates in prison?

346

A:    Yes, ma'am.  I know the Texas Syndicate does that

quite heavily.

(35 RR at 76-77.)

1067.  Merillat testified that violence was pervasive within the prison system.
According to Merillat, inmates avoid assaults by paying other inmates for
protection.  (35 RR at 83-84.)  Another way to avoid being assaulted, including
being raped within a prison when first assigned to a particular unit, is for an inmate
to "catch out," or engage in an activity that would lead that inmate to incur a
disciplinary violation so that the inmate could be housed in a disciplinary cell and
thus isolated from other inmates.  (*Id*. at 84.)  A way of catching out includes
fabricating a weapon.  (*Id*. at 84-85.)

Q:    But does that count against them as far as

potentially raising their level of housing?

A:    It's very difficult, because -- well, we prosecuted a

hundred -- almost 200 weapons cases last year

alone.  We have hundreds of weapons.  That's

probably our most frequent crime.  It's hard to

determine what's a catch out and what is really

going to be used to cut an officer's throat or kill

another man, so that's one of my jobs is to get that

case in, that report of the case and try to determine

through witnesses or through the man himself,

through the circumstances, through the

documentation of what he's been through the past

several weeks to see if that matches up, and if it

does, we won't prosecute.  We'll dismiss those

cases.  We're not out just to hang inmates at all.  So

347

> it's a difficult situation, and whereas there are many
> catch out cases, there are many, many more that are
> not, that are serious crimes that when it's time to go
> to trial, the inmates all of a sudden say hey, that was
> a catch out case, I was getting hogged or I was
> getting ho checked by these guys, I had to make
> that thing, so it's real hard to determine.

(35 RR at 85-86.)

   1068.  According to Merillat, the top type of security available within the
prison system was high security and death row, which were similar in most respects
but for the fact that those on death row received a sentence of death.  (35 RR at
122.)  According to Merillat, even within the more restrictive high security cells,
opportunities for violence still existed:

> Now, there are only a few high security units in the state.
> They're reserved for the absolute worst that you can do
> nothing else with, nothing else would help, so they put
> him in this high security.  That's a whole nother [sic]
> story.  Everything an inmate does is done inside the cell,
> eat, shower, everything.  He gets out one hour a day if
> he's been good by himself to go recreate in a small yard
> by himself.  He has to be escorted by two officers to come
> out of that cell in handcuffs, so he's fed through that --
> that's called a bean slot, that little door that opens that
> looks into the cell down at the bottom . . . .

(35 RR at 90-91.)  Merillat also testified that inmates can make weapons out of
virtually anything in prison.  (35 RR at 86, 93.)

   1069.  Asked whether there would be a way to ensure Young was confined

348

within the highest level of security in the prison system, Merillat testified that no one could tell the prison system how to house an inmate:

> Q:     Okay.  Is there any way that these ladies and
>        gentleman of the jury can be assured as to what an
>        inmate's classification will be other than what
>        you've already told us about or what type or
>        housing an inmate will have in prison?
>
> A:     It will depend on the inmate, no one else.
>
> Q:     Okay.  So even if they wanted to send a message to
>        prison and say, "House this guy in Administrative
>        Segregation," could a jury do that?
>
> A:     A jury or a judge, nobody can tell the prison where
>        or how to house an inmate.

(35 RR at 96-97.)

1070.   According to Merillat, if an inmate is "a member of one of seven recognized street gangs, he'll never get out of Seg.  That's about the only person who will never get out of Ad Seg is one of those seven street gang members.  Even an escapee will sooner or later work his way out of Ad Seg if he behaves."  (35 RR at 120.)

1071.   According to Merillat, inmates have escaped from prison, including from death row, and he considered that the statistics published by the Texas Department of Criminal Justice did not accurately reflect such incidents.  (35 RR at 126.)  According to Merillat, his definition of when an escape occurs within the prison system is more accurate than the definition of the Texas Department of Corrections.  (35 RR at 127.)

**B.     Suppressed Evidence**

1072.   Unbeknown to defense counsel at trial, Merillat's testimony was

349

questionable, and his credibility could have been challenged but for the State's suppression of the evidence.

1073. As far back as 1998, Merillat was assisting an inmate achieve "deconfirmation" as a gang member (a benefit in the prison system) so that the inmate could procure information for the SPU which the SPU would in turn use against other inmates.  (*See* Dkt. No. 59, Ex. 132.)  Merillat continued assisting that inmate even though Merillat knew the inmate had not given up his gang activity. (*See* Dkt. No. 59, Ex. 133.)

1074. As far back as 1999, Merillat acknowledged that although an inmate who had been providing SPU with information concerning another inmate had been caught manufacturing a weapon by prison authorities, "just because a disciplinary case was written, it does not mean that our office will file a criminal charge."  (*See* Dkt. No. 59, Ex. 134.).

1075. As far back as 2000, Merillat was arranging for inmates to be transferred within the prison system (*See* Dkt. No. 59, Ex. 135.), and even get out of segregation units.  (*See* Dkt. No. 59, Ex. 136.)

1076. Also as far back as March 2000, Merillat was making arrangements with prison officials to allow letters from gang members to reach an inmate informant, even though that inmate, with help from Merillat, had informed prison authorities he had renounced his gang affiliation.  (Exs. 139 [Innes 3/6/2000 Letter]; 43 [Depo. of Bierbaum].)

1077. Unbeknownst to Young's defense team, the SPU prosecutorial team in a capital murder case against an inmate had suppressed exculpatory evidence against that defendant.  *See Anibal Canales Jr. v. Quarterman*, CV No. 03-69-TJW (E. Dist. Tex).  Merillat, as a Senior Criminal Investigator and part of that SPU team, was intrinsically involved with that suppression.  (*See e.g.* Dkt. No. 59, Ex. 138) ("As far as a witness list, we haven't sent one out yet, Mr. Mullin [the SPU

prosecutor] and I are holding off as long as we can.").[94]

## C.   Relevant Law

1078.  As previously stated, it is clearly established federal law that "[t]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilty or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Mahler v. Kaylo*, 537 F.3d 494, 499 (5th Cir. 2008); *Kopycinski v. Scott*, 64 F.3d 223, 225 (5th Cir.1995).  The duty to provide favorable evidence applies "even when the accused fails to specifically request such evidence." *Mahler*, 537 F.3d at 499 (*citing Strickler*, 527 U.S. at 280; *Kyles*, 514 U.S. at 433).

1079.  To prevail on a *Brady* claim, a petitioner "must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material" to his guilt or punishment.  *Mahler*, 537 F.3d at 500 (*citing Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994)).

## D.   The Prosecution Suppressed Evidence Concerning A. P. Merillat

1080.  Under *Brady*, the prosecution's duty to disclose favorable evidence is not limited to evidence within the actual knowledge or possession of the prosecutor. It is well-settled that *Brady* obligates the "individual prosecutor . . . to learn of any favorable evidence known to the others acting on the government's behalf . . . [,] including the police." *Mahler*, 537 F.3d at 499 (*citing Kyles*, 514 U.S. at 437). Furthermore, under certain circumstances, the prosecution may be deemed in constructive possession of *Brady* material.  *See United States v. Webster*, 392 F.3d

---

[94]  In his pending petition for federal habeas relief, Mr. Canales alleges the prosecutorial team:  suppressed evidence, contrary to *Brady*; allowed a material witness to testify falsely in violation of *Napue* and its progeny; and that the SPU, including Merillat, deliberately elicited information form a defendant in custody and under indictment in violation of *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), and its progeny.

787, 798, n.20 (5th Cir. 2004) (*citing Martinez v. Wainwright*, 621 F.2d 184, 186-87 (5th Cir. 1980) (finding no suggestion in *Brady* "that different 'arms' of the government are severable entities" and thus holding that prosecutor had suppressed deceased's rap sheet, which resided in medical examiner's office and had been provided by the FBI); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (finding prosecution was in possession of criminal history of witness even though no background check was conducted, reasoning, in part, that "[i]f disclosure were excused in instances where the prosecution has not sought out information readily available to it, [the court] would be inviting and placing a premium on conduct unworthy of representatives of the United States Government."); *United States v. Deutsch*, 475 F.2d 55, 57-58 (5th Cir. 1973) (finding prosecutor was, for purposes of *Brady*, in possession of information in Postal Service files).

