THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

CLINTON LEE YOUNG,                        §
            Petitioner,           §
                  §
v.                                        §          No. 7:07-cv-00002-RAJ
                  §          DEATH PENALTY CASE
RICK THALER,                              §
Director, Texas Department of             §
Criminal Justice, Correctional            §
Institutions Division,                    §
            Respondent.          §

**RESPONDENT THALER'S SECOND AMENDED ANSWER
WITH BRIEF IN SUPPORT**

Petitioner Clinton Lee Young shot and killed Samuel Petrey and Doyle Douglas in November 2001. A Texas jury subsequently convicted Young of capital murder and sentenced him to die. Following unsuccessful direct appeal and state writ proceedings, Young sought relief in this Court pursuant to 28 U.S.C. §§ 2254 and 2241 with a federal habeas petition. Young then obtained new attorneys, who filed an amended petition and asked the Court to stay the case so that Young could return to state court and present certain unexhausted claims. The Court acquiesced to the stay, and Young returned to state court. But Young found no relief in that forum and has now returned to this Court with a second amended petition. Yet as shown below, Young still fails to demonstrate that he is entitled to any relief. He does not show that the state courts unreasonably applied clearly established federal law in

rejecting his claims; nor does he overcome the state courts' factual findings with clear and convincing evidence.   Accordingly, Young's bid for federal habeas relief should be denied.[1]

## YOUNG'S ALLEGATIONS

The Director understands Young to allege that:

(1)     the prosecution failed to disclose exculpatory evidence of purported plea deals made with witnesses Mark Ray and David Page, presented false testimony regarding the same, and violated Young's Confrontation Clause rights by not signing the purported plea deals before Young's trial;

(2)     the trial judge was not impartial;

(3)     Young's jury lacked a vehicle for expressing its reasoned moral response to Young's mitigating evidence;

(4)     Young did not receive effective assistance of counsel;

(5)     the evidence was insufficient to show that the killings occurred in the same criminal transaction or in different criminal transactions committed pursuant to the same scheme or course of conduct;

(6)     the evidence was insufficient to find that the Petrey murder occurred in the commission of a robbery or a kidnaping;

(7)     the trial court violated Young's constitutional rights by disallowing impeachment evidence of David Page;

(8)     Young was denied an impartial jury when a venire person was struck for expressing reservations about the death penalty;

---

[1]     The Director denies all allegations of fact made by Young except those supported by the record and those specifically admitted herein.

(9)     the Texas offense of murder in the course of kidnaping is unconstitutional;

(10-11)     Young's rights to due process and the freedom from cruel and unusual punishments were violated because the prosecutor had unfettered discretion in making the decision to seek the death penalty;

(12)     the evidence was insufficient to warrant an affirmative finding by the jury to Texas capital-sentencing Special Issue No. 2;

(13)     the trial court's supplemental instruction regarding Special Issue No. 2 violated Young's constitutional rights;

(14)     Sheriff Painter's lunch with the jury denied Young a fair and impartial punishment phase;

(15)     since Young was eighteen at the time of the offense and purportedly suffers from Attention Deficit Hyperactivity Disorder (ADHD), he is ineligible for the death penalty;

(16)     the trial court did not instruct the jury on the burden of proof on the mitigation issue, and the punishment charge failed to give proper guidance to the jury regarding the heightened standard required for a death penalty case;

(17)     the Court of Criminal Appeals's refusal to review the sufficiency of the mitigating evidence violated Young's constitutional rights;

(18)     the evidence was insufficient for the jury to find Young was a future danger;

(19)     Young could not be given the death penalty because the factors that would prevent such a sentence were not alleged in the indictment;

(20)     Texas's "12/10" rule is unconstitutional;

(21)   Young's constitutional right to have his sentencing jury fully consider and give effect to his mitigating evidence was violated when the trial court did not advise the jury of the consequences of their failure to agree on the resolution of the special issues;

(22)   Young did not receive effective assistance of appellate counsel;

(23)   the cumulative effect of all errors rendered Young's trial fundamentally unfair;

(24)   Young is innocent of capital murder;

(25)   the prosecution suppressed evidence concerning State witness A.P. Merillat;

(26)   the prosecution lost or destroyed key evidence;

(27)   the prosecution interfered with the defense's investigation and presentation of its mitigation case;

(28)   the prosecution engaged in misconduct; and

(29)   the prosecution knowingly presented the false testimony of a witness.

*See generally* DE 87 (Second Amended Petition).

## STATEMENT OF THE CASE

A grand jury indicted Young for capital murder.  1 CR[2] 4-5.  As subsequently amended, the first paragraph of the indictment alleged that Young intentionally and knowingly caused the deaths of Samuel Petrey and Doyle Douglas during different criminal transactions but pursuant to the same scheme and course of conduct.  4 CR 754-56.  The second paragraph alleged that Young intentionally and knowingly caused the death of Petrey during the course of committing the offenses of kidnaping and robbery.  *Id.* On March 26, 2003, a jury found Young guilty as charged in the indictment. 5 CR 867-68.  After hearing additional evidence on punishment, the jury answered "yes" to the first special issue, which asked whether Young posed a continuing threat to society, answered "yes" to the second special issue, which asked whether Young had actually caused the death of the deceased, and "no" to the third special issue, which asked whether there were sufficient mitigating circumstances to warrant a life sentence.  *Id.* at 868-69. Consequently, the trial court entered judgment finding Young guilty of capital murder and sentencing him to death.  *Id.* at 866.  Appeal was

---

[2]   "CR" refers to the clerk's record of pleadings and documents that were filed with the trial court.  "RR" refers to the court reporter's transcript of the trial proceedings.  "SHCR-01, -03" refer to the clerk's records of pleadings and documents filed during Young's respective state habeas proceedings.  "SHRR-01, -03" refer to the court reporter's transcripts of Young's respective state habeas proceedings. "DE" refers to entries on Court's electronic case docketing system, available on PACER.  All references are preceded by volume number and followed by page numbers, where applicable.

automatic, and the Court of Criminal Appeals affirmed the judgment of the trial court.  *Young v. State*, No. 74,643 slip op. (Tex. Crim. App. Sept. 28, 2005) (unpublished).  The Supreme Court refused Young's petition for a writ of certiorari.  *Young v. Texas*, 547 U.S. 1056 (2006).

With his direct appeal pending, Young filed a state application for a writ of habeas corpus, alleging fourteen grounds for relief.  1 SHCR-01 1.  After filing his petition, Young also submitted a list of pro se complaints and additional claims.  5 SHCR-01 674, 759; DE 87 at at Petitioner's Exhibits 51, 54.  Following a hearing, the state habeas court entered its findings of fact and conclusions of law.  2 SHCR-01 163-289.  Based on those findings of fact and conclusions of law—as well as on its own review of the state court record—the Court of Criminal Appeals denied Young's request for habeas relief with regard to his original fourteen claims.  *Ex parte Young*, Nos. 65,137-01, -02 (Tex. Crim. App. Dec. 20, 2006).  The Court of Criminal Appeals also denied relief on Young's pro se and late-filed claims, finding that they constituted an impermissible successive application.  *Id.*

Young then filed a petition for habeas relief in this Court pursuant to 28 U.S.C. §§ 2254 and 2241.  DE 18.  The Director answered the petition and moved for summary judgment.  DE 34.  But before the Director responded, the Court appointed new counsel for Young.  DE 29.  Young's new attorneys filed an amended petition, raising new claims and expanding on Young's

prior claims.  DE 51.  Concurrently with his amended petition, Young filed a motion to stay and abate the case in order to return to state court and exhaust three of his new claims.  DE 52.  Over the Director's opposition, the Court granted the stay, and Young returned to state court.  DE 72.  Following a hearing in which both sides were given the opportunity to present testimony and evidence, the state trial court issued its findings and conclusions and recommended the denial of Young's third state habeas application.  10 SHCR-03 2692-844.  Based on this recommendation—as well as its own review of the record—the Court of Criminal Appeals denied the application.  *Ex parte Young*, No. 65,137-03 (Tex. Crim. App. Jun. 20, 2012).  Young appealed this determination to the Supreme Court, but the Court denied certiorari review.  *Young v. State*, No. 12-6386 (Jan. 7, 2013).

Returning to this Court, Young filed his second amended federal habeas petition on October 18, 2012.   DE 87.   The instant proceeding followed.

## STATEMENT OF THE FACTS

I.    **Facts of the Crime**[3]

On direct appeal the Court of Criminal Appeals accurately summarized

the facts of the crime in its discussion of the sufficiency of the evidence:

> On November 24, 2001, [Young], Darnell McCoy, Mark Ray, and David Page decided to drive to Longview to buy some marijuana. Because none of them owned a car, [Young] asked Douglas if he could borrow his car. Douglas refused, but offered to drive the group to Longview himself. When they arrived at their destination, [Young] shot Douglas in the head with a .22 caliber semi-automatic handgun. Ray testified that [Young] threatened the remainder of the group by saying, "If y'all don't get him in the trunk, you're going to be like him." Ray assumed that [Young] meant that they would also be shot. Ray, McCoy, and Page put Douglas in the trunk.
>
> The group then got back in the car and [Young] drove off. [Young] later told Ray that he needed Douglas's car to go see his girlfriend. [Young] stopped the car in a remote wooded area near a creek and ordered Ray, Page, and McCoy to take Douglas's body out of the trunk. The men complied and dragged Douglas's body down to the creek while [Young] smoked a cigarette. Page testified that [Young] told Ray that he was going to have to prove himself by shooting Douglas in the head. [Young] got a pillow from the car and held it against Douglas's head which was face-down in the creek. Ray shot Douglas in the head once more.
>
> Ray testified that [Young] then drove to a gas station and told his companions that one of them had to go to Midland with him to see his girlfriend because "[i]f y'all squeal, you know, by

---

[3]    Young produced a new summary of facts for his amended petitions. But many (of the exhibits underlying this summary were not presented to the state court until Young's third state habeas application. Consequently, the exhibits and the facts contained therein can only be considered in relation to those non-procedurally-barred claims raised in Young's third state habeas application. *See* Argument, Sections II(B) and XXX, below.

the time I hear about it, your friend's going to be dead."  Page volunteered to go, and [Young] took Ray and McCoy home. [Young] called his girlfriend, Amber Lynch, presumably to make arrangements to meet her, and learned that her father, Bart Lynch, was with her.  Page testified that [Young] realized that Bart would recognize Douglas's car because Douglas and Bart knew each other.  Thus, [Young] looked for another car to steal in Weatherford, but was unsuccessful.

The two then drove to Eastland and stopped at a Brookshire Brothers grocery store to get some gas.  Petrey was walking back to his pick-up truck from the grocery store when [Young] abducted him at gunpoint.  [Young] ordered Petrey into his truck and then drove off with Page following in Douglas's car. [Young] later stopped at a rest area and telephoned Amber.  Page testified that [Young] decided that they would slit Petrey's throat and "leave him somewhere."

[Young] got back in the truck, and Page continued to follow in Douglas's car until they could find a location to abandon Douglas's car.  Page testified that Petrey told [Young] that he was familiar with the area and knew of a place to hide Douglas's car.   According to Page, Petrey was compliant and helpful. Petrey directed them to another wooded remote area, and Page parked Douglas's car in some bushes.  [Young] then fired several shots into the car in an attempt to "blow it up" but was unsuccessful.

[Young], Page, and Petrey then drove toward Midland. They made several stops and eventually stopped at a Wal-Mart, where [Young] ordered Petrey to buy a $500 assault rifle. Because of the waiting period, Petrey was not able to leave with the rifle.  When they returned to the truck, [Young] called Amber again.  Bart got on the phone with [Young] and told him that he knew what had happened to Douglas.  Bart indicated that the police were looking for [Young] and Page.  He also indicated that Page's father knew about the situation and wanted Page to call him.  Page then called his father and, after speaking with him, told [Young] that he needed to be dropped off so that he could turn himself in.  [Young] refused and instead drove to a "pump-

jack site," where he told Page that they needed to "get rid of all the evidence."

Page testified that Petrey was leaning up against his truck smoking a cigarette when [Young] walked up to him and said, "Sorry, Sam, you know too much.  You got to die."  [Young] then shot Petrey twice.  Some blood splashed on the bumper of Petrey's truck, so [Young] ordered Page to clean it off.  The two then left in Petrey's truck.  After discussing what to do next, Page finally persuaded [Young] to drop him off at an IHOP so he could turn himself in.

*Young v. State*, No. 74,643 slip op. at 3-5.

## II.   Facts Relating to Punishment

On direct appeal the Court of Criminal Appeals provided the following summary of the punishment evidence in its discussion of Young's future dangerousness:

In addition to the evidence offered at the guilt phase, the [S]tate's punishment evidence showed that on November 23, 2001, the day before the murders charged in this case, [Young] burglarized a sporting goods store in Diana, Texas, and stole several guns, and that on November 20, 2001, [Young] and several accomplices broke into the home of Carlos Torres Ramos with the intent to rob him.  Ramos was able to barricade himself in a closet where he had a .22-caliber rifle.  [Young] and his accomplices shot at Ramos through the closet door and, although Ramos was hit twice, he survived.  Ramos managed to get a shot off and wounded one of [Young]'s accomplices.  When the others retreated, [Young] reloaded his gun and said, "Let's go back and kill the mother fucker."

[Young]'s girlfriend, Amber Lynch, testified that on September 8, 2001, she was riding in a car with [Young] when she learned from listening to a cell-phone call that [Young] intended to commit a robbery of a Dairy Queen.  [Young] colluded with Barbara McCord, a Dairy Queen employee, to fake the

robbery while McCord was depositing the nightly receipts. The two did, in fact, commit the robbery.

The [S]tate also presented evidence that [Young] committed assault and attempted to commit sexual assault while he was confined at the Waco Home for Youth. [Young] and his roommate, Nathan Wendell, were wrestling when a necklace that [Young] was wearing broke. [Young] became so enraged that he began to punch, slap, and hit Wendell. During the altercation, [Young] pulled his pants down and ordered Wendell to suck his penis. Wendell refused, turned his head, and [Young]'s penis touched Wendell's ear. Wendell testified that the confrontation lasted for approximately an hour.

Dr. Helen Short, a psychiatrist at the Waco Home for Youth, testified that [Young] had nine instances of violence in the 100 days he lived at the home. She testified further that he had been diagnosed with attention deficit disorder, a conduct disorder, and a disorder of written expression. She considered him "very dangerous."

As a juvenile, [Young] was adjudicated for two charges and committed to the Texas Youth Commission [(TYC)] in July 1998. He was released in February 2001. In the commission of unauthorized use of a motor vehicle, [Young] stole a neighbor's car and took the neighbor's children, who were eight and twelve years old. He stole a gun from his mother and began driving to Louisiana with the children, but was quickly caught. [Young] also served time for burglary of a building. During the commission of that offense, [Young], his half-sister, and two friends stole alcohol, cigarettes, and candy from a store.

*Young v. State*, No. 74,643 slip op. at 6-7.

## STANDARD OF REVIEW

Confined pursuant to a state court judgment, Young is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Thus, any claims Young raises which are based solely on alleged violations of state law should be denied as a matter of law.

Habeas relief is also inappropriate for claims which are either unexhausted and procedurally defaulted, or claims which were exhausted yet were dismissed in a successive state habeas application and, thus, are also procedurally defaulted.  Indeed, under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal habeas application shall not be granted unless:

    (A)    the applicant has exhausted the remedies available in the courts of the State; or

    (B)    (i)    there is an absence of available State corrective process; or

            (ii)    circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  Moreover, a writ may be denied on the merits, notwithstanding any failure to exhaust available state court remedies.  28 U.S.C. § 2254(b)(2).

Regarding exhausted claims, under AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has explained that a state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent but reaches an opposite result.[4] (*Terry*) *Williams*, 529 U.S. at 405-06.

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the

---

[4] "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court reaches its decision." *Id.* at 71-72 (citing (*Terry*) *Williams*, 529 U.S. at 405, 413, and *Bell v. Cone*, 535 U.S. 685, 698 (2002)).

"unreasonable application" clause. *Id.* at 406. To this end, a state court unreasonably applies Supreme Court precedent *only if* it correctly identifies the governing precedent but unreasonably applies it to the facts of the particular case. *Id.* at 407-09. And as the Supreme Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree* that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

Thus, "a state court's only decision that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2002)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable, "whether or not [this Court] would reach the same conclusion."). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The

-14-

more general the rule, the more leeway the courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 644.   This is particularly true when reviewing a state court's application of *Strickland v. Washington*, 466 U.S. 668 (1984), which when analyzed in conjunction with § 2254(d) creates a difficult to surmount and "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 786.

It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable:

> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court litigation of claims already rejected in state proceedings.  It preserves the authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with this Court's precedents.  It goes no farther.  [28 U.S.C. §] 2254(d) reflects the view that habeas corpus is a "guard against *extreme malfunctions* in the state court criminal justice systems, *not a substitute for ordinary error correction through appeal.*"

*Id.* (emphasis added, internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate

legal conclusion the state court reached and not on whether the state court considered and discussed every angle of the evidence;" *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review only the state court's decision, not its reasoning or written opinion[.]").  And a state court's decision need not expressly cite any federal law or even be aware of applicable Supreme Court precedent in order to be entitled to deference.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the result does not contradict Supreme Court precedent).

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficiently to satisfy the AEDPA bar" under either the "contrary to" or "unreasonable application" standard. (*Terry*) *Williams*, 529 U.S. at 381.  Stated differently:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement*.

*Richter*, 131 S. Ct. 786-87 (emphasis added).  And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply it to the facts at hand" because such a

process suggests the proposed rule is not "clearly established." *Alvarado*, 541 U.S. at 666.

Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "This presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which would challenge a state court finding must have been presented to the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (explaining that § 2254(d)(1) "refers in the past tense, to a state court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law." This language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the time, i.e., the record before the state court."). Further, because a federal habeas court is also prohibited from granting relief unless a decision was based on an "unreasonable determination of the facts in light of the evidence *presented in*

*the state court proceeding*," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254 (d)(2) (emphasis added).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found him guilty.  28 U.S.C. § 2254(e)(2).  A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Beazley v. Johnson*, 242 F.3d 248, 272-73 (5th Cir. 2001).  For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2). (*Michael*) *Williams*, 529 U.S. at 433; *Beazley*, 242 F.3d at 273.  But even if a petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to

make an informed decision on the merits.  *Clark v. Johnson*, 227 F.3d 273, 284-85 (2000).

## ARGUMENT

**I.      Young's *Brady*[5], *Napue*[6], and Confrontation Clause Claims Are Barred by the Statute of Limitations.     Alternatively, the State Court Reasonably Determined that There Were No Constitutional Violations. (Claim No. 1)**

In his first claim for relief, Young argues that: (1) the prosecution violated *Brady* by failing to disclose impeachment evidence that witnesses/co-accomplices David Page and Mark Ray were purportedly offered plea bargains by the State; (2) the prosecution knowingly presented the allegedly perjured testimony that Page and Ray had not engaged in plea negotiations with the district attorney; and (3) the alleged nondisclosure of the plea negotiations constituted a Confrontation Clause violation.  DE 87 at 58-123. However, these claims are all barred by the statute of limitations.  And, in the alternative, the state court reasonably found that they were meritless, precluding relief under AEDPA.

Concerning the merits, Young alleges that the prosecution offered Ray numerous plea bargains that were never disclosed to the defense.  *Id.* at 63-66.   Young also alleges that the prosecution failed to disclose material

---

[5]      *Brady v. Maryland*, 373 U.S. 83 (1963).

[6]      *Napue v. Illinois*, 360 U.S. 264 (1959).

evidence of an "inducement" for his testimony allegedly proffered by the district attorney—namely, a statement that the district attorney would "probably" make him a plea offer. *Id.* at 74-76. Young complains that the district attorney's statement that he would "probably" make Ray an offer constituted materially favorable evidence that the State failed to disclose to his defense team. *Id.* at 85-96. Young asserts that this constitutes a *Brady* violation and further contends that the prosecution committed a *Napue* violation by presenting Ray's allegedly false testimony. *Id.* at 116-18. Young complains that the prosecution further committed a *Brady/Napue* violation by failing to disclose the existence of yet another deal between the prosecution and Page and then presenting Page's allegedly false testimony. *Id.* at 66-68, 76-78

While the state court found that the district attorney's statement could have constituted "a motive or inducement"[7] to Ray for his friendly testimony and further that this statement was never disclosed to the defense, the state court correctly found that there was never any express or implied plea bargain between the prosecution and Ray. 10 SHCR-03 2757. And to the

---

[7]   Young complains that the state court failed to find that the district attorney's statement constituted favorable evidence that the prosecution was obligated to disclose. DE 87 at 95-96. But Young's argument is confused on this point. Indeed, Young seems to acknowledge that the state court agrees with him that this statement could have constituted an undisclosed inducement to Ray. DE 87 at 95-96; 10 SHCR-03 2757.

extent that the district attorney's statement should have been disclosed, the state court properly found that the statement was not material.  *Id.* at 2794-2800, 2839-43.  As for Page, the state court found the prosecution made no express or implied agreement with Page prior to trial, and Page himself denied the existence of any such agreement.  10 SHCR-03 2821; 4 SHRR-03 45-48.  But regardless, the state court found no materiality with regard to any undisclosed agreement with Page even if such an agreement did exist.  As shown below, these conclusions are undeniably correct.

In his petition, Young argues that the state court unreasonably denied relief on his claims because the state court failed to take into account how the undisclosed information would have affected the defense team's trial preparation.  DE 87 at 82-89.  But the state court observed several factors in favor of a determination that any undisclosed information or inducement was immaterial; in particular: (1) the overwhelming evidence of Young's guilt; (2) a co-accomplice witness instruction highlighting Ray's and Page's lack of credibility; and (3) the fact that Ray's and Page's trial testimony comported with their earlier statements.  10 SHCR-03 2794-2800, 2839-43.  In light of this, Young's contentions that the state court botched its *Brady* analysis are unavailing.

As for Young's Confrontation Clause claim, his argument that he is entitled to de novo review because the state court did not enter findings and conclusions concerning that claim is unfounded. DE 87 at 118-23. When a state court summarily dismisses a claim without any opinion whatsoever, that decision is still be entitled to deference by the Court. *Richter*, 131 S. Ct. at 784. But even if he were entitled to de novo review, Young concedes that a plurality of the Supreme Court has found that the State's nondisclosure of evidence does not constitute a Confrontation Clause violation. DE 87 at 120 n.42. Moreover, to the extent that there was Confrontation Clause error, such error was plainly harmless in light of the state court's finding that there was overwhelming evidence against Young and the entirety of the record.

Indeed, it is clear that the state court's decision with regard to these claims was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, nor resulted in a decision that was contrary to, or involve an unreasonable application of, clearly-established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d). As such, granting relief on this claim is barred by AEDPA.

**A.     Young's *Brady*, *Napue*, and Confrontation Clause claims are barred by AEDPA's statute of limitations.**

A one-year period of limitation applies to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court.  28 U.S.C. § 2244(d)(1).  Specifically, the statute of limitations created by § 2244 of AEDPA provides:

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –

(A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)    The time during which a properly filed application for State

> post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d) (2004).

Young filed his original federal petition on the last day permitted by the statute of limitations—December 20, 2007.[8]   DE 18, 19.  Young's first amended petition raising this claim was not filed until October 20, 2008.  DE 51.  The instant second amended petition was filed October 18, 2012.  DE 87.  Accordingly, any new claims presented within Young's amended petitions were raised after the expiration of the statute of limitations.

The Supreme Court recognizes that AEDPA's statute of limitation bars any new claims interjected into an amended habeas petition unless they "relate back to the date of the original pleading" as understood by Federal Rule of Civil Procedure 15(c)(2).  *Mayle v. Felix*, 545 U.S. 644 (2005).  Under *Mayle*, claims in an amended habeas petition will relate back to the original filing "only when the claims added by amendment arise from the same core facts as the timely filed claims, and not when the new claims depend upon

---

[8]     Young filed his first state habeas application while his direct appeal was still pending.  Allowing tolling for this application, Young's federal petition was due 365 days after the application's denial by the Court of Criminal Appeals.  28 U.S.C. § 2244(d)(2).  The Court of Criminal Appeals denied Young's first and second applications on December 20, 2006.  *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 6, 2006.

events separate in 'both time and type' from the originally raised episodes."
*Id.* at 657.  "If claims asserted after the one-year period could be revived
simply because they relate to the same trial, conviction, or sentence as a
timely filed claim, AEDPA's limitation period would have slim significance."
*Id.* at 662.  Young's *Brady*, *Napue*, and Confrontation Clause claims were not
presented in Young's original federal petition.  *See generally* DE 18.  Nor do
they relate back to any of the claims contained therein.  Accordingly, these
claims are barred by the statute of limitations.

Additionally, Young has not alleged any facts that could support a
finding that equitable tolling applies.  *See Holland v. Florida*, 130 S. Ct. 2549
(2010) (holding that AEDPA's statute of limitations is subject to equitable
tolling).  The Fifth Circuit has long held that equitable tolling is available
only in "rare and exceptional circumstances."  *Davis v. Johnson*, 158 F.3d
806, 811 (5th Cir. 1999); *Flores v. Quarterman*, 467 F.3d 484, 486 (5th Cir.
2006) (citing *Felder v. Johnson*, 204 F.3d 168, 170-71 (5th Cir. 2000) (citation
omitted)).  It applies principally where the plaintiff is "actively misled by the
defendant about the cause of action or is prevented in some extraordinary
way from asserting his rights."  *Flores*, 467 F.3d at 487 (quoting *Coleman v.
Johnson*, 184 F.3d 398, 402 (5th Cir. 1999) (citation omitted)).  But, a "garden
variety claim of excusable neglect" does not support equitable tolling.

*Lookingbill v. Cockrell*, 293 F.3d 256, 264 (5th Cir. 2002) (citing *Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir. 1996)).

"Where [petitioner] could have filed his claim properly with even a modicum of due diligence, we find no compelling equities to justify tolling." *Rashidi*, 96 F.3d at 128; *see Fisher v. Johnson*, 174 F.3d 710, 715 (5th Cir. 1999) ("equity is not intended for those who sleep on their rights" (citation omitted)); *In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006) (same).  To be entitled to equitable tolling, Young must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" and prevented timely filing.  *Lawrence v. Florida*, 127 S. Ct. 1079, 1085 (2007) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).  Young's case does not present the necessary "rare and exceptional circumstances" to merit such tolling.[9]  *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999).

Extrapolating from his amended petition, it appears that Young may later attempt to argue that the affidavits from Page's attorney and Ray serve as the "factual predicate" for his claims and § 2244(d)(1)(D) is applicable.  DE 87 at 68-69, Petitioner's Exhibits 111, 117.  However, the statute of

---

[9]    To the extent Young claims that any attorney error in filing his first state writ entitles him to equitable tolling, "mere attorney error or neglect" cannot justify equitable tolling. *Cousin v. Lensing*, 310 F.3d 843, 848–49 (5th Cir. 2002); *U.S. v. Riggs*, 314 F.3d 796, 799 (5th Cir. 2002) (same); *Fierro*, 294 F.3d at 682 (neither "excusable neglect" nor ignorance of the law justifies equitable tolling) (citing *Coleman*, 184 F.3d at 402).

limitations runs from the point in time at which the factual predicate "could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D).  Young makes no showing that he could not have discovered these claims through the exercise of due diligence.  Indeed, these claims could have been discovered much earlier.  The Midland County District Attorney made its file available to prior state and federal habeas counsel.  DE 45, 47.  The witness affidavits supplied from Page's attorney and Ray do not indicate that these witnesses were unavailable from any period of time between the end of Young's trial and the time at which he secured their affidavits.  DE 87 at Petitioner's Exhibits 111, 117.  Accordingly, the Court must find these claims to be barred by the statute of limitations.

**B.    Young's *Brady* and *Napue* claims also fail on the merits.**

**1.    Standard of review**

In order to establish a *Brady* violation, Young must prove: (1) the evidence in question was favorable to him, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the evidence was material, i.e., prejudice ensued from its nondisclosure.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

With respect to prejudice, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1978). Rather, the evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id.*

In *Napue*, the Supreme Court held that it is a violation of the Fifth and Fourteenth Amendments for the prosecution to knowingly use perjured testimony.   A conviction must be set aside where the petitioner has demonstrated that: (1) a witness gave false testimony; (2) the falsity was material; and (3) the prosecution used the testimony knowing it was false. *May v. Collins*, 955 F.2d 299, 315 (5th Cir. 1992).  False evidence is deemed material for this analysis "if there is any reasonable likelihood that [it] could have affected the jury's verdict." *Giglio v. United States*, 405 U.S. 150, 153-54 (1972).[10]

---

[10]    The *Giglio* materiality standard—which embraces the harmless-error rule of *Chapman v. California*, 386 U.S. 18 (1967)—was abrogated by the Supreme Court's opinion in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *See Barrientes v. Johnson*,

### 2. Notwithstanding the district attorney's isolated statement, the state court reasonably found that there was no deal with Ray, either express or implied.

As noted in the Statement of Facts, Ray was a witness at the guilt/innocence phase of Young's trial.  22 RR 37-256.  He was granted use immunity for his testimony.  5 CR 802-03.  The jury was aware both that Ray was charged with capital murder for his role in the crime and that he had been granted use immunity for his testimony.  22 RR 36-37.

On September, 24, 2002, the trial judge granted the defense's motion that the State "disclose to the defense the existence of any agreement, written or unwritten, expressed or implied with the witness or with the witness's agent which could possibly influence the witness's testimony in the above entitled and numbered cause."  1 CR 142.  A pretrial hearing was held on the issue.  Rick Berry, the former District Attorney of Harrison County, Joe Black, the present District Attorney of Harrison County, and Hall Reavis, an investigator employed by the Office of the District Attorney of Harrison County, all testified at the hearing.  2 Supp. RR 108-40.  Berry denied that he

---

221 F.3d 741, 756-57 (5th Cir. 2000) (assuming *Brecht* harmless-error standard applies to *Giglio* claims raised in federal habeas proceedings) (citing *Gilday v. Callahan*, 59 F.3d 257, 268 (1st Cir. 1995)).  Because this is a postconviction proceeding, the State no longer bears the onus of proving harmlessness of trial error under *Chapman*; rather, it is Young who must prove harm.  At a minimum, such a showing would require proof of materiality under *Bagley*, i.e., a reasonable probability that, but for the false testimony, the result of the proceeding would have been different.  473 U.S. at 682.

or anyone else made any deals with Ray.  *Id.* at 109-10, 111-13.  Reavis,
likewise testified that he was not aware of any deals with Ray.  *Id.* at 123-25,
125-28.  Black, who testified he was new to the job, did not state there was a
deal either.  *Id.* at 122-40.

During direct examination at Young's trial, Ray testified that he had
not received any preferential treatment from the prosecution. 22 RR 147-48.
On cross-examination, Ray admitted that the prosecution had leverage over
him and conceded the possibility that the prosecution might abandon the
death penalty based on his testimony.  *Id.* at 240-41.  Nevertheless, Ray
stated that he was not relying on it and that he had told the truth and that
he had done so consistently.  *Id.* at 206-07.  In subsequent state habeas
proceedings, however, Ray changed his story, detailing numerous offers that
the prosecution allegedly made him prior to Young's trial.  10 SHCR-03 2735-
38.

But Ray's allegations have been flatly contradicted by both Berry and
Ray's former attorney, Richard Hurlburt, at the subsequent writ hearing in
state court.  Hurlburt testified that he was appointed to represent Ray in
relation to the Douglas murder.  3 SHRR-03 70-71.  Contrary to his former
client, Hurlbert had no recollection of any of the district attorney's alleged
offers.  *Id.* at 94-98.  He also disagreed with Ray's assertion that Berry told

Ray not to publicly acknowledge that a plea bargain was in the works.  "We didn't have a plea bargain."  *Id.* at 90.  "There was no plea bargain."  *Id.*

Hurlburt did acknowledge, however, "It seems like the conversation that I recall with Rick Berry was something to the effect that he would probably make him and offer that he could not refuse."[11]  *Id.* at 76.  But on being questioned regarding whether statement constituted a plea offer, Hurlburt responded that the prosecution "wouldn't make me an offer because they didn't want to make a plea bargain prior to [Ray] testifying.  They weren't going to make any promises."  *Id.* at 97-98.  Hurlburt later reiterated, "They did not make me an offer.  We made no plea bargain prior to [Ray] testifying.  *Id.* at 98.

