**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION**

FILED

FEB 1 0 2014

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | |
|---|---|
| CLINTON LEE YOUNG,<br>TDCJ No. 999447, | §<br>§<br>§<br>§ |
| Petitioner, | §<br>§ |
| V. | §<br>§ |
| WILLIAM STEPHENS, Director,<br>Texas Department of Criminal<br>Justice, Correctional Institutions<br>Division, | §   CIVIL NO. MO-07-CA-002-RAJ<br>§<br>§<br>§<br>§ |
| Respondent. | §<br>§<br>§ |

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

Petitioner Clinton Lee Young filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his Midland County conviction for capital murder and sentence of death. For the reasons set forth at length hereinafter, petitioner is entitled to neither federal habeas relief nor a Certificate of Appealability.

---

## TABLE OF CONTENTS

I.   STATEMENT OF THE CASE........................................................................................9
   A.   The Offenses........................................................................................................9
      1.   The Murder of Doyle Douglas........................................................................9
      2.   The Kidnaping, Robbery, and Murder of Samuel Petrey..................................9
   B.   Indictments.........................................................................................................15
   C.   Guilt-Innocence Phase of Trial.............................................................................19
      1.   Prosecution's Evidence................................................................................20
      2.   The Defense's Evidence................................................................................20
      3.   The Verdict..................................................................................................28
   D.   Punishment Phase of Trial....................................................................................28
      1.   The Prosecution's Case-in-Chief...................................................................29
      2.   The Defense's Case-in-Chief.........................................................................29
      3.   Prosecution's Rebuttal Evidence...................................................................43
                                                 54

|  |  |  |  |
|---|---|---|---|
|  | 4. | Defense's Rebuttal Evidence | 57 |
|  | 5. | Prosecution's Sur-Rebuttal | 59 |
|  | 6. | The Jury's Deliberations and Verdict | 59 |
| E. | | Motion for New Trial | 62 |
| F. | | Direct Appeal | 67 |
| G. | | First (and Second) State Habeas Corpus Proceedings | 68 |
| H. | | Proceedings in this Court | 77 |
| I. | | Return to State Court (Third State Habeas Proceeding) | 78 |
|  | 1. | Petitioner's Third State Habeas Corpus Application | 78 |
|  | 2. | Evidentiary Hearing Ordered on Some Claims | 79 |
|  | 3. | Evidentiary Hearing | 79 |
|  | 4. | State Habeas Trial Court's Findings & Conclusions | 91 |
|  | 5. | Texas Court of Criminal Appeals' Ruling | 92 |
|  | 6. | Return to this Court | 92 |

**II.** **STANDARD OF REVIEW** ............ 93

**III.** ***BRADY*, *GIGLIO/NAPUE* & CONFRONTATION CLAUSE CLAIMS (Claims 1 & 25)** ............ 98

| | | | |
|---|---|---|---|
| A. | | The Claims | 98 |
|  | 1. | Page and Ray's Alleged Plea Agreements | 98 |
|  | 2. | Alleged Impeachment Evidence Against Expert Merillat | 98 |
| B. | | State Court Disposition | 99 |
|  | 1. | Claims Concerning Alleged Secret Deals for Page & Ray | 99 |
|  | 2. | Impeachment Evidence Against Merillat | 99 |
| C. | | Clearly Established Federal Law | 100 |
|  | 1. | *Brady* Claims | 100 |
|  | 2. | *Giglio/Napue* (Knowing Use of Perjured Testimony) Claim | 102 |
| D. | | AEDPA Analysis of Claims Relating to Page and Ray | 103 |
| E. | | Analysis of Claim Concerning Impeachment of A.P. Merillat | 108 |
|  | 1. | Procedural Default Generally | 108 |
|  | 2. | The Duty to Exhaust Available State Remedies | 109 |
|  | 3. | Procedural Default on Unexhausted Claims | 113 |
|  | 4. | Longstanding Exceptions to Procedural Default Doctrine | 115 |
|  | 5. | Inapplicable Recently Recognized Narrow Exception | 116 |
|  | 6. | Conclusions Regarding Procedural Default | 117 |
|  | 7. | Alternatively, No Merit on *De Novo* Review | 118 |
| F. | | AEDPA & *De Novo* Review of Confrontation Clause Claims | 127 |

**IV.** **INSUFFICIENT EVIDENCE CLAIMS  (Claims 5, 6, 12 & 18)** ............ 130

| | | | |
|---|---|---|---|
| A. | | The Claims | 130 |
| B. | | State Court Disposition | 130 |
| C. | | AEDPA Analysis | 131 |
|  | 1. | Clearly Established Federal Law | 131 |
|  | 2. | Same Scheme and Course of Conduct | 132 |
|  | 3. | Petrey was Murdered During His Kidnaping and Robbery | 134 |

  4. Future Dangerousness.................................................................
  5. Personal Moral Culpability.....................................................135
  6. Conclusions.............................................................................138

**V.** **CHALLENGES TO THE TEXAS CAPITAL SENTENCING SCHEME**.....................139
 **(Claims 10, 11, 16, 17, 19, 20 & 21)**
 A. Overview of the Claims....................................................................140
 B. State Court Disposition......................................................................140
 C. Clearly Established Federal Law: An Overview of Recent................141
  Eighth Amendment Jurisprudence.
 D. Challenges to Prosecutorial Discretion at Indictment Stage.............143
 E. Absence of a Burden of Proof on Mitigation Special Issue...............149
 F. Lack of Meaningful State Appellate Review on Jury's Answer to......152
  Mitigation Special Issue.
 G. Failure to Include Sentencing Factors in the Indictment...................163
 H. The Texas Twelve/Ten Rule.............................................................166
 I. Failure to Give Hung Jury Instruction..............................................177

**VI.** **CHALLENGE TO PUNISHMENT PHASE JURY CHARGE  (Claim 3)**.............182
 A. The Claim.........................................................................................185
 B. State Court Disposition......................................................................185
  1. Punishment Phase Jury Charge.............................................186
  2. Prosecution's Punishment Phase Jury Argument..................186
  3. Texas Court of Criminal Appeals' Direct Appeal Ruling......188
 C. AEDPA Analysis...............................................................................189
 D. In the Alternative, Procedural Default...............................................190

**VII.** **ALLEGED PROSECUTORIAL MISCONDUCT (Claims 26, 27, 28, 29)**.............195
 A. The Claims........................................................................................195
 B. State Court Disposition......................................................................195
 C. Procedural Default.............................................................................196
 D. *De Novo* Review.................................................................................198
 E. Lost or Destroyed Evidence..............................................................198
  1. The Constitutional Standard..................................................199
  2. Shell Casings.........................................................................199
  3. Lost Convenience Store Surveillance Video Tape.................200
  4. Unidentified Eyewitness to Petrey's Abduction....................202
 F. Interference with Mitigation Specialist..............................................204
 G. More Prosecutorial Misconduct (Comments & Questions)................206
  1. The Constitutional Standard..................................................210
  2. Petitioner's Confession to Douglas' Murder.........................210
  3. Petitioner's Lack of Remorse................................................214
  4. "Victim Impact" Testimony from Mark Ray.........................215
  5. Conclusions...........................................................................220
 H. *Giglio/Napue* Claim Involving Jacqueline Timmons......................222
  .................................................................................................222

VIII.   **BIASED TRIAL JUDGE (Claim 2)**............................................................225
   A.   The Claim..................................................................................225
   B.   State Court Disposition.............................................................225
   C.   Procedural Default....................................................................226
   D.   No Merit on *De Novo* Review....................................................226
IX.   **SHERIFF'S ALLEGED FRATERNIZATION WITH JURY (Claim 14)**..............227
   A.   The Claim..................................................................................231
   B.   State Court Disposition.............................................................231
   C.   AEDPA Analysis.......................................................................232
   D.   Conclusions...............................................................................233
X.   **EXTENDING *ROPER & ATKINS* TO ADHD & MENTAL IMMATURITY (Claim 15)**............237
   A.   The Claim..................................................................................238
   B.   State Court Disposition.............................................................238
   C.   AEDPA Analysis.......................................................................238
   D.   *Teague* Foreclosure...................................................................239
   E.   Conclusions...............................................................................245
XI.   **EXCLUSION OF POLYGRAPH TEST RESULTS (Claim 7)**..............247
   A.   The Claim..................................................................................247
   B.   State Court Disposition.............................................................247
   C.   AEDPA Analysis.......................................................................248
   D.   Conclusions...............................................................................249
XII.   **EXCLUSION OF VENIRE MEMBER ROBERTS (Claim 8)**..............251
   A.   The Claim..................................................................................251
   B.   State Court Disposition.............................................................251
   C.   AEDPA Analysis.......................................................................252
      1.   Voir Dire Examination of Venire Member Roberts......................253
      2.   Clearly Established Federal Law.............................................253
      3.   Synthesis.............................................................................261
   D.   Conclusions...............................................................................264
XIII.   **OVER-BREADTH OF TEXAS MURDER-WITHIN-KIDNAPING STATUTE (Claim 9)**............265
   A.   The Claim..................................................................................265
   B.   State Court Disposition.............................................................265
   C.   AEDPA Analysis.......................................................................266
   D.   Conclusions...............................................................................267
XIV.   **SUPPLEMENTAL PUNISHMENT-PHASE JURY INSTRUCTIONS (Claim 13)**............273
   A.   The Claim..................................................................................274
   B.   State Court Disposition.............................................................274
   C.   Procedural Default....................................................................274
   D.   Alternatively, No Merit on *De Novo* Review...............................276
      1.   Eighth Amendment Arguments...............................................277

        2.      Due Process Arguments........................................................280
        3.      Sixth Amendment Arguments...........................................284
   E.   Conclusions....................................................................................285

**XV.   INEFFECTIVE ASSISTANCE AT TRIAL (Claim 4)........................285**
   A.   Overview of the Claims..................................................................286
   B.   Clearly Established Federal Law....................................................286
   C.   Failure to Present Evidence Showing Petitioner Did Not Shoot Petrey.............290
        1.      The Complaint..................................................................290
        2.      Procedural Default on Unexhausted Complaint...................291
        3.      Alternatively, No Merit on *de Novo* Review........................295
            a.      No Deficient Performance.....................................296
            b.      No Prejudice........................................................298
            c.      Conclusions.........................................................301
   D.   Failure to Object to Admission of TYC Records (State Exhibit no. 142)...........304
        1.      The Complaints...............................................................304
        2.      State Court Disposition....................................................304
        3.      Procedural Defaults.........................................................306
        4.      AEDPA Analysis of Exhausted Complaint.........................307
            a.      No Deficient Performance.....................................307
            b.      No Prejudice........................................................311
            c.      Conclusions.........................................................314
        5.      Alternatively, No Merit on *De Novo* Review of Procedurally
            Defaulted Complaints......................................................315
            a.      No Deficient Performance.....................................315
            b.      No Prejudice........................................................318
            c.      Conclusions.........................................................319
   E.   Failure to Present Ballistics Evidence to Show Someone  Other than
       Petitioner Shot Doyle Douglas......................................................320
        1.      The Complaint..................................................................320
        2.      State Court Disposition....................................................320
        3.      Procedural Default...........................................................322
        4.      AEDPA Review of Exhausted Portion of Complaint............323
            a.      No Deficient Performance.....................................324
            b.      No Prejudice........................................................330
            c.      Conclusions.........................................................331
        5.      No Merits under *De Novo* Review on Procedurally Defaulted
            Portions of this Claim.....................................................332
            a.      No Deficient Performance.....................................333
            b.      No Prejudice........................................................338
            c.      Conclusions.........................................................340
   F.   Failure to Test Douglas' Vehicle....................................................340
        1.      The Complaint..................................................................340
        2.      State Court Disposition....................................................340

3.    Procedural Default...................................................................341
4.    Alternatively, No Merit on *De Novo* Review.........................341
      a.    No Deficient Performance..........................................342
      b.    No Prejudice.............................................................344
      c.    Conclusions..............................................................345
G.  Failure to Perform Testing on Page's Gloves.................................346
1.    The Complaint............................................................................346
2.    State Court Disposition..............................................................346
3.    Procedural Default......................................................................347
4.    Alternatively, No Merit on *De Novo* Review.........................347
      a.    No Deficient Performance..........................................347
      b.    No Prejudice.............................................................350
      c.    Conclusions..............................................................352
H.  Failure to Investigate Conspiracy Among the Eyewitnesses............352
1.    The Complaint............................................................................352
2.    State Court Disposition..............................................................352
3.    Procedural Default......................................................................352
4.    Alternatively, No Merit on *De Novo* Review.........................353
      a.    No Deficient Performance..........................................353
      b.    No Prejudice.............................................................355
      c.    Conclusions..............................................................356
I.   Failure to Move for Mistrial..........................................................356
1.    The Complaint............................................................................356
2.    State Court Disposition..............................................................356
3.    Procedural Default......................................................................357
4.    Alternatively, No Merit on *De Novo* Review.........................357
      a.    No Deficient Performance..........................................358
      b.    No Prejudice.............................................................359
      c.    Conclusions..............................................................361
J.   Failure to Cross-Examine Deborah Sanders Re Mark Ray..............361
1.    The Complaint............................................................................361
2.    State Court Disposition..............................................................361
3.    Procedural Default......................................................................362
4.    Alternatively, No Merit on *De Novo* Review.........................362
      a.    No Deficient Performance..........................................362
      b.    No Prejudice.............................................................364
      c.    Conclusions..............................................................366
K.  Failure to Strike Venire Member Haydee Guerrero........................366
1.    The Complaint............................................................................366
2.    State Court Disposition..............................................................367
      a.    Voir Dire Proceedings...............................................367
      b.    Motion for New Trial.................................................368
      c.    Second State Habeas Proceeding................................369

6

3. Procedural Default..................................................................370
4. Alternatively, No Merit on *De Novo* Review..............................370
   a. No Deficient Performance...........................................370
   b. No Prejudice.............................................................371
   c. Conclusions.............................................................372

L. Failure to Present Mental Health Evidence at Guilt-Innocence
  Phase of Trial........................................................................372
1. The Complaint....................................................................372
2. State Court Disposition.........................................................372
3. Procedural Default..............................................................373
4. Alternatively, No Merit on *De Novo* Review..............................373
   a. No Deficient Performance...........................................373
   b. No Prejudice.............................................................376
   c. Conclusions.............................................................377

M. Failure to Call Petitioner's Former Teachers to Testify.....................377
1. The Complaint....................................................................377
2. State Court Disposition.........................................................378
3. AEDPA Review....................................................................379
   a. No Deficient Performance...........................................379
   b. No Prejudice.............................................................381
   c. Conclusions.............................................................383

N. Failure to Present Mitigating Evidence Showing Why Petitioner
  Stopped Taking His Prescription Medication Upon Discharge from
  The TYC and Why Petitioner Appeared Coherent and Calm
  Throughout Trial....................................................................384
1. The Complaint....................................................................384
2. State Court Disposition.........................................................384
3. Procedural Default..............................................................384
4. Alternatively, No Merit on *De Novo* Review..............................385
   a. No Deficient Performance...........................................385
   b. No Prejudice.............................................................388
   c. Conclusions.............................................................389

O. Failure to Object to Supplemental Jury Instructions on Grounds
  It was a Comment on the Weight of the Evidence, Allowed an
  Affirmative Answer Sans Unanimity, and Prevented
  Consideration of Mitigating Evidence..........................................389
1. The Complaint....................................................................389
2. State Court Disposition.........................................................390
3. Procedural Default..............................................................390
4. Alternatively, No Merit on *De Novo* Review..............................390
   a. No Deficient Performance...........................................390
   b. No Prejudice.............................................................392
   c. Conclusions.............................................................393

P.  Failure to Object to Prosecution Displaying/Waving "Serial Killer" Book..........393
    1.  The Complaint..........................................................................393
    2.  State Court Disposition.............................................................393
    3.  Procedural Default...................................................................394
    4.  Alternatively, No Merit on *De Novo* Review.............................397
        a.  No Deficient Performance.................................................397
        b.  No Prejudice....................................................................397
        c.  Conclusions.....................................................................398
Q.  Failure to Object to the Admission of Petitioner's Midland County
    Jail Records (State Exhibit no. 145).........................................400
    1.  The Complaint..........................................................................400
    2.  State Court Disposition.............................................................400
    3.  Procedural Default...................................................................401
    4.  Alternatively, No Merit on *De Novo* Review.............................401
        a.  No Deficient Performance.................................................401
        b.  No Prejudice....................................................................402
        c.  Conclusions.....................................................................403
R.  Failure to Impeach Prosecution Witness Timmons.............................403
    1.  The Complaint..........................................................................404
    2.  State Court Disposition.............................................................404
    3.  Procedural Default...................................................................404
    4.  Alternatively, No Merit on *De Novo* Review.............................404
        a.  No Deficient Performance.................................................405
        b.  No Prejudice....................................................................405
        c.  Conclusions.....................................................................406
S.  Failure to Object to Prosecutorial Comments About Petitioner's
    Confession to the Douglas Murder & Lack of Remorse.................406
    1.  The Complaint..........................................................................406
    2.  State Court Disposition.............................................................407
    3.  Procedural Default...................................................................408
    4.  Alternatively, No Merit on *De Novo* Review.............................408
        a.  No Deficient Performance.................................................408
        b.  No Prejudice....................................................................410
        c.  Conclusions.....................................................................411
XVI.  **INEFFECTIVE ASSISTANCE ON APPEAL  (Claim 22)**.................411
  A.  The Claim................................................................................411
  B.  State Court Disposition.............................................................411
  C.  Procedural Default...................................................................411
  D.  Alternatively, No Merit on *De Novo* Review............................412
    1.  The Complaint..........................................................................412
    2.  The Constitutional Standard......................................................412
    3.  Synthesis.................................................................................413
        a.  No Deficient Performance.................................................416

          b.      No Prejudice..................................................................418

          c.      Conclusions..................................................................418

**XVII.  CUMULATIVE ERROR (Claim 23)**................................................419

      A.     The Claim..................................................................419

      B.     State Court Disposition..................................................419

      C.     Procedural Default..........................................................419

      D.     Alternatively, No Merit on *De Novo* Review......................419

      E.     Conclusions..................................................................422

**XVIII. ACTUAL INNOCENCE (Claim 24)**.............................................422

      A.     The Claim..................................................................422

      B.     State Court Disposition..................................................422

      C.     Procedural Default..........................................................422

      D.     Alternatively, No Merit on *De Novo* Review......................423

      E.     Conclusions..................................................................425

**XIX.  STATUTE OF LIMITATIONS**.......................................................426

**XX.  REQUESTS FOR A FEDERAL EVIDENTIARY HEARING**...........429

**XXI.  REQUESTS FOR STAY & "REMAND"**...........................................431

**XXII.  CERTIFICATE OF APPEALABILITY**............................................435

**XXIII. CONCLUSION AND ORDER**.......................................................445

# I. <u>Statement of the Case</u>

A.    <u>The Offenses</u>

    1.    <u>The Murder of Doyle Douglas</u>

Viewed in the light most favorable to the jury's verdict, the evidence at petitioner's capital murder trial showed (1) late on the evening of November 24, 2001, petitioner rode with Doyle Douglas, Mark Ray, David Lee Page, Jr., and Darnell McCoy in Douglas' two-door vehicle to Longview, Texas to purchase marijuana,[1] (2) when they arrived at the location to which the

---

[1] See Statement of Facts from Petitioner's Trial (henceforth "S.F. Trial"), Volume 21, testimony of Darnell McCoy, at pp. 99-102, 154; Volume 22, testimony of Mark Ray, at pp. 61-70, 154; Volume 26, testimony of David Lee Page, Jr., at pp. 145-51.

    McCoy, Ray, and Page all testified as prosecution witnesses at petitioner's capital murder trial.  As is not unusual in cases involving multiple eyewitnesses, these three individuals disagreed on a number of details, such as their exact seating locations in the back seat of Douglas' vehicle during their ride to Longview.  At petitioner's trial, all three agreed Page sat behind Douglas on the driver's side of the vehicle's rear seat; McCoy testified he was seated in the middle with Ray on his right; Ray gave a recorded statement to police on November 26, 2001 in which he stated he was in the middle, McCoy was on his left, and Page on his right but Ray testified at petitioner's trial that he was seated in the middle with McCoy on his right; Page gave conflicting written statements to authorities regarding where McCoy and Ray

petitioner had directed them, Page left Douglas' vehicle and attempted unsuccessfully to get someone to answer the door of the residence where they were stopped,[2] (3) when Page returned to Douglas' vehicle, Douglas opened the driver's side door, slid his seat forward, and turned his head away from the petitioner, who was seated in the front passenger seat,[3] (4) while Page was getting back into the rear seat directly behind Douglas, petitioner pulled out a .22 caliber semiautomatic handgun, announced he needed Douglas' car, and shot Douglas twice in the head,[4] (5) petitioner then

had been seated but testified at trial McCoy was seated in the middle with Ray behind petitioner on the right side of the vehicle. See S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 100, 153,; Volume 22, testimony of Mark Ray, at pp. 66, 83, 194-95; Volume 27, Testimony of David Lee Page, Jr., at pp. 9, 12-13, 54-55, 225-26, 230.

Likewise, McCoy testified (1) he could hear sounds coming from the trunk which he believed were coming from Douglas moving around, scraping, or scratching, (2) he believed the sounds were loud enough that everyone inside the vehicle could hear them, and (3) at one point, the petitioner shouted at Douglas to remain still, threatened to shoot Douglas again, and turned up the radio. S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 120-22, 204. Ray testified at petitioner's trial he personally heard nothing coming from the trunk but the petitioner did say something about Douglas moving around or making a gurgling sound and then turned up the car's radio. S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 113, 208, 215. Page testified (1) he could hear gurgling sounds coming out of Douglas, as if Douglas were trying to breathe, as they put Douglas in the trunk, (2) he heard a "last gush of air" exit Douglas lungs when they dropped Douglas on the ground while lifting Douglas out of the trunk, but (3) admitted he had given a written statement to authorities on November 27, 2001 in which he stated he had not heard any sounds coming from the trunk or Douglas. S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 164, 175; Volume 27, testimony of David Lee Page. Jr., at pp. 123,

Nonetheless, Page, Ray, and McCoy all testified they witnessed petitioner shoot Douglas twice in the head with little to no warning while Page was attempting to get back into Douglas' car. S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 105-12, 164-65, 200-01; Volume 22, testimony of Mark Ray, at pp. 84-93, 163-67, 197, 199, 201; Volume 26, testimony of David Lee Page, Jr., at pp. 157-62; Volume 27, testimony of David Lee Page, Jr., at pp. 13-15, 76-77, 80-81, 182, 229.

[2] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 153-59. Page testified without contradiction at trial that he exited Douglas' vehicle, knocked on both the front and back doors of the house to which petitioner had directed them, but no one answered his knocks and he found a note indicating the residents were left town for the holiday. Id., at pp. 153-57. Ray testified (1) petitioner directed Douglas to drive them to a residence in Longview where petitioner instructed Page to go purchase marijuana, (2) Ray and petitioner each gave Page ten dollars for that purpose, (3) petitioner instructed Page to tell the residents of the home that it was for "Clint," (4) Page knocked on the front door, and (5) when no one answered, Page went around the house briefly before returning to the car. S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 69-72, 76-80.

[3] S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 104-09; Volume 22, testimony of Mark Ray, at pp. 82-92; Volume 26, testimony of David Lee Page, Jr., at pp. 157-61; Volume 27, testimony of David Lee Page, Jr., at pp. 13-15.

[4] S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 106-12, 155; Volume 22, testimony of Mark Ray, at pp. 89-92, 164-67,197, 199, 201, 226; Volume 26, testimony of David Lee Page, Jr., at pp. 141-42, 159-61; Volume 27, testimony of David Lee Page, Jr., at pp. 13-15, 76-77, 182.

shoved Douglas' body out the open driver's side door,[5] (6) petitioner threatened the others in the

vehicle and directed them to place Douglas' body in the trunk of the vehicle,[6] (7) once the others had

done so and returned to the vehicle, petitioner drove them away from the murder scene,[7] (8)

---

[5] S.F. Trial, Volume 21, testimony of Darnell McCoy, at p. 112; Volume 22, testimony of Mark Ray, at p. 95' Volume 26, testimony of David Lee Page, Jr., at p. 161.

[6] Once again, there were discrepancies between the three eyewitness accounts of the events which took place in the immediate aftermath of petitioner's shooting of Douglas.

McCoy testified (1) petitioner directed Page to grab Douglas and help petitioner push/pull Douglas out of the vehicle, (2) petitioner and Ray got out of the vehicle while McCoy remained inside, (3) petitioner threatened Ray and Page to get them to put Douglas in the trunk, and (4) Page and petitioner put Douglas in the trunk while Ray stood and watched. S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 113-15, 160, 166-67, 184, 187-88, 201-02, 227.

Ray testified (1) petitioner waved his gun at all three occupants of the rear seat and instructed them to help him get Douglas into the trunk, (2) he (Ray) was scared because petitioner had given no indication before shooting Douglas as to why he was doing so, (3) petitioner said "If y'all don't get him in the trunk, you're going to be like him," (4) petitioner lowered his gun, unfastened Douglas' seat belt, and messed with the gear shift to get the key out of the ignition, (5) after unfastening Douglas' seat belt and pushing Douglas to the ground, petitioner repeated his threat, (6) petitioner said "Y'all are just as much a part of this as I am," (7) Page had to push on Douglas seat in order to get out of the rear seat, (8) petitioner got the keys and opened the trunk, (9) petitioner continued to point his gun at the other three men and told them once again to put Douglas in the trunk, (10) Page grabbed Douglas' wrists, McCoy grabbed Douglas around the waist, and Ray grabbed Douglas' ankles and together they lifted Douglas into the trunk of the car, bending Douglas' legs at the knees to fit his body inside the confined space, and (11) petitioner pointed the gun at the three of them and instructed them to get back in the car. S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 92-101, 173, 176.

Page testified (1) he was about halfway back into Douglas' vehicle but still had one foot outside the vehicle when petitioner fired the two shots into Douglas' head, (2) Page, the petitioner, and Ray all jumped out of the vehicle, (3) petitioner walked around to the driver's side of the vehicle, waved his gun around, and said "Hey, man, y'all are in it just as much as I am. Y'all need to get out and help me. Y'all were here whenever I did this," (4) petitioner dug through Douglas' pockets, found a toy badge that said "Ranger" on it, and remarked "Well, I always knew that he had something to do with the law," (5) petitioner told them to grab petitioner and put him in the trunk, (6) Page picked up Douglas under the arms by the shirt, McCoy grabbed one of Douglas' legs, Ray grabbed Douglas' other leg, and they put Douglas in the trunk, (7) as they loaded Douglas into the trunk, Page could hear air escaping Douglas' mouth, causing a gurgling sound, as if Douglas were trying to breathe, and (8) petitioner instructed them to get into the car and they did. S.F. Trial, Volume 26, testimony of David Lee Page. Jr., at pp. 161-65,; Volume 27, testimony of David Lee Page. Jr., at pp. 19, 70-71.

[7] McCoy testified that, as the petitioner drove them away from the scene of Douglas' shooting, (1) petitioner was smiling and smirking, (2) petitioner and Page (who was now seated in the front passenger seat with McCoy and Ray in the rear seat) discussed how best to dispose of Douglas' body, and (3) Page went through Douglas' wallet, removed a twenty dollar bill, burned Douglas' identification and threw it out the window. S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 115, 118-20.

Ray testified (1) after they loaded Douglas in the trunk, petitioner directed Page to get in the front passenger seat, (2) Ray sat in the rear seat on the passenger side while McCoy sat behind petitioner, (3) petitioner held his gun in his lap as he drove away from the scene of Douglas' murder with one hand, (4) when Ray asked petitioner why he shot Douglas, petitioner replied "Well, Doyle deserved to die. He's a child molester," (5) when Ray protested the accuracy of that accusation, petitioner told Ray to shut up, (6) later on down the road, petitioner told the others he needed a car to go to Midland to see his girlfriend, (7) he did not recall seeing Page with Douglas' wallet, and (8) before they dumped Douglas' body, petitioner drove the vehicle to a car wash where the group searched the trunk of Douglas' car. S.F. Trial,

petitioner explained to the others he needed Douglas' vehicle to get to Midland to see petitioner's

girlfriend and rationalized his shooting of Douglas by accusing Douglas of being a child molester,[8]

(9) petitioner drove the group to an isolated, wooded, area where petitioner directed the others to

remove Douglas' body from the trunk and place Douglas face down in a creek,[9] (10) petitioner then

---

Volume 22, testimony of Mark Ray, at pp. 101-03, 107-11, 116, 220-21, 231.

Page testified (1) after they loaded Douglas in the trunk, petitioner directed them to get in the car (2) petitioner drove them to a gas station where Page purchased cigarettes and a soda while petitioner purchased a pornographic magazine, (3) petitioner then drove to a motel where petitioner handed Ray and McCoy handguns, (4) the petitioner, Ray, and McCoy went inside a motel room to meet with Pat Brook while Page remained in the car, (5) petitioner walked to a nearby restaurant and purchased french fries, (6) the others returned in about thirty minutes, (7) petitioner then drove the group to an isolated location where they disposed of Douglas' body, (8) after disposing of Douglas' body, petitioner drove to a car wash where he handed Page a butterfly knife and directed Page to cut out a section of carpet from Douglas' trunk that had blood on it, and (9) after leaving the car wash to return to Ore City, petitioner instructed McCoy and Ray to give the handguns back to petitioner (and they did). S.F. Trial, Volume 26, testimony of David Lee Page. Jr., at pp. 165-66, 167-71, 180-83; Volume 27, testimony of David Lee Page, Jr., at pp. 136, 139.

[8] S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 117, 134; Volume 22, testimony of Mark Ray, at pp. 102-03, 130, 142; Volume 26, testimony of David Lee Page. Jr., at pp. 179-80, 264.

[9] McCoy testified petitioner and Page lifted Douglas out of the trunk when they reached the wooded area where Douglas body was dumped face down in a creek and petitioner directed Ray to shoot Douglas one more time. S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 128-32, 207-09.

Ray testified petitioner drove them to a wooded area where (1) petitioner directed the others to get out and help him take Douglas' body out of the trunk, (2) Ray, McCoy, and Page lifted Douglas out of the trunk with help from petitioner, (3) Ray lifted Douglas' ankles, McCoy grabbed Douglas' mid-section, Page picked up Douglas' arms, and petitioner grabbed one wrist, (4) petitioner instructed the others to roll petitioner down toward a creek, (5) once Douglas was in the creek, petitioner directed that the others roll Douglas face down, (6) petitioner said "One of y'all got to shoot him again," because "that way I know that y'all won't snitch on me when I go to Midland," (7) petitioner pointed his gun at Ray and said "You're going to do it," (8) petitioner removed a pillow from the car, handed the pillow to Ray, and said "I want you to put it over him and I want you to shoot him," (9) petitioner removed a small caliber revolver, handed it to Ray, and directed Ray to get down on his knees, (10) petitioner continued to point his semiautomatic pistol at Ray, (11) petitioner said "Shoot him one time just to make sure," (12) petitioner told Ray "You and J.R. and NaNa are going to wind up just like him if you don't do what I say," (13) Ray placed the pillow over Douglas' head, pointed the revolver toward Douglas, closed his eyes, and pulled the trigger, (14) petitioner grabbed the gun away from Ray while Ray's eyes were still closed, and (15) Ray would not have shot Douglas if petitioner had not threatened Ray. S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 114, 116-29.

Page testified (1) petitioner drove them to a wooded area near Hallsville where petitioner waved his gun around and directed the others to take Douglas' body out of the trunk, (2) Page grabbed Douglas' upper body, Ray and McCoy each grabbed a foot and they lifted Douglas out of the trunk, (3) Douglas hit the ground hard and his head struck the back bumper of the car, (4) Page heard a "gush of air" when Douglas hit the ground, (5) after that, Page did not hear Douglas breathing, (6) they half-dragged/half-carried Douglas toward a small creek, (7) petitioner directed them to roll Douglas into the creek, (8) they rolled Douglas from his back over on to his front in the creek, (9) petitioner said "Mark, you're going to have to prove yourself," (10) when Ray inquired what petitioner meant, petitioner explained he wanted Ray to fire one more shot into Douglas' head, (11) petitioner then retrieved a pillow from the car, folded it over Douglas' head and held it down with his gun, (12) when Ray hesitated, petitioner said "If you don't do this, you're going to be laying in the creek with Doyle," and (13) Ray grabbed the .22, stuck it down in the pillow, shied away a little bit, and pulled

retrieved a pillow from Douglas' vehicle, handed the pillow to Ray, directed Ray to place the pillow

over Douglas' head, and directed Ray in a threatening manner to shoot Douglas in the head again

(which Ray did),[10] (11) leaving Douglas' body in the creek, petitioner drove the group to a motel

where petitioner and Ray described to Pat Brook how they had each shot Douglas,[11] (12) petitioner

---

the trigger. S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 171-72, 174-78.

[10] The relevant trial testimony concerning the circumstances of Ray's shooting of Douglas at the creek is summarized in note 9, *supra.* McCoy testified Ray appeared to be scared when he shot Douglas and Ray had to be talked into shooting Douglas by petitioner. S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 129-32. Ray insisted he only shot Douglas because petitioner had threatened Ray and petitioner was holding his gun on Ray. S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 120-25, 129. Page testified (1) petitioner told all three of the others when they arrived at the creek that if they said anything, petitioner would take care of them and their families, (2) Page had seen petitioner shoot one person and believed petitioner capable of doing it again, and (3) after Ray shot Douglas, petitioner reminded the other three they were all accessories. S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 174-80.

[11] Brook testified (1) he allowed the petitioner, Ray, and McCoy (but not Page) to enter the motel room Brook was sharing with Deborah Sanders (the niece of Doyle Douglas and sister of petitioner's girlfriend Amber Lynch) (2) petitioner stated he had been putting in some work "leaving people face down," (3) petitioner stated further he had left "Uncle Doyle" face down and, because he had found a "star" on Douglas, he believed Douglas had been working with the police, (4) petitioner told Brook he shot Douglas twice in the back of the head, (5) Ray explained they put Douglas in the trunk, drove into the country, opened the trunk, found Douglas alive, and shot Douglas two more times, (6) Brook noticed what appeared to be blood on petitioner's shoes, (7) petitioner said he was going to Midland to see his girlfriend, (8) petitioner's demeanor appeared to be proud, not remorseful, and (9) petitioner remarked that he had "cotton fever," a condition Brook described as resulting from intravenous drug abuse. S.F. Trial, Volume 21, testimony of Patrick Lee Brook, at pp. 247-49, 251-56, 258, 260-61, 265-66, 268.

Once again, the testimony of McCoy, Ray, and Page on the subject of the group's meeting with Brook contained many inconsistencies. More specifically, McCoy testified (1) the purpose for going to meet Brook was to permit petitioner to retrieve a gun from Brook that belonged to petitioner, (2) their entire group (including Page) visited Pat Brook *before* they disposed of Douglas' body because petitioner gave Page and Ray guns before they met with Brook, (3) everyone in their group except McCoy had a gun during the meeting with Brook, (4) petitioner described to Brook how he shot Douglas, and (5) petitioner was unable to retrieve his gun from Brook because Brook had loaned it to someone else. S.F. Trial, Volume 26, testimony of Darnell McCoy, at pp. 123-26, 158.

Ray testified (1) they arrived at Pat Brook's motel room the first time before disposing of Douglas' body, (2) petitioner pointed his gun at Page and directed Page to remain outside in the car, (3) when they went to Brook's room, he was not in, (4) they then went to a car wash before disposing of Douglas' body and returning to the motel where Brook was staying, (5) this time Brook was home, (6) Ray and McCoy went inside Brook's motel room with petitioner, (7) petitioner had two guns but neither Ray nor McCoy were armed during petitioner's meeting with Brook, (8) during the meeting, petitioner said "I just did a lick on Doyle," (9) petitioner then described how he shot Douglas and how he had made Ray shoot Douglas, (10) Ray and McCoy were silent throughout the meeting, (11) petitioner's demeanor when he described his shooting of Douglas suggested petitioner got a thrill out of it, (12) Brook appeared surprised by petitioner's confession until he spotted what appeared to be blood on petitioner's shoes, (13) petitioner described getting cotton fever from shooting up dope, (14) petitioner did not give Ray a handgun prior to the meeting with Brook, (15) Ray never told Brook he had shot Douglas twice, and (16) Ray remained silent during petitioner's meeting with Brook and thereafter because petitioner had threatened Ray's family. S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 104, 132-37, 185.

Page testified (1) with Douglas' body still in the trunk, they drove to the motel where Brook was staying, (2) when they arrived at the motel, petitioner handed Ray a loaded .22 caliber revolver and McCoy a loaded .38 Special,

then drove the group to Ray's home and dropped off Ray,[12] (13) petitioner next drove himself, McCoy, and Page to a location near McCoy's home and dropped off McCoy,[13] (14) when Page exited the vehicle to allow McCoy to get out the rear seat on the passenger side of the vehicle, petitioner pointed his gun at Page, threatened Page and Page's family, and directed Page to get back into the car,[14] and (15) petitioner explained Page was going to Midland with petitioner because petitioner did not want Page to "rat out" petitioner.[15]

---

(3) petitioner, Ray, and McCoy went into Brook's room while Page remained outside in the car, (4) Page went to buy french fries but returned to the car before the others concluded their meeting, (5) petitioner explained he had not retrieved his gun from Brook and that Brook had appeared edgy because McCoy kept putting his hand in his pocket, (6) they left the motel to go dispose of Douglas' body, (7) after dropping off Ray and McCoy, petitioner and Page returned the .38 Special and .22 revolver to petitioner's brother Dano Young before they departed for Midland, and (8) they stopped by Brook's motel again on the way west but found Brook was not in and petitioner left a note for Brook. S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 166-71, 188-90.

[12] S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 135-36, 212, 224; Volume 22, testimony of Mark Ray, at pp. 143-44.

Ray testified (1) petitioner refused to drop any of them off until Page agreed to go to Midland with petitioner, (2) when petitioner dropped off Ray, petitioner said "Look, this is going to be our little secret, right?" (3) Ray replied that he would not say anything, (4) Page said everything was going to be all right, (5) Ray broke down, began crying and said he didn't think so, and (6) petitioner again threatened the three others and their families. S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 142-44.

Page testified (1) halfway back to Ore City from Longview, petitioner insisted Ray and McCoy return the handguns petitioner has given them, (2) both Ray and McCoy did so, (3) when petitioner let Ray out of the car, petitioner told Ray (Man, you know if you say anything, I'll come back and handle up with you and your family," (4) Ray replied "Don't worry about it man. I ain't going to say anything." S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 181-83.

[13] S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 213-14; Volume 26, testimony of David Lee Page, Jr., at p, 183.

McCoy also testified (1) as soon as he got home, he contacted his wife and then the police to report what he had observed that night and (2) he led law enforcement officials to Douglas' body. S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 137-38.

[14] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 183, 186-87.  Page testified petitioner threatened Page's family and insisted Page accompany petitioner to Midland. Id.  Page testified petitioner continued to threaten Page throughout their drive to Midland. S.F. Trial, Volume 27, testimony of David Lee Page, Jr., at pp. 83-84, 165.

[15] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at p. 183.  Page testified he had previously informed Amber Lynch (petitioner's girlfriend) that petitioner had cheated on her. Id., at p. 185.

2.      The Kidnaping, Robbery, and Murder of Samuel Petrey

When viewed in the light most favorable to the jury's verdict, the evidence at petitioner's trial also showed (1) petitioner and Page drove toward Midland, stopping to purchase a calling card which petitioner used to telephone petitioner's girlfriend Amber Lynch, who was spending the Thanksgiving holiday weekend at her grandmother's residence in Midland,[16] (2) they continued their drive toward Midland, during which petitioner commented that Amber's father, Bart Lynch, would likely recognize Douglas' vehicle and suggested they needed to obtain a different vehicle before they went to see Amber at her grandmother's residence in Midland,[17] (3) they stopped at a grocery store in Brookshire where they noticed a white pickup truck in the parking lot,[18] (4) when the owner and driver of the pickup, Samuel Petrey, emerged from the store, petitioner walked over to the pickup and asked for directions,[19] (5) after Petrey gave petitioner directions, petitioner pulled out his gun and told Petrey "Yeah, scoot over.  I'm taking your truck,"[20] (6) Petrey complied with petitioner's command and petitioner got into Petrey's truck,[21] (7) Page and petitioner briefly discussed who would drive which vehicle and ditching Douglas' car,[22] (8) petitioner drove off with Petrey in Petrey's truck while Page followed in Douglas' car,[23] (9) they drove to a rest stop along an interstate

---

[16] S.F. Trial, Volume 26, testimony of David Lee Page. Jr., at pp. 189-97.

[17] Id., at pp. 197-98.

[18] Id., at pp. 201-03.

[19] Id., at pp. 203-04.

[20] Id., at p. 205.

[21] Id.

[22] Id.

[23] Id.

15

highway where petitioner telephoned Amber Lynch using Petrey's cell phone,[24] (10) petitioner

calmly informed Page they would need to slit Petrey's throat and "leave him somewhere,"[25] (11)

petitioner and Page drove to an isolated location where petitioner directed Page to drive through a

locked gate and park Douglas' vehicle near some tress and bushes,[26] (12) petitioner fired several

shots at Douglas' vehicle, explaining he was attempting to blow it up,[27] (13) they drove toward

Midland, stopping multiple times at stores to buy CD's and .22 caliber bullets, buy a porcelain doll

for Amber Lynch, acquire new tennis shoes and clothes for petitioner, and engage in an aborted

attempt to have Petrey purchase an assault rifle for petitioner,[28] (14) they drove to a hospital in

Odessa, where they abandoned a plan to locate and steal another vehicle when a security guard began

following them through a parking lot,[29] (15) petitioner made multiple telephone calls to Amber

---

[24] *Id.*, at pp. 205-06.

[25] *Id.*, at pp. 207-09.

[26] *Id.*, at pp. 210-12.

[27] *Id.*, at pp. 213-14.

[28] *Id.*, at pp. 214-24, 231-37.
Page testified they entered a Walmart in Odessa where petitioner "traded" his tennis shoes for a new pair. *Id.*, at p. 224.
Page also described petitioner's unsuccessful attempt to have Petrey purchase an assault rifle for petitioner at a Walmart in Midland after Petrey had already purchased pants and other new clothes for petitioner. *Id.*, at pp. 231-35. Page testified petitioner coerced Petrey into attempting to purchase the assault rifle. *Id.*, at pp. 236-38`.
The store clerk who refused to sell the assault rifle to Petrey and petitioner testified (1) petitioner appeared to be in charge throughout the attempted transaction, (2) petitioner asked multiple times about the availability of an extended capacity magazine for the rifle, (3) Petrey said little and seemed unconcerned when the sale could not be completed due to an FBI communication prohibiting the sale, and (4) Page did handle the rifle at one point but remained in the background during most of the attempted transaction. S.F. Trial, Volume 23, testimony of Bobby Jobe, at pp. 291-311.

[29] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 225-31.
Page testified that they parked Petrey's pickup truck in the hospital parking lot and walked toward the entrance to the hospital when Petrey alerted them to the existence of a metal detector just inside the hospital entrance. *Id.*, at p. 225. At that point, Page testified, the trio returned to the pickup truck. *Id.*, at p. 226.
The hospital security officer who spotted Petrey's white pickup cruising the hospital parking lot and saw petitioner, Page, and Petrey walking toward the hospital testified (1) petitioner appeared irritated by his presence, (2)

Lynch throughout this time frame,[30] (16) during one such call, petitioner learned from Amber's father Bart that a warrant for Page's arrest had been issued back in east Texas,[31] (17) Page telephoned his father and then informed petitioner that he (Page) needed to turn himself in to law enforcement authorities,[32] (18) initially, petitioner did not want to allow Page to leave,[33] (19) petitioner drove them to an isolated pumping station where petitioner told Page they needed to "get rid of all the evidence,"[34] (20) petitioner gave Page a butterfly knife, a box of .22 shells, and directed Page to put the items inside Page's gloves,[35] (21) Page did so and threw the gloves and their contents as far as he could,[36] (22) petitioner handed Petrey a lug wrench and directed Petrey to throw it away,[37] (23) petitioner then began pacing while Page leaned against the pickup and Petrey stood near the pickup

---

the three men walked toward the hospital then returned to their pickup and drove away, (3) he jotted down the licence plate number of the pickup (4TV-M59), and (4) noted the oldest of the three would not look up and was kept close by one of the younger men. S.F. Trial, Volume 24, testimony of Carlos Martinez, at pp. 8-28.  Martinez also identified a pair of surveillance photos of the three men walking in the parking garage taken by a hospital security camera. *Id.*, at p. 22.

[30] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 197, 206, 238-39.
The area manager for Cingular Wireless testified that numerous telephone calls were placed from Petrey's cell phone to the telephone number Amber Lynch's father Bart lynch identified as that of Amber Lynch's grandmother on November 25-26, 2001. *See* S.F. Trial, Volume 23, testimony of Thomas F. Woodruff, at pp. 271-86 (listing multiple calls from Petrey's company-issued cell phone to a particular number in Midland); Volume 24, testimony of Bart Lynch, at p. 45 (identifying the same number as belonging to his mother).

[31] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 238-39; Volume 27, testimony of David Lee Page, Jr., at pp. 47-52, 87.

[32] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 239-40.

[33] *Id.*, at pp. 240, 248-50.

[34] *Id.*, at pp. 240-41.

[35] *Id.*, at p. 241.

[36] *Id.*, at p. 242.

[37] *Id.*

truck smoking a cigarette,[38] (24) petitioner said "Sorry, Sam, you know too much.  You got to die" and shot Petrey twice in the head,[39] (25) Petrey fell where he had been standing, smoking a cigarette,[40] (26) petitioner directed Page to find something to get the blood off the bumper of the truck,[41] (27) Page poured a soda on the bumper and got back into the truck,[42] (28) when Page reminded petitioner that petitioner had previously indicated an intention to let Petrey go, petitioner replied "I was, but he knew our names,"[43] (29) Page pleaded with petitioner to release him,[44] (30) eventually, petitioner did so, dropping Page off at a restaurant,[45] (31) petitioner informed Page that he planned to go see Amber, go blow up Douglas' car, and then return to east Texas,[46] (32) Page turned himself into authorities and gave multiple, conflicting, statements concerning the crimes he had witnessed,[47] and (33) when law enforcement authorities spotted petitioner driving Petrey's

---

[38] *Id.*, at p. 246.

[39] *Id.*, at p. 246; S.F. Trial, Volume 27, testimony of David Lee Page, Jr., at pp. 42-44, 46-52, 58-59, 61, 90-97.

[40] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 246-47; S.F. Volume 27, testimony of David Lee Page. Jr., at p. 95.

[41] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at p. 247.

[42] *Id.*

[43] *Id.*, at p. 248.
Page testified that petitioner told Page three or four times that he (petitioner) planned to let Petrey go prior to the point the petitioner shot Petrey. S.F. Trial, Volume 27, testimony of David Lee Page, Jr., at pp. 89, 163.

[44] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 248-50.

[45] *Id.*, at pp. 249-50.

[46] *Id.*

[47] *Id.*, at pp. 250-55,
Page repeatedly admitted on both direct and cross-examination that he gave misleading and even false information to law enforcement officers initially as he attempted to protect his friend Mark Ray from potential criminal liability and to conceal the fact the trio had stopped at the hospital in Odessa. S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 260-61; Volume 27, testimony of David Lee Page, Jr., at pp. 7, 12, 16-17, 20-22, 26, 29, 54-55, 66, 99-100, 107, 109, 111-13, 119-20, 158-60.

pickup, petitioner led them on a high speed chase that involved petitioner driving the wrong direction on an interstate highway, exiting the highway, driving through fences, and refusing to halt until after two of the tires of the pickup had been shot out by law enforcement officers and a third officer managed to cut off petitioner, exit his vehicle, and draw a bead on petitioner with his handgun.[48]

B.   Indictments

On December 20, 2001, a Midland County grand jury indicted petitioner on a single count of murder in connection with the fatal shooting of "Samuel Petrey" [sic].[49]

On February 7, 2002, a Midland County grand jury indicted petitioner on two counts of capital murder, two wit (1) the murders of Samuel Petrey by fatally shooting Petrey on or about November 26, 2001 and fatally shooting Doyle Douglas on or about November 25, 2001 in a different criminal transaction with both murders having been committed pursuant to the same

---

Page also testified on cross-examination that his first statements to police were given when he was very tired and while he was making assumptions or "guessing" about many things, such as the precise location of the shots to Douglas' and Petrey's head by petitioner and precise location of Ray's shot fired into Douglas' head, which Page later learned were not factually accurate. S.F. Trial, Volume 27, testimony of David Lee Page, Jr., at pp. 14-17, 43, 57-59, 77, 90-91, 94-97, 143-47, 170, 182, 229. More specifically, Page admitted (1) he was not looking at either Douglas' head or Petrey's head at the time petitioner shot both men and (2) he assumed Ray shot Douglas in the back of the head at the creek but could not tell if that was what actually happened because it was dark and there was a pillow over Douglas' head. *Id.*, at pp. 14-15, 143-47, 168-70.

[48] S.F. Trial, Volume 24, testimony of Gregory Chatwell, at pp. 145-56 (describing high speed chase of Petrey's pickup driven by petitioner); Volume 24, testimony of Kenneth Callahan, at pp. 157-78 (describing high speed chase and petitioner's evasive maneuvers despite one tire having been shot out by law enforcement officers); Volume 24, testimony of Earl Stroup, at pp. 178-86 (describing petitioner driving at speeds in excess of one hundred miles per hour the wrong direction on an interstate highway and crashing through fences and his actions in shooting out the right rear tire of the pickup); Volume 24, testimony of John Young, at pp. 186-99 (describing his efforts to stop on-coming traffic on interstate as petitioner approached going the wrong direction, the successful attempt by another officer to shoot out the left front tire of the pickup, and his ultimately successful effort to cut off the pickup truck and take aim at the driver, i.e., petitioner). *Officer Callahan also testified, following the chase, he discovered State Exhibit no. 3, a .22 caliber semi-automatic pistol, inside the pickup truck between the center console and passenger seat.* S.F. Trial, Volume 24, testimony of Kenneth Callahan, at p. 170.

[49] See Transcript of pleadings, motions, and other documents filed in petitioner's state trial court criminal proceeding (henceforth "Trial Transcript"), Volume 1 of 5, at p. 3.

scheme and course of conduct and (2) the murder of Petrey in the course of committing and attempting to commit the offense of kidnaping and robbery of Petrey.[50]

On January 6, 2003, the State moved to amend the capital murder indictment against petitioner.[51] In an Order issued February 3, 2003, the state trial court granted the State's motion for leave to amend the indictment.[52] In the first paragraph of the first amended indictment, petitioner was charged with intentionally and knowingly causing Petrey's and Douglas' deaths by shooting both with a firearm in different criminal transactions but pursuant to the same scheme and course of conduct; in the second paragraph, petitioner was charged with intentionally and knowingly causing Petrey's death by shooting Petrey with a firearm while in the course of committing and attempting to commit the offense of kidnaping and robbery of Petrey.[53]

C.    Guilt-Innocence Phase of Trial

The guilt-innocence phase of petitioner's capital murder trial commenced on March 17, 2003.

1.    Prosecution's Evidence

In addition to the testimony summarized above, the prosecution presented testimony from (1) a Harrison County Sheriff's Deputy who was led to the body of Doyle Douglas by Darnell McCoy,[54] (2) the Harrison County Sheriff's Office crime scene investigator who photographed and

---

[50] Trial Transcript, Volume 1 of 5, at pp. 4-5.

[51] Trial Transcript, Volume 4 of 5, at pp. 713-14.

[52] Trial Transcript, Volume 4 of 5, at pp. 752-53.

[53] Trial Transcript, Volume 4 of 5, at pp. 754-56.

[54] Deputy Brody West testified, in pertinent part, that (1) McCoy led him to a wooded area in Harrison County thick with trees and underbrush, (2) McCoy directed him to Douglas' body, which was located about a football field away from the main road, down a four-wheeler trail, (3) Douglas' body was laying face down in a small creek about five feet wide and two feet deep, (4) he determined Douglas was not alive, (5) a pillow with an apparent bullet hole covered the back of Douglas' head, and (6) there was an apparent injury to Douglas' back. S.F. Trial, Volume 21, testimony of

documented the crime scene where Douglas' body was discovered,[55] (3) petitioner's older half-brother Dano Young concerning the unloaded handgun Dano loaned to petitioner the night of Douglas' murder, petitioner's threats against Douglas and Pat Brook, and events the night of Douglas' murder,[56] (4) John Nunn concerning the .22 caliber revolver he loaned to petitioner the night of Douglas' murder and events the night of the murder and thereafter,[57] (5) the medical

---

William Brody West, at pp. 43-81.

[55] Investigator Todd Smith testified, in pertinent part, that (1) the pillow he removed from on top of Douglas covered Douglas' head and shoulders, (2) Douglas' entire body was laying in a prone position in the creek, (3) Douglas' head was not, however, facing directly downward, (4) rather, Douglas' head was facing to Douglas' left, i.e., Douglas' head was lying on Douglas' right cheek, (5) the only bullet wound visible on Douglas' body was located on the left side of Douglas' head, and (6) a jacket was lying over Douglas' body but Douglas' arms were not in the sleeves of the jacket. S.F. Trial, Volume 23, testimony of Todd Smith, at pp. 121-32, 172, 175, 184, 190. Crime scene photographs reflecting the condition and position of Douglas' body in the creek were admitted into evidence as State Exhibit nos. 266, 272-75, 285. *Id.*, at pp. 121-26. The three bullet fragments removed from Douglas' brain during autopsy were identified and admitted into evidence as State Exhibit nos. 9-11. *Id.*, at pp. 144-45.

[56] Dano Young testified, in pertinent part, that (1) Doyle Douglas was the uncle of Dano's former girlfriend Deborah Sanders, (2) petitioner said he was going to kill Pat Brook because Brook had taken Deborah away from Dano, (3) Dano did not believe petitioner was serious about killing Brook, however, (4) Dano had heard Doyle Douglas was a pedophile and a child molester, (5) petitioner told Dano he was going to borrow Douglas' car to drive to Longview, (6) petitioner also told Dano that, if Douglas would not lend petitioner his car, he (petitioner) would beat Douglas in the head, knock him out, and take Douglas' car, (7) petitioner did not tell Dano he planned to kill Douglas, (8) Dano asked petitioner not to beat up Douglas, (9) late on the Saturday night Douglas was murdered, petitioner, Douglas, McCoy, Ray, and Page visited the home of John "Hippie" Nunn, where Dano was staying, (10) petitioner asked Dano for a .38 Special handgun, explaining he planned to sell or trade the handgun for a rifle, (11) Dano gave petitioner the .38 Special handgun, which was not loaded, (12) several hours later, petitioner, Ray, and Page returned to Nunn's home and returned the .38 Special to Dano, (13) *the .38 Special was unloaded when Dano gave it to petitioner and still unloaded when petitioner returned it to Dano*, (14) petitioner was acting "normal," which meant "hyper," at the time petitioner returned the unloaded handgun to Dano, (15) petitioner owned a silverish, grayish, .22 caliber handgun with a ten-shot clip, and (16) during the second visit to Nunn's home, Ray informed Dano that "they all shot" Douglas. S.F. Trial, Volume 21, testimony of Dano Young, at pp. 277-315. Dano Young was very clear the .38 Special handgun he gave to petitioner that night was unloaded when he gave it to petitioner and still unloaded when petitioner returned it several hours later. *Id.*, at pp. 299, 310.

[57] John Nunn testified, in pertinent part, that (1) Thanksgiving weekend, 2001, petitioner came by Nunn's home, where Dano was living, (2) petitioner asked to borrow a .22 caliber revolver, (3) Nunn loaned petitioner that handgun, (4) later, petitioner came back to Nunn's home and returned the .22 revolver, (5) when petitioner returned the revolver, the gun was broken, i.e., a piece was broken off the bottom of the pistol's hand grip, (6) petitioner appeared nervous when he returned the handgun, (7) petitioner told Nunn he might have done something he regretted, (8) the following day, the FBI searched Nunn's home, (9) Nunn's brother Charles Hallmark purchased Dano Young's .38 Special, and (10) methamphetamine use was widespread throughout the Shady Shores area where Nunn lived at that time, i.e., Nunn used the drug, Dano Young used the drug, as did Douglas, Bart Lynch, and many others. S.F. Trial, Volume 22, testimony of John Nunn, at pp. 8-33. Nunn also testified (1) he could not remember whether the .22 caliber revolver

21

examiner who performed the autopsy on Douglas' body,[58] (6) the FBI Special Agent who conducted

the examination of Doyle Douglas' white Pontiac Grand Prix after it was recovered and taken to a

secure facility,[59] (7) the Harrison County Sheriff's Office crime scene investigator who processed

---

he loaned to petitioner was loaded when petitioner returned it and (2) he did not check to see if the .22 revolver had been fired after petitioner returned it. *Id.*, at pp. 16-17.

[58] Dr. Jill Urban testified in pertinent part as follows: (1) Douglas suffered several injuries, including three gunshot sounds to the head, (2) she could not determine the sequence of the three gunshot wounds to Douglas' head, (3) one of Douglas' gunshot wounds (identified by Dr. Urban as gunshot wound #3) was to the right side of Douglas' face (or temple) above the right eye, (4) the entrance wound for this gunshot included a partial (or "keyhole") exit wound on the left side of the face reflecting possible fragmentation of the small caliber bullet or possible fragmentation of the skull, (5) the bullet that caused this wound was recovered in the brain tissue in the front of the brain but traveled in a slightly front to back trajectory, (6) another small caliber bullet (identified by Dr. Urban as gunshot wound #1) entered the back of Douglas' head, traveled front to back, and was recovered on the left side of Douglas' brain, having traveled in a slightly right to left and slightly upward trajectory, (7) the third small caliber bullet (identified by Dr. Urban as gunshot wound #2) entered Douglas' head on the left side above the left ear and traveled horizontally through the brain from left to right in a slightly back to front, slightly upward, trajectory, (8) there was bleeding around each of Douglas' head wounds, (9) all three of Douglas' gunshot wounds were pre-mortem, i.e., occurred while Douglas was still alive, (10) all three gunshots wounds would have been fatal, (11) Douglas probably lived minutes to hours after his gunshot wounds, which did not cause an immediate cessation of life, (12) Dr. Urban did not observe any gunshot residue on the skin around Douglas' gunshot wounds, (13) Douglas also suffered other pre-mortem injuries consisting of (a) a superficial one-inch laceration to the center of the scalp, (b) several small abrasions to the forehead, bridge of the nose, and left cheek, (c) two bruises to the left side of the neck, (d) a group of linear scratches to the middle of the back, and (e) small scrapes to the left pinky finger and back of the right middle finger, (14) there was a synergistic effect to the three gunshot wounds to Douglas' head, in which the concussive effect of the gunshot wounds penetrating the scalp and skull combined with the injuries caused by the bullets traversing his brain, and the resulting brain swelling to cause loss of consciousness and death, and (15) Douglas died as a result of multiple gunshot wounds to the head. S.F. Trial, Volume 22, testimony of Jill Urban, at pp. 258-304. Dr. Urban identified State Exhibit no. 9 as the bullet fragment responsible for causing gunshot wound #1, i.e., the bullet wound in the back of Douglas' head. *Id.*, at pp. 284-85. Curiously, Dr. Urban identified State Exhibit nos. 10 and 11 only as the other two bullet fragments she removed from Douglas' brain without specifically identifying either of them with the two remaining gunshot wounds. *Id.*

On cross-examination and re-direct examination, Dr. Urban testified (1) if no interposing object existed, she would expect to find soot in a gunshot wound caused by a shot fired less a foot away from the victim, (2) with no interposing object, she would expect to find gun powder stripling if the firearm were fired within three feet of the victim, (3) larger particles released from some gunshots can travel up to three to four feet, (4) she would expect to find gunpowder stripling if a gun were fired within six inches of the victim, (5) the presence or absence of gunshot residue depends upon several factors, including the type of firearm and ammunition, the presence or absence of any interposing object, bleeding at the entrance wound, and environmental factors such as water, rain, or the body being jostled in a moving vehicle while in a laying position, and (6) the best way to determine the likelihood of gunshot residue being found on a victim is to test-fire the weapon and ammunition in question to determine firsthand the amount of residue a particular weapon and ammunition will leave at various distances. *Id.*, at pp. 287-303.

[59] Crime scene technician Ann Hinkle testified in pertinent part as follows: (1) Douglas' vehicle bore several bullet holes and ricochet damage to the front windshield, (2) there was discoloration in the trunk consistent with a fairly significant amount of blood, (3) five live .22 caliber rounds were recovered inside the central console area of the passenger compartment, (4) a pair of spent .22 caliber shell casings (admitted at trial as State Exhibit nos. 14 & 15) were found underneath the front passenger seat and on the front floorboard on the passenger side, and (5) she could not tell

the scene where Douglas' body was recovered,[60] (8) the father of Mark Ray concerning Mark Ray's

sullen, unusually quiet demeanor the morning after Douglas' murder,[61] (9) Samuel Petrey's widow

concerning the events leading up to Petrey's disappearance on November 25, 2001,[62] (10) the Texas

Ranger who located Douglas' abandoned vehicle,[63] (11) petitioner's girlfriend Amber Lynch and her

father Bart regarding petitioner's admission that he stole Petrey's pickup truck,[64] (12) Rosemary

---

what caused an apparent defect in the vehicle's dashboard. S.F. Trial, Volume 23, testimony of Ann Hinkle, at pp. 8-92. Numerous photographs of Douglas' vehicle were admitted into evidence as State Exhibit nos. 370-465. *Id.*

[60] Todd Smith testified in pertinent part as follows: (1) Douglas' head was lying on his right cheek with the left side of his head facing upward when he (Smith) removed the pillow from on top of Douglas' head and shoulders, (2) Douglas' entire body was laying in the water, (3) he found no footprints at the scene he would document with a plaster cast, (4) he photographed and attempted to collect samples of what appeared to be blood stains on a tree located about three feet from Douglas' head, (5) he recovered a cigarette butt which Dr. Urban found in Douglas' hair during the autopsy, (6) he received various items of trace evidence from Dr. Urban, including the bullet fragments recovered during Douglas' autopsy, (7) he took the bullet fragments and other trace evidence to the Austin DPS crime lab, along with samples of petitioner's blood, and (8) tests for gunshot residue must be conducted within two hours of the firing of a weapon to be efficacious. S.F. Trial, Volume 23, testimony of Todd Smith, at pp. 127-28, 130-35, 138-59, 172, 175, 185-86, 190, 195.

[61] S.F. Trial, Volume 23, testimony of Jimmy Ray, at pp. 196-206.

[62] S.F. Trial, Volume 23, testimony of Lana Petrey, at pp. 207-31.

[63] S.F. Trial, Volume 23, testimony of David Hullum, at pp. 235-65. Hullum testified in pertinent part as follows: (1) he observed a spent shell casing on the passenger side seat and another on the passenger side floorboard but (2) he touched neither shell casing and (3) his subsequent search of the same location produced no additional spent shell casings. *Id.*, at pp. 243-44, 256-57.

[64] Amber Lynch testified in pertinent part (1) she received five or six telephone calls from petitioner while she was at her grandmother's home in Midland over the Thanksgiving holiday weekend, (2) petitioner told her he had borrowed a car and was coming to Midland, (3) petitioner later told her the car broke down, (4) she and her father went to a grocery store to meet petitioner, (5) petitioner drove up in a pretty new white pickup, (6) she saw groceries when she got inside the truck, (7) petitioner appeared to be wearing new clothes and admitted he had stolen the truck, (8) when she hugged petitioner, she felt a gun on his waistband, (9) petitioner called her when she got back to her grandmother's home and told her the police were chasing him because they thought he had killed someone, (10) she could hear on the phone that petitioner did not pull over, and (11) the police came to her grandmother's home and spoke with petitioner ob the phone. S.F. Trial, Volume 24, testimony of Amber Lynch, at pp. 65-97.
   Bart Lynch testified in pertinent part (1) he spoke with petitioner on the phone and gave his permission for petitioner to meet with his daughter Amber in Midland, (2) he subsequently learned the police were looking for petitioner and Page, (3) he instructed petitioner to drop Page off at the police station before coming to see Amber, (4) he and Amber went to a grocery store to meet petitioner, (5) petitioner arrived in a white pickup truck with a shell over its bed, and (6) petitioner initially said he had borrowed the truck from his uncle but then admitted he stole it, (7) he saw petitioner stick a gun in his sock. S.F. Trial, Volume 24, testimony of Bart Lynch, at pp. 29-64.

Sanders regarding petitioner's admission that he had stolen Petrey's pickup,[65] (13) the Midland

Police Sergeant who spoke with petitioner on the telephone while law enforcement officers engaged

in a high speed vehicular pursuit of petitioner,[66] (14) a Midland County Sheriff's Office criminal

investigator who participated in several different aspects of the Samuel Petrey murder investigation,[67]

(15) the oil field equipment worker who discovered Petrey's body,[68] (16) the Midland County

Sheriff's Office investigator who was the first law enforcement officer at the scene where Petrey's

body was discovered, collected and examined much of the physical evidence found there, and helped

process Petrey's pickup truck after the high speed chase,[69] (17) the Midland County paramedic who

---

[65] Rosemary Sanders testified in pertinent part (1) she lived with Bart Lynch in 2001, (2) she spent the Thanksgiving holiday with Bart's family in Midland, (3) while in Midland, they received a telephone call alerting them to Doyle Douglas' disappearance, (4) they went to a grocery store to allow Amber to meet with petitioner, (5) petitioner arrived in a late model pickup truck, (6) petitioner was acting nervous, (7) petitioner initially told them he had borrowed the truck but later admitted he had stolen it, and (8) the Lynch family told petitioner to go back and take care of his troubles. S.F. Trial, Volume 24, testimony of Rosemary Sanders, at pp. 115-30.

[66] S.F. Trial, Volume 24, testimony of Darin L. Clements, at pp. 133-45. During their telephone conversation, petitioner repeatedly denied having anything to do "with it." *Id.*, at pp. 140, 142.

[67] Gregory Kent Spencer testified in pertinent part (1) he went to the scene where petitioner's high speed pursuit ended and took custody of the .22 caliber semiautomatic handgun he found on the hood of Petrey's pickup truck, (2) he observed several bullet holes in Petrey's truck, (3) he went to the location where Petrey's body was recovered and located a pair of gloves that had been folded together about thirty nine steps from where Petrey's body was discovered, (4) the gloves felt heavy to him, (5) he also located a tire iron at the same scene about 32 steps from Petrey's body, (6) when the gloves were opened the following day, a butterfly knife and an almost full box of .22 caliber ammunition were discovered inside, (7) he obtained and watched a security video from a convenience store which showed petitioner enter the store, browse, and then exit the store, (8) nothing significant appeared on the videotape, (9) he did not observe anything on the videotape suggesting petitioner was carrying a gun, (10) he was present when medical personnel drew blood samples from both petitioner and Page, (11) he did not observe any footprints on the caliche pad where Petrey's body was discovered, (12) he interviewed Page on November 26, 27, & 28, 2001, and again on December 7, 2001 (13) Page's statement changed over time, (14) while the details of Page's account changed over the time, the thrust of Page's statement remained the same. S.F. Trial, Volume 24, testimony of Gregory Kent Spencer, at pp. 200-98).

[68] S.F. Trial, Volume 24, testimony of Henry Wurtz, at pp. 298-302.

[69] Paul Hallmark testified, in pertinent part (1) he was the first law enforcement officer to arrive at the scene where Petrey's body was discovered, (2) numerous photographs of the crime scene admitted into evidence accurately reflected what he found upon his arrival on November 26, 2001 (i.e., State Exhibit nos. 75-83, 87-A, 88-A, 98, 99, 101, 104, 109, 109, 113, 133), (3) there were no tire tracks deep enough on the caliche pad to permit taking an impression, (4) the tire tracks present did appear to almost run over Petrey's body, which was laying face up with a red rag on top of it, (5) he observed and recovered two spent shell casings (admitted at trial collectively as State Exhibit no. 91) and

drew both petitioner's and Page's blood samples,[70] (18) a Texas Department of Public Safety

forensic firearms and tool mark examiner who examined the .22 caliber handguns, spent shell

---

a cigarette butt in the immediate area near Petrey's body (the spent shell casings were two feet, eleven inches and five feet, eleven inches from Petrey's body respectively), (6) a pair of gloves found at the scene where Petrey's body was recovered were later determined to contain a live round and a box of live ammunition, and (7) following the end of petitioner's high speed chase by law enforcement, he discovered a Big Gulp drink container in the open console of Petrey's pickup truck which contained a liquid which smelled like gasoline. S.F. Trial, Volume 24, testimony of Paul Hallmark, at pp. 304-33.

Hallmark returned to the stand the following day and testified further that (1) with a closed breach weapon like a semiautomatic handgun, gunshot residue tests are usually less effective than with a pistol because the residue tends to exit the weapon through the gun barrel than in the case of a revolver, (2) he made the decision not to test anyone for gunshot residue, (3) hand washing can affect the reliability of gunshot residue tests, (4) to be effective, gunshot residue tests need to be conducted within two hours of a weapon being fired, (5) when he was at the crime scene where Petrey's body was discovered, he failed to locate the gloves containing the ammunition, (6) he failed to place butcher paper under the gloves to catch and preserve hair and other fibers when he removed the gloves from an evidence bag and examined and photographed their contents, (7) the failure to do so was a mistake, (8) he inspected the rear of Petrey's truck but found no indication of blood, (9) he failed to seize petitioner's white tennis shoes and send them off for analysis, (10) he did not conduct gunshot residue tests on the gloves, (11) hair samples were not obtained from petitioner despite a search warrant for same having been issued, (12) Petrey's truck was not vacuumed for hair and fibers, (13) spraying gunshot residue and trace metal reagents on items can degrade any DNA present on those items, (14) trace metal tests conducted on petitioner's hands produced results consistent with contact with an automatic firearm, (15) trace metal tests are not definitive, (16) petitioner's fingerprints were not recovered from Petrey's truck, and (17) trace metal tests on Page's hands produced results consistent with a round metal object but not other items. S.F. Trial, Volume 25, testimony of Paul Hallmark, at pp. 5-118.

Subsequent presumptive testing of the white tennis shoes worn by petitioner at the time of his arrest produced negative results for blood. S.F. Trial, Volume 27, testimony of Maurice Padilla, at pp. 74-75.

[70] S.F. Trial, Volume 25, testimony of Armando Rodriguez, at pp. 127-33.

25

casings, and the three bullet fragments removed from Douglas' brain and introduced into evidence,[71]

(19) the supervisory Dallas County medical examiner who reviewed and signed off on the autopsy

---

[71] Tim Counce testified (1) he examined and identified State Exhibit no. 3 (i.e., the pistol found in petitioner's possession at the time of his arrest) as a single action, .22 caliber semiautomatic Colt Huntsman economy model repeating detachable box fed magazine pistol, (2) he examined and identified State Exhibit no. 5 as an RG double action .22 caliber long rifle revolver, (3) he test fired both weapons, (4) he concluded the two shell casings identified as State Exhibit no. 91 (i.e., the two shell casings recovered in close proximity to Petrey's body) were both fired by State Exhibit no. 3, the semiautomatic pistol, (5) the two shell casings found on the passenger side floorboard and under the passenger seat of Douglas' car (i.e., State Exhibit nos. 14 & 15) were also fired by State Exhibit no. 3, (6) he was unable to eliminate the possibility State Exhibit no. 9 (which Dr. Urban identified with the gunshot wound to the back of Douglas' head) and State Exhibit no. 10 (i.e., two of the bullet fragments removed from Douglas' brain) had been fired by State Exhibit no. 3 (i.e., the .22 caliber semiautomatic pistol) but he was able to determine those two bullet fragments had NOT been fired by State Exhibit no. 5 (i.e., the .22 caliber revolver), (7) State Exhibit no. 11 (i.e., another of the bullet fragments removed from Douglas' brain was NOT fired by State Exhibit no. 3, (8) while he found lead on the left glove found at the scene of Petrey's murder, the source of the lead could not be identified and may have come from the lead bullets found inside the gloves when they were opened and pulled apart, (9) all four spent shell casings he examined had been fired by State Exhibit no. 3 (i.e., the semiautomatic pistol), (10) he found no gunshot residue on the gloves, and (11) a revolver has more areas where gas and residue escape than an automatic weapon. S.F. Trial, Volume 25, testimony of Tim Counce, at pp. 136-98.

of Doyle Douglas and who personally performed the autopsy on Samuel Petrey,[72] and (20) a pair of

criminalists from the Texas Department of Public Safety's Austin Laboratory.[73]

The prosecution rested its case in chief at the guilt-innocence phase of trial on March 25,

2003.

---

[72] Pathologist Dr. Janice Townsend Parchman testified in pertinent part (1) gunshot wound #1 to the back of Douglas' head grazed the right occipital lobe of his brain, went through the left occipital lobe and the left temporal lobe and into the left front lobe, (2) gunshot wound #1 would have been fatal by itself, (3) gunshot wound #2 to the left side of Douglas' head penetrated the left temporal scalp, went through the left temporal and parietal lobes and into the right front lobe, (4) gunshot wound #2 would have been fatal by itself, (5) gunshot wound #3 to Douglas' right temple penetrated the right scalp and was potentially fatal, but (6) there remained a remote possibility Douglas could have survived gunshot wound #3 if it had been his only injury. S.F. Trial, Volume 26, testimony of Janice Townsend Parchman, at pp. 16-24.

Dr. Parchman testified further that (1) Samuel Petrey had more than two hundred ninety four dollars in bills and change among his personal effects when presented for autopsy, (2) Petrey displayed two gunshot wounds to the head, (3) she could not determine which gunshot wound occurred first, (4) the gunshot wound she identified as #1 was to the left temple and bore a faint suggestion of soot and sparse stripling, (5) this gunshot wound likely resulted from close to medium range firing (about six to twelve inches), (6) gunshot wound #1 penetrated the left temple bone, the left temporal lobe, left basal ganglia, the pons, the right occipital lobe, and lodged in the right parietal bone, (7) gunshot wound #2 penetrated the scalp in the left parietal area with no serious stripling, went through the left parietal bone and the bullet split, resulting in two wound tracks, (8) one part of this bullet went through the left parietal lobe, causing considerable disruption of the perimeter of the brain, to the occipital lobe, the other part of this bullet perforated the posterior left parietal scalp and exited the scalp. (9) both gunshot wound #1 and gunshot wound #2 were potentially fatal, (10) gunshot wound #1 was definitely fatal because it penetrated the pons or brain stem, which would necessarily have resulted in an instant loss of consciousness, collapse, and nearly instantaneous death, (11) gunshot wound #1 would have caused the victim to drop like a tree trunk and expire within minutes, (12) the main part of the bullet associated with gunshot wound #2 went through the brain and struck the back of the skull, (13) there was a low probability of blood splatter from Petrey's wounds because of the small caliber of the bullets which struck Petrey, (14) the predominant direction of both shots which struck Petrey was back to front with a left to right component, (15) the shots rendered Petrey instantly unconscious, and (16) the momentary expansion of the brain caused by entry of a bullet often causes fractures of (a) the thin bones around the frontal lobes with associated bleeding that resembles a black eye and (b) the orbital plate and additional associated bleeding. Id., at pp. 25-51.

[73] A former DPS DNA serologist testified, in pertinent part, that she found DNA consistent with Douglas' DNA (1) in a blood stain found on petitioner's jacket and (2) a separate blood stain found on Page's left boot. S.F. Trial, Volume 26, testimony of Alice Amillant, at pp. 85-106.

Another DPS serologist testified she found (1) multiple stains on the brown gloves recovered at Petrey's murder site, (2) one such stain was consistent with the DNA of Douglas, (3) another stain was consistent with a mixture of the DNA of Douglas, petitioner, and Page, (4) a stain on the right glove was consistent with a mixture of the DNA of Ray and Douglas, and 95) a stain on the right palm was consistent with a mixture of DNA from Page and another, unknown, source. S.F. Trial, Volume 26, testimony of Cassie Carradine, at pp. 107-25.

2.    The Defense's Evidence

Petitioner's trial counsel called the following witnesses at the guilt-innocence phase of trial:

(1) a DNA expert from the Tarrant County medical Examiner's office who testified, in pertinent part, (a) it is better to package biological material in paper than plastic containers, (b) she found DNA consistent with Page on both of the gloves but nothing from either Petrey or petitioner, (c) she believed petitioner could be excluded as a contributor to any of the DNA found on the gloves, and (d) there was some indication Douglas' DNA might be on the right glove,[74] (2) a TDCJ inmate who testified (a) he was housed for five months at the Midland County Jail and spoke with Page about the murders and (b) when he accused Page of shooting Douglas, Page replied "Well, they can't prove it anyway.  I was wearing gloves,"[75] and (3) an investigator for the Midland County Sheriff's Office who testified (a) Page told him that petitioner went into a convenience store in Midland and left both his gun and the keys outside but Page didn't drive off and (b) when he examined a surveillance videotape from the convenience store, he saw no sign of a gun on petitioner's person.[76]

3.    The Verdict

On March 26, 2003, the jury heard the trial judge read the jury charge at the guilt-innocence phase of petitioner's capital murder trial, listened to closing arguments from counsel, and retired to begin its deliberations around 11:05 a.m.[77]  At approximately 4:20 p.m. the same date the jury

---

[74] S.F. Trial, Volume 27, testimony of Caroline Van Winkle, at pp. 245-69.

[75] S.F. Trial, Volume 27, testimony of Christopher McElwee, at pp. 271-83.  On cross-examination, McElwee admitted he had once faked mental problems so he could get into see another member of his gang. *Id.*, at p. 282.

[76] S.F. Trial, Volume 27, testimony of Kent Spencer, at pp. 293-96.

[77] S.F. Trial, Volume 29, at pp. 4-72; Trial Transcript, Volume 5 of 5, at pp. 808-34.

returned its verdict, finding petitioner guilty beyond a reasonable doubt on both of the theories alleged in the separate paragraphs of the indictment.[78]

D.    Punishment Phase of Trial

The punishment phase of petitioner's capital murder trial commenced on March 28, 2003.

1.    The Prosecution's Case-in-Chief

The prosecution presented testimony establishing (1) on November 23, 2001 petitioner participated in the burglary of a sporting goods store in which a shotgun and multiple handguns were stolen and display cases smashed,[79] (2) on November 20, 2001, petitioner participated in a home invasion in which petitioner and Patrick Brook violently entered the residence of Carlos Torres, Brook and petitioner fired several shots at Torres (who retreated to his bedroom closet), and which ended only after Torres managed to load a rifle and get off a single shot which grazed Brook's backside,[80]    (3)    as    Brook    and    petitioner    fled    the    scene    in    a    vehicle

---

[78] *Id.*, at pp. 72-73; Trial Transcript, Volume 5 of 5, at pp. 835-43.

[79] The store owner testified in pertinent part (1) the alarm went off at his business between 4:30 and 5:00 AM on that date, (2) when he arrived, he found the back door apparently had been pried open, (3) there was glass everywhere inside the store, (4) a number of shotguns and handguns were missing, including a Colt Huntsman .22 caliber pistol with a serial number matching that of State Exhibit no. 3 (i.e., the handgun used to shoot both Douglas and Petrey), and (5) also missing were a .38 caliber Colt pistol, a pair of nine millimeter pistols, a Remington Turkey gun and a Remington twelve gauge. S.F. Trial, Volume 30, testimony of Ronnie Wall, at pp. 30-39. Photographs of the damage done to the back door and interior of Wall's store were admitted into evidence as State Exhibit nos. 109-13. *Id.*
    An investigator from the Upshur County Sheriff's Office testified he lifted fingerprints from several locations within the store, including three lifts from the back door (i.e., State Exhibit nos. 114-16) which appeared to be the point of entry. S.F. Trial, Volume 30, testimony of Phillip Hill, at pp. 40-53.
    A latent fingerprint examiner testified one of the fingerprints lifted from the back door of the store, i.e., State Exhibit no. 114, matched petitioner's right middle finger. S.F. Trial, Volume 30, testimony of John Warren, at pp. 54-66.

[80] The homeowner testified in pertinent part (1) on November 20, 2001, he was home alone when someone knocked on his front door around nine a.m., (2) when he did not open the front door, two armed men kicked in his back door, (3) he ran to his bedroom and locked the door, (4) he ran into his closet, retrieved a .22 caliber rifle, and began attempting to load the rifle, (5) the two intruders shot through his bedroom door while he remained in the closet, (6) he recognized one of the intruders as Pat Brook, (7) he was shot twice by Pat Brook, (8) one shot hit him in the back and the other shot struck him in the leg and testicle, (9) he managed to get one shot loaded and returned fire, (10) both intruders fled his house once he returned fire, (11) he pursued the two intruders and saw them drive off in a black Dodge automobile, (12) he later picked Pat Brook out of a lineup as one of the intruders, and (13) the second intruder was a

white male whom he did not recognize. S.F. Trial, Volume 30, testimony of Carlos Torres, at pp. 67-84.

A Longview Police officer testified in pertinent part (1) he examined, videotaped, and photographed Torres' home and collected evidence shortly after the home invasion (around ten a.m. on November 20, 2001), (2) he recorded and observed multiple bullet holes in the bedroom walls, the closet door, and in a sheet on the bed, (3) the bedroom door was broken, and (4) he recovered six .25 caliber shell casings from the floor. S.F. Trial, Volume 30, testimony of Dan Reigstad, at pp. 85-186. Numerous photographs of the crime scene showing bullet holes in the walls, the broken bedroom door, and spent .25 caliber shell casings on the floor were admitted into evidence as State Exhibit nos. 124, 126, 128, 130-38, 140-44. *Id.*

Dano Young's former girlfriend Deborah Sanders testified (1) in November, 2001, he was present at the home of John Nunn when petitioner, Patrick Brook, and Josh Tucker made plans to rob what they described as a "drug house," (2) petitioner said he did not want to get into a shootout, (3) they left Nunn's house in a black Pontiac Firebird belonging to Krystal Wilbanks and Wilbanks drove the three men away from Nunn's home, (4) when they returned the next day, petitioner was carrying a .22 caliber handgun and Patrick Brook had been shot in the butt, (5) she spent the Thanksgiving holiday that year with Patrick Brook in a motel, (6) at some point in the early morning hours the day after Thanksgiving, petitioner, petitioner, McCoy, Page, and Ray all entered the motel room, (7) she awoke but did not let the others know she was awake, (8) she overheard petitioner say Doyle Douglas was dead, (9) petitioner described himself as like a pit bull with his first taste of blood, (10) the day after Thanksgiving, she saw petitioner at John Nunn's house, (11) petitioner had three handguns in his possession, (12) petitioner said he was going to sell the guns to get to Midland to see her little sister, Amber Lynch, and (13) there was a lot of drug use, methamphetamine in particular, at Shady Shores. S.F. Trial, Volume 30, testimony of Deborah Sanders, at pp. 107-26.

Krystal Wilbanks testified in pertinent part (1) on November 20, 2001, she rode in her black, two-door, 1997 Dodge Avenger with Josh Tucker, petitioner, and Patrick Brook to a duplex where petitioner and Brook exited the vehicle, (2) Tucker drove her vehicle, let petitioner and Brook out, and then drove around and returned in about five to ten minutes, (3) petitioner and Brook went into a house, (4) when she and Tucker returned, Brook and petitioner got back into her vehicle, and (5) neither petitioner nor Brook complained of any injury. S.F. Trial, Volume 30, testimony of Krystal Wilbanks, at pp. 127-38.

Joshua Tucker testified in pertinent part (1) he had purchased drugs from Carlos Torres and believed Torres had money inside his home, (2) he, petitioner, and Patrick Brook went to Torres' home in Wilbanks' car to rob Torres, (3) he dropped off petitioner and Brook in front of Torres' house and circled the block, (4) when Brook and petitioner returned to the car, petitioner said "Let's go back and kill the mother fucker," (5) Brook was injured, (6) they went to the home of "a dude named Eric," (7) they then went to Tucker's home, (8) next they rented a motel room, (9) he pleaded guilty in Gregg County to a charge of burglary of a habitation in connection with the incident at Torres' home, (10) he recalled petitioner saying at one point it wouldn't be a shootout, (11) he observed both petitioner and Brook carrying handguns when they went to Torres' house, (12) Brook had a black revolver, and (13) petitioner carried a handgun similar to State Exhibit no. 6 (a semiautomatic pistol). S.F. Trial, Volume 30, testimony of Joshua Tucker, at pp. 139-49.

Patrick Brook testified in pertinent part (1) he and Tucker planned the robbery of Torres' house, (2) when petitioner heard their plan, petitioner decided to go along, (3) Brook carried a .22 caliber revolver and petitioner had a .25 caliber semiautomatic pistol, (4) earlier, they had stolen some tanks and petitioner fired his weapon, (5) when they arrived at Torres' home, petitioner and Brook got out and knocked on the front door, (6) no one answered so they went to the back door where no one answered their knock, either, (7) petitioner kicked in the back door and yelled "Come on, cous, he's home," (8) Brook pulled out his gun and followed petitioner into the house, (9) petitioner also had his gun out, (10) Torres ran to his bedroom and shut the bedroom door, (11) petitioner kicked in the bedroom door and broke the bottom portion of the door, (12) Brook hit the bedroom door with his shoulder and it opened, (13) Torres ran to the closet, (14) petitioner shot four times at Torres over Brook's shoulder, (15) a gun fight ensured with all three men firing shots, (16) Torres got off only one shot, which grazed Brook's backside, (17) Brook ran out of the house through the back door and petitioner followed him, (18) they got into the car Wilbanks was driving, (19) petitioner said "Let's go back and kill the mother fucker," (20) they dropped off petitioner at John Nunn's house, (21) they then went to pawn an air compressor to raise bail money for John Eric Ritz, (22) Brook went to John Nunn's house on November 23, 2001 with Deborah Sanders, (23) petitioner was there and had three handguns in his possession, i.e., a .22 caliber pistol and a pair of nine millimeter handguns (one of which was a Glock and the other, manufactured by Heckler & Knight), (24)

30

belonging to one of their accomplices, petitioner suggested they return to the house and kill Torres,[81]

(4) petitioner and an employee of a fast food restaurant planned and carried out a staged robbery in

September, 2001 in which petitioner made off with the restaurant's night deposit bag,[82] (5) during

a brief stay at a youth psychiatric facility in Waco in 1998, petitioner assaulted another youth who

refused to fight back, petitioner exposed himself to the other youth, and petitioner attempted to force

the other youth to perform fellatio upon petitioner,[83] (6) petitioner was discharged from the Waco

---

petitioner said the guns had come from a pawn shop, (25) Brook obtained the Glock, (26) no one said the robbery of Torres' house would be a simple "in and out" or said there would be no guns involved, and (27) there were a lot of drugs at Shady Shore. S.F. Trial, Volume 30, testimony of Patrick Lee Brook, at pp. 151-77.

[81] S.F. Trial, Volume 30, testimony of Joshua Tucker, at p. 144; Volume 30, testimony of Patrick Lee Brook, at p. 162.

[82] Amber Lynch testified during the punishment phase of petitioner's trial in pertinent part (1) in September, 2001 she heard petitioner discussing robbing a Dairy Queen in Longview with Barbara McCord, an employee of that restaurant, (2) they drove to a location where petitioner and an accomplice (Jason) put on black clothes and approached Barbara, (3) petitioner was armed with a gun, (4) petitioner went over and took the night deposit bag from Barbara, (5) petitioner and his accomplice returned to the vehicle and left the scene, and (6) the night deposit bag contained a couple of thousand dollars was in the deposit bag. S.F. Trial, Volume 30, testimony of Amber Lynch, at pp. 180-86, 189.
   Amber Lynch also testified (1) petitioner had guns on his person all the time she knew him, (2) there was a lot of methamphetamine use at Shady Shores (including by her own sister Deborah Sanders), (3) petitioner could be good and loving but didn't always treat her well, (4) she tried without success to get petitioner to stop using drugs, (5) petitioner's behavior grew worse the longer he stayed at Shady Shores, (6) there were times petitioner was mean to her and hurt her, (7) petitioner struck her and yelled at her, (8) petitioner once picked her up and threw her against a wall, (9) on another occasion, petitioner picked her up and threw her against a pole, (10) on another occasion, petitioner struck her in the jaw and bruised her, (11) petitioner always apologized after he had been violent with her, and (12) petitioner made her think she deserved it when he was violent with her. Id., at pp. 190-93.

[83] The other youth testified without contradiction at the punishment phase of petitioner's capital murder trial (1) he lived in the same cottage at the Waco Center for Youth for approximately a month, (2) at first he had no problems with petitioner, (3) on April 30, 1998 he and petitioner were engaged in horseplay when a necklace petitioner had received from a girlfriend at the facility broke, (4) petitioner suddenly became furious and began punching, kicking, and slapping him, (5) petitioner was cursing, mumbling but he refused to fight back, (6) petitioner also held him down so a third youth could strike him with a board, (7) after the assault, which went on for approximately an hour, he had bruises and swelling in his hands, head, and backside from petitioner's assault, (8) at one point during the assault, petitioner pulled down his pants and told him "Suck, you bitch, suck it," (9) petitioner attempted to put his penis in the other youth's face, (10) when the other youth turned away, petitioner touched his penis in the other youth's ear, (11) petitioner was fourteen at the time of the assault and he was fifteen or sixteen, (12) he had never had a problem with petitioner prior to this incident and was surprised at how quickly petitioner turned angry that day, (13) the counseling the other youth received at the Waco facility helped him learn to control his anger, which was why he refused to fight back when petitioner assaulted him, (14) the same counselor attempted to help petitioner at the Waco facility, and (15) after the incident, he considered petitioner to be dangerous. S.F. Trial, Volume 31, testimony of Nathan Timothy Wendall, at pp. 6-31.

facility because the facility's staff were not capable of handling petitioner's aggressive behavior, which threatened the safety of other patients,[84] (7) petitioner displayed violent behavior in first grade,[85] (8) in the fourth grade, petitioner brought a gun to school which resulted in petitioner being

---

[84] A social worker employed at the Waco Center for Youth in 1998 testified without contradiction (1) the Waco Center for Youth is a residential treatment facility where most youth were admitted voluntarily, (2) upon petitioner's involuntary, court-ordered, admission, petitioner displayed problems related to ADHD, criminal behavior, and opposition to authority, (3) weekly meetings with staff and a psychiatrist took place, as well as therapy sessions, (4) medications were administered only with the consent of the youth, (5) initially, petitioner made a good appearance and displayed a good personality, appeared friendly, and made a good impression, (6) petitioner's problems in the classroom appeared to relate to his ADHD, (7) over time, petitioner showed problems with depression and disruptive behavior, (8) petitioner's recurring disruptive behavior began to take away the staff resources available for other youth and interfered with the staff's ability to provide a therapeutic environment, (9) toward the end of petitioner's stay at the Waco facility, he grew concerned about his ability to keep others safe from petitioner, (10) petitioner had a girlfriend at the facility who lived in another cottage and had other youth watching the girl to make sure she did not speak with other boys, (11) petitioner displayed manipulative behavior, including intimidating other boys into not talking with petitioner's girlfriend, (12) petitioner's Global Assessment of Functioning Scale in February, 1998 was 35-45, which indicated impairment in reality testing or communication, speech that was illogical, obscure, or irrelevant with major impairment in work, school, family relationships, judgment, thinking, and mood, (13) petitioner also displayed serious symptoms including suicidal ideation, severe obsessional rituals, shoplifting, and serious impairment in social, occupational, or school functioning, nonetheless, (14) petitioner took Ritalin, which helped, but petitioner developed a tolerance to it - the same thing happened when petitioner was prescribed Cylert, and (15) petitioner made some progress, i.e., became less disruptive, in the classroom setting toward the end of his stay at the Waco facility. S.F. Trial, Volume 31, testimony of Richard McMullen, at pp. 31-59, 85-89.

On cross-examination, McMullen also furnished a great deal of testimony concerning the dysfunctional nature of petitioner's family background and developmental problems petitioner experienced as a child, specifically testifying (1) petitioner's father dropped out of school at age nine and had at least two alcohol-related arrests, (2) petitioner's mother indicated petitioner's father had used drugs and alcohol for eight-to-ten years, (3) petitioner's paternal grandfather had been in and out of prison due to alcohol-related problems such as DWI and disorderly conduct, (4) petitioner's mother said the paternal side of petitioner's family all abused drugs and alcohol, (5) petitioner's paternal uncle Tony went to prison at age eighteen and violated his parole shortly after his release from prison, (6) petitioner's paternal aunt had sixteen children, fourteen of whom went to prison, (7) petitioner's grandmother experienced depression, (8) petitioner's paternal half-brothers had both been in trouble with the law, (9) petitioner's paternal half-sisters both used drugs and were promiscuous, (10) all of petitioner's father's children dropped out of school, (11) petitioner's parents divorced when petitioner was young because of his father's abuse, (12) petitioner's father was not involved with petitioner's treatment at the Waco facility and offered petitioner no supervision when petitioner stayed with him, (13) petitioner was born three weeks premature and had a history of febrile seizures, (14) petitioner had behavioral problems in kindergarten and anger problems in the third grade, (15) petitioner displayed severe ADHD, and (16) petitioner was easily frustrated, impulsive, and hyperactive. *Id.*, at pp. 45-100.

[85] Petitioner's first grade teacher testified in pertinent part (1) petitioner bit other students and struck other students continuously, (2) petitioner was suspended for three days on one occasion for his violent behavior, (3) petitioner was suspended from riding the bus for ten days on another occasion, (4) petitioner would not do his class work, (5) petitioner tore up textbooks in the classroom, which she described as unusual behavior for a first grader, (6) petitioner was temporarily withdrawn from school at her request, (7) she believed petitioner had learning disabilities and emotional problems, (8) petitioner's mother would not allow her to use corporal punishment with petitioner, which she described as a failure to support her efforts to maintain class room discipline, (9) petitioner was violent, hostile, hyperactive but usually clean and dressed appropriately for class, and (10) petitioner talked about guns all the time and cut other students

32

assessed by a psychologist for emotional disturbance,[86] (9) in middle school, petitioner once

---

with scissors. S.F. Trial, Volume 31, testimony of Debbie Barton, at pp. 101-06, 118.

On cross-examination, Ms. Barton testified (1) petitioner appeared to lack the ability to control his own behavior, (2) it was obvious to her that something was wrong with petitioner, (3) in addition to destroying textbooks, petitioner drew on and tore up a library book, (4) she was concerned about the stability of petitioner's home, (5) petitioner was not taking his prescribed medication, (6) petitioner was an extremely frustrating child and did not appear to enjoy school, (7) petitioner lived part of his first grade year with his adoptive grandparents, (8) petitioner received corporal punishment in kindergarten frequently, which was unusual, and (9) petitioner had a real problem adjusting to school, was high maintenance, and displayed a clear inability to control or modify his own behavior. *Id.*, at pp. 106-19.

[86] The psychologist who evaluated petitioner following the incident in which petitioner brought a gun to school testified in pertinent part (1) petitioner, then a nine-year-old fourth grader, had an extremely strong obsession with Rambo-like personalities, (2) petitioner was attracted to guns and violence and preoccupied with guns and knives, (3) he decided to take the highly unusual step of suggesting petitioner for evaluation by a child psychiatrist, (4) petitioner appeared to be ADHD with a possible conduct disorder, petitioner had high average intelligence, (5) some children outgrow ADD/ADHD, and (6) many people have been able to adapt to ADHD, which is not an excuse for killing people. S/F. Trial, Volume 31, testimony of Don Walker, at pp. 120-27, 153-57.

On cross-examination, Walker testified (1) petitioner displayed an inability to build or maintain satisfactory interpersonal relationships with peers and teachers but not the inability to learn, (2) petitioner displayed inappropriate feelings under normal circumstances but no signs of pervasive unhappiness or depression, (3) during administration of the Bender-Visual Motor Gestalt test, petitioner took two and a half times the normal length of time to reproduce a series of geometric figures, appeared to be cover-controlling himself, i.e., overdrawing, re-drawing, putting more pressure on himself, and growing frustrated, (4) petitioner's behavior in that regard reflected that found in fearful people, (5) petitioner's posture was extremely intense, (6) petitioner displayed extreme frustration with a relatively simple task, (7) petitioner viewed himself as someone who gets in trouble at school, (8) physical discipline had been used against petitioner extensively, (9) children of divorce or separation are often caught in family conflicts which can have a devastating effect on them, (10) petitioner displayed indications of a dysfunctional family life with a lot of conflict and poor resolution skills, (11) there was no history of violence in petitioner's early childhood, (12) petitioner was on Ritalin when he saw petitioner but the medication did not appear to render petitioner well-controlled, (13) petitioner showed an unusual intensity, was highly self-critical and had difficulty letting himself off the hook, (14) he believed someone needed to do a further examination of petitioner to rule out a conduct disorder and ADD/ADHD, (15) despite the foregoing, petitioner was performing quite well academically (except in math and spelling) and had a high IQ, (16) petitioner's academical performance was better than expected for a person with attention deficit disorder, (17) petitioner had difficulty receiving and processing words and had a performance IQ higher than his verbal IQ, indicative of a person who tends to act out their feelings rather than talking them out, (18) children with ADD tend to have low frustration tolerance, are subject to temper outbursts, and typically display bossiness, are stubborn and demanding, and mood labile (i.e., their feelings are all over the place), (19) such children also suffer peer rejection and poor self-esteem, (20) the family relationships of ADD children are characterized by resentment and antagonism, (21) control of ADHD is problematic, i.e., some children can control ADHD and some cannot, (22) when both a father and son are ADHD, problems and conflict often arise, (23) there is a higher incidence of alcoholism among persons who were ADD/ADHD when they were children (a possible indication of attempted self-medication), (24) child abuse victims tend to be either very angry or very depressed, (25) when he saw petitioner in 1993, he feared petitioner would hurt others or himself, and (26) he could best characterize petitioner in 1993 as a person with two strikes against him and a fast-breaking curve over the edge of the plate on its way. *Id.*, at pp. 127-53, 157-60.

33

slammed a door on a teacher in anger,[87] (10) prisoners within the Texas Department of Criminal

Justice's prison system have access to materials they can fashion into weapons and, despite the best

efforts of prison officials, prisoners still commit acts of violence inside Texas prisons,[88] (11) while

a juvenile, petitioner was charged with a wide variety of criminal offenses, including multiple thefts,

unauthorized use of a motor vehicle, burglary of a building, burglary of a habitation, indecency with

---

[87] A teacher at Jefferson Junior High in Jefferson, Texas, testified (1) she did not have petitioner in her class but she spoke often with him in the hallway, (2) on one occasion, she asked petitioner to either put up a billfold chain or give it to her, (3) petitioner became angry, slammed the door and the door struck her, (4) she had seen petitioner angry with other teachers before but never with her, (5) when he slammed the door on her, petitioner gave her a look she described as such "that I felt if he could have, he would have killed me," (6) petitioner had a Jekyll and Hyde personality, (7) as a result of petitioner's slamming the door on her, she wrote up a disciplinary referral, (8) after the incident, she avoided petitioner, (9) she heard about an incident in which petitioner brought a gun and knife to school, and (10) she perceived petitioner as a lonely, angry, discouraged child. S.F. Trial, Volume 31, testimony of Crystal Stokely, at pp. 161-68.

[88] The Chief Investigator for the Special Prison Prosecution Unit in Huntsville testified, in pertinent part (1) there are different security levels within the TDCJ, including minimum, medium (where most inmates enter the system), closed custody (for inmates with disciplinary problems), and maximum custody, (2) additionally, there are levels of security within each of the foregoing levels, (3) upon admission, inmates go through a diagnostic process that takes several weeks and in which their medical, educational, psychological, and occupational characteristics are evaluated, (4) there are no separate facilities within TDCJ for capital murderers sentenced to serve life sentences, (5) no special safeguards or conditions are imposed on all life-sentenced capital offenders, (6) even maximum security facilities house inmates at all classification levels, (7) on average, there are five to ten homicides within the TDCJ annually, (8) since 1984, three prison employees have been murdered inside the TDCJ's facilities, (9) most crimes committed in prison are crimes of opportunity, (10) homemade weapons exist within TDCJ facilities, (11) an inmate given a life sentence will have the opportunity to hurt others regardless of his classification status, (12) the number of assaults within the TDCJ has increased every year he had been with the unit, (13) inmates housed on death row are in the same classification level as administrative segregation, i.e., they are locked down twenty-three hours a day but may come out for legal visits, to shower, have recreation, and for medical and dental examinations, (14) under the TDCJ's post-Connally seven prison break classification scheme, inmates are classified as either G-1 (nonviolent inmates), G-2 (lesser restrictive custody), G-3 (combination of the old "medium" custody level), G-4 (previously "medium" custody under the prior scheme but with work restrictions and not housed in dormitories, and G-5 (administrative segregation), (15) capital murderers have to be classified at G-3 or higher and are not permitted to work outside prison fences, (16) inmates are placed in administrative segregation for constant rules violations, assaultive conduct, and committing a felony while housed within the prison system, (17) there were only four homicides within the TDCJ in calendar year 2001 and only two during the first half of 2002, (18) there are approximately 150,000 inmates in the TDCJ, (19) there were 61 serious assaults on staff in 2001 but only 16 in the first half of 2002, (20) there were six murders within TDCJ throughout all of 2002, (21) there were 673 inmate-on-inmate assaults within TDCJ in 2001 and 328 during the first half of 2002, (22) some administrative segregation cells are one-person cells and some are designed to house two inmates, (23) most recreation is limited in administrative segregation, (24) some capital murderers have bettered themselves while incarcerated, (25) there is less opportunity for escape on death row, (26) a jury cannot lawfully direct TDCJ how it should house an inmate except when the jury imposes a sentence of death (which requires TDCJ to house that defendant on death row), and (27) if sentenced to life imprisonment, petitioner would enter the prison system at a minimum level of G-3. S.F. Trial, Volume 31, testimony of Royce Smithey, at pp. 168-213.

a child, and assault causing bodily injury (petitioner was convicted of the latter two charges both of which arose from the incident on April 30, 1998 when petitioner assaulted and exposed himself to another patient at the Waco Center for Youth, which led to petitioner's transfer to the Texas Youth Commission),[89] and (12) during his stay in the Texas Youth Commission,  petitioner served as a gang leader and led multiple assaults upon other youth and TYC staff.[90]

_____

[89] Petitioner's juvenile probation officer testified in pertinent part (1) around age ten, petitioner successfully completed a term of juvenile probation imposed after petitioner was charged with theft of musical instruments (flutes) valued above $750 from his school, (2) in September, 1997 petitioner was charged with unauthorized use of a motor vehicle, (3) shortly thereafter, petitioner was placed in a residential treatment facility at the Waco Center for Youth, (4) petitioner remained at th Waco Center from January 26, 1998 until May 6, 1998 when, as a result of petitioner's assault upon another patient, petitioner was transferred to the custody of the Texas Youth Commission, (5) petitioner's juvenile criminal records included adjudications for burglary of a building in 1996, unauthorized use of a motor vehicle in September, 1997, theft of a firearm in September, 1997, burglary of a habitation in December, 1997, indecency with a child in April, 1998, and assault causing bodily injury in April, 1998, (6) petitioner was sent to TYC with an indeterminate sentence and released from TYC custody on February 20, 2001, and (7) petitioner was the most violent and dangerous child she had ever dealt with by a wide margin. S.F. Trial, Volume 31, testimony of Deborah Clem, at pp. 214-23.

On cross-examination, Clem testified (1) petitioner was never threatening or assaultive toward her, (2) petitioner's step father Quentin Sexton drank too much and was not a positive role model for petitioner, (3) she was unaware of any positive role models for petitioner in his life, (4) petitioner's mother loved petitioner but was not good at protecting parenting petitioner, (5) a physician who evaluated petitioner in May, 1998 concluded petitioner was "savable," (6) she believed it was essential to properly medicate petitioner but she was never certain petitioner had ever been properly medicated, (7) in September, 1997 (at age fourteen), petitioner drove off in an automobile with a twelve-year-old girl and an eight-year-old boy after petitioner obtained a gun from his mother's house, (8) petitioner was stopped by Texas DPS after the vehicle petitioner was driving was clocked at speeds in excess of sixty five miles per hour, (9) in 1996, petitioner regularly broke into a store to steal alcohol, cigarettes, and candy, (10) petitioner's mother was prosecuted for child endangerment after petitioner took a gun to school, (11) she was unaware of any violent outbursts by petitioner while he was in juvenile detention, (12) petitioner lived with his biological father from September to December, 1996, during which time petitioner used marijuana daily tried crack and acid, and drank beer and whiskey on weekends, (13) petitioner had no supervision while he lived with his biological father, (14) petitioner's biological father abused drugs and did not pay child support, (15) petitioner was furloughed briefly between the time he was dismissed from the Waco Center and the time he reported to the TYC and experienced no problems during that time frame, and (16) petitioner's theft of flutes in 1993 involved petitioner acting in concert with several older children and the flutes were returned to the school the following day by petitioner's half-sister Brandy. Id., at pp. 223-55.

[90] A former TYC case worker testified (1) he had several physical confrontations with petitioner, including an incident on August 7, 2000 in which (a) petitioner and another youth were fighting, (b) when a female guard attempted to intervene, she and both youths went down, (c) petitioner was on top of the pile and continued to punch, (d) when the case worker tried to intervene, petitioner punched the case worker in the chin, (e) the case worker thereafter tackled petitioner to get petitioner off the pile, put petitioner in restraint, and waited for security, (f) the other youth involved in the fight was quite a bit smaller than petitioner, and (g) before he struck the case worker, petitioner turned around and looked at the case worker, (2) petitioner was involved in a series of riots within the TYC dorm, (3) petitioner was a gang leader, along with two other youth in same dorm in the Five Deuce Hoover Crip gang, (4) during the riots petitioner instigated, the dorm was out of control, (5) petitioner started one riot by exiting his cell, throwing a trash can, and calling

Before resting, the prosecution called Dr. Helen Short, the staff psychiatrist from the Waco

Center for Youth who treated petitioner during his stay of approximately 100 days at that facility in

1998.  Dr. Short testified in pertinent part as follows: (1) the usual stay at the Waco Center is

approximately nine months, (2) petitioner was 14.6 years of age upon admission, (3) she had seen

numerous reports on petitioner prior to his admission, (4) during the admissions process, she

observed obvious signs petitioner was ADHD, (5) petitioner showed no sign of psychosis or

schizophrenia, had no history of same, and displayed no psychotic or unusual symptoms but was

hyperactive, (6) petitioner had a lengthy history of fighting in school and on the bus and failing to

follow the rules, (7) she concluded petitioner was oppositional (i.e., defiant, rebellious, impulsive,

whiny, uncooperative, and demanding), (8) petitioner lacked insight into his own behavior, showed

no sign of remorse, and did not accept responsibility for his behavior, (9) petitioner informed her his

---

on others to get the place "krunk," i.e., out of control, and fight and destroy everything they could, (6) the last three-to-four days the case worker worked at TYC, there were three or four similar incidents of violence, (7) petitioner was aggressive, dangerous, unpredictable, impulsive, yet deliberate at times, (8) during one riot, petitioner and another youth fought to lure TYC staff into the dorm and, when staff arrived, both youth turned and assaulted the staff, (9) the case worker quit after an unbelievable four-day period of violence instigated by petitioner in retaliation for a lock down which concluded with an incident in which the case worker had to forcibly cuff another juvenile and use that juvenile as a human shield to keep from getting struck by petitioner and other rioting youth, (10) the case worker quit because his work environment was simply too dangerous, and (11) while petitioner wrote a conditional letter of apology to the case worker following the August 7, 2000 incident, such letters were required as a condition to youth obtaining release from restrictive custody. S.F. Trial, Volume 31, testimony of Garrett Gilliam, at pp. 256-69, 277-78, 282-83, 285-87.

　　　On cross-examination, the case worker testified in part that, after a hearing, petitioner was found by TYC personnel not to have intentionally and knowingly caused physical contact with the case worker on August 7, 2000. *Id.*, at pp. 276-77.

　　　A former TYC juvenile corrections officer who had worked in petitioner's TYC dorm testified (1) about an incident in April, 1999 in which petitioner raised a chair over his head as if to strike her, (2) about a separate incident in which petitioner and another youth fought until she and other staff arrived to break up the fight and the two youths turned and began assaulting the staff, (3) during the latter incident, petitioner struck her several times, as did the other youth. S.F. Trial, Volume 31, testimony of Jacqueline Timmons, at pp. 287-93, 299.

　　　On cross-examination, Ms. Timmons testified (1) petitioner was written up in connection with the April, 1999 incident for "being a danger to others" not for assault, (2) petitioner did not actually strike her with the chair during the April, 1999 incident, (3) no criminal charges were filed against petitioner for an incident in which petitioner and another youth struck a guard other than her, (4) there was no chemical dependency program at petitioner's TYC facility, (5) petitioner assaulted her only once, and (6) petitioner had regular visits with the staff psychiatrist. *Id.*, at pp. 293-99, 300-02.

real motivation in coming to the Waco Center was to avoid being sent to TYC, (10) petitioner related stories of (a) stealing his mother's cigarettes and smoking as much as he could, (b) getting "plastered" on alcohol seven to ten times, (c) being with his biological father in North Carolina and having no supervision from August, 1996 to January, 1997, (d) breaking into a house in December, 1997 to steal alcohol, (e) smoking marijuana daily for a month and using cocaine four times while in North Carolina, and (f) returning to Texas where he smoked marijuana on weekends and used crystal meth twice, (11) petitioner comes from a long line of people with legal problems, (12) petitioner's paternal family includes many persons with alcohol-related problems and criminal records (i.e., petitioner's father had multiple DWI's, had abused alcohol from age nine, and had abused drugs for the past eight-to-ten years, a paternal uncle spent twenty years in prison for armed robbery and picked up a DWI shortly after his release on parole, two of petitioner's paternal cousins used drugs and alcohol, fourteen of petitioner's sixteen paternal cousins had been to prison, petitioner's mother dropped out of school and never returned, petitioner's maternal grandmother suffered from depression and situational stress, both of petitioner's paternal half-brothers and both of petitioner's paternal half-sisters never went beyond the eleventh grade, both of petitioner's paternal half-brothers had been in juvenile detention), (13) she diagnosed petitioner with Attention Deficit Disorder, ADHD, primarily inattentive, conduct disorder, and a disorder of written expression, (14) ADD can only be inferred, there is no objective test for same, (15) ADD is a common diagnosis (found in 7-10% of school age children), (16) petitioner entered the Waco center on a low dose of the stimulant Adderrall, which was continued, (17) petitioner had been on Ritalin, a stimulant similar to Adderrall, and had a "fairly good response" to same when he was younger, (18) petitioner was switched to Adderrall because it has a longer half-life and must be taken less

frequently than Ritalin (which is out of the system in three-to-four hours and, therefore, requires administration four to five times a day), (19) shortly after petitioner's admission, she increased petitioner's Adderrall dose from five mg to ten mg twice daily because petitioner was hyperactive and impulsive, (20) on February 6, 1998, she changed petitioner's medications because petitioner was physically aggressive, i.e., he got into fights with his peers, (21) petitioner also taught other youth how to stick wires into an electrical socket to heat them up and use the heated wires to light cigarette butts, (22) on one occasion, petitioner had to be taken out of the unit because he was trying to instigate a riot, i.e., petitioner was yelling and screaming, hitting the walls and cursing, and trying to get other youth to fight, (23) after being moved to another unit, petitioner calmed down, (24) on another occasion, petitioner was placed on restriction for possessing dangerous contraband, (25) throughout early-February, 1998, petitioner continued to display aggressive behavior, on one occasion, throwing poker chips and attacking another youth, (26) on February 19, 1998, she stopped petitioner's Adderrall and substituted a mixture of Clonidine and Dexedrine (another stimulant), (27) there is no easy way to determine the best stimulant regimen for a patient with ADHD, (28) Clonidine is often used with a stimulant to help hyperactive people sleep, (29) a period of adjustment is needed where psychiatrists go through a combination of drugs at different levels and intervals to find what works best for a particular patient - this is a fairly slow process, (30) on February 24, 1998, petitioner remained aggressive, throwing a trash can at a staff member, (31) thereafter, petitioner was placed on restriction and prohibited from leaving his unit (even to go to school or the cafeteria) due to petitioner's accumulation of excessive "fines" for misbehavior, (32) she bumped petitioner's Dexedrine up to ten mg twice daily on March 3-4 and added Mellaril but halted his Dexedrine on March 5 after petitioner displayed aggressive behavior toward staff and had to be restrained, (33) on

March 16, she increased petitioner's Clonidine and added Benadryl, (34) on April 1, petitioner was restrained after he fought a peer, (35) on April 3, petitioner struck a peer, (36) on April 6, she started petitioner on Wellbutrin, an anti-depressant, and later bumped it up when petitioner requested to be taken off Clonidine because it was making him tired, (37) she tried reducing petitioner's Clonidine but, by April 27, petitioner was again having problems so she bumped it back up, (38) on April 27, petitioner got another restriction for being out of control, (39) on April 30, petitioner was once more placed in restriction for striking a peer and engaging in inappropriate sexual behavior, (40) on May 1, petitioner engaged in physically aggressive and threatening conduct, (41) on May 4, petitioner was placed on homicide precaution, (42) at that point, she had to stay an arm's length away from petitioner at all times, (43) petitioner did not react well to the news he was going to TYC, (44) petitioner was too deliberately, consciously, aggressive to remain at the Waco Center, (45) during his approximately 100 days at the Waco Center, petitioner had nine episodes of physical aggression toward others, (46) she gave petitioner a final diagnosis of ADHD and conduct disorder but added Anti-Social Personality Disorder (which was inappropriate because petitioner was then not yet eighteen years old), (47) nonetheless, other than his age, petitioner displayed all the criteria for an Anti-Social Personality, including (a) displaying a conduct disorder prior to age fifteen, (b) engaging in manipulative, impulsive, aggressive, reckless, irresponsible behavior, and (c) displaying mechanical emotions, little-to-no remorse, and a lack of conscience, (48) petitioner was very bright, had anger management issues, and wanted to be the leader, i.e., the person in control of the unit as far as the other youth went, (49) petitioner engaged in a lot of behind the scenes intimidation and threats to control others, (50) the best predictor of future behavior is past behavior, (51) petitioner was very dangerous, in the top five percent of the most dangerous children she has treated during her

39

practice, (52) petitioner's recent criminal past convinces her the proper adult diagnosis for petitioner is Anti-Social Personality Disorder, a condition for which there is no pharmacological treatment, (53) she believes petitioner requires further evaluation to determine if he is a true psychopath, i.e., a person who views other persons more as objects, possesses no empathy, is deceitful and manipulative, has shallow emotions, is impulsive, possesses poor behavioral controls, is over-reactive to perceived insults, has a high need for excitement, and lacks a sense of personal responsibility), and (54) there is no proven treatment regimen for psychopaths.[91]

On cross-examination, Dr. Short testified in pertinent part as follows: (1) petitioner presented at the Waco Center as a healthy young man with no reported medical problems, (2) there were plenty of documents showing petitioner was hyperactive and inattentive, (3) she agreed petitioner was ADD/ADHD, (4) petitioner also had a child onset conduct disorder, (5) her diagnosis of petitioner with Anti-Social Personality Disorder was premature (petitioner was not yet eighteen) but factually accurate and not unethical, (6) in persons with Anti-Social Personality Disorder, aggressiveness tends to wane as one ages but the person retains other characteristics of the disorder, (7) thus, for those with Anti-Social Personality Disorder, aggressive/violent behavior tends to decrease with age but not criminality, (8) petitioner's father and grandfather both demonstrated antisocial traits, (9) there may be a genetic predisposition toward certain personality disorders and mood or conduct disorders, (10) Anti-Social Personality Disorder is more common among young males from lower socio-economic backgrounds, (11) family and environmental factors influence the risk of Anti-Social Personality Disorder, (12) "conduct disorder" is the proper diagnosis for younger people while Anti-Social Personality Disorder is the diagnosis for adults with the same personality traits, (13) petitioner

---

[91] S.F. Trial, Volume 32, testimony of Helen Short, at pp. 15-69.

was no better and possibly more aggressive when he left the Waco Center than when he entered, (14) petitioner had not been on Adderrall very long before he entered the Waco Center, (15) she cannot rule out the possibility Adderrall made petitioner more aggressive during his time at the Waco Center, (16) Adderrall is a longer-lasting stimulant closely related to Ritalin, which had proven beneficial for petitioner in the past, (17) in stimulant-resistant patients, use of stimulants can cause weight loss, insomnia, and more aggression, (18) the drug abuse common to patients with ADHD results from their underlying impulsivity, not the use of stimulants, (19) petitioner's febrile seizures (which took place when he was 18 months old) are common with fever, did not reoccur thereafter, and are not significant vis-a-vis petitioner's current problems, (20) thus, there is no relationship between petitioner's febrile seizures and petitioner's adult criminal behavior, (21) petitioner reported heavy drug abuse when he was living in North Carolina but none for two months prior to his admission to the Waco Center (petitioner reported being drug free for 41 days prior to admission) and no withdrawal symptoms, (22) therefore, she did not refer petitioner for chemical dependency treatment, (23) she did not believe petitioner needed to go to Vernon State Hospital for chemical dependency treatment, (24) petitioner's ADHD exacerbated his conduct disorder and contributed to his extremes in impulsiveness and poor judgment, (25) petitioner also suffers from a learning disability, (26) petitioner's misbehavior at school was a defense mechanism for poor academic performance, (27) petitioner has a strong family history of anti-social personality disorder and drug and alcohol dependence, (28) petitioner was harmed by the early loss of his biological father from his life and later rejection by his biological father, (29) a broken family affects a child's ability to develop long term, meaningful, sustained, healthy, relationships, (30) as an adolescent, petitioner tended to identify with the paternal side of his family, (31) ADD/ADHD is a biological problem

centered in the brain, (32) she discontinued petitioner's Adderrall on February 19 after petitioner's mother called the Waco Center and reported petitioner had sounded more angry, irritable, and hyper-talkative during a telephone call, (33) she began petitioner on Clonidine (a blood pressure medication) on February 19 because of petitioner's impulsivity and hyperactivity, (34) Benadryl is used to help kids sleep, (35) Depakote is used to treat seizures and bi-polar-mood lability, (36) on February 23, she prescribed Clonidine and Dexedrine for petitioner, who appeared calmer, (37) when she increased petitioner's Dexedrine on March 4, petitioner became more irritable and aggressive, (38) on March 16, she increased petitioner's Clonidine, (39) on April 6, petitioner hung up a punching bag and falsely stated maintenance had done it, (40) Wellbutrin is an anti-depressant and mood elevator not typically used to treat bi-polar disorder, (41) it is difficult to distinguish conduct disorder, ADHD, and bi-polar disorder, (42) petitioner seemed to be intolerant to stimulants during his time at the Waco Center, (43) the frontal lobes of the brain are the seat of executive functioning and the last part of the brain to mature, (44) the brain is not fully formed until age twenty to twenty-one, (45) she believed petitioner was fully capable of participating in judgments regarding petitioner's medications, (46) she felt petitioner should be in a secure jail facility rather than a psychiatric treatment facility or hospital, and (47) petitioner was suspended from school for taking an antique gun to school and then suspended again two weeks later for taking a knife to school.[92]

---

[92] *Id.*, at pp. 69-163, 166-72.

In addition to the foregoing testimony, the State introduced without objection from petitioner's trial counsel the entirety of petitioner's voluminous TYC file as State Exhibit no. 147. S.F. Trial, Volume 30, at pp. 194-95. These voluminous documents appear at S.F. Trial, Volumes 42-44.

2.     The Defense's Case in Chief

Petitioner's trial counsel presented numerous witnesses, including (1) a clinical neurophysiologist who took a quantitative EEG (qEEG) of petitioner's brain in February, 2003 and testified petitioner's qEEG was abnormal,[93] (2) a retired TDCJ Warden who testified regarding (a) TDCJ's classification/diagnostic process, (b) the process for placing inmates in administrative segregation, (c) the incidence of violence within the TDCJ prison system, and (d) the resources

---

[93] More specifically, he testified (1) petitioner's brain impulses were markedly slow for petitioner's age, (2) petitioner's brain showed indications of an abnormal, intermittent sharp wave, suggesting petitioner was more likely to have seizures than others, (3) there was a localized area of abnormally slow activity in the posterior cortex, (4) petitioner's EEG showed overall more (but slower) activity than should be present, with lower frequency, (5) petitioner's brain frequencies are slower, with fewer waves per second, than normal, (6) abnormalities in the frontal lobes of the brain, where petitioner's EEG showed marked abnormalities, indicate problems with planning, judgment, and impulse control, (7) the front portion of petitioner's brain showed an abnormal degree of incoherence or high pole incoherence, i.e., the two sides of the brain were more out of phase than is normal, (8) petitioner's Alpha and Theta waves were pathologically low, (9) the voltage in each side or petitioner's brain was asymmetrical, i.e., the voltage was higher on the rights side than the left side, (10) petitioner's EEG indicated a lesion of unspecified type was present, (11) the magnitude of the abnormalities in petitioner's EEG's increased between 1993 and 2003, (12) petitioner's 2003 EEG is consistent with a diagnosis of ADHD, (13) patients with the same type of EEG as petitioner often respond well to stimulants, (14) spikes in irritable sharp waves, such as those in petitioner's EEG, are treated with anticonvulsants, (15) he could not say what caused petitioner's abnormal EEG results, and (16) a person with an abnormal EEG can be perfectly normal. S.F. Trial, Volume 32, testimony of Meyer L. Proler, at pp. 175-209, 221-24, 226-27.

On cross-examination, the same expert witness testified (1) an article written by one of his colleagues stated that there had only been limited success in employing qEEG's diagnostically, (2) the American Academy of Neurology had not accepted qEEG's as a basis for diagnosis, (3) qEEG's were not in everyday use to diagnosis psychosis of Anti-Social Personality Disorder, (4) qEEG's were more relevant to diagnosing strokes, seizures, and blunt force trauma than to diagnosing behavioral problems, (5) EEG's are generally not a diagnostic tool for behavioral problems, and (6) Dr. Sheerani had taken petitioner's EEG in 2002 which reported nothing remarkable. *Id.*, at pp. 209-21, 224-26.

available to prison officials to reduce violence within the inmate population,[94] (3) petitioner's

mother, who testified in detail regarding (a) petitioner's disadvantaged and abusive childhood, (b)

her efforts to obtain medical help for petitioner's hyperactivity, and (c) petitioner's history of trouble

at school, juvenile misconduct, and detention,[95] (4) a number of

---

[94] More specifically, this witness (1) testified TDCJ amended its classification procedures following the escape of seven inmates from the Connally Unit in December, 2000, (2) described TDCJ's the diagnostic/classification process in terms very similar to those described by prosecution witness Royce Smithey, albeit in more detail, (3) explained that inmates placed in administrative segregation had their status reviewed every thirty days and a ninety-day hearing was held by the State Classification Committee, (4) opined that an inmate could remain in administrative segregation indefinitely if the inmate's conduct warranted same, (5) explained that dormitory-style housing was only available to inmates housed in minimum security, (6) testified inmates who were sentenced to life imprisonment for capital murder would (a) be classified as either G-4 or G-5, (b) necessarily be housed in cell block style housing, (c) not be able to work outside the main perimeter, (d) experience restrictions on commissary, recreation, movement, and visitation, and (e) could not have their classification status raised for at least ten years, (7) testified psychiatric treatment was provided to inmates as per state law and inmates had access to religious programs, including weekly worship and chaplain rounds, (8) testified there were sixteen attempted escapes in TDCJ in 2001, only one of which was successful, (9) testified in 2002, there were twelve attempted escapes, only two of which were successful, (10) testified in 2001, there were seventeen murders within TDCJ facilities but only six in 2002, (11) testified in 2001, there were sixty-one serious assaults on staff throughout the TDCJ but only forty-five in 2002, (12) testified in 2001, there were 629 possession of weapon incidents in TDCJ and 594 such incidents in 2002, (13) testified in 2001, there were 673 inmate-on-inmate assaults in TDCJ and 826 in 2002, (14) stated it was her experience that inmates serving longer sentences were more apt to behave, adhere to individual treatment plans (such as sex offender therapy, substance abuse treatment, and vocational training), and take advantage of programs offered, (15) opined education is the key to reducing violence in prison, (16) testified in administrative segregation, an inmate remains in a cell twenty-three hours a day and normally two guards escort an inmate at all times the inmate is out of his cell, and (17) testified that, as of 2001, there were 11,698 male inmates in TDCJ who had been convicted of murder and 1,421 male inmates who had been convicted of capital murder. S.F. Trial, Volume 33, testimony of Dessie Cherry, at pp. 9-57, 72-73, 76.

On cross-examination Warden Cherry testified (1) she had never worked inside any of the TDCJ units to which petitioner would be sent if petitioner received a life sentence, (2) she retired in August, 2001 after the TDCJ instituted a new classification system following the escape of seven inmates from the maximum security John B. Connally Unit in December, 2000, (3) she had spent most of her career as a warden in TDCJ working at units housing female inmates but had worked for a year and a half at a men's unit, (4) TDCJ inmates serving life sentences are housed with the general prison population where they are not handcuffed when moved, (5) those inmates placed in administrative segregation have their classification status reviewed at ten, thirty, sixty, ninety, and one hundred sixty day intervals to see if they should remain in administrative segregation, (6) only those inmates sent to death row remain under administrative segregation restrictions permanently, (7) low pay and budget cuts have resulted in security problems within TDCJ, and (8) guards have been found sneaking drugs and other contraband into prisons. *Id.*, at pp. 14-16, 57-71, 73-77.

[95] Petitioner's mother testified at the punishment phase of petitioner's capital murder trial in pertinent part as follows: (1) her own biological father never married her biological mother, (2) she was raised by adoptive parents and an uncle, (3) in her teen years she was in a hurry to get married so she could move out of her home, (4) she was eighteen years old when she had petitioner in July, 1983, (5) petitioner was born about a month premature due to her hypertension, (6) when petitioner was born, her husband Billy Young already had custody of four other children from his previous marriages - Dino, Dano, Renee, and Christy, (7) Billy was physically abusive toward her, petitioner, and all four of his other children, (8) Billy's abuse became so bad she took petitioner and left Billy when petitioner was about nine months old, (9) she received no counseling following the breakup of her marriage, (10) petitioner had seizures at ages 18 and

24 months, (11) around age 3-4, she noticed petitioner appeared hyperactive, (12) Billy took petitioner at one point, filed for divorce, and refused to return petitioner until she signed divorce papers, (13) to get petitioner back, she signed the papers without reading them, (14) in 1990, when petitioner was about seven, she went to court to get an award of child support and legal custody of petitioner, (15) nonetheless, Billy Young only paid child support for two or three years of petitioner's life, (16) she worked three jobs to support petitioner, (17) she met Quentin Sexton in 1985 and married him in 1987, (18) petitioner loved his kindergarten teacher but had problems in the classroom and on the bus with biting, not being still, and not paying attention, (19) the school diagnosed petitioner with Attention Deficit Disorder, (20) she took petitioner to a doctor to have his condition treated but had difficulty getting petitioner to take his Ritalin, (21) petitioner did not get along with his first grade teacher so she put petitioner in a different school, (22) she discontinued petitioner's Ritalin because of the side effects - stomach aches and headaches - and because it did not seem to control petitioner's hyperactivity, (23) at some point, their home burned down, devastating petitioner, (24) she and her second husband, Quentin Sexton, quarreled over how best to discipline petitioner, (25) Quentin drank a lot of beer (twelve to eighteen a day), (26) petitioner was labeled emotionally disturbed in the second grade and she took him to see many doctors, (27) petitioner remained on medications (which ran the gamut from Ritalin, Cylert, Wellbutrin, and Zoloft to Thorazine) through ths third grade but none of the medications helped, (28) she often lost her patience with petitioner, yelled at him, put him in the corner, spanked him, took away his things, but nothing she did seemed to work, (29) petitioner struggled in school, was often sent to the cafeteria for misbehavior, and grew to dislike school, (30) in the third grade, petitioner took an antique gun to school and charges were filed against her and Quentin for child endangerment, (31) she received deferred adjudication, (32) she sent petitioner to live with his biological father in Wyoming for three months after the gun incident but observed no improvement in petitioner's behavior when he returned home, (33) she later sent petitioner to Triangle Pines Group Home where he received stimulants to treat his ADHD but petitioner's brief stay there (two to three months) did nothing to help him, (34) shortly after petitioner's return from Wyoming, he got in trouble with the law for stealing flutes and received juvenile probation, which he successfully completed, (35) petitioner's next legal troubles occurred around age 13-14 when he was charged with stealing wine coolers, (36) Quentin was drinking heavily and she argued with him constantly, (37) petitioner's doctors were still prescribing different drugs but none of them seemed to help and the drugs made petitioner irritable, unable to sleep, hyperactive, and inconsistent, (38) petitioner wanted to go live with his biological father and she felt she needed a break so she sent petitioner to North Carolina to live with Billy, (39) petitioner returned to Texas with Billy in the Fall of 1996 and enrolled in school there, (40) petitioner telephoned her from the Kent County Sheriff's Office and told her he was scared, (41) when she arrived at the Sheriff's office, she observed bruises on petitioner's neck, stomach, and back so she took petitioner home with her, (42) petitioner continued to get into trouble with the law, (43) she received a telephone call from police informing her petitioner had taken a car and driven to Louisiana, (44) she went to Louisiana and picked up petitioner, (45) during the drive back home, petitioner repeatedly attempted to get out of the vehicle and stated he hated her and did not want to go back home, (46) she took petitioner to the Marion County Sheriff's office and filed charges against petitioner because she wanted to keep him off the street, (47) shortly thereafter, petitioner was declared to be mentally ill, was prosecuted for breaking and entering her home, and sent to the Waco Center in January, 1998, (48) she visited petitioner at the Waco Center once, took petitioner out to go visit a zoo, and they had a good day except for petitioner's temper tantrum associated with his constant demand that she purchase a necklace for his girlfriend, (49) petitioner was kicked out of the Waco Center and sent to the TYC, (50) petitioner was initially set to stay thirteen months at the TYC but wound up staying almost three years, (51) she separated from Quentin in 2000 because of his drinking, (52) she noticed a dramatic improvement in petitioner toward the end of his stay at the TYC, i.e., petitioner was calmer and more settled, (53) petitioner earned his GED while in the TYC, (54) when petitioner left the TYC in February, 2001, he was "wonderful," - "it was like a different kid," (55) when he returned home, initially, petitioner was very good about taking his prescription medication, (56) petitioner quit taking his medications, however, and stopped keeping curfew, (57) eventually, petitioner lost his job and quit going to school, (58) she wanted petitioner to stay as far away from his half-brothers Dino and Dano as possible but petitioner seemed obsessed with his paternal relatives and took an out-of-town job laying carpet with his biological father and half-brothers, (59) when petitioner returned home, he was no longer taking his medications, no longer clean, and went to live with Dano, (60) she was afraid petitioner was doing drugs, (61) petitioner had a good relationship with her daughter Jessie, (62) as a child, petitioner was constantly into things but was kind, loved to fish, ride motorcycles, go-carts, jump on trampolines, and help with chores, and (63) when he was a child, petitioner was also

45

petitioner's paternal relatives and others who knew petitioner as a child, all of whom testified

regarding (a) petitioner's abusive, alcoholic, biological father, (b) petitioner's abusive childhood, and

(c) petitioner's redeeming personal characteristics,[96] (5) a pair of women whom petitioner met in

---

accident prone - he broke his leg climbing up on a forge and, when he was nine or ten, cut a cord off a lamp, stuck it in a socket, and it knocked him back and blew the breakers. S.F. Trial, Volume 33, testimony of Carla Sexton, at pp. 78-143, 150-51.

    On cross-examination, she testified (1) petitioner had behavioral problems at school early on, (2) she was honest with the petitioner's psychologists and psychiatrists regarding petitioner's problems, (3) as a child, petitioner set fires, stole things, and vandalized property, (4) it was petitioner's choice not to continue taking his medications when he left the TYC, (5) petitioner sold a car her father gave to petitioner after his return from the TYC and she believes petitioner used the proceeds to buy drugs, but (6) neither she nor Quentin Sexton ever beat petitioner. *Id.*, at p. 143. She asked the jury to spare petitioner's life. *Id.*, at p. 143.

[96] One of petitioner's older, paternal, half-sisters testified in pertinent part (1) their father Billy Young was rougher with the boys in their family than with the girls, (2) Billy "whooped" petitioner with a two by four on one occasion behind the shed when petitioner was eleven-to-thirteen years old, (3) on another occasion when petitioner was thirteen, Billy beat up petitioner at their aunt's house (i.e., Billy dragged petitioner out the door, wrestled petitioner to the ground, and struck petitioner) and their aunt cursed Billy and ordered Billy off her property, (4) she recalled an incident when she was seven when she believed Billy was on drugs, (5) Billy was violent when he drank and he drank often and to excess (Billy had a chronic, long term, drinking problem), (6) petitioner was on Ritalin at an early age but it only made him worse, (7) when petitioner was on Cylert, he would fall asleep in school, (8) petitioner was shipped back and forth between his biological parents several times a month, (9) petitioner lived with Billy in Ohio, Wyoming, and North Carolina for a few months at a time, (10) Billy was convicted of injury to a child for beating petitioner, (11) Billy deprived petitioner emotionally, (12) she never actually saw Billy use drugs, (13) petitioner was a good brother and never aggressive toward anyone in their family, (14) she lied to police who investigated an incident in January, 1997 in which Billy beat up petitioner because she was afraid of Billy and he told her what to say, and (15) Billy again violently assaulted petitioner in March, 1997. S.F. Trial, Volume 33, testimony of Christy Young, at pp. 153-71, 211-21.

    The twice-convicted and then-incarcerated father of three of Christy Young's children testified (1) he lived with Christy from 1996-2000, (2) they had three children while they were together, (3) he met petitioner when petitioner was thirteen, (4) his impression of petitioner was that of a normal kid with a little bit of problems, (5) Billy Young drank every day until he passed out, (6) Billy Young did crack cocaine and spent hundreds of dollars a week on crack cocaine, (7) Billy Young once struck petitioner with a two by four behind the shed, (8) he personally witnessed Billy Young assault petitioner with his fists on multiple occasions, (9) Billy Young was placed on probation in 1996 for beating petitioner, (10) he and Christy witnessed petitioner living on his own (at age thirteen or fourteen) in North Carolina, and (11) he lied to law enforcement authorities to protect Billy Young on one occasion after Billy beat petitioner. S.F. Trial, Volume 33, testimony of Timothy Williams, at pp. 241-56.

    The former wife of Quentin Sexton's brother testified (1) she met petitioner when he was four, (2) as a child petitioner was a busy body who could not sit down and was always outside, (3) petitioner played nicely with her daughter who was two years younger than him, (4) Quentin Sexton was always very distant toward petitioner, (5) Quentin was a constant drinker, who frequently drank to excess, (6) petitioner went back and forth between Carla and Billy, (7) she never saw Carla or Quentin behaving abusively toward petitioner, (8) Carla appeared to be a loving mother and tried to get petitioner treated, (9) Carla and Quentin furnished petitioner a suitable home, and (10) at age six, petitioner walked to the store to get Quentin a beer when there were none in the refrigerator. S.F. Trial, Volume 33, testimony of Kelly Sexton, at pp. 172-81.

    Petitioner's oldest paternal half-sister testified in pertinent part (1) Billy's father was an abusive alcoholic, (2) fourteen of their sixteen paternal cousins went to prison, (3) Billy was married twice before he married petitioner's mother Carla, (4) Billy traveled from state to state for work, (5) Billy paid Carla no child support and sent petitioner no

2001 after he left the TYC who testified regarding his good character,[97] (6) petitioner's older, paternal, half-brother who testified regarding (a) their father's alcoholism, anger management problems, and (b) their father's physical and emotional abuse of petitioner,[98] and (7) several relatives and family friends on the maternal side of petitioner's family who testified regarding (a) petitioner's step-father's alcoholism, (b) petitioner's step-father's physical and emotional abuse of petitioner, and (c) petitioner's good character.[99]

---

birthday cards or Christmas presents, (6) petitioner had a seizure around age 18 months while staying with Billy, (7) petitioner was a calm, normal, child who was well-behaved around her, (8) Billy was abusive toward the women with whom he lived and all his children, (9) when petitioner was five or six, he attempted to light a Christmas tree with a lighter, (10) petitioner was passed back and forth between Billy and Carla, (11) Billy didn't get along with Carla, (12) petitioner was close to her brothers Dino and Dano, (13) petitioner showed up for her third wedding but wasn't himself, appeared to be on drugs, (14) she has used methamphetamine before and can recognize behavior consistent with a meth binge, (15) when she asked petitioner to go home, take a shower, and eat something, petitioner did so, returned, and was acting normal again, and (16) when he got out of TYC in February, 2001, petitioner visited her and was "great." S.F. Trial, Volume 33, testimony of Sharon Renee Gentry, at pp. 189-210.

[97] A small business owner who briefly employed petitioner in 2001 testified (1) petitioner was a terrific employee and a great salesman, (2) she introduced petitioner to her oldest daughter, (3) petitioner took all three of her children to the mall and the movies, (4) in October, 2001, petitioner telephoned her and sounded scared and upset, "not the Clint that I know," and (5) she was unaware of petitioner's criminal record before she met him. S.F. Trial, Volume 33, testimony of Patricia Feela, at pp. 223-32.

A nineteen-year-old Army reservist testified (1) petitioner was a "real nice person," (2) he encouraged her to stay in school, (3) he was never violent with her or her family, (4) petitioner is intelligent and cares about others, and (5) she was unaware that petitioner had multiple convictions as a juvenile, used methamphetamine, stole guns, or was involved in a home invasion in Longview. S.F. Trial, Volume 33, testimony of Shauntel Feela, at pp. 232-40.

[98] Dino Young testified in pertinent part (1) Billy Young was drunk every day he wasn't working, drank until he passed out all the time, and had anger management problems when he drank, (2) Billy was verbally and physically abusive toward petitioner, often telling petitioner he was worthless, (3) Billy also physically abused petitioner by beating and kicking petitioner, throwing things at petitioner, striking petitioner with a work boot, and throwing petitioner against a bathroom wall, all when petitioner was only four or five, (4) Billy often lost control when he was spanking petitioner and left bruises on petitioner, (5) Billy belittled petitioner for crying, called petitioner a baby (when petitioner was five or six years old), (6) petitioner was very hyper as a child, with a short attention span, (7) petitioner could, however remain calm and still when he wanted to do so, (8) petitioner worked with him in the Summer of 2001 laying carpet and petitioner did a good job, showed up for work daily, but his mind would occasionally drift while on the job, often struck petitioner with a belt buckle, (10) Billy had a lot of animosity focused toward petitioner, (11) he (Dino) used cocaine with Billy but he never saw Billy use drugs with petitioner or give alcohol to petitioner, and (12) Billy was not a good influence on petitioner. S.F. Trial, Volume 33, testimony of Dino Young, at pp. 256-73.

[99] Petitioner's step-sister testified (1) she lived with Carla and Quentin Sexton during her fourth, seventh, and eighth grade years, as well as during Summers, (2) she stopped visiting the Sexton home when she was sixteen and petitioner was fourteen, (3) Quentin Sexton was an alcoholic who drank a six pack a day and was mean and grouchy when he drank, (4) Quentin Sexton assaulted petitioner once by kicking petitioner while wearing steel-toed boots, (5)

Petitioner's trial counsel presented expert testimony from a psychologist (Dr. Daneen Milam) who opined, among other things, that petitioner (1) had mild brain damage, severe ADHD, and severe behavioral problems and (2) could not be "fixed" but could be "controlled" with proper medication and incarceration.[100]  More specifically, Dr. Milam testified (1) petitioner has a pretty high IQ, in the 85th-90th percentile, (2) there appears to be no structural damage to petitioner's brain, (3) petitioner has severe Attention Deficit Disorder, (4) petitioner became hyperactive after febrile seizures around age two, (5) petitioner also has ADHD and the attention span of a gnat, (6) petitioner's behavior, which was consistent with ADHD, was a source of problems throughout his

---

Quentin repeatedly kicked petitioner for yelling at her sister, (6) petitioner cried when Quentin kicked him, (7) Quentin played rough with petitioner, i.e., wrestling petitioner to the ground, when petitioner was only six or seven years old, (8) when petitioner told Quentin to stop, Quentin called petitioner names, (9) Carla and Quentin paddled petitioner with paddles and belts, (10) petitioner would scream and cry when paddled, (11) petitioner sporadically visited Billy Young during the Summers she lived in the Sexton home and petitioner often complained to her when he returned to the Sexton home about Billy Young being mean to him, (12) she often saw bruises on petitioner when he returned from visiting Billy Young, (13) petitioner is a kind, loving, person who is also smart, funny, and fun, (14) petitioner loves their family and has never been mean to her, and (15) petitioner has never been cruel to their family pets and is close to his younger half-sister. S.F. Trial, Volume 34, testimony of Brandy Sexton, at pp. 116-26.

The step-daughter of Quentin Sexton testified (1) she has known petitioner since he was three years old, (2) Quentin Sexton had a drinking problem as early as 1983-84 and it got worse over time, (3) petitioner was a likeable child, hyperactive but otherwise likeable, (4) Quentin and petitioner were not close, (5) Quentin's drinking got in the way of their relationship, (6) when petitioner was nine or ten, petitioner began coming over and visiting her home near the Sexton home by himself, (7) petitioner helped her by mowing and raking her yard, (8) petitioner was never aggressive or violent toward her, (9) she did witness petitioner having temper tantrums when he was seven or eight, (10) petitioner was never totally calm, always fidgety, (11) Quentin's drinking caused his and Carla's relationship to deteriorate, (12) petitioner was disadvantaged by his father, step-father, and medical problems, (13) there are two sides to petitioner, (14) petitioner always sought approval, and (15) she was unaware of petitioner's entire criminal record. S.F. Trial, Volume 34, testimony of Paula Pettingale, at pp. 127-41.

Petitioner's twelve-year-old half-sister testified (1) she loves petitioner and corresponds with him, (2) petitioner has never been cruel to her, (3) she has never seen him break the law, and (4) she had fun with him when he was out of TYC. S.F. Trial, Volume 34, testimony of Jessie Sexton, at pp. 153-59.  She asked the jury to spare petitioner's life. Id., at p. 158.

A friend of the Sexton family testified (1) she met petitioner when he was eight years old, (2) her son was a schoolmate of petitioner, who visited their home frequently, (3) petitioner was a polite, friendly, talkative, but fidgety, nervous, boy who had trouble getting to sleep the nights he slept over at her home, (4) she made sure petitioner took his medications when he stayed with her family, (5) petitioner was always well-behaved in their home, (6) when he got out of TYC, petitioner looked good and seemed really nice, and (7) she had never seen petitioner be mean or engage in inappropriate behavior. S.F. Trial, Volume 34, testimony of Betty Tolbert, at pp. 145-52.

[100] S.F. Trial, Volume 34, testimony of Daneen Milam, at pp. 20, 23-27, 31, 50-52, 61-64, 95-96, 103-08.

school years, (7) ADHD presents in a continuum of behaviors and petitioner's is "off the charts" in terms of severity, (8) petitioner's early childhood was characterized by (a) bouncing back and forth between his biological parents, (b) the fact his step-father never liked petitioner, (c) petitioner lived in a house in which he was not wanted, and (d) his house burned down, further disrupting his family life, (9) ADHD is genetic in origin and results in impulsiveness, i.e., poor impulse control, (10) in school, when he was allowed to run around and move about the classroom, petitioner's behavior was "pretty good," (11) petitioner's ADHD continued into first grade when Ritalin was prescribed but did nothing to improve petitioner's behavior, (12) petitioner did not respond well to stimulants, (13) petitioner's mother withdrew him from school over conflict with his teacher, (14) in second grade, petitioner was deemed at risk in math and writing, (15) when petitioner saw a psychologist, his mother noticed remarkable improvement, (16) in the third grade, however, petitioner once more fell below average academically, displayed poor judgment, impulsiveness, and disruptive behavior, (17) an EEG obtained at that time showed a slow left hemisphere consistent with petitioner's observed poor emotional modulation, (18) in the fourth grade, petitioner was labeled emotionally disturbed by a psychologist and family dysfunction was clearly present, (19) despite that diagnosis, no followup psychiatric evaluation was performed, (20) sending petitioner to live with his biological father in Wyoming at that time had a devastating effect on petitioner because Billy was not an appropriate parental figure, (21) in fifth grade, petitioner was sent to Triangle Pines from May to July, which was another disaster because there was no targeting of petitioner's behavior (i.e., petitioner was sent to that facility for displaying impulsiveness and lack of inhibition and he was discharged for exhibiting those same behaviors), (22) ADHD children need a structured environment but one in which they are allowed to move their bodies, i.e., run, hop, jump, skip, et cetera, (23)

petitioner performed well in a structured behavior improvement program in the Jefferson ISD, where he was escorted from classroom to classroom, (24) petitioner did terrible on the bus, however, because it was an unstructured environment, (25) at the Waco Center, petitioner's behavior was out of control (Adderrall likely made him more aggressive and he was punished for displaying that aggression), (26) petitioner's conviction for indecency with a child was, in her opinion, "a totally bogus event," i.e., it consisted of a physical assault not a sexual assault, (27) at the TYC, petitioner was diagnosed as needing much supervision yet he was placed in a dormitory setting, (28) petitioner was chemically dependent and should have received chemical dependency treatment while in the custody of the TYC, (29) petitioner did receive anger management treatment while at TYC but was kicked out of anger management class for fighting another student, (30) while at TYC, petitioner was diagnosed with chronic adjustment problems, being emotionally unstable, having a negative self-perception, and displaying general intolerance and hostility toward others, (31) TYC staff finally "got his meds straight" near the end of petitioner's stay at the TYC, (32) yet, on discharge, petitioner's documents were checked off indicating "no known medications needed," (33) petitioner's initial parole documents in March, 2001 indicated petitioner was to stay on his medications but similar documents issued in May, 2001 did not include this condition, (34) petitioner's TYC records record more than 200 disciplinary incidents but 148 of them were for relatively minor "disruptive acts," and (35) while petitioner had 26 assaults listed in his TYC records, some were relatively minor and almost all occurred prior to September, 2000 when petitioner's proper medication regimen was established.[101]  On cross-examination, she opined that (1) it was inappropriate for her to review the police reports regarding petitioner's capital offense, (2) she had not heard the trial testimony of Dr.

---

[101] S.F. Trial, Volume 34, testimony of Daneen Milam, at pp. 6-96.

Walker or Dr. Short but had read their reports, (3) petitioner has mild brain damage, severe ADHD, and severe behavioral problems, (4) while petitioner cannot be "fixed," he can be "controlled" with medication, and (5) only twelve "serious" or deadly assaults occurred in Texas prisons in the past ten years.[102]

Likewise, petitioner's trial counsel presented expert testimony from a psychiatrist and substance abuse adviser (Dr. Roy Mathew) who opined (1) there is a considerable degree of trial and error involved in prescribing psychotropic medications, (2) it can often take months to figure out the proper medications for a patient, (3) it is inappropriate to diagnose a fourteen year old with Anti-Social personality Disorder, (4) petitioner's primary condition is Attention Deficit Disorder which includes impulsiveness as a symptom, (5) petitioner also has severe ADHD, which is an involuntary brain disorder, (6) persons with ADHD have physical differences in their brains from other persons, (7) stimulants are used to treat ADHD because they stimulate the brain and eliminate the drive for adrenalin which causes the hyperactivity, (8) the symptoms of ADHD include the inability to focus, quickness to show extreme emotions, lack of impulse control, and hyperactivity, (9) there is a significant correlation between ADHD and drug abuse at an early age, (10) amphetamine abuse is particularly pernicious because it can produce psychosis similar to that seen in paranoid schizophrenia, (11) patients with paranoid schizophrenia experience too much Dopamine (a neural transmitter) in the mesolimbic tract, (12) methamphetamine abuse causes an increase in Dopamine in the same tract, (13) over time, methamphetamine abuse causes a syndrome identical to paranoid schizophrenia, (14) while petitioner did not advise this psychiatrist that he (petitioner) was high on methamphetamine during either of the murders, based upon petitioner's descriptions of his

---

[102] *Id.*, at pp. 97-110, 114-15.

methamphetamine abuse in the days leading up to the murders and petitioner's descriptions of his symptoms, he believed (a) petitioner was intoxicated and psychotic at the time of the first murder (Douglas) and (b) while not intoxicated at the time of the second murder (Petrey), petitioner was then withdrawing from methamphetamine, (15) petitioner's ADD is treatable with new medications, (16) petitioner's other conditions, i.e., petitioner's addiction and childhood trauma, can be treated with cognitive therapy, (17) prison (which he likened to life in a monastery) offers an opportunity for reflection and cognitive therapy, and (18) petitioner's ADD, family dysfunction, alcohol parents, chaotic and abusive childhood environment, and methamphetamine abuse all were factors in petitioner's offenses.[103]

On cross-examination, Dr. Mathew also testified (1) petitioner is quite bright, a "stand out" intellectually, (2) he had read the police reports from petitioner's offenses but not the witnesses statements, (3) criminal activity is high among those patients with ADD, (4) he had not observed Dr. Milam's testimony, (5) petitioner has a disease that is "crippling," (6) petitioner's childhood is a textbook example of ADD, (7) he does not believe petitioner is bi-polar, (8) petitioner refused to discuss either the Douglas murder or the Petrey murder with him, other than to deny having committed the Petrey murder, (9) petitioner did not claim to be high during either murder, (10) petitioner did explain to him how to manufacture methamphetamine from pseudoephedrine or ephedrine, (11) petitioner vividly described symptoms of methamphetamine intoxication and withdrawal, explaining that, for the ten days before Douglas' murder, petitioner doubled his

---

[103] S.F. Trial, Volume 34, testimony of Dr. Roy Mathew, at pp. 159-208, 239-42.

methamphetamine use and slept and ate very little, (12) in a structured environment with proper medications, petitioner should do well, and (13) not all kids with ADD turn into serial killers.[104]

Petitioner's trial counsel presented testimony from a pair of individuals who participated in volunteer ministry work at the Midland County Jail, both of whom described petitioner's participation in worship and Bible study and testified they had seen spiritual growth in petitioner.[105]

Petitioner's trial counsel concluded their case-in-chief by presenting testimony from four female employees at the TYC facility where petitioner had been housed (one teacher and three corrections officers) who described petitioner as cooperative, very bright, never violent toward them, and someone whose hyperactivity seemed to improve markedly toward the end of his stay at their facility.[106]

---

[104] Id., at pp. 209-39.

[105] S.F. Trial, Volume 34, testimony of Miguel B. Medina, at pp. 242-49; testimony of Isadora Nya, at pp. 250-58.

[106] More specifically, petitioner's former English teacher (1) described petitioner as "very bright," (2) explained her only problem with petitioner was keeping him seated because he liked to roam around the room, (3) described how she gave petitioner chores to that kept him busy, like sweeping and straightening books, (4) described petitioner as never violent in her presence, (5) testified petitioner improved "miraculously" toward the end of his stay in the TYC and became very focused, calmer, and happy, and (6) her nickname for petitioner was "Tigger" because he was always hyper and bouncing around. S.F. Trial, Volume 35, testimony of Rachel Polk, at pp. 24-29, 31. On cross-examination, she admitted she was unaware of petitioner's assaults on other TYC staff persons. Id., at pp. 29-31.
     A night shift TYC corrections officer testified (1) petitioner never gave her problems, (2) was easy to get up in the morning, (3) always volunteered to help her clean the dorms, (4) she never saw petitioner violent, (5) she did see petitioner extremely upset with a case worker on one occasion but petitioner was always willing to calm down and listen to her, (6) on one occasions, she witnessed petitioner fighting with another youth and when she approached, petitioner pushed her to the side so she would not be hurt, (7) petitioner later apologized for pushing her and denied any desire to harm her, (8) petitioner was very bright and earned his GED while at TYC, (9) she never had any problems with petitioner, and (10) she was unaware of petitioner having any problems with male TYC guards. S.F. Trial, Volume 35, testimony of Drucilla Hamilton Angel, at pp. 7-13, 22-31. On cross-examination, she admitted she was unaware of petitioner's assaults on other TYC staff persons. Id., at pp. 14-22, 24.
     Another female guard testified (1) initially, she had problems with petitioner because he was hyper, (2) petitioner read a lot and was very bright, (3) petitioner was polite toward her, (4) she never felt threatened by petitioner, and (5) knowing about petitioner's offenses did not change her belief in petitioner. S.F. Trial, Volume 35, testimony of Sherone Morris, at pp. 31-37.
     A third TYC guard described petitioner as a busy body who was never a problem for her, helped her clean restrooms, and whom she liked enough to call him "Her boy." S.F. Trial, Volume 35, testimony of Homeria McRea, at

3.     Prosecution's Rebuttal Evidence

The prosecution called a Senior Criminal Investigator (A.P. Merillat) for the Special Prosecution Unit in Huntsville who testified in pertinent part (1) under the TDCJ's then-recently adopted classification scheme, any new inmate with an aggravated sentence in excess of fifty years would get at least a G-3 classification status for at least ten years, (2) G-3 status would permit the inmate access to the chow hall and commissary, i.e., they would be in the general prison population, but the inmate could be moved to administrative segregation or high security housing if they engaged in misconduct, (3) the previous year, there were 130 drug cases prosecuted throughout the prison system, (4) drugs enter the prison system through guards, visitors, legal mail, and inmates who work outside the exterior walls picking up packages and bringing them into the unit, (5) psychotropic medications are routinely administered in Texas prisons, (6) while forced medication can be administered in administrative segregation and high security settings, medications are usually administered to the general prison population through a "pill line," in which medications are dispensed and consumed voluntarily, (7) the Texas Syndicate prison gang operates a black market in prescription medication within TDCJ units, (8) sometimes, new inmates are forced to fight to establish their rank or authority within the prison population, (9) inmates sometimes intentionally violate the rules in an effort to secure placement in a disciplinary cell for their own protection (this is known as "catching out"), (10) the previous year, almost two hundred weapons cases were prosecuted throughout the prison system, (11) weapons cases represent the most frequent offense for which TDCJ inmates are prosecuted and homemade weapons (ranging from simple shanks to sling

pp. 38-44.

shots and even a homemade explosive device) have been constructed from a wide variety of materials available to inmates, (12) Texas prisons are very noisy, even at night due to inmates shouting and banging on metal, (13) juries cannot dictate the manner in which a TDCJ inmate will be housed, (14) capital murderers sentenced to life imprisonment will receive at least a G-3 classification status and their status can be moved to G-4 or G-5 if such inmates misbehave, (15) he was uncertain whether a capital murderer sentenced to life imprisonment could receive a G-4 or G-5 classification status at initial diagnostic evaluation, (16) there were four murders in the TDCJ in 2001 and six in 2002, (17) G-3 inmates are not permitted to work outside the fences as trustees, (18) G-3 inmates do not stay in dormitories, (19) inmates housed at TDCJ hospital units can be restrained and forced to take medications, (20) inmates who fear they will be assaulted can request placement in protective custody but that is not a pleasant place and is similar to administrative segregation, (21) inmates are not placed in administrative segregation on a permanent basis unless the inmate's misbehavior continuously warrants same - most inmates will eventually leave administrative segregation if they behave, (22) inmates have escaped from administrative segregation, high security, and even death row in the TDCJ, (23) TDCJ statistics regarding escapes focus on incidents but he believes it is more efficacious to count the number of inmates who escape, as opposed to the incidents of escape, because a single escape may involve multiple inmates, and (24) between 1992 and 2002, approximately 140 TDCJ inmates escaped.[107]

The prosecution re-called petitioner's mother, who testified  (1) she was unaware of any abuse of petitioner in her house, (2) petitioner never complained to her about any abuse or neglect by his biological father while petitioner was in North Carolina except for an incident when petitioner

---

[107] S.F. Trial, Volume 35, testimony of A.P. Merillat, at pp. 55-130.

lived in Camp County in which Billy assaulted petitioner, (3) the photographs admitted into evidence as Defense Exhibit no. 25 did not fully convey the extent of the injuries petitioner suffered in that assault by Billy Young, (4) Quentin Sexton once broke a broom over petitioner's head and gave petitioner a scar on his ear, (5) Quentin quit drinking in November, 2000, and (6) petitioner did not act aggressively toward her or Quentin.[108]

The prosecution called a Midland neurologist (Dr. G. Herman Cirkovic) specializing in pediatric neuropsychiatry who testified (1) a qEEG is derived from a computer presenting data from an EEG in numerical form, (2) he had worked with both EEG's and qEEG's. (3) he was present for Dr. Proler's testimony and "totally disagreed" with Dr. Proler testimony that petitioner had an abnormal qEEG, (4) very few neurologists employ the qEEG, (5) in his view, the spikes identified by Dr. Proler were the products of the digital EEG technology and did not indicate a brain abnormality, (6) the slowing Dr. Proler noted was likely a function of drowsiness, (7) he did not observe any asymmetry between the left and right hemispheres of petitioner's brain, (8) he believed the other differences identified by Dr. Proler were the result of increased facial or head muscle activity not indications of brain activity, (9) most adult neurologists tend to "over read" pediatric EEG's, (10) there is a marked change in appearance of brain waves based on the maturation of the human brain, (11) the febrile convulsions petitioner suffered between ages 18 and 24 months are not uncommon in boys that age, were most likely related to temperature, and were most likely benign occurrences that did not cause any lasting after-effects, (12) he conducted tests on petitioner's non-verbal memory in which petitioner scored better than ninety-to-ninety-five percent of his patients, (13) during his examination, petitioner displayed very appropriate emotional content, (14) he found

---

[108] S.F. Trial, Volume 35, testimony of Carla Sexton, at pp. 130-41.

no neurological impairment and no neurological abnormalities in petitioner, (15) in his opinion, ADD is not a true diagnosis but merely a label to describe certain types of symptoms or conduct, i.e., a label for a category of behaviors, (16) he believed the proper diagnosis for petitioner was "mania," a condition he described as involving a variety of personality traits including tremendous impulsiveness, aggression, and anti-social behaviors, (17) he agreed with Dr. Milan that, while petitioner could not be "fixed," medications such as the Ritalin, Depakote, and Clonidine cocktail petitioner received during his last months at the TYC could help treat some of petitioner's symptoms, (18) petitioner is extremely intelligent and has displayed escalating negative behavior, (19) in his opinion, petitioner will not respond well to being housed in a loud, noisy, aggressive environment such as the TDCJ, (20) petitioner suffers from two components of ADHD, i.e., mania and conduct disorder, and is extremely dangerous, and (21) while petitioner's "mania" can be treated pharmacologically, petitioner's conduct disorder cannot be treated with medications.[109]

### 4.   Defense's Rebuttal Evidence

Petitioner's trial counsel recalled Dr. Mathew, who testified (1) in his opinion, Dr. Cirkovic was not qualified to make a psychiatric diagnosis of petitioner, (2) the Diagnostic and Statistical Manual - IV, which he helped develop, was recognized by the World Health Organization and International Classification of Diseases, and recognized ADHD as a proper diagnosis, (3) while Dr. Cirkovic was correct that ADHD is a syndrome characterized by multiple symptoms, many recognized diseases are defined by the presence of multiple symptoms (despite the absence of a clear understanding of the causes for those symptoms), (4) ADHD is the proper diagnosis for petitioner and is a treatable condition, (5) the proper treatment for ADHD is the use of stimulants, (6) caution

---

[109] S.F. Trial, Volume 35, testimony of G. Herman Cirkovic, at pp. 141-201.

is appropriate in treating petitioner with stimulants because petitioner has a history of stimulant abuse, (7) every human being is capable of change, (8) there are new medications available that may help change personalities, such as Lithium, Depakote, and anti-psychotics, and (9) he sees no evidence petitioner is a serial killer.[110]

Petitioner's trial counsel also called a child psychologist who served on the faculty of the Harvard Medical School who testified in pertinent part (1) the three core features of ADHD are inattention, poor impulse control, and hyperactivity, (2) about sixty-five percent of children diagnosed with ADHD later are diagnosed with oppositional defiant disorder and about a third of children diagnosed with ADHD are later diagnosed with conduct disorder, (3) the most effective treatment for ADHD is stimulants including Adderrall, Ritalin, Dexedrine, and now Concerta, (4) stimulants do not always work, however, (5) hyperactivity and poor impulse control can be treated with medications, (6) petitioner is the poster child for ADHD, (7) petitioner appeared to have been a stimulant non-responder who was treated with virtually every stimulant known to mankind with very limited effectiveness, (8) it should have been possible to determine whether petitioner was a stimulant non-responder within six months, (9) Clonidine is atypically used but can be prescribed when stimulants fail to work, (10) Wellbutrin (an antidepressant) can also be used for non-responders, (11) in patients who are stimulant non-responders, mood elevators such as Lithium, Depakote, and Tegretol are used, (12) petitioner was exceedingly hyperactive and exceedingly impulsive and inattentive, (13) none of the pre-adolescent treatments tried with petitioner worked, (14) a consequence-based treatment program in which misbehavior is punished is a treatment option for ADHD children, (15) some children are consequence non-responders, however, (16) in such

---

[110] S.F. Trial, Volume 35, testimony of Roy Mathew, at pp. 202-15.

children a more cognitive-based program (designed to teach cognitive skills and emphasizing consideration of options) is recommended, (17) petitioner is very bright, (18) petitioner was kicked out of the Triangle Pines consequence-based program after less than three months for engaging in the same behavior that led to his placement there, (19) petitioner made no progress during the approximately 100 days he stayed at the Waco Center, where the medications and consequence-based program did nothing for petitioner, (20) the treatment petitioner received at TYC resulted in a dramatic reduction in petitioner's hyperactivity, poor impulse control, and noncompliance, (21) petitioner's ADHD and his conduct disorder are both highly treatable with the same medications petitioner received at the TYC, (22) ADHD children are manipulative but good manipulation requires planning and most ADHD kids lack foresight, and (23) petitioner did not respond well to consequence-based programs and he cannot give a prognosis for petitioner within the TDCJ.[111]

    5.    <u>Prosecution's Sur-Rebuttal</u>

The prosecution called Samuel Petrey's widow to testified regarding the negative impact on herself and her family of their loss of her husband and to request imposition of the death penalty.[112]

    6.    <u>The Jury's Deliberations and Punishment Phase Verdict</u>

On April 10, 2003, after both parties rested and closed, the jury heard the trial court's punishment phase jury instructions, listened to counsel for both parties make their closing arguments, and retired to begin its deliberations around 12:15 p.m.[113]

---

[111] S.F. Trial, Volume 36, testimony of Ross Greene, at pp. 5-63.

[112] S.F. Trial, Volume 36, testimony of Lana Petrey, at pp. 66-70.

[113] S.F. Trial, Volume 36, at pp. 70-71, 87-134.

Later that afternoon, the jury sent out a note requesting clarification on the second capital sentencing special issue.[114]  The trial judge crafted a written response to the jury's question and, over objections by petitioner's trial counsel, informed the jury as follows:

> "Members of the jury.  Paragraph 1 of the indictment charged capital murder by the death of two individuals pursuant to the same scheme or course of conduct. Paragraph 2 of the indictment charged capital murder by the death of an individual during the course of kidnaping and robbery.  If your consideration of Issue Number 2 on punishment is as to Paragraph 1 of the indictment, the death of two individuals is required to be found by the jury.  If your consideration is as to the second paragraph of the indictment, the death of an individual, Samuel Petrey, is required."[115]

The jury's deliberations continued until approximately seven p.m., when the jury was sequestered at a nearby hotel for the evening.[116]

The following day, April 11, 2003, the jury continued its deliberations and, around nine thirty a.m., sent out a second note inquiring about documentary evidence in the record regarding petitioner's medications while an inmate at the Midland County Jail.[117]  With no objection from either party, the trial court sent back an instruction reading "Members of the jury, the documents before you are the only documentary exhibits in evidence."[118]

At approximately 2:21 p.m., the trial court held a brief hearing in which one of petitioner's trial counsel testified he had observed (1) the Midland County Sheriff accompanying several other

---

[114] More specifically, the jury's note read "Regarding Issue Number 2 cause of death of deceased individuals. Question: Do you have to believe both or at least one?" S.F. Trial, Volume 36, at p. 135.

[115] S.F. Trial, Volume 36, at pp. 135-38.

[116] S.F. Trial, Volume 36, at pp. 134-39.

[117] Specifically, the jury's second note read "We find no record of his current medication for ADHD during his stay in Midland County.  Is this in the record or are we just not finding it." S.F. Trial, Volume 37, at p. 5.

[118] S.F. Trial, Volume 37, at p. 5.

law enforcement personnel as they escorted jurors to a restaurant a short distance from the courthouse during the jury's lunch break that date and (2) the Sheriff appeared to be conversing with one or more jurors.[119]   The Midland County Sheriff testified (1) he accompanied the jury, along with five other law enforcement officers, to a nearby restaurant as additional security at lunch and (2) while he did converse with jurors, those conversations were unrelated to the trial.[120]   The Bailiff responsible for the jury testified (1) the jury foreman said he would like to talk with the Sheriff once the trial was over but (2) he heard no conversation regarding the case between the jurors and the officers who accompanied them to lunch.[121]

At approximately 3:24 p.m., the jury returned its verdict, finding (1) beyond a reasonable doubt there was a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society, (2) beyond a reasonable doubt the defendant, himself, actually caused the death of the deceased individuals or did not himself actually cause the death of the deceased individuals but intended to kill the deceased individuals or anticipated that human life would be taken, and (3) taking into consideration all of the evidence, including the circumstances of the offense, the circumstances of the defendant, and the defendant's character, background, and personal moral culpability, there was insufficient mitigating circumstance or were insufficient mitigating circumstances to warrant a sentence if life imprisonment, rather than a death sentence, be imposed.[122]

---

[119] S.F. Trial, Volume 37, testimony of Rodion Cantacuzene, at pp. 6-13.

[120] S.F. Trial, Volume 37, testimony of Gary Painter, at pp. 14-20.

[121] S.F. Trial, Volume 36. Testimony of Ronnie Bearden, at pp. 20-25.

[122] S.F. Trial, Volume 37, at pp. 27-28; Trial Transcript, Volume 5 of 5, at pp. 860-63.

E.      Motion for New Trial

On May 9, 2003, petitioner filed a motion for new trial in which he argued (1) the Midland County Sheriff improperly fraternized with members of the jury during deliberations in violation of state statute, (2) the evidence introduced at the guilt-innocence phase of trial was legally and factually insufficient to support the jury's guilty verdicts, (3) there was legally and factually insufficient evidence to support the jury's answers to the capital sentencing special issues at the punishment phase of trial, and (4) petitioner's trial counsel rendered ineffective assistance by (a) having defense counsel Paul Williams cross-examine prosecution witness David Page, rather than co-counsel Cantacuzene, (b) failing to call witnesses who could testify Page admitted he shot Petrey, (c) failing to obtain and introduce records showing Page had a bad record in jail, (d) failing to call Daniel Gilbert and Amanda Williams to testify regarding statements made to them by Page, (e) failing to impeach prosecution witnesses who had prior convictions or gang affiliations, (f) failing to request a change of venue, (g) failing to subpoena Billy Young and Quentin Sexton and call them to testify regarding their abuse of petitioner, (h) failing to introduce evidence showing petitioner had been denied psychotropic medication while in the Midland County Jail, (i) failing to object (as an improper comment on petitioner's failure to testify) to the prosecution's closing argument at the punishment phase of trial claiming petitioner had never shown remorse for his crimes, and (j) failing to strike venire member Haydee Guerrero.[123]

The trial court held an evidentiary hearing on petitioner's motion for new trial on June 19-20, 2003, and heard testimony establishing (1) the Midland County Attorney's office received a telephone threat from an unidentified female voice on April 7, 2003 stating "Young was going out

---

[123] Trial Transcript, Volume 5 of 5, at pp. 901-09.

with a bang,"[124] (2) a subsequent investigation revealed the telephone threat was placed from a public telephone located about six blocks from the Midland County courthouse,[125] (3) Midland County Sheriff Gary Painter and courthouse security officers were informed of the telephone call and took actions to increase security inside the courtroom where petitioner's case was being tried,[126] (4) Sheriff Painter was unavailable to accompany the jury when it left the courthouse for lunch on April 10 but accompanied the jury when it left the courthouse for lunch on April 11,[127] (5) Sheriff Painter accompanied the jury because he was concerned about security in light of the telephone threat, the jury's potential exposure while away from the courthouse, and the high visibility of the petitioner's trial,[128] (6) as the jury was leaving the courthouse to walk to a nearby restaurant on April 11, jury foreman James Bobo approached Sheriff Painter and stated that he wished to talk with the Sheriff after the trial was "completely over,"[129] (7) Sheriff Painter replied he would be happy to talk with

---

[124] S.F. Trial, Volume 38, testimony of Cheryl Becker, at pp. 11-23. The administrative assistant who received the telephone threat testified she immediately informed courthouse security officers, her supervisor, and an investigator for the County District Attorney's office. *Id.*, at pp. 17-21.

[125] S.F. Trial, Volume 38, testimony of Benny Matlock, at pp. 28-32. Lieutenant Matlock, who served as Supervisor of Courthouse Security, also testified (1) he informed the Sheriff, his chain of command, as well as the Criminal Investigation Division about the threat, (2) thereafter Deputy Glenn Wells and Ronnie Bearden (Bailiff of the 238th District Court) furnished additional security, (3) once the jury was sequestered on April 10, the Sheriff personally assisted in escorting the jury to the hotel near the courthouse where the jury spent the lone night they were sequestered, (4) Matlock and the Sheriff are always present for the return of the verdict in high profile trials, and (5) Matlock and the Sheriff were both invited to go with the jury to lunch on April 11 but, when he learned the Sheriff was going, Matlock went to lunch with his wife instead. *Id.*, at pp. 23-70.

[126] S.F. Trial, Volume 38, testimony of Cheryl Becker, at pp. 17-21; testimony of Benny Matlock, at pp. 28-32; testimony of Ronnie Bearden, at pp. 79-87, 100-02; testimony of Gary Painter, at pp. 125, 128-33, 144-47.
     Sheriff Painter testified he assigned an additional deputy, Glenn Wells, to the courtroom and instructed courthouse security chief Matlock and courtroom bailiff Bearden to make sure additional security personnel were in the courtroom. *Id.*, testimony of Gary Painter, at pp. 130-32, 147.

[127] S.F. Trial, Volume 38, testimony of Gary Painter, at pp. 137-40, 146-47, 160, 168-69,

[128] *Id.*, at pp. 128-33, 136-40, 147-51, 156-59, 168-69.

[129] *Id.*, at pp. 134-35, 171-74.

Mr. Bobo,[130] (8) the Sheriff spoke with the male members of the jury during lunch about their service records but nothing was said by anyone regarding the trial,[131] (9) after the trial concluded and the jury was excused, Mr. Bobo informed Sheriff Painter the jury wanted the Sheriff to examine the trial testimony of Sheriff's Deputy Paul Hallmark,[132] (10) petitioner's lead trial counsel (Paul Williams) made the decision that he would cross-examine prosecution witness David Page,[133] (13) most of the witnesses identified by petitioner as potential sources of testimony that Page admitted shooting Petrey would also have testified Page admitted to shooting Petrey once *after* petitioner had already done so,[134] (14) petitioner's trial counsel did call one witness (Christopher McElwee) who testified

---

[130] S.F. Trial, Volume 38, testimony of Ronnie Bearden, at pp. 88-89.

[131] S.F. Trial, Volume 38, testimony of Gary Painter, at pp. 137-40, 145-46, 153-54.

[132] *Id.*, at pp. 135, 153-54, 171-74.
Sheriff Painter also testified (1) he routinely attends trials to supplement the regular bailiff in emotionally charged cases, especially during closing arguments and when the verdict is returned, (2) he began attending petitioner's trial during closing arguments at the guilt-innocence phase of trial and continued attending thereafter, (3) no one from his office testified during the punishment phase of petitioner's trial, (4) his presence in the courtroom and on the jury's trip to the restaurant April 11 was to supplement security, and (5) he did not discuss his presence in the courtroom or on the trip to the restaurant with the trial judge or bailiff because he believed they understood the reason for his presence (at six feet five inches and approximately two hundred fifty pounds) was for security. *Id.*, at pp. 128-29, 147-51, 156-59, 168-69.

[133] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at p. 198; Volume 39, testimony of Paul Williams, at pp. 13-14, 26-27, 30-31.
While attorney Cantacuzene testified that attorney Williams was unable to "get under the skin" of Page on cross-examination, petitioner identified no areas of potential questions attorney Williams failed to explore on cross-examination with Page that petitioner claimed would have produced any identified exculpatory or mitigating evidence.

[134] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 256-82; Volume 39, testimony of Paul Williams, at pp. 57-60, 62.
More specifically, attorney Cantacuzene testified without contradiction at the hearing on petitioner's motion for new trial (1) the defense team was concerned about putting TDCJ inmate Christopher McElwee on the stand because he was scary looking but did so anyway because he was the only witness they found who indicated Page alone had shot Petrey, (2) the defense team was concerned about Richard Corser because of his membership in gangs, Corser's many prior convictions, Corser did not appear credible to them, and Corser would have testified both petitioner and Page shot Petrey, (3) they had trouble getting Johnny Ray Robinson to do more than speculate about what Page meant by various veiled comments, (4) Page apparently never told Robinson that Page shot Petrey and Robinson had several recent convictions, (5) when defense investigator Marugg interviewed Robinson, he appeared evasive and unclear on exactly what Page had told him, (6) Tedrick Earl Jenkins told them petitioner shot Petrey first and then Page did so, (7) Jenkins would have implicated petitioner in Petrey's murder, (8) Ramsey Mitchell would have testified Page said he shot Petrey

Page obliquely suggested he had shot Petrey,[135] (15) given the length and breadth of Page's cross-examination and the defense team's desire to focus on Page's inconsistent prior statements, little additional value would have resulted from attempting to impeach Page based upon his allegedly poor disciplinary record in jail when Page's alleged misconduct had not resulted in a criminal conviction,[136] (16) petitioner's trial counsels' investigator was unable to locate either Daniel Gilbert or Amanda Williams,[137] (17) the prior convictions petitioner urged should be used to impeach some prosecution witnesses were too old to be available for that purpose,[138] (18) petitioner's trial counsel had strategic reasons for wishing to get some of those same prosecution witness off the stand as quickly as possible,[139] (19) petitioner's trial counsel had strategic reasons for choosing to try

---

once but only because petitioner had forced him to do so and that Page believed he had talked petitioner out of shooting Petrey but petitioner later shot Petrey and then put the gun on Page, (9) petitioner never told Cantacuzene about Mitchell Edward McClure, (10) Cantacuzene had never heard of Raynaldo Ray Villa, and (11) the defense's strategy was to attempt to show that petitioner had not shot Petrey but most of the potential fact witnesses identified by petitioner would have testified that Page told them petitioner did shoot Petrey at least once. S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 256-82. Attorney Paul Williams corroborated Cantacuzene's testimony regarding the information the defense team learned during interviews with the witnesses identified by petitioner. S.F. Trial, Volume 39, testimony of Paul Williams, at pp. 54, 57-60, 62.

[135] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 256-59; Volume 39, testimony of Paul Williams, at pp. 57-59.

McElwee's trial testimony appears at S.F. Trial, Volume 27, testimony of Christopher McElwee, at pp. 271-83.

[136] Attorney Cantacuzene testified that Page did not have a prior criminal record that subjected him to cross-examination. S.F. trial, Volume 38, testimony of Ian Cantacuzene, at pp. 195-96. Attorney Williams testified (1) an incident in which Page allegedly struck a jail guard with a cup could not be used to impeach Page under Texas evidentiary rules because it had not resulted in a criminal conviction, (2) Page's multiple written statements to law enforcement officers contained many inconsistencies and internal contradictions which offered a more legitimate basis for cross-examination, and (3) he focused on those matters during his extensive cross-examination of Page. S.F. Trial, Volume 39, testimony of Paul Williams, at pp. 25-31, 55.

[137] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 249-50; Volume 39, testimony of Paul Williams, at pp. 53-54.

[138] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 239-48.

[139] Id.

petitioner's case in Midland County and not filing a motion for change of venue,[140] (20) petitioner's trial counsel determined that neither Billy Young nor Quentin Sexton would offer any helpful testimony if called to testify at the punishment phase of petitioner's capital murder trial,[141] (21) introducing evidence showing petitioner had been denied any psychotropic medications during his stay at the Midland County Jail would have undermined the defense's strategy of showing petitioner was the poster child for ADHD and unable to function sans such medications,[142] (22) petitioner's trial counsel considered it error for him not to object to the prosecution's closing punishment phase argument regarding the lack of evidence of remorse in the trial record,[143] and (23) petitioner's trial counsel had strategic reasons for not using one of their peremptory strikes against venire member

---

[140] Attorney Cantacuzene testified (1) the amount of pretrial publicity in Midland concerning petitioner's case was similar to the level of pretrial publicity in two previous capital murder cases in which he had been involved, both of which included denials of motions for change of venue, (2) he personally liked Midland County juries because, historically, Midland County had sent very few criminal defendants to death row, (3) the resources of petitioner's defense team were based in Midland County, and (4) he believed it was advantageous to try petitioner in a location where the defense team was familiar with the community from which the jury would be drawn. S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 203, 229-30. Attorney Williams testified (1) there was remarkably little pretrial publicity about petitioner's case and (2) because Midland County had a history of not executing criminal defendants, he believed it would be a favorable venue for petitioner's capital murder trial. S.F. Trial, Volume 39, testimony of Paul Williams, at pp. 45-46.

[141] Attorney Cantacuzene testified without contradiction at the hearing on petitioner's motion for new trial (1) confronting Billy Young at trial might have been cathartic for petitioner but it would have proved harmful because, based on pretrial interviews, Billy Young would have denied he abused petitioner, (2) Quentin Sexton would have testified he was a great step-father, which also would not have been helpful to the defense, and (3) he believed it was a better trial strategy to call witnesses who would testify Billy Young and Quentin Sexton had abused petitioner. S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 206-09, 231-35. Attorney Williams testified after interviewing both Billy Young and Quentin Sexton, the defense team believed both of them would give testimony harmful to the defense, i.e., testimony that would have contradicted other defense witnesses concerning the fact both these men were abusive alcoholics. S.F. Trial, Volume 39, testimony of Paul Williams, at pp. 42-45.

[142] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 212-13; Volume 39, testimony of Paul Williams, at pp. 32-34, 62-64.

[143] S.F. Trial, Volume 39, testimony of Paul Williams, at p. 38.

Haydee Guerrero (specifically they needed to maintain their strikes to eliminate other, far less desirable, potential jurors).[144]

The state trial court denied petitioner's motion for new trial, finding among other things (1) the telephone threat justified enhanced security on April 7, 2003 and thereafter, (2) the Sheriff's conduct vis-a-vis the jury did not constitute an undue influence on the jury and did not subvert petitioner's rights, (3) petitioner acquiesced in the decision by his trial counsel not to strike venire member Guerrero, (4) there was no evidence suggesting the outcome of either phase of petitioner's trial would have been different had other fact witnesses been called to testify, (5) the decision not to move for a change of venue was reasonably based upon petitioner's trial counsels' knowledge of the facts and their experience, (6) the decision to have attorney Williams cross-examine Page was a tactical decision, and (7) nothing petitioner's trial counsel did or failed to do would have made any difference in the outcome of either phase of petitioner's trial.[145]

F.     Direct Appeal

Petitioner appealed his conviction and sentence, asserting thirty-four points of error on direct appeal.[146]  In an unpublished opinion issued September 28, 2005, the Texas Court of Criminal

---

[144] Attorney Cantacuzene testified (1) venire member Haydee Guerrero had trouble with English during voir dire but when a challenge for cause was made against her, the trial court denied same, (2) the decision not to strike her was based upon her views on the death penalty and the views of those venire members who followed her, (3) the defense team would have struck her if petitioner had insisted, but (4) eventually petitioner acquiesced in the defense team's decision not to strike her. S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 190-95, 237-38.  Attorney Williams testified defense counsel chose not to strike Haydee Guerrero because (1) the five or six venire members who followed her "we thought were just awful for the defense" and (2) the defense team did not want to exhaust their peremptory challenges before they reached the "murderer's row" of venire members. S.F. Trial, Volume 39, testimony of Paul Williams, at p. 41.

[145] S.F. Trial, Volume 39, at pp. 100-04.

[146] As points of error on direct appeal, petitioner's appellate brief argued (1) the trial court's supplemental jury instruction at the punishment phase of trial regarding special issue no. 2 (a) improperly coerced the jury, (b) allowed an affirmative answer without requiring jury unanimity, (c) constituted an impermissible comment on the weight of the

67

Appeals affirmed petitioner's conviction and sentence. *Young v. State*, AP-74,643, 2005 WL 2374669 (Tex. Crim. App. 2005), The United States Supreme Court denied petitioner's petition for writ of certiorari on April 3, 2006. *Young v. Texas*, 547 U.S. 1056, 126 S.Ct. 1652, 164 L.Ed.2d 398 (2006).

G.   First (and Second) State Habeas Corpus Proceedings

On April 22, 2005, petitioner filed his first state habeas corpus application, asserting fourteen claims for relief consisting of arguments that (1) the state trial court's assessment of court costs against petitioner violated various constitutional provisions, (2) the Texas Court of Criminal Appeals' refusal to engage in an evidentiary sufficiency review of the jury's answer to the mitigation special issue violated due process and Eighth Amendment principles, (3) because substantial evidence exists that petitioner did not personally cause Petrey's death or anticipate that Petrey's life

---

evidence, and (d) precluded the jury from considering mitigating evidence, (2) the jury improperly fraternized with the Sheriff during deliberations, (3) the Texas statutory scheme authorizing prosecutorial discretion in determining which murders to charge as capital murders violates due process considerations, (4) petitioner's jury had no vehicle through which to give effect to petitioner's mitigating evidence, such as his evidence he suffers from ADHD, (5) the trial court erred in denying petitioner's motion to quash the indictment based upon the failure of the indictment to allege facts supporting answers favorable to the prosecution on the Texas capital sentencing special issues, (6) the third special issue did not comport with the Supreme Court's holding in *Apprendi*, (7) there was legally and factually insufficient evidence showing a capital murder committed through multiple murders committed during the course of the same scheme or course of conduct, (8) there was legally and factually insufficient evidence showing capital murder in the course of a robbery, (9) there was legally and factually insufficient evidence to support the jury's affirmative answer to the second Special Issue regarding the petitioner's personal commission of the murders or his knowledge that a human life would be taken, (10) there was legally and factually insufficient evidence to support the jury's negative answer to the final capital sentencing Special Issue, i.e., the mitigation special issue, (11) the trial court erred when it denied petitioner's request to include a definition of "reasonable doubt" in the punishment phase jury charge, (12) the trial court erred in failing to define various terms employed in the capital sentencing special issues, including "probability," "continuing threat to society," "criminal acts of violence," (13) the trial court erred in denying petitioner's request for a definition of "probability" as "more likely than not," (14) the trial court erred in failing to instruct the jury regarding the burden of proof on the final special issue, i.e., the mitigation special issue, (15) the Texas capital sentencing statute unconstitutionally prohibits the trial court and parties from informing the jury regarding the effect of a single holdout juror at the punishment phase of trial, (16) the final capital sentencing special issue impermissibly places the burden of proof on the defense, (17) the Texas twelve/ten rule violates the Eighth and Fourteenth Amendments, (18) the trial court erred when it excluded petitioner's proffered testimony that Page flunked a polygraph examination, (19) the Texas capital sentencing statute is unconstitutional insofar as it permits application of the death penalty to persons younger than twenty-one years of age, and (20) the Texas Code of criminal procedure permits challenges for cause which violate the First Amendment. Attorney J.K. Rusty Wall filed petitioner's appellate brief.

would be taken, petitioner's execution would violate the Eighth Amendment, (4) petitioner's execution is prohibited under the Eighth Amendment by virtue of petitioner's age and lack of maturity, (5) petitioner's trial counsel rendered ineffective assistance by (a) failing to discover and present evidence showing petitioner had been sexually abused as a child and (b) failing to seek the exclusion of hearsay information contained within petitioner's TYC records admitted into evidence as State Exhibit no. 147, (6) in light of new evidence showing petitioner was sexually abused as a child, petitioner's conviction and sentence violate due process principles, and (7) the prosecution engaged in misconduct and interfered with the ability of petitioner's trial counsel to render effective assistance when it (a) interfered with the defense's ability to interview witnesses (by intimidating and threatening fact witnesses to discourage them from communicating with the defense team) and (b) challenged the legal ability of petitioner's mitigation expert to perform investigatory services.[147]

On January 17, 2006, petitioner's new state habeas counsel filed a pleading styled "Additional Ground and Memorandum Showing Entitlement to Relief Due to Ineffective Assistance of Counsel," wherein petitioner set forth a fifteenth claim, to wit, an argument that his trial counsel rendered ineffective assistance by failing to object to the trial court's supplemental jury instruction regarding the second capital sentencing Special Issue on the grounds that (1) it was a comment on the weight of the evidence, (2) it permitted the jury to answer the second Special Issue affirmatively

---

[147] Transcript of pleadings, motions, and other documents filed in petitioner's initial state habeas corpus proceeding (henceforth "First State Habeas Transcript"), Volume 1, at pp. 1-162. The First State Habeas Transcript from petitioner's initial state habeas corpus proceeding consists of seven volumes with pages numbered sequentially 1 through 1143. Petitioner's first state habeas corpus application was filed by attorney Gary Taylor, who was appointed to represent petitioner on April 16, 2003. First State Habeas Transcript, Volume 3, at pp. 346-47. On July 11, 2005, attorney Taylor filed a motion to withdraw as counsel of record for petitioner, citing a job offer he had received in Nevada. First State Habeas Transcript, Volume 3, at pp. 359-64. In an Order issued August 8, 2005, the trial court granted attorney Taylor's motion to withdraw and appointed attorney Ori White as petitioner's new counsel of record. First State Habeas Transcript, Volume 3, at p. 365.

without requiring jury unanimity, and (3) the supplemental instruction prevented the jury from considering circumstances of the offense favorable to petitioner as mitigating evidence.[148]

On March 1-2, 2006, the state trial court held two days of evidentiary hearing in petitioner's first state habeas corpus proceeding.[149]

On March 9, 2006, after the state trial court had held two full days of evidentiary hearings in petitioner's first state habeas corpus proceeding, petitioner's new state habeas counsel filed a document styled "Summary of Applicant's Pro Se Complaints," in which he summarized a variety of pro se documents submitted by petitioner to the state trial court in which petitioner urged a variety of additional claims for state habeas corpus relief, as well as assorted requests for additional testing of various items of physical evidence.[150]

---

[148] First State Habeas Transcript, Volume 5, at pp. 674-710.

[149] The verbatim transcription of the proceedings held March 1 and March 2, 2006 in petitioner's first state habeas corpus proceeding are found in a Volume marked "Second Supplemental Reporter's Record," in Volume 2 of 7 and Volume 3 of 7, respectively. For ease of reference, this Court will henceforth refer to the verbatim transcription of the proceedings from petitioner's evidentiary hearing in his first state habeas corpus proceeding as "S.F. First State Habeas Hearing,"

[150] First State Habeas Transcript, Volume 5, at pp. 759-63.
    More specifically, the document in question asserted pro se claims that (1) petitioner's trial counsel rendered ineffective assistance by (a) failing to admit "additional reports that pertained to the ballistic reports and autopsy reports which challenged the state's theory" [nothing in the document in question identified the reports in question with any reasonable degree of specificity], (b) failing "to have tests conducted on the car of victim Doyle Douglas which would have provided exculpatory evidence" [nothing in the document purported toidentify the tests petitioner claimed to be necessary or what exculpatory evidence would have been produced by such tests], (c) failing to object to the admission of petitioner's County jail records because unidentified false information was included therein [nothing in the document identified any allegedly false information allegedly contained in the records in question which were themselves never specifically identified], (d) failing to investigate and present evidence showing that prosecution witness Page conspired with other prosecution witness through a "mutual friend" [nothing in the document identified the "mutual friend" nor offered any specific facts showing any alleged conspiracy ever took place], (e) failing to request a mistrial when it was determined a relative of Petrey had been selected to serve as an alternate juror, (f) failing to question Deborah Sanders about a conversation she had with Carla Sexton regarding a conversation Sexton allegedly heard between Mark Ray and Patrick Brook in which Ray allegedly admitted he had shot Douglas, (g) failing to exercise a peremptory strike against venire member Haydee Guerrero, (h) failing to use a report written by prosecution witness Jacqueline Timmons to impeach Timmons, (i) failing to object to the prosecution's closing arguments at the punishment phase of trial suggesting petitioner had confessed to "the murder to a defense witness" and never expressed remorse, and (j) failing to introduce evidence during the guilt-innocence phase of trial showing petitioner suffered from ADHD which precluded petitioner from anticipating another defendant's actions, (2) the prosecution engaged in misconduct consisting of (a) failing to

On March 9 and March 10, 2006 the state trial court continued to receive testimony and other evidence in petitioner's first state habeas corpus proceeding, by the conclusion of which hearing it had heard testimony from (1) petitioner's state appellate counsel (attorney J.K. Rusty Wall),[151] (2) petitioner's mother (Carla Sexton),[152] (3) petitioner's mitigation expert (Gerald Byington),[153] (4)

---

tender a written report by Jacqueline Timmons to defense counsel which would have impeached Timmons' trial testimony, (b) arguing at the punishment phase of trial that petitioner had confessed to "the murder to a defense witness," (c) having District Attorney Rick Berry and prosecution witness Mark Ray give victim impact testimony, and (d) arguing at the punishment phase of trial that petitioner had not expressed remorse, (3) petitioner's trial counsel rendered ineffective assistance by failing to "introduce David Page as a defendant in the guilt innocence jury instructions pertaining to the murder of Doyle Douglas, (4) the trial court erred in failing to "introduce David Page as a defendant in the guilt innocence jury instructions pertaining to the murder of Doyle Douglas, (5) certain unidentified items had not been located or tested in an unspecified manner, (6) petitioner had received a letter from an unidentified prison inmate indicating that an unidentified co-defendant had confessed to one of the murders, (7) a District Attorney investigator told David Page to lie about whether Page had shot Petrey, (8) the ballistic report prepared by prosecution witness Tim Counce contains unidentified exculpatory evidence, and (9) the prosecution did not turn over the defense counsel a letter sent to petitioner by another, unidentified, Midland County Jail inmate suggesting a co-defendant had bragged about committing one of the murders.

[151] Attorney Wall testified in pertinent part (1) petitioner's trial counsel made an extensive, very comprehensive, objection to the trial court's supplemental jury instruction regarding the second Special Issue and attempted to federalize that objection, (2) petitioner's punishment phase jury charge was complicated by the application of the Texas law of parties and the existence of multiple victims, (3) petitioner's trial counsel appeared to have conducted a thorough investigation of the case against petitioner and petitioner's background in preparation for trial, (4) petitioner never informed him that petitioner had ever been sexually molested, (5) he (attorney Wall) assisted petitioner's trial counsel at trial with regard to the jury charge, and (6) the trial court appointed numerous experts who assisted the defense team before and during trial. S.F. First State Habeas Hearing, Volume 2 of 7, testimony of J.K. Rusty Wall, at pp. 11-48.

[152] Petitioner's mother testified in pertinent part (1) the first time she ever heard that petitioner had been sexually molested was after petitioner had been sent to death row, (2) she had never seen any indication petitioner was sexually molested, (3) petitioner's father was abusive toward her and his children and beat petitioner, (4) on one occasion, petitioner's father beat petitioner so badly petitioner was left with bruises on his neck and upper torso, (5) petitioner's father only paid child support when forced to do so, (6) petitioner's defense team asked her about physical abuse of petitioner and she discussed the case thoroughly with petitioner's trial counsel and mitigation specialist Gerald Byington, (7) she informed them both petitioner's biological father Billy Young and petitioner's step-father Quentin Sexton had physically abused petitioner, (8) Billy Young did not abuse drugs or alcohol during their brief marriage but did so later, (9) she had not heard anything prior to petitioner's trial about Billy Young sexually abusing petitioner and first heard about same after petitioner went to death row, (10) during the months that petitioner stayed with his biological father in North Carolina, she received a telephone call from law enforcement authorities inquiring about petitioner's relationship with an adult male other than Billy Young, (11) no one at Triangle Pines of the Waco Center who evaluated petitioner ever informed her the petitioner had been sexually abused by anyone, and (12) she had only recently heard allegations that Dano Young had been sexually molested. S.F. First State Habeas Hearing, Volume 2 of 7, testimony of Carla Sexton, at pp. 49-77.

[153] The Licensed Clinical Social Worker who served as petitioner's defense team's mitigation specialist testified in pertinent part (1) beginning in early 2002, he gathered information from a wide variety of sources to create a biopsychosocial history of petitioner, (2) funding for his investigation ran out in May, 2002 and a request for additional

71

petitioner's defense team's legal assistant (Nancy Pietto),[154] (5) one of petitioner's testifying mental

health experts (Dr. Daneen Milam),[155] (6) petitioner's former girlfriend (Amber Harrison),[156] (7) both

of petitioner's trial counsel (attorneys Rodion Cantacuzene, Jr. and Paul Williams),[157] (8) two of the

---

funding in June, 2002 was denied but later granted, (3) despite that he continued doing interviews and collecting documentary evidence, (4) he did no interviews after September, 2002 due to a lack of funding, (5) petitioner had a very dysfunctional family, including verbal, emotional, and physical abuse, (6) many members of petitioner's family had psychological problems, (7) *petitioner denied any history of sexual abuse when he interviewed petitioner in the Spring of 2002,* (8) he interviewed petitioner's biological parents but did not interview petitioner's step-father or siblings, (9) the first time he had heard any information from petitioner suggesting petitioner had been sexually abused was during an interview in March, 2006, (10) based on this new information, he believes there is a likelihood petitioner was abused by at least two individuals while living in North Carolina, (11) petitioner's biological mother and father both denied petitioner had been sexually abused, (12) nothing in petitioner's school records suggested petitioner had been sexually abused, and (13) multiple psychological reports introduced into evidence at petitioner's trial stated petitioner had no history of sexual abuse. S.F. First State Habeas Hearing, Volume 2 of 7, testimony of Gerald Byington, at pp. 70-129.

[154] The legal assistant who assisted petitioner's trial counsel with trial preparation and trial testified in pertinent part (1) she discussed petitioner's background with petitioner, (2) she searched for good character witnesses, several of whom testified on petitioner's behalf at trial, (3) she reviewed petitioner's TYC records in detail and felt most of the incidents of "assault" contained therein were not serious assaults, (4) she found evidence in petitioner's TYC records suggesting petitioner's behavior improved dramatically near the end of his stay in TYC once his prescription medications were properly adjusted, (5) she was never made aware of any information which warranted exploration of whether petitioner had been sexually abused, and (6) she was never made aware of any allegation that petitioner had been sexually abused as a child. S.F. First State Habeas Hearing, Volume 2 of 7, testimony of Nancy Pietto, at pp. 130-38.

[155] Dr. Milam testified in pertinent part (1) she did a neuropsychological evaluation of petitioner and testified on his behalf at trial, (2) she found no indication of sexual abuse in petitioner's history, (3) petitioner informed her he had no history of sexual abuse, (4) sexual abuse was not an issue at petitioner's trial, (5) methamphetamine is very addictive, (6) petitioner is very bright (with an IQ of about 121), (7) petitioner told her he had been using methamphetamine for three days straight prior to the murders, (8) petitioner's records indicate episodes in which petitioner acted out sexually (i.e., engaged in masturbation), but (9) while acting out can be a red flag, it does not necessarily mean someone has been sexually abused. S.F. First State Habeas Hearing, Volume 2 of 7, testimony of Daneen Milam, at pp. 139-76.

[156] The former Amber Lynch testified in pertinent part (1) she was seventeen years old at the time of petitioner's trial, (2) she could not read the written statement FAXed to her but signed it anyway, (3) petitioner physically assaulted her on multiple occasions when they were dating, (4) at the time of petitioner's trial, she knew petitioner would hurt others, and (5) no one ever told her she could not speak with members of petitioner's defense team and she would have done so had she been contacted. S.F. First State Habeas Hearing, testimony of Amber Harrison, at pp. 176-96.

[157] Attorney Cantacuzene testified in pertinent part (1) he was aware that a baby sitter had sexual contact with petitioner when he was eight or nine years old, (2) he was aware petitioner had a sexual experience with an older woman when petitioner was near puberty, (3) petitioner expressed the view that he was "wealthier and better off for those experiences," (4) petitioner denied having been molested by an adult in North Carolina, (5) petitioner admitted his biological father introduced him to smoking crack but denied having been molested by his father, (6) *he believed it was better to admit petitioner's TYC records than to invite a parade of live witnesses from the TYC who could testify about every bad act committed by petitioner while in the TYC and possibly expand upon what was contained in petitioner's TYC records,* (7) some of petitioner's TYC record grossly over-stated the severity of petitioner's misconduct, (8)

prosecuting attorneys from petitioner's trial (Teresa Clingman and Al Schorre),[158] (9) both of

---

allowing petitioner's TYC records in also helped to show petitioner had ADD, (9) the defense introduced extensive evidence showing petitioner had been physically abused as a child, (10) he spoke with petitioner's siblings and holds Dano Young responsible for introducing petitioner to methamphetamine, (11) *admitting petitioner's TYC records, which were properly authenticated as business records and double-edged in nature, contained some of the damage by avoiding the impact of live witnesses*, (12) at trial, Dr. Milam's testimony contrasted the charges against petitioner during his stay at the TYC with petitioner's actual conduct, (13) the defense team did not call Mary Hall or Mrs. Faut to testify at trial because they would have undermined the defense's theory that petitioner was unable to control his impulsive behavior, and (14) during the guilt-innocence phase of trial, the defense attempted to urge a theory that Darnell McCoy or David Page had shot Doyle Douglas but there was no forensic evidence to support that theory. S.F. First State Habeas Hearing, Volume 2 of 7, testimony of Rodion Cantacuzene, Jr., at pp. 196-237; Volume 3 of 7, testimony of Rodion Cantacuzene, Jr., at pp. 5-54.

Attorney Paul Williams testified in pertinent part (1) at the guilt-innocence phase of petitioner's trial, the defense attempted to argue that at least one of the shots in Douglas' head had come from someone in the back seat but that theory could only be supported by carefully matching the ballistics report with the autopsy report, (2) the defense also offered the theory that the fatal shot to Douglas was fired not inside the car but at the creek by Mark Ray, (3) petitioner told him that, after Douglas' car was abandoned, a number of rounds were fired into that vehicle by either petitioner, Page, or both, (4) he did discuss with petitioner a man petitioner met in North Carolina and the possibility petitioner had been sexually abused, (5) petitioner denied that anything untoward happened with the man in North Carolina, (6) Dano Young did not tell the defense team that Billy Young had molested him, (7) the defense team did not call petitioner's teachers who said petitioner was not hyperactive, (8) instead, the defense called TYC employees who testified petitioner was loveable, (9) he feared objecting to admission of the TYC records because it would look bad and the records contained some helpful information, including background information on petitioner's family and indications most of petitioner's infractions were minor, (10) the linchpin of the defense team's punishment phase strategy was to show petitioner had made dramatic improvements once properly medicated, (11) the presence of multiple victims made the second Special Issue problematic, (12) the defense's theory at the guilt-innocence phase of trial was that none of Douglas' head wounds were caused by petitioner because there was no gunpowder residue or stripling, (13) the prosecution's ballistics expert could not definitively ascertain which gun had caused which wound, (14) the pathologist could not say which bullet wound came first or last, (15) the defense felt the prosecution's pathologist and ballistic's expert supported the defense's theory. (16) the defense did not ask the prosecution's ballistics expert or pathologist to comment on the defense's theory because they did not know what answers those experts might give. S.F. First State Habeas Hearing, Volume 3 of 7, testimony of Paul Williams, at pp. 55-108.

[158] Midland County District Attorney Teresa Clingman testified (1) the District Attorney's office did not tell any witnesses not to talk with the petitioner's investigators, (2) the DA's office maintained an open file policy throughout petitioner's trial, (3) authorities did intercept a letter from petitioner during trial in which petitioner requested that his brother get methamphetamine to petitioner, and (4) the prosecution did not receive or intercept any letters from other jail inmates stating that a third party had confessed to either murder. S.F. First State Habeas Hearing, Volume 3 of 7, testimony of Teresa Clingman, at pp. 109-14.

Al Schorre testified (1) he had a book on serial killers on the prosecution's table during the punishment phase of trial while defense counsel questioned a mental health expert but he did not wave it around, (2) law enforcement authorities reported that defense mitigation specialist Gerald Byington was performing investigative work without a Texas investigator's license, (3) concerned Midland County would be required to pay for Byington's work, his office communicated with the State licensing board for investigators, (4) no one in his office instructed any witness not to speak with the defense team, (5) Dr. Cirkovic informed Schorre that petitioner told Cirkovic he had not been sexually molested, and (6) none of the mental healthy experts who evaluated petitioner testified petitioner had any history of sexual abuse. S.F. First State Habeas Hearing, Volume 3 of 7, testimony of Al Schorre, at pp. 114-23.

petitioner's half-brothers (Dano and Dino Young),[159] (10) a Texas Ranger who helped investigate Doyle Douglas' murder and Petrey's kidnaping (David Hullum),[160] (11) petitioner's biological father (William Clifton Young, Jr.),[161] (12) a criminal investigator for the Midland County District Attorney's Office (J.D. Luckie),[162] (13) petitioner's half-sisters (Sharon Renee Gentry and Christy

---

[159] Dano Gregg Young testified (1) the written statement he signed for an investigator (Lisa Milstein) working with petitioner's first state habeas counsel was false and the product of a drug-fueled binge paid for my Milstein, (2) Doyle Douglas was a pedophile, (3) his uncle Darrell exposed himself to Dano when Dano was 13 or 14 years old, (4) his biological father (Billy Young) abused alcohol and beat Dano and his siblings but did not use cocaine or smoke pot with Dano, (5) Billy's girlfriend Frances abused petitioner and Dano physically, (6) the prosecutors did not coach Dano's trial testimony, (7) Lisa Milstein coached Dano's young stepson to falsely say Billy Young molested him, (8) Billy Young physically abused his children but not sexually, (9) Dano previously lied to protect Billy Young from prosecution for child abuse and urged his girlfriend Crystal Deshotel to lie to protect Billy as well, (10) he testified truthfully at petitioner's trial, and (11) after Lisa Milstein convinced Dano's stepson to accuse Billy Young of molesting him, case workers for Child Advocacy interviewed Dano's stepson and concluded there had been no molestation. S.F. First State Habeas Hearing, Volume 3 of 7, testimony of Dano Young, at pp. 124-66; Volume 5 of 7, testimony of Dano Young, at pp. 112-51.

Dino Young testified in pertinent part (1) he never heard any allegation of sexual abuse in their family, (2) their father would get drunk and get mean, (3) their father never touched Dino's penis or otherwise molested Dino, and (4) he has no knowledge of petitioner ever having been molested. S.F. First State Habeas Hearing, Volume 3 of 7, testimony of Dino Young, at pp. 166-83.

[160] The Texas Ranger testified (1) he discovered Douglas' vehicle in Callahan County and inventoried its contents, (2) no little girl's panties were found inside the vehicle, and (3) two spent .22 caliber shell casings and five live .22 caliber rounds were found inside the vehicle. S.F. First State Habeas Hearing, Volume 3 of 7, testimony of David Hullum, at pp. 187-94.

[161] Petitioner's biological father (1) denied any sexual contact with petitioner, Dano Young, Dino Young, or Christy Young, (2) petitioner visited him occasionally when petitioner was growing up, (3) petitioner came to live with him in North Carolina for three or four months, (4) while living in North Carolina, he became aware of an allegation the petitioner had been involved with an older man but he never met the man and does not know who that person was, (5) admitted he was arrested for allegedly improperly touching his daughter Sharon Renee Gentry but those charges were dropped, (6) testified he had no inappropriate sexual contact with Sharon gentry, (7) testified he had no inappropriate sexual contact with Dano Young's girlfriend's son Dylan Keen, (8) denied ever making a sexual advance toward Crystal Deshotel, (9) testified petitioner's mother Carla was a good mother, (10) stated he disciplined his children with corporal punishment but loves his children, (11) denied he was abusive toward petitioner, (12) denied beating Carla, (13) admitted he was once arrested for getting into a fight with petitioner, striking petitioner in the jaw, and pleaded guilty to the resulting charge, (14) denied ever striking petitioner on the nose with a belt buckle, and (15) denied ever missing a day of work due to alcohol. S.F. First State Habeas Hearing, Volume 3 of 7, testimony of William Clifton Young, Jr., at pp. 195-220.

[162] The Midland County criminal investigator (1) denied telling any witnesses not to speak with petitioner's defense investigators, (2) admitted he checked out Gerald Byington after Byington testified at a hearing in petitioner's case, (3) did not recall talking to David Page, but (4) denied telling Page or anyone else to change their story. S.F. First State Habeas Hearing, Volume 3 of 7, testimony of J.D. Luckie, at pp. 231-35.

Jetton),[163] (14) the chief investigator for the Harrison County District Attorney's Office (Hall

---

[163] Petitioner's half-sister Sharon Renee Gentry testified in pertinent part (1) her father did not rape her, (2) on one occasion when she was fifteen or sixteen and lying ill on the sofa, Billy Young came home drunk, put his hand between her legs for a few seconds, and, when she instructed him to move his hand, he passed out, (3) she went to a neighbor, who called her boyfriend, (4) her boyfriend took her to the hospital, where she remained for several weeks with pneumonia, (5) she filed a police report about the incident with her father and has not lived with her father since then, (6) she regrets filing that report, (7) no similar event ever happened between her and her father before or after that incident, (8) her father has not initiated any sexual contact with her, (9) she has never heard any allegation suggesting petitioner had been sexually molested or abused by their father or that their father engaged in any inappropriate sexual behavior, (10) their father did physically abuse her and her siblings when they were children by severely beating and kicking them, both when he was sober and when he was drunk, (11) their father gave her money to buy him drugs, including cocaine, marijuana, and crack, and (12) she had seen their father use crack with her brothers, Dano in particular. S.F. First State Habeas Hearing, Volume 5 of 7, testimony of Sharon Renee Gentry, at pp. 9-40.

Petitioner's other half-sister Christy Jetton testified (1) her brother Dano was under pressure to protect their father and (2) Dano's former girlfriend Crystal Deshotel once told her Billy Young placed his hand between her legs. S.F. First State Habeas Hearing, Volume 5 of 7, testimony of Christy Jetton, at pp. 152-55.

Reavis),[164] (15) Dano Young's girlfriend (Crystal Deshotel),[165] and (16) a Midland County Deputy

District Clerk (Amanda Davis).[166]

On June 21, 2006, petitioner filed a pleading requesting permission to supplement

petitioner's initial state habeas corpus application with new grounds sixteen through twenty-two, and

requesting the trial court issue factual findings regarding petitioner's proposed fifteenth ground for

relief.[167]

---

[164] Inspector Reavis testified in pertinent part (1) Darnell and Patricia McCoy telephoned his office on one occasion, (2) he did not tell them not to talk with defense lawyers for petitioner, (3) they stayed with Dano's father in Beaumont so to her whether she spoke with petitioner's defense team, (4) neither of the McCoy's ever told him that petitioner had been molested by Billy Young, (5) he did not recall either of the McCoy's ever telling him petitioner was strung out on drugs for weeks prior to the murders, (6) he did once show the McCoy's a photograph of Doyle Douglas' body the District Attorney planned to introduce through the McCoy's, and (7) he was involved in the witness preparation for all the East Texas witnesses in preparation for petitioner's trial. S.F. First State Habeas Hearing, Volume 5 of 7, testimony of Hall Reavis, at pp. 41-59.

[165] Dano Young's girlfriend testified in pertinent part (1) she and Dano took her son Dylan to visit Dano's father in Daingerfield only occasionally and usually for only brief periods, (2) they stayed with Dano's father in Beaumont on one occasion for about a week, (3) on one occasion, Lisa Milstein came to their home, took Dano out, and did not return with Dano until three a.m., (4) she went with Dano and Milstein the next time they went out, (5) on April 20, 2005, Lisa Milstein spoke with Dylan alone for about three hours and then told her and Dano that Billy Young had molested Dylan, (6) Milstein played a recording for them in which Dylan said Billy Young had touched him, (7) it appeared to her that Milstein had coached Dylan to say that, i.e., Dylan gave one-word answers to a series of leading questions asked by Milstein, (8) she signed a document Milstein produced without reading the document, (9) she had no idea Dylan or Dano had been molested by Billy Young before Milstein arrived at their home, (10) she has never heard Sharon Gentry say Billy Young raped her, (11) on one occasion, Billy Young did lewdly ask to perform cunnilingus on her but he had never touched her, (12) Dano's sister Christy told her about being molested by an uncle, (13) she took Dylan to Child Advocacy after Milstein's visit, (14) no charges were ever filed against Billy Young arising from Milstein's accusation of inappropriate touching of Dylan, (15) Dano told her to lie about Billy Young's lewd suggestion to her because Dano is afraid of Billy Young, (16) Dylan never complained about his backside hurting after being alone with Billy Young, (17) Dano told her that Billy Young fondled him, and (18) Dano told her that Billy Young raped Sharon Renee Gentry. S.F. First State Habeas Hearing, Volume 5 of 7, testimony of Crystal Deshotel, at pp. 59-111.

[166] The deputy District Clerk testified regarding the amount of funds that had been removed from petitioner's inmate trust account in payment of court costs. S.F. First State Habeas Hearing, Volume 6 of 7, testimony of Amanda Davis, at pp. 5-11.

[167] First State Habeas Transcript, Volume 7, at pp. 1136-41.
As his proposed grounds sixteen through twenty-two, petitioner argued (1) his trial counsel rendered ineffective assistance by failing to object to the punishment phase jury charge and supplemental jury instruction regarding the second Special Issue on the grounds the instructions and supplemental instruction (a) were an ambiguous response to an ambiguous question which contained imperative language depriving petitioner of a trial by jury on Special Issue number two, (b) failed to clearly instruct the jury that they should deliberate on each count of the indictment concerning Special Issue number two and created the possibility of the petitioner receiving a non-unanimous verdict on Special Issue number

In an Order issued June 26, 2006, the state trial court adopted the State's suggested summary of the trial evidence, the petitioner's affidavits, and the evidence from the evidentiary hearing held in petitioner's first state habeas corpus proceeding.[168]

On December 20, 2006, the Texas Court of Criminal Appeals issued an unpublished per curiam Order in which it (1) adopted the trial court's findings of fact and "conclusions" and denied relief on petitioner's first fourteen claims for state habeas relief and (2) collectively considered petitioner's fifteenth through twenty-second claims and petitioner's pro se complaints, determined they constituted a subsequent writ application, concluded the claims contained therein all failed to satisfy the statutory standards in Section 5 of Article 11.071 of the Texas Code of Criminal Procedure, and dismissed the subsequent writ application as an abuse of the writ. *Ex parte Clinton Lee Young*, WR 65,137-01 & WR 65,137-02, 2006 WL 3735395 (Tex. Crim. App. December 20, 2006).

H.     Proceedings in this Court

On December 20, 2007, petitioner filed his original petition for writ of habeas corpus relief and memorandum in support thereof in this Court, along with three volumes of exhibits. *Docket entry nos. 18-22.*

---

two, (c) used imperative language and forced the jury to answer Special Issue number two affirmatively, and (d) failed to clearly set out the jury's need to consider and vote on their findings as to counts one and two of the indictment independently, and (2) his trial counsel rendered ineffective assistance by failing to (a) object on hearsay and Confrontation Clause grounds to the admission of petitioner's TYC records, (b) obtain trace metal test on the gloves belonging to Page, and (c) object to the prosecution's waving the book *Serial Killer* in front of the jury. First State Habeas Transcript, Volume 7, at pp. 1138-39.

[168] First State Habeas Transcript, Volume 7, at p. 1142.

The State's proposed evidentiary summary appears at First State Habeas Transcript, Volume 7, at pp. 989-1096. The Order issued June 26, 2006 does not purport to adopt any proposed legal conclusions proposed by either party. Nor does that Order purport to set forth any other legal conclusions.

On October 20, 2008, petitioner filed his first amended petition for federal habeas corpus relief, motion for stay of federal proceedings to permit exhaustion of state remedies on new claims, and seven volumes of exhibits. *Docket entry nos. 51-59.*

In an Order issued February 25, 2009, this Court granted petitioner's request for a stay to permit petitioner to return to state court and exhaust available remedies on petitioner's new claims. *Docket entry no. 72.*

I.    Return to State Court (Third State Habeas Proceeding)

1.    Petitioner's Third State Habeas Corpus Application

On March 25, 2009, petitioner filed his second subsequent [third] application for state habeas corpus relief in state district court, in which petitioner asserted many claims, including arguments that (1) the prosecution withheld evidence from petitioner's trial counsel, and knowingly introduced false testimony, concerning the absence of plea negotiations with prosecution witnesses Mark Ray and David Page, (2) the prosecution withheld evidence from the defense which could have been used to impeach prosecution rebuttal witness A.P. Merillat, (3) the trial judge's letter to the jurors following trial revealed bias against petitioner, (4) petitioner's first state habeas counsel rendered professionally deficient performance, (5) petitioner's trial counsel rendered ineffective assistance by failing to (a) prove Page and Ray shot Doyle Douglas, (b) object to the admission of petitioner's TYC records, (c) utilize ballistics evidence, (d) investigate, locate, and test unspecified items of physical evidence, (e) test Douglas' car in an unspecified manner, (f) check the crime scenes (including the location where Douglas was shot) for unspecified evidence, (g) test Page's gloves for trace metal, and (h) present mitigating evidence regarding why petitioner stopped taking his ADHD medications after his release from the TYC, petitioner's bi-polar disorder, and the concept of "hyper-

78

focusing," (6) the prosecution interfered with the defense team's mitigation investigation, (7) the prosecution knowingly lost evidence, including (a) spent shall casings from the front of the house where Douglas was shot, (b) a surveillance video from a convenience store showing petitioner shopping unarmed, and (c) eyewitness testimony from an unidentified woman in a white van at a grocery store in Brookshire, and (8) petitioner's appellate counsel rendered ineffective assistance by failing to raise unspecified points of error on direct appeal.[169]

### 2.   Evidentiary Hearing Ordered on Some Claims

In an unpublished Order issued June 3, 2009, the Texas Court of Criminal Appeals determined that the first two of the new claims contained in petitioner's subsequent application satisfied the standard for consideration under Section 5 of Article 11.071, i.e., (1) the prosecution's failure to produce exculpatory evidence and presentation of false testimony regarding the absence of plea negotiations with prosecution witnesses Page and Ray violated petitioner's constitutional rights and (2) the prosecution's suppression of evidence concerning prosecution witness A.P. Merillat violated petitioner's constitutional rights. *Ex parte Clinton Lee Young*, WR-65,137-03, 2009 WL 1546625 (Tex. Crim. App. June 3, 2009). Petitioner's remaining claims were dismissed. *Id.*

### 3.   Evidentiary Hearing

On January 11-13 and July 22-23, 2010, the state trial court held an evidentiary hearing in petitioner's third state habeas corpus proceeding and heard testimony from (1) the private investigator who worked for Mark Ray's trial counsel (James Maxwell),[170] (2) prosecution witness

---

[169] The transcript of pleadings, motions, and other documents filed in petitioner's third state habeas corpus proceeding, i.e., WR 65,137-03, henceforth "Third State Habeas Transcript," Volume 1 of 10, at pp. 1-203.

[170] Maxwell testified during the hearing in petitioner's third state habeas corpus proceeding in pertinent part (1) he worked for attorney Richard Hurlburt on Mark Ray's case, beginning in early-December, 2001, (2) in late-January, 2002, attorney Hurlburt contacted Maxwell and informed Maxwell that Ray was going to receive "a deal he could not

Mark Ray,[171] (3) Mark Ray's mother (Carolyn Darlene Ray),[172] (4) Mark Ray's trial counsel (Richard Hurlburt),[173] (5) former Harrison County District Attorney (Richard Berry, Jr.),[174] (6) a former

refuse," (3) Maxwell immediately put his investigation on hold and did no further work on Ray's case, and (4) Maxwell has no personal knowledge of any plea bargain agreement in Ray's case nor of any promises made to Ray or Hurlburt. The verbatim transcription of the live testimony from petitioner's third state habeas corpus proceeding (henceforth "S.F. Third State Habeas Hearing"), Volume 2 of 9, testimony of James Maxwell, at pp. 11-25.

[171] Prosecution witness Mark Ray testified in pertinent part (1) he rejected plea bargain offers from former Harrison County District Attorney Rick Berry for terms of sixty years, forty-to-forty-five years, twenty years, and ten years, (2) he accepted a plea offer from Berry of five years imprisonment prior to the November, 2002 election, (3) during a meeting at the jail, District Attorney Berry, Midland County investigator J.D. Luckie, and another person from the Harrison County District Attorney's Office all told Ray he would receive a five-year sentence in exchange for Ray's testimony at petitioner's trial, (4) Ray was also told his plea agreement would not be put into writing, (5) J.D. Luckie strongly advised Ray to keep quiet about the five-year plea deal, (6) no one from the Midland County District Attorney's Office offered or promised Ray anything in exchange for his testimony against petitioner, (7) subsequent to the election in November, 2002, the new Harrison County District Attorney (Joe Black) indicated he would not honor Ray's five-year deal, (8) the day before Ray testified at petitioner's trial, however, former Harrison County District Attorney Berry informed Ray, Ray's attorney (Hurlburt), and Ray's parents that Ray's five-year deal would be honored, (9) nonetheless Ray's trial testimony in which he denied having a deal in exchange for his trial testimony was true because there was nothing in writing, (10) he told an investigator for petitioner in 2005 that he had no deal with prosecutors in connection with his trial testimony against petitioner, (11) eventually, Ray entered a guilty plea to an aggravated kidnaping charge and received a fifteen-year sentence, (12) Ray's trial testimony that petitioner shot Doyle Douglas twice in the head was accurate, and (13) while his trial testimony denying any deal between himself and prosecutors in exchange for his trial testimony was not truthful, the rest of his trial testimony was accurate. S.F. Third State Habeas Hearing, Volume 2 of 9, testimony of Mark Ray, at pp. 132-87; Volume 3 of 9, testimony of Mark Ray, at pp. 207-15.

[172] Mrs. Ray testified in pertinent part (1) during a lunch across the street from the Midland County courthouse during petitioner's trial, in the presence of her son, a Sheriff's Deputy and a plain clothes person, her son's attorney Richard Hurlburt informed her that her son (Mark Ray) would probably get a five-year sentence with time off for good behavior or time served, (2) former Harrison County District Attorney Rick Berry was present at the restaurant at the same time but she did not converse with Berry nor did she hear Berry make any representations regarding her son receiving a five-year sentence, (3) several times prior to petitioner's trial, and even prior to March, 2002, her son informed her that he would receive a five-year deal, (4) after petitioner's trial, her son wrote her and told her he would receive a five-year sentence, and (5) no prosecutor told her that her son would receive a five-year deal, only attorney Hurlburt made that representation. S.F. Third State Habeas Hearing, testimony of Carolyn Darlene Ray, at pp. 4-47.

[173] Attorney Hurlburt testified in pertinent part (1) he represented Mark Ray in connection with Ray's capital murder charge (for the murder of Doyle Douglas) in Harrison County, (2) early on, former Harrison County District Attorney Rick Berry told Hurlburt that he (Berry) would "probably" make Ray an offer he could not refuse, (3) Hurlburt was present when Mark Ray was granted use immunity and testified during petitioner's trial in Midland County, (4) he has no recollection of Ray ever receiving any plea offers for sixty years, forty-to-forty-five years, thirty years, twenty years, ten years, or five years, (5) there was no plea offer for five years in Ray's case, (6) in fact, there was no plea offer whatsoever in Ray's case prior to petitioner's trial, (7) Hurlburt never attended a lunch meeting with Ray, Ray's parents, and Berry, (8) he had no recollection of ever having met with Ray and Berry at the jail, (9) Mark Ray pleaded guilty on June 18, 2003 pursuant to a plea bargain Hurlburt negotiated with then-Harrison County District Attorney Joe Black, (10) there was no plea bargain with Joe Black prior to petitioner's trial, (11) he never discussed the possibility of a five-year deal with Joe Black, (12) he never complained about not receiving a five-year deal for Ray, (13) there was never any plea bargain for Ray with former District Attorney Berry, (14) he did not construe Berry's comment about probably making Ray an offer he couldn't refuse as a promise or a plea offer, (15) he believed Ray's trial testimony denying the

investigator for the Midland County District Attorney (J.D. Luckie),[175] (7) the Harrison County

District Attorney (Joe Black),[176] (8) prosecution witness David Lee Page, Jr.,[177] (9) David Page's trial

---

existence of any deals in exchange for Ray's testimony to be true, (16) no plea agreement existed for Ray as of the time of petitioner's trial, (17) he would not have allowed Mark Ray to commit perjury, and (18) Mark Ray's capital murder case was never considered by him to be a death penalty case, in part, because Harrison County authorities only appointed one attorney to represent Ray whereas death penalty cases usually involved appointment of two defense attorneys. S.F. Third States Habeas Hearing, Volume 3 of 9, testimony of Richard Hurlburt, at pp. 70-173.

[174] The former Harrison County District Attorney, who served as an appointed Assistant Midland County District Attorney during petitioner's trial, testified in pertinent part (1) he never had any plea negotiations with Hurlburt regarding Mark Berry, (2) he did not recall ever having lunch with Mark Ray or Ray's parents, (3) he does not eat lunch during trials, (4) there was no plea agreement regarding Mark Ray or with Mark Ray, (5) there was no agreement whatsoever with Ray regarding Ray's testimony at petitioner's trial, (6) no promises of leniency were made to Ray or Hurlburt, (7) he never made any offers to Ray, (8) he did not work much on petitioner's or Ray's case as Harrison County District Attorney after the March, 2002 primary election (which Berry lost) because he knew he would not be trying either of their cases, (9) he never told Hurlburt that he wanted Ray to testify, and (10) he never spoke with Ray about Ray testifying at petitioner's trial. S.F. Third State Habeas Hearing, Volume 5 of 9, testimony of Richard Berry, Jr., at pp. 48-115.

[175] Former Midland County criminal investigator Luckie testified in pertinent part (1) he did not recall ever taking Ray to his office to meet with Ray's parents, (2) he never spoke with Mark Ray about a five-year deal still being on, (3) he never told Ray to remain silent about any plea deal, (4) he had no knowledge of any plea deal for Mark Ray, (5) he never made any promises to Ray to induce Ray's testimony against petitioner, (6) to the best of his knowledge Midland County District Attorney Al Schorre made no offer to David Page's attorney regarding Page's testimony against petitioner, (7) he was unaware of any plea offers made to Page in connection with the Midland case (i.e., Petrey's murder), (8) he did not recall ever talking with Mark Ray, and (9) he has no knowledge of any plea offers to Mark Ray. S.F. Third States Habeas Hearing, Volume 3 of 9, testimony of J.D. Luckie, at pp. 178-206.

[176] The Harrison County District Attorney testified in pertinent part (1) he was elected in November, 2002 and took office January 1, 2003, (2) he had no discussions with Hurlburt regarding a plea for Mark Ray prior to petitioner's trial in March, 2003, (3) all plea negotiations regarding Ray took place after March 18, 2003, (4) in June, 2003, Ray pleaded guilty to kidnaping and the capital murder charge against Ray was dismissed pursuant to Ray's plea agreement, (5) no deal with Ray was in place when he took office, (6) no plea negotiations with Hurlburt concerning Ray took place until after Ray testified at petitioner's trial, (7) he has no knowledge of any agreement for a five-year sentence for Ray, (8) no promises of leniency were made to Ray to induce Ray's testimony against petitioner, (9) he never engaged in any plea negotiations with David Page of Page's attorney, (10) he had no role whatsoever in Ray's prosecution until he took office, (11) when he took office, he was led to believe there were no plea offers outstanding to either petitioner or Ray, (12) a conscious decision was made not to offer a plea bargain to Ray, (13) all his discussions with Hurlburt concerning a plea bargain for Ray took place after Ray's testimony at petitioner's trial, (14) no plea bargain existed with Ray at the time of petitioner's trial, (15) Hurlburt never complained to him that Ray had made a deal with Rick Berry, (16) Berry informed him that there was no plea bargain with Ray, (17) he did not begin plea negotiations with Hurlburt until April, 2003, and (18) Ray did not voice any complaint or protest when Ray pled guilty and received a fifteen-year sentence. S.F. Third States Habeas Hearing, Volume 3 of 9, testimony of Joe Black, at pp. 16-68.

[177] Prosecution witness David Page testified in pertinent part (1) he was convicted of aggravated kidnaping in the Sam Petrey case and received a sentence of thirty years, (2) Woody Leverett was his trial counsel, (3) his testimony at petitioner's trial denying he had any deals with prosecutors was true, (4) when he testified at petitioner's trial, Page did not believe he then had any binding plea bargain agreement with prosecutors or any other agreement other than an agreement for use immunity in connection with his trial testimony against petitioner, (5) Leverett never gave Page any

counsel (H.W. Woody Leverett),[178] (10) both of petitioner's trial counsel (Ian Cantacuzene and Paul

---

firm information regarding a number of years that had been promised or offered to Page, (6) Leverett never told Page there was a plea bargain, (7) he recalled no plea offer prior to taking his polygraph examination, (8) no promises of leniency were made in exchange for his trial testimony against petitioner, (9) no one promised him anything in exchange for his trial testimony against petitioner, (10) nonetheless, he thought his testimony against petitioner would lessen the time he had to serve for his own offenses, (11) no plea discussions took place when Page met with Midland County prosecutors prior to petitioner's trial, (12) comments made to Page during trial recesses were not construed by Page as promises of leniency but, rather, as observations that Page's trial testimony could help Page, (13) Page was hoping for some benefit arising from his trial testimony but knew there was no quid pro quo for his testimony, (14) Leverett told Page that Page's trial testimony would help Page, and (15) there was no agreement or promise regarding Page's testimony against petitioner. S.F. Third States Habeas Hearing, Volume 4 of 9, testimony of David Lee Page, Jr., at pp. 7-52; Volume 6 of 9, testimony of David Lee Page. Jr., at pp. 62-116.

[178] Attorney Leverett testified in pertinent part (1) beginning in December, 2001, he was David Page's attorney, (2) early on, in February, 2002, before any ballistics analysis had been done, prosecutor Schorre informed Leverett that he was thinking about a sentence range of fifteen to thirty years for Page if the ballistics evidence was consistent with Page's account of Petrey's murder and Page passed a polygraph examination, (3) Leverett understood Schorre's comments were the first stages of negotiations and did not constitute a binding promise or plea offer, (4) Schorre was clear that he was not extending a plea offer to Page and Leverett did not construe them as such, (5) nonetheless, Leverett assumed an implied promise existed that Page would benefit from testifying against petitioner, (6) he informed Page that Page would have to pass a polygraph examination to obtain any benefit from Schorre, (7) in February, 2002, Page took and flunked a polygraph examination, (8) while negotiations continued between Leverett and prosecutors in March and April, 2002, no plea bargain was reached, (9) Leverett and Page operated under the assumption Page would get the deal Schorre had mentioned in February, 2002 if Page testified against petitioner, (10) Leverett hoped for leniency for Page in exchange for Page's trial testimony against petitioner but knew no express promises had been made by prosecutors that could be enforced by specific performance, (11) In April, 2003, Schorre offered Page a thirty-five-year sentence as part of a plea offer involving a charge of aggravated kidnaping, (12) eventually, Page entered a plea to a charge of aggravated kidnaping and received a thirty-year sentence, and (13) Leverett believed Page testified accurately at petitioner's trial when Page denied the existence at that time of any deal with prosecutors. S.F. Third State Habeas Hearing, Volume 2 of 9, testimony of H.W. Woody Leverett, at pp. 26-100, 125-31.

82

Williams),[179] (11) the former Midland County District Attorney (Al Schorre),[180] (12) a former

---

[179] Attorney Williams testified (1) the defense team requested information on any agreements between prosecutors and any prosecution witness, (2) the trial court granted the defense's motion for disclosure of such information, (3) the defense never received any information regarding the existence of any agreement between prosecutors and any prosecution witness, (4) he believed the defense's motions were broad enough to include information regarding requests for leniency by a prosecution witness that included a specific term of years but not broad enough to cover all requests for leniency, and (5) he was uncertain whether the rule in *Brady* covered plea negotiations that did not result in an actual plea agreement. S.F. Third States Habeas Hearing, Volume 2 of 9, testimony of Paul Williams, at pp. 101-22.

Attorney Cantacuzene testified in pertinent part (1) the trial court granted the defense's requests for disclosure of agreements with Page and other prosecution witnesses, (2) if the defense team had known about the existence of agreements between prosecutors and prosecution witnesses, the defense team's strategy at jury selection would have been different, (3) he believed there were discrepancies between the eyewitness testimony and the forensic evidence regarding the angles of entry wounds in Douglas' head which permitted an argument that petitioner had not shot Douglas, and (4) Page's attorney Woody Leverett told petitioner's defense team there was no plea agreement between prosecutors and Page. S.F. Third States Habeas Hearing, Volume 2 of 9, testimony of Ian Cantacuzene, at pp. 188-209.

[180] The former Midland County District Attorney testified in pertinent part (1) Mark Ray's trial testimony was handled by the prosecutors from East Texas and he (Schorre) had no involvement in preparing Ray's trial testimony, (2) he made no deals with either Ray or Hurlburt to obtain Ray's trial testimony, (3) he made no promises to Ray or Hurlburt to obtain Ray's trial testimony, (4) he has no knowledge of any deals or promises made to Ray or Hurlburt by any person to induce Ray's trial testimony against petitioner, (5) the purpose of his February 2, 2002 meeting with Leverett and Page was to interview Page to see if Page would testify against petitioner, (6) during that meeting, Leverett wanted a plea offer but Schorre would not give one and made it clear no plea offer would be made because the investigation was in its early stages and new evidence could turn up which shed new light on Page's role in the offense, (7) nonetheless, Schorre informed Leverett that, *assuming* Page passed a polygraph, testified at trial, and the evidence showed Page's involvement was only as to Petrey's kidnaping, a sentence of thirty years was possible, (8) Schorre said nothing to Leverett on February 2, 2002 which Schorre believed could be construed as a plea offer, (9) the only deal Schorre reached regarding Page's trial testimony was for use immunity, (10) Schorre rejected outright Leverett's request for a sentence for Page of fifteen years, (11) everything Schorre discussed with Leverett in February, 2002 was expressly conditioned upon (a) Page passing a polygraph examination, (b) the evidence showing Page was NOT the shooter (in Petrey's murder), (c) the evidence showing Page had not actively participated in Petrey's homicide, (d) the evidence showing Page had been truthful with investigators, and (e) the evidence showing Page was not guilty of aggravated kidnaping, (12) the report from Page's polygraph showed Page had been "generally deceptive," (13) Schorre, and his fellow prosecutors Berry and Black were all in agreement that no deals would be offered to any accomplice witnesses, (14) Page was present during the February 2, 2002 meeting with Schorre and Leverett, (15) Schorre's discussions in February, 2002 with Leverett regarding a thirty-year sentence were all conditioned upon the factors Schorre listed above, and (16) Schorre never committed to a thirty-year deal for Page. S.F. Third States Habeas Hearing, Volume 3 of 9, testimony of Al Schorre, at pp. 207-75.

Harrison County Deputy Sheriff (Todd Smith),[181] (13) an investigator for the Harrison County District Attorney (Hall Reavis),[182] and (14) prosecution expert witness A.P. Merillat.[183]

On the final day of petitioner's evidentiary hearing, the parties introduced a stipulation regarding the matters TDCJ officials consider when making determinations as to where and how TDCJ inmates are housed within the TDCJ system.[184]   Petitioner's federal habeas counsel then called former prosecution expert witness A.P. Merillat to testify about (1) Merillat's work as an employee of the Special Prosecution Unit ("SPU"), (2) the leadership of the SPU, Merillat's personal experience with the spiritual conversions of some TDCJ inmates, (3) Merillat's knowledge of TDCJ prison gangs, (4) deposition testimony Merillat gave in another case regarding which form of

---

[181] Former Harrison County Deputy Sheriff Smith testified in pertinent part (1) on December 26, 2002, he and another deputy served a subpoena on Mark Ray regarding Ray's duty to testify at petitioner's trial, (2) neither he (Smith) nor the other deputy with him on that date communicated anything to Ray regarding any deal in exchange for Ray's trial testimony, (3) he had never communicated with any prisoner on behalf of the County District Attorney's office, (4) he neither delivered to, nor received from, Ray any message on that date or any other date, (5) on one occasion during petitioner's trial, he witnessed Ray eating lunch with Ray's parents at a restaurant in Midland, (6) he (Smith) had no role in transporting Ray to the restaurant, (7) attorney Richard Hurlburt was present in the same restaurant the same date but he (Smith) never heard Hurlburt converse with Ray or Ray's parents, (8) he was uncertain whether Rick Berry was also present at the restaurant but admitted it was possible, (9) he did not hear Berry converse with either Ray or Ray's parents, (10) he never delivered a plea offer to Mark Ray, and (11) he had nothing to do with any plea negotiations in petitioner's case. S.F. Third State Habeas Hearing, Volume 6 of 9, testimony of Todd Smith, at pp. 7-37.

[182] Investigator Reavis testified in pertinent part (1) he and Midland County investigator J.D. Luckie were present one day during petitioner's trial at a restaurant for lunch when he saw Mark Ray at the same restaurant, (2) he (Reavis) did not recall seeing either Rick Berry or Richard Hurlburt also present, (3) Mark Ray's parents were present in the same restaurant, (4) he has no knowledge of either Hurlburt or Berry making any comments regarding any deal for Mark Ray, (5) he never heard about, and has no knowledge of, any deal for Mark Ray prior to Ray's March 18, 2003 testimony at petitioner's trial, (6) he never met with Hurlburt to discuss Ray's case, (7) Ray's prosecution in Harrison County was put on hold pending petitioner's trial, and (8) he did not recall ever telling David Page that Page's trial testimony would help Page. S.F. Third State Habeas Hearing, Volume 6 of 9, testimony of Hall Reavis, at pp. 38-61, 118-21.

[183] Called by the prosecution as a rebuttal witness at the punishment phase of petitioner's capital murder trial, Merillat's trial testimony appears at S.F. Trial, Volume 35, testimony of A.P. Merillat, at pp. 55-120, and is summarized in Section I.D.3. above. *See* note 107, *supra*, and accompanying text.

[184] The two-page stipulation of the parties regarding the testimony of Edith Reeves appears as State Exhibit no. 38 in the exhibit volume, S.F. Third State Habeas Hearing, Volume 8 of 9 (Exhibit Volume 1). It was admitted when offered by the State. S.F. Third State Habeas Hearing, Volume 7 of 9, at p. 7.

housing within the TDCJ Merillat viewed as the most restrictive, (5) letters Merillat had received and written regarding an inmate who was attempting to "deconfirm" his gang membership, and (6) Merillat's requests to TDCJ officials on behalf of different inmates for changes in the inmates' housing circumstances (which Merillat explained were sometimes granted and sometimes ignored).[185] At that point, the trial judge interrupted petitioner's federal habeas counsel's examination of Merillat to suggest that petitioner's counsel identify those portions of Merillat's trial testimony petitioner's counsel believed to be inaccurate or otherwise subject to impeachment based upon newly discovered evidence identified in petitioner's most recent state habeas corpus pleadings.[186] After a brief recess, petitioner's counsel declined the trial court's invitation, questioned Merillat about postings Merillat made in 2006 on a Texas District and County Attorneys Association website regarding the daily cost of housing TDCJ inmates on death row, and then passed the witness.[187]

When the trial court asked petitioner's counsel how any of the foregoing testimony by Merillat was inconsistent with Merillat's trial testimony, the following exchanges between petitioner's counsel, the trial judge, and the witness took place:

> MR. LEVENSON: I'll pass the witness, Your Honor.
> THE COURT: Whoa, whoa, whoa. How is that inconsistent with his testimony at trial?
> MR. LEVENSON: I'm sorry?
> THE COURT: How is that inconsistent with his testimony at trial?
> MR. LEVENSON: Just showing bias, Your Honor.
> THE WITNESS: No, sir, I wrote that in 2006. I believe I testified here in 2003 or something like that. It was after the fact. The jury couldn't have known that because it didn't happen yet.

---

[185] S.F. Third States Habeas Hearing, Volume 7 of 9, testimony of A.P. Merillat, at pp. 7-31.

[186] *Id.*, at pp. 31-35.

[187] *Id.*, at pp. 35-37.

MR. LEVENSON: Again, we're showing his bias towards if someone is writing, Your Honor, about it's cheaper to house someone on death row than life without prison (sic), we're showing a bias towards the death penalty, Your Honor, and he testified as a future dangerousness expert. It goes to his bias whether he wrote it in 2006 or not.

THE WITNESS: That's incorrect.

THE COURT: Sounds to me like you're assuming a bias.

THE WITNESS: Absolutely.

MR. LEVENSON: I think certainly it's arguable that there's bias.

THE WITNESS: If you had gotten the newest version of my book, it clearly says in there if a jury determines that the person should have a life sentence, then so be it, and if I can help do that with my information, that is fine with me. I don't come to a courthouse hoping somebody gets a death sentence, never have and I never will.

MR. LEVENSON: I don't have any more questions, Your Honor.

THE COURT: Well, now, wait a minute, Mr. Levenson. What are you talking about? What we're doing here is important. I want to understand. I really do. I mean, I want you to tell me how this article, Number 1, I guess he's just now stated it didn't even exist at the time of his testimony, but how somehow or another this indicates a bias on his part in favor of the death penalty by stating facts with regard to how much it costs to house prisoners in various classifications --

MR. LEVENSON: Your Honor, I think different people could read this article different ways. I certainly read it as showing bias towards the death penalty. It's something that we will argue. If Your Honor doesn't think so, if Mr. Merillat doesn't think so, I think it's a reasonable --

THE COURT: Well, no, see, I don't know Mr. Merillat. I mean , he may have some great bias in favor of the death penalty, but I certainly can't conclude it from this, you know, I -- so -- but by the same token, I don't think you can conclude that he does or does not. This is simply a -- maybe I haven't read it closely enough, maybe you need to point it out, simply a factual deal of, you know, Michelin tires cost $200.00 a piece and Goodyear tires cost 95, that doesn't mean that I'm for Michelin or Goodyear either one. I'm just stating a fact. I'm trying to appreciate what your position is about why this is evidence of bias.

MR. LEVENSON: I think if you read the whole article, I think it shows -- I believe it shows a bias towards --

THE WITNESS: Then you should introduce the whole article. Don't just give the Court parts of what you believe to be true and then try to damage my credibility and reputation. I think that's pretty sorry on your account.

MR. LEVENSON: I'm sorry, Your Honor, I'm not usually used to addressing witnesses back and forth, but this is the whole posting on the TDCA [sic] website on this particular one.

THE COURT: Okay. Thank you, sir.[188]

---

[188] S.F. Third State Habeas Hearing, Volume 7 of 9, testimony of A.P. Merillat, at pp. 37-41.

The State's attorney then cross-examined Merillat extensively, eliciting testimony establishing (1) the Special Prosecution Unit which employs Merillat was created by the Texas Legislature to assist local prosecutors prosecuting criminal offenses committed within TDCJ and TYC facilities,[189] (2) Merillat testified at petitioner's trial as an expert witness on the opportunities TDCJ Inmates have to commit acts of violence within Texas prisons, (3) Merillat never investigated petitioner's case and had no personal knowledge regarding petitioner's case, (4) upon occasion, Merillat does conduct investigations and testify as a fact witness at trial but did not do so at petitioner's trial, (5) he routinely consults with both prosecutors and defense counsel concerning conditions and procedures within the TDCJ system, (6) he has also testified on many occasions as an expert witness on prison conditions and violence within the TDCJ, and (7) the letters petitioner's federal habeas counsel identified which Merillat wrote and received several years before petitioner's trial concerning a TDCJ inmate named Bruce Innes could not have been employed to impeach any of Merillat's expert testimony at petitioner's trial, (8) the Innes letters concerned a situation in which (a) Innes, a TDCJ inmate who had been a ranking member of the Texas Mafia prison gang sought to exit that gang by going through what is known in the TDCJ as the "deconfirmation process," (b) after Innes began that process, Innes received a letter or "kite" from another Texas Mafia gang member in which that other gang member confessed to having murdered a third inmate (a capital offense) and described in detail the precise manner with which he dispatched the third inmate, (c) Innes made the "kite" available to the SPU and was requested to maintain the appearance he was still

---

[189] Sections 41.301-41.310, *Tex. Govt. Code Ann.* (Vernon Supp. 2012). A copy of these statutory provisions was admitted into evidence during the hearing as State Exhibit no. 39 and appears in S.F. Third States Habeas Hearing, Volume 8 of 9 (Exhibit Volume 1).

a member of the gang, (d) Innes testified in court on multiple occasions in support of the prosecution of the inmate who sent Innes the "kite," thereby incurring the wrath of the prison gang, and (e) Merillat's letter identified by petitioner's federal habeas counsel was intended to communicate the foregoing information to TDCJ officials and request they not punish Innes for having maintained open channels of communication with his fellow gang members during the investigation and prosecution of the capital murder offense.[190]

At that point, petitioner's federal habeas counsel interrupted Merillat's cross-examination and requested a break to consult with petitioner.[191]  When the hearing resumed, the following exchanges took place:

> THE COURT: Okay.  You had asked for the continuance, Mr. Levenson, I mean for the break.  You ready to proceed?
>
> MR. LEVENSON: Yes, Your Honor.  We are going to formally withdraw the claim in the petition regarding Mr. Merillat's Claim Number 2.  We will keep Claim Number 1, obviously, which we've already litigated, and we will formally withdraw Claim 2.
>
> MR. PETTY: Your Honor, the State would accept the withdrawal of their Claim Number 2 concerning A.P. Merillat.
>
> THE COURT: Okay.
>
> MR. LEVENSON: And Your Honor, *we would ask that this not be transcribed and be part of the hearing record of this morning's — I guess this morning's testimony by Mr. Merillat, his interrupted testimony.*
>
> THE COURT: Well, I don't see any reason why it would be transcribed and made a part of the record if you're abandoning any objections or complaint about Mr. Merillat's testimony.  Mr. Petty, do you see any problem with that?
>
> MR. PETTY: No, Your Honor.
>
> THE COURT: Okay.  All right.  I want to make sure that the record doesn't get cloudy here.  Number 1, I got all the time in the world.  I got today, I could rearrange some things, come back Monday, work Saturday, whatever, so I don't want anybody ever complaining that they were cut short.

---

[190] S.F. Third State Habeas Hearing, Volume 7 of 9, testimony of A.P. Merillat, at pp. 41-61.

[191] *Id.*, at p. 61.

Number 2. I made some earlier requests by way of some — an approach that I would like to see you take with regard to this witness. I don't want anybody later claiming that I in anyway dictated to them how they would proceed or fashion which they would present their case, because that's no so. You're perfectly free to pursue it any way you see fit, irregardless [sic] of my suggestions, which may or may not have any merit. This witness is here, I assume he's willing to stay until we're through, so I'm taking at least as far as my position in this case, when this gentleman gets off this stand, that that's the last time I'm going to hear his name or anybody's going to hear his name in connection with this Application for Writ, am I right?

MR. LEVENSON: That's correct.

MR. PETTY: Your Honor, I would ask the Court to do one thing, and that is to get on the record before the Court that counsel for defense, Mr. Levenson and co-counsel, consulted with Mr. Clinton Young about the withdrawal of it and that the withdrawal of Claim 2 is done with the consent and agreement by Clinton Young. We would like that on the record. If you'd make an inquiry to him —

THE DEFENDANT: Want me to say something?

MR. PETTY: Huh?

THE DEFENDANT: Want me to say it?

MR. PETTY: Your Honor, I would ask that you call upon the Defendant to see whether he agrees to the withdrawal of this claim against Mr. Merillat, that is Claim Number 2 in this application.

THE COURT: Okay. Now, first off, Mr. Young, I assume you have read the various applications that have been filed on behalf of your defense team with regard to the complaining about Mr. Merillat's testimony at the time of your trial. You've read all that, have you not?

THE DEFENDANT: Yes, sir.

THE COURT: You're aware of the allegations that have been made in the motions filed on behalf of your counsel throughout this proceeding for Writ of Habeas Corpus?

THE DEFENDANT: Yes, sir.

THE COURT: And I want to assume, but that's — well, I don't want to assume, either, but tell me, in your opinion have they been open with you in their explanation of the various claims that have been made in connection with this writ such that you fully understood what was going on?

THE DEFENDANT: Hundred percent.

THE COURT: Okay. You don't have any question, then, about them having proceeded on on the assumption that you knew what was going on and you understood when, in fact, you really didn't?

THE DEFENDANT: I've got pretty comprehensive skills. I know what's going on.

THE COURT: Okay. All right. So you've now heard the testimony of Mr. Merillat here today and you've heard Mr. Levenson say that they are prepared with your concurrence to abandon any claim that they may have earlier asserted with

regard to seeking a new trial because of their inability to have properly, in their opinion, cross-examined at the time of trial Mr. Merillat because of having been denied the benefit of alleged facts which they claim would have been the basis of some kind of cross-examination which may have established a bias on the part of Mr. Merillat or may have in some way discredited him by some prior inconsistent statements or positions he may have made to have done all of that in the presence of the jury for the purpose, once again, of impeaching his testimony. And you're aware that that was the whole purpose of the complaint about Mr. Merillat to start with, are you not?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. You've heard that they have, and they've represented to the court, by the way, that that decision has been made only after concurring with you and conferring with you, that being the purpose of the earlier request for a recess, and they did, in fact, during that period of time, discuss this fully with you?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Once again, Mr. Young, time is not of the essence here. I've got time, so if you want another break to discuss it with them further, if you say I would like another 15 minutes. Or matter of fact, Judge, it's 10:00 o'clock, I would like until 1:00 o'clock today to visit with my lawyers to make sure that I concur in this decision, I'm going to give you that time, you understand?

MR. LEVENSON: We have one more thing to talk about with Mr. Young, not about Merillat, we'll need an extra five minutes, but it's not about the Merillat part, so you can finish question with him, I just wanted to assure my client we can have five more minutes with him down the road.

THE COURT: Okay. You mean before we leave here today?

MR. LEVENSON: Yes, sir.

THE COURT: Okay. Well, are you going to need another recess before we continue this hearing, or are we about to bring this matter to a conclusion and you're just saying you need some more time to visit with him today before y'all depart?

MR. LEVENSON: No, I think I need five more minutes, we need five more minutes with him before we conclude the hearing. If you wanted to conclude the Merillat part, that part's been taken care of, we can finish that conversation and then we'll just ask for an additional five minutes to talk to Mr. Young.

THE COURT: *You understand, do you not, Mr. Young, that this is not a decision that you can go to sleep tonight, wake up in the morning and say huh-oh, you know, I acted hastily. I really was kind of forced into something and didn't realize it was coming, didn't see it coming, was confronted with it all of a sudden and had to make a decision and I've now concluded that decision was improvident and I wish I hadn't made it and I want to take it back, you understand you won't have that option?*

THE DEFENDANT: *I understand the structure of the claim. My attorney outlined everything, Mr. Levenson outlined everything to me and I trust Mr.*

*Levenson to do what he feels best, and he's doing that and I support him in his decision.*

THE COURT: Okay. Satisfied, Mr. Petty?

MR. PETTY: Yes, Your Honor. May this witness, Mr. A.P. Merillat, be excused?

THE COURT: You are excused, sir.

THE WITNESS: Sir, could I ask for clarification?

THE COURT: Sure.

THE WITNESS: Are you dropping all of the claims you made against me in the writ?

MR. PETTY: Yes.

MR. LEVENSON: Yes, Claim 2 has been dropped.

THE WITNESS: Item 2 means all of the allegations?

MR. PETTY: That's correct.

THE WITNESS: I just wanted —

MR. LEVENSON: We're withdrawing it. We're not dropping it, we're just withdrawing it.

THE COURT: Same thing.

THE WITNESS: Yes, sir. Thank you.

THE COURT: You're free to go.

THE WITNESS: Thank you.[192]

4.    State Habeas Trial Court's Findings & Conclusions

In an Order issued May 18, 2011,[193] the state trial court issued its findings of fact and conclusions of law in petitioner's third state habeas corpus proceeding, finding in pertinent part (1) at the time of petitioner's trial, no agreement existed between prosecutors and Mark Ray for leniency for Ray in exchange for Ray's testimony against petitioner,[194] (2) no express or implied plea agreement or understanding existed between David Page and prosecutors at the time of petitioner's

---

[192] *Id.,* at pp. 62-69 (Emphasis added).

[193] Multiple copies of the state trial court's lengthy Order issued May 18, 2011 appear in the records relating to petitioner's third state habeas corpus proceeding (sometimes referred to in the pleadings of petitioner's third state habeas corpus proceeding as petitioner's "second subsequent" state habeas proceeding). One copy of the trial court's findings and conclusions appears at pp. 2692-2843 of Third State Habeas Transcript, Volume 10 of 10. Another copy appears as a separate, unnumbered, volume among the records relating to petitioner's third (or "second subsequent") state habeas corpus proceeding. For consistency, when referring to the trial court's Order issued May 18, 2011, this Court will refer to the page numbers found in Third State Habeas Transcript, Volume 10 of 10.

[194] Third State Habeas Transcript, Volume 10 of 10, at pp. 2757, 2775-77.

trial,[195] (3) both Ray and Page testified accurately at petitioner's trial that no agreement or deals

existed between themselves and prosecutors in connection with their testimony against petitioner,[196]

(4) in all other respects, the trial testimony of Page and Ray was factually accurate,[197] and (5)

petitioner expressly abandoned all of his claims challenging the trial testimony of A.P. Merillat.[198]

>       5.      Texas Court of Criminal Appeals' Ruling

In an unpublished per curiam Order issued June 20, 2012, the Texas Court of Criminal

Appeals (1) denied relief on petitioner's *Brady* and *Giglio/Napue* claims (alleging the existence of

undisclosed plea agreements between prosecutors and prosecution witnesses Page and Ray and

knowing use by prosecutors of false trial testimony by those same witnesses at petitioner's trial) and

(2) dismissed petitioner's *Brady* and *Giglio/Napue* claims (alleging prosecutors failed to disclose

information or evidence which could have been employed to impeach prosecution expert A.P.

Merillat's trial testimony and knowing use by prosecutors of false testimony by Merillat). *Ex parte

Clinton Lee Young,* WR-65,137-03 (Tex. Crim. App. June 20, 2012).

J.      Return to this Court

On October 18, 2012, petitioner filed his second amended federal habeas corpus petition and

two thick volumes of exhibits, asserting therein thirty-nine claims for relief (including one

ineffective assistance claim comprised of eighteen discrete assertions of deficient performance by

---

[195] *Id.,* at pp. 2817, 2824.

[196] *Id.,* at pp. 2777, 2817-18, 2843.

[197] *Id.,* at pp. 2839-43. Specifically, the state trial court pointed to the relative consistency on all major points between Page's and Ray's statements to law enforcement authorities immediately after their arrests and their subsequent testimony at petitioner's trial as furnishing evidence they both testified accurately at petitioner's trial. *Id.*

[198] *Id.,* at p. 2839.

petitioner's trial counsel and numerous other claims that have never been presented in any manner to the state courts)(henceforth "Second Amended Petition"). *Docket entry nos. 87-90.*

On January 16, 2013, respondent filed his second amended answer. *Docket entry no. 95.*

On March 28, 2013, petitioner filed his reply in support of his second amended petition (henceforth "Petitioner's Reply"). *Docket entry no. 100.*

## II. <u>Standard of Review</u>

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 l.Ed.2d 334 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme

Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1439; *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534-35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33, 130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010)("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of...clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)("The

question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

As the Supreme Court has recently explained:

Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, ___ U.S. ___, ___, 132 S.Ct. 26, 27, 181 L.Ed.2d 328 (2011)(quoting *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 786-87, 178 L.Ed.2d 624 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301,

130 S.Ct. 841, 849, 175 L.Ed.2d 738 (2010)("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410, 120 S.Ct. at 1522 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U.S. at 301, 130 S.Ct. at 849; *Rice v. Collins*, 546 U.S. 333, 341-42, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006).

   In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74, 127 S.Ct. at 1939-40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005)("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1). It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood v. Allen*, 558 U.S. at 300, 130 S.Ct. at 849 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all

challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339, 126 S.Ct. at 974

(likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA

does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545

U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*,

537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003)("Even in the context of federal

habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not

by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits

of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate

decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's

written opinion supporting its decision. *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir.

2010)(federal habeas review of a state court's adjudication involves review only of a state court's

decision, not the written opinion explaining the decision), *cert. denied*, ___ U.S. ___, 132 S.Ct. 124,

181 L.Ed.2d 46 (2011); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir. 2006)(holding

Section 2254(d) permits a federal habeas court to review only a state court's decision and not the

written opinion explaining that decision), *cert. denied*, 550 U.S. 921 (2007); *Amador v. Quarterman*,

458 F.3d 397, 410 (5th Cir. 2006)(holding the same), *cert. denied*, 550 U.S. 920 (2007); *Pondexter

v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)(holding the precise question before a federal habeas

court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether

the state court's ultimate conclusion was objectively reasonable), *cert. denied*, 541 U.S. 1045 (2004);

*Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir. 2003)(holding a federal habeas court reviews only

a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230,

246 (5th Cir. 2002)(*en banc*)(holding a federal court is authorized by §2254(d) to review only a state

court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104

(2003).

### III. *Brady, Giglio/Napue,* & Confrontation Clause Claims

A. The Claims

    1.    Page and Ray's Alleged Plea Agreements

In his first claim for relief in his second amended petition

herein, petitioner argues (1) the prosecution failed to disclose to petitioner's trial counsel that it had

offered prosecution witnesses Page and Ray "informal promises of leniency and of favorable plea

agreements" to induce their testimony against petitioner and (2) the prosecution knowingly elicited

false testimony from both Page and Ray denying the existence of any promises or deals with

prosecutors to induce their trial testimony.[199]

    2.    Alleged Impeachment Evidence Against Expert Merillat

In his twenty-fifth claim for relief in his second amended petition, petitioner argues the

prosecution withheld from petitioner's trial counsel potential impeachment evidence which showed

(1) contrary to the testimony of prosecution expert A.P. Merillat, that Merillat had authority to order

---

[199] Second Amended Petition, filed October 18, 2012, docket entry no. 87 (henceforth "*Second Amended Petition*"), at pp. 58-118.; Petitioner's Reply in Support of Second Amended Petition, filed March 28, 2013, docket entry no. 100. at pp. 38-66.
    Petitioner also argues the prosecutors at his trial violated petitioner's Confrontation Clause rights by delaying the execution of Page's and Ray's plea agreements until after petitioner's trial. *Second Amended Petition*, at pp. 118-23.

TDCJ officials to change the housing and classification status of TDCJ inmates and (2) Merillat was involved in withholding *Brady* material in a different capital murder case.[200]

B.    State Court Disposition

1.    Claims Concerning Alleged Secret Deals for Page & Ray

Petitioner presented his complaints about alleged secret plea agreements involving Page and Ray to the state courts as his first claim for relief in his second subsequent (third) state habeas corpus application.[201]  As this Court explained above, the state habeas trial court heard extensive live testimony from a wide variety of witnesses,[202] reviewed petitioner's proffered affidavits and other documents, and expressly found (1) there were no plea agreements or promises of leniency made to either Page or Ray to induce their trial testimony and (2) neither Page nor Ray testified falsely during petitioner's trial.[203]  The Texas Court of Criminal Appeals reviewed the trial court's findings and conclusions and denied relief on the merits. *Ex parte Clinton Lee Young*, WR 65,137-03 (Tex. Crim. App. June 20, 2012).

2.    Impeachment Evidence Against Merillat

Petitioner presented his allegations regarding undisclosed impeachment evidence against prosecution expert Merillat as his second claim for relief in his second subsequent (third) state

---

[200] *Second Amended Petition*, at pp. 343-60.
In support of his assertions against Merillat, petitioner's federal habeas counsel submitted a number of sealed exhibits, attached as Exhibit nos. 132-39 to petitioner's first amended federal habeas corpus petition, filed October 20, 2008, docket entry no. 51.  The sealed exhibits were docketed as docket entry no. 59.

[201] Third States Habeas Transcript, Volume 1 of 10, at pp. 50-68.

[202] See notes 170-82, *supra*, and accompanying text.

[203] Third State Habeas Transcript, Volume 10 of 10, at pp. 2757, 2775-77, 2817-19, 2843.

habeas corpus application.[204]   As was explained above, after failing to confront Merillat with any

evidence allegedly in existence at the time of petitioner's trial and hearing Merillat's uncontradicted

testimony explaining the circumstances of his correspondence regarding TDCJ inmate Bruce Innes,

petitioner and his federal habeas counsel formally withdrew petitioner's *Brady* claim concerning

allegedly undisclosed impeachment evidence against Merillat.[205]   The state habeas trial court

expressly found petitioner had abandoned this claim.[206]   The Texas Court of Criminal Appeals

dismissed this claim. *Ex parte Clinton Lee Young*, WR 65,137-03 (Tex. Crim. App. June 20, 2012).

C.      Clearly Established Federal Law

   1.      *Brady* Claims

   Few constitutional principles are more firmly established by Supreme Court precedent than

the rule that "'the suppression by the prosecution of evidence favorable to an accused upon request

violates due process where the evidence is material either to guilt or to punishment, irrespective of

the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256,

1272, 157 L.Ed.2d 1166 (2004); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10

L.Ed.2d 215 (1963).

   The Supreme Court has consistently held the prosecution's duty to disclose evidence material

to either guilt or punishment, i.e., the rule announced in *Brady v. Maryland*, applies even when there

---

[204] Third State Habeas Transcript, Volume 1 of 10, at pp. 68-85.   In support of his claim the prosecution withheld evidence which could have been used to impeach Merillat's trial testimony, petitioner referenced a series of written communications written by or sent to Merillat several years prior to petitioner's capital murder trial and a *Texas Bar Journal* article published by Merillat in 2006. *Id.*

[205] *See* notes 185-92, *supra*, and accompanying text.

[206] Third States Habeas Transcript, Volume 10 of 10, at p. 2839.

has been no request by the accused. *Banks v. Dretke*, 540 U.S. at 690, 124 S.Ct. at 1272; *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 l.Ed.2d 286 (1999); *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).    This duty also applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280, 119 S.Ct. at 1948; *United States v. Bagley*, 473 U.S. 667, 676 & 685, 105 S.Ct. 3375, 3380 & 3385, 87 L.Ed.2d 481 (1985).

The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler v. Greene*, 527 U.S. at 280-81, 119 S.Ct. at 1948; *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995).   "[T]he individual prosecutor has a duty to learn of any favorable evidence *known to the others acting on the government's behalf* in this case, including the police." *Strickler v. Greene*, 527 U.S. at 281, 119 S.Ct. at 1948 *(Emphasis added)*; *Kyles v. Whitley*, 514 U.S. at 437, 115 S.Ct. at 1567.

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non-disclosure. *Banks v. Dretke*, 540 U.S. at 691, 124 S.Ct. at 1272; *Strickler v. Greene*, 527 U.S. at 281-82, 119 S.Ct. at 1948.    Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Smith v. Cain*, ___ U.S. ___, ___, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012); *Cone v. Bell*, 556 U.S. 449, 469-70, 129 S.Ct. 1769, 1783, 173 L.Ed.2d 701 (2009); *Banks v. Dretke*, 540 U.S. at 698-99, 124 S.Ct. at 1276.  A reasonable probability does not mean that the defendant would more likely than

not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Smith v. Cain*, ___ U.S. at ___, 132 S.Ct. at 630; *Kyles v. Whitley*, 514 U.S. at 434, 115 S.Ct. at 1566.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does *not* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383 (expressly adopting the "prejudice" prong of the *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*). Second, the materiality standard is *not* a sufficiency of the evidence test. *Kyles v. Whitley*, 514 U.S. at 434-35, 115 S.Ct. at 1566. Third, once materiality is established, harmless error analysis has no application. *Kyles v. Whitley*, 514 U.S. at 435-36, 115 S.Ct. at 1566-67. Finally, materiality must be assessed collectively, not item by item. *Kyles v. Whitley*, 514 U.S. at 436-37, 115 S.Ct. at 1567.

2.      *Giglio/Napue* (Knowing Use of Perjured Testimony) Claim

A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153-54, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 269-70, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in

question *knowing* that it was false. *Giglio v. United States*, 405 U.S. at 153-54, 92 S.Ct. at 766; *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007).

D.   <u>AEDPA Analysis of Claims Relating to Page and Ray</u>

During his most recent state habeas corpus proceeding, when he was represented by his federal habeas counsel herein, petitioner fully litigated his *Brady* and his *Giglio/Napue* claims involving the trial testimony of prosecution witnesses Ray and Page. The AEDPA's standard of review governs this Court's analysis of petitioner's first claim herein. This Court has reviewed the entirety of the voluminous state court records from petitioner's trial, direct appeal, and multiple state habeas corpus proceedings. This Court concludes the state habeas court's factual findings that (1) there were no secret plea agreements or promises of leniency between prosecutors and either Ray or Page and (2) both Page and Ray testified in a factually accurate manner during petitioner's trial concerning the absence of any such agreements or promises are fully supported by the evidence before the state habeas court.

While Ray and his mother testified during petitioner's third state habeas corpus proceeding that Ray had been offered a five-year sentence in exchange for his trial testimony against petitioner,[207] their assertions were categorically denied by not only the prosecutors and investigators Ray claimed had extended that offer to him,[208] but also by Ray's own trial counsel, attorney Richard

---

[207] S.F. Third States Habeas Hearing, Volume 2 of 9, testimony of Mark Ray, at pp. 145-46, 150-53, 165-66, 168, 174-75, 177, 180, 183, 185-86; Volume 5 of 9, testimony of Carolyn Darlene Ray, at pp. 11, 15, 23-24, 27, 29, 31-32, and 40.

[208] S.F. Third States Habeas Hearing, Volume 3 of 9, testimony of Joe Black, at pp. 21, 23-24, 26, 28-31, 38, 43-44, 47, 50, 52-53, 62-65; Volume 3 of 9, testimony of J.D. Luckie, at pp. 181-85, 193-94, 196-97, 204-05; Volume 5 of 9, testimony of Richard Berry, Jr., at pp. 60, 64, 74, 92-96, 98-106, 110-12, 115; Volume 3 of 9, testimony of Al Schorre, at p. 220.

Hurlburt, who testified (1) he had never heard of a five-year plea offer for Ray (or any of the other offers Ray claimed he had received for sixty, forty-forty-five, thirty, twenty, or ten years) and (2) neither former Harrison County District Attorney Rick Berry nor Berry's successor, Joe Black, ever extended such an offer to either him or Mark Ray.[209] Attorney Hurlburt also testified that, while he and former Harrison County District Attorney Rick Berry did engage in very preliminary discussions about Ray's case during which Berry opined that he "probably would make [Ray] an offer he couldn't refuse," he (Hurlburt) never construed Berry's words as a promise of a plea offer.[210] Berry fully corroborated Hurlburt's account of their conversations never reaching the stage where an agreement regarding a plea and sentence for Ray had been reached.[211] In addition, Ray admitted during his testimony at petitioner's most recent state habeas corpus proceeding that (1) his trial testimony denying the existence of any promises of leniency to induce his trial testimony against petitioner was "true" and (2) he told an investigator for petitioner in 2005 he had no deal with prosecutors.[212] Finally, petitioner presented no evidence to the state habeas court showing that either Ray or Hurlburt ever complained to anyone when Ray subsequently entered a plea in connection with the kidnaping of Doyle Douglas and received a fifteen-year sentence.

---

[209] S.F. Third State Habeas Hearing, Volume 3 of 9, testimony of Richard Hurlburt, at pp. 82-90, 95-100, 122-23, 126, 138-39, 148, 150.

[210] Id., at pp. 76, 89-93, 95, 96-98, 122-23, 126, 138-39, 149, 150, 160. Hurlburt also testified he was present during Ray's testimony at petitioner's trial and would never have permitted Ray to commit perjury by falsely denying the existence of a plea agreement had such an agreement existed, Id., at pp. 82, 150.

[211] S.F. Third State Habeas Hearing, Volume 5 of 9, testimony of Richard Berry, Jr., at pp. 60, 64, 74, 92-96, 98, 110-12.

[212] S.F. Third States Habeas Hearing, Volume 2 of 9, testimony of Mark Ray, at pp. 174-75, 181-82.

David Page insisted both at petitioner's trial and throughout his testimony at petitioner's most recent state habeas corpus proceeding that he never had a plea agreement with prosecutors in connection with the charges against him related to the murder of Samuel Petrey.[213]  Page admitted that he hoped he would benefit and possibly obtain some unspecified degree of leniency in exchange for his testimony against petitioner but insisted he knew there was no binding plea agreement in existence at the time he testified at petitioner's capital murder trial.[214]  Once again, the responsible prosecutor denied making any plea offers to Page or Page's attorney.[215]  Page's attorney testified that, while he had preliminary discussions in February, 2002 with Midland County District Attorney Al Schorre about a possible sentencing range of up to thirty years for Page, he understood Schorre was not promising to make such an offer and he did not construe Schorre's comments as a plea offer.[216]  Page's attorney also testified that while he and Page both hoped Page would receive some degree of leniency as a result of Page's testimony against petitioner, he and Page both understood there was no plea bargain in existence for a specific term of years and nothing the prosecutor had told them rose to the level of an enforceable agreement.[217]  Finally, both the Midland County District Attorney and Page's attorney testified that the prosecutor's comments in February, 2002 about a possible thirty-year sentence for Page were expressly conditioned upon Page passing a polygraph examination

---

[213] S.F. Third State Habeas Hearing, Volume 4 of 9, testimony of David Lee Page, Jr., at pp. 11-13, 19, 33, 37-39, 45-47, 49-51.

[214] Id., at pp. 19, 33, 37-39, 45-46, 51.

[215] S.F. Third States Habeas Hearing, Volume 3 of 9, testimony of Al Schorre, at pp. 223-24, 227-30, 233, 249-53, 264-65, 267, 275.

[216] S.F. Third States Habeas Hearing, Volume 2 of 9, testimony of H.W. Woody Leverett, at pp. 31-32, 55-56, 63-64, 66-67, 70-77, 97-98, 128-30.

[217] Id., at pp. 63-64, 67, 70-72, 76-77, 97-98, 128-30.

and other, then-undeveloped, evidence showing Page was not the shooter in Petrey's murder.[218] It was undisputed that (1) Page flunked a polygraph administered in late-February, 2002 and (2) all discussions between the Midland County District Attorney and Page's lawyer about a thirty-year sentence promptly ended.[219] Finally, Page's trial counsel testified he was present during Page's testimony at petitioner's trial and believed Page's testimony denying the existence of any agreements or promises to induce Page's testimony against petitioner to be factually accurate.[220]

A witness must possess more than a mere unilateral expectation or subjective belief he or she will receive a benefit in exchange for their testimony before information regarding the arrangement between the witness and prosecution rises to the level of *Brady* materiality. *See Knox v. Johnson*, 224 F.3d 470, 482 (5th Cir. 2000)(witness' subjective hope the State would recognize his assistance did not establish the State had even subtly offered him a deal for his testimony), *cert. denied*, 532 U.S. 975 (2001); *Hill v. Johnson*, 201 F.3d 481, 486 (5th Cir. 2000)(subjective beliefs of witnesses regarding the possibility of future favorable treatment are insufficient to trigger the State's duty to disclose under *Brady*), *cert. denied*, 532 U.S. 1039 (2001); *Goodwin v. Johnson*, 132 F.3d 162, 187 (5th Cir. 1997)("a nebulous expectation of help from the state" is not *Brady* material).

Under such circumstances, the state habeas court reasonably rejected as factually flawed petitioner's contentions that either Page or Ray had been offered a plea agreement or that promises of leniency had been made to Ray or Page to induce their trial testimony against petitioner. The state

---

[218] S.F. Third States Habeas Hearing, Volume 2 of 9, testimony of H.W. Woody Leverett, at pp. 32, 35, 38-39, 56, 58, 63-64, 66-67; Volume 3 of 9, testimony of Al Schorre, at pp. 250-51, 253, 265, 275.

[219] S.F. Third States Habeas Hearing, Volume 2 of 9, testimony of H.W. Woody Leverett, at pp. 35, 38-39; Volume 3 of 9, testimony of Al Schorre, at pp. 227-28, 249-53.

[220] S.F. Third States Habeas Hearing, Volume 2 of 9, testimony of H.W. Woody Leverett, at pp. 126-27.

habeas court's factual findings, fully supported by the evidence before that court, establish there was no false testimony given by Ray or Page at trial concerning the absence of any plea agreements or promises of leniency to induce their trial testimony against petitioner. Thus, petitioner failed to show the existence of any evidence at the time of petitioner's trial concerning secret plea agreements or promises of leniency that could have been used to impeach Ray's or Page's trial testimony. Petitioner's first claim does not satisfy the first or second prongs of *Brady* analysis, i.e., petitioner has failed to establish that any potentially beneficial information regarding undisclosed plea agreements or promises of leniency made to Ray or Page actually existed at the time of petitioner's trial. In addition, because petitioner failed to establish that Ray or Page furnished any factually inaccurate testimony at petitioner's trial, petitioner's first claim also fails to satisfy the first and third prongs of *Giglio/Napue* analysis, i.e., petitioner failed to show Ray or Page gave any false testimony or that prosecutors knew Ray or Page testified falsely.

The Texas Court of Criminal Appeals' rejections on the merits of petitioner's *Brady* and *Giglio/Napue* claims premised on the existence of plea agreements or promises of leniency made to Ray and Page were neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's third state habeas corpus  proceeding.  Petitioner's *Brady* and *Giglio/Napue* claims contained in petitioner's first claim for relief herein do not warrant federal habeas relief.

E.     Analysis of Claim Concerning Impeachment of A.P. Merillat

In open court during petitioner's third, and most recent, state habeas corpus proceeding, petitioner and his federal habeas counsel formally withdrew his *Brady* claim premised upon the prosecution's alleged failure to disclose evidence which could have been used to impeach prosecution expert witness A.P. Merillat.[221]  Nonetheless, petitioner has asserted the same claim as his twenty-fifth claim herein.[222]  Respondent argues petitioner has procedurally defaulted on this claim by failing to exhaust available state remedies on same.[223]

1.     Procedural Default Generally

Procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1, 111 S.Ct. 2546, 2557 n.1, 115 L.Ed.2d 640 (1991). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999).  Procedural defaults only bar federal habeas review when the state procedural rule which forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state

---

[221] *See* notes 185-92, *supra*, and accompanying text.

[222] *Compare Second Amended Petition*, at pp. 343-60 with Third State Habeas Transcript, Volume 1 of 10, at pp. 68-85.
Curiously, petitioner's pleadings in this Court make no reference or allusion to any of the testimony given by A.P. Merillat during the evidentiary hearing held July 23, 2010 in petitioner's most recent state habeas corpus proceeding.

[223] Respondent's Second Amended Answer, filed January 16, 2013, docket entry no. 95, at p. 207.

judicial review of the merits of a federal constitutional claim. *Ford v. Georgia*, 498 U.S. 411, 424, 111 S.Ct. 850, 857-58, 112 L.Ed.2d 935 (1991).

2.     The Duty to Exhaust Available State Remedies

Before seeking federal habeas corpus relief, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' *federal* rights. *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 1731, 144 L.Ed.2d 1 (1999); *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); 28 U.S.C. §2254(b)(1). To provide the State with this necessary "opportunity," the prisoner must "fairly present" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim. *See Baldwin v. Reese*, 541 U.S. at 29-32, 124 S.Ct. at 1349-51 (rejecting the argument that a petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan v. Boerckel*, 526 U.S. at 844-45, 119 S.Ct. at 1732-33 (holding comity requires that a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that State's established appellate review process); *Gray v. Netherland*, 518 U.S. 152, 162-63, 116 S.Ct. 2074, 2081, 135 L.Ed.2d 457 (1996) (holding that, for purposes of exhausting state remedies, a claim for *federal* relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and

rejecting the contention that the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief).

The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts and, thereby, to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. *Carey v. Saffold*, 536 U.S. 214, 220, 122 S.Ct. 2134, 2138, 153 L.Ed.2d 260 (2002); *Duncan v. Walker*, 533 U.S. 167, 179, 121 S.Ct. 2120, 2128, 150 L.Ed.2d 251 (2001); *O'Sullivan v. Boerckel*, 526 U.S. at 845, 119 S.Ct. at 1732; *Rose v. Lundy*, 455 U.S. 509, 518-19, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982).

Under the AEDPA, federal courts lack the power to grant habeas corpus relief on unexhausted claims. *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003)("28 U.S.C. § 2254(b)(1) requires that federal habeas petitioners fully exhaust remedies available in state court before proceeding in federal court."), *cert. denied*, 543 U.S. 835 (2004),; *Riley v. Cockrell*, 339 F.3d 308, 318 (5th Cir. 2003); *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003); *Henry v. Cockrell*, 327 F.3d 429, 432 (5th Cir. 2003)("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."), *cert. denied*, 540 U.S. 956 (2003); *Mercadel v. Johnson*, 179 F.3d 271, 276-77 (5th Cir. 1999); *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir. 1998); *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998), *cert. denied*, 528 U.S. 895 (1999). However, Title 28 U.S.C. §2254(b)(2) empowers a federal habeas court to deny an unexhausted claim on the merits. *Pondexter v. Quarterman*, 537 F.3d 511, 527 (5th Cir. 2008), *cert, denied*, 555 U.S. 1219, 129 S.Ct. 544, 173 L.Ed.2d 671 (2009)); *Moreno v. Dretke*, 450 F.3d 158, 166 (5th Cir. 2006), *cert. denied*, 549 U.S. 1120, 127 S.Ct. 935,

166 L.Ed.2d 717 (2007); *Smith v. Cockrell*, 311 F.3d 661, 684 (5th Cir. 2002), *cert. dism'd*, 541 U.S. 913 (2004); *Daniel v. Cockrell*, 283 F.3d 697, 701-02 (5th Cir. 2002), *cert. denied*, 537 U.S. 874 (2002). The exhaustion of *all* federal claims in state court is a fundamental prerequisite to requesting federal collateral relief under Title 28 U.S.C. Section 2254. *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001); *Sterling v. Scott*, 57 F.3d 451, 453 (5th Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996); 28 U.S.C. §2254(b)(1)(A).

In order to "exhaust" available state remedies, a petitioner must "fairly present" *all* of his claims to the state courts. *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. at 270, 275-76, 92 S.Ct. 509, at 512-13, 30 L.Ed.2d 438 (1971); *Kunkle v. Dretke*, 352 F.3d at 988; *Riley v. Cockrell*, 339 F.3d at 318; *Anderson v. Johnson*, 338 F.3d at 386; *Jones v. Jones*, 163 F.3d at 296; *Shute v. State of Texas*, 117 F.3d at 237 ("a habeas petitioner 'must fairly apprize [sic] the highest court of his state of the federal rights which were allegedly violated.'"). In Texas, the highest state court with jurisdiction to review the validity of a state criminal conviction is the Texas Court of Criminal Appeals. *Richardson v. Procunier*, 762 F.2d 429, 431-32 (5th Cir. 1985).

More simply, the exhaustion doctrine requires that the petitioner present his *federal* claim in a manner reasonably designed to afford the State courts a meaningful opportunity to address same. The exhaustion requirement is satisfied when the substance of the *federal* habeas claim has been "fairly presented" to the highest state court, i.e., the petitioner presents his claims before the state courts in a procedurally proper manner according to the rules of the state courts. *Baldwin v. Reese*, 541 U.S. at 29-32, 124 S.Ct. at 1349-51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said

counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002), *cert. denied*, 537 U.S. 1236 (2003); *Mercadel v. Johnson*, 179 F.3d at 275.  However, the petitioner need not spell out each syllable of the claim before the state court for the claim to have been "fairly presented" and thereby fulfill the exhaustion requirement. *Riley v. Cockrell*, 339 F.3d at 318; *Fisher v. Texas*, 169 F.3d 295, 303 (5th Cir. 1999).

The exhaustion requirement is not met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless*, 459 U.S. 4, 6-7, 103 S.Ct. 276, 277-78, 74 L.Ed.2d 3 (1982); *Scott v. Hubert*, 635 F.3d 659, 667 (5th Cir.), *cert, denied*, ___ U.S. ___, 132 S.Ct. 763, 181 L.Ed.2d 485 (2011); *Riley v. Cockrell*, 339 F.3d at 318 ("It is not enough that the facts applicable to the federal claims were all before the State court, or that the petitioner made a similar state-law based claim.  The federal claim must be the 'substantial equivalent' of the claim brought before the State court."); *Wilder v. Cockrell*, 274 F.3d at 259 ("where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement"); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001). Likewise, to have "fairly presented" his <u>federal</u> claim, the petitioner must have reasonably alerted the state courts to the *federal* nature of his claim. *Baldwin v. Reese*, 541 U.S. at 29-32, 124 S.Ct. at 1349-51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Wilder v. Cockrell*, 274 F.3d at 260 ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not

sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights.").

### 3. Procedural Default on Unexhausted Claims

The Fifth Circuit has consistently held that federal habeas review on unexhausted claims presented by a convicted Texas criminal defendant is barred under the procedural default doctrine. *See, e.g., Aguilar v. Dretke*, 428 F.3d 526, 533 (5th Cir. 2005)(holding the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling), *cert. denied*, 547 F.3d 1136 (2006); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004)(holding the violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim), *cert. denied*, 543 U.S. 1124 (2005); *Bagwell v. Dretke*, 372 F.3d 748, 755-56 (5th Cir. 2004)(holding a petitioner procedurally defaulted by failing to "fairly present" a claim to the state courts in his state habeas corpus application), *cert. denied*, 543 U.S. 989 (2004); *Cotton v. Cockrell*, 343 F.3d 746, 755 (5th Cir. 2003)(holding the Texas writ abuse doctrine is an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied*, 540 U.S. 1186 (2004); *Henderson v. Cockrell*, 333 F.3d 592, 605 (5th Cir. 2003(recognizing the Texas writ-abuse doctrine has been strictly and regularly applied since before August, 1997), *cert. denied*, 540 U.S. 1163 (2004); *Smith v. Cockrell*, 311 F.3d 661, 684 (5th Cir. 2002)(holding unexhausted claims were procedurally barred), *cert. dism'd*, 541 U.S. 913 (2004); *Jones v. Johnson*, 171 F.3d 270, 276-77 (5th Cir. 1999)(holding unexhausted ineffective assistance claim procedurally barred from federal habeas review), *cert. denied*, 527 U.S. 1059 (1999); *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998)(holding unexhausted claims procedurally barred), *cert. denied*, 523 U.S. 1113 (1998); *Nobles v. Johnson*, 127

F.3d 409, 423 (5th Cir. 1997)(holding the Texas writ-abuse rule an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied*, 523 U.S. 1139 (1998).

Section 5 of Article 11.071 of the Texas Code of Criminal procedure prohibits a successive state habeas corpus application except in limited circumstances which do not apply to petitioner's complaint about the violation of the presumption of innocence arising from the alleged vagueness of the first Texas capital sentencing special issue. *See* Art. 11.071, §5(a), Tex. Code Crim. Proc. Ann. (Vernon Supp. 2011)(barring consideration on the merits of new claims contained in a subsequent state habeas corpus application unless either (1) the new claims could not have been presented in a previous application because the legal or factual basis for the new claims were unavailable at the time the previous application was filed, (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt, or (3) by clear and convincing evidence, but for a violation of the United States Constitution, no rational juror would have answered in the state's favor one or more of the capital sentencing special issues). Absolutely nothing prevented petitioner from asserting this same *Brady* claim in the course of his direct appeal or any of his three state habeas corpus proceeding. Petitioner did, in fact, present (and then formally withdraw) this same *Brady* claim in the course of his third state habeas corpus proceeding. Likewise, petitioner alleges no facts in this Court and presented the state habeas court with no evidence which satisfied either of the final two exceptions to the Texas writ-abuse barrier erected by Section 5 of Article 11.071. On the contrary, the evidence of petitioner's guilt was overwhelming (three eyewitnesses corroborated petitioner's confession to Patrick Brook that he murdered Doyle Douglas; David Page identified petitioner as the lone shooter of Samuel Petrey; petitioner confessed to Bart Lynch, Rosemary Sanders, and Amber

114

Lynch that he (petitioner) stole Petrey's pickup truck; and, in stark contrast to Page's actions in turning himself into authorities following Petrey's murder, petitioner took extremely dangerous, evasive, action to avoid apprehension when approached by law enforcement officers), as was the evidence supporting the jury's answers to the petitioner's capital sentencing special issues.

### 4.    Longstanding Exceptions to Procedural Default Doctrine

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show either (1) "cause and actual prejudice" for his default or (2) that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750, 109 S.Ct. at 2565; *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989).

To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine).

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335-36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable

115

juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. at 346-48, 112 S.Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347, 112 S.Ct. at 2523.

     5.    <u>Inapplicable Recently Recognized Narrow Exception</u>

In a pair of recent decisions, the United States Supreme Court has recognized an equitable exception to the doctrine of procedural default where a federal habeas corpus petition can make a showing that his failure to exhaust available state remedies *on a federal constitutional claim of ineffective assistance by trial counsel* resulted from deficient performance on the part of the petitioner's state habeas counsel. More specifically, the Supreme Court's recent holding in *Martinez v. Ryan*, 566 U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), carved out of the Supreme Court's procedural default jurisprudence a narrow exception for *claims of ineffective assistance by trial counsel* which were not raised in a convicted criminal defendant's state habeas corpus proceeding because of the ineffective assistance of the defendant's state habeas counsel. *See Martinez v. Ryan*, 566 U.S. at ___, 132 S.Ct. at 1315 ("Inadequate assistance of counsel at initial review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial). In *Trevino v. Thaler*, ___ U.S. ___, ___, 133 S.Ct. 1911, 1912, 185 L.Ed.2d 1044 (2013), the Supreme Court reaffirmed the narrow focus of its holding in *Martinez*: "In *Martinez v. Ryan,* 566 U.S. 1, ___, 132 S.Ct. 1309, 1320, 182 L.Ed.2d 272, this Court held that 'a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance

at trial if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.'"

Petitioner's twenty-fifth claim herein does not present a complaint of ineffective assistance by petitioner's trial counsel that was foreclosed from state habeas review by virtue of the ineffective assistance of petitioner's state habeas counsel. On the contrary, petitioner's twenty-fifth claim herein is an attempt to resurrect a *Brady* claim which petitioner and his federal habeas counsel (acting as petitioner's state habeas counsel following this Court's issuance of a stay to permit exhaustion of then-unexhausted federal constitutional claims) formally chose to withdraw from consideration by the state habeas court. As such, the Supreme Court's recent holdings in *Trevino v. Thaler, supra,* and *Martinez v. Ryan, supra,* have no application to petitioner's procedural default on petitioner's twenty-fifth claim herein.

6.    Conclusions Regarding Procedural Default

By formally withdrawing his *Brady* claim based upon allegedly undisclosed impeachment evidence applicable to prosecution expert Merillat, petitioner effectively deprived the state habeas court of a fair opportunity to address the merits of that claim. *See Johnson v. Cain*, 712 F.3d 227, 233-34 (5th Cir.)("By disclaiming reliance on a potential ground for habeas relief, a state habeas petitioner signals to the state courts that they need not pass judgment upon it. Allowing the petitioner to revive that claim in a federal habeas petition, without giving the state courts the initial opportunity to review it, would be inconsistent with comity interests and would subvert the primary purpose of the exhaustion requirement."), *cert. denied*, ___ U.S. ___, 134 S.Ct. 431, ___ L.Ed.2d ___ (2013).

Thus, petitioner's twenty-fifth claim herein currently remains unexhausted, despite this Court's stay of this cause for more than three years (from February 25, 2009 until June 25, 2012) to permit petitioner to exhaust available state remedies on this and other previously unexhausted claims, and is therefore procedurally defaulted. *Id.* Petitioner has alleged no facts showing that either of the longstanding exceptions to the procedural default doctrine discussed above excuse petitioner's failure to exhaust state habeas remedies on his twenty-fifth claim herein. Likewise, petitioner's twenty-fifth claim herein does not fall within the narrow purview of the Supreme Court's recent holdings in *Martinez v. Ryan, supra,* and *Trevino v. Thaler, supra.* Petitioner has procedurally defaulted on his unexhausted twenty-fifth claim herein.

7.   Alternatively, No Merit on *De Novo* Review

Nonetheless, Title 28 U.S.C. §2254(b)(2) empowers a federal habeas court to deny an unexhausted claim on the merits. *Pondexter v. Quarterman,* 537 F.3d at 527; *Moreno v. Dretke,* 450 F.3d at 116.

Because no state court has ever addressed the merits of the petitioner's twenty-fifth claim herein, this Court's review of that federal constitutional claim is necessarily *de novo. See Porter v. McCollum,* 558 U.S. 30, 39, 130 S.Ct. 447, 452, 175 L.Ed.2d 398 (2009)(holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice).

In his pleadings in both this Court and his most recent state habeas corpus proceeding, petitioner refers to a series of letters written by or sent to Merillat by TDCJ inmates concerning a TDCJ inmate named Bruce Innes.[224] Petitioner argues this correspondence somehow shows Merillat misrepresented during his trial testimony the limited scope of his authority vis-a-vis the housing and classification status of TDCJ inmates (by furnishing evidence Merillat routinely communicates with TDCJ officials on those subjects).

The problems with this argument are two-fold.  First, contrary to the implications of petitioner's argument, Merillat never denied that he communicated with TDCJ officials regarding the housing or classification status of at least some TDCJ inmates.  Rather, during his trial testimony, Merillat testified only that, in his experience, neither a jury, a judge, nor anyone else could dictate to the TDCJ how or where it could house an inmate.[225]  During his testimony in petitioner's most recent state habeas corpus proceeding, Merillat testified without contradiction that he had on many occasions passed on requests for changes in housing status or location of incarceration from TDCJ inmates to TDCJ officials but Merillat made clear the response of TDCJ officials to his communications had ranged from TDCJ officials following his recommendations to them telling him to mind his own business.[226]

Second, this Court has carefully reviewed the documents petitioner submitted as sealed exhibits herein and finds they contain absolutely no evidence suggesting A.P. Merillat or the Special

---

[224] These documents appear as sealed exhibit nos. 132-39 to petitioner's first amended federal habeas corpus petition and were docketed as Docket entry no. 59.

[225] S.F. Trial, Volume 35, testimony of A.P. Merillat at p. 96.

[226] S.F. Third State Habeas Hearing, Volume 7 of 9, testimony of A.P. Merillat, at pp. 30-31.

Prosecution Unit for which he is employed possesses any legal authority to dictate to TDCJ officials how or where TDCJ inmates will be housed.[227]  Contrary to the suggestions contained in petitioner's pleadings herein, nothing in any of Merillat's correspondence suggests or implies that he or anyone else at the SPU possesses or has ever exercised or attempted to exercise the legal authority to direct

---

[227] Exhibit 132 is a one-page letter dated June 15, 1998 from Merillat to a TDCJ official regarding the efforts of a TDCJ inmate named Bruce Innes to pursue "the de-confirmation process." Nothing in either the tone or language of that letter suggests Merillat was instructing the TDCJ official addressed therein to take any particular action regarding Innes.

Exhibit 133 is an envelope and four-page handwritten letter dated July 9, 2000 addressed to Merillat apparently from a TDCJ inmate. The contents of that letter suggest the inmate-author possessed information concerning a criminal case Merillat was investigating. Nothing in that letter, which is itself frank hearsay vis-a-vis Merillat, could have been utilized to impeach Merillat's trial testimony.

Exhibit 134 is a one-page letter from Merillat to TDCJ inmate Innes addressing a number of apparent complaints Innes had communicated to Merillat. In his letter, Merillat (1) encourages Innes to communicate to Merillat any concerns Innes had over any unkept promises Innes feels have been made to Innes by unidentified persons involved with Innes' cases and (2) explains to Innes that the SPU has the authority to determine independently of the TDCJ whether it will pursue criminal charges against an inmate accused of a disciplinary violation. Nothing in that letter suggests or implies Merillat possesses any authority to dictate anything to TDCJ officials.

Exhibit 135 is a one-page letter dated July 12, 2000 from Merillat to Innes explaining that Merillat has forwarded requests for a change of Innes' housing to TDCJ officials but admonishes that Innes' housing will depend on Innes' classification status and other factors and concludes with the caveat that Merillat is not promising Innes anything and cannot do so because others have the power of the final decision regarding where Innes will be housed.

Exhibit 136 is an envelope and a twenty-page type-written letter from a different TDCJ inmate to Merillat (1) in which the inmate asks for assistance for himself and other inmates with a variety of matters and (2) which would have been rank hearsay vis-a-vis Merillat at petitioner's trial and, therefore, unavailable to impeach Merillat.

Exhibit 137 appears to be two pages of hand-written notes concerning the capital murder investigation Merillat involving inmate Innes which was described in detail during his testimony at petitioner's most recent state habeas corpus proceeding. Once again, nothing therein suggests Merillat or the SPU possesses any authority over TDCJ officials with regard to any matter.

Exhibit 138 is a one-page letter dated June 12, 2000 from Merillat to Innes discussing the capital murder investigation Merillat described in detail in his testimony during petitioner's most recent state habeas corpus proceeding. The letter concludes with Merillat encouraging Innes to pass on to Merillat any new information Innes obtains regarding the capital murder in question.

Exhibit 139 is a four-page, handwritten, letter addressed to Merillat dated March 6, 2000 and apparently from Innes which would have been rank hearsay vis-a-vis Merillat at petitioner's trial.

Nothing in any of this correspondence could have been utilized to impeach any of Merillat's testimony at petitioner's trial. Nowhere in any of these documents does Merillat purport to exercise or claim authority over TDCJ officials with regard to inmate housing issues. On the contrary, as Merillat repeatedly makes clear to the individuals to whom he writes, he can only pass on requests and recommendations to TDCJ officials.

TDCJ personnel with regard to how or where TDCJ inmates are housed.  Thus, none of those documents could have been employed to impeach Merillat's trial testimony.[228]

Petitioner has failed to allege any specific facts, much less present this Court with any evidence, showing that any evidence existed at the time of petitioner's capital murder trial which was available to impeach any of prosecution expert Merillat's trial testimony. Petitioner's pleadings both herein and in petitioner's third state habeas corpus proceeding argue that an article Merillat wrote which was published in a 2006 edition of the *Texas Bar Journal* somehow suggests Merillat is biased in favor of the death penalty.  However, petitioner has alleged no facts, much less furnished any evidence, showing any of the information contained in Merillat's 2006 *Texas Bar Journal* article was either (1) in existence at the time of petitioner's 2003 capital murder trial or (2) withheld by the prosecution from petitioner's trial counsel before or during petitioner's 2003 capital murder trial. In fact, as pointed out succinctly by the state trial judge, the only information petitioner identified during petitioner's most recent state habeas corpus proceeding as arguably showing bias on Merillat's part consisted of information Merillat furnished to an unidentified person on a web site message board consisting of statistics regarding the cost of housing inmates on Texas death row.[229] Petitioner has alleged no facts, much less furnished any evidence, showing any of the factual information (statistical or otherwise) Merillat furnished in either his 2006 Texas Bar Journal article or any of the statistics Merillat cited in his 2006 entry on an electronic message board was factually inaccurate or otherwise furnished any rationale basis for imputing bias to Merillat. Thus, petitioner's

---

[228] Exhibits 133, 136, and 139 are all letters written by TDCJ inmates to Merillat.  Nothing in the documents now before this Court suggests or implies Merillat has ever adopted any of the hearsay declarations contained in those three documents as his own.

[229] *See* note 188, *supra*, and accompanying text.

twenty-fifth claim herein fails to satisfy the first two prongs of *Brady* analysis, i.e., petitioner has failed to allege any specific facts showing any information which could have been used to impeach Merillat's trial testimony at petitioner's 2003 capital murder trial was actually available for that purpose at that time and withheld by prosecutors.

Petitioner also alleges in conclusory fashion that Merillat and the SPU were guilty of withholding unspecified evidence in connection with a different capital murder case but fails to identify with any reasonable degree of specificity either (1) the role, if any, Merillat personally played in the aforementioned alleged *Brady* violation, (2) any rational basis for believing Merillat, who apparently is not a licensed attorney, could be deemed responsible for the failure of a prosecuting attorney to comply with the disclosure requirements of *Brady*, (3) how the failure of prosecutors to disclose *Brady* information in that separate capital murder case has any relevance to Merillat's trial testimony regarding policies and procedures at TDCJ facilities, or (4) how the failure of the prosecutors in that other case to comply with the Supreme Court's holding in *Brady* casts any aspersions upon Merillat's personal character or reputation for truthfulness as an expert witness on TDCJ policies and practices. Petitioner presented the state habeas court with no evidence supporting his conclusory assertion that Merillat was somehow personally involved in a vaguely defined *Brady* violation in a separate case and offers this Court absolutely no specific facts to support that assertion.[230]

---

[230] Petitioner presents this Court with no fact-specific allegations, much less any evidence, establishing Merillat's personal role in the other capital murder case in which the alleged *Brady* violation occurred. Merillat testified without contradiction during both petitioner's trial and most recent state habeas corpus proceeding that he serves as an investigator, expert witness, and consulting expert in criminal prosecutions involving TDCJ inmates. At no point, did Merillat identify himself as a prosecuting attorney or place himself in a position in which he would personally have been responsible for furnishing a criminal defense counsel with *Brady* material. Nor has petitioner alleged any facts showing Merillat personally withheld any information falling within the parameters of *Brady* from any criminal defense counsel. Finally, petitioner has alleged no facts showing Merillat has ever had any personal knowledge regarding any alleged

Moreover, petitioner has alleged no facts, much less furnished any evidence, showing any allegedly undisclosed impeachment evidence vis-a-vis Merillat existed at the time of petitioner's trial which was "material" within the meaning of *Brady* analysis. There was very little difference in the testimony of the prosecution's experts and the defense's expert regarding policies and procedures within the TDCJ for housing and classifying inmates. Royce Smithey, Dessie Cherry, and A.P. Merillat all described the TDCJ's classification process in basically the same terms, cited the same statistics regarding the incidence of violence within the TDCJ, and described the different types of housing available within TDCJ in much the same terms.[231] The only significant difference between the testimony of petitioner's trial expert, i.e., retired Warden Cherry, and the prosecution's experts addressed the classification status of inmates convicted of capital murder sentenced to life imprisonment. Warden Cherry testified at the punishment phase of petitioner's trial that inmates convicted of capital murder would necessarily be classified at the G-4 or G-5 level upon their admission to the TDCJ.[232] In contrast, prosecution expert Merillat testified inmates sentenced to life imprisonment following a capital murder conviction would not *automatically* enter the TDCJ system at level G-4 or G-5 but, rather, would enter at level G-3 *unless* the classification committee deemed those inmates unusually dangerous or violent.[233] Thus, the only difference of significance appeared

_____

withholding of *Brady* material from any criminal defense counsel.

[231] *See* notes 88, 94, and 107, *supra*, and accompanying text.

[232] S.F. Trial, Volume 33, testimony of Dessie Cherry, at pp. 34-35, 76.

[233] S.F. Trial, Volume 35, testimony of A.P. Merillat, at pp. 58-59, 63-64, 97-99, 106-07, 125. Specifically, Merillat testified he did not know if an inmate could be classified at the G-4 or G-5 level during initial diagnostic evaluation but assumed it was possible depending upon the inmate's behavior. *Id.*, at p. 99. Thus, when viewed objectively there did not appear to be any significant difference between the expert testimony of witnesses Cherry and Merillat other than their disagreement over whether, if petitioner received a life sentence, petitioner faced the prospect of *automatic* classification at the G-4/G-5 level upon admission to the TDCJ. Given the fact TDCJ changed its classification scheme in December, 2000, only eight months before Warden Cherry retired, and the reasonable possibility

to be expert witness Cherry's testimony that petitioner would *automatically* receive a G-4 or G-5 classification while expert Merillat opined petitioner would receive a G-3 classification unless petitioner's classification committee deemed petitioner a higher threat to institutional security. Significantly, petitioner has presented this Court with absolutely no fact-specific allegations, much less any evidence, showing Merillat's trial testimony in this, or any other, regard was factually inaccurate or that prosecutors withheld any evidence available at the time of petitioner's trial which could have been used to impeach Merillat's trial testimony.

Petitioner points to testimony given by Merillat at trial to the effect that no one can dictate to the TDCJ how or where a particular inmate will be housed. The specific quote is as follows: "A jury or a judge, nobody can tell the prison where or how to house an inmate."[234] During the hearing on petitioner's third state habeas corpus application, petitioner's federal habeas counsel introduced a two-page "stipulation" from a TDCJ employee which provided in pertinent part (1) the TDCJ had received communications from members of the Special Prosecution Unit, including A.P. Merillat, relevant to where or how an inmate should be classified, (2) TDCJ had considered that information in determining where an inmate was housed and how an inmate was classified, and (3) the TDCJ "has sole authority and discretion to determine where an inmate is housed and how an inmate is

---

TDCJ officials were still attempting to iron out the wrinkles in their new classification scheme at the time of petitioner's capital murder trial in March and April, 2003, the differences between Warden Cherry's testimony and Mr. Merillat's testimony on this point appear relatively insignificant. Both appeared to agree petitioner would be classified at least at the G-3 level; they only disagreed on whether petitioner would *automatically* receive a G-4 or G-5 classification based solely upon his conviction for capital murder and receipt of a potential life sentence.

[234] S.F. Trial, Volume 35, testimony of A.P. Merillat, at p. 96.

classified within the prisons operated by" the TDCJ.[235]  Nothing in this stipulation can reasonably be construed as establishing A.P. Merillat's testimony during trial quoted above was factually inaccurate.  Furthermore, as was explained at length above, when petitioner's federal habeas counsel attempted to challenge Merillat on this same point by presenting a letter written to TDCJ officials by Merillat concerning the housing of a particular inmate, Merillat explained the purpose behind his letter was to help protect an inmate who was cooperating with an ongoing capital murder investigation into a gang-related murder within the TDCJ from being punished or disciplined by TDCJ officials for receiving written communications from gang members when prosecutors and investigators had specifically requested the inmate in question remain open to receipt of such communications.   At that point, petitioner and his federal habeas counsel formally withdrew petitioner's claim attacking Merillat's trial testimony and all allegations against Merillat.[236]

There is no evidence currently before this Court showing that any evidence existed at the time of petitioner's trial which could have been employed to impeach any of the trial testimony of prosecution expert witness A.P. Merillat.  Merillat's expert testimony was introduced in rebuttal to the testimony of petitioner's own expert but Merillat and Warden Cherry did not differ significantly on any matters substantial to the outcome of the punishment phase of petitioner's capital murder trial.  Merillat testified, among other things, regarding the availability of materials in TDCJ facilities from which inmates could fashion weapons, the frequency of violent offenses and escapes in the TDCJ system, and the manner in which prescription medications are distributed in the general prison

---

[235] Stipulation of the Parties Regarding the Testimony of Edith Reeves, State Exhibit no. 38 in petitioner's third state habeas corpus proceeding, admitted into evidence July 23, 2010, S.F. Third State Habeas Hearing, Volume 7 of 9, at p. 7.

[236] S.F. Third State Habeas Hearing, Volume 7 of 0, testimony of A.P. Merillat, at pp. 62-69.

population.  Warden Cherry did not disagree with those aspects of Merillat's testimony.  Petitioner

has alleged no facts nor furnished any evidence showing any of Merillat's testimony on those

subjects was factually inaccurate.  Petitioner has failed to identify any evidence available at the time

of petitioner's trial showing Merillat possessed any bias which might have rendered his opinions and

other testimony (such as his testimony regarding the availability of homemade weapons within TDCJ

facilities) subject to impeachment.   By the time Merillat testified at the punishment phase of

petitioner's capital murder trial, petitioner's capital sentencing jury (1) had already convicted

petitioner of capital murder under two separate theories and (2) had heard extensive testimony

regarding (a) petitioner's long history of violent conduct dating back to elementary school, (b)

petitioner's discharge from both the Triangle Pines and Waco Center facilities, (c) multiple incidents

in which petitioner led a gang within the TYC in riots that included assaults on TYC staff, (d)

petitioner's history of physical abuse as a child at the hands of his biological father and step-father,

(e) the eighteen-year-old petitioner's romantic relationship with a fifteen year old, (f) petitioner's

long-term fascination with guns, (g) petitioner's participation in a staged robbery of a fast-food

restaurant, (h) petitioner's participation in a violent attempted home invasion in which both the home

owner and petitioner's accomplice were wounded, and (i) petitioner's participation in a burglary of

a sporting goods store in which multiple weapons were taken, including the .22 caliber semi-

automatic handgun used to execute both Doyle Douglas and Samuel Petrey.   Under such

circumstances, there is not even a remote possibility, much less a reasonable probability, that

successful impeachment of Merillat (a prosecution *rebuttal* witness) along the lines suggested by

petitioner in his pleadings herein would have had any impact on the outcome of the punishment

phase of petitioner's capital murder trial.

Petitioner's twenty-fifth claim herein fails to satisfy any of the prongs of *Brady* analysis and does not warrant federal habeas corpus relief.

F.     AEDPA & De Novo Review of Confrontation Clause Claims

Petitioner also argues in both his first and twenty-fifth claims herein that his Sixth Amendment right to confront adverse witnesses was violated by (1) the prosecution's decision to delay the signing of Ray's and Page's plea agreements until after petitioner's trial, (2) the state's instructions to Ray not to disclose the contents of his plea agreement at petitioner's trial, and (3) the prosecution's "suppression" of potential impeachment evidence against Merillat.[237]  This Court has independently examined the record from petitioner's trial, direct appeal, and multiple state habeas corpus proceedings and concludes, for the reasons set forth at length above, these contentions are factually flawed.  Even when viewed under a de novo standard, there simply is no evidence currently before this Court showing that, *at the time of petitioner's trial*, there was evidence available showing either (1) Ray or Page had entered into a plea agreement with the prosecution, (2) any enforceable promise of leniency had been made to induce Ray's or Page's trial testimony, (3) any of Merillat's trial testimony was factually inaccurate, or (4) Merillat possessed any bias in favor of the death penalty.   The Supreme Court has never held the Sixth Amendment's Confrontation Clause guarantees the right to introduce extrinsic evidence for impeachment purposes; the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to expose testimonial infirmities through cross-examination. *Nevada v. Jackson*, ___ U.S. ___, ___, 133 S.Ct. 1990, 1994, 186 L.Ed.2d 62 (2013).  Petitioner's trial counsel had a full and fair opportunity to cross-

---

[237] *Second Amended Petition*, at pp. 118-23, 359.

examine Ray, Page, and Merillat. They took full advantage of that opportunity to cross-examine all three of these prosecution witnesses. Petitioner's Sixth Amendment Confrontation Clause rights were not violated by virtue of the failure of the prosecution to disclose then-non-existent evidence.

This Court independently concludes after a de novo review of the voluminous record now before this Court there was no evidence available at the time of petitioner's capital murder trial for use in impeaching prosecution rebuttal expert A.P. Merillat through a showing that either (1) any of Merillat's trial testimony was factually inaccurate or (2) Merillat possessed any bias in favor of the death penalty. As explained at length above, the documents presented by petitioner herein as sealed exhibits did not include any information which could have been used to impeach Merillat's trial testimony. A mere disagreement between Merillat and defense expert Cherry does not, standing alone, establish that Merillat gave inaccurate testimony regarding the classification status petitioner would have received upon admission to the TDCJ had petitioner received a life sentence. *See, e.g., Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988), (holding contradictory testimony from witnesses or inconsistencies in a witness' testimony at trial are to be resolved by the trier of fact and do not suffice to establish that certain testimony was perjured); *Hawkins v. Lynaugh*, 844 F.2d 1132, 1141 (5th Cir. 1988)(holding inconsistencies between a tape of defendant's interrogation and the trial testimony of his interrogators, at best, raised only credibility issues as to the voluntariness of defendant's confession and did not, therefore, establish perjury), *cert. denied*, 488 U.S. 900 (1988).

With regard to the allegations of secret plea agreements or promises of leniency to Ray or Page, when it rejected petitioner's first claim therein on the merits in the course of petitioner's most recent state habeas proceeding, the state habeas trial court implicitly determined the credibility of the prosecutors and defense counsel (who denied the existence of any plea agreements or promises

of leniency) to be greater than those witnesses who claimed secret agreements or promises had been made to Ray or Page. Those implicit credibility determinations were fully supported by the record before the state habeas court and are fully supported by the evidence now before this Court. The state habeas trial court reasonably concluded it defies credulity to believe Ray's and Page's veteran criminal defense counsel would have conspired to suborn perjury at petitioner's trial. Moreover, Page and his defense counsel consistently asserted there was no plea agreement or enforceable promise of leniency made to induce Page's trial testimony against petitioner. Thus, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's first claim for relief in petitioner's most recent state habeas corpus proceeding necessarily included a rejection of the factual basis underlying petitioner's Confrontation Clause claims herein relating to Ray and Page's trial testimony. The Texas Court of Criminal Appeals' rejection on the merits of petitioner's first claim in petitioner's most recent state habeas corpus proceeding necessarily included a rejection on the merits of the factual theory underlying petitioner's Confrontation Claim contained in petitioner's first claim herein and was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's third state habeas corpus proceeding.

Thus, regardless of whether reviewed under the AEDPA's narrow standard of review or a broader, de novo, standard, petitioner's Confrontation Clause complaints contained in petitioner's first and twenty-fifth claims herein are premised on faulty factual theories reasonably rejected by the state habeas court and lack any arguable merit.

# IV. Insufficient Evidence Claims

## A.   The Claims

In his fifth, sixth, twelfth, and eighteenth claims herein, petitioner argues there was insufficient evidence to support the jury's verdicts that (1) the murders of Douglas and Petrey occurred in the same criminal transaction or in different criminal transactions but pursuant to a common scheme or course of conduct,[238] (2) Petrey's murder occurred in the course of a kidnaping and robbery,[239] (3) petitioner was criminally responsible for Petrey's and Douglas' deaths (i.e., the jury's affirmative answer to the second capital sentencing special issue)[240] and (4) there was a probability petitioner would commit future acts of criminal violence that would constitute a continuing threat to society (i.e., the jury's affirmative answer to the future dangerousness special issue).[241]

## B.   State Court Disposition

Petitioner presented his fifth and sixth claims herein as his eleventh and thirteenth points of error on direct appeal.[242]  The Texas Court of Criminal Appeals rejected these arguments on the merits. *Young v. State*, AP 74,643, 2005 WL 2374669, at *1-*3.

---

[238] *Second Amended Petition*, at pp. 246-54; *Petitioner's Reply*, at pp. 134-38.

[239] *Second Amended Petition*, at pp. 254-59; *Petitioner's Reply*, at pp. 138-41.

[240] *Second Amended Petition*, at pp. 277-80; *Petitioner's Reply*, at pp. 156-58.

[241] *Second Amended Petition*, at pp. 317-22; *Petitioner's Reply*, at pp. 180-82.

[242] Appellate Brief, at pp. 53-60.

130

Petitioner presented his twelfth claim herein as his nineteenth point of error on direct appeal.[243] The Texas Court of Criminal Appeals rejected this argument on the merits. *Young v. State*, AP 74,643, 2005 WL 2374669, at \*4-\*5.

Petitioner presented his eighteenth claim herein as his seventeenth point of error on direct appeal.[244] The Texas Court of Criminal Appeals rejected this argument on the merits. *Young v. State*, AP 74,643, 2005 WL 2374669, at \*3-\*4.

## C.    AEDPA Analysis

### 1.    Clearly Established Federal Law

For more than a generation, the United States Supreme Court has consistently applied a single standard for evaluating the sufficiency of the evidence to support a state criminal jury verdict. "In *Jackson v. Virginia,* 443 U.S. 307, [324], 99 S.Ct. 2781, [2791-92], 61 L.Ed.2d 560 (1979), we held that a state prisoner is entitled to habeas corpus relief if a federal judge finds that 'upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *McDaniel v. Brown*, 558 U.S. 120, 121, 130 S.Ct. 665, 666, 175 L.Ed.2d 582 (2010)(*citation omitted*). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789; *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir.), *cert. denied*, 555 U.S. 995, 129 S.Ct. 496, 172 L.Ed.2d 358 (2008). To determine whether the evidence is sufficient to support a state criminal conviction,

---

[243] Appellate Brief, at pp. 73-75.

[244] Appellate Brief, at pp. 66-72.

we must look to state law for the substantive elements of the relevant criminal offense. *Jackson v.*

*Virginia*, 443 U.S. at 324 n.16, 99 S.Ct. at 2792 n.16.   The standard of federal habeas review for

insufficient evidence claims under the AEDPA is highly deferential. *See McDaniel v. Brown.* 558

U.S. at 133, 130 S.Ct. at 673 ("a reviewing court 'faced with a record of historical facts that supports

conflicting inferences must presume - even if it does not affirmatively appear in the record - that the

trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

resolution.'").

 2. Same Scheme and Course of Conduct

 When viewed in the light most favorable to the jury's verdict, the evidence at the guilt-

innocence phase of petitioner's capital murder trial established (1) petitioner shot both Douglas and

Petrey twice in the head at fairly close range,[245] using the same firearm,[246] (2) both Douglas and

---

[245] Three eyewitnesses testified they saw or heard petitioner shoot Douglas twice in the head while petitioner was seated next to Douglas in the front seats of Douglas' vehicle. S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 106-07, 109-12, 155, 165, 199-201; Volume 22, testimony of Mark Ray, at pp. 89-91, 163-66, 197-98; Volume 26, testimony of David Lee Page, Jr., at pp. 152-61; Volume 27, testimony of David Lee Page, Jr., at pp. 14-15, 55, 65-66, 182, 229.

 Patrick Brook testified petitioner told Brook that he (petitioner) shot Douglas twice in the back of the head. S.F. Trial, Volume 21, testimony of Patrick Lee Brook, at pp. 251-54, 265-66.

 David Page testified without contradiction that he witnessed petitioner shoot Petrey twice in the head at fairly close range. S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 245-47; Volume 27, testimony of David Lee Page, Jr, at pp. 90-97.

[246] The firearms and tool mark examiner who testified at the guilt-innocence phase of petitioner's capital murder trial testified the two shell casings found in Doyle Douglas' vehicle and the two shell casings found near the body of Samuel Petrey were all fired by the same weapon, i.e., State Exhibit no. 3 - the .22 caliber semi-automatic handgun found in petitioner's possession at the time of his arrest. S.F. Trial, Volume 25, testimony of Tim Counce, at pp. 144-45, 153-54, 156-57, 159, 167.

 McCoy identified the weapon petitioner used to shoot Douglas as a long barrel, .22 caliber, handgun with a long clip. S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 113.   Mark Ray described the gun petitioner used to shoot Douglas as an automatic, nickel-plated, and with a four-to-six inch barrel. S.F. Trial, Volume 22, testimony of Mary Ray, at p. 167.   David Page testified that, while petitioner briefly handed a .22 caliber revolver and a .38 Special to Ray and McCoy, respectively, petitioner was the only person who had possession of the .22 caliber semi-automatic pistol throughout the entire scenario, including during both murders. S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 165, 178-83, 188, 205, 214, 246-47; Volume 27, testimony of David Lee Page, Jr., at pp. 27.

Petrey were white males, middle aged or older, who were not engaged in any behavior which threatened petitioner at the time petitioner shot them,[247] (3) petitioner's apparent purpose in murdering both his victims was to obtain or retain control over their vehicles,[248] (4) petitioner disposed of both of his victims' bodies in isolated locations,[249] and (5) petitioner directed his accomplice or accomplices to clean blood and other evidence from both of the vehicles in question.[250]  From the foregoing, it is readily apparent there was more than ample evidence from which petitioner's jury could reasonably have concluded petitioner murdered Douglas and Petrey in two different criminal transactions that were part of the same criminal scheme or course of conduct. The Texas Court of Criminal Appeals reasonably concluded there was ample evidence in the trial record from which the jury could rationally conclude petitioner murdered Douglas and Petrey in separate criminal transactions that were part of the same scheme or course of conduct.

The Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's direct appeal of petitioner's complaint about the sufficiency of the evidence supporting

---

[247] S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 106-07, 109-12, 116, 155, 165, 199-201; Volume 22, testimony of Mark Ray, at pp. 89-91, 163-66, 197-98; Volume 26, testimony of David Lee Page, Jr., at pp. 152-61, 245-47; Volume 27, testimony of David Lee Page, Jr., at pp. 14-15, 55, 65-66, 90-97, 182, 229.

[248] S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 134, 214 (after shooting Douglas' petitioner said he was going to use Douglas' car to go see his girlfriend in Midland); Volume 21, testimony of Patrick Brook, at p. 258 (after describing how he shot Douglas, petitioner told Brook he was going to Midland to see his girlfriend Amber); Volume 22, testimony of Mark Ray, at pp. 138, 142-43 (after shooting Douglas' petitioner informed the others he was going to Midland to see his girlfriend); Volume 26, testimony of David Lee Page, Jr., at pp. 179-80, 193 (petitioner told the others he needed Douglas' vehicle to drive to Midland to see Amber).

[249] There was ample evidence at trial establishing the isolated nature of the location where Douglas' body was rolled into a creek. *See, e.g.,* S.F. Trial, Volume 23, testimony of Todd Smith, at pp. 115-139.  Smith took several photographs of the location where Douglas' body was discovered, including State Exhibit nos. 266, 272-75, and 285.
Likewise, there were many photographs of the location where Petrey's body was discovered admitted into evidence at petitioner's trial, including State Exhibit nos. 75-83, 87A, 88A, 98-99, 101, 104, 107, 113. S.F. Trial, Volume 24, testimony of Paul Hallmark, at pp. 307-21.

[250] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 180-81, 247.

the jury's guilt-innocence phase verdict finding petitioner guilty beyond a reasonable doubt of capital murder for having murdered Douglas and Petrey as part of the same scheme or course of conduct was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal. Petitioner's fifth claim herein does not warrant federal habeas corpus relief.

3.     Petrey was Murdered During His Kidnaping and Robbery

When viewed in the light most favorable to the jury's guilt-innocence phase verdict finding petitioner guilty beyond a reasonable doubt of having murdered Petrey in the course of kidnaping and robbing Petrey, the evidence at trial established (1) petitioner approached Petrey's pickup truck after petitioner and Page began having trouble with Douglas' vehicle,[251] (2) petitioner commented to Page that Amber Lynch's father Bart would be suspicious if they arrived in Douglas' vehicle,[252] (3) petitioner approached Petrey in a grocery store parking lot in Brookshire, asked for directions, then pulled out his handgun and directed Petrey to scoot over and allow petitioner to take the drivers' seat,[253] (4) Petrey appeared shocked and complied with petitioner's directive,[254] (5) after abandoning Douglas' car in an isolated location, petitioner, Page, and Petrey headed toward Midland in Petrey's

---

[251] David Page testified without contradiction that he and petitioner experienced problems with Douglas' vehicle overheating on their way to Midland. S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 191-92.

[252] *Id.*, at p. 197.  Page also testified they drove around Weatherford looking for another vehicle. *Id.*, at p. 198.

[253] *Id.*, at pp. 203-05.

[254] *Id.*, at p. 205.  Petitioner drove off in Petrey's truck with Petrey while Page followed behind in Douglas' car. *Id.*

vehicle with petitioner and Page driving,[255] (6) petitioner coerced Petrey into purchasing new clothes for petitioner,[256] (7) petitioner attempted to have Petrey purchase an assault rifle for petitioner,[257] and (8) after shooting Petrey, petitioner informed Page "he knew our names."[258]  From the foregoing evidence the jury could have rationally concluded petitioner kidnaped and robbed Petrey at gunpoint and murdered Petrey while Petrey was still petitioner's hostage.  The Texas Court of Criminal Appeals reasonably concluded there was ample evidence in the trial record from which the jury could conclude Petrey's murder occurred during the course of petitioner's armed kidnaping and robbery of Petrey.

The Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's direct appeal of petitioner's sixth claim herein was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal.  Petitioner's sixth claim herein does not warrant federal habeas corpus relief.

4.    Future Dangerousness

In addition to the evidence introduced during the guilt-innocence phase of trial showing petitioner executed both Douglas and Petrey so he could obtain their vehicles to go to Midland to

---

[255] *Id.*, at pp. 207-14.

[256] *Id.*, at pp. 231-33, 237.

[257] *Id.*, at pp. 233-35.  Page testified that, when Petrey balked at purchasing the assault rifle, petitioner said "Well, is the amount of this gun worth your life?" *Id.*, at pp. 237-38.

[258] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at p. 248.

see his younger teenage girlfriend, the prosecution presented evidence at the punishment phase of

trial which, when viewed in the light most favorable to the jury's verdict, showed petitioner (1) had

a long history of drug and alcohol abuse, (2) was physically abused by both his biological father and

step-father, (3) had engaged in a pattern of violent conduct directed toward his peers dating back to

his earliest years of elementary school, (4) was dismissed from both the Triangle Pines and Waco

Center facilities as a young teenager for violent, disruptive, behavior, including beating and exposing

himself to another youth, (5) helped instigate and led gang-related riots while an inmate in the Texas

Youth Commission that included violent assaults on TYC staff, (6) was sent to the TYC for thirteen

months but stayed for almost three years, (7) following his release from TYC, participated in a

burglary of a sporting goods store in which multiple weapons were taken, (8) participated with

Patrick Brook in an armed home invasion in which petitioner fired multiple rounds from a .25 caliber

pistol and both Brook and the homeowner were wounded, (9) physically assaulted Amber Lynch on

multiple occasions, and (10) failed to maintain employment or to continue taking his psychotropic

medications following his release from TYC custody.[259]  The prosecution's mental health expert

described petitioner (whom she treated in his mid-teens) as displaying little-to-no remorse and all

of the criteria for a diagnosis of anti-social personality disorder.[260]  One of petitioner's own mental

health experts testified the petitioner was kicked out of an anger management program in the TYC

for fighting another youth.[261]  The same mental health expert described petitioner as someone who

---

[259] *See* notes 79-111, *supra*, and accompanying text.

[260] S.F. Trial, Volume 32, testimony of Helen Short, at pp. 18, 48-54.  Dr. Short also opined that the best indicator of future behavior is past behavior and petitioner's behavior was among the most dangerous she had ever seen. *Id.,* at pp. 54-56.  Based upon petitioner's criminal conduct as an adult, Dr. Short testified she believed her premature diagnosis of Anti-social Personality Disorder was accurate. *Id.,* at pp. 56-58.

[261] S.F. Trial, Volume 34, testimony of Daneen A. Milam, at pp. 68-69.

suffers from mild brain damage, severe ADHD, and severe behavioral problems, and who "can't be fixed."[262]  There was ample evidence in the trial record from which petitioner's capital sentencing jury could rationally conclude beyond a reasonable doubt "there was a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society."

While petitioner points to the substantial evidence in the record showing petitioner suffers from ADHD, petitioner fails to acknowledge that diagnosis is a double-edged sword.  Petitioner's own experts testified persons with severe ADHD, like petitioner, suffer from impulsiveness, an inability to focus, and a lack of inhibition.[263]  The familiar *Jackson v. Virginia* standard of federal habeas review does not permit this Court under the guise of an evidentiary sufficiency analysis to second-guess the sentencing jury's implicit credibility choices made between the disparate diagnoses and divergent prognoses given by the parties' respective mental health professionals. *See McDaniel v. Brown.* 558 U.S. at 133, 130 S.Ct. at 673 ("a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'").  Viewed in the light most favorable to the jury's verdict, there was ample evidence in the trial record to support the jury's finding of a probability petitioner would commit criminal acts of violence that posed a continuing threat to society.

----

[262] S.F. Trial, Volume 34, testimony of Daneen A. Milam, at pp. 103, 107-08. Dr. Milam also testified petitioner will probably have to be incarcerated for the rest of his life. *Id.*, at pp. 107-08.

[263] S.F. Trial, Volume 34, testimony of Daneen A. Milam, at pp. 18-21, 23-24; Volume 34, testimony of Roy Mathew, at pp. 174, 183-84; Volume 36, testimony of Ross Greene, at pp. 12-15, 18, 22.
    Dr. Greene did opine that medications are available to treat most of petitioner's ADHD symptoms (such as hyperactivity and impulsiveness) and that new forms of therapy may also help treat petitioner's conduct disorder. S.F. Trial, Volume 36, testimony of Ross Greene, at pp. 16-17, 23-24, 30-33, 41-44.

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's direct appeal of petitioner's complaint of insufficient evidence to support the jury's affirmative answer to the Texas capital sentencing scheme's future dangerousness special issue was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal. Petitioner's eighteenth claim herein does not warrant federal habeas corpus relief.

5.    Personal Moral Culpability

When viewed in the light most favorable to the jury's verdict, the evidence showed (1) petitioner intentionally fired two shots into the head of Doyle Douglas and two shots into the head of Samuel Petrey,[264] (2) directed Ray at gunpoint to fire a third shot into Douglas' head,[265] and (3) repeatedly threatened McCoy, Ray, and Page if they refused to comply with his directives regarding (a) the disposition of Douglas' body[266] and (b) the necessity of Page accompanying petitioner to Midland.[267] From the foregoing evidence, the jury rationally could have determined petitioner either

---

[264] See note 245, supra.

[265] All three eyewitnesses testified petitioner forced Ray to fire a third shot into Douglas while Douglas' body was lying in a prone position in a creek. S.F. Trial Volume 21, testimony of Darnell McCoy, at pp. 129-32, 171, 173-75, 208-09 (describing Ray as apparently frightened of petitioner when Ray pulled the trigger at the creek); Volume 22, Testimony of Mark Ray, at pp. 120-29, 251 (describing petitioner's threats against Ray and Ray's family); Volume 26, testimony of David Lee Page, Jr., at pp. 176-80, 182, 186, 220, 228-29 (describing petitioner's threats which induced Ray to shoot Douglas once); Volume 27, testimony of David Lee Page, Jr., at pp. 139-40, 143-47 (describing Page's inability to determine in the dark precisely where in the head Ray shot Douglas).

[266] S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 112, 120-21, 129, 131-32, 160, 187-88, 227; Volume 22, testimony of Mark Ray, at pp. 92-95, 97-99, 101-02, 106-07, 112-13, 116-18, 123-26, 131; Volume 26, testimony of David Lee Page, Jr., at pp. 162, 172, 174, 180, 182.

[267] S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 142-44; Volume 26, testimony of David Lee Page, Jr., at pp. 183, 186-87.

actually caused the deaths of Douglas and Petrey, intended to cause their deaths, or anticipated that human life would be taken.

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's direct appeal of petitioner's complaint of insufficient evidence to support the jury's affirmative answer to the Texas capital sentencing scheme's second (personal culpability) special issue was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal. Petitioner's twelfth claim herein does not warrant federal habeas corpus relief.

6.     Conclusions

Petitioner's insufficient evidence claims herein invite this Court to re-weigh the evidence presented during petitioner's capital murder trial and to substitute its own credibility determinations for those of petitioner's trial court. Under the well-settled *Jackson v. Virginia* standard, this Court may not do so. Rather, it is only appropriate for a federal habeas court to set aside a criminal jury's verdict for insufficient evidence if, when viewed in the light most favorable to the jury's verdict, the evidence before the jury was insufficient to permit a rational finder of fact to conclude the prosecution had proved all essential elements of the crime beyond a reasonable doubt. As explained above, when viewed in the light most favorable to the jury's verdict, the evidence before petitioner's jury was more than sufficient to permit a rational jury to conclude the prosecution had proved its case on each of the essential elements of the theories of capital murder included in the indictment against

petitioner and on both of the first two capital sentencing special issues (i.e., petitioner's future dangerousness and personal criminal culpability) beyond a reasonable doubt.

## V. Challenges to the Texas Capital Sentencing Scheme

### A.   Overview of the Claims

In his tenth, eleventh, sixteenth, seventeenth, nineteenth, twentieth, and twenty-first claims herein, petitioner argues (1) his due process and Eighth Amendment constitutional rights were violated by virtue of the unfettered discretion exercised by Texas prosecutors when determining whether to charge a criminal defendant with capital murder,[268] (2) his Eighth Amendment rights were violated when the trial court failed to instruct the jury at the punishment phase of trial regarding the burden of proof on the mitigation or *Penry* special issue in violation of the Supreme Court's holdings in *Ring v. Arizona* and *Apprendi v. New Jersey*,[269] (3) the Texas Court of Criminal Appeals' refusal to engage in evidentiary sufficiency review of the jury's answer to the mitigation special issue violated due process and Eighth Amendment principles,[270] (4) the failure of the trial court to require the pleading of facts supporting pro-prosecution answers to each of the Texas capital scheme's special issues in petitioner's indictment violated the Fifth, Sixth, Eighth, and Fourteenth Amendments,[271] (5) the Texas twelve/ten rule (requiring total unanimity for pro-prosecution answers to the Texas capital sentencing special issues but only ten votes for answers favoring the defendant)

---

[268] *Second Amended Petition*, at pp. 270-77; *Petitioner's Reply*, at pp. 154-56.

[269] *Second Amended Petition*, at pp. 301-09; *Petitioner's Reply*, at pp. 173-76.

[270] *Second Amended Petition*, at pp. 309-17; *Petitioner's Reply*, at pp. 176-80.

[271] *Second Amended Petition*, at pp. 322-28; *Petitioner's Reply*, at pp. 182-84.

violated petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendments,[272] and (6) the trial court's refusal to inform the petitioner's capital sentencing jury of the impact of a single hold-out juror effectively prevented the individual jurors from giving effect to all of petitioner's mitigating evidence.[273]

B.     State Court Disposition

Petitioner presented his complaints about unfettered prosecutorial discretion in charging criminal defendants with capital murder as his sixth and seventh points of error on direct appeal.[274] The Texas Court of Criminal Appeals rejected these due process and Eighth Amendment claims on the merits. *Young v. State*, AP 74,643, 2005 WL 2374669, at *9.

Petitioner presented his complaint regarding the absence of a burden of proof in the mitigation special issue as his tenth, twenty-eighth, and thirtieth points of error on direct appeal.[275] The Texas Court of Criminal Appeals rejected these arguments on the merits. *Young v. State*, AP 74,643, 2005 WL 2374669, at *9-*10.

Petitioner complained about the state appellate court's refusal to engage in evidentiary sufficiency review of the jury's answer to the mitigation special issue in points of error twenty-one and twenty-two on direct appeal[276] and in claims six and seven in petitioner's initial state habeas

---

[272] *Second Amended Petition*, at pp. 329-35; *Petitioner's Reply*, at pp. 185-89.

[273] *Second Amended Petition*, at pp. 326-28; *Petitioner's Reply*, at pp. 189-91.

[274] Appellate Brief, at pp. 31-39.

[275] Appellate Brief, at pp. 50-52, 86-87, 90-92.

[276] Appellate Brief, at pp. 76-77.

corpus application.[277] On direct appeal, the Texas Court of Criminal Appeals reaffirmed its practice of not reviewing the sufficiency of the evidentiary basis for the jury's answer to the mitigation capital sentencing special issue. *Young v. State*, AP 74,643, 2005 WL 2374669, at *5. In petitioner's first state habeas corpus proceeding, the Texas Court of Criminal Appeals rejected on the merits petitioner's complaint about the absence of meaningful state appellate review of the jury's answer to the mitigation special issue. *Ex parte Clinton Lee Young*, WR 65,137-01, 2006 WL 3735395, at *1.

Petitioner presented his complaints about the absence of factual allegations in his indictment supporting pro-prosecution answers to the Texas capital sentencing special issues as his ninth and tenth points of error on direct appeal.[278] The Texas Court of Criminal Appeals rejected these arguments on the merits. *Young v. State*, AP 74,643, 2005 WL 2374669, at *9.

Petitioner presented his challenge to the Texas twelve/ten rule as his thirty-first point of error on direct appeal.[279] The Texas Court of Criminal Appeals rejected this argument on the merits. *Young v. State*, AP 74,643, 2005 WL 2374669, at *10.

Petitioner presented his complaint about the state trial court's refusal to inform petitioner's capital sentencing jury regarding the effect of a single holdout juror on direct appeal as his twenty-ninth point of error.[280] The Texas Court of Criminal Appeals rejected this argument on the merits. *Young v. State*, AP 74,643, 2005 WL 2374669, at *10.

---

[277] First State Habeas Transcript, at pp. 45-51.

[278] Appellate Brief, at pp. 46-52.

[279] Appellate Brief, at pp. 93-94.

[280] Appellate Brief, at pp. 88-89.

C.    Clearly Established Federal Law: An Overview of Recent Eighth Amendment Jurisprudence

Until fairly recently, the Supreme Court's opinions addressing capital punishment offered a wide array of rather ambiguous analytical approaches to resolving Eighth Amendment claims, none of which claimed adherence from a clear majority of the Supreme Court.  For instance, in *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), the Supreme Court addressed the issue of a former soldier sanctioned for desertion with loss of his citizenship.  In the course of an opinion that reflected little more than his own views on the subject, Chief Justice Earl Warren wrote as follows:

> The exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court.  But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice.  The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta.  The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.  While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards.  Fines, imprisonment and even execution may be imposed depending upon the enormity of the crime, but any technique outside the bounds of these traditional penalties is constitutionally suspect.  This Court has had little occasion to give precise content to the Eighth Amendment, and, in an enlightened democracy such as ours, this is not surprising.  But when the Court was confronted with a punishment of 12 years in irons at hard and painful labor imposed for the crime of falsifying public records, it did not hesitate to declare that the penalty was cruel in its excessiveness and unusual in its character. *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793.  The Court recognized in that case that the words of the Amendment are not precise, and that their scope is not static.  The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

*Trop v. Dulles*, 356 U.S. at 99-101, 78 S.Ct. at 597-98 *(Footnotes omitted)*.

Though often cited in subsequent Supreme Court opinions, Chief Judge Warren's "evolving standards of decency" Eighth Amendment test proved to be as difficult to apply consistently as Justice Stewart's classic definition of obscenity ("I know it when I see it") from his famous

143

concurring opinion in *Jacobellis v. State of Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964).  For example, in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), a bare majority of the Supreme Court struck down capital sentencing schemes in several southern States but failed to reach any degree of consensus in terms of an analytical approach to the Eighth Amendment.  The result  in *Furman* was nine separate opinions issued from the Supreme Court, each reflecting a different analytical approach to the Eighth Amendment claims presented therein.

The situation changed little when, four years later, a less than cohesive majority of the Supreme Court upheld the new capital scheme adopted by the Texas Legislature in response to *Furman. See Jurek v. Texas*, 428 U.S. 262, 268, 96 S.Ct. 2950, 2954, 49 L.Ed.2d 929 (1976)(holding imposition of the death penalty does not *per se* violate the Eighth Amendment's proscription of "cruel and unusual punishment" in an opinion issued by Justice Stevens writing for himself and Justices Powell and Stewart with Chief Justice Burger and Justices White and Rehnquist concurring separately).  The Court was equally lacking in cohesion the same term when it upheld Georgia's effort to re-institute capital punishment in that jurisdiction following *Furman. See Gregg v. Georgia*, 428 U.S. 153, 175, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976)(distinguishing the role of judicial review of capital punishment from that of legislative prerogative in an opinion issued by Justice Stewart for himself and Justices Powell and Stevens with Chief Justice Burger and Justices White and Rehnquist concurring separately).

The lack of Supreme Court consensus on an analytical approach to the Eighth Amendment continued for more than a decade thereafter, including a case rejecting an "as applied" challenge to the Texas capital sentencing scheme. *See Franklin v. Lynaugh*, 487 U.S. 164, 172-73, 108 S.Ct.

2320, 2327, 101 L.Ed.2d 155 (1988)(holding there is no constitutional right to have a capital sentencing jury consider "residual doubts" as to the defendant's guilt in an opinion by Justice White for himself, Chief Justice Burger, and Justices Scalia and Kennedy, with Justices O'Connor and Blackmun concurring separately).

A degree of consensus did begin to appear within the Supreme Court early the following decade when five Justices finally agreed on a single standard for reviewing the adequacy of jury instructions in a capital sentencing proceeding:

> We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Boyde v. California*, 494 U.S. 370, 380-381, 110 S.Ct. 1190, 1198,   108 L.Ed.2d 316 (1990)(*Footnotes omitted*).

True consensus on an overarching analytical approach to Eighth Amendment claims did not emerge, however, until eight Supreme Court Justices agreed in *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), on the principle that the Eighth Amendment addresses two different but related aspects of capital sentencing: the eligibility decision and the selection decision.

*Tuilaepa*, 512 U.S. at 971, 114 S.Ct. at 2634 (Justice Kennedy writing for himself, Chief Justice

Rehnquist, and Justices O'Connor, Scalia, Souter, and Thomas, with Justices Stevens and Ginsburg

concurring separately but not rejecting the analytical approach offered by Justice Kennedy).  The

Supreme Court's analysis of those two aspects of capital sentencing provided the first comprehensive

system for analyzing Eighth Amendment claims a clear majority of the Supreme Court had ever

offered:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment.  To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase.  The aggravated circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both).  As we have explained, the aggravating circumstance must meet two requirements.  First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder.  Second, the aggravating circumstance may not be unconstitutionally vague.  * * *
>
> We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.  "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime."  That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Tuilaepa*, 512 U.S. at 971-73, 114 S.Ct. at 2634-35 (citations omitted).

In *Tuilaepa*, the Supreme Court clearly declared that States may adopt capital sentencing

procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa*,

512 U.S. at 974, 114 S.Ct. at 2636.  The Supreme Court also concluded, at the *selection* stage, States

are not confined to submitting to the jury specific propositional questions but, rather, may direct the

jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime,"

"the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa*, 512 U.S. at 978, 114 S.Ct. at 2638.

In *Loving v. United States*, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996), the Supreme Court described the first part of the *Tuilaepa* analysis, i.e., the eligibility decision, as follows:

> The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Loving*, 517 U.S. at 755, 116 S.Ct. at 1742 (citations omitted).

The Supreme Court subsequently elaborated on the distinction between the narrowing function or "eligibility decision" and the "selection phase" of a capital sentencing proceeding in *Buchanan v. Angelone*, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998):

> Petitioner initially recognizes, as he must, that our cases have distinguished between two different aspects of the capital sentencing process, the eligibility phase and the selection phase. *Tuilaepa v. California,* 512 U.S. 967, 971, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994). In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. *Ibid.* In the selection phase, the jury determines whether to impose a death sentence on an eligible defendant. *Id.,* at 972, 114 S.Ct., at 2634-2635. Petitioner concedes that it is only the selection phase that is at stake in his case. He argues, however, that our decisions indicate that the jury at the selection phase must both have discretion to make an individualized determination and have that discretion limited and channeled. See, *e.g., Gregg v. Georgia,* 428 U.S. 153, 206-207, 96 S.Ct. 2909, 2940-2941, 49 L.Ed.2d 859 (1976). He further argues that the Eighth Amendment therefore requires the court to instruct the jury on its obligation and

authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State.

No such rule has ever been adopted by this Court.   While petitioner appropriately recognizes the distinction between the eligibility and selection phases, he fails to distinguish the differing constitutional treatment we have accorded those two aspects of capital sentencing.  It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition.  In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination. *Tuilaepa, supra,* at 971-973, 114 S.Ct., at 2634-2636; *Romano v. Oklahoma,* 512 U.S. 1, 6-7, 114 S.Ct. 2004, 2008-2009, 129 L.Ed.2d 1 (1994); *McCleskey v. Kemp,* 481 U.S. 279, 304-306, 107 S.Ct. 1756, 1773-1775, 95 L.Ed.2d 262 (1987); *Stephens, supra,* at 878-879, 103 S.Ct., at 2743-2744.

In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Penry v. Lynaugh,* 492 U.S. 302, 317-318, 109 S.Ct. 2934, 2946-2947, 106 L.Ed.2d 256 (1989); *Eddings v. Oklahoma,* 455 U.S. 104, 113-114, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973 (1978).  However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. *Johnson v. Texas,* 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993); *Penry, supra,* at 326, 109 S.Ct., at 2951; *Franklin v. Lynaugh,* 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988).  Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. Thus, in *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), we held that the standard for determining whether jury instructions satisfy these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.,* at 380, 110 S.Ct., at 1198; see also *Johnson, supra,* at 367-368, 113 S.Ct., at 2669.

But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible. See *Tuilaepa, supra,* at 978-979, 114 S.Ct., at 2638-2639 (noting that at the selection phase, the state is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled discretion); *Stephens, supra,* at 875, 103 S.Ct., at 2741-2742 (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional,

and noting that accepting that argument would require the Court to overrule *Gregg, supra*).

*Buchanan v. Angelone*, 522 U.S. at 275-277, 118 S.Ct. at 761-62.

With these principles in mind, the Court now turns to petitioner's attacks upon the Texas capital sentencing scheme, both on its face and as applied to his case.

D.      Challenges to Prosecutorial Discretion at Indictment Stage

In his tenth and eleventh claims herein, petitioner cites the United States Supreme Court's opinion in *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 389 (2000), and argues his due process and Eighth Amendment constitutional rights were violated by virtue of the unfettered discretion exercised by Texas prosecutors when determining whether to charge a criminal defendant with capital murder.[281]   The short answer to this argument is that *Bush v. Gore, supra*, has no application in the criminal procedure context. *Coleman v. Quarterman*, 456 F.3d 537, 542-43 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343, 127 S.Ct. 2030, 167 L.Ed.2d 772 (2007).

The somewhat longer answer is that prosecutors must necessarily exercise considerable discretion in matters traditionally reserved for their determination:

> In recent years the Court has considered a number of claims that prosecutors have acted improperly. *E.g., Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *United States v. Goodwin,* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982); *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).  Our decisions in those cases uniformly have recognized that courts normally must defer to prosecutorial decisions as to whom to prosecute. The reasons for judicial deference are well known.  Prosecutorial charging decisions are rarely simple.  In addition to assessing the strength and importance of a case, prosecutors also must consider other tangible and intangible factors, such as government enforcement priorities. See *Wayte v. United States,* 470 U.S., at 607, 105 S.Ct., at 1530.  Finally, they also must decide how best to allocate the scarce resources of a criminal justice system that simply cannot accommodate the litigation of every serious criminal charge.  Because these decisions "are not

---

[281] *Second Amended Petition*, at pp. 270-77; *Petitioner's Reply*, at pp. 154-56.

readily susceptible to the kind of analysis the courts are competent to undertake,"
we have been "properly hesitant to examine the decision whether to prosecute."
*Id.,* at 607–608, 105 S.Ct., at 1531. See *United States v. Goodwin, supra,* 457
U.S., at 373, 102 S.Ct., at 2488.

*Town of Newton v. Rumery*, 480 U.S. 386, 396, 107 S.Ct. 1187, 1193 -94, 94 L.Ed.2d 405
(1987).

Absent a showing that the broad discretion exercised by prosecutors has been abused in

an unconstitutional manner, i.e., deliberately based upon an unjustifiable standard such as race,

religion, or other suspect or arbitrary classification (including the exercise of a protected statutory

or constitutional right), judicial review of prosecutorial decisions is narrowly circumscribed:

In our criminal justice system, the Government retains "broad discretion"
as to whom to prosecute. *United States v. Goodwin,* 457 U.S. 368, 380, n. 11, 102
S.Ct. 2485, 2492, n. 11, 73 L.Ed.2d 74 (1982); *accord, Marshall v. Jerrico, Inc.,*
446 U.S. 238, 248, 100 S.Ct. 1610, 1616, 64 L.Ed.2d 182 (1980). "[S]o long as
the prosecutor has probable cause to believe that the accused committed an
offense defined by statute, the decision whether or not to prosecute, and what
charge to file or bring before a grand jury, generally rests entirely in his
discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54
L.Ed.2d 604 (1978). This broad discretion rests largely on the recognition that the
decision to prosecute is particularly ill-suited to judicial review. Such factors as
the strength of the case, the prosecution's general deterrence value, the
Government's enforcement priorities, and the case's relationship to the
Government's overall enforcement plan are not readily susceptible to the kind of
analysis the courts are competent to undertake. Judicial supervision in this area,
moreover, entails systemic costs of particular concern. Examining the basis of a
prosecution delays the criminal proceeding, threatens to chill law enforcement by
subjecting the prosecutor's motives and decisionmaking to outside inquiry, and
may undermine prosecutorial effectiveness by revealing the Government's
enforcement policy. All these are substantial concerns that make the courts
properly hesitant to examine the decision whether to prosecute.

As we have noted in a slightly different context, however, although
prosecutorial discretion is broad, it is not "'unfettered.' Selectivity in the
enforcement of criminal laws is ... subject to constitutional constraints." *United
States v. Batchelder,* 442 U.S. 114, 125, 99 S.Ct. 2198, 2205, 60 L.Ed.2d 755
(1979) (footnote omitted). In particular, the decision to prosecute may not be
"'deliberately based upon an unjustifiable standard such as race, religion, or other
arbitrary classification,'" *Bordenkircher v. Hayes, supra,* 434 U.S., at 364, 98

150

S.Ct., at 668, *quoting Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962), including the exercise of protected statutory and constitutional rights, *see United States v. Goodwin, supra,* 457 U.S., at 372, 102 S.Ct., at 2488.

*Wayte v. United States*, 470 U.S. 598, 607-608, 105 S.Ct. 1524, 1530-31, 84 L.Ed.2d 547 (1985).

Petitioner has not alleged any specific facts showing he was the victim of selective prosecution or retaliation for his exercise of a protected right.  Moreover, under the Texas capital sentencing scheme, the eligibility determination discussed in *Tuilaepa* is accomplished at the guilt-innocence phase of trial by virtue of the narrow manner with which Texas statutorily defines the offense of capital murder. *See Johnson v. Texas*, 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993)(holding its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifications of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. 231, 243-47, 108 S.Ct. 546, 554-55, 98 L.Ed.2d 568 (1988)(comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek v. Texas*, 428 U.S. at 268-75, 96 S.Ct. at 2955-57 (*plurality opinion* recognizing the Texas capital sentencing scheme narrows the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory schemes which require proof of aggravating circumstances to justify the imposition of the death penalty).  The discretion exercised by Texas prosecutors in deciding whether to charge a criminal defendant with capital murder is considerably more limited than the "unfettered discretion" petitioner describes in his tenth and eleventh claims herein.

151

Thus, the petitioner's conclusory complaints about the discretion exercised by his prosecutors, bereft of any specific factual allegations of selective or retaliatory prosecution, do not even begin to establish a violation of petitioner's federal constitutional rights and do not warrant habeas corpus relief. *See United States v. Molina*, 530 F.3d 326, 332 (5th Cir. 2008)(absent a showing of vindictiveness or otherwise unconstitutional discrimination by the prosecutors, a criminal defendant's complaint that his conduct could have been subject to less severe punishment if the government had made a different prosecutorial decision fails); *United States v. Lawrence*, 179 F.3d 343, 347-50 (5th Cir. 1999)(rejecting equal protection complaint premised upon disparate sentences imposed on co-defendants where there was no allegation of invidious discrimination), *cert. denied*, 528 U.S. 1096, 120 S.Ct. 836, 145 L.Ed.2d 703 (2000).

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's complaints about the discretion exercised by his Texas prosecutors was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal.  Petitioner's tenth and eleventh claims herein do not warrant federal habeas corpus relief.

E.      Absence of a Burden of Proof on Mitigation Special Issue

In his sixteenth claim herein, petitioner argues his Eighth Amendment rights were violated when the trial court failed to instruct the jury at the punishment phase of trial regarding the burden of proof on the mitigation or *Penry* special issue in violation of the Supreme Court's holdings in *Ring v. Arizona*,  536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

In *Apprendi v. New Jersey, supra,* the Supreme Court struck down on due process grounds a state scheme that permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing range for the offense by a factor of one hundred percent. *Apprendi,* 530 U.S. at 497, 120 S.Ct. at 2366. The Supreme Court's opinion in *Apprendi* emphasized it was merely extending to the state courts the same principles discussed in Justice Stevens' and Justice Scalia's concurring opinions in *Jones v. United States,* 526 U.S. 227, 252-53, 119 S.Ct. 1215, 1228-29, 143 L.Ed.2d 311 (1999): other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362-63. Put more simply, the Supreme Court held in *Apprendi* (1) it was unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal is exposed and (2) all such findings must be established beyond a reasonable doubt. *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2363.

Two years later, in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the Supreme Court applied the holding and its reasoning in *Apprendi* to strike down a death sentence in a case in which the jury had declined to find the defendant guilty of pre-meditated murder during the guilt-innocence phase of a capital trial (instead finding the defendant guilty only of felony murder) but a trial judge subsequently concluded the defendant should be sentenced to death based upon *factual* determinations that (1) the offense was committed in expectation of the defendant receiving something of pecuniary value (i.e., the fatal

153

shooting of an armored van guard during a robbery) and (2) the foregoing aggravating factor out-

weighed the lone mitigating factor favoring a life sentence (i.e., the defendant's minimal criminal

record).[282]  *Ring v. Arizona*, 536 U.S. at 609, 122 S.Ct. at 2443.  The Supreme Court emphasized,

as it had in *Apprendi*, the dispositive question "is not one of form, but of effect": "[i]f a State

makes an increase in a defendant's authorized punishment contingent on the finding of a fact,

that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt."

*Ring*, 536 U.S. at 602, 122 S.Ct. at 2439.  "A defendant may not be exposed to a penalty

*exceeding* the maximum he would receive if punished according to the facts reflected in the jury

verdict alone." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439-40, *quoting Apprendi*, 530 U.S. at 483,

120 S.Ct. at 2359.  Because Ring would not have been subject to the death penalty but for the

trial judge's factual determination as to the existence of an aggravating factor, the Supreme Court

declared Ring's death sentence violated the right to trial by jury protected by the Sixth

Amendment. *Ring v. Arizona*, 536 U.S. at 609, 122 S.Ct. at 2443.

  The essential elements of the offense of capital murder, as defined by Texas law, are set

forth in Sections 19.02(b) and 19.03 of the Texas Penal Code.[283]  Capital murder, as so defined

by Texas law, is punishable by a sentence of either life imprisonment or death.[284]  Applicable

Texas law does not include any of the sentencing factors included in the Texas capital sentencing

---

  [282] In point of fact, the Arizona trial judge found a second aggravating factor applied in Ring's case, i.e., Ring's comments after the fatal shooting in which he chastised his co-conspirators for their failure to praise Ring's marksmanship rendered his offense "especially heinous, cruel, or depraved." The Arizona Supreme Court later held there was insufficient evidence to support the trial judge's finding of depravity but nonetheless re-weighed the remaining aggravating factor against the lone mitigating factor and affirmed Ring's death sentence. *Ring v. Arizona*, 536 U.S. at 595-96, 122 S.Ct. at 2435-36.

  [283] Tex. Pen. Code Ann. §19.02(b) (Vernon 2003); Tex. Pen. Code Ann. §19.03 (Vernon Supp. 2010).

  [284] Tex. Pen. Code Ann. §12.31(a) (Vernon Supp. 2010),

special issues set forth in Article 37.071 of the Texas Code of Criminal Procedure as "essential elements" of the offense of capital murder: "In Texas, the statutory maximum for a capital offense is death.  The mitigation issue does not increase the statutory minimum.  To the contrary, the mitigation issue is designed to allow for the imposition of a life sentence, which is *less* than the statutory maximum." *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003), *cert. denied*, 543 U.S. 823 (2004).  Thus, the nature of petitioner's capital sentencing proceeding was vastly different from the sentencing proceedings the Supreme Court addressed in *Ring*.

In *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2ed 403 (2004), the Supreme Court struck down as a violation of the Sixth Amendment's right to jury trial a judge-imposed sentence of imprisonment that exceeded by more than three years the state statutory maximum of 53 months. *Blakely v. Washington*, 542 U.S. at 303-04, 124 S.Ct. at 2537.  In so ruling, the Supreme Court relied upon its prior holding in *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362-63 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").  In *Blakely*, the Supreme Court also relied upon its prior opinion in *Ring v. Arizona, supra*, for the principle "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington*, 542 U.S. at 303, 124 S.Ct. at 2537 (Emphasis added).  None of the foregoing legal principles were violated when petitioner's *jury* rendered its verdict during the punishment phase of petitioner's capital murder trial.

Petitioner's capital sentencing *jury* made a key factual determination at the punishment phase of petitioner's trial *beyond a reasonable doubt*; i.e., finding a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society.[285] Petitioner's capital sentencing jury also found *beyond a reasonable doubt* the petitioner either (1) himself actually caused the death of the deceased individuals or (2) intended to kill the deceased individuals or (3) anticipated that human life would be taken.[286] Petitioner's *jury* also determined, after taking into consideration all the evidence, including the circumstances of the offense, petitioner's character and background, and petitioner's personal moral culpability, there was insufficient mitigating circumstance to warrant a life sentence.[287] Thus, the capital sentence imposed upon petitioner pursuant to Texas law was based on jury findings, unlike the judicially-imposed sentences struck down in *Apprendi*, *Ring*, *Jones*, and *Blakely*.

Moreover, the Arizona capital sentencing scheme the Supreme Court addressed in *Ring* relied upon a trial judge's factual findings of "aggravating" factors and directed the trial judge to weigh those aggravating factors against any mitigating factors found to apply to the defendant. Thus the Arizona trial judge's factual findings in *Ring* were part of the constitutionally-mandated eligibility determination, i.e., the narrowing function. In contrast, the Texas capital sentencing scheme under which petitioner was tried, convicted, and sentenced performed the constitutionally-required narrowing function discussed in *Tuilaepa* and *Loving* at the guilt-innocence phase of petitioner's trial and further narrowed the category of those eligible for the

---

[285] Trial Transcript, Volume 5 of 5, at p. 860.

[286] Trial Transcript, Volume 5 of 5, at p. 861.

[287] Trial Transcript, Volume 5 of 5, at pp. 862-63.

death penalty by requiring jury findings, beyond a reasonable doubt, of both future dangerousness and personal moral culpability. *See Sonnier v. Quarterman*, 476 F.3d 349, 365-67 (5th Cir. 2007)(recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), performs the constitutionally-required narrowing function through its statutory definition of capital murder and further narrows the category of those eligible for the death penalty by requiring an additional fact finding, beyond a reasonable doubt, that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society), *cert. denied*, 552 U.S. 948 (2007).

Unlike Arizona's weighing scheme, the Texas capital sentencing scheme performs the constitutionally-mandated narrowing function, i.e., the process of making the "eligibility decision," at the guilt-innocence phase of a capital trial by virtue of the manner with which Texas defines the offense of capital murder in Section 19.03 of the Texas Penal Code. *See Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at 2666 (holding its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifications of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. at 243-47, 108 S.Ct. at 554-55 (comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek v. Texas*, 428 U.S. at 268-75, 96 S.Ct. at 2955-57 (*plurality opinion* recognizing the Texas capital sentencing scheme narrows the category of murders for which a death sentence may be imposed

and this serves the same purpose as the requirements of other statutory schemes which require proof of aggravating circumstances to justify the imposition of the death penalty).

The Texas capital sentencing scheme under which petitioner was convicted and sentenced involved a significantly different approach to capital sentencing than the Arizona scheme involved in *Ring*. By virtue of (1) its guilt-innocence phase determination *beyond a reasonable doubt* that the petitioner committed *capital* murder, as defined by applicable Texas law, and (2) its factual findings of future dangerousness and personal moral culpability, also made *beyond a reasonable doubt*, petitioner's jury found *beyond a reasonable doubt* the petitioner was *eligible* to receive the death penalty. *Sonnier v. Quarterman*, 476 F.3d at 365-67. In contrast, Ring's jury made no analogous factual findings. Instead, Ring's Arizona jury found beyond a reasonable doubt only that Ring was guilty of "felony murder," a wholly separate offense from the offense of capital murder as defined under Texas law.

The petitioner's first and second capital sentencing special issues, i.e., the future dangerousness and personal moral culpability issues, each included a "beyond a reasonable doubt" burden of proof squarely placed on the prosecution. Petitioner's *jury* made both those determinations. Thus, no violation of the principles set forth in *Apprendi*, *Jones*, *Ring*, or *Blakely* occurred during petitioner's trial. Insofar as petitioner argues his jury's factual finding on the future dangerousness special issue was an essential part of the procedural process under Texas law for determining whether the petitioner was *eligible* to receive the death penalty, that argument is foreclosed by the Supreme Court's *express* recognition that the Texas capital sentencing scheme accomplishes the eligibility determination, i.e. the constitutionally mandated

158

"narrowing function," at the guilt-innocence phase of trial. *Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at 2666; *Jurek v. Texas*, 428 U.S. at 270-71, 96 S.Ct. at 2956.

In contrast, the *Penry* or "mitigation" special issue employed at the punishment phase of petitioner's capital trial was designed to address the second aspect of capital sentencing discussed in *Tuilaepa*, i.e., the constitutional requirement that the jury be given an opportunity "to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 549 U.S. at 174, 126 S.Ct. at 2524-25; *Sonnier v. Quarterman*, 476 F.3d at 365; *Garcia v. Thaler*, 2009 WL 4931069, *14 (W.D. Tex. December 14, 2009), *CoA denied*, 389 Fed. Appx. 396, 2010 WL 31195119 (5th Cir. August 9, 2010), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1604, 179 L.Ed.2d 505 (2011). "The use of mitigation evidence is a product of the requirement of individualized sentencing." *Kansas v. Marsh*, 549 U.S. at 174, 126 S.Ct. at 2525.

The Supreme Court has distinguished the constitutional requirements of the *eligibility* decision, i.e., the narrowing function, from the *selection* decision, i.e., the individualized assessment of mitigating circumstances, holding the latter requires only that the sentencing jury be given broad range to consider all relevant mitigating evidence but leaving to the States wide discretion on how to channel the sentencing jury's balancing of mitigating and aggravating factors. *See Kansas v. Marsh*, 549 U.S. at 174-75, 126 S.Ct. at 2525 (holding, in connection with the *selection* phase of a capital sentencing proceeding, the Constitution mandates only that (1) the defendant has a right to present the sentencing authority with information relevant to the sentencing decision and (2) the sentencing authority is obligated to consider that information in determining the appropriate sentence); *Tuilaepa*, 512 U.S. at 978, 114 S.Ct. at 2638 (holding, at

the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment.").

At the *selection* phase of a capital trial, the Supreme Court has left to the States the decision whether to channel a sentencing jury's weighing of mitigating evidence or grant the jury unfettered discretion to consider all relevant mitigating evidence and weigh same in any manner the jury deems reasonable. *See Kansas v. Marsh*, 549 U.S. at 174, 126 S.Ct. at 2525 ("So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed."). Likewise, the Supreme Court has not yet imposed a particular burden of proof requirement with regard to a capital sentencing jury's consideration of mitigating evidence when such consideration occurs exclusively within the selection process.

> "[D]iscretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty,...the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has been found that the defendant is a member of the class made eligible for that penalty."

*Tuilaepa*, 512 U.S. at 979, 114 S.Ct. at 2639 (citations omitted).

"[T]here is no constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Johnson v. Texas*,

509 U.S. at 362, 113 S.Ct. at 2666 (*quoting Boyde v. California*, 494 U.S. at 377, 110 S.Ct. at 1196). "We have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Kansas v. Marsh*, 549 U.S. at 175, 126 S.Ct. at 2525 (*quoting Franklin v. Lynaugh*, 487 U.S. at 179, 108 S.Ct. at 2330).

As explained above, the "eligibility" decision required by the Eighth Amendment is satisfied under Texas law by the jury's findings "beyond a reasonable doubt" that (1) the defendant is guilty of capital murder as defined under Section 19.03 of the Texas Penal Code, (2) there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society, and (3) the petitioner bears personal moral culpability for the deaths of the decedents as required by the Supreme Court's holdings in *Enmund v. Florida*, 458 U.S. 782, 797-800, 102 S.Ct. 3368, 3377-79, 73 L.Ed.2d 1140 (1982)(holding death penalty may only be imposed upon a defendant who has either himself killed, attempted to kill, or intended that a killing take place or that lethal force will be employed) and *Tison v. Arizona*, 481 U.S. 137, 157-58, 107 S.Ct. 1676, 1687-88, 95 L.Ed.2d 127 (1987)(holding the death penalty could be imposed on a criminal defendant who acted with reckless disregard for human life in knowingly engaging in criminal activities known to carry a grave risk of death and whose personal involvement in the criminal offense was not minor). *Sonnier v. Quarterman*, 476 F.3d at 365-67. This is all the Constitution requires to satisfy the concerns discussed by the Supreme Court in *Apprendi* and *Ring*.

Consistent with the Supreme Court's holdings in *Kansas v. Marsh, Tuilaepa v. California*, and *Johnson v. Texas*, a Texas capital sentencing jury may be granted "unfettered discretion" regarding how it should weigh the mitigating evidence, if any, relevant to a particular

defendant's background and character against the aggravating circumstances of the defendant's offense and the defendant's demonstrated propensity for future dangerousness.  Thus, the Texas Legislature's decision *not* to assign a particular burden of proof on either party in connection with the Texas capital sentencing scheme's *Penry* or mitigation special issue falls well within the broad range of discretionary authority a State may exercise in connection with the *selection* phase of a capital trial.[288]

Neither the Supreme Court's opinion in *Apprendi* nor any of the Supreme Court's subsequent opinions construing its holding in *Apprendi* mandate imposition of a burden of proof on the prosecution with regard to the Texas capital sentencing scheme's mitigation special issue.

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's direct appeal of petitioner's complaint about the absence of a burden of proof in the Texas capital sentencing scheme's mitigation special issue was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal.  Petitioner's sixteenth claim herein does not warrant federal habeas corpus relief.

---

[288] It can be argued the absence of a burden of proof standard in the *Penry* or mitigation special issue could be reasonably expected to enure to the benefit of defendants because a shrewd defense counsel could argue the absence of an instruction mandating a particular burden of proof on this special issue permits the jury to answer the *Penry* special issue affirmatively if the jury concludes there is only a scintilla of evidence supporting an affirmative finding on that special issue.

F.     Lack of Meaningful State Appellate Review on Jury's Answer to Mitigation Special Issue

In his seventeenth claim herein, petitioner argues his Fifth, Eighth, and Fourteenth Amendment rights were violated when the Texas Court of Criminal Appeals refused to undertake an evidentiary sufficiency review of the jury's negative answer to his third (mitigation) capital sentencing special issue.

This Court has long held the Supreme Court's holding in *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989), forecloses any complaints about the "lack of meaningful appellate review" applicable to a Texas capital sentencing jury's answer to the "mitigation" special issue. *See, e.g., Bartee v. Quarterman*, 574 F.Supp.2d 624, 696 (W.D. Tex. 2008)("At the time petitioner's conviction and sentence became final for *Teague* purposes, no federal court had held the Texas capital sentencing scheme either deprived a capital defendant of meaningful appellate review of the jury's answers to the capital sentencing special issues or deprived a Texas capital murder defendant of a constitutional right to proportionality review of his capital sentence."), *CoA denied*, 339 Fed.Appx. 429, 2009 WL 2351641 (5th Cir. July 31, 2009), *cert. denied*, 559 U.S. 1009, 130 S.Ct. 1882, 176 L.Ed.2d 370 (2010); *Martinez v. Dretke*, 426 F.Supp.2d 403, 530-32 (W.D. Tex. 2006)(identifying Fifth Circuit precedent repeatedly rejecting the argument the Constitution mandates state appellate review of the sufficiency of mitigating evidence), *CoA denied*, 270 Fed. Appx. 277 (5th Cir. March 17, 2008).

Moreover, the Fifth Circuit has repeatedly rejected arguments that the Constitution mandates state appellate review of the sufficiency of "mitigating" evidence supporting or opposing a capital sentencing jury's answer to the Texas capital sentencing scheme's mitigation special issue. *See, e.g., Woods v. Cockrell*, 307 F.3d 353, 359-60 (5th Cir. 2002)(holding Texas

Court of Criminal Appeals' refusal to review the sufficiency of the evidence supporting negative answers to the Texas capital sentencing scheme's "mitigation" special issue, i.e., the *Penry* issue, did not violate due process principles); *Johnson v. Cockrell*, 306 F.3d 249, 256 (5th Cir. 2002)(denying CoA on claim that Texas Court of Criminal Appeals' refusal to review whether sufficient mitigating evidence existed to support a life sentence violated Eighth Amendment), *cert. denied*, 538 U.S. 926 (2003); *Beazley v. Johnson*, 242 F.3d 248, 261 (5th Cir.)(holding petitioner was afforded *meaningful* state appellate review of death sentence when state appellate court reviewed sufficiency of evidence supporting future dangerousness special issue), *cert. denied*, 534 U.S. 945 (2001); *Moore v. Johnson*, 225 F.3d 495, 505-07 (5th Cir. 2000)(holding Texas Court of Criminal Appeals' refusal to review the sufficiency of the evidence supporting negative answers to the Texas capital sentencing scheme's "mitigation" special issue, i.e., the *Penry* issue, did not violate due process principles), *cert. denied*, 532 U.S. 949 (2001); *Hughes v. Johnson*, 191 F.3d 607, 621-23 (5th Cir. 1999)(holding no Eighth Amendment violation resulted from Texas Court of Criminal Appeals' refusal to engage in proportionality review of capital sentencing jury's answer to mitigation special issue because Texas is a non-weighing jurisdiction), *cert. denied*, 528 U.S. 1145 (2000).

This Court has repeatedly rejected the Eighth Amendment component of petitioner's seventeenth claim herein as foreclosed by the Supreme Court's holding in *Tuilaepa. See, e.g., Jasper v. Thaler*, 765 F.Supp.2d 783, 836 (W.D. Tex. 2011)(because of the unique role the Texas capital sentencing scheme gives to Texas capital sentencing juries through the mitigation special issue, i.e., permitting a Texas capital sentencing jury to engage in an act of grace for an otherwise condemned capital murderer, there is no constitutional requirement that the evidence supporting

or opposing a jury's answer to the Texas capital sentencing scheme's mitigation special issue be subjected to state appellate review for evidentiary sufficiency), *affirmed*, 466 Fed.Appx. 429, 2012 WL 1449250 (5th Cir. April 26, 2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 788, 184 L.Ed.2d 584 (2012); *Bartee v. Quarterman*, 574 F.Supp.2d at 696-97 (no clearly established Supreme Court authority mandates state appellate review of the evidentiary sufficiency underlying a Texas capital sentencing jury's answers to the Texas special issues beyond that afforded by *Jackson v. Virginia*); *Martinez v. Dretke*, 426 F.Supp.2d at 530-32 (holding the Supreme Court's opinion in *Tuilaepa* permits states to adopt capital sentencing schemes which vest the sentencing jury with virtually unfettered discretion at the selection phase of a capital trial); *Cordova v. Johnson*, 993 F.Supp. 473, 509 (W.D. Tex. 1998)("Insofar as proportionality analysis is constitutionally necessary with regard to the Texas capital sentencing scheme, that analysis is incorporated in the 'eligibility decision' described in *Tuilaepa* and *Buchanan* and is accomplished in the Texas capital sentencing scheme at the guilt-innocence phase of a trial because the Texas capital murder statute itself performs the constitutionally-mandated narrowing function."), *CoA denied*, 157 F.3d 380 (5th Cir. 1998), *cert. denied*, 525 U.S. 1131 (1999).

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's complaint about that court's refusal to engage in evidentiary sufficiency review with regard to the jury's answer to petitioner's mitigation special issue was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct

appeal.  Petitioner's seventeenth claim herein is also *Teague*-barred and does not warrant federal habeas relief.

G.     Failure to Include Sentencing Factors in the Indictment

In his nineteenth claim herein, petitioner argues the failure of the trial court to require the pleading of facts supporting pro-prosecution answers to each of the Texas capital scheme's special issues in petitioner's indictment violated the Fifth, Sixth, Eighth, and Fourteenth Amendments.

In support of his complaint about the absence of any mention of the capital sentencing factors from his indictment, petitioner cites the Supreme Court's opinions in *Allen v. United States*, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002)(Memorandum reversing and remanding for further consideration in light of *Ring v. Arizona*); *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).  As will be explained hereinafter, however, none of these Supreme Court opinions, however, require a Texas grand jury to deliberate upon or include specific factual allegations in a capital murder indictment regarding either (1) a capital murder defendant's future dangerousness, (2) a capital murder defendant's personal moral culpability for a particular offense, or (3) the presence or absence of any mitigating evidence warranting imposition of a life sentence.

In *Apprendi v. New Jersey*, *supra*, the Supreme Court struck down on due process grounds a state scheme that permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing

166

range for the offense by a factor of one hundred percent. *Apprendi*, 530 U.S. at 497, 120 S.Ct. at 2366. The Supreme Court's opinion in *Apprendi* emphasized it was merely extending to the state courts the same principles discussed in Justice Stevens' and Justice Scalia's concurring opinions in *Jones v. United States*, 526 U.S. 227, 252-53, 119 S.Ct. 1215, 1228-29, 143 L.Ed.2d 311 (1999), i.e., the view that, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362-63. Put more simply, the Supreme Court held in *Apprendi* (1) it was unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal is exposed and (2) all such findings must be established beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2363.

Two years later, in *Ring v. Arizona, supra*, the Supreme Court applied the holding and its reasoning in *Apprendi* to strike down a death sentence in a case in which the jury had declined to find the defendant guilty of pre-meditated murder during the guilt-innocence phase of a capital trial (instead finding the defendant guilty only of felony murder) but a trial judge subsequently concluded the defendant should be sentenced to death based upon *factual* determinations that (1) the offense was committed in expectation of receiving something of pecuniary value (i.e., the fatal shooting of an armored van guard during a robbery) and (2) the foregoing aggravating factor out-weighed the lone mitigating factor favoring a life sentence (i.e., the defendant's minimal criminal record).[289] *Ring v. Arizona*, 536 U.S. at 609, 122 S.Ct. at 2443. The Supreme Court

---

[289] In point of fact, the Arizona trial judge found a second aggravating factor applied in Ring's case, i.e., Ring's comments after the fatal shooting in which he chastised his co-conspirators for their failure to praise Ring's marksmanship rendered his offense "especially heinous, cruel, or depraved." The Arizona Supreme Court later held there

emphasized, as it had in *Apprendi*, the dispositive question "is not one of form, but of effect": "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439.  "A defendant may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439-40, *quoting Apprendi*, 530 U.S. at 483, 120 S.Ct. at 2359.  Because Ring would not have been subject to the death penalty but for the trial judge's factual determination as to the existence of an aggravating factor, the Supreme Court declared Ring's death sentence violated the right to trial by jury protected by the Sixth Amendment. *Ring v. Arizona*, 536 U.S. at 609, 122 S.Ct. at 2443.

The essential elements of the offense of capital murder, as defined by Texas law, are set forth in Sections 19.02(b) and 19.03 of the Texas Penal Code.[290]  Capital murder, as so defined by Texas law, is punishable by a sentence of either life imprisonment or death.[291]  Applicable Texas law does not include any of the sentencing factors included in the Texas capital sentencing special issues set forth in Article 37.071 of the Texas Code of Criminal Procedure as "essential elements" of the offense of capital murder: "In Texas, the statutory maximum for a capital offense is death.  The mitigation issue does not increase the statutory minimum.  To the contrary, the mitigation issue is designed to allow for the imposition of a life sentence, which is

---

was insufficient evidence to support the trial judge's finding of depravity but nonetheless re-weighed the remaining aggravating factor against the lone mitigating factor and affirmed Ring's death sentence. *Ring v. Arizona*, 536 U.S. at 595-96, 122 S.Ct. at 2435-36.

[290] Tex. Pen. Code Ann. §19.02(b) (Vernon 2003); Tex. Pen. Code Ann. §19.03 (Vernon Supp. 2010).

[291] Tex. Pen. Code Ann. §12.31(a) (Vernon Supp. 2010),

*less* than the statutory maximum." *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003), *cert. denied*, 543 U.S. 823 (2004).  As was explained above, the nature of petitioner's capital sentencing proceeding was vastly different from the sentencing proceedings the Supreme Court addressed in each of the cases relied upon by petitioner.

   More significantly, none of the foregoing Supreme Court opinions constitute "clearly established" federal law mandating grand jury consideration, or inclusion in an indictment, of the facts supporting pro-prosecution answers to the capital sentencing factors contained in Article 37.071 of the Texas Code of Criminal Procedure.

   In sharp contrast to the situations in *Ring* and *Apprendi* and their progeny, petitioner's capital sentencing *jury* made two factual determinations at the punishment phase of petitioner's trial *beyond a reasonable doubt*; more specifically, finding (1) a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) petitioner either (a) actually caused the decedents' deaths or (b) intended to kill another or (c) anticipated that a human life would be taken.[292]  Petitioner's *jury* also determined, after taking into consideration all the evidence, including the circumstances of the offense, petitioner's character and background, and petitioner's personal moral culpability, there was insufficient mitigating circumstance to warrant a life sentence.[293]  Thus, the capital sentence imposed upon petitioner pursuant to Texas law was based on jury findings, unlike the judicially-imposed sentences struck down in *Apprendi*, *Ring*, and *Jones*.

--------

[292] Trial Transcript, Volume 5 of 5, at pp. 860-61.

[293] Trial Transcript, Volume 5 of 5, at pp. 862-63.

Moreover, the Arizona capital sentencing scheme the Supreme Court addressed in *Ring* relied upon a trial judge's factual findings of "aggravating" factors and directed the trial judge to weigh those aggravating factors against any mitigating factors found to apply to the defendant. Thus the Arizona trial judge's factual findings in *Ring* were part of the constitutionally-mandated eligibility determination, i.e., the narrowing function. In contrast, the Texas capital sentencing scheme under which petitioner was tried, convicted, and sentenced performed the constitutionally-required narrowing function discussed in *Tuilaepa* and *Loving* at the guilt-innocence phase of petitioner's trial and further narrowed the category of those eligible for the death penalty by requiring a jury finding, beyond a reasonable doubt, of future dangerousness. *See Sonnier v. Quarterman*, 476 F.3d at 365-67 (recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh*, *supra*, performs the constitutionally-required narrowing function through its statutory definition of capital murder and further narrows the category of those eligible for the death penalty by requiring an additional fact finding, beyond a reasonable doubt, there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society)

Unlike Arizona's weighing scheme, the Texas capital sentencing scheme performs the constitutionally-mandated narrowing function, i.e., the process of making the "eligibility decision," at the guilt-innocence phase of a capital trial by virtue of the manner with which Texas defines the offense of capital murder in Section 19.03 of the Texas Penal Code. *See Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at 2666 (holding its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different

classifications of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. at 243-47, 108 S.Ct. at 554-55 (comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek v. Texas*, 428 U.S. at 268-75, 96 S.Ct. at 2955-57 (recognizing the Texas capital sentencing scheme narrows the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory schemes which require proof of aggravating circumstances to justify the imposition of the death penalty).

The Texas capital sentencing scheme under which petitioner was convicted and sentenced involved a significantly different approach to capital sentencing than the Arizona scheme involved in *Ring*. By virtue of (1) its guilt-innocence phase determination *beyond a reasonable doubt* that the petitioner committed *capital* murder, as defined by applicable Texas law, and (2) its factual findings of future dangerousness and personal moral culpability, also made *beyond a reasonable doubt*, petitioner's jury found *beyond a reasonable doubt* the petitioner was *eligible* to receive the death penalty. *Sonnier v. Quarterman*, 476 F.3d at 365-67. In contrast, Ring's jury made no analogous factual findings. Instead, Ring's Arizona jury found beyond a reasonable doubt only that Ring was guilty of "felony murder," a wholly separate offense from the offense of capital murder as defined under Texas law.

The petitioner's first and second capital sentencing special issues, i.e., the future dangerousness and personal moral culpability special issues, each included a "beyond a reasonable doubt" burden of proof squarely placed on the prosecution. Petitioner's *jury* made those determinations. Thus, no violation of the principles set forth in *Apprendi*, *Jones*, *Ring*, or *Allen* occurred during petitioner's trial. The Supreme Court's *express* recognition that the Texas

171

capital sentencing scheme accomplishes the eligibility determination, i.e., the constitutionally mandated "narrowing function," at the guilt-innocence phase of trial forecloses any argument that factual allegations supporting pro-prosecution answers to the Texas capital sentencing special issues must be alleged in a Texas capital murder indictment. *Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at 2666; *Jurek v. Texas*, 428 U.S. at 270-71, 96 S.Ct. at 2956.

In contrast to the first two Texas capital sentencing special issues, the *Penry* or "mitigation" special issue employed at the punishment phase of petitioner's capital trial was designed to address the second aspect of capital sentencing discussed in *Tuilaepa*, i.e., the constitutional requirement that the jury be given an opportunity "to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 549 U.S. at 174, 126 S.Ct. at 2524-25; *Sonnier v. Quarterman*, 476 F.3d at 365. "The use of mitigation evidence is a product of the requirement of individualized sentencing." *Kansas v. Marsh*, 549 U.S. at 174, 126 S.Ct. at 2525.

The Supreme Court has distinguished the constitutional requirements of the *eligibility* decision, i.e., the narrowing function, and the *selection* decision, i.e., the individualized assessment of mitigating circumstances, holding the latter requires only that the sentencing jury be given broad range to consider all relevant mitigating evidence but leaving to the States wide discretion on how to channel the sentencing jury's balancing of mitigating and aggravating factors. *See Kansas v. Marsh*, 549 U.S. at 174-75, 126 S.Ct. at 2525 (holding, in connection with the *selection* phase of a capital sentencing proceeding, the Constitution mandates only that (1) the defendant has a right to present the sentencing authority with information relevant to the

172

sentencing decision and (2) the sentencing authority is obligated to consider that information in determining the appropriate sentence); *Tuilaepa*, 512 U.S. at 978, 114 S.Ct. at 2638 (holding, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment.").

At the *selection* phase of a capital trial, the Supreme Court has left to the States the decision whether to channel a sentencing jury's weighing of mitigating evidence or grant the jury unfettered discretion to consider all relevant mitigating evidence and weigh same in any manner the jury deems reasonable. *See Kansas v. Marsh*, 549 U.S. at 174, 126 S.Ct. at 2525 ("So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed."). Likewise, the Supreme Court has not yet imposed a particular burden of proof requirement with regard to a capital sentencing jury's consideration of mitigating evidence when such consideration occurs exclusively within the selection process.

> "[D]iscretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty,...the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has been found that the defendant is a member of the class made eligible for that penalty."

*Tuilaepa*, 512 U.S. at 979, 114 S.Ct. at 2639 (citations omitted).

As explained above, the "eligibility" decision required by the Eighth Amendment is satisfied under Texas law by the jury's findings "beyond a reasonable doubt" that (1) the defendant is guilty of capital murder as defined under Section 19.03 of the Texas Penal Code, (2) there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society, and (3) petitioner was personally morally culpable for the deaths of the decedents pursuant to the Supreme Court's holdings in *Enmund v. Florida, supra,* and *Tison v. Arizona, supra. Sonnier v. Quarterman,* 476 F.3d at 365-67. This is all the Constitution requires to satisfy the concerns discussed by the Supreme Court in *Ring* and its progeny.

Consistent with the Supreme Court's holdings in *Kansas v. Marsh, Tuilaepa v. California,* and *Johnson v. Texas,* a Texas capital sentencing jury may be granted "unfettered discretion" regarding how it should weigh the mitigating evidence, if any, relevant to a particular defendant's background and character against the aggravating circumstances of the defendant's offense and the defendant's demonstrated propensity for future dangerousness. There is simply no "clearly established" federal law holding any provision of the Constitution mandates a specific listing of the evidence supporting a pro-prosecution (negative) answer to the Texas capital sentencing scheme's mitigation special issue.

The Arizona trial judge's affirmative factual finding regarding the existence of an aggravating factor made in *Ring* did not serve the same constitutionally-mandated purpose as the jury's negative answer to the *Penry* special issue made at petitioner's Texas capital murder trial. The Arizona trial judge's factual findings were designed to satisfy the "eligibility" requirement discussed in *Tuilaepa.* In jurisdictions such as Texas (where the "eligibility" decision discussed in *Tuilaepa* is made at the guilt-innocence phase of a capital trial) the factual issues before the

174

jury at the punishment phase of a capital trial address the "selection" decision identified by the Supreme Court in *Tuilaepa*. Furthermore, even if Texas' future dangerousness and personal moral culpability special issues could be construed as falling within the scope of the constitutionally-mandated eligibility decision, Texas law clearly places the burden of proving affirmative answers to both those special issues beyond a reasonable doubt squarely on the prosecution and mandates jury determination of both those special issues.

Thus, the procedural requirements applicable to the *eligibility* decision in weighing jurisdictions such as Arizona and the federal capital sentencing scheme (where specific findings of aggravating factors are made during a separate post-conviction proceeding and then weighed against any "mitigating" factors also found by the sentencing authority) are inapplicable to a Texas capital sentencing jury's *selection* decision, i.e., its determination as to whether the mitigating evidence in a particular case warrants a sentence of less than death for a criminal defendant who has already been convicted beyond a reasonable doubt of capital murder and already determined beyond a reasonable doubt to pose a risk of future dangerousness. *See Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007)("a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death."); *Sonnier v. Quarterman*, 476 F.3d at 363-67 (holding the deletion of the former special issue inquiring into whether the defendant acted "deliberately" in connection with the capital murder from the Texas capital sentencing scheme did not render same vulnerable to attack on Eighth Amendment grounds); *Granados v. Quarterman*, 455 F.3d 529, 537 (5th Cir. 2006)(distinguishing *Ring* and *Apprendi* on the ground a jury's affirmative answer to the Texas capital sentencing scheme's *Penry* or "mitigation" special issue reduces a sentence from death rather than increasing it to

death, as was the case with the factual findings made by the trial judges in *Apprendi* and *Ring*),

*cert. denied*, 549 U.S. 1081 (2006); *Rowell v. Dretke*, 398 F.3d 370, 379 (5th Cir. 2005)("No

Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue

be assigned a burden of proof."), *cert. denied*, 546 U.S. 848 (2005).

None of the Supreme Court opinions relied upon by petitioner herein establish "clearly

established" federal law mandating grand jury consideration, or inclusion in a Texas capital

murder indictment, of factual allegations relating to either (1) a capital murder defendant's future

dangerousness, (2) a capital murder defendant's personal moral culpability for a particular

offense, or (3) the presence or absence of any mitigating evidence warranting imposition of a life

sentence upon a capital murder defendant.  Unlike the many sentencing schemes addressed by the

Supreme Court in its *Jones, Apprendi, Ring,* and *Allen* line of cases, the Texas capital sentencing

scheme accomplishes the constitutionally mandated "narrowing" function, i.e., the eligibility

determination, at the guilt-innocence phase of trial through jury determinations of relevant facts.

The Texas capital sentencing scheme operates in a very different manner from those sentencing

schemes which the Supreme Court concluded in its *Jones, Apprendi, Ring, and Allen* line of

cases violated the Sixth Amendment right to jury trial.

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's

direct appeal of petitioner's *Allen/Ring/Apprendi/Jones* claim challenging petitioner's indictment

was neither contrary to, nor involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States, nor based on an unreasonable

determination of the facts in light of the evidence presented in the petitioner's state trial court and

state habeas corpus proceedings.  Petitioner's nineteenth claim herein does not warrant federal

habeas relief under the AEDPA.

H.      The Texas Twelve/Ten Rule

In his twentieth claim herein, petitioner argues the Texas twelve/ten rule (requiring total

unanimity for pro-prosecution answers to the Texas capital sentencing special issues but only ten

votes for answers favoring the defendant) violated petitioner's Fifth, Sixth, Eighth, and

Fourteenth Amendments.  More specifically, petitioner argues the provisions of Article 37.071,

Section 2(d) violate the principles set forth in the Supreme Court's opinions in *Mills v.*

*Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North*

*Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).  Because there is no clearly

established federal legal authority mandating jury instructions advising the jury of the impact of a

single holdout juror, petitioner's twentieth claim herein lacks any arguable merit.

The Supreme Court has implicitly rejected petitioner's arguments underlying his

twentieth claim herein. *See Jones v. United States* 527 U.S. 373, 382, 119 S.Ct. 2090, 2099, 144

L.Ed.2d 370 (1999)(holding the Eighth Amendment does not require a capital sentencing jury be

instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to

give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict

and (2) such an instruction might well undermine the strong governmental interest in having the

jury express the conscience of the community on the ultimate question of life or death).

On numerous occasions, the Fifth Circuit has expressly rejected the legal premise

underlying petitioner's twentieth claim herein, i.e., the argument a Texas capital murder

defendant is constitutionally entitled to have his punishment-phase jury instructed regarding the

177

consequences of a hung jury or a single holdout juror. *See, e.g., Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005)(holding the same arguments underlying petitioner's twentieth claim herein were so legally insubstantial as to be unworthy of a certificate of appealability), *cert. denied*, 546 U.S. 1177 (2006); *Alexander v. Johnson*, 211 F.3d 895, 897-98 (5th Cir. 2000)(holding the *Teague v. Lane* non-retroactivity doctrine precluded applying such a rule in a federal habeas context); *Davis v. Scott*, 51 F.3d 457, 466-67 (5th Cir. 1995)(holding the same), *cert. denied*, 516 U.S. 992 (1995); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994)(rejecting application of the Supreme Court's holding in *Mills v. Maryland* to a Texas capital sentencing proceeding), *cert. denied*, 513 U.S. 1067 (1995).

Likewise, petitioner's reliance upon the Supreme Court's holdings in *McKoy* and *Mills* is unpersuasive. Petitioner's argument that the Texas twelve-ten rule violates the due process principles set forth in these opinions has repeatedly been rejected by both the Fifth Circuit and this Court. See *Blue v. Thaler*, 665 F.3d 647, 669-70 (5th Cir. 2011)(rejecting an Eight Amendment challenge to the Texas twelve-ten rule), *cert.* denied, ___ U.S. ___, 133 S.Ct. 105, 184 L.Ed.2d 49 (2012); *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000) (specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas twelve-ten rule in the course of affirming this Court's rejection of claims virtually identical to those raised by petitioner herein); *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir. 2000)(holding *Mills* inapplicable to a Texas capital sentencing proceeding), *cert. denied*, 531 U.S. 849 (2000); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996)(holding the same), *cert. denied*, 519 U.S. 854 (1996); *Hughes v. Johnson*, 191 F.3d 607, 628-29 (5th Cir. 1999)(holding both *Mills* and *McKoy* inapplicable to the Texas capital sentencing scheme), *cert. denied*, 528 U.S. 1145 (2000); *Jacobs v. Scott*, 31 F.3d

1319, 1328-29 (5th Cir. 1994)("Under the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance. Thus, *Mills* is inapplicable."), *cert. denied*, 513 U.S. 1067 (1995); *Bartee v. Quarterman*, 574 F.Supp.2d at 700-01 (rejecting reliance upon *Mills* and *McKoy* as bases for challenging the very different Texas capital sentencing scheme).

Because the Texas capital sentencing scheme is vastly different from those employed on Maryland and North Carolina, petitioner's reliance on the Supreme Court's opinions in *McKoy* and *Mills* is misplaced. *See Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000)(specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas twelve-ten rule in the course of affirming this Court's rejection of claims identical to those raised by petitioner herein); *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir. 2000)(holding *Mills* inapplicable to a Texas capital sentencing proceeding), *cert. denied*, 531 U.S. 849 (2000); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996)(holding the same), *cert. denied*, 519 U.S. 854 (1996); and *Jacobs v. Scott*, 31 F.3d at 1328-29 (holding the same).

The Supreme Court has established the constitutional standard for evaluating the propriety of a jury instruction at the punishment phase of a capital murder trial is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). The Supreme Court has consistently applied this standard to evaluate challenges to punishment-phase jury instructions. *See Weeks v. Angelone*, 528 U.S. 225, 226, 120 S.Ct. 727, 729, 145 L.Ed.2d 727 (2000)(emphasizing the *Boyde* test requires a showing of a reasonable likelihood, as opposed to a mere possibility, the

jury construed the jury instructions to preclude its consideration of relevant mitigating evidence); *Jones v. United States*, 527 U.S. 373, 390 & n.9, 119 S.Ct. 2090, 2102-03 & n.9, 144 L.Ed.2d 370 (1999)(holding the same); *Calderon v. Coleman*, 525 U.S. 141, 146, 119 S.Ct. 500, 503, 142 L.Ed.2d 521 (1998)(holding the same); *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998)(holding the same); *Johnson v. Texas*, 509 U.S. 350, 367, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993)(holding *Boyde* requires a showing of a reasonable likelihood the jury interpreted the jury instructions so as to preclude it from considering relevant mitigating evidence).

This "reasonable likelihood" standard does not require the petitioner to prove the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than "only a possibility" of an impermissible interpretation. *Johnson v. Texas*, 509 U.S. at 367, 113 S.Ct. at 2669; *Boyde v. California*, 494 U.S. at 380, 110 S.Ct. at 1198. This Court must analyze the challenged language included in the jury charge within the context of the overall jury charge. *Cupp v. Naughten*, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would--with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas*, 509 U.S. at 368, 113 S.Ct. at 2669; *Boyde v. California*, 494 U.S. at 381, 110 S.Ct. at 1198.

Nothing in petitioner's punishment-phase jury charge can reasonable be construed as foreclosing the consideration by petitioner's jury of any of the potentially mitigating evidence actually presented during petitioner's capital murder trial. None of petitioner's jurors could

180

rationally have been led to believe by petitioner's punishment-phase jury charge that either (1) they lacked the authority to answer any of the Texas capital special issues in a manner consistent with their own conscience and the evidence regardless of the votes of other jurors or (2) their determination to vote in a manner inconsistent with other jurors would have no legal impact. Thus, there is no reasonable likelihood any of petitioner's jurors construed their punishment phase jury instructions in a manner which prevented them from considering or giving effect to any constitutionally relevant mitigating evidence. Likewise, nothing in petitioner's punishment-phase jury charge misled petitioner's capital sentencing jury regarding its role as the ultimate arbiter of petitioner's fate.

There is no arguable legal merit to any of the petitioner's constitutional arguments in support of his twentieth claim in this cause. The petitioner's punishment-phase jury charge accurately informed petitioner's capital sentencing jury of their responsibility under Texas law to reach a verdict favorable to the prosecution only if they agreed unanimously on the Texas capital sentencing special issues and to return a verdict favorable to the defense on those special issues only if ten or more jurors agreed to do so. The Constitution's Eighth and Fourteenth Amendments required nothing more. Insofar as petitioner argues otherwise, his arguments herein amount to advocacy of a "new rule" of federal constitutional criminal procedure and are foreclosed by the *Teague v. Lane* non-retroactivity doctrine.

The Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's direct appeal of the constitutional arguments underlying petitioner's twentieth claim herein was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based

upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal.  Petitioner's twentieth claim herein does not warrant federal habeas corpus relief.

I.    Failure to Give Hung Jury Instruction

In his twenty-first claim herein, petitioner argues the trial court's refusal to inform the petitioner's capital sentencing jury of the impact of a single hold-out juror effectively prevented the individual jurors from giving effect to all of petitioner's mitigating evidence.

Insofar as petitioner complains that his jury was not specifically instructed that a failure by the jury to answer any of the Texas capital sentencing issues would result in petitioner receiving a life sentence, that argument is foreclosed by both Supreme Court and Fifth Circuit precedent recognizing there is no constitutional right to jury instructions instructing individual jurors how they can achieve a "hung jury." *See Jones v. United States*, 527 U.S. at 382, 119 S.Ct. at 2099 (the Eighth Amendment does *not* require a capital sentencing be instructed as the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death); *Druery v. Thaler*, 647 F.3d 535, 544 (5th Cir. 2011)(holding an argument that a Texas capital defendant had a constitutional right to an instruction informing the jury of the impact of a hung jury barred under the non-retroactivity doctrine of *Teague v. Lane*), cert. denied, ___ U.S. ___, 132 S.Ct. 1550, 182 L.Ed.2d 180 (2012); *Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir.) (recognizing Fifth Circuit precedent foreclosed arguments the Eighth

Amendment and Due Process Clause of the Fourteenth Amendment mandated jury instructions regarding the effect of a capital sentencing jury's failure to reach a unanimous verdict), *cert. denied*, 551 U.S. 1193 (2007); *Barrientes v. Johnson*, 221 F.3d 741, 776-78 (5th Cir. 2000)(holding trial court's voir dire instructions informing jury the court would impose sentence, not the jury, but specifically explaining how the jury's answers to the capital sentencing special issues would require the court to impose either a sentence of life or death did not result in a *Caldwell* violation), *cert. denied*, 531 U.S. 1134 (2001); *Hughes v. Johnson*, 191 F.3d 607, 618 (5th Cir. 1999)(holding voir dire explanations to potential jurors of the impact of affirmative answers to the Texas capital sentencing special issues were sufficient to avoid any possibility the jurors misunderstood their role or the effect of their punishment-phase verdict), *cert. denied*, 528 U.S. 1145 (2000); *Alexander v. Johnson*, 211 F.3d 895, 897 n.5 (5th Cir. 2000)(holding the same).

　　This Court has likewise repeatedly rejected the constitutional arguments underlying petitioner's twentieth claim herein. *See Jasper v. Thaler*, 765 F.Supp.2d at 838-39 (there is no constitutional right to a jury instruction informing the jurors of the effect of a hung jury or a single hold-out juror); *Bartee v. Quarterman*, 574 F.Supp.2d at 702-03 (holding there is no constitutional right to have a capital sentencing jury informed of the effect of a hung jury); *Moore v. Quarterman*, 526 F.Supp.2d 654, 729-30 (W.D. Tex. 2007)(holding there is no constitutional requirement that a capital sentencing jury be informed of the consequences of a hung jury or of a single holdout juror), *CoA denied*, 534 F.3d 454 (5th Cir. 2008); *Blanton v. Quarterman*, 489 F.Supp.2d 621, 644-45 (W.D. Tex. 2007)(holding the same), *affirmed*, 543

F.3d 230 (5th Cir. 2008), *cert. denied*, 556 U.S. 1240 (2009); *Martinez v. Dretke*, 426 F.Supp.2d at 534-36 (holding the same).

There is no arguable legal merit to any of the petitioner's constitutional arguments in support of his twenty-first claim in this cause. The Constitution's Eighth and Fourteenth Amendments do not mandate jury instructions inviting individual jurors to "hang" the rest of the jury. Insofar as petitioner argues otherwise, his arguments herein amount to advocacy of a "new rule" of federal constitutional criminal procedure and are foreclosed by the *Teague v. Lane* non-retroactivity doctrine.

In his state appellate brief, petitioner supported his twenty-ninth point of error therein with a citation to the United States Supreme Court's opinion in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Petitioner's reliance upon the Supreme Court's holding in *Caldwell v. Mississippi, supra*, is misplaced. In *Caldwell*, the Supreme Court addressed an instance in which a capital murder prosecutor's jury argument suggested, in an erroneous and misleading manner, the jury was *not* the final arbiter of the defendant's fate.[294] To establish a *Caldwell* violation, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989). Both the Fifth Circuit and this Court have repeatedly rejected efforts identical to petitioner's to shoe-horn the Supreme Court's holding in *Caldwell v. Mississippi*, into the wholly dissimilar context of a Texas capital sentencing trial.

---

[294] In *Caldwell*, the Supreme Court held the following statement by the prosecution during its closing argument undermined reliable exercise of jury discretion:

> Now, [the defense] would have you believe that you're going to kill this man and they know--they know that your decision is not the final decision. My God, how unfair can they be? Your job is reviewable. They know it.

*Caldwell v. Mississippi*, 472 U.S. at 325 & 329, 105 S.Ct. at 2637 & 2639.

*See, e.g., Turner v. Quarterman*, 481 F.3d at 300 (recognizing Fifth Circuit precedent foreclosed arguments the Eighth Amendment and Due Process Clause of the Fourteenth Amendment mandated jury instructions regarding the effect of a capital sentencing jury's failure to reach a unanimous verdict); *Alexander v. Johnson*, 211 F.3d at 897 n.5 (holding the same); *Moore v. Quarterman*, 526 F.Supp.2d 654, 729-30 (W.D. Tex. 2007)(holding there is no constitutional requirement that a capital sentencing jury be informed of the consequences of a hung jury or of a single holdout juror), *CoA denied*, 534 F.3d 454 (5th Cir. 2008); *Blanton v. Quarterman*, 489 F.Supp.2d at 644-45 (holding the same); *Martinez v. Dretke*, 426 F.Supp.2d at 534-36 (holding the same).

The Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's direct appeal of the constitutional arguments underlying petitioner's twenty-first claim herein was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal. Petitioner's twenty-first claim herein does not warrant federal habeas corpus relief.

## VI. <u>Challenge to Punishment Phase Jury Charge</u>

A.     <u>The Claim</u>

In his third claim herein, petitioner argues the punishment phase jury charge (specifically the anti-sympathy instruction) and the prosecution's punishment phase jury arguments combined

to deprive petitioner of a vehicle to permit the jury to give a reasoned moral response to petitioner's mitigating evidence.[295]

B.    State Court Disposition

1.    Punishment Phase Jury Charge

The state trial court instructed petitioner's capital sentencing jury in pertinent part in the following manner at the punishment phase of petitioner's capital murder trial:

> In answering the issues submitted to you, the jury must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feelings.[296]
>
>                    *                              *                              *
>
> In deliberating on issues in this case except as provided in the following paragraph, the jury shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or circumstances of the offense that militate for or mitigate against the imposition of the death penalty.
> The Jury's answer or answers to the issues must be directly related to the defendant's personal culpability. You are instructed in answering Issue No. 1 **and** Issue No. 2 that only the conduct of the defendant can be considered and that the instructions pertaining to the conduct of other persons under the law of parties heretofore given you on guilt/innocence cannot be considered in answering Issue No. 1 or in answering Issue No. 2.[297]
>
>                    *                              *                              *
>
> You are instructed that in answering Issue No. 2 the State has the burden to prove beyond a reasonable doubt that the answer should be "yes." The jury may not answer Issue No. 2 "yes" unless the jury agrees unanimously on the answer, AND the jury may not answer Issue No. 2 "no" unless ten or more jurors agree. The members of the jury need not agree on what particular evidence supports a negative answer. If any juror has a reasonable doubt as to his or [sic] answer to Issue No. 2, the juror shall vote "no" to that issue.[298]
>
>                    *                              *                              *

---

[295] *Second Amended Petition*, at pp. 129-82; *Petitioner's Reply*, at pp. 69-72.

[296] Trial Transcript, Volume 5 of 5, at p. 858.

[297] Trial Transcript, Volume 5 of 5, at p. 859.

[298] Id., at p. 861.

\*                    \*                    \*

The members of the jury need not agree on what particular evidence supports an affirmative finding on this [the mitigation] issue. The jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness or which would make a death sentence inappropriate in this case. In answering Issue No. 3, you are further instructed that there is no presumption that a sentence of death or life imprisonment is more appropriate. If the jury answers that a circumstance or circumstances warrant that a sentence of life imprisonment rather than a death sentence be imposed, the court will sentence the defendant to imprisonment in the institutional division of the Texas Department of Criminal Justice for life. If the jury finds that there is no sufficient mitigating circumstance or circumstances to warrant a life sentence rather than a death sentence, the Court will sentence the Defendant to death.[299]

\*                    \*                    \*

You are instructed that if there is testimony or evidence before you in this case introduced by the State regarding the Defendant having committed acts or participated in transactions other than the offense of capital murder of which you have found the defendant guilty, you are instructed that you cannot consider such other acts or transactions, if any, against the defendant in answering the special issues submitted to you unless you find beyond a reasonable doubt that the defendant committed such other acts or participated in such other transactions, if any, and if you do not so believe or if you have a reasonable doubt thereof, you shall not consider such testimony or evidence introduced by the State, if any, for any purpose against the defendant.[300]

---

[299] *Id.*, at p. 862.

[300] *Id.*, at p. 863.
This portion of petitioner's punishment phase jury instruction was not mandated by federal law. *See Brown v. Dretke*, 419 F.3d 365, 376-77 (5th Cir. 2005)(holding the U.S. Constitution does not mandate that unadjudicated extraneous offenses be proven beyond a reasonable doubt for evidence of those offenses to be admitted at the punishment phase of a capital murder trial), *cert. denied*, 546 U.S. 1217 (2006); *Harris v. Cockrell*, 313 F.3d 238, 246 (5th Cir. 2002)(holding the introduction of evidence of extraneous offenses, even those of which the defendant had been acquitted, does not violate due process and there is no constitutional requirement that extraneous offenses offered at the punishment phase of a capital trial be proven beyond a reasonable doubt), *cert. denied*, 540 U.S. 1218 (2004); *Vega v. Johnson*, 149 F.3d 354, 359 (5th Cir. 1998)("Extraneous offenses offered at the punishment phase of a capital trial need not be proven beyond a reasonable doubt."), *cert. denied*, 525 U.S. 1119 (1999); *Harris v. Johnson*, 81 F.3d 535, 541 (5th Cir.), *cert. denied*, 517 U.S. 1227 (1996):

> The authorities do not support Harris' claim that the Constitution requires that the state prove unadjudicated offenses beyond a reasonable doubt before they may be used during the sentencing phase. Fully aware that the due process clause clearly requires that for conviction the state must prove the elements of the offense charged beyond a reasonable doubt, neither we nor the Supreme Court has stated that a similar burden exists regarding the admission of evidence of unadjudicated

*                    *                    *

Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.[301]

2.    Prosecution's Punishment Phase Jury Argument

In its opening argument at the punishment phase of petitioner's capital murder trial,

*without objection from petitioner's trial counsel,* the prosecution represented, in pertinent part, it

planned to introduce evidence regarding petitioner's background which would show "a pattern of

criminal conduct that started when this Defendant was very young that has persisted on

through."[302] In its closing jury argument at the punishment phase of petitioner's capital murder

trial, *without objection from petitioner's trial counsel*, the prosecution argued, in pertinent part

(1) the defense had promised in its own opening jury argument not to present excuses for

petitioner's murderous conduct but had done just that,[303] (2) not a single witness had testified

there was any causal link between petitioner's ADD and petitioner's murders of Douglas and

Petrey,[304] (3) the jury should reserve its sense of compassion for the families of petitioner's

---

offenses in a capital case sentencing hearing. (Footnotes omitted)

[301] Trial Transcript, Volume 5 of 5, at pp. 863-84.

[302] S.F. Trial, Volume 30, at p. 14.

[303] S.F. Trial, Volume 36, at p. 98.

[304] *Id.*

victims and petitioner's potential future victims,[305] (4) petitioner's mitigating evidence amounted

to an effort to shift the blame and responsibility for petitioner's criminal conduct to everyone

other than himself,[306] (5) many other people had experienced childhoods far worse than petitioner

and not turned to crime,[307] (6) petitioner's murder of Doyle Douglas was planned and calculated,

not impulsive,[308] (7) most of the mental health experts agreed their profession could not cure

petitioner,[309] (8) petitioner was highly intelligent and manipulative,[310] and (9) called upon the jury

to restore a sense of justice to the families of Douglas and Petrey.[311]

3.    Texas Court of Criminal Appeals' Direct Appeal Ruling

Petitioner presented a less expansive, very different, version of his third claim herein as

his eighth point of error on direct appeal, i.e., petitioner did not specifically complain on direct

appeal about the anti-sympathy language in his punishment phase jury charge.[312]  The Texas

Court of Criminal Appeals held as follows:

> In his eighth point of error, appellant argues that the jury "had no vehicle to
> consider and give effect to petitioner's ADHD and other mitigating evidence."
> The jury in this case was given the statutory mitigation instruction. *See* Art.
> 37.071 § 2(e)(1).  The statutory instruction allows the jury to consider all of the
> evidence presented at trial in answering the mitigation special issue. *Cantu v.*

---

[305] *Id.*, at p. 126.

[306] *Id.*, at pp. 127-29.

[307] *Id.*, at p. 128.

[308] *Id.*, at pp. 129-31.

[309] *Id.*, at p. 131.

[310] *Id.*

[311] *Id.*, at p. 133.

[312] Appellate Brief, at pp. 40-45.

*State*, 939 S.W.2d 627, 639-40 (Tex.Crim.App.1996)).  Appellant presented evidence of his ADHD and other mitigating evidence, and the jury was given a vehicle through which it could consider and give effect to that evidence. Appellant's eighth point of error is overruled.

*Young v. State*, AP 74,643, 2005 WL 2374669, *8 (Tex.Crim.App. September 28, 2005).

C.     AEDPA Analysis

As was explained above, the Supreme Court has explained the appropriate legal standard

for reviewing the adequacy of punishment phase jury instructions as follows:

> We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.  Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition.  This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction.  There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation.  Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might.  Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Boyde v. California*, 494 U.S. at 380-381, 110 S.Ct. at 1198 (*Footnotes omitted*).

The Texas Court of Criminal Appeals reasonably concluded there was nothing in

petitioner's punishment phase jury instructions which could rationally have be construed as

having precluded, prevented, or otherwise foreclosed jury consideration of any of petitioner's

mitigating evidence in connection with the petitioner's third (mitigation) special issue, which

required petitioner's capital sentencing jury to answer the following question:

190

> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the circumstances of the defendant, his character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?[313]

As respondent correctly points out, in *Penry v. Johnson (Penry II)*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001), the United States Supreme Court described the Texas capital sentencing scheme's mitigation special issue in terms that strongly suggest that issue is sufficiently broad to encompass almost any imaginable mitigating evidence:

> A clearly drafted catchall instruction on mitigating evidence also might have complied with *Penry I.* Texas' current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference.  Texas now requires the jury to decide "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." Tex.Code Crim. Proc.Ann., Art. 37.071(2)(e)(1) (Vernon Supp.2001).  Penry's counsel, while not conceding the issue, admitted that he "would have a tough time saying that *[Penry I]* was not complied with under the new Texas procedure." Tr. of Oral Arg. 16. At the very least, the brevity and clarity of this instruction highlight the confusing nature of the supplemental instruction actually given, and indicate that the trial court had adequate alternatives available to it as it drafted the instructions for Penry's trial.

*Penry v. Johnson*, 532 U.S. at 803, 121 S.Ct. at 1923 -24.

The construction of petitioner's punishment phase jury instructions urged by petitioner in his third claim herein is simply unreasonable.  Petitioner's jury was repeatedly instructed it was to consider all of the evidence before it in answering the final (mitigation) special issue.  While the prosecutors expressed their doubts as to the efficacy of much of petitioner's mitigating

---

[313] Trial Transcript, Volume 5 of 5, at pp. 862-63.

evidence showing petitioner (1) suffered from ADHD and ADD (which petitioner's trial counsel argued rendered petitioner prone to impulsiveness and less morally responsible for the murders of Douglas and Petrey), (2) had experienced a difficult childhood, and (3) had not been properly diagnosed or medicated as a child, unlike the prosecutorial jury arguments in *Penry I* and *Penry II*, petitioner's prosecutors did not argue petitioner's jury was unable to consider or give effect to evidence the defendant suffered from a mental illness or mental defect.

On the contrary, reasonably construed within the context of petitioner's trial, and the closing arguments of petitioner's own trial counsel, the arguments of petitioner's prosecutors at the punishment phase of trial implicitly acknowledged the jury could consider and give effect to petitioner's mitigating evidence but suggested that same evidence did not warrant the answers to the capital sentencing special issues urged by petitioner's trial counsel. The prosecutors' jury arguments suggesting there was no causal connection between petitioner's ADD/ADHD and petitioner's murders of Douglas and Petrey addressed the issue of petitioner's personal moral blameworthiness for those crimes. Those prosecutorial arguments did not purport to preclude or foreclose the jury's consideration of petitioner's mitigating evidence; rather, the prosecutors merely sought to put that evidence in what the prosecution viewed as its proper evidentiary context. There is no reasonable likelihood any rational member of petitioner's capital sentencing jury construed the punishment phase jury instructions, with or without the prosecutor's punishment phase jury arguments, as preventing him or her from giving full mitigating effect to any of petitioner's mitigating evidence by voting affirmatively on the final special issue.

Petitioner's belated attack upon the anti-sympathy instruction contained in petitioner's punishment phase jury charge does not alter this Court's rejection on the merits of petitioner's

third claim herein.  In *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), the

Supreme Court rejected precisely the same argument attacking an anti-sympathy jury instruction

urged by petitioner in his third claims herein:

> We also reject Parks' contention that the antisympathy instruction runs afoul of
> *Lockett* and *Eddings* because jurors who react sympathetically to mitigating
> evidence may interpret the instruction as barring them from considering that
> evidence altogether.  This argument misapprehends the distinction between
> allowing the jury to consider mitigating evidence and guiding their consideration.
> It is no doubt constitutionally permissible, if not constitutionally required, see
> *Gregg v. Georgia*, 428 U.S. 153, 189-195, 96 S.Ct. 2909, 2932-2935, 49 L.Ed.2d
> 859 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.), for the State to insist
> that "the individualized assessment of the appropriateness of the death penalty
> [be] a moral inquiry into the culpability of the defendant, and not an emotional
> response to the mitigating evidence." *California v. Brown*, 479 U.S., at 545, 107
> S.Ct., at 841 (O'CONNOR, J., concurring).  Whether a juror feels sympathy for a
> capital defendant is more likely to depend on that juror's own emotions than on
> the actual evidence regarding the crime and the defendant.  It would be very
> difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries
> of particular jurors' emotional sensitivities with our longstanding recognition that,
> above all, capital sentencing must be reliable, accurate, and nonarbitrary. See
> *Gregg, supra*, 428 U.S., at 189-195, 96 S.Ct., at 2932-2935; *Proffitt v. Florida*,
> 428 U.S. 242, 252-253, 96 S.Ct. 2960, 2966-2967, 49 L.Ed.2d 913 (1976)
> (opinion of Stewart, Powell, and STEVENS, JJ.); *Jurek v. Texas, supra*, 428 U.S.,
> at 271-272, 96 S.Ct., at 2956 (same); *Woodson v. North Carolina*, 428 U.S. 280,
> 303-305, 96 S.Ct. 2978, 2990-2991, 49 L.Ed.2d 944 (1976) (plurality opinion);
> *Roberts v. Louisiana*, 428 U.S. 325, 333-335, 96 S.Ct. 3001, 3006-3007, 49
> L.Ed.2d 974 (1976) (plurality opinion).  At the very least, nothing in *Lockett* and
> *Eddings* prevents the State from attempting to ensure reliability and
> nonarbitrariness by requiring that the jury consider and give effect to the
> defendant's mitigating evidence in the form of a "reasoned *moral* response,"
> *Brown*, 479 U.S., at 545, 107 S.Ct., at 841 (emphasis in original), rather than an
> emotional one. The State must not cut off full and fair consideration of mitigating
> evidence; but it need not grant the jury the choice to make the sentencing decision
> according to its own whims or caprice. See *id.*, at 541-543, 107 S.Ct., at 839-840.

*Saffle v. Parks*, 494 U.S. at 492-93, 110 S.Ct. at 1262-63.

Likewise, a plurality of the Supreme Court held in *California v. Brown*, 479 U.S. 538, 107 S.Ct.

837, 93 L,Ed,2d 934 (1987), held a punishment phase jury instruction directing the jury not to be

swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" did not violate due process or Eighth Amendment principles. *California v. Brown*, 479 U.S. at 542-43, 107 S.Ct. at 839-40. This Court concludes after *de novo* review there is no reasonable likelihood the inclusion of the anti-sympathy instruction in petitioner's punishment phase jury charge caused any rational member of petitioner's jury to feel precluded from giving full effect to any of petitioner's mitigating evidence by voting affirmatively on the final special issue.

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's direct appeal of petitioner's challenge to the scope of his punishment phase jury instructions was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal.

Petitioner has not exhausted available state remedies on his complaint attacking the anti-sympathy portion of his punishment phase jury charge. The new legal theory underlying this complaint is quite distinct from the legal arguments petitioner raised in his eighth point of error on direct appeal. Nonetheless, Section 2254(b)(2) permits this Court to deny relief on the merits of an unexhausted claim. Petitioner's unexhausted argument attacking the anti-sympathy instruction contained in petitioner's punishment phase jury charge is foreclosed by the Supreme Court's holding in *Saffle v. Parks, supra*. Petitioner's third claim herein does not warrant federal habeas corpus relief.

D.      In the Alternative, Procedural Default

194

Alternatively, respondent correctly points out petitioner did not include his challenge to the anti-sympathy instruction contained in petitioner's eighth point of error on direct appeal.  In fact, even a cursory comparison of petitioner's lengthy (53-page) third claim herein and petitioner's six-page eighth point of error on direct appeal reveals petitioner presented two very different sets of legal and factual arguments in support thereof, respectively.  Simply put, petitioner did not "fairly present" the state appellate court with the same factual and legal theories he has included in his third claim herein.  Petitioner's substantially new and different third claim herein (when contrasted with his eighth point of error on direct appeal) is unexhausted and, therefore, procedurally defaulted.

## VII. Alleged Prosecutorial Misconduct

A.     The Claims

In his twenty-sixth through twenty-ninth claims herein, petitioner argues (1) the State lost or destroyed exculpatory evidence in the form of (a) shell casings left in front of the house in Longview where Doyle Douglas was shot, (b) a convenience store security video showing petitioner shopping, and (c) testimony from an unidentified eyewitness at the Brookshire grocery store where Samuel Petrey was abducted,[314] (2) the prosecution interfered with the petitioner's defense team's selection of Gerald Byington to serve as petitioner's mitigation specialist,[315] (3) the prosecution engaged in misconduct in the form of (a) erroneously arguing petitioner had confessed to shooting Douglas, (b) improperly presenting victim impact testimony from prosecution witness Mark Ray (i.e., asking Ray how he felt when he shot Douglas at the creek),

---

[314] *Second Amended Petition*, at pp. 360-65; *Petitioner's Reply*, at pp. 197-99.

[315] *Second Amended Petition*, at pp. 365-81; *Petitioner's Reply*, at pp. 199-202.

and (c) erroneously arguing to the jury that petitioner had not expressed remorse for the deaths of Douglas and Petrey,[316] and (4) the prosecution knowingly presented false testimony from prosecution witness Jacqueline Timmons regarding the contents of a TYC incident report (and his trial counsel rendered ineffective assistance by failing to use the same report to impeach Timmons).[317]

B.   State Court Disposition

Petitioner presented his complaints about lost or destroyed exculpatory evidence as part of his omnibus fourth claim for relief in his second subsequent (third) state habeas corpus application.[318]   The Texas Court of Criminal Appeals summarily dismissed that claim for failure to satisfy the requirements for a subsequent application contained in the Texas writ-abuse statute, i.e., Section 5 of Article 11.071, Texas Code of Criminal Procedure. *Ex parte Clinton Lee Young*, WR 65,137-03, 2009 WL 1546625, *1 (Tex. Crim. App. June 3, 2009).

Petitioner presented his complaint about alleged interference by the prosecution with the defense team's mitigation specialist (Byington) as part of the multi-faceted fourth claim in petitioner's second subsequent (third) state habeas corpus application.[319]   The Texas Court of Criminal Appeals summarily dismissed that claim for failure to satisfy the requirements for a subsequent application contained in the Texas writ-abuse statute, i.e., Section 5 of Article

---

[316] *Second Amended Petition*, at pp. 382-86; *Petitioner's Reply*, at pp. 202-05.

[317] *Second Amended Petition*, at pp. 386-88; *Petitioner's Reply*, at pp. 205-07.

[318] Third States Habeas Transcript, at pp. 187-91.

[319] *Id.*, at pp. 168-83.

11.071, Texas Code of Criminal Procedure. *Ex parte Clinton Lee Young*, WR 65,137-03, 2009 WL 1546625, *1 (Tex. Crim. App. June 3, 2009).

Petitioner presented his complaints about allegedly improper jury argument and the solicitation of victim impact testimony from prosecution witness Mark Ray among the pro se complaints petitioner presented to the state habeas court in March, 2006.[320]  The Texas Court of Criminal Appeals construed those claims as a subsequent writ application and summarily dismissed same pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-02, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

Petitioner presented his *Giglio/Napue* claim about prosecutors allegedly knowingly permitting perjured testimony by prosecution witness Jacqueline Timmons as another of the pro se complaints petitioner presented to the state habeas trial court in March, 2006.[321]  The Texas Court of Criminal Appeals construed that complaint as a subsequent writ application and summarily dismissed same pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-02, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

C.    Procedural Default

Petitioner could have presented all of these four complaints to the state court either on direct appeal or as part of his first state habeas corpus proceeding.  In view of the Texas Court of Criminal Appeals' summary dismissal of these four claims pursuant to the Texas writ-abuse

---

[320] First State Habeas Transcript, Volume 5, at pp. 760-61.

[321] *Id.*, at p. 760.

statute, petitioner's failure to do so now constitutes a procedural default precluding federal

habeas review. *See McGowen v. Thaler*, 675 F.3d 482, 499 n.72 (5th Cir.) ("Texas's abuse of the

writ doctrine is a valid state procedural bar foreclosing federal habeas review."), *cert. denied*, ___

U.S. ___, 133 S.Ct. 647, 184 L.Ed.2d 482 (2012);  Coleman v. *Quarterman*, 456 F.3d 537, 542

(5th Cir. 2006)(holding the same), *cert. denied*, 549 U.S. 1343 (2007).  Furthermore, as

explained below, none of these claims possess any arguable merit; therefore petitioner cannot

demonstrate prejudice arising from the failure of his state appellate or first state habeas counsel

to present these same complaints to the state appellate courts in a timely fashion. *Coleman v.*

*Quarterman*, 456 F.3d at 542.

D.    *De Novo* Review

Because no state court has ever addressed the merits of the petitioner's twenty-sixth

through twenty-ninth claims herein, this Court's review of those federal constitutional claim is

necessarily *de novo*. *See Porter v. McCollum*, 558 U.S. at 39, 130 S.Ct. at 452 (holding *de novo*

review of the allegedly deficient performance of petitioner's trial counsel was necessary because

the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545

U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* was

required where the state courts rested their rejection of an ineffective assistance claim on the

deficient performance prong and never addressed the issue of prejudice).

E.    Lost or Destroyed Evidence

Petitioner complains the police lost or destroyed (1) shell casings left in front of the house

in Longview where Doyle Douglas was shot, (2) a convenience store security video showing

petitioner shopping, and (3) testimony from an unidentified eyewitness at the Brookshire grocery store where Samuel Petrey was abducted.

    1.    The Constitutional Standard

Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process. *Illinois v. Fisher*, 540 U.S. 544, 545, 124 S.Ct. 1200, 1200-01, 157 L.Ed.2d 1060 (2004).

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta, supra,* 467 U.S., at 486, 104 S.Ct., at 2532, that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause, see *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941), as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Arizona v. Youngblood*, 488 U.S. 51, 57-58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988).

    2.    Shell Casings

The fundamental problem with petitioner's complaint about allegedly "lost" shell casings from the location where petitioner shot Douglas is that petitioner has alleged absolutely no specific facts showing police ever had possession of any shell casings found at the Longview residence where petitioner shot Doyle Douglas inside Douglas' vehicle in the presence of Darnell McCoy, Mark Ray, and David Page. Petitioner has alleged no specific facts showing there were any shell casings to be found outside Douglas' vehicle on the night of the fatal shooting. Nor has petitioner alleged any specific facts, much less furnished any affidavits or other evidence, establishing that, as of the time and date police became aware of Douglas' brutal murder, there were any shell casings physically present (and subject to discovery and recovery) at the location in Longview where petitioner shot Douglas. There is no fact-specific allegation before this Court, much less any evidence, establishing (1) police ever identified the precise location in Longview where petitioner shot Douglas, (2) either petitioner, Darnell McCoy, David Lee Page, Jr., or Mark Ray ever identified for police the exact location in Longview where petitioner shot Douglas, or (3) police ever conducted a search of any location in or near Longview where they suspected Douglas' vehicle was parked at the instant petitioner shot Douglas. This Court has conducted a painstakingly detailed review of the voluminous record from petitioner's trial, direct appeal, and multiple state habeas corpus proceedings and finds absolutely no evidence in the record suggesting police ever successfully identified, much less conducted a search of, the location in or near Longview where petitioner shot Douglas.

In his reply brief, petitioner argues "the state admits to scanning the area with metal detectors to search for casings around the area where Douglas was shot."[322] The record citation

---

[322] *Petitioner's Reply*, at p. 198.

accompanying petitioner's statement refers not to a search of the Longview location where petitioner twice shot Douglas but, rather, to testimony by Texas Ranger David Hullum about a search he conducted on or about December 12, 2001 at the location in Midland County where Doyle Douglas' vehicle was recovered, i.e., the so-called "lease location" described by Hullum in his trial testimony.[323]  There is absolutely no evidence in the record suggesting Doyle Douglas was ever physically present at the location near Midland where Douglas' vehicle was discovered and photographed by Ranger Hullum.  Nor is there any evidence in the record now before this Court suggesting petitioner shot Douglas in Midland County anywhere near the location where Ranger Hullum conducted his searches.  On the contrary, the evidence from petitioner's trial established petitioner shot Douglas somewhere in the Longview area[324] and later directed his accomplices to roll Douglas' body into a shallow creek at an isolated location in Harrison County near Vanderslice Road.[325]

---

[323] S.F. Trial, Volume 23, testimony of David Hullum, at pp. 255-57.  During his trial testimony, Hullum described (1) interviewing David Page on or about November 26, 2001, (2) going to a location near Midland where Hullum observed Douglas' white vehicle with bullet holes in it, took photographs, and searched for evidence, including shell casings, (3) returning to the same "lease" location on December 12, 2001 with a metal detector to search (unsuccessfully) for more shell casings. *Id.*, at pp. 241-57.

[324] Each of the other occupants of Douglas' vehicle at the time petitioner shot Douglas described the location they had gone to purchase marijuana on the night in question as the Spring Hill area of Longview. S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 101-02, 154; Volume 22, testimony of Mark Ray, at pp. 69-72, 74, 158; Volume 26, testimony of David Lee Page, Jr., at pp. 151-52.

[325] Harrison County Sheriff's Office criminal investigator Todd Smith testified without contradiction at trial that he photographed and process the location where Douglas' body was recovered on November 25, 2001 near Vanderslice Road in Harrison County. S.F. Trial, Volume 23, testimony of Todd Smith, at pp. 113-50.

Moreover, the testimony at petitioner's trial established petitioner shot Douglas twice in the head while Douglas was seated inside Douglas' vehicle.[326] Two shell casings fired by the same semi-automatic handgun found in petitioner's possession at the time of his arrest were later recovered from inside Douglas' vehicle.[327] Under such circumstances, petitioner has failed to allege any specific fact, much less furnish any affidavits or other evidence, establishing police ever had custody or possession of any shell casings found at the location in the Spring Hill area of Longview where petitioner shot Douglas. This aspect of petitioner's twenty-sixth claim herein is both legally and factually frivolous and does not warrant federal habeas relief.

3.  Lost Convenience Store Surveillance Video Tape

At petitioner's trial a Midland County Sheriff's Office criminal investigator testified without contradiction that (1) after interviewing David Page, he obtained a security videotape from a Midland convenience store which he watched, (2) the video showed a white truck arrive at the store and the petitioner exiting the passenger side of the truck wearing extremely white tennis shoes, (3) the video showed the petitioner enter the store and remain inside for about eleven minutes doing nothing remarkable, and (4) he did not see anything on the videotape to

---

[326] The testimony at trial established petitioner confessed to Patrick Brook in the presence of McCoy and Ray that he (petitioner) shot Douglas twice in the head. S.F. Trial, Volume 21, testimony of Darnell McCoy, at p. 126; Volume 21, testimony of Patrick Lee Brook, at pp. 251-53; Volume 22, testimony of Mark Ray, at pp. 134-35.

[327] An FBI Special Agent testified at petitioner's trial without contradiction that State Exhibit nos. 14 and 15 were a pair of spent .22 caliber shell casings found inside Doyle Douglas' vehicle when it was processed. S.F. Trial, Volume 23, testimony of Ann Hinkle, at pp. 43-45. A Midland Police officer testified he discovered State Exhibit no. 3, a pistol, in between the center console and passenger seat of Petrey's pickup truck after law enforcement officers finally managed to bring petitioner's high-speed chase to an end and to arrest petitioner. S.F. Trial, Volume 24, testimony of Kenneth Callahan, at pp. 169-70. A forensic firearms and tool mark examiner testified at petitioner's trial without contradiction that State Exhibit nos. 14 and 15 were fired from State Exhibit no. 3, i.e., a Colt Huntsman .22 caliber semi-automatic handgun. S.F. Trial, Volume 25, testimony of Tim Counce, at pp. 156-59. Counce also testified the two spent shell casings marked collectively as State Exhibit no. 91 (i.e., the two spent shell casings found at the location where Petrey's body was discovered) had also been fired from State Exhibit no. 3. *Id.*, at p. 156.

indicate petitioner was carrying a concealed weapon throughout the time petitioner was inside the convenience store.[328]   It was undisputed that the video tape from the convenience store in question was lost by the time petitioner's capital murder case went to trial.[329]   David Page testified at trial, in pertinent part, that (1) at one point while he and petitioner had Petrey in the back seat of Petrey's truck, he (Page) drove to a convenience store, (2) petitioner got out, left the keys in the truck, and went inside the store, and (3) he (Page) did not drive off because he feared petitioner would make good on his threats to harm Page's family.[330]

Petitioner has alleged no specific facts, much less furnished any evidence, establishing the loss of the video tape in question was the product of any bad faith or malicious intent on the part of prosecutors or other law enforcement officials.   Thus, this aspect of petitioner's twenty-sixth claim herein fails to allege a federal constitutional violation.  *Arizona v. Youngblood*, 488 U.S. at 57-58, 109 S.Ct. at 337.

Moreover, other than furnishing evidence the petitioner apparently entered and remained inside the convenience store in question while unarmed, a matter to which investigator Spencer and Page both testified without contradiction at petitioner's trial, petitioner does not identify any potential exculpatory or mitigating value to the video tape in question.   Under such circumstances, petitioner has failed to allege any specific facts showing any exculpatory or mitigating evidence was rendered unavailable at trial due to the loss of the video tape in question.

---

[328] S.F. Trial, Volume 24, testimony of Gregory Kent Spencer, at pp. 217-19, 233.

[329] *Id.*, at pp. 232-33.

[330] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 222-24; Volume 27, testimony of David Lee Page, Jr., at pp. 166-67.

Petitioner's complaint regarding the loss of the convenience store video tape in question does not rise above the level of harmless error. *See Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)(holding the test for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict"). Given that investigator Spencer testified without contradiction regarding the contents of the video tape, David Page admitted the incident depicted on the video tape took place, and that petitioner has failed to allege any specific facts showing any additional exculpatory or mitigating material appeared on the video tape, the loss of the video tape in question did not have a substantial or injurious effect or influence on the outcome of either phase of petitioner's capital murder trial. This aspect of petitioner's twenty-sixth claim herein does not warrant federal habeas relief.

4.     Unidentified Eyewitness to Petrey's Abduction

Petitioner argues law enforcement officials should have investigated the grocery store in Brookshire where Petrey was abducted to locate unidentified eyewitnesses to the abduction. The closest petitioner comes to factual specificity in support of this claim is his highly conclusory statement that an unidentified eyewitness (described only as a "woman in a white vehicle") could have been located who would have testified Page, rather than petitioner, abducted Petrey.[331] Petitioner offers this Court no clue as to how law enforcement officials could have identified this potential eyewitness. Significantly, petitioner does not allege any facts showing he ever informed law enforcement officials following his arrest about the existence of this potential

---

[331] *Second Amended Petition,* at p. 362.

eyewitness.  Petitioner has failed to allege any facts showing law enforcement officials ever "lost" or "destroyed" any information which could have led to the identification of any eyewitness to the abduction of Petrey in Brookshire.

Given the undisputed facts that (1) Petrey left his home between eight and eight-thirty p.m. to go to a grocery store in Brookshire about seven miles from his home on the evening of Sunday, November 25, 2001,[332] and (2) Sam's wife did not report Sam's disappearance to police until after eleven p.m. that evening,[333] petitioner has failed to allege any specific facts showing there was any rational basis to believe police could have located an eyewitness to Petrey's abduction had they gone immediately to the grocery store as soon as they learned of Petrey's failure to return home.  More importantly, petitioner has alleged no specific facts, much less furnished any affidavits or other evidence, showing any eyewitness to the abduction of Samuel Petrey in Brookshire (other than David Page) has ever been identified by law enforcement officials, petitioner's defense team, or any of petitioner's state or federal habeas counsel.  Petitioner has no legitimate basis to complain that law enforcement officials failed to do the impossible.  Petitioner has alleged no facts showing the eyewitness or eyewitnesses in question, assuming any such person or persons ever existed, were any more available to law enforcement officials than to petitioner's own trial counsel.  No constitutional violation occurs when law enforcement officials fail to locate or identify potential witnesses who are equally available or

---

[332] Petrey's widow Lana testified without contradiction at petitioner's trial that (1) she and her husband returned home after spending the Thanksgiving holiday with relatives on Sunday, November 25, 2001, (2) Sam left for the grocery store between eight and eight-thirty that evening, and (3) she reported Sam's failure to return home to police later that same night, between eleven p.m. and midnight. S.F. Trial, Volume 23, testimony of Lana Petrey, at pp. 216-19.

[333] *Id.*, at p. 219.

unavailable to both the prosecution and defense counsel.  For instance, a federal habeas petitioner

cannot succeed on a *Brady* claim if he could have discovered the allegedly withheld evidence

through the exercise of reasonable due diligence. *Trottie v. Stephens*, 720 F.3d 231, 2451 (5th

Cir. 2013), *cert. filed November 13, 2013 (no. 13-7367)*; *United States v. Brown*, 650 F.3d 581,

588 (5th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S.Ct. 1969, 182 L.Ed.2d 833 (2012).  Thus,

petitioner's conclusory complaint about the alleged failure of law enforcement officers to locate a

still-unidentified eyewitness to the abduction of Petrey in Brookshire is both legally and factually

frivolous and does not warrant federal habeas corpus relief.

F.    <u>Interference with Mitigation Specialist</u>

Petitioner complains the prosecution interfered with the petitioner's defense team's

selection of Gerald Byington to serve as petitioner's mitigation specialist.  Petitioner alleges

further that prosecutors filed a complaint against Byington with the state board responsible for

regulating private investigators but fails to allege any specific facts showing the filing of that

complaint actually interfered with Byington's work for petitioner's defense team.  Petitioner

alleges in conclusory fashion that the filing of the complaint against Byington, a licensed master

of social work but not a licensed private investigator, "foreclose[d] the defense from properly

investigating and presenting a biopsychosocial history" of petitioner.[334]

It is undisputed Midland County officials filed a complaint with the Texas Commission

on Private Security once they became aware Byington, who was not a licensed private

investigator, had been appointed by a state district judge, and would likely be paid, by the County

_____

[334] *Second Amended Petition*, at p. 367.

206

to engage in activities which County officials believed could arguable be considered private investigation.  The state trial court held at least two evidentiary hearings on the prosecution's expressed concern that Byington was being utilized as an investigator, rather than a licensed master of social work, but was not licensed in Texas to perform services as an investigator.[335] The Midland County District Attorney testified without contradiction during petitioner's first state habeas corpus proceeding that his office reported Byington to responsible state officials when they became aware of the possibility Byington was undertaking the work of a private investigator without possessing the proper license.[336]  Byington also testified extensively during petitioner's first state habeas corpus proceeding concerning (1) the work he did for petitioner's defense team, including interviewing petitioner and petitioner's parents and gathering a wide array of documentary evidence regarding petitioner's background and (2) the restrictions imposed upon his work by the limited financial resources made available by the state trial court, but identified no impediments to the completion of his work and no additional mitigating evidence available at the time of petitioner's trial which he was unable to gather and present to petitioner's defense team due to the filing of the complaint against Byington with the Texas

---

[335] The first hearing, during which Byington testified extensively concerning the nature of his duties as a mitigation specialist, took place on September 19, 2002, and is found at S.F. trial, Volume 8, at pp. 5-39.  Byington's testimony appears at S.F. Trial, Volume 8, testimony of Gerald Byington, at pp. 14-33.

    During the second hearing, held November 21, 2002, the trial court heard testimony from (1) the executive director of the Texas State Board of Social Worker Examiners (who expressed the view that Byington's work in petitioner's case fell within the scope of work properly performed by a Licensed Master of Social Work) S.F. Trial, Volume 10, testimony of Andrew Marks, at pp. 7-11; and (2) an official with the Texas Commission on Private Security (who had a very different opinion regarding the propriety of Byington's work on petitioner's case) S.F. Trial, Volume 10, testimony of Cliff Grumbles, at pp. 13-27.

[336] S.F. First State Habeas Hearing, Volume 3, testimony of Al Schorre, at pp. 117-18. District Attorney Schorre testified the concern was that Midland County was going to be asked to pay Byington for furnishing the services of a private investigator when Byington was not licensed as a private investigator. *Id.*

Commission on Private Security.[337]  The legal assistant who assisted petitioner's defense team also testified during petitioner's first state habeas corpus proceeding regarding the efforts she undertook to help gather mitigating evidence on petitioner's behalf and did not identify any additional mitigating evidence available at the time of petitioner's trial which was rendered unavailable to the defense team due to the complaint about Byington filed with state officials.[338] Finally, both of petitioner's trial counsel testified during the evidentiary hearings held on petitioner's motion for new trial and during petitioner's first state habeas corpus proceeding but failed to identify any additional mitigating evidence available at the time of petitioner's trial which they were unable to gather due to the filing of the complaint against their mitigation specialist.[339]

More significantly, at the punishment phase of petitioner's capital murder trial, petitioner's trial counsel presented testimony from eighteen friends and family members concerning petitioner's background, difficult childhood, and good character traits, as well as four mental health experts and an expert on Texas prisons.[340]  In addition, during cross-examination of the prosecution's punishment phase witnesses, petitioner's trial counsel elicited a wealth of potentially mitigating evidence regarding petitioner's background and troubled childhood.[341]

---

[337] S.F. First State Habeas Hearing, Volume 2, testimony of Gerald Byington, at pp. 70-129.

[338] S.F. First State Habeas Hearing, Volume 2, testimony of Nancy Piette, at pp. 130-38.

[339] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 175-288; Volume 39, testimony of Paul Williams, at pp. 5-73; S.F. First State Habeas Hearing, Volume 2, testimony of Rodion Cantacuzene, Jr., at pp. 197-237; Volume 3, testimony of Rodin Cantacuzene, Jr., at pp. 5-54; Volume 3, testimony of Paul Williams, at pp. 55-108.

[340] *See* notes 93-105, 110-11, *supra*, and accompanying text.

[341] *See* notes 84-86, 89-90, *supra*.

In most instances in which a convicted criminal defendant alleges prosecutorial misconduct, the burden is on the convict to establish the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987) (holding the question of whether a prosecutor's *attempt* to violate rule in *Doyle* (prohibiting use of a defendant's post-arrest silence to impeach by asking an improper question) turned on whether the prosecutorial misconduct was "of sufficient significance to result in the denial of the defendant's right to a fair trial"); *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)(discussing allegedly improper jury arguments by the prosecutor and holding proper due process analysis is whether the prosecutor's comment rendered the trial fundamentally unfair).

At least one of the state officials who testified before the state trial court in November, 2002 had grave reservations about whether Byington could perform the duties of an investigator in petitioner's case.[342]   Throughout petitioner's trial court proceedings, his trial counsel were assisted by multiple investigators besides Byington, including licensed investigator Jeff Marugg and a legal assistant who later became a licensed investigator (Nancy Piette).[343]   Petitioner has alleged no specific facts showing that the filing of the complaint against Byington or the holding of the hearings regarding Byington prevented petitioner's defense team from investigating, discovering, or developing any then-available potentially mitigating evidence.   Petitioner's defense team gathered and presented a wealth of mitigating evidence during the punishment phase of petitioner's capital murder trial.

---

[342] S.F. Trial, Volume 10, testimony of Cliff Grumbles, at pp. 13-27

[343] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 217-23.

Under such circumstances, the prosecutor's filing of a complaint against Byington with the Texas Commission on Private Security did not render petitioner's trial fundamentally unfair. Petitioner presented a plethora of potentially mitigating evidence during the punishment phase of his trial and has not identified any additional potentially mitigating evidence he was unable to discover or develop because of the proceedings involving Byington which took place in the Fall of 2002. Petitioner's twenty-seventh claim herein does not warrant federal habeas corpus relief.

G.      More Prosecutorial Misconduct (Comments & Questions)

Petitioner argues the prosecution engaged in misconduct in the form of (1) erroneously arguing petitioner had confessed to shooting Douglas, (2) improperly presenting "victim impact" testimony from prosecution witness Mark Ray (i.e., asking Ray how he felt when he shot Douglas at the creek), and (3) erroneously arguing to the jury that petitioner had not expressed remorse for the deaths of Douglas and Petrey.

1.      The Constitutional Standard

Under Texas law at the time of petitioner's trial, proper closing argument by the prosecution in criminal trials fell into four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) pleas for law enforcement. *Westbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001); *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999), *cert. denied*, 531 U.S. 837 (2000); *Hathorne v. State*, 848 S.W.2d 101, 117 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 932 (1993). *See also Buxton v. Collins*, 925 F.2d 816, 825 (5th Cir. 1991)(recognizing the four proper areas for prosecutorial jury argument are summation of the

210

evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and

pleas for law enforcement), *cert. denied*, 498 U.S. 1128 (1991).

> The Fifth Amendment prohibits a prosecutor from commenting on a defendant's failure to testify, *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965), if "the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." *Jackson v. Johnson,* 194 F.3d 641, 652 (5th Cir.1999)(citing *United States v. Grosz,* 76 F.3d 1318, 1326 (5th Cir.1996)). "The prosecutor's intent is not manifest if there is some other, equally plausible explanation for the remark." *Grosz,* 76 F.3d at 1326. As for whether a jury would naturally and necessarily construe a remark as a comment on the defendant's failure to testify, "the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury necessarily would have done so." *Id.* (quoting *United States v. Collins,* 972 F.2d 1385, 1406 (5th Cir.1992)).

*United States v. Davis,* 609 F.3d 663, 685 (5th Cir. 2010), *cert. denied,* ___ U.S. ___, 131 S.Ct. 1676, 179 L.Ed.2d 621 (2011).

An improper prosecutorial argument which does *not* implicate a specific constitutional

provision is not cognizable on collateral review unless the defendant shows an abridgment of due

process, i.e., the improper argument rendered the proceeding fundamentally unfair. *Darden v.*

*Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)("it is not enough

that the prosecutors' remarks were undesirable or even universally condemned.  The relevant

inquiry is whether the prosecutors' comments so infected the trial with unfairness as to make the

resulting conviction a denial of due process"); *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th

Cir. 2008)(holding improper remarks by a prosecutor are sufficient ground for federal habeas

relief only if they are so prejudicial that they render the trial fundamentally unfair, i.e., either the

remarks evince persistent and pronounced misconduct or the evidence was so insubstantial that

in all probability but for the remarks no conviction would have occurred), *cert, denied*, 556 U.S.

1239 (2009); *Harris v. Johnson*, 313, F.3d 238, 245 (5th Cir. 2002)(holding prosecutorial

remarks are a sufficient ground for habeas relief only if they are so prejudicial they render the

trial fundamentally unfair and such unfairness exists only if the prosecutor's remarks evince

either persistent and pronounced misconduct or the evidence was so insubstantial that, in

probability, but for the remarks no conviction would have occurred), *cert. denied*, 540 U.S. 1218

(2004); *Dowthitt v. Johnson*, 230 F.3d 733, 755 (5th Cir. 2000)(holding (1) the relevant question

is whether the prosecutor's comments so infected the trial with unfairness as to make the

resulting conviction a denial of due process and (2) the prosecutor is permitted to argue to the

jury those inferences and conclusions the prosecutor wishes the jury to draw from the evidence so

long as those inferences are grounded upon evidence), *cert. denied*, 532 U.S. 915 (2001);

*Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000)(holding (1) federal habeas review of

allegedly improper prosecutorial statements made during the punishment phase of a capital trial

focuses on whether the remarks so infected the punishment phase as to make the resulting

sentence a denial of due process and (2) a trial is fundamentally unfair only if there is a

reasonable probability the verdict might have been different had the trial been properly

conducted), *cert. dism'd*, 531 U.S. 1134 (2001).

      Improper jury argument by the state does not present a claim of constitutional magnitude

in a federal habeas action unless it is so prejudicial that the state court trial was rendered

fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth

Amendment. *Parker v.* Matthews, ___ U.S. ___, ___, 132 S.Ct. 2148, 2153, 183 L.Ed.2d 32,

(2012); *Darden v. Wainwright*, 477 U.S. at 181, 106 S.Ct. at 2471; *Donnelly v. DeChristoforo*,

416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974).  To establish that a prosecutor's

remarks are so inflammatory, the petitioner must demonstrate the misconduct is persistent and pronounced or the evidence of guilt was so insubstantial the conviction would not have occurred but for the improper remarks. *Woodfox v. Cain*, 609 F.3d 774, 806 (5th Cir. 2010)("Improper prosecutorial remarks are constitutionally unfair only if they are persistent and pronounced, or if the evidence is so weak that no conviction would have occurred but for the remarks."); *Hughes v. Quarterman*, 530 F.3d at 347 (holding the same);  *Harris v. Johnson*, 313 F.3d at 245; *Turner v. Johnson*, 106 F.3d 1178, 1188 (5th Cir. 1997); *Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir. 1995)(wholly apart from the issue of procedural bar, failure to object to an argument is an indication it was not perceived as having a substantial adverse effect or would not naturally and necessarily be understood as advancing improper considerations)(*citing Milton v. Procunier*, 744 F.2d 1091, 1095 (5th Cir. 1984), *cert. denied*, 471 U.S. 1030 (1985)), *cert. denied*, 518 U.S. 1022 (1996); *Buxton v. Collins*, 925 F.2d at 825 (recognizing the four proper areas for prosecutorial jury argument are summation of the evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and pleas for law enforcement).

"A prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most egregious cases." *Harris v. Johnson*, 313 F.3d at 245 n.12; *Ortega v. McCotter*, 808 F.2d 406, 410 (5th Cir. 1987)(*quoting Menzies v. Procunier*, 743 F.2d 281, 288-89 (5th Cir. 1984)).  The burden is on the habeas petitioner to show a reasonable probability that, but for the prosecutor's remarks, the result of the trial would have been different. *Nichols v. Scott*, 69 F.3d at 1278.

2.     Petitioner's Confession to Douglas' Murder

Insofar as petitioner complains in his Second Amended Petition about the prosecutor's allegedly "erroneous" argument stating petitioner had confessed to shooting Douglas, that complaint is without arguable merit.  As explained above, at the guilt-innocence phase of petitioner's trial, Patrick Brook testified, as did both Mark Ray and Darnell McCoy, that, shortly after shooting Douglas, petitioner arrived at Brook's motel room and described to Brook in detail how he (petitioner) shot Douglas twice in the head.[344]  Thus, there was nothing even arguably improper with the prosecution referring generally to petitioner's "confession" to Douglas' murder.

In his Reply Brief, however, petitioner redefines his complaint and points out, quite correctly, that the prosecutor, without objection from defense counsel, erroneously suggested Dr. Mathew had testified petitioner admitted to shooting Douglas.[345]  In point of fact, petitioner did not confess his role in the Douglas murder to Dr. Mathew but, rather, to Patrick Brook.[346]  Dr. Mathew testified the petitioner refused to discuss the Douglas murder with him and denied shooting Petrey.[347]

It is important to remember that, at the time the prosecutor made her misstatement (during closing argument at the punishment phase of petitioner's capital murder trial), the jury had already found petitioner guilty beyond a reasonable doubt of capital murder under both

---

[344] See note 326, supra.

[345] S.F. Trial, Volume 36, at p. 95.

[346] See note 326, supra.

[347] S.F. Trial, Volume 34, testimony of Roy Mathew, at p. 221.

214

theories listed in the indictment, i.e., the murder of Petrey in the course of kidnaping and robbing

Petrey and the murder of Petrey in the same scheme or course of conduct involved in the murder

of Douglas.  The prosecutor's erroneous suggestion during closing argument *at the punishment*

*phase of trial* that petitioner had confessed his role in Douglas' murder to Dr. Mathew when, in

fact, petitioner confessed same to Patrick Brook (in the presence of Mark Ray and Darnell

McCoy) did not render petitioner's trial fundamentally unfair.  The comment in question was an

isolated misstatement of the evidence, was not repeated, and was immediately followed by

prosecutorial comments shifting the jury's attention to the final special issue.

3.     Petitioner's Lack of Remorse

During closing argument at the punishment phase of petitioner's trial, the prosecutor

made the following statement without objection from petitioner's trial counsel:

> Did you ever once hear from any witness any remorse for the death of
> these men at this punishment phase?  No, you didn't.  Not any.  Not from a single
> witness that testified.[348]

Petitioner argues this comment was improper because, during the punishment phase testimony of

petitioner's mother, the prosecution successfully objected to a question designed to elicit hearsay,

potentially remorseful, declarations attributed to petitioner.[349]

A prosecutor's comment will be construed as an improper comment on the defendant's

failure to testify only when the character of the remark was such that the jury would naturally and

---

[348] S.F. Trial, Volume 36, at p. 94.

[349] One such objection was sustained during the punishment phase testimony of petitioner's mother. S.F. Trial, Volume 33, testimony of Carla Sexton, at p. 138.  The other record citation  included in petitioner's pleadings herein (specifically the reference at *Second Amended Petition*, p. 385, to S.F. Trial, Volume 33, at pp. 142-43) does not reflect any objection by the prosecution to Mrs. Sexton's testimony.

necessarily construe same as a comment on the defendant's silence. *Gongora v. Thaler*, 710 F.3d

267, 277 (5th Cir. 2013), *rehearing denied*, 726 F.3d 701 (5th Cir. 2013), *cert. denied*, ___ U.S.

___, ___ S.Ct. ___, ___ L.Ed.2d ___, 2014 WL 102991 (January 13, 2014); *Jackson v. Johnson*,

194 F.3d 641, 652-53 (5th Cir. 1999), *cert. denied*, 529 F.3d 1027 (2000).

> For there to have been a denial of one's fifth amendment right to remain silent, the
> prosecutor's manifest intent in making the remark must have been to comment on
> the defendant's silence, or the character of the remark must have been such that
> the jury would naturally and necessarily construe it as a comment on the
> defendant's silence.  To expound on the first inquiry, the prosecutor's intent is not
> manifestly impermissible if there is some other, equally plausible explanation for
> the remark.  For the second inquiry, the question is not whether the jury might or
> probably would view the challenged remark in this manner, but whether it
> necessarily would have done so.

*Jackson v. Johnson*, 194 F.3d at 652 (Footnotes omitted).

The initial problem with this complaint is that petitioner presented extensive testimony

during the punishment phase of his capital murder trial from several qualified mental health

experts, all of whom testified at great length based upon hearsay information they either heard

directly from petitioner or read in documents or obtained in test results concerning petitioner.[350]

None of these expert witnesses testified petitioner had ever said *or done* anything which

suggested to them petitioner was sincerely remorseful for either the death of Douglas or the death

of Petrey.  Petitioner's own expert, Dr. Mathew testified on cross-examination by the prosecution

that the petitioner refused to discuss the Douglas murder with him and denied having shot

---

[350] S.F. Trial, Volume 32, testimony of Meyer L. Proler, at pp. 175-227; Volume 34. Testimony of Daneen
Milam, at pp. 6-116; Volume 34, testimony of Roy Mathew, at pp. 159-242; Volume 35, testimony of Roy Mathew, at
pp. 202-15; Volume 36, testimony of Ross Greene, at pp. 5-63.

Petrey.[351]  The testimony at the guilt-innocence phase of trial established that (1) immediately

after the Douglas shooting, petitioner told his companions that Douglas was a child molester who

deserved to die[352] and (2) immediately after the Petrey murder, petitioner told Page that he

(petitioner) shot Petrey because Petrey knew their names.[353]  The foregoing statements attributed

to petitioner could rationally have been construed as demonstrating a lack of remorse on

petitioner's part separate and apart from the petitioner's failure to testify at his own trial.  Finally,

when confronted by law enforcement officials, petitioner chose to attempt to flee in a particularly

violent and extremely dangerous manner.[354]  No witness who testified at petitioner's trial

indicated petitioner had ever *done* anything to suggest petitioner was truly remorseful or

sincerely contrite for his murders of Douglas and Petrey.

      The evidence properly before the jury at the punishment phase of trial permitted more

than an inference that the petitioner's words and actions immediately after his fatal shootings of

both Douglas an Petrey displayed not only a lack of remorse but also a callous and wanton

disregard for human life.  Despite the many witnesses who testified on petitioner's behalf at the

---

[351] S.F. Trial, Volume 34, testimony of Roy Mathew, at p. 221.  Dr. Mathew also testified that, while the petitioner did describe extensive methamphetamine abuse in the days leading up to the Douglas and Petrey murders, petitioner himself never claimed to be high during either of the murders. *Id., at* pp. 222-26.  Dr. Mathew nonetheless testified the petitioner was convinced Douglas was going to snitch on petitioner. *Id.*, at p. 226.

[352] S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 117 (petitioner described Douglas as a bad person, rapist, someone who deserved what happened to him); Volume 21, testimony of Patrick Lee Brook, at pp. 251-54, 260-61 (petitioner said he thought Douglas was working with the police and petitioner appeared calm and proud he had shot Douglas, not remorseful); Volume 22, testimony of Mark Ray, at pp. 102-03, 120-25, 129-30, 134, 136 (petitioner called Douglas a child molester who deserved to die, forced Ray at gunpoint to shoot Douglas a third time, and petitioner appeared excited when he described shooting Douglas to Brook); Volume 26, testimony of David Lee Pages. Jr., at pp. 175-78, 182, 237-38  (petitioner directed the others to roll Douglas down face down into the creek and forced Ray to shoot Douglas a third time, all the while threatening them, and petitioner threatened Petrey to force Petrey to attempt to purchase an assault rifle for petitioner).

[353] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at p. 248.

[354] *See* note 48, *supra.*

217

punishment phase of trial, including several mental health experts who testified without objection as to their conversations with petitioner (including Dr. Mathew's testimony that the petitioner had refused to discuss the Douglas murder with him), none of the defense's witnesses testified they had witnessed any *conduct* by the petitioner which suggested or indicated the petitioner was remorseful for his crimes. In such circumstances, the prosecutor's comment about the lack of evidence in the trial record showing petitioner had ever displayed remorse for his crimes did not manifest an intent to comment upon petitioner's exercise of his constitutional right to remain silent at trial and was not of such character that the jury would naturally and necessarily have construed that comment as a comment on the petitioner's silence. *See Jackson v. Johnson*, 194 F.3d at 652-53 (*Footnote omitted*):

> The state contends that the comment addressed Jackson's behavior at the time of the incident, not his exercise of his right to remain silent during trial. Viewed in context, the prosecution's argument was as follows: "Look at him; he hasn't shown any remorse. After he and Clary killed this girl, they went into the beer joint and drank beer and shot pool." The state correctly notes that, though it may not directly or indirectly comment on Jackson's decision not to testify, it may call to the jury's attention the fact that the defense did not rebut evidence offered by the state. The state offered evidence that, after the incident, Jackson drank beer and played pool, and it argued that this behavior reflected a lack of remorse. Jackson has offered nothing to rebut this argument. We cannot conclude that there is no plausible and permissible explanation for the prosecution's comment nor that the jury necessarily viewed this statement as a comment on Jackson's silence.

Likewise, under such circumstances, the prosecutor's comment on the absence of any evidence in the record showing petitioner had ever expressed remorse for his murders of Douglas and Petrey did not render petitioner's trial fundamentally unfair. If petitioner wished to present evidence showing he was sincerely remorseful for his crimes, the hearsay rule did not preclude petitioner from calling a witness who had observed petitioner *do something* (other than speak)

which indicated petitioner was sincerely remorseful. Petitioner has not alleged any facts showing he was prevented by any outside force from testifying at the punishment phase of his trial to express sincere contrition for his crimes. In fact, petitioner has alleged no facts showing there was any evidence available at the punishment phase of his capital murder trial showing petitioner had ever demonstrated sincere contrition or remorse for his murders of Douglas and Petrey.

Furthermore, the evidence showing petitioner's propensity for violence was overwhelming. The prosecution's witnesses, and even some of petitioner's experts, described petitioner as a person who was violent from the time he entered school through the time petitioner was incarcerated in the TYC, where petitioner served as a prison gang leader and led multiple riots. The punishment phase evidence also showed that, after his release from the TYC, petitioner voluntarily chose to stop taking his prescription medications and participated in (1) "an inside job" robbery of a fast food store, (2) a burglary of a sporting goods store in which tremendous property damage was done and many guns taken, (3) a home invasion in which petitioner fired multiple rounds and both the homeowner and petitioner's accomplice were wounded, (4) the murder of Doyle Douglas, (5) the kidnaping, robbery, and murder of Samuel Petrey, and (6) a high speed pursuit which did not end until after law enforcement officers shot out two of the tires of Petrey's pickup truck. Given the record at petitioner's trial, the prosecutor's comment on the absence of evidence showing petitioner's remorse for his crimes did not render petitioner's trial fundamentally unfair.

For the reasons set forth above, neither of the objections to the prosecution's punishment-phase jury arguments urged by petitioner identify any trial error which rises above the level of harmless error. *See Gongora v. Thaler*, 710 F.3d at 274 (holding *Griffin* error subject to harmless

error analysis).  Simply put, neither separately nor in union did the prosecutorial comments in question have a substantial and injurious effect or influence in determining the jury's verdict at the punishment phase of petitioner's capital murder trial. *Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S.Ct. 1710, 1718, 123 L.Ed.2d 353 (1993).

    4.    <u>"Victim Impact" Testimony from Mark Ray</u>

During his direct examination at the guilt-innocence phase of trial, prosecution witness Mark Ray testified without objection from petitioner's trial counsel that he (Ray) (1) would not have shot Douglas in the head had petitioner not directed Ray to do so at gunpoint and also threatened others and (2) felt extremely low after pulling the trigger and shooting Douglas the third time.[355]  Petitioner argues in his Second Amended Petition this latter testimony was improper "victim impact" testimony but cites no legal authority holding that questions designed to ask an individual his state of mind during and immediately after committing a violent act constitutes "victim impact" evidence within the meaning of the Supreme Court's holding in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).  In his Reply Brief, petitioner appears to concede this point, arguing Ray's testimony in question did not really constitute "victim impact" testimony.[356]  Because petitioner apparently now concedes Ray's testimony did not constitute "victim impact" testimony, the respondent's argument that petitioner has failed to identify a legitimate basis for excluding the testimony in question has merit.

The short answer to this claim is Ray's answers to the prosecutor's questions about Ray's mental state immediately after Ray's shooting of Douglas did not constitute "victim impact

---

[355] S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 120-25, 128-29.

[356] *Petitioner's Reply*, at p. 205.

evidence" within the meaning of that term as used by the Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 825-26, 111 S.Ct. 2597, 2608-09, 115 L.Ed.2d 720 (1991)(holding both the admission of evidence of *the impact of a capital murder on the victim and his or her survivors,* as well as prosecutorial jury argument regarding same, are constitutionally permissible at the punishment phase of a capital murder trial).

The prosecution's questions directed to Ray (i.e., inquiring how Ray felt after he shot Douglas at petitioner's direction) were arguably relevant to petitioner's offense because they addressed Ray's mental state when he fired the third shot into Douglas. The questions about Ray's mental and emotional state when he fired the third shot into Douglas were arguably intended to elicit testimony relevant to the law of parties theory of criminal responsibility submitted to the jury at the guilt-innocence phase of petitioner's trial, i.e., to ascertain whether Ray was acting at petitioner's behest when Ray fired the third shot into Douglas. The questions to Ray about how he felt after he shot Douglas were arguably designed to ascertain whether Ray was acting solely at the direction of petitioner or out of an independent motive.

Respondent is correct that, once the facade of "victim impact" is removed from the equation, petitioner has failed to identify any legitimate basis for objecting to the questions directed to Ray. Ray claimed he had fired the third shot into Douglas only because petitioner (1) pointed a gun at Ray and directed Ray to do so and (2) also threatened to harm Ray's friends. Neither the questions asking Ray how he felt after shooting Douglas nor Ray's responses thereto rendered petitioner's trial fundamentally unfair.

5.    Conclusions

None of the complaints included in petitioner's twenty-eighth claim herein warrant federal habeas corpus relief.  None of the complaints contained in petitioner's twenty-eighth claim herein rise above the level of harmless error.  None of these complaints, individually or collectively, identify any trial error which had a substantial and injurious effect or influence in determining the jury's verdict at either phase of petitioner's capital murder trial.

H.    *Giglio/Napue* Claim Involving Jacqueline Timmons

In his twenty ninth claim herein, petitioner argues the prosecution knowingly presented false testimony from prosecution witness Jacqueline Timmons regarding the contents of a TYC incident report (and his trial counsel rendered ineffective assistance by failing to use the same report to impeach Timmons).

The report identified by petitioner as the "Timmons Report" appears as Exhibit no. 20 in the group of exhibits filed October 18, 2013 as docket entry no. 88, accompanying petitioner's Second Amended Petition.  The first page of that four-page report, dated January 26, 2000, states the incidents recorded therein include "assault on staff," "assault of student/other," "disruption of program," and "use of physical force."  The comment section of the first page of the report in

222

question states "I saw Clint & Peer [blacked out] fighting & Staff Rhodes was attempting to break them up & was being hit by both youth - I restrained Clint & he continued to try and got to the peer (RE)." The second page of the report states, in part, "Youth fighting & was hitting Peer & Staff who was attempting to break up the fight." The third page of the report in question consists of a handwritten account of the same incident that is barely legible but appears to be consistent with the information on the first two pages of the report. The fourth and final page of the report (a pre-printed TYC form) has items labeled "assault on staff," "assault on youth/other," "disruption of program" and "use of physical force" all circled and includes a brief summary once again stating that Timmons observed petitioner and another youth (identified as RE) fighting and Staff person Rhodes was involved.

Petitioner argues that because the Timmons Report does not specifically state that Timmons was injured during the altercation in question, the report could have been used to impeach that portion of Timmons' trial testimony in which she claimed she was injured in the incident in question. The problem with this argument is that the Timmons Report furnishes substantial corroboration for those aspects of Timmons' trial testimony in which she described petitioner's violent conduct during the incident in question. On three of the four pages of the report there are indications that the incident involved an assault upon TYC staff. While it is far from clear in the report whether the TYC staff person or persons assaulted referenced therein included Timmons herself, nothing in the report excludes the possibility that both Timmons and TYC staff person Rhodes may have been assaulted. In fact, the third page of the report, i.e., the handwritten page, appears to suggest that Timmons attempted to restrain petitioner at one point

223

during the altercation but the petitioner broke free and charged the other youth involved in the initial fight, cursing and threatening the other youth.

Petitioner's trial co-counsel, attorney Ian Cantacuzene, testified during the evidentiary hearing in petitioner's first state habeas corpus proceeding (which contained a plethora of complaints about the performance of petitioner's trial counsel). Attorney Cantacuzene testified, in part, that he believed it was a strategic advantage for the defense team to allow admission of the petitioner's TYC records, rather than attempting to exclude those documents, because he felt having the prosecution parade TYC employees as live witnesses into the courtroom, where they would be free to embellish the information contained in their written reports with additional details harmful to petitioner, was potentially more harmful to petitioner than admission of the dry, summary, reports themselves.[357] Attorney Cantacuzene may have had prosecution witness Timmons in mind when he gave that testimony. Ms. Timmons' live testimony was more detailed and harmful to petitioner than her dry, four-page, report. Her report corroborated most of the worst aspects of Ms. Timmons' punishment phase trial testimony about the incident in question and, contrary to the implications underlying petitioner's twenty-ninth claim herein, did not categorically refute Timmons' trial testimony that she was injured in the incident in question. On the contrary, the statements on page three of the report suggesting petitioner pulled free from Timmons while she was attempting to restrain petitioner imply at least the possibility Timmons was injured during the incident. What is very clear from the report is that Timmons indicated on three of the four pages thereof that a TYC staff person was assaulted in the incident.

---

[357] S.F. First State Habeas Hearing, Volume 2, testimony of Rodion Cantacuzene, at pp. 211-12, 214; Volume 3, testimony of Rodion Cantacuzene, at pp. 21-24.

As was explained in connection with petitioner's first claim herein, a state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. at 153-54, 92 S.Ct. at 766; *Napue v. Illinois*, 360 U.S. at 269-70, 79 S.Ct. at 1177.  To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question *knowing* that it was false. *Giglio v. United States*, 405 U.S. at 153-54, 92 S.Ct. at 766; *Reed v. Quarterman*, 504 F.3d at 473.

Nothing in the Timmons Report or petitioner's twenty-ninth claim herein satisfies any of the requirements of *Giglio/Napue* analysis.  The report itself does not categorically establish that Timmons was uninjured in the incident in question.  Furthermore, rather than being a source of information for possibly impeachment, the report would have corroborated virtually every other detail of Timmons' trial testimony about the incident in question.  Finally, there is nothing in the report which would have put prosecutors on notice of the possibility any portion of Timmons' trial testimony was factually inaccurate.  Under these facts, the alleged failure of the prosecutors to make a copy of the Timmons' report available to petitioner's trial counsel did not violate petitioner's federal constitutional rights and does not warrant federal habeas corpus relief.[358] Petitioner's twenty-ninth claim herein lacks any arguable merit.

---

[358] Insofar as petitioner argues in his twenty-ninth claim herein that his trial counsel rendered ineffective assistance by failing to employ the Timmons report to impeach Timmons at trial, for reasons set forth hereinafter in detail in connection with petitioner's fourth claim herein, that argument fails to satisfy either prong of *Strickland* analysis. The short answer is that valid strategic reasons existed at the time of trial for the decision by petitioner's trial counsel not to object to the admission of the petitioner's TYC records.

## VIII. Biased Trial Judge

A.     The Claim

In his second claim herein, petitioner argues a letter mailed out by the state trial judge to petitioner's jurors a few days *after* the conclusion of petitioner's capital murder trial, in which the judge thanked the jurors for their service and expressed his opinion the jury had "made the correct decision,"[359] establishes the state trial judge had bias and was not impartial toward petitioner.[360]

B.     State Court Disposition

Petitioner presented the same complaint of judicial bias or lack of judicial impartiality arising from the trial judge's letter as his third claim for relief in his second subsequent (third) state habeas corpus application.[361]  The Texas Court of Criminal Appeals summarily dismissed this claim pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-03, 2009 WL 1546625, *1 (Tex. Crim. App. June 3, 2009).

C.     Procedural Default

Respondent correctly points out petitioner procedurally defaulted on this claim of judicial bias by virtue of the Texas Court of Criminal Appeals' summary dismissal of this claim and petitioner's failure to present the same claim as a point of error on direct appeal or as a claim for

---

[359] Four copies of the state trial judge's form letter to the jurors appear as Exhibit no. 93 to petitioner's Second Amended Petition, filed October 18, 2012, docket entry no. 89-3, at pp. 974-77.  In pertinent part, Judge Hyde's letter reads as follows:

> After spending several weeks with the Defendant in jury selection before the trial began, I gained insight into his personality and I got to hear and see much more than the jury heard.  In my view, he is a dangerous man who is fully capable of harming someone else.  Your jury made the correct decision.

[360] *Second Amended Petition*, at pp. 123-29; *Petitioner's Reply*, at pp. 66-69.

[361] Third State Habeas Transcript, Volume 1 of 10, at pp. 85-91, 129-32.

relief in petitioner's first state habeas corpus proceeding. *See McGowen v. Thaler*, 675 F.3d at 499 n.72 ("Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review."); Coleman *v. Quarterman*, 456 F.3d at 542 (holding the same). Furthermore, as explained below, this claim possesses no arguable merit; therefore petitioner cannot demonstrate prejudice arising from the failure of his state appellate or first state habeas counsel to present the same complaint to the state appellate courts in a timely fashion. *Coleman v. Quarterman*, 456 F.3d at 542.

D.     No Merit on *De Novo* Review

Because no state court has ever addressed the merits of the petitioner's third claim herein, this Court's review of this claim is necessarily *de novo. See Porter v. McCollum*, 558 U.S. at 39, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice).

A criminal defendant's constitutional right to a trial before a fair and impartial tribunal includes the right to proceed before a judicial officer who has no actual bias against the defendant and has no personal interest in the outcome of the proceeding:

> [T]he floor established by the Due Process Clause clearly requires a "fair trial in a fair tribunal," *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975), before a judge with no actual bias against the defendant or interest in the outcome of his particular case. See, *e.g., Aetna, supra*, at 821-822, 106 S.Ct., at 1585-1586; *Tumey, supra*, at 523, 47 S.Ct., at 441.

*Bracy v. Gramley*, 520 U.S. 899, 904-05, 117 S.Ct. 1793, 1797, 138 L.Ed.2d 97 (1997).

> [A] 'fair trial in a fair tribunal is a basic requirement of due process.' In re
> Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). This
> applies to administrative agencies which adjudicate as well as to courts.  Gibson
> v. Berryhill, 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973).  Not
> only is a biased decisionmaker constitutionally unacceptable but 'our system of
> law has always endeavored to prevent even the probability of unfairness.' In re
> Murchison, supra, 349 U.S., at 136, 75 S.Ct., at 625; cf. Tumey v. Ohio, 273 U.S.
> 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927).  In pursuit of this end, various
> situations have been identified in which experience teaches that the probability of
> actual bias on the part of the judge or decisionmaker is too high to be
> constitutionally tolerable.  Among these cases are those in which the adjudicator
> has a pecuniary interest in the outcome and in which he has been the target of
> personal abuse or criticism from the party before him.

*Withrow v. Larkin*, 421 U.S. 35, 46-47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975)(Footnotes
omitted).

Nonetheless, the Supreme Court has implicitly and explicitly rejected the notion that

rulings, statements, and comments made by a judicial officer antagonistic to a party, its counsel,

or the party's case necessarily warrant relief under the federal habeas corpus statutes as proof of

disqualifying bias:

> "[J]udicial remarks during the course of a trial that are critical or disapproving of,
> or even hostile to, counsel, the parties, or their cases, ordinarily do not support a
> bias or partiality challenge." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct.
> 1147, 127 L.Ed.2d 474 (1994) (noting that we look for "a deep-seated favoritism
> or antagonism that would make fair judgment impossible").

*United States v. Irby*, 703 F.3d 280, 282 (5th Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S.Ct.
2810, 186 L.Ed.2d 871 (2013).

On the contrary, the Supreme Court has recognized that trials are conducted by judicial

officers who retain their character as human beings:

> First, judicial rulings alone almost never constitute a valid basis for a bias or
> partiality motion. See *United States v. Grinnell Corp.,* 384 U.S., at 583, 86 S.Ct.,
> at 1710.  In and of themselves ( *i.e.,* apart from surrounding comments or
> accompanying opinion), they cannot possibly show reliance upon an extrajudicial
> source; and can only in the rarest circumstances evidence the degree of favoritism
> or antagonism required (as discussed below) when no extrajudicial source is
> involved.  Almost invariably, they are proper grounds for appeal, not for recusal.

Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. *Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.* An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). *Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration-remain immune.*

*Liteky v. United States*, 510 U.S. 540, 555-56, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994)(Emphasis added).

The Supreme Court may have had the comments expressed by petitioner's state trial

judge in his letter to petitioner's jurors in mind when it declared as follows:

*The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.* As Judge Jerome Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (CA2 1943). Also not subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant.

*Liteky v. United States*, 510 U.S. at 550-551, 114 S.Ct. at 1155 (Emphasis added).

There is no allegation in this case that any of the petitioner's state trial judge's allegedly

biased comments resulted from the state trial judge receiving information about petitioner other

than through the petitioner's pretrial and trial court proceedings.

> [O]pinions formed by the judge on the basis of facts introduced or events
> occurring in the course of the current proceedings, or of prior proceedings, do not
> constitute a basis for a bias or partiality motion unless they display a deep-seated
> favoritism or antagonism that would make fair judgment impossible. Thus,
> judicial remarks during the course of a trial that are critical or disapproving of, or
> even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias
> or partiality challenge. They *may* do so if they reveal an opinion that derives from
> an extrajudicial source; and they *will* do so if they reveal such a high degree of
> favoritism or antagonism as to make fair judgment impossible. *Liteky v. United
> States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)
>
>       First, the trial judge's remarks regarding his opinion of the case—that the
> Allens were likely in criminal contempt and that they violated the courts
> orders—did not reveal opinions derived from an extrajudicial source. Even if they
> did, however, "opinions formed by the judge on the basis of facts introduced or
> events occurring in the course of the current proceedings, *or of prior proceedings,*
> do not constitute a basis for a bias or partiality motion unless they display a deep-
> seated favoritism or antagonism that would make fair judgment impossible."

*United States v. Allen,* 587 F.3d 246, 252 (5th Cir. 2009), cert. denied, 559 U.S. 961 (2010)
(Footnotes omitted).

> [J]udicial rulings alone almost never constitute a valid basis for a bias or partiality
> motion.  In and of themselves...they cannot possibly show reliance upon an
> extrajudicial source; and can only in the rarest circumstances evidence the degree
> of favoritism or antagonism required...when no extrajudicial source is involved.
> Almost invariably, they are proper grounds for appeal, not for recusal.

*United States v. Allen,* 587 F.3d at 253 (Footnote omitted).

Insofar as petitioner asserts his trial judge was biased against him, petitioner must bear a

substantial burden and support that assertion with more than mere allegations his trial judge

expressed views antagonistic to petitioner or petitioner's case:

> "[B]ias by an adjudicator is not lightly established." *Valley v. Rapides Parish Sch.
> Bd.,* 118 F.3d 1047, 1052 (5th Cir.1997).  Courts ordinarily "presume that public
> officials have properly discharged their official duties." *Bracy v. Gramley,* 117
> S.Ct. at 1799 (internal quotation marks and citations omitted).  General
> allegations of bias or prejudice are insufficient to establish a constitutional

violation. *See Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 1585,
89 L.Ed.2d 823 (1986) (holding that general allegations of a judge's frustration
with insurance companies are not sufficient to force recusal under the Due Process
Clause from a case in which an insurance company was a party). The Supreme
Court has stated that "most matters relating to judicial disqualification [do] not
rise to a constitutional level." *Id.* at 1584 (quoting *FTC v. Cement Inst.,*333 U.S.
683, 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948)). So even if a judge is disqualified
under state or federal law, the disqualification is not always required by the Due
Process Clause. *See id.* at 1585.

*Richardson v. Quarterman*, 537 F.3d 466, 474-75 (5th Cir. 2008), cert. denied, 555 U.S. 1173 (2009).

Petitioner's state trial judge's comments to petitioner's jurors written days after the conclusion of petitioner's lengthy capital murder trial do not evidence the high degree of favoritism or antagonism that makes fair judgment impossible. Rather, petitioner's trial judge's post-trial comments to petitioner's jurors reflect little more than the perfectly human antipathy which naturally attaches to persons who express no remorse for their own unprincipled, violent, misconduct. The trial judge's comments were no more evidence of disqualifying bias than this Court's rulings rejecting petitioner's insufficient evidence claims herein on the merits.

Nor did the trial judge's comments reveal any suggestion the judge's views toward the petitioner resulted from anything other than the trial judge's own personal observations of petitioner during proceedings before the state trial court. Thus, there is no allegation, much less any evidence, now before this Court establishing the state trial judge's expressed antipathy toward petitioner resulted from an extra-judicial source. As such, petitioner's complaint of judicial bias lacks any arguable merit. *Liteky v. United States*, 510 U.S. at 550-551, 114 S.Ct. at 1155. Petitioner's second claim herein does not warrant federal habeas corpus relief.

## IX. Sheriff's Alleged Fraternization with Jury

A.      The Claim

In his fourteenth claim herein, petitioner argues his constitutional rights were violated when Midland County Sheriff Gary Painter went to lunch with the jury at a restaurant a short distance from the courthouse on the final day of the jury's deliberations at the punishment phase of petitioner's trial.[362]

B.      State Court Disposition

Petitioner first raised this complaint in his motion for new trial.[363]  As explained in Section I.E. above, the trial court held a lengthy evidentiary hearing on petitioner's motion for new trial which included extensive testimony surrounding the circumstances of the Sheriff's trip to the restaurant with the jury on the final day of petitioner's trial.[364]

Petitioner again raised his complaint regarding the Sheriff joining the jury for lunch at the restaurant near the courthouse as his fifth point of error on direct appeal.[365]  The Texas Court of Criminal Appeals ruled as follows:

> In his fifth point of error, appellant claims that Sheriff Gary Painter improperly communicated and fraternized with the jury during its deliberations on punishment.  Specifically, he claims that, during a break in the proceedings, presiding juror James Bobo approached Painter, who was an acquaintance, and asked to speak with him after the trial was over.  He claims further that, during a lunch break, the sheriff accompanied the jury to a local restaurant and that his presence improperly influenced the jury to set appellant's punishment at death.
>      When a juror converses with an unauthorized person about the case, injury is presumed. *Alba v. State,* 905 S.W.2d 581, 587 (Tex.Crim.App.1995).  However, the state may show that the case was not discussed or it may rebut the presumption of harm by showing that nothing prejudicial to the accused was said.  *Id.*  We defer to the trial court's resolution of historical facts and its determinations

---

[362] *Second Amended Petition*, at pp. 287-95; *Petitioner's Reply*, at pp. 167-70.

[363] Trial Transcript, Volume 5 of 5, at pp. 901-12.

[364] *See* notes 124-45, *supra*, and accompanying text.

[365] Appellate Brief, at pp. 26-30.

concerning credibility and demeanor, and we view the evidence in the light most favorable to the trial court's ruling. *Quinn v. State,* 958 S.W.2d 395, 401-02 (Tex.Crim.App.1997).

At the hearing on appellant's motion for new trial, Painter testified that when Bobo approached him, he said "When this is over and through with, I need to talk to you." Bobo did not indicate what he needed to talk to him about, and there was no further discussion between the two. Without more, appellant has failed to show that his case was discussed or that anything prejudicial to appellant was said.FN4 *Alba,* 905 S.W.2d at 587. Appellant's bare allegation that Painter was present at lunch does not warrant relief on appeal. Tex.R.App. P. 38.1. Appellant's fifth point of error is overruled.

FN4. At the motion for new trial hearing, Painter testified that he accompanied the jurors to lunch because additional security was needed. Earlier in the week, a threat had been phoned into the Midland County Attorney's Office indicating that appellant was "going out with a bang." Painter, as head of courthouse security, thought it prudent to accompany the jurors because of the attention this case received.

*Young v. State,* AP 74,643, 2005 WL 2374669, *8 (Tex. Crim. App. September 28, 2005)

## C.    AEDPA Analysis

The record from the evidentiary hearing on petitioner's motion for new trial establishes

(1) an ambiguous threat that petitioner was "going out with a bang" was telephoned to the office

of the Midland County Attorney on April 7 during the punishment phase of petitioner's capital

murder trial, (2) that information was passed on to responsible courthouse and Midland County

officials, (3) Sheriff Painter, who had been present at petitioner's trial for jury arguments and the

return of verdict at the guilt-innocence phase of trial, instructed courthouse security personnel to

increase their vigilance, arranged for a uniformed Deputy Sheriff (Glenn Wells) to be present  in

the courtroom throughout the remainder of petitioner's trial, and arranged his own schedule so he

could continue to be present in the courtroom as well, (4) on the final day of deliberations at the

punishment phase of petitioner's trial, the jury decided to eat lunch at a nearby restaurant, (5)

without consulting his subordinates, Sheriff Painter decided to accompany the three other law

233

enforcement officers who were escorting the jury to and from the restaurant, (6) as the jurors were leaving the courthouse, the jury foreman, (James Bobo) approached the Sheriff and asked if he could speak with the Sheriff once petitioner's trial was over, (7) the Sheriff indicated a willingness to do so, (8) the Sheriff accompanied the jury and three other law enforcement officers to the restaurant, (9) the Sheriff sat at a table with the male members of the jury while another law enforcement officer sat at a separate table with the female jurors, (10) the two other law enforcement officers escorting the jury sat by themselves at a third table, (11) the Sheriff returned to the courthouse with the jury, (12) the Sheriff and Deputy Wells were both present in the courtroom later that same day when the verdict was returned at the punishment phase of petitioner's trial, and (13) after the trial was over and the jury had been excused, Mr. Bobo spoke with the Sheriff and asked the Sheriff to examine the guilt-innocence phase trial testimony of Sheriff's Office employee Paul Hallmark.[366]

During his testimony at the guilt-innocence phase of petitioner's trial, Hallmark, a Midland County Sheriff's Office crime scene investigator, had been cross-examined vigorously by petitioner's trial counsel.[367] During closing argument at the guilt-innocence phase of trial, petitioner's trial counsel criticized Hallmark by name for allegedly failing to conduct proper tests and properly preserve and handle various items of physical evidence recovered at the locations

---

[366] See notes 124-32, supra, and accompanying text.

[367] On cross-examination by petitioner's trial counsel, Hallmark admitted (1) he failed to put down butcher paper or some other material on the top of a desk to help preserve hair, fibers, and other trace evidence before he opened sealed bags of evidence recovered from the location where Petrey's body was discovered, (2) the first time he went out to the location where Petrey's body was discovered, he failed to locate and recover the pair of gloves belonging to David Page that contained a knife and a box of live .22 caliber rounds, (3) hair samples were not taken from Page or petitioner despite authorization in a pair of warrants for recovery of same, (4) no trace metal testing was performed on any clothing, (5) no Luminol testing was performed on petitioner's tennis shoes, and (6) no photographs of petitioner's or Page's hands were taken using an ultraviolet filter. S.F. Trial, Volume 25, testimony of Paul Hallmark, at pp. 23-89, 103-16.

where Samuel Petrey's body was discovered and where petitioner was finally arrested at the conclusion of a high speed chase.[368]

Significantly, other than Bobo's's brief conversation with Sheriff Painter as the two men were leaving the courthouse with the jury for the restaurant on the final day of petitioner's trial (wherein Bobo indicated cryptically a desire to speak with the Sheriff when petitioner's trial was over), there was no allegation, much less any evidence, before the state court suggesting the Sheriff or any other law enforcement officer had any conversations with the jury regarding petitioner's case.[369]  Petitioner did not furnish the state courts with an affidavit from a juror or any other evidence suggesting any communication regarding petitioner's case ever took place between the jurors and the Sheriff or any other person external to the jury.  Equally significant, there was no evidence before the state court suggesting that Sheriff Painter had any conversation or communication with any juror at lunch the final day of trial *concerning petitioner's case*.  The Sheriff testified without contradiction at both an impromptu hearing held the final day of petitioner's trial as well as during the hearing on petitioner's motion for new trial, both times categorically denying he had engaged in any communication with any juror about petitioner's case.[370]

In *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), the Supreme Court held as follows:

---

[368] During closing argument at the guilt-innocence phase of trial, petitioner's trial counsel repeatedly criticized hallmark's testimony and performance of his duties as a crime scene investigator. S.F. Trial, Volume 29, at pp. 58-61.

[369] *See* notes 124-32, *supra*, and accompanying text.

[370] S.F. Trial, Volume 37, testimony of Gary Painter, at pp. 14-20; Volume 38, testimony of Gary Painter, at pp. 123-74.

In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. *The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.* (Emphasis added).

There was no evidence before the state courts suggesting any extrinsic evidence reached the petitioner's jury as a result of some improper communication. In its findings of fact and conclusions of law denying petitioner's motion for new trial, the state trial court reasonably concluded from the evidence before it that Sheriff Painter's conduct was motivated by a desire to enhance security in petitioner's courtroom after the telephone threat and did not appear to have had any undue influence on petitioner's jury.[371] The Texas Court of Criminal Appeals' holding in petitioner's direct appeal was fully consistent with a conclusion that the state had overcome the presumption of prejudice recognized in *Remmer* for unauthorized contact with the jury. In short, the Texas Court of Criminal Appeals' holding in petitioner's direct appeal appears to be an objectively reasonable application of the legal principle set forth in *Remmer*.

This Court's independent, de novo, review of the record from petitioner's trial reveals (1) Sheriff Painter did not appear at petitioner's trial until the jury arguments and return of verdict at the guilt-innocence phase of trial, (2) Deputy Wells did not appear in petitioner's courtroom until after the April 7 telephone threat, i.e., after the commencement of the punishment phase of petitioner's trial, (3) neither Sheriff Painter nor any other law enforcement officer engaged in any improper or inappropriate communication with the jury, and (4) neither Sheriff Painter nor any

---

[371] S.F. Trial, Volume 39, at p. 101.

employee of the Midland County Sheriff's Office testified during the lengthy punishment phase of petitioner's capital murder trial.[372] Bobo's isolated, unsolicited, cryptic comment to Sheriff Painter cannot reasonably be construed as an improper "external" influence upon the petitioner's jury. *See Oliver v. Quarterman*, 514 F.3d 329, 336-40 (5th Cir. 2008)(discussing the distinction between "external" influences on juries, which are prohibited, and "internal" influences and holding the presence of a Bible reading in the jury room constituted an impermissible "external" influence), *cert. denied,* ___ U.S. ___, 129 S.Ct. 1985, 173 L.Ed.2d 1084 (2009).  The same holds for Sheriff Painter's conversations over lunch with the male jurors, all of which were unrelated to petitioner's trial.[373]

The Supreme Court's holding in *Turner v. State of Louisiana*, 379 U.S. 466, 472-73, 85 S.Ct. 546, 550, 13 L.Ed.2d 424 (1965)(mandating a new criminal trial where two courtroom bailiffs testified as key witness for the prosecution) does not apply to petitioner's case.  None of the law enforcement personnel who served as courtroom security at petitioner's trial (including Sheriff Painter and Deputy Wells) ever testified at either phase of petitioner's trial.

D.    Conclusions

The Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's direct appeal of petitioner's complaint about Sheriff Painter's contact with the jury on the final day of deliberations at petitioner's capital murder trial was neither (1) contrary to, nor

---

[372] *See* notes 124-32, *supra*, and accompanying text.

[373] Sheriff Painter testified without contradiction at the hearing held outside the jury's presence during jury deliberations the final day of petitioner's trial that his conversations over lunch that day with Mr. Bobo and the other male jurors were limited to discussions about the Sheriff's children, the service, the Sheriff's kids being in the service, a golf game, playing golf in Marfa and Alpine, and some people who lived in Marfa and Alpine. S.F. Trial, Volume 37, testimony of Gary Painter, at pp. 15-16.

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal. Petitioner's fourteenth claim herein does not warrant federal habeas corpus relief.

## X. Extending *Roper & Atkins* to ADHD and Mental Immaturity

A.    The Claim

In his fifteenth claim herein, petitioner argues his execution would violate the Eighth Amendment because his mental age, immaturity, and mental illness (ADD/ADHD) entitle him to the benefits of the same constitutional exemptions from execution for persons who commit capital murder while under the age of eighteen or who are mentally retarded recognized in the Supreme Court's holdings in *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), respectively.[374]

B.    State Court Disposition

In his thirty-third point of error on direct appeal, petitioner argued the Eighth Amendment should be construed as prohibiting the execution of any person who commits a capital offense while under the age of twenty-one.[375]  The Texas Court of Criminal Appeals held as follows:

> In his thirty-third point of error, appellant alleges that the Texas death-penalty scheme is unconstitutional because it permits the execution of offenders aged eighteen to twenty-one. He argues that the brain does not fully develop until the age of twenty-one, and therefore, offenders aged eighteen to twenty-one are less culpable than offenders twenty-two years of age and older. Appellant cites *Roper*

---

[374] *Second Amended Petition*, at pp. 295-301; *Petitioner's Reply*, at pp. 170-73.

[375] Appellate Brief, at pp. 97-99.

> *v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), as evidence that
> evolving standards of decency require this Court to raise the age of offenders
> eligible for the death penalty. However, in *Roper v. Simmons,* the United States
> Supreme Court held that the execution of offenders who were seventeen years of
> age at the time they committed capital murder is unconstitutional. The Supreme
> Court did not extend its ruling to offenders who were aged eighteen or over when
> they committed capital murder, and we decline to do so. Appellant's thirty-third
> point of error is overruled.

*Young v. State*, 2005 WL 2374669, *9 (Tex. Crim. App. September 28, 2005), *cert. denied*, 547 U.S. 1056 (2006).

Petitioner argued in his ninth claim for relief in his first state habeas corpus application that petitioner's relative youth at the time of his capital offense (eighteen years and four months) combined with petitioner's immaturity and ADHD to render his execution a violation of the Eighth Amendment principles announced in *Roper v. Simmons, supra.*[376] The Texas Court of Criminal Appeals denied relief on the merits based upon the trial court's finding. *Ex parte Clinton Lee Young*, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

C.   AEDPA Analysis

The Supreme Court's Eighth Amendment analysis in *Atkins* focused initially on current trends among state legislatures regarding the imposition of the death sentence on mentally retarded murderers. *See Atkins v. Virginia*, 536 U.S. at 311-17, 122 S.Ct. at 2246-50 (holding the Eighth Amendment draws its meaning from the evolving standards of decency marking the progress of a maturing society and the clearest and most reliable objective evidence of contemporary values is the legislation enacted by state legislatures). The Supreme Court then shifted its focus to the dual penological purposes served by the death penalty: retribution and

---

[376] First State Habeas Transcript, at pp. 57-67.

deterrence of capital crimes by prospective offenders. *Atkins v. Virginia*, 536 U.S. at 318-21, 122

S.Ct. at 2250-52.

With regard to retribution, the Court held an exclusion from the death penalty for

mentally retarded murderers was warranted by virtue of "the lesser culpability of the mentally

retarded offender" which it contrasted with "the culpability of the average murderer." *Atkins v.

Virginia*, 536, U.S. at 319, 122 S.Ct. at 2251.

The Supreme Court then held, in pertinent part, as follows:

With respect to deterrence — the interest in preventing capital crimes by
prospective offenders — "it seems likely that 'capital punishment can serve as a
deterrent only when murder is the result of premeditation and deliberation.'"
Exempting the mentally retarded from that punishment will not affect the "cold
calculus that precedes the decision" of other potential murderers.  Indeed, that sort
of calculus is at the opposite end of the spectrum from behavior of mentally
retarded offenders.  The theory of deterrence in capital sentencing is predicated
upon the notion that the increased severity of the punishment will inhibit criminal
actors from carrying out murderous conduct.  Yet it is the same cognitive and
behavioral impairments that make these defendants less morally culpable—for
example, the diminished ability to understand and process information, to learn
from experience, to engage in logical reasoning, or to control impulses—that also
make it less likely that they can process the information of the possibility of
execution as a penalty and, as a result, control their conduct based upon that
information.

*Atkins v. Virginia*, 536 U.S. at 319-20, 122 S.Ct. at 2251 (citations omitted).

The Supreme Court ultimately concluded the execution of mentally retarded criminals

would not measurably advance the deterrent or retributive purposes underlying the death penalty

and, therefore, the Eighth Amendment prohibits such punishment. *Atkins v. Virginia*, 536 U.S. at

321, 122 S.Ct. at 2252.

Significantly, the Supreme Court declined in *Atkins* to furnish state and lower federal courts with a definitive *legal* definition of "mental retardation" or "mentally retarded," instead offering two *clinical* definitions as possible options:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage [sic] intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18."
>
> The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage [sic] general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."

*Atkins v. Virginia*, 536 U.S. at 308 n.3, 122 S.Ct. at 2245 n.3 (*citations omitted*).

As the Supreme Court noted in *Atkins*, "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins v. Virginia*, 536 U.S. at 317, 122 S.Ct. at 2250. Moreover, the Supreme Court went to point out the clinical definitions of mental retardation which it had expressed approved "require not only subaverage [sic] intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction *that become manifest before age 18.*" *Atkins v. Virginia*, 536 U.S. at 318, 122 S.Ct. at 2250 (emphasis added).

241

Thus, it is clearly established under the Supreme Court's holding in *Atkins* that a convicted capital murderer asserting he is constitutionally exempt from execution based on his mental retardation must support his claim of mental deficiency with a showing he suffered "significant limitations in adaptive skills" before age 18. *Id.*

In *Roper v. Simmons, supra*, the Supreme Court extended its holding in *Thompson v. Oklahoma*, 487 U.S. 815, 838, 108 S.Ct. 2687, 2700, 101 L.Ed.2d 702 (1987)(plurality holding Eighth Amendment precludes execution of persons who commit6 a capital offense while under the age of sixteen), to preclude the execution of persons who commit capital murder while under the age of eighteen. *Roper v. Simmons*, 543 U.S. at 578, 125 S.Ct. at 1200. In support of its holding in *Roper*, the Supreme Court cited, in part, the prohibition in the mental health community against diagnosing a minor with anti-social personality disorder:

> It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. See Steinberg & Scott 1014–1016. As we understand it, this difficulty underlies the rule forbidding psychiatrists from diagnosing any patient under 18 as having antisocial personality disorder, a disorder also referred to as psychopathy or sociopathy, and which is characterized by callousness, cynicism, and contempt for the feelings, rights, and suffering of others. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 701–706 (4th ed. text rev.2000); see also Steinberg & Scott 1015. If trained psychiatrists with the advantage of clinical testing and observation refrain, despite diagnostic expertise, from assessing any juvenile under 18 as having antisocial personality disorder, we conclude that States should refrain from asking jurors to issue a far graver condemnation—that a juvenile offender merits the death penalty. When a juvenile offender commits a heinous crime, the State can exact forfeiture of some of the most basic liberties, but the State cannot extinguish his life and his potential to attain a mature understanding of his own humanity.

*Roper v. Simmons*, 543 U.S. at 573-574, 125 S.Ct. at 1197.

The Supreme Court concluded that, while admittedly arbitrary, drawing the line on the execution

of young offenders at age eighteen was justified:

> Drawing the line at 18 years of age is subject, of course, to the objections always
> raised against categorical rules. The qualities that distinguish juveniles from
> adults do not disappear when an individual turns 18. By the same token, some
> under 18 have already attained a level of maturity some adults will never reach.
> For the reasons we have discussed, however, a line must be drawn. The plurality
> opinion in *Thompson* drew the line at 16. In the intervening years the *Thompson*
> plurality's conclusion that offenders under 16 may not be executed has not been
> challenged. The logic of *Thompson* extends to those who are under 18. The age of
> 18 is the point where society draws the line for many purposes between childhood
> and adulthood. It is, we conclude, the age at which the line for death eligibility
> ought to rest.

*Roper v. Simmons*, 543 U.S. at 574, 125 S.Ct. at 1197-98.

Given the record before the state court on direct appeal and in petitioner's first state

habeas corpus proceeding, the Texas Court of Criminal Appeals' refusal to extend the Supreme

Court's holdings in *Atkins* and *Roper* to persons such as petitioner was fully consistent with the

principles underlying those decisions.

In contrast to mental retardation, which in *Atkins* the Supreme Court emphasized renders

an individual less capable of responding to the threat of execution as a deterrent to criminal

behavior and less able to assist their counsel in making a persuasive showing of mitigation,

*Atkins v. Virginia*, 536 U.S. at 320-21, 122 S.Ct. at 2251-52, petitioner was able to assist his

counsel in presenting an extensive and impressive array of both fact and expert witnesses during

the punishment phase of petitioner's trial - almost all of whom made favorable comments about

petitioner's keen intellectual capabilities.  Petitioner's trial counsel both testified petitioner was

active in his own defense and more than willing to suggest strategic and tactical maneuvers.[377]
There was no evidence before the state courts suggesting petitioner, while admittedly sometimes
impulsive when not properly medicated,[378] was unable to comprehend the deterrent effect of
capital punishment.  Furthermore, petitioner's own mental health experts testified that
petitioner's ADHD, unlike mental retardation, was not necessarily a permanent condition and
was subject to treatment.[379]  Thus, the record from petitioner's trial showed there are significant
differences between ADHD and mental retardation.  The Texas Court of Criminal Appeals'
refusal to extend the holding in *Atkins* to petitioner based upon petitioner's diagnosis of severe
ADHD was neither (1) contrary to, nor involved an unreasonable application of, clearly
established Federal law, as determined by the Supreme Court of the United States, nor (2) based

---

[377] At the hearing on petitioner's motion for new trial, petitioner's lead trial counsel, attorney Paul Williams, testified in pertinent part (1) petitioner was very bright, (2) despite not being on any psychotropic medications while awaiting trial in the Midland County Jail, petitioner was fully capable of offering input to his trial counsel, (3) petitioner made an informed decision not to testify at trial, and (4) petitioner also fully understood and acquiesced in the decision not to strike venire member Haydee Guerrero. S.F. Trial, Volume 39, testimony of Paul Williams, at pp. 17-18, 28-29, 32, 34, 41, 62-64.

    During the same hearing, petitioner's co-counsel at trial, attorney Ian Cantacuzene, testified in pertinent part (1) petitioner discussed his case extensively with both trial counsel and actively participated in voir dire and jury selection and (2) passed notes to attorney Williams during his cross-examination of prosecution witness David Page. S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 187-89.

[378] Both of petitioner's trial counsel testified at the hearing on petitioner's motion for new trial that petitioner was able to participate and contribute to his own defense despite not being on any psychotropic medications before or during petitioner's trial.  S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 212-13; Volume 39, testimony of Paul Williams, at pp. 32-34, 62-64.

[379] Dr. Milan testified in part that, while petitioner could not be "fixed," petitioner was highly intelligent and his symptoms could be treated with proper medication, as they had been during the petitioner's final months in the custody of the TYC. S.F. Trial, Volume 34, testimony of Daneen A. Milam, at pp. 16, 70, 73-74, 91-96, 107-08, 110.  Dr. Mathew testified petitioner was quite bright and his condition, including petitioner's diagnosed conduct disorder, could be treated with proper medication and cognitive therapy. S.F. Trial, Volume 34, testimony of Roy Mathew, at pp. 202-05, 213, 238; Volume 35, testimony of Roy Mathew, at pp. 206-08. Dr. Greene testified, in part, that (1) petitioner's hyperactivity could be treated with proper medication, (2) petitioner's behavior could be addressed with cognitive or consequences-based therapies, and (3) petitioner was very bright. S.F. Trial, Volume 36, testimony of Dr. Ross Greene, at pp. 15-18, 23-25, 28, 30-33, 40-43.

    On cross-examination by petitioner's trial counsel, prosecution witness Dr. Walker testified some kids can control ADHD and some cannot. S.F. Trial, Volume 31, testimony of Don Walker, at p. 146.

upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

Petitioner also complains he was eighteen years and four months of age and extremely immature emotionally at the time of his capital offense.  Yet, as the Supreme Court emphasized in *Roper*, the age of eighteen is considered the age at which human beings reach adulthood and assume the mantle of full citizenship with all its responsibilities and duties. *See Roper v. Simmons*, 543 U.S. at 574, 125 S.Ct. at 1198(holding the age of eighteen is the line for death eligibility despite the fact some adults never reach the level of maturity other achieve before they reach 18).  The Texas Court of Criminal Appeals' refusal to extend the holding in *Roper* to petitioner, despite petitioner's purported lack of emotional maturity upon reaching age eighteen, was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

D.     *Teague* Foreclosure

Furthermore, extension of the Supreme Court's holdings in *Atkins* and *Roper* to petitioner is precluded by the non-retroactivity doctrine announced in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).  Under the holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389-90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time

245

the defendant's conviction became final. *See O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct.

1969, 1973, 138 L.Ed.2d 351 (1997)(holding a "new rule" either "breaks new ground," "imposes

a new obligation on the States or the Federal Government," or was not "dictated by precedent

existing at the time the defendant's conviction became final").   Under this doctrine, unless

reasonable jurists hearing the defendant's claim at the time his conviction became final would

have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred

from doing so on collateral review. *Id.*

     As of the date petitioner's conviction became final for *Teague* purposes (i.e., April 3,

2006), no federal court had ever *extended* the Supreme Court's holding in *Atkins* to bar the

execution of a capital murderer diagnosed with ADHD.   While the holding in *Atkins* itself clearly

does fall within an exception to the rule in *Teague* for those who are mentally retarded, *see, e.g.,*

*In re Sparks*, 657 F.3d 259, 262 (5th Cir. 2011)(citing numerous opinions holding *Atkins*

retroactive), extending the rule in *Atkins* to those persons such as petitioner who possess

exceptionally high intellectual abilities yet suffer from ADHD is precluded by the rule in *Teague*.

Such an extension would amount to adoption of a new rule of constitutional criminal procedure

which is not an option in the context of this federal habeas corpus proceeding. *Teague v. Lane*,

489 U.S. at 310, 109 S.Ct. at 1075.

     Likewise, as of the date petitioner's conviction became final, no federal court had ever

*extended* the Supreme Court's holding in *Roper* to someone older than eighteen based upon a

diagnosis of ADHD or a finding of emotional immaturity.   Once again, the holding in *Roper* is

entitled to retroactive application. *In re Sparks*, 657 F.3d at 262.   However, extending the holding

in *Roper* to persons such as petitioner who were older than eighteen at the time of their capital

offense but who have been diagnosed as emotionally immature or with mental illnesses other than mental retardation is precluded by the rule in *Teague*.

E.      Conclusions

Petitioner's fifteenth claim herein is foreclosed by the non-retroactivity principle announced in *Teague*.  The Texas Court of Criminal Appeals' rejections on the merits in the course of petitioner's direct appeal and first state habeas corpus proceeding of petitioner's arguments for the extension of the Supreme Court's holdings in *Atkins* and *Roper* to himself were neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.  Petitioner's fifteenth claim herein does not warrant federal habeas corpus relief.

## XI. Exclusion of Polygraph Test Results

A.      The Claim

In his seventh claim herein, petitioner argues his Sixth Amendment Confrontation Clause rights were violated when the state trial court refused to permit petitioner's trial counsel to introduce impeachment evidence showing prosecution witness David Page "flunked" a polygraph examination.[380]

---

[380] *Second Amended Petition*, at pp. 259-61; *Petitioner's Reply*, at pp. 141-47.

Petitioner's Second Amended Petition also contains an unexhausted, procedurally defaulted, claim of ineffective assistance buried in the text of his complaint about the state trial court's exclusion of testimony about Page's bad polygraph test results: "Further, Young's Sixth Amendment right to the effective assistance of counsel was violated when his trial counsel failed to cross examine Page on his statement that he knew what 'it' was when he was told that he had not given investigators and attorneys complete details about what had happened or his direct involvement in the

247

B.    State Court Disposition

Petitioner's trial counsel proffered the expert testimony of a polygraph examiner who

testified during a hearing outside the jury's presence that Page's negative answers to a polygraph

test she administered on February 25, 2002 showed deception when she asked Page whether (1)

he had shot Doyle Douglas, (2) he shot Sam Petrey, and (3) he fired a bullet into either Douglas

or Petrey.[381]  The trial court denied petitioner's request to admit the polygraph examiner's

testimony.[382]

---

murders." *Second Amended Petition*, at p. 260.

Petitioner's conclusory assertion of ineffective assistance is unaccompanied by any specific factual allegations showing either (1) how cross examination of prosecution witness Page on this cryptically referenced subject by petitioner's trial counsel would have resulted in evidence favorable to petitioner being presented to the jury or (2) how cross examination of Page on this subject might have impacted the outcome of either phase of petitioner's capital murder trial. This Court has concluded a *de novo* review of this conclusory ineffective assistance claim and finds it satisfies neither prong of *Strickland* analysis. Page was cross-examined extensive during petitioner's trial. Petitioner offers no rational explanation for believing that, had his trial counsel asked Page any questions about what "it" was, the resulting answers would have proven beneficial to petitioner. Likewise, there is absolutely no reasonable probability that, had petitioner's trial counsel asked questions regarding what "it" was, the outcome of either phase of petitioner's trial would have been different.

Petitioner's reply brief also contains numerous other legal arguments and citations to authority not contained in his Second Amended petition. Insofar as petitioner's reply brief contains legal arguments in support of petitioner's seventh claim herein that were not included in petitioner's thirty-second claim on direct appeal, those legal arguments are unexhausted and, at this point, procedurally defaulted. For example, petitioner cites the Supreme Court's opinion in *Sears v. Upton*, ___ U.S. ___, ___, 130 S.Ct. 3259, 3263, 177 L.Ed.2d 1025 (2010)(reaffirming the longstanding rule that reliable hearsay evidence relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule), and argues exclusion of his proffered testimony regarding Page's polygraph test results violates the holding therein. However, the holding in *Sears* was premised on Eighth Amendment principles never mentioned or even alluded to in petitioner's thirty-second point of error on direct appeal. Petitioner proffered the testimony of Page's polygraph examiner during the guilt-innocence phase of petitioner's capital murder trial and did not seek to admit the same testimony during the punishment phase of trial. Thus, the holding in *Sears* is inapposite to the facts of petitioner's case and does not justify federal habeas relief for petitioner herein. Moreover, petitioner failed to "fairly present" his Eighth Amendment legal arguments in support of his seventh claim herein to the state courts in the course of his direct appeal or any of his multiple state habeas corpus proceedings and is precluded from doing so at this juncture by the Texas writ-abuse statute.

[381] S.F. Trial, Volume 27, testimony of Irma Rodriguez, at pp. 239-41.

[382] *Id.*, at p. 243.

248

Petitioner presented a much more narrow version of his seventh claim herein as his thirty-second point of error on direct appeal.[383]  The Texas Court of Criminal Appeals rejected this claim on the merits as follows:

> In his thirty-second point of error, appellant claims that the trial court erred in sustaining the state's objection to appellant's attempt to impeach Page with the results of a polygraph examination.  "It has long been the rule in this State that the results of a polygraph test are inadmissible *for all purposes.*" *Nethery v. State,* 692 S.W.2d 686, 700 (Tex. Crim. App. 1985)(emphasis in original).  The trial court's ruling sustaining the state's objection and excluding the results of the polygraph was proper.  Appellant's thirty-second point of error is overruled.

*Young v. State*, AP 74,643, 2005 WL 2374669, *10 (Tex. Crim. App. September 28, 2005).

## C.    AEDPA Analysis

Petitioner cites no decisions by the United States Supreme Court, any decisions of any other federal court, nor any other source of clearly established federal law, holding a criminal defendant possesses a federal constitutional right (under either the Confrontation Clause or any other federal constitutional provision) to impeach a prosecution witness at trial using said witness' poor results on a polygraph examination.  The Supreme Court has never held that the Sixth Amendment's Confrontation Clause guarantees the right to impeach adverse witnesses through the admission of extrinsic evidence, such as Page's polygraph test results. *See Nevada v. Jackson,* ___ U.S. ___, ___, 133 S.Ct. 1990, 1994, 186 L.Ed.2d 62 (2013):

> But this Court has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes. See *Delaware v. Fensterer,* 474 U.S. 15, 22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) ( *per curiam* ) (observing that "the Confrontation Clause is generally satisfied when

---

[383] Appellate Brief, at pp. 95-96.  In contrast to the multi-faceted legal arguments petitioner presents to this Court in his reply brief, petitioner's brief on direct appeal argued

the defense is given a full and fair opportunity to... expose [testimonial] infirmities through cross-examination").

A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. at 825, 111 S.Ct. at 2608; *Darden v. Wainwright*, 477 U.S. at 179-83, 106 S.Ct. at 2470-72; *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007), *cert. denied*, 552 U.S. 1314 (2008); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005), *cert. denied*, 546 U.S. 1217 (2006); *Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir. 2005), *cert. denied*, 546 U.S. 900 (2005); *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir. 2000).

Petitioner's trial counsel's cross-examination of David Page fills more than two hundred pages in the transcript from petitioner's trial.[384]  Petitioner's trial counsel confronted Page with the numerous inconsistencies between Page's trial testimony and Page's previous written statements to law enforcement officers, repeatedly challenged Page on his assertions that petitioner shot both Douglas and Petrey, and elicited admissions from Page that he (Page) had attempted to mislead police regarding who shot Douglas at the creek.[385]  Petitioner's trial counsel also obtained admissions from Page that he (Page) did not see exactly where the shots petitioner fired inside Douglas' car struck Douglas' head, where the shot Mark Ray fired at the creek struck Douglas' head, nor where the shots petitioner fired at the oil and gas pumping station struck Petrey's head.  Given the length and breadth of petitioner's trial counsel's cross-examination of

---

[384] S.F. Trial, Volume 27, testimony of David Lee Page, Jr., at pp. 6-73, 76-217, 224-35.

[385] *Id.*

prosecution witness David Page, the refusal of the state trial court to permit admission of the testimony proffered by petitioner's trial counsel did not violate petitioner's rights under the Confrontation Clause; nor did it render petitioner's trial fundamentally unfair.

D.    Conclusions

The Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's direct appeal of petitioner's complaint about the trial court's exclusion of petitioner's proffered expert testimony regarding Page's polygraph test results was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal. Petitioner's seventh claim herein does not warrant federal habeas corpus relief.

## XII. Exclusion of Venire Member Roberts

A.    The Claim

In his eighth claim herein, petitioner argues the trial court erroneously excluded venire member Danie Lynn Roberts during jury selection because she expressed some reservations about the death penalty.[386]

---

[386] *Second Amended Petition*, at pp. 261-66; *Petitioner'S Reply*, at pp. 147-49.
  In addition to his challenge to the state trial court's ruling on venire member Robert's qualifications as a juror in a capital trial, petitioner also included an unexhausted, procedurally defaulted, ineffective assistance claim in his eighth claim herein. *Second Amended Petition*, at p. 266. This ineffective assistance claim is legally and factually frivolous. Petitioner complains that his prior counsel failed to "raise the bases for relief alleged in these claims." However, petitioner's trial counsel did everything necessary to preserve for state appellate review petitioner's challenge to the state trial court's ruling on the prosecution's challenge for cause to venire member Roberts. Furthermore, petitioner's state appellate counsel included a point of error in petitioner's appellate brief challenging the state trial court's granting of the prosecution's challenge for cause to venire member Roberts on both state and federal grounds. Appellate Brief, at pp. 95-96. The Texas Court of Criminal Appeals ruled on the merits of petitioner's challenge to the trial court's ruling regarding venire member Roberts. *Young v. State*, 2005 WL 2374669, *5-*6. Accordingly, each of those counsel did

B.    State Court Disposition

Petitioner presented the same complaint as his sixteenth point of error on direct appeal.[387]

The Texas Court of Criminal Appeals rejected this complaint on the merits as follows:

> In his sixteenth point of error, appellant contends that the trial court erred
> in granting the state's challenge for cause of prospective juror Danie Lynn
> Roberts.  We review the trial court's ruling under an abuse of discretion standard
> and will not disturb the trial court's ruling if it is supported by the record. *Herron*
> *v. State,* 86 S.W.3d 621, 629 (Tex.Crim.App.2002).  "We examine the record as a
> whole to determine whether there is support for the trial court's ruling, deferring to
> the trial judge who was in a position to see and hear the venireperson." *Id.*
>
> When asked about her feelings regarding the death penalty, Roberts
> initially stated that she did not have anything against the death penalty, but was
> unsure as to whether she had the right to decide if someone should live or die.
> The prosecutor gave her several examples of cases in which the death penalty was
> assessed and asked her if she agreed that the defendants in those cases deserved
> the death penalty. In some instances she agreed; in others, she did not. She
> indicated that in some cases the death penalty was "okay," but was reluctant to
> "have that on [her] hands."  When pressed further about rendering a death
> sentence, she stated, "I don't think I could do it." However, she later stated, "If I
> was on a jury that the facts really added up to where that person deserved to die,
> then I could probably [assess the death penalty]."
>
> During voir dire by defense counsel, Roberts was again asked whether she
> could answer the questions in such a way that the death penalty would be assessed
> and she stated, "I really-couldn't tell you."  She added, "Until that moment arrives,
> I couldn't say.  I really couldn't."  Finally, the trial judge asked Roberts the
> following:
>
> THE COURT: Ms. Roberts, let me ask you did I understand you to say
> that you did not think you could envision any circumstance in which you could

---

exactly what was necessary to obtain state appellate and federal habeas review of the petitioner's complaint about that
trial court ruling. The reason petitioner's eighth claim herein does not entitled petitioner to federal habeas corpus relief
is because it lacks any arguable merit, not because of any deficiency in the performance of petitioner's state trial or
appellate counsel.  Petitioner's state habeas counsel cannot reasonably be faulted for failing to re-represent a complaint
that had already been adjudicated on the merits in the course of petitioner's direct appeal.  Thus, none of petitioner's
prior counsel were guilty of ineffective assistance in connection with the complaints voiced in petitioner's eighth claim
herein.

[387] Appellate Brief, at pp. 64-65.

assess the death penalty or vote in such a way as the death penalty would be inflicted?

[ROBERTS]: Not right now.

The state challenged Roberts for cause. When granting the state's challenge, the trial judge noted that Roberts initially vacillated in her responses, ultimately stating that she could not assess the death penalty. The trial judge noted on the record that he recognized her "hesitancy and demeanor" in evaluating her ability to serve on the jury. Because the record reflects that Roberts was a vacillating juror, the trial court did not abuse its discretion in granting the state's challenge for cause. *See Granados v. State,* 85 S.W.3d 217, 232-33 (Tex. Crim. App.2002). Appellant's sixteenth point of error is overruled.

*Young v. State*, 2005 WL 2374669, at *5 -*6.


C.      AEDPA Analysis

1.      Voir Dire Examination of Venire Member Roberts

During the voir dire examination of venire member Danie Lynn Roberts, the prosecution elicited the following testimony, in pertinent part:

Q.  Okay.  Share with us, then, what are your personal beliefs and opinions about the death penalty.

A.  Well, it's basically I just — I don't have anything against it, but I don't know if I have the right to say whether or not a person should live or die.

Q.  So you don't have anything against it?

A.  Uh-huh.

Q.  What kind of case do you think the death penalty might be appropriate?

A.  There's not a particular thing.  I mean, it's just — it's not anything that I'd say that I have a right to say.

Q.  Okay.  Well, are you telling me that you don't think there's any case that you feel like you ought to have to make that decision?

A.  No, it's just I think it all depends on each individual.  You know, I don't know, unless I hear the evidence and everything like that along with it, then there's not a —[388]

---

[388] S.F. Trial, Volume 19, voir dire examination of Danie Lynn Roberts, at pp. 13-14,

The prosecution then asked about the Oklahoma City bombing case and Ms. Roberts indicated, in her view, the death sentence imposed in that case had been appropriate.[389]  Ms. Roberts then expressed the view that, in the racially-charged case of the Jasper, Texas men who dragged a black man to death that imposing the death penalty in that case might be more problematic: "I just think it would be more of punishment to just make them live the rest of their life [sic] in jail than to be able to get it over with quickly and die."[390]

The prosecution's voir dire examination then turned to the case of the sniper serial shooting case from the District of Columbia area and continued, in pertinent part, as follows:

Q.  Okay.  This Malvo case up in Virginia and Maryland, the sniper deal?

A.  Uh huh.

Q.  They're looking at the death penalty, potentially looking at the death penalty in that case.  Does that seem like that might be one that was appropriate to you for the death penalty?

A.  I don't know, I haven't heard much about it.  I mean, I just heard little bits and pieces.

Q.  Okay.  All right.  What — do you have any other cases that come to your mind that you think the death penalty is appropriate in those kind of cases?

A.  The whole September 11th thing.

Q.  Okay.  That would be a good one for you?  Okay.  Why don't you think — here's what I'm hearing you say.  On the one hand you say I don't think I would have the right, and on the other hand you're saying bit in these cases, it's okay.  How do you balance all that out?

A.  I just think of it as long as I'm not the one deciding, then, because I don't —

Q.  Well, you will be the one deciding.

A.  — want something like that on my hands.

_____

[389] *Id.*, at p. 14.

[390] *Id.*, at p. 15.

Q.   Yeah.  You will be the one deciding in this case.  See the man sitting in the white shirt?

Okay.  To get on this jury, to serve on the jury, you have to swear to the Court that in the right circumstance you will sentence him to death.  He is like one year younger than you are, maybe two years younger than you are, but this isn't going to be like reading a book and deciding what to do.  This is going to be you looking in his eyes and sentencing him to death.

A.   I don't think I could do it.

Q.   Well, that's what we're talking about in this case, okay?

A.   Uh-huh.

Q.   I mean, it's very heavy, okay?  Can you even look him in the eyes?

A.   No.

Q.   Okay.  Are you telling me, then, that regardless of the fact situation, you're not going to be able to serve on a jury, and regardless of the facts vote for the death penalty.

A.   Not looking in his eyes, I wouldn't.

Q.   Well, you're going to be up here looking in his eyes for two and a half weeks, okay?

Well, you know, when you talk about the death penalty in — the philosophical part of it is one thing, okay, but really serving on a case where a jury's going to make that decision would you agree with me is a whole different deal?

A.   I don't know.[391]

The prosecution then discussed with Ms. Roberts several terms likely to be included in the guilt-innocence phase and punishment phase jury instructions.  After discussing those topics and concluding with the third capital sentencing special issue, in general, the prosecution returned to the issue of Ms. Robert's ability to vote to impose the death penalty:

Q.   Okay.  Well, going back then to your personal beliefs about the death penalty, do you ever think there's going to be a case that when you get down to Special Issue No. 3 that you could ever see yourself voting for the death penalty?

---

[391] *Id.*, at pp. 15-17.

A.   I really don't -- there's nothing that I can see in my head right now that I could -- sitting on that jury, I don't think I could.  I would rather go for life imprisonment than the death penalty.

Q.   Okay.  Well, here's the deal.  To actually serve on a jury in Texas, you have to be for the full range of punishment, okay?  Remember a little bit ago we were talking where you said in a murder case they're always going to have to go to prison for killing somebody, even if they did it for, quote, or what they tried to explain was the right reason, you know, that in your opinion, they would always have to go to prison, ans to be a fair juror, you've got to be able to say well, I'll look at all of it, you know, and that was true for murder and it's also true for capital murder, you know.  If you can't within yourself say "I can assure the court that I can really look at this full range of punishment, life or death, and decide it on the facts of the case rather than emotionally deciding it, okay, then you would be great on some kind of other case like a drug case maybe or car burglary or something like that, but not on a capital murder case, you following me?

A.   Uh-huh.

Q.   Is that kind of where you are right now, that you just don't know that you can really consider the death penalty in this kind of case?

A.   Maybe after I heard all of the evidence and everything, but right now with not knowing anything about it.

Q.   And we can't tel you anything about it.

A.   Right.

Q.   Okay.  So we have to go on your assurance now that you're open-minded for the death penalty just like you could be open-minded for life.  I take it life isn't a problem for you?

A.   Huh-uh

Q.   Okay.  Well, and that's good.  I got you halfway there, okay, but you also have to be open-minded on the death — for the death penalty considering that you – you know, you don't know anything about this case and we can't tell you, but you have to assure us that even though you don't know anything about it, that you can be open-minded for the death penalty, depending on what the facts are?

A.   Depending on what the facts are.

Q.   Yeah.

A.   I could be open-minded about it depending on what the facts are.

Q.   Okay.  But you don't favor the death penalty?

A.   Uh-huh.

Q.   Can you envision some facts in which you could see yourself voting for the death penalty?

256

A.  The only thing that really comes to mind is if it was something along the lines of the terrorism on September 11th, something along — I mean, that's the only specific example that I could give.

Q.  Okay.

THE COURT:   And you really don't have to give us specific examples, but is there a case that where you could imagine that if you were on the jury, that it would justify you voting for the death penalty.

VENIREPERSON:   If I was on a jury that the facts really added up to where the person deserved to die, then I could probably.

THE COURT:   Okay.

Q.  [By Mr. Schorre]   You could or you probably could?

A.  I can't say for definite.

Q.  Okay.[392]

The trial judge then attempted to clarify Ms. Roberts' position on the same issue:

THE COURT:   Do you think that – and you see that the questions are worded not where the jury says we sentence this person to death, but you answer yes or no to those questions, but you know what the effect is going to be by the answers.

VENIREPERSON:   Yes.

THE COURT:   See that?  Do you think that there could be a case that — where a person commits capital murder that you could think the facts would be bad enough for you to vote no on that third question, that is to say "I don't find anything redeeming about this person, I don't find my mitigation evidence that justifies sparing this person's life?"   Could there be such a case?

VENIREPERSON:   There could.

THE COURT:   Okay.  Well, Mr. Schorre's difficulty is that when you say I probably could, in order to be a juror, you have to take an oath to say I will follow the law and return a verdict according to the evidence.

VENIREPERSON:   Uh-huh.

THE COURT:   And that doesn't allow jurors the luxury of saying I probably will do this, you have to say "yes, I will do this," so I'm going to let him talk to you a little bit more.  We do have to have a definite answer.  Do you think you could or you could not?

---

[392] *Id.*, at pp. 24-27.

VENIREPERSON:  If I was totally convinced, I could.

THE COURT:  Okay.  Mr. Schorre.

Q.  [By Mr. Schorre]  Convinced of what, I'm sorry?

A.  That they did it, that they deserve —

Q.  Okay.

A.  That they deserve the death penalty, if I was totally convinced that they deserve the death penalty.

Q.  What would it take to convince you?  I'm not looking for specific facts on a case, but in general, okay, what would be the kind of thing that would convince you that —

A.  I mean, if every single ounce of evidence pointed directly to that person, if there was nothing that could kind of sway in any direction that, you know, this wasn't for sure a person, if there was not any kind of evidence that could say this person couldn't have done it because of this.

Q.  Okay.  No, no, okay.  We've jumped.  We've already convicted the guy, okay?  In my example I'm giving you, he's already been convicted, you're totally convinced he did whatever the killing was that made it capital, you've already decided when you listened to it he'd going to be dangerous and you've already decided that he is morally responsible for the death or deaths, whatever the case might be, and now we're on that Question Number 3, should his life be spared, okay?

A.  Uh-huh.

Q.  What are the type of things you're looking for then to make your decision?

A.  It would just basically be based on the crime.

Q.  On the crime?

A.  Uh-huh.

Q.  Okay.[393]

After a lunch recess, Ms. Robert's voir dire examination continued with petitioner's trial counsel asking the questions.  After explaining the concept of reasonable doubt, discussing the role of a juror, discussing several of the terms included in the Texas capital sentencing special

---

[393] *Id.*, at pp. 28-30.

issues, and questioning Ms. Roberts about her ability to consider evidence of the petitioner's

background in mitigation, petitioner's trial counsel returned again to the issue at hand:

> Q.  I fact, they don't even pay you to do this except a couple bucks a day, and most people don't volunteer, but to be on a jury, you don't have to tell the Judge, "Well, I'm happy about the death penalty, I believe in it, it's the best thing in the world," okay, because a jury can be made up with all people with all different views.  But the one thing everybody has to bear in common is when you raise your hand, your right hand, and swear an oath that you will follow the law and render a true verdict that you're telling the truth.

> Now, as hard as this is, you can follow the law on the first phase of trial, innocence or guilt, right?

> A.  Right.

> Q.  On the second phase of the trial, you can answer the first question about whether they'll probably be dangerous in the future, you can answer that based upon the evidence, right?

> A.  Right.

> Q.  You can answer the second one about did they deliberately take the life or anticipate or intend a life would be taken, correct?

> A.  Right.

> Q.  And now this in this situation, if you're in a capital murder case and you've heard all the evidence, could you foresee a circumstance based upon the evidence where you would sentence somebody to life in prison instead of the death penalty?

> A.  Yes.

> Q.  I thought I would ask you the easy one first.  And although it may be a rare thing for you, feeling how you feel about the value of human life, if you found somebody guilty and you thought they were going to be dangerous and you thought they not only intended — I mean, they deliberately shot somebody or stabbed them or killed them whatever way the murder occurred and there was nothing in the evidence about the crime of the background of the person or anything you heard that that person should live, in that rare case, could you give the death penalty?

> A.  I really — I couldn't tell you.

> Q.  Okay.

> A.  Until that moment arrives, I couldn't say.  I really couldn't.

> Q.  And of course, it's hard, there's no doubt.  I know you've talked about some circumstances where you thought like Osama bin Laden killing, you know, 2,000 plus people, almost 3,000 people.  Let me think of how to ask you this, because

what we need is people who can sat they don't have to like doing it, they have to be able to say "Yes, I could consider it in the right case," no matter how rare that could be.

Let me ask them one question.

Well, let me ask you this. I'm going to ask you the third — we don't have any problem with the first two questions. On the third question, could you honestly answer that question yes or no based upon what you heard? I other words, could you answer whether or not you thought there was some mitigating circumstance or circumstances based upon the evidence?

A. Yes.

Q. Okay. And in a situation like that, the law doesn't ever say you got to give death. But it says you have to consider death as a possible punishment, and consider once again means you have to honestly be able to consider it if the evidence and the circumstances and the person and the crime are the kind that warrant the death penalty in your view.

A. Uh-huh.

Q. Okay. And so thinking about that for a moment, can you — and it may be hard, you've probably never sat at home and said. "Boy, when could I give the death penalty and when I couldn't?" But can you envision, if the evidence was right, the facts were right and the Defendant, man or woman was just, you know, evil, bad, had nothing good going for them, nothing good to commend them for life at all, could you consider in the right circumstances death as a possible punishment?

A. I can't envision anything, no.

Q. Okay.

MR. CANTACUZENE: Thank you, ma'am.

MR. SCHORRE:  I don't think I have any other questions.

THE COURT:  Ms. Roberts, let me ask you did I understand you to say that you did not think you could envision any circumstances in which you could assess the death penalty or vote in such a way as the death penalty would be inflicted?

VENIREPERSON:  Not right now.

THE COURT:  Any other questions?

MR. SCHORRE:  I have none.

MR. CANTACUZENE:  No.[394]

---

[394] *Id.*, at pp. 56-60.

260

After the trial judge excused Ms. Roberts, the prosecution

challenged for cause.[395]  Petitioner's trial counsel the argued Ms. Roberts had indicated a

willingness to answer the Texas capital sentencing special issues based upon the evidence and to

follow the law.[396]  The trial judge then ruled as follows:

> THE COURT:   When the question by Mr. Schorre, my notes reflect that she could think of cases that were death worthy, but when she was asked whether or not she could consider it, she was very hesitant, we have her the noon hour to think it over, and only the defense asked her questions when came back, and even with the leading questions by Mr. Cantacuzene, said she could not commit to saying no, the Court noticed her demeanor and her hesitancy, and when asked by the Court finally if she could ever consider envisioning assessing the death penalty or voting in favor of the death penalty in any case, she said no, she could not. State's challenge is granted.  Court's satisfied that she's not qualified to serve.[397]

2.   <u>Clearly Established Federal Law</u>

The standard for determining the constitutional fitness of a capital sentencing juror is set

forth in a series of Supreme Court opinions dating back several decades:

> In *Witherspoon v. Illinois*, 391 U.S. 510, 521-23, 88 S.Ct. 1770, 1776-77, 20 L.Ed.2d 776 (1968), the Supreme Court held that prospective jurors may not be excused from sitting on a capital jury simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.  Rather, the Supreme Court held as follows:
> > The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty regardless of the facts and circumstances that might emerge in the course of the proceedings.
> *Witherspoon v. Illinois*, 391 U.S. at 522 n.21, 88 S.Ct. at 1777 n.21.
> In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court emphasized the limitations *Witherspoon* imposed on the

---

[395] *Id.*, at p. 60.

[396] *Id.*, at pp. 61-62.

[397] *Id.*, at pp. 62-63.

ability of the State to exclude members of a jury venire from service on a petit
capital jury and directly addressed jury selection in Texas capital murder trials:

> a juror may not be challenged for cause based on his views about
> capital punishment unless those views would prevent or
> substantially impair the performance of his duties as a juror in
> accordance with his instructions and his oath. The State may
> insist, however, that jurors will consider and decide the facts
> impartially and conscientiously apply the law as charged by the
> court.

*Adams v. Texas*, 448 U.S. at 45, 100 S.Ct. at 2526.

In *Adams*, the Supreme Court further discussed the many practical
consequences of its *Witherspoon* holding:

> If the juror is to obey his oath and follow the law of Texas,
> he must be willing not only to accept that in certain circumstances
> death is an acceptable penalty but also to answer the statutory
> questions without conscious distortion or bias. The State does not
> violate the *Witherspoon* doctrine when it excludes prospective
> jurors who are unable or unwilling to address the penalty questions
> with this degree of impartiality. * * *

> [A] Texas juror's views about the death penalty might
> influence the manner in which he performs his role but without
> exceeding the 'guided jury discretion" permitted him under Texas
> law. In such circumstances, he could not be excluded consistently
> with *Witherspoon.*

> The State could, consistently with *Witherspoon*, use §
> 12.31(b) to exclude prospective jurors whose views on capital
> punishment are such as to make them unable to follow the law or
> obey their oaths. But the use of § 12.31(b) to exclude jurors on
> broader grounds based on their opinions concerning the death
> penalty is impermissible. * * *

> [N]either nervousness, emotional involvement, nor inability
> to deny or confirm any effect whatsoever is equivalent to an
> unwillingness or an inability on the part of the jurors to follow the
> court's instructions and obey their oaths, regardless of their feelings
> about the death penalty. * * * Nor in our view would the
> Constitution permit the exclusion of jurors from the penalty phase
> of a Texas murder trial if they aver that they will honestly find the
> facts and answer the questions in the affirmative if they are
> convinced beyond a reasonable doubt, but not otherwise, yet who
> frankly concede that the prospects of the death penalty may affect
> what their honest judgment of the facts will be or what they may
> deem to be a reasonable doubt. * * * [T]he State may bar from jury
> service those whose beliefs about capital punishment would lead
> them to ignore the law or violate their oaths.

262

*Adams v. Texas*, 448 U.S. at 46-50, 100 S.Ct. at 2527-29 (citations omitted).

In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court further clarified its holdings in *Witherspoon* and *Adams*, holding that the proper inquiry when faced with a venire member who expresses personal, conscientious, or religious views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. at 424, 105 S.Ct. at 852. In *Wainwright v. Witt*, the Supreme Court also emphasized that considerable deference is to be given the trial court's first-hand evaluation of the potential juror's demeanor and that no particular magical incantation or word choice need necessarily be followed in interrogating the potential juror in this regard. *Id.*, 469 U.S. at 430-35, 105 S.Ct. at 855-58.

More recently, in *Uttecht v. Brown*, 551 U.S. 1, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007), the Supreme Court reviewed its *Witherspoon-Witt* line of opinions and identified the following "principles of relevance":

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Uttecht v. Brown*, 551 U.S. at 9, 127 S.Ct. at 2224 (*citations omitted*).

The Supreme Court emphasized the critical inquiry for *Witherspoon-Witt* purposes is not whether a state appellate court properly reviewed the propriety of the exclusion but, rather, whether the trial court correctly applied the appropriate federal constitutional standard. *Uttecht v. Brown*, 551 U.S. at 16-17, 127 S.Ct. at 2228. Finally, the Supreme Court admonished reviewing courts to defer to the trial court's resolution of questions of bias arising from a potential juror's conflicting voir dire answers because the trial court had the opportunity to observe the demeanor of the potential juror. *Uttecht v. Brown*, 551 U.S. at 20, 127 S.Ct. at 2230 ("where, as here there is a lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion."). "Courts reviewing claims of *Witherspoon-Witt* error, however, especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and

qualifications of a potential juror." *Uttecht v. Brown*, 551 U.S. at 22, 127 S.Ct. at 2231.
*Bartee v. Quarterman*, 574 F.Supp.2d at 662-64.

    3.    <u>Synthesis</u>

    Having independently reviewed the entirety of the voir dire examination of venire member Roberts, this Court finds venire member Roberts constituted the quintessential vacillating juror when it came to her willingness to state whether she could ever answer the Texas capital sentencing special issues in a manner that resulted in the imposition of the death penalty.  As such, Ms. Roberts was properly subject to challenge for cause. *Beazley v. Johnson*, 242 F.3d 249, 261-62 (5th Cir.)(holding a state trial court's ruling regarding a venire member's bias under the *Witherspoon* test is a factual finding subject to a presumption of correctness on collateral review), *cert. denied*, 534 U.S. 945 (2001).  In fact, this Court concludes Ms. Robert's voir dire answers were more than merely equivocating; like the venire member at issue in *Feldman v. Thaler,* 695 F.3d 372, 387 (5th Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 1584, 185 L.Ed.2d 585 (2013), Ms. Roberts' voir dire examination concluded with assertions strongly suggesting she was likely incapable of imposing the death penalty.  Ms. Roberts' voir dire answers, even when examined on the dry record now before this Court, firmly establish her ability to impose the death penalty was substantially impaired.  The Texas Court of Criminal Appeals' rejection of petitioner's *Witherspoon* claim on the merits was plainly reasonable.

    Furthermore, the state trial judge had the opportunity to examine venire member Roberts' demeanor during her voir dire examination and commented upon same when he issued his ruling.  *See Uttecht v. Brown*, 551 U.S. at 22, 127 S.Ct. at 2231 (emphasizing the deference owed to trial judges' decisions regarding potential disqualifying juror bias based upon their first-hand

examination of venire members' demeanor during voir dire).  The state trial court's conclusion

that venire member Roberts lacked the proper qualifications to serve as a juror in a capital trial

was eminently reasonable and fully supported by Ms. Roberts' voir dire answers quoted at length

above.[398]  The state trial court reasonably found as a factual matter that venire member Roberts

could not fulfill the constitutional duties of a capital juror to consider the evidence and render a

verdict based upon the evidence and the trial court's instructions.  This Court's review of venire

member Roberts' voir dire examination leads this Court to conclude the state trial court's factual

finding was eminently reasonable in light of the evidence before that court.

D.      Conclusions

        The Texas Court of Criminal Appeals' rejection on the merits during the course of

petitioner's direct appeal of the arguments contained in petitioner's eighth claim for relief herein

was neither (1) contrary to, nor involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States, nor (2) based upon an

unreasonable determination of the facts in light of the evidence presented in the petitioner's trial

and direct appeal.  Petitioner's eighth claim herein does not warrant federal habeas corpus relief.

### XIII. Over-breadth of Texas Murder-Within-Kidnaping Statute

A.      The Claim

        In his ninth claim herein, petitioner argues the Texas capital murder statute is

unconstitutional insofar as it incorporates the Texas Penal Code's statutory definition of

---

[398] *See* notes 388-97, *supra*, and accompanying text.

kidnaping, which petitioner argues is so over-broad as to permit a finding of capital murder within a kidnaping in virtually every murder case.[399]

B.    State Court Disposition

Petitioner presented this same federal constitutional argument as his fifteenth point of error on direct appeal.[400]  The Texas Court of Criminal Appeals rejected same on the merits:

> In his fifteenth point of error, appellant claims that Texas Penal Code §
> 19.03(a)(2) is unconstitutional because it fails to narrow the class of offenses for
> which the death penalty may be sought.  He argues that kidnapping [sic] should
> not be included in this section because "[v]irtually every murder involves some
> restraint of the victim's movements and every murder by definition involves using
> deadly force."  We have previously rejected this claim. *Rayford,* 125 S.W.3d at
> 524-25. Appellant's fifteenth point of error is overruled.

*Young v. State,* 2005 WL 2374669, at * 9.

---

[399] *Second Amended Petition*, at pp. 266-70; *Petitioner's Reply*, at pp. 149-54.

In addition to his challenge to the statutory over-breadth of the Texas capital murder statute's murder-within-kidnaping provision, petitioner asserts an unexhausted, procedurally defaulted ineffective assistance claim complaining that "all prior counsel provided ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims." *Second Amended Petition*, at p. 270.  As was also true with regard to petitioner's eighth claim herein, however (*see* note 386, *supra*), petitioner's trial counsel did everything necessary to preserve for state appellate review (and potentially federal habeas review) the merits of petitioner's over-breadth challenge to the Texas capital statute's murder-within-kidnaping provision. Furthermore, petitioner's state appellate counsel presented a point of error on direct appeal challenging the same federal constitutional challenge raised by petitioner in his ninth claim herein as point of error fifteen in petitioner's direct appeal. Appellate brief, at pp. 61-63.  The Texas Court of Criminal Appeals rejected this claim on the merits. *Young v. State*, 2005 WL 2374669, at *9.  Thus, petitioner's trial and state appellate counsel did everything necessary to preserve petitioner's federal constitutional challenge to the Texas capital murder statute's murder-within-kidnaping provision.  They failed to nothing necessary to preserve petitioner's federal constitutional complaint for state appellate and federal habeas review.  Likewise, petitioner's state habeas counsel cannot reasonably be faulted for failing to re-present a claim that had been fully litigated during petitioner's state direct appeal.  Neither petitioner's trial counsel, state appellate counsel, nor state habeas counsel rendered ineffective assistance with regard to petitioner's ninth claim herein.  Petitioner's arguments to the contrary and legally and factually frivolous.

[400] Appellate Brief, at pp. 61-63.

C.    AEDPA Analysis

The factually faulty premise underlying petitioner's ninth claim herein is that "[e]very murder offense involves to some degree restraint or abduction."[401]  The short answer to this assertion is that neither the assassinations of President John F. Kennedy, Dr. Martin Luther King, Jr. , or Robert F. Kennedy, to name a few infamous murders, nor the attempted assassination of President Ronald Reagan involved any use of, or attempted, restraint or abduction as those terms are understood under Texas law.  Nor, for that matter, do the often gang-related, fatal, drive-by shootings that plague the residents of many communities in this nation typically involve "restraint" or "abduction" as those terms are reasonably understood under applicable Texas law. There is no legal or evidentiary support in the record before this Court for the premise underlying petitioner's ninth claim herein, i.e., petitioner's contention that "virtually every murder involves some degree of restraint or abduction."

Section 19.03(a)(2) of the Texas Penal Code defines capital murder, in pertinent part, as including murders in which a person "intentionally commits the murder in the course of committing or attempting to commit kidnaping...."  Section 20.03(a) of the Texas Penal Code provides "[a] person commits an offense if he intentionally or knowingly abducts another person."  Section 20.01(2) of the Texas Penal Code defines "abduct" as "to restrain a person with intent to prevent his liberation" by either secreting or holding him in a place where he is not likely to be found or using or threatening to use deadly force.  Section 20.01(1) of the Texas Penal Code defines "restrain" as "to restrict a person's movements without consent so as to

---

[401] *Second Amended Petition*, at p. 268.
Petitioner's federal habeas pleadings borrow this statement from petitioner's appellate brief.  Not surprisingly, petitioner has never cited any authority to support of this proposition.

interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." Section 20.01(1) further provides, in part, that "restraint" is "without consent" if it is accomplished by either "force, intimidation, or deception." Thus, the offenses of kidnaping and capital murder arising from an intentional murder committed during the course of a kidnaping or attempted kidnaping are clearly and specifically defined by applicable Texas statutes.

The fact the Texas Court of Criminal Appeals has (1) instructed Texas juries to examine all of the evidence surrounding an alleged kidnaping to determine whether the essential elements of that offense have been satisfied and (2) refused to adopt mandatory minimum duration or distance requirements as essential elements of the Texas kidnaping statute does not render the foregoing statutory definitions any less clear or unambiguous. *See Reyes v. State*, 84 S.W.3d 633, 637 (Tex. Crim. App. 2002)(holding a fact-finder should look at all the circumstances surrounding an offense to determine whether it meets the statutory definition of kidnaping); *Hines v. State*, 75 S.W.3d 444, 447-48 (Tex. Crim. App. 2002)(holding the Texas kidnaping statute does not require the State to prove a defendant moved his victim a specific distance or that the defendant held his victim a specific length of time before he can be found guilty of kidnaping). Nor does it render the definition of capital murder involved in one of the theories of capital murder in petitioner's case, i.e., intentional murder occurring during Petrey's kidnaping, any less narrow for Eighth Amendment purposes.

In his reply brief, petitioner attacks the reasoning of the Texas Court of Criminal Appeals' opinion rejecting petitioner's fifteenth point of error on direct appeal.[402] The quality of

---

[402] *Petitioner's Reply*, at pp. 151-52.

the state appellate court's opinion is not, however, determinative of petitioner's ninth claim herein.  Under the AEDPA, this Court reviews the holding of the state court, not the quality of the reasoning or legal analysis contained in its opinion. *See Maldonado v. Thaler*, 625 F.3d at 239 (federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision); *St. Aubin v. Quarterman*, 470 F.3d at 1100 (holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision); *Amador v. Quarterman*, 458 F.3d at 410 (holding the same); *Pondexter v. Dretke*, 346 F.3d at 148 (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable); *Anderson v. Johnson*, 338 F.3d at 390 (holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d at 246 (holding a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision).

Petitioner is correct that the Supreme Court has emphasized the need for state statutory capital murder schemes to clearly define the offenses to which the death penalty may attach. *See, e.g., Arave v. Creech*, 507 U.S. 463, 470-71, 113 S.Ct. 1534, 1540-41, 123 L.Ed.2d 188 (1993)(holding (1) a state must "suitably direct and limit the sentencing entity's discretion so as to minimize the risk of wholly arbitrary and capricious action," (2) the state must channel the sentencing entity's discretion by clear and objective standards that provide specific and detailed guidance and make rationally reviewable the process for imposing a sentence of death, and (3) the federal court must determine whether the statutory language defining the circumstance,

viewed in light of any limiting construction, is itself too vague to provide any guidance to the sentencing entity); *Lewis v. Jeffers*, 497 U.S. 764, 774-76, 110 S.Ct. 3092, 3099-3100, 111 L.Ed.2d 606 (1990) (holding a state's definitions of its aggravating circumstances play a significant role in channeling the sentencing entity's discretion); *Zant v. Stephens.* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 236 (1983)(holding an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder).

The Supreme Court's holdings in the foregoing cases and others shed great light on the types of statutory terms employed to define capital murder that will pass constitutional murder under Eighth Amendment analysis. In *Arave v. Creech,* for example, the Supreme Court upheld as constitutional aggravating factors that included "utter disregard for human life" and "cold-blooded, pitiless slayer." *Arave v. Creech*, 507 U.S. at 471-75, 113 S.Ct. at 1541-43. In *Lewis v. Jeffers*, the Supreme Court upheld against constitutional challenge an Arizona aggravating circumstance which asked the sentencing entity to determine of the defendant's offense was "especially heinous...or depraved." *Lewis v. Jeffers*, 497 U.S. at 774-78, 110 S.Ct. at 3099-3101. In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court upheld against a facial constitutional challenge an aggravating factor which permitted the imposition of the death penalty if the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery." *Gregg v. Georgia*, 428 U.S. at 201-03, 96 S.Ct. at 2938-39. In *Profitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), a Supreme Court plurality upheld statutory aggravating factors that

permitted imposition of the death penalty if the murder was either "especially heinous, atrocious,

or cruel" or "the defendant knowingly created a great risk of death to many persons." *Profitt v.*

*Florida*, 428 U.S. at 255-56, 96 S.Ct. at 2968.

In contrast to the many, much less precise, terms the Supreme Court has upheld as

constitutional in *Arave v. Creech, supra*, and *Lewis v. Jeffers, supra*, the Texas capital murder

statute's statutory definition of capital murder as intentional murder committed in the course of

committing or attempting to commit the offense of kidnaping (as narrowly defined by Texas

statute) is a fount of precision and exactitude, lacking any of the defects the Supreme Court

found determinative in *Godfrey v. Georgia*, 446 U.S. 420, 428-33, 100 S.Ct. 1759, 1765-67, 64

L.Ed.2d 398 (1980)(plurality opinion striking down as vague and over-broad an aggravating

factor which permitted the death penalty when the jury found the murder was "outrageously or

wantonly vile, horrible or inhuman").

The same day it rendered its decisions in *Gregg* and Profitt, the United States Supreme

Court upheld the Texas capital sentencing scheme in *Jurek v. Texas,* holding in part that the

Texas Penal Code's statutory definition of capital murder narrowed the category of persons

eligible to receive the death penalty sufficiently to withstand Eighth Amendment scrutiny. *See*

*Jurek v. Texas*, 428 U.S. at 273-76, 96 S.Ct. at 2957-58 (holding the Texas statutory definition of

capital murder essentially requires at least one aggravating circumstance exist in a murder case

before the defendant was eligible for the death penalty and recognizing, at least implicitly, the

statutory inclusion of murder-within-kidnaping as such a constitutionally sufficient narrowing

factor).

In *Santellan v. Cockrell*, 271 F.3d 190 (5th Cir. 2001), *cert. denied*, 535 U.S. 982 (2002), the Fifth Circuit rejected the same argument raised by petitioner in his ninth claim herein, i.e., the argument that the Texas capital murder statute failed to adequately narrow the class of persons death-eligible in the case of a defendant charged with a capital murder committed in the course of an attempted kidnaping:

> Santellan alternatively argues that, as applied in this case, the Texas capital punishment statute is unconstitutional for vagueness and because it does not sufficiently narrow the class of death-eligible defendants. These arguments are meritless. Attempted kidnapping is a statutory aggravating factor that elevates Santellan's crime above the offense of ordinary murder and narrows the class of crimes to which the death penalty may attach. *See* Tex. Penal Code § 19.03; *Jurek v. Texas,* 428 U.S. 262, 268-72, 96 S.Ct. 2950, 2954-56, 49 L.Ed.2d 929 (1976); *Lowenfield v. Phelps,* 484 U.S. 231 at 243-46, 108 S.Ct. 546, 554-55, 98 L.Ed.2d 568 (1988). The offense of attempted kidnapping [sic]requires both specific intent and more than mere preparation to "restrain" the victim. Santellan's argument ignores the evidence of specific intent to kidnap and the evidence of attempted intimidation and restraint by means of deadly force. As the State observes, not only could a reasonable jury infer both specific intent and the requisite amount of pre-murder restraint, but the evidence of Santellan's specific intent to kidnap Garza distinguishes his case from ordinary murders. It is thus incorrect to assert, as Santellan does, that his capital murder conviction threatens to transform every murder into a death-eligible crime.

*Santellan v. Cockrell*, 271 F.3d at 196 n.5.

Petitioner's efforts in his reply brief to distinguish the Fifth Circuit's holding in *Santellan* from his own case are unpersuasive.

The evidence at trial showed (1) petitioner approached Petrey's vehicle and forced Petrey to surrender control of his pickup truck at gun point, (2) petitioner and Page drove Petrey from Brookshire to Midland, Texas, stopping several times along the way to have Petrey make purchases for their benefit, including purchases of new clothing for petitioner and an attempted purchase of an assault rifle for petitioner, and (3) petitioner and Page drove Petrey to an isolated

location where petitioner twice shot Petrey in the head at relatively close range and explained later to Page that he had killed Petrey because Petrey knew their names.[403]   Thus, there was ample evidence in the record to show petitioner abducted Petrey at gunpoint and, with Page's assistance, transported Petrey more than a hundred miles across the State before killing Petrey in an isolated location.   Petitioner's kidnaping and murder of Petrey distinguished his offense from other murders in several significant ways, including petitioner's abduction of Petrey at gunpoint, petitioner's subsequent substantial interference with Petrey's liberty, and petitioner's use of threats and intimidation to retain control over Petrey.   Petitioner has no rational basis to complain that he was charged with Petrey's capital murder based upon petitioner having murdered Petrey while in the course of kidnaping Petrey.

D.   Conclusions

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's direct appeal of petitioner's federal constitutional complaint about the alleged over-breadth of the Texas capital murder statute's "murder-within-kidnaping" provision was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and direct appeal.   Petitioner's ninth claim herein does not warrant federal habeas corpus relief.

---

[403] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 201-48.

273

## XIV. Supplemental Punishment Phase Jury Instruction

A.      The Claim

In his thirteenth claim herein, petitioner argues the state trial court's supplemental jury instruction issued in response to a jury note inquiring about the second capital sentencing special issue violated his constitutional rights by directing the jury to answer that special issue affirmatively.[404]

B.      State Court Disposition

As was explained at length in Section I.D.6. above, during deliberations at the punishment phase of petitioner's capital murder trial, the jury sent out a note which read as follows: "Regarding Issue Number 2 cause of death of deceased individuals.  Question: Do you have to believe both or at least one?"[405]  The trial judge crafted a written reply which read as follows:

> "Members of the jury.  Paragraph 1 of the indictment charged capital murder by the death of two individuals pursuant to the same scheme or course of conduct. Paragraph 2 of the indictment charged capital murder by the death of an individual during the course of kidnaping and robbery.  If your consideration of Issue Number 2 on punishment is as to Paragraph 1 of the indictment, the death of two individuals is required to be found by the jury.  If your consideration is as to the second paragraph of the indictment, the death of an individual, Samuel Petrey, is required."[406]

Petitioner's trial counsel voiced several objections to the trial judge's supplemental instructions, specifically (1) complaining the supplemental instruction effectively lessened the State's burden of proof on the second special issue, (2) invoking a variety of state and federal constitutional

---

[404] *Second Amended Petition*, at pp. 281-87; *Petitioner's Reply*, at pp. 158-67.

[405] S.F. Trial, Volume 36, at p. 135.

[406] *Id.*

provisions, (3) arguing the supplemental instruction eliminated the requirement that the State

carry the burden of proof on the second special issue beyond a reasonable doubt, and (4) arguing

the correct response to the jury's note would be a directive that the jury had to find beyond a

reasonable doubt that petitioner was responsible for the death of both individuals.[407]  The trial

judge overruled petitioner's objections and gave the instruction quoted above.[408]

      In his first four points of error on direct appeal, petitioner argued the trial court's note to

the jury (1) improperly coerced the jury to answer the second special issue affirmatively, (2)

allowed the jury to answer the second special issue affirmatively without rendering a unanimous

verdict, (3) constituted an impermissible comment on the weight of the evidence, and (4)

prevented the jury from considering unspecified mitigating evidence showing the petitioner had

not intended to kill both men.[409]  The Texas Court of Criminal Appeals ruled as follows:

>     In points of error one through four, appellant challenges the trial court's
> submission of a supplementary instruction to the jury at the punishment phase of
> trial.  During their deliberations, the jurors sent a note to the trial judge asking
> whether, with regard to the anti-parties issue, they were required to find that
> appellant committed both murders in this case or only one.[FN3]  The trial court sent
> a written instruction to the jurors explaining that the first paragraph of the
> indictment alleged the murders of two victims pursuant to the same scheme or
> course of conduct, while the second paragraph alleged the murder of one victim
> committed during the course of committing kidnapping and robbery. The trial
> court continued,
>
> FN3. The note said, "Do you have to believe both or at least one?"
>
>     If your consideration of Issue No. 2 on punishment is as to Paragraph 1
> of the indictment, the death of two individuals is required to be found by the
> jury. If your consideration is as to the second paragraph of the indictment, the
> death of an individual, Samuel Petrey, is required.  Appellant objected to this

---

[407] *Id.*, at pp. 136-37.

[408] *Id.*, at p. 137.

[409] Appellate Brief, at pp. 22-25.

instruction on the grounds that it lessened the state's burden of proof, that it
violated his Sixth Amendment right to a fair trial, that it violated his Fifth and
Fourteenth Amendment rights to due process, and that it violated his Eighth
Amendment rights because the jury was required to find appellant was
responsible for the death of two individuals.  On appeal, appellant claims that
the instruction improperly coerced the jury to answer the second special issue
in the affirmative, that the instruction allowed the jury to answer the second
special issue in the affirmative without requiring all twelve jurors to answer
"yes," that the instruction was an improper comment on the weight of the
evidence, and that the instruction prevented the jury from "considering
circumstances of the offense favorable to appellant that might have been
considered mitigating evidence."  Because appellant's objections at trial do not
comport with the claims he now raises, he has failed to preserve those claims
for appeal. Tex.R.App. P. 33.1. Appellant's first, second, third, and fourth
points of error are overruled.

*Young v. State*, 2005 WL 2374669, at *7.

C.      Procedural Default

        Respondent correctly points out the Texas Court of Criminal Appeals' ruling that

petitioner failed to comply with the Texas contemporaneous objection rule and, thereby,

failed to properly preserve the multi-faceted arguments contained in petitioner's first four

points of error on direct appeal, bars this Court's federal habeas review of those same claims

as asserted in petitioner's thirteenth claim herein. *See Turner v. Quarterman*, 481 F.3d 292,

301 (5th Cir.)(holding the Texas contemporaneous objection rule is regularly applied in the

vast majority of similar cases and is an adequate procedural bar to federal habeas review),

*cert. denied*, 551 U.S. 1193 (2007); *Rowell v. Dretke*, 398 F.3d 370, 374-75 (5th

Cir.)(holding a state court's express finding that the petitioner failed to comply with the

Texas contemporaneous objection rule foreclosed federal habeas review of a challenge to the

defendant's punishment phase jury charge)*cert. denied*, 546 U.S. 848 (2005); *Cotton v.

Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003)(holding the Texas contemporaneous objection

276

rule is an adequate and independent state ground that procedurally bars federal habeas

review), *cert. denied*, 540 U.S. 1186 (2004). Petitioner's failure to raise timely objection

before the state trial court asserting the specific federal constitutional claims he now includes

in his thirteenth claim herein resulted in a procedural default on those claims. *See Scheanette*

*v. Quarterman*, 482 F.3d 815, 823-24 (5th Cir. 2007)(holding failure to present same Sixth

and Fourteenth Amendment claims in state court (on direct appeal) as petitioner raised in

federal habeas corpus proceeding constituted procedural default on same even though

petitioner had raised related Eighth Amendment claims attacking his punishment phase jury

charge), *stay denied*, 555 U.S. 1160 (2009).

D.     Alternatively, No Merit on *De Novo* Review

Because no state court has ever addressed the merits of the petitioner's thirteenth

claim herein, this Court's review of this claim is necessarily *de novo*. *See Porter v.*

*McCollum*, 558 U.S. at 39, 130 S.Ct. at 452 (holding *de novo* review of the allegedly

deficient performance of petitioner's trial counsel was necessary because the state courts had

failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390, 125

S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* was required

where the state courts rested rejection of an ineffective assistance claim on the deficient

performance prong and never addressed the issue of prejudice).

1.     Eighth Amendment Arguments

Insofar as petitioner argues in his thirteenth claim herein that the trial court's

supplemental jury instruction somehow prevented petitioner's jury from giving effect to any

of the mitigating evidence petitioner presented during the trial, that complaint is legally and factually frivolous. The petitioner's jury charge, in pertinent part, directed petitioner's jury to consider "all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or circumstances of the offense that militate for or mitigate against the imposition of the death penalty."[410]

As was explained above, the proper Eighth Amendment standard for reviewing the sufficiency of punishment phase jury instructions is found in *Boyde v. California*, 494 U.S. at 380, 110 S.Ct. at 1198 ("the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence"). *See Ayers v. Belmontes*, 549 U.S. 7, 14-16, 127 S.Ct. 469, 474-75, 166 L.Ed.2d 334 (2006)(applying the familiar *Boyde* standard and holding an instruction directing the capital sentencing jury to consider any other circumstance that might excuse the crime sufficiently broad to permit consideration of possible future good conduct). The trial court's supplemental jury instruction in question addressed only the manner the jury was to consider and answer the *second* special issue and cannot reasonably be construed as interfering with the jury's consideration of any mitigating evidence in the record when the jury turned its attention to the third special issue, i.e., the mitigation special issue. Nothing the state trial court instructed the jury with regard to petitioner's *second* capital sentencing special issue precluded, prevented, or otherwise reasonably impeded petitioner's jury's ability to give full effect to any and all of the mitigating evidence petitioner presented at trial in the course of answering the *final* capital sentencing special issue, i.e., the

---

[410] Trial Transcript, Volume 5 of 5, at p. 859.

mitigation special issue. There is no reasonable likelihood petitioner's jury construed the trial court's note answering the jury's specific question about the second special issue as somehow limiting the jury's ability to consider and give effect to any of the mitigating evidence before it when the jury answered the final special issue concerning mitigation. *See Buchanan v. Angelone*, 522 U.S. 269, 161-62, 118 S.Ct. 757, 276-77, 139 L.Ed.2d 702 (1998)(holding (1) the inquiry is whether there is a reasonable likelihood the jury applied the challenged instruction in a way that prevented the consideration of constitutionally relevant mitigating evidence and (2) jury instructions directing the jury to consider "all the evidence" justifying a sentence of less than death fully satisfied the Eighth Amendment). Nothing in the Eighth Amendment requires the State of Texas to structure its second capital sentencing special issue in such a way as to expressly permit consideration by the jury of mitigating evidence when answering that factual inquiry. The final special issue, i.e., the mitigation special issue, furnishes a more than adequate vehicle for a capital sentencing jury's consideration of all mitigating evidence in the record. *See Scheanette v. Quarterman*, 482 F.3d at 826-27 (holding that, even if jury instructions precluded consideration of petitioner's evidence of good character and low likelihood of committing a serious act of violence during incarceration in connection with mitigation special issue, the same evidence could be adequately considered by the jury in answering the future dangerousness special issue). The Eighth Amendment component of petitioner's thirteenth claim herein lacks any arguable merit.

2.    Due Process Arguments

Insofar as petitioner argues the supplemental jury instruction at issue somehow removed the State's burden of proving an affirmative answer to the second capital sentencing special issue beyond a reasonable doubt, that argument urges an interpretation of petitioner's punishment phase jury charge that is wholly unreasonable. The petitioner's punishment phase jury charge very clearly imposed the burden of proof on the State with regard to the second special issue:

> You are instructed that in answering Issue No. 2 the State has the burden to prove beyond a reasonable doubt that the answer should be "yes." The jury may not answer Issue No. 2 "yes" unless the jury agrees unanimously on the answer, AND the jury may not answer Issue No. 2 "no" unless ten or more jurors agree. The members of the jury need not agree on what particular evidence supports a negative answer. If any juror has a reasonable doubt as to his or [sic] answer to Issue No. 2, the juror shall vote "no" to that issue.[411]

View in proper context, the jury's note inquiring about the second special issue asked whether the jury had to find petitioner personally responsible for one or both murders before it could return an affirmative answer to that special issue: "Regarding Issue Number 2 cause of death of deceased individuals. Question: Do you have to believe both or at least one?"[412]

The trial judge's reply to that inquiry did not address the subject of the burden of proof because that subject was already more than adequately addressed by both the jury instruction quoted above and the fact the second special issue itself included the mandatory language regarding the burden of proof, i.e., the second special issue commenced "Do you

---

[411] Id., at p. 861.

[412] S.F. Trial, Volume 36, at p. 135.

find from the evidence beyond a reasonable doubt that the defendant...."[413]   The trial judge's

written response to the jury's note did not mention the burden of proof applicable to the

second special issue and cannot reasonably be construed as removing or lessening the State's

burden of proof with regard to that special issue:

> "Members of the jury.  Paragraph 1 of the indictment charged capital murder
> by the death of two individuals pursuant to the same scheme or course of
> conduct.  Paragraph 2 of the indictment charged capital murder by the death of
> an individual during the course of kidnaping and robbery.  If your
> consideration of Issue Number 2 on punishment is as to Paragraph 1 of the
> indictment, the death of two individuals is required to be found by the jury.  If
> your consideration is as to the second paragraph of the indictment, the death of
> an individual, Samuel Petrey, is required."[414]

By the time the state trial judge issued his supplemental jury instruction during

deliberations at the punishment phase of petitioner's capital murder trial, petitioner's jury had

already returned verdicts finding petitioner guilty beyond a reasonable doubt of capital

murder under two distinct legal theories.  In order to find petitioner guilty under both those

theories, the jury had to be convinced beyond a reasonable doubt the petitioner was

criminally responsible, either individually or under the Texas law of parties, for the

intentional killings of both Douglas and Petrey.  Thus, petitioner's guilt had already been

established beyond a reasonable doubt.  Therefore, petitioner's reliance upon the Supreme

Court's holdings in *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344

(1985), *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and *In re

Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), is misplaced.  Those opinions

---

[413] Trial Transcript, Volume 5 of 5, at p. 861.

[414] S.F. Trial, Volume 36, at p. 135.

address the constitutional requirement of proof beyond a reasonable doubt on the essential

elements of a criminal offense. Moreover, *Francis* and *Sandstrom* addressed the issue of jury

instructions at the guilt-innocence phase of criminal trials which instructed the respective

juries regarding presumptions which the Supreme Court held improperly shifted the burden

of proving essential elements of a criminal offense from the State. Nothing in the petitioner's

trial judge's supplemental jury instruction addressed any presumption or shifted the burden of

proving any essential element of petitioner's capital offense. Likewise, viewed in proper

context, the supplemental jury instruction did not shift the burden of proof from the State on

the second capital sentencing special issue. Rather, the only rational construction of the

supplemental jury charge possible is that the jury was instructed therein it could not answer

the second capital sentencing special issue affirmatively (1) with regard to the first paragraph

of the indictment unless it were convinced beyond a reasonable doubt the petitioner either

actually caused, intended, or anticipated the deaths of both Douglas and Petrey and (2) with

regard to the second paragraph of the indictment unless it were convinced beyond a

reasonable doubt the petitioner either actually caused, intended, or anticipated Petrey's death.

Insofar as petitioner complains that the supplemental jury charge permitted the jury to

answer the second capital sentencing special issue affirmatively without requiring the jury to

unanimously agree on a particular factual theory of capital murder supporting that answer

(i.e., either the murder of Petrey in the course of a kidnaping and robbery or the murder of

Petrey in the course of the same scheme or course of conduct that included the murder of

Douglas), petitioner's complaint is non sequitur. The Supreme Court's holding in *Schad v.*

*Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), does not require a jury to

agree unanimously on a specific factual theory of capital murder before returning a "guilty" verdict. *Id.* Furthermore, the non-retroactivity doctrine of *Teague v. Lane, supra,* precludes adoption of such a new rule of federal constitutional criminal procedure in this federal habeas corpus proceeding. *Salazar v. Dretke*, 393 F.Supp.2d at 487.

In *Schad,* a majority of the Supreme Court recognized the general rule that a single count may include allegations the defendant committed the offense by one or more specified means and held there is no constitutional requirement the jury reach unanimity on the preliminary factual issues which underlie the verdict. *See Schad v. Arizona*, 501 U.S. at 631-32, 111 S.Ct. at 2496-97 (plurality opinion of Justice Souter, Chief Justice Rhenquist, and Justices O'Connor and Kennedy); *Schad v. Arizona*, 501 U.S. at 649-50, 111 S.Ct. at 2506 (Justice Scalia's separate concurring opinion in which he specifically agreed with the plurality's determination the jury need not agree on the mode of commission of a single crime when that offense can be committed in various ways). If, as the Supreme Court majority held in *Schad*, there is no constitutional requirement that a capital murder jury reach unanimity with regard to any of several specific means by which such a crime may be committed when the indictment alleges multiple theories of the offense, then the premise underlying petitioner's complaint about the lack of unanimity underlying the jury's answer to his second capital sentencing special issue vanishes. In *Schad*, as occurred in petitioner's case, the prosecution properly indicted petitioner on a single count of capital murder and alleged and attempted to prove multiple factual theories by which petitioner could have committed that single offense. *Id.* Hence, petitioner's complaint his punishment phase jury charge, as read in conjunction with the trial court's supplemental instruction concerning the second capital

sentencing special issue, did not instruct his jury to render an affirmative answer to the second special issue only if the jury unanimously agreed on a particular factual theory of capital murder underlying same is *non sequitur*. It is not within the province of this Court to either disregard or overrule the Supreme Court majority's clear holding in *Schad*.

There is no rational possibility, much less a reasonable likelihood, the petitioner's jury construed the trial court's punishment phase jury instructions, including the supplemental instruction responding to the jury's inquiry about the second special issue, as removing or lessening the State's burden of proving an affirmative answer to the second capital sentencing special issue based on evidence beyond a reasonable doubt.

3.      Sixth Amendment Arguments

Petitioner once more cites to *Apprendi* and *Ring* and argues the supplemental instruction somehow deprived him of his Sixth Amendment rights. However, as was explained at length in Section V.E. above, neither *Apprendi* nor *Ring* applies to the capital sentencing special issue submitted to the jury at the punishment phase of a Texas capital murder trial. In Texas, the eligibility issue discussed in *Tuilaepa* is accomplished at the guilt-innocence phase of trial, i.e., once the jury finds a Texas capital murder defendant guilty beyond a reasonable doubt of capital murder, the punishment phase of trial is focused exclusively on the selection decision discussed in *Tuilaepa*. *See Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at 2666 (holding the Texas capital sentencing scheme accomplishes the eligibility determination, i.e., the constitutionally mandated "narrowing function," at the guilt-innocence phase of trial). A Texas capital sentencing jury's answers to the Texas

284

capital sentencing special issue do not serve the same purpose as the trial judge's factual findings did in either *Apprendi* or *Ring*. *The jury's answers to the Texas capital sentencing special issues are not factual findings on the essential elements of capital murder under Texas law.*

Moreover, reasonably construed in proper context, nothing in the state trial court's supplemental jury instruction "directed" or "instructed" petitioner's capital sentencing jury that it had to return an affirmative answer to the second capital sentencing special issue. Likewise, nothing in the supplemental instruction could reasonably be construed as usurping the jury's responsibility for determining whether the State had proven by evidence beyond a reasonable doubt that an affirmative finding to the second special issue was warranted in petitioner's case. The construction of the supplemental instruction in question urged by petitioner in his thirteenth claim herein is wholly unreasonable.

E.    Conclusions

Petitioner procedurally defaulted on his thirteenth claim herein by failing to comply with the Texas contemporaneous objection rule and by virtue of the Texas Court of criminal Appeals' dismissal of same in the course of petitioner's direct appeal. Alternatively, even when reviewed under a *de novo* standard, petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendment complaints in his thirteenth claim herein do not warrant federal habeas corpus relief.

# XV. Ineffective Assistance at Trial

## A.    Overview of the Claims

In his fourth claim herein, petitioner asserts some eighteen complaints about the performance of his trial counsel.[415]  Perhaps because many of these complaints originated as cryptic concerns the petitioner submitted pro se to the state trial court, and were disposed of in what later became petitioner's second state habeas corpus proceeding, many of these complaints are ambiguous.[416]  Because petitioner presented his ineffective assistance claims to the state courts in a wide variety of contexts, and because the state court disposition of those claims is sufficiently confusing, this Court will discuss the state procedural history of each ineffective assistance complaint individually.

## B.    Clearly Established Federal Law

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, 558 U.S. 15, 16-17, 130 S.Ct 383, 384, 175 L.Ed.2d

---

[415] *Second Amended Petition*, at pp. 182-245; *Petitioner's Reply*, at pp. 73-134.
    The numbering system employed by petitioner in his Second Amended Petition to identify his assertions of ineffective assistance in his fourth claim for relief herein is, to be charitable, extremely confusing.  As respondent correctly points out (See *Respondent's Second Amended Answer*, docket entry no. 95, at p. 95 n.22), petitioner has listed two different assertions of ineffective assistance under the heading "4.B.2."  In addition, this Court has identified at least one assertion of ineffective assistance to which petitioner did not give a separate designation in its operative pleading. Accordingly, this Court's analysis of petitioner's multi-faceted fourth claim herein will be broken down into discrete discussions of each separate assertion of ineffective assistance by petitioner (identified by the pages in petitioner's Second Amended Petition where that complaint is presented), regardless of how petitioner numbered or failed to number his complaints in his fourth claim herein.

[416] *See* note 150, *supra*, and accompanying text.

328 (2009); *Bobby v. Van Hook*, 558 U.S. 4, 7, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009));

and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different (*Porter v. McCollum*, 558 U.S. 30, 38-40,

130 S.Ct. 447, 452-53, 175 L.Ed.2d 398 (2009); *Wong v. Belmontes*, 558 U.S. at 19-20, 130

S.Ct. at 386).

      The constitutional standard for determining whether a criminal defendant has been

denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was

announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct.

2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to
> require reversal of a conviction or death sentence has two components. First,
> the defendant must show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant by the Sixth
> Amendment. Second, the defendant must show that the deficient performance
> prejudiced the defense. This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose result is
> reliable.

      To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance

was constitutionally deficient, a convicted defendant must show that counsel's representation

"fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521,

123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91,

120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must

carry the burden of proof and overcome a strong presumption that the conduct of his trial

counsel falls within a wide range of reasonable professional assistance. *Strickland v.*

*Washington*, 466 U.S. at 687-91, 104 S.Ct. at 2064-66.  Courts are extremely deferential in

scrutinizing the performance of counsel and make every effort to eliminate the distorting

effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the

proper analysis under the first prong of *Strickland* is an objective review of the

reasonableness of counsel's performance under prevailing professional norms which includes

a context-dependent consideration of the challenged conduct as seen from the perspective of

said counsel at the time).  "No particular set of detailed rules for counsel's conduct can

satisfactorily take account of the variety of circumstances faced by defense counsel or the

range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v.

Van Hook*, 558 U.S. at 7, 130 S.Ct. at 16; *Strickland v. Washington*, 466 U.S. at 688-89, 104

S.Ct. at 2065.  It is strongly presumed  counsel rendered adequate assistance and made all

significant decisions in the exercise of reasonable professional judgment. *Strickland v.

Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable

probability that, but for the objectively unreasonable misconduct of his counsel, the result of

the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at

2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068.  A reasonable probability

is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

In evaluating prejudice in the context of the punishment phase of a capital trial, a

federal habeas court must re-weigh all the evidence in aggravation against the totality of

available mitigating evidence (had the petitioner's trial counsel chosen a different course).

*Wong v. Belmontes*, 558 U.S. at 20, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534, 123

S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes*, 558 U.S. at 27, 130 S.Ct. at 390-91.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, i.e., those complaints which the state courts have addressed on the merits, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is *de novo. See Porter v. McCollum*, 558 U.S. at 39, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009), *cert. denied*, 558 U.S. 839 (2009); *Blanton v. Quarterman*, 543 F.3d at 235; *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000), *cert. denied*, 522 U.S. 1067 (2001).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. at 698, 122 S.Ct. at 1852; *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman*, 482 F.3d at 820; *Sonnier v. Quarterman*, 476 F.3d 349, 356 (5th Cir. 2007), *cert.* denied, 552 U.S. 948 (2007); *Amador v. Quarterman*, 458 F.3d at 410; *Gonzales v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006), *cert. denied*, 549 U.S. 1323 (2007).

C.   Failure to Present Evidence Showing Petitioner Did Not Shoot Petrey

1.   The Complaint

In his first assertion of ineffective assistance by his trial counsel raised in his fourth claim herein, petitioner argues his trial counsel should have called a former Midland County Jail inmate named Raynaldo Ray Villa to testify he had overheard prosecution witness David Page admit that he (Page) shot Petrey.[417]

2.   Procedural Default on Unexhausted Complaint

---

[417] *Second Amended Petition*, at pp. 188-90; *Petitioner's Reply*, at pp. 73-75.

In his Second Amended Petition, petitioner alleged he exhausted state remedies on this complaint by presenting same as part of his twelfth ground for relief in his first state habeas corpus application.[418]  In point of fact, however, petitioner's twelfth ground for relief in petitioner's first state habeas corpus application contained a complaint that petitioner's trial counsel failed to present a ballistics report which allegedly showed prosecution witness Mark Ray, and not petitioner, had possession at some point in time of the handgun which was used to twice shoot Doyle Douglas in the head.[419]  Nothing in petitioner's first state habeas corpus application "fairly presented" the state courts with a complaint about the failure of petitioner's trial counsel to call Raynaldo Ray Villa to testify about allegedly inculpatory remarks made by David Page.

In his reply brief, for the first time, petitioner asserts that he raised his complaint about his trial counsel's failure to call Raynaldo Ray Villa to testify about Page's alleged confession to the Petrey shooting in the course of petitioner's motion for new trial.[420]  Petitioner's motion for new trial did include an assertion of ineffective assistance by petitioner's trial counsel which referred cryptically to an attached affidavit furnished by petitioner.[421]  Petitioner's affidavit accompanying petitioner's motion for new trial does

---

[418] *Second Amended Petition*, at p. 182.

[419]      Applicant further believes that trial counsel were in possession of ballistics reports which demonstrate that the gun to which accomplice witnesses testified he was in possession of did not shoot Doyle Douglas twice in the head as indicated by the testimony at trial.  According to these reports, Mark Ray was in possession of the gun which caused the injury to the right side of Douglas' head.
First State Habeas Transcript, Volume 1, at pp. 90-91.

[420] *Petitioner's Reply*, at p. 73.

[421] Trial Transcript, Volume 5 of 5, at p. 903.

contain an ineffective assistance complaint about the failure of petitioner's trial counsel to call several named witnesses to testify at the guilt-innocence phase of petitioner's capital murder trial but Raynaldo Ray Villa is not among the names of potential witnesses listed in petitioner's affidavit.[422] Instead, there is a cryptic reference in petitioner's motion for new trial to an affidavit of "R.R. Villa attached thereto as exhibit 2.[423] In his affidavit, dated April 25, 2003, Raynaldo Ray Villa states, in pertinent part (1) Villa was an inmate at the Midland County Jail in October, 2002, (2) Villa became acquainted and had many conversations with David Page, (3) Page informed Villa that Page had killed Petrey but was pinning it on petitioner because Page did not want to get life in prison, and (4) Villa understood he could be called to testify concerning the contents of his affidavit.[424]

The state trial court heard extensive testimony from petitioner's trial counsel, but not petitioner and not Raynaldo Ray Villa, concerning the claims asserted in petitioner's motion for new trial. Petitioner's co-counsel at trial, attorney Ian Cantacuzene, testified without contradiction that (1) he and the defense team interviewed a number of jail house informants, all but one of whom indicated they would testify Page had told them both petitioner and Page shot Petrey, (2) the defense did call the one jail house informant who claimed Page had admitted to shooting Petrey, but (3) he had never heard of Raynaldo Ray Villa until after petitioner's trial was completed and was unaware at the time of trial that Villa had any

---

[422] Trial Transcript, Volume 5 of 5, at pp. 905.

[423] *Id.*, at p. 903.

[424] Trial Transcript, Volume 5 of 5, at p. 910.

information relevant to petitioner's case.[425]  Petitioner's lead trial counsel, attorney Paul

Williams, testified without contradiction at the same hearing on petitioner's motion for new

trial in pertinent part (1) the defense's trial strategy was to call only those jailhouse

informants who would testify that Page alone had shot Petrey and (2) all but one of these

witnesses would have testified Page had stated that both he and petitioner had shot Petrey.[426]

The state trial court denied petitioner's motion for new trial on the merits, finding, in

pertinent part there was no evidence showing the outcome of either phase of petitioner's trial

would have been different had any of the uncalled fact witnesses identified by petitioner been

called to testify at trial.[427]  Petitioner did not raise a point of error on direct appeal

complaining about the denial of his motion for new trial.  At no point in his state appellate

brief or any of his state habeas corpus applications did petitioner specifically complain about

his trial counsel's failure to call Raynaldo Ray Villa as a witness at either phase of

petitioner's trial.

Petitioner argues in his reply brief, without any citation to authority, that the inclusion

of his complaint about his trial counsel's failure to call Villa to testify at trial in petitioner's

motion for new trial renders that claim "exhausted" for federal habeas corpus purposes.[428]

The problems with this argument are two-fold.  First, contrary to petitioner's assertion

petitioner's motion for new trial did not "fairly present" a complaint about the failure of

---

[425] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 256-82.

[426] S.F. Trial, Volume 39, testimony of Paul Williams, at pp. 51-62.

[427] S.F. Trial, Volume 39, at pp. 102-04.

[428] *Petitioner's Reply*, at p. 73.

petitioner's trial counsel to call Villa to testify at petitioner's trial.  Such alleged failure is not

mentioned in either petitioner's motion itself or in petitioner's affidavit attached thereto.

While Villa's affidavit was attached to petitioner's motion for new trial, nothing in the

motion for new trial nor in petitioner's affidavit asserting Villa had information relevant to

petitioner's trial was ever presented to the Texas Court of Criminal Appeals, either in the

context of an ineffective assistance claim or otherwise.

The second, and more significant, problem with petitioner's latest argument is that it

misconstrues the nature of the exhaustion doctrine.  To satisfy the exhaustion doctrine, a

habeas petitioner must fairly apprise the *highest* court of his state of the federal rights which

were allegedly violated. *Smith v. Quarterman*, 515 F.3d 392, 402 (5th Cir. 2008); *Anderson v.

Johnson*, 338 F.3d 382, 388 n.22 (5th Cir. 2003); *Beazley v. Johnson*, 242 F.3d at 263; *Shute

v. State of Texas*, 117 F.3d 233, 237 (5th Cir. 1997).  In Texas, the highest state court with

jurisdiction to review the validity of a state criminal conviction is the Texas Court of

Criminal Appeals. *See Tigner v. Cockrell*, 264 F.3d 521, 526 (5th Cir. 2001)(sua sponte

refusing to review a claim that had never been presented to the Texas Court of Criminal

Appeals); *Richardson v. Procunier*, 762 F.2d 429, 432 (5th Cir. 1985)("[A] Texas inmate

seeking federal habeas relief who, in directly appealing his state criminal conviction, has by-

passed the Texas Court of Criminal Appeals will not be deemed to have exhausted his state

remedies until he has raised his claims before the state's highest court through collateral

review provided by state habeas procedures.").

Because petitioner has never presented the Texas Court of Criminal Appeals with any

complaint about his trial counsel's failure to call Raynaldo Ray Villa to testify at petitioner's

294

trial in any of petitioner's three state habeas corpus proceedings, that complaint is currently unexhausted and, therefore, procedurally defaulted. *See Trottie v. Stephens*, 720 F.3d at 248-49 (holding unexhausted and procedurally defaulted factual bases for claims that had not been included in the federal habeas petitioner's state habeas corpus affidavits); *Johnson v. Cain*, 712 F.3d at 234 (holding unexhausted claim procedurally defaulted where petitioner could not satisfy either "cause and actual prejudice" or "fundamental miscarriage of justice" exceptions to procedural default doctrine). This Court held this cause in abeyance for the very purpose of permitting petitioner to fairly present to the Texas Court of Criminal Appeals and, thereby exhaust, his previously unexhausted claims. Because petitioner has failed to do so and has offered no rational justification for that failure, this complaint about the performance of his trial counsel is procedurally defaulted.

Nonetheless, Title 28 U.S.C. §2254(b)(2) empowers a federal habeas court to deny an unexhausted claim on the merits. *Pondexter v. Quarterman*, 537 F.3d at 527; *Moreno v. Dretke*, 450 F.3d at 116.

3.   Alternatively, No Merit on *De Novo* Review

Because no Texas court has ever addressed the merits of this unexhausted and procedurally defaulted ineffective assistance claim, this Court's review of both prongs of the *Strickland* test is necessarily *de novo*. *See Porter v. McCollum*, 558 U.S. at 39, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of

the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

      a.      <u>No Deficient Performance</u>

The evaluation of defense counsel's performance under the first prong of *Strickland* is an objective one focusing on the reasonableness of said counsel's conduct in view of the information in the possession of defense counsel and the information which, through the exercise of due diligence, defense counsel could and should have had at their disposal. *Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. at 698, 122 S.Ct. at 1852; *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman*, 482 F.3d at 820); *Sonnier v. Quarterman*, 476 F.3d at 356.

Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir.

2009); *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007); *Miller v. Dretke*, 420 F.3d 356, 362 (5th Cir. 2005).

This Court has carefully reviewed Villa's affidavit attached to petitioner's motion for new trial, as well as the record from the evidentiary hearing held in connection with petitioner's motion for new trial. There is no fact-specific allegation now before this Court, much less any evidence, showing either (1) Villa ever communicated what he knew (about Page's allegedly inculpatory comment) to either petitioner or any member of the petitioner's defense team prior to the conclusion of petitioner's trial, (2) the petitioner or any member of the petitioner's defense team were otherwise aware of Villa's knowledge of Page's allegedly inculpatory comment prior to the conclusion of petitioner's trial, (3) Villa was available to testify at petitioner's trial, or (4) through the exercise of due diligence petitioner's defense team could have discovered Villa's knowledge of Page's allegedly inculpatory comment prior to the conclusion of petitioner's trial. As explained above, petitioner's co-counsel at trial testified without contradiction at the hearing on petitioner's motion for new trial that, while he and the rest of the defense team interviewed a plethora of jail house informants who claimed to have heard Page make inculpatory comments (most of which did not really exculpate petitioner), he had never heard Villa's name until after petitioner's trial was completed.[429] Petitioner neither testified at the hearing on his motion for new trial nor called Villa to testify during that evidentiary proceeding. Petitioner has alleged no facts showing his trial counsel either knew about Villa's possession of relevant information or, with the exercise of due diligence, could have learned of Villa's possession of beneficial information

---

[429] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 256-82.

*prior to the conclusion of petitioner's trial.* Accordingly, petitioner has failed to allege specific facts showing the failure of petitioner's trial counsel to call Villa to testify at petitioner's trial caused the performance of said counsel to fall below an objective level of reasonableness.

b.    No Prejudice

To satisfy the second or "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068.

Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness (either a law witness or an expert witness) satisfy  the prejudice prong of *Strickland* analysis only by naming the witness, *demonstrating the witness was available to testify and would have done so*, setting out the content of the witness' proposed testimony, and showing the testimony would have been favorable to a particular defense. *Woodfox v. Cain*, 609 F.3d at 808; *Day v. Quarterman*, 566 F.3d at 538.

Petitioner has failed to allege any specific facts, much less furnish any evidence, showing Villa was available to testify at petitioner's trial and would have done so.  Villa's affidavit states only that he was an inmate in the Midland County Jail, he had conversations with Page, and Page made an inculpatory statement that exculpated petitioner.[430] While Villa's affidavit concludes that he understand he may be called to testify about the foregoing

---

[430] *See* note 424, *supra*, and accompanying text.

(presumably in the future), that affidavit was dated several weeks after the conclusion of petitioner's capital murder trial and Villa says nothing therein about his availability or willingness to testify had he been called to do so during petitioner's trial. Accordingly, petitioner's first assertion of ineffective assistance fails to satisfy the prejudice prong of *Strickland*. *Woodfox v. Cain*, 609 F.3d at 808; *Day v. Quarterman*, 566 F.3d at 538.

Moreover, there is no reasonably probability that, but for the failure of petitioner's trial counsel to call Villa to testify during petitioner's trial, the outcome of either phase of petitioner's capital murder trial would have been different. The evidence of petitioner's guilt was overwhelming. Three eyewitnesses testified (1) they observed petitioner shoot Doyle Douglas in the head at point blank range and (2) petitioner thereafter directed them to dispose of Douglas' body after petitioner forced Mark Ray at gunpoint to shoot Douglas in the head an additional time. Patrick Brook and two other eyewitnesses testified petitioner confessed to shooting Douglas twice in the head. David Page identified petitioner as the principal kidnaper and lone shooter of Samuel Petrey. Petitioner confessed to Bart Lynch, Rosemary Sanders, and Amber Lynch that he stole Petrey's pickup truck. Petitioner took extremely dangerous, evasive, action to avoid apprehension when approached by law enforcement officers while petitioner was driving Petrey's pickup truck. *See United States v. Martinez*, 190 F.3d 673, 678 (5th Cir. 1999)(evidence of an accused's flight is generally admissible as tending to establish guilt). At the time of his arrest, petitioner had possession of the .22 caliber semi-automatic pistol which fired each of the shell casings found by law enforcement officers inside Douglas' abandoned vehicle and at the isolated crime scene where Petrey's body was discovered. Moreover, petitioner's trial counsel did present testimony from a jail

house informant (Christopher McElwee) at the guilt-innocence phase of petitioner's trial that he had overheard Page make an inculpatory statement regarding Petrey's fatal shooting.[431] There is simply no reasonable probability Villa's testimony, which was likely subject to the same type of cross-examination about prior criminal convictions which impeached McElwee's trial testimony, would have convinced the jury to acquit petitioner.[432]

Likewise, in addition to the evidence presented at the guilt-innocence phase of petitioner's trial, the largely uncontradicted evidence at the punishment phase of petitioner's capital murder trial established (1) petitioner's long history of violent conduct dating back to elementary school, (2) petitioner's discharge after only about three months (likely an insufficient time according to petitioner's own mental health experts to permit proper determination of the proper combination and dosage of Psychotropic medications needed to calm petitioner) from both the Triangle Pines and Waco Center facilities, (3) multiple incidents in which petitioner led a gang within the TYC in violent riots that included assaults on TYC staff, (4) petitioner's history of physical abuse as a child at the hands of his biological father and step-father (which was clearly double-edged in nature), (5) the eighteen-year-old petitioner's romantic relationship with a fifteen year old, (6) the petitioner's long-term fascination with guns, (7) the petitioner's participation in a staged robbery of a fast-food restaurant (a crime which petitioner's underage girlfriend heard him plan and saw him carry out), (8) petitioner's participation in a violent attempted home invasion in which both the

---

[431] S.F. Trial, Volume 27, testimony of Christopher McElwee, at pp. 264-75.

[432] During the hearing on petitioner's motion for new trial, the State introduced State Exhibit nos. 17A through 17D, containing a list of Raynaldo Ray Villa's prior convictions. S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at p. 282.

home owner and petitioner's accomplice (Patrick Brook) were wounded, and (9) petitioner's participation in the burglary of a sporting goods store in which multiple weapons were taken (and many display cases needlessly smashed), including the .22 caliber semi-automatic handgun used to execute both Doyle Douglas and Samuel Petrey.  Furthermore, as correctly pointed out by the prosecution, the record before the petitioner's capital sentencing jury was bereft of any evidence showing the petitioner had ever *done* anything which could rationally be construed as signaling sincere contrition or genuine remorse for his murders of Douglas or Petrey.  Under such circumstances, there is not even a remote possibility, much less a reasonable probability, that the jury's answers to the Texas capital sentencing scheme's special issues would have been any different had petitioner's trial counsel called Villa to testify at either phase of trial.

c.    Conclusions

Petitioner procedurally defaulted on his first assertion of ineffective assistance by failing to fairly present that complaint to the Texas Court of Criminal Appeals, either in a point of error on direct appeal complaining about the trial court's denial of petitioner's motion for new trial or in an ineffective assistance claim fairly presented during any of petitioner's three state habeas corpus proceedings.  The petitioner cannot avail himself of the new rule announced by the United States Supreme Court in *Martinez v. Ryan, supra*, and *Trevino v. Thaler, supra*, because responsibility for petitioner's procedural default on this ineffective assistance complaint lies not with petitioner's state appellate counsel or with petitioner's first or second state habeas counsel.  Rather, the responsibility for petitioner's failure to exhaust state remedies on this ineffective assistance complaint lies with petitioner's

current federal habeas counsel - who failed to "fairly present" the state habeas court with this still-unexhausted claim during the course of petitioner's most recent state habeas corpus proceeding.

After three unsuccessful state habeas corpus proceedings, were petitioner now to attempt to return to state court and litigate the merits of his first assertion of ineffective assistance in his fourth claim herein, that effort would be precluded by the Texas writ-abuse statute. *See* Art. 11.071, §5(a), Tex. Code Crim. Proc. Ann. (Vernon Supp. 2011)(barring consideration on the merits of new claims contained in a subsequent state habeas corpus application unless either (1) the new claims could not have been presented in a previous application because the legal or factual basis for the new claims were unavailable at the time the previous application was filed, (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt, or (3) by clear and convincing evidence, but for a violation of the United States Constitution, no rational juror would have answered in the state's favor one or more of the capital sentencing special issues).  Absolutely nothing prevented petitioner from asserting this same ineffective assistance complaint in his direct appeal or any of his three state habeas corpus proceedings.  Petitioner was aware of the alleged factual and legal bases for this ineffective assistance claim at the time he filed his motion for new trial.  Likewise, petitioner alleges no facts in this Court and presented the state habeas court with no evidence which satisfied either of the final two exceptions to the Texas writ-abuse barrier erected by Section 5 of Article 11.071.  Because the complaint asserted by petitioner does not satisfy either prong of *Strickland* analysis, no constitutional violation resulted from the failure of

petitioner's trial counsel to call Villa to testify at petitioner's trial.  This conclusion renders inapplicable the last two exceptions to the Texas writ-abuse statute summarized above.

Moreover, even when given *de novo* review, petitioner's first assertion of ineffective assistance in his fourth claim herein fails to allege sufficient facts to satisfy either prong of *Strickland* analysis.  Thus, the failure of petitioner's state appellate and state habeas corpus counsel to present this meritless ineffective assistance complaint did not cause the performance of said counsel to fall below an objective level of reasonableness. *See Clark v. Thaler*, 673 F.3d 410, 429 (5th Cir.)("failure to assert a meritless objection cannot be grounds for a finding of deficient performance."), *cert. denied*, ___ U.S. ___, 133 S.Ct. 179, 184 L.Ed.2d 90 (2012); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009)(holding failure to raise a meritless objection  does not satisfy the deficient performance prong of *Strickland*), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1050, 178 L.Ed.2d 870 (2011); *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007)(failure to raise futile or meritless objections is not ineffective lawyering), *cert. denied*, 552 U.S. 1314 (2008); *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002)(holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied*, 538 U.S. 926 (2003); *Robison v. Johnson*, 151 F.3d 256, 261 (5th Cir. 1998)(nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible), *cert. denied*, 526 U.S. 1100 (1999); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997)(failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), *cert. denied*, 525 U.S. 969 (1998).  Because there was nothing objectively unreasonable (i.e., professionally deficient) with the

failure of petitioner's state appellate or state habeas counsel to fairly present petitioner's first assertion of ineffective assistance in his fourth claim herein to the state courts, the Supreme Court's recent rulings in *Martinez v. Ryan* and *Trevino v. Thaler* do not furnish a legal basis for overcoming the procedural default arising from petitioner's failure to exhaust available state remedies on his first assertion of ineffective assistance in his fourth claim herein.

Accordingly, this aspect of petitioner's multi-faceted fourth claim herein is procedurally defaulted, alternatively lacks arguable merit, and does not warrant federal habeas corpus relief.

D.   Failure to Object to Admission of TYC Records

1.   The Complaints

In his second and third assertions of ineffective assistance in his fourth claim herein, petitioner argues his trial counsel should have objected to the admission of petitioner's TYC records on the grounds (1) the records were illegally obtained, (2) the record contained hearsay, and (3) admission of the TYC records violated Confrontation Clause principles.[433]

2.   State Court Disposition

Petitioner presented his complaints about the failure of his trial counsel to object to the admission of his TYC records on hearsay grounds in his multi-faceted twelfth ground for relief contained in his first state habeas corpus application.[434]   The Texas Court of Criminal

---

[433] *Second Amended Petition*, at pp. 190-212; *Petitioner's Reply*, at pp. 76-87.

[434] First State Habeas Transcript, Volume 1, at pp. 85-90.

304

Appeals denied this claim on the merits. *Ex parte Clinton Lee Young*, WR 65,137-01, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

Petitioner presented his complaint about the failure of his trial counsel to object to the admission of his TYC records on the grounds they were illegally obtained as part of his multi-faceted fourth claim for relief in his third state habeas corpus application.[435]  The Texas Court of Criminal Appeals summarily dismissed petitioner's fourth claim in his third state habeas corpus application on writ-abuse grounds. *Ex parte Clinton Lee Young*, WR 65,137-03, 2009 WL 1546625, *1 (Tex. Crim. App. June 3, 2009).

Contrary to the allegations in petitioner's pleadings herein, at no point has petitioner ever "fairly presented" his complaint about the failure of his trial counsel to object to the admission of petitioner's TYC records on Confrontation Clause grounds to the Texas Court of Criminal Appeals.[436]

### 3.   Procedural Defaults

---

[435] Third State Habeas Transcript, Volume 1 of 10, at pp. 134-51.

[436] Petitioner's allegation in his Second Amended Petition herein (at p. 182) that he presented the entirety of his second assertion of ineffective assistance contained in his fourth claim hereon to the state courts in his twelfth claim in his original state habeas corpus application is factually erroneous. The only complaint about his trial counsel's failure to object to the admission of his TYC records fairly presented as an ineffective assistance claim in petitioner's first state habeas corpus application focused exclusively on an omitted hearsay objection. First State Habeas Transcript, at pp. 85-90.  There was no mention, allusion, or reference in that state pleading to any additional grounds for objection to petitioner's TYC records. *Id.*  Petitioner's third state habeas application complained exclusively about the failure of petitioner's trial counsel to object to the admission of petitioner's TYC records on the grounds the records in question had been obtained illegally by state prosecutors in a manner which violated petitioner's Fourth Amendment right to privacy. Third States Habeas Transcript, at pp. 134-51.

Petitioner procedurally defaulted on his complaint about the failure of his trial counsel to object to the admission of his TYC records on the ground those records had been illegally obtained in violation of petitioner's Fourth Amendment rights.  The Texas Court of Criminal Appeals dismissed this complaint pursuant to the Texas writ-abuse statute in the course of petitioner's third state habeas corpus proceeding.  Such a dismissal constitutes an adequate and independent barrier to federal habeas review of this complaint. *Hughes v. Quarterman*, 530 F.3d at 342; *Aguilar v. Dretke*, 428 F.3d at 533.  As explained hereinafter, petitioner's second assertion of ineffective assistance in his fourth claim herein fails to satisfy either prong of *Strickland.*  Thus, the failure of petitioner's state habeas counsel to fairly present this same complaint to the state habeas courts did not cause the performance of said state habeas counsel to dip below an objective level of reasonableness.  Petitioner cannot, therefore, satisfy the cause and actual prejudice exception to the procedural default doctrine. Nor, as explained below, can petitioner satisfy the fundamental miscarriage of justice exception thereto.

For the reasons similar to those discussed at length in Section XV.C.2. above, petitioner procedurally defaulted on his unexhausted complaint about his trial counsel's failure to object to the admission of petitioner's TYC records on Confrontation Clause grounds by failing to fairly present same to the state courts in any of petitioner's state habeas corpus proceeding. *See Trottie v. Stephens*, 720 F.3d at 239-40 (federal habeas petitioner procedurally defaulted on unexhausted claims where factual allegations underlying the claims had not been presented to the state courts); *Johnson v. Cain*, 712 F.3d at 234 (petitioner procedurally defaulted on ineffective assistance complaint by failing to fairly present same to

the state courts); *Scott v. Hubert*, 635 F.3d at 667 (holding the exhaustion requirement has both a legal and a factual component which require a federal habeas petitioner to present his claims to the state court (1) within the same federal constitutional framework as he presents them to the federal habeas court and (2) with the same material evidentiary support upon which he relies in the federal habeas court). Petitioner did fairly present his complaint about his trial counsel's failure to object to the admission of petitioner's TYC records on hearsay grounds in his initial state habeas corpus application but did not include in his first state habeas corpus application any hint, suggestion, or clue that petitioner was also attempting to argue his trial counsel should also have raised a Confrontation Clause objection to petitioner's TYC records. Petitioner thereby procedurally defaulted on that complaint. For the reasons discussed hereinafter, petitioner cannot satisfy any of the recognized exceptions to the procedural default doctrine with regard to this same complaint.

    4.    <u>AEDPA Analysis of Exhausted Complaint</u>

As explained above, during petitioner's first state habeas corpus proceeding the Texas Court of Criminal Appeals rejected on the merits petitioner's complaint that his trial counsel rendered ineffective assistance by failing to object to the admission of petitioner's TYC records on hearsay grounds.

    a.    <u>No Deficient Performance</u>

During petitioner's first state habeas corpus proceeding, petitioner co-counsel at trial testified without contradiction (1) petitioner's defense team had access to petitioner's TYC records eight-to-ten months prior to trial and reviewed same, (2) petitioner's TYC records

307

were properly authenticated as business records under Texas law, (3) much of the information contained therein was double-edged in nature, i.e., it was both potentially helpful and harmful, (4) the defense made a strategic decision not to oppose admission of petitioner's TYC records because the defense wished to avoid the potential harm that could result from having a large number of TYC employees testify to wrongdoing by petitioner that was not recorded in the petitioner's TYC records, (5) defense expert Dr. Milam was able to contrast the relatively minor conduct actually recorded in petitioner's TYC records with the more ominous-sounding charges listed therein against petitioner, (6) admission of petitioner's TYC records supported the defense's strategy of showing mitigating evidence of a correlation between petitioner's improved behavior and petitioner's psychiatrist finding the proper mixture of psychotropic medications, and (7) petitioner's TYC records furnished mitigating evidence showing petitioner suffered from ADHD.[437]  Petitioner's lead trial counsel testified during the petitioner's first state habeas corpus proceeding (1) he feared that objecting to the admission of petitioner's TYC records would make the defense look bad in front of the jury because the records were going to be admitted, (2) when the defense review petitioner's TYC record, they found helpful information therein, (3) careful examination of the record revealed they overstated the seriousness of many of the infractions with which petitioner had been charged (e.g., one "assault" with which petitioner was charged had actually been an instance of petitioner shooting a rubber band at another youth), (4) the linchpin of the defense's punishment phase trial strategy was to show that, despite petitioner's problems at the TYC,

---

[437] S.F. First State Habeas Hearing, Volume 2, testimony of Rodion Cantacuzene, at pp. 212-17; Volume 3, testimony of Rodion Cantacuzene, at pp. 21-27.

once the proper identity and dosage of petitioner's medications was ascertained, petitioner's disciplinary problems took a precipitous drop, (5) that punishment phase strategy was fully supported by admission of petitioner's TYC records, (6) the defense's investigation revealed that some of the full TYC incident reports had been destroyed and all that were left were summaries of those reports, and (7) petitioner's TYC records supported the testimony of defense's expert from Harvard (Dr. Greene) that petitioner had been improperly medicated for most of his life and, once properly medicated, petitioner's hyperactivity and violent conduct disappeared.[438]

Petitioner furnished the state habeas court with no testimony or other evidence showing there was any information available to petitioner's trial counsel at or prior to petitioner's trial which rendered any of the foregoing strategic decisions made by said counsel objectively unreasonable.  On the contrary, this Court's independent review of the record from petitioner's trial fully supports the state habeas court's implicit finding of objective reasonableness in petitioner's trial counsel's strategic decision not to oppose admission of petitioner's TYC records.

Other than the teenage victim of petitioner's attempted sexual assault, the two witnesses who likely did the most harm to petitioner during the punishment phase of trial were a pair of former TYC employees, Garrett Gilliam and Jacqueline Timmons, both of whom testified about multiple incidents in which petitioner instigated or participated in violent altercations with other youth and with TYC staff.[439]  Petitioner's trial counsel

---

[438] S.F. First State Habeas Hearing, Volume 3, testimony of Paul Williams, at pp. 73-80.

[439] *See* note 90, *supra,*

attempted to cross-examine both of these witnesses using petitioner's TYC records and to show thereby that much of their testimony on direct examination was not directly supported by petitioner's TYC records.  Both of these witnesses furnished substantially more bad evidence as live witnesses against petitioner than was present in the petitioner's TYC records; thus proving objectively reasonable defense attorney Cantacuzene's explanation that the defense wished to avoid a parade of live witnesses who would furnish additional bad facts against petitioner that were not included in the often summary incident reports contained in petitioner's TYC file.

Furthermore, petitioner's mental health expert witnesses relied extensively on the contents of petitioner's TYC records in reaching their conclusions that (1) petitioner had been improperly medicated during most of his life and (2) once properly medicated, petitioner's behavior became considerable calmer; all three of petitioner's primary mental health experts, Dr. Daneen Milam, Dr. Roy Mathew, and Dr. Ross Greene, testified extensively about the psychotropic medications petitioner received while prior to and during petitioner's stay in the TYC, as well as about the petitioner's history of childhood abuse and dysfunctional family reflected in petitioner's voluminous TYC records.[440] The conclusions of both of petitioner's trial counsel that petitioner's TYC records contained considerable potentially mitigating evidence was both factually accurate and objectively reasonable.

Finally, petitioner has identified only a few instances in which petitioner's TYC records contained identifiable hearsay information subject to exclusion in the event a timely

---

[440] *See* notes 101-04, 111, 261-63, *supra*, and accompanying text.

hearsay objection had been made to the punishment phase admission of the petitioner's voluminous TYC records.  Given that (1) the contents of the petitioner's TYC records furnished the bulk of the documentary support for the opinion testimony of petitioner's mental health experts, (2) the records contained a wealth of potentially mitigating evidence concerning petitioner's disadvantaged background, dysfunctional family, and childhood history of abuse and neglect, and (3) the defense team had an objectively reasonable plan to neutralize many of the harshest aspects of petitioner's TYC records (i.e., the testimony of Dr. Milam comparing the charges against petitioner with the record of petitioner's actual conduct), this Court independently concludes the failure of petitioner's trial counsel to object on hearsay grounds to the admission of petitioner's TYC records did not cause the failure of performance of petitioner's trial counsel to fall below an objective level of reasonableness. Petitioner's trial counsel had valid, objectively reasonable, strategic reasons for choosing not to object to the admission of petitioner's TYC records.  The trial testimony of former TYC employees Gilliam and Timmons amply demonstrates the wisdom of petitioner's trial counsel's strategic decision; both of those witnesses furnished more "bad acts" evidence against petitioner than had been included in the dry TYC records of those same incidents.

      b.    <u>No Prejudice</u>

     As correctly pointed out by petitioner's trial counsel in their testimony during petitioner's first state habeas corpus proceeding, petitioner's TYC records had been properly authenticated under applicable Texas law and most were, in all reasonable likelihood, going to be admitted in at least some form.  While petitioner has identified a few instances of alleged hearsay information contained with his voluminous TYC records, there is no

reasonable probability that, but for the failure of petitioner's trial counsel to seek exclusion of the hearsay *portion* of petitioner's TYC records, the outcome of the punishment phase of petitioner's capital murder trial would have been different. Petitioner has alleged no facts, much less furnished any evidence, and identified no legal authority showing his TYC records could have been excluded *in their entirety* by a timely hearsay objection.

Furthermore, there were considerable benefits to be gained by the defense from the admission of petitioner's TYC records. Those records furnished considerable corroboration for the testimony of many of petitioner's punishment phase fact witnesses who described petitioner's abused, neglected, childhood, dysfunctional family, and long-term drug and alcohol use. The same records furnished the bases for much of the expert opinion testimony of petitioner's mental health professionals about petitioner's history of ADHD and the repeated failure of state officials to properly medicate petitioner throughout his childhood (until the final months of petitioner's stay in the TYC).

Finally, petitioner's trial counsel presented petitioner's jury with as comprehensive a punishment phase defense as appears to have been reasonably available at the time of petitioner's trial. Eighteen facts witnesses and a quartet of mental health experts testified extensively about petitioner's history of childhood abuse and neglect, petitioner's good character traits, petitioner's history of drug and alcohol abuse, petitioner's highly dysfunctional family, the inability of treating physicians and state officials to properly medicate petitioner (until very late in petitioner's youth), and petitioner's significant

behavioral problems growing up that were caused by his ADD/ADHD.[441]  Petitioner's trial

counsel also elicited considerable potentially mitigating evidence during their cross-

examination of the prosecution's fact and expert witnesses.[442]

The problems facing petitioner's defense team at the punishment phase of trial were

that (1) the jury had already found petitioner guilty beyond a reasonable doubt under two

separate theories of capital murder, one of which necessarily compelled a factual

determination that petitioner was criminally responsible for two separate murders, (2) the

prosecution's punishment phase evidence established (a) petitioner's long history and

demonstrated propensity for violence when not properly medicated, (b) petitioner's history of

alcohol and drug abuse, (c) petitioner's failure to continue with his prescription medications

and decision to self-medicate with methamphetamine following his release from the TYC, (d)

petitioner's long-term fascination with guns, (e) petitioner's physically abused and neglected

childhood, (f) the lack of stability within petitioner's family throughout his childhood, and (g)

the petitioner's commission of numerous criminal, violent, acts in the relatively brief time

since his release from the TYC, and (3) the absence of any evidence in the record indicating

---

[441] See notes 93-106, 110-11, *supra,* and accompanying text.

[442] See S.F. Trial, Volume 31, testimony of Richard McMullen, at pp. 45-100 (testimony on cross-examination regarding petitioner's difficult childhood and dysfunctional family life); Volume 31, testimony of Debbie Barton, at pp. 106-18 (testimony on cross-examination regarding petitioner's dysfunctional family and the failure of petitioner's motion to properly administer petitioner's prescription medications); Volume 31, testimony of Don Walker, at pp. 127-53 (testimony on cross-examination that petitioner displayed classic symptoms of ADD/ADHD as a child, suffered emotionally as a result of his parents' divorce, and displayed the expected behavior of a person whose ADD/ADHD had not been successfully treated); Volume 31, testimony of Deborah Clem, at pp. 223-55 (testimony on cross-examination regarding alcohol abuse by petitioner's step-father, the absence of any positive male roles models in petitioner's life, petitioner's father's drug and alcohol abuse, and petitioner's serious drug abuse by age thirteen); Volume 32, testimony of Helen Short, at pp. 89-171 (testimony on cross-examination regarding petitioner's non-responsiveness to stimulant medications prescribed to address petitioner's ADHD, failure of officials to furnish petitioner with chemical dependency treatment, petitioner's dysfunctional family, and petitioner's positive response to medication during the latter stages of his stay in TYC).

313

petitioner had ever *done* anything to suggest his sincere contrition or genuine remorse over the deaths of Doyle Douglas or Samuel Petrey.

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U.S. at 20, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes*, 558 U.S. at 27, 130 S.Ct. at 390-91.

Given the foregoing, this Court independently concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to object to (and gain the exclusion of) the hearsay portion of petitioner's TYC records (State Exhibit no. 147), the outcome of the punishment phase of petitioner's capital murder trial would have been different.

c.   <u>Conclusions</u>

This Court independently concludes petitioner's ineffective assistance complaint about the failure of his trial counsel to object on hearsay grounds to the admission of petitioner's TYC records (State Exhibit no. 147) satisfies neither prong of *Strickland* analysis. Therefore, the Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's first state habeas corpus proceeding of petitioner's complaint about the

314

failure of his trial counsel to object on hearsay grounds to the admission of petitioner's TYC records (State Exhibit no. 147) was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceeding.  The state habeas court's ruling was an eminently reasonable application of the well-settled *Strickland* standard.  Petitioner's ineffective assistance complaint arising from the failure of his trial counsel to object on hearsay grounds to the punishment-phase admission of petitioner's TYC records (part of petitioner's third assertion of ineffective assistance in his fourth claim herein) does not warrant federal habeas corpus relief.

     5.      <u>Alternatively, No Merit on *De Novo* Review of Procedurally Defaulted Complaints</u>

      Reviewed *de novo*, petitioner's complaints about his trial counsel's failure to object to the admission of petitioner's TYC records on the grounds their admission violated petitioner's Fourth Amendment privacy rights and Sixth Amendment Confrontation Clause rights also do not satisfy either prong of *Strickland* analysis.

      a.     <u>No Deficient Performance</u>

      As was explained at length in Section XV.D.4.a. above, there were very compelling, objectively reasonable, strategic reasons why petitioner's trial counsel believed it was in the petitioner's best interests not to raise objections to the admission of petitioner's voluminous TYC records.  More specifically, petitioner's trial counsel reasonably believed the TYC records contained substantial mitigating evidence and the aggravating aspects of those

records could be mitigated at trial through Dr. Milam's expert testimony identifying the relatively minor nature of the petitioner's misconduct recorded therein.  Petitioner's trial counsel also reasonably believed the petitioner would benefit from confronting the summary accounts of misconduct contained in petitioner's dry TYC records rather than facing a parade of live witnesses who, like prosecution witnesses Gilliam and Timmons, possessed the potential risk of furnishing the jury with additional bad acts testimony beyond the summary facts contained in petitioner's TYC records of what appeared to petitioner's trial counsel and defense expert Dr. Milam to be relatively minor incidents of misconduct.

Furthermore, petitioner does not identify any legal authority in existence at the time of petitioner's 2003 capital murder trial to which petitioner's trial counsel could have cited in support of a motion to exclude petitioner's TYC records upon either Confrontation Clause or Fourth Amendment grounds.

Petitioner's trial counsel cannot be faulted reasonably for failing to urge a Confrontation Clause objection to the admission of petitioner's TYC records premised upon the Supreme Court's rationale in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), as urged by petitioner herein.[443]  That decision was handed down subsequent to the conclusion of petitioner's 2003 capital murder trial.  Petitioner's trial counsel cannot reasonably be faulted for failing to anticipate the sea-change in Confrontation Clause jurisprudence resulting from that opinion. *See United States v. Fields*, 565 F.3d 290,

---

[443] *Second Amended Petition*, at p. 211.

295 (5th Cir.)(clairvoyance is not a required attribute of effective representation), *cert.*

*denied*, 558 U.S. 914 (2009).

Likewise, petitioner's arguments suggesting petitioner's TYC records had been

obtained by prosecutors in a manner which contravened petitioner's right to privacy are

unsupported by citation to any legal authority in existence at the time of petitioner's 2003

trial specifically declaring any records similar to petitioner's TYC records to be inadmissible

at the punishment phase of a Texas capital murder trial based upon the Fourth Amendment or

other constitutional notions of personal privacy. As respondent correctly points out, since the

effective date of Rule 509 of the Texas Rules of Criminal Evidence, there has been no

physician-patient privilege in Texas criminal proceedings. *State v. Hardy*, 963 S.W.2d 516,

519 (Tex. Crim. App. 1997); *Richardson v. State*, 865 S.W.2d 944, 953 n.7 (Tex. Crim. App.

1993). Thus petitioner possessed no reasonable expectation of privacy with regard to any

communications he may have had with TYC personnel during his stay in the TYC, whether

those conversations were made for the purpose of obtaining medical care or otherwise; nor

did petitioner possess a reasonable expectation of privacy with regard to the information

contained in any documents created by the TYC personnel with whom petitioner came into

contact during his stay in the TYC based upon their observations of petitioner's behavior.

*Hudson v. Palmer.* 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 92 L.Ed.2d 392

(1984)("[S]ociety is not prepared to recognize as legitimate any subjective expectation of

privacy that a prisoner might have in his prison cell...").

Petitioner's trial counsel were not required by the Sixth Amendment to assert

groundless or meritless objections to the admission of petitioner's TYC records based upon

either the Fourth Amendment or the Sixth Amendment's Confrontation Clause. *See Clark v. Thaler*, 673 F.3d at 429 (holding failure to assert a meritless objection cannot be grounds for a finding of deficient performance); *Paredes v. Quarterman*, 574 F.3d at 291 (holding failure to raise a meritless objection  does not satisfy the deficient performance prong of *Strickland*); *Wood v. Quarterman*, 503 F.3d at 413 (failure to raise futile or meritless objections is not ineffective lawyering).

Given the objectively reasonable reasons petitioner's trial counsel possessed for not objecting to the admission of petitioner's TYC records *on any grounds*, the failure of petitioner's trial counsel to raise Fourth Amendment privacy or Sixth Amendment Confrontation Clause objections at the punishment phase of trial to the admission of petitioner's TYC records did not cause the performance of said counsel to fall below an objective level of reasonableness.

   b.  <u>No Prejudice</u>

Even if petitioner's trial counsel had somehow succeeded in excluding petitioner's TYC records, it is reasonably likely that maneuver would have resulted in even more former TYC personnel like prosecution witnesses Gilliam and Timmons testifying in person about incidents of violence or misconduct by petitioner they personally witnessed, with the accompanying possibility their trial testimony would include even more "bad acts" evidence than were included in petitioner's TYC records.

There is no reasonable probability that exclusion of the petitioner's TYC records in the manner urged by petitioner herein would have altered the outcome of the punishment

phase of petitioner's capital murder trial. Since petitioner's mental health experts expressly relied upon those records in formulating their opinions, the petitioner's mental health experts would have been subject to cross-examination by the prosecution in such a manner as to lay out the worst features of petitioner's history contained in petitioner's TYC records. Moreover, as correctly argued by respondent, most of the factual information contained in petitioner's TYC records was introduced by either the prosecution's experts or by petitioner's experts, such as Dr. Milam's detailed testimony chronicling petitioner's childhood problems with ADHD and the juvenile justice system.

For the same reasons set forth at length in Section XV.D.4.b. above, given the other evidence then before petitioner's capital sentencing jury, there is no reasonable probability that, but for the failure of petitioner's trial counsel to object to the admission of petitioner's TYC records on either Fourth Amendment privacy or Sixth Amendment Confrontation Clause grounds, the outcome of the punishment phase of petitioner's capital murder trial would have been different.

c.      Conclusions

This Court independently concludes after a *de novo* review that petitioner has failed to allege any specific facts in support of his procedurally defaulted complaints about his trial court's failure to object on Fourth Amendment privacy grounds or Sixth Amendment Confrontation Cause grounds to the admission of petitioner's TYC records to satisfy either prong of *Strickland* analysis. Petitioner's second and third assertions of ineffective assistance in his fourth claim herein do not warrant federal habeas corpus relief.

319

E.   **Failure to Present Ballistics Evidence to Show Someone Other Than Petitioner Shot Doyle Douglas**

1.   **The Complaint**

In his fourth assertion of ineffective assistance contained in his fourth claim for relief herein, petitioner argues his trial counsel should have (1) introduced the ballistics report of prosecution witness Tim Counce, (2) retained the services of an independent ballistics expert and introduced testimony (such as that contained in the affidavit of Richard Ernest attached as Exhibit 95 to petitioner's Second Amended Petition herein), and (3) argued therefrom that this ballistics evidence, in conjunction with the evidence from Doyle Douglas' autopsy and the trial testimony regarding the relative positions of the three accomplices, established that someone other than petitioner actually shot Douglas.[444]

2.   **State Court Disposition**

In his twelfth claim for relief in his first state habeas corpus application, petitioner argued as follows:

> Applicant further believes that trial counsel were in possession of ballistics reports which demonstrate that the gun to which accomplice witnesses testified he was in possession of [sic] did not shoot Doyle Douglas twice in the head as indicated by the testimony at trial. According to these

---

[444] *Second Amended Petition*, at pp. 212-19; *Petitioner's Reply*, at pp. 87-104.

The declaration of Richard Ernest, along with Mr. Ernest's CV, is marked as Exhibit 95 to petitioner's Second Amended Petition, appears at pp. 988-1001, in docket entry no. 89-3.

Prosecution witness Tim Counce's three-page ballistics report dated November 20, 2002 was not admitted into evidence during petitioner's trial but was admitted into evidence during the evidentiary hearing held in petitioner's first state habeas corpus proceeding as Defendant's Exhibit W-5 and is found in S.F. First State Habeas Hearing, Volume 7 of 7.

reports, Mark Ray was in possession of the gun which caused the injury to the right side of Douglas' head.[445]

The Texas Court of Criminal Appeals rejected this complaint on the merits in the course of petitioner's first state habeas corpus proceeding. *Ex parte Clinton Lee Young*, WR 65,137-01, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

In March, 2006, petitioner submitted a number of pro se claims to the state trial court, including specific complaints that petitioner's trial counsel had rendered ineffective assistance by failing to introduce Tim Counce's ballistics report, the autopsy report, and other unspecified evidence which showed David Page was the person who shot Douglas twice in the head.[446] The Texas Court of Criminal Appeals construed these complaints as a subsequent state habeas corpus application and dismissed same pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-02, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

In the omnibus fourth claim contained in his second subsequent (third) state habeas corpus application, petitioner argued (1) *once again* that his trial counsel rendered ineffective assistance by failing to (a) introduce the ballistics report of Tim Counce, (b) introduce the expert opinion testimony of Richard Ernest, and (c) argue that, based upon the foregoing and the autopsy results, Mark Ray and David Page shot Douglas, and (2) *for the first time* that his trial counsel rendered ineffective assistance by failing to introduce the expert opinion testimony of Richard Ernest and argue this evidence, along with the autopsy results and other

---

[445] First State Habeas Transcript, Volume 1, at p. 91.

[446] First State Habeas Transcript, Volume 5, at pp. 759, 761-62.

trial evidence, showed that Page shot Samuel Petrey.[447]  The Texas Court of Criminal

summarily dismissed these ineffective assistance claims pursuant to the Texas writ-abuse

statute. *Ex parte Clinton Lee Young*, WR 65,137-03, 2009 WL 1546625, *1 (Tex. Crim. App.

June 3, 2009).

### 3.    Procedural Default

By failing to raise his complaints that his trial counsel rendered ineffective assistance

by (1) failing to (a) introduce the ballistics report of Tim Counce, (b) introduce the expert

opinion testimony of Richard Ernest, and (c) argue  that, based upon the foregoing and the

autopsy results, Mark Ray and David Page shot Douglas, and (2) failing to  introduce the

expert opinion testimony of Richard Ernest and argue this evidence, along with the autopsy

results and other trial evidence, showed that Page shot Samuel Petrey, petitioner procedurally

defaulted on those complaints.  The Texas Court of Criminal Appeals dismissed those

complaints based upon the Texas writ-abuse statute in the course of petitioner's second and

third state habeas corpus proceedings.  Those dismissals constitute independent and adequate

barriers to this Court's federal habeas review of these ineffective assistance complaints.

*Hughes v. Quarterman*, 530 F.3d at 342; *Aguilar v. Dretke*, 428 F.3d at 533.

For the reasons discussed hereinafter, these complaints also possess no merit and,

therefore, petitioner can satisfy neither the "cause and actual prejudice" nor the "fundamental

miscarriage of justice" exceptions to the procedural default doctrine.  Likewise, because the

failure of petitioner's first state habeas counsel to present these same arguments in the course

---

[447] Third States Habeas Transcript, Volume 1 of 10, at pp. 152-58, 161-67.

of petitioner's initial state habeas corpus proceeding did not cause the performance of said counsel to fall below an objective level of reasonableness, the Supreme Court's recent holdings in Martinez v. Ryan *and Trevino v. Thaler* afford petitioner no relief from his procedural default.

Finally, insofar as petitioner's reply brief asserts wholly new factual and legal theories in support of this claim that were never presented to the state courts in any of petitioner's state habeas corpus proceedings,[448] those new factual allegations and legal theories are currently unexhausted and procedurally defaulted. *Trottie v. Stephens*, 720 F.3d at 239-40; *Johnson v. Cain*, 712 F.3d at 234; *Scott v. Hubert*, 635 F.3d at 667.

4.   AEDPA Review of Exhausted Portion of Complaint

As explained above, in the course of petitioner's first state habeas corpus proceeding, the Texas Court of Criminal Appeals rejected on the merits petitioner's arguments that his trial counsel should have (1) introduced the ballistics report of prosecution witness Tim Counce and other ballistic reports and (2) argued based thereon, the autopsy evidence, and other trial testimony, that the gun in the possession of Mark Ray "caused the injury to the right side of Doyle Douglas' head."

Insofar as petitioner presents this Court with the declaration of Richard Ernest and other new documents not previously presented to the state court during petitioner's first state habeas corpus proceeding, this Court is precluded from considering those documents and any

---

[448] Petitioner's Reply Brief contains a variety of new complaints about the performance of petitioner's trial counsel during the guilt-innocence phase of petitioner's trial, including assertions petitioner's trial counsel should have presented evidence from Ernest showing the physical dimensions inside Douglas vehicle made it impossible for petitioner to have fired the shots which struck the back and left of Douglas' head. *Petitioner's Reply*, at pp. 87-104.

other new evidence under the AEDPA's narrow standard of review. *See Cullen v. Pinholster*,

___ U.S. ___, ___, 131 S.Ct. 1388, 1401, 179 L.Ed.2d 557 (2011)(holding a federal habeas

petitioner is not entitled to present new evidence supporting a claim in federal court when the

state court has ruled on the merits of the underlying claim).

      a.      <u>No Deficient Performance</u>

      The initial analytical problem with this complaint is that petitioner never presented

any evidence to the state habeas court showing any ballistics reports (other that of Tim

Counce) were in existence at the time of petitioner's trial.  Petitioner also failed to allege any

specific facts or present any evidence in his first state habeas corpus proceeding showing that

Tim Counce's ballistics report or any other ballistics report available at the time of

petitioner's trial identified precisely who had previously had possession of which of the guns

that were submitted to the Texas Department of Public Safety's crime lab for examination

and testing.  It was undisputed at trial that the .22 caliber semi-automatic pistol found in

petitioner's possession at the time of his arrest (after a high speed chase) fired both of the

spent shell casings found inside Douglas' abandoned vehicle and both of the spent shell

casings found at the location where Petrey's body was discovered.[449]  Counce's ballistics

report states, in pertinent part and fully consistently with his trial testimony, that he was

unable to rule out the possibility (1) two of the projectiles sent to the lab from Harrison

County may have been fired from the weapon identified at trial as State Exhibit no. 3 (the .22

semiautomatic handgun in petitioner's possession at the time of his arrest) and (2) a third

---

[449] S.F. Trial, Volume 25, testimony of Tim Counce, at pp. 156-59.

projectile sent to the lab from Harrison County may have been fired by the weapon later

identified at trial as State Exhibit no. 5 (a .22 caliber revolver).  Counce's report does not

purport to identify any of the projectiles recovered during Douglas' autopsy as having

actually been fired by any identified weapon.  This is hardly surprising since Douglas'

autopsy report (State Exhibit no. 99 at trial) describes each of the projectiles removed from

Douglas' cranium during autopsy as "markedly deformed."[450]  Thus, Counce's report, like

Counce's trial testimony, was fully consistent with the prosecution's theory at trial, i.e., that

petitioner was shot twice in the head with State Exhibit no. 3 (petitioner's weapon) and once

with the .22 revolver petitioner handed to Mark Ray at the creek.

    Even when viewed in conjunction with Douglas' autopsy report, Counce's report (the

only documentary evidence admitted in support of this aspect of petitioner's ineffective

assistance claim in petitioner's first state habeas corpus proceeding) fails to establish that

petitioner did *not* shoot Douglas in the manner to which the three eyewitness testified at trial,

i.e., it is not truly exculpatory.  First, it was undisputed at trial that Ray shot Douglas in the

head after the group rolled Douglas' body into the shallow creek where it was subsequently

discovered with Douglas' head completely covered by a pillow.[451]  While there was

---

[450] Douglas' autopsy report appears among the trial exhibits found in S.F. Trial, Volume 42.

[451] Darnell McCoy testified petitioner forced Ray to shoot Douglas one time after the group rolled Douglas'
body into the creek. S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 129-31, 208-09.  McCoy identified th
weapon petitioner gave to Ray and which Ray used to shoot Douglas at the creek as a black revolver. *Id.*, at p. 208.
    Mark Ray testified petitioner directed the others to roll Douglas' body until it was face down in the creek and
then retrieved a pillow from Douglas' vehicle and directed Ray at gun point to shoot Douglas once in the head through
the pillow with a gun petitioner handed to Ray and then took away from Ray as soon as Ray fired the one shot into the
pillow. S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 118-29, 220, 228.  Ray described the handgun petitioner
handed to Ray and which Ray used to shoot Douglas as a revolver. *Id.*, at pp. 124-25.
    David Page testified Ray shot Douglas at the creek with a .22 caliber handgun petitioner gave to Ray after they
rolled Douglas into the creek and that Ray appeared reluctant to do so. S.F. Trial, Volume 26, testimony of David Lee
Page, Jr., at pp. 176-79; Volume 27, testimony of David Lee Page, Jr., at pp. 65, 139-40, 143-46.

conflicting testimony at trial between Mark Ray, David Page, and Darnell McCoy regarding

which guns petitioner allegedly gave to McCoy and Ray prior to their meeting with Patrick

Brook in a motel room,[452] all three eyewitnesses were consistent in their trial testimony that

petitioner used a semi-automatic pistol to shoot Doyle Douglas in the head while all five men

were in Longview on the night in question.[453]  Mark Ray's trial testimony that he

subsequently shot Douglas in the head with a *revolver* (at petitioner's direction) after the

group had rolled Douglas into a shallow creek was not controverted by any other trial witness

or any forensic evidence.  More importantly, *there was no evidence introduced at trial*

---

[452] McCoy testified (1) denied he had a gun when the group visited Patrick Brook in Brook's motel room, (2) Ray was given the .38 Special by petitioner when they arrived at Brook's motel, (3) petitioner handed McCoy the .38 Special at the creek and directed McCoy to shoot Douglas but McCoy refused to do so, (4) petitioner and Page had .22 caliber handguns when the group was at the creek,  (5) on the drive away from the creek, petitioner took back all the handguns. S.F. Trial, Volume 21, testimony of Darnell McCoy, at pp. 124-25, 185-87, 209.

    Ray testified that, other than the brief period at the creek when petitioner handed Ray a revolver, Ray shot Douglas, and petitioner grabbed the revolver back from Ray, he did not have possession of any handgun the night in question. S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 123-25, 172, 178, 183, 185, 211, 250. Ray identified State Exhibit no. 5, a .22 caliber revolver with a broken handle, as the gun petitioner handed to Ray which Ray used to shoot Douglas at the creek. *Id.*, at pp. 250-51.

    Page testified in part (1) when the group arrived after Douglas' shooting at the motel where Patrick Brook was staying, petitioner handed McCoy a .38 Special and gave Ray a .22 caliber revolver before the three men entered Brook's motel room, (2) after the group dumped Douglas' body they drove back to Ore City and petitioner directed Ray and McCoy to give petitioner back the two guns the petitioner had previously given to them, and (3) both McCoy and Ray later gave petitioner back the guns petitioner had given to them. S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 167-69, 175-76, 181-83. Page denied that he ever had a gun. S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at p. 174; Volume 27, testimony of David Lee Page, Jr., at p. 185. Page also specifically denied that he shot Douglas or Petrey. S.F. Trial, Volume 27, testimony of David Lee Page, Jr., at p. 221.

[453] McCoy identified the handgun petitioner used to shoot Douglas as a long barrel .22 with a long clip on it. S.F. trial, Volume 21, testimony of Darnell McCoy, at pp. 113, 182.

    Ray identified State Exhibit no. 3, the .22 caliber semi-automatic pistol found in petitioner's possession at the time of petitioner's arrest, as the weapon petitioner used to shoot Douglas. S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 167, 250.

    Page testified (1) petitioner had State Exhibit no. 3 (the semi-automatic .22 caliber pistil), State Exhibit no. 5 (a .22 caliber revolver), and a .38 Special with him on the night of Douglas' murder, (2) petitioner kept the .22 semi-automatic with him at all times that night, (3) petitioner returned the .22 revolver and .38 Special to Dano Young following Douglas' murder, and (4) petitioner kept the .22 semi-automatic with him on their trip to Midland, (5) petitioner used the .22 semi-automatic to shoot both Douglas and Petrey. S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 141-43, 165, 168-68, 188, 214; Volume 27, testimony of David Lee Page, Jr., at pp. 76-77, 175-76.

*showing any person in or near Douglas' vehicle other than petitioner had possession of a firearm at the time Doyle Douglas was initially shot inside Douglas' parked vehicle in Longview.* Finally, while all three eyewitnesses testified or gave statements to law enforcement officers suggesting that both petitioner and Ray shot Douglas "in the back of the head," they all admitted during their trial testimony they could not identify with specificity the precise locations in Douglas' head into which either petitioner or Ray had fired.[454]

Contrary to the implications underlying this complaint (as well as petitioner's related unexhausted complaints regarding ballistics evidence), neither Douglas' autopsy report nor the trial testimony of the medical examiner who performed Douglas' autopsy specifically identified any of the three bullets she retrieved during Douglas' autopsy with any of the three gunshot entrance wounds she identified *except* for State Exhibit no. 9, which she testified was associated with gunshot wound number 1, i.e., the wound in the middle of the back of

---

[454] McCoy testified (1) petitioner shot Douglas in the head while Douglas was looking toward Douglas' left at David Page, who was getting back into the car seat directly behind Douglas, (2) he heard but did not see the shots fired into Douglas, (3) he could not tell precisely where in the head Ray shot Douglas at the creek because there was a pillow over Douglas head at the time, but (4) he believed it was the back of the head based upon the fact Douglas was face down in the creek at the time Ray fired that shot. S.F. trial, Volume 21, testimony of Darnell McCoy, at pp. 106-07, 109, 171-73, 164-65, 200-01.

Ray testified (1) Douglas was seated in the driver's seat looking toward the open car door to his left when the shots were fired by petitioner, (2) petitioner put the gun close to Douglas' head (sox to eight inches) and said "Doyle, I need your car," just before firing twice, (3) Douglas did not have time to react to petitioner's words or turn his head before petitioner fired the shots, (4) at the creek, petitioner handed Ray the .22 revolver and directed petitioner to kneel down in the creek and shoot Douglas through the pillow, (5) Ray put the pillow over Douglas' head, closed his eyes, and fired the shot with his right hand, and (6) petitioner then grabbed the gun back from Ray and yelled at Ray to get up. S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 84-85, 87-89, 91-92, 121-29, 164-67, 178, 199, 201, 250-51.

Page testified (1) Douglas was leaning forward, pulling his driver's seat up, and looking to his left when petitioner shot Douglas, (2) Page did not see the actual gunshots but when he looked after hearing the shots, petitioner's gun was about a foot to eighteen inches from Douglas' head, (3) at the creek, Ray put the pillow over Douglas' head, kind of shied away a little, and then fired a shot into Douglas, (4) while he was certain petitioner shot Douglas in the head, he could testify as to exactly where in the head Douglas was shot by petitioner, (5) he could only estimate the number of shots fired inside Douglas' car, and (6) he was only guessing where Douglas was shot at the creek and could not really tell because it was dark and he did not see the exact position of Douglas' head when Ray fired the shot. S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 157-60, 178; Volume 27, testimony of David Lee Page, Jr., at pp. 14-15, 20-21, 26, 66, 77, 80-81, 143-47, 168, 170, 182, 229.

Douglas' head.[455]  Counce did testify at trial that State Exhibit no. 9, i.e., the projectile the medical examiner linked with the gunshot wound to the back of Douglas' head, had *not* been fired by the .22 revolver admitted at trial as State Exhibit no. 5, i.e., the weapon Ray identified as the one he used to shoot Douglas at the creek.[456]  Counce could not, however, definitively determine whether State Exhibit no. 9 had been fired by State Exhibit no. 3, i.e., the .22 semi-automatic petitioner had in his possession at the time of petitioner's arrest; rather, Counce could only testify he could not rule out that possibility.[457]

It should be evident from the foregoing discussion that petitioner's trial was not one in which the ballistics evidence relating to the bullets removed from Douglas' body established petitioner's guilt.  Rather, what proved to be the most highly inculpatory forensic testimony introduced during the guilt-innocence phase of petitioner trial was Counce's expert testimony that the two shell casings found on the floorboard of Douglas' abandoned vehicle AND the two shell casings found in close proximity to Samuel Petrey's body were all fired by the .22 semi-automatic weapon in petitioner's possession at the time of his arrest. Nothing petitioner's trial counsel could have done at trial in terms of either admitting then-available evidence or making jury arguments could have changed that fact.  Admitting Counce's ballistics report would only have corroborated Counce's trial testimony on that same point.

---

[455] S.F. Trial, Volume 22, testimony of Jill Urban, at pp. 284-85.

[456] S.F. Trial, Volume 25, testimony of Tim Counce, at pp. 161-62.

[457] *Id.*

Petitioner's assertion that Counce's report, combined with Douglas' autopsy report, somehow furnished a basis for "compelling" jury argument that Ray or Page initially shot Douglas was without evidentiary foundation in the record before petitioner's state habeas court. Petitioner's trial counsel testified during petitioner's first state habeas corpus proceeding (1) they had reviewed Counce's report prior to trial, (2) they attempted to argue a theory at the guilt-innocence phase of trial suggesting that McCoy or Page had been the initial shooter of Douglas, (3) this argument was based on the angles of the entry wounds in Douglas' head and the absence of gunpowder residue in or around Douglas' gunshot wounds, (4) determining the pathways of each bullet removed from Douglas' body and attempting to match same with specific firearms was problematic in view of the medical examiner's testimony, (5) the defense did elicit testimony from the medical examiner that it was possible the fatal shots had been fired from the back seat of Douglas' vehicle, (6) there was no hard evidence in the record to support the defense's theory, and (7) defense counsel decided not to ask Counce about their theory because they were uncertain how he would respond.[458]

The problem with petitioner's complaint about his trial counsel failing to take the strategic approach petitioner urged in his first state habeas corpus proceeding is that such an approach (1) would not have addressed the ballistics evidence linking petitioner's weapon to the *shell casings* found both inside Douglas' abandoned vehicle and beside Petrey's body and (2) the ballistics evidence presented by the prosecution was not based upon any findings linking any particular weapon with any of the "markedly deformed" projectiles removed from

---

[458] S.F. First State Habeas Hearing, Volume 3, testimony of Rodion Cantacuzene, at pp. 52, 54; testimony of Paul Williams, at pp. 56-59.

Douglas' body at autopsy.  Simply put, it did not matter to the prosecution's theory of the case which of the gunshot wounds identified during Douglas' autopsy had been caused by petitioner or which had been caused by Ray.  The medical examiner who performed Douglas' autopsy testified all three gunshot wounds would have been fatal.[459]  A second medical examiner testified there was a remote possibility Douglas could have recovered from the gunshot wound to the right side of Douglas' face (i.e., gunshot wound no. 3) but the other two gunshots wounds would each have been fatal to Douglas individually.[460]

In view of the foregoing, this Court independently concludes the failure of petitioner's trial counsel to introduce Counce's report and argue more forcefully that someone other than petitioner shot Douglas initially did not cause the performance of petitioner's trial counsel to fall below an objective level of reasonableness.

b.    No Prejudice

Even if petitioner's trial counsel could have employed ballistics reports and other evidence available at the time of petitioner's trial to establish (as petitioner urged in his first state habeas corpus application), that Mark Ray fired the shot that caused the injury to the right side of Douglas' head, proving that fact would not have cast any aspersions on the other evidence establishing petitioner's guilt in connection with the fatal shooting of Douglas.  As explained above, all three gunshot wounds to Douglas head were likely fatal, two of which

---

[459] S.F. Trial, Volume 22, testimony of Jill Urban, at p. 297.

[460] S.F. Trial, Volume 26, testimony of Janice Townsend-Parchman, at pp. 21-24.

most certainly.[461]  The three eyewitnesses all testified petitioner shot Douglas in the head but admitted they could not be certain precisely where in Douglas' head those shots entered. Furthermore, proving Ray's shot entered the right side of Douglas' head would not have cast any doubt upon the trial testimony of Patrick Brook, McCoy, and Ray in which they described petitioner's confession to Brook that he (petitioner) shot Douglas twice in the head. At trial, it was undisputed the two spent shell casings found on the floorboard of Douglas' abandoned vehicle were fired by the semi-automatic handgun petitioner had in his possession at the time of his arrest.

Given such evidence, this Court independently concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to introduce Tim Counce's ballistics report and argue that Ray fired the shot which entered the right side of Douglas' head, the outcome of either phase of petitioner's capital murder trial would have been any different.

c.    Conclusions

This Court has independently concluded the exhausted portion of petitioner's fourth assertion of ineffective assistance contained in petitioner's fourth claim for relief herein does not satisfy either prong of *Strickland* analysis.

The Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's first state habeas corpus proceeding of the exhausted portion of petitioner's fourth assertion of ineffective assistance in petitioner's fourth claim herein was neither (1)

___

[461] S.F. Trial, Volume 22, testimony of Jill Urban, at p. 297; Volume 26, testimony of Janice Townsend-Parchman, at pp. 21-24.

contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceeding. The exhausted portion of petitioner's fourth assertion of ineffective assistance in petitioner's fourth claim for relief herein does not warrant federal habeas corpus relief.

5.   No Merits under *De Novo* Review on Procedurally Defaulted Portions of this Complaint

As explained above, petitioner procedurally defaulted on a wide variety of additional complaints relating to the failure of his trial counsel to more aggressively present a defense at the guilt-innocence phase of trial premised upon ballistics evidence. Some of those procedurally defaulted complaints were dismissed under the Texas writ-abuse statute in the course of petitioner's second and third state habeas corpus proceedings. Others, including a number of new factual and legal assertions presented for the first time in petitioner's reply brief, are procedurally defaulted because they remain wholly unexhausted.

As a practical matter, however, the Supreme Court's recent opinions in *Trevino v. Thaler, supra,* and *Martinez v. Ryan, supra,* compel a federal habeas court to examine the merits of even procedurally defaulted ineffective assistance claims when, as here, there are allegations by a federal habeas corpus petitioner that his state counsel rendered ineffective assistance during a prior state habeas corpus proceeding and thereby caused the procedural default of a claim of ineffective assistance by the petitioner's state trial counsel. *See Trevino v. Thaler,* ___ U.S. at ___, 133 S.Ct. at 1912 ("In *Martinez v. Ryan,* 566 U.S. 1, ___, 132 S.Ct.

332

1309, 1320, 182 L.Ed.2d 272, this Court held that 'a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.'").  The state courts have not addressed the merits of petitioner's procedurally defaulted ineffective assistance complaints.  This Court is required, therefore, to conduct a *de novo* review of the otherwise procedurally defaulted aspects of petitioner's fourth assertion of ineffective assistance in petitioner's fourth claim herein. *Porter v. McCollum*, 558 U.S. at 39, 130 S.Ct. at 452; *Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

### a.   No Deficient Performance

The procedurally defaulted portion of petitioner's fourth assertion of ineffective assistance in his fourth claim herein relies heavily on the declaration of Richard Ernest attached as Exhibit no. 95 to petitioner's Second Amended Petition.  In his declaration, Mr. Ernest asserts (1) his examination of State Exhibit no. 11, which he associates with gunshot wound no. 3 to Douglas' head (i.e., the wound to the right side of Douglas' face) reveals indications it was fired by State Exhibit no. 5, i.e., the .22 revolver Mark Ray admitted he used to shoot Douglas at the creek[462] and (2) based upon his review of Texas Department of Public Safety records and Douglas' autopsy report (but apparently without actually examining any projectiles), Douglas' gunshot wound numbers 1 and 2 (i.e., those to the rear

---

[462] Declaration of Richard Ernest, Exhibit 95 to *Second Amended Petition*, docket entry no. 89-3, at p. 989.

and left side of Douglas' head) are associated with the State Exhibit no. 3.[463]  Mr. Ernest, a

firearms and tool mark examiner whose CV does not appear to include any training or

experience in human physiology or forensic medicine, then opines as follows:

> Because of the physical dimensions and limitations involved in an automobile,
> it is the opinion of this examiner that it is unlikely that these two shots (State
> Exhibits 9 and 10) were fired inside the automobile by the front seat
> passenger, Clinton Young, into the left side of the head and back of the head
> of the victim, Doyle Douglas, while he (the victim) was in the driver's
> position in the automobile.  Given this evidence, it is more likely that Douglas
> was shot by someone who was firing from the victim's left side (the driver's
> side of the car).[464]

Mr. Ernest then proceeds to speculate, without citation to anything in the trial record, that the

shell casings found inside Douglas' abandoned vehicle may not have been associated with the

shots fired into Douglas' head in Longview.[465]

     The initial analytical problem with the foregoing assertions by Mr. Ernest is that, as

explained above, identifying the precise bullet which Mark Ray fired into Douglas' head

would not have exculpated petitioner.  None of the three eyewitnesses testified at trial that

they identify with specificity precisely where in Douglas' head either the petitioner or Ray

had fired their weapons.  It was far from clear precisely where Ray shot Douglas.  It was

undisputed the location at the creek where Ray fired his shot was unlit and there was a pillow

over Douglas' head when Ray fired his shot.  Even if Ernest had been called to testify at

petitioner's trial that Ray fired the shot which struck Douglas on the right side of the face,

---

[463] *Id.*, at p. 990.

[464] *Id.*, at pp. 990-91.

[465] *Id*, at p. 991.

that evidence would not have exculpated petitioner.  Any attempt by petitioner's trial counsel to utilize Ernest's expert conclusions regarding State Exhibit no. 11 and gunshot wound no. 3 to impeach the assertions of the three eyewitnesses that Ray shot Douglas "in the back of the head" would surely have been met with arguments from the prosecution pointing out the numerous instances in which all three eyewitnesses had repeatedly disavowed any personal knowledge of the precise locations in Douglas' head where either the petitioner or Ray had fired their weapons.

Ernest's speculative assertions about "the physical dimensions and limitations involved in an automobile," appear on their face to well beyond the normal scope of expertise for a firearms and tool mark examiner.  Moreover, a portion of Ernest's opinion appears wholly inconsistent with the trial testimony of the medical examiner.  Dr. Urban testified without contradiction at trial that State Exhibit no. 9 was associated with gunshot wound no. 1 in the back of Douglas' head.[466]  Mr. Ernest does not appear to dispute or disagree with this finding.  Dr. Urban testified further that gunshot wound no. 1 entered the back of Douglas' head, traveled through the skull and brain from back to front, in a slightly right to left and slightly upward direction.[467]  All three eyewitnesses testified without contradiction at trial that Douglas was seated in the driver's seat of his vehicle *facing away* from petitioner who was seated in the front passenger seat at the moment petitioner fired the first shot.[468]  Viewed objectively, there was nothing the least bit "unlikely" about the possibility a person seated in

---

[466] S.F. Trial, Volume 22, testimony of Jill Urban, at p. 285.

[467] *Id.*, at p. 268.

[468] *See* note 454, *supra.*

the driver's side of a small car looking to his left and leaning forward could be shot in the back of the head or the side of the head by a person seated to his immediate right. This analytical defect in Mr. Ernest's opinion would likely have subjected him to vigorous cross-examination and possible impeachment. Moreover, there was no evidence before the trial court establishing the order of the shots fired into Douglas' head in Longview or the time differential between the two shots fired inside Douglas' vehicle. Nor did any of the eyewitnesses testify regarding the possible movement, if any, in the position of Douglas' head after the first shot and before the second shot. Even assuming petitioner could have established at trial that Ray fired the shot at the creek which entered the right side of Douglas' face, that fact did not standing alone, furnish a basis for establishing that petitioner did not fire either of the two remaining shots into Douglas' head while Douglas was seated behind the wheel inside his car in Longview. It certainly would not have impeached any of the trial testimony of the three eyewitnesses about the circumstances of petitioner's shooting of Douglas. Nor would Ernest's proffered testimony have impeached the trial testimony of Patrick Brook (and two other eyewitnesses) that petitioner confessed to shooting Douglas in the head *twice.* Nor would any of the evidence Ernest offers have impeached any of the eyewitness testimony as to the events at the creek when petitioner directed Ray at gunpoint to shot Douglas a third time through a pillow. *Finally, nothing in Ernest's declaration negates the findings of the prosecution's tool mark examiner that State Exhibit no. 3 fired all four shell casings found inside Douglas' abandoned vehicle and at the scene of Petrey's murder.* Ernest's highly speculative comments about other possible sources for the shell casings found inside douglas' vehicle are outside the proper scope of expertise for a firearms and tool mark

336

examiner and would have been subject to proper objection on that ground, as are Ernest's comments about the forensic science of gunshot wounds to the head.

Insofar as Ernest identifies discrepancies between Page's trial testimony regarding the details of Samuel Petrey's fatal shooting and the medical examiner's testimony regarding her findings during her autopsy on Samuel Petrey, Ernest offers absolutely nothing new. Petitioner's trial counsel cross-examined Page extensively concerning precisely those discrepancies, as well as many others between Page's description at trial of petitioner's fatal shooting of Petrey and the physical evidence concerning that event.[469] *In fact, petitioner's trial counsel elicited admissions on cross-examination from Page that (1) Page had not actually seen petitioner shoot Petrey, (2) Page misled investigators when they first interviewed Page about the details of Petrey's shooting, and (3) Page had "guessed" about where and how petitioner shot Petrey when Page did a videotaped re-enactment of Petrey's shooting for law enforcement officers.*[470]

In light of the foregoing, this Court independently concludes the failure of petitioner's trial counsel retain a ballistics expert who could have offered the same testimony at trial as that contained in Ernest's declaration did not cause the performance of said counsel to fall below an objective level of reasonableness. Ernest's speculative assertions about the circumstances of Douglas' murder would likely have been subject to potentially damaging cross-examination based upon Ernest's lack of expertise in human physiology or forensic

---

[469] S.F. Trial, Volume 27, testimony of David Lee Page, Jr., at pp. 57-58, 90-97.

[470] *Id.*

337

medicine and Ernest's observations about discrepancies between Page's trial testimony about Petrey's murder and the results of Petrey's autopsy offer nothing of substance beyond that which petitioner's trial counsel obtained during the defense's extensive cross-examination of Page.

        b.    <u>No Prejudice</u>

Moreover, for much the same reasons discussed in Section XV.E.4.b. above, there is no reasonable probability that, but for the failure of petitioner's trial counsel to present testimony at trial similar to that furnished by Ernest in his declaration now before this Court, the outcome of either phase of petitioner's capital murder trial would have been different. Nothing in Ernest's declaration offers any arguable basis for attacking the trial testimony showing petitioner confessed to Patrick Brook (in the presence of two other witnesses) that he had shot Douglas in the head twice. Nor do Ernest's opinions offer any potentially significant basis for impeaching the trial testimony of the three eyewitnesses to the Douglas' shooting, all of whom repeatedly denied any knowledge of the exact locations in Douglas' head into which petitioner or Ray fired. There was no dispute at trial that Ray fired a shot into Douglas' head using State Exhibit no. 5. As explained above, which of the three shots Ray fired into Douglas' head mattered very little because none of the three eyewitnesses claimed to possess either (1) personal knowledge of the exact locations of the respective entrance wounds in Douglas' head or (2) the ability to match same with the shots fired by petitioner and Ray, respectively. Ernest's declaration offers nothing substantially new that petitioner's trial counsel could have used to further impeach Page on cross-examination. It was painfully evident by the conclusion of Page's cross-examination that (1) he knew very

338

little about the details of Petrey's murder and (2) his prior statements to law enforcement officials on that subject were highly speculative, if not misleading.

Finally, insofar as petitioner attempts to rely upon the affidavits of members of his jury as evidence his trial counsel's failure to present petitioner's new ballistics theory "prejudiced" petitioner within the meaning of *Strickland*, that effort is in vain.  Petitioner cannot rely upon the affidavits of jury foreman James Bobo or juror Michael Byrne speculating about how additional evidence or different jury arguments might have swayed their subjective thought processes or altered the jury's deliberations to undermine the validity of petitioner's capital murder conviction. *See Tanner v. United States*, 483 U.S. 107, 120-25, 107 S.Ct. 2739, 2747-50, 97 L.Ed.2d 90 (1987)(recognizing that Rule 606(b), Fed.R.Evid., precludes juror testimony regarding "any matter or statement occurring during the course of the jury's deliberations *or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith...*"); Summers v. Dretke, 431 F.3d 861, 873 (5th Cir. 2005)("Under Rule 606(b) of the Federal Rules of Evidence, jurors' affidavits are inadmissible 'regarding the following four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations.'"), *cert. denied*, 549 U.S. 840 (2006); *United States v. Jones*, 132 F.3d 232, 245 (5th Cir. 1998)("Federal Rule of Evidence 606(b) bars juror testimony regarding at least four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the

deliberations, (3) the mindset or emotions of any juror during deliberations, and (4) the testifying juror's own mental process during the deliberations."), *affirmed*, 527 U.S. 373 (1999).

### c.   Conclusions

The procedurally defaulted portions of petitioner's fourth assertion of ineffective assistance in his fourth claim for relief herein fail to satisfy either prong of *Strickland* analysis.

## F.   Failure to Test Douglas' Vehicle

### 1.   The Complaint

In his fifth assertion of ineffective assistance in his fourth claim for relief herein, petitioner argues his trial counsel failed to "test Douglas's vehicle so that the defense could explain why two .22 caliber shell casings were found in the passenger side of the vehicle."[471]

### 2.   State Court Disposition

Petitioner presented a similar, equally cryptic, pro se complaint about the performance of his trial counsel in a pleading petitioner filed in March 2006 in the state trial court: "Ineffective assistance of trial counsel for failing to have tests conducted on the car of victim Doyle Douglas which would have provided exculpatory evidence."[472]  The Texas Court of Criminal Appeals construed this and other pro se complaints voiced by petitioner as a subsequent writ application and summarily dismissed same pursuant to the Texas writ-abuse

---

[471] *Second Amended Petition*, at pp. 220-21; *Petitioner's Reply*, at pp. 105-07.

[472] First State Habeas Transcript, Volume 5, at p. 759.

statute. *Ex parte Clinton Lee Young*, WR 65,137-02, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

Petitioner also included a similar, slightly expanded, version of this complaint in his omnibus fourth claim for relief in his second subsequent (third) state habeas corpus application.[473]  The Texas Court of Criminal Appeals summarily dismissed this claim pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-03, 2009 WL 1546625, *1 (Tex. Crim. App. June 3, 2009).

3.      Procedural Default

Because petitioner failed to fairly present this same  ineffective assistance complaint in his first state habeas corpus application, the Texas Court of Criminal Appeals' summary dismissal of same on state writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on same. *McGowen v. Thaler*, 675 F.3d at 499 n.72;  Coleman *v. Quarterman*, 456 F.3d at 542.

4.      Alternatively, No Merit on *De Novo* Review

As was explained in Section XV.E.5. above, as a practical matter, the Supreme Court's recent opinions in *Trevino v. Thaler, supra,* and *Martinez v. Ryan, supra,* compel a federal habeas court to examine *de novo* the merits of even procedurally defaulted ineffective assistance claims when, as here, there are allegations by a federal habeas corpus petitioner that his state counsel rendered ineffective assistance during a prior state habeas corpus proceeding and thereby caused the procedural default of a claim of ineffective assistance by

---

[473] Third State Habeas Transcript, Volume 1 of 10, at pp. 159-60.

341

the petitioner's state trial counsel. *See Trevino v. Thaler*, ___ U.S. at ___, 133 S.Ct. at 1912

("In *Martinez v. Ryan,* 566 U.S. 1, __, 132 S.Ct. 1309, 1320, 182 L.Ed.2d 272, this Court

held that 'a procedural default will not bar a federal habeas court from hearing a substantial

claim of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding,

there was no counsel or counsel in that proceeding was ineffective.'").  This Court is

required, therefore, to conduct a *de novo* review of the petitioner's otherwise procedurally

defaulted fifth assertion of ineffective assistance in petitioner's fourth claim herein. *Porter v.

McCollum*, 558 U.S. at 39, 130 S.Ct. at 452; *Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at

2467; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

> a.   <u>No Deficient Performance</u>

In his Second Amended Petition, petitioner argues that testing of Douglas' vehicle

would have shown that defects in the dashboard of Douglas' vehicle were, in fact, bullet

holes, thereby creating an alternative explanation for how the shell casings came to be inside

Douglas' vehicle.[474]  In his reply brief, petitioner alleges for the first time that testing would

have shown "the defects in the dashboard of Douglas's car were created by shots fired at the

car from outside, *after* Douglas was shot."[475]  Petitioner does not, however identify exactly

what type of tests he now believes should have been conducted.

Another fundamental problem with these assertions is that petitioner has failed to

allege any specific facts, much less furnish any evidence, showing petitioner's trial counsel

---

[474] *Second Amended Petition*, at p. 220.

[475] *Petitioner's Reply*, at p. 106 (Emphasis added).

were actually aware, or through the exercise of due diligence could have learned, of any information prior to petitioner's trial which would have led reasonable counsel to believe conducting these unspecified tests would produce either exculpatory evidence, mitigating evidence, or impeachment evidence. Assuming there were bullet holes or other defects in the dashboard or interior of Douglas' vehicle, that fact is hardly surprising. Page testified without contradiction that, after petitioner kidnaped Petrey, they drove both Petrey's pickup truck and Douglas' Grand Prix to an isolated location where petitioner fired several shots at Douglas' vehicle.[476] Page also testified petitioner was standing fairly close to Douglas' vehicle when petitioner fired those shots.[477] Neither Page nor any other witness testified, however, that petitioner was close enough to Douglas' vehicle that any of the shell casings ejected from petitioner's semi-automatic handgun could have fallen into the interior of Douglas' vehicle at that time. The prosecution introduced photographs showing defects in the exterior of Douglas' vehicle presumably attributable to petitioner's shooting spree.[478] Thus, the presence or absence of bullet holes or other defects in the interior of Douglas' vehicle was not determinative of any issue properly before the jury at either phase of petitioner's capital murder trial. Petitioner's trial counsel cannot reasonable be faulted for failing to investigate a matter which does not rationally appear relevant to any issue to be determined at trial.

---

[476] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 210-14; Volume 27, testimony of testimony of David Lee Page, Jr., at pp. 80-81.

[477] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at p. 213.

[478] S.F. Trial, Volume 23, testimony of Ann Hinkle, at pp. 13-23.

Moreover, petitioner does not allege any facts showing any reputable scientific tests existed at the time of petitioner's trial which could have ascertained precisely when (i.e., whether before or after Douglas' fatal shooting) the spent shell casings found inside Douglas' abandoned vehicle came to be inside that vehicle. Petitioner also alleges no specific facts showing that establishing the presence or absence of bullet holes or other defects inside Douglas' vehicle would have helped resolve this issue. Petitioner does not identify any information he communicated to his trial counsel or which his defense team could have otherwise discovered through the exercise of due diligence showing any tests existed at the time of petitioner's trial which could have shown exactly *when* the bullet holes or other defects petitioner alleges existed in the interior of Douglas' vehicle or showing exactly when the shell casings found inside Douglas' abandoned vehicle came to be there.

"The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." Smith v. Collins, 977 F.2d 951, 960 (5th Cir. 1992), *cert. denied*, 510 U.S. 829 (1993). Petitioner has failed to allege any specific facts which show the failure of petitioner's trial counsel to seek the very nonspecific testing on Douglas' vehicle petitioner now complaints should have been conducted caused the performance of said counsel to fall below an objective level of reasonableness.

b.     No Prejudice

Petitioner has alleged no specific facts showing that any testing method existed at the time of petitioner's capital murder trial which could have determined whether the spent shell

344

casings found inside Douglas' abandoned vehicle resulted from shots fired *after* Douglas' fatal shooting in Longview.  Likewise, petitioner fails to allege any specific facts showing any testing method was available at the time of petitioner's capital murder trial which could have determined whether any identifiable defects inside Douglas' vehicle had resulted from a gunshot fired before or after Douglas' murder.  Thus, petitioner has failed to allege specific facts which show a reasonable probability that, but for the failure of petitioner's trial counsel to seek unspecified testing on Douglas' vehicle, the outcome of either phase of petitioner's capital murder trial would have been any different.

Accordingly, petitioner's conclusory fifth assertion of ineffective assistance in his fourth claim for relief herein fails to satisfy the prejudice prong of *Strickland* analysis. *See Day v. Quarterman*, 566 F.3d at 540-41 (conclusory assertions of ineffective assistance during cross-examination and conclusory assertions trial counsel failed to examine medical records prior to trial failed to satisfy prejudice prong of *Strickland* analysis); *Collier v. Collins*, 300 F.3d 577, 587 (5th Cir.)(conclusory allegations of ineffective assistance do not raise a constitutional issue in a federal habeas corpus proceeding), *cert. denied*, 537 U.S. 1084 (2002).

c.    Conclusions

Petitioner's procedurally defaulted, conclusory, fifth assertion of ineffective assistance in his fourth claim for relief herein does not satisfy either prong of *Strickland* analysis and does not warrant federal habeas relief.

G.   Failure to Perform Testing on Page's Gloves

1.   The Complaint

In his sixth assertion of ineffective assistance contained in his fourth claim for relief herein, petitioner argues his trial counsel should have obtained "trace metal testing," gunshot residue testing, and a visual inspection of David Page's gloves found at the location where Samuel Petrey's body was discovered.[479]

2.   State Court Disposition

Petitioner presented a cryptic version of this complaint for the first time as a proposed claim twenty-one contained in a motion he filed in June, 2006 with the state habeas court in which he sought permission to add a variety of claims to his initial state habeas corpus application.[480]  The Texas Court of Criminal Appeals construed this pleading and others as a subsequent state habeas application and dismissed same pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-02, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

Petitioner presented a slightly more expanded but no less conclusory version of the same complaint in his omnibus fourth claim in his second subsequent (third) state habeas corpus application.[481]  The Texas Court of Criminal Appeals summarily dismissed this claim

---

[479] *Second Amended Petition*, at pp. 221-22; *Petitioner's Reply*, at 107-10.

[480] First State Habeas Transcript, Volume 7, at p. 1139.

[481] Third States Habeas Transcript, Volume 1 of 10, at pp. 165-66.

346

pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-03, 2009 WL 1546625, *1 (Tex. Crim. App. June 3, 2009).

### 3.    Procedural Default

The Texas Court of Criminal Appeals' multiple dismissals of this complaint based upon state writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on same. *McGowen v. Thaler*, 675 F.3d at 499 n.72;  *Coleman v. Quarterman*, 456 F.3d at 542.

### 4.    Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in *Trevino v. Thaler, supra,* and *Martinez v. Ryan, supra,* compel a federal habeas court to examine *de novo* the merits of even procedurally defaulted ineffective assistance claims when, as here, there are allegations by a federal habeas corpus petitioner that his state counsel rendered ineffective assistance during a prior state habeas corpus proceeding and thereby caused the procedural default of a claim of ineffective assistance by the petitioner's state trial counsel. *Trevino v. Thaler*, ___ U.S. at ___, 133 S.Ct. at 1912; *Martinez v. Ryan*, 566 U.S. at ___, 132 S.Ct. at 1320.

#### a.    No Deficient Performance

In his Second Amended Petition, petitioner argues that testing of Page's gloves could have shown that the gloves contained gunshot residue and that examination of the gloves would have somehow refuted Page's trial testimony that he wore them earlier that day when

he was doing yard work at his home.[482]  In his reply brief, petitioner argues for the first time that petitioner told law enforcement authorities Page was wearing the gloves when Page shot Petrey.[483]

Curiously, however, petitioner does not allege any specific facts showing that he ever informed his trial counsel or defense team that Page was wearing the gloves at the time Page allegedly shot Petrey.  Moreover, petitioner alleges no specific facts showing how the presence of gunshot residue on the gloves would have proven exculpatory.  The presence or absence of gunshot residue on the gloves did not itself establish who was wearing the gloves when one or more shots were fired by the person wearing the gloves.  Petitioner did not present any evidence at trial, and does not allege any specific facts before this Court, suggesting it was physically impossible for petitioner to have ever worn the gloves.  More specifically, petitioner alleges no facts showing it was physically impossible for petitioner to have worn the gloves when petitioner fired shots into Douglas' vehicle or when petitioner shot Petrey.  Petitioner also alleges no facts showing that it was possible to determine at the time of trial whether the petitioner or Page was wearing the gloves at the time one or more shots were fired by whoever was wearing the gloves.  The presence of "trace metal" on the

---

[482] *Second Amended Petition*, at p. 222.

[483] *Petitioner's Reply*, at p. 108.
    Contrary to petitioner's contention, however, Midland County Sheriff's Office criminal investigator Spencer did not testify that petitioner had indicated that Page shot Petrey.  Instead, Spencer testified only that petitioner told Spencer that "Page was wearing the gloves at the time of the shooting." S.F. Trial, Volume 24, testimony of Gregory Kent Spencer, at p. 286.  Moreover, this is a wholly new factual allegation which petitioner did not include in his third state habeas corpus application or even in his Second Amended Petition herein.  As such, this new factual allegation is unexhausted. *See Scott v. Hubert*, 635 F.3d at 667 (recognizing the exhaustion doctrine contains both factual and legal components and that a petitioner is required to furnish the state courts with the same material factual support he presents to the federal court).  Nowhere in his state habeas pleadings did petitioner present the factual allegation that Young had informed law enforcement authorities that Page shot Petrey while wearing the gloves in question.

gloves would have been consistent with the uncontradicted trial testimony that, when recovered, the gloves were wrapped around a box of live .22 caliber shells and at least one loose live round.[484]

Petitioner's trial counsel testified without contradiction during the hearing on petitioner's motion for new trial that they and their defense team interviewed a number of jail house informants who told them David Page claimed that both he and petitioner shot Samuel Petrey.[485] They made a conscious decision not to present any of these witnesses.[486] Even if petitioner's trial counsel could have obtained evidence showing the gloves did contain evidence of gunshot residue, such evidence would not have contradicted the potential testimony of the same jail house informants with whom the defense team had spoken who indicated Page told them that both petitioner and Page had shot Petrey.

In sum, because there was no way to prove who was wearing the gloves in question at the time any gunshots were fired by a person wearing those gloves, the potentially exculpatory value of evidence showing gunshot residue on the gloves was minimal, at best. The uncontradicted testimony at trial established that gunshot residue and trace metal testing had the potential to destroy any DNA that was present on the items tested.[487] In light of the information available to petitioner's trial counsel that Page had told numerous jail inmates

---

[484] S.F. Trial, Volume 24, testimony of Paul Hallmark, at pp. 322-24; Volume 25, testimony of Paul Hallmark, at pp. 6, 64-65.

[485] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 259-82; Volume 39, testimony of Paul Williams, at pp. 57-62.

[486] Id.

[487] S.F. Trial, Volume 25, testimony of Paul Hallmark, at p. 91.

that *both* he and petitioner had shot Petrey, the failure of petitioner's trial counsel to obtain trace metal and gunshot residue testing on the gloves did not cause the performance of said counsel to fall below an objective level of reasonableness.

### b. No Prejudice

For the reasons discussed above, petitioner has failed to allege any specific facts showing gunshot residue testing or trace metal testing of the gloves would have produced any exculpatory evidence, mitigating evidence, or impeachment evidence. Petitioner alleges no facts showing it was possible, at the time of petitioner's trial, to definitively determine who was wearing the gloves at the time gunshot residue, if any, was deposited on same. Petitioner also fails to allege any specific facts showing it was possible at the time of trial to establish scientifically precisely when any gunshot residue found on the gloves was deposited thereon. Likewise, the uncontradicted testimony at trial established that gunshot residue testing is generally less effective when dealing with semi-automatic weapons such as State Exhibit no. 3 because in such weapons the gunshot residue goes down the barrel (away from the shooter), rather than backward as in the case of a revolver.[488] It was undisputed at trial that the gloves belonged to Page and he had worn them in the days immediately before Petrey's murder.[489] It was equally undisputed at trial that the optimal time for performing a gunshot residue test is within two hours of the firing of a firearm.[490]

---

[488] S.F. Trial, Volume 25, testimony of Paul Hallmark, at pp. 19-20.

[489] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at p. 137; Volume 27, testimony of David Lee Page, Jr., at pp,. 205-06.

[490] S.F. Trial, Volume 25, testimony of Paul Hallmark, at p. 36.

Petitioner alleges in conclusory fashion that unspecified examination of the gloves might have produced unidentified evidence showing that, contrary to Page's trial testimony, Page did not wear the gloves earlier on the day before Douglas' shooting. However, petitioner offers no specific facts showing how a visual inspection or an examination of the gloves for "age, wear, and dirt" at the time of trial would have definitively determined either (1) precisely when Page acquired the gloves or (2) whether Page had worn the gloves, as Page claimed, the day before Douglas' murder to do yard work.[491] It was undisputed at trial that (1) Page wrapped a butterfly knife and a box of .22 caliber live rounds inside the gloves and (2) Page threw the gloves and their contents away at the pump jack site where Petrey was fatally shot.[492] Page testified he did so before Petrey was shot.[493]

Because there is no specific allegation now before this Court showing (1) there was any way to establish at the time of petitioner's trial either (a) the identity of the person wearing the gloves at the time that person fired a shot or (b) exactly when a shot was fired by a person wearing the gloves, or (2) gunshot residue testing, trace metal testing, or examination of the gloves at the time of petitioner's trial would have actually produced exculpatory evidence, mitigating evidence, or impeachment evidence, there is no reasonable probability that, but for the failure of petitioner's trial counsel to obtain such testing and examination of Page's gloves, the outcome of either phase of petitioner's capital murder trial would have been any different. Petitioner's speculative assertions regarding what testing or

---

[491] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 137.

[492] S.F. Trial, Volume 26, testimony of David Lee Page, Jr., at pp. 241-42.

[493] *Id.*

351

inspection of the gloves might have proven do not satisfy the prejudice prong of *Strickland*. *See Woodfox v. Cain*, 609 F.3d at 808-09 (speculative assertions, even from an expert, will not support a finding of "prejudice" under *Strickland*).

   c.  Conclusions

  Petitioner's procedurally defaulted, conclusory, sixth assertion of ineffective assistance in his fourth claim for relief herein does not satisfy either prong of *Strickland* analysis and does not warrant federal habeas relief.

H.  Failure to Investigate Conspiracy Among the Eyewitnesses

   1.  The Complaint

  In his seventh assertion of ineffective assistance contained in his fourth claim for relief herein, petitioner argues his trial counsel should have investigated the existence of an ill-defined conspiracy among Page, Ray, and McCoy and a person identified only as Page's girlfriend "Amanda."[494]

   2.  State Court Disposition

  Petitioner first raised this cryptic complaint in a quasi-pro se pleading he filed in March, 2006 in the state trial court.[495]  The Texas Court of Criminal Appeals construed this claim as part of a subsequent writ application and dismissed same pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-02, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

---

[494] *Second Amended Petition*, at pp. 222-23; *Petitioner's Reply*, at pp. 110-11.

[495] First State Habeas Transcript, Volume 5, at p. 759.

3.      Procedural Default

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; *Coleman v. Quarterman*, 456 F.3d at 542.

4.      Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in *Trevino v. Thaler* and *Martinez v. Ryan* compel a federal habeas court to examine *de novo* the merits of even procedurally defaulted ineffective assistance claims when, as here, there are allegations the petitioner's state counsel rendered ineffective assistance during a prior state habeas corpus proceeding.

a.      No Deficient Performance

In his Second Amended Petition, petitioner argues cryptically that, had his trial counsel investigated, they would have learned Page, Ray, and McCoy were coordinating their stories "through someone on the outside."[496]  In his reply brief, petitioner alleges such an investigation would have proven the three eyewitnesses were coordinating their stories while in prison.[497]

Petitioner fails to allege any facts in support of this assertion of ineffective assistance showing there was any information either known to petitioner's defense team or which could have been learned by them through the exercise of due diligence at or before the time of

---

[496] *Second Amended Petition*, at p. 223.

[497] *Petitioner's Reply*, at p. 111.

petitioner's trial suggesting that an investigation into a possible "conspiracy" between Page, Ray, McCoy, and possibly others might produce either exculpatory, mitigating, or impeachment evidence.  In his reply brief, petitioner alleges that he complained to his first state habeas counsel, attorney Gary Taylor, about such a conspiracy.[498]  What petitioner fails to allege are any facts showing that he ever voiced a similar complaint to his *trial* counsel or that he ever furnished his *trial* counsel with any information which might have led said counsel to reasonably believe that undertaking an investigation into a possible conspiracy between the eyewitnesses to Douglas' murder might prove advantageous to petitioner's defense at trial.

Furthermore, petitioner alleges no specific facts showing what information, if any, was available at the time of petitioner's trial to suggesting the three eyewitnesses had conspired or were then conspiring against petitioner or attempting to "coordinate" their testimony at petitioner's capital murder trial.  Nor has petitioner alleged any specific facts suggesting precisely how his trial counsel could have conducted the investigation in question. None of the three eyewitnesses nor their own trial counsel were required to comply with a request by petitioner's trial counsel for information or interviews relevant to petitioner's case. *See United States v. Girod*, 646 F.3d 304, 311 (5th Cir. 2011)(as a general rule, witnesses to a crime are the property of neither the prosecution nor the defense - both sides have an equal right of access thereto - *but* no right of the defendant is violated when a potential witness freely chooses not to talk to defense counsel).  Petitioner has also alleged no specific facts showing any facts or circumstances existed prior to petitioner's trial which would have

---

[498] *Petitioner's Reply*, at p. 110.

entitled petitioner's trial counsel to request or take the pretrial deposition of any of the eyewitnesses or any other person pursuant to a state law analogue to Rule 15(a), Federal Rules of Criminal Procedure.

Accordingly, petitioner has failed to allege any specific facts showing the failure of his trial counsel to investigate the possibility the three eyewitnesses were engaged in a conspiracy to coordinate their trial testimony caused the performance of petitioner's trial counsel to fall below an objective level of reasonableness. *See Smith v. Collins*, 977 F.2d at 960 ("The defense of a criminal case is not an undertaking in which everything not prohibited is required.  Nor does it contemplate the employment of wholly unlimited time and resources.").

        b.    <u>No Prejudice</u>

Petitioner alleges no specific facts showing what, if anything, a timely investigation by his trial counsel into an alleged pretrial conspiracy between Page, Ray, McCoy, and possibly others would have produced in terms of admissible exculpatory, mitigating, or impeachment evidence.  In fact, petitioner alleges no specific facts showing what information, if any, such an investigation would have produced.  Thus, petitioner has failed to satisfy the prejudice prong of *Strickland. See Day v. Quarterman*, 566 F.3d at 541 (complaint regarding trial counsel's failure to examine the State's medical records failed to establish *Strickland* prejudice where petitioner alleged no facts showing what would have been discovered by review of the State's records).

c.      Conclusions

Petitioner's procedurally defaulted, conclusory, seventh assertion of ineffective assistance in his fourth claim for relief herein does not satisfy either prong of *Strickland* analysis and does not warrant federal habeas relief.

I.      Failure to Move for Mistrial

1.      The Complaint

In his eighth assertion of ineffective assistance in his fourth claim herein, petitioner argues his trial counsel should have moved for a mistrial after it was discovered one of the jurors was related to Samuel Petrey.[499]

2.      State Court Disposition

At the start of the second day of the guilt-innocence phase of petitioner's capital murder trial, the trial court informed the parties and their counsel outside the presence of the jury that the second alternate juror, Ms. Huckabee, had learned the previous day from her own sister that the widow of Samuel Petrey was the sister-in-law of Mrs. Huckabee's brother, i.e., Samuel Petrey was the husband of a sister of Mrs. Huckabee's brother's wife.[500]  Both sides requested that Mrs. Huckabee be dismissed from the jury; the trial court granted their request and excused Mrs. Huckabee.[501]  The trial judge informed the remaining jurors in open court that, the previous evening Mrs. Huckabee had learned she was distantly related to "a

---

[499] *Second Amended Petition*, at pp. 223-24; *Petitioner's Reply*, at pp. 111-12.

[500] S.F. Trial, Volume 22, at p. 5.

[501] *Id.*, at pp. 6-7.

person involved in this case" and explained she would no longer be serving as an alternate juror.[502]

Petitioner first presented his complaint about his trial counsel's failure to move for a mistrial following Mrs. Huckabee's dismissal as an alternate juror in a pleading filed in March, 2006 in the state trial court wherein petitioner's state habeas counsel summarized a number of pro se complaints petitioner wished to present to the state habeas court.[503]  The Texas Court of Criminal Appeals construed this claim as part of a subsequent writ application and dismissed same pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-02, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

### 3.    Procedural Default

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; *Coleman v. Quarterman*, 456 F.3d at 542.

### 4.    Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5., above, the Supreme Court's recent opinions in *Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of the merits of petitioner's procedurally defaulted ineffective assistance complaints

---

[502] *Id.*, at p. 7.

[503] First State Habeas Transcript, Volume 5, at p. 759.

a.   No Deficient Performance

In his Second Amended Petition, petitioner argues his trial counsel should have moved for a mistrial because "the jurors had bonded with one another and Huckabee's departure could only have influenced the juror's [sic] decision about Young's fate."[504]  In his reply brief, petitioner alleges in conclusory fashion that bias had infected his jury because the jury had "talked and prayed together."[505]  Petitioner alleges no specific facts in support of these assertions and cites nothing in the record now before this Court establishing the jury had, in fact, either "bonded" or "prayed together."  Nor has petitioner alleged any facts showing that any of his substantive or procedural rights were violated by virtue of the mere presence of Mrs. Huckabee in the courtroom as an alternate juror during the first day of testimony at the guilt-innocence phase of petitioner's trial.  There are no fact-specific allegations before this Court showing Mrs. Huckabee had participated in any activity as an alternate juror beyond simply sitting in the courtroom during the first day of trial testimony. Petitioner does not identify anything procedurally inappropriate, much less legally improper, with the manner in which she was dismissed from the jury.

Petitioner does not allege any specific facts showing his trial counsel were aware, or could have learned with the exercise of due diligence, of any facts as of the date Mrs. Huckabee was dismissed which should have put said counsel on notice of the existence of either (1) a legitimate basis under applicable law for a mistrial, (2) any reason to suspect

---

[504] *Second Amended Petition*, at p. 224.

[505] *Petitioner's Reply*, at p. 111.

petitioner's jury had been exposed to any bias or extrinsic information regarding petitioner's case, (3) Mrs. Huckabee had communicated in any manner with any of the other jurors concerning either her distant relationship to Petrey or any other aspect of the petitioner's case, or (4) any information suggesting the remaining jurors would be unable to render a verdict based solely upon the evidence and the trial court's jury instructions. Under such circumstances, petitioner's conclusory assertions herein do not establish the failure of petitioner's trial counsel to move for a mistrial caused the performance of said counsel to fall below an objective level of reasonableness.

      b.    <u>No Prejudice</u>

Petitioner has identified no legal authority suggesting that a mistrial was mandated, much less permissible, under the facts surrounding Mrs. Huckabee's dismissal as an alternate juror at the start of the second day of the guilt-innocence phase of petitioner's trial. Petitioner has alleged no specific facts showing his jury was exposed to any extrinsic information as a result of Mrs. Huckabee's mere presence in the jury box the first day of trial. Nor has petitioner alleged any specific facts showing Mrs. Huckabee communicated any information to any other juror about herself, her distant relationship to Samuel Petrey, or any other matter not otherwise presented to the jury in open court.

Petitioner alleges no specific facts showing Mrs. Huckabee falsely answered any question during voir dire or that she withheld any relevant information concerning her personal knowledge of the facts of petitioner's case or the persons involved therein. In fact, petitioner alleges no specific facts showing that Mrs. Huckabee had ever met Samuel Petrey

or was aware she was distantly related to him until she was informed of that fact on the first day of petitioner's trial.  Thus, this is not a case in which there is an allegation a juror withheld information from the trial court or parties concerning the juror's personal knowledge of either the facts of the case, the parties, the potential witnesses, or any other person or subject involved therein.  Petitioner has not alleged any specific facts showing Mrs. Huckabee withheld any information or gave a less than fully honest answer to a material question during voir dire. *See McDonough Power Equipment, Inc. v. Greenwood,* 454 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984)(to obtain a new trial where a juror gave a mistaken though honest response to a voir dire question, a party must demonstrate (1) the juror failed to answer honestly a material question on voir dire and (2) a correct response would have provided a valid basis for a challenge for cause); *Montoya v. State,* 65 F.3d 405, 418-19 (5th Cir. 1995)(applying the two-pronged *McDonough* test in a federal habeas corpus context to a complaint about an allegedly inaccurate voir dire answer), *cert. denied,* 517 U.S. 1133 (1996).

Petitioner does not allege any specific facts showing there was any off-the-record contact with any juror (other than Mrs. Huckabee by her own sister) by any person regarding petitioner's case.  The presumption of prejudice recognized in the authorities cited by petitioner in his Second Amended Petition is inapplicable to petitioner's case. *See Remmer v. United States,* 347 U.S. at 229, 74 S.Ct. at 451 (discussing the constitutional standard applicable when there is an improper outside contact).

360

c.     Conclusions

Petitioner's procedurally defaulted, conclusory, eighth assertion of ineffective assistance in his fourth claim for relief herein does not satisfy either prong of *Strickland* analysis and does not warrant federal habeas relief.

J.     Failure to Cross-Examine Deborah Sanders Re Mark Ray

1.     The Complaint

In his ninth assertion of ineffective assistance in his fourth claim herein, petitioner argues his trial counsel should have cross-examined Sanders during the punishment phase of petitioner's capital murder trial about an alleged conversation between Sanders and petitioner's mother, Carla Sexton, in which Sanders allegedly admitted she had overheard Mark brag about shooting Doyle Douglas.[506]

2.     State Court Disposition

Petitioner first presented this complaint about his trial counsel's failure to cross-examine Sanders about her conversation with Carla Sexton regarding Mark Ray's allegedly inculpatory statements about the Douglas murder in a pleading filed in March, 2006 in the state habeas court.[507] The Texas Court of Criminal Appeals construed this claim as part of a subsequent writ application and dismissed same pursuant to the Texas writ-abuse statute. *Ex*

---

[506] *Second Amended Petition,* at p. 225; *Petitioner's Reply,* at pp. 112-13.
     For unknown reasons, petitioner's second Amended Petition lists this ineffective assistance complaint among the complaints he raises about the performance of his trial counsel during the guilt-innocence phase of trial. Deborah Sanders did not testify until the punishment phase of petitioner's trial, however.

[507] First State Habeas Transcript, Volume 5, at p. 760.

state habeas court.[507]  The Texas Court of Criminal Appeals construed this claim as part of a subsequent writ application and dismissed same pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-02, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

### 3.  Procedural Default

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; *Coleman v. Quarterman*, 456 F.3d at 542.

### 4.  Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in *Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of petitioner's procedurally defaulted complaints of ineffective assistance claims by his trial counsel

#### a.  No Deficient Performance

Deborah Sanders testified for the prosecution during the punishment phase of petitioner's capital murder trial about conversations she had with petitioner and what she overheard the night of Doyle Douglas' murder when petitioner and others visited the motel room she was sharing with Patrick Brook.[508]  Petitioner argues his trial counsel should have

---

[507] First State Habeas Transcript, Volume 5, at p. 760.

[508] S.F. Trial, Volume 30, testimony of Deborah Sanders, at pp. 107-26.  Her punishment phase testimony is summarized in note 80, *supra*.

asked Sanders about an purported conversation between Sanders and Carla Sexton in which Sanders allegedly said she had heard Mark Ray brag about shooting Doyle Douglas. The initial analytical problem with this complaint is, by the time Sanders testified at petitioner's trial, Mark Ray had already admitted during his guilt-innocence phase testimony at petitioner's trial that he (Ray) shot Douglas.[509]  Furthermore, by the time Sanders testified at the punishment phase of petitioner's trial, the jury had also (1) heard Patrick Brook's guilt-innocence phase testimony that Ray claimed to have shot Douglas twice[510] and (2) convicted petitioner of capital murder, finding petitioner guilty beyond a reasonable doubt on two separate theories, one of which required it to determine petitioner was criminally responsible for the murder of Douglas.

Petitioner alleges no facts showing that, at the time of Sanders' testimony during petitioner's trial, petitioner's trial counsel were aware, or could have learned through the exercise of due diligence, that Sanders had allegedly made the statement in question to Carla Sexton.  Once more, petitioner alleges in his reply brief that he requested his first state habeas counsel present this ineffective assistance claim but does not specifically allege any facts showing that he or anyone else ever made petitioner's *trial* counsel aware of information suggesting such a line of cross-examination with Sanders might prove fruitful.  More specifically, petitioner alleges no specific facts showing that his trial counsel were aware, or could reasonably have learned through diligent investigation, that Sanders had ever told anyone that she heard Mark Ray "brag" about shooting her uncle Doyle Douglas.

---

[509] S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 120-29.

[510] S.F. Trial, Volume 21, testimony of Patrick Brook, at pp. 253-54, 266.

Under such circumstances, there was nothing objectively unreasonable with the failure of petitioner's trial counsel to explore this subject with Deborah Sanders on cross-examination during her punishment-phase testimony at petitioner's trial. By the time Sanders testified, petitioner's jury had already heard (1) Ray, McCoy, and Page all testify that Ray shot Douglas once at the creek and (2) Brook testify Mark Ray had described shooting Douglas twice and kicking Douglas down into a creek. Even if Sanders had admitted to making the statement in question to Carla Sexton, such an admission would have added little to the potentially mitigating evidence already before petitioner's jury.

Under such circumstances, the failure of petitioner's trial counsel to cross-examine prosecution witness Deborah Sanders at the punishment phase of trial regarding statements Sanders allegedly made to Carla Sexton suggesting Sanders had heard Mark Ray brag about shooting Doyle Douglas, did not cause the performance of said counsel to fall below an objective level of reasonableness. In fact, petitioner's trial counsel could reasonably have concluded an attempt to belabor at the punishment phase of trial a point the jury had apparently already rejected, i.e., petitioner's implicit suggestion he was not responsible for Douglas' murder, could backfire by alienating the jury.

b.   No Prejudice

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U.S. at 20, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534, 123

S.Ct. at 2542.  The prosecution's evidence during the punishment phase of petitioner's trial included largely uncontradicted testimony establishing (1) petitioner's long history of violent conduct dating back to elementary school, (2) petitioner's discharge after only about three months from both the Triangle Pines and Waco Center facilities for misconduct, (3) multiple incidents in which petitioner led a gang within the TYC in violent riots that included assaults on TYC staff, (4) petitioner's history of physical abuse as a child at the hands of his biological father and step-father (clearly double-edged in nature), (5) the eighteen-year-old petitioner's romantic relationship with a fifteen year old, (6) the petitioner's long-term fascination with guns, (7) the petitioner's participation in a staged robbery of a fast-food restaurant (a crime which petitioner's underage girlfriend heard him plan and saw him carry out), (8) petitioner's participation in a violent attempted home invasion in which both the home owner and petitioner's accomplice were wounded, and (9) petitioner's participation in the burglary of a sporting goods store in which multiple weapons were taken, including the .22 caliber semi-automatic handgun used to execute both Doyle Douglas and Samuel Petrey. In addition, three days after the jury heard Deborah Sanders' punishment-phase trial testimony, it heard the testimony of a young man whom petitioner had assaulted and whom petitioner had violently attempted to force to perform fellatio on petitioner.[511]  Meanwhile, petitioner's punishment phase witnesses attempted to paint petitioner as basically a good person whose criminal misconduct was the product of improper medications for ADHD and an abused, neglected, childhood.  The petitioner's capital sentencing jury weighed all of the foregoing evidence and concluded beyond a reasonable doubt (1) there was a probability the

---

[511] S.F. Trial, Volume 31, testimony of Nathan Wendell, at pp. 6-31.

petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) the petitioner either actually caused Petrey's death, intended to kill Petrey, or anticipated that a human life would be taken. The jury also concluded the mitigating evidence in the record did not warrant the imposition of a life sentence upon petitioner.

Under the foregoing circumstances, there is no reasonable probability that, but for the failure of petitioner's trial counsel to cross-examine Deborah Sanders at the punishment phase of trial concerning her prior statement to Carla Sexton in which Sanders allegedly admitted she had overheard Mark Ray brag about shooting Doyle Douglas, the jury's answers to any of the Texas capital sentencing special issues would have been any different.

### c.   Conclusions

Petitioner's procedurally defaulted, conclusory, ninth assertion of ineffective assistance in his fourth claim for relief herein does not satisfy either prong of *Strickland* analysis and does not warrant federal habeas relief.

### K.   Failure to Strike Venire Member Haydee Guerrero

### 1.   The Complaint

In his tenth assertion of ineffective assistance in his fourth claim herein, petitioner argues his trial counsel should have employed a peremptory strike against venire member (and later juror) Haydee Guerrero because she had only limited English fluency.[512]

---

[512] *Second Amended Petition*, at pp. 226-27; *Petitioner's Reply*, at pp. 113-16.

In his most recent pleading, petitioner appears to be arguing that his trial counsel should have made a challenge for cause to Ms. Guerrero based upon her lack of English fluency.  There are two problems with this new argument.

First, absolutely nothing in petitioner's pleadings before the state courts "fairly presented" such an ineffective assistance complaint to the Texas Court of criminal Appeals.  All of petitioner's complaints in his motion for new trial and the affidavit attached thereto, filed in May, 2003, or in petitioner's "Summary of Applicant's Pro Se Complaint,"

2.     State Court Disposition

    a.     Voir Dire Proceedings

At the conclusion of the individual voir dire examination of venire member Haydee

Guerrero, petitioner's trial counsel challenged her for cause based upon her answers to a

number of voir dire questions.[513]   The trial court denied petitioner's challenge for cause.[514]

The prosecution then voiced a "concern," in which petitioner's trial counsel concurred, that

both Ms. Guerrero and another venire member had both appeared to have had some difficulty

comprehending some of the terms used by both parties during voir dire.[515]   The trial judge

responded to petitioner's trial counsel's observations about Mrs. Guerrero's apparently

conflicting answers to two questions about psychologists as follows:

> I got the impression it was a result of a very long, convoluted question that
> had a lot of legal phraseology in it, and I watched Mrs. Guerrero very

---

filed in March, 2006, focused on the issue of whether petitioner's trial counsel should have utilized a "strike" against Ms. Guerrero. At no point in any of those pleadings, did petitioner "fairly present" the state court with a complaint about his trial counsel's failure to challenge Ms. Guerrero for cause.

    The second problem with this complaint may explain that omission. In point of fact, the comments made by both the prosecution and petitioner's trial counsel to the trial judge at the conclusion of Ms. Guerrero's voir dire examination, discussed hereinafter, cannot reasonably be construed as anything other than a joint challenge for cause to Ms. Guerrero and another venire member. This Court has reviewed the record from that proceeding and independently concludes petitioner's trial counsel reasonably believed, just as they testified during the hearing on petitioner's motion for new trial, that they had, in fact, unsuccessfully challenged Ms. Guerrero for cause on the ground of her lack of English fluency. Thus, insofar as petitioner herein urges an unexhausted (and necessarily procedurally defaulted) complaint about the failure of his trial counsel to make a challenge for cause against Ms. Guerrero based upon her lack of English fluency, that ineffective assistance complaint fails to satisfy the deficient performance prong of *Strickland* analysis.

[513] Ms. Guerrero's voir dire examination appears in Volume 14 of 26 of the Supplemental Reporter's Record from trial, which includes the voir dire examination of the entire jury venire, at pp. 50-112. Volumes 7 through 14 of that record appear in a single bound volume among the records from petitioner's state trial court proceedings.
    Petitioner's trial counsel's challenge for cause to Ms. Guerrero appears at Supplemental Reporter's Record, Volume 14, at pp. 110-11.

[514] Supplemental Reporter's Record, Volume 14, at p. 111.

[515] *Id.*, at pp. 111-12.

367

carefully. She never said "I don't understand what you're saying." She would be thoughtful and take her time answering questions, but she — and frequently she would shake her head yes or no. I do not have the impression Mrs. Guerrero had any difficulty understanding plain English.[516]

     b.    <u>Motion for New Trial</u>

Petitioner first complained about the failure of his trial counsel to strike Ms. Guerrero in petitioner's affidavit attached to his motion for new trial, filed in May, 2003.[517] At the evidentiary hearing held on petitioner's motion for new trial, both of petitioner's trial counsel testified (1) they made a deliberate decision after consultation with their jury selection expert and petitioner not to strike venire member Guerrero because their peremptory strikes were shrinking and they believed a number of the venire member who followed Guerrero posed the risk of doing great harm to petitioner if they served on his capital jury, (2) petitioner was initially opposed to Guerrero serving on his jury but acquiesced to his trial counsel's recommendation, and (3) they would have struck Guerrero if petitioner had continued to insist they do so.[518]

More specifically, petitioner's co-counsel at trial, attorney Cantacuzene, testified it was the defense team's belief that if they struck Ms. Guerrero, they stood a very realistic possibility of having someone on the jury who was more favorable disposed to impose the death penalty than was Ms. Guerrero.[519] Petitioner's lead trial counsel was even more blunt

---

[516] Supplemental Reporter's Record, Volume 14, at p. 112.

[517] Trial Transcript, Volume 5 of 5, at p. 909.

[518] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 187-95, 225, 237-38, 287; Volume 39, testimony of Paul Williams, at pp. 18-19, 41, 69.

[519] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at p. 287.

in his assessment of the prospects facing the defense team when the time to choose whether to strike venire member Guerrero arrived.  He testified that, in his opinion, the venire members who followed Guerrero "were just awful for the defense" and he feared the defense would run out of peremptory challenges before they reached what he termed the members of "murderer's row."[520]

Interestingly, petitioner's attorneys both testified they believed the comments made by both parties to the trial court at the conclusion of Ms. Guerrero's voir dire amounted to challenges for cause based upon her lack of English fluency.[521]

Petitioner neither testified at the hearing on his motion for new trial nor presented any other evidence controverting the foregoing testimony of his trial counsel.  The state trial court denied petitioner's motion for new trial after making express factual findings that (1) petitioner acquiesced in the decision not to strike Guerrero and (2) petitioner's trial counsel determined Guerrero would be more favorably disposed toward the defense than other potential jurors.[522]  Petitioner did not complain on direct appeal about the denial of this aspect of his motion for new trial.

       c.     <u>Second State Habeas Proceeding</u>

Petitioner next presented his complaint about his trial counsel's failure to strike Ms. Guerrero in a pleading filed in March, 2006 listing a number of pro se ineffective assistance

---

[520] S.F. Trial, Volume 39, testimony of Paul Williams, at p. 41.

[521] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at p. 191; Volume 39, testimony of Paul Williams, at p. 19.

[522] S.F. Trial, Volume 39, at pp. 101-02.

complaints.[523] The Texas Court of Criminal Appeals construed this claim as part of a subsequent writ application and dismissed same pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-02, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

### 3. Procedural Default

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; *Coleman v. Quarterman*, 456 F.3d at 542.

### 4. Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5., above, the Supreme Court's recent opinions in *Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of petitioner's procedurally defaulted complaints of ineffective assistance by his trial counsel.

#### a. No Deficient Performance

Petitioner alleges no specific facts which show any of the sworn testimony given by petitioner's trial counsel about venire member Guerrero or their decision not to employ a peremptory strike against her was either factually inaccurate or otherwise reflected an objectively unreasonable assessment of the facts as petitioner's defense knew it. Moreover, petitioner does not allege any facts showing the state trial court's factual determinations made in the course of denying petitioner's motion for new trial were objectively unreasonable in

---

[523] First State Habeas Corpus Transcript, Volume 5, at p. 760.

light of the evidence then before that court.[524]   Insofar as petitioner complains about Ms.

Guerrero's alleged lack of English fluency, petitioner tenth assertion of ineffective assistance

in his fourth claim herein fails to address in an intelligible manner the uncontroverted

testimony of his trial counsel that the venire members who followed Guerrero were much less

desirable as jurors than was Guerrero.  In view of the uncontroverted testimony of said

counsel in the record now before this Court, this Court finds there is no fact-specific

allegation currently before this Court establishing the failure of petitioner's trial counsel to

strike venire member Guerrero caused the performance of said counsel to fall below an

objective level of reasonableness.

  b.   No Prejudice

Given the evidence before the petitioner's capital sentencing jury discussed in Section

XV.J.4.b. above and the uncontradicted testimony of petitioner's trial counsel during

petitioner's motion for new trial proceeding in the petitioner's trial court record, this Court

independently concludes there is no reasonable probability that, but for the failure of

petitioner's trial counsel to strike venire member Guerrero, the outcome of either phase of

petitioner's capital murder trial would have been any different.

---

[524] Because petitioner never directly appealed the denial of his motion for new trial and procedurally defaulted on this same ineffective assistance complaint when he attempted to present it to the state courts in 2006, the AEDPA's highly deferential standard of review does not apply to the state trial court's factual findings made in conjunction with the denial of petitioner's motion for new trial.  Nonetheless, those factual findings were fully supported by the evidence before that state court and may not be completely disregarded, as petitioner implicitly urges this Court to do in his pleadings herein.  Petitioner's pleading herein make no mention of this aspect of petitioner's motion for new trial, the testimony of petitioner's trial counsel on this ineffective assistance complaint, or the state trial court's express factual findings.

c.   Conclusions

Petitioner's procedurally defaulted, conclusory, tenth assertion of ineffective assistance in his fourth claim for relief herein does not satisfy either prong of *Strickland* analysis and does not warrant federal habeas relief.

L.   Failure to Present Mental Health Evidence at the Guilt-Innocence Phase of Trial

1.   The Complaint

In his eleventh assertion of ineffective assistance in his fourth claim herein, petitioner argues his trial counsel should have introduced evidence during the guilt-innocence phase of trial, much like the mental health evidence petitioner's trial counsel introduced during the punishment phase of trial, showing petitioner's ADHD rendered petitioner incapable of anticipating his accomplice's actions.[525]

2.   State Court Disposition

Petitioner first presented this ineffective assistance complaint in a pleading he filed in the state habeas trial court in March, 2006 listing a number of pro se ineffective assistance complaints.[526]   The Texas Court of Criminal Appeals construed this claim as part of a subsequent writ application and dismissed same pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-02, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

---

[525] *Second Amended Petition*, at pp. 227-29; *Petitioner's Reply*, at pp. 116-18.

[526] First State Habeas Corpus Transcript, Volume 5, at p. 760.

3. <u>Procedural Default</u>

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; Coleman *v. Quarterman*, 456 F.3d at 542.

4. <u>Alternatively, No Merit on *De Novo* Review</u>

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in *Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of petitioner's procedurally defaulted complaints of ineffective assistance by his trial counsel.

a. <u>No Deficient Performance</u>

Petitioner argues his trial counsel should have mounted a defense at the guilt-innocence phase of trial premised upon the contention that petitioner was so mentally ill he could not anticipate the actions of his accomplices.

There is no argument here, nor could there reasonably be, that petitioner's trial counsel were unaware at the guilt-innocence phase of petitioner's capital murder trial of the extensive body of expert and lay testimonial evidence then-available establishing petitioner suffers from severe ADHD. There is no allegation before this Court suggesting the investigation of petitioner's background and mental health conducted by his trial counsel and mental health expert witnesses was anything less than thorough. Petitioner's trial counsel presented extensive, compelling, evidence of petitioner's background and documented mental health problems during the punishment phase of trial.[527] Thus, the issue properly before this

---

[527] *See* notes 92-104, 110-11, *supra*, and accompanying text.

Court is whether the failure of petitioner's trial counsel to present the same or similar evidence during the guilt-innocence phase of petitioner's trial was objectively unreasonable.

Based upon this Court's independent review of the record from petitioner's capital murder trial, there are readily apparent, objectively reasonable, strategic reasons why petitioner's trial counsel may have wished to avoid initiating a battle of mental health experts during the guilt-innocence phase of petitioner's trial like the one which emerged during the punishment phase of the same trial. The most glaringly obvious is the high degree of likelihood the jury would misconstrue such double-edged evidence as a tacit admission on petitioner's behalf that he was guilty of capital murder, either based upon the Texas law of parties or the petitioner's documented history of violent conduct dating back to petitioner's years in kindergarten. Each of the mental health experts who testified on petitioner's behalf at the punishment phase of trial spent a considerable portion of their testimony addressing the petitioner's history of (1) childhood physical abuse at the hands of his alcoholic father and step-father, (2) many violent outbursts, and (3) long-term drug and alcohol abuse, all of which could have convinced the jury at the guilt-innocence phase of trial that the petitioner was a violent drug abuser. In addition, Dr. Mathew testified during the punishment phase of trial regarding petitioner's voluntary ingestion of large quantities of methamphetamine in the days leading up to petitioner's capital offenses.[528] Voluntary intoxication is not generally a defense to a criminal offense under applicable Texas law. Section 8.04 of the Texas Penal Code bars a criminal defendant from using evidence of intoxication to challenge his culpable mental state. *See Davis v. State*, 313 S.W.3d 317, 330 (Tex. Crim. App. 2010)(Texas law

---

[528] S.F. Trial, Volume 34, testimony of Roy Mathew, at pp. 225-26.

does not authorize a defense of intoxication or a special instruction on the mitigating value of intoxication with respect to the guilt-innocence phase of a capital murder trial), *cert. denied*, ___ U.S. ___, 132 S.Ct. 122, 181 L.Ed.2d 45 (2011).  Thus, there was no vehicle readily available at the guilt-innocence phase of petitioner's capital murder trial  through which petitioner's jury could have given mitigating value to evidence the petitioner suffered from ADHD or was voluntarily intoxicated at the time of his capital offense.

Petitioner's trial counsel could have easily concluded, in an eminently objectively reasonable manner, the proper place for jury consideration of such double-edged mental health evidence was the punishment phase of petitioner's capital murder trial, not the guilt-innocence phase.  Unlike the mitigation special issue submitted to the jury during the punishment phase of petitioner's capital murder trial, there was no readily available vehicle at the guilt-innocence phase of trial through which the jury could give mitigating effect to the double-edged mental health evidence petitioner presented during the punishment  phase of his trial. *Davis v. State*, 313 S.W.3d at 330.  Petitioner has failed to overcome the presumption of reasonableness this Court must apply when reviewing petitioner's ineffective assistance complaints. *See Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S.Ct. 2574, 2589, 91 L.Ed.2d 305 (1986) (petitioner must overcome a presumption that a counsel rendered reasonable professional assistance).

This Court independently concludes the decision by  petitioner's trial counsel to forego the use of double-edged mental health evidence, like that employed by said counsel during the punishment phase of petitioner's capital murder trial, during the guilt-innocence phase of petitioner's capital murder trial was objectively reasonable. *See St. Aubin v.*

*Quarterman*, 470 F.3d at 1103 (a tactical decision not to pursue and present potentially mitigating evidence on the ground it is double-edged in nature is objectively reasonable and does not amount to deficient performance); *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997)(holding the same), *cert. denied*, 522 U.S. 1120 (1998).  The same reasoning applies to the objectively reasonable decision by petitioner's trial counsel not to present mental health evidence at the guilt-innocence phase of trial which showed the defendant has a mental illness which renders him prone to impulsive, violent, outbursts and reduces his capacity for reflection and genuine contrition.  Petitioner's eleventh ineffective assistance complaint in his fourth claim herein fails to satisfy the first prong of *Strickland* analysis.

      b.   <u>No Prejudice</u>

For similar reasons, petitioner was not prejudiced within the meaning of *Strickland* by the decision of petitioner's trial counsel to forego use of clearly double-edged mental health evidence until the punishment phase of trial.  There was no vehicle available at the guilt-innocence phase of petitioner's trial through which the jury could have rendered factual findings favorable to petitioner based upon a showing petitioner suffered from ADHD or was voluntarily intoxicated at the time of his offense.  None of the mental health experts who testified on petitioner's behalf suggested petitioner's ADHD and other mental health problems rendered petitioner legally insane or incapable of forming the requisite mental state to commit the offense of capital murder.

Petitioner's argument that evidence of his ADHD could have been utilized to argue petitioner failed to foresee the actions of his accomplices ignores the overwhelming evidence

at the guilt-innocence phase of trial showing (1) petitioner was the individual directing events in connection with the fatal shooting of Doyle Douglas and (2) petitioner shot Samuel Petrey. There was no evidence introduced at the guilt-innocence phase of trial suggesting the petitioner was merely along for the ride during the events which culminated in the fatal shootings of either Douglas or Petrey.  Given the extensive evidence of petitioner's primary roles in both murders introduced during the guilt-innocence phase of petitioner's trial, there is no reasonable probability that, but for the failure of petitioner's trial counsel introduce evidence of petitioner's ADHD and other mental health problems during the guilt-innocence phase of trial, the outcome of either portion of petitioner's capital murder trial would have been different.  This complaint fails to satisfy the prejudice prong of *Strickland* analysis.

        c.     <u>Conclusions</u>

Petitioner's procedurally defaulted, conclusory, eleventh assertion of ineffective assistance in his fourth claim for relief herein does not satisfy either prong of *Strickland* analysis and does not warrant federal habeas relief.

M.    <u>Failure to Call Petitioner's Former Teachers to Testify</u>

    1.    <u>The Complaint</u>

In his twelfth assertion of ineffective assistance in his fourth claim herein, petitioner argues his trial counsel should have called a pair of petitioner's former elementary school teachers (Margaret Fant and Mary Hall) to testify during the punishment phase of trial.[529]

---

[529] *Second Amended Petition,* at pp. 230-34; *Petitioner's Reply,* at pp. 118-22.

2.     State Court Disposition

Petitioner raised this same complaint as part of his twelfth claim in his first state

habeas corpus proceeding.[530]  Petitioner did not call either of these individuals to testify

during the hearing held in petitioner's first state habeas corpus proceeding and did not offer

any affidavits of other written declarations from either of these potential witnesses suggesting

exactly what their trial testimony might have been.  Petitioner's trial counsel testified during

that hearing, moreover, that their defense investigator interviewed both of these potential

witnesses and they made a decision not to call either of these individuals to testify, in part,

because (1) they had several members of petitioner's family beg for petitioner's life, (2) they

called several other witnesses who testified petitioner was a kind, good, person, (3) Mrs. Hall

would have testified petitioner was able to control his hyperactivity, and (4) Mrs. Fant would

have contradicted the defense's position that petitioner's mother had tried to help petitioner

but could not overcome the pernicious influences of petitioner's violent, alcoholic, father and

step-father.[531]  The state habeas trial court expressly found (1) petitioner had failed to support

this ineffective assistance complaint with any evidence establishing what either Fant or Hall

would have testified had they been called as witnesses at the punishment phase of petitioner's

---

[530] First State Habeas Transcript, Volume 1, at p. 90.
More specifically, petitioner alleged as follows:
 Applicant complains of additional actions by trial counsel.  Applicant contends that his
former teachers Margaret Ann Font and Mary Hall would have testified that he was a good child,
bright, if hyperactive. Such evidence would have presented favorable evidence from the same general
time periods in which the State's witnesses observed applicant and was relevant to the jury's
consideration of the first and third punishment issues.

[531] S.F. First State Habeas Hearing, Volume 3, testimony of Rodion Cantacuzene, Jr., at pp. 42-45, 51-52;
Volume 3, testimony of Paul Williams, at pp. 70-72.

trial, (2) the defense presented substantial evidence at trial that petitioner was a bright and good child, and (3) the suggested evidence from Fant and Hall is cumulative of the evidence presented at trial.[532]  The Texas Court of Criminal Appeals rejected this ineffective assistance complaint on the merits. *Ex parte Clinton Lee Young*, WR 65,137-01, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

    3.    <u>AEDPA Review</u>

        a.    <u>No Deficient Performance</u>

Petitioner presents a two-page sworn declaration from Margaret Fant as Exhibit no. 104 in support of his Second Amended Petition herein.[533]  Because the state habeas court addressed the merits of this ineffective assistance complaint in the course of petitioner's first state habeas corpus proceeding, this Court may not consider this new evidence in ruling on the propriety of the state habeas court's ruling under the AEDPA. *See Cullen v. Pinholster*, ___ U.S. at ___, 131 S.Ct. at 1401 (holding a federal habeas petitioner is not entitled to present new evidence supporting a claim in federal court when the state court has ruled on the merits of the underlying claim).

Moreover, even if this Court were to consider this complaint *de novo*, in light of the uncontradicted testimony of petitioner's trial counsel in petitioner's first state habeas corpus proceeding, neither the declaration of Margaret Fant nor the petitioner's conclusory pleadings herein support a finding that the failure of petitioner's trial counsel to cal either Fant or Hall,

---

[532] State Trial Court's Order issued June 26, 2006, First State Habeas Transcript, Volume 2, at p. 251.

[533] Docket entry no. 89-3, at pp. 1094-95.

or both, caused the performance of said counsel to fall below an objective level of reasonableness. Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative. *Day v. Quarterman*, 566 F.3d at 538; *Coble v. Quarterman*, 496 F.3d at 436; *Miller v. Dretke*, 420 F.3d at 362.

As the state habeas trial court correctly noted, petitioner's trial counsel presented numerous witness who testified as to petitioner's good character, high intellect, and generally good behavior as a child.[534] Petitioner's trial counsel also elicited testimony on cross-examination of prosecution witnesses highlighting petitioner's difficult childhood and positive character traits.[535] In sum, petitioner's trial counsel presented substantial evidence which cast petitioner in a favorable light, showed he was a bright, albeit hyperactive, child, and generally portrayed him as a good child burdened with ADHD and an extremely dysfunctional family situation.

The state habeas court reasonably concluded that petitioner failed to overcome the presumption of reasonableness with regard to the failure of petitioner's trial counsel to call either Hall or Fant to testify at trial. This was an eminently reasonable conclusion based upon the evidence presented during petitioner's first state habeas corpus proceeding. More specifically, the petitioner's trial counsel testified without contradiction that both Fant and hall had been interviewed by the defense team and a strategic decision had been made not to

---

[534] *See* notes 95-99, 105-06, *supra*, and accompanying text.

[535] *See* notes 84-86, 89, *supra*.

call them to testify because they posed the risk of undermining at least some aspects of the story petitioner's trial counsel were attempting to tell the jury at the punishment phase of petitioner's trial. This Court own examination of the record from petitioner's trial and first state habeas corpus proceeding, even if the new Fant declaration is considered, leads to the inescapable conclusion that this assertion of ineffective assistance fails to satisfy the deficient performance prong of *Strickland* analysis.

        b.    <u>No Prejudice</u>

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U.S. at 20, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542. The prosecution's evidence during the punishment phase of petitioner's trial included largely uncontradicted testimony establishing (1) petitioner's long history of violent conduct dating back to elementary school, (2) petitioner's discharge after only about three months from both the Triangle Pines and Waco Center facilities for misconduct, (3) multiple incidents in which petitioner led a gang within the TYC in violent riots that included assaults on TYC staff, (4) petitioner's history of physical abuse as a child at the hands of his biological father and step-father (clearly double-edged in nature), (5) the eighteen-year-old petitioner's romantic relationship with a fifteen year old, (6) the petitioner's long-term fascination with guns, (7) the petitioner's participation in a staged robbery of a fast-food restaurant (a crime which petitioner's underage girlfriend heard him plan and saw him carry out), (8) petitioner's participation in a violent attempted home invasion in which both the

home owner and petitioner's accomplice were wounded, and (9) petitioner's participation in the burglary of a sporting goods store in which multiple weapons were taken, including the .22 caliber semi-automatic handgun used to execute both Doyle Douglas and Samuel Petrey. In addition, petitioner's jury heard the testimony of a young man whom petitioner had assaulted and whom petitioner had violently attempted to force to perform fellatio on petitioner.[536]

Meanwhile, petitioner's punishment phase witnesses attempted to paint petitioner as basically a good person whose criminal misconduct was the product of improper medications for ADHD and an abused, neglected, childhood.  The petitioner's capital sentencing jury weighed all of the foregoing evidence (including the extensive case in mitigation presented by petitioner's defense team) and concluded beyond a reasonable doubt (1) there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) the petitioner either actually caused Petrey's death, intended to kill Petrey, or anticipated that a human life would be taken.  The jury also concluded the mitigating evidence in the record did not warrant the imposition of a life sentence upon petitioner.

Given the evidence before petitioner's capital sentencing jury, there is no reasonable probability that, but for the failure of petitioner's trial counsel to present clearly cumulative testimony from Fant and Hall regarding petitioner's keen intellect and good behavior as a child at the punishment phase of trial, the jury's answers to any of the Texas capital

---

[536] S.F. Trial, Volume 31, testimony of Nathan Wendell, at pp. 6-31.

sentencing special issues would have been any different. Petitioner's jury already had extensive testimony concerning petitioner's intellectual talent and good conduct as a child. The problem was, petitioner was not a child as of the date of his capital murder trial. By the time the jury began its deliberations at the punishment phase of petitioner's trial (1) had already convicted petitioner beyond a reasonable doubt of being criminally responsible for two homicides and (2) had heard additional testimony showing petitioner's many other violent and criminal acts, including petitioner's attempted sexual assault upon another teen, the violent riots petitioner led as a gang leader inside the TYC, and the high speed chase on which petitioner led law enforcement officers immediately prior to his arrest.

c.   Conclusions

The Texas Court of Criminal Appeals' rejection on the merits during the course of petitioner's first state habeas corpus proceeding of petitioner's complaint about his trial counsel's failure to call Margaret Fant and Mary Hall to testify at the punishment phase of petitioner's capital murder trial was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.

N.  Failure to Present Mitigating Evidence Showing Why Petitioner Stopped Taking His Prescription medication Upon Discharge from the TYC and Why Petitioner Appeared Coherent and Calm Throughout Trial

1.  The Complaint

In is thirteenth assertion of ineffective assistance in his fourth claim herein, petitioner argues his trial counsel should have presented evidence during the punishment phase of trial showing why petitioner (1) stopped taking his prescription medications after his release from the TYC and (2) appeared to be coherent and focused throughout trial.[537]

2.  State Court Disposition

Petitioner raised this same complaint for the first time in his omnibus fourth claim in his second subsequent (third) state habeas corpus application.[538]  The Texas Court of Criminal Appeals summarily dismissed this claim pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young,* WR 65,137-03, 2009 WL 1546625, *1 (Tex. Crim. App. June 3, 2009).

3.  Procedural Default

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; *Coleman v. Quarterman*, 456 F.3d at 542.

---

[537] *Second Amended Petition*, at pp. 234-39; *Petitioner's Reply*, at pp. 122-24.

[538] Third State Habeas Transcript, Volume 1 of 10, at pp. 183-87.

4.      Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in *Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of petitioner's procedurally defaulted complaints of ineffective assistance by his trial counsel.

a.      No Deficient Performance

Petitioner argues his trial counsel should have presented  testimony from defense expert Dr. Milam establishing (1) petitioner was addicted to drugs before he entered the TYC, (2) petitioner never received treatment for his drug and alcohol addiction, (3) the chances were high petitioner would abuse drugs once he was released from custody, (4) the concept of "hyperfocusing" explained how petitioner could appear coherent and attentive throughout trial, and (5) petitioner's ADHD rendered petitioner incapable of assessing and responding to the rapidly changing situation in his capital offense.

The initial two of the foregoing topics were amply covered by the testimony of Dr. Milam and Dr. Mathew already before petitioner's capital sentencing jury.[539]  Thus, any additional testimony by Dr, Milam or petitioner's other mental health experts would have been cumulative.  From the trial testimony of Dr. Milam and Dr. Mathew regarding petitioner's drug dependency, the third concept listed above could also reasonably be inferred.  Dr Mathew testified that persons such as petitioner who suffer from severe

---

[539] See S.F. Trial, Volume 34, testimony of Daneen Milam, at pp. 61-63, 96 (petitioner received no chemical dependency treatment at TYC despite being chemically dependent); Volume 34, testimony of Roy Mathew, at pp. 186, 193-98, 224-26, 241 (there is a high correlation between ADD and drug abuse, petitioner using large quantities of methamphetamine during the ten days before Douglas' murder, likely psychotic during Douglas murder, and likely withdrawing at time of Petrey murder); Volume 35, testimony of Roy Mathew, at pp. 206-07 (petitioner has a history of stimulant abuse).

ADD/ADHD have a difficult time planning ahead and setting goals.[540]  Dr. Greene testified

that extreme difficulty focusing and the inability to consider the consequences of one's

actions before acting are two of the core features of ADHD.[541]  From this testimony the jury

could reasonably have inferred the final concept listed above.  The failure of petitioner's trial

counsel to have Dr. Milam address the first three and final areas listed above did not cause

the performance of said counsel to fall below an objective legal of reasonableness.  Those

matters were already properly before petitioner's jury.

      As far as why petitioner chose to stop taking his prescription medications some period

after his release from the TYC, petitioner offers no suggestions that his decision was anything

other than a voluntary decision made by petitioner following almost three years of detention

in the TYC and the Waco Center for Youth.  Petitioner alleges no specific facts in his

pleadings herein stating exactly why petitioner chose to stop taking the prescription

medications which his own family and friends said had rendered petitioner a different person

upon his emergence from the TYC.  Furthermore, petitioner alleges no facts showing Dr.

Short's trial testimony that petitioner reported no drug use for more than a month prior to his

admission to the Waco Center was factually inaccurate.  Thus, petitioner's jury was faced

with evidence which showed petitioner had not used street drugs for almost three years before

his release from the TYC.  The record before this Court is bereft of any evidence showing

petitioner was ever treated for drug withdrawal during either his time at the Waco Center or

his time in the TYC.  Under such circumstances, there was nothing objectively unreasonable

---

[540] S.F. Trial, Volume 34, testimony of Roy Mathew, at pp. 173-74, 183-84, 240.

[541] S.F. Trial, Volume 36, testimony of Ross Greene, at p, 12.

with the decision by petitioner's trial counsel to avoid having to explain why petitioner decided to stop taking his prescription medications and begin self-medicating with methamphetamine. Such a tactic could have undermined the defense's punishment phase trial strategy. Moreover, petitioner does not allege any specific facts showing why he chose to stop taking his prescription medications or how his trial counsel could have presented evidence of same without petitioner himself taking the stand at trial.

Petitioner's pleadings herein do not present this Court with any fact-specific allegations showing exactly what the concept of "hyperfocusing" involves or how that concept might have proven helpful to petitioner at trial without utterly eviscerating the defense team's trial strategy of convincing the jury that petitioner was unable to control himself due to his severe ADHD. Petitioner's lead trial counsel testified without contradiction during petitioner's first state habeas corpus proceeding that the linchpin of the defense's trial strategy at the punishment phase of trial was to show the petitioner suffered from severe ADHD (which caused petitioner's impulsive behavior) and that, once properly medicated, petitioner could be expected to behave in a non-violent manner.[542] Petitioner's trial counsel testified without contradiction during the hearing on petitioner's motion for new trial that they wanted to exclude any evidence showing the petitioner could control his ADHD symptoms, including petitioner's Midland County Jail medical records showing petitioner was not taking psychotropic medications during trial.[543] There was nothing

---

[542] S.F. First State Habeas Hearing, Volume 3, testimony of Paul Williams, at pp. 74-77.

[543] S.F. Trial, Volume 38, testimony of Ian Cantacuzene, at pp. 212-13; Volume 39, testimony of Paul Williams, at pp. 32-34, 62-64.

objectively unreasonable with the decision by petitioner's trial counsel not to present expert testimony suggesting that petitioner could, in fact, control his ADHD symptoms through "hyperfocusing" or any other form of treatment that did not include psychotropic medications. Such a tactic would have undermined the trial strategy of petitioner's defense team, which was to blame petitioner's history of violence on petitioner's improperly or unmedicated ADHD and to argue that, *once properly medicated*, petitioner did not pose a threat of future violence.

> b. <u>No Prejudice</u>

For reasons similar to those discussed in Section XV.M.3.b. above, the failure of petitioner's trial counsel to introduce expert testimony on hyperfocusing or any of the other subjects discussed by petitioner in this assertion of ineffective assistance did not prejudice petitioner within the meaning of *Strickland*. Petitioner's trial counsel reasonably believed they could obtain favorable jury answers to the Texas capital sentencing special issues by presenting evidence and arguing that (1) petitioner's violent history was the product of untreated or improperly treated ADHD (a matter outside petitioner's control) and (2) once properly medicated, petitioner would no longer pose a risk of future dangerousness. Petitioner's trial counsel actually presented substantial lay and expert testimony in support of their punishment-phase strategy, much of which overlaps the "new" mitigating evidence petitioner now argues should have been presented at his trial.

Given the extensive punishment phase case presented by the prosecution, the scope of the prosecution's punishment phase case, and the nature of petitioner's capital offense,

however, there is no reasonable probability that, but for the failure of petitioner's trial counsel to introduce additional mitigating evidence of the type outlined above, the outcome of the punishment phase of petitioner's trial would have been different. In fact, adopting the new tactic urged by petitioner would have seriously undermined the defense's reasonable punishment-phase trial strategy.

        c.    <u>Conclusions</u>

Petitioner's procedurally defaulted thirteenth assertion of ineffective assistance in his fourth claim herein does not satisfy either prong of *Strickland* and does not warrant federal habeas corpus relief.

O.    <u>Failure to Object to Supplemental Jury Instructions on Grounds It Was a Comment on the Weight of the Evidence, Allowed an Affirmative Answer Sans Unanimity, and Prevented Consideration of Mitigating Evidence</u>

    1.    <u>The Complaint</u>

In his fourteenth assertion fo ineffective assistance in his fourth claim herein, petitioner argues his trial counsel should have objected to the trial court's supplemental jury instructions regarding the second capital sentencing special issue on the grounds the supplemental instruction (1) constituted a comment on the weight of the evidence, (2) allowed an affirmative answer to the second special issue without requiring unanimity among the jurors on the specific factual theory justifying an affirmative answer thereto, and (3) precluded the jury from giving consideration to all of petitioner's mitigating evidence.[544]

---

[544] *Second Amended Petition*, at pp. 239-42; *Petitioner's Reply*, at p. 125.

2.      State Court Disposition

Petitioner first presented this ineffective assistance complaint as his proposed

fifteenth claim in his first state habeas corpus proceeding in a pleading filed in January, 2006

in the state trial court.[545]  The Texas Court of Criminal Appeals construed this claim, and

several others, as a subsequent state writ application and dismissed same pursuant to the

Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 63,137-02, 2006 WL 3735395, *1

(Tex. Crim. App. December 20, 2006).

3.      Procedural Default

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state

writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on

same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; *Coleman v. Quarterman*, 456 F.3d at 542.

4.      Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in

*Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of

petitioner's procedurally defaulted complaints of ineffective assistance by his trial counsel.

a.      No Deficient Performance

Petitioner's complaint that his trial counsel should have objected to the supplemental

jury instruction in question on the ground that the supplemental instruction constituted a

comment on the weight of the evidence is foreclosed by the state habeas trial court's

---

[545] First State Habeas Transcript, Volume 5, at p. 675.

conclusion that, under applicable state law, the supplemental instruction did not constitute an improper comment on the weight of the evidence because it did not "instruct, command, or suggest" that the jury answer the second special issue in any particular manner.[546]  The state trial court's findings were made in the context of its analysis of petitioner's fifteenth claim, which the state habeas trial court concluded did not satisfy the requirements for a subsequent writ under the Texas writ-abuse statute.  The Texas Court of Criminal Appeals reached the same conclusion.  A state court's interpretation of state law binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 603, 163 L.Ed.2d 407 (2005); *Paredes v. Quarterman*, 574 F.3d at 291; *Wood v. Quarterman*, 503 F.3d at 414. Because petitioner's trial counsel reasonably could have concluded (as did the state habeas trial court) that the supplemental instruction in question did not constitute an improper comment on the weight of the evidence under applicable Texas law, the failure of petitioner's trial counsel to raise such an objection did not cause the performance of petitioner's counsel to fall below an objective level of reasonableness.

Likewise, the state habeas trial court found the supplemental jury instruction in question did not improperly relieve the prosecution of its duty to obtain a unanimous jury verdict to the second capital sentencing special issue.[547]  This holding is eminently reasonable and fully consistent with the Supreme Court's holding in *Schad v. Arizona, supra*.

---

[546] Trial Court's Order of June 26, 2006, First State Habeas Transcript, Volume 2, at pp. 282-83.

[547] Trial Court's Order of June 26, 2006, First State Habeas Transcript, Volume 2, at pp. 283-85.

For the reasons set forth at length in Section XIV.D. above, petitioner's complaint about that the supplemental jury instruction precluded petitioner's capital sentencing jury from giving consideration to any of the mitigating evidence properly before it lacks any arguable merit. *See Ayers v. Belmontes*, 549 U.S. at 14-16, 127 S.Ct. at 474-75 (applying the familiar *Boyde* standard and holding an instruction directing the capital sentencing jury to consider any other circumstance that might excuse the crime sufficiently broad to permit consideration of possible future good conduct). The trial court's supplemental jury instruction in question addressed only the manner the jury was to consider and answer the *second* special issue and cannot reasonably be construed as interfering with the jury's ability to give full mitigating effect to any of petitioner's mitigating evidence pursuant to the third capital sentencing special issue.

The failure of petitioner's trial counsel to make any of the three objections to the supplemental jury instruction identified by petitioner in this assertion of ineffective assistance did not cause the performance of petitioner's trial counsel to fall below an objective level of reasonableness. None of those objections possessed any arguable legal merit, under either state or federal law. Trial counsel are not required to make meritless or frivolous objections. *Miller v. Thaler*, 714 F.3d 897, 904 n.6 (5th Cir. 2013); *Roberts v. Thaler*, 681 F.3d 597, 612 (5th Cir.), *cert. denied*, ___ U.S. ___, 133 S.Ct. 529, 184 L.Ed.2d 345 (2012).

b.      No Prejudice

Because none of the objections petitioner now urges possessed any arguable legal merit under either state or federal law, there is no reasonable probability that, but the failure

392

of petitioner's trial counsel to make any of those objections to the supplemental jury instructions, the outcome of the punishment phase of petitioner's capital murder trial would have been different.  The failure of trial counsel to make futile or meritless objections cannot possibly prejudice petitioner within the meaning of *Strickland. See Paredes v. Quarterman*, 574 F.3d at 291 n.13 (failure to raise a meritless argument cannot be the basis for an ineffective assistance claim because the result of the proceeding would not have been different had the attorney raised the issue).

### c. Conclusions

Petitioner's procedurally defaulted fourteenth assertion of ineffective assistance in his fourth claim herein does not satisfy either prong of *Strickland* analysis and does not warrant federal habeas corpus relief.

## P. Failure to Object to Prosecution Displaying/Waving "Serial Killer" Book

### 1. The Complaint

In his fifteenth assertion of ineffective assistance in his fourth claim herein, petitioner argues his trial counsel should have objected to the prosecution "waving the book <u>Serial Killer</u> in front of the jury during the punishment phase" of trial.[548]

---

[548] *Second Amended Petition*, at p. 242; *Petitioner's Reply*, at pp. 126-28.
In addition to the exchange between the prosecution and its expert witness Dr. Short, the term "serial killer" was used by the prosecutor and Dr. Mathew during a brief exchange in which Dr, Mathew testified he failed to see any link between petitioner's conduct and that which he believed was typical of a legitimate serial killer. S.F. Trial, Volume 35, testimony of Roy Mathew, at p. 214.

2.      State Court Disposition

During the prosecution's direct examination of prosecution mental health expert Dr. Short, the prosecution, without objection, followed up a question as whether children with ADD were necessarily dangerous (which Dr. Short answered negatively) with a question as to whether a child who had ADD would necessarily be classified as a serial killer.[549]  Dr. Short again answered negatively.[550]  The prosecutor then began questioning Dr. Short regarding the definition of the term "psychopath" and the characteristics of psychopaths as defined in Hare's Psychopathy Checklist.[551]  When the prosecutor then shifted terminology and inquired about serial killers, Dr. Short replied that Hare's definition rendered "serial killers" a very small subset of what Hare termed "psychopaths."[552]

The following exchanges then took place:

> MR. CANTACUZENE: Your Honor, if I may, I don't believe this is relevant, because she has not been able to say based upon a reasonable medical probability that the psychopathy — being a psychopath or a sociopath applies to Mr. Young.  I don't see how this is relevant without any underlying psychiatric evaluation performed by the doctor.
>
> MR. SCHORRE: Okay.  Actually what I would propose doing is letting the doctor give us the —
>
> MR. CANTACUZENE: Your Honor, may we approach for a moment?
>
> (At Bench, on the record)
>
> MR. SCHORRE: You're getting smarter.

---

[549] S.F. Trial, Volume 32, testimony of Helen Short, at p. 55.

[550] *Id.*

[551] *Id.*, at pp. 57-59.

[552] *Id.*, at p. 60.

MR. CANTACUZENE: Yeah.

MR. SCHORRE: I'm going to have her just describe the characteristics. I'm not going to ask her to make the jump over to Clint because she hasn't evaluated him.

MR. CANTACUZENE: Right.

MR. SCHORRE: Thank you.

THE COURT: Wait just a moment. We're not through.

MR. CANTACUZENE: Your Honor, I don't believe it's relevant. I believe it is misleading to the jury. I believe the prejudicial effect outweighs any probative value this jury may answer. I don't believe its based upon a reasonable medical probability that this applies to Clint, there's been no psychiatric or psychological evaluation by the State that gives him the underlying foundation of this, there is — she has clearly admitted that she unethically and improperly diagnosed him at the age of 14 years 8 months with antisocial personality disorder, and to use that which she clearly admits was wrong and the DSM IV says is not appropriate, she's now linking — Mr. Schorre now wants to leap to, you know, books he buys at Barnes & Nobles, and serial killers, and I don't think that is appropriate, I don't —

MR. SCHORRE: Actually, J. D. Gave me the book. I don't know where he bought it.

THE COURT: Well —

MR. SCHORRE: Here's my point.

THE COURT: Let me explain this. The issue before this jury is not whether or not this Defendant is likely to be a serial killer. The issues are those three questions they've got to answer. You do go too far when you start describing things that really this jury's not going to have to answer.

MR. SCHORRE: I think it goes to, in my opinion, future dangerousness. If, in fact, yes, the jury has the facts before them of what the Defendant's done, okay, I think the jury's entitled to find, to hear what a psychopath and a serial killer are, and then they can apply the facts that they've heard to that definition for them to make the prediction on future dangerousness, because they're the only ones that can really make the definition or make the decision on future dangerousness, and that's — I'm just trying to give them the tools so they can effectively make that decision.

395

THE COURT: Well, asking Doctor Short characteristics of someone that's got antisocial personality disorder or let's say psychotic behavior is legitimate, but you are, it seems to me, inciting

the jury when you start talking about things like serial killer. I mean, they can make this diagnosis without even going into that. Now, if she makes that evaluation, that's one thing, but you have suggested it to her by raising that book and showing her a book called Serial Killers, and my conclusion is that that is improper and that's the ruling. You let her make the diagnosis without suggesting to her.

MR. SCHORRE: Can I ask her what, according to the literature, what traits th4e serial killers that have been studied have?

THE COURT: The evaluation this jury's got to make is not whether this guy's going to be a serial killer. It is whether he is going to be dangerous and whether or not — and that's really the primary thing. Being dangerous in future can be things other than being a serial killer.

MS. CLINGMAN: There would be no problem, then, since she's already testified that psychopaths are a substantive antisocial to have her delineate those characteristics of a psychopath and say that multiple murders or persons who are multiple murderers would fit into those categories.

THE COURT: Let's let her make the evaluation. I mean, let her describe what those characteristics are.

MR. SCHORRE: Can we take a break? I need to go down the hall and I bet some of the jury does, too. Is that agreeable?

THE COURT: Yes.

MR. WILLIAMS: Your Honor, we would ask for a running objection to any testimony from the doctor on psychopaths or antisocial personality disorder since she has testified that she can't sat that he'd a psychopath and that her diagnosis antisocial personality disorder was improper.

THE COURT: The ruling is that she's not going to be permitted to say he is, but the objection as to her describing the characteristics of someone with antisocial personality disorder for a psychopath is overruled. The Court determines that she may make that. She can describe to the jury those characteristics and let the jury decide.

MS. CLINGMAN: Well, and she's already testified that based on her conclusion to his hypothetical that a person such as Clint with multiple murders is antisocial.

THE COURT: And Mr. Williams, yes, you may have your running objection.

396

MR. WILLIAMS: Thank you.[553]

Petitioner first presented this ineffective assistance complaint as his proposed twenty-second claim in a pleading filed the state trial court in June, 2006.[554]  The Texas Court of Criminal Appeals construed this claim, and several others, as a subsequent state writ application and dismissed same pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 63,137-02, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

3.      Procedural Default

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; *Coleman v. Quarterman*, 456 F.3d at 542.

4.      Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in *Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of petitioner's procedurally defaulted complaints of ineffective assistance by his trial counsel.

a.      No Deficient Performance

While not raising precisely the same objection petitioner now urges, petitioner's trial counsel did timely object to the line of questioning in which the prosecution attempted to elicit testimony from the prosecution's mental health expert identifying petitioner as a serial

---

[553] S.F. Trial, Volume 32, at pp. 60-65.

[554] First State Habeas transcript, Volume 7, at p. 1139.

killer and obtained a ruling from the state trial court which foreclosed that line of questioning and clearly directed the prosecution to refrain from holding up the book in question while questioning Dr. Short.  There is no fact-specific allegation in the record now before this Court establishing that the prosecution ever again allegedly "waved" the book in question in front of the jury during petitioner's trial.  Thus, petitioner's trial counsel could reasonably have believed their objection achieved the desired result, i.e., the prosecution would not be displaying the book to Dr. Short again.  Nor does petitioner allege any specific facts showing he was reasonably entitled to any other relief from the trial court at that point in the trial.  On the contrary, making further objection could reasonably have unduly emphasized the book's title and shifted the jury's focus from the contents of Dr. Short's trial testimony to the book, which had not been admitted into evidence, and thereby increased any prejudicial impact of the prosecutor's actions.

Under such circumstances, the failure of petitioner's trial counsel to specifically object to the prosecutor displayed the book in question did not cause the performance of petitioner's trial counsel to drop below any objective level of reasonableness.  Petitioner's trial counsel timely objected to the line of questioning and the trial court not only sustained the objection but also instructed the prosecutor to refrain from holding up the book while questioning Dr. Short.

      b.    <u>No Prejudice</u>

The record before this Court reveals only the information quoted above regarding the prosecution's allegedly waving the book in question before the jury.  At the time of the

398

incident in question, petitioner's jury had already convicted petitioner beyond a reasonable doubt of capital murder under two separate theories.  Moreover, the evidence of petitioner's long history of violent, criminal, behavior was overwhelming.  Petitioner's trial counsel did make a timely objection and the state trial court ruled in petitioner's favor and directed the prosecution, at least implicitly, to refrain from displaying the book in question to the witness. Petitioner does not allege any specific facts showing he was prejudiced within the meaning of *Strickland* by his trial counsel's failure to move for a mistrial following the trial court's favorable ruling on petitioner's objection.

The trial court precluded the prosecution from inquiring on direct examination of its own expert whether the petitioner could be classified as a serial killer.  On cross-examination, the petitioner's expert, Dr. Mathew, rejected out of hand the prosecution's suggestion that petitioner qualified as a serial killer.

Given the evidence of petitioner's long history of violent conduct, the details of petitioner's capital offense, and the extensive case in mitigation actually presented by petitioner's trial counsel, all properly before petitioner's capital sentencing jury, there is no reasonable probability that, but for the failure of petitioner's trial counsel to specifically object to the prosecution displaying the book in question before the jury, the outcome of the punishment phase of petitioner's capital murder trial would have been different.

c.     Conclusions

Petitioner's procedurally defaulted fifteenth assertion of ineffective assistance in his

fourth claim herein does not satisfy either prong of *Strickland* analysis and does not warrant

federal habeas corpus relief.

Q.     Failure to Object to the Admission of Petitioner's Midland County Jail Records (State
       Exhibit no. 145)

1.     The Complaint

In his sixteenth assertion of ineffective assistance in his fourth claim herein, petitioner

argues his trial counsel should have objected to the admission of petitioner's Midland County

Jail records (State Exhibit no. 145) because some of the records in that exhibit contained

false information.[555]

---

[555] *Second Amended Petition*, at pp. 242-43; *Petitioner's Reply*, at pp. 129-31.

    In his reply brief, for the first time, petitioner asserts a number of new complaints about the performance of his trial counsel which petitioner has never fairly presented to any state court.  These new complaints are currently unexhausted and, therefore, procedurally defaulted.  Included among these unexhausted, procedurally defaulted complaints are arguments petitioner's trial counsel should have (1) investigated the factual accuracy of an undated report by a Deputy Elder concerning a telephone conversation the Deputy allegedly overheard in which petitioner commented on having access to the names and addresses of his jurors, (2) moved to exclude Deputy Elder's report as factually inaccurate, and (3) sought to exclude documents included in petitioner's Midland County Jail records that reflected bad behavior by petitioner.  This Court independently concludes after *de novo* review that none of these new complaints satisfy either prong of *Strickland* analysis.  At no point in his pleadings herein does petitioner allege any specific facts showing he ever complained to his *trial* counsel concerning any alleged factual inaccuracies in Deputy Elder's report or any other document contained in State Exhibit no. 145.  Nor does petitioner allege any specific facts showing his trial counsel were aware, or with the exercise of due diligence could have learned, of any information which would have furnished a legitimate basis for excluding State Exhibit no. 145 or any of its contents.  Contrary to the implication underlying these complaints, the fact petitioner complained to his first state habeas counsel about some of the information in State Exhibit no. 145 does not establish petitioner or anyone else made petitioner's trial counsel aware of any factual inaccuracies in State Exhibit no. 145.  That petitioner disagreed with some of the information contained in State Exhibit no. 145 did not, standing alone, furnish a legal basis for seeking the exclusion of State Exhibit no. 145 or any of its contents.  Petitioner did not testify at trial or in any of his subsequent proceedings attacking his conviction, i.e., his motion for new trial hearing or his multiple state habeas corpus hearing.  Petitioner does not allege he was ever willing to testify in a hearing to challenge the factual accuracy of any of the information contained in State Exhibit no. 145.  Petitioner does not allege any specific facts showing that any other evidence existed at the time of petitioner's trial which his trial counsel could have employed to exclude State Exhibit no. 145 or any of its contents.  Thus, petitioner's new, unexhausted, procedurally defaulted, conclusory  assertions of ineffective assistance fail to satisfy either prong of

2.     State Court Disposition

Petitioner's Midland County Jail records were admitted into evidence without

objection at the punishment phase of petitioner's capital murder trial.[556]  Petitioner first

argued  his trial counsels' failure to object to the admission of these records constituted

ineffective assistance in a pleading filed in March, 2006 in the state trial court.[557]  The Texas

Court of Criminal Appeals construed this claim, and several others, as a subsequent state writ

application and dismissed same pursuant to the Texas writ-abuse statute. *Ex parte Clinton*

*Lee Young*, WR 63,137-02, 2006 WL 3735395, *1 (Tex. Crim. App. December 20, 2006).

3.     Procedural Default

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state

writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on

same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; Coleman *v. Quarterman*, 456 F.3d at 542.

4.     Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in

*Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of

petitioner's procedurally defaulted complaints of ineffective assistance by his trial counsel.

---

*Strickland* analysis.

[556] S.F. Trial, Volume 30, at p. 179.

[557] First State Habeas Transcript, Volume 5, at p. 759.
Petitioner's pleading filed March 9, 2006 did not identify any factual errors contained in petitioner's Midland County Jail records or specify what information petitioner had alleged made known to his trial counsel concerning same.

a.    No Deficient Performance

At the hearing held on petitioner's motion for new trial, petitioner's lead trial counsel

testified without contradiction that he was not concerned about admission of petitioner's

Midland County Jail records because the petitioner's behavior while housed in that facility

had been pretty good.[558] Petitioner alleges no specific facts showing his trial counsel's

assessment of the contents of petitioner's Midland County Jail records was objectively

unreasonable in view of the information then available to said counsel.

Petitioner's pleadings herein identify only one alleged factual inaccuracy included

within the almost two hundred pages of State Exhibit no. 145, i.e., a January 10, 2003 report

made by a Deputy Elder.[559] While petitioner complains the records include various accounts

of bad behavior on his part, he does not specifically allege any facts showing any of the

information contained in the other reports or documents in State Exhibit no. 145 were

factually inaccurate.  Nor does petitioner allege any specific facts showing the existence of

any evidence at the time of his trial which his attorney could have employed to challenge the

admission of State Exhibit no. 145 or to exclude any portion of same.  Nor, for that matter,

does petitioner identify any potential meritorious legal basis for objecting to the admission of

the petitioner's Midland County Jail records.  Like petitioner's TYC records, petitioner's

Midland County Jail records were accompanied by an authenticating affidavit sufficient to

render them public or business records within the meaning of the long recognized exception

---

[558] S.F. Trial, Volume 39, testimony of Paul Williams, at pp. 34, 64.

[559] For ease of reference, this Court has added page numbers to State Exhibit no. 145.  The January 10, 2003 report by Deputy Elder appears at page 142 of that trial exhibit.

to the Texas hearsay rule.  Thus, petitioner has failed to identify any legitimate legal basis to support an objection by his trial counsel to the admission of State Exhibit no. 145. Petitioner's trial counsel cannot reasonably be faulted for failing to make a futile or meritless objection. *Clark v. Thaler*, 673 F.3d at 429; *Paredes v. Quarterman*, 574 F.3d at 291.

       b.    <u>No Prejudice</u>

Likewise, the failure of petitioner's trial counsel to make a futile or meritless objection did not "prejudice" petitioner within the meaning of *Strickland. Paredes v. Quarterman*, 574 F.3d at 291 n.13.  Given the evidence of petitioner's long history of violent conduct, the details of petitioner's capital offense, and the extensive case in mitigation actually presented by petitioner's trial counsel, all properly before petitioner's capital sentencing jury, there is no reasonable probability that, but for the failure of petitioner's trial counsel to object to the admission of petitioner's Midland County Jail records, the outcome of the punishment phase of petitioner's capital murder trial would have been different.

       c.    <u>Conclusions</u>

Petitioner's procedurally defaulted, conclusory, sixteenth assertion of ineffective assistance in his fourth claim herein does not satisfy either prong of *Strickland* analysis and does not warrant federal habeas corpus relief.

R.    <u>Failure to Impeach Prosecution Witness Timmons</u>

1.    <u>The Complaint</u>

In his seventeenth assertion of ineffective assistance in his fourth claim herein,
petitioner argues his trial counsel should have utilized the "Timmons Report" discussed at
length above in Section VII.H. above to impeach prosecution witness Jacqueline Timmons.[560]

2.    <u>State Court Disposition</u>

Petitioner first complained about his trial counsel's failure to use the report in
question to impeach Timmons in a pleading filed in the state trial court in March, 2006.[561]
The Texas Court of Criminal Appeals construed this claim, and several others, as a
subsequent state writ application and dismissed same pursuant to the Texas writ-abuse
statute. *Ex parte Clinton Lee Young*, WR 63,137-02, 2006 WL 3735395, *1 (Tex. Crim. App.
December 20, 2006).

3.    <u>Procedural Default</u>

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state
writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on
same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; *Coleman v. Quarterman*, 456 F.3d at 542.

---

[560] *Second Amended Petition*, at pp. 243-44; *Petitioner's Reply*, at pp. 131-32;

[561] First State Habeas Transcript, Volume 5, at p. 760.

4.    Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in *Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of petitioner's procedurally defaulted complaints of ineffective assistance by his trial counsel.

a.    No Deficient Performance

As was explained in Section VII.H. above, contrary to the thesis underlying this ineffective assistance complaint, the report in question[562] corroborated the most salient aspects of prosecution witness Timmons' trial testimony about an incident in which she witnessed petitioner assault another youth and a TYC staff person. Likewise, also as discussed in Section VII.H., contrary to petitioner's suggestion, nothing in that report either (1) establishes that petitioner did NOT also assault Timmons during the same altercation or (2) suggest, contrary to Timmons' trial testimony, that another, more detailed report on the incident did not exist. On the contrary, the report indicates that, when Timmons attempted to restrain the petitioner, he pulled away from her and violently charged the other youth with whom he had been fighting.[563] Thus, there were objectively reasonable reasons why petitioner's trial counsel may have chosen not to employ the four-page report in question in an attempt to impeach Timmons' trial testimony. Simply put, there were objectively reasonable reasons why petitioner's trial counsel may have wished to avoid calling the jury's attention to the Timmons Report. The failure of petitioner's trial counsel to employ the

_____

[562] Petitioner attached a copy of the Timmons Report to his Second Amended Petition herein as Exhibit 20. Docket entry no. 88, at pp. 209-12.

[563] Exhibit 20 to Petitioner's Second Amended Petition, docket entry no. 88, at p. 211.

report to attempt to impeach Timmons did not cause the performance of petitioner's trial counsel to fall below an objective level of reasonableness.

    b.  <u>No Prejudice</u>

  Because the report could not have been utilized to impeach Timmons in the manner suggested by petitioner, the failure of petitioner's trial counsel to attempt to do so did not "prejudice" petitioner within the meaning of *Strickland*. *Paredes v. Quarterman*, 574 F.3d at 291 n.13. Given the evidence of petitioner's long history of violent conduct, the details of petitioner's capital offense, and the extensive case in mitigation actually presented by petitioner's trial counsel, all properly before petitioner's capital sentencing jury, there is no reasonable probability that, but for the failure of petitioner's trial counsel to object to the admission of petitioner's Midland County Jail records, the outcome of the punishment phase of petitioner's capital murder trial would have been different.

    c.  <u>Conclusions</u>

  Petitioner's procedurally defaulted, conclusory, seventeenth assertion of ineffective assistance in his fourth claim herein does not satisfy either prong of *Strickland* analysis and does not warrant federal habeas corpus relief.

S.  <u>Failure to Object to Prosecutorial Comments About Petitioner's Confession to the Douglas Murder & Lack of Remorse</u>

    1.  <u>The Complaint</u>

  In his final assertion of ineffective assistance in his fourth claim herein, petitioner argues his trial counsel should have objected to the prosecution's closing arguments at the

punishment phase of trial suggesting (1) petitioner had confessed to murdering Doyle

Douglas and (2) petitioner had never expressed remorse for either of his murders.[564]

2.   State Court Disposition

Petitioner first complained about his trial counsel's failure to object to the

prosecution's comment on the lack of evidence of petitioner's remorse in his affidavit

attached to his motion for new trial.[565]  At the evidentiary hearing held on petitioner's motion

for new trial, petitioner's lead trial counsel testified that, in hindsight, he believed he should

have objected to the prosecutor's comment in question.[566]  Nonetheless, the state trial court

overruled petitioner's motion for new trial, rejecting on the merits all of petitioner's

ineffective assistance claims therein.[567]  Petitioner did not appeal the denial of his motion for

new trial.  Likewise, while petitioner did assert a number of ineffective assistance claims in

his first state habeas corpus application, he did not complain therein about his trial counsel's

failures to object to any prosecution argument at the punishment phase of trial.

Rather, petitioner next complained about his trial counsel's failures to object to the

prosecution's punishment-phase jury arguments in a pleading filed in the state trial court in

March, 2006.[568]  The Texas Court of Criminal Appeals construed this claim, and several

others, as a subsequent state writ application and dismissed same pursuant to the Texas writ-

---

[564] *Second Amended Petition*, at pp. 244-45; *Petitioner's Reply*, at pp. 132-34.

[565] Trial Transcript, Volume 5 of 5, at pp. 908-09.

[566] S.F. Trial, Volume 39, testimony of Paul Williams, at p. 38.

[567] S.F. Trial, Volume 39, at pp. 100-04.

[568] First State Habeas Transcript, Volume 5, at p. 760.

abuse statute. *Ex parte Clinton Lee Young*, WR 63,137-02, 2006 WL 3735395, *1 (Tex.

Crim. App. December 20, 2006).

>    3.    Procedural Default

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state

writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on

same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; *Coleman v. Quarterman*, 456 F.3d at 542.

>    4.    Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in

*Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of

petitioner's procedurally defaulted complaints of ineffective assistance by his trial counsel.

>        a.    No Deficient Performance

As was explained in Section VII.G.2 above, the record from petitioner's trial included

ample evidence establishing petitioner confessed to Patrick Brook in the presence of McCoy

and Ray that petitioner shot Douglas twice in the head.[569]  Thus, petitioner's complaint in his

Second Amended Petition about his trial counsel's failure to object to the prosecution's

reference to petitioner's "confession" to the Douglas shooting lacks any arguable merit.  In

his latest pleading, however, petitioner asserts for the first time a new, unexhausted,

ineffective assistance complaint, about his trial counsel's failure to object to the prosecution

suggesting that petitioner confessed to Dr. Mathew.  As was explained in Section VII.G.2.

above, petitioner is correct that the prosecutor, without objection from defense counsel,

------

[569] *See* note 326, *supra.*

erroneously suggested Dr. Mathew had testified petitioner admitted to shooting Douglas.[570] In point of fact, petitioner did not confess his role in the Douglas murder to Dr. Mathew but, rather, to Patrick Brook.[571]  Dr. Mathew testified the petitioner refused to discuss the Doyle Douglas murder with him.[572]

Under such circumstances, the most petitioner's trial counsel could have reasonably hoped to achieve with a timely objection to the prosecutor's erroneous comment that petitioner had confessed to Dr. Mathew was a ruling from the trial court sustaining the objection and instructing the jury that it was the sole judge of the facts and that the arguments of counsel did not constitute evidence.  Moreover, a timely objection might have given the prosecution the opportunity to correct her misstatement and remind the jury, once again, that petitioner had confessed to Patrick Brook in the presence of at least two witnesses that he had shot Douglas twice in the head.[573]  Finally, it must be remembered that, by the time the prosecutor gave her jury argument at the punishment phase of trial, the jury had already convicted petitioner of capital murder under two separate theories, one of which necessarily required the jury to find petitioner guilty beyond a reasonable doubt of criminal responsibility for the murder of Doyle Douglas.

---

[570] S.F. Trial, Volume 36, at p. 95.

[571] See note 326, supra.

[572] S.F. Trial, Volume 34, testimony of Roy Mathew, at p. 221.

[573] Deborah Sanders was present in the motel room when Patrick Brook, Darnell McCoy, and Mark Ray testified they witnessed the petitioner confess to shooting Douglas in the head twice.  But she testified she fell asleep off and on during the meeting and apparently overheard only petitioner's statements that Douglas (her uncle) was dead. S.F. Trial, Volume 30, testimony of Deborah Sanders, at pp. 113-16, 121, 125.

The prosecutor's misstatement that petitioner had confessed to Dr. Mathew (when in fact petitioner had confessed to Patrick Brook) was an isolated comment that was immediately followed by the prosecutor moving on to a discussion of the final capital sentencing special issue.  In view of the context, the failure of petitioner's trial counsel to object to the prosecutor's punishment-phase misstatement as to the identity of the person(s) to whom petitioner had confessed that he committed the Douglas murder did not cause the performance of petitioner's trial counsel to fall below an objective level of reasonableness.

As this Court explained in detail in Section VII.G.3. above, the prosecutor's comment on the lack of evidence in the trial record showing petitioner had ever displayed or expressed remorse for his murders of Douglas and Petrey was an accurate interpretation of the evidence then before the jury and not an improper comment on the petitioner's failure to testify at trial. Therefore any objection petitioner's trial counsel may have raised to the prosecutor's remark as a comment on the petitioner's silence lacked any arguable merit.  The failure of petitioner's trial counsel to object to the prosecutor's remark about the lack of evidence in the record showing petitioner had ever demonstrated sincere remorse or contrition for his crimes did not cause the performance of petitioner's trial counsel to fall below an objective level of reasonableness.

b.     No Prejudice

Because neither of the objections urged by petitioner in his final assertion of ineffective assistance in his fourth claim herein had any legitimate basis in law or fact, the failure of petitioner's trial counsel to raise either of those objections did not "prejudice"

410

petitioner within the meaning of *Strickland*. *Paredes v. Quarterman*, 574 F.3d at 291 n.13. Given the evidence of petitioner's long history of violent conduct, the details of petitioner's capital offense, and the extensive case in mitigation actually presented by petitioner's trial counsel, all properly before petitioner's capital sentencing jury, there is no reasonable probability that, but for the failure of petitioner's trial counsel to object to the prosecution's jury arguments in question, the outcome of the punishment phase of petitioner's capital murder trial would have been different.

c.   <u>Conclusions</u>

Petitioner's procedurally defaulted eighteenth assertion of ineffective assistance in his fourth claim herein does not satisfy either prong of *Strickland* analysis and does not warrant federal habeas corpus relief.

## XVI. <u>Ineffective Assistance on Appeal</u>

A.   <u>The Claim</u>

In his twenty-second claim herein, petitioner argues his state appellate counsel rendered ineffective assistance in connection with petitioner's direct appeal by failing "to raise critical claims on Young's behalf, claims that were readily apparent from the record."[574]

B.   <u>State Court Disposition</u>

Petitioner presented the state habeas court with same conclusory assertion of ineffective assistance by his state appellate counsel that he presents in his twenty-second

---

[574] *Second Amended Petition*, at pp. 338-40; *Petitioner's Reply*, at pp. 191-93.
Petitioner requests permission to supplement or amend this claim and also requests an evidentiary hearing on same. *Second Amended Petition*, at p. 338.

411

claim herein as part of petitioner's omnibus fourth claim for relief in his second subsequent (third) state habeas corpus application.[575]   The Texas Court of Criminal Appeals dismissed this claim pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-03, 2009 WL 1546625, *1 (Tex. Crim. App. June 3, 2009).

C.   Procedural Default

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; Coleman v. *Quarterman*, 456 F.3d at 542.

D.   Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in *Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of petitioner's procedurally defaulted complaints of ineffective assistance by his trial counsel. To avoid a possible remand in the event the holdings in those cases are extended to the performance of petitioner's state *appellate* counsel, this Court will conduct an alternative, *de novo*, review of petitioner's twenty-second claim herein.

1.   The Complaint

Petitioner's argues his state appellate counsel failed to present "claims that are readily apparent from the record."  Petitioner offers no other clue as to what these claims might have been or where in the trial record petitioner's state appellate counsel could have found them.

---

[575] Third States Habeas Transcript, Volume 1 of 10, at pp. 191-92.

2.      The Constitutional Standard

The same two-pronged standard for evaluating ineffective assistance claims against

trial counsel announced in *Strickland* applies to complaints about the performance of counsel

on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 764, 145 L.Ed.2d 756

(2000)(holding a petitioner arguing ineffective assistance by his appellate counsel must

establish both (1) his appellate counsel's performance was objectively unreasonable and (2)

there is a reasonable probability that, but for appellate counsel's objectively unreasonable

conduct, the petitioner would have prevailed on appeal); *Dorsey v. Stephens*, 720 F.3d 309,

319 (5th Cir. 2013)("A criminal defendant has a constitutional right to receive effective

assistance of counsel on his first appeal.  In a direct appeal, ineffective assistance of counsel

claims are governed by the standard established by the Supreme Court in *Strickland v.*

*Washington.*"*(Footnotes omitted), cert. filed November 8, 2013 (no. 13-7687)); Higgins v.*

*Cain*, 720 F.3d 255, 261 n.8 (5th Cir.)("The *Strickland* standard is used to evaluate claims for

ineffective assistance of appellate counsel."), *cert.* denied, ___ U.S. ___, 134 S.Ct. 688, ___

L.Ed.2d (2013); *Blanton v. Quarterman*, 543 F.3d at 240 (the traditional *Strickland* standard

applies to claims alleging ineffective assistance by appellate counsel); *Ries v. Quarterman*,

522 F.3d 517, 531 (5th Cir.) (*Strickland* analysis applies to claims of ineffective assistance by

appellate counsel), *cert. denied*, 555 U.S. 990 (2008); *Henderson v. Quarterman*, 460 F.3d

654, 665 (5th Cir. 2006)(*Strickland* furnishes the proper standard for review of a complaint of

ineffective assistance by state appellate counsel), *cert. denied*, 549 U.S. 1252 (2007); *Amador*

*v. Quarterman*, 458 F.3d at 410-11 (holding complaints of ineffective assistance by state

appellate counsel are governed by the *Strickland* standard of review); *Moreno v. Dretke*, 450

F.3d 158, 168 (5th Cir. 2006)(applying the dual prongs of *Strickland* analysis to complaints of ineffective assistance by appellate counsel), *cert. denied*, 549 U.S. 1120 (2007); *Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir.)(holding *Strickland* applies to a prisoner's claim his appellate counsel was ineffective for failing to raise a certain issue on appeal), *cert. denied*, 541 U.S. 1087 (2004).

Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into (1) whether appellate counsel's performance was deficient, i.e., whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) whether appellate counsel's allegedly deficient performance "prejudiced" petitioner, i.e., whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of petitioner's appeal would have been different. *Smith v. Robbins*, 528 U.S. at 285, 120 S.Ct. at 764; *Higgins v. Cain*, 720 F.3d at 260-61; *Henderson v. Quarterman*, 460 F.3d at 665; *Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d at 444.

Appellate counsel who files a merits brief need not and should not raise every non-frivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins*, 528 U.S. at 288, 120 S.Ct. at 765; *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983); *Henderson v. Quarterman*, 460 F.3d at 665; *Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d at 445.

The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477

414

U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986); *Jones v. Barnes*, 463 U.S. at 751-52, 103 S.Ct. at 3313.

Nonetheless, appellate counsel is obligated to research relevant facts and law or to make an *informed* decision that certain avenues will not prove fruitful. *See Busby v. Dretke*, 359 F.3d at 714 (a reasonable attorney has an obligation to research relevant facts and law or make an informed decision that certain avenues will not be fruitful); *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004)(holding the same); *Schaetzle v. Cockrell*, 343 F.3d at 445 (failure to raise a discrete, purely legal issue, where the precedent could not be more pellucid or applicable, denies adequate representation).  Likewise, solid,  meritorious arguments based on directly controlling precedent should be discovered and brought to the appellate court's attention. *United States v. Reinhart*, 357 F.3d at 525; *Schaetzle v. Cockrell*, 343 F.3d at 445.

Where, as in petitioner's case, appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more non-frivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores-Ortega*, 528 U.S. 470, 477 & 482, 120 S.Ct. 1029, 1034 & 1037, 145 L.Ed.2d 985 (2000)(holding the dual prongs of *Strickland* apply to complaints of ineffective appellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith v. Robbins*, 528 U.S. at 287-89, 120 S.Ct. at 765-66 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland*); *Busby v.*

*Dretke*, 359 F.3d at 714-17 (applying dual prongs of *Strickland* to a complaint about appellate counsel's failure to present a point of error on appeal).

     3.    <u>Synthesis</u>

          a.     <u>No Deficient Performance</u>

Petitioner's state appellate counsel filed an appellate brief on petitioner's behalf which asserted thirty-four points of error, which included many of the same claims petitioner has raised herein attacking the Texas capital sentencing scheme, petitioner's jury charge (including the trial court's supplemental jury instructions), the sufficiency of the evidence supporting the jury's verdicts at both phases of trial, and the trial court's rulings on a variety of evidentiary matters.  Petitioner does not identify a single, additional, potentially meritorious, point of error his state appellate counsel could have added to petitioner's thorough state appellate brief.  Petitioner's wholly conclusory assertion that petitioner's state appellate counsel failed to raise unidentified claims which were "readily apparent from the record" is insufficient to satisfy the deficient performance prong of *Strickland* analysis. There was nothing objectively unreasonable with the failure of petitioner's state appellate counsel to raise any of the substantive claims (i.e., those other than ineffective assistance complaints) petitioner has included in his Second Amended Petition herein in petitioner's direct appeal.  As explained above, none of petitioner's substantive claims herein possess any arguable federal constitutional merit.

Nor does petitioner allege any specific facts showing how his state appellate counsel's failure to appeal the denial of petitioner's motion for new trial caused the performance of

petitioner's state appellate counsel to fall below an objective level of reasonableness. As explained at great length in Section XV. above, none of the ineffective assistance complaints petitioner voiced in his motion for new trial satisfied either prong of *Strickland* analysis. There was nothing objectively unreasonable in the decision by petitioner's state appellate counsel not to raise points of error urging the arguments contained in petitioner's overruled motion for new trial. The evidence elicited during the evidentiary hearing on petitioner's motion for new trial established beyond any doubt the frivolous nature of petitioner's complaints of ineffective assistance in that motion.

Petitioner has failed to allege any facts sufficient to overcome the presumption that the performance of his state appellate counsel fell within the broad range of objectively reasonable, professionally competent, appellate representation. *See Dorsey v. Stephens*, 720 F.3d at 320 (rejecting complaint of ineffective assistance by appellate counsel where petitioner failed to allege specific facts showing the existence of a particular non-frivolous issue appellate counsel failed to present that was clearly stronger than the issues appellate counsel did present). Petitioner has not identified any non-frivolous potential points of error available to petitioner's state appellate counsel which were stronger than any of the points of error petitioner's state appellate counsel did include in petitioner's state appellate brief.

        b.    <u>No Prejudice</u>

Because petitioner has failed to allege any specific facts showing the existence of a non-frivolous point of error which his state appellate counsel failed to assert on direct appeal that was "clearly stronger than issues counsel did present," petitioner has failed to satisfy the

prejudice prong of *Strickland* analysis. *Smith v. Robbins*, 528 U.S. at 288, 120 S.Ct. at 765-66.

        c.      Conclusions

Petitioner's procedurally defaulted, conclusory, twenty-second claim herein fails to satisfy either prong of *Strickland* analysis and does not warrant federal habeas corpus relief.

## XVII. Cumulative Error

A.      The Claim

In his twenty-third claim for relief herein, petitioner argues that he is entitled to federal habeas corpus relief by virtue of the "cumulative and inter-related errors that occurred at the guilt and penalty phases of trial."[576]

B.      State Court Disposition

Petitioner presented the state court with the same conclusory cumulative error argument he included in his twenty-third claim herein in as part of his omnibus fourth claim in his second subsequent (third) state habeas corpus application.[577]  The Texas Court of Criminal Appeals dismissed this claim pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-03, 2009 WL 1546625, *1 (Tex. Crim. App. June 3, 2009).

---

[576] *Second Amended Petition*, at pp. 340-42; *Petitioner's Reply*, at pp. 193-94.

[577] Third State Habeas Transcript, Volume 1 of 10, at pp. 192-94.

C.      Procedural Default

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; *Coleman v. Quarterman*, 456 F.3d at 542.

D.      Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in *Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of petitioner's procedurally defaulted complaints of ineffective assistance by his trial counsel. To avoid a possible remand in the event the holdings in those cases are extended to the performance of petitioner's state *appellate* counsel, this Court will conduct an alternative, *de novo*, review of petitioner's twenty-third claim herein.

Writing for this Court more than a decade ago in another capital habeas corpus proceeding, then-District Judge (now Circuit Judge) Edward C. Prado addressed a conclusory cumulative error claim virtually identical to the one petitioner presents in his twenty-third claim herein:

> In his thirteenth and final claim for relief, petitioner argues that the cumulative effect of the foregoing alleged errors by his trial counsel and the state trial court warrant federal habeas relief. However, federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process. The cumulative error doctrine provides relief only when the *constitutional* errors committed in the state trial court so fatally infected the trial that they violated the trial's fundamental fairness. Insofar as petitioner asserts a "cumulative error" theory as a separate ground for relief, that argument is foreclosed by the Fifth Circuit's opinion in

419

*Derden v. McNeel* and its progeny. In order to satisfy the cumulative error rule in the Fifth Circuit, a federal habeas petitioner must show that (1) the state trial court actually committed errors, (2) the errors are not procedurally barred, (3) the errors rise to the level of constitutional deprivations, and (4) the record as a whole reveals that an unfair trial resulted from those errors. As this Court's discussion of the many details of petitioner's trial set forth at great length above makes clear, none of the alleged errors by the petitioner's state trial court or alleged deficiencies in the performance of petitioner's trial counsel identified by petitioner rise to the level of a violation of petitioner's constitutional rights. This Court independent review of the record of petitioner's trial, as a whole, reveals that proceeding was *not* unfair in any constitutional sense. In this case, petitioner attempts to rely upon the collective force and effect of the various alleged errors committed by his state trial court in presiding over petitioner's capital murder trial as an independent basis for federal habeas relief. However, a petitioner who attempts to cumulate trial court errors that do not rise to the federal constitutional dimension has presented nothing to cumulate. As the Fifth Circuit once succinctly put it, "[t]wenty times zero equals zero." For the foregoing reasons, petitioner's final ground for relief is without merit.

*Cordova v Johnson*, 993 F.Supp. 473, 542-43 (W.D. Tex. 1998), *CoA denied*, 157 F.3d 380 (5th Cir. 1998), *cert. denied*, 525 U.S. 1131 (1999).

These same principles apply to petitioner's cumulative error claim herein. *See Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir.)(Federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process), *cert. denied*, 551 U.S. 1193 (2007); *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992)(*en banc*) (holding the same), *cert. denied*, 508 U.S. 960 (1993); *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987)("Twenty times zero equals zero.").

For the reasons set forth at length above, petitioner has not alleged any specific facts showing that there was any constitutional error committed during the course of his trial. Petitioner's many ineffective assistance of counsel complaints all suffer from the same defect - they fail to allege any specific facts showing any of those claims satisfy either prong of *Strickland* analysis.  Thus, like Cordova, petitioner has failed to allege any facts showing there was any constitutional error which can be cumulated. *See Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007)("Federal habeas relief is only available for cumulative errors that are of a constitutional dimension.").

E.      Conclusions

Petitioner's procedurally defaulted, conclusory, twenty-third claim herein does not identify any constitutional error which occurred during his capital murder trial and does not warrant federal habeas relief.

## XVIII. <u>Actual Innocence</u>

A.      The Claim

In his twenty-fourth claim herein, petitioner argues he is actually innocent of capital murder "for the multiple reasons discussed above."[578]

B.      State Court Disposition

Petitioner presented the same, conclusory, claim for relief as part of his omnibus fourth claim in his second subsequent (third) state habeas corpus application.[579]  The Texas

---

[578] *Second Amended Petition*, at pp. 342-43; *Petitioner's Reply*, at pp. 195-97.

[579] Third State Habeas Transcript, Volume 1 of 10, at p. 194.

Court of Criminal Appeals dismissed this claim pursuant to the Texas writ-abuse statute. *Ex parte Clinton Lee Young*, WR 65,137-03, 2009 WL 1546625, *1 (Tex. Crim. App. June 3, 2009).

C.      Procedural Default

The Texas Court of Criminal Appeals' dismissal of this complaint based upon state writ-abuse principles bars federal habeas review, i.e., petitioner has procedurally defaulted on same. *McGowen v. Thaler*, 675 F.3d at 499 n.72; Coleman *v. Quarterman*, 456 F.3d at 542.

D.      Alternatively, No Merit on *De Novo* Review

As explained in Section XV.E.5. above, the Supreme Court's recent opinions in *Trevino v. Thaler* and *Martinez v. Ryan* compel this Court to conduct a *de novo* review of petitioner's procedurally defaulted complaints of ineffective assistance by his trial counsel. To avoid a possible remand in the event the holdings in those cases are extended to the performance of petitioner's state *appellate* counsel, this Court will conduct an alternative, *de novo*, review of petitioner's twenty-fourth claim herein.

Actual innocence may furnish a gateway for federal habeas review of a procedurally defaulted claim of constitutional error. *McQuiggin v. Perkins*, ___ U.S. ___, ___, 133 S.Ct. 1924, 1932, 185 L.Ed.2d 1019 (2013); *House v. Bell*, 547 U.S. 518, 537-38, 126 S.Ct. 2064, 2076-77, 165 L.Ed.2d 1 (2006). It does not, however, furnish an independent basis for a grant of federal habeas corpus relief. *See Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an

independent constitutional violation occurring in the underlying state criminal proceeding.");
*Coleman v. Thaler*, 716 F.3d 895,908 (5th Cir. 2013)(holding the same).

Unlike the defendants in *Herrera v. Collins, supra,* and *House v. Bell, supra,*
petitioner has not presented this Court with any new evidence which casts any doubt on the
efficacy of the jury's verdicts at either phase of petitioner's capital murder trial. Instead,
petitioner's assertion herein that he is "actually innocent" of capital murder merely refers to
the legal and factual arguments petitioner had made in his pleadings herein and appears based
upon vague and conclusory assertions which invite this Court to re-weigh all of the guilt-
innocence phase trial testimony and to substitute its own determination of the credibility of
the prosecution's witnesses for that implicitly made by petitioner's jury. Petitioner's naked,
conclusory, assertion of actual innocence does not even begin to satisfy the *House* standard
for establishing "actual innocence" under applicable federal law:

> This "claim of 'actual innocence' is not itself a constitutional claim, but
> instead a gateway through which a habeas petitioner must pass to have his
> otherwise barred constitutional claim considered on the merits." Proving such
> a claim is "daunting indeed," requiring the petitioner to show, "'as a factual
> matter, that he did not commit the crime of conviction.'" The petitioner "must
> support his allegations with new, reliable evidence that was not presented at
> trial and must show that it was 'more likely than not that no reasonable juror
> would have convicted him in the light of the new evidence.'" Such "new,
> reliable evidence" may include, by way of example, "exculpatory scientific
> evidence, credible declarations of guilt by another, trustworthy eyewitness
> accounts, and certain physical evidence."

*McGowen v. Thaler*, 675 F.3d at 499-500 (*Footnotes omitted*)

Petitioner's citation to the Supreme Court's opinion in *Schlup v. Delo*, 513 U.S. 298,
115 S.Ct. 851, 130 L.Ed.2d 808 (1995), compels no different conclusion. *See Henderson v.
Thaler*, 626 F.3d 773, 783 (5th Cir. 2010)(holding that claims of "actual innocence" under

both *Schlup* and *Herrera* are conditioned on the existence of new evidence that was not

presented at trial and which calls the petitioner's conviction into question), *cert. denied*, ___

U.S. ___, 131 S.Ct. 2961, 180 L.Ed.2d 250 (2011).  Petitioner has failed to furnish this Court

with any new evidence sufficient to satisfy the *Schlup* "actual innocence" standard.[580]

Nor does petitioner's citation to the Supreme Court's "actual innocence" analysis in

the context of the sentencing phase of a capital trial in *Sawyer v. Whitley*, 505 U.S. 333, 350,

112 S.Ct. 2514, 2524, 120 L.Ed.2d 269 (1992), afford petitioner any basis for relief herein.[581]

"To prevail on a *Sawyer* claim of actual innocence, the petitioner must show "by clear and

convincing evidence that but for constitutional error at his *sentencing hearing,* no reasonable

juror would have found him eligible for the death penalty under [state] law." *Henderson v.*

*Thaler*, 626 F.3d at 784.  As explained at length above, petitioner has failed to demonstrate

---

[580] The Supreme Court's explanation of what it meant by the term "actual innocence" is far more helpful to understanding how a federal habeas court must evaluate such a claim than the standard itself:

> The meaning of actual innocence as formulated by *Sawyer*, and *Carrier* does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty.  It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do.  Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.
>
> We note finally that the *Carrier* standard requires a petitioner to show that it is more likely than not that "no reasonable juror" would have convicted him.  The word "reasonable" in that formulation is not without meaning.  It must be presumed that a reasonable juror would consider fairly all of the evidence presented.  It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt.

*Schlup v. Delo*, 513 U.S. at 329, 115 S.Ct. at 868 (footnote omitted).

[581] The Supreme Court has held that a showing of "actual innocence" is made in connection with the punishment phase of a capital murder trial when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. 333, 346-48, 112 S.Ct. 2514, 2523, 120 L.Ed.2d 269 (1992).  The Supreme Court explained in *Sawyer v. Whitley* that this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347, 112 S.Ct. at 2523.

the existence of any constitutional error during his capital murder trial, either at the guilt-innocence phase of his trial or the punishment phase of same.

E.      Conclusions

Thus, petitioner's procedurally defaulted, conclusory, "actual innocence" claim herein fails to satisfy the Supreme Court's "actual innocence" jurisprudence under either the *House/Herrera* standard, the *Schlup* standard, or the *Sawyer* standard. Petitioner's twenty-fourth claim herein affords no basis for a finding sufficient to overcome petitioner's multiple procedural defaults, much less a basis for federal habeas corpus relief.

## XIX. <u>Statute of Limitations</u>

Respondent argues that a large number of petitioner's claims in petitioner's Second Amended Petition herein are barred from federal habeas review by the AEDPA's one-year statute of limitations.

Petitioner filed his original federal habeas corpus petition in this cause on December 20, 2007, asserting therein a wide range of claims, including arguments that (1) there was insufficient evidence to support the jury's verdicts at the guilt-innocence phase of trial and on Special issues nos. 1 and 2 at the punishment phase of trial, (2) the jury lacked a proper vehicle at the punishment phase of trial to give full effect to all of petitioner's mitigating evidence, (3) the exercise of prosecutorial discretion in determining whether to charge petitioner with capital murder violated Due Process and Eighth Amendment principles, (4) petitioner's trial counsel rendered ineffective assistance by failing to (a) object to the admission of petitioner's TYC records, (b) call petitioner's former teachers to testify at the punishment phase of trial, (c) use ballistics evidence to show someone other than petitioner

shot Douglas, and (d) do all of the things outlined in petitioner's pro se complaints filed in March, 2006 with the state trial court, (5) the state appellate court's refusal to review the sufficiency of the evidence supporting the jury's negative answer to the third Special Issue, i.e., the mitigation special issue, violated Fifth and Eighth Amendment principles, (6) petitioner's relative youth and immaturity render him ineligible for execution under the Eighth Amendment, (7) the state trial court's supplemental punishment-phase jury instruction regarding the second Special Issue constituted an improper comment on the weight of the evidence, shifted or reduced the State's the burden of proof on that Special Issue, and precluded the jury's consideration of relevant mitigating evidence, and (8) the prosecution interfered with the defense team's efforts to interview Amber Lynch and Darnell and Patricia McCoy. *Docket entry no. 18.* The claims asserted in petitioner's original federal habeas corpus petition correspond generally, and share a common core of operative facts, with the following claims included in petitioner's Second Amended Petition, filed October 18, 2012: claims 3-6, 10-13, 15, 17-18, 21, and 26-29.[582]

Respondent is correct the remaining claims contained in petitioner's Second Amended Petition herein petition (i.e., claims 1-2, 7-9, 14, 16, 19-20, 22-25) do not relate back, either legally or factually, to any of the claims in petitioner's original federal habeas corpus petition. None of the claims in this latter group are tied to a common core of

---

[582] In addition to the dozen claims petitioner enumerated in his original petition herein, petitioner attached thereto a copy of the pleading he filed March 9, 2006 in the state trial which listed a plethora of pro se complaints about the performance of his trial counsel and alleged instances of prosecutorial misconduct. This Court has construed the petitioner's original petition herein as having incorporated by reference those pro se complaints. Therefore, this Court has concluded the conclusory, often cryptic, ineffective assistance complaints and complaints of alleged prosecutorial misconduct contained therein are not barred by the AEDPA's one-year statute of limitations. For the reasons discussed at length in Sections VII. and XV. above, however, none of those complaints possess any arguable legal or factual merit.

operative facts with any of the claims petitioner presented in his timely, original, petition herein.   Respondent is correct, therefore, that these latter claims are, alternatively, barred from federal review by the AEDPA's one-year statute of limitations. *See Mayle v. Felix*, 545 U.S. 644, 664, 125 S.Ct. 2562, 2574, 162 L.Ed.2d 582 (2005)(holding only those claims contained in a timely original federal habeas corpus petition and an untimely amended petition which shared a common core of operative facts related back for purposes of Rule 15(c)(2) of the Federal Rules of Civil Procedure).

Moreover, because this Court has reviewed the merits of all of these untimely claims and has concluded that none of them possess any merit under applicable federal law, petitioner cannot avoid the impact of his untimely amendment of his pleadings herein by arguing his state appellate or state habeas counsel rendered ineffective assistance in such a manner as to prevent petitioner's timely filing of his untimely claims herein.   There was nothing objectively unreasonable or prejudicial within the meaning of *Strickland* about the failure of petitioner's state appellate or state habeas counsel to take any action in conjunction with any of petitioner's time-barred claims herein.

Finally, for the reasons discussed at length in Section XVIII.D. above, petitioner's conclusory assertion of "actual innocence" does not entitle petitioner to avoid the impact of his untimely filing of his time-barred claims herein.   Petitioner has not alleged any specific facts sufficient to satisfy any of the Supreme Court's different versions of the "actual innocence" equation.   Accordingly, the Supreme Court's recent holding in *McQuiggin v. Perkins*, ___ U.S. ___, ___, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)(holding a showing of

actual innocence can overcome the AEDPA's statute of limitations), furnishes no vehicle for petitioner to obtain merits review of his time-barred claims herein.

Petitioner's first, second, seventh through ninth, fourteenth, sixteenth, nineteenth, twentieth, and twenty-second through twenty-fifth claims herein are time-barred under the AEDPA's one-year statute of limitations.

## XX. Requests for a Federal Evidentiary Hearing

At numerous points in his pleadings herein petitioner requests an evidentiary hearing for the purpose of permitting him to develop the factual and evidentiary bases for his claims herein. With regard to those claims herein on which petitioner obtained a ruling on the merits from the Texas Court of Criminal Appeals, either on direct appeal or in the course of petitioner's first or third state habeas corpus proceedings, petitioner is not entitled to an evidentiary hearing in this Court. *See Cullen v. Pinholster*, ___ U.S. at ___, 131 S.Ct. at 1398-1401 (holding an evidentiary hearing is unnecessary when a state court has rejected a claim on the merits and federal habeas review of that rejection is governed by §2254(d)(1)); *Clark v. Thaler*, 673 F.3d 410, 416-17 (5th Cir.)(no evidentiary hearing or factual development in federal court where the claim was adjudicated on the merits in state court), *cert. denied*, ___ U.S. ___, 133 S.Ct. 179, 184 L.Ed.2d 90 (2012); *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011)(holding the same), *cert. denied*, ___ U.S. ___, 132 S.Ct. 1100, 181 L.Ed.2d 987 (2012). Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a petitioner made insufficient effort to prove in state proceedings. *Cullen v. Pinholster*, ___ U.S. at ___, 131 S.Ct. at 1401; *Lewis v. Thaler*, 701 F.3d 783, 790 (5th Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 1739, 185 L.Ed.2d 798 (2013).

Thus, petitioner is not entitled to a federal evidentiary hearing on either his first claim herein or his first through fourth and twelfth assertions of ineffective assistance in his fourth claim herein, all of which were litigated to a resolution on the merits in petitioner's first or latest state habeas corpus proceedings. Likewise, petitioner fully litigated the factual basis for his fourteenth claim herein in the context of his motion for new trial and obtained a ruling on the merits from the Texas Court of Criminal Appeals on that claim in the course of his direct appeal. *Young v. State*, 2005 WL 2374669, at *8. Petitioner likewise obtained merits rulings from the same state appellate court on direct appeal with regard to his fifth through seventh, ninth through thirteenth, fifteenth through twenty-first claims herein and is not entitled to an evidentiary hearing in this Court on any of those claims.

Moreover, Title 28 U.S.C. Section 2254(e)(2) restricts this Court's ability to hold an evidentiary hearing even when a claim has not been fully adjudicated on the merits by a state court. *See Schriro v. Landrigan*, 550 U.S. 465, 474, 127 S.Ct. 1933, 1940, 167 L.Ed.2d 836 (2007)("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petitioner's factual allegations which, if true, would entitle the applicant to federal habeas relief."). "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* Petitioner presents a number of claims herein which are record-based - such as his complaints of insufficient evidence to support the jury's guilt-innocence phase and punishment-phase verdicts, challenges to the Texas capital sentencing scheme and his jury instructions at both phases of trial, and challenges to state trial court evidentiary rulings and rulings on challenges for cause during voir dire. These

429

record-based challenges must necessarily be evaluated based upon the record as it existed before the state trial court at the time it ruled on petitioner's motions, challenges, and objections. Factual or evidentiary development is not necessary for such claims in this Court because the record before the state court will determine the propriety of the state trial court's rulings on such matters. *Id.* Therefore, petitioner's second, third, fifth through thirteenth, fifteenth through twenty-first, and twenty-eighth claims herein, all of which present purely record-based legal issues, do not require factual development or an evidentiary hearing in this Court.

This Court has examined *de novo* the merits of petitioner's second and twenty-second through twenty-ninth claims herein, assumed the accuracy of the facts petitioner alleges in support of these claims (except where refuted by the record from petitioner's state trial court, state direct appeal, and state habeas proceedings), conducted a *de novo* review of same, and has determined petitioner has failed to allege any facts which would entitle him to federal habeas relief. Likewise, this Court has conducted a *de novo* review of all of petitioner's complaints of ineffective assistance contained in petitioner's fourth claim herein and has concluded that, even assuming the accuracy of the facts petitioner alleges in support of those complaints (except where refuted by the state court record), none of those complaints satisfy either prong of *Strickland* analysis. Therefore, petitioner is not entitled to a federal evidentiary hearing on any of these claims. *Id.; see also Spence v. Johnson,* 80 F.3d 989, 1000 (5th Cir. 1996)(holding in a pre-AEDPA case that a federal habeas petitioner must allege facts which, if proved, would entitle him to relief before the petitioner is entitled to a

federal evidentiary hearing and that the federal court need not "blindly accept speculative and inconcrete claims as the basis to order a hearing"), *cert, denied*, 519 U.S. 1012 (1996).

For the foregoing reasons, petitioner is not entitled to an evidentiary hearing before this Court to present new evidence or to further develop the facts in support of any of his claims herein in this federal habeas corpus proceeding.

## XXI. Requests for Stay & "Remand"

Petitioner has filed motions requesting that this Court once more hold this case in abeyance to permit another return by petitioner to state court or, alternatively, that this Court "remand" this cause to the state courts.

The latter request is *non sequitur*. Federal habeas courts cannot "remand" a case to the state courts. *Billiot v. Puckett*, 135 F.3d 311, 316 n.5 (5th Cir.), *cert. denied*, 525 U.S. 966 (1998). A federal habeas corpus proceeding is an original action filed in federal court collaterally attacking an otherwise valid and final state criminal conviction or sentence. It is not an appeal from the defendant's underlying conviction or sentence.

Insofar as petitioner seeks another stay of this federal habeas proceeding for the purpose of returning to state court to litigate the issue of ineffective assistance by his state habeas counsel, that request lacks any arguable merit for two, equally compelling, reasons. First, this Court has undertaken an exhaustive review of the record from petitioner's trial motion for new trial, direct appeal, and multiple state habeas corpus proceedings, has assumed the accuracy of the factual allegations underlying petitioner's claims herein (except those refuted by the state court records), and has independently concluded after *de novo* review that none of petitioner's claims herein (including his complaints of ineffective

assistance by his state trial and state appellate counsel) warrant federal habeas corpus relief.

Thus, any alleged deficiencies in the performance of petitioner's state habeas counsel in

failing to adequately or timely assert any of petitioner's claims herein during a prior state

habeas corpus proceeding did not "prejudice" petitioner within the meaning of *Strickland*.

*See Paredes v. Quarterman*, 574 F.3d at 291 n.13 (failure to make a futile or meritless

objection did not "prejudice" petitioner within the meaning of *Strickland*).   Moreover, there

was nothing objectively unreasonable about the failure of petitioner's initial state habeas

counsel to present any of petitioner's procedurally defaulted, meritless, claims herein during

petitioner's first state habeas corpus proceeding. *Clark v. Thaler*, 673 F.3d at 429; *Paredes v.

Quarterman*, 574 F.3d at 291.

Second, infirmities in state habeas corpus proceedings, including alleged deficiencies

in the performance of state habeas counsel, do not furnish a basis for federal habeas corpus

relief. *See In re Gantras*, 666 F.3d 910, 911 (5th Cir. 2012)(holding challenges to Louisiana

procedures for addressing post-conviction petitions were not cognizable in a federal habeas

corpus proceeding); *Kinsel v. Cain*, 647 F.3d 265, 273 n.32 (5th Cir.)(challenges to state

court's rulings in state post-conviction proceeding did not afford a basis for federal habeas

relief because infirmities in state habeas proceedings do not constitute grounds for relief in

federal court), *cert. denied*, ___ U.S. ___, 132 S.Ct. 854, 181 L.Ed.2d 551 (2011); *Wiley v.

Epps*, 625 F.3d 199, 207 (5th Cir. 2010)(holding complaint about state habeas court's denial

of evidentiary hearing not cognizable in federal court); *Stevens v. Epps*, 618 F.3d 489, 502

(5th Cir. 2010)("Ineffectiveness of post-conviction counsel cannot be the grounds for federal

habeas relief."), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1815, 179 L.Ed.2d 775 (2011); *Haynes*

*v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008)(holding complaints about the performance of state-appointed counsel in petitioner's first post-conviction proceeding were inadequate to warrant federal habeas relief); *Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005)(complaint about state judge's consideration in a post-conviction proceeding of evidence heard by a previously recused judge did not furnish a basis for federal habeas corpus relief), *cert. denied*, 546 U.S. 1217 (2006); *Moore v. Quarterman*, 369 F.3d 844, 846 (5th Cir. 2004)(holding infirmities in state habeas proceedings do not constitute grounds for federal habeas relief because an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself); *Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir.)(complaints of denial of effective assistance of counsel during state post-conviction proceeding did not furnish a basis for federal habeas relief), *cert. denied*, 543 U.S. 849 (2004); *Henderson v. Cockrell,* 333 F.3d 592, 606 (5th Cir. 2003)(complaints of ineffective assistance by state habeas counsel did not furnish a basis for federal habeas relief), *cert. denied*, 540 U.S. 1163 (2004); 28 U.S.C. Section 2254(i)("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

Petitioner is not entitled to another stay of the proceedings in this cause to permit his return to state court to litigate the alleged ineffective assistance of his initial state habeas corpus counsel. Petitioner presented extensive testimony and other evidence on that topic during his first state habeas corpus proceeding.[583] This Court held this cause in abeyance for a considerable length of time and yet petitioner still failed to exhaust available state remedies

---

[583] *See* notes 159 & 165, *supra.*

on his currently unexhausted twenty-fifth claim herein, as well as the plethora of new factual allegations and new legal theories petitioner has presented for the first time in his rely brief herein.  The fault for petitioner's procedural defaults on his unexhausted twenty-fifth claim herein and the new factual allegations and legal theories petitioner presents in his reply brief lies squarely on the shoulders of his current federal habeas counsel, not petitioner's initial state habeas counsel.  There is no reasonable likelihood another stay at this juncture for the purposes urged by petitioner in his latest motions would produce anything relevant to petitioner's claims herein.  This Court's *de novo* rejection on the merits of all of petitioner's procedurally defaulted claims herein renders superfluous, if not moot, all of petitioner's complaints about the alleged deficiencies in the performance of his initial state habeas counsel.  It is unnecessary to determine whether petitioner's initial state habeas counsel rendered ineffective assistance for purposes of the exception to the procedural default doctrine recognized in *Martinez v. Ryan, supra,* and *Trevino v. Thaler, supra,* because this Court has conducted a *de novo* review of the merits of all of petitioner's procedurally defaulted claims and finds none of them present any meritorious federal constitutional claims.

## XXII. Certificate of Appealability

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA").  *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997)(holding the standard for obtaining a CoA is the same as for a CPC).  The CoA

requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).  Effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in United States District Courts requires this Court to issue or deny a CoA when it enters an order adverse to a federal habeas corpus petitioner.

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. §2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000)(holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997)(holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted).  In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569; *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S.Ct. at 3394 n.4. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel*, 529

U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir.), *cert. denied*, 558 U.S. 993 (2009); *Moore v. Quarterman*, 534 F.3d 454, 460 (5th Cir. 2008); *Foster v. Quarterman*, 466 F.3d at 364; *Dickson v. Quarterman*, 462 F.3d 470, 476 (5th Cir. 2006); *Pippin v. Dretke*, 434 F.3d at 787; *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See* Miller-El v. Cockrell 537 U.S. at 337, 123 S.Ct. at 1040 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."); *Sonnier v. Quarterman*, 476 F.3d at 364-69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

437

Reasonable minds could not disagree over this Court's conclusion that none of petitioner's complaints about the performance of his trial counsel contained in his fourth claim herein satisfy the prejudice prong of *Strickland* analysis.  The evidence of petitioner's guilt at the guilt-innocence phase of his trial was over whelming.  Three eyewitnesses testified they saw petitioner shoot Doyle Douglas in the head and then force Mark Ray to do likewise at gunpoint.[584]  Patrick Brook, petitioner's former partner in crime, testified petitioner admitted to Brook (in the presence of two other witnesses) on the night of the fatal shooting of Douglas that he (petitioner) shot Douglas twice in the head.[585]  There was overwhelming evidence, in the form of the uncontradicted trial testimony of David Page and other eyewitnesses, presented during the guilt-innocence phase of petitioner's trial that Samuel Petrey was abducted from a grocery store parking lot, driven have way across the State of Texas, forced to purchase clothing for petitioner, and forced to attempt to purchase an assault rifle for petitioner.[586]  Petitioner told others he killed Douglas because he needed a vehicle to get to Midland to see his girlfriend.[587]  The jury could reasonably have inferred from the trial testimony that petitioner compelled David Page to accompany petitioner to Midland because Page had previously "snitched" on petitioner to Amber Lynch about petitioner's infidelity and petitioner feared Page would tell authorities about Douglas'

---

[584] *See* notes 1-15, *supra*, and accompanying text.

[585] *See* note 11, *supra*, and accompanying text.

[586] *See* notes 16-47, *supra*, and accompanying text.

[587] *See* note 8, *supra*, and accompanying text.

murder.[588]  When approached by law enforcement officers, petitioner led them on a high

speed chase that included petitioner driving the wrong direction on a major highway and did

not end until after two of the tires on the vehicle petitioner was driving had been shot out and

an officer drew a bead on the petitioner.[589]  When taken into custody, petitioner had in his

possession the semi-automatic handgun which jurors could reasonable infer (based upon the

presence of shell casings fired from that weapon having been found inside Douglas' vehicle

and near Petrey's body) had been used to fatally shoot both Douglas and Petrey.[590]

The prosecution's evidence at the punishment phase of petitioner's capital murder

trial was equally compelling.[591]  In addition to the facts of petitioner's capital offense, the

prosecution presented ample evidence showing petitioner's (1) long history of violent and

---

[588] *See* notes 14-15, *supra*, and accompanying text.  Mark Ray also testified Page reluctantly agreed to accompany petitioner to Midland only after petitioner threatened the families of Page, McCoy, and Ray. S.F. Trial, Volume 22, testimony of Mark Ray, at pp. 142-44.

[589] *See* note 48, *supra*, and accompanying text.

[590] *See* notes 48 & 71, *supra*.

[591] Dr. Helen Short, a psychiatrist who had treated petitioner at the Waco Center for Youth, testified for the prosecution at the punishment phase of trial (1) she diagnosed petitioner with ADHD and a conduct disorder but added antisocial personality disorder which she admitted was improper because petitioner was not then eighteen years of age and the DSM-IV requires a patient reach age 18 before that latter diagnosis may be made, (2) nonetheless, when she examined him the petitioner displayed all the classic symptoms of antisocial personality disorder, including being manipulative deceitful, impulsive, aggressive, reckless, irresponsible, lacking empathy for others, and displaying mechanical emotions, lacking a conscience, no respect for authority, and having little-to-no remorse, (3) petitioner was very bright but had anger management issues and really wanted to be the person in charge of everyone else, (4) the best predictor of future behavior is past behavior, (5) petitioner was extremely dangerous - too dangerous to be housed in a psychiatric facility, (6) in light of petitioner's many criminal actions as an adult, she believed her prior diagnosis of antisocial personality disorder was accurate, and (7) petitioner needed further diagnosis to determine whether he was a true psychopath. S.F. Trial, Volume 32, testimony of Helen Short, at pp. 47-58.  When challenged by petitioner's trial counsel on cross-examination that her previous diagnosis of petitioner with antisocial personality disorder had been "unethical," Dr. Short responded she believed her diagnosis of petitioner with antisocial personality disorder at age fourteen had not been unethical but, rather, had been factually accurate and "premature." *Id.*, at pp. 102-03.  She also explained that the conduct disorder she diagnosed petitioner possessing when she treated him was essentially the same thing as antisocial personality disorder, only that designation was what the DSM-IV used for persons under the age of eighteen. *Id.*, at pp. 108-09.

criminal conduct, (2) long history of drug and alcohol abuse, (3) troubled childhood

punctuated by physical abuse from both his alcoholic, drug-addicted, father and his alcoholic

step-father, and (4) participation in both a violent burglary and armed home invasion only

days before Douglas' murder.[592]  Furthermore, as pointed out by the prosecutor during closing

argument, the record before petitioner's capital sentencing jury was bereft of any indication

petitioner had ever done anything which could be construed as signaling sincere remorse or

genuine contrition for his capital offense.

Petitioner's punishment-phase evidence showing he suffered from severe ADHD and

had not been properly medicated during most of his youth must be re-weighed in the context

of the *Strickland* prejudice analysis with full realization that petitioner's ADHD rendered him

prone to impulsive behavior and unlikely to appreciate the consequences of his conduct.[593]

As explained in Section I.D.2. above,[594] petitioner's state trial counsel presented an extensive,

compelling, case in mitigation on petitioner's behalf , albeit one based primarily upon

double-edged mental health evidence.[595]  The additional mitigating evidence and new

---

[592] *See* notes 79-92, *supra*, and accompanying text.

[593] Petitioner's own mental health expert Dr. Milam (1) described petitioner as impulsive, "like a Mercedes Benz without brakes," (2) explained petitioner had requested to participate in anger management classes while at TYC but, when admitted to anger management class, was later kicked out for fighting with another youth, (3) while the psychiatrist at the TYC did a good job finding the appropriate medications to calm petitioner, petitioner had not been required to remain on those medications once he left the TYC, (4) something was significantly wrong with petitioner's brain and, while petitioner's behavior had been treated, the petitioner's underlying problems had not been treated, and (5) her prognosis was that petitioner would probably have to be incarcerated for the rest of his life because he could not be fixed. S.F. Trial, Volume 34, testimony of Daneen A. Milam, at pp. 23-25, 68-69, 73-74, 85-86, 91-92, 95-96, 107-08.

[594] *See* notes 92-106, *supra*, and accompanying text.

[595] The fundamental problem with petitioner's mitigation evidence concerning his ADHD was that it was double-edged in nature.  While petitioner's mental health experts Dr. Mathew and Dr. Greene testified petitioner's symptoms (i.e., petitioner's impulsiveness, hyperactivity, and possibly even his conduct disorder) could be treated with proper medication, even they acknowledged there were negative aspects to petitioner's condition. Dr. Mathew testified ADHD patients are quick to anger, lack self-control, and impulsive. S.F. Trial, Volume 34, testimony of Roy Mathew, at pp. 183-

arguments petitioner now argues in his ineffective assistance claims should also have been presented at his trial pales in comparison to the mitigating evidence considered and rejected by petitioner's capital sentencing jury.  There is no rational basis to believe any of the new evidence or arguments urged by petitioner herein would have made any difference had they been presented to the jury at either phase of petitioner's trial.  Reasonable jurists could not disagree with this Court's conclusion there is no reasonable probability that, but for the alleged failures of petitioner's trial counsel identified by petitioner in his pleading herein, the outcome of either phase of petitioner's capital murder trial would have been any different.

Even if it is possible to quibble over this Court's resolution of the deficient performance prong of *Strickland* analysis with regard to some of the complaints about the performance of petitioner's trial counsel listed in petitioner's fourth claim herein, no reasonable jurist can disagree with this Court's conclusions that (1) petitioner procedurally defaulted on virtually all of his ineffective assistance complaints herein and (2) petitioner was not prejudiced within the meaning of *Strickland* by any of the alleged deficiencies in the performance of petitioner's trial counsel identified by petitioner herein.  Petitioner is not entitled to a CoA on any of his complaints about the performance of his trial counsel.

---

84. Dr. Greene testified (1) the overwhelming majority (65%) of children with ADHD will develop oppositional defiant disorder, (2) children with ADHD are manipulative, (3) the most effective treatment for ADHD is stimulant medication, but (4) petitioner had proven to be a "stimulant nonresponder," and (5) petitioner had been tried on virtually every stimulant known to mankind with very little effectiveness. S.F. Trial, Volume 36, testimony of Ross Greene, at pp. 12, 15-19, 21-23, 30-31, 45.

Another problem with both of these experts' punishment-phase testimony was that when they attempted to justify their assertions that, with proper medication, petitioner would not pose a risk of future dangerousness, their testimony tended to depart from the scientific and enter the realm of the metaphysical. Dr. Mathew testified ever person has the capacity for change and personalities can change through faith systems, stating "I have too much faith in the goodness of people", and "Every person has the potential to become better." S.F. Trial, Volume 35, testimony of Roy Mathew, at pp. 207-08. Dr. Greene testified "I'm not sure what evil means" and admitted he could not give a prognosis for petitioner once petitioner arrived in the TDCJ. S.F. Trial, Volume 36, testimony of Ross Greene, at pp. 44, 62.

Petitioner's challenges to the Texas capital sentencing scheme re-urge arguments both this Court and the Fifth Circuit have repeatedly held do not warrant a CoA. *See, e.g., Jasper v. Thaler*, 765 F.Supp.2d at 875 (denying CoA on the same challenges to the Texas capital sentencing scheme raised by petitioner herein); *Bartee v. Quarterman*, 574 F.Supp.2d at 712-14 (denying CoA on similar challenges to the Texas capital sentencing scheme); *Moore v. Quarterman*, 526 F.Supp.2d at 740 (denying CoA on similar challenges to the Texas capital sentencing scheme). Petitioner's third, sixteenth, seventeenth, and nineteenth through twenty-first claims do not warrant a CoA.

Likewise, for reasons similar to those discussed above in connection with petitioner's complaints of ineffective assistance by his trial counsel, this Court's conclusion the Texas Court of Criminal Appeals reasonably rejected petitioner's challenges to the sufficiency of the evidence supporting the jury verdicts at both phases of his trial is not subject to disagreement by reasonable jurists. Reasonable jurists could not disagree with this Court's conclusion that, viewed in the light most favorable to the jury's verdicts, with all reasonable inferences drawn therefrom in favor of the jury's verdicts, the evidence at both phases of petitioner's capital murder trial supporting the jury's verdicts was overwhelming. *See McDaniel v. Brown*. 558 U.S. at 133, 130 S.Ct. at 673 ("a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"). Petitioner's fifth, sixth, twelfth, and eighteenth claims herein do not merit a CoA.

442

Reasonable jurists could not disagree with this Court's conclusions that (1) the Texas Court of Criminal Appeals reasonably rejected petitioner's *Brady* claims and *Giglio/Napue* claims premised on alleged secret plea deals with Mary Ray and David Page, (2) petitioner procedurally defaulted on his twenty-fifth claim herein by expressly withdrawing same from the state habeas court's consideration during his most recent state habeas corpus proceeding, (3) petitioner's *Brady* claim premised upon the alleged withholding of impeachment evidence regarding prosecution expert witness A.P. Merillat also fails to satisfy the materiality prong of *Brady* analysis, (4) petitioner procedurally defaulted on his meritless complaint of judicial bias arising from the trial judge's post-trial letter to jurors, and (5) the Texas Court of Criminal Appeals reasonably rejected petitioner's complaints about the Sheriff sharing lunch with the jury on the final day of punishment-phase deliberations and listening to the jury forearm's concerns after the conclusion of petitioner's trial. Petitioner's first, second, fourteenth, and twenty-fifth claims herein do not warrant a CoA.

Reasonable jurists also could not disagree with this Court's conclusions that petitioner's remaining claims, including virtually all of his complaints of ineffective assistance by either his trial counsel or state appellate counsel raised herein, are procedurally defaulted and, alternatively when given *de novo* review, lack arguable merit under well-settled Supreme Court jurisprudence. Reasonable jurists could not disagree with this Court's conclusion that petitioner has procedurally defaulted on myriad new legal arguments and new factual theories contained in his reply brief herein which are currently unexhausted.

Finally, reasonable jurists could not disagree with this Court's conclusion that petitioner's first, second, seventh through ninth, fourteenth, sixteenth, nineteenth, twentieth,

twenty-second through twenty-sixth, twenty-eighth, and twenty-ninth claims herein are all barred by the AEDPA's one-year statute of limitations. None of those claims bear any rational relationship, factually or legally, to the claims petitioner presented in his timely original petition herein. Petitioner is not entitled to a CoA with regard to any of his claims herein.

## XXII. Conclusion and Order

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in petitioner's second amended federal habeas corpus petition, filed October 18, 2012, docket entry no. 87, as supplemented by petitioner's reply brief, filed March 28, 2013, docket entry no. 100, is **DENIED**.

2. Petitioner is **DENIED** a Certificate of Appealability on all claims herein.

3. All of petitioner's requests for an evidentiary hearing, including those contained in his pleadings herein and in his motions filed September 6, 2013, docket entry no. 112, October 22, 2013, docket entry no. 121, and November 20, 2013, docket entry no. 125, respectively, are **DENIED**.

4. Petitioner's motion for stay, filed April 12, 2013, docket entry no. 101, is **DENIED**.

5. Petitioner's motion for remand, filed October 22, 2013, docket entry no. 122, is **DENIED**.

6. All other pending motions are **DISMISSED AS MOOT**.

7. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

SIGNED and ENTERED this ___ day of February, 2014 at Midland, Texas.

**ROBERT JUNELL**
**United States District Judge**