1081. Although the availability of information is measured in terms of whether the information is in the possession of some arm of the state, *Crivens v. Roth*, 172 F.3d 991, 997-98 (7th Cir. 1999) (*citing United States v. Perdomo*, 929 F.2d 967, 971 (3d Cir.1991), for purposes of *Brady* "the prosecution is deemed to have knowledge of information readily available to it." *Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991).

1082. In Young's case, the State was in possession of evidence challenging Merillat's credibility.  As Merillat testified, part of his responsibilities included investigating felonies occurring in the Texas prison system, and providing special investigative assistance to local district attorneys and Statewide Capital Murder prosecution assistance.  Thus, Merillat's assistance to the prosecutorial team in Young's case in the form of his testimony, at the minimum, means the prosecutorial team against Young was in possession of Merillat's knowledge concerning Merillat's dealings in the Canales's case.  *See e.g. United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979) (imputing knowledge of state law enforcement team that

352

witness' lawyer had been paid from state funds to federal prosecuting team and finding that "nondisclosure, whether stemming from negligence or design, was the responsibility of the prosecutor.").

1083. Furthermore, as the Fifth Circuit has held in the past, there is no suggestion in *Brady* "that different 'arms' of the government are severable entities. *Martinez v. Wainwright*, 621 F.2d 184, 186-87 (5th Cir. 1980). As in *Martinez*, here, the prosecutor team was in constructive possession of the letters written by Merillat, when Merillat, funded by the Governor's office of the State of Texas, was required to assist and consult with local district attorney's offices as part of the Statewide Capital Murder prosecution assistance.

1084. As in the case of *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980), the prosecution in Young's case cannot argue that it did not possess the impeaching evidence against Merillat because it did not seek it. As in *Auten*, "[i]f disclosure were excused in instances where the prosecution has not sought out information readily available to it, [the court] would be inviting and placing a premium on conduct unworthy" of representatives of a State seeking the death penalty against a defendant. *Id*.

1085. The State will no doubt argue that it did not suppress the evidence because the defense team could have easily accessed the information through the "well-honored, traditional non-*Brady* method of simply asking the witness while he is testifying." *See e.g. Crivens v. Roth*, 172 F.3d at 998; *Titsworth v. Dretke*, 401 F.3d 301, 307 (5th Cir. 2005). As in *Crivens* and *Titsworth*, that principle is pushed too far on the facts of Young's case. Merillat would not have told the complete truth if asked about his participation in the prosecution of the Canales case based on the fact that SPU had not disclosed that evidence to Canales's trial counsel and had only been obtained by federal counsel during the pendency of Mr. Canales' federal habeas petition. (*Canales* post-stay briefing, Doc #36 at 4).

353

1086. Thus, evidence that could be used to impeach Merillat's testimony was suppressed at Young's death penalty trial.

**E.    Evidence That Could Be Used to Impeach Merillat Was Favorable to Young**

1087. "*Brady* encompasses evidence that may be used to impeach a witness's credibility. *Kopycinski*, 64 F.3d at 225 (*citing Bagley*, 473 U.S. at 676).

1088. The communications between Merillat and various inmates raises doubt as to Merillat's credibility and the accuracy of his testimony.  While Merillat testified that no one, either a judge or a jury, could tell the prison system where or how to house an inmate (35 RR at 96), Merillat's letters show that he, although independent from the prison system, could tell the prison system how to house an inmate who was assisting SPU obtain evidence against other inmates.  (Exs. 132 [SPU 6/15/98 Letter]; 133 [Eason letter to Merillat 07/09/2000]; 135 [SPU 7/12/2000 Letter]; 136 [Whited 4/4/2000 Letter]).

1089. While Merillat testified that the "only person who will never get out of Administrative Segregation is one of those seven street gang members" (35 RR at 120), he neglected to mention that gang members, even while still participating in gang related activities, can get out of Administrative Segregation in exchange for their cooperation with SPU.  (*See* Dkt. No. 59, Ex. 136.)

1090. While Merillat testified that it was extremely difficult to investigate a "catch out" allegation, where the inmate had manufactured a weapon in order to be placed in a safer location (35 RR at 85-86), letters from Merillat contradicted the difficulty of such investigation, and in some circumstances, all Merillat needed was the inmate's self-serving statement.  (*See* Dkt. No. 59, Ex. 134.)

1091. The suppressed evidence concerning Merillat's role in the Canales investigation and prosecution was favorable to Young's case because it is quintessential impeaching evidence.

354

**F.     The Suppressed and Favorable Evidence Was Material for Young's Sentence to the Death Penalty**

1092. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *Kopycinski*, 64 F.3d at 225-26. "[O]nce a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review.  Assuming, *arguendo*, that a harmless-error enquiry were to apply, "a *Bagley* error could not be treated as harmless, since a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury's verdict." *Kyles*, 514 U.S. at 435 (internal quotation marks and citations omitted).  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Bagley*, 473 U.S. at 682.

1093. Merillat's credibility was instrumental to the finding that there was a probability that Young would commit acts of violence while in the prison system if given a life sentence, because Merillat testified that opportunities of violence were abundant there.  Merillat went as far as saying that his testimony, at least when it came to the number of escapes within the prison system, was more believable than what the Department of Corrections itself published.  (35 RR at 126.)

1094. As Merillat himself has described his testimony, "[i]n the numerous capital cases [he has] been called to testify in, that question -- the "future danger" issue -- has become the central, significant matter under consideration."  A. P. Merillat, *The Question of Future Dangerousness of Capital Defendants*, 69 Tex. B.J. 738, 738 (2006).  According to Merillat himself, his testimony is instrumental in capital death cases, because:

> [T]he information that I bring to juries quite frequently

355

rebuts defense testimony and theories that if a capital murderer is given a life sentence, the restrictions placed upon him would make it nearly impossible for him to continue a course of violence after arriving at prison. It is not uncommon for capital murder juries to hear testimony from many retired TDCJ administrators who travel across the state testifying for the defense. If jurors hear only testimony from these witnesses who attempt to portray a picture of a super-secure prison system designed to prevent convicted killers from victimizing anyone during their time in prison, then verdicts can render favorably to defendants.  But those verdicts might not be rendered on what is factual. The information that follows is a sampling of what I testify to when called into capital trials.  The facts will illustrate why jurors over the years may have been convinced to issue affirmative answers to the future dangerousness question after hearing this testimony.  A benefit to you readers who are on the defense bar is that you can examine and dissect this information, put your heads together, and come up with ways to rebut my testimony and convince jurors that I am a crackpot.  Most important, however, the citizens who pay for the Texas prison juggernaut deserve to know the facts.  When I write articles, give lectures, or even have informal conversations regarding the crime situation in Texas prisons, I never fail to receive reactions betraying the fact that few people know what it's really like in our state's

356

penitentiary system.

(Ex. 130 [69 Tex. B.J. at 739].)

1095. While the defense bar may not yet be able to convince a jury that Merillat is a "crackpot," a complete disclosure of Merillat's actions, including those in the case of Mr. Canales, would have allowed Young to come up with ways to rebut his testimony, by showing that Merillat has himself suppressed exculpatory evidence in at least one death penalty case, thereby putting into question his credibility.