Former District Attorney Berry testified at the state writ hearing that he did not engage in plea bargaining with Hurlburt or Ray because Berry believed that Ray would be tried after Berry left office.  5 SHRR-03 92-95.  Berry stated that he did not have "any wink-and-nod agreement or anything like that" with Ray or make any "promise to [Hurlburt] or [Ray] for any reward or consideration for his testimony against [Young]."  *Id.* at 98, 105-06.  Berry denied making any of the alleged offers.  *Id.* at 98-106.

---

[11]    This is also reflected in the log of James Maxwell, Hurlburt's investigator.  2 SHRR-03 17.

Based on this testimony, the state court reasonably held that there were no plea agreements—either express or implied—between the prosecution and Ray.  10 SHCR-03 2757.  At most, the state habeas court found that Berry had stated to Ray's attorney prior to trial that Berry would "probably make him [Ray] an offer that he could not refuse" and this statement was not disclosed to the defense.  *Id.*

In his petition, Young argues that the state court erred in making this finding and should have instead credited the testimony of Ray and his mother.  DE 87 at 63-66, 74-76.  Young argues that this testimony shows that the district attorney made Ray a series of plea offers.  *Id.*  He also alleges that this testimony is bolstered by an alleged meeting between Ray and Young's prosecutors at a restaurant during trial.  *Id.*  However, federal courts must give deference to state court findings of fact unless they are based on an unreasonable interpretation of the evidence presented in the state court proceeding.  *Brewer v. Dretke*, 410 F.3d 773, 775 (5th Cir. 2005) (citing *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000) (as modified on denial of rehearing)).  In addition, any factual findings made by the state court in deciding a petitioner's claims are presumed correct under 28 U.S.C. § 2254(e)(1), unless the petitioner rebuts those findings with "clear and convincing evidence to the contrary."  *Smith v. Cockrell*, 311 F.3d 661, 668

(5th Cir. 2002).  And a trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are "virtually unreviewable" by the federal courts.  *Moore v. Johnson*, 194 F.3d 586, 605 (5th Cir. 1999).

Although Young obviously takes issue with the state court's assessment of the witnesses' credibility, the governing statute requires this Court to presume that the state court's credibility determinations are correct.  28 U.S.C. §§ 2254(d)(2), 2254(e)(1); *see also Valdez,* 274 F.3d at 948 n.11 (explaining that the presumption of correctness "not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact") (citations omitted).  While Young has suggested there is conflicting evidence regarding the nature of State's dealing with Ray, he has not presented the clear and convincing evidence necessary to surmount the state court's explicit and implicit credibility determinations.  It was clearly not unreasonable for the state court to rely on the testimony of respected members of the bar (including Ray's own attorney) to support its conclusions.

### 3. The state court reasonably found that there was no plea bargain with Page prior to Young's trial.

Young alleges that the prosecution suppressed evidence of a plea bargain between the prosecution and Page and then presented false evidence regarding the same. DE 87 at 66-68, 76-78. But the state court reasonably found that the prosecution could not have suppressed evidence of a deal with Page or presented false evidence concerning the same because there never was any deal.

On direct examination, Page testified that he was charged with the offense of murder in Midland County and with the offense of aggravated kidnaping in Eastland and murder in Harrison County. 26 RR 257. Page stated that none of the prosecutors had made any agreement for his testimony or any agreement for a particular sentence. *Id.* Page was granted use immunity for his testimony, which Page understood to mean that his testimony in this case could not be used against him at his trial. Page understood that use immunity for his testimony did not mean that the charges against him were going away. *Id.* at 256-58.

Page also later testified on cross-examination that he was given "some type of immunity" in order for him to testify, but that he had not been offered anything for his testimony and the prosecution had not made a deal with

him.  27 RR 127-30.   During subsequent state writ proceedings, the state court found that the prosecution had no agreement with Page prior to Young's trial, and Page himself denied that there was ever any deal.   10 SHCR-03 2827-34; 4 SHRR-03 45-48.  Page's attorney, Woody Leverett, also acknowledged that there was no plea offer.  10 SHCR-03 2817-27.  Finally, Ian Cantacuzene, Young's lawyer, testified that before trial he repeatedly asked Leverett if there was a deal, and Leverett repeatedly told him there was not.  10 SHCR-03 2834; 2 SHRR-03 206.  Young has not presented any clear and convincing evidence sufficient to rebut this testimony.

> ### 4.   The habeas court correctly found that Young's alleged evidence was immaterial under *Brady* and *Napue*.

The state court reasonably found that Young's alleged evidence concerning Page and Ray was immaterial under *Brady* and *Napue*.   In response, Young contends that the state court failed to take into account how the undisclosed information would have affected his defense's preparation for trial.   However, the state habeas court found several factors mitigated in favor of its determination.  Most importantly, it observed that—regardless of the district attorney's statement that he would probably make Ray a plea offer—there was no plea bargain in place with Ray or Page before Young's trial.   *See*, *e.g.*, *Bagley*, 473 U.S. at 682 (finding that even a direct,

undisclosed payment to a witness is not a reversible *per se Brady* violation).
The state court also noted: (1) the overwhelming evidence against Young; (2)
a co-accomplice witness instruction that directed the jury to view Ray and
Page's testimony with skepticism; and (3) the fact that Ray and Page's
testimony at trial was consistent with Ray and Page's prior statements
concerning the crime and the overall veracity of their testimony.  10 SHCR-03
2794-2800, 2839-43.  In light of these compelling factors, Young cannot show
that the state court acted unreasonably under AEDPA in denying relief.

### a. There was "clear, [i]ndisputable[,] and overwhelming" evidence of Young's guilt.

In assessing the materiality of undisclosed impeachment evidence, a
court "must consider the nature of the impeachment evidence improperly
withheld and the additional evidence of the defendant's guilt independent of
the disputed testimony."  *United States v. Weintraub*, 871 F.2d 1257, 1262
(5th Cir. 1989).  Evidence having only a cumulative or "marginal negative
impact" on the jury's verdict is not material.  *Pyles v. Johnson*, 136 F.3d 986,
999 (5th Cir. 1998); *Westley v. Johnson*, F.3d 714, 725 (5th Cir. 1996); *Spence
v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996); *Jackson v. Johnson*, 194 F.3d
641, 650 (5th Cir. 1991).

The state court found that even "entirely eliminating the testimony of

[Ray] and entirely eliminating the testimony of [Page][], the evidence is clear,

[i]ndisputable[,] and overwhelming that Clinton Young murdered [Douglas]."

10 SHCR-03 2794.  Similarly, on direct appeal, the state court conducted a

review of the legal and factual sufficiency of the evidence and concluded:

> The evidence showed that [Young] personally shot both victims,
> formulated the plan to get a different vehicle, and repeatedly
> threatened his cohorts with severe consequences should they be
> inclined to tell anyone of their escapades.

*Young v. State*, No. 74,643 slip op. at 9.

Indeed, the evidence overwhelmingly established that Young shot

Douglas two times in the head with a Colt Huntsman semi-automatic .22

caliber handgun, that Young forced Ray to shoot Douglas one time in the

head with a .22 caliber revolver to make sure he died, and that Young shot

Petrey two times in the head with the same handgun he used to shoot

Douglas.  The record shows that on November 24, 2001, Young wanted to go

to Midland to see his girlfriend, Amber Lynch, but he did not have a vehicle

to make the journey.  Young's brother, Dano, testified that on November 24,

2001, Young told him he was going to knock out Douglas and steal his car.

That evening, Young, McCoy, Ray and Page decided to go to Longview to buy

some marijuana.  22 RR 47-48, 62-69.  None of them had a vehicle so Young

asked Douglas if he could borrow his car.  Douglas refused, but agreed to

drive the men to a dope house in Longview in his 1996 white, two-door Pontiac Grand Prix in exchange for gas money.  22 RR 61-62; 26 RR 146-147. Before they left for the dope house, Young and his companions went to Dano and John Nunn's home.  22 RR 8-9.  Young borrowed an empty .38 caliber handgun from Dano.  Young had previously borrowed a .22 caliber revolver from Nunn.  21 RR 296-98.  Later the same night, Young, Page, Ray, and McCoy returned to Dano and Nunn's home, and Young returned the empty .38 caliber handgun that he had borrowed from Dano Young and the .22 caliber revolver that he had borrowed from Nunn.   The men came in Douglas's car, but Douglas was not with them.  21 RR 298-99; 26 RR 187-88.

Three witnesses—Page, Ray, and McCoy—testified that while they were parked outside of a dope house near Longview, they saw Young shoot Douglas two times in the head without warning as Page was entering the car. 22 RR 76-97; 21 RR 104-12; 26 RR 149-65.  All three men further testified that Young forced them to assist him in taking the mortally wounded Douglas to a shallow creek where Young forced Ray to shoot Douglas in the head again to make sure he was dead.  21 RR 113-19; 22 RR 94-126; 26 RR 162-79.  Young then drove to the hotel room of Patrick Brook to get a gun from him and confessed to Brook that he shot Douglas and left him face down in a creek.  21 RR 245-256.  Young then dropped off Ray and McCoy and

headed to Midland in Douglas's stolen car.  22 RR 142-44; 26 RR 181-87.  A few hours after Young dropped off McCoy, McCoy contacted the police and led them to the Douglas's body found face down in a shallow creek.  21 RR 51-58.

Young called Amber in Weatherford on the way to Midland and learned that she was with her father, Bart Lynch, who was a half-brother to Douglas. Young realized that if Bart saw him in Douglas's car, Lynch would know that he stole it and connect him to Douglas's disappearance.   26 RR 197-98.  So Young decided to steal another vehicle.   Young and Page, acting together, then kidnapped Petrey outside Brookshire's Grocery store in Eastland on November 25, 2001, and stole his pickup truck.  23 RR 204-05.  Douglas's Pontiac Grand Prix was found abandoned on an oil lease about twenty miles from Eastland.  *Id.* at 235-44.  Two .22 caliber shell casings were found inside the car.   *Id.* at 242-43.   Ballistics showed that the two shell casings were fired from a Colt Huntsman semi-automatic .22 caliber handgun recovered from Young.  25 RR 158-59.  DNA from saliva on the soda bottle found in Douglas's car matched the DNA profiles of Young and Page.  26 RR 103-04. DNA from a cigarette butt found in Douglas's car matched Young's DNA.  *Id.* at 105-06.

On the morning of November 26, 2001, after arriving in Midland, Young arranged to meet Amber and her father in an Albertson's parking lot.

24 RR 41-46.  Shortly before the meeting, Young and Page took Petrey out to an oil lease where, according to Page, Young shot Petrey two times in the head, killing him.  26 RR 39-46.  Young then dropped off Page, who went to the Sheriff's Department and informed the law enforcement authorities of Petrey's kidnaping and murder.  *Id.* at 248-54.

On November 26, 2001, at about 11:00 A.M., Henry Wurtz discovered Petrey's body at a pump jack site in Midland County and reported the discovery.  24 RR 298-301.  Deputy Paul Hallmark, a crime scene investigator for the Midland County Sheriff's Office, went to the oil lease where Petrey's body was found.  Deputy Hallmark found two .22 caliber shell casings at the scene near Petrey's body.  *Id.* at 304-05.  Ballistics showed that the two shell casings found with Petrey's body were fired from Young's Colt Huntsman semi-automatic .22 caliber handgun.  25 RR 152-53, 156.

Meanwhile, Young met with Amber and her father in the Albertson's parking lot.  24 RR 47-48, 74-75.  During the meeting, Bart Lynch questioned Young about how he got the pickup truck, and Young eventually confessed that he stole it.  *Id.* at 49-50.  Bart Lynch observed during the meeting that Young was carrying a gun.  *Id.* at 49.  After Bart Lynch arrived home, he and his mother, Claudette Bowen, informed the police of the matter, and the police began looking for the pickup truck.  *Id.* at 51-52.  The police spotted the

stolen vehicle on a highway heading out of Midland and attempted to stop it. *Id.* at 145-50.  Young frantically tried to escape driving at speeds between ninety and one hundred miles per hour, driving the wrong way down a highway service road, driving though a trailer park and a barbed wire fence and continuing on until the police shot out two tires and forced the vehicle to a stop.  *Id.* at 157-67, 178-81, 184-95.  A Colt Huntsman semi-automatic .22 caliber handgun was taken from Young.  *Id.* at 170-71.  Ballistics showed that Young's Colt Huntsman semi-automatic .22 caliber handgun could not be eliminated as the gun used to inflict two of the three gunshot wounds to Douglas's head or the two gunshot wounds to Petrey's head.[12]  25 RR 161-68. A bloodstain on Young's jacket contained Douglas's DNA.  A stain on Page's boot also contained Douglas's DNA.   26 RR 8-11, 66-68, 85, 97-98.

### b.   The jury received instructions to view Ray and Page's testimony with skepticism.

Ray was granted use immunity for his trial testimony, and the trial court informed the jury of this fact.  5 CR 802-03; 22 RR 36-37.  The jury knew that Ray was charged with Douglas's murder and that Ray was therefore motivated to lie or to favor the prosecution in his testimony in

---

[12]   Young complains that the ballistics indicate that he did not shoot Douglas, and this argument would have been bolstered if he had been able to further impeach Page and Ray.  However, as shown with regard to Young's related ineffectiveness claim, Young's ballistics claims are without merit.  *See* Argument, Section IV(D), below.

hopes of securing future leniency.  Thus, even assuming that the prosecution failed to disclose evidence of a deal with Ray, such evidence would not have added much to the jury's perception of Ray's motivation to lie.  Moreover, because Ray was indicted for Douglas's murder, he was an accomplice as a matter of law.  *Ex parte Zepeda*, 819 S.W.2d 874 (Tex. Crim. App. 1991).  As required by statute, the trial court instructed the jury as to that fact.  5 CR 825-29.  The trial court told the jury to regard Ray's testimony as unreliable, to view his testimony with suspicion, and cautioned the jury that they could not rely upon Ray's testimony to find Young guilty of killing Douglas unless Ray's testimony was corroborated by other evidence outside Ray's testimony and any other accomplice witness tending to connect Young with the commission of the offense.

Likewise, the jury knew that Page was charged with the Petrey murder in Midland County, aggravated kidnaping in Eastland, and the Douglas murder in Harrison County.  22 RR 257-258.  The trial court instructed the jury on guilt/innocence on the law of accomplice witnesses as a matter of fact with respect to Page and Darnell McCoy in the Douglas killing.  The trial court also instructed the jury on guilt/innocence that Page was an accomplice as a matter of law with respect to the Petrey killing.  5 CR 825-29.  As with Ray, even assuming that the prosecution failed to disclose evidence of a deal

with Page, the withheld evidence would not have altered the jury's perception of him.

"When *Brady* evidence would have only a cumulative or marginal impact on the jury's credibility assessment, habeas relief is not in order because the evidence is not material, that is, there is no reasonable probability that the result of the proceeding would have been different if the defense had been provided the evidence in question." *Jackson*, 194 F.3d at 650 & n.24; *see also*, *e.g.*, *Felder v. Johnson*, 180 F.3d 206, 213 (5th Cir. 1999) (citing *United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) ("Suppressed evidence is not material when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.") (internal quotation omitted), *rev'd on other grounds*, 209 F.3d 195 (2d. Cir. 2000)); *Pyles*, 136 F.3d at 999 (*Brady* evidence with "marginal negative impact on jury's credibility assessment" does not warrant habeas relief); *Spence*, 80 F.3d at 995 (*Brady* evidence that is "cumulative" does not warrant habeas relief); *United States v. Aubin*, 87 F.3d 141, 149 (5th Cir. 1996) (additional impeachment evidence would have been merely cumulative and, thus, petitioner did not meet burden of showing suppression of any material evidence); *Drew v. Collins*, 964 F.2d 411, 419-20 (5th Cir. 1992) (evidence with only "incremental impeachment value" does not warrant

habeas relief).   Given that the record is full of impeachment evidence with respect to Page and Ray on this very issue, Young cannot prove the third requirement of *Brady*—that the suppressed evidence was material.   *Brady*, 373 U.S. at 87.

**c.   Page's and Ray's trial testimony conformed to their prior statements.**

Lastly, Page's and Ray's trial testimony was consistent with their prior statements about the crime.   The state habeas court found that:

> In this case, both [Page] and Ray had given earlier statements, early on in the history of their involvement and before either could have possibly tailored their statements to assist the State, being motivated by a plea agreement that [i]ndisputably did not exists within the days immediately following the deaths of [Douglas] and [Petrey].   There is no rational way to believe that the witnesses' early statements were promoted, motivated or influenced by any attempt to assist the State, much less being the product of an agreement with the State.

10 SHRR-03 2842.

As correctly recognized by the state court, evidence of a promise from the State would only be material to the extent that it influenced a witness to change his story.   Here, Page and Ray gave a consistent story before they had any possible motivation to lie.

**5.    Young has not shown that there is a reasonable probability that the result of the proceeding would have been different or any reasonable likelihood that it could have affected the jury's verdict if the allegedly withheld deals had been disclosed.**

With respect to materiality, Young contends that the habeas court failed to take into account how the undisclosed information would have affected the defense's trial preparation.  DE 87 at 80-83.  Specifically, Young suggests that the undisclosed information could have affected the defense's voir dire in that "[m]ore emphasis could have been placed on trying to pick a jury that was more geared towards people who might be more skeptical of the accomplice witness or a codefendant's testimony in this case."  *Id.* at 82 (citing 2 SHRR-03 195-96).  Young also argues that disclosure would have affected his counsel's trial "themes."  *Id.* at 83 (citing 2 SHRR-03 197).  Finally, Young claims that his attorneys would have cross-examined Ray and Page more vigorously if they had known about the undisclosed statement.  *Id.* (citing 2 SHRR-03 108-09).  But as shown below, these arguments are not persuasive.

With respect to voir dire, Young's attorneys were doubtlessly aware that Young had co-accomplices.  To suggest that they did not consider how the jury would view co-accomplice testimony is not plausible.  Moreover, Young's allegation is conclusory.  Young has not named any particular juror

or jurors that he would have struck had known about the alleged deals prior to voir dire. A conclusory allegation does not state a claim for federal habeas corpus relief and is subject to summary dismissal. *See Koch v. Puckett*, 907 F.2d 524, 529 (5th Cir. 1990).

As for the purported effect on counsel's trial themes and their cross-examination of Page and Ray, any alleged failure to disclose did not affect the verdict. As shown below, Young's attorneys adequately pursued Young's "themes." For instance, during direct examination, Ray testified that he had not received any preferential treatment from the prosecution:

Q.   Have you received any kind of a deal, any kind of a promise, any kind of favor from any District Attorney's Office or anyone in exchange for your testimony today?

A.   None whatsoever, sir.

Q.   You do realize you are still charged with the death of Mr. Douglas?

A.   Yes, sir.

Q.   Are you currently incarcerated?

A.   Yes, sir.

Q.   Awaiting trial on that?

A.   Yes, sir.

Q.   You don't have any idea what's going to happen, do you?

A.    No, sir.

22 RR 147-48.

Young's attorneys then cross-examined Ray as follows:

Q.    (By Mr. Williams) Mr. Ray, you're under indictment for capital murder out of Harrison County, is that correct?

A.    Yes, sir.

Q.    What kind of leverage do you think the State of Texas has over you given that fact?

MR. BERRY:    We're going to object at this time.  This is the third time that Mr. Williams has asked about the indictment and asked about the leverage. I think we're getting repetitive.

THE COURT:    Asked and answered, objection is sustained.

Q.    (By Mr. Williams) Has the State told you anything about abandoning the death penalty on your case?

A.    No, sir.  As far as I know, we're still -- between me and my lawyer, we're still preparing to go to trial on the capital murder charge.

Q.    Are you preparing for a death penalty case or a non death penalty case?

A.    Well, assuming it's a capital murder, they're seeking the death penalty.

Q.    Well, not necessarily.  They can abandon it. Do you know whether or not they've abandoned it?

A.    I don't believe -- I haven't heard anything about them abandoning it.

Q.    So your testimony -- you think your testimony today could have an effect on whether or not the State does abandon the death penalty?

A.    It is a possibility, but I'm not counting on it.

Q.    It is a possibility they could abandon it if you say what they want you to here today, right?

A.    I'm not saying what anybody wants me to say, I'm saying what needs to be said.  No one's trying to coerce me into saying anything.  The only thing they talked to me about was telling the truth.

22 RR 240-41.

And further:

Q.    Okay.  And but [sic] you wouldn't do something like that? You wouldn't try to make yourself look better and make Clint Young look worse, is that correct?

A.    No, sir.

Q.    All right.  The State of Texas has quite a bit of leverage over you, Mr. Ray, don't they?

A.    As to how?  Elaborate.

Q.    You're under charge for capital murder, right?

A.    Yes, sir.

Q.    I mean, argument could certainly be made that whether you live or die is at the mercy of the State of Texas, correct?

A.    That is true.

Q.    You think you would lie to save your own life?

A.    The evidence is there.  I owned up to what I had a part to
      do, so why would I try to make up something that anybody
      else did?

Q.    You owned up from the beginning to your part, right?

A.    Yes, sir.

Q.    All right.  Let's go on.

*Id.* at 205-07.

On direct examination, Page testified:

Q.    Now, you're charged with a crime out of this case, are you
      not?

A.    Yes, ma'am.

Q.    What are you charged with?

A.    I believe it's murder.

Q.    And are you charged in any other county for this case?

A.    I believe I'm charged in Eastland with aggravated
      kidnap[]ing and murder back in Harrison County.

Q.    Now, have any of those prosecutors made any agreement
      with you at all for your testimony?

A.    No, ma'am.

Q.    Have you had any kind of an agreement to give you any
      particular sentence in any of those counties for your
      testimony here today?

A.   No, ma'am.

Q.   Now, you know that the State for your testimony in this case granted you what's called use immunity.  Did you talk to your lawyer, Mr. Leverett, about that?

A.   Yes, ma'am, I did.

Q.   And your lawyer has been here listening to what you've had to say, has he not?

A.   Yes, ma'am, he has.

Q.   And what does that mean, use immunity?

A.   It means that what I say can't be used against me in my trial.

Q.   Right, but that doesn't mean your charges are going away, does it?

A.   No, ma'am, it does not.

Q.   You fully expect to go to prison over this deal, do you not?

A.   You never know.

Q.   That's right.

A.   Stranger things have happened.

Q.   Yeah.  Have you ever been convicted of a felony offense?

A.   No, ma'am.

Q.   Have you ever been convicted of even a misdemeanor?

A.   I went to jail one time for a PI.

22 RR 257-58.

Page also testified on cross-examination:

Q.     (By Mr. Williams)   Let's talk about here where you're talking to the investigators.   Investigator Spencer:  "Do you know the difference between capital murder and murder?"  Mr. Page:  "I think one is murder, and if there are more, it's capital."   Investigator Spencer:  "No, capital murder is what you are charged with.   Two sentences, death by lethal injection or life in prison.   You could be sentenced to 99 years or anything in between.   Inaudible.   Capital murder is inaudible, and that is what they are going to go after, inaudible.   That is why so far everything you've been telling us we've been able to check.   You've been telling us what we hoped to believe is the truth."   Do you recall that conversation with Investigator Spencer?

A.     Yes, sir, I do.

Q.     Did you interpret this as any kind of a threat by Investigator Spencer?

A.     I already knew I was being charged with capital murder, and I had been to the law library I believe that day or earlier the previous day.

Q.     So you already knew you were being charged with capital murder?

A.     Yes, sir.

Q.     And you have no kind of a deal with the State of Texas?

A.     No, sir.

MR. WILLIAMS:  May I approach again, Your Honor?

THE COURT:     Yes, sir.

Q.    (By Mr. Williams)  Mr. Page, let me show you a copy of your indictment.  You are currently under indictment here in Midland County, is that correct?

A.    I haven't seen this, no.

Q.    You've never seen a copy of your indictment?

A.    Not that I can recall.  Yeah, I do, yes.

Q.    All right.

A.    It was a different color, though.  Yes, I remember that.

Q.    Shows that you're being charged with murder, is that correct?

A.    Yes, sir.

Q.    And do you know that the -- and this is a certified copy of your indictment, is that right?

A.    Yes, sir.

Q.    And do you know that murder is anywhere from five years probation to life in the penitentiary?

A.    Yes, sir.

Q.    And do you know that capital murder is anywhere from life in the penitentiary to the death sentence, is that right?

A.    Yes, sir.

Q.    So by charging you this way, you don't think you've made any kind of an agreement or a deal with the State of Texas?

A.    I haven't made no deals.  Whenever I first came to jail and I got my bond set for this here, it was for capital murder.

Q.   Uh-huh.

A.   And then I was in single cell for a little while and they
     pulled me out of single cell, and whenever they pulled me
     out of single cell, I talked to Investigator Spencer,
     Investigator Reed and Sergeant Beam, and that's when
     they told me they dropped the charge down to murder.

Q.   They dropped the indictment on you, right?

A.   Well, they dropped the charge down to murder instead of
     capital murder.

Q.   They gave you a lesser charge, correct?

A.   Yes.

Q.   But you don't think that's any kind of a deal or any kind of
     an offer for your testimony?

A.   They haven't came to me with anything.

MR. WILLIAMS:   Your Honor, we would move for the admission
                of Defendant's Exhibit 2, a copy of the
                indictment.

(Defendant's Exhibit No. 2 offered)

MS. CLINGMAN:   No objection, Your Honor.

THE COURT:      Defendant's Exhibit 2 is admitted.

(Defendant's Exhibit No. 2 received)

Q.   (By Mr. Williams)  Do you recall at that time, evening of
     November 27, 2002, Investigator Spencer telling you, "You
     have been telling us what we hoped to believe is the truth."
     Do you recall him saying that?

A.   Yes, sir.

Q.    So at that point, did you know that in order to live, to avoid capital murder, you had to tell the State what you knew the State wanted to hear?

A.    No, sir, I knew that I had to tell them the truth.

Q.    Even after Investigator Spencer said, "You've been telling us what we hoped to believe is the truth," even after that, you thought, "Well, I'll just tell them the truth?"

A.    Yes, sir.

Q.    All right.  And it was after that that you changed your story and told them about Mark Ray shooting Doyle Douglas, correct?

A.    Yes, sir.

Q.    After you were basically threatened, is that right?

A.    Whenever I changed my story, it was just because Sergeant Beam told me, "If you keep lying, because I know you're not telling the whole truth, but if you keep lying on little things, they're going to build up and become bigger and they're going to hang you whenever you go to trial."  That's whenever I changed my story.

Q.    Do you recall Investigator Spencer telling you, "If I think you are lying to me, I'll write that in my report to the D.A. I'll tell them he is blowing smoke up my ass."  You recall Investigator Spencer telling that to you?

A.    Yes, sir, I do.

Q.    And it was after that that you changed your story and said that Mark Ray was the one who shot Doyle Douglas, isn't that correct?

A.    Yes, sir.

Q.    All right.  After you're basically threatened, is that right?

A.    I wouldn't call it a threat.  It's his job to do stuff like that.

Q.    You would not call that a threat?

A.    No, sir, I would not.  It's his job if he believes that I'm lying or if he believes that Clint was lying or whoever he takes the statement from, if he believes they're lying, it's his job to do that.

Q.    But you don't consider that a threat?

A.    No, sir.

Q.    He told you that capital murder has two punishments, life in prison or death by lethal injection, correct?

A.    Yes, sir.

Q.    He told you that "you've been telling us what we hoped to believe is the truth," is that correct?

A.    Yes, sir.

Q.    And he told you, "If I think you're lying to me, I'll write that in my report to the D.A., I'll tell them he's blowing smoke up my ass," you remember that, correct?

A.    Yes, sir.

Q.    And yet, after he told you these things, you did not consider that any kind of a threat?

A.    No, sir, because I was telling the straight truth.

Q.    You were telling the straight truth at that time?

A.   Not the straight truth, but I was adding to it, like I said earlier, going back to cell block and  remembering other things.

Q.   Well, how about Mark Ray?  Did that just suddenly come to you, Mark Ray shooting Doyle Douglas, did that just suddenly come to you after you went back to the cell block?

A.   No, that came to me after Sergeant Beam told me if I didn't tell the truth, that they were going to hang me whenever I came to trial.

Q.   Did you consider that a threat?

A.   I didn't figure it as a threat.  I figured it as the truth.  If I kept lying it would look worse on me, and the jury would have a better chance of convicting me.

Q.   Sergeant Beam told you they would hang you if you went to trial?

A.   If I kept lying.

27 RR 128-35.

Thus, it is clear that Young's attorneys were well aware of Page and Ray's motivations to lie and cross-examined them accordingly.

Lastly, Young states the habeas court neglected to consider the effect that nondisclosure would have on his counsel's preparation for the punishment phase of trial.  Young asserts that this information may have had relevance to the second special issue, which asked whether Young had actually caused the death of the deceased.  5 CR 868-69.  But, as noted above, the state habeas court found that even "entirely eliminating the testimony or

[Ray] and entirely eliminating the testimony of [Page], the evidence is clear, [i]ndisputable[,] and overwhelming that [Young] murdered [Douglas]."   10 SHCR-03 2794.   Consequently, Young could not have been harmed in any way at punishment by the statement's nondisclosure.

As demonstrated above, the Court of Criminal Appeals correctly denied Young's subsequent state habeas petition.   There was no deal with respect to Ray or Page.   And had the allegedly withheld evidence been disclosed to the defense there is neither a reasonable probability that the result of the proceeding would have been different (*Brady*) or any reasonable likelihood that it could have affected the jury's verdict (*Napue*).   Thus, Young cannot show the state court's adjudication of his claim resulted in a decision which was contrary to, or involved an unreasonable interpretation of, clearly-established federal law, as set out by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   28 U.S.C. § 2254(d).   Accordingly, Young's *Brady* and *Napue* claims should be denied

**6.    The alleged nondisclosure did not violate Young's rights under the Confrontation Clause or deprive Young of a fundamentally fair trial.**

Young further contends that the nondisclosure of Page's and Ray's

alleged plea deals violated the Confrontation Clause.  DE 87 at 118-23.  This claim was raised in Young's second subsequent state habeas proceeding.  1 SHCR-03 67.  Young further asserts that since the state trial court did not issue specific findings on this claim the Court should review it de novo and without AEDPA deference.  DE 87 at 115.  But, "[e]ven assuming that the state court failed to express certain factual findings that necessarily underlie its conclusion that [Petitioner] failed to demonstrate prejudice, a presumption of correctness would apply "to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."  *Pondexter v. Dretke*, 346 F.3d 142, 149-52 (5th Cir. 2003) (citing *Valdez*, 274 F.3d at 948 n.11).  Even summary rulings by state habeas courts are not to be denied AEDPA deference.  *Richter*, 131 S. Ct. at 784 ("There is no merit to the assertion that compliance should be excused when state courts issue summary rulings. . .").  As the Supreme Court has recognized, AEDPA deference "does not require that there be an opinion from the state court explaining the state court's reasoning."  *Id.* (collecting cases) (other citations omitted).  Instead, the burden falls to the state habeas petitioner to show that there was no reasonable basis for the state court to deny relief.  *Id.* Requiring more out of the state courts tasked with regularly reviewing scores of these petitions ignores that "[o]pinion-writing practices in state courts are

influenced by considerations other than avoiding scrutiny by collateral attack in federal court."[13] *Id.* (other citations omitted).

But even if AEDPA deference did not apply, Young has not demonstrated a Confrontation Clause violation. The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Maryland v. Craig*, 497 U.S. 836 (1990); *see also Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (Confrontation Clause guarantees criminal defendants the opportunity to cross-examine witnesses against them). However, the Supreme Court has observed: "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original). "The relevant inquiry is whether the jury had sufficient information to appraise the bias and motives of the witness." *United States v. Tansley*, 986 F.2d 880, 886 (5th Cir. 1993).

Here, Young was not precluded in any way from actually cross-examining either Page or Ray. Rather, he simply believes that he did not have adequate information to do so. Assuming arguendo the veracity of his

---

[13]     This same logic applies to Young's complaints concerning the adequacy of the state court's findings on the alleged *Brady/Napue* violations. DE 87 at 103-04.

facts, Young has stated a straightforward *Brady* violation, not a Confrontation Clause violation.  Indeed, Young acknowledges that a plurality of the Supreme Court has opined that the Confrontation Clause does not extend to the prosecution's nondisclosure of evidence before trial.  DE 87 at 120 n.42 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 52-54 (1987) (plurality opinion)).