1096. Had Merillat's trickery in the investigation of Mr. Canales and his trial been revealed,[95] defense counsel in Young's case would no doubt had reminded the trial court, as well as the jury, of the outmost duty a prosecutorial team has to follow the law.  As the Supreme Court has stated:

> [A Prosecutor] is the representative not of an ordinary
> party to a controversy, but of a sovereignty whose
> obligation to govern impartially is as compelling as its
> obligation to govern at all; and whose interest, therefore,
> in a criminal prosecution is not that it shall win a case, but
> that justice shall be done.  As such, he is in a peculiar and
> very definite sense the servant of the law, the twofold aim
> of which is that guilt shall not escape or innocence suffer.
> He may prosecute with earnestness and vigor-indeed, he
> should do so.  But, while he may strike hard blows, he is
> not at liberty to strike foul ones.  It is as much his duty to
> refrain from improper methods calculated to produce a

---

[95]  Canales was prosecuted by the Special Prosecution Unit out of Hunstville. *Canales v. State*, 98 S. W. 3d 690 (Tex. Crim. App. 2003); Appellant Canales' Opening Brief,  2001 WL 34386405, *3.  Trial in the Canales case was conducted from October 24 to October 27, 2000.  *Id*. at *9.

wrongful conviction as it is to use every legitimate means

to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629,  79 L. Ed. 1314 (1935). As part of the SPU, and in particular, as part of the prosecutorial team that prosecuted Mr. Canales, Merillat not only struck hard blows, as he should have, but he also struck foul ones.  Without the disclosure of the evidence illustrating Merillat's foul strokes in other death penalty cases, Young's defense team could not challenge Merillat's credibility.

1097. In Young's case, Merillat's testimony as to inmates' opportunities to distribute prescribed drugs was particularly instrumental to the jury's finding as to the future dangerous issue.  Young presented evidence that, with proper medication, his ADHD induced disciplinary problems while in an institutionalized setting were nonexistent.  By testifying that inmates housed  anywhere but death row or High Security could use their medications as contraband, Merillat testified as to the "probability" that Young would do so if sentenced to life, simply because, according to Merillat, the opportunity in prison to do so existed.[96]  Thus, although Young presented unrefuted evidence that his ADHD behavior was controlled under the proper medication and that he had never refused to take his medication while institutionalized, let alone that he had used such prescribed medications as contraband, Merillat's testimony allowed for the "possibility" that Young "could" refuse to take his medication and instead, use it as contraband if given a life sentence.

1098. Because Texas law requires the jury to be unanimous when voting for death, "the proper reference, at least with regard to the punishment assess, is

---

[96]  Although Royce Smithey, Merillat's fellow investigator, also testified at trial as to prison conditions (31 RR at 168 et seq.), Smithey did not testify as to prescription drugs being a source of contraband.

whether the mind of one juror could have been changed with respect to the imposition of the sentence of death. *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) (discussing Louisiana law). Without Merillat's testimony, Young's evidence that his behavior was controlled with the proper medication, went unrefuted. Thus, there is a reasonable probability that, had the evidence been disclosed to the defense, at least one juror could have changed with respect to the imposition of the death penalty. In Young's case, the suppressed evidence is sufficient to undermine confidence in the outcome of Young's death sentence.[97]

1099. Because the State suppressed impeaching evidence concerning Merillat, and because Merillat's testimony was material to the jury's finding that Young could commit acts of violence while in prison if given a life sentence, rather than a death penalty, Young's sentence to death was the result of a *Brady* violation which deprived Young of due process. As such, Young's sentence to death does not pass constitutional muster and should therefore be vacated.

**G.    The State Deprived Young of His Right to Confront Merillat**

1100. Independent of the error described above, the State deprived Young of his right to confront Merillat when it suppressed the evidence described above. *See Burbank*, 535 F.3d at 358 (defendant's confrontation rights violated where he refused to permit cross examination on witnesses' plea deal).

1101. This error, in conjunction with the error described above, warrants habeas relief.

**H.    Conclusion**

1102. The foregoing violations of Young's constitutional rights constitute structural error and warrant the granting of this Petition without any determination

---

[97] If, through the course of Young's federal habeas proceedings, counsel discovers that the prosecutors were aware that Merillat was testifying falsely or allowed his untrue testimony to go uncorrected, in violation of *Napue* and its progeny, counsel will amend his Petition accordingly.

of whether the violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

1103. The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Young's convictions and sentence.

1104. In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668. Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM TWENTY-SIX:  THE STATE LOST OR DESTROYED KEY EVIDENCE

1105. Young's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the State lost or destroyed evidence that was exculpatory in nature, including shell casings left in front of the house where Douglas was first shot; the 7-Eleven video tape of Young shopping in the convenience store; and eyewitness evidence from persons at Brookshires Grocery Store on the day that Mr. Petrey was kidnapped.

1106. *Exhaustion*:  This claim was presented in Claim Four of Young's Successor Petition to the state court.

1107. If Respondent disputes any of the facts alleged below, Young  requests an evidentiary hearing so that the factual disputes may be resolved.  After Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

1108. The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

1109. The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

## A.    Factual Background

1110. As revealed during trial, Kent Spencer, Midland County Sheriff Investigator, testified that the district attorney's office lost the tape of Young in Midland at the Midkiff and Loop 250 7-Eleven on November 26, 2001.  (24 RR 232-33; *see also* Ex. 75 [Spencer 7-11 report].)  The tape that the jury never saw showed Young walking around the store for eleven minutes, without a weapon, while Page and Petrey stayed in the car.  Thereafter, Young returned to the car and to the passenger side.  (24 RR 217-19; Ex. 75 [same report].)

1111. Further, the State lost or destroyed the shell casings that could have been found on the ground outside of the house where Douglas was first shot. Douglas was shot twice by Page who was standing to his left by the passenger side door.  Therefore the shell casings would have been left at that scene on the ground. The State was in possession of such shell casings, but has since lost or destroyed this evidence.

1112. Finally, the State failed to investigate the scene where Petrey was kidnapped. Had they done so, they could have interviewed eyewitnesses, including a woman in a white vehicle, who would have identified Page as the person who kidnapped Petrey.

**B.     Analysis**

1113. In *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984), the Supreme Court applied a standard for determining the materiality of lost evidence:  the high Court concluded that nonmalicious destruction of evidence does not involve a violation of the federal Constitution unless the evidence possessed "an exculpatory value" that was apparent before it was destroyed, and the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.  *Trombetta*, 467 U.S. at 488-89.

1114. Under *Trombetta*, Young's constitutional rights were violated.  The court looks at whether the lost evidence had "an exculpatory value" that was apparent before the evidence was destroyed, and whether the evidence was of a nature that the defendant could not obtain comparable evidence by other reasonable means.  *Trombetta*, 467 U.S. at 489.  Having "exculpatory value" does not mean that under *Trombetta* a defendant must establish that the lost evidence would have exonerated him.  Were that the standard, proof that such evidence once existed would be tantamount to proof of innocence entitling a defendant to a dismissal wholly apart from the fact that the evidence was destroyed or lost.  Rather, the *Trombetta* standard should be met when it is apparent that:  (1) the evidence was exculpatory to some degree, and (2) the defendant is prejudiced by its loss or destruction because he is left unable to establish the full extent of its exculpatory nature.  *Id*.  In other words, if the full extent of the exculpatory nature were apparent to the police prior to the loss or destruction of the evidence, proof of that fact at trial

362

would in most cases be the equivalent of having the evidence at trial, and defendant would not be harmed by its loss.

1115. Accordingly, the intentional destruction of the 7-Eleven videotape violated the federal Constitution because the videotape was prima facie exculpatory (in that it showed that Page and Petrey were not being held against their will and were free to go as Young walked around the 7-Eleven for eleven minutes without a weapon and it was destroyed before the full extent of their exculpatory nature could be determined.

1116. Second, the State's loss or destruction of the shell casings located on the ground in front of the house where Douglas was first shot would have been material to establish that Young did not shoot Douglas, but that Mr. Page shot him while standing outside the car.

1117. And third, the failure to investigate the place where Petrey was kidnapped resulted in the failure to interview key eyewitnesses to the event - witnesses who would have identified the kidnapper as Page, not Young.

1118. The second prong of the *Trombetta* requirements, that the evidence be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means, is clearly met in the case of the video tape because the video tape itself would have been the best evidence of how long he was in the 7-Eleven, and that Mr. Page and Mr. Petrey were not kidnapped by Young. Sanctions should have been imposed for the destruction of the videotape. The instruction given by the court did not cure the prejudice to Young, and was no substitute for actually showing the jury the videotape.