And assuming even further that the prosecution's actions somehow violated the Confrontation Clause, federal habeas corpus relief should not be granted unless the error had a substantial and injurious effect or influence in determining the jury's verdict.  *Lee v. Illinois*, 476 U.S. 530, 539-40 (1986); *see also Brecht*, 507 U.S. at 637; *Cupit v. Whitley*, 28 F.3d 532 (5th Cir. 1994) (erroneous admission of evidence does not merit federal habeas relief unless it is a crucial, critical, highly significant factor that renders the trial as a whole fundamentally unfair).  As shown above, the state court found overwhelming evidence of Young's guilt.  10 SHCR-03 2794.  Consequently, any relief on Young's Confrontation Clause claim would be precluded by harmless error.

For these reasons, the record does not demonstrate that Young's rights under the Confrontation Clause were violated or that Young was denied a fair trial.   Because the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, federal habeas relief should be denied.

## II.   Young's Claim that the Trial Judge Was Biased Against Him Is Both Time-Barred and Procedurally Barred.   Alternatively, this Claim Is Meritless.  (Claim No. 2)

In his second claim for relief, Young argues that his "convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because [trial judge] Judge [John G.] Hyde was biased, and if counsel had known of this bias, they would have moved to recuse the judge from presiding over Young's trial, motion for new trial, and state writ hearing."  DE 87 at 123-29.   In support of his claim, Young offers a letter that Judge Hyde sent to the jurors following Young's trial, in which Judge Hyde thanks the jurors for their service and states that he believes that the jury made the right decision.  *Id.* at Petitioner's Exhibit 93.  But Young's claim is time-barred because Young failed to file it within

the statute of limitations.  It is also procedurally barred because Young failed to present it the state court in a procedurally correct manner.  Finally, as shown below, this claim is wholly without merit.  Accordingly, this Court is required by AEDPA to deny relief.

### A.   This claim is time-barred.

This claim does not "relate back" to any of the claims presented in Young's original petition.  *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644.  As such, review is barred by the statute of limitations.[14]   28 U.S.C. § 2244(d)(1).

### B.   This claim is procedurally barred.

Young presented this claim in his third state application for habeas corpus.  1 SHCR-03 85-90.  The Court of Criminal Appeals dismissed this allegation because it did not meet the requirements for consideration of subsequent claims under Texas Code of Criminal Procedure Article 11.071, Section 5.  *Ex parte Young*, No. 65,173-03 at Order of June 3, 2009.  Accordingly, Young's claim is unequivocally procedurally barred.

The exhaustion doctrine codified in 28 U.S.C. § 2254(b)(1) reflects a policy of comity consistently adhered to by the Supreme Court and the Fifth

---

[14]    To the extent that Young later claims that the factual predicate of this claim was unavailable to him, it appears that the letter to the jurors was made available to Young's investigator upon a simple request to see the case documents.  DE 87 at Petitioner's Exhibit 140.  Consequently, Young cannot show that this letter could not have been discovered earlier through the use of due diligence.

Circuit. *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 8-10 (1992); *Picard v. Connor*, 404 U.S. 270, 275, 277-78 (1971); *Dowthitt v. Johnson*, 230 F.3d 733, 745-46 (5th Cir. 2000). Thus, before a federal court will entertain the alleged errors, a petitioner must have first provided the state's highest court with a fair opportunity to apply (1) the controlling federal constitutional principles to (2) the same factual allegations. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *Rose v. Lundy*, 455 U.S. 509, 522 (1982); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Thomas v. Collins*, 919 F.2d 333, 334 (5th Cir. 1990). This requirement is designed to give state courts the initial opportunity to pass upon and, if necessary, correct errors of federal law in a state prisoner's conviction. *Picard*, 404 U.S. at 275-76.

Where a petitioner "advances in federal court an argument based on a legal theory distinct from that relied on in the state court, he fails to satisfy the exhaustion requirement." *Nobles v. Johnson*, 127 F.3d at 420 (citing *Vela v. Estelle*, 708 F.2d 954, 958 n.5 (5th Cir. 1983)). In order to satisfy exhaustion, all of the grounds raised in a federal application for writ of habeas corpus must have been "fairly presented" to the state courts prior to being presented to the federal courts. *Dowthitt*, 230 F.3d at 745-46; *see also Nobles*, 127 F.3d at 420. The Supreme Court has reasoned that the purpose of exhaustion "is not to create a procedural hurdle on the path to federal

habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court." *Keeney*, 504 U.S. at 10. "Comity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court." *Id.*

It is well-settled that habeas relief "shall not be granted" under any circumstances unless it appears that "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1). "Because [the exhaustion] requirement refers only to remedies still available at the time of the federal petition, it is satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law." *Gray v. Netherland*, 518 U.S. 152, 161 (1996) (internal citations omitted); *see also Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Graham v. Johnson*, 94 F.3d 958, 969 (5th Cir. 1996) ("exhaustion is not required if it would plainly be futile").

However, such an unexhausted claim is subject to denial in federal court as procedurally defaulted. Further "[a]lthough AEDPA authorizes a district court to *deny* relief on an unexhausted claim, it does *not* authorize a district court to *grant* relief on an unexhausted claim, 'unless the State,

through counsel, expressly waives the requirement.'" *Alexander v. Johnson,* 163 F.3d 906, 908 (5th Cir. 1998) (emphasis added).

Although under *Harris v. Reed*, 489 U.S. 255, 265 (1989), federal review of a habeas claim is procedurally barred only if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default,

> [t]his rule does not apply if the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.  In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

*Coleman*, 501 U.S. at 735.   "[T]he procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default," or that the federal court's failure to consider the claim will result in a miscarriage of justice.  518 U.S. at 162 (barring claim on basis that claim would be barred in state court if it were presented there); *Coleman*, 501 U.S. at 750; *Nichols v. Scott*, 69 F.3d 1255, 1280 (5th Cir. 1995).

The Fifth Circuit has held that where a petitioner raises claims in federal court that have not previously been presented to the state courts, and Texas Code of Criminal Procedure Article 11.071, Section 5(a) would foreclose review of those claims if presented in a successive state habeas application, such is an adequate state procedural bar foreclosing federal habeas review of the claims. *Nobles*, 127 F.3d at 422; *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998).

It is also well-settled that federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729; *Harris*, 489 U.S. at 262. Thus, federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default.[15] *Coleman*, 501 U.S. at 729; *Harris*, 489 U.S. at 265; *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995).

As noted above, Young did not raise the instant claim until his third state habeas application, which was dismissed as an abuse of the writ. Thus, the state court's dismissal of his claims as an abuse of the writ precludes federal habeas relief as a matter of law. *See Fearance v. Scott,* 56 F.3d 633,

---

[15]     A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim. *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999).

642 (5th Cir. 1995) (holding that pre-11.071 abuse-of-the-writ doctrine was strictly and regularly applied and, thus, was independent and adequate state procedural bar); *Emery v. Johnson,* 139 F.3d 191, 195-96 (5th Cir. 1997) (extending *Fearance* to Article 11.071 statutory abuse-of-writ doctrine); *Barrientes v. Johnson*, 221 F.3d 741, 758-59 (5th Cir. 2000); *Fuller v. Johnson,* 158 F.3d 903, 906 (5th Cir. 1998); *see also Moore v. Texas*, 535 U.S. 1044, 1047-48 (2002) (Scalia, J., *dissenting*) (recognizing Texas abuse-of-the-writ statute as independent and adequate state ground).

Young's default of this claim can only be excused if he can demonstrate (1) cause for the default and prejudice as a result of the alleged violation of federal law, or (2) a resulting "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750-51. To establish "cause," a habeas petitioner must ordinarily identify circumstances external to the defense that prevented him from properly asserting the claim in state court. *McCleskey v. Zant*, 499 U.S. 467, 497 (1991) (citing *Murray v. Carrier*, 477 U.S. 478, 492 (1986)). Ineffective assistance of counsel cannot constitute "cause" unless deficiencies or omissions in counsel's performance both resulted in the default and amounted to constitutionally ineffective assistance of counsel at trial or on direct appeal.[16] *Coleman*, 501 U.S. at 752. Moreover, the requisite showing of "prejudice" is significantly greater than that required to establish plain

---

[16]     *See* Argument, Sections XXII & XXXIII, below.

error.  "The habeas petitioner must show 'not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Murray*, 477 U.S. at 493 (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).   Furthermore, the claim of ineffective assistance of counsel must have been independently raised as a claim for relief.  *Edwards v. Carpenter*, 529 US 446, 453-54 (2000).

Finally, a petitioner may come within the "fundamental miscarriage of justice" exception, (1) if, as a consequence of the identified constitutional error in the guilt-innocence phase and in light of new evidence, "it is more likely than not that no reasonable juror would have convicted him," *Schlup v. Delo*, 513 U.S. 298, 329 (1995), or (2) if he establishes "by clear and convincing evidence that, but for the constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty" under state law.  *Sawyer v. Whitley*, 505 U.S. 333, 350 (1992).

Young's petition fails to acknowledge that this claim is procedurally barred, much less argue why this Court should review it.   Thus, Young presents no reason that might be considered cause and makes no argument on how he was prejudiced.  He also fails to make any credible argument that he is actually innocent of either his crime or the death penalty.  Thus, this

claim should be barred from review and relief denied.

## C.   Alternatively, Young's claim is without merit.[17]

All cases should begin with the presumption that the judicial officer is unbiased. *Schweiker v. McClure,* 456 U.S. 188, 195 (1982). In *Liteky v. United States*, 510 U.S. 540 (1994), the Supreme Court discussed the "extrajudicial source" doctrine. The Court first noted that the terms "bias" and "prejudice" "connote a favorable or unfavorable disposition or opinion that is somehow wrongful or inappropriate." *Id.* at 550. The following passage from this opinion explains the kind of bias or prejudice requiring recusal:

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. As Judge Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." Also not subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case

---

[17]   Because of Young's failure to present his claim in procedurally correct fashion, there is no state court decision to which this Court must pay deference. To the extent that the Court believes that Young can circumvent the various bars preventing relief on this claim, any review on the merits must necessarily be de novo.

upon its remand, and to sit in successive trials involving the same defendant.

It is wrong in theory, though it may not be too far off the mark as a practical matter, to suggest, as many opinions have, that "extrajudicial source" is the only basis for establishing disqualifying bias or prejudice. It is the only common basis, but not the exclusive one, since it is not the exclusive reason a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as "bias" or "prejudice" because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment. (That explains what some courts have called the "pervasive bias" exception to the "extrajudicial source" doctrine. *See, e.g., Davis v. Board of School Comm'rs of Mobile County*, 517 F.2d 1044, 1051 (5th Cir. 1975) [].)

*Liteky*, 510 U.S. at 550-51.

In the instant case, the jury returned its verdict to the special punishment issues on April 11, 2003. That same day, Judge Hyde pronounced the sentence of death. 5 CR 866-71 (judgment and sentence). After the jury was discharged, Judge Hyde sent the jurors a letter dated April 14, 2003, thanking them for their jury service. In the letter, Judge Hyde stated, "After spending several weeks with the Defendant in jury selection before the trial began, I gained some insight into his personality and I got to hear and see much more than the jury heard. In my view, he is a dangerous man who is fully capable of harming someone else. Your jury made the

correct decision."   Petitioner's Exhibit 93.   Young claims that this letter establishes that Judge Hyde was not an impartial judge.

But the fact that Judge Hyde came to believe that Young was dangerous based on the information that he acquired during the trial of the case does not establish judicial bias.   Judges are not required to be naïve or gullible.   *Liteky,* 510 U.S. at 551.   Judges are only required to give the defendant a fair trial.   Young did not file a motion to recuse Judge Hyde at any time before or during Young's trial.   Young does not allege or show any "presumptive bias" or any appearance of judicial bias.   *See Richardson v. Quarterman,* 537 F.3d 466, 475-77 (5th Cir. 2008).

In fact, the record reflects that Judge Hyde gave Young a fair and impartial trial.   For instance, Gary Taylor, first state writ counsel, filed a motion to extend the time to file Young's state habeas application.   3 SHCR-01 351.   The court granted the motion.   *Id.* at 355.   Ori White, successor writ counsel, filed an "Application for Extension for Court to File the 11.071 Sec. 9(a) Determination of Unresolved Factual Issues and Request for Leave to Supplement Postconviction Writ of Habeas Corpus" in which Young requested the court to extend the time for designating the factual issues to be resolved in order to give him time to file additional complaints.   5 SHCR-01 635.   The State opposed the extension.   *Id.* at 642.   The trial court, over the

objection of the State, granted the sixty-day extension.  *Id.* at 646.  Young then filed "Clinton Young's Request for Permission to Supplement Writ to Allow the Possible Consideration of Additional Grounds and Alternative Request that the Court Add Applicant's Ground 15 to Controverted Facts Listed by the State" in which Young requested leave of trial court to "supplement" his original state habeas application with additional grounds. 7 SHCR-01 1136-41.  The State opposed the motion.  5 SHCR-01 665.  Judge Hyde granted the Young's request to supplement the Young's original Application with ground 15 contrary over the objection of the State and despite the fact that the time for supplementing the application had long passed.  *Id.* at 671.  In the trial court's order on the Young's state habeas application, the court held that Young's fifteenth claim constituted a subsequent application for postconviction writ of habeas corpus under Article 11.07, Section 5, and by law could not be considered, but the court considered the merits of the claim anyway.  2 SHCR-01 281-82.  Young also sent letters to Judge Hyde in which he voiced pro se complaints.  The court requested counsel to summarize the complaints and file them so the pro se complaints would be a part of the record.  5 SHCR-01 759.

The record reflects that Judge Hyde gave Young a fair and impartial trial.  In instances where Young requested accommodation, the judge gave it

to him.  Thus, Young is not entitled to federal habeas relief on this claim even if it were not time-barred and procedurally defaulted.[18]

### III. The State Court Reasonably Determined that Young's Jury Had a Vehicle for Expressing Its Reasoned Moral Response to Young's Mitigating Evidence.  (Claim No. 3)

In Young's third claim, Young argues that his "convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because Young's jury was denied a vehicle for expressing its reasoned moral response to [Young]'s mitigating evidence; the jury was prevented from giving *full* consideration and *full* effect to Young's mitigating circumstances."   DE 87 at 129-82. Young's claim presented this claim to the Court of Criminal Appeals as claim number eight on direct appeal.  The Court of Criminal Appeals held that

---

[18]    Young further argues that *all* of his claims should be reviewed de novo because of the judge's bias, but he does not provide any precedent from this Circuit that would support such a proposition.  DE 87 at 128-29.  Young also contends that the Court should remand the case to the state court with instructions to provide Young with a new state habeas proceeding.  But, contrary to Young's argument, this Court may not remand and "order" the state court to conduct a hearing because such an order exceeds this Court's power.  *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (vacating district court directive that state court reopen a state habeas application and conduct a fact-finding hearing); *Moore v. Johnson*, 194 F.3d at 622 (explaining that while federal courts can grant a writ of habeas corpus, "[t]he federal habeas court is without power, however, to order that the state conduct a new [] hearing"); *Smith v. Lucas*, 9 F.3d 359, 367 (5th Cir. 1993) (federal courts may only "suggest a corrective procedure in broad terms," but may not compel the state court to sua sponte reopen a postconviction proceeding).  Compelling the state court in this fashion would constitute an "impermissible interference with the state court's autonomy in applying its own criminal procedures."  *Smith*, 9 F.3d at 367. Thus, Young's proposition should be flatly rejected.

"[t]he jury in this case was given the statutory mitigation instruction.  *See*
[Tex. Code Crim. Proc.] Art. 37.071 § 2(e)(1).  The statutory instruction allows
the jury to consider all of the evidence presented at trial in answering the
mitigation special issue."  *Young v. State*, No. 74,643, slip op. at 14 (citing
*Cantu v. State*, 939 S.W.2d 627, 639-40 (Tex. Crim. App. 1996)).  As shown
below, a review of the instruction given clearly shows that Young's capital-
sentencing jury was not denied a vehicle for expressing its reasoned moral
response to Young's mitigating evidence.  The trial court instructed the jury
on the mitigation issue, Issue No. 3, as follows:

ISSUE NO. 3

Do you find from the evidence, taking into consideration all
of the evidence, including the circumstances of the offense, the
defendant's character and background, and the personal moral
culpability of the defendant, that there is a sufficient mitigating
circumstance or circumstances that a sentence of life
imprisonment rather than a death sentence be imposed?

5 CR 858-65 (jury charge on punishment).

The trial court further instructed the jury with respect to Issue No. 3:

The members of the jury need not agree on what particular
evidence supports an affirmative finding on this issue.  The jury
shall consider mitigating evidence to be evidence that a juror
might regard as reducing the defendant's moral
blameworthiness.  In answering Issue No. 3, you are further
instructed that there is no presumption that a sentence of death
is more appropriate than a sentence of life imprisonment.  If the
jury answers that a circumstance or circumstances warrant that
a sentence of life imprisonment rather than a death sentence be

imposed, the court will sentence the defendant to imprisonment in the institutional division of the Texas Department of Criminal Justice for life.  If the jury finds that there is no sufficient mitigating circumstance or circumstances to warrant a life sentence rather than a death sentence, the Court will sentence the Defendant to death.

*Id.*

The trial court also gave the jury an anti-sympathy charge:

In answering the issues submitted to you, the jury must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feelings.

*Id.*

Young contends that, "[w]hile [he] was allowed to introduce mitigating evidence, the jury that sentenced him to death was not allowed to fully consider Young's evidence in mitigation, or to give full effect to such mitigation.  Instead, the jury instructions, as well as the argument by the State:  (1) improperly limited the type of evidence the jury could consider as mitigating;  (2) improperly required a nexus between Young's mitigating evidence and the crime; (3) prevented the jury from giving Young an individualized sentencing process; and (4) prevented the jury from considering Young's mitigating evidence beyond the scope of the future dangerousness special issue and Young's personal conduct in the criminal acts."  DE 87 at 167.

The trial court instructed the jury with respect to the mitigation issue, "The jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."  5 CR 858-65. No limitation was placed on the evidence that a juror might consider as mitigating.  Special Issue No. 3, as required by Article 37.071, Section 2(e)(1) of the Texas Code of Criminal Procedure allows the jury to consider all of the evidence at both stages of the trial in answering the mitigation special issue. Indeed, the Fifth Circuit has repeatedly held that "Texas' definition 'encompasses 'virtually any mitigating evidence.''" *Roach v. Quarterman*, 220 Fed. App'x 270, 277 (5th Cir. 2007) (quoting *Beazley*, 242 F.3d at 260). Furthermore, the Supreme Court specifically commended the current Texas capital sentencing scheme, calling the new statute "[a] clearly drafted catchall instruction on mitigating evidence" and a model of "brevity and clarity."  *Penry v. Johnson* (*Penry II*), 532 U.S. 782, 802-803 (2001).  This Court is therefore bound by controlling precedent to deny relief on this claim.

Young also complains about the anti-sympathy instruction given to the jury.  But the Director asserts that any claim concerning the anti-sympathy instruction is time-barred because it was not presented in Young's original federal petition and does not relate back to the *Penry* line of cases.  *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644.    Moreover, this claim is

unexhausted and procedurally defaulted because it was never properly raised to the state court in either Young's direct appeal or first state habeas application.  Habeas procedure "respect[s] the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as all factual allegations supporting those grounds." *Knox v. Butler*, 884 F.2d 849, 852 n.7 (5th Cir. 1989).  In order to satisfy exhaustion, all of the grounds raised in a federal application for writ of habeas corpus must have been "fairly presented" to the state courts prior to being presented to the federal courts.  *Dowthitt,* 230 F.3d at 740, 745-46; *see also Nobles*, 127 F.3d at 420. Where a petitioner "advances in federal court an argument based on a legal theory distinct from that relied on in the state court, he fails to satisfy the exhaustion requirement." *Nobles*, 127 F.3d at 420 (citing *Vela*, 708 F.2d at 958 n.5); *see also Anderson*, 459 U.S. at 6-7.

To the extent that Young's claim has expanded beyond what Young actually argued in the state court, Young did not "fairly present" the claim to the state court and relies on "legal theor[ies] distinct from [those] relied on in the state court." *Dowthitt*, 230 F.3d at 745-46; *Nobles*, 127 F.3d at 420; *see also Keeney*, 504 U.S. at 9, 10 (holding that AEDPA's exhaustion requirement requires more than notice, more than petitioner simply stating a

federal claim in state court; it requires that the petitioner afford the state court a full and fair opportunity to address his claim).

Alternatively, this claim is without merit. Clearly established federal law does not forbid such instructions. *California v. Brown*, 479 U.S. 538, 542 (1987) (holding that it is not error under federal law to instruct the jury not to base its sentencing recommendation on sympathy). In *Saffle v. Parks*, 494 U.S. 484, 492 (1990), the Supreme Court rejected an argument condemning the anti-sympathy instruction given during the sentencing proceedings in a death-penalty case. In so doing, the Supreme Court recognized that the state may "insist that 'the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.'" *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 189-95 (1976)). Since capital sentencing must be reliable, accurate, and nonarbitrary, the jury should be required to consider mitigating evidence in the form of a reasoned moral response, rather than an emotional one. *Saffle*, 494 U.S. at 493. Given this clearly established federal precedent, the state court's denial of relief was not unreasonable.[19]

Young's complaint that the jury was not allowed to fully consider his evidence in mitigation, or to give full effect to his mitigating evidence, is

---

[19]    Relief on this claim would also be barred by *Teague*, 489 U.S. at 310.

without merit.  Thus, the state court's decision did not result in a decision that was contrary to, or involve an unreasonable application of, clearly-established federal law, as determined by the Supreme Court of the United States.  As such, federal habeas relief is barred by AEDPA.

## IV. Many of Young's Ineffective-assistance-of-counsel Claims Are Unexhausted and Procedurally Defaulted.  Alternatively, Young Received Effective Assistance of Counsel at Both Guilt-innocence and Punishment.  (Claim No. 4)

In Young's fourth claim, Young asserts that his "convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because his court-appointed attorneys failed to provide reasonably competent assistance at the guilt and punishment phases of trial.  But for counsel's unprofessional actions and omissions, the result of the proceeding would have been different."  DE 87 at 182-254.  But many of Young's ineffective-assistance-of-counsel claims are unexhausted and procedurally defaulted.  Alternatively, it is clear that Young received constitutionally effective assistance of counsel throughout all phases of his capital-murder trial, and AEDPA precludes the Court from granting any relief on these claims.

### A.    Standard for ineffective assistance of counsel

The familiar two-prong standard by which a claim of ineffective assistance of counsel is weighed is set forth in *Strickland*.   That is, to establish that counsel performed ineffectively, Young must show both that his attorney's performance was deficient and the deficient performance prejudiced his defense.   466 U.S. at 687.   Furthermore, because a convicted defendant must satisfy both prongs of the *Strickland* test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.   *Id.* at 697.

In order to establish that counsel's performance was constitutionally deficient, a convicted defendant must show that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.   In so doing, a convicted defendant must overcome a strong presumption that trial counsel's conduct fell within a wide range of reasonable professional assistance, and every effort must be made to eliminate the "distorting effect of hindsight." *Id.* at 689.   To render effective assistance, the Sixth Amendment requires counsel "to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary." *Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997) (citing *Strickland*, 466 U.S. at 691).   When assessing

effectiveness at the sentencing stage of a capital trial, counsel's "investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). "[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Id.* That is, "[g]enerally accepted standards of competence require that counsel conduct an investigation regarding the accused's background and character." *Id.* Yet, *Strickland* does not "require defense counsel to present mitigating evidence at sentencing in every case." *Miniel v. Cockrell*, 339 F.3d 331, 344 (5th Cir. 2003).

With respect to counsel's duty to investigate, the Supreme Court has observed:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91; *Bell v. Lynaugh*, 828 F.2d 1085, 1088 (5th Cir. 1987); *Lowenfield v. Phelps*, 817 F.2d 285, 290 (5th Cir. 1987).   When a petitioner argues that his counsel failed to adequately investigate mitigation evidence, the proper inquiry is "not whether counsel should have presented a mitigation case . . . [but] whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." *Wiggins*, 539 U.S. at 523 (emphasis in original).

The reasonableness of an attorney's investigation must be determined by considering not only the evidence already known to counsel, but also whether such evidence would lead a reasonable attorney to investigate further.  *Id.* at 527.  The reasonableness of an investigation depends in large part on the information supplied by the defendant.  *Ransom*, 126 F.3d at 123; *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir. 1989); *Mattheson v. King,* 751 F.2d 1432, 1440 (5th Cir. 1985) (in denying ineffective-assistance claim based on failure to investigate and pursue insanity defense, court noted defendant's failure to tell counsel that he either was presently insane or so intoxicated at time of offense as to be incapable of forming requisite intent).  At a minimum, counsel should interview potential witnesses and independently investigate the facts and circumstances of the case.  *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994).

Furthermore, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland,* 466 U.S. at 692. In order to establish that he has sustained prejudice, Young "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* A mere allegation of prejudice is not sufficient to satisfy the prejudice prong of *Strickland*; rather, Young must "affirmatively prove" prejudice. *Id.* at 693. Where counsel is alleged to have been ineffective at the punishment phase, the inquiry is whether the "additional mitigating evidence [is] so compelling that there is a reasonable probability at least one juror could have reasonably determined that, because of [Petitioner's] reduced moral culpability, death was not an appropriate sentence." *Neal,* 286 F.3d at 241.

Moreover, when a petitioner seeks a federal writ of habeas corpus based on ineffective assistance of counsel:

> [i]t bears repeating that the test for federal habeas purposes is not whether [petitioner] made that showing. Instead, the test is whether the state court's decision—that [petitioner] did not make the *Strickland* showing—was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his [ineffective-assistance-of-counsel] claim.

*Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003).   Accordingly, to succeed in this Court on an ineffective-assistance-of-counsel claim, a petitioner must at a minimum show that the state habeas court's decision was contrary to, or an unreasonable application of, the standards provided by the clearly-established federal law (i.e., *Strickland*).   Indeed, the Court's review of a state court's resolution of an ineffective-assistance-of-counsel claim under AEDPA is "doubly deferential," *Pinholster*, 131 S. Ct. at 1403 (quoting *Knowles v. Mirzayance*, 556 U.S. 111 (2009)), since the question is "whether the state courts application of the *Strickland* standard was unreasonable." *Richter*, 131 S. Ct. at 785.   Importantly, "[t]his is different from asking whether defense counsel's performance fell below *Strickland*'s standard," because the "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id*.   Consequently, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 786. Rather, in order to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

**B.    Young's claim that counsel was ineffective for not calling inmate Raynaldo Villa to testify that Page admitted to killing Petrey is time-barred, procedurally barred, and meritless.   (Claim No. 4.B.1)**

Young asserts that counsel was ineffective for not calling inmate Raynaldo Villa to testify that Page admitted to killing Petrey while in custody.   DE 87 at 188-89.   But this claim is time-barred, procedurally barred, and otherwise meritless.   Consequently, AEDPA precludes granting relief on this claim.

**1.    This claim is time-barred.**

This claim does not "relate back" to any of the claims presented in Young's original petition, which does not mention Villa at all.   *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644.   Consequently, review is barred by the statute of limitations.   28 U.S.C. § 2244(d)(1).

**2.    This claim is procedurally barred.**

While Young argues that he presented this claim in his first state habeas petition, Villa's name is not mentioned here either.   DE 87 at 182 (citing 1 SHCR-01 85-91).   Nor was this claim was raised on direct appeal.

Accordingly, it is unexhausted and procedurally defaulted.  *Nobles*, 127 F.3d at 420.

### 3.    Alternatively, this claim is meritless.

Even if this claim were not both time-barred and procedurally barred, this claim is also wholly without merit.  The Fifth Circuit has stated that to prevail on a claim that counsel was ineffective for failing to call a witness requires that the petitioner "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  Villa does not state that he was available and willing to testify if called.  DE 87 at Petitioner's Exhibit 125.

Furthermore, Young cannot now complain that his counsel was ineffective for investigating this issue, as it appears that Young himself was aware of Villa's story and could have related the information to counsel.  DE 87 at 189.  The reasonableness of an attorney's investigation depends in large part on the information supplied by the defendant.  *Ransom*, 126 F.3d at 123; *McCoy*, 874 F.2d at 964; *Mattheson,* 751 F.2d at 1440.

Finally, even if counsel was aware of Villa, they had many good reasons not call Villa to the stand.  As an inmate, Villa's credibility is immediately

suspect.   The prosecution could also have struck his testimony as hearsay. These are valid strategic considerations that militate against calling Villa.

In light of the foregoing, Young cannot demonstrate either deficiency or prejudice with respect to counsel not calling Villa to testify at trial.   Any relief on this claim should be denied.

C.   **Young's claim that counsel should have prevented admission of his TYC records is largely unexhausted and procedurally defaulted.  Additionally, it is meritless. (Claim No. 4.B.2)**

1.   **Young's claim that counsel failed to object to the introduction of the TYC records on the basis that they were illegally obtained and improperly used to enhance his death sentence is unexhausted and procedurally defaulted.**

Young's claim that counsel should have objected to the introduction of his TYC records was presented as Ground for Review Twelve in his first state habeas application.  DE 87 at 182.  Young also alleges a Confrontation Clause violation occurred through the admission of these records.  *Id.* at 211.  While Young raised a claim with respect to his TYC records in ground twelve of his state habeas application, there he claimed only that counsel should have objected to introduction of the records on the hearsay and Confrontation Clause grounds.  1 SHCR 85-91; 7 SHCR-01 1139.  Young now asserts:

> In this case, trial counsel failed to investigate how the State obtained the [TYC] records pertinent to Young's detention before any charges against Young were filed.  Had counsel bothered to investigate how those records were obtained, they would have

> discovered the records were not only illegally obtained by the
> State, but also that, more likely than not, the records were used
> by the State in deciding to charge Young with the death penalty.
> Counsel's failure to investigate how the State obtained the
> records, and whether the State improperly used those records in
> charging Young with a capital crime, was ineffective.

DE 87 at 190-91.   These are completely different claims than the ones presented on state habeas review.   To exhaust his state court remedies, a petitioner must have fairly presented the substance of his claim to the state courts.   *Nobles*, 127 F.3d at 420 (citing *Picard*, 404 U.S. at 275-76).   The petitioner does not satisfy the exhaustion requirement if he presents in his federal petition new legal theories or factual claims that he failed previously to present to the state courts.   *Id.* (citing *Anderson*, 459 U.S. at 6-7). Consequently, any of Young's claims concerning these records (save the exhausted claim that counsel should have objected on the basis of hearsay and the Confrontation Clause claim[20]) are unexhausted and procedurally defaulted.

### 2.   Alternatively, Young's claims concerning the TYC records are meritless.

In assessing the reasonableness of counsel's performance, the court must indulge a strong presumption that the performance falls within the

---

[20]   Although not unexhausted, the Confrontation Clause argument is procedurally barred because Young raised it in a supplemental pleading that the Court of Criminals found constituted an impermissible subsequent application.   7 SHCR-01 1139; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.

"wide range of reasonable professional assistance" and that "the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689; *Gray v. Lynn*, 6 F.3d 265, 268 (5th Cir. 1993). "So long as counsel made an adequate investigation, any strategic decisions made as a result of that investigation fall within the wide range of objectively reasonable professional assistance." *Cotton v. Cockrell,* 343 F.3d 746, 752 (5th Cir. 2003) (citing *Smith*, 311 F.3d at 668 (internal citations and quotation marks omitted)). "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Id.* at 752-53.

With regard to Young's exhausted claim, the state court found that Young failed to demonstrate either deficiency or prejudice under *Strickland* with respect to the introduction of Young's TYC records:

> The Court finds that as a matter of strategy the defense decided not to object to State's Trial Exhibit [147] and that this strategy was not unreasonable.  The Court further finds that considering the totality of the evidence on guilt-innocence and punishment, moreover, if State's Trial Exhibit 147 in whole or part had been excluded, the result of the punishment phase of the trial in reasonable probability would not have been different.

2 SHCR-01 249.

This conclusion is supported by the record. Ian Cantacuzene, one of Young's attorneys, testified during Young's state habeas proceedings that the defense was aware of the records and did not object as a matter of strategy. 3 SHRR-01 27. Counsel testified that he considered it preferable for the entire TYC package to be admitted—providing context for the adverse information contained therein—rather than have witnesses testify to each of incident involving Young. 2 SHRR-01 210-12. Also, counsel was concerned that having officers testify to individual incidents might jog their memories and cause them to remember other incidents that were not documented in the record. *Id.* Lastly, Young's defense team also thought that the records supported the testimony of their experts. The defense team presented evidence that Young's behavioral deficiencies could be controlled by medication, and the TYC records indicated the Young could control his impulsiveness in an institutional setting with medication. *Id.* at 214-15. The defense thus believed that on the whole, the records helped their case. 3 SHRR-03 22. Consequently, they made the strategic decision not to object to their introduction. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir 1999) ("We will not find ineffective assistance of counsel [merely because] we disagree with counsel's trial strategy.")