1119. With respect to the shell casings found at the house where Douglas was initially shot, aside from the ballistics evidence that showed that Douglas was shot from the left, there was no comparable evidence to show that Douglas was shot by Page from outside of the vehicle, which would have refuted the State's theory that

Young shot him inside the car from the passenger's seat.

1120. And with respect to the eyewitnesses at the grocery store parking lot, there was no comparable evidence to show that Page, not Young, was the person who kidnapped Petrey.

1121. The trial court should have imposed sanctions as a result of the State's loss/destruction of material evidence and habeas relief is required.[98]  Assuming arguendo, that the prosecution's intentional destruction of evidence did not rise to the level of a violation of federal due process, an alternative sanction should have been issued.  Furthermore, trial counsel was ineffective for failing to move for sanctions.

## C.   Conclusion

1122. The foregoing violation of Young's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507  U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Young's rights had a substantial and injurious effect or influence on Young's convictions and sentence, rendering them fundamentally unfair and resulting in a

---

[98]  The Supreme Court's decision in *Arizona v. Youngblood*,  488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), does not require a different result. *Youngblood* holds that under the due process clause, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58.  As the *Youngblood* Court pointed out, however, the "presence or absence of bad faith by the police for purposes of the due process clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."  488 U.S. at 56, n. 1.  Intentional destruction of evidence by the individual having knowledge of its exculpatory character must meet this standard, even if there is no claim that the destruction was malicious.

miscarriage of justice.

1123. The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Young's convictions and sentence.

1124. In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## CLAIM TWENTY-SEVEN:  THE STATE INTERFERED WITH THE DEFENSE'S INVESTIGATION AND PRESENTATION OF  ITS MITIGATION CASE[99]

1125. Young's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution because the State interfered with the defense's selection of Gerald Byington as the mitigation specialist/bio-psychosocial historian expert in Young's case.

1126. *Exhaustion*:  This claim was presented in Claim D of Young's Successor Petition to the state court.

1127. If Respondent disputes any of the facts alleged below, Young  requests an evidentiary hearing so that the factual disputes may be resolved.  After Young

---

[99]  This Claim was raised in Claim Twenty-Five of the First Amended Petition filed in this Court and in Claim Four of the Successor Petition filed in the Texas Court of Criminal Appeals.

has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

1128. The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

1129. The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

## A.    Relevant Law

1130. Unlike the lawyer who is bound only by the rules of the State Bar, it has long been recognized that a prosecutor has an even greater duty to conduct himself with propriety. *See* A.B.A. Standards, The Prosecution Function, Section 3-1.1(d). Although prosecutorial discretion is broad, it is not unlimited. *United States v. Batchelder*, 442 U.S. 114, 125, 99 S. Ct. 2198, 60 L. Ed. 2d 755 (1979). Rather, "prosecutorial discretion is subject to constitutional constraints." *United States v. Armstrong*, 517 U.S. 456, 464, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996) (internal quotations omitted).

1131. In all cases, but most particularly during a capital trial, a prosecutor must not simply pursue a conviction, but rather, must seek to ensure that justice is done. *Kyles* v. *Whitley*, 514 U.S. 419, 439, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (*citing Berger*, 295 U.S. at 88).

1132. A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 183, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986); *see Greer v. Miller*, 483 U.S. 756, 765, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987) (conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process); *Riddle*

366

*v. Cockrell*, 288 F.3d 713, 720 (5th Cir. 2002); *United States v. Burke*, 496 F.2d 373, 377 (5th Cir. 1974) . "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). The federal habeas court must distinguish between "ordinary trial error of a prosecutor and that sort of egregious misconduct . . . amount[ing] to a denial of constitutional due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000).

## B.   The Prosecutor Interfered with the Investigation and Presentation of Mitigating Evidence

1133. After improperly receiving the sealed billing records of the defense's mitigation specialist/social historian, Gerald Byington, the State reported Byington to the Texas Commission on Private Security alleging Byington was conducting investigatory work illegally. (Ex. 49 [Judge Hyde Letter dated October 29, 2002]; 8 RR at 6-7.) The result of the prosecutor's actions was to foreclose the defense from properly investigating and presenting a bio-psychosocial history of Young, which should have been presented at trial. The prosecutor's actions constituted misconduct and violated Young's constitutional rights to due process, a fair trial, and the effective assistance of counsel.

### 1.   Relevant Facts

1134. In late summer 2001, the defense contacted Gerald Byington to work as their mitigation specialist. Byington was to assist the defense in investigating and presenting mitigation evidence at trial. Byington's duties included preparing a bio-psychosocial history of Young. (Ex. 94 at ¶ 3 [Decl. of Gerald Byington].)

1135. Byington, who was a Licensed Clinical Social Worker and a certified expert in social history, had participated in the development of mitigation witnesses,

experts, and strategies in more than 200 felony criminal trials in Texas.  Of those cases, at least half of them involved death penalty defendants.  (*Id*. at ¶¶ 1-2.)

1136.  In preparation for his appointment by the court to Young's case, Byington prepared a detailed ex-parte affidavit outlining his anticipated investigation of Young's history and the amount of funding that would be required to complete the task.  Byington anticipated requiring 139 hours of time to prepare Young's  bio-psychosocial history, at a cost of $10,843.20.  (*Id*. at ¶ 4; Ex. 76 [August 2002 Affidavit of Byington].)

1137.  In a sealed order by the Court in early 2002, Byington was appointed to Young's case, and was granted initial funding in the amount of $5,000.  (Ex. 32 [April 02 Appointment of Byington]; 94 at ¶ 5 [Decl. of Byington].)

1138.  Based upon his past experiences as a social historian, Byington formulated a precise and detailed vision of how Young's bio-spychosocial history should be investigated and presented.  This included investigating and presenting evidence related to the client's family history, medical history -- including mental and physical health, educational history, employment history, and history as it related to incarceration.  To accomplish this task, Byington would gather and review records as well as conduct interviews with family members, friends, teachers, and others who knew Young.  (Ex. 94 at ¶ 6 [Decl. of Byington].)

1139.  Byington submitted his first bill in late April, 2002.  That bill, which included work from February 11 to April 16, 2002, was in the amount of $5,033.91.  (Exs. 94 at ¶ 7 [Decl. of Byington]; 64 [Byington's first billing statement].)  The Court paid the bill in late June 2002.  (Ex. 94 at ¶ 8 [Decl. of Byington].)

1140.  In a letter to defense counsel dated June 26, 2002, Byington requested additional funds for further specified mitigation services including, but not limited to, the collection of additional family history documents in order to develop a genogram for display at trial, and further neuropsychological, EEG and SPECT

368

scan testing.  (Exs. 94 at ¶ 8 [Decl. of Byington]; 64 [June 26 Letter].) The funding
request was submitted to the court.

1141.  Byington informed defense counsel that no further services would be
provided by him until such time as additional funding by the court was authorized.
Byington agreed to continue to consult with the attorneys regarding information
that had already been obtained however, Byington stated he would not gather any
additional information.  (Ex. 94 at ¶ 9 [Decl. of Byington].)

1142.  On September 9, 2002, Byington received a letter from the Texas
Commission on Private Security.  The letter explained that someone had filed an
anonymous complaint against Byington alleging that he had been doing the work of
a private investigator, and that he was not licensed to do such work in the state of
Texas.  (Ex. 94 at ¶ 10 [Decl. of Byington].)

1143.  A court hearing on this matter, presided over by Judge Hyde, was held
on September 19, 2002.  When Byington arrived at the hearing, he was surprised to
find that besides the defense attorneys who had hired him, also present was Midland
County District Attorney Al Schorre, who was prosecuting Young.  Byington felt
the presence of the prosecutor was highly unusual because, in his experience, the
prosecution was never involved in the preparation of the defense mitigation case.
(Ex. 94 at ¶ 11 [Decl. of Byington].)