Concerning Young's unexhausted and procedurally defaulted assertions regarding these records, the Director notes, first, the decision of the prosecution to seek death against a defendant indicted for capital murder is a proper discretionary decision.  And whether or not the prosecution would have elected to seek the death penalty against Young without consideration of Young's TYC records is pure speculation.  Second, Young's TYC records were not unlawfully obtained.  Third, Young's TYC records formed only a small part in the decision of the prosecution to seek the death penalty against Young, and the prosecution would have sought the death penalty against Young even if the prosecution had not seen or considered Young's TYC records.  Fourth, the information in Young's TYC records about which Young was also available from other sources and introduction of these records was therefore not prejudicial.

> **a.)   The prosecution's decision to seek the death penalty was a proper discretionary decision.**

The decision of the prosecution to seek death against a defendant indicted for capital murder is a proper discretionary decision.  *See Gregg v. Georgia*, 428 U.S. 153 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976).  The Fifth Circuit has stated that "'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision, whether or not to prosecute, and what charge to file or bring before

a grand jury, generally rests entirely in his discretion.'" *In re United States of America*, 397 F.3d 274, 284 (5th Cir. 2005) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)); *see also McCleskey v. Kemp*, 481 U.S. 292, 296, 297 (1987) (recognizing a prosecutor's "traditionally 'wide discretion;'" "discretion is essential to the criminal justice process").   This discretion is tempered only by the Equal Protection Clause.  *Id.*

### b.)   Young's contention that the State's decision to seek the death penalty against Young was based on the TYC records is pure speculation.

A pretrial hearing was held on the defense's "Motion to Exclude Death Penalty on Account of the Arbitrary Use of Prosecutorial Discretion and the Plea Bargaining Process in this Judicial District."  5 RR 90.   District Attorney Schorre testified that his office has a written policy with respect to seeking the death penalty for capital murder defendants.  *Id.* at 96.   The written policy was and admitted into evidence.  *Id.* at 116.   Schorre testified as to seeking the death penalty for Young.  *Id.* at 120-21.   Schorre did not testify that the decision was based solely on Young's TYC records.[21]   Schorre testified that he also considered the crimes Young committed as an adult in deciding to seek the death penalty.   Those crimes included the home invasion

---

[21]     Furthermore, even without the TYC records, the petition to adjudicate Young a delinquent child and the judgment entered on the petition still showed Young's juvenile criminal history.   45 RR at State's Exhibits 148-149 (petition to adjudicate Young a delinquent child and the judgment).

and attempted capital murder of Carlos Torres Ramos on November 20, 2001;
the burglary of the East Texas Polaris Shop on November 23, 2001; and the
theft of night deposits at a Dairy Queen on September 8, 2001.  Young's
contention that the State would not have sought the death penalty without
Young's TYC records is pure speculation.

> ### c.) The prosecution did not unlawfully obtain Young's TYC records.

Young alleges that the prosecution's acquisition of his TYC records
violated his Fourth Amendment right to privacy.  DE 87 at 196-206.  Young
argues that "[t]here is a general understanding that there is an expectation of
privacy in physician-patient communications."  *Id.*  Young also contends that
Young had an objective expectation of privacy in his TYC records by virtue of
Texas Occupations Code, Sections 159.002 and 159.003.  *Id.* at 202-05.

Where defense counsel's failure to litigate a Fourth-Amendment claim
competently is alleged to constitute ineffective assistance, the defendant
must prove that his Fourth-Amendment claim is meritorious and that there
is a reasonable probability that the verdict would have been different absent
the excludible evidence in order to demonstrate actual prejudice.
*Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).  Here, Young's TYC
records belonged to TYC and not Young.  The mere fact that the records were
about Young does not make the records his.  Moreover, there is no patient-

physician privilege in Texas criminal law.  Texas Rule of Evidence 509(b), "Limited Privilege in Criminal Proceedings" states, "There is no physician privilege in criminal proceedings.  However, a communication to any person involved in the treatment or examination of alcohol or drug abuse by a person being treated voluntarily or being examined for admission to a treatment for alcohol or drug abuse is not admissible in a criminal proceeding."   The promulgation of Rule 509 and the repeal of the Texas Medical Practice Act abrogated any physician patient privilege in Texas criminal proceedings. *State v. Hardy*, 963 S.W.2d 516 (Tex. Crim. App. 1997).  That being so, Young had neither a reasonable expectation of privacy in his TYC records nor standing to complain that the records were unlawfully obtained.

> **d.)   No prejudice could have accrued because of the introduction of Young's TYC records since they were redundant to other testimony.**

Young complains that his TYC records included "information concerning Young's diagnosis and treatment while at TYC; information concerning his involuntary commitment to TYC; incidents preceding his commitment to TYC; alcohol and drug abuse information; and [Young]'s mental health impressions."  DE 87 at 191-92.  Young further states, "The records obtained by the State also indicated that Young suffered from ADHD ([DE 87 at Petitioner's Exhibit 21] at 293); that Young had 'mental health

needs requiring treatment' for which he was prescribed 'psychotropic medications' (*id.* at 300); and that Young presented evidence of emotional pain (*id.* at 362). . . TYC records also disclosed the extensiveness of Young's alcohol problems. (*Id.* at 367.)." *Id.* at 192.

But the information in the TYC records was also contained in the records of Waco Center for Youth to which Young was committed on January 26, 1998 (32 RR 5-7, 13), the punishment testimony of Dr. Helen Short of the Waco Center for Youth who treated Young (*Id.* at 5-150), and the petition and judgment of the Marion County Juvenile Court committing the Young to the TYC (45 RR at State's Exhibits 148, 149). Consequently, there was no prejudice with regard to the introduction of Young's TYC records even if counsel was deficient. Accordingly, relief on this claim should be denied.

### D.    Young's counsel did not perform ineffectively with regard to the ballistics report. (Young's Claim No 4.B.2[22])

Young alleges that counsel rendered ineffective assistance because "[a]t the time of trial, defense counsel had a ballistics  report from State's witness, Tim Counce, that cast doubt on whether the firearm in Young's possession could have been the gun that was used to shoot Doyle Douglas. However, counsel failed to utilize this report in cross-examination of lay and expert witnesses who testified to the shooting, and failed to retain and present their

---

[22]    Young has two claim 4.B.2's.

own expert witness who could have testified consistently to Counce's opinion in the report and during his testimony." DE 87 at 211.   However, the state court found this would not be a viable strategy:

> [Douglas] was shot three times in the head, and all head wounds were mortal.   The jury was authorized to find [Young] guilty of the offense of murder of [Douglas] on the basis of his own conduct and as a party to the conduct of [Ray] in shooting [Douglas].   The Court finds that the evidence in this case clearly shows beyond [a] reasonable doubt both by direct eye witness testimony, by the admission of [Young] to Patrick Brook and by circumstantial evidence that [Young] shot [Douglas] two times in the head with the Colt Hunstman .22 caliber semi-automatic handgun, State's Trial Exhibit 3, seized from [Young]'s possession.   The Court further finds beyond a reasonable doubt that [Ray] shot [Douglas] in the head at the creek, and that [Young] was criminally responsible as a party to that conduct of [Ray].   The Court finds that the failure of the defense to show at trial which gun shot [Douglas] in the left and right side of his head was not unprofessional error and that if such evidence had been presented at trial, there is no reasonable probability that the result of the proceeding would have been different.

2 SHCR 257-58.

As shown below, these findings are supported by the record.

### 1.   Counsel did not act deficiently in challenging the ballistics.

#### a.)   Background

Medical examiner Dr. Urban testified before the jury that she randomly assigned each of Douglas's three head wounds the numbers 1, 2, and 3.   22 RR 265.   Head wound number 1 entered the back of the head and traveled through the left side of the brain from back to front.   *Id.* at 268.   Head wound

number 2 entered the left side of the head above the ear.  *Id*. at 265. Head wound number 3 entered the right side of the head behind the right eye.  *Id*. at 267.

Dr. Urban testified that bullet fragment State's Exhibit 9 was recovered and was associated with gunshot wound number 1, fired into the back of Douglas's head.  *Id*. at 285.  Dr. Urban testified that bullet fragments State's Exhibits 10 and 11 were recovered from Douglas's head, but she did not associate bullet fragment State's Exhibit 10 with head wound 2 or 3 and did not associate bullet fragment State's Exhibit 11 with head wound 2 or 3. *Id*.

While Dr. Urban's testimony at trial did not associate State's Exhibit 9 and 10 with which head wound 2 or 3, her autopsy report reflects that she marked all three bullets, State's Exhibits 9, 10 and 11 with an identifying number on the base of the bullets.  The bullet associated with gunshot wound 1 to the back of the head was inscribed with "1."  The bullet associated with the gunshot wound number 2 to the left temporal scalp was inscribed "4264 JU 2."  The bullet associated with gunshot wound number 3 to the right forehead was inscribed "4364 3."  DE 86 at Petitioner's Exhibit 86 (Autopsy Report of Jill Urban).

There were two .22 caliber guns involved in the shooting of Douglas.  A Colt Huntsman semi-automatic .22 caliber pistol, labeled State's Exhibit 3, was seized from Young's possession, and an RG .22 caliber revolver with a broken handle, labeled State's Exhibit 5, seized from John Nunn and used by Ray to shoot Douglas.

Counce testified for the State that State's Exhibit 9 was not fired by the RG .22 caliber revolver used by Ray, which meant by process of elimination between the two guns involved that it was fired from the Colt Huntsman semi-automatic handgun seized from Young.  25 RR 161-62.  Counce testified that State's Exhibit 10 was not fired from the RG .22 caliber revolver used by Ray, which meant by process of elimination between the two guns involved that it was fired from the Colt Huntsman semi-automatic handgun seized from Young.  *Id*.  Counce testified that State's Exhibit 11 was not fired by the Colt Huntsman semi-automatic handgun seized Young, which meant by process of elimination between the two guns involved that it was fired from State's Exhibit 5, the RG revolver with the broken handle.  *Id*.

### b.)    Earnest's report does not exculpate Young.

Young presents the affidavit of Richard N. Earnest in support of his contention that counsel erred in failing to present "independent, corroborating ballistics evidence through their own expert."   DE 87 at

Petitioner's Exhibit 95.   But "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398.  This affidavit was not secured until 2008.   Consequently, the Court cannot consider the Earnest affidavit in evaluating the state court's decision on this claim.

Even so, the Earnest report does not help Young.  The Earnest report purports to conclude that State's Exhibit 11 is the bullet that caused head wound number 3 to the right side of Douglas's head, and that State's Exhibit 11 "is consistent with being fired by State's Exhibit 4[23], the R-G .22 LR Revolver, which witness Ray admitted was the firearm he used to shoot Douglas (22 RR at 521)."  This conclusion is relevant, Young argues, because the remaining two wounds were to the left and the back.  Since Young was sitting to the right of Douglas when testimony showed Young shot him, Young believes that this shows that he was not the shooter of the second two shots.[24]

---

[23]    The .22 revolver is actually State's Exhibit 5.  22 RR 180.

[24]    The Director notes that the relative positions of the participants hardly rules out any scenario.  Dr. Urban testified on cross-examination that gunshot wound number 2 (to the left side of the head) that went left to right was consistent, among other things, with someone shooting a driver from a position at the driver's door, that gunshot wound number 3 that entered the right temple above the eyebrow was consistent, among other things, with a back seat passenger shooting a driver that was leaning over and looking back, and gunshot wound number 1 (to the back of the head) was consistent with someone putting a pillow over the head of the victim

However, Earnest states no facts or data to associate State's Exhibit 11 with the gunshot wound number 3 to Douglas's right forehead.  The autopsy report and Dr. Urban's testimony do not associate State's Exhibit 11 with gunshot wound number 3 to Douglas's right forehead.  The testimony and ballistic report by Counce likewise do not associate State's Exhibit 11 with gunshot wound number 3.  While Dr. Urban noted in her autopsy report that she inscribed the projectile associated with head wound number 3 to the right forehead of Douglas's head with "4364 3," the Earnest report does not refer that inscription with the projectile he claims is State's Exhibit 11.  Counce's ballistic report states that he received three lead projectiles identified as 16 G, 16 H and 16 I.  The report, however, does not note the autopsy inscriptions on the three projectiles or associate the three projectiles with State's Exhibits 9, 10 and 11.  DE 87 at Petitioner's Exhibit 88 (Counce ballistic report).  Earnest's assertion that State's Exhibit 11 caused the head wound number 3 to the right side of Douglas's head therefore appears to have no basis.

---

lying face down and shooing him through the pillow into the back of the head.  22 RR 293-296.  However, Dr. Urban testified on redirect that gunshot wounds would be consistent with many different theories with respect to the position of the shooter and the victim.  With respect to gunshot wound number 1 to the back of the head, Dr. Urban noted that it would be consistent among other things with a passenger shooting a driver who had turned his head to the left, that gunshot wound number 3 (to the right side of the head) would be consistent with a passenger shooting a driver, and that gunshot wound number 2 (to the left side of the head) was consistent with shooting a victim lying on the ground.  22 RR 301-03.  Thus, the position of the wounds could support a number of scenarios, some favorable to the prosecution and some favorable to the defense.

The same may also be said for Earnest's conclusion that State's Exhibit 10, was fired into the left side of Douglas's head, causing head wound number 2. Earnest simply provides no basis for that conclusion. In the end, the only bullet associated with any head wound to Douglas is State's Exhibit 9, which Dr. Urban testified caused head wound number 1 to the back of Douglas's head and was fired by the State's Exhibit 3, the Colt Huntsman semi-automatic handgun seized from Young's possession.

### 2. Even if counsel was somehow deficient, no prejudice accrued.

Three eyewitnesses testified that Young shot Douglas in the car two times in the head with State's Exhibit 3, the semi-automatic pistol seized from Young. 21 RR 113; 22 RR 249-50. Young also admitted shooting Douglas to Patrick Brook. 21 RR 250-54. Two fired shell casings fired from State's Exhibit 3 were found in the front passenger seat and on the front passenger floorboard of Douglas's abandoned car. Three eyewitnesses, moreover, testified Young forced Ray to shoot Douglas in the head with State's Exhibit 5, the RG revolver, while Douglas laid face down in a creek with a pillow placed over his head. Young's guilt in the Douglas murder by the Young's own conduct and as a party to the conduct of Ray is not in doubt. Young's complaint that trial counsel erred in failing to introduce the Counce

ballistic report into evidence and present independent expert ballistic testimony is without merit.

In light of the foregoing, Young has failed to demonstrate that the state court's resolution of any of his ineffective-assistance-of-counsel claims is objectively unreasonable.  Indeed, Young has failed to demonstrate either deficient performance on the part of trial counsel or prejudice as required by *Strickland.*  466 U.S. at 697 (directing this Court to reject an ineffectiveness claim based on failure to prove either prong).  This Court cannot grant habeas relief unless the state court's decision conflicts with clearly-established federal law as determined by the Supreme Court or "[is] based on an unreasonable determination of the facts in light of the evidence."  28 U.S.C. § 2254(d).  There is no such unreasonable conflict or determination here.  Young has shown neither deficiency nor prejudice by counsel, and therefore the state court's application of *Strickland* was reasonable.  Accordingly, this Court should deny Young's ballistics claim.

### E.   Young's claim that counsel was ineffective for not testing Douglas's vehicle for an alternative explanation of how the shell casings were found the car is procedurally barred.  Alternatively, this claim is without merit.  (Claim No. 4.B.3)

Young argues that counsel was ineffective for failing to test Douglas's vehicle for an alternative explanation of how shell casings were found the car.  DE 87 at 220-21.  In particular, Young believes that certain holes in the car's

dash were bullet holes, which would have provided a possible alternative explanation for how shell casings came to be found in the car.  *Id.*  But this claim is procedurally barred as well as wholly meritless.  Consequently, any relief is precluded by AEDPA.[25]

### 1.    This claim is procedurally barred.

This claim was presented for the first time in Young's pro se supplement that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  5 SHCR-01 759; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.   Consequently, this claim is procedurally barred. *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006) ("Texas's abuse-of-the-writ doctrine is a valid state procedural bar foreclosing federal habeas review."); *Aguilar v. Dretke*, 428 F.3d 526, 533 (5th Cir. 2005) (holding the Texas abuse-of-the-writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004) (holding the violation of the Texas

---

[25]    Young attached a document called "Applicant's Unexhausted State Claims" and a letter to his attorney to his federal petition.  These documents contain the first mention of this argument in federal court.  These documents appear to be verbatim copies, but they are attached before the petition's affidavit and the exhibit list.  If the Court does not construe this document as properly raising the claims contained therein—instead considering it an exhibit—the Director argues that all of the claims contained therein that have not been briefed elsewhere in the petition are barred by the statute of limitations.

writ-abuse rule ordinarily furnishes an adequate and independent procedural

ground which bars federal habeas review of a claim).

### 2.    Alternatively, this claim is meritless.

In this claim, Young argues that:

> Trial counsel inexplicably failed to test Douglas's vehicle so that
> the defense could explain why two .22 caliber shell casings were
> found in the passenger side of the vehicle. (23 RR at 43-46.)   In
> his closing argument, the prosecutor argued that the shell
> casings found in Douglas's vehicle, one in the seat and one on the
> floorboard, were fired from Young's gun, the Colt Huntsman .22
> caliber (29 RR at 19-20, 67), and thus the shooter was inside the
> car at the time of the shooting.   The shell casings matched the
> Colt Huntsman, which, by process of elimination, were
> responsible for two of the gunshot wounds to Douglas.   (25 RR at
> 158-59.)

DE 87 at 220.

But Young has not provided a forensic report validating his assertions

that the holes in the car's dash were caused by bullets or that the bullets that

caused the holes match the shell casings.  *Id.* at 220-21.  A petitioner's mere

conclusory and speculative allegations of ineffective assistance will not entitle

him to habeas relief. *Kinnamon v. Scott*, 40 F.3d 731, 734-35 (5th Cir. 1994)

(finding "speculation" of ineffective assistance to be no basis for habeas

relief); *Barnard v. Collins*, 958 F.2d 634, 643 n.11 (5th Cir. 1992) (holding

that "conclusory allegations" of ineffective assistance are without merit "[i]n

the absence of a specific showing of how these alleged errors and omissions

were constitutionally deficient, and how they prejudiced his right to a fair trial); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (noting that "mere conclusory allegations do not raise a constitutional issue in a habeas proceeding"); *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (noting that claims which are "unsupported by specifics are subject to summary dismissal"). Since this claim is conclusory, the Court should summarily dismiss it.

### F.   Young's claim that counsel was ineffective for not testing Page's gloves is procedurally barred.  Alternatively, it is without merit. (Claim No. 4.B.4)

Young claims that counsel was ineffective for failing to conduct forensic testing on Page's (alleged) gloves.  DE 87 at 221-22.  Young asserts such testing would have demonstrated that: (1) Page had bought the gloves on the trip; and (2) Page had shot a gun while wearing the gloves.  *Id*.  But this claim is time-barred, procedurally barred, and wholly meritless. Consequently, any relief is precluded by AEDPA.

#### 1.   This claim is time-barred.

This claim does not "relate back" to any of the claims presented in Young's original petition.  *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644. As such, review is barred by the statute of limitations.  28 U.S.C. § 2244(d)(1).

#### 2.   This claim is procedurally barred.

This claim was presented for the first time in Young's supplemental briefing that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  7 SHCR-01 1139; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.   Consequently, this claim is procedurally barred. *Coleman*, 456 F.3d at 542.

### 3.   Alternatively, this claim is meritless.

Alternatively, the Director notes again that Young has not provided a forensic report validating his assertion that gunpowder residue is on the gloves.   DE 87 at 221-22.   He merely speculates that such a report could validate his assumptions.   *Id*.   Young does cite to the procedurally barred Earnest report in support of his claim, but Earnest merely states that it is possible that testing could be done and does not appear to have actually conducted any testing of his own.   *Id*.   Nor has Young provided any evidence to support his claim that Page bought the gloves during the kidnaping. As noted, a petitioner's mere conclusory and speculative allegations of ineffective assistance will not entitle him to habeas relief.   *Kinnamon*, 40 F.3d at 734-35. Since this claim is conclusory, the Court should summarily dismiss it.

**G.   Young's claim that counsel was ineffective for not investigating how Page, Ray, and McCoy conspired through Page's ex-girlfriend to corroborate their version of events is procedurally barred.  Alternatively, it is without merit.  (Claim No. 4.B.5)**

Young claims that counsel was ineffective not investigating how Page, Ray, and McCoy allegedly conspired through Page's ex-girlfriend to corroborate their version of events.   DE 87 at 222-23.   But this claim is procedurally barred as well as wholly meritless.   Consequently, any relief is precluded by AEDPA.

### 1.   This claim is procedurally barred.

This claim was presented for the first time in Young's pro se supplement that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  5 SHCR-01 759; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.   Consequently, this claim is procedurally barred. *Coleman*, 456 F.3d at 542.

### 2.   Alternatively, this claim is meritless.

Young claims that Page "admits" this conspiracy in his testimony; however, it is plain that Page does no such thing.  DE 87 at 223 (citing 27 RR at 220-21).   Rather, Page merely states that he was aware of the chase videotape.  He acknowledges no conspiracy, and he clearly could have learned of the video from any number of sources.  Young provides no other evidence to

support his claim.  As noted, a petitioner's mere conclusory and speculative allegations of ineffective assistance will not entitle him to habeas relief. *Kinnamon*, 40 F.3d at 734-35.  Since this claim is conclusory, the Court should summarily dismiss it.

### H. Young's claim that counsel was ineffective for not requesting a mistrial when Petrey's relative was discovered on the jury is procedurally barred.  Alternatively, it is without merit.  (Claim No. 4.B.6)

Young claims that counsel was ineffective for not requesting a mistrial when a relative of Petrey's was discovered on the jury.  DE 87 at 223-24. However, this claim is procedurally barred.  It is also meritless. Consequently, any relief is precluded by AEDPA.

#### 1.   This claim is procedurally barred.

This claim was presented for the first time in Young's supplemental briefing that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  5 SHCR-01 759; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.   Consequently, this claim is procedurally barred. *Coleman*, 456 F.3d at 542.

#### 2.   Alternatively, this claim is meritless.

In this claim, Young argues that:

On the second day of Young's trial, the court informed the parties of the following.   Juror Cathie Huckabee had just informed the court that she was distantly related to victim Samuel Petrey.  Huckabee knew that there had been a murder in her family, but had not made the connection that the family member was the same as the murder victim in Young's case until her sister had called.   When the court asked Huckabee if she could still fairly assess the evidence in the case, Huckabee told the court: "I don't see how it cannot affect my evaluation of the case."  The court had asked Huckabee to remain until a decision was made. (22 RR at 5-6.)

DE 87 at 223.

But Young's claim is conclusory in that he does not provide any evidence concerning defense counsel's motivations in not asking for a mistrial.  *Kinnamon*, 40 F.3d at 734-35.   Furthermore, the relative was a distant one who did not even know she was related to the victim until after the trial had begun.   22 RR 5-6.   Even if counsel should have requested a mistrial, no prejudice accrued.  The claim should be dismissed.

## I.   Young's claim that counsel should have cross-examined Debbie Sanders concerning her alleged conversation with Carla Sexton is procedurally barred.  Alternatively, it is without merit.  (Claim No. 4.B.7)

Young claims that counsel was ineffective for failing to question Debbie Sanders about her conversation with Carla Sexton (Young's mother) in which Sexton allegedly told her that she heard Ray brag to Patrick Brook that Ray shot Douglas.  DE 87 at 225.  However, this claim is both procedurally barred and meritless.

### 1.    This claim is procedurally barred.

This claim was presented for the first time in Young's pro se supplement that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  5 SHCR-01 759; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.  Consequently, this claim is procedurally barred. *Coleman*, 456 F.3d at 542.

### 2.    Alternatively, this claim is without merit.

Young provides an affidavit from Sexton in conjunction with his petition.  DE 87 at Petitioner's Exhibit 123.  But she does not discuss this claim or state the contents of her allegedly omitted testimony.  Sanders does not offer an affidavit either.  Young's claim is therefore both conclusory, *Kinnamon*, 40 F.3d at 734-35, and fails to meet the requirements of *Day*, 566 F.3d at 538.  The Director also notes that this testimony would have been twice-hearsay.  Consequently, Young cannot demonstrate either deficiency or prejudice with regard to counsel not seeking admission of this testimony.

### J.    Young's claim that counsel was ineffective for not striking juror Haydee Guerro from Young's jury because she allegedly did not speak or understand English is procedurally barred. Alternatively, it is without merit.  (Claim No. 4.B.8)

Young claims that counsel was ineffective not striking juror Haydee Guerro from Young's jury because she allegedly did not speak or understand

English.  DE 87 at 226-27.  However, this claim is both procedurally barred and meritless.  Accordingly, relief on this claim should be denied.

### 1.    This claim is procedurally barred.

This claim was presented for the first time in Young's pro se supplement which was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  5 SHCR-01 760; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.  Consequently, this claim is procedurally barred. *Coleman*, 456 F.3d at 542.

### 2.    Alternatively, this claim is without merit.

Young has not provided a single citation to the record or an affidavit that shows that the juror did not speak or understand English.  DE 87 at 226-27.  As noted, a petitioner's mere conclusory and speculative allegations of ineffective assistance will not entitle him to habeas relief.  *Kinnamon*, 40 F.3d at 734-35.  Since this claim is conclusory, the Court should summarily dismiss it.

**K.    Young's claim that counsel was ineffective for not seeking to admit into evidence that Young was incapable of anticipating his co-defendant's actions is both barred by the statute of limitations and procedurally barred.   Alternatively, it is without merit. (Claim No. 4.B.9)**

Young claims that counsel was ineffective for not seeking to admit into evidence that Young was incapable of anticipating his co-defendant's actions because he suffered from ADHD.  DE 87 at 227-29.  However, this claim is both procedurally barred and meritless.  Accordingly, AEDPA precludes relief on this claim.

### 1.    This claim is procedurally barred.

This claim was presented for the first time in Young's pro se supplement that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  5 SHCR-01 760; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.   Consequently, this claim is procedurally barred. *Coleman*, 456 F.3d at 542.

### 2.    Alternatively, this claim is without merit.

Young has not presented any information from counsel concerning their decision-making process in this respect.  This instantly defeats his claim. Furthermore, counsel did introduce evidence concerning Young's ADHD.  At trial, Dr. Milam diagnosed Young as having mild brain damage, a severe

attention deficit disorder and severe behavioral problems.  34 RR 103.  Dr.
Milam was of the opinion that Young "can't be fixed."  *Id.* at 108.  She
testified that ADHD prevented regular inhibitors of conduct from developing
normally.  *Id.* at 24.  Dr. Milam also testified that ADHD affects a person's
ability to pick up or perceive social clues due to an inability to focus.  *Id.* at
48.  Dr. Milam concluded that most of the conduct identified as problematic
in Young's life as a result of severe ADHD.  *Id.* at 27.  If the jury wished to
draw the inference that Young could not anticipate his accomplices's actions
because of his ADHD, the evidence necessary for them to do so was available.
Any further testimony concerning Young's ADHD would have been
redundant.  *Murray*, 736 F.2d at 282 (counsel's decision not to present
cumulative and redundant testimony does not constitute ineffective
assistance).

### L.  Young's claim that his attorneys should have called two of his former grade school teachers as witnesses is meritless. (Claim No. 4.C.1)

Young claims that his attorneys rendered ineffective assistance when
they did not call two of his former grade school teachers to testify at trial.  DE
87 at 229.  Young raised this issue in his first state habeas application as
ground number twelve.  In his state habeas application, Young contended
that Young's former teachers, Margaret Ann Fant and Mary Hall "would

have testified that he was a good child, bright, if hyperactive." Young did not provide any affidavit from Margaret Ann Fant or Mary Hall in his state habeas application. The trial court rejected Young's complaint, and its findings were adopted by the Court of Criminal Appeals.

Now, on federal habeas review, Young offers the affidavit of Margaret Fant in support of his claim. DE 87 at Petitioner's Exhibit 104. Young does not present an affidavit by Mary Hall, but states that "Mary Hall was Young's physical education teacher in kindergarten and first grade. Hall never had any problems with Young and he behaved himself in her class. She thought he was more of a follower than a leader." DE 87 at 230-31.

However, the Fant affidavit (and Young's unsupported statements about Hall) cannot be considered by this Court. As noted, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398. But even assuming arguendo that this evidence could be considered, Young has not demonstrated that he is entitled to relief. With respect to errors at the sentencing phase of a death penalty trial, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer [] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also*

*Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) ("If the petitioner brings a claim of ineffective assistance with regard to the sentencing phase, he has the difficult burden of showing a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel." (internal quotation marks omitted)).

Young's allegedly mitigating evidence does not compare to the mitigating evidence the Supreme Court has found to be prejudicially omitted in other cases.  In *Wiggins*, for example, counsel focused on Wiggins's direct responsibility for the murder, but asked the jury to also consider his "difficult life" during opening statement.  But *no* evidence was presented as to Wiggins's life history.  539 U.S. at 526.  And as the Court described, "[t]he mitigating evidence counsel failed to discover and present in this case is powerful[:]"

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother.  He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care.  The time Wiggins spent homeless, along with his diminished mental capacities further augment this mitigation case.

*Id.* at 534-35; *see also id.* at 516-17, 525.

In *Rompilla v. Beard*, the case for mitigation was composed of the testimony of five family members who "argued in effect for residual doubt, and beseeched the jury for mercy, saying that they believed Rompilla was a

good man." 545 U.S. 474, 378 (2005). But the evidence that was readily available to trial counsel included "a range of mitigation leads that no other source had opened up." *Id.* at 390. As the Court wrote:

> The prison files pictured Rompilla's childhood and mental health very differently from anything defense counsel had seen or heard. An evaluation by a corrections counselor states that Rompilla was "reared in the slum environment of Allentown, [Pennsylvania] vicinity. He early came to the attention of juvenile authorities, quit school at 16, [and] started a series of incarcerations in and out of [Pennsylvania], often of assaultive nature and commonly related to over-indulgence in alcoholic beverages." . . . The same file discloses test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling. . . . The accumulated entries would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts.

*Id.* at 390-91 (citations omitted). Still other evidence established that Rompilla's mother drank during her pregnancy, that his father had a "vicious temper," that Rompilla and his siblings "lived in terror," that he and a brother were locked "in a small wire mesh dog pen that was filthy and excrement filled," that they were isolated from other children, that their home had no indoor plumbing, and that they slept in an attic with no heat. *Id.* at 392. Ultimately, the Supreme Court said of the later-discovered

evidence, it "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury[.]" *Id.* at 393.

Furthermore, in assessing the relative weight of the new mitigating evidence, a reviewing court compares and contrasts the new evidence with that from the trial.  The Fifth Circuit has indicated that it will look to see if the petitioner's new evidence will "lessen the impact of the other evidence against him[,]" *Conner v. Quarterman*, 477 F.3d 287, 294 (5th Cir. 2007), because "overwhelming aggravating factors" can outweigh unpresented mitigating evidence.  *Sonnier v. Quarterman*, 476 F.3d 349, 360 (5th Cir. 2007).  For instance, the "brutal and senseless nature of the crime," *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006), or the "cruel manner in which he killed," *Miniel v. Quarterman*, 339 F.3d 331, 347 (5th Cir. 2003), may weigh heavily against a finding of *Strickland* prejudice. *See also Strickland*, 466 U.S. at 700; *Knight v. Quarterman*, 186 Fed. App'x 518, 535 (5th Cir. 2006); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002); *Andrews v. Collins*, 21 F.3d 612, 624 n.23 (5th Cir. 1994); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989).

These witnesses would have presented testimony already provided by other witnesses.  Counsel's decision not to present cumulative testimony does not constitute ineffective assistance.  *Murray v. Maggio*, 736 F.2d 279, 282

(5th Cir. 1984).

Here, the state court held:

The Court finds that [Young] does not support his claim of ineffective assistance of counsel for failing to present the testimony of Margaret Ann [Fant] and Mary Hall 'who would have testified that he was a good child, bright, if hyperactive' with any affidavit or testimony by Margaret Ann [Fant] or Mary Hall. The Court further finds that the defense presented substantial evidence at trial that [Young] was a bright and good child, and that the suggested evidence is cumulative to evidence presented at trial. The Court further finds that the suggested evidence or testimony if presented at trial, moreover, would not in reasonable probability have changed the result of the punishment verdict.

The Court finds that trial counsel did not render ineffective assistance of counsel by failing to present the suggested testimony of Margaret Ann [Fant] or Mary Hall or other character witnesses at the punishment phase of the trial that [Young] was a bright and good person.