1144.  Byington also noticed that DA Schorre had a copy of Byington's initial
ex parte request for funding, the court order granting the funding, a copy of
Byington's billing records, as well as a copy of  the "anonymous" complaint that
had been filed against Byington.   (Ex. 94 at ¶ 12 [Decl. of Byington].)

1145.  At the hearing, DA Schorre told the court that he objected to the
request for Byington's additional funding.  According to DA Schorre, the court had
not funded investigation into mitigation, but rather, had approved funds for
someone who would investigate the facts of the case, and that Byington was not

369

licensed to do this type of investigation.  (8 RR at 5-7.)

1146. Defense counsel argued that while Jeff Marugg was the defense investigator for guilt, Byington was hired as a mitigation specialist, and was trained to conduct the type of investigation he was undertaking.  Defense counsel also argued that Byington was not only funded for the mitigation investigation, but also to assist counsel in the presentation of a "knowledgeable and informative" mitigation case to the jury including explaining to the jury and helping them understand the issues surrounding Special Issue No. 3 under Texas Criminal Procedure Code section 37.07(1).  (8 RR at 8-11.)  Counsel also argued that Byington was a critical member of the defense team.  (8 RR at 12.)

1147. At the hearing, Byington testified about the significance of a mitigation specialist, and explained the work he had performed to date in Young's case. Byington also testified that the type of services he provided as a mitigation specialist were clearly covered by his licensure as a Clinical Social Worker. Byington provided the court with a copy of those rules. (8 RR at 14-24;  Exs. 94 at ¶ 15 [Decl. of Byington]; 50 [Texas Adminisrative Code, Title 22].)  Rusty Wall, Young's appellate counsel, also testified at the hearing regarding the importance of the defense hiring and working with a mitigation specialist in a case such as Young's.  (8 RR at 24-28.)

1148. Following the testimony of Byington and Wall, defense counsel alerted the court that it had previously, as had another local court, appointed a mitigation specialist that was not a private investigator and that no one had lodged a complaint. (8 RR at 37-38.)  At the conclusion of the hearing, Judge Hyde stated he would render a decision regarding Byington's work after contacting the Commission on Private Security.  (8 RR at 38-39.)

1149. A second hearing was held on this matter in November 2002.  At that hearing, the court heard evidence from Cliff Grumbles of the Private Securities

Board and Andrew Marks, the Executive Director of the Texas State Board of Social Worker Examiners.  (10 RR at 7-8, 12.)

1150.  Marks testified that the work conducted by Byington was within the normal duties of social workers, and  "absolutely" within the duties of a LMSW. (10 RR at 8-11.)  Grumbles, on the other hand, testified that Byington's work, as far as conducting interviews, was outside the bounds of a private investigator.  (10 RR at 13-17.)

1151.  Judge Hyde took the matter under submission and did not issue an order for additional funding for mitigation services.  (10 RR at 29-30; Ex. 94 at ¶ 17 [Decl. of Byington].)  With no authority to interview witnesses, Byington's work as a mitigation specialist was severely curtailed.  (Ex. 94 at ¶ 19 [Decl. of Byington].) At the time Byington stopped receiving court funding, he had completed no more than half the research he would have considered mandatory for a proper mitigation defense of Young.  (*Id*. at ¶ 22.)

1152.  Judge Hyde never rendered a decision regarding Byington's ability to work on Young's case.  In June 2003, *after* the completion of the trial, the court approved some of Byington's previously incurred expenses.  (Ex. 65 [Final funding approval for Byington].)

**2.     Argument**

1153.  Prosecutor's and law enforcement are prohibited from invading the defendant's Sixth Amendment zone of privacy.  *See Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995); *see also United States v. Levy*, 577 F.2d 200, 210 (3rd Cir. 1978); *United States v. Kelly*, 790 F.2d 130, 138 (D.C. Cir. 1980).  Here, the prosecution deliberately interfered with Young's investigation and presentation of mitigation evidence.

1154.  At the time of Young's trial in 2003, counsel's duty to investigate and present mitigating evidence was well established.  *Williams v. Taylor*, 529 U.S. at

371

395-96.  Young's attorneys' obligations were governed by the 2003 ABA Guidelines.

1155.  The ABA Guidelines require defense counsel to retain a mitigation specialist as part of the capital defense team.  Guideline § 4.1.  The Commentary to the Guidelines discuss the role of the mitigation specialist with regard to the social history document:  "The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation."  The Commentary to § 4.1 also explains that the mitigation specialist is an "indispensable member of the defense team as they have "the time and ability to elicit sensitive, embarrassing and often humiliating evidence . . . that the defendant may have never disclosed."

1156.  Based upon the Commentary to Guideline 10.7 [Investigation], defense counsel had an obligation at the punishment phase to conduct an extensive and unparalleled investigation into Young's personal and family history including: mental history, family and social history, educational history, military service, employment and training history, and prior juvenile and adult correctional experience.  The Commentary also states that it is necessary to locate and interview the client's family members, and virtually anyone else who knew the client and his family including, but not limited to teachers, neighbors, clergy, case workers, doctors, correctional, probation or parole officers.

1157.  A sampling of contemporary Texas cases demonstrate the prevalence of mitigation specialists.  *Scheanette v. Quarterman*, 482 F.3d 815 (5th Cir. 2007) (mitigation specialist retained for 1996 trial); *United States v. Hall*, 455 F.3d 508, 517 (5th Cir. 2006) (mitigation specialist retained in 1995); *United States v. Webster*, 392 F.3d 787, 795 (5th Cir. 2004) (mitigation specialist retained for 1996 trial); *Rosales v. Cockrell*, 220 F. Supp. 2d 593, 611 (N. D. Tex. 2001); *Shields v. Dretke*, 122 Fed. Appx. 133, 136 (5th Cir. 2005) (use of a mitigation specialist in a

372

1995 trial); *see also Watts v. Quarterman*, 448 F. Supp. 2d 786, 796 (W.D. Tex. 2006) (defense introduced testimony of mitigation specialist in 2003 trial); *Roberts v. State*, 220 S.W. 3d 521 (Tex. Crim. App. 2007).

1158.  In this case, however, the prosecution prohibited counsel from fulfilling their defense obligations when it interfered with counsel's ability to investigate and present a mitigation case through the use of their chosen mitigation specialist.

1159.  As discussed above, the prosecution improperly received the sealed billing records of Byington, and then contacted the Texas Commission on Private Security alleging that the work Byington was conducting was illegal.  This interference caused the court to question its continued funding of Byington, and the defense was left without a mitigation specialist to assist them in investigating and presenting a comprehensive mitigation case.

1160.  To that end, at the time Byington's services were brought into question by the State, Byington had only completed half the research into Young's history that Byington would have considered mandatory for a proper mitigation presentation.  (Ex. 94 at ¶ 22 [Decl. of Byington].)  Further, while Byington continued to discuss the case from time to time with Young's defense team, the discussions were all based on the incomplete information that Byington had obtained prior to June 2002, almost a full year before Young's trial began.  (*Id.* at ¶ 23.)

1161.  Without Byington's services, there were a number of important areas that were left unexamined by Young's defense counsel.  To that end, Byington would have presented far more information culled from Young's family, key teachers, treatment providers and others to help differentiate between Clinton Young as a person and the problems he manifested, from his infancy on.  (Ex. 94 at ¶ 24 [Decl. of Byington].)  Further, Byington would have identified and interviewed

373

additional lay witnesses who could have presented testimony about Young's attempts at being a "normal" child and teenager.  (*Id*. at ¶ 25.)

1162. Byington would have developed a family genogram for both the maternal and paternal families, which could have been presented at trial.  Byington also would have provided evidence that Young's behavior was sometimes intentional, while at other times it was the result of his mental disorders.  With his assistance, Byington could have collected such evidence and prepared expert testimony which would have provided the jury with specific, clear examples Young's intentional behavior in contrast with behavior that was an expression of his disability.  (Ex. 94 at ¶¶ 26-27 [Decl. of Byington].)