2 SHCR-01 251-52.

This conclusion is supported by the record. The defense contacted Margaret Fant, but decided not to call her as a witness because she did not think that Young's mother gave him the support that he needed and because she thought that he was able to control his behavior when he wanted, thereby contradicting their other evidence. 3 SHRR-01 50-51. Paul Williams, another one of Young's lawyers, testified that he remembers that one of the two women was of the opinion that Young was not hyperactive, which also

contracted their evidence.[26]

Regarding prejudice, even without the testimony of these individuals, ample evidence was presented at trial that Young was a bright child.  Dr. Helen Short, Daneen Milam, Dr. Roy Mathew, Drucilla Angel, and Rachel Polk also stated that Young was a bright individual.  32 RR 51; 34 RR 51, 212-13; 35 RR 26-27.  Likewise, evidence was also presented that Young was a good person.  Patricia Feela employed Young and testified that he did not steal and acted politely.  33 RR 223-30.  Shauntel Maria Feela testified that she was friends with Young and thought that he was a nice person.  33 RR 233.  Paula Pettingale, a friend of Young's family, testified that he was a likeable child and did not exhibit signs of violence.  *Id.* at 127-32.  Homerica McRae, a staff office at the Jefferson County State School, testified that Young was helpful and that she liked him.  35 RR 38-43.  A reviewing court must be wary of "argument[s] [that] essentially come[] down to a matter of degrees.  Did counsel investigate enough?  Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second-guessing." *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999).

---

[26]   "Complaints of uncalled witnesses are not favored [on federal habeas review], because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)).

Moreover, given the egregious facts of the murders of Douglas and Petrey, the extraneous offenses offered of the home invasion and attempted capital murder of Carlos Torres Ramos on November 20, 2001, the burglary of the East Texas Polaris Shop on November 23, 2001, and the theft of the night deposits of the Dairy Queen on September 8, 2001, the criminal offenses for which Young was adjudicated a delinquent child, the suggested evidence or testimony of Fant and Hall, if presented on punishment at the Young's trial, would not in reasonable probability have changed the punishment result.  Consequently, AEDPA precludes relief on this claim.

### M. Young's claim that counsel was ineffective not seeking to admit certain mitigation evidence is procedurally barred.  Alternatively, this claim is without merit.  (Claim No. 4.C.2)

Young claims that counsel was ineffective for not seeking to admit certain evidence in mitigation.  DE 87 at 234-39.  Specifically, he claims that counsel should have introduced evidence that explained: "(1) why Young would stop taking his ADHD medication upon his discharge from TYC; and (2) why Young, who was apparently unmedicated at the time of the trial, seemed to be able to sit still and converse with his trial counsel."  *Id.*  However, this claim is both time-barred and procedurally barred.  Alternatively, this claim is without merit.

### 1.   This claim is barred by the statute of limitations.

This claim does not "relate back" to any of the claims presented in Young's original petition.  *Mayle*, 545 U.S. at 644.  As such, review is barred by the statute of limitations.  28 U.S.C. § 2244(d)(1).

### 2.   This claim is procedurally barred.

Young claims that he raised this claim in his third state habeas proceeding.  However, the complaint that he now makes (ineffective assistance for failing to present key mitigation evidence) does not comport with the complaint that he made in his state habeas application (ineffective assistance of state habeas counsel for failing to raise a claim of ineffective assistance for failing to present key mitigation evidence).  1 SHCR-03 91, 191.  However, even if it was properly raised, since this claim was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5, this claim is also procedurally barred.  *Ex parte Young*, No. 65,173-03 at Order of June 3, 2009; *Coleman v*, 456 F.3d at 542.

### 3.   Alternatively, this claim is without merit.

Alternatively, this claim is without merit.  Several experts testified during the punishment phase concerning Young's ADHD.  For instance, Dr. Milam, administered the Halstead-Reitan Battery, a neuropsychological test,

to Young.  34 RR 6-7, 16.  The results of the Halstead-Reitan Battery were within normal limits, and indicated that Young has no structural brain damage, but that he did have a processing deficiency.  *Id.* at 16-17.  Young's IQ was 121 within the 85th to 90th percentile.  *Id.*  Dr. Milam determined that Young had an attention deficit disorder and was hyperkinetic.  *Id.* at 18-19.

Dr. Milam reviewed Young's records from kindergarten through his incarceration and release from the TYC on July 8, 2001.  *Id.* at 26-94.  Dr. Milam noted that Young's records from kindergarten indicated that Young was aggressive and disruptive.  34 RR 26-27.  It appeared from kindergarten through his confinement in the TYC that "when he was allowed to run around and move around, his behavior was pretty good.  It's that sitting down and keeping your mouth shut that seems to be like a major problem for him."  *Id.* at 27.

Upon admission to the TYC, Young was given a SASSI or Chemical Dependency Assessment and interviewed about his drug use.  He admitted to extensive drug use including the use of marijuana, alcohol, mushrooms, cocaine, crack cocaine, and methamphetamine.  Young stated that he did not need drug or alcohol treatment and had enough self-discipline to stop on his own.  *Id.* at 60-63.  Dr. Milam noted that Young did not receive any drug

treatment while at the TYC or while at Jefferson County Elementary School. *Id.* at 63-64.

With respect to Young's mental health needs, Dr. Milam noted that when the TYC "finally got his meds straight" Young's behavior improved. *Id.* at 70. Dr. Milam was of the opinion that Young should have been required as a condition of his TYC parole to take the medications which controlled his behavior, but there was no such term of his parole. *Id.* at 74-75.

Dr. Milam concluded that Young is a bright person, but there is something significantly wrong with his brain. 34 RR 95. Dr. Milam concluded that Young's symptoms were treated but not his underlying problem, and she believed that Young did not receive treatment for substance abuse which he needed. *Id.* at 95-96. Dr. Milam diagnosed Young as having mild brain damage, a severe attention deficit disorder, and severe behavioral problems. *Id.* at 103. Dr. Milam understood that Young was using methamphetamine "for three solid days" before the killings and that the Young's drug history explains the killings. *Id.* at 106, 108. Dr. Milam was of the opinion that Young's behavior "can be controlled by medication and they proved that at TYC." 34 RR 110.

Dr. Roy Mathew, a psychiatrist and professor of psychiatry at Texas Tech University in Odessa, Texas, also testified that he reviewed Young's

reports and interviewed Young on two occasions for a total of five hours.  *Id.* at 163-165.  Dr. Mathew testified that Young was "bright," that he had a severe attention deficit hyperactive disorder, and that he had a loss of impulse control.  *Id.* at 172-73, 184, 212-13.  Dr. Mathew believed that Young "definitely was intoxicated with amphetamine during the first murder [of Doyle Douglas].  In my opinion beyond a reasonable doubt he was psychotic at that time."  *Id.* at 196-97, 226.  Dr. Mathew did not think that Young was "amphetamine intoxicated" or psychotic at the time of the second murder but rather in a state of amphetamine withdrawal.  *Id.* at 197-98.  Dr. Mathew based his opinions on the information Young gave him.  34 RR 219-26.

Dr. Mathew was of the opinion that Young's condition was treatable by a combination of drugs and cognitive therapy.  *Id.* at 200-05.  Dr. Mathew reviewed Young's records from the TYC where he was taking a combination of Ritalin, Clonidine and Depakote, and noted that there seemed to be fewer reports of trouble.  *Id.* at 206-207.  Dr. Mathew opined, "If he had been on that medication and then somebody kept an eye on him and made sure he took that treatment, two people would not have died unnecessarily and he wouldn't be in the predicament he's in."  *Id.* at 207.

Dr. Ross Greene, Ph.D. is a psychologist who practices child psychology at the Massachusetts General Hospital of Harvard Medical School, and is the

director of the CPS Institute that provides free medical attention for children who otherwise could not afford it.  36 RR 5-6.  Dr. Greene is also an associate professor in the Department of Psychiatry at Harvard Medical School and trains child psychiatrists and child psychologists in the treatment of extremely difficult children.  *Id.* at 6-7.  Dr. Greene reviewed the reports and documents concerning Young and concluded that Young was "the poster child for ADHD" and that he was a stimulant "nonresponder."  *Id.* at 18.  Dr. Greene believed that the medications Young was prescribed at TYC worked for Young and that Young's ADHD was highly treatable through medication and cognitive therapy.  *Id.* at 41-42.

As demonstrated, there was ample testimony at trial about Young's mental state and ADHD.   Further testimony would have simply been redundant.   *Murray*, 736 F.2d at 282 (counsel's decision not to present cumulative and redundant testimony does not constitute ineffective assistance).  Young has not shown either deficiency or prejudice with respect to this claim.  Accordingly, relief on this claim should be denied.

### N.   Young's claim that counsel was ineffective for not objecting to the trial court's supplemental jury charge is procedurally barred. Alternatively, this claim is without merit. (Claim No. 4.C.3)

Young claims that counsel was ineffective for not objecting to the trial court's supplemental instruction.  DE 87 at 239-42.  However, this claim is

procedurally barred.  Alternatively, this claim is without merit.  Thus, all relief should be denied under AEDPA.

### 1.    This claim is procedurally barred.

This claim was presented for the first time in Young's supplemental briefing that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  5 SHCR-01 675; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.  Consequently, this claim is procedurally barred. *Coleman*, 456 F.3d at 542.

### 2.    Alternatively, this claim is without merit.

Young was charged in paragraph one of the First Amended Indictment with the offense of capital murder of Petrey and Douglas pursuant to the same scheme and course of conduct.  Young was charged in paragraph two of the indictment with the offense of capital murder of Petrey in the course of committing and attempting to commit the offense of kidnapping and robbery directed against Petrey.  4 CR 754.

The jury found Young guilty of the offense of capital murder of Petrey and Douglas pursuant to the same scheme or course of conduct as charged in paragraph one of the indictment, and the jury found Young guilty of the offense of capital murder of Petrey by murdering Petrey in the course of

committing or attempting to commit the offense of kidnapping or robbery of

Petrey as charged in paragraph two of the indictment.  5 CR 808-47, 866-71.

The trial court authorized the jury to convict Young of capital murder in both

paragraphs on the basis of his own conduct or as a party to the offense.  *Id.*

at 808-47.

Texas Code of Criminal Procedure Article 37.071, Section 2(b)(2),

required that special issue number two be given to the jury.  The Court

instructed the jury on special issue number two as follows:

> Do you find from the evidence beyond a reasonable doubt
> that the defendant, himself, actually caused the death of the
> deceased individuals or he did not himself actually cause the
> death of the deceased individuals, but he intended to kill the
> deceased individuals or anticipated that human life would be
> taken?  Answer by stating "yes" or "no."
>
> Answer _____

5 CR 861.

During the punishment deliberations, the jury sent out a note asking

with regard to special issue number 2:

> Let the record reflect that the jury has sent out a question
> regarding Issue Number 2, outside the presence of the jury with
> the Defendant present in court with his counsel I read the
> question.  "Regarding Issue Number 2," the question says, "cause
> the death of deceased individuals, quote, intended to kill the
> deceased individuals.  Question:  Do you have to believe both or
> at least one?"

36 RR 135.

The trial court answered the question:

> Members of the Jury.  Paragraph 1 of the indictment charged capital murder by the death of two individuals pursuant to the same scheme or course of conduct.  Paragraph 2 of the indictment charged capital murder by the death of an individual during the course of kidnapping and robbery.  If your consideration of Issue No. 2 on punishment is as to Paragraph 1 of the indictment, the death of two individuals is required to be found by the jury.  If your consideration is as to the second paragraph of the indictment, the death of an individual, Samuel Petrey, is required.

36 RR 135.

The jury answered special issue number two, "YES."

Young objected to the trial court's supplementary instructions to special issue number two:

> [U]nder the Sixth Amendment of the Federal Constitution because that's our right to trial by jury.  We object under the Fourteenth Amendment because it violates due process, and we further object under the Fifth Amendment as applicable to the State under the Fourteenth Amendment.  We likewise object under our own Texas Constitution under Articles 10, Sections 9, 10 and 19. . .

36 RR 136-37.  Young also objected on the ground that "the Court has lessened the State's burden of proof under the Second Special Issue."  *Id.*  Young noted that the "burden should remain beyond a reasonable doubt as presently tendered to the jury in Special Issue Number 2."  *Id.*  The trial court overruled the Young's objections.  *Id.* at 137.

Since Young's attorney did, in fact, object (albeit not on the basis he now asserts), Young is not entitled to relief on this claim. *See Strickland*, 466 U.S. at 689 ("Even the best criminal defense attorneys would not defend a particular client in the same way."); *see also Engle v. Isaac*, 456 U.S. 107, 134 (1982) ("[T]he [C]onstitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.").

Moreover, as shown below in relation to Young's free-standing claim on this issue, below, Young's contention that he would have prevailed on appeal if counsel had objected on the basis he proposes is meritless. Consequently, counsel could not have been ineffective for failing to object on this basis. *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); *Morlett v. Lynaugh*, 851 F.2d 1521, 1525 (5th Cir. 1988); *Koch*, 907 F.2d at 526 ("This Court has made clear that counsel is not required to make futile motions or objections."); *McCoy v. Lynaugh*, 874 F.2d 954, 963 (5th Cir. 1989). Since Young cannot show either deficiency or prejudice with respect to this claim, federal habeas relief should be denied.

O.     **Young's claim that counsel was ineffective for not objecting to the prosecutor allegedly waving a book about serial killers in front of the jury is procedurally barred.   Alternatively this claim is meritless.  (Claim No. 4.C.4)**

Young claims that counsel was ineffective not objecting to the prosecutor allegedly waving around a book about serial killers before the jury.   DE 87 at 242.   However, this claim is both time-barred and procedurally barred.  Alternatively, this claim is without merit.  Accordingly, federal habeas relief is precluded by AEDPA.

### 1.     This claim is barred by the statute of limitations.

This claim does not "relate back" to any of the claims presented in Young's original petition.   *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644. As such, review is barred by the statute of limitations.   28 U.S.C. § 2244(d)(1).

### 2.     This claim is procedurally barred.

This claim was presented for the first time in Young's supplemental briefing that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  7 SHCR-01 1139; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.   Consequently, this claim is procedurally barred. *Coleman*, 456 F.3d at 542.

### 3.     Alternatively, this claim is conclusory.

Although the book was being used in the district attorney's questioning, there is no indication that the book was being "waved."   36 RR 55-63.   As noted, a petitioner's mere conclusory and speculative allegations of ineffective assistance will not entitle him to habeas relief. *Kinnamon*, 40 F.3d at 734-3 (finding "speculation" of ineffective assistance to be no basis for habeas relief).   Furthermore, Young's attorneys did, in fact, object to the general line of questioning.   36 RR 55-63.   And, as noted, even if counsel were somehow deficient in their objection, Young still has not proved prejudice accrued. Given the egregious facts of the murders of Douglas and Petrey, the extraneous offenses offered of the home invasion and attempted capital murder of Carlos Torres Ramos on November 20, 2001, the burglary of the East Texas Polaris Shop on November 23, 2001, and the theft of the night deposits of the Dairy Queen on September 8, 2001, the criminal offenses for which Young was adjudicated a delinquent child, and the entirety of the record, whether or not the prosecutor waved this booked would not have had any effect whatsoever on the verdict.   Since this claim is conclusory, the Court should summarily dismiss it.

**P.      Young's claim that counsel was ineffective for not objecting to the admission of Young's county jail records is procedurally barred. Alternatively, this claim is without merit.  (Claim No. 4.C.5)**

Young claims that counsel was ineffective not objecting to the admission of Young's county jail records.  DE 87 at 242-43.  However, this claim is procedurally barred.  Alternatively, this claim is without merit.

### 1.      This claim is procedurally barred.

This claim was presented for the first time in Young's pro se supplement that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  5 SHCR-01 759; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.  Consequently, this claim is procedurally barred. *Coleman*, 456 F.3d at 542.

### 2.      Alternatively, this claim is conclusory.

Young claims that these records are false, but Young has not cited to any false information contained in these records.  As noted, a petitioner's mere conclusory and speculative allegations of ineffective assistance will not entitle him to habeas relief. *Kinnamon*, 40 F.3d at 734-35.  Since this claim is conclusory, the Court should summarily dismiss it.

**Q.**   **Young's claim that counsel was ineffective for not impeaching witness Jacqueline Timmons based on her purportedly false testimony is procedurally barred.   Alternatively, this claim is without merit.  (Claim No. 4.C.6)**

Young claims that counsel was ineffective for not impeaching witness J. Timmons based on her purportedly false testimony.  DE 87 at 243-44.  Young states that:

> During the punishment phase, Jacqueline Timmons, a juvenile correctional officer at TYC, testified to a fight that broke out between Young and another youth.  According to Timmons, she was injured while trying to break up the fight as both Young and the other youth punched her on the upper body.  Timmons also testified that another correctional officer was injured in this same altercation.  (31 RR at 291-92.)

> []  On cross examination, defense counsel questioned Timmons about the actual January 2000 incident report.  Specifically, counsel asked Timmons whether the written report stated that she was assaulted by Young.  Timmons testified that the report counsel had was merely a synopsis, and the actual incident report contained the information that Timmons was assaulted by Young.  (31 RR at 301.)

DE 87 at 243.

 Young now alleges that there was only one report, and Timmons therefore testified falsely.   *Id*.   However, Young's claim is procedurally barred.   Alternatively, his claim is without merit.   Consequently, federal habeas relief must be denied.

### 1.    This claim is procedurally barred.

This claim was presented for the first time in Young's pro se supplement that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  5 SHCR-01 760; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.   Consequently, this claim is procedurally barred. *Coleman*, 456 F.3d at 542.

### 2.    Alternatively, this claim is conclusory.

Young has not demonstrated that Petitioner's Exhibit 22 is the only report.  He merely cites to the report without providing any further testimony or evidence that it is the only one.  As noted, a petitioner's mere conclusory and speculative allegations of ineffective assistance will not entitle him to habeas relief. *Kinnamon*, 40 F.3d at 734-35 (finding "speculation" of ineffective assistance to be no basis for habeas relief).  Since this claim is conclusory, the Court should summarily dismiss it.

### R.    Young's claim that counsel was ineffective for not objecting to the prosecution's purportedly false assertion that Young had admitted to the Douglas murder and had no remorse is procedurally barred.  Alternatively, this claim is without merit. (Claim No. 4.C.7)

Young claims that counsel was ineffective for not objecting to the prosecution's allegedly false assertions that Young had admitted the Douglas

murder and that he had no remorse for his crimes.   DE 87 at 244-45. However, this claim is procedurally barred.   Alternatively, this claim is without merit.  Accordingly, relief should be denied.

### 1.    This claim is procedurally barred.

This claim was presented for the first time in Young's pro se supplement that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  5 SHCR-01 760; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.   Consequently, this claim is procedurally barred. *Coleman*, 456 F.3d at 542.

### 2.    Alternatively, this claim is meritless.

As noted, counsel is not ineffective for failing to make meritless objections. *Clark*, 19 F.3d at 966.  Here, Young admitted shooting Douglas to Patrick Brook.  21 RR 250-54. As for Young's lack of remorse, Young has not demonstrated that any witnesses believed that he had shown remorse. Young contends that this is because the prosecution objected to counsel's efforts in this respect.   In support, Young cites to two instances where he believes the prosecution objected to questions designed to elicit that information.  DE 87 at 244 (citing 33 RR 138, 142-43).  But Young has not stated the evidentiary reason that the prosecution's objections were

improper.

Moreover, of Young's cited instances of alleged prosecutorial interference, only the first (33 RR 138) contains a completed objection by the prosecution.   And that instance lacks a proffer of the witness's answer to counsel's question.   Consequently, it is impossible to say that the witness actually believed that Young had shown remorse.   Even now, Young does not cite to any affidavit in which the affiant states that Young has remorse for committing the instant murders.[27]   Without such a showing, Young cannot demonstrate any prejudice accrued.   Given that Young cannot show either deficiency or prejudice with respect to this claim, any relief should be denied.

S.    Conclusion

Federal courts cannot grant habeas relief unless the state court's decision conflicts with clearly-established federal law as determined by the Supreme Court or "[is] based on an unreasonable determination of the facts in light of the evidence."   28 U.S.C. § 2254(d).   There is no such unreasonable conflict or determination here.   Young has shown neither deficiency nor prejudice by counsel, and therefore the state court's application *of Strickland* was reasonable.   *See Bell*, 535 U.S. at 699 (holding that the burden is on the petitioner to do more than just "convince a federal habeas court that, in its

---

[27]    It is worth noting that Young persistently claims that he is actually innocent of the crime.

independent judgment, the state-court decision applied *Strickland* incorrectly," but instead the petitioner "must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner"). Young's ineffective-assistance-of-counsel claims should be denied.

## V. The Evidence Was Sufficient to Show that the Shootings of Douglas and Petrey Occurred in Different Criminal Transactions Committed Pursuant to the Same Scheme or Course of Conduct. (Claim No. 5)

In Young's fifth claim, Young argues that "there is insufficient evidence to find that the shootings of Douglas and Petrey occurred either in the same criminal transaction[28] or in different criminal transactions committed pursuant to the same scheme or course of conduct." DE 87 at 246-254. The Court of Criminal Appeals considered Young's complaint on direct appeal and

---

28      Young states that the evidence is insufficient to show that he killed Douglas and Petrey in the same criminal transaction. DE 87 at 251. However, the State never alleged that theory in the amended indictment. The First Amended Indictment alleged in paragraph I that "in the County of Midland and State of Texas, CLINTON LEE YOUNG did then and there intentionally and knowingly cause the death of an individual, Samuel Petrey, by shooting him with a firearm, and on or about the 25th day of November A.D., 2001 in the County of Harrison and State of Texas during a different criminal transaction, the said CLINTON LEE YOUNG, did then and there intentionally and knowingly cause the death of an individual, Doyle Douglas, by shooting him with a firearm, and the said CLINTON LEE YOUNG murdered the said Samuel Petrey and the said Doyle Douglas pursuant to the same scheme and course of conduct." Paragraph II of the First Amended Indictment alleged that "on or about the 26th day of November 2001 in the County of Midland and State of Texas, CLINTON LEE YOUNG did then and there intentionally cause the death of an individual, Samuel Petrey, by shooting him with a firearm, and the said CLINTON LEE YOUNG, did then and there intentionally cause the death of the said individual in the course of committing and attempting to commit the offense of kidnap[]ing and robbery directed against Samuel Petrey." 4 CR 754.

declined to reach it, finding it unnecessary in light of its decision that the evidence was sufficient to support the jury's finding that Young had killed Petrey in the course of a robbery or kidnaping.  *Young v. State*, No. 74,643 slip op. at 1-3.

Young further argues that the Court must conduct a de novo review of this claim because the Court of Criminal Appeals upheld his conviction on the ground that Young had killed Petrey in the course of a robbery and kidnaping and did not reach the first.  DE 87 at 246.  This is correct; however, the Director notes that for Young to receive any relief on this claim, the Court must necessarily grant relief on Young's claim that the evidence was insufficient to show that Young killed Petrey in the course of a robbery and a kidnaping as well, since either theory is adequate to support the jury's verdict.  *See* Argument, Section VI, below.

In resolving an insufficiency claim, a federal habeas court must consider whether, viewing the evidence "in the light most favorable to the prosecution, any rational of fact could have found the existence of facts necessary to establish the essential elements of the offense beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Dupuy v. Cain*, 201 F.3d 582, 589 (5th Cir. 2000).  This inquiry must be conducted with "explicit reference to the substantive elements of the criminal offense as

defined by state law," and all credibility choices and conflicting inferences are to be resolved in favor of the verdict. *Jackson*, 443 U.S. at 324 n.16; *Dupuy*, 201 F.3d at 589; *see also Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1989) ("[W]e should not substitute our view of the evidence for that of the fact-finder."); *Cobb v. Wainwright*, 666 F.2d 966, 971 (5th Cir. 1982) ("[T]he jury has the sole responsibility to judge the weight and credibility of the evidence."). The *Jackson* standard applies in both direct and circumstantial evidence cases. *Schrader v. Whitley*, 904 F.2d 282, 287 (5th Cir. 1990).

Young states "[t]hat those who commit murders pursuant to the 'same scheme or course of conduct' have an 'over-arching objective or motive' or engage in a 'regular mode or pattern of . . . behavior.[']" DE 87 at 250 (citing *Corwin v. State,* 870 S.W.2d 23, 28-29 (Tex. Crim. App. 1993)). However, in this case the evidence shows that Young killed Douglas and Petrey in this case to obtain their vehicles in order to facilitate Young's motive/objective of seeing his girlfriend Amber Lynch, who was visiting her grandmother in Midland.

During the week before Thanksgiving, Amber received five or six telephone calls from Young while she was at her grandmother"s house in Midland. 24 RR 70. Dano Young, Young's brother, testified that on November 24, 2001, Young told him that he was going to knock out Douglas

and steal his car.  21 RR 287-91.  Sitting outside a dope house after having convinced Douglas to drive him and his friends to buy marijuana, Young said "Sorry, Doyle, I need your car," and fired two shots into Douglas's head.  26 RR 158-61; 22 RR 80-91.  Following the murder and in possession of the car, Young told Patrick Brook that he was going to Midland to see Amber.  21 RR 258.  Before Young dropped off Mark Ray and Darnell McCoy, he announced that one of them had to go with him to Midland to see his girlfriend, and that if those left behind talked, their friend would die.  22 RR 141-42.  At some point, Young told Ray that he needed Douglas's car to see his girlfriend.  *Id.* at 103.  Page testified that when they reached Weatherford, Young called Amber in Midland and learned that she was with her father, Bart Lynch, who is Douglas's half-brother.  Young realized that Bart would recognize Douglas's car and know that Douglas would not have loaned his car to him. Consequently, Young decided that they needed to steal another vehicle.  26 RR 197-98.  Young and Page arrived in Eastland about dark and drove around an hour or two looking for another car to steal.  *Id.* at 200-01.  They stopped at Brookshire's grocery store in Eastland, where Young abducted Petrey and stole his pickup truck at gunpoint.  23 RR 204-05.

Young postulates several alternative reasons why he committed the murders.  Sufficient evidence can be found, however, even though the facts

may also support another reasonable hypothesis consistent with claims of innocence. *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991). The state court set forth the facts as related above and determined that the evidence was sufficient to support Young's conviction. Giving due deference to "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weight the evidence, and to draw reasonable inferences from basic facts to ultimate facts," the evidence presented at Young's trial was enough to support his conviction of for capital murder. *Jackson*, 443 U.S. at 319. The instant claim of insufficient evidence is nothing more than an improper attempt by Young to have this Court second-guess the jury's credibility choices, implicit factual findings, and resolution of conflicts in evidence. There is no question that the state court's conclusion that the evidence was sufficient to support the conviction was correct.

## VI. The State Court Reasonably Determined that the Evidence Was Sufficient to Find that the Petrey Murder Occurred in the Commission of a Robbery and Kidnaping. (Claim No. 6)

In Young's sixth claim, Young argues that "there is insufficient evidence to find that the intentional murder of victim Petrey occurred in the course of the commission of robbery or kidnap[]ing." DE 87 at 254-59. The

Court of Criminal Appeals considered and rejected Young's complaint on direct appeal in points of error eleven, twelve, thirteen and fourteen.[29]

As noted above, in resolving an insufficiency claim, a federal habeas court must consider whether, viewing the evidence "in the light most favorable to the prosecution, any rational of fact could have found the existence of facts necessary to establish the essential elements of the offense beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19; *Dupuy*, 201 F.3d at 589. Paragraph II of the amended indictment alleged that Young "did then and there intentionally cause the death of an individual, Samuel Petrey, by shooting him with a firearm, and the said CLINTON LEE YOUNG, did then and there intentionally cause the death of the said individual in the course of committing and attempting to commit the offense of kidnaping and robbery directed against Samuel Petrey." 4 CR 754-56.

The trial court authorized the jury to convict Young of the offense of capital murder of Petrey in paragraph two on the basis of his own conduct or on the conduct of Page as a party to the offense. The trial court correctly also charged the jury on the relevant legal definitions:

> "In the course of committing or attempting to commit"
> KIDNAP[]ING or ROBBERY means conduct that occurs in an

---

[29]   Young notes that the opinion of the Court of Criminal Appeals quoted the wrong parties statute applicable to the case. The mistake appears typographical and does not affect the validity of the Court of Criminal Appeals's analysis or holding that the evidence was sufficient.

attempt to commit or during the commission of or in immediate flight after the attempt or commission of the offense of KIDNAP[]ING or ROBBERY.

"Attempt" means to commit an act with the specific intent to commit an offense where that act committed amounts to more than mere preparation that tends but fails to effect the commission of the offense intended.

5 CR 808.

The evidence shows that Young and Page arrived in Eastland following the Douglas murder and drove around for an hour or two looking for another car to steal.  26 RR 200-01.  They stopped at Brookshire's grocery store in Eastland, and Young abducted Petrey and stole his pickup truck at gunpoint.  23 RR 204-05.  Page, Petrey, and Young then went to the Wal-mart in Midland around 7:30 A.M. where Petrey wrote a check to Gladis Gomez in the amount of $25.12.  *Id.* at 266-70.  Bobby Jobe, clerk for sporting goods department, testified that Young attempted to purchase a Ruger Mini-14 assault type rifle.  *Id.* at 290-94.  Petrey filled out the paper work to buy the rifle, but Young could not take possession of the weapon until a background check on Petrey could be completed.  *Id.* at 294-97.  Jobe became suspicious of Young and stapled a note to Petrey's application that said "do not sell this gun to this guy under any circumstances."  *Id.* at 299-300, 304-05.

On November 26, 2001, Bart Lynch was informed that the police had been to the Fisherman's Motel about something to do with Douglas, and that

the police were looking for Page.  Lynch talked to Young on the phone on the morning of November 26, 2001, and Young told Lynch that Page was with him.  24 RR 43.  Bart told Young that he could see Amber, but that if the police were looking for Page, then Young had to drop Page off at the Sheriff's station before he could see her.  *Id.* at 41-44.  Bart agreed to take Amber to an Albertson's grocery store to meet Young.  *Id.* at 46.

Page testified that after Young talked to Bart, Young told him that "they" found out something had happened to Douglas and the cops were after "us" because they knew "we" had some involvement in what happened to Douglas.  26 RR 239.  Young also told Page that Bart had talked to Page's father.  Page's father told Bart that there was a warrant out for Page and Page's father requested that Page call him.  *Id.* at 239.  Page called his father and after speaking to him, Page told Young that he needed to drop him off somewhere so he could turn himself in.  *Id.* at 239-40.  Young refused, and told Page that Page was in it as much as he, and he needed to "ride it out with me."  *Id.* at 240.  Young then drove to a pump jack site.  He pulled up and parked, and they all got out of the pickup truck. *Id.* at 241.

Page stated that at the pump jack Young instructed them to get rid of the evidence and handed Page a butterfly knife and the .22 caliber bullets, telling Page to put them in a pair of Page's gloves.  26 RR 241.  Page put the

bullets and knife inside one glove and folded the other glove over it and threw the pair of gloves as hard as he could. *Id.* at 241-42. Young handed the lug wrench to Petrey and told him to throw it away, and Petrey threw it toward the pump jack. *Id.* at 242.

Following the disposal of the evidence, Page testified that Petrey was standing near the truck and had one hand in his pocket, a cigarette in his other hand and was kicking at rocks while Young was pacing back and forth muttering to himself. Page testified that while was leaning against the truck smoking a cigarette, he heard Young say, "Sorry, Sam, you know too much. You got to die." Young then shot Petrey, who fell to the ground. *Id.* at 244-46.

The above evidence clearly shows that Young killed Petrey in the course of robbing and kidnaping him. As for Young's claim that Page's testimony was not corroborated, only federal constitutional claims are cognizable in a federal habeas proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "[T]he Constitution imposes no requirement that the testimony of an accomplice-witness be corroborated by independent evidence. Accordingly, the prosecution's failure to satisfy the requirements of the accomplice-witness sufficiency rule, and a state court's failure to enforce that

purely state rule, simply [does] not warrant constitutional attention." *Brown v. Collins*, 937 F.2d 175, 182 n.12 (5th Cir. 1991).

Thus, the state court's decision did not result in a decision that was contrary to, or involve an unreasonable application of, clearly-established federal law, as determined by the Supreme Court of the United States.  As such, relief is barred by AEDPA.