1163. However, without Byington's authority to perform his task as a mitigation specialist/bio-psychosocial historian, the defense was left rudderless with regard to the investigation and presentation of a mitigation case.  More important, the jury was left without a clear idea who Young was, and how his problems affected his life.

1164. For example, the jury was confused as to why Young, who suffered from ADHD, could sit quietly throughout his trial without medication.  (37 RR at 5.)  If the defense had been permitted to use a mitigation specialist, like Byington, this type of potential problem could have been addressed either before or at trial. (Ex. 40 at ¶¶ 5, 10-12 [Decl. of Dr. Milam].)  A mitigation specialist like Byington could also have foreseen the jurors struggle regarding Young's "choice" to return to drugs after his release from TYC.  (*Id*. at ¶¶ 13-19; Ex. 96 at ¶¶ 111-19 [Decl. of Toni Knox].)

1165. If the defense had been permitted to use their mitigation specialist, instead of losing him through prosecutorial interference, the defense could have presented a more accurate portrait of their client through the presentation of both lay and expert witnesses, and by Byington's own testimony.  Such a portrait, like

374

that presented by Toni Knox, the mitigation specialist/social historian retained by current federal habeas counsel, would have shown the jury that:

> In addition to Clint being genetically loaded toward mental illness and chemical dependency, there were numerous social and family problems which contributed to Clint's development.  These factors affected his social functioning, impulse control and lack of appropriate coping skills from a young age.

(Ex. 96 at ¶ 8 [Decl. of Toni Knox].)

1166.  Had the defense been permitted to investigate and present the mitigation case they wanted, the jury would have learned about the considerable research regarding "an unborn child's ability to understand and 'feel' the environment they are about to be born into," and that Young "experienced stress and violence before he was even born" based upon his father's assaults upon his mother during her pregnancy.  (*Id*. at ¶ 167.)

1167.  The jury would have heard about the interplay between Young's chemical dependency and mental illness; the systemic failure of the institutions which were supposed to help Young with his drug and alcohol dependence; the family dysfunction which invaded all aspects of Young's life; and the psychological barriers which delayed Young's mental and emotional development.  (*Id*.)

1168.  The jury would have heard testimony about Young's maternal family history including information about Carla Sexton's adoption and her own distant relationship with her adopted mother.  This information would have given the jurors context to why Carla had such trouble parenting her own child, especially one that required so much attention as Young did due to his ADHD.  The jury also would have understood the unstable environment Young was born into.  (*Id*. at ¶¶ 9-12, 168.)  The jury also would have heard evidence about Young being genetically

predisposed to addiction and mental illness based upon his maternal family background.  (*Id*. at ¶ 13.)

1169.  Had the prosecution not interfered with Young's mitigation presentation, the jury also would have heard information about Young's paternal family history.  This information would have given context to the abuse suffered by Young by his father Billy when viewed in light of the rampant abuse which permeated Billy's own family history.  A view of Young's paternal family history also would have added to the evidence of Young's own genetic predisposition to addiction.  (*See id*. at ¶¶ 14-23.)

1170.  Had the prosecution not interfered with Young's case, the jury would have learned that Carla Young was ill equipped to raise Young at the age of eighteen, and especially ill equipped to raise five children, four of whom belonged to a new husband who was abusing her.  (*Id*. at ¶¶ 25-26.)  The jury would have heard of the neonatal abuse suffered by Carla at the hands of Billy, abuse which caused the premature birth of Young.  (*Id*. at ¶¶ 27, 168.)

1171.  The jury would have heard evidence about the familiar interplay between Young's half brothers and sisters, and how those relationships colored Young's own upbringing and development.  (*Id*. at ¶¶ 28-50.)  The jury would have learned of the chaos the surrounded Young's early years including Young being shuttled back and forth between his mother and father.  The jury too would have received evidence regarding Carla's courtship and marriage to Quentin Sexton, how Quentin could not accept or love Young as his own biological child, and how Young was very aware that Quentin did not love him and often rebelled against Quentin's rigid rules and abusive treatment.  The jury also would have learned that Young constantly felt like an "outsider," as he was shuttled between the families, and how Young was made to feel like he was a "problem child."  (*Id*. at ¶¶ 51-60, 63, 169-70, 173.)

376

1172. Had Byington been permitted to complete his work as a mitigation specialist, the jury would have learned that not only did Young not fit in with both his maternal and paternal families, he also did not fit in at school because of his hyperactivity which often led to behavioral problems. The jury would have had enough information to understand how Young's hyperactivity led to his feelings of frustration. (*Id*. at ¶ 172.)

1173. The jury would have been informed about the acrimony between Carla and Billy and how that affected Young emotionally and physically. The jury would have had explained how the increasing level of chaos in Young's family, coupled with Young's ADHD, led to problematic behavior that Carla did not know how to control. The jury would have been better able to understand how the institutions, which were meant to assist Young with his behavioral problems, did nothing more than house Young until the institution grew tired of Young and kicked him out. (*Id*. at ¶¶ 60-81.)

1174. The jury would have been given a roadmap regarding Young's rapid mental and emotional decline that occurred without the treatment that he so badly required. The jury would have had a better understanding of why the treatments that were prescribed to Young failed. The jury also would have learned that while successful treatment required Young's family to be involved so that unhealthy familiar interactions could change, this type of treatment never took place. (*Id*. at ¶¶ 82-100, 173.)

1175. And had a mitigation specialist been permitted to do the job he was appointed to do, the jury would have learned that Young was discharged from TYC without any provisions for chemical dependency or psychiatric treatment. The jury also would have learned that Young returned to the same "unhealthy" environment that had exacerbated his previous problems. (*Id*. at ¶ 175; Ex. 97 at ¶¶ 15-17 [Decl. of Milam].)

1176. Had a mitigation specialist, like Byington, been permitted to conduct the investigation he was hired to do, the jury would have been given a comprehensive overview of Young's chemical dependency and its genetic component (Ex. 96 ¶¶ 121-27 [Decl. of Knox]; psychiatric treatment history and including medications (*id.* at ¶¶ 128-36); educational history (*id.* at ¶¶ 148-52);  and physical and emotional abuse since childhood (*id.* at ¶¶ 153-58).

1177. The jury would have learned that had Young been given proper long term treatment, including family therapy and appropriate medications, he could have led a productive life.  And although Young was assessed by a myriad of professionals over the years, and recommendations were made regarding treatment, those recommendations were not carried out in any real or logical way.  (*Id.* at ¶ 174.)

1178. Had the defense been permitted to investigate and present the mitigation case they had desired, with the help of a mitigation specialist, the jury would have learned that Young could not overcome the risk factors which stemmed from family dysfunction.  The jury would have heard evidence that Young was never able to develop the appropriate coping skills and, upon release from TYC, attempted to use the survivor skills he had learned in the prison system.  (*Id.* at ¶ 177.)

1179. Without a mitigation specialist/bio-psychosocial historian, the jury did not hear that Young's bad behavior was often the result of his hyperactivity and impulsivity, which he struggled throughout his life to contain.  From outward appearances, Young was a nice looking intelligent young man, which made it more difficult for a jury to understand his feelings of alienation.  (*Id.* at ¶ 180.)  A mitigation specialist could also have helped the jury to understand that over the years, Young experienced numerous side effects and frequent disappointment from the various medications he was prescribed, causing him to lose hope and thus,

378

reinforcing his reluctance to take any medication.  (Ex. 96 at ¶ 181 [Decl. of Knox].)  In sum, without a mitigation specialist/bio-psychosocial historian, the defense was unable to present to the jury a comprehensive, linear, and cohesive story about Young.  This portrait would have shown what can and will go wrong when a young person is born into, and travels through a life filled with emotional and physical abuse, lack of stability and support, and a lack of positive role models. (*Id*. at ¶ 183.)