## VII. Young's Claim that the Trial Court Should Have Allowed the Defense to Impeach Page with Evidence that He Failed a Polygraph Test Is Barred by the Statute of Limitations.  Alternatively, the State Court Reasonably Denied Young's Claim.  (Claim No. 7)

In Young's seventh claim for relief, Young contends that the trial court erred in refusing the defense the right to impeach State's witness Page with evidence that he failed a polygraph examination.  DE 87 at 259-61.  As Young notes, this claim was presented to the Court of Criminal Appeals on direct appeal as point of error thirty-two.  The Court of Criminal Appeals denied the claim, stating: "'It has long been the rule in this State that the results of a polygraph test are inadmissible *for all purposes*.'"  *Young v. State*, No. 74,643, slip op. at 17 (quoting *Nethery v. State*, 692 S.W.2d 686, 700 (Tex. Crim. App. 1985)).[30]   However, this claim is barred from federal review by AEDPA's statute of limitations.

---

[30]     Young claims that the Court should examine this issue de novo because the Court of Criminal Appeals did not address his federal claim; however, *Nethery* (quoted by the Court of Criminal Appeals in the *Young* opinion) clearly states that

### A.   This claim is time-barred.

This claim does not "relate back" to any of the claims presented in Young's original petition.   *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644. As such, review is barred by the statute of limitations.   28 U.S.C. § 2244(d)(1).

### B.   Alternatively, this claim is without merit.

It is not "the province of a federal habeas court to reexamine state-court determinations on state-law questions.   In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 67-68.   "In reviewing state court evidentiary rulings, the federal habeas court's role 'is limited to determining whether a trial judge's error is so extreme that it constituted denial of fundamental fairness' under the Due Process Clause" of the Fourteenth Amendment.   *Castillo v. Johnson*, 141 F.3d 218, 222, 224 (5th Cir. 1998) (instructing that "[f]ederal habeas corpus review is limited to errors of constitutional dimension, and federal courts do not sit to review the mere admissibility of evidence under state law").

Young utterly fails to demonstrate a due process violation in connection with the trial court's evidentiary ruling.   There was ample evidence to

---

the Court of Criminal Appeals "find[s] *per se* exclusion of polygraph evidence is constitutionally permissible."

impeach Page without the polygraph, and the probative value of a failed polygraph is clearly debatable.   Absent a showing that disallowing this impeachment evidence constituted a denial of fundamental fairness, Young has not established the state court's decision to reject his claim was contrary to or involved an unreasonable application of clearly established precedent. Therefore, Young is not entitled to federal habeas corpus relief on this issue. And to the extent that Young is attempting to argue for a change in federal law that would recognize the admissibility of polygraph results in criminal trials (DE 87 at 260), this claim is barred by *Teague*.

**VIII.  Young's Claim that He Was Denied a Trial by an Impartial Jury When Venire Person Diane Lynn Roberts Was Excluded Because She Expressed Reservations about the Death Penalty Is Barred by the Statute of Limitations.   Alternatively, the State Court Reasonably Denied this Claim.  (Claim No. 8)**

In Young's eighth claim, Young argues that the exclusion of venire person Diane Lynn Roberts on the State's challenge for cause violated Young's rights under the Sixth, Eighth and Fourteenth Amendments.  DE 87 at 261-266.  Young claims that Roberts was improperly excluded from the jury "simply because she expressed reservations about the death penalty." *Id.*  However, this claim is both time-barred and wholly without merit. Accordingly, AEDPA precludes relief on this claim.

### A. This claim is time-barred.

This claim does not "relate back" to any of the claims presented in Young's original petition. *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644. As such, review is barred by the statute of limitations. 28 U.S.C. § 2244(d)(1).

### B. Alternatively, the state court reasonably denied this claim.

The Sixth Amendment right to a fair trial guarantees the right to an impartial jury. *Miniel v. Cockrell*, 339 F.3d 331, 338 (5th Cir. 2003) (citing *Morgan v. Illinois*, 504 U.S. 719, 727 (1992)). In *Witherspoon v. Illinois*, the Supreme Court held that a death sentence cannot be carried out where the jury that imposed that punishment was "chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. 510, 522 (1968); *see also Adams v. Texas*, 448 U.S. 38, 46 (1980) (holding that the *Witherspoon* rule is applicable to the bifurcated procedure employed by Texas in capital cases). However, a venire member must be willing not only to accept that the death penalty is, in certain circumstances, an acceptable punishment, but also to answer the statutory questions without conscious distortion or bias. *Mann v. Scott*, 41 F.3d 968, 981 (5th Cir. 1994) (citing *Adams*, 448 U.S. at 46).

In *Witt v. Wainwright*, the Supreme Court explained,

> What common sense should have realized experience has proven;
> many veniremen simply cannot be asked enough questions to
> reach the point where their bias had been made "unmistakably
> clear"; these veniremen may not know how they will react when
> faced with imposing the death sentence, or may be unable to
> articulate, or may wish to hide their true feelings.  Despite this
> lack of clarity in the printed record, however, there will be
> situations where the trial judge is left with the definite
> impression that a prospective juror would be unable to faithfully
> and impartially follow apply the law. . . [T]his is why deference
> must be paid to the trial judge who sees and hears the jurors.

469 U.S. 412, 424-26 (1985).

More recently, in *Uttecht v. Brown*, the Supreme Court reviewed its
*Witherspoon-Witt* line of opinions and identified the following "principles of
relevance":

> First, a criminal defendant has the right to an impartial jury
> drawn from a venire that has not been tilted in favor of capital
> punishment by selective prosecutorial challenges for cause.
> Second, the State has a strong interest in having jurors who are
> able to apply capital punishment within the framework state law
> prescribes.  Third, to balance these interests, a juror who is
> substantially impaired in his or her ability to impose the death
> penalty under the state-law framework can be excused for cause;
> but if the juror is not substantially impaired, removal for cause is
> impermissible.  Fourth, in determining whether the removal of a
> potential juror would vindicate the State's interest without
> violating the defendant's right, the trial court makes a judgment
> based in part on the demeanor of the juror, a judgment owed
> deference by reviewing courts.

551 U.S. 1, 10 (2007) (citations omitted).

The Supreme Court emphasized the critical inquiry for *Witherspoon-Witt* purposes is not whether a state appellate court properly reviewed the propriety of the exclusion but, rather, whether the trial court correctly applied the appropriate federal constitutional standard.   *Id.* at 16-17. Finally, the Supreme Court admonished reviewing courts to defer to the trial court's resolution of questions of bias arising from a potential juror's conflicting voir dire answers because the trial court had the opportunity to observe the demeanor of the potential juror.  *Id.* at 17-21 ("[W]here, as here there is a lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful voir dire, the trial court has broad discretion.").  "Courts reviewing claims of *Witherspoon-Witt* error, however, especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." *Id.* at 22.

Thus, the appropriate federal constitutional inquiry is whether Roberts could put aside her personal views regarding the death penalty and answer the capital-sentencing special issues based solely on the evidence before her and the law as explained by the trial court.  As shown below, Roberts indicated that she could not put aside her personal views on the death penalty and answer the capital-sentencing special issues based on the

evidence presented during the trial.  Roberts's voir dire answers reveal the type of confusion over applicable principles which would "substantially impair" her ability to even-handedly apply the death penalty.

Young correctly notes that this claim was presented as point of error sixteen on direct appeal to the Court of Criminal Appeals.  The state court reasonably concluded that Young was not deprived of a fair trial and impartial jury in this instance:

> When asked about her feelings regarding the death penalty, Roberts initially stated that she did not have anything against the death penalty, but was unsure as to whether she had the right to decide if someone should live or die. The prosecutor gave her several examples of cases in which the death penalty was assessed and asked her if she agreed that the defendants in those cases deserved the death penalty. In some instances she agreed; in others, she did not. She indicated that in some cases the death penalty was "okay," but was reluctant to "have that on [her] hands." When pressed further about rendering a death sentence, she stated, "I don't think I could do it." However, she later stated, "If I was on a jury that the facts really added up to where that person deserved to die, then I could probably [assess the death penalty]."

> During voir dire by defense counsel, Roberts was again asked whether she could answer the questions in such a way that the death penalty would be assessed and she stated, "I really—couldn't tell you." She added, "Until that moment arrives, I couldn't say. I really couldn't." Finally, the trial judge asked Roberts the following:

> > THE COURT: Ms. Roberts, let me ask you did I understand you to say that you did not think you could envision any circumstance in which you could

> assess the death penalty or vote in such a way as the
> death penalty would be inflicted?
>
> [ROBERTS]: Not right now.
>
> The state challenged Roberts for cause. When granting the
> state's challenge, the trial judge noted that Roberts initially
> vacillated in her responses, ultimately stating that she could not
> assess the death penalty. The trial judge noted on the record that
> he recognized her "hesitancy and demeanor" in evaluating her
> ability to serve on the jury. Because the record reflects that
> Roberts was a vacillating juror, the trial court did not abuse its
> discretion in granting the state's challenge for cause.

*Young v. State*, No. 74,643 slip op. at 9-10.

The state trial court's holding that Roberts had a disqualifying bias was

a reasonable determination of the facts.   *See Uttecht*, 521 U.S. at 20

(emphasizing the need to defer to the trial court's broad discretion in making

implicit factual findings regarding a potential juror's "substantial

impairment"); *Patton v. Yount*, 467 U.S. 1025, 1036-037 & n.1 (1984)

(recognizing that, even in the pre-AEDPA context, while the question of a

venire member's disqualification is a mixed question of law and fact, a trial

judge's determination regarding a venire member's bias is essentially a

factual determination entitled to deference on collateral review); *Beazley*, 242

F.3d at 262 (recognizing a trial judge's finding of bias during voir dire is a

determination of fact subject to a presumption of correctness on collateral

review).   Because Young has not rebutted the presumption of correctness

owed to the trial court's findings with clear and convincing evidence, relief on this claim should be denied.

IX.   **Young's Claim that the Texas Capital Offense of Murder in the Course of Kidnaping Is Unconstitutional Is Time-barred.  In the Alternative, it Is without Merit.  (Claim No. 9)**

In Young's ninth claim, Young argues that the Texas capital offense of murder in the course of committing or attempting to commit the felony offense of kidnaping as stated in Texas Penal Code Section 19.03(a)(2) is unconstitutionally overbroad due to its failure to narrow the class of people eligible for the death penalty.  DE 87 at 266-270.  Young states:

> Every murder offense involves to some degree restraint or abduction.  The only way a person with a gun could commit murder without abducting or restraining an individual would be to shoot a person instantly at the same place where he, the assailant, first comes in contact with the decedent.  Virtually every murder involves some restraint of the victim's movements and every murder by definition involves using deadly force.  Thus, it is impossible to see how Section 19.03(a)(2), capital murder/kidnap[]ings, generally narrows the group who is eligible to receive the death penalty.

*Id.* at 268.

However, this claim is both time-barred and wholly without merit.  As a consequence, federal habeas relief should be denied.

A.   **This claim is time-barred.**

This claim does not "relate back" to any of the claims presented in Young's original petition.  *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644.

As such, review is barred by the statute of limitations.   28 U.S.C. § 2244(d)(1).

### B.    This claim is without merit.

Young has failed to demonstrate that Texas's kidnaping aggravator can be applied to transform all murders into capital offenses.  Young's complaint was considered and rejected by the Court of Criminal Appeals on direct appeal.[31]  *Young v. State*, No. 74,643 slip op. at 16.  The Fifth Circuit has also explicitly rejected such a contention.  In *Santellan*, the court overturned a federal district court's finding that no rational jury could have found an attempted kidnaping to support Santellan's capital murder conviction.  271 F.3d 190.  The *Santellan* court found that the state court's affirmance of Santellan's conviction in the face of his sufficiency claim did not violate clearly established federal law, and the Fifth Circuit overturned the district court's grant of the writ.  In a footnote, the court rejected a claim based on the Eighth Amendment identical to the challenge Young raises here, citing *Jurek v. Texas*, 428 U.S. 262, 268-72 (1976).  The Fifth Circuit noted that even attempted kidnaping requires proof of both specific intent to restrain the victim and some act that amounts to more than mere preparation to

---

[31]    Young insists that a de novo review should apply because the Court of Criminal only addressed this claim on the basis of state law.  However, the Court of Criminal Appeals explicitly acknowledged that Young had claimed that the statute was "unconstitutional" and the state precedent referred to by the court likewise addressed the claim as a constitutional violation.

restrain the victim.  These elements are simply not present in every murder.
"It is thus incorrect to assert, as Santellan does, that his capital murder
conviction threatens to transform every murder into a death-eligible crime."
*Santellan*, 271 F.3d at 196 n.5.  It is further worth noting that, in the instant
case, Petrey was abducted from Eastland, Texas, and taken to Midland,
Texas, some 210 miles distant, held captive for approximately fourteen-plus
hours, and then executed to prevent him from going to the police.  This
conduct would fit any definition of "kidnaping."

Contrary to Young's assertions, Texas's kidnaping aggravator satisfies
the Eighth Amendment, and the state court's conclusion did not result in a
decision that was contrary to, or involve an unreasonable application of,
clearly-established federal law, as determined by the Supreme Court of the
United States.  As such, relief is barred by AEDPA.

### X-XI.     Young's Due Process Rights and His Right to Be Free from Cruel and Unusual Punishment Were Not Violated by the Prosecutor's Discretion in Charging His Case Capitally.  (Claim Nos. 10-11)

In Young's tenth claim, Young argues that the fact "the Texas statutory
scheme allowing unfettered prosecutorial discretion in deciding which
murder cases should be worthy of the death penalty denies Young due
process of law and equal protection."  DE 87 at 270-75.  In Young's eleventh
claim, he argues that his "convictions, confinement and sentence violate the

Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the Texas statutory scheme allows unfettered prosecutorial discretion in deciding which murder cases should be worthy of the death penalty in violation of the prohibition on cruel and unusual punishment and the requirement of reliable capital sentencing." *Id.* at 275-77. Young correctly notes that this claim was presented as point of error seven on direct appeal to the Court of Criminal Appeals.

The Supreme Court has held that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher*, 434 U.S. at 364; *see also McCleskey*, 481 U.S. at 296, 297 (recognizing a prosecutor's "traditionally 'wide discretion;'" "discretion is essential to the criminal justice process"); *Wayte v. United States*, 470 U.S. 598, 607 (1985). This discretion is tempered only by the Equal Protection Clause. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Selectivity in prosecution does not amount to a federal constitutional violation as long it is not based on an arbitrary classification, such as race or religion. *Hayes*, 434 U.S. at 357; *Armstrong*, 517 U.S. at 464.

Here, Young is not alleging that the prosecution sought the death penalty against him because of his race or ethnicity; nor is he claiming that the Texas death-penalty scheme's lack of standards leads prosecutors to discriminate on the basis of a suspect class.[32]  *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 457 (1988).  And the Supreme Court has never held that capital murderers constitute a suspect class.  Indeed, the Supreme Court has indicated otherwise.  *See Gregg,* 428 U.S. at 187-88 (holding that the decision to authorize capital punishment for some classes of crimes was one that was best left to the legislature unless "clearly wrong").  If a suspect classification is not implicated, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 440 (1985).  Given that prosecutorial discretion is essential to the criminal justice process,  *McCleskey*, 481 U.S. at 297, Young cannot satisfy this standard.

Young also ignores that Texas *does* have procedural safeguards.  They are codified in the Texas Penal Code at Section 19.03(a).  This section provides that, in addition to proving the defendant committed an intentional

---

[32]     *McCleskey* forecloses Young's claim.  The *McCleskey* Court held that in order to establish an equal protection violation in the capital-sentencing context, a defendant must prove that the decision-makers in *his* case acted with a discriminatory purpose.  481 U.S. at 292.

or knowing murder as defined in Section 19.02(b)(1), the State must also prove one of the enumerated aggravating factors listed in the statute.  Tex. Penal Code §§ 19.02(b)(1) & 19.03 (a).  The Supreme Court approved this scheme in *Jurek v. Texas*, 428 U.S. 262, 270-71 (1976).

Additionally, the Supreme Court has never held that the Texas death-penalty scheme violates equal protection because it lacks standards to guide prosecutors whether to seek a death sentence.  Thus, Young is clearly seeking a new rule of constitutional law that was not dictated by precedent when his conviction became final.  As such, his claim is barred under *Teague*.  489 U.S. at 310 ("[N]ew constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.").  Under *Teague*, new rules of constitutional criminal procedure will not be announced on federal habeas review and retroactively applied unless an exception applies.  *Id*.  The first exception to *Teague*'s retroactivity limitation is for rules that would place primary conduct beyond the government's power to proscribe or prohibit a certain category of punishment for a class of defendants based on their status or offense.  *See Graham v. Collins*, 506 U.S. 461, 477 (1993).  The second *Teague* exception is reserved for bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial.  *Id*. at 478.

Young has not attempted to argue that his case falls into one of the *Teague* exceptions.  And, indeed, it falls into neither.  Therefore, absent any Supreme Court precedent dictating otherwise, relief on this claim is barred, and the state court rightly denied it.  *Teague*, 489 U.S. at 316.

## XII. The State Court Reasonably Concluded that the Evidence Was Sufficient to Warrant an Affirmative Finding by the Jury as to Special Issue No. 2.  (Claim No. 12)

In Young's twelfth claim, Young argues that "at the punishment phase, there was insufficient evidence to warrant an affirmative finding by the jury as to special Issue No. 2, i.e., that Young caused the death of both Petrey and Douglas, or if he did not actually cause the deaths, that he intended to kill them or anticipated that human life would be taken."  DE 87 at 277-80.  The second, or anti-parties, punishment issue, read:

> Do you find from the evidence beyond a reasonable doubt that the defendant, himself, actually caused the death of the deceased individuals or he did not himself actually cause the death of the deceased individuals, but he intended to kill the deceased individuals or anticipated human life would be taken?

An anti-parties charge is a prophylactic instruction to the jury, in cases in which the jury was instructed on the law of parties, to limit its consideration of penalty phase evidence to conduct shown to have been committed by the defendant.  *Belyeu v. State*, 791 S.W.2d 66, 72 (Tex. Crim. App. 1989).

In support of his argument that the evidence was insufficient to

warrant an affirmative finding by the jury, Young contends:

> With regard to the Petrey murder, no DNA belonging to Petrey
> was found on Young or any articles of clothing belonging to
> Young.  Moreover, the only evidence suggesting that [Young] shot
> Petrey, or intended Petrey's death, came from the testimony of
> David Page.  (26 RR at 128, 246-47.)  However, Page was a
> charged co-defendant in this offense and clearly held a motive to
> shift his culpability to Young, as is evident from the several
> conflicting confessions he gave to the police.  For example, Page
> attempted to portray himself as a 'hostage' in this case, along
> with Petrey.  The record here, however, clearly demonstrates that
> this was not true as there were numerous instances in the record
> where Page was left alone with Petrey in Petrey's vehicle, and
> Page did not try to escape.  (*See* 27 RR at 165-67.)

DE 87 at 278-79.

Young also points out that Page was an accomplice witness as a matter
of law and thus, a discredited witness.  Young concludes, "Thus, Page's
testimony, standing alone, was insufficient to support a finding on Special
Issue No. 2.  However, without Page's testimony, there was virtually no
evidence showing who killed Petrey, that Young intended to kill Petrey, or
that Young anticipated that Petrey's life would be taken." *Id.* at 279.

Young correctly notes that his claim was presented as points of error
nineteen and twenty on direct appeal to the Court of Criminal Appeals.  The
state court conducted a review of the legal and factual sufficiency of the
evidence and concluded:

> The evidence showed that [Young] personally shot both victims,
> formulated the plan to get a different vehicle, and repeatedly

> threatened his cohorts with severe consequences should they be inclined to tell anyone of their escapades. This evidence is both legally and factually sufficient to support the jury's finding that [Young], himself, actually caused the death of the victims and intended to kill them.

*Young v. State*, No. 74,643 slip op. at 9.

In habeas sufficiency-of-the-evidence claims, the constitutionally deferential *Jackson* standard converges with the statutorily mandated federal habeas standards to create a most daunting burden for federal petitioners. *See Garcia v. Carey*, 395 F.3d 1099, 1103 (9th Cir. 2005) (noting that AEDPA "adds a second level of deference" to the *Jackson* standard); *Torres v. Mullin*, 317 F.3d 1145, 1151 (10th Cir. 2003) ("AEDPA ha[s] added an additional degree of deference to state courts' resolution of sufficiency of the evidence questions."). A prisoner must not only show that a rational juror could not have convicted him of capital murder, he must show that the state court was unreasonable in its assessment of his arguments. The doubly deferential standard utilized in habeas insufficiency claims creates a high, though not insurmountable, barrier to federal habeas relief.

In the instant case, the evidence overwhelmingly established that Young shot Douglas two times in the head with a Colt Huntsman semi-automatic .22 caliber handgun, that Young forced Ray to shoot Douglas one time in the head with a .22 caliber revolver to make sure he died, and that

Young shot Petrey two times in the head with the Colt Huntsman semi-automatic .22 caliber handgun he used to shoot Douglas. The evidence shows that Young killed Douglas and Petrey and intended that they be killed. *See* Statement of Facts, above. The Court of Criminal Appeals's rejection on the merits, in the course of Young's direct appeal, of his insufficiency claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in Young's trial and direct appeal. Young's claim simply does not warrant federal habeas relief under AEDPA.

## XIII. Young's Claim that the Trial Court's Supplemental Instruction on Special Issue No. 2 Violated his Constitutional Rights Is Procedurally Barred. Alternatively, this Claim Is without Merit. (Claim No. 13)

In Young's thirteenth claim, Young argues that his "convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendment of the United States Constitution because the court's supplemental instruction directed the jury to answer 'yes' to special Issue No. 2[] regarding his intent to kill." DE 87 at 281. As background, on direct appeal the Court of Criminal Appeals explained:

> [Young] challenges the trial court's submission of a supplementary instruction to the jury at the punishment phase of trial. During their deliberations, the jurors sent a note to the trial judge asking whether, with regard to the anti-parties issue,

they were required to find that [Young] committed both murders in this case or only one.  The trial court sent a written instruction to the jurors explaining that the first paragraph of the indictment alleged the murders of two victims pursuant to the same scheme or course of conduct, while the second paragraph alleged the murder of one victim committed during the course of committing kidnap[]ing and robbery.  The trial court continued,

> If your consideration of Issue No. 2 on punishment is as to Paragraph 1 of the indictment, the death of two individuals is required to be found by the jury.  If your consideration is as to the second paragraph of the indictment, the death of an individual, Samuel Petrey, is required.

[Young] objected to this instruction on the grounds that it lessened the State's burden of proof, that it violated his Sixth Amendment right to a fair trial, that it violated his Fifth and Fourteenth Amendment rights to due process, and that it violated his Eighth Amendment rights because the jury was required to find [Young] was responsible for the death of two individuals.  On appeal, [Young] claims that the instruction improperly coerced the jury to answer the second special issue in the affirmative, that the instruction allowed the jury to answer the second special issue in the affirmative without requiring all twelve jurors to answer "yes," that the instruction was an improper comment on the weight of the evidence, and that the instruction prevented the jury from "considering circumstances of the offense favorable to [Young] that might have been considered mitigating evidence."

*Young v. State*, No. 74,643 slip op. at 12-13 (footnote omitted).  The Court of Criminal Appeals then held that "[Young]'s objections at trial do not comport with the claims he now raises, [thus,] he has failed to preserve those claims for appeal."  *Id.*

**A.    Young's claims concerning this instruction are procedurally barred.**

A finding by a Texas appellate court that a criminal defendant has failed to comply with the Texas contemporaneous-objection rule constitutes an independent and adequate basis for a federal habeas court's refusal to address the merits of a claim for federal habeas corpus relief.   *Rowell v. Dretke*, 398 F.3d 370, 374-75 (5th Cir. 2005) (holding that a defendant's failure to timely object to alleged errors in a jury charge that was subsequently determined by a Texas appellate court to be a violation of the contemporaneous-objection rule barred federal habeas relief under the procedural default doctrine); *Cotton,* 343 F.3d at 754 (holding that a violation of the Texas contemporaneous-objection rule is an adequate and independent barrier to federal habeas review); *Dowthitt,* 230 F.3d at 752 (holding that the Texas contemporaneous-objection rule is strictly or regularly and evenhandedly applied in the vast majority of cases and, therefore, an adequate state bar).   Consequently, this claim is procedurally barred from federal review.

**B.    Young's original claim is meritless.**

Young is also not entitled to relief on his original claim even if the Court were to address it on the merits.   Young's claim requires an odd reading of the instructions; namely, that the trial court was requiring a

finding, rather than the statute/directions required a finding.   Indeed, Young's reading of the court's supplemental instruction ignores the context in which it was given; i.e., in response to a question by the jury asking how many killings they were required to find for an affirmative answer. Moreover, even if one were to evaluate the instruction in a void, the fact that the instruction requires the jury's "consideration" plainly indicates that the judge was not attempting to mandate the result.

In any event, a review of the jury charge demonstrates that the trial court properly instructed the jury on Young's right not to testify, the burden of proof, and reasonable doubt.   Even if the supplemental instruction were somehow defective, considering the charge in its entirety and the verdict sheet, Young cannot demonstrate that the supplemental instruction forced the jury to return an adverse verdict.

### C.   Young's new, additional claims concerning the supplemental instruction also fail on the merits.

Young also complains that the supplemental instruction violated his rights under *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), and also prevented the jury from giving effect to allegedly mitigating evidence.   DE 87 at 285-87.   However, the *Apprendi* issue was not raised in Young's initial federal petition and is now time-barred.   *Mayle*, 545 U.S. at 644; 28 U.S.C. § 2244(d)(1).

Alternatively, these claims fail on the merits.  Young complains that the court's supplemental instruction on Special Issue No. 2 prompted by the jury's question violated Young's rights under *Apprendi* to have all sentencing facts found by the jury beyond a reasonable doubt.  But the instruction does no such thing.  The court's instruction to the jury on Special Issue No. 2 clearly instructed the jury that before they could answer Special Issue No. 2 "yes," the jury must believe beyond a reasonable doubt that the defendant himself actually caused the death of the deceased individuals or he did not himself actually cause the death of the deceased individuals, but he intended to kill the deceased individuals or anticipated that human life would be taken.

Young also complains that the trial court's supplemental jury instruction directed a finding of intent to kill and did not allow the jury to give effect to mitigation evidence in answering Special Issue No. 2 in violation of the Eighth and Fourteenth Amendments.  But the instruction did not direct the jury to find an intent to kill.  The court's instructions to the jury on Special Issue No. 2 and the trial court's supplementary instruction on Special Issue No. 2 did not address the evidence the jury could consider in answering Special Issue No. 2.  The jury was free to consider any and all of the evidence adduced at trial in answering Special Issue No. 2.

Consequently, even if the Court did consider Young's new, additional claims, he still would not be entitled to relief.

## XIV. Young's Claim Regarding Sheriff Painter's Lunch with the Jury Is Time-barred.  Alternatively, the State Court Reasonably Determined that Sheriff Painter's Lunch with the Jury Did Not Deny Young a Fair and Impartial Punishment-Phase Trial.  (Claim No. 14)

In Young's fourteenth claim, Young asserts that his "convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendment of the United States Constitution because Young  was not tried by a fair and impartial jury when the jurors were exposed to external influences and discussed the case with head Sheriff Gary Painter, including lunch with him during deliberations."  DE 87 at 287-95.  However, this claim is barred by AEDPA's statute of limitations.  Alternatively, it is without merit.  Consequently, this Court should deny any federal habeas relief on this claim.

### A.    This claim is barred by the statute of limitations.

This claim does not "relate back" to any of the claims presented in Young's original petition.  *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644.  As such, review is barred by the statute of limitations.   28 U.S.C. § 2244(d)(1).

**B.    Alternatively, this claim is meritless.**

Young's claim was presented and rejected as point of error five during direct appeal.   *Young v. State*, No. 74,643 slip op. at 13-14.   The Court of Criminal Appeals held that:

> When a juror converses with an unauthorized person about the case, injury is presumed.  *Alba v. State*, 905 S.W.2d 581, 587 (Tex. Crim. App. 1995).   However, the state may show that the case was not discussed or it may rebut the presumption of harm by showing that nothing prejudicial to the accused was said.  *Id.* We defer to the trial court's resolution of historical facts and its determinations concerning credibility and demeanor, and we view the evidence in the light most favorable to the trial court's ruling.  *Quinn v. State*, 958 S.W.2d 395, 401-02 (Tex. Crim. App. 1997).
>
> At the hearing on [Young's] motion for new trial, Painter testified that when [juror] Bobo approached him, he said "When this is over and through with, I need to talk to you." Bobo did not indicate what he needed to talk to him about, and there was no further discussion between the two.  Without more, [Young] has failed to show that his case was discussed or that anything prejudicial to [Young] was said.[33]   *Alba*, 905 S.W.2d at 587. [Young's] bare allegation that Painter was present at lunch does not warrant relief on appeal. Tex. R. App. P. 38.1.  [Young's] fifth point of error is overruled.

*Id.*

---

[33]    At the motion for new trial hearing, Painter testified that he accompanied the jurors to lunch because additional security was needed. Earlier in the week, a threat had been phoned into the Midland County Attorney's Office indicating that [Young] was "going out with a bang." Painter, as head of courthouse security, thought it prudent to accompany the jurors because of the attention this case received.  [Footnote 4 in original]

Young's claim was also raised in a motion for new trial, and the trial court held an evidentiary hearing on the claim.  During the hearing, Cheryl Becker, legal assistant to the Midland County Attorney, testified that she worked in the courthouse, and on April 7, 2003, during the punishment phase of Young's trial, she received a phone call from an anonymous female that stated Young "was going out with a bang." 38 RR 11-14.  Becker immediately reported the matter to courthouse security personnel.  *Id.* at 17-18.  Becker was able to determine to phone number of the anonymous call and gave that information to Deputy Benny Matlock, chief of courthouse security and employee of the Sheriff's Department.  *Id.* at 17-19, 23, 28.  The phone call was placed from a pay phone in a Subway restaurant about six blocks from the courthouse.  *Id.* at 30-32.  Deputy Matlock considered the threat serious and informed the Sheriff's Department of the incident.  *Id.* at 33-34.  Deputy Matlock also spoke directly with Sheriff Painter about the matter.  38 RR 34. The Sheriff was in charge of courthouse security.  *Id.* at 145, 124-25.  After the phone call, Sheriff Painter instructed Deputy Matlock to make sure that he had additional personnel in the courtroom, and Deputy Glenn Wells was assigned to the trial.  *Id.* at 131-32.  Deputy Matlock also informed the court bailiffs about the matter, including Bailiff Ronnie Bearden and Deputy Wells.

*Id.* at 36-37.   All persons entering the courthouse had to pass through a magnetometer and all bags were checked.   *Id.* at 25-26.

On April 10, 2003, the jury had lunch at Luigi's Restaurant, about a block from the courthouse, where security was provided by Deputy Wells, Charlie Bollinger, Joe Carr and Bearden. 38 RR at 83-84.   Sheriff Painter was not present.   *Id.* at 84.   On the evening of April 10, 2003, after jury deliberations commenced, the jurors were sequestered at the Hilton Hotel near the courthouse.   *Id.* at 49-52.   Sheriff Painter went to the hotel to make sure that the jurors had rooms and were fed.   *Id.* at 57.   Sheriff Painter did not escort the jurors to the hotel but went to the hotel and talked to the manager and assistant manager to make sure that all of the jurors would be staying on the same floor of the hotel and that the telephones and televisions were turned off.   *Id.* at 161.   The jurors had supper in a private room of the hotel on the evening of April 10, 2003.   Bailiff Charlie Bollinger asked the Sheriff and Deputy Matlock to join them for supper, but both declined and left.  38 RR 59-61.   Sheriff Painter did not dine with the jurors the night of April 10, 2003.   *Id.* at 150, 105.   Sheriff Painter did not have breakfast with the jurors on April 11, 2001.   *Id.* at 163.

The jury resumed deliberations at 9:00 a.m. on April 11, 2003.   *Id.* at 52-53.   Sheriff Painter returned to the courtroom on April 11, 2003, to wait

for the verdict.  *Id.* at 150.  The jury requested to eat lunch at Wall Street Bar and Grill.  *Id.* at 86-87.  When the jury ended their deliberations for lunch on April 11, 2003, Sheriff Painter was present in the courtroom.  38 RR 63. Bailiff Bollinger asked Deputy Matlock and Sheriff Painter if they would join them in taking the jury to the Wall Street Bar and Grill where the jury wished to dine.  Deputy Matlock declined, and Sheriff Painter joined the other bailiffs and the jury.  *Id.* at 63-65.  Bailiff Bollinger testified that the first time he became aware that the Sheriff was going to eat with the jury at lunch was when they arrived at the restaurant.  *Id.* at 119.