1180.  As social historian Toni Knox states in her social history declaration:

It is my strong professional opinion that the findings contained in this declaration were absolutely necessary for the jury to hear through the testimony of an expert such as myself, in order for the jury members to get some idea of how Clinton Young became involved with the criminal element, and to give them a firm basis for finding the mitigating factors necessary to impose a judgment of life without parole instead of death.  Various pieces of the information contained herein were presented through competent witnesses, but there was not an expert that was able to "tie" all of the pieces together to give the jury the full story of Clint's life.  It is this "fully story" that could have helped the jury understand everything that affected Clint throughout his life.

Had I or some other competent expert been asked by counsel to present this story to the jury in the form of trial testimony at the penalty phase, and had the jury been presented with this evidence by competent counsel and a competent expert, there is a reasonable probability that the

jury would have returned a verdict of life without parole

instead of a death sentence.

(Ex. 96 at ¶¶ 185-86 [Decl. of Knox].)

1181. Based upon the above, the direct interference in the defense

punishment case, by the prosecution, rendered Young's trial fundamentally unfair.

*Wainwright*, 477 U.S. at 183.  Had the defense been permitted to present Young's

social history to the jury, one juror may have voted for life imprisonment.  *Wiggins*

*v. Smith,* 539 U.S. 510, 537, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (relief

required when "there is a reasonable probability that at least one juror would have

struck a different balance"); *Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) ("A

reasonable probability that . . . one juror considering the original and newly raised

evidence together would have voted for life imprisonment satisfies this [prejudice]

standard."); *Foster v. Johnson*, 293 F.3d 766, 784 (5th Cir. 2002) (discussing

whether the defense mitigation evidence "would have altered at least one juror's

balancing determination in favor of life").

1182. Moreover, independent of the prosecutorial misconduct claim, the trial

court's failure to rule on Byington's ability to conduct the investigation he was

appointed to do was a violation of Young's due process rights.  As stated above, the

trial court only funded Byington for work completed from February through April

of 2002.  And while Byington submitted further billing requests, and the court held

two hearings on Byington's ability to act as a mitigation specialist on this case, the

court never made a ruling as to this issue.  This, despite the fact the court

acknowledged at the conclusion of the November 2002 hearing that it would "report

to you as quickly as I can. . . . I know it's of -- time is growing of [sic] essence in

this matter.  I'll try to get it resolved as quickly as I can for you."  (10 RR at 29-30.)

However, the court made no ruling, and only partially funded Byington's work *after*

the conclusion of trial.  (Ex. 65 [Final Payment].)

380

1183. Finally, independent of the prosecutor's improper interference, and the trial court's failure to rule on the issue, Young's trial counsel was ineffective for failing to press the court for a ruling. At a minimum, counsel should have either: (1) hired a mitigation specialist who was a licensed private investigator or: (2) hired a private investigator to conduct the interviews and then have given that information to Byington so he could complete his bio-psychosocial history.

1184. It was incumbent upon trial counsel "to locate and interview the client's family members, and virtually everyone else who knew the client and his family." Guideline § 10.7; *see Wiggins*, 539 U.S. at 516. But despite the fact that "in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances," *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cr. 2002), the defense was without a mitigation expert/bio-psychosocial historian from June of 2002 until the conclusion of trial.

1185. Because trial counsel failed to press the court for a ruling, or, at a minimum, hire a licensed private investigator to complete that portion of Byington's work, counsel's performance was objectively unreasonable. *See Wiggins*, 539 U.S. at 527-28 ("counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible"); *Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008) (prejudicial failure to conduct timely and complete mitigation investigation); *Sonnier*, 476 F.3d at 358 (finding trial counsel provided deficient performance by conducting only cursory interviews of some family members because "the trial attorneys stopped short of making a reasonable investigation for purposes of uncovering relevant mitigating evidence").

**CLAIM TWENTY-EIGHT:  THE PROSECUTOR ENGAGED IN MULTIPLE INSTANCES OF MISCONDUCT THROUGHOUT THE PUNISHMENT PHASE**

1186.  Young's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecutor engaged in multiple instances of misconduct through Young's punishment phase, including erroneously stating that Young had confessed to the Douglas shooting, improperly presenting a victim impact statement from Mark Ray, and erroneously telling the jury that Young had not expressed remorse for the death of Petrey and Douglas.  These claims, individually, or when combined with the other instances of misconduct alleged throughout the instant Petition, denied Young a fair trial and warrant relief.

1187.  *Exhaustion*:  This claim was presented as Claims 12, 13, and 14 of the Successor Petition filed in the Texas Court of Criminal Appeals.  (See Exs. 51, 54.)

1188.  If Respondent disputes any of the facts alleged below, Young  requests an evidentiary hearing so that the factual disputes may be resolved.  After Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

1189.  The declarations and other exhibits accompanying this Petition, as well as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

1190.  The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

1191.  Although prosecutorial discretion is broad, it is not unlimited. *Belmontes v. Brown*, 414 F.3d 1094, 1126 (9th Cir. 2005), *overruled on other*

382

*grounds sub nom.*, *Ayers v. Belmontes*, 549 U.S. 7, 127 S. Ct. 469, 166 L. Ed. 2d 334 (2006); *United States v. Batchelder*, 442 U.S. 114, 125, 99 S. Ct. 2198, 60 L. Ed. 2d 755 (1979).  Rather, "prosecutorial discretion is subject to constitutional constraints." *United States v. Armstrong*, 517 U.S. 456, 464, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996) (internal quotations omitted).

1192.  In all cases, but especially during a capital trial, a prosecutor must not simply pursue a conviction, but rather, must seek to ensure that justice is done. *Kyles v. Whitley*, 514 U.S. 419, 439, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (citing *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935)).  Likewise, the decision to charge the death penalty cannot rest on criteria that offend the Constitution.  *McCleskey v. Kemp*, 481 U.S. 279, 293, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987).

1193.  A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair.  *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (quoting *Darden v. Wainwright*, 477 U.S. 168, 183, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)); *see Greer v. Miller*, 483 U.S. 756, 765, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987) (prosecutorial misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).  The federal habeas court must distinguish between "ordinary trial error of a prosecutor and that sort of egregious misconduct . . . amount[ing] to a denial of constitutional due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647–48, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).

383

**A.   The Prosecutor Improperly Stated that Young Confessed to the Douglas Murder**

1194. During the punishment phase argument, the prosecutor argued to the jury that Young had admitted to killing Douglas.  However, no such evidence had ever been introduced at trial.  (36 RR at 95.)  The prosecutor committed misconduct when she improperly told the jury that Young confessed to the Douglas murder even though there was nothing in the record and no one testified to this fact.

**B.   The Prosecutor Improperly Presented a Victim Impact Statement by Mark Ray**

1195. District Attorney Rick Berry improperly presented a victim impact statement by co-defendant Mark Ray.  This statement could have influenced the jury to hold Ray less accountable and add weight to his testimony.

1196. During his direct examination, Ray testified about the impact that shooting Doyle Douglas had on his life.  The district attorney asked him how "did that make you feel, shooting a man in a muddy ditch in the head?"  (22 RR at 128).  Ray testified that it made him "feel low," that he had to "think about it every day," that he could not sleep, that he has to "live with it," and it's something that he wouldn't wish on anyone.  (22 RR at 128.)  The district attorney asked him again, "how were you feeling" and Ray answered that it was the "worst tragedy" that had ever happened to him.  (22 RR at 129.)

1197. The prosecutor also later asked Ray, "How has this affected you since November 21st, Mark?"  (22 RR at 148.)  Ray answered: "mentally it's been a downhill slide since that night occurred."  (*Id.*)  Trial counsel objected to this last question after Ray answered it on relevance grounds.  The trial court sustained the objection.  (*Id.*)

1198. The district attorney tried to defend this question, saying that Ray was "in some respects a victim of the actions of the Defendant and I think that's

384

pertinent here to show that he's been cooperative and how this has affected him." (*Id.*)  However, Ray was not a victim; he was charged as a co-perpetrator of the Douglas shooting and ultimately pled guilty to kidnaping, a second degree felony, and got a fifteen year prison term in exchange for testifying against Young.  Young incorporates herein by reference Claim One.