While the jury was in the process of leaving for lunch, James Bobo, the presiding juror, walked up to the Sheriff on the fourth floor outside of the courtroom and told the Sheriff, "When this trial is over with, I need to talk to you."  Bobo emphasized, "I mean completely over with, I need to talk to you." The Sheriff said he would be glad to talk to him.  *Id.* at 88, 108.

In that same regard, Sheriff Painter testified that before lunch on April 11, 2003, juror Bobo approached him in the hall and said, "When this is over with and through, I need to talk to you."  *Id.* at 171.  Bobo did not say what he wanted to talk to the Sheriff about.  38 RR 171.  After the trial was over, Sheriff Painter contacted Bobo, and Bobo said that he wanted him to look at the testimony of Investigator Paul Hallmark.  *Id.* at 172.  On the occasion

that Bobo contacted the Sheriff in the hall, Bobo did not state what he wanted to talk to the Sheriff about. *Id.* Sheriff Painter was acquainted with Bobo, but he had never visited Bobo's home, and Bobo has never visited Sheriff Painter's home. *Id.* at 150. Sheriff Painter and Bobo were not related, and they had never had lunch together or socialized together. *Id.* at 151-52.

Sheriff Painter joined the other bailiffs in escorting the jury to and from lunch on April 11, 2003. 38 RR at 87-91, 96-97, 110. The Sheriff ate at one of the jury tables at which five male jurors dined, including jury foreman, James Bobo. *Id.* at 91, 109-10, 137-38. The Sheriff did not discuss the case with any of the jurors, and none of the jurors discussed the case with him. *Id.* at 144-45, 153-54. The Sheriff did not do anything or say anything to influence the jury in their verdict. *Id.* at 145, 153-54.

Sheriff Painter often attended the jury argument proceedings and the announcement of the jury verdict on high-profile cases for security purposes. *Id.* at 148-49. Sheriff Painter was present in the courtroom for security purposes during the arguments on guilt/innocence and remained in the courtroom during deliberations and the return of the guilty verdict. 38 RR 149. Sheriff Painter was also in the courtroom for the arguments on punishment. *Id.* at 150.

Sheriff Painter did not testify at the trial of the case before the jury. *Id.* at 102, 144, 154. Three deputies did testify before the jury, however: Deputy Earl Stroup (who arrested Young), Investigator Paul Hallmark (crime scene specialist), and Deputy Kent Spencer (who investigated the Petrey killing). *Id.* at 102-103.

The effect of an ex parte communication on a juror's impartiality is a question of "historical fact." *Rushen v. Spain*, 464 U.S. 114, 120 (1983) (*per curiam*) (deferring to state court's finding of "historical fact" that the *ex parte* communications between a judge and a juror did not bias the jury's decision). A state court's post-trial factual finding regarding a juror's impartiality is entitled to a "presumption of correctness." *Id.* at 120.

For example, in *Moody v. Johnson*, the state court conducted two evidentiary hearings and determined that the improper conversation between the bailiff and one of the jurors did not impact the jury's deliberations. 139 F.3d 477, 483 (5th Cir. 1998). On federal habeas review, the Fifth Circuit noted that "[t]he determination of whether there was any improper conduct and its [e]ffect, if any, on juror impartiality are questions of historical fact that must be determined, in the first instance, by state courts and deferred to, in the absence of convincing evidence to the contrary, by the federal courts." *Id.* (internal quotations omitted)

By virtue of his position, Sheriff Painter is the chief bailiff of the courts of Midland County.  Tex. Code of Crim. Proc. Article 36.24.  Sheriff Painter acted as a bailiff for the jury on the occasion in question as the law permits him to do.  Sheriff Painter did not testify before the jury, and Sheriff Painter did not discuss the case with any of the jurors.  While allowing a witness to testify against a defendant and to act as bailiff for the jury may deny the defendant due process of law if the testimony of the witness was important to a finding of guilt and the contact of the witness with the jury as bailiff was extensive so as to enhance his credibility, *Turner v. Louisiana,* 379 U.S. 466 (1965), no such violation occurred here.

Young has not presented clear and convincing evidence to rebut the presumption of correctness that is afforded to the state court's factual findings. *See Rushen*, 464 U.S. at 120 ("This finding of 'fact'—on a question the state courts were in a far better position than the federal courts to answer—deserves a high measure of deference. . ." (internal quotation marks and citation omitted)); *Young v. Herring*, 938 F.2d 543, 559 n.8 (5th Cir. 1991) (noting that the trial judge is "uniquely qualified to appraise the prejudicial effect of a communication on the jury").  As Young has not presented clear and convincing evidence to rebut the state court's finding, this Court cannot find that the juror contact had "substantial and injurious

effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Thus, the state court reasonably denied relief on this claim.

## XV.    The State Court Reasonably Rejected Young's Claim that He Is Ineligible for the Death Penalty because of his Youth and Mental Illness. (Claim No. 15)

In the Young's fifteenth claim, Young asserts that his death sentence "violates the Eighth and Fourteenth Amendments of the United States Constitution, due to [his] mental age, immaturity, and mental illness at the time of the crimes under the principles of *Roper v. Simmons*, 543 U.S. 551 [] (2005)."   DE 87 at 295-301.   Young was eighteen years old when he committed his capital murder.[34]  The state court properly rejected this claim, noting that "in *Roper* [], the United States Supreme Court held that the execution of offenders who were seventeen years of age at the time they committed capital murder is unconstitutional.  The Supreme Court did not extend its ruling to offenders who were aged eighteen or over when they committed capital murder, and we decline to do so."   *Young v. State*, No. 74,643 slip op. at 15.  Young's claim was also presented in Young's first state application as ground number nine and was denied.

Young argues that "[w]hile Young was four months over eighteen years when the crimes were committed, his mental age and immaturity, bought

---

[34]    Young was born on July 19, 1983.  Young's capital murders occurred on November 26, 2001.

about by his ADHD, made him the equivalent of the type of juvenile described in *Roper*." DE 87 at 297. Young states "Psychologist Daneen Milam testified that ADHD prevented regular inhibitors of conduct from developing normally, thereby creating an inability to inhibit behavior. (34 RR at 24). Dr. Milam also testified that ADHD affected a person's ability to pick up or perceive social clues due to an inability to focus. (34 RR at 48). Dr. Milam concluded that most of the conduct identified as problematic in Young's life emanated from severe ADHD. (34 [RR] at 27). By way of analogy, Dr. Milam described Young as a 'Mercedes-Benz with this great motor and no brakes, no brakes at all.' (34 RR at 25.)" DE 87 at 298.

In *Roper*, the Supreme Court drew the line on the death penalty at eighteen years of age and observed:

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. The plurality opinion in *Thompson* drew the line at 16. In the intervening years the *Thompson* plurality's conclusion that offenders under 16 may not be executed has not been challenged. The logic of *Thompson* extends to those who are under 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

543 U.S. at 574 (citing *Thompson v. Oklahoma*, 487 U.S. 815 (1988)).

Young does not provide any authorities or evidence to show that "the evolving standards of decency" that mark the progress of a maturing society require adjustment of the bright-line rule governing imposition of the death penalty on juveniles.  Young conceded in his original federal habeas petition that he "understands that this Court must by necessity go on precedent. However, [he] raises this issue in the event that a court of appropriate rule-making authority might grant relief on this complaint."  DE 19 at 60.

Young cannot show the state court's adjudication of his claim resulted in a decision which was contrary to, or involved an unreasonable interpretation of, clearly-established federal law, as set out by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Accordingly, this claim for relief should also be denied.

## XVI.  Young's Claim that the Trial Court Refused to Instruct the Jury Regarding the Burden of Proof on the Mitigation Issue and the Punishment Charge Failed to Give Proper Guidance to the Jury Regarding the Heightened Standard Required for the Death Penalty Is Barred by the Statute of Limitations.  Alternatively, It Is without Merit. (Claim No. 16).

In Young's sixteenth claim, Young argues that his "convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the trial court failed

to instruct the jury that the burden of proof was on the prosecution to prove beyond a reasonable doubt that there were no sufficient mitigating circumstances to warrant a life sentence.  The punishment charge also failed to give proper guidance to the jury regarding the heightened standard required for a death penalty case."  DE 87 at 301-09.  But this claim is both barred by the statute of limitations and wholly without merit.  Accordingly, AEDPA precludes granting relief on this claim.

### A.   This claim is barred by the statute of limitations.

This claim does not "relate back" to any of the claims presented in Young's original petition.  *Mayle*, 545 U.S. at 644.  As such, review is barred by the statute of limitations.  28 U.S.C. § 2244(d)(1).

### B.   Alternatively, this claim is without merit.

Young's claim was presented as points of error twenty-six and twenty-eight on direct appeal.  The Court of Criminal Appeals rejected this claim. *Young v. State*, No. 74,643 slip op. at 9.  The Fifth Circuit has upheld Texas's scheme of not instructing the jury on who has the burden of proof for mitigating factors. *Granados v. Quarterman*, 455 F.3d 529, 537 (5th Cir. 2006).  The Fifth Circuit has further noted that "[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell*, 398 F.3d at 378; *see also Ortiz*

*v. Quarterman*, 504 F.3d 492, 504-05 (5th Cir. 2007); *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007).  Given the extensive Supreme Court and Circuit precedent on this issue, there is no question that the state courts' conclusion did not result in a decision that was contrary to, or involve an unreasonable application of, clearly-established federal law, as determined by the Supreme Court of the United States.  As such, relief is barred by AEDPA.

## XVII.     The State Court Reasonably Concluded that Young Is Not Constitutionally Entitled to a Sufficiency Review of the Mitigation Special Issue.  (Claim No. 17)

In Young's seventeenth claim, Young argues that his "convictions, confinement, and sentence violate the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution because by refusing to review the sufficiency of Young's mitigating evidence, Young was denied a meaningful appellate review of his sentence of death."  DE 87 at 309-17.  With respect to Young's complaint, the Court of Criminal Appeals held, "In his twenty-first and twenty-second points of error, appellant challenges the legal and factual sufficiency of the evidence to support the jury's finding on the mitigation special issue.  This Court does not review the sufficiency of the evidence to support the mitigation special issue."  *Young v. State*, No. 74,643 slip op. at 9 (citing *McGinn v. State*, 961 S.W.2d 161, 166 (Tex. Crim. App.

1998)).   Now, because the Constitution does not mandate a sufficiency review of the mitigation special issue, and because Young has failed to establish that the state court's adjudication of this claim was either contrary to, or involved an unreasonable application of, clearly-established federal law, Young's request for federal habeas relief on this claim should be denied.

Supreme Court jurisprudence distinguishes between a jury's "eligibility decision," in which the jury must convict the defendant of murder and find at least one aggravating circumstance, and its "selection decision," in which the jury must determine whether a defendant who is eligible for the death penalty should, in fact, receive it. *Tuilaepa v. California*, 512 U.S. 967, 972-73 (1994).   The Court further recognized that "separate requirements" apply to each decision.   *Id.* at 972.   The "eligibility decision" must be made with "maximum transparency" so as to make the process for imposing the death penalty "rationally reviewable."   *Id.* at 973.   On the other hand, the "selection decision" requires "individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability."   *Id.*

In Texas, the "eligibility decision" is made at guilt-innocence when the trier-of-fact determines whether to convict the defendant of capital murder. *Woods v. Cockrell*, 307 F.3d 353, 359 (5th Cir. 2002).   Once the defendant is

convicted, or determined to be "death eligible," the jury then answers the statutory punishment issues, and decides whether that defendant receives the death penalty or life imprisonment. During this selection process, the sentencing jury is "free to consider a myriad of factors to determine whether death is the appropriate punishment." *California v. Ramos*, 463 U.S. 992, 1008 (1983). Indeed, the Supreme Court has authorized "unbridled discretion" in the jury's determination of whether to impose the death penalty. *Zant v. Stephens*, 461 U.S. 862, 875 (1983).

Such unfettered discretion assures a capital defendant that the punishment imposed is "an individual determination on the basis of the character of the individual and circumstances of the crime." *See id.* at 879. That is, the jury is free to hear, consider, and give effect to all relevant evidence before assessing such a severe penalty. As such, there is no restriction on the jury's ability to extend mercy and choose *not* to sentence a defendant to death. Requiring an appellate court to second-guess a jury's subjective determination of extenuating circumstances would inevitably result in courts prioritizing certain mitigating factors over others and, therefore, restricting a sentencing jury's capacity to individually assess the circumstances and situation of each defendant in violation of the Supreme Court's directive.

Thus, although a capital defendant is entitled to "meaningful appellate review" of a death sentence under the Eighth and Fourteenth Amendments, appellate courts are not required to conduct an independent review of the jury's finding that no sufficient mitigating circumstances existed.   As the Supreme Court has explained,

> an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance.   Whatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record.   This inability to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of what this Court has termed "[those] compassionate or mitigating factors stemming from the diverse frailties of humankind."   *When we held that a defendant has a constitutional right to the consideration of [mitigating] factors...we clearly envisioned that that consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses.*

*Caldwell v. Mississippi*, 472 U.S. 320, 330-31 (1985) (internal citations omitted) (emphasis added).

Accordingly,   the   Fifth   Circuit   has   emphatically   upheld   the constitutionality of the Texas courts' refusal to review the sufficiency of mitigating evidence.   *See Moore v. Johnson*, 225 F.3d 495, 507 (5th Cir. 2000) (holding that "Texas followed Supreme Court instruction to the letter.   No court could find that Texas had acted contrary to federal law as explained by the Supreme Court, and no benefit will arise from further consideration of

the obvious."). Circuit precedent also holds that the absence of mitigation sufficiency review does not violate constitutional concerns because the state appellate court satisfies federal constitutional requirements when it provides a meaningful review of the evidence supporting the future dangerousness special issue. *Beazley*, 242 F.3d at 261. Finally, because appellate review of mitigating evidence has never been required, any recognition of Young's claim on federal habeas review would require the announcement and retroactive application of a new rule of constitutional law in violation of *Teague*. For these reasons, this Court should refuse Young's request to review the sufficiency of the evidence to support the jury's negative answer to the mitigation special issue and deny federal habeas relief.

XVIII.    **The State Court Reasonably Held that the Evidence Was Not Insufficient to Find Beyond a Reasonable Doubt that There Was a Probability That Young Would Commit Criminal Acts of Violence that Would Constitute a Continued Threat to Society. (Claim No. 18).**

In Young's eighteenth claim, Young asserts that his "convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because there is insufficient evidence to find that there was a probability Young would commit criminal acts of violence that would constitute a continu[ing] threat to society." DE 87 at 317-22. Based on the evidence presented, however, it is clear that the

state court's resolution of this claim was not unreasonable.  Consequently, this Court should deny federal habeas relief.

When a petitioner asserts that the evidence presented to the state court was insufficient to find future dangerousness, the limited question before a federal habeas court is "whether the [Court of Criminal Appeals'] decision constitutes an 'unreasonable application' of *Jackson*." *Martinez v. Johnson*, 255 F.3d 229, 241 n.21 (5th Cir. 2001); *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993).  Under this standard, the court again looks at the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have concluded beyond a reasonable doubt that petitioner would probably commit criminal acts of violence that would constitute a continuing threat to society.  *Jackson*, 443 U.S. at 307; *Allridge v. State*, 850 S.W.2d 471 (Tex. Crim. App. 1991) .

In the instant case, the Court of Criminal Appeals directly cited *Jackson* and framed its analysis under that constitutional standard.  *Young v. State*, No. 74,673, slip op. at 5-6.  After evaluating the evidence in the light most favorable to the prosecution, the Court of Criminal Appeals concluded that a rational trier of fact could find the essential elements of future dangerousness beyond a reasonable doubt.  *Id.*

This finding is supported by the record. The State showed that the day before the instant crime Young committed a burglary involving the theft of several guns. 30 RR 40-50, 54-58. The State also showed that Young and several accomplices broke into the home of Carlos Torres Ramos with the intention of robbing him (shooting Ramos twice) and that Young had once robbed a Dairy Queen. 30 RR 69, 85-99, 129-33, 144-49, 151-63, 180-86.

As a juvenile, Young was adjudicated for burglary and unauthorized use of a motor vehicle and committed to the TYC. 31 RR 216-17. Dr. Short, psychiatrist at the Waco Home for Youth, testified that Young committed nine acts of violence in the hundred days he lived there. 32 RR 47. He also committed an assault and attempted to commit sexual assault. 31 RR 11-20. Dr. Short further testified that Young had been diagnosed with attention deficit disorder, a conduct disorder, and a disorder of written expression. She considered him "very dangerous." *Id.* at 51-55.

With due deference to "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weight the evidence, and to draw reasonable inferences from basic facts to ultimate facts," the evidence presented at Young's trial was plainly enough to support a finding of future dangerousness. *Jackson*, 443 U.S. at 319. Accordingly, relief is barred under

AEDPA.[35]

## XIX. Young's Defective-indictment Claim Is Time-barred.  Alternatively, the State Court Reasonably Concluded that this Claim Is without Merit. (Claim No. 19)

In Young's nineteenth claim, Young argues that his "convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the State failed to plead in the indictment, and prove beyond a reasonable doubt to a unanimous jury, the facts of the Texas 'future dangerousness' aggravator, and the militating factors considered in deliberation upon the mitigation issue, on which it relied to enhance a maximum life sentence to death."  DE 87 at 322-328.    However, this claim is both time-barred and without merit. Consequently, any federal habeas relief should be denied.

### A.    This claim is barred by the statute of limitations.

This claim does not "relate back" to any of the claims presented in Young's original petition.    *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644. As such, review is barred by the statute of limitations.    28 U.S.C. § 2244(d)(1).

### B.    Alternatively, this claim is without merit.

The Court of Criminal Appeals addressed Young's complaint as follows:

---

[35]    Young's assertions concerning A.P. Merillat's testimony are time-barred as well as unexhausted and procedurally defaulted.  DE 87 at 319-20.

In his ninth point of error, [Young] claims that the trial court erred in failing to quash the indictment because it failed to allege the special issues.   Noting the [Young's] ninth, tenth and thirteenth points of error, the Court of Criminal Appeals stated: "We have previously rejected these claims.   *Rayford v. State,* 125 S.W.3d 521, 533-34 (Tex. Crim. App. 2003).   [Young's] ninth, tenth, and thirteenth points of error are overruled.

*Young v. State*, No. 74,643 slip op. at 16.

Young claims that the Constitution requires that the State plead the special jury issue on future dangerousness (issue no. 1) in the indictment and that the State failed to do so.   The future dangerousness issue inquires whether the jury finds beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.   Young argues that *Jones v. United States*, 525 U.S. 227, 119 (1999), requires that the government plead in the indictment and prove at trial beyond a reasonable doubt any fact that increases the maximum penalty for a crime on trial.   DE 87 at 324.   Young states that this rule was extended by *Apprendi v. New Jersey,* 530 U.S. 466 (2000), to the states.   *Id.* at 325.

Young is wrong.   The holding of *Jones* and *Apprendi* apply to facts that enhance the punishment for an offense beyond the range of punishment attached to the offense without the enhancement fact.   Capital murder in Texas is a separate offense from the offense of murder and by definition

requires the commission of murder under special circumstances such as murder in the course of committing robbery or kidnaping.  *Compare* Tex. Penal Code Section 19.03 (capital murder) *with* 19.02 (murder).  The special circumstances are the aggravating factors that raise the offense of non-capital murder to capital murder, and those special circumstances or aggravating facts or factors are a part of the offense of capital murder and are plead in every indictment for the offense of capital murder.  The range of punishment for the offense of capital murder is life or death.  There are no enhancement provisions or enhancement facts for the offense of capital murder.  Whether the defendant convicted of capital murder is assessed life or death depends upon the jury's answers to the special punishment issues set out in Code of Criminal Procedure Article 37.071.  *Apprendi* applies to facts that increase the penalty beyond the "prescribed statutory maximum."  Under Article 37.071, the statutory maximum is fixed at death.  There are no statutory enhancements.  A positive jury finding on the mitigation issue does not have the potential of increasing the penalty; rather, it has the potential to reduce a defendant's sentence.

Neither *Apprendi* nor *Ring v. Arizona*, 536 U.S. 584 (2002), held that aggravating factors in a state capital case must be pleaded in the

indictment.[36]  *See Apprendi*, 530 U.S. at 477 n.3 (declining to address the indictment issue because it was not raised by the petitioner); *Ring*, 536 U.S. at 597 n.4 (noting that petitioner did not contend that his indictment was constitutionally defective); *see also United States v. Bourgeois*, 423 F.3d 501, 507 (5th Cir. 2005) (noting that the Supreme Court has yet to hold that aggravating factors must be charged in the indictment).  Accordingly, the state court's ruling on the merits was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States

Young further claims that the State is required to prove beyond a reasonable doubt the special dangerousness issue that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.  DE 87 at 325.  And, indeed, the

---

[36]    Young also alleges that the Constitution requires that the State allege in the indictment "the militating factors [for death] considered in deliberation upon the mitigation issue, on which it relied to enhance a maximum life sentence to death." DE 87 at 322.  However, as shown above, the penalty range for capital murder in Texas is life or death.  The maximum punishment for capital murder is death and the minimum is life.  Life is not the maximum punishment; it is the minimum punishment.  Facts that militate for death are not enhancement facts.  Moreover, the State is not required to plead in the indictment the evidentiary facts that the State intends to show at trial.  And even if that were so, the State gave Young written notice of the extraneous acts and offenses that the State intended to prove on punishment at trial which militate for imposition of death.  2 CR 222.  Further, given the wide range of evidence and factors that may reasonably militate against mitigating circumstances to warrant a sentence of life, it would be impossible to give complete, accurate, and sufficient notice of such militating factors or evidence in the indictment.

punishment charge to the jury instructed the jury that the burden was on the State to prove beyond a reasonable doubt that there is a probability that Young would commit criminal acts of violence in the future that would constitute a continuing threat to society.  5 CR 858-65 (charge to the jury on punishment).

Young also re-alleges that the Constitution requires that the State disprove the mitigation issue beyond a reasonable doubt, i.e. that the State prove beyond a reasonable doubt that there are insufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.  Again, the Constitution does not require that the State bear any burden of disproving that there are insufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.  *Rowell*, 398 F.3d at 379 ("[N]o Supreme Court or Fifth Circuit authority requires the State to prove the absence of mitigating circumstances beyond a reasonable doubt.").

Young cannot show the state court's adjudication of this claim resulted in a decision which was contrary to, or involved an unreasonable interpretation of, clearly-established federal law, as set out by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in

the state court proceeding.   28 U.S.C. § 2254(d).   Accordingly, this claim for relief should also be denied.

## XX.   Young's Claim that Texas's "12/10 Rule" Is Unconstitutional Is Barred by the Statute of Limitations.   Alternatively, the State Court Reasonably Determined that This Claim Is without Merit.   (Claim No. 20).

In Young's twentieth claim, Young argues that his "convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the '12/10' punishment charge inherently produces a chilling effect on the jury's deliberating process."   DE 87 at 329-335.[37]   However, this claim is both time-barred and without merit.   Consequently, any federal habeas relief should be denied.

---

[37]   Young states that he presented his claim twenty-one "on direct appeal as a challenge to both the state and federal constitutions.   The Court of Criminal Appeals, however, only addressed this claim with respect to Texas law."   The Director observes that the Court of Criminal Appeals acknowledged this was a constitutional claim and its cited precedent addressed the claim in that manner. However, even if Young's assertion that the Court of Criminal Appeals did not acknowledge federal law, in such a situation, the court: (1) assumes that the state court applied the proper "clearly established Federal law"; and (2) then determines whether its decision was "contrary to" or "an objectively unreasonable application of" that law. *Catalan*, 315 F.3d at 493 & n. 3 (quotation omitted); *see Robertson v. Cain*, 324 F.3d 297, 303 (5th Cir. 2003) (assuming state court was aware of relevant Supreme Court decisions, although not cited in its opinion); *Neal*, 286 F.3d at 246 ("It seems clear to us that a federal habeas court is authorized by [§] 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision.").

**A.    This claim is barred by the statute of limitations.**

This claim does not "relate back" to any of the claims presented in Young's original petition.    *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644. As such, review is barred by the statute of limitations.    28 U.S.C. § 2244(d)(1).

**B.    Alternatively, this claim is without merit.**

The Court of Criminal Appeals addressed Young's complaint as follows:

> In his twenty-eighth point of error, [Young] argues that the trial court erred in failing to instruct the jury that the state was required to prove beyond a reasonable doubt that there were insufficient mitigating circumstances to warrant a life sentence. In his twenty-ninth point of error, [Young] contends that Article 37.071 is unconstitutional because it prohibits the trial court from instructing the jurors regarding the consequences of their failure to agree on the special issues.  In his thirty-first point of error, he claims that the "12-10" rule of Article 37.071 violates the Sixth, Eighth, and fourteenth Amendments to the United States Constitution.  We have previously rejected these claims. *Resendiz v. State*, 112 S.W.3d 541, 548-50 (Tex. Crim. App. 2003).

*Young v. State*, No. 74,643 slip op. at 17.

Texas Code of Criminal Procedure Article 37.071, Section 2(d)(2) provides that the jury "may not answer any issue submitted under Subsection (b) of this article "yes" unless it agrees unanimously and  it may not answer any issue "no" unless 10 or more jurors agree."   The dangerousness issue and the anti-parties issue falls under subsection (b).

Texas Code of Criminal Appeals Article 37.071, Section 2(f)(2) provides "that in answering the issue submitted under Subsection (e) of this article [the mitigation issue], the jury: (2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree."  The jury was instructed on the "12/10" agreement requirements as set out in Article 37.071.  5 CR 858-65.

Young argues that the "'12/10' Rule violates the Eighth and Fourteenth Amendments because there is a reasonable probability that, under the present Texas capital sentencing scheme, all twelve jurors in a capital case could believe that a life sentence would be appropriate under state law, but, because at least ten jurors could not collectively agree on their answer to any one of the special issues, the jury could not return a life sentence.  Such a 'majority rules' mentality could lead jurors to change their potential hold-out votes for life to a vote for the death penalty."  DE 87 at 332.

This claim is without merit.  The Fifth Circuit has held that an argument that "the 12/10 rule" in Texas violated a capital murder defendant's Eighth and Fourteenth Amendments is without merit. *Alexander v. Johnson*, 211 F.3d 895, 897, n.5 (5th Cir. 2000).  Moreover, the Fifth Circuit has also consistently held that any ruling that "the 12/10 rule" violated the federal Constitution would be a new constitutional rule of

criminal procedure as defined in *Teague* and therefore could not form the basis for federal habeas corpus relief. *Hughes v. Dretke*, 412 F.3d 582 (5th Cir. 2005); *Alexander*, 211 F.3d at 897; *Davis v. Scott*, 51 F.3d 457, 467 (5th Cir. 1995); *Webb v. Collins*, 2 F.3d 93 (5th Cir. 1993).

Far from harming Young, the "12/10" jury instruction was actually to Young's benefit. Without the "12/10" jury instruction, the trial court would have to grant a mistrial on punishment if a verdict could not be returned because one juror refused to vote on any of the three special issues favorably to Young and a new trial on punishment would be required. Under the "12/10" jury instruction if two jurors refused to vote on any of the three issues favorable to Young, a verdict favorable to Young could be returned.

Young has failed to show that the state court's rejection of his claim is an objectively unreasonable application of Supreme Court precedent. Accordingly, this Court should deny relief. 28 U.S.C. § 2254(d).

**XXI.     Young's Claim that his Constitutional Rights Were Violated When the Court Refused to Allow the Sentencing Jury to Fully Consider and Give Effect to Young's Mitigating Evidence Is Barred by the Statute of Limitations. Alternatively, this Claim Is Meritless. (Claim No. 21)**

In Young's twenty-first claim, Young argues that his "convictions, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the trial court

prevented the attorneys representing the State, Young, and Young's counsel from informing the jurors or the prospective jurors of the effect of the failure to agree on the issues submitted." DE 87 at 336-38. However, this claim is both time-barred and wholly meritless. Accordingly, AEDPA precludes the Court from granting federal habeas relief on this claim.

### A. This claim is barred by the statute of limitations.

This claim does not "relate back" to any of the claims presented in Young's original petition. *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644. As such, review is barred by the statute of limitations. 28 U.S.C. § 2244(d)(1).

### B. Alternatively, this claim is without merit.

The Court of Criminal Appeals addressed Young's complaint and held:

> In his twenty-eighth point of error, [Young] argues that the trial court erred in failing to instruct the jury that the state was required to prove beyond a reasonable doubt that there were insufficient mitigating circumstances to warrant a life sentence. In his twenty-ninth point of error, appellant contends that Article 37.071 is unconstitutional because it prohibits the trial court from instructing the jurors regarding the consequences of their failure to agree on the special issues. In his thirty-first point of error, he claims that the "12-10" rule of Article 37.071 violates the Sixth, Eighth, and fourteenth Amendments to the United State's constitution. We have previously rejected these claims. *Resendiz v. State*, 112 S.W.3d 541, 548-50 (Tex. Crim. App. 2003).

*Young v. State*, slip op. at 17.

Texas Code of Criminal Procedure Article 37.071, Section 2(a)(1) provides, "The Court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on the issues submitted under Subsection (c) or (e) of this article." The Supreme Court has explicitly rejected the theory that the Eighth Amendment requires jurors to be instructed as to the consequences of a failure to agree. *Jones v. United States*, 527 U.S. 373, 381 (1999).

In *Jones*, the petitioner requested that the jury be informed regarding the consequences of a deadlock. *Id*. The Court noted that the requested instruction was not essential to either of the functions constitutionally required in all capital sentencing schemes. That is, the instruction had no bearing on the "eligibility decision" of the sentencing process, nor did the failure to issue such an instruction prevent the jury from broadly inquiring into all constitutionally mitigating evidence, as required to make the "selection decision." *Id*. at 381. The Court also rejected the idea that the trial court, by neglecting to inform a jury regarding the consequences of its failure to reach a verdict, "affirmatively misle[d] [the jury] regarding its role in the sentencing process." *Id*. at 381-82. The Court reasoned that an instruction informing the jury that a life sentence would be imposed if it could not reach

a unanimous verdict had no bearing on the jury's role in the sentencing process. *Id.* Rather, such an instruction "speaks to what happens in the event that the jury is unable to fulfill its role—when deliberations break down and the jury is unable to produce a unanimous sentence recommendation." *Id.*

Because the Supreme Court has squarely rejected Young's claim that jurors are required to be instructed as to the consequences of failure to agree, the state court's decision can hardly be said to be "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1), (2). Therefore, this Court should deny relief.

## XXII. Young's Claims that He Received Ineffective Assistance of Appellate Counsel Are Both Time-barred and Procedurally Barred. Alternatively, these Claims Are without Merit. (Claim No. 22)

In his twenty-second claim for relief, Young argues that appellate counsel was ineffective. DE 87 at 338. Young also repeatedly alleges throughout his petition that appellate counsel was ineffective for failing to raise various procedurally-defaulted claims. *See generally* DE 87. However, Young's claim of ineffectiveness of appellate counsel is both time-barred and procedurally barred. Alternatively, this claim is without merit. Consequently, federal habeas relief must be denied.

### A. This claim is barred by the statute of limitations.

This claim does not "relate back" to any of the claims presented in Young's original petition. *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644. As such, review is barred by the statute of limitations. 28 U.S.C. § 2244(d)(1).

### B. This claim is procedurally barred.

Young claims that he raised the ineffectiveness of appellate counsel in his third state habeas proceeding. But the complaint that he now makes (ineffective assistance of appellate counsel) does not comport with the complaint that he made in his state habeas application (ineffective assistance of state habeas counsel for failing to raise a claim of ineffective assistance of appellate counsel). 1 SHCR-03 91, 191. Consequently, this claim is unexhausted and procedurally defaulted. And even if this claim had been properly raised in state court, it was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5. *Ex parte Young*, No. 65,173-03 at Order of Jun 3, 2009. Thus, this claim would be procedurally barred even if it was not procedurally defaulted. *Coleman v*, 456 F.3d at 542.

## C.    Alternatively, this claim is without merit.

Appellate counsel's effectiveness is measured by the same standard applied to trial counsel:  whether the performance was objectively reasonable and whether any deficient performance prejudiced the proceeding.  *Sharp v. Puckett*, 930 F.2d 450, 452 (5th Cir. 1991).  Counsel is not ineffective merely because he fails to raise issues that the defendant, his client, requests him to raise.  *Smith v. Robbins,* 528 U.S. 259, 285 (2000).  Nor is counsel ineffective for failing to raise every possible point on appeal.    *Id.* at 288.   Rather, appellate counsel is obliged to raise and brief only those issues that he believes have the best chance of success.  *Smith,* 528 U.S. at 285; *see also Engle*, 456 U.S. at 134 ("[T]he constitution guarantees criminal defendants only a fair trial and a competent attorney.  It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.").  Only "solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention."  *United States v. Williamson*, 183 F.3d 458, 462-63 (5th Cir. 1999).  Furthermore, prejudice cannot be shown in the absence of a reasonable probability that, but for counsel's omitting a particular ground of error, the case would have been reversed on appeal.  *Smith,* 528 U.S. at 285.  Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the

result would likely have been different absent the alleged errors of counsel. *Strickland*, 466 U.S. at 695-96. Petitioners must "affirmatively prove prejudice." *Id.* at 693. They cannot satisfy the second prong of *Strickland* with mere speculation and conjecture. *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992).

Young argues that if any foregoing violation in his petition should have been raised on direct appeal, the Court should find appellate counsel ineffective. But this is simply conclusory. Young has also provided no evidence regarding appellate counsel's strategic considerations. Furthermore, as shown above, all of Young's underlying claims are meritless. Absent a showing that the result of the appeal would have been different but for his counsel's deficient performance, Young does not demonstrate the requisite actual prejudice. Accordingly, Young has not established a valid claim for ineffective assistance of counsel on appeal.

## XXIII.   Young Is Not Entitled to Relief Under the Cumulative Error Doctrine. (Claim No. 23)

In his twenty-third claim for relief (and repeatedly throughout his petition), Young argues that the cumulative effect of all of the errors described in his petition denied him due process. DE 87 at 340-342. However, this claim is both time-barred and procedurally barred.

Alternatively, this claim is without merit. Consequently, federal habeas relief on this claim should be denied.

### A.    This claim is barred by the statute of limitations.

This claim does not "relate back" to any of the claims presented in Young's original petition. *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644. As such, review is barred by the statute of limitations. 28 U.S.C. § 2244(d)(1).

### B.    This claim is procedurally barred.

Young claims that he raised this claim in his third state habeas proceeding. But the complaint that he now makes (cumulative error) does not comport with the complaint that he made in his state habeas application (ineffective assistance of state habeas counsel for failing to raise a cumulative-error claim). 1 SHCR-03 91, 192. Consequently, it is unexhausted and procedurally defaulted. And even if this claim was properly raised in state court, it was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5. *Ex parte Young*, No. 65,173-03 at Order of June 3, 2009. Thus, this claim would be procedurally barred even if it were not unexhausted and procedurally defaulted. *Coleman v*, 456 F.3d at 542.

### C.   Alternatively, this claim is without merit.

Moreover, as explained at length throughout this pleading, none of Young's individual claims have merit.   Consequently, Young's cumulative-error claim is meritless because the cumulative effect of no error is nothing. In general, the cumulative-error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal.   *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998).   Thus, the doctrine presupposes that error, whether reversible or harmless, must first be found before considering any aggregate impact of improper State conduct.

The claim is barred by *Teague*, however, because the Supreme Court has never recognized such a claim.   Although the Fifth Circuit did announce a rule espousing a cumulative-error analysis, a circuit court case is no substitute for Supreme Court precedent when determining whether a claim may form the basis of federal habeas relief under AEDPA.   In fact, the Supreme Court has specifically rejected the significance of circuit court opinions. *See*, *e.g.*, *O'Dell v. Netherland*, 521 U.S. 151, 159-160 (1997) (noting that the rule under *Teague* is whether "the rule . . . [is], in light of *this Court's precedent*, 'susceptible to debate among reasonable minds.'") (citation

omitted) (emphasis added).  Accordingly, *Teague* and its progeny foreclose the grant of federal habeas relief on Young's cumulative-error claim.

In any event, Young has not satisfied the Fifth Circuit's cumulative-error standard, which warrants a cumulative-error analysis only when: (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process or fundamental fairness. *Jackson v. Johnson*, 194 F.3d at 655 n.59; *Westley*, 83 F.3d at 726.  Hence, claims that have no merit cannot be cumulated, regardless of the total number raised.  *Westley*, 83 F.3d at 726; *United States v. Moye*, 951 F.2d 59, 63 n. 7 (5th Cir. 1992) ("Because we find no merit to any of Moye's arguments of error, his claim of cumulative error must also fail."); *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero.").

For the reasons set forth at length above, none of Young's claims sufficiently establish constitutional error of any kind.  Thus, there is therefore nothing for this Court to cumulate, and the petition should be denied in its entirety.  *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997) (reiterating that cumulative errors must be of a "constitutional dimension").

**XXIV.    Young's Claim that He Is Actually Innocent Is Both Time-barred and Procedurally Barred.   Alternatively, It Is without Merit. (Claim No. 24)**

In his twenty-fourth claim for relief, Young argues that his "convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because he is actually innocent of the capital murder of which he was convicted."  DE 87 at 342-43.  However, this claim is both time-barred and procedurally barred.  Alternatively, this claim is without merit.  Consequently, federal habeas relief should be denied.

**A.    This claim is barred by the statute of limitations.**

This claim does not "relate back" to any of the claims presented in Young's original petition.  *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644.  As such, review is barred by the statute of limitations.   28 U.S.C. § 2244(d)(1).

**B.    This claim is procedurally barred.**

Young claims that he raised this claim in his third state habeas proceeding.  However, the complaint that he now makes (actual innocence) does not comport with the complaint that he made in his state habeas application (ineffective assistance of state habeas counsel for failing to raise an actual innocence claim).   1 SHCR-03 91, 194.   Consequently, it is

unexhausted and procedurally defaulted.  And even if this claim was properly raised in state court, it was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  *Ex parte Young*, No. 65,173-03 at Order of June 3, 2009. Consequently, this claim would be procedurally barred even if it were not unexhausted and procedurally defaulted.  *Coleman v*, 456 F.3d at 542.

### C.   Alternatively, this claim is meritless.

Alternatively, this claim is conclusory.  Young provides nothing to support his one-page claim except for a general reference to all of the other claims in his petition.  Such conclusory allegations are insufficient to warrant federal habeas relief.  *Ross*, 694 F.2d at 1012.  Accordingly, this claim must be denied.

### XXV.   Young's Claim that the Prosecution Suppressed Evidence Concerning A.P. Merrillat Is Both Time-Barred and Procedurally Barred.  Alternatively, this Claim Is without Merit.  (Claim No. 25)

In his twenty-fifth claim for relief, Young argues that his "convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecution suppressed evidence that State's witness A.P. Merillat's testimony was more than questionable, and the State's suppression of the evidence prevented the defense from challenging

the witnesses' credibility."  DE 87 at 343.  However, this claim is both time-barred and procedurally defaulted.  Alternatively, this claim is without merit.  Consequently, federal habeas relief must be denied.

## A.    This claim is barred by the statute of limitations.

This claim does not "relate back" to any of the claims presented in Young's original petition.  *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644.  As such, review is barred by the statute of limitations.  28 U.S.C. § 2244(d)(1).

## B.    This claim is procedurally defaulted.

Young states that he raised this claim in his third state habeas proceeding.  DE 87 at 343.  However, this complaint was dismissed on Young's own motion.  10 SHCR-03 2839.  Consequently, this claim remains unexhausted and procedurally defaulted.  28 U.S.C. §§ 2254(b), (c) (2002); *Vega*, 149 F.3d at 362; *Nobles*, 127 F.3d at 422.

## C.    Alternatively, this claim is without merit.

### 1.    Background.

A.P. Merillat is a certified police officer and was employed by the Special Prosecution Unit in Huntsville, which prosecutes offenses committed within the Texas prison system.  35 RR 55-56.  Merillat testified at Young's punishment phase regarding inmate classification and prison life.  Young

alleges that the State suppressed the following impeachment evidence relating to Merillat's testimony:

1073.   As far back as 1998, Merillat was assisting an inmate achieve 'deconfirmation' as a gang member (a benefit in the prison system) so that the inmate could procure information for the SPU [Special Prosecution Unit] which the SPU would in turn use against other inmates.  (Ex. [SPU 6/15/98 Letter].) Merillat continued assisting that inmate even though Merillat knew the inmate had not given up his gang activity.  (Ex. 133 [Eason letter to Merillat 6/2000].)

1074.   As far back as 1999, Merillat acknowledged that although an inmate who had been providing SPU with information concerning another inmate had been caught manufacturing a weapon by prison authorities, 'just because a disciplinary case was written, it does not mean that our office will file a criminal charge.'  (Ex. 134 [SPU 10/14/99 Letter].)

1075. As far back as 2000, Merillat was arranging for inmates to be transferred within the prison system (Ex. 135 [SPU 7/12/2000 Letter].)

1076.  Also as far back as March 2000, Merillat was making arrangements with prison officials to allow letters from gang members to reach an inmate informant, even though that inmate, with help from Merillat, had informed authorities he had renounced his gang affiliation. (Ex. 137 [Innes Notes 3-01-001].)

1077.   Unbeknownst to Young's defense team, the SPU prosecutorial team in a capital murder case against an inmate had suppressed exculpatory evidence against that defendant.  *See Anibal Canales Jr. v. Quarterman*, CV No. 03-69-TJW (E. Dist. Tex).  Merillat, as a Senior Criminal Investigator and part of that SPU team was intrinsically involved with that suppression.  (*See e.g.* Ex. 138 [Merillat at 6/12/2000 Letter]) ('As far as a witness list, we haven't sent one out yet, Mr. Mullin [the SPU prosecutor] and I are holding off as long as we can.').

DE 87 at 350-51.

### 2. This evidence was not suppressed or favorable to the defense.

As noted earlier, to establish a *Brady* violation, the defendant must show that:  (1) there was a failure to disclose evidence; (2) the evidence was favorable to the defendant; and (3) the evidence that the State failed to disclose was sufficient to undermine the confidence in the outcome of the proceeding, i.e., that is that the result of the trial would have been different if the evidence had been disclosed. *Strickler*, 527 U.S. at 282.  The burden is on the defendant to prove that if the suppressed evidence had been disclosed, there was a reasonable probability that the outcome of the proceeding would have been different. *Id.* at 291.

The impeaching evidence that Young contends that the State suppressed does not readily appear to have any impeachment value.  Young cites to *Canales v. Quarterman*, but Canales's federal habeas petition appears to have been denied by the court on August 24, 2012. *Anibal Canales Jr. v. Thaler*, No. 03-69 at 2:03-cv-00069 (DE 157).  The prosecution, moreover, did not know of or have any reason to know of the alleged suppressed evidence, and, thus, did not suppress it.  Although "the prosecution" for *Brady* purposes does encompass more than the individual prosecutor or group of prosecutors trying the case, and the prosecution may

be deemed, in limited circumstances, to be in "constructive possession" of *Brady* material, *see*, *e.g.*, *Martinez v. Wainwright*, 621 F.2d 184, 186-87 (5th Cir. 1980) (finding no suggestion in *Brady* "that different 'arms' of the government are severable entities"); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (finding prosecution was in possession of criminal history of witness even though no background check was conducted); *United States v. Deutsch*, 475 F.2d 55, 57-58 (5th Cir. 1973) (finding prosecutor was, for purposes of *Brady*, in possession of information in Postal Service files), there are limits on the imputation of knowledge from one arm of the government to prosecutors. "[T]he prosecution is deemed to have knowledge of information readily available to it. . ." *Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991) (emphasis added).  Young argues that Merillat was a member of the prosecution team, but Young provides no evidence that showed he was involved with Young's case in any fashion other than testifying at trial. Simply being called as a State's does not make one a member of the prosecution team.

### 3.   There is no reasonable probability of a different result.

"In assessing the materiality of undisclosed impeachment evidence, 'we must consider the nature of the impeachment evidence improperly withheld and the additional evidence . . . independent of the disputed testimony.'"

*Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994) (*quoting Weintraub*, 871 F.2d at 1262).  Here, the suggested suppressed evidence appears to consist of specific acts by Merillat which Young believes have impeachment value.  In Texas, a witness may not be impeached by specific acts of misconduct unless the specific act of misconduct shows some bias or motive for the testimony of the witness.   Specific acts of misconduct by a witness not resulting in conviction are not admissible as evidence of character to impeach the credibility of the witness.   *See* Tex. R. Evid. 608(b); *Martinez v. State*, 17 S.W.3d 677, 688 (Tex. Crim. App. 2000); *Ramirez v. State*, 802 S.W.2d 674, 676 (Tex. Crim. App. 1990).

Furthermore, the State also presented the testimony of Royce Smithey, Chief Investigator for the Special Prosecution Unit at Hunstville.  Smithey testified about inmate classification and prison life, and to most of the subjects testified to by Merillat.  31 RR 168-212.   Moreover, the defense presented the testimony of Dessie Cherry, a former senior warden with twenty-eight years of experience in the Texas prison system, who likewise testified about inmate classification, prison life and most of the subjects testified to by Merillat.  33 RR 9-76.

Even assuming that the State suppressed evidence that would have impeached Merillat in some way, the burden is on Young to show that had the impeachment evidence been admitted, the result of the punishment

phase would have been different.  Considering the punishment evidence and the fact that Smithey and Cherry testified to most of the matters related by Merillat, there is no reasonable probability that the outcome of the proceeding would have been different if the allegedly suppressed information had been presented to the defense.  Thus, Young is not entitled to federal habeas relief.

## XXVI.  Young's Claim that the Prosecution Lost or Destroyed Exculpatory Evidence is Both Time-Barred and Procedurally Defaulted.  Alternatively, this Claim Is without Merit.  (Claim No. 26)

In his twenty-sixth claim for relief, Young argues that his "convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the State lost or destroyed evidence that was exculpatory in nature, including shell casings left in front of the house where Douglas was first shot; the 7-Eleven video tape of Young shopping in the convenience store; and eyewitness evidence from persons at the Brookshires Grocery Store on the day that Mr. Petrey was kidnapped."  DE 87 at 360.  However, this claim is both time-barred and procedurally barred.  Alternatively, this claim is without merit.  Consequently, any federal habeas relief should be denied.

## A.    This claim is barred by the statute of limitations.

These claims do not "relate back" to any of the claims presented in Young's original petition.   *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644. As such, review is barred by the statute of limitations.   28 U.S.C. § 2244(d)(1).

## B.    This claim is procedurally barred.

Young claims that he raised this claim in his third state habeas proceeding.   DE 87 at 361.   But the complaint that Young now makes (prosecutorial misconduct) does not comport with the complaint that he made in his state habeas application (ineffective assistance of state habeas counsel for failing to raise a claim prosecutorial misconduct).   1 SHCR-03 91, 187. Consequently, this claim is unexhausted and procedurally defaulted.   Yet even if this claim was properly raised in Young's state habeas application, since it was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5, this claim is would instead be procedurally barred.   *Ex parte Young*, No. 65,173-03 at Order of June 3, 2009; *Coleman v*, 456 F.3d at 542.

## C.    Alternatively, this claim is without merit.

Regarding the shell casings, Young has not provided a single citation or affidavit that suggests that the State ever had this evidence much/ess lost/destroyed it.   With respect to the eyewitness, Young has not offered not

identified them or provided affidavits outlining their testimony. Young's claims in this respect are therefore both conclusory, *Kinnamon*, 40 F.3d at 734-35, and the latter fails to meet the requirements of *Day*, 566 F.3d at 538.

Concerning the 7-11 tape, in order to establish due process violation based on the destruction of evidence potentially useful to the defendant, a defendant must show that law enforcement acted in bad faith in destroying the evidence. *Arizona v. Youngblood*, 488 U.S. 51 (1988). Young has not presented any evidence of bad faith on the part of the police. Moreover, it is unclear what import Young believes that the tape has, since Young and Page were clearly co-accomplices in the commission of the Petrey kidnaping. This claim for relief should be denied.

## XXVII.    Young's Claim that the State Interfered with the Defense's Investigation is both Time-Barred and Procedurally Barred. Alternatively, this Claim Is without Merit (Claim No. 27)

In his twenty-seventh claim for relief, Young argues that "convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the State interfered with the defense's selection of Gerald Byington as the mitigation specialist/bio-psychosocial historian expert in Young's case." DE 87 at 365-81. However, this claim is both time-barred and procedurally barred. Alternatively, this claim is without merit. Accordingly, federal habeas relief must be denied.

### A.    This claim is barred by the statute of limitations.

This claim does not "relate back" to any of the claims presented in Young's original petition.    *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644. As such, review is barred by the statute of limitations.    28 U.S.C. § 2244(d)(1).

### B.    This claim is procedurally barred.

Young claims that he raised this claim in his third state habeas proceeding.    But the complaint that Young now makes (prosecutorial misconduct) does not comport with the complaint that he made in his state habeas application (ineffective assistance of state habeas counsel for failing to raise a claim prosecutorial misconduct).    1 SHCR-03 91, 167. Consequently, this claim is unexhausted and procedurally defaulted.    Yet even if this claim was properly raised in Young's state habeas application, since it was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5, this claim would instead be procedurally barred.    *Ex parte Young*, No. 65,173-03 at Order of June 3, 2009; *Coleman v*, 456 F.3d at 542.

### C.    Alternatively, this claim is without merit.

Even assuming that the Court could consider this claim, it is without merit.    "Prosecutorial misconduct implicates due process concerns." *Foy v. Donnelly*, 959 F.2d 1307, 1316 (5th Cir. 1992).    Actions by a prosecutor may

violate due process in two ways: "They may abridge a specific right conferred by the Bill of Rights, or may constitute a denial of due process generally, thus constituting a 'generic substantive due process' violation." *Id.* (quoting *Rogers v. Lynaugh*, 848 F.2d 606, 608 (5th Cir. 1988)).   Federal courts apply "a two-step analysis to charges of prosecutorial misconduct." *United States v. Duffaut*, 314 F.3d 203, 210 (5th Cir. 2002).   The courts first decide whether the prosecutor's actions were improper and, if so, they then determine whether the actions "prejudiced the defendant's substantive rights." *Id.*

Prosecutorial misconduct, when alleged in habeas corpus proceedings, is reviewed to determine whether it "'so infected the [trial] with unfairness as to make the resulting [conviction] a denial of due process.'" *Barrientes*, 221 F.3d at 753 (quoting *Ables v. Scott*, 73 F.3d 591, 592 n.2 (5th Cir. 1996)); *accord Greer v. Miller*, 483 U.S. 756, 765 (1987).   This means the alleged conduct must render the trial fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment. *Darden v. Wainwright*, 477 U.S. 168, 180-81 (1986); *Dowthitt*, 230 F.3d at 755.   "To constitute a due process violation, the prosecutorial misconduct must be of 'sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Greer*, 483 U.S. at 765 (citation and internal citation omitted).   In turn, a trial will not be deemed fundamentally unfair unless "there is a reasonable probability that the verdict might have been different had the

trial been properly conducted. *Barrientes*, 221 F.3d at 753 (*quoting Foy*, 959 F.2d at 1317). Only in the most egregious situations will a prosecutor's improper conduct violate constitutional rights. *Ortega v. McCotter*, 808 F.2d 406, 410-11 (5th Cir. 1987) (quotation omitted).

Here, the record shows that the prosecution raised concerns about Byington's qualifications to perform the work that he was billing the trial court for. The court held a hearing on the issue. *See generally* 8 RR, 10 RR. Young was permitted to bring witnesses to show that Byington was properly qualified to do the work and did actually present such witnesses. *Id.* It is not at all clear how the prosecution acted improperly in this matter. The mere fact that Young disagrees with the prosecution's contention that Byington was unqualified does not mean that the prosecution committed misconduct. And even if the prosecution was incorrect in its belief that Byington was not qualified, it is clear that the prosecution pursued their concerns in an entirely legal and appropriate manner.

Moreover, a trial is fundamentally unfair only "if there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Riddle v. Cockrell*, 288 F.3d 713, 720 (5th Cir. 2002) (internal quotation marks omitted). In light of the entirety of the record, there is no reasonable probability that the verdict might have been different had Byington received the funding that he was asked. In fact, it does appear

that some of his expenses were authorized after the trial.   DE 87 at Petitioner's Exhibit 65.   Thus, this claim for relief should be denied on the merits even if the Court does not find that it is time-barred or procedurally barred.

### XXVIII.   Young's Claim that the State Committed Misconduct is Both Time-Barred and Procedurally-barred.  Alternatively, This Claim Is without Merit.  (Claim No. 28)

In his twenty-eighth claim for relief, Young argues that his "convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecutor engaged in multiple instances of misconduct through Young's punishment phase, including erroneously stating that Young had confessed to the Douglas shooting, improperly presenting a victim impact statement from Mark Ray, and erroneously telling the jury that Young had not expressed remorse for the death of Petrey and Douglas.   DE 87 at 382.   However, this claim is both time-barred and procedurally barred.  Alternatively, this claim is without merit.  Accordingly, federal habeas relief should be denied.

### A.   These claims are barred by the statute of limitations.

These claims do not "relate back" to any of the claims presented in Young's original petition.   *See generally* DE 18, 19; *Mayle*, 545 U.S. at 644.

As such, review is barred by the statute of limitations.   28 U.S.C. § 2244(d)(1).

### B.   These claims are procedurally barred.

These claims were presented for the first time in Young's pro se supplement that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  5 SHCR-01 759; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.   Consequently, these claims are procedurally barred. *Coleman*, 456 F.3d at 542.

### C.   Alternatively, this claim is without merit.

Even assuming that the Court could consider this claim, it is without merit.  As noted above, in evaluating a prosecutorial misconduct claim, the Court must first decide whether the prosecutor's actions were improper and, if so, they then determine whether the actions "prejudiced the defendant's substantive rights." *Duffaut*, 314 F.3d at 210.  Here, the prosecution did not act improperly.  Young admitted shooting Douglas to Patrick Brook.  21 RR 250-54.  As for Young's lack of remorse, Young has not demonstrated that any witnesses believed that he had shown remorse. *See* Argument, Section IV(R), *supra*.  As for the prosecutor questioning Ray concerning how the crime made him feel, Young has not explained on what basis he would exclude this testimony, stating simply that he does not think that it is appropriate victim

impact testimony.  Thus, Young has not demonstrated that the prosecution acted improperly or that he was harmed in way.  This claim for relief should be denied.

**XXIX.**      **Young's Claim That the State Presented False Evidence from Witness Timmons Is Procedurally Barred.  Alternatively, this Claim is Conclusory.  (Claim No. 29)**

In his twenty-ninth claim for relief, Young argues that "convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecutor knowingly presented to the jury false evidence, without which the jury would not have sentenced Young to death."  DE 87 at 386.  However, this claim is procedurally barred.  Alternatively, this claim is without merit.  Accordingly, this claim for relief should be denied.

**A.     This claim is procedurally barred.**

This claim was presented for the first time in Young's pro se supplement that was dismissed by the Court of Criminal Appeals for failing to meet the requirements of Texas Code of Criminal Appeals Article 11.071, Section 5.  5 SHCR-01 759; *Ex parte Young*, Nos. 65,137-01, -02 at Order of December 20, 2006.  Consequently, this claims is procedurally barred. *Coleman*, 456 F.3d at 542.

### B.     Alternatively, this claim is without merit.

As noted in conjunction with his related ineffectiveness claim, Young's claim concerning witness Timmons is conclusory.  *See* Argument, Section 4(Q), *supra*.  Young has not demonstrated that Timmons was incorrect when she stated that there was another report.  Rather, Young merely cites to the existing report without providing any further testimony that it is the only one.  DE 87 at Petitioner's Exhibit 22.  As noted, a petitioner's mere conclusory and speculative allegations of ineffective assistance will not entitle him to habeas relief.  *Kinnamon*, 40 F.3d at 734-35 (finding "speculation" of ineffective assistance to be no basis for habeas relief).  Since this claim is conclusory, the Court should summarily dismiss it.

### XXX.    When Reviewing the Reasonableness of State Court Determinations Pursuant to 28 U.S.C. § 2254(d)(1), Federal Courts Are Barred from Considering Anything But the Record Before the State Court.

Young has submitted voluminous exhibits and affidavits to this Court.  To the extent that these affidavits were not presented in conjunction with the relevant claims in state court, this Court is precluded from considering them with reference to those claims.  As relevant to this appeal, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Pinholster*, 131 S. Ct. at 1398.  To the extent that Young attempts to have the Court review

claims presented in his first and second state habeas application while citing support in the affidavits and evidence presented in his third state habeas proceeding, such review is prohibited.

## XXXI.    The Director Reserves All Affirmative Defenses With Respect to Young's Claims.

The Director has pointed out numerous instances where Young has filed new claims that were not presented in his original federal habeas petition or even in his amended petition.  Young has filed these new claims without explanation or notice to the Court or the Director, instead placing new claims throughout an almost 400-page petition.   The Director has attempted to correct Young's oversight for the Court.  But to the extent that any unexhausted, procedurally defaulted, or time-barred claims or facts were missed, such oversight was inadvertent and unintentional.  The Director fully intends to exert all of his affirmative defenses in this matter and does not waive them, either implicitly or explicitly.

The Director also notes that Young has also failed to address any of the affirmative defenses raised in the Director's previous two briefs refuting his claims.  Doubtlessly, he hopes to prolong this interminable proceeding with additional briefs where he (finally) explains his objections.  The Director would request that any further briefing by Young's attorneys be subject to reasonable page limitations.  Young's voluminous, yet meritless, briefs make

it clear that he is not interested in pursuing valid and worthy claims, but rather only in delaying these proceedings and his execution.

## XXXII.   Young's Repeated Requests for an Evidentiary Hearing Should Be Denied.

Young repeatedly asks the Court to hold an evidentiary hearing with respect to his claims.  But since an evidentiary hearing is barred under 28 U.S.C. § 2254(e)(2), the Court should deny Young's motion.  Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  28 U.S.C. § 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.  28 U.S.C. § 2254(e)(2)(B).  The Supreme Court has held that under § 2254(e)(2), a habeas petitioner has not failed to develop the factual basis of a claim in state court unless there has been a lack of diligence, or some greater fault, on the part of the petitioner or petitioner's counsel.  *(Michael)Williams*, 529 U.S. at 432. The Court further stated that such diligence depends on whether the

petitioner made a reasonable attempt to investigate and pursue claims in state court. *Id.* at 435. Diligence will therefore require that a petitioner, at a minimum, seek an evidentiary hearing in state court and that the petitioner be diligent in developing the record and presenting, if possible, all claims of constitutional error. *Id.* at 437.

Nevertheless, even if a petitioner has satisfied the requirements of § 2254(e)(2), he is not necessarily entitled to an evidentiary hearing. "[O]vercoming the narrow restrictions of § 2254(e)(2) does not guarantee a petitioner an evidentiary hearing; it merely opens the door for one[.]" *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000). Federal law leaves "[t]he decision whether to conduct an evidentiary hearing . . . to the sound discretion of the district court[.]" *Barrientes*, 221 F.3d at 770. "[W]here a district court has before it sufficient facts to make an informed decision regarding the merits of a claim, a district court does not abuse its discretion in refusing to grant an evidentiary hearing (even where no factual findings are explicitly made by any state court)." *Murphy*, 205 F.3d at 816; *see also McDonald v. Johnson*, 139 F.3d 1056 (5th Cir. 1998) ("The district court had sufficient facts before it to make an informed decision on the merits . . . and, accordingly, did not abuse its discretion in refusing to hold an evidentiary hearing."); *Young v. Herring*, 938 F.2d 543, 560 n.12 (5th Cir. 1991) ("[A] petitioner need not receive an evidentiary hearing if it would not develop

material facts relevant to the constitutionality of his conviction.").

Furthermore, a petitioner is not entitled to an evidentiary hearing "if his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." *Young v. Herring*, 938 F.2d at 559. "If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require." Rule 8 of the Rules Governing Section 2254 Cases. In deciding whether to grant a hearing, under Rule 8(a) of the Rules Governing Habeas Corpus Cases Under Section 2254, "the judge must review the answer [and] any transcripts and records of state-court proceedings to determine whether an evidentiary hearing is warranted." *Hall v. Quarterman*, 534 F.3d 365, 368 (5th Cir. 2008) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

Therefore, before granting petitioner's request for a hearing, the Court must consider whether further factual development could "enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474. Furthermore, "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id.* "[I]f the record refutes the applicant's factual allegations or otherwise

precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*

In the case-at-bar, many of Young's claims are time-barred and procedurally barred, prohibiting relief even if he were to uncover more favorable facts. Moreover, *Pinholster* dictates that any claim must be evaluated solely in the context of the evidence presented to the state court. Finally, with respect to any claim not presented to the Court of Criminal Appeals at this point, Young has displayed what can only be described as an abject lack of diligence by not raising it in the third state habeas proceeding. Consequently, there is no basis for further fact-finding, and this Court should deny Young's request for an evidentiary hearing.

## XXXIII.   Young Is Not Entitled to Circumvent the Statute of Limitations or his Procedural Bars Because of Ineffective Assistance of State Habeas Counsel.

Many of Young's claims are either procedurally barred or barred by the AEDPA statute of limitations. Throughout his petition, Young repeatedly contends that he can circumvent these barriers to a merits review because of the ineffective assistance of previous state habeas counsel. In his reply brief, Young will undoubtedly cite the Supreme Court's recent decision in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), in further support of his argument. In *Martinez*, the Supreme Court found for the first time a narrow and equitable exception to the general rule that error by an attorney in a postconviction

proceeding does not qualify as cause to excuse a procedural default. But the Director preemptively notes that the Fifth Circuit has rejected the notion that *Martinez* applies to ineffective-assistance-of-counsel claims raised in Texas cases because Texas procedures do not mandate that ineffectiveness claims be heard in the first instance in habeas proceedings.[38]  *Ibarra v. Thaler*, 687 F.3d 222, 227 (5th Cir. 2012) (such claims can be brought "through counseled motions for new trial and direct appeal"). The Director also notes the Fifth Circuit has found previously that even lack of representation during the applicable filing period will not merit equitable tolling. *Turner v. Johnson*, 177 F.3d 390, 392 (5th Cir. 1999).

## CONCLUSION

For the above reasons, the Director respectfully requests that the Court deny Young's petition for a writ of habeas corpus with prejudice and *sua*

---

[38]   On October 29, 2012, the Supreme Court granted certiorari in the case of *Trevino v. Thaler*, No. 11-10189, to consider whether it should vacate the Fifth Circuit's opinion and remand back to that court for consideration of Trevino's argument that he established cause under *Martinez v. Ryan* to excuse his procedural default. But such action is not binding precedent absent further guidance from the Court. *Neville v. Johnson*, 440 F.3d 221, 222 (5th Cir. 2006) (holding that Fifth Circuit precedent "remains binding until the Supreme Court provides contrary guidance"). Indeed, the Fifth Circuit has long made clear that "[t]he [Supreme] Court's grant of certiorari in a capital case does not cause us to deviate from circuit law, nor is it grounds for a stay of execution." *Cantu v. Collins*, 967 F.3d 1006, 1012 n.10 (5th Cir. 1992) (citing *Johnson v. McCotter*, 804 F.2d 300, 301 (5th Cir. 1986)); *Bridge v. Collins*, 963 F.2d 767, 770 n.5 (5th Cir. 1992) (citing *Johnson*); *Ellis v. Collins*, 956 F.2d 76, 79 (5th Cir. 1992). Thus, this Court should apply "the settled law of [this] circuit until it is changed by [the Fifth Circuit] or the Supreme Court has plainly signaled a change." *Selvage v. Lynaugh*, 842 F.2d 89, 95 (5th Cir. 1988).

*sponte* deny a certificate of appealability.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (explaining that the district court has the power to *sua sponte* deny a certificate of appealability without prior briefing and argument by counsel).

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction
Litigation Division


s/  Stephen M. Hoffman

\* Attorney-in-charge   \*STEPHEN M. HOFFMAN
Assistant Attorney General
Texas Bar No. 24048978
P. O. Box 12548, Capitol Station
Austin, Texas   78711
Tel:  (512) 936-1400
Fax: (512) 320-8132
Stephen.Hoffman@texasattorneygeneral.gov

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that on January 16, 2013, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means:

Joseph A. Trigilio
Office of the Federal Public Defender
321 East 2nd Street
Los Angeles, CA 90012-4012
Email: joseph_trigilio@fd.org

Sean K. Kennedy
Office of the Federal Public Defender
321 East 2nd Street
Los Angeles, CA 90012-4012

Margo A. Rocconi
Office of the Federal Public Defender
321 East 2nd Street
Los Angeles, CA 90012-4012
Email: margo_rocconi@fd.org

/s/ Stephen M. Hoffman
STEPHEN M. HOFFMAN
Assistant Attorney General