1199.  Although victim impact testimony is generally admissible, Ray was not a victim in this case and the trial court violated Young's due process rights by allowing all of the above-referenced impact testimony into evidence.  Further, trial counsel was ineffective for failing to continuously object to this line of questioning by the district attorney.  Young was prejudiced by this testimony because it lent credibility to Ray's story and unfairly influenced the jury to feel that Ray was not responsible for the shooting of Douglas.

## C.   The Prosecutor Violated the Judge's Ruling, and her own Objections, on Hearsay When She Told the Jury That Young Had Not Expressed Remorse

1200.  The prosecutor committed misconduct when she objected each time a defense witness was asked whether Young had ever expressed remorse, and then argued to the jury that Young never expressed remorse.  *See Thomas v. State*, 519 S.W.2d 430 (Tex. Crim. App. 1975).

1201.  At the punishment phase, the prosecutor successfully objected when defense counsel attempted to elicit evidence from witnesses that Young was remorseful about the crimes.  (See 33 RR at 138, 142-43.)  However, in closing, the prosecutor argued to the jury that Young never showed remorse:  "Did you ever once hear from any witness any remorse for the death of these men at this punishment phase?  No, you didn't.  Not any.  Not from a single witness that testified."  (36 RR at 94.)  This argument amounted to misconduct.  *See Commonwealth v. Mosby*, 11 Mass.App. 1 (App. Suffolk 1980) ("it is particularly

improper for a prosecutor to call the jury's attention to an absence of evidence when the absence is a result of the prosecutor's objection to the introduction of that evidence"); *Thomas v. State*, 519 S.W.2d 430 (Tex. Crim. App. 1975) (prosecutor's argument that the defendant's niece did not testify because she was afraid of her uncle was not supported by the record and therefore constituted an improper argument).

1202.  The foregoing violation of Young's rights by the prosecutor's misconduct had a substantial and injurious effect or influence on his conviction and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice. *Beck v. Alabama*, 447 U.S. 625, 637–38, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980); *Chambers v. Mississippi*, 410 U.S. 284, 298, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) (the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair.)

## CLAIM TWENTY-NINE:  THE PROSECUTOR KNOWINGLY PRESENTED THE FALSE TESTIMONY OF WITNESS TIMMONS

1203.  Young's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecutor knowingly presented to the jury false evidence, without which the jury would not have sentenced Young to death.

1204.  *Exhaustion*:  This claim was presented as Claim 11 of the Successor Petition filed in the Texas Court of Criminal Appeals.  (See Exs. 51, 54.)

1205.  If Respondent disputes any of the facts alleged below, Young  requests an evidentiary hearing so that the factual disputes may be resolved.  After Young has been afforded discovery and the disclosure of material evidence by the State, the use of this Court's subpoena power, and the opportunity to investigate fully, counsel requests an opportunity to supplement or amend this Petition.

1206.  The declarations and other exhibits accompanying this Petition, as well

386

as the allegations and facts set forth elsewhere in this Petition, are hereby incorporated by reference into this claim as though set forth in full.

1207. The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

1208. The Due Process Clause of the Fourteenth Amendment forbids the State from knowingly using perjured testimony. *Giglio v. United States*, 405 U.S. 150,153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). To prove that the state violated the Fourteenth Amendment by relying on such testimony, including relying on such testimony at the punishment phase, the petitioner must show "(1) that a witness for the State testified falsely; (2) that such testimony was material; and (3) that the prosecution knew that the testimony was false." *Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000). Here, Young meets can prove all three elements.

1209. During the punishment phase, Jacqueline Timmons, a juvenile correctional officer at TYC, testified to a fight that broke out between Young and another youth. According to Timmons, she was injured while trying to break up the fight as both Young and the other youth punched her on the upper body. Timmons also testified that another correctional officer was injured in this same altercation. (31 RR at 291-92.)

1210. On cross examination, defense counsel questioned Timmons about the actual January 2000 incident report. Specifically, counsel asked Timmons whether the written report stated that she was assaulted by Young. Timmons testified that the report counsel had was merely a synopsis, and the actual incident report contained the information that Timmons was assaulted by Young. (31 RR at 301.)

1211. Timmons's testimony was false. In reality, the report Timmons referred to made no mention of any assault that Young inflicted on Timmons. (*See* Ex. 20 [incident report].) Counsel's failure to impeach Timmons with the actual

report was ineffective.  *Strickland*, 466 U.S. at 694.  The prosecutor, having had possession of the report itself, knew or should have known that Timmons's testimony was false.

1212.  Young was prejudiced by Timmons's false evidence.  With the false evidence seen as credible to the jury, the jurors were left with the impression that Young was a dangerous person while in custody who would be a threat to guards in prison, which supported the prosecutor's future dangerousness argument.  Had the jury known that Young did not assault Timmons, there is at least a reasonable probability that they would not have found him to be a future danger and would not have sentenced him to death.

## VI.

## PRAYER FOR RELIEF

WHEREFORE, Clinton Lee Young prays that the Court:

1.     After full consideration of the issues raised in this Petition, issue a writ of habeas corpus to the end that Young might be discharged from his unconstitutional confinement and restraint and relieved of his unconstitutional convictions and sentences of death and other sentences;

2.     Order Respondent to answer this Petition by specifically admitting or denying each allegation and claim herein;

3.     Permit Young, who is indigent, to proceed without prepayment of costs and fees and grant him authority to obtain subpoenas without fees for witnesses and documents necessary to prove the facts alleged in this Petition;

4.     Conduct an evidentiary hearing at which proof may be offered concerning the allegations in this Petition or any affirmative defenses presented by Respondent;

5.     Require Respondent to bring forth the entire state court record so that the Court can review those parts of the record that are relevant to the issues and

388

defenses raised in this proceeding;

      6.     Continue the stay of Young's execution pending final disposition of this matter;

      7.     Grant Young sufficient funds to secure investigation and expert assistance as necessary to prove the facts alleged in this Petition;

      8.     Grant Young the authority to obtain subpoenas for witnesses and documents;

      9.     Grant Young the authority to conduct discovery;

      10.    Permit Young to amend this Petition, if necessary; and,

      11.    Grant such other and further relief as may be appropriate and necessary to dispose of the matter as justice may require.

 

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

 

Dated: October 18, 2012      By _/s/ Margo A. Rocconi_ 
                              MARGO A. ROCCONI
Deputy Federal Public Defender

Attorneys for Petitioner
CLINTON LEE YOUNG

# VII.

## VERIFICATION OF PETITION

I, Margo A. Rocconi, declare as follows, under penalty of perjury:

1.      I am an attorney admitted to practice law in the State of California and am an attorney with the Office of the Federal Public Defender.  I am admitted to practice in this Court.

2.      I have read the foregoing Petition for Writ of Habeas Corpus and declare that the facts alleged are true to the best of my knowledge based upon my reading of what I know to be true copies of documents in this action.

3.      I am authorized by Clinton Lee Young to file this Petition for Writ of Habeas Corpus on his behalf.  I make this verification because Young is incarcerated in a state different than that in which my office is located, and because the truth and accuracy of the facts contained herein are more within my knowledge than that of Young.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 18th day of October, 2012, at Los Angeles, California.

_/s/ Margo A. Rocconi_
MARGO A. ROCCONI
Deputy Federal Public Defender

390

## VIII.

## VERIFICATION REGARDING AUTHENTICITY OF EXHIBITS

I, Margo A. Rocconi, declare as follows, under penalty of perjury:

1.      I am an attorney admitted to practice law in the State of California and am a Deputy Federal Public Defender appointed to represent Clinton Lee Young, who is confined and restrained of his liberty at the Polunksy Unit, Livingston, Texas.

2.      The originals of all Exhibits filed by Young are in the custody and control of counsel for Young whose office is located at 321 East 2nd Street, Los Angeles, California.  Viewing of the originals are available upon request.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on October 18, 2012, at Los Angeles, California.


                                               */s/ Margo A. Rocconi*
                                               MARGO A. ROCCONI
                                               Deputy Federal Public Defender